# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

NATIONAL AUTOMOBILE
DEALERS ASSOCIATION and
TEXAS AUTOMOBILE DEALERS
ASSOCIATION,

    *Petitioners,*

v.

FEDERAL TRADE COMMISSION,

    *Respondent.*

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. _____

U.S. COURT OF APPEALS
RECEIVED
**Jan 04, 2024**
FIFTH CIRCUIT

## PETITION FOR REVIEW

Pursuant to Section 18(e) of the Federal Trade Commission Act, 15 U.S.C. §57a(e), and Federal Rule of Appellate Procedure 15(a), the National Automobile Dealers Association and Texas Automobile Dealers Association respectfully petition for review of a final rule of the Federal Trade Commission (the "Combating Auto Retail Scams Trade Regulation Rule") in Matter Number P204800, RIN 3084-AB72. The final rule was published in the Federal Register today, January 4, 2024. A copy is attached as Exhibit A.

The final rule comprehensively regulates the advertising, sales, and financing of vehicles by auto dealers. Petitioners challenge the rule on the ground that it is arbitrary, capricious, an abuse of discretion, without observance of procedure required by law, or

otherwise not in accordance with law, and thus must be set aside and vacated under 15 U.S.C. §57a(e)(3) and 5 U.S.C. §706(2). Petitioners respectfully request that the Court vacate or modify the Rule, in whole or in part, stay its enforcement pending resolution of this petition (per Petitioners' forthcoming motion for stay), and grant such other and further relief to which Petitioners may be entitled.

Dated: January 4, 2024

Andrew D. Koblenz
General Counsel
NATIONAL AUTOMOBILE DEALERS
ASSOCIATION
8484 Westpark Drive, Suite 500
Tysons, VA 22102

Karen Phillips
General Counsel
TEXAS AUTOMOBILE DEALERS
ASSOCIATION
1108 Lavaca Street, Suite 800
Austin, TX 78701

Respectfully submitted,

_/s/ Jeffrey M. Harris_
Jeffrey M. Harris
Seanhenry VanDyke*
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
jeff@consovoymccarthy.com

*Supervised by principals of the firm who are members of the Virginia bar.

*Counsel for Petitioners*

## CERTIFICATE OF SERVICE

I certify that on January 4, 2024, the foregoing petition for review was electronically filed with the United States Court of Appeals for the Fifth Circuit using the CM/ECF system.

I further certify that there are no parties "admitted to participate in the agency proceedings" for purposes of Federal Rule of Appellate Procedure 15(c)(1) other than the respondent.

Respectfully submitted,

Dated: January 4, 2024

　/s/ Jeffrey M. Harris　
Jeffrey M. Harris

*Counsel for Petitioners*

# EXHIBIT A

## FEDERAL TRADE COMMISSION

### 16 CFR Part 463

**RIN 3084–AB72**

### Combating Auto Retail Scams Trade Regulation Rule

**AGENCY:** Federal Trade Commission.

**ACTION:** Final rule.

**SUMMARY:** The Federal Trade Commission ("FTC" or "Commission") is issuing this Combating Auto Retail Scams Trade Regulation Rule ("CARS Rule," "Rule," or "Final Rule") and Statement of Basis and Purpose ("SBP") related to the sale, financing, and leasing of covered motor vehicles by covered motor vehicle dealers. The Final Rule, among other things, prohibits motor vehicle dealers from making certain misrepresentations in the course of selling, leasing, or arranging financing for motor vehicles, requires dealers to make certain pricing disclosures in dealers' advertising and sales communications, requires dealers to obtain consumers' express, informed consent for charges, prohibits the sale of any add-on product or service that confers no benefit to the consumer, and requires dealers to keep records of certain advertisements and customer transactions.

**DATES:** This rule is effective July 30, 2024.

**ADDRESSES:** Copies of this document are available on the Commission's website, *www.ftc.gov*.

**FOR FURTHER INFORMATION CONTACT:** Daniel Dwyer or Sanya Shahrasbi, Division of Financial Practices, Bureau of Consumer Protection, Federal Trade Commission, 202–326–2957 (Dwyer), 202–326–2709 (Shahrasbi), *ddwyer@ftc.gov, sshahrasbi@ftc.gov*.

**SUPPLEMENTARY INFORMATION:**

## Table of Contents

I. Background
  A. Statutory Authority
  B. Commission Actions Following the Dodd-Frank Act and the Rulemaking Process
II. Motor Vehicle Financing and Leasing
  A. Overview of the Motor Vehicle Marketplace
  B. Deceptive and Unfair Practices in the Motor Vehicle Marketplace
  1. Bait-and-Switch Tactics
  2. Unlawful Practices Relating to Add-On Products or Services and Hidden Charges
  C. Law Enforcement and Other Responses
III. Section-by-Section Analysis
  A. § 463.1: Authority
  B. § 463.2: Definitions
  1. Overview
  2. Definition-by-Definition Analysis
  (a) Add-On or Add-On Product(s) or Service(s)
  (b) Add-On List
  (c) Cash Price Without Optional Add-Ons
  (d) Clearly and Conspicuously
  (e) Motor Vehicle (finalized as '"Covered Motor Vehicle' or 'Vehicle'")
  (f) Dealer or Motor Vehicle Dealer (finalized as '"Covered Motor Vehicle Dealer' or 'Dealer'")
  (g) Express, Informed Consent
  (h) GAP Agreement
  (l) Government Charges
  (j) Material or Materially
  (k) Offering Price
  C. § 463.3: Prohibited Misrepresentations
  1. General Comments
  2. Paragraph-by-Paragraph Analysis of § 463.3
  (a) The Costs or Terms of Purchasing, Financing, or Leasing a Vehicle
  (b) Any Costs, Limitation, Benefit, or Any Other Aspect of an Add-On Product or Service
  (c) Whether Terms Are, or Transaction Is, for Financing or a Lease
  (d) The Availability of Any Rebates or Discounts That Are Factored Into the Advertised Price but Not Available to All Consumers
  (e) The Availability of Vehicles at an Advertised Price
  (f) Whether Any Consumer Has Been or Will Be Preapproved or Guaranteed for Any Product, Service, or Term
  (g) Any Information on or About a Consumer's Application for Financing
  (h) When the Transaction Is Final or Binding on All Parties
  (i) Keeping Cash Down Payments or Trade-in Vehicles, Charging Fees, or Initiating Legal Process or Any Action If a Transaction Is Not Finalized or If the Consumer Does Not Wish To Engage in a Transaction
  (i) Keeping Cash Down Payments or Trade-in Vehicles, Charging Fees, or Initiating Legal Process or Any Action If a Transaction Is Not Finalized or If the Consumer Does Not Wish To Engage in a Transaction
  (j) Whether or When a Dealer Will Pay Off Some or All of the Financing or Lease on a Consumer's Trade-in Vehicle
  (k) Whether Consumer Reviews or Ratings Are Unbiased, Independent, or Ordinary Consumer Reviews or Ratings of the Dealer or the Dealer's Products or Services
  (l) Whether the Dealer or Any of the Dealer's Personnel or Products or Services Is or Was Affiliated With, Endorsed or Approved by, or Otherwise Associated With the United States Government or Any Federal, State, or Local Government Agency, Unit, or Department, Including the United States Department of Defense or Its Military Departments
  (m) Whether Consumers Have Won a Prize or Sweepstakes
  (n) Whether, or Under What Circumstances, a Vehicle May Be Moved, Including Across State Lines or Out of the Country
  (o) Whether, or Under What Circumstances, a Vehicle May Be Repossessed
  (p) Any of the Required Disclosures Identified in This Part
  D. § 463.4: Disclosure Requirements
  1. Overview
  2. Paragraph-by-Paragraph Analysis of § 463.4
  (a) Offering Price
  (b) Add-On List
  (c) Add-Ons Not Required
  (d) Total of Payments and Consideration for a Financed or Lease Transaction
  (e) Monthly Payments Comparison
  E. § 463.5: Dealer Charges for Add-Ons and Other Items
  1. Overview
  2. Paragraph-by-Paragraph Analysis of § 463.5
  (a) Add-Ons That Provide No Benefit
  (b) Undisclosed or Unselected Add-Ons
  (c) Any Item Without Express, Informed Consent
  F. § 463.6: Recordkeeping
  G. § 463.7: Waiver Not Permitted
  H. § 463.8: Severability
  I. § 463.9: Relation to State Laws
IV. Effective Date
V. Paperwork Reduction Act
  A. Add-On List Disclosures
  B. Disclosures Relating to Cash Price Without Optional Add-Ons
  C. Prohibited Misrepresentations and Required Disclosures
  D. Recordkeeping
  E. Capital and Other Non-Labor Costs
  1. Disclosures
  2. Recordkeeping
VI. Regulatory Flexibility Act
  A. Significant Impact Analysis
  1. Comments on Significant Impact
  2. Certification of the Final Rule
  (a) Industry Averages
  (b) Dealer Size Based on the Number of Employees
  B. Initial and Final Regulatory Flexibility Analysis
  1. Comments on the Initial Regulatory Flexibility Analysis
  (a) Description of the Reasons Why Action by the Agency Is Being Considered
  (b) Succinct Statement of the Objectives of, and Legal Basis for, the Proposed Rule
  (c) Description of and, Where Feasible, Estimate of the Number of Small Entities to Which the Proposed Rule Will Apply
  (d) Description of the Projected Reporting, Recordkeeping, and Other Compliance Requirements of the Proposed Rule
  (e) Duplicative, Overlapping, or Conflicting Federal Rules
  (f) Description of Any Significant Alternatives to the Proposed Rule Which Accomplish the Stated Objectives of Applicable Statutes and Which Minimize Any Significant Economic Impact of the Proposed Rule on Small Entities
  2. Final Regulatory Flexibility Analysis
  (a) Statement of the Need for, and Objectives of, the Rule
  (b) Issues Raised by Comments, Including Comments by the Chief Counsel for Advocacy of the SBA, the Commission's Assessment and Response, and Any Changes Made as a Result

(c) Description and Estimate of the Number of Small Entities to Which the Final Rule Will Apply or an Explanation of Why No Such Estimate Is Available

(d) Description of the Projected Reporting, Recordkeeping, and Other Compliance Requirements

(e) Description of the Steps the Commission Has Taken To Minimize the Significant Economic Impact on Small Entities Consistent With the Stated Objectives of Applicable Statutes

VII. Final Regulatory Analysis Under Section 22 of the FTC Act
  A. Introduction
  B. Estimated Benefits of Final Rule
  1. Consumer Time Savings When Shopping for Motor Vehicles
  2. Reductions in Deadweight Loss
  3. Framework
  4. Estimation
  5. Benefits Related to More Transparent Negotiation
  C. Estimated Costs of Final Rule
  1. Prohibited Misrepresentations
  2. Required Disclosure of Offering Price in Advertisements and in Response to Inquiry
  3. Disclosure of Add-On List and Associated Prices
  4. Required Disclosure of Total of Payments for Financing/Leasing Transactions
  5. Prohibition on Charging for Add-Ons that Provide No Benefit
  6. Requirement to Obtain Express, Informed Consent Before Any Charges
  7. Recordkeeping
  D. Other Impacts of Final Rule
  E. Conclusion
  F. Appendix: Derivation of Deadweight Loss Reduction
  G. Appendix: Uncertainty Analysis
VIII. Other Matters

# I. Background

## A. Statutory Authority

The Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank Act") was signed into law in 2010.[1] Section 1029 of the Dodd-Frank Act authorizes the FTC to prescribe rules with respect to unfair or deceptive acts or practices by motor vehicle dealers.[2] The FTC is authorized to do so under the FTC Act and in accordance with section 553 of the Administrative Procedure Act ("APA").[3] The grant of

APA rulemaking authority set forth in section 1029 of the Dodd-Frank Act became effective as of July 21, 2011— the designated "transfer date" established by the Treasury Department.[4]

## B. Commission Actions Following the Dodd-Frank Act and the Rulemaking Process

Following enactment of the Dodd-Frank Act, the Commission published in the **Federal Register** a notice discussing its authority to prescribe rules with respect to unfair or deceptive acts or practices by motor vehicle dealers and announcing that it would be hosting a series of public roundtables to explore consumer protection issues pertaining to motor vehicle sales and leasing, including what consumer protection issues, if any, exist that could be addressed through a possible rulemaking.[5] The Commission sought participation from regulators, consumer advocates, industry participants, and other interested parties and ultimately held three such public roundtables.[6]

The Commission subsequently focused on enforcement and business guidance in the motor vehicle dealer marketplace. As discussed in SBP II.C,[7]

however, certain unfair and deceptive acts or practices have persisted, despite more than a decade of enforcement and education. Accordingly, on June 23, 2022, the Commission announced a notice of proposed rulemaking ("NPRM") addressing unfair or deceptive acts or practices by motor vehicle dealers.[8] That notice was published in the **Federal Register** on July 13, 2022.[9] The NPRM, among other things, proposed to (i) prohibit motor vehicle dealers from making certain misrepresentations, (ii) require accurate pricing disclosures, (iii) prohibit the sale of any add-on product or service that confers no benefit to the consumer, (iv) require express, informed consent for add-ons and other charges, and (v) impose certain recordkeeping requirements. The comment period for the NPRM closed on September 12, 2022.

In response to the NPRM and proposed rule, the Commission received more than 27,000 comments from stakeholders representing a wide range of viewpoints.[10] These stakeholders included numerous individual consumers who described deceptive practices during recent car purchases and many who discussed current or former military service and deceptive and predatory practices common near military installations.[11] Commenters

---

[1] Public Law 111–203, 124 Stat. 1376 (2010).

[2] 12 U.S.C. 5519(d). *See* 12 U.S.C. 5519(f)(1) and (2) for definitions of the terms "motor vehicle" and "motor vehicle dealer" under section 1029 of the Dodd-Frank Act, respectively.

[3] *See* 12 U.S.C. 5519(a) (discussing the authority over "motor vehicle dealer[s] that [are] predominantly engaged in the sale and servicing of motor vehicles, the leasing and servicing of motor vehicles, or both"); 12 U.S.C. 5519(d) ("Notwithstanding section 57a of title 15, the Federal Trade Commission is authorized to prescribe rules under sections 45 and 57a(a)(1)(B) of title 15[ ] in accordance with section 553 of title 5, with respect to a person described in subsection (a)."); 5 U.S.C. 553. Because the Commission has authority to promulgate this Rule in accordance

with the APA, it is not required to include a statement as to the prevalence of the acts or practices treated by the Rule under section 18(d) of the FTC Act. *Compare* 12 U.S.C. 5519(d) and (a) (providing the FTC with APA rulemaking authority for purposes of section 1029 of the Dodd-Frank Act), *with* 15 U.S.C. 57a(b)(3) (requiring a statement as to prevalence for certain rulemaking proceedings by the Commission under non-APA procedures), *and* 15 U.S.C. 57a(b)(1) (establishing that certain rulemaking proceedings by the Commission under non-APA procedures are subject to requirements in addition to those under the APA).

[4] *See* 12 U.S.C. 5411(a).

[5] 76 FR 14014, 14015 (Mar. 15, 2011).

[6] *See* Fed. Trade Comm'n, "The Road Ahead: Selling, Financing & Leasing Motor Vehicles" (Apr. 12, 2011), *https://www.ftc.gov/news-events/events/2011/04/road-ahead-selling-financing-leasing-motor-vehicles* (providing materials from roundtable in Detroit, Michigan); Fed. Trade Comm'n, "The Road Ahead: Selling, Financing & Leasing Motor Vehicles" (Aug. 2, 2011), *https://www.ftc.gov/news-events/events/2011/08/road-ahead-selling-financing-leasing-motor-vehicles* (providing materials from roundtable in San Antonio, Texas); Fed. Trade Comm'n, "The Road Ahead: Selling, Financing & Leasing Motor Vehicles" (Nov. 17, 2011), *https://www.ftc.gov/news-events/events/2011/11/road-ahead-selling-financing-leasing-motor-vehicles* (providing materials from roundtable in Washington, District of Columbia).

[7] As used herein, references to the "Statement of Basis and Purpose" or "SBP" refer to the portions of this document that precede the regulatory text of the Final Rule. References to the "Rule," "Final Rule," or "CARS Rule" refer to the text in part 463—Combating Auto Retail Scams ("CARS") Trade Regulation Rule. Because the Final Rule is narrower than the proposed Motor Vehicle Dealers Trade Regulation Rule in the NPRM, the Commission has modified the Rule title to reflect the more limited scope.

[8] *See* Press Release, Fed. Trade Comm'n, "FTC Proposes Rule to Ban Junk Fees, Bait-and-Switch Tactics Plaguing Car Buyers" (June 23, 2022), *https://www.ftc.gov/news-events/news/press-releases/2022/06/ftc-proposes-rule-ban-junk-fees-bait-switch-tactics-plaguing-car-buyers.*

[9] *See* Fed. Trade Comm'n, Notice of Proposed Rulemaking, Motor Vehicle Dealers Trade Regulation Rule, 87 FR 42012 (released June 23, 2022; published July 13, 2022) [hereinafter NPRM], *https://www.govinfo.gov/content/pkg/FR-2022-07-13/pdf/2022-14214.pdf.*

[10] The Commission received 27,349 comment submissions filed online in response to its NPRM. *See* Gen. Servs. Admin., Dkt. No. FTC–2022–0046, Proposed Rule, Motor Vehicle Dealers Trade Regulation Rule (July 13, 2022), *https://www.regulations.gov/document/FTC-2022-0046-0001* (noting comments received). To facilitate public access, over 11,000 such comments have been posted publicly on *Regulations.gov* at *https://www.regulations.gov/document/FTC-2022-0046-0001/comment* (noting posted comments). As explained at *Regulations.gov*, agencies may choose to redact or withhold certain submissions (or portions thereof) such as those containing private or proprietary information, inappropriate language, or duplicate/near duplicate examples of a mass-mail campaign. *See* Gen. Servs. Admin., *Regulations.gov* Frequently Asked Questions, Find Dockets, Documents, and Comments FAQs, "How are comments counted and posted to *Regulations.gov?*," *https://www.regulations.gov/faq?anchor=downloadingdata* (last visited Dec. 5, 2023). The Commission has considered all timely and responsive public comments it received in response to its NPRM.

[11] *See, e.g.,* Individual commenter, Doc. No. FTC–2022–0046–4648 ("As a young Marine stationed in
Continued

also included dealerships and their employees, industry groups, consumer and community groups, and Federal and State lawmakers and law enforcement agencies. Many commenters, such as consumers, some dealers and dealer employees, consumer groups, and lawmakers and enforcers, were supportive of the proposed rule in whole or in part. Many of these commenters also urged the FTC to include additional protections for consumers and law-abiding businesses, while others, such as industry groups, dealers, and dealer employees, asked questions or criticized the proposal.[12] These comments and responses to comments are discussed primarily in the discussion of the Final Rule in SBP III.

The Commission notes that it has undertaken careful review and consideration of each of the comments it received in response to its NPRM. The Commission has dedicated the majority of its section-by-section analysis to descriptions of, and responses to, comments or portions thereof that were

critical of the Commission's proposal or that urged the Commission to adopt additional requirements. Thus, to ensure that this document also reflects the many comments in the public record from stakeholders who supported the proposal as is, the Commission has excerpted a number of such comments in portions of its SBP.

## II. Motor Vehicle Financing and Leasing

### A. Overview of the Motor Vehicle Marketplace

For many consumers, buying or leasing a motor vehicle is essential, expensive, and time-consuming.[13] Americans rely on their vehicles for work, school, childcare, groceries, medical visits, and many other important tasks in their daily lives.[14] These vehicles have become increasingly costly: the average price of a new vehicle sold at a new car dealership in 2022 was more than $46,000,[15] while the average price of a used vehicle sold at such dealerships was more than $30,000.[16] By the second quarter of 2023, the average monthly payment for used cars reached $533, and the average monthly payment for new cars reached $741—both record highs.[17] Vehicles are now many

consumers' largest expense—on a par with housing, child care and food, and accounting for 16% of the median annual household income before taxes.[18] In 2022 alone, Americans spent more than $720 billion on motor vehicles and vehicle parts.[19]

Given these costs, many consumers who purchase a motor vehicle rely on financing to complete their purchases. According to public reports, 81% of new motor vehicle purchases, and nearly 35% of used vehicle purchases, are financed.[20] By the first quarter of 2023, Americans had more than 107 million outstanding auto financing accounts and owed more than $1.56 trillion thereon,[21] making auto finance the third-largest source of debt for U.S. consumers, and the second-largest for U.S. consumers ages 40 and over.[22] Servicemembers have an average of twice as much auto debt as civilians—particularly young servicemembers, who generally require vehicles for transportation while living on military bases.[23] By the age of 24, around 20

a military town I was taken advantage of by a dealership when purchasing my first car. It set me back financially for years. I know of many young military people who purchased vehicle[ ]s and we[ ]re instantly so far upside down after leaving the dealership with thousands of dollars in add on junk charges . . . ."); Individual commenter, Doc. No. FTC–2022–0046–0542 ("As a former member of the Military, the amount of scams and horror stories I have heard regarding young service members buying cars is absurd. . . . Someone shouldn't have to do hours of research on how to buy a car so they don't get taken advantage of."); Individual commenter, Doc. No. FTC–2022–0046–0637 ("As a small business owner and active duty military member I have played the role of both a buyer, toiling for hours to just reach fair deals on vehicles, as well as that of an advocate for my Sailors who have been preyed upon by local dealerships. Nowhere else in our society do so many average citizens have to mentally prepare for a battle over fair pricing and treatment for something that is realistically a modern necessity."); Individual commenter, Doc. No. FTC–2022–0046–9840 ("I can't list the number of times I have either seen, or have stepped in a situation, where car dealers have either attempted to take, or have successfully taken, advantage of a young military member or their family by baiting and switching when it came to the price of a car, or stated that the price was one amount, only to be charged, and over-charged a higher amount. These dealers have even attempted to pull unethical tricks on me and my wife, even after they found out that I was a military member, a combat veteran, that was serving this great nation."); Individual commenter, Doc. No. FTC–2022–0046–0845 ("Predatory practices like [bait-and-switch pricing] are common near military installations . . . .").

[12] Industry commenters claimed that many of the areas covered by the proposed rule are already addressed in industry guidance. The Commission notes that, although industry guidance can provide helpful information to dealers, dealers who choose not to follow such guidance, or who engage in deceptive or unfair practices, subject their customers to significant harm. The Rule addresses such practices, thus protecting consumers and law-abiding dealers.

[13] Unless otherwise indicated, the terms "auto," "automobile," "car," "motor vehicle," and "vehicle," as used in this SBP and the Commission's final regulatory analysis, refer to "Covered Motor Vehicle" as defined in this part.

[14] During 2017 to 2022, the average of 91% of American workers who did not work from home drove to work. *See* U.S. Census Bureau, "American Community Survey: Means of Transportation to Work by Selected Characteristics, 2022: ACS 1-Year Estimates Subject Tables" (2023), *https://data.census.gov/table?q=Commuting&tid=ACSST1Y2022.S0802* (reporting 110,245,368 workers 16 years and over who drove alone to work in a car, truck, or van, and 13,881,067 workers 16 years and over who drove by carpool to work in a car, truck or van, together accounting for 91% of the total of 136,196,004 workers 16 years and over who did not work from home); U.S. Census Bureau, "American Community Survey: Means of Transportation to Work by Selected Characteristics, 2021: 2017–2021 ACS 5-Year Estimates Subject Tables" (2022), *https://data.census.gov/table?q=Commuting&tid=ACSST5Y2021.S0802* (reporting 113,724,271 workers 16 years and over who drove alone to work in a car, truck, or van, and 13,340,838 workers 16 years and over who drove by carpool to work in a car, truck or van, together accounting for 91% of the total of 140,223,271 workers 16 years and over who did not work from home).

[15] Nat'l Auto. Dealers Ass'n, "NADA Data 2022" 7, *https://www.nada.org/media/4695/download?inline* (noting average retail selling price of $46,287 for new vehicles sold by dealerships in 2022).

[16] *Id.* at 10 (noting average retail selling price of $30,736 for used vehicles sold by new-vehicle dealerships in 2022).

[17] Lydia DePillis, "How the Costs of Car Ownership Add Up," N.Y. Times (Oct. 6, 2023), *https://www.nytimes.com/interactive/2023/10/07/*

*business/car-ownership-costs.html* (citing average monthly payment figures from TransUnion).

[18] *Id.* (citing data from AAA and the U.S. Census Bureau).

[19] Bureau of Econ. Analysis, "National Data: National Income and Product Accounts, Personal Consumption Expenditures by Major Type of Product" tbl. 2.3.5, *https://apps.bea.gov/iTable/?reqid=19&step=2&isuri=1&categories=survey#eyJhcHBpZCI6MTksInN0ZXBzIjpbMSwyLDNdLCJkYXRhIjpbWyJjYXRlZ29yaWVzIiwiU3VydmV5Il0sWyJOSVBBX1RhYmxlX0xpc3QiLCI2NjddXX0=* (last revised July 27, 2023) (listing estimated annual expenditure rates of between $713.1 billion and $737.1 billion in 2022).

[20] Melinda Zabritski, Experian Info. Sols., Inc., "State of the Automotive Finance Market Q4 2020" 5, *https://www.experian.com/content/dam/marketing/na/automotive/quarterly-webinars/credit-trends/2020-quarterly-trends/v2-2020-q4-state-automotive-market.pdf* (on file with the Commission).

[21] Fed. Rsrv. Bank of N.Y., "Quarterly Report on Household Debt and Credit, 2023: Q1" 3–4 (May 2023), *https://www.newyorkfed.org/medialibrary/interactives/householdcredit/data/pdf/HHDC_2023Q1*; Fed. Rsrv. Bank of N.Y., "Data Underlying Report" on "Page 3 Data" and "Page 4 Data" tabs, *https://www.newyorkfed.org/medialibrary/interactives/householdcredit/data/xls/HHD_C_Report_2023Q1* (last visited Dec. 5, 2023) (listing number of open "Auto Loan" accounts and total outstanding balance in such accounts).

[22] Fed. Rsrv. Bank of N.Y., "Quarterly Report on Household Debt and Credit, 2023: Q1" 3, 21 (May 2023), *https://www.newyorkfed.org/medialibrary/interactives/householdcredit/data/pdf/HHDC_2023Q1*; Fed. Rsrv. Bank of N.Y., "Data Underlying Report" on "Page 3 Data" and "Page 21 Data" tabs, *https://www.newyorkfed.org/medialibrary/interactives/householdcredit/data/xls/HHD_C_Report_2023Q1* (last visited Dec. 5, 2023) (listing total "Auto Loan" debt balance compared to other product type categories).

[23] *See* Consumer Fin. Prot. Bureau, "Financially Fit? Comparing the Credit Records of Young Servicemembers and Civilians" 27 (July 2020), *https://files.consumerfinance.gov/f/documents/cfpb_financially-fit_credit-young-servicemembers-civilians_report_2020-07.pdf*.

percent of young servicemembers have at least $20,000 in auto debt, which equates to nearly two-thirds of an enlisted soldier's typical base salary at that age.[24]

In addition to the expense, the process of buying or leasing a vehicle is often time-consuming and arduous. It can take several hours or days to finalize a transaction,[25] on top of the hours it can take, particularly in rural areas, to drive to a dealership.[26] Consumers may need to take time off work or arrange childcare, and families with a single vehicle may be forced to delay other important appointments due to the length of the vehicle-buying or -leasing process.

Most consumers—approximately 70%—finance vehicle purchases through a motor vehicle dealer,[27] using what is known as dealer-provided "indirect" financing.[28] This financing is

typically offered through dealers' financing and insurance ("F&I") offices, which may also offer leasing and add-on products or services. In the dealer-provided financing scenario, the dealer collects financial information about the consumer and forwards that information to prospective motor vehicle financing entities. These financing entities evaluate this information and, in the process, determine whether, and on what terms, to provide credit.[29] These terms include the "buy rate": a risk-based finance charge that reflects the interest rate at which the entity will finance the deal.[30] Dealers often add a finance charge called a "dealer reserve" or "markup" to the buy rate.[31] Unlike the buy rate, the markup is not based on the underwriting risk or credit characteristics of the applicant, and dealers retain the markup as profit.[32] New vehicle dealers average a gross profit of about $2,444 per vehicle,[33] more than half of which comes from the dealers' F&I offices. Independent used vehicle dealers averaged a gross profit of more than $6,000 per vehicle, as of 2019.[34] While some used vehicle dealerships do not have a separate F&I office, more than half of such dealerships sell add-on products.[35]

Six to eight percent of financed vehicle purchases use what is called

"buy here, pay here" dealers.[36] In this scenario, consumers typically borrow from, and make their payments directly to, the dealership.

The remainder of financed vehicle transactions use what is commonly referred to as "direct" financing, provided by a credit union, bank, or other financing entity.[37] In this scenario, consumers typically receive an interest rate quote from the financing entity prior to arriving at a dealership to purchase a vehicle, and use the financing to pay for their chosen vehicle.[38] Dealerships do not profit on the financing portion of the vehicle sale transaction when a consumer arranges financing directly.

Finally, consumers may choose to lease a vehicle from a dealership rather than purchase one. In this scenario, consumers may drive a vehicle for a set period of time—typically around three years [39]—and for a certain maximum number of miles—typically 10,000–15,000 miles per year—in exchange for an upfront payment, a monthly payment, and fees before, during, and at the end of the lease, including for excess wear and usage over the mileage limit.[40] When consumers lease a vehicle, they do not own it, and they must return the vehicle when the lease expires, though they may have the option to purchase

[24] *See* Consumer Fin. Prot. Bureau, "Protecting Servicemembers from Costly Auto Loans and Wrongful Repossessions" (July 18, 2022), *https://www.consumerfinance.gov/about-us/blog/protecting-servicemembers-from-costly-auto-loans-and-wrongful-repossessions/.*

[25] Mary W. Sullivan, Matthew T. Jones & Carole L. Reynolds, Fed. Trade Comm'n, "The Auto Buyer Study: Lessons from In-Depth Consumer Interviews and Related Research" 15 (July 2020) [hereinafter Auto Buyer Study], *https://www.ftc.gov/system/files/documents/reports/auto-buyer-study-lessons-depth-consumer-interviews-related-research/bcpreportautobuyerstudy.pdf* (noting that the purchase transactions in the FTC's qualitative study often took 5 hours or more to complete, with some extending over several days); *Cf.* Cox Auto., "2020 Cox Automotive Car Buyer Journey" 6 (2020) [hereinafter 2020 Cox Automotive Car Buyer Journey], *https://b2b.autotrader.com/app/uploads/2020-Car-Buyer-Journey-Study.pdf* (reporting average consumer time spent shopping for a vehicle at 14 hours, 53 minutes); Cox Auto., "2022 Car Buyer Journey: Top Trends Edition" 6 (2023) [hereinafter 2022 Car Buyer Journey], *https://www.coxautoinc.com/wp-content/uploads/2023/01/2022-Car-Buyer-Journey-Top-Trends.pdf* (reporting average consumer time spent shopping for a vehicle at 14 hours, 39 minutes).

[26] For example, consumers have complained about going to a dealership based on an offer that the dealer refuses to honor only after they have spent hours driving there and additional time on location. *See, e.g.,* Complaint ¶¶ 23–26, *Fed. Trade Comm'n v. N. Am. Auto. Servs., Inc.,* No. 1:22–cv–0169 (N.D. Ill. Mar. 31, 2022) (alleging that many consumers drive hours to dealerships based on the advertised prices; that test-driving and selecting a vehicle, and negotiating the price and financing terms, is an often hours-long process; and that, after this time, dealers falsely told consumers that add-on products or packages were required to purchase or finance the vehicle, even though they were not included in the low prices advertised or disclosed to consumers who called to confirm prices).

[27] Unless otherwise indicated, the terms "dealer," "dealership," and "motor vehicle dealer" as used in this SBP and the Commission's final regulatory analysis refer to "'Covered Motor Vehicle Dealer' or 'Dealer'" as defined in this part.

[28] *See* Nat'l Auto. Dealers Ass'n, "Dealer-Assisted Financing Benefits Consumers," *https://www.nada.org/autofinance/[https://web.archive.org/web/20220416131718/https://www.nada.org/autofinance/]* (Apr. 16, 2022) (noting

that 7 out of 10 consumers finance through their dealership). This is also known as "dealer financing," because consumers obtain financing through the dealer that partners with other entities in the financing process.

[29] Dealers often originate the contract governing the extension of retail credit or retail leases and then sell, or otherwise assign, these contracts to unaffiliated third-party finance or leasing sources, including such third parties the dealer may have contacted in the course of arranging dealer-provided "indirect" financing. *See* Consumer Fin. Prot. Bureau, "Automobile Finance Examination Procedures" 3 (Aug. 2019), *https://files.consumerfinance.gov/f/documents/201908_cfpb_automobile-finance-examination-procedures.pdf.*

[30] *See* Nat'l Auto. Dealers Ass'n, Nat'l Ass'n of Minority Auto. Dealers & Am. Int'l Auto. Dealers Ass'n, "Fair Credit Compliance Policy & Program" 2 (2015), *https://www.nada.org/media/4558/download?inline.* (defining "buy rate" as "the rate at which the finance source will purchase the credit contract from the dealer").

[31] *See, e.g., id.* at 1 n.4 & accompanying text.

[32] *Id.* (describing this as the amount dealers earn for arranging financing, measured as the difference between the consumer's annual percentage rate ("APR") and the wholesale "buy rate" at which a finance source buys the finance contract from the dealer, and noting that finance sources typically permit dealers to retain the dealer participation).

[33] Nat'l Auto. Dealers Ass'n, "Average Dealership Profile" 1 (2020), *https://www.nada.org/media/4136/download?attachment[http://web.archive.org/web/20220622041158/https://www.nada.org/media/4136/download?attachment]* (June 23, 2022).

[34] Nat'l Indep. Auto. Dealers Ass'n, "NIADA Used Car Industry Report 2020" 21 (2020).

[35] *Id.* at 8, 10.

[36] Melinda Zabritski, Experian Info. Sols., Inc., "State of the Automotive Finance Market Q2 2020" 8 (2020), *https://www.experian.com/content/dam/marketing/na/automotive/quarterly-webinars/credit-trends/2020-q2-safm-final.pdf [http://web.archive.org/web/20201106002015/https://www.experian.com/content/dam/marketing/na/automotive/quarterly-webinars/credit-trends/2020-q2-safm-final.pdf]* (Mar. 6, 2023).

[37] Consumer Fin. Prot. Bureau, "Automobile Finance Examination Procedures" 4 (Aug. 2019), *https://files.consumerfinance.gov/f/documents/201908_cfpb_automobile-finance-examination-procedures.pdf.*

[38] Consumer Fin. Prot. Bureau, "Consumer Voices on Automobile Financing" 5 (June 2016), *https://files.consumerfinance.gov/f/documents/201606_cfpb_consumer-voices-on-automobile-financing.pdf.*

[39] Melinda Zabritski, Experian Info. Sols., Inc., "State of the Automotive Finance Market Q4 2020" 26 (2020), *https://www.experian.com/content/dam/marketing/na/automotive/quarterly-webinars/credit-trends/2020-quarterly-trends/v2-2020-q4-state-automotive-market.pdf [http://web.archive.org/web/20210311174922/https://www.experian.com/content/dam/marketing/na/automotive/quarterly-webinars/credit-trends/2020-quarterly-trends/v2-2020-q4-state-automotive-market.pdf]* (Mar. 6, 2023).

[40] *See* Fed. Trade Comm'n, "Financing or Leasing a Car," *https://www.consumer.ftc.gov/articles/0056-financing-or-leasing-car* (last visited Dec. 5, 2023) ("The annual mileage limit in most standard leases is 15,000 or less."); Consumer Fin. Prot. Bureau, "What should I know about the differences between leasing and buying a vehicle?," *https://www.consumerfinance.gov/ask-cfpb/what-should-i-know-about-the-differences-between-leasing-and-buying-a-vehicle-en-815/* (last visited Aug. 24, 2023) ("Most leases restrict your mileage to 10,000–15,000 miles per year.").

the vehicle at the end of the lease period. Nearly 27% of new vehicles are leased, as are just over 8% of used vehicles.[41]

## B. Deceptive and Unfair Practices in the Motor Vehicle Marketplace

Section 5 of the Federal Trade Commission Act ("FTC Act"), as amended (15 U.S.C. 45), authorizes the FTC to address deceptive or unfair acts or practices in or affecting commerce, including in the motor vehicle marketplace.

An act or practice is deceptive if there is a representation, omission, or other practice that is likely to mislead consumers acting reasonably under the circumstances and is material to consumers—that is, it is likely to affect consumers' conduct or decisions with regard to a product or service.[42] Deceptive conduct can involve omission of material information, the disclosure of which is necessary to prevent the claim, practice, or sale from being misleading.[43]

An act or practice is considered unfair under section 5 of the FTC Act if: (1) it causes, or is likely to cause, substantial injury to consumers; (2) the injury is not reasonably avoidable by consumers; and (3) the injury is not outweighed by countervailing benefits to consumers or to competition.[44]

In each of the past four years, the FTC received more than 100,000 complaints regarding motor vehicle sales, financing, service and warranties, and rentals and leasing.[45] This industry is also

consistently at or near the top of private sources of consumer complaints.[46] Many of these complaints concerned deceptive or unfair acts or practices affecting U.S. consumers. Complaints about motor vehicle transactions are regularly in the top ten complaint categories tracked by the FTC.[47] For military consumers as well, auto-related complaints are among the top 10 complaint categories outside of identity theft.[48]

Moreover, law enforcement experience shows that complaints are just the tip of the iceberg.[49] The Commission's recent enforcement action against a large, multistate dealership group is illustrative of this point in the motor vehicle marketplace: in that

matter, the Commission received 391 complaints—about add-ons and other issues—over a several-month period prior to filing a complaint against the thirteenth largest dealership group in the country by revenue as of 2020.[50] However, in a survey of the dealer's customers over the same time period, 83% of respondents—or at least 16,848 customers—indicated they were subject to the dealer's unlawful practices related to add-ons alone.[51]

Similarly, in other contexts where companies were charged with making misrepresentations or engaging in misconduct regarding add-on products, information obtained after filing has shown widespread harm far beyond the initial consumer complaint volumes reported prior to filing.[52]

As examined in greater detail in the paragraphs that follow, consumers in the motor vehicle marketplace are confronted with chronic deceptive or unfair practices, including bait-and-switch tactics and hidden charges.[53]

### 1. Bait-and-Switch Tactics

Advertisements for motor vehicles are often consumers' first contact in the vehicle-buying or -leasing process. Dealers utilize a variety of means to

---

[41] Melinda Zabritski, Experian Info. Sols., Inc., "State of the Automotive Finance Market Q4 2020" 5 (2020), *https://www.experian.com/content/dam/marketing/na/automotive/quarterly-webinars/credit-trends/2020-quarterly-trends/v2-2020-q4-state-automotive-market.pdf* [*https://www.experian.com/content/marketing/na/automotive/quarterly-webinars/credit-trends/2020-quarterly-trends/v2-2020-q4-state-automotive-market.pdf*] (Mar. 6, 2023).

[42] *See* Fed. Trade Comm'n, "FTC Policy Statement on Deception" 2, 5, 103 F.T.C. 174 (1984) [hereinafter FTC Policy Statement on Deception] (*appended to Cliffdale Assocs., Inc.*, 103 F.T.C. 110, 183 (1984)), *https://www.ftc.gov/system/files/documents/public_statements/410531/831014deceptionstmt.pdf.*

[43] *Id.*

[44] 15 U.S.C. 45(n).

[45] *See, e.g.,* Fed. Trade Comm'n, "Consumer Sentinel Network Data Book 2022" app. B3 at 85 (Feb. 2023) [hereinafter Consumer Sentinel Network Data Book 2022], *https://www.ftc.gov/system/files/ftc_gov/pdf/CSN-Data-Book-2022.pdf* (reporting complaints about new and used motor vehicle sales, financing, service & warranties, and rentals & leasing, collectively, of more than 100,000 in 2020, 2021, and 2022); Fed. Trade Comm'n, "Consumer Sentinel Network Data Book 2021" app. B3 at 85 (Feb. 2022) [hereinafter Consumer Sentinel Network Data Book 2021], *https://www.ftc.gov/system/files/ftc_gov/pdf/CSN%20Annual%20Data%20Book%202021%20Final%20PDF.pdf* (reporting complaints about new and used motor vehicle sales,

financing, service & warranties, and rentals & leasing, collectively, of more than 100,000 in 2019, 2020, and 2021).

[46] According to commenters, complaints to the Better Business Bureau about new and used auto dealers, when combined, have been either the first or second highest regarding any industry in the U.S. for the past twenty years. *See* Comment of Nat'l Consumer L. Ctr. et al., Doc. No. FTC–2022–0046–7607 at ii; *see also* Better Bus. Bureau, "BBB Complaint and Inquiry Statistics," *https://www.bbb.org/all/bbb-complaint-statistics* (last visited Dec. 5, 2023) (listing complaint statistics from 2010 through 2022, sorted by industry). In addition, for the past seven years annual surveys of State and local consumer protection agencies have reported that auto-related complaints were the top complaint received from consumers. *See* Comment of Nat'l Consumer L. Ctr. et al., Doc. No. FTC–2022–0046–7607 at 13; Consumer Fed'n of Am., "2022 Consumer Complaint Survey Report" 4–5 (May 2023), *https://consumerfed.org/wp-content/uploads/2023/05/2022-Consumer-Complaint-Survey-Report.pdf* ("For the seventh year in a row, auto sales, leases and repairs are the #1 complaint category. Consumers filed complaints about add-on products and services, bait and switch pricing, and mechanical condition issues.").

[47] *See* Consumer Sentinel Network Data Book 2021, *supra* note 45, at 8 (listing vehicle-related complaints as the seventh most common report category, outside of identity theft, in 2021); Consumer Sentinel Network Data Book 2022, *supra* note 45, at 8 (listing motor vehicle-related complaints as the fifth most common report category, outside of identity theft, in 2022).

[48] *See* Consumer Sentinel Network Data Book 2021, *supra* note 45, at 18 (listing vehicle-related complaints as the eighth most common complaint category for military consumers, outside of identity theft categories, in 2021); Consumer Sentinel Network Data Book 2022, *supra* note 45, at 18 (listing vehicle-related complaints as the ninth most common complaint category for military consumers, outside of identity theft categories, in 2022).

[49] *See, e.g., United States* v. *Brien,* 617 F.2d 299, 308 (1st Cir. 1980); *United States* v. *Offs. Known as 50 State Distrib. Co.,* 708 F.2d 1371, 1374–75 (9th Cir. 1983); Keith B. Anderson, Fed. Trade Comm'n, "Consumer Fraud in the United States: An FTC Survey" 80 (2004), *https://www.ftc.gov/sites/default/files/documents/reports/consumer-fraud-united-states-ftc-survey/040805confraudrpt.pdf* (staff report noting consumers who reported they were victims of fraud complained to an official source only 8.4 percent of the time, filing complaints with the BBB in 3.5 percent of incidents and to a Federal agency, including the FTC, in only 1.4 percent of cases).

[50] *See* Complaint, *Fed. Trade Comm'n* v. *N. Am. Auto. Servs., Inc.,* No. 1:22–cv–0169 (N.D. Ill. Mar. 31, 2022); *see also* WardsAuto, "WardsAuto 2020 Megadealer 100," *https://www.wardsauto.com/dealers/wardsauto-2020-megadealer-100-industry-force* (last visited Dec. 5, 2023) (listing Napleton Automotive Group as the 13th-ranked dealership group by total revenue).

[51] Complaint ¶ 27, *Fed. Trade Comm'n* v. *N. Am. Auto. Servs., Inc.,* No. 1:22–cv–0169 (N.D. Ill. Mar. 31, 2022) (alleging that defendants buried charges for add-ons in voluminous paperwork, making them difficult to detect); *see* Press Release, Fed. Trade Comm'n, "FTC Returns Additional $857,000 To Consumers Harmed by Napleton Auto's Junk Fees and Discriminatory Practices" (Nov. 20, 2023), *https://www.ftc.gov/news-events/news/press-releases/2023/11/ftc-returns-additional-857000-consumers-harmed-napleton-autos-junk-fees-discriminatory-practices.*

[52] For example, in a recent action involving deceptive pre-approval claims, the FTC had received roughly 30 complaints about the company's pre-approval conduct in the five-year period prior to announcing its action. But in the five months following announcement of the action, more than 900 additional consumers came forward with complaints about the conduct. *See* Press Release, Fed. Trade Comm'n, "FTC Announces Claims Process for Consumers Harmed by Credit Karma 'Pre-Approved' Offers for Which They Were Denied" (Dec. 5, 2023), *https://www.ftc.gov/news-events/news/press-releases/2023/12/ftc-announces-claims-process-consumers-harmed-credit-karma-pre-approved-offers-which-they-were* ("[W]ithin five months of that announcement, the agency received nearly 900 more such complaints").

[53] While other issues exist in the motor vehicle sales, financing, and leasing space, including issues involving discrimination, financing application falsification, data privacy and security, and yo-yo financing, this Rule's core focus is on misrepresentations and add-on and pricing practices.

reach consumers, including social media and online advertisements, television and radio commercials, and direct mail marketing. New vehicle dealers spend an average of more than $700 on advertising per vehicle sold [54]—more than two-thirds of which goes toward online advertising.[55]

The FTC has brought many law enforcement actions involving motor vehicle dealers' deceptive advertising and other unlawful tactics. Such actions have charged dealers with, *inter alia*, making misrepresentations regarding the price of a vehicle, the availability of discounts and rebates, the monthly payment amount for a financed purchase or lease, the amount due at signing, and whether an offer pertains to a purchase or a lease.[56] Other such actions have charged dealers with misrepresentations regarding whether the dealer or consumer is responsible for paying off "negative equity," *i.e.*, the outstanding debt on a vehicle that is being "traded in" as part of another vehicle purchase.[57] And in other FTC actions, some dealers have lured potential buyers through financial incentives incidental to the purchase, such as deceptive promises of a valuable prize that is redeemable only by visiting the dealership.[58]

Deceptive tactics can cause significant consumer harm and impede competition, competitively disadvantaging law-abiding dealers. When dealerships advertise prices, discounts, or other terms that are not actually available to typical consumers, consumers who select that dealership instead of others spend time visiting the dealership or otherwise interacting with the dealership under false pretenses.

### 2. Unlawful Practices Relating to Add-On Products or Services and Hidden Charges

Another key consumer protection concern is the sale of add-on products or services in a deceptive or unfair manner. Add-ons in connection with the sale or financing of motor vehicles include extended warranties, service and maintenance plans, payment programs, guaranteed automobile or asset protection ("GAP") agreements, emergency road service, VIN etching and other theft protection devices, and undercoating. Individual add-ons can cost consumers thousands of dollars and can significantly increase the overall cost to the consumer in the transaction.[59] Moreover, in the past two years, dealers have substantially increased prices for these add-ons, notwithstanding that such products or services largely are not constrained by supply.[60]

A significant consumer protection concern is consumers paying for add-ons without knowing about, or expressly agreeing to, these products or services.[61] This type of payment packing has been a particular concern in the military community.[62] The protracted and paperwork-heavy vehicle-buying or -leasing process can make it difficult for consumers to spot add-on charges, particularly when advertised prices or payment terms do not mention add-ons.[63] If consumers are financing or leasing the vehicle, they undergo a separate financing process after selecting a vehicle, which can include wading through a thick stack of dense paperwork filled with fine print.[64] For example, according to an FTC law enforcement action, consumers visiting one large dealership group were required to complete a stack of paperwork that ran more than sixty pages and required more than a dozen signatures.[65] This paperwork can include hidden charges for add-on products or services, causing consumers

---

[54] Nat'l Auto. Dealers Ass'n, "NADA Data 2022" 15, *https://www.nada.org/media/4695/download?inline* (listing average dealership advertising per new vehicle sold of $718 in 2022, and $602 in 2021).

[55] *Id.* at 16 (listing 68.2% of estimated advertising expenditures by medium as internet expenditures).

[56] *See, e.g.,* Complaint, *Timonium Chrysler, Inc.,* No. C–4429 (F.T.C. Jan. 28, 2014) (alleging dealership advertised internet prices and dealer discounts that were only available through rebates not applicable to the typical consumer); Complaint, *Ganley Ford West, Inc.,* No. C–4428 (F.T.C. Jan. 28, 2014) (alleging dealership advertised discounts on vehicle prices, but failed to disclose that discounts were only available on the most expensive models); Complaint, *Progressive Chevrolet Co.,* No. C–4578 (F.T.C. June 13, 2016) (alleging deceptive failure to disclose material conditions of obtaining the lease monthly payment in their online and print advertising); Complaint ¶¶ 38–46, *Fed. Trade Comm'n* v. *Tate's Auto Ctr. of Winslow, Inc.,* No. 3:18–cv–08176–DJH (D. Ariz. July 31, 2018) (alleging that company issued advertisements for attractive terms but concealed that the terms were only applicable to lease offers); Complaint ¶¶ 36–38, *United States* v. *New World Auto Imports, Inc.,* No. 316–cv–02401–K (N.D. Tex. Aug. 18, 2016) (alleging misrepresentation that terms were for financing instead of leasing); Complaint ¶¶ 85–87, *Fed. Trade Comm'n* v. *Universal City Nissan, Inc.,* No. 2:16–cv–07329 (C.D. Cal. Sept. 29, 2016) (alleging that dealerships claimed consumers could finance the purchase of vehicles with attractive terms and buried disclosures indicating that such terms were applicable to leases only).

[57] Complaint ¶¶ 82–84, *Fed. Trade Comm'n* v. *Universal City Nissan, Inc.,* No. 2:16–cv–07329 (C.D. Cal. Sept. 29, 2016) (alleging misrepresentation that dealer would pay off a consumer's trade-in when in fact consumers were still responsible for outstanding debt on trade-in vehicles); Complaint ¶¶ 17–19, *TXVT Ltd. P'ship,* No. C–4508 (F.T.C. Feb. 12, 2015) (alleging misrepresentation in leasing advertising that the dealership would pay off the negative equity of a consumer's trade in vehicle, when in fact, it was merely rolled into the financed amount for the consumer's newly financed vehicle).

[58] *See, e.g.,* Complaint ¶¶ 12, 17–19, *Traffic Jam Events, LLC,* No. 9395 (F.T.C. Aug. 7, 2020); Complaint ¶¶ 4, 7–9, *Fowlerville Ford, Inc.,* No. C–4433 (F.T.C. Feb. 20, 2014).

[59] *See, e.g.,* Complaint ¶¶ 25, 27–28, *Fed. Trade Comm'n* v. *N. Am. Auto. Servs., Inc.,* No. 1:22–cv–0169 (N.D. Ill. Mar. 31, 2022).

[60] *See* Ben Eisen, "Car Dealer Markups Helped Drive Inflation, Study Finds," Wall St. J., Apr. 23, 2023, *https://www.wsj.com/articles/car-dealer-markups-helped-drive-inflation-study-finds-7c1d5a2d;* U.S. Bureau of Labor Statistics, "Automotive Dealerships 2019–2022: Dealer Markup Increases Drive New-Vehicle Consumer Inflation" (Apr. 2023), *https://www.bls.gov/opub/mlr/2023/article/automotive-dealerships-markups.htm.*

[61] *See* Nat'l Consumer L. Ctr., "Auto Add-ons Add Up: How Dealer Discretion Drives Excessive, Arbitrary, and Discriminatory Pricing" (Oct. 1, 2017), *https://www.nclc.org/images/pdf/car_sales/report-auto-add-on.pdf;* Adam J. Levitin, "The Fast and the Usurious: Putting the Brakes on Auto Lending Abuses," 108 Geo. L.J. 1257, 1265–66 (2020), *https://www.law.georgetown.edu/georgetown-law-journal/wp-content/uploads/sites/26/2020/05/Levitin_The-Fast-and-the-Usurious-*

*Putting-the-Brakes-on-Auto-Lending-Abuses.pdf* (discussing "loan packing" as the sale of add-on products that are falsely represented as being required in order to obtain financing); Complaint ¶¶ 12–19, *Fed. Trade Comm'n* v. *Liberty Chevrolet, Inc.,* No. 1:20–cv–03945 (S.D.N.Y. May 21, 2020) (alleging deceptive and unauthorized add-on charges in consumers' transactions); Complaint ¶¶ 59–64, *Fed. Trade Comm'n* v. *Universal City Nissan, Inc.,* No. 2:16–cv–07329 (C.D. Cal. Sept. 29, 2016) (alleging deceptive and unauthorized add-on charges in consumers' transactions); Complaint ¶ 6, 9, *TT of Longwood, Inc.,* No. C–4531 (F.T.C. July 2, 2015) (alleging misrepresentations regarding prices for added features); *see also* Auto Buyer Study, *supra* note 25, at 14 ("Several participants who thought that they had not purchased add-ons, or that the add-ons were included at no additional charge, were surprised to learn, when going through the paperwork, that they had in fact paid extra for add-ons. This is consistent with consumers' experiencing fatigue during the buying process or confusion with a financially complex transaction, but would also be consistent with dealer misrepresentations.").

[62] Consumers for Auto Reliability and Safety, Comment Letter on Motor Vehicle Roundtables, Project No. P104811 at 2–3 (Apr. 1, 2012), *https://www.ftc.gov/sites/default/files/documents/public_comments/public-roundtables-protecting-consumers-sale-and-leasing-motor-vehicles-project-no.p104811-00108/00108-82875.pdf* (citing a U.S. Department of Defense data call summary that found that the vast majority of military counselors have clients with auto financing problems and cited "loan packing" and yo-yo financing as the most frequent auto lending abuses affecting servicemembers).

[63] Complaint ¶¶ 17–19, *Fed. Trade Comm'n* v. *Liberty Chevrolet, Inc.,* No. 1:20–cv–03945 (S.D.N.Y. May 21, 2020); Complaint ¶ 60, *Fed. Trade Comm'n* v. *Universal City Nissan, Inc.,* No. 2:16–cv–07329 (C.D. Cal. Sept. 29, 2016); Carole L. Reynolds & Stephanie E. Cox, Fed. Trade Comm'n, "Buckle Up: Navigating Auto Sales and Financing" (2020) [hereinafter Buckle Up], *https://www.ftc.gov/reports/buckle-navigating-auto-sales-financing.*

[64] *See, e.g.,* Buckle Up, *supra* note 63, at 10–11 (noting the long, complex transaction process); Complaint ¶¶ 23–28, *Fed. Trade Comm'n* v. *N. Am. Auto. Servs., Inc.,* No. 1:22–cv–01690 (N.D. Ill. Mar. 31, 2022) (same).

[65] Complaint ¶ 24, *Fed. Trade Comm'n* v. *N. Am. Auto. Servs., Inc.,* No. 1:22–cv–01690 (N.D. Ill. Mar. 31, 2022); *see also* Buckle Up, *supra* note 63, at 10–11.

to purchase those add-ons without knowing about or agreeing to them, or without knowing or agreeing to their costs or other key terms.[66] Unscrupulous dealers are able to slip the often considerable additional costs

for these items past consumers unnoticed and into purchase contracts through a variety of means, including by not mentioning them at all,[67] or by focusing consumers' attention on other aspects of the complex transaction, such as monthly payments, which might increase only marginally with the addition of prorated add-on costs, or may even be made to decrease if the financing term is extended.[68] This type of conduct can target immigrants, communities of color, and servicemembers.[69] In other instances,

dealers might wait until late in the transaction to mention add-ons, and then do so in a misleading manner. For example, participants in an FTC qualitative study on consumers' car-buying experiences cited situations where dealers waited until the financing stage to mention add-ons, after consumers believed they had agreed on terms, and even though many add-ons have nothing to do with financing and were not mentioned at all during the sales process or when prices were initially negotiated.[70] According to FTC enforcement actions, dealers also have represented that add-ons are required when in fact they are not,[71] have misrepresented the purported benefits of add-ons, and have failed to disclose material limitations.[72]

[66] Complaint ¶¶ 25, 27, 29–32, *Fed. Trade Comm'n* v. *N. Am. Auto. Servs., Inc.,* No. 1:22–cv–01690 (N.D. Ill. Mar. 31, 2022); *see also* Complaint ¶¶ 17–19, *Fed. Trade Comm'n* v. *Liberty Chevrolet, Inc.,* No. 1:20–cv–03945 (S.D.N.Y. May 21, 2020); Dale Irwin, Slough Connealy Irwin & Madden LLC, Comment Letter on Public Roundtables: Protecting Consumers in the Sale and Leasing of Motor Vehicles, Project No. P104811, Submission No. 558507–00060 (Dec. 29, 2011), *https://www.regulations.gov/comment/FTC-2022-0036-0051* (consumer protection lawyer noting "payment packing" among problems "that cry out for scrutiny and regulation"); Michael Archer, Comment Letter on Public Roundtables: Protecting Consumers in the Sale and Leasing of Motor Vehicles, Project No. P104811, Submission No. 558507–00041 at 3 (Aug. 6, 2011), *https://www.regulations.gov/comment/FTC-2022-0036-0014* (workshop panelist stating, "I have seen cases wherein the dealer uses financing to pack in extra costs or to wipe out trade-in value."); Dawn Smith, Comment Letter on Public Roundtables: Protecting Consumers in the Sale and Leasing of Motor Vehicles, Project No. P104811, Submission No. 558507–00027 (July 27, 2011), *https://www.regulations.gov/comment/FTC-2022-0036-0043* ("Confusing or misleading sales terms[.] Extra fees was [sic] added at the time of purchase and to this day I still do not understand what the fee was for; it made the payment higher."); Carrie Ferraro, Legal Servs. of N.J., Comment Letter on Public Roundtables: Protecting Consumers in the Sale and Leasing of Motor Vehicles, Project No. P104811, Submission No. 558507–00061 (Dec. 29, 2011), *https://www.regulations.gov/comment/FTC-2022-0036-0059* (citing "[d]ealers engage[d] in packing" as an example of the common consumer complaints of car-sales-related fraud received by LSNJ's legal advice hotline); Rosemary Shahan, Consumers for Auto Reliability and Safety, Comment Letter on Public Roundtables: Protecting Consumers in the Sale and Leasing of Motor Vehicles, Project No. P104811, Submission No. 558507–00069 at 3 (Jan. 31, 2012), *https://www.regulations.gov/comment/FTC-2022-0036-0069* (noting that "[m]any common auto scams do not generate complaints in proportion to how pervasive or costly the practices are, simply because the consumers generally remain unaware they have been scammed," including as a result of "[l]oan packing"); Mary W. Sullivan, Matthew T. Jones & Carole L. Reynolds, Fed. Trade Comm'n, "The Auto Buyer Study: Lessons from In-Depth Consumer Interviews and Related Research," Supplemental Appendix: Redacted Interview Transcripts at 525 (2020) [hereinafter Auto Buyer Study: Appendix], *https://www.ftc.gov/system/files/documents/reports/buckle-navigating-auto-sales-financing/bcpstaffreportautobuyerstudysuppappendix.pdf* (Study participant 169810: consumer had "additional items" charges on contract that consumer could not identify); *id.* at 730, 740–42 (Study participant 188329: dealer did not tell consumer about GAP or service contract but consumer was charged $599 and $1,950 for those add-ons, respectively); Press Release, N.Y. State Att'y Gen., "A.G. Schneiderman Announces Nearly $14 Million Settlement with NYC and Westchester Auto Dealerships for Deceptive Practices that Resulted in Inflated Car Prices" (June 17, 2015), *https://ag.ny.gov/press-release/2015/ag-schneiderman-announces-nearly-14-million-settlement-nyc-and-westchester-auto* ("This settlement is part of the [New York] attorney general's wider initiative to end the practice of 'jamming,' unlawfully charging consumers for hidden purchases by car dealerships.").

[67] Under the Truth in Lending Act ("TILA") and its implementing Regulation Z, required add-on products or services must be factored into the APR and the finance charge disclosed during the transaction. *See* 15 U.S.C. 1605, 1606, 1638; 12 CFR 226.4, 226.18(b), (d), (e), and 226.22. It is legally impermissible for dealers to include charges for such products in a consumer's contract without disclosing them. *See, e.g.,* Complaint ¶¶ 57–60, *Fed. Trade Comm'n* v. *Stewart Fin. Co. Holdings, Inc.,* No. 1:03–CV–2648 (N.D. Ga. Sept. 4, 2003) (alleging violations for failure to include the cost of required add-on products in the finance charge and annual percentage rate disclosed to consumers).

[68] *See, e.g.,* Buckle Up, *supra* note 63, at 6; Fed. Trade Comm'n, Military Consumer Financial Workshop, Panel 1, Tr. 19:25–41 (July 19, 2017), *https://www.ftc.gov/news-events/events-calendar/military-consumer-workshop;* Fed. Trade Comm'n, "The Road Ahead: Selling, Financing & Leasing Motor Vehicles," Public Roundtable, Session 2, Tr. at 40–41 (Aug. 2 2011), *https://www.ftc.gov/news-events/events/2011/08/road-ahead-selling-financing-leasing-motor-vehicles* (noting that optional products and services are often already included in the monthly payment prices advertised or quoted); Christopher Kukla, Ctr. for Responsible Lending, Comment Letter on Public Roundtables: Protecting Consumers in the Sale and Leasing of Motor Vehicles, Project No. P104811, Submission No. 558507–00071 at 10 (Feb. 1, 2012), *https://www.regulations.gov/comment/FTC-2022-0036-0068* (discussing how dealers conceal packing by expressing an increase in price in terms of monthly payment); Att'y General of 31 States & DC, Comment Letter on Public Roundtables: Protecting Consumers in the Sale and Leasing of Motor Vehicles, Project No. P104811, Submission No. 558507–00112 at 5 (Apr. 13, 2012), *https://www.regulations.gov/comment/FTC-2022-0036-0124* (discussing the "age-old auto salesperson's trick" of quoting monthly payment prices without disclosing that the quote includes the cost of optional items that the customer has not yet agreed to purchase).

[69] *See, e.g.,* Complaint ¶¶ 9, 26, *Fed. Trade Comm'n* v. *Liberty Chevrolet, Inc.,* No. 1:20–cv–03945 (S.D.N.Y. May 21, 2020) (charging defendants with discriminating on the basis of race, color, and national origin by charging higher interest rates and inflated fees); Press Release, N.Y. State Att'y Gen., "Attorney General James Delivers Restitution to New Yorkers Cheated by Auto Dealership" (Nov. 17, 2020), *https://ag.ny.gov/press-release/2020/attorney-general-james-delivers-restitution-new-yorkers-cheated-auto-dealership* (dealership targeted Chinese speakers for unlawful payment packing or "jamming"); Military Consumer Financial Workshop, Tr. 19:21 (July 19, 2017), *https://www.ftc.gov/news-events/events/2017/07/military-consumer-workshop* (panelist discussing servicemembers experiencing payment packing); *see also* Fed. Trade Comm'n, "Staff Perspective: A Closer Look at the Military Consumer Financial Workshop" 2–3 (Feb. 2018), *https://www.ftc.gov/system/files/documents/reports/closer-look-military-consumer-financial-workshop-federal-trade-commission-staff-perspective/military_consumer_workshop_-_staff_perspective_2-2-18.pdf* (explaining the unique situation of servicemembers whose steady paychecks make them attractive customers for dealers, while having no or minimal credit history, meaning they qualify for less advantageous credit terms and higher interest rate financing).

[70] *See, e.g.,* Buckle Up, *supra* note 63, at 6 (observing that the introduction of "add-ons during financing discussions caused several participants' total sale price to balloon from the cash price"); *id.* at 9 (observing that, for most consumers in the study, "add-ons did not come up until the financing process, if at all, after a long car-buying process and at a time when the consumer often felt pressure to close the deal"); *id.* (noting that most study participants' contracts included add-ons charges, but that many "were unclear what those add-ons included, and sometimes did not realize they had purchased any add-ons at all"); *id.* at 7 (explaining situations where the consumer reached the financing office after negotiating with the sales staff and were then told that the agreed upon price was not compatible with key financing terms—for example, a promised rebate or discount could not be combined with an advertised interest rate).

[71] Complaint ¶¶ 12–19, *Fed. Trade Comm'n* v. *Liberty Chevrolet, Inc.,* No. 1:20–cv–03945 (S.D.N.Y. May 21, 2020) (alleging deceptive and unauthorized add-on charges in consumers' transactions); Complaint ¶¶ 59–64, *Fed. Trade Comm'n* v. *Universal City Nissan, Inc.,* No. 2:16–cv–07329 (C.D. Cal. Sept. 29, 2016) (alleging deceptive and unauthorized add-on charges in consumers' transactions); Complaint ¶ 6, 9, *TT of Longwood,* No. C–4531 (F.T.C. July 2, 2015) (alleging misrepresentations regarding prices for added features); *see also* Auto Buyer Study, *supra* note 25, at 14.

[72] Complaint ¶ 4–14, *Nat'l Payment Network, Inc.,* No. C–4521 (F.T.C. May 4, 2015) (alleging failure to disclose fees associated with financing program; misleading savings claims in advertisements); Complaint ¶¶ 4–13, *Matt Blatt Inc.,* No. C–4532 (F.T.C. July 2, 2015) (alleging failure to disclose fees associated with financing program; misleading savings claims); Buckle Up, *supra* note 63, at 10 (noting that some Auto Buyer Study participants did not fully understand material aspects of extended warranties or service plans they purchased and "were surprised to discover during the interview that their plans had unexpected limitations" or that "they had to pay out-of-pocket for repairs or services that were not covered"; for example, one "consumer purchased a 'Lifetime' maintenance plan, only to discover later that he received a one-year plan that covered periodic oil changes"). *Cf.* Consent Order ¶¶ 10–16, *Santander*

Indeed, as previously noted, in a recent FTC enforcement action, the Commission cited a survey finding that 83% of consumers from the named dealers were charged for add-on products or services that they did not authorize or as a result of deceptive claims.[73]

One participant in an FTC qualitative study of consumers' car-buying experiences summed up these issues during an interview after having purchased a vehicle.[74] The consumer purchased a $2,000 service contract that the dealer falsely said was free, and a $900 GAP agreement that the dealer falsely said was mandatory. The consumer only learned about these purchases during the study interview. This consumer remarked:

I feel I've been taken advantage of, to be honest with you. Even though I thought that I was getting a great deal with the interest rate, but I know [sic] see that they're also very sneaky about putting stuff on your paperwork. They only let you skim through the paperwork that you have to sign and they just kind of tell you what it is. This is this, this is that, this is this, and then you just sign it away. You're so tired, you're so worn down, you don't want to be there no more. You just want to get it done and over with. They take advantage of that. Yes, they still play this friendly card, you know, thank you for your business card kind of thing. Like I said, they never lose. They never lose.[75]

Similarly, in response to the Commission's notice of proposed rulemaking, thousands of commenters described issues they faced when purchasing, financing, or leasing a vehicle. Many comments the Commission received in support of the NPRM were from self-identified military

consumers and dealership employees. Examples of supportive comments include the following:

• As a young Marine stationed in a military town I was taken advantage of by a dealership when purchasing my first car. It set me back financially for years. I know of many young military people who purchased vehicle[]s and we[]re instantly so far upside down after leaving the dealership with thousands of dollars in add on junk charges . . . . Please make it more difficult for dishonest dealers like these to financially burden young Americans and Americans of any age for that matter.[76]

• Imagine going to a restaurant franchise and order[ing] a burger and fries for $10 and the franchise employees say[,] 'Sorry that will be $25 dollars, there is a $10 restaurant adjustment price due to market conditions and $5 for us to place and document your order.' You would walk away without hesitation because that would [be] absolutely ridiculous. Yet, dealerships are allowed to do exactly that. . . . IT IS TIME TO CHANGE AND PROTECT CONSUMERS[.][77]

• As in many other areas, it is the vulnerable in our society who are probably most affected by such deceptive practices. . . . Sadly, it is often these very people who desperately need a dependable, affordable car for transportation to work, school, shopping, or medical care. To entice, pressure, or trick people into buying a car that is more than they can afford sets them up for financial failure, not only in possibly having a needed car repossessed, but in long-term damage to their credit. . . . In closing, I would be extremely happy to see rules such as those described above enacted, and don't think these could come a day too soon. It's a step in the right direction for the protection of the consumer.[78]

• None of us working here at the dealership in sales benefit from [unfair and deceptive practices]. We cringe as much as every customer and have to show up to work every[ ]day and hope we are not forced to screw someone with these BS products. . . . I would hope when [t]he regulators are making their decisions, they understand the positive implications this would have for dealership employees this both financially and mentally.[79]

• Generally, I'm not a person in favor of government regulation. However, as a potential customer and cash buyer, I feel there is certainly a need to bring car dealers back into check. I'm just looking for a more honest and transparent process. I don't want to be taken advantage of. I certainly don't want my family members or [s]oldiers to be taken advantage of. Therefore, I feel it is in the best interest of future customers to support this regulation.[80]

• I cannot stress enough my support for these new rules. Currently, dealerships across the US, including the one I work for, have made the car buying process needlessly confusing, expensive, and frustrating by engaging in false advertising and hidden add-on products.[81]

• I can tell you after many years of car buying I have NEVER walked out of a dealership feeling good. Even worse, I've never purchased a car feeling like I fully understood what I was getting. . . . Looking forward to seeing the change happen SOON![82]

• When I buy a gallon of milk from the store, the price is written next to the milk. When I go pay, I pay the price advertised next to the milk. Would it be OK if I go up to pay and that gallon of milk had anywhere between 1% and 1,200% markup depending on the day, what you look like, what you drove to the store in, if you're a man or a woman?[83]

• We ended up having to drive 3 hours to the [vehicle we] wanted. Upon arriving to pick[ ]up the car we were told there was a [$]4,300 increase over MSRP. We were told if we didn't take it they had someone else waiting to purchase it. We needed the car and didn't have time to hunt down another one so ended up purchasing it. Very disappointed in the long and awful process.[84]

• The worst is dealing with car dealers. You never know what the real price is on a vehicle until you spend a few hours with them. Mandatory add[-] on[ ]s, market availability surcharges, doc fees that vary from dealer to dealer. . . . Then dealing with the finance manager who tr[ie]s to sell you everything you don't[ ]need. They high pressure the consumer on purchasing extend[ed] warranties. There

---

*Consumer USA, Inc.,* CFPB No. 2018–BCFP–0008 (Nov. 20, 2018) (finding that defendant sold GAP product allegedly providing ''full coverage'' to consumers with loan-to-value ratios (''LTVs'') above 125%, when in fact coverage was limited to 125% of LTV).

[73] Complaint ¶ 27, *Fed. Trade Comm'n v. N. Am. Auto. Servs., Inc.,* No. 1:22–cv–01690 (N.D. Ill. Mar. 31, 2022).

[74] The study is described in the Commission's reports: Auto Buyer Study, *supra* note 25, and Buckle Up, *supra* note 63. Some industry commenters critiqued the FTC's reliance on this qualitative study. The Commission notes that the study provides helpful qualitative insight from consumer interviews regarding their recent motor vehicle purchases and is one of the many sources the Commission has considered, including consumer complaints, enforcement actions, outreach and dialogue with stakeholders and consumer groups, among others, as described in this SBP and in the NPRM.

[75] Auto Buyer Study: Appendix, *supra* note 66, at 130 (Study participant 152288); *see also id.* at 202–03 (Study participant 180267: dealership included a charge for GAP in the final paperwork but not in retail sales contract); *id.* at 296 (Study participant 146748: consumer learned during interview with FTC that consumer purchased GAP: ''maybe they're just throwing that in there without telling you'').

[76] Individual commenter, Doc. No. FTC–2022–0046–4648.

[77] Individual commenter, Doc. No. FTC–2022–0046–0016.

[78] Individual commenter, Doc. No. FTC–2022–0046–1216.

[79] Individual commenter, Doc. No. FTC–2022–0046–3615.

[80] Individual commenter, Doc. No. FTC–2022–0046–7366.

[81] Individual commenter, Doc. No. FTC–2022–0046–3693.

[82] Individual commenter, Doc. No. FTC–2022–0046–3678.

[83] Individual commenter, Doc. No. FTC–2022–0046–1479.

[84] Individual commenter, Doc. No. FTC–2022–0046–1878.

needs [to be] some sort of policing [of] these unscrupulous car dealers to protect the buyers.[85]

• This is a good start to making car purchasing a better experience. . . . I remember looking at a Lexus and being told by the dealership, the only one in the state, that [S]cotchguard and undercoating were mandatory and they refused to sell any vehicles without them. There were two Acura dealerships in town and one of them included 'free' lifetime oil changes that I didn't learn about until negotiating the price and had already spent two hours in negotiations. All of these services/price adjustments were not disclosed at the start of the negotiation and were only revealed either in the manager's office or when the purchase agreement was presented to me by the salesperson. After spending time on the test drive and negotiating the price, it felt that these last minute price adjustments were being revealed that late in the process so that I wouldn't leave.[86]

• Please enact and enforce these regulations to protect vulnerable consumers from predatory business practices enjoyed by dealers. Our family experienced such practices when trying to purchase a vehicle in early 2022. It was only after five hours at the dealership that we discovered the dealer had added on a $3,000 market adjustment and $3,100 in other add-ons (nitrogen-filled tires, LoJack, paint protection) to MSRP. This raised the price by about $6,000 and caused us to use extra PTO over that week to find a new vehicle at a price within our budget. Greater transparency in the car-buying process is desperately needed to protect vulnerable consumers—who usually lack any bargaining power—against power dealer networks and their special interest groups. . . .[87]

## C. Law Enforcement and Other Responses

The Commission has taken action to protect consumers from deceptive and unfair acts or practices in the motor vehicle marketplace. As noted in the NPRM, the Commission has brought more than 50 auto law enforcement actions;[88] led two law enforcement

sweeps, including one that involved 181 State enforcement actions;[89] published two reports on a qualitative study of consumer experiences while purchasing motor vehicles; and held workshops with various stakeholders to discuss the motor vehicle marketplace.[90]

[85] Individual commenter, Doc. No. FTC–2022–0046–0825.

[86] Individual commenter, Doc. No. FTC–2022–0046–4833.

[87] Individual commenter, Doc. No. FTC–2022–0046–1690.

[88] Complaint, *Fed. Trade Comm'n* v. *Rhinelander Auto Ctr., Inc.,* No. 3:23–cv–00737 (W.D. Wis. Oct. 24, 2023); Complaint, *Fed. Trade Comm'n* v. *Passport Auto. Grp., Inc.,* No. 8:22–cv–02670–GLS (D. Md. Oct. 18, 2022); Complaint, *Fed. Trade Comm'n* v. *N. Am. Auto. Servs., Inc.,* No. 1:22–cv–01690 (N.D. Ill. Mar. 31, 2022); Complaint, *Traffic Jam Events, LLC,* No. 9395 (F.T.C. Aug. 7, 2020); Complaint, *Fed. Trade Comm'n* v. *Liberty Chevrolet, Inc.,* No. 1:20–cv–03945 (S.D.N.Y. May 21, 2020); Complaint, *Federal-Mogul Motorparts LLC,* No. C–4717 (F.T.C. May 12, 2020); Complaint, *LightYear Dealer Techs., LLC,* No. C–4687 (F.T.C. Sept. 3, 2019); Complaint, *Fed. Trade Comm'n* v. *Passport Imports, Inc.,* No. 8:18–cv–03118 (D. Md. Oct. 10, 2018); Complaint, *Fed. Trade Comm'n* v. *Tate's Auto Ctr. of Winslow, Inc.,* No. 3:18–cv–08176–DJH (D. Ariz. July 31, 2018); Complaint, *Cowboy AG, LLC,* No. C–4639 (F.T.C. Jan. 4, 2018); Complaint, *Fed. Trade Comm'n* v. *Norm Reeves, Inc.,* No. 8:17–cv–01942 (C.D. Cal. Nov. 3, 2017); Complaint, *Asbury Auto. Grp., Inc.,* No. C–4606 (F.T.C. Mar. 22, 2017); Complaint, *CarMax, Inc.,* No. C–4605 (F.T.C. Mar. 22, 2017); Complaint, *West-Herr Auto. Grp., Inc.,* No. C–4607 (F.T.C. Mar. 22, 2017); Complaint, *Fed. Trade Comm'n* v. *Volkswagen Grp. of Am., Inc.,* No. 3:16–cv–01534 (N.D. Cal. Jan. 31, 2017); Complaint, *Fed. Trade Comm'n* v. *Uber Techs., Inc.,* No. 3:17–cv–00261 (N.D. Cal. Jan. 19, 2017); Complaint, *Gen. Motors LLC,* No. C–4596 (F.T.C. Dec. 8, 2016); Complaint, *Jim Koons Mgmt. Co.,* No. C–4598 (F.T.C. Dec. 8, 2016); Complaint, *Lithia Motors, Inc.,* No. C–4597 (F.T.C. Dec. 8, 2016); Complaint, *Fed. Trade Comm'n* v. *Universal City Nissan, Inc.,* No. 2:16–cv–07329 (C.D. Cal. Sep. 29, 2016); Complaint, *United States* v. *New World Auto Imports, Inc.,* No. 3:16–cv–02401–K (N.D. Tex. Aug. 18, 2016); Complaint, *Progressive Chevrolet Co.,* No. C–4578 (F.T.C. June 13, 2016); Complaint, *BMW of N. Am., LLC,* No. C–4555 (F.T.C. Oct. 21, 2015); Complaint, *United States* v. *Tricolor Auto Acceptance, LLC,* No. 3:15–cv–3002 (N.D. Tex. Sept. 15, 2015); Complaint, *JS Autoworld, Inc.,* No. C–4535 (F.T.C. Aug. 13, 2015); Complaint, *TC Dealership, L.P.,* No. C–4536 (F.T.C. Aug. 13, 2015); Complaint, *Matt Blatt Inc.,* No. C–4532 (F.T.C. July 2, 2015); Complaint, *TT of Longwood, Inc.,* No. C–4531 (F.T.C. July 2, 2015); Complaint, *Fin. Select, Inc.,* No. C–4528 (F.T.C. June 2, 2015); Complaint, *First Am. Title Lending of Ga., LLC,* No. C–4529 (F.T.C. June 2, 2015); Complaint, *City Nissan Inc.,* No. C–4524 (F.T.C. May 4, 2015); Complaint, *Jim Burke Auto., Inc.,* No. C–4523 (F.T.C. May 4, 2015); Complaint, *Nat'l Payment Network, Inc.,* No. C–4521 (F.T.C. May 4, 2015); Complaint, *TXVT Ltd. P'ship,* No. C–4508 (F.T.C. Feb. 12, 2015); Complaint, *Fed. Trade Comm'n* v. *Regency Fin. Servs., LLC,* No. 1:15–cv–20270–DPG (S.D. Fla. Jan. 26, 2015); Complaint, *United States* v. *Billion Auto, Inc.,* No. 5:14–cv–04118–MWB (N.D. Iowa Dec. 11, 2014); Complaint, *Fed. Trade Comm'n* v. *Ramey Motors, Inc.,* No. 1:14–cv–29603 (S.D. W. Va. Dec. 11, 2014); Complaint, *Fed. Trade Comm'n* v. *Consumer Portfolio Servs., Inc.,* No. 14–cv–00819 (C.D. Cal. May 28, 2014); Complaint, *Nissan N. Am., Inc.,* No. C–4454 (F.T.C. May 1, 2014); Complaint, *TBWA Worldwide, Inc.,* No. C–4455 (F.T.C. May 1, 2014); Complaint, *Bill Robertson & Sons, Inc.,* No. C–4451 (F.T.C. Apr. 11, 2014); Complaint, *Paramount Kia of Hickory, LLC,* No. C–4450 (F.T.C. Apr. 11, 2014); Complaint, *Fed. Trade Comm'n* v. *Abernathy Motor Co.,* No. 3:14–cv–00063–BRW (E.D. Ark. Mar. 12, 2014); Complaint, *Fowlerville Ford, Inc.,* No. C–4433 (F.T.C. Feb. 20, 2014); Complaint, *Infiniti of Clarendon Hills, Inc.,* No. C–4438 (F.T.C. Feb. 20, 2014); Complaint, *Luis Alfonso Sierra,* No. C–4434 (F.T.C. Feb. 20, 2014); Complaint, *Mohammad Sabha,* No. C–4435 (F.T.C. Feb. 20, 2014); Complaint, *Norm Reeves, Inc.,* No. C–4436 (F.T.C. Feb. 20, 2014); Complaint, *Ganley Ford West, Inc.,* No. C–4428 (F.T.C. Jan. 28, 2014); Complaint, *Timonium Chrysler, Inc.,* No. C–4429 (F.T.C. Jan. 28, 2014); Complaint, *Courtesy Auto Grp., Inc.,* No. 9359 (F.T.C. Jan. 7, 2014); Complaint, *Franklin's Budget Car Sales, Inc.,* No. C–4371 (F.T.C. Oct. 3, 2012); Complaint, *Fed. Trade Comm'n* v. *Matthew J. Loewen,* No. 2:12–cv–01207–MJP (W.D. Wash. July 13, 2012); Complaint, *Key Hyundai of Manchester, LLC,* No. C–4358 (F.T.C. May 4, 2012); Complaint, *Billion Auto, Inc.,* No. C–4356 (F.T.C. May 1, 2012); Complaint, *Frank Myers AutoMaxx, LLC,* No. C–4353 (F.T.C. Apr. 19, 2012); Complaint, *Ramey Motors, Inc.,* No. C–4354 (F.T.C. Apr. 19, 2012); Complaint, *Fed. Trade Comm'n* v. *Hope for Car Owners, LLC,* No. 2:12–cv–00778–GEB–EFB (E.D. Cal. Mar. 27, 2012); Complaint, *Fed. Trade Comm'n* v. *NAFSO VLM, Inc.,* No. 2:12–cv–00781–KJM–EFB (E.D. Cal. Mar. 27, 2012); Complaint, *Fed. Trade Comm'n* v. *Stewart Fin. Co. Holdings, Inc.,* No. 1:03–CV–2648 (N.D. Ga. Sept. 4, 2003); Complaint, *Pacifico Ardmore, Inc.,* No. C–3920 (F.T.C. Feb. 7, 2000).

[89] Operation Steer Clear and Operation Ruse Control, brought with State law enforcement partners around the nation and Canada, encompassed 252 enforcement actions. *See* Press Release, Fed. Trade Comm'n, "Multiple Law Enforcement Partners Announce Crackdown on Deception, Fraud in Auto Sales, Financing and Leasing" (Mar. 26, 2015), *https://www.ftc.gov/news-events/press-releases/2015/03/ftc-multiple-law-enforcement-partners-announce-crackdown.*

[90] For example, the FTC has held public workshops: (1) in conjunction with the National Highway Traffic Safety Administration to examine the consumer privacy and security issues posed by automated and connected motor vehicles, *see* Fed. Trade Comm'n, "Connected Cars: Privacy, Security Issues Related to Connected, Automated Vehicles" (June 28, 2017), *https://www.ftc.gov/news-events/events-calendar/2017/06/connected-cars-privacy-security-issues-related-connected;* (2) to explore competition and related issues in the U.S. motor vehicle distribution system including how consumers and businesses may be affected by State regulations and emerging trends in the industry, *see* Fed. Trade Comm'n, "Auto Distribution: Current Issues & Future Trends" (Jan. 19, 2016), *https://www.ftc.gov/news-events/events-calendar/2016/01/auto-distribution-current-issues-future-trends;* (3) on military consumer financial issues, including automobile purchases, financing, and leasing, *see* Fed. Trade Comm'n, "Military Consumer Workshop" (July 19, 2017), *https://www.ftc.gov/news-events/events-calendar/military-consumer-workshop;* and (4) through a series of three roundtables on numerous issues in selling, financing, and leasing automobiles, *see* Fed. Trade Comm'n, "The Road Ahead: Selling, Financing & Leasing Motor Vehicles" (Apr. 12, 2011), *https://www.ftc.gov/news-events/events-calendar/2011/04/road-ahead-selling-financing-leasing-motor-vehicles;* Fed. Trade Comm'n, "The Road Ahead: Selling, Financing & Leasing Motor Vehicles" (Aug. 2, 2011), *https://www.ftc.gov/news-events/events-calendar/2011/08/road-ahead-selling-financing-leasing-motor-vehicles;* Fed. Trade Comm'n, "The Road Ahead: Selling, Financing & Leasing Motor Vehicles" (Nov. 17, 2011), *https://www.ftc.gov/news-events/events-calendar/2011/11/road-ahead-selling-financing-leasing-motor-vehicles; see also* Consumers for Auto Reliability and Safety, Comment Letter on Motor Vehicle Roundtables, Project No. P104811, at 6 (Apr. 1, 2012), *https://www.ftc.gov/sites/default/files/documents/public_comments/public-roundtables-protecting-consumers-sale-and-leasing-motor-vehicles-project-no.p104811-00108/00108-82875.pdf* (stating that the Director of the Navy-Marine Corps Relief Society in San Diego indicated before the California Assembly Committee on Banking and Finance that "the number one issue they are confronted with is used car dealers who are taking advantage of military personnel"). These events, and others, have included speakers representing consumers, dealers, regulators, and other industry stakeholders.

As discussed in the NPRM, the Commission's law enforcement partners have also brought actions addressing unfair, abusive, and deceptive practices in the motor vehicle industry. For example, the Consumer Financial Protection Bureau (''CFPB'') has taken action against third-party motor vehicle financing entities in matters that raise similar, and sometimes identical, claims of deceptive and unfair acts or practices as have been at issue in FTC enforcement actions.[91]

In addition, States have engaged in enforcement actions alleging similar dealer misconduct in the motor vehicle dealer marketplace, and have implemented legislative and regulatory measures to address corresponding consumer protection issues. With regard to law enforcement, State regulators and Attorneys General have participated in law enforcement sweeps with the FTC, and have filed hundreds of actions alleging unlawful conduct by motor vehicle dealerships across the country.[92] Furthermore, with regard to

legislative and regulatory efforts, at least four States have enacted consumer protection measures relating to pricing or add-ons by motor vehicle dealers.[93] For example, to ''ensure that dealers do not add in hidden or undisclosed costs after the price for a vehicle has been advertised,'' Oregon promulgated a rule that requires dealerships to state an ''offering price'' that is the actual offer and amount the consumer can pay to own the vehicle, excluding only taxes and other specific items.[94] California and Wisconsin have similarly enacted laws that make it unlawful for dealerships to advertise a total price without including additional costs to the purchaser outside the mandatory tax, title, and registration fees.[95] Other States, such as Indiana, have enacted codes that prohibit the sale of add-ons in certain circumstances.[96]

The Commission and its law enforcement partners also regularly provide business guidance and consumer education regarding the motor vehicle marketplace. The Commission has compiled its motor vehicle business guidance into a portal on its website, with links to guidance documents, frequently asked questions, and legal resources.[97] Likewise, the Commission provides a web page for consumers to learn more about buying, financing, and leasing motor vehicles.[98] Several States have published similar such guidance manuals for motor vehicle dealers,[99]

[91] The CFPB has brought at least 23 enforcement actions involving motor vehicles, financing, or add-on products or services. *See* Consent Order ¶¶ 3, 13–57, *Toyota Motor Credit Corp.*, CFPB No. 2023–CFPB–0015 (Nov. 20, 2023) (finding auto lender engaged in unfair or abusive acts or practices by making it unreasonably difficult for consumers to cancel unwanted add-ons; failing to ensure consumers received refunds of payments they had made for certain add-ons that had become void and worthless; and failing to provide refunds owed to consumers who canceled their vehicle service agreements);

Complaint ¶¶ 75–104, *CFPB* v. *USASF Servicing, LLC*, No. 1:23–cv–03433–VMC (N.D. Ga. Aug. 2, 2023) (alleging auto loan servicer illegally disabled and repossessed consumers' vehicles, wrongfully double-billed consumers, misapplied payments, and failed to ensure refunds of unearned GAP premiums to which consumers were entitled); Consent Order ¶¶ 7–33, *TMX Finance LLC*, CFPB No. 2023–CFPB–0001 (Feb. 23, 2023) (finding auto lender understated and inaccurately disclosed the finance charge and annual percentage rate on loans and unfairly charged borrowers for a product that provided no benefit); Complaint ¶¶ 33–135, 171–226, *CFPB* v. *Credit Acceptance Corp.*, No. 1:23–cv–00038 (S.D.N.Y. Jan. 4, 2023) (alleging indirect auto lender misrepresented key terms of loans provided to subprime and deep-subprime consumers and substantially assisted dealers in the deceptive sale of add-on products); Consent Order ¶¶ 7–22, *Wells Fargo Bank, N.A.*, CFPB No. 2022–CFPB–0011 (Dec. 20, 2022) (finding bank incorrectly applied borrowers' auto loan payments, erroneously assessed fees and interest, wrongly repossessed borrowers' vehicles, and failed to ensure borrowers received refunds of unearned GAP fees at early payoff); Consent Order ¶¶ 4–55, *Hyundai Capital America*, CFPB No. 2022–CFPB–0005 (July 26, 2022) (finding auto finance company furnished inaccurate information about consumers to credit reporting agencies); Consent Order ¶¶ 4–14, *3rd Generation, Inc.*, CFPB No. 2021–CFPB–0003 (May 21, 2021) (finding subprime auto loan servicer charged interest on late payments of fees without the knowledge or consent of consumers); Consent Order ¶¶ 8–50, *Santander Consumer USA Inc.*, CFPB No. 2020–BCFP–0027 (Dec. 22, 2020) (finding auto finance company provided inaccurate records to credit reporting agencies); Consent Order ¶¶ 11–52, *Nissan Motor Acceptance Corp.*, CFPB No. 2020–BCFP–0017 (Oct. 13, 2020) (finding auto finance company misrepresented financing extension agreements, repossessions, and limitations to consumer bankruptcy protections); Consent Order ¶¶ 8–22, *Lobel Fin. Corp.*, CFPB No. 2020–BCFP–0016 (Sept. 21, 2020) (finding auto-loan servicer unfairly charged delinquent consumers add-on charges in the form of Loss Damage Waiver premiums); Consent Order ¶¶ 6–30, *Santander Consumer USA Inc.*, CFPB No. 2018–BCFP–0008 (Nov. 20, 2018) (finding auto finance company sold GAP to consumers with LTV over 125%, misrepresenting that such consumers would be fully covered with total loss);

Consent Order ¶¶ 27–39, *Wells Fargo Bank, N.A.*, CFPB No. 2018–BCFP–0001 (Apr. 20, 2018) (finding

bank imposed duplicative or unnecessary forced-placed auto loan insurance on consumers); Consent Order ¶¶ 12–23, *Toyota Motor Credit Corp.*, CFPB No. 2016–CFPB–0002 (Feb. 2, 2016) (finding auto finance company engaged in discriminatory pricing markup for motor vehicle financing, without regard to creditworthiness); Consent Order ¶¶ 73–75, *Y King S Corp.*, CFPB No. 2016–CFPB–0001 (Jan. 21, 2016) (finding used car dealer failed to disclose mandatory add-ons as financing charges); Consent Order ¶¶ 12–51, *Interstate Auto Grp., Inc.*, CFPB No. 2015–CFPB–0032 (Dec. 17, 2015) (finding dealership and financing company reported information they knew or had reasonable cause to believe was inaccurate to credit reporting entities, harming consumer credit); Consent Order ¶¶ 7–90, *Westlake Servs., LLC*, CFPB No. 2015–CFPB–0026 (Sept. 30, 2015) (finding indirect auto financing entity used illegal debt collection tactics); Consent Order ¶¶ 8–23, *Fifth Third Bank*, CFPB No. 2015–CFPB–0024 (Sept. 28, 2015) (finding discrimination against loan applicants in credit applications based on characteristics such as race and national origin); Consent Order ¶¶ 9–24, *Am. Honda Fin. Corp.*, CFPB No. 2015–CFPB–0014 (July 14, 2015) (same);

Consent Order ¶¶ 4–60, *DriveTime Auto. Grp., Inc.*, CFPB No. 2014–CFPB–0017 (Nov. 19, 2014) (finding buy-here-pay-here dealership made harassing debt collection calls and provided inaccurate credit information to credit reporting agencies); Consent Order ¶¶ 4–37, *First Investors Fin. Servs. Grp., Inc.*, CFPB No. 2014–CFPB–0012 (Aug. 20, 2014) (finding auto financing company provided inaccurate records to credit reporting agencies); Consent Order ¶¶ 7–27, *Ally Fin. Inc.*, CFPB No. 2013–CFPB–0010 (Dec. 20, 2013) (finding auto lender engaged in discriminatory pricing); Consent Order ¶¶ 14–29, *U.S. Bank Nat'l Ass'n*, CFPB No. 2013–CFPB–0004 (June 26, 2013) (finding bank failed to properly disclose all the fees charged to participants in the companies' Military Installment Loans and Educational Services auto loans program, and misrepresented the true cost and coverage of add-on products financed along with the auto loans); Consent Order ¶¶ 10–22, *Dealers' Fin. Servs., LLC*, CFPB No. 2013–CFPB–0004 (June 26, 2013) (finding financing company made deceptive statements regarding the cost of add-on products and the scope of coverage of the vehicle service contract).

[92] Operation Steer Clear and Operation Ruse Control, brought with State law enforcement partners around the nation and Canada, encompassed 252 enforcement actions. *See* Press Release, Fed. Trade Comm'n, ''Multiple Law Enforcement Partners Announce Crackdown on Deception, Fraud in Auto Sales, Financing and Leasing'' (Mar. 26, 2015), *https://www.ftc.gov/news-events/press-releases/2015/03/ftc-multiple-law-enforcement-partners-announce-crackdown*. Separately, the California Attorney General's office sued a dealership chain under State consumer protection laws for deceiving consumers about add-on product charges and misrepresenting consumers' income on credit applications; the alleged practices specifically targeted low-income consumers with subprime credit. Complaint ¶¶ 37–86, *People* v.

[93] *See, e.g.*, Cal. Veh. Code 11713.1(b), (c); Or. Admin. R. 137–020–0020(3)(c); Wis. Admin. Code Trans. 139.03(3); Ind. Code 24–4.5–3–202.

[94] Or. Admin. R. 137–020–0020(3)(c); Official Commentary, Or. Admin. R. 137–020–0020(3)(c).

[95] Cal. Veh. Code 11713.1(b), (c); Wis. Admin. Code Trans. 139.03(3).

[96] Ind. Code 24–4.5–3–202(3)(e)(ix) (prohibiting the sale of any GAP coverage when the LTV is less than 80%); Cal. Civ. Code 2982.12(a)(5)(B) (prohibiting the sale of any GAP waiver in three scenarios, including when the amount financed for the vehicle exceeds the amount covered by the GAP waiver).

[97] *See* Fed. Trade Comm'n, Business Guidance, ''Automobiles,'' *https://www.ftc.gov/business-guidance/industry/automobiles* (last visited Dec. 5, 2023).

[98] *See* Fed. Trade Comm'n, ''Buying and Owning a Car,'' *https://consumer.ftc.gov/shopping-and-donating/buying-and-owning-a-car* (last visited Dec. 5, 2023).

[99] *See, e.g.*, Ill. Sec'y of State Police, Dealer Handbook (Apr. 2022), *https://www.ilsos.gov/publications/pdf_publications/sos_dop66.pdf*; Wis. DOT—Div. of Motor Vehicles, Motor Vehicle Salesperson Manual—2020, *https://wisconsindot.gov/Documents/dmv/shared/salesmanual-20.pdf*; Enf't Div. of the Tex. Dep't of Motor Vehicles, Motor Vehicle Dealer Manual (2017), *https://www.txdmv.gov/sites/default/files/body-files/Motor_Vehicle_Dealer_Manual.pdf*.

*Paul Blanco's Good Car Co. Auto Grp.*, No. RG–19036081 (Cal. Super. Ct. Sept. 23, 2019).

while others have provided online consumer education resources.[100]

While some commenters stated that existing Federal and State efforts are sufficient, recent Commission and partner actions indicate that misconduct has persisted despite prior law enforcement and other efforts, and despite the NPRM's detailed description of chronic problems relating to bait-and-switch tactics and hidden add-on and other charges. For example, in a recent enforcement action, filed after publication of the NPRM, the Commission charged several auto dealer locations in an auto dealership group with misrepresenting the price of vehicles. According to the complaint, the dealers advertised one price to lure consumers to their dealerships, then charged them hundreds to thousands of dollars more than the advertised price by tacking on bogus extra fees for inspection, reconditioning, preparation, and certification.[101] The action also addressed the practice of dealers charging Black and Latino consumers these fees more often and in higher amounts.[102]

Multiple actions by partners since publication of the Commission's NPRM have involved auto add-ons. The Commission and the State of Wisconsin alleged that a dealership group, its current and former owners, and its general manager deceived consumers by tacking on hundreds or even thousands of dollars for add-ons without those consumers' authorization or by leading the consumers to believe the add-ons were mandatory, and doing so disproportionately more frequently with American Indian customers.[103] The CFPB and the New York State Office of the Attorney General alleged that a subprime auto lender knew or recklessly disregarded that dealers were tricking borrowers into purchasing add-on products without their knowledge or consent and had incentivized such behavior.[104] In addition, the Commonwealth of Massachusetts has brought two recent cases involving unfair add-on pricing practices.[105] In one such case, Massachusetts emphasized the dynamics of auto transactions that frequently lead to deceptive and unfair practices, particularly with respect to add-ons, noting that add-on products "are often sprung on consumers in the final steps of completing a transaction" after "multiple rounds of negotiation on the price of a car and/or car financing."[106]

Efforts to combat deceptive and unfair practices in the motor vehicle industry since the NPRM have gone beyond enforcement actions. The CFPB announced that it uncovered several unlawful practices through supervisory examinations, including auto loan servicers charging for add-ons that provide no benefit to the consumer[107]

and failing to ensure consumers received refunds for add-on products that no longer offered any benefits.[108] In addition, the State of California enacted new legislation that regulates a particular type of add-on product—GAP agreements.[109] A press release introducing the legislation cited concerns about unfair practices in the sale of GAP agreements, stating that this add-on has little value and is often targeted at consumers with lower incomes and subprime credit.[110] California's law requires several disclosures related to GAP agreements, including disclosures pertaining to their financed cost and informing consumers that such products are optional.[111] The law also prohibits the sale of GAP agreements that will not actually cover consumers' debt.[112]

Despite the array of actions by the Commission and its partners, unfairness and deception continue in the motor vehicle marketplace, including (1) deceptive or unfair sales and advertising tactics and (2) hidden charges, particularly with respect to add-on products or services. To address the harm these issues inflict on consumers and on law-abiding dealers, the Final Rule, in general:

• Prohibits dealers from making misrepresentations regarding material information, including about the cost of the vehicle, the financing terms, and the availability of rebates or discounts;

• Requires dealers to disclose the offering price of the vehicle—its full cash price, provided that dealers may exclude required government charges; that optional add-ons are not required; the total of payments for the vehicle when making a representation about monthly payment; and that a discussed lower monthly payment will increase

[100] See, e.g., Cal. Dept. of Just., "Buying and Maintaining a Car," https://oag.ca.gov/consumers/general/cars (last visited Dec. 5, 2023); Fla. Highway Safety & Motor Vehicles, "Buying from a Licensed Dealer," https://www.flhsmv.gov/safety-center/consumer-education/buying-vehicle-florida/buying-licensed-dealer (last visited Dec. 5, 2023); Or. Dep't of Just., "Buying a Vehicle," https://www.doj.state.or.us/consumer-protection/motor-vehicles/buying-a-vehicle/ (last visited Dec. 5, 2023).

[101] Complaint ¶ 17, Fed. Trade Comm'n v. Passport Auto. Grp., Inc., No. 8:22–cv–2670 (D. Md. Oct. 18, 2022).

[102] Id. ¶ 18. Recent actions outside the auto marketplace, even in transactions that may not be as complex and time consuming as motor vehicle transactions, further illustrate unfair and deceptive practices related to advertising, add-ons, and hidden charges. In one such action, the court noted "the realities of the disparate bargaining power" between the corporate defendant and its customers, adding that customers "might have believed the [add-on] fees were mandatory," and "might not have had the time" to negotiate or complain about them. Fed. Trade Comm'n v. FleetCor Techs., Inc., 1:19–cv–5727, 2022 WL 3350066, at *13 (N.D. Ga. Aug. 9, 2022) (granting the Commission's motion to exclude the defendant's expert testimony); see also Fed. Trade Comm'n v. FleetCor Techs., Inc., 620 F. Supp. 3d 1268, 1337 (N.D. Ga. 2022) (finding on summary judgment that (1) defendants did not tell consumers about fees at sign-up; (2) disclosures about fees in contractual documents were inadequate; and (3) defendants failed to get consent to add-on charges); id. at 1334 (concluding that defendants had "charged a slew of fees that: were never discoverable to customers [and] were obscured by undecipherable language"); Complaint ¶¶ 41–43, Fed. Trade Comm'n v. Harris Originals of NY, Inc., No. 2:22–cv–4260 (E.D.N.Y. July 20, 2022) (alleging that a jewelry company charged military consumers for add-on products without their consent or under false pretenses); Complaint ¶¶ 61–73, Fed. Trade Comm'n v. Benefytt Techs., Inc., No. 8:22–cv–1794 (M.D. Fla. Aug. 8, 2022) (alleging illegal add-on charges by healthcare companies); Complaint ¶¶ 1–4, Fed. Trade Comm'n v. First Am.

Payment Sys., LP, No. 4:22–cv–654 (E.D. Tex. July 29, 2022) (alleging that a payment processing company misrepresented the terms and costs of its services, resulting in unexpected and unauthorized fees); Fed. Trade Comm'n, Notice of Proposed Rulemaking, Trade Regulation Rule on Unfair or Deceptive Fees, 88 FR 77420, 77435–37 (released Oct. 11, 2023; published Nov. 9, 2023); https://www.govinfo.gov/content/pkg/FR-2023-11-09/pdf/2023-24234.pdf.

[103] Complaint ¶¶ 3–5, 11–18, 33–43, 48–51, Fed. Trade Comm'n v. Rhinelander Auto Ctr., Inc., No. 3:23–cv–00737 (W.D. Wis. Oct. 24, 2023).

[104] Complaint ¶¶ 128–30, CFPB v. Credit Acceptance Corp., No. 1:23–cv–38 (S.D.N.Y. Jan. 4, 2023).

[105] Complaint ¶ 3, Massachusetts v. Jaffarian's Serv., Inc., No. 2277–cv–881 (Mass. Super. Ct. Sept. 15, 2022); Assurance of Discontinuance ¶¶ 7–9, In re Hometown Auto Framingham, Inc., No. 2384–cv –116 (Mass. Super. Ct. Jan. 17, 2023).

[106] Complaint ¶ 5, Massachusetts v. Jaffarian's Serv., Inc., No. 2277–cv–881 (Mass. Super. Ct. Jan. 17, 2023).

[107] Consumer Fin. Prot. Bureau, "Supervisory Highlights: Issue 24, Summer 2021" 3–4 (June 2021), https://files.consumerfinance.gov/f/documents/cfpb_supervisory-highlights_issue-24_2021-06.pdf (finding servicers added and

maintained unnecessary collateral protection insurance (CPI) when consumers had adequate insurance and thus the CPI provided no benefit to the consumers, and also when consumers' vehicles had been repossessed even though no actual insurance protection was provided after repossession).

[108] Consumer Fin. Prot. Bureau, "Supervisory Highlights: Issue 28, Fall 2022" 4–5 (Nov. 2022), https://files.consumerfinance.gov/f/documents/cfpb_supervisory-highlights_issue-28_2022-11.pdf (finding consumers paid off their vehicle financing early but servicers failed to ensure consumers received refunds for unearned fees related to add-on products which no longer offered any possible benefit to consumers after payoff).

[109] Cal. Civ. Code 2982.12.

[110] Press Release, Off. of the Att'y Gen. of Cal., "Attorney General Bonta and Assemblymember Maienschein Announce Legislation to Strengthen Protections for Car Buyers" (Feb. 16, 2022), https://oag.ca.gov/news/press-releases/attorney-general-bonta-and-assemblymember-maienschein-announce-legislation.

[111] Cal. Civ. Code 2982.12.

[112] Id.

the total amount the consumer will pay, if true;

• Prohibits dealers from charging for add-on products or services that provide no benefit to the consumer; and

• Requires dealers to obtain express, informed consent from the consumer for any charge.

As discussed in the section-by section analysis in SBP III and in response to comments, the Commission is declining to finalize certain provisions proposed in the NPRM, including the provision that dealers must disclose a list of prices for all optional add-on products or services, and the provision that dealers must obtain certain signed declinations from consumers prior to charging for optional add-on products or services. The Commission also is finalizing the defined terms "Covered Motor Vehicle" and "Covered Motor Vehicle Dealer" to reflect edits to narrow the scope of these definitions compared to the scope of the terms "Motor Vehicle" and "Motor Vehicle Dealer" in the NPRM.

## III. Section-by-Section Analysis

The following discussion provides a section-by-section analysis that states the provisions proposed in the NPRM, and discusses the comments received, the Commission's responses to comments, and the provisions adopted in the Final Rule.[113]

### A. § 463.1: Authority

Section 463.1 states that the Final Rule is promulgated pursuant to section 1029 of the Dodd-Frank Act, and that it is an unfair or deceptive act or practice within the meaning of section 5(a)(1) of the FTC Act to violate, directly or indirectly, any provision of the Final Rule, including the recordkeeping requirements, which are necessary to prevent such unfair or deceptive acts or practices and to enforce this Rule.[114] The prohibition against violating any applicable provision "directly or indirectly" applies to each section of part 463. As discussed in SBP I.A,

section 1029 authorizes the FTC to prescribe rules under Sections 5 and 18(a)(1)(B) of the FTC Act with respect to motor vehicle dealers predominantly engaged in the sale and servicing of motor vehicles, the leasing and servicing of motor vehicles, or both.[115]

---

[113] Regarding the thousands of comments received, the Commission notes that many commenters raised similar concerns or addressed overlapping issues. To avoid repetition, the Commission has endeavored to respond to issues raised in similar comments together. Responses provided in any given section apply equally to comments addressing the same subject in the context of other sections. Moreover, throughout the SBP, the Commission discusses justifications for the Final Rule that are informed by its careful consideration of all comments received, even where that discussion is not linked to a particular comment.

[114] The proposed authority provision in the NPRM omitted the second reference to "unfair" acts or practices with regard to the proposed recordkeeping requirements; the Final Rule consistently refers to both "unfair" and "deceptive" acts or practices together.

[115] One industry group argued that the proposed rule violated the APA because it did not comply with the FTC's rule requiring publication of an Advance Notice of Proposed Rulemaking ("ANPR"), 16 CFR 1.10. Section 1.10, however, like the rest of subpart B of part 1 of the Commission's Rules of Practice, applies only to "proceedings for the promulgation of rules as provided in section 18(a)(1)(B) of the Federal Trade Commission Act." 16 CFR 1.7. The ANPR requirement in section 1.10 implements section 18(b)(2) of the FTC Act, which requires an ANPR when the Commission promulgates rules under the procedures set forth in that section. In this case, the FTC is acting under statutory authority under section 1029(d) of the Dodd-Frank Act, *see* NPRM at 42031, which authorizes the Commission to promulgate rules using the APA's informal notice-and-comment procedure, *see* 5 U.S.C. 553, notwithstanding the additional procedural requirements set forth in section 18. Accordingly, this rulemaking is governed by subpart C of part 1 of the Commission's Rules of Practice, which "sets forth procedures for the promulgation of rules under authority other than section 18(a)(1)(B) of the FTC Act." 16 CFR 1.21. Neither subpart C nor the APA requires publication of an ANPR.

This is consistent with Commission practice in prior notices to issue or amend regulations, including with the Made in USA Labeling Rule, the Children's Online Privacy Protection Rule, and the Telemarketing Sales Rule. *See, e.g.,* Fed. Trade Comm'n, Notice of Proposed Rulemaking, Made in USA Labeling Rule, 85 FR 43162 (July 16, 2020), *https://www.govinfo.gov/content/pkg/FR-2020-07-16/pdf/2020-13902.pdf* (issuing original notice of proposed rulemaking that was not preceded by an advance notice of proposed rulemaking); Fed. Trade Comm'n, Notice of Proposed Rulemaking, Children's Online Privacy Protection Rule, 64 FR 22750 (Apr. 27, 1999), *https://www.govinfo.gov/content/pkg/FR-1999-04-27/pdf/99-10250.pdf* (same); Fed. Trade Comm'n, Notice of Proposed Rulemaking, Telemarketing Sales Rule, 60 FR 8313 (Feb. 14, 1995), *https://www.govinfo.gov/content/pkg/FR-1995-02-14/pdf/95-3537.pdf* (same); Fed. Trade Comm'n, Notice of Proposed Rulemaking, Telemarketing Sales Rule, 78 FR 41200 (July 19, 2013), *https://www.govinfo.gov/content/pkg/FR-2013-07-09/pdf/2013-12886.pdf* (issuing notice of proposed rulemaking for rule amendment that was not preceded by an advance notice of proposed rulemaking); Fed. Trade Comm'n, Proposed Rule, Children's Online Privacy Protection Rule, 76 FR 59804 (Sept. 27, 2011), *https://www.govinfo.gov/content/pkg/FR-2011-09-27/pdf/2011-24314.pdf* (same); Fed. Trade Comm'n, Notice of Proposed Rulemaking, Telemarketing Sales Rule, 74 FR 41988 (Aug. 19, 2009), *https://www.govinfo.gov/content/pkg/FR-2009-08-19/pdf/E9-19749.pdf* (same); Fed. Trade Comm'n, Notice of Proposed Rulemaking, Children's Online Privacy Protection Rule, 70 FR 2580 (Jan. 14, 2005), *https://www.govinfo.gov/content/pkg/FR-2005-01-14/pdf/05-877.pdf* (same); Fed. Trade Comm'n, Notice of Proposed Rulemaking, Telemarketing Sales Rule, 69 FR 67287 (Nov. 17, 2004), *https://www.govinfo.gov/content/pkg/FR-2004-11-17/pdf/04-25470.pdf* (same); Fed. Trade Comm'n, Notice of Proposed Rulemaking, Telemarketing Sales Rule, 69 FR 7330 (Feb. 13, 2004), *https://www.govinfo.gov/content/pkg/FR-2004-02-13/pdf/04-3287.pdf* (same); Fed. Trade Comm'n, Notice of Proposed Rulemaking, Telemarketing Sales Rule, 67 FR 4492 (Jan. 30, 2002), *https://www.govinfo.gov/content/pkg/FR-*

2002-01-30/pdf/02-1998.pdf (same); Fed. Trade Comm'n, Notice of Proposed Rulemaking, Children's Online Privacy Protection Rule, 66 FR 54963 (Oct. 31, 2001), *https://www.govinfo.gov/content/pkg/FR-2001-10-31/pdf/01-27390.pdf* (same). This is also true of regulation amendments pursuant to the authority under which this Final Rule is promulgated—that which Congress granted to the Commission under section 1029 of the Dodd-Frank Act, 15 U.S.C. 5519, pertaining to motor vehicle dealers. *See, e.g.,* Fed. Trade Comm'n, Notice of Proposed Rulemaking, Used Motor Vehicle Trade Regulation Rule, 77 FR 74746, 74748 (Dec. 17, 2012), *https://www.govinfo.gov/content/pkg/FR-2012-12-17/pdf/2012-29920.pdf* ("Because the Dodd-Frank Act authorized the Commission to use APA procedures for notice and public comment in issuing or amending rules with respect to motor vehicle dealers, the FTC will not use the procedures set forth in Section 18 of the FTC Act, 15 U.S.C. 57a, with respect to these proposed revisions to the Used Car Rule and the Used Car Buyers Guide. Accordingly, the Commission is publishing this Notice of Proposed Rulemaking pursuant to Section 553 of the APA."); *see also* Fed. Trade Comm'n, Notice of Proposed Rulemaking, Privacy of Consumer Financial Information Rule Under the Gramm-Leach-Bliley Act ("Privacy Rule"), 84 FR 13150 (Apr. 4, 2019), *https://www.govinfo.gov/content/pkg/FR-2019-04-04/pdf/2019-06039.pdf* (issuing notice of proposed rulemaking for rule amendment that was not preceded by an advance notice of proposed rulemaking).

This same commenter argued the FTC had not complied with the "Principles of Regulation" enumerated in section 1(b) of Executive Order 12866. *See* Comment of Nat'l Auto. Dealers Ass'n, Doc. No. FTC–2022–0046–8368 at 34–36 & n.123; E.O. 12866 3(b) (defining "Agency" to mean an authority of the United States "other than those considered to be independent regulatory agencies"). This provision of the Executive Order does not apply to independent agencies such as the FTC. Regardless, the Commission did take into account the principles set forth in section 1(b), as is evident throughout the NPRM. *See, e.g.,* NPRM at 42015–17 (identifying problems in the marketplace); *id.* at 42028–42031 (soliciting comments on alternative approaches); *id.* at 42036–42044 (assessing costs and benefits).

The same commenter also argued that the Commission's denial of its request to extend the comment period prejudiced the commenter's ability to collect and provide data pertaining to the proposed rule and was inconsistent with the Commission's grant of extensions in other rulemakings. As described in its letter, the Commission also received requests opposing an extension of the comment period. *See* Letter, Fed. Trade Comm'n, "Duration of the Public Comment Period in Matter No. P204800" (Aug. 23, 2022), *https://www.ftc.gov/system/files/ftc_gov/pdf/Matter%20No.%20204800%20-%20Letter%20re%20Extension%20for%20publication.pdf.* In the letter, the Commission noted its ongoing engagement with stakeholders on issues relating to the sale, financing, and lease of motor vehicles, since before its 2011 **Federal Register** notice inviting stakeholder feedback on these issues and continuing since that time. *See* Fed. Trade Comm'n, Public Roundtables: Protecting Consumers in the Sale and Leasing of Motor Vehicles, 76 FR 14,014 (Mar. 15, 2011), *https://www.federalregister.gov/documents/2011/03/15/2011-5873/public-roundtables-protecting-consumers-in-the-sale-and-leasing-of-motor-vehicles.* The Commission determined that a sixty-day comment period, along with an additional twenty days following the public announcement and release of the NPRM and prior to its publication in the **Federal Register**, provided meaningful opportunity to comment. *See also* Steven J. Balla, "Public Commenting on Federal Agency Regulations: Research on Current Practices
Continued

The Final Rule defines with specificity certain unfair or deceptive acts or practices; the Final Rule provisions are also "prescribed for the purpose of preventing such acts or practices." [116]

### B. § 463.2: Definitions

1. Overview

The proposed rule included definitions for the following terms: "Add-on" or "Add-on Product(s) or Service(s)"; "Add-on List"; "Cash Price without Optional Add-ons"; "Clearly and Conspicuously"; "Dealer" or "Motor Vehicle Dealer"; "Express, Informed Consent"; "GAP Agreement"; "Government Charges"; "Material" or "Materially"; "Motor Vehicle"; and "Offering Price." In the definition-by-definition analysis in SBP III.B.2, the Commission discusses each definition proposed in the NPRM, relevant comments that are not otherwise addressed in the discussion of the corresponding substantive provisions of the Final Rule, and the definition the Commission is finalizing.

2. Definition-by-Definition Analysis

(a) Add-On or Add-On Product(s) or Service(s)

The proposed rule defined "Add-on" or "Add-on Product(s) or Service(s)" as "any product(s) or service(s) not provided to the consumer or installed on the vehicle by the motor vehicle manufacturer and for which the Motor Vehicle Dealer, directly or indirectly, charges a consumer in connection with a vehicle sale, lease, or financing transaction." This term appeared in the following definitions and substantive provisions of the rule proposal: the definitions of "Add-on List" and "Cash Price without Optional Add-ons"; the Prohibited Misrepresentations provision at proposed § 463.3(b); the add-on list disclosure provision at proposed § 463.4(b); the requirement to disclose that add-ons are not required at proposed § 463.4(c); the prohibition against charging for add-ons that provide the consumer no benefit at proposed § 463.5(a); and the proposed provision relating to undisclosed or unselected add-ons at § 463.5(b). As

discussed in the following paragraphs, in response to stakeholder comments, the Commission declines to finalize certain of these provisions; in the Final Rule, this term appears in paragraph (a) of the Prohibited Misrepresentations section (§ 463.3); the Disclosure Requirements provision in paragraph (c) of § 463.4; and the provision in § 463.5(a) titled "Dealer Charges for Add-ons and Other Items" and subtitled "Add-ons that provide no benefit."

For the following reasons, the Commission adopts the definition of "Add-on" or "Add-on Product(s) or Service(s)" largely as proposed, with conforming modifications to reflect changes to the defined terms "'Covered Motor Vehicle' or 'Vehicle'" and "'Covered Motor Vehicle Dealer' or 'Dealer'" as described in more detail in the discussion of § 463.2(e) and (f), in SBP III.B.2(e) and (f).

The Commission received several comments relating to the scope of its proposed definition for "Add-on" or "Add-on Product(s) or Service(s)." Industry association and other commenters recommended that the Commission broaden the definition to include manufacturer-provided products or services, expressing concern that exclusion of such products or services would put other companies that provide such items at a competitive disadvantage. Products or services provided by manufacturers, however, are already covered by several provisions of the Final Rule. Under the substantive provisions the Commission is finalizing, dealers are prohibited from making misrepresentations regarding material information, including about the "costs or terms of purchasing, financing, or leasing a Vehicle" (§ 463.3(a)); must disclose the vehicle's true "Offering Price," which includes any amounts dealers charge for items already installed or provided by the manufacturer (§§ 463.4(a) and 463.2(k)); and are required to obtain "Express, Informed Consent" for charges for any item (§§ 463.5(c) and 462.2(g)). The additional substantive add-on-specific provisions [117] address harms associated with products or services not provided to the consumer or installed on the vehicle by the motor vehicle manufacturer. Commenters did not provide evidence that the proposed provisions covering manufacturer-provided products or services would be insufficient to address consumer harm. Accordingly, the Commission has determined not to include manufacturer-provided products or services within this defined term. The

Commission will continue to monitor this issue to determine whether additional action is warranted.

One individual commenter expressed concern that, under the Commission's proposed definition, dealers could raise the price of a vehicle by advertising additional products or services, such as "free lifetime benefits" with the vehicle, and that dealers could mislead consumers by charging more for the vehicle based on a supposedly "free" add-on.[118] The Commission notes that the Rule the Commission is finalizing contains several provisions relating to this concern. For example, dealers are prohibited from making misrepresentations under § 463.3, including misrepresentations regarding "*costs*, limitation, benefit, or any other aspect" of add-ons.[119] Furthermore, dealers are required to disclose a vehicle's offering price, which must include charges for required add-ons; this disclosure will allow consumers to know the true price of the vehicle and comparison shop before selecting and visiting a particular dealership.[120]

Several dealership association commenters expressed concern that the proposed definition was too broad, contending that it might apply to hundreds of items and include fees, such as a processing or document fee, that a dealer charges a consumer. As discussed in SBP III.B.2(b), III.D.2(b), and III.E.2(b), upon careful review of comments, including comments regarding the breadth of this requirement, the Commission has determined not to finalize the provision that would have required listing all optional add-ons—the "Add-on List" definition and the associated requirement that dealers disclose such a list—as well as proposed § 463.5(b) relating to undisclosed or unselected add-ons.[121] The remaining substantive provisions that use the term "Add-ons" prohibit misrepresentations (§ 463.3(b)); require dealers to disclose, if true, that add-ons are not required (§ 463.4(c)); and prohibit charges for add-ons that provide the consumer no benefit (§ 463.5(a)). The law already prohibits misrepresentations, regardless of the product or service at issue; dealers that offer consumers additional products or services are already required to ask

---

and Recommendations to the Administrative Conference of the United States" App. A (2011), *https://www.acus.gov/sites/default/files/documents/Consolidated-Reports-%2B-Memoranda.pdf* (reporting data from a pool of 703 comment periods associated with actions by dozens of Federal agencies, and finding that the average duration of comment periods for proposed agency actions was 38.7 days, and 45.1 days for actions that are economically significant).

[116] 15 U.S.C. 57a(a)(1)(B) (the Commission "may include requirements prescribed for the purpose of preventing" unfair or deceptive acts or practices).

[117] §§ 463.3(b), 463.4(c), 463.5(a).

[118] Individual commenter, Doc. No. FTC–2022–0046–7445 at 10–11.

[119] § 463.3(b) (emphasis added).

[120] *See* §§ 463.2(k) (defining Offering Price), 463.4(a) (requiring disclosure of Offering Price); *see also* § 463.3(p) (prohibiting misrepresentations regarding the disclosures required by the Final Rule).

[121] *See* NPRM at 42044, 42046 (proposed §§ 463.2(b), 463.4(b), 463.5(b)).

consumers if they want such products, rather than suggesting that such products or services are mandatory, when they are not; and any hardship associated with refraining from charging for products or services that provide consumers no benefits are outweighed by the harms to consumers and competition from permitting this practice, as explained in the analysis of § 463.5(a).

Commenters including an industry association suggested limiting the definition to products or services sold at the ''point of vehicle purchase'' to clarify that indirect charges, such as the inclusion of a one-year subscription to a satellite radio service, need not be separately itemized.[122] The industry association commenter suggested that, as proposed, the definition would include charges for which dealers and consumers ''would otherwise not account.'' [123] The Commission has determined not to finalize the add-on list and form requirements in proposed §§ 463.4(b) and 463.5(b). For the provisions being finalized, excluding subscription charges, or including only items added to the vehicle at the ''point of vehicle purchase,'' would narrow the definition of ''Add-on'' and the corresponding requirements in a manner that would allow for deceptive or unfair practices, including by allowing dealers to represent a price that is not the offering price, or to deceptively state that add-ons are required. In the example provided by the commenter, if the satellite radio subscription service is mandatory, it needs to be included in the offering price of the vehicle, as required by § 463.4(a) of the Final Rule; if it is not mandatory, the dealer needs to disclose, when making any representations about the service, that it is not required under § 463.4(c). Further, regardless of whether such a product or service is mandatory or optional, dealers must follow other aspects of the Final Rule, including by not making any misrepresentations about the subscription under § 463.3 and by obtaining the express, informed consent of the consumer for the associated charges under § 463.5(c).

Another industry association commenter contended that add-ons sold in the marine industry are typically different than those offered in the context of automobile sales and described in the NPRM. While all motor vehicle dealers must refrain from engaging in deceptive or unfair conduct relating to add-ons, the Commission is excluding recreational boats and marine equipment from the Final Rule's definition of '' 'Covered Motor Vehicle' or 'Vehicle,' '' as discussed in additional detail in the definition-by-definition analysis of § 463.2(e) in SBP III.B.2(e).

An industry association commenter and comments from a number of dealership associations noted that certain State laws already regulate the sale of add-ons, including, for example, laws in many States that regulate vehicle sales contracts or deceptive sales practices generally or that regulate insurance products. To the extent that the Final Rule's add-on provisions may duplicate State law, commenters have provided no evidence that any such duplication in the provisions that incorporate this defined term—which prohibit misrepresentations, require disclosures in the event add-ons are not required, and prohibit charges for add-ons from which the consumer would not benefit—will harm consumers or competition. Moreover, the Final Rule provides additional remedies that will benefit consumers who encounter conduct that is already illegal under State or Federal law, including by adding a mechanism for the Commission to redress consumers injured by a dealer's violation of the rule, and will assist law-abiding dealers that presently lose business to competitors that act unlawfully. Under the Final Rule, State laws may provide more or less specific requirements as long as such requirements are not inconsistent with part 463, as set forth at § 463.9, and in the event of an inconsistency, the Rule only affects such State law to the extent of the inconsistency.[124]

A few dealership association commenters expressed concern that the proposed definition of ''Add-on Products or Services'' would include insurance-related products, such as credit life and credit disability insurance, and as such, could implicate the McCarran-Ferguson Act's reverse-preemption of certain Federal laws that ''invalidate, impair, or supersede'' State laws enacted ''for the purpose of regulating the business of insurance.'' [125] Commenters have provided no evidence that the Rule will invalidate, impair, or supersede State laws enacted for the purpose of regulating the business of insurance.[126] To the contrary, the Final Rule addresses deceptive or unfair conduct—it prohibits dealers, *inter alia*, from making misrepresentations regarding material information about add-ons, from failing to disclose when add-ons are not required, and from charging for add-ons from which the consumer would not benefit. Nor has the Commission been presented with evidence that the Rule's other substantive provisions (prohibiting misrepresentations; requiring disclosures of a vehicle's offering price and about total of payments; and requiring consumers' express, informed consent before charging them) invalidate, impair, or supersede State laws enacted for the purpose of regulating insurance.[127]

A number of industry and dealership association commenters contended that, as proposed, this definition may extend to products or services that are provided by the manufacturer but that are installed by a distributor of motor vehicles, or alternatively, by the dealer, at the instruction of the manufacturer. Relatedly, a State governmental association commenter expressed concern that the proposed definition could create confusion with regard to the sale of used vehicles, where a prior owner of a vehicle may have added a product to the vehicle. The commenter contended that a motor vehicle dealer selling the used vehicle may be unaware of the added product, and further, that listing any such items may confuse buyers.

To the extent the commenters' concerns stem from the proposed provisions related to add-on lists and proposed § 463.5(b)'s provisions related to separate disclosures, the Commission is not finalizing those provisions. Under the provisions being finalized, if a product is provided to the dealer by the manufacturer or another entity, and a consumer chooses to have the product

---

[122] Comment of Serv. Cont. Indus. Council, Guaranteed Asset Prot. All., & Motor Vehicle Prot. Prods. Ass'n, Doc. No. FTC–2022–0046–8113 at 13–14.

[123] *Id.* at 13.

[124] *See, e.g., English* v. *Gen. Elec. Co.,* 496 U.S. 72, 79 (1990).

[125] *See* 15 U.S.C. 1012(b).

[126] *See Union Labor Life Ins. Co.* v. *Pireno,* 458 U.S. 119, 129 (1982) (setting forth test for whether an activity constitutes the ''business of insurance''; *Humana Inc.* v. *Forsyth,* 525 U.S. 299, 307–08 (1999) (establishing criteria for whether a Federal law operates to ''invalidate, impair, or supersede'' State law).

[127] The Supreme Court has refused to interpret the McCarran Ferguson Act to invalidate Federal law when applied to remedy a misrepresentation and undo the harm caused by alleged deception. *See SEC* v. *Nat'l Sec., Inc.,* 393 U.S. 453, 462 (1969). Moreover, lower courts have rejected precisely the concern raised by the commenter about credit life insurance. *See Fed. Trade Comm'n* v. *Dixie Fin. Co.,* 695 F.2d 926, 930 (5th Cir. 1983) (McCarran Ferguson Act does not preclude FTC investigation of ''whether the sale of insurance is a precondition to the arrangement of credit''); *Fed. Trade Comm'n* v. *Mfrs. Hanover Consumer Servs., Inc.,* 567 F. Supp. 992, 94 (E.D. Pa. 1983) (same).

installed and pay for it, the dealer may install it and charge for it, as long as the dealer complies with the provisions of the Final Rule, including by disclosing that the product is not required and by obtaining the consumer's express, informed consent for the charge. If the manufacturer requires the dealer to install the product or if the dealer chooses to install the product, and the dealer requires any consumer to pay charges for it, the amount of the charge must be included in the vehicle's offering price, and the dealer must comply with other aspects of the Final Rule, including the express, informed consent requirement. Relatedly, regarding used vehicles, if a prior owner of such a vehicle installed an add-on, and the dealer that subsequently sells such a vehicle requires any consumer to pay charges for the add-on, the amount of those charges must be included in the vehicle's offering price and the dealer must comply with other aspects of the Final Rule, including the express, informed consent requirement at § 463.5(c). If, alternatively, the dealer does not require any consumers to pay for the pre-installed add-on, then the dealer does not have to add that amount to the vehicle's offering price, and there is no charge for that add-on for which the dealer must obtain express, informed consent. Thus, the definition of "Add-on" and the Rule requirements being finalized address deceptive or unfair price and add-on disclosures and hidden charges without requiring dealers to list or itemize charges that they do not impose on consumers. For the reasons explained in this section, the Commission is finalizing the definition of "Add-on" or "Add-on Product(s) or Service(s)" largely as proposed, with conforming modifications to reflect changes to the defined terms "'Covered Motor Vehicle' or 'Vehicle'" and "'Covered Motor Vehicle Dealer' or 'Dealer'" as described in more detail in the discussion of § 463.2(e) and (f), in SBP III.B.2(e) and (f).

(b) Add-On List

The NPRM proposed defining the term "Add-on List," which appeared in the associated Add-on List disclosure provision at proposed § 463.4(b), as well as in the recordkeeping provision at proposed § 463.6(a)(2). Based on the following, the Commission has determined not to include this definition in its Final Rule.

Several commenters supported the substantive add-on list proposal and its associated definition, and commenters including consumer advocacy organizations urged the Commission to finalize additional related restrictions or disclosures, such as requiring add-on prices to be fixed and non-negotiable, or requiring a distinct add-on list for each vehicle sold. Other commenters, including dealership associations, raised concerns that, as proposed, the add-on list definition could impose significant economic burdens on dealerships for a disclosure that, in some circumstances, might be too voluminous to be optimally meaningful to consumers, or permit price ranges that could be too broad to prevent abuses and effectively inform consumers.

After careful consideration, and in light of the concerns raised by commenters, the Commission has determined not to include the add-on list disclosure provision at proposed § 463.4(b) or the recordkeeping provision at proposed § 463.6(a)(2) in its Final Rule, and therefore will not include a definition of the term "Add-on List" in its Final Rule. Here, as elsewhere, the Commission remains committed to promoting fair, non-deceptive, and competitive markets for consumer products and services; it will continue to monitor the marketplace for add-on-related acts or practices that are unfair or deceptive, and will evaluate whether to propose additional measures pertaining to such products and services.

(c) Cash Price Without Optional Add-Ons

The NPRM proposed defining the term "Cash Price without Optional Add-ons," which appeared in the proposed provision addressing undisclosed or unselected add-ons at § 463.5(b). Based on the following, the Commission is declining to finalize this definition.

A number of commenters favored the proposed provision and definition, and several, including consumer advocacy organizations, urged the Commission to include additional requirements, such as requiring the proposed disclosure documents associated with this proposed definition to be available in different languages, while others, including a dealership association, raised concerns that the definition and relevant provision were burdensome or confusing for dealers.

As explained in additional detail in SBP III.E.2(b) with respect to § 463.5(b), in light of commenter concerns that the proposed provision using this term would increase costs for legitimate dealers and add to the time and paperwork for consumers in an already lengthy, paperwork-heavy transaction, the Commission has elected not to include a Cash Price without Optional Add-ons disclosure requirement in its Final Rule. Thus, after careful consideration, and in light of the concerns raised by commenters, the Commission has determined not to include a definition of "Cash Price without Optional Add-ons" in its Final Rule.

(d) Clearly and Conspicuously

The proposed rule defined the term "Clearly and Conspicuously" as "in a manner that is difficult to miss (*i.e.,* easily noticeable) and easily understandable," including in all of seven enumerated ways, listing proposed requirements for "any communication that is solely visual or solely audible," "[a] visual disclosure," "[a]n audible disclosure," and "any communication using an interactive electronic medium," and providing, *inter alia,* that such disclosures "must use diction and syntax understandable to ordinary consumers and must appear in each language in which the representation that requires the disclosure appears" and "must not be contradicted or mitigated by, or inconsistent with, anything else in the communication." Based on the following, the Commission is finalizing this definition largely as proposed, with a modification to clarify that the definition applies whether the term appears as an adjective or an adverb, by adding the parentheses in the following manner to the defined term: "Clear(ly) and Conspicuous(ly)."

Some consumer advocacy organization commenters favored the Commission's proposed definition while also suggesting that the Commission include a provision requiring translation of any deal consummating documents, including buyer's orders and retail installment sales contracts, into the language in which the negotiations were conducted. This issue, however, is addressed by § 463.5(c) of the Rule, which requires express, informed consent for each item charged.[128] As explained in additional detail in the paragraph-by-paragraph analysis of § 463.5(c) in SBP III.E.2(c), if a deal-consummating document is provided in a language that the consumer does not understand, and the document's contents are not otherwise clearly understood by the consumer, then the consumer is in no position to give unambiguous assent to the charges described therein. The Commission therefore has determined not to add

---

[128] The language requirements, as they relate to obtaining express, informed consent, are further explained in the discussion of § 463.5(c) in SBP III.E.2(c).

such a provision to its "Clear(ly) and Conspicuous(ly)" definition. However, the Commission will continue to monitor the marketplace and determine whether further language requirements or additional measures are warranted to address deceptive or unfair practices—particularly those that target or otherwise disproportionately impact language-minority communities.

Commenters, including consumer advocacy organizations, expressed concern that proposed § 463.2(d)(5) may be read to apply only to certain disclosures with triggering representations and only to disclosures that are in writing. These commenters also requested that the Commission incorporate into its Final Rule the FTC's policy statement regarding foreign language advertising and sales materials, which is separately codified at 16 CFR 14.9.[129] In response, the Commission notes that to be clear and conspicuous, the disclosure must be "easily understandable," as stated in the definition. If a disclosure is being made in a language the consumer does not understand, it does not meet this requirement. Further, the disclosures highlighted by the commenters are indeed subject to the language requirements of § 463.2(d)(5), which requires that disclosures "appear in each language in which the representation that requires the disclosure appears." With regard to the offering price disclosure in § 463.4(a)(1), the applicable "representation that requires the disclosure" is the "advertisement that references . . . a specific Vehicle"; thus, for example, if an advertisement that references a specific vehicle is in Spanish, the offering price disclosure must also be in Spanish. Similarly, in § 463.4(a)(2), the applicable representation that requires the disclosure is an "advertisement that represents . . . any monetary amount or financing term for any Vehicle." In § 463.4(a)(3), the applicable representation is "any communication . . . that includes a reference . . . regarding a specific Vehicle, or any monetary amount or financing term for any Vehicle." In § 463.4(c) and (d), "any representation" regarding an add-on product or service or a monthly payment for any vehicle, respectively, triggers the language requirement of § 463.2(d)(5). The monthly payments comparison disclosure in § 463.4(e) is required when there is a "comparison

between payment options . . . that includes discussion of a lower monthly payment." Thus, the language requirements in § 463.2(d)(5) apply.

In response to this concern regarding the applicability of § 463.2(d)(5) to disclosures that are not in writing, the Commission notes that its use of the word "appear" in § 463.2(d)(5) incorporates common meanings, such as "to show up," "to come into existence," or "to become evident or manifest," which cause this provision to apply whether the representation requiring the disclosure appears visually, orally, or otherwise.[130] Where the Commission instead intended a provision to be limited to a visual disclosure, as in § 463.2(d)(2), the Rule states so explicitly.

In response to the request that the Commission incorporate into this Rule its policy statement regarding foreign language advertising and sales materials, separately codified at 16 CFR 14.9, the Commission emphasizes that the enforcement statement sets out what is already impermissible under current law and is consistent with the requirements the Commission is finalizing. To the extent dealers take actions that are inconsistent with Commission statements about such law, they are risking enforcement proceedings by the Commission or others. Accordingly, the Commission has determined not to add to the Rule further requirements regarding foreign language advertising. The Commission will continue to monitor the market to determine whether further action is warranted.

Industry association commenters raised concerns about how the Commission's proposed definition interacts with other Federal laws, such as Regulations Z and M, which implement the Truth in Lending Act and the Consumer Leasing Act, respectively, and contended that it conflicts with a clear and conspicuous definition in Commodity Futures Trading Commission regulations.[131] Industry and dealership association commenters contended that State advertising standards already address what constitutes "clear and conspicuous" advertising and provide guidance on disclosures, such that the

FTC's proposal will cause confusion or possible conflict with State law.

The Commission's definition of "Clear(ly) and Conspicuous(ly)" is not inconsistent with the existing Federal legal requirements raised by these commenters. Dealers can comply with these laws to the extent they apply as well as with the requirements that follow from the Commission's definition. Regarding State law, commenters did not provide examples of actual conflicts. Further, to the extent there is truly an inconsistency between the operation of the Commission's definition and any State law, the Commission notes that the definition is based on decades of Commission experience policing deceptive and unfair conduct; addresses harmful practices including those related to hidden disclosures and charges; and that § 463.9 of the Final Rule sets out the Rule's relation to State laws.

Other industry association commenters also contended that the proposed definition of "Clearly and Conspicuously" would be overly broad and challenging for compliance, but did not explain why or suggest alternative language. In addition, some dealership association commenters requested more guidance to understand the definition. The Commission's definition spells out, in seven subparts, what clear and conspicuous means, using simple terms that provide additional information about how dealers can make a disclosure in a manner that is easily understandable and easily noticeable to the consumer. The definition elaborates basic, common-sense principles, including that visual disclosures be in a size that consumers will easily notice and that audible disclosures be in a volume, speed, and cadence such that consumers will easily hear it. Thus, for example, disclosures in an illegible font, or that consumers cannot hear, are not clear and conspicuous. The Commission also notes that it did not mandate specific fonts, volumes, or other prescriptive measures. Thus, dealers have the flexibility to determine the best way to meet the definition's requirements for their consumers under the circumstances.

A dealership association commenter contended that the proposed definition does not include a reasonableness standard and may be interpreted as prohibiting any limitations and exclusions, given the requirement in proposed § 462.3(d)(7) that a disclosure must not be contradicted or mitigated by or inconsistent with anything else in the communication. The commenter further asked whether a statement such as "with approved credit" would

---

[129] 16 CFR 14.9 is an enforcement policy statement that provides information to advertisers about clear and conspicuous disclosures in foreign language advertisings and sales materials, including ensuring the language of the disclosure matches the language in the publication. *See* 16 CFR 14.9.

[130] *See Appear* (defs. 1b, 4, 6), Merriam-Webster.com Dictionary, *https://www.merriam-webster.com/dictionary/appear* (last visited Dec. 5, 2023); *see also* Order ¶¶ 2–3, *Asbury Auto. Grp., Inc.,* No. C–4606 (F.T.C. Mar. 22, 2017) (identical usage in definition provision); Order ¶ 2, *Lithia Motors, Inc.,* No. C–4597 (F.T.C. Dec. 8, 2016) (same); Order ¶¶ 2–3, *Jim Koons Mgmt. Co.,* No. C–4598 (F.T.C. Dec. 8, 2016) (same).

[131] 17 CFR 162.2.

impermissibly mitigate an offer of low financing under this proposed definition.[132] The Commission responds as follows. The standard is an objective one, evaluated from the perspective of a reasonable consumer.[133] The definition does not prohibit all advertising that contains limitations and exclusions, but it does provide that if dealers are advertising offers that are limited in some way, they may not misrepresent such offers. Thus, if a dealer presents consumers with an unqualified representation of low financing terms, those terms must be available to typical consumers. Alternatively, a dealer may offer low financing terms to consumers with particular credit characteristics if that requirement is presented in a manner that does not deceive reasonable consumers. For example, a dealer may offer "0% annual percentage rate (APR) for consumers with a credit score above 800." By contrast, it would be deceptive if the dealer offered "0% APR," and then separately disclosed in fine print that such terms are only available to consumers with a credit score above 800, because the qualifying disclosure is inconsistent with an offer of "0% APR" that contained no limitations and thus indicated that 0% APR is available to the typical consumer regardless of credit score.[134] Further, the Commission notes that to qualify as clear and conspicuous, "disclaimers or qualifications in any particular ad are not adequate to avoid liability unless they are sufficiently prominent and unambiguous to change the apparent meaning of the claims and to leave an accurate impression. Anything less is only likely to cause confusion by creating contradictory double meanings." [135]

Lastly, another dealership association commenter asked how the proposed definition translates to visual, audible, and electronic media disclosures and expressed concern about subjectivity, characterizing the terms "easily" understood and "unavoidable" within the proposed definition as subjective and open to different interpretations, particularly in the context of websites and internet promotions. Here, the Commission declines to mandate more prescriptive language regarding, for example, font sizes, what volumes are to be used, and where exactly the language should appear on a website, such as on an overlay with mandated color, size, and location.[136] As courts [137] have recognized, whether a disclosure is clear and conspicuous is an objective standard rather than a subjective one. While more prescriptive language would provide additional objective criteria, the Commission is concerned such language might constrain dealers from determining the best way to meet the definition's requirements for their consumers under the circumstances involved, and might require dealers that are already making clear and conspicuous disclosures to change their existing disclosure materials.

The Commission reiterates that the definition of "Clear(ly) and Conspicuous(ly)" elaborates basic, common-sense principles, such as requiring visual disclosures in a size consumers can see and audible disclosures in a volume they can hear. Regarding the requirement that internet disclosures be unavoidable, this language requires evaluating an objective standard—whether or not

consumers could have avoided the disclosure. In addition, the disclosure must be easily noticeable and easily understandable, as set forth expressly in the definition. Disclosures that do not meet this standard include those that are buried in other text, including as illustrated by many FTC actions against dealers.[138] Regarding the requirement that disclosures be "easily" noticeable and understandable, the standard is also an objective one, evaluated from the perspective of a reasonable consumer. Determining how reasonable consumers are likely to respond may be resolved on the basis of the advertisement, context, or disclosure itself, or based on extrinsic evidence, such as consumer complaints.[139] To this end, as noted previously, the definition enumerates in seven subparts the meaning of clear and conspicuous using simple terms that provide additional guidance on how dealers may make disclosures that are easily understandable and easily noticeable to the consumer.

After carefully considering the comments, the Commission adopts § 463.2(d) with a modification to clarify, through the addition of parentheses—"Clear(ly) and Conspicuous(ly)"—that the definition applies whether the term is used as an adjective or adverb. Consistent with the Commission's experience addressing unfair or deceptive conduct, the Commission has defined the term "Clear(ly) and Conspicuous(ly)" to include disclosures that are easily understandable and easily noticeable, while also providing dealers with additional information on how to meet those requirements.[140]

---

[132] Comment of Ohio Auto. Dealers Ass'n, Doc. No. FTC–2022–0046–6657 at 4.

[133] *See* FTC Policy Statement on Deception, *supra* note 42, at 2–5.

[134] Complaint ¶¶ 5–7, *Progressive Chevrolet Co.,* No. C–4578 (F.T.C. June 13, 2016) (alleging ads touting attractive terms deceptively failed to disclose high credit score requirement).

[135] *Removatron Int'l Corp.* v. *Fed. Trade Comm'n,* 884 F.2d 1489, 1496–97 (1st Cir. 1989); *see also Fed. Trade Comm'n* v. *Brown & Williamson Tobacco Corp.,* 778 F.2d 35, 42–43 (D.C. Cir. 1985) (finding that a disclosure in virtually illegible form, placed in an inconspicuous corner of Barclay advertisements, did not eliminate deception); *see Fed. Trade Comm'n* v. *Cap. Choice Consumer Credit, Inc.,* 2003 U.S. Dist. LEXIS 29086, at *5 (S.D. Fla. June 2, 2003) (finding that, where advertisements promised a general purpose credit card, such as VISA or MasterCard, "fine print on reverse side" of ad clarifying that the credit card was a "merchandise card and not a major bank card" was inadequate to modify net impression); *Fed. Trade Comm'n* v. *Cyberspace.com LLC,* 453 F.3d 1196, 1200 (9th Cir. 2006) (rejecting defendant's argument that truthful fine print notices on reverse side of checks, invoices, and marketing inserts cured deception that check/invoice was a refund rather than offer for services); *Fed. Trade*

*Comm'n* v. *Alcoholism Cure Corp.,* No. 3:10–cv–266–J–34JBT, 2011 WL 13137951, at * 51 (M.D. Fla. Sept. 16, 2011) (finding that "not MD" disclaimers were inadequate to dispel net impression regarding professional qualifications of defendant and other employees as advertised); *Fed. Trade Comm'n* v. *Wash. Data Res.,* 856 F. Supp. 2d 1247, 1274–75 (M.D. Fla. 2012) (rejecting defendants' argument that retainer agreement contained sufficient disclaimer to dispel a misrepresentation about whether a home loan was guaranteed).

[136] The Commission has included such requirements elsewhere. *See, e.g.,* Order ¶ 6, *United States* v. *Sunkey Publ'g, Inc.,* No: 3:18–cv–1444–HNJ (N.D. Ala. Sept. 6, 2018).

[137] *See. e.g., Palmer* v. *Champion Mortg.,* 465 F.3d 24, 28 (1st Cir. 2006) (applying an objective standard in evaluating Truth in Lending Act claim regarding clear and conspicuous disclosure); *Smith* v. *Check-N-Go of Ill., Inc.,* 200 F.3d 511, 515 (7th Cir. 1999) (same); *Zamarippa* v. *Cy's Car Sales, Inc.,* 674 F.2d 877, 879 (11th Cir. 1982) (same); *Bustamante* v. *First Fed. Sav. & Loan Ass'n,* 619 F.2d 360, 364 (5th Cir. 1980) (same); *see also Herrera* v. *First N. Sav. & Loan Ass'n,* 805 F.2d 896, 900 (10th Cir. 1986) (resolving question of clear and conspicuous disclosure under Truth in Lending Act as a legal, rather than factual, matter); *Dixey* v. *Idaho First Nat'l Bank,* 677 F.2d 749 (9th Cir. 1982) (same).

[138] Complaint ¶¶ 6–14, *Jim Burke Auto., Inc.,* No. C–4523 (F.T.C. May 4, 2015); Complaint ¶¶ 6, 9, *TT of Longwood, Inc.,* No. C–4531 (F.T.C. July 2, 2015); Complaint ¶ 13, *City Nissan Inc.,* No. C–4524 (F.T.C. May 4, 2015); Complaint ¶¶ 17–19, *Fed. Trade Comm'n* v. *Liberty Chevrolet, Inc.,* No. 1:20–cv–03945 (S.D.N.Y. May 21, 2020); Complaint ¶¶ 4–9, 12–15, 18–20, *Billion Auto, Inc.,* No. C–4356 (F.T.C. May 1, 2012) (alleging false ads promising to pay off consumers' existing motor vehicle debt and failing to disclose legally required financing and leasing terms); *see also* Complaint ¶¶ 57–60, *Fed. Trade Comm'n* v. *Stewart Fin. Co. Holdings, Inc.,* No. 1:03–CV–2648 (N.D. Ga. Sept. 4, 2003) (alleging violations for failure to include the cost of required add-on products in the finance charge and annual percentage rate disclosed to consumers).

[139] *See* FTC Policy Statement on Deception, *supra* note 42, at 2–5 (describing application of reasonable consumer standard).

[140] *See, e.g.,* Decision and Order, JS Autoworld, Inc., No. C–4535 (F.T.C. Aug. 13, 2015); Decision and Order, Nat'l Payment Network, Inc., No. C–4521 (F.T.C. May 4, 2015); Decision and Order, Matt Blatt Inc., No. C–4532 (F.T.C. July 2, 2015); Decision and Order, Ganley Ford West, Inc., No. C–4428 (F.T.C. Jan. 28, 2014).

(e) Motor Vehicle (Finalized as " 'Covered Motor Vehicle' or 'Vehicle' ")

The proposed rule defined the term "Motor Vehicle" as "(1) any self-propelled vehicle designed for transporting persons or property on a street, highway, or other road; (2) Recreational boats and marine equipment; (3) Motorcycles; (4) Motor homes, recreational vehicle trailers, and slide-in campers, as those terms are defined in §§ 571.3(b) and 575.103(d) of title 49, Code of Federal Regulations, or any successor thereto; and (5) Other vehicles that are titled and sold through Dealers." The Commission has determined to finalize the definition with the modifications discussed in the following paragraphs.

The Commission received several comments regarding the substance and scope of this proposed definition. A number of industry association commenters requested that certain vehicle types, including marine vehicles, motorcycles, RVs, and other recreational vehicles be excluded from coverage. These commenters contended that the dealerships that sell such vehicles function differently from automobile dealerships, and that recreational vehicles are discretionary, rather than essential, purchases. After careful consideration, the Commission is excluding recreational boats and marine equipment; motorcycles; and motor homes, recreational vehicle trailers, and slide-in campers from the definition of " 'Covered Motor Vehicle' or 'Vehicle.' " Moving forward, the Commission will continue to monitor for unfair and deceptive practices to determine whether further action is warranted to protect consumers, through law enforcement, a future rulemaking, or other measures. The Commission notes that no dealer may misrepresent material terms; deceive customers about prices, add-ons, or payments; charge for products that provide no benefit; or charge consumers without express, informed consent. To the extent that dealers engage in such conduct, they are in violation of the FTC Act.

Another commenter contended it was unclear whether all-terrain vehicles, go-carts, snowmobiles, scooters, electric bicycles, and golf carts were covered by the proposed definition. In response, the Commission has modified the first enumerated subpart of the definition to refer only to vehicles designed for use on a "public" street, highway, or road, and to expressly exclude scooters, electric bicycles, and golf carts. The definition of " 'Covered Motor Vehicle' or 'Vehicle' " in the Final Rule does not cover all-terrain vehicles, go-carts, or snowmobiles because such vehicles are not designed for use on a "public" street, highway, or road.[141]

A number of industry association commenters claimed that the proposed definition conflicts with definitions of motor vehicle under various State laws, and one such commenter requested that, rather than finalize a definition of "Motor Vehicle," the Commission defer to the definitions promulgated by each State's department of motor vehicles. The commenters did not explain how the Rule's definition may actually conflict with any laws, or how any alleged duplication would harm consumers or competition. To the extent that States have broader or narrower definitions, it is not clear why motor vehicle dealers covered by the Rule cannot comply with the Rule's provisions and applicable State laws. Moreover, the Final Rule provides additional remedies that will benefit consumers who encounter conduct that is already illegal under State or Federal law, including by adding a mechanism for the Commission to redress consumers injured by a dealer's violation of the rule, and will assist law-abiding dealers that presently lose business to competitors that act unlawfully. Section 463.9 provides further discussion of State laws.

Thus, after careful consideration of the comments, the Commission is finalizing the definition of "Motor Vehicle" with modifications, including adding the word "Covered" to the definition to reflect the fact that the definition is narrower than the term "Motor Vehicle" in the NPRM and adding "or Vehicle" to the definition to clarify that all references in the Rule to the term "Covered Motor Vehicle" and "Vehicle" refer to the defined term.

(f) Dealer or Motor Vehicle Dealer (Finalized as " 'Covered Motor Vehicle Dealer' or 'Dealer' ")

The proposed rule defined the term "Dealer" or "Motor Vehicle Dealer" as "any person or resident in the United States, or any territory of the United States, that: (1) Is licensed by a State, a territory of the United States, or the District of Columbia to engage in the sale of motor vehicles; (2) Takes title to, holds an ownership interest in, or takes physical custody of motor vehicles; and (3) Is predominantly engaged in the sale and servicing of motor vehicles, the leasing and servicing of motor vehicles,

or both." Based on the following, the Commission is finalizing this definition in the Final Rule with modifications for clarity.

Many stakeholders commented in support of the proposed rule and expressed no concern over this definition. Other commenters expressed views that the Commission examines in the following paragraphs.

A few industry association commenters contended that parts of the proposed definition may have captured certain financial entities, such as financial entities that maintain licenses to engage in the sale of motor vehicles, and requested that the Commission make clear that any rule does not apply to such entities. In response, the Commission notes that only entities that meet all three components of the definition are covered "Dealers." Thus, an entity that maintains an applicable license to engage in the sale of Covered Motor Vehicles but is not, for example, predominantly engaged in the sale or leasing of motor vehicles would not be a covered "Dealer."

Another industry association commenter similarly requested a "carve-out" from any definition of "Dealer" for trusts and trusts' investors.[142] This commenter asserted that trusts and their investors do not satisfy two of the definition's components, and did not describe how any part of the definition creates concerns or is unclear. The Commission reiterates that if an entity meets the three parts of the "Covered Motor Vehicle Dealer" definition, then it is covered; if an entity does not meet these three parts, it is not covered. The Commission sees no benefit to adding language stating that entities that do not meet the definition are not covered.

Other commenters, including vehicle association commenters, claimed that dealerships specializing in RV, marine, motorcycles, and other recreational vehicles, including certain high-end recreational vehicles,[143] should be excluded from coverage, generally contending that such dealerships operate differently from automobile dealerships, and that these types of vehicles are used for different purposes than are automobiles. As explained in the section-by-section analysis of the definition of "Covered Motor Vehicle" in SBP III.B.2(e), after considering stakeholder comments, the Commission

---

[141] According to the National Highway Traffic Safety Administration, "Public road means any road under the jurisdiction of and maintained by a public authority and open to public travel." 23 CFR 1300.3.

[142] Comment of Structured Fin. Ass'n, Doc. No. FTC–2022–0046–7646 at 3.

[143] The Marine Retailers Association of the Americas requested that transactions in excess of $70,000 be excluded from coverage, as an alternative to excluding marine transactions altogether. *See* Comment of Marine Retailers Ass'n of the Ams., Doc. No. FTC–2022–046–9291 at 4.

is removing marine, motorcycle, RV, and certain other vehicles from the definition in § 463.2(e), and to reflect this change, finalizing the defined term as " 'Covered Motor Vehicle' or 'Vehicle,' " thereby excluding from the Final Rule entities who otherwise would have qualified as "Dealers" solely based on their sale and servicing, or leasing and servicing, of such vehicles. The Commission underscores that, regardless of the definition of "Covered Motor Vehicle" under the Final Rule, unfair and deceptive practices remain unlawful under the FTC Act. The Commission will continue to monitor all vehicle markets to determine whether additional action is warranted to protect consumers.

Some dealership association commenters argued that, under the Commission's proposal, this definition exempted dealers subject to the jurisdiction of the CFPB. Other such commenters similarly contended that, under the proposal, used car dealers that do not engage in extensive post-sale repairs do not "service" vehicles or that do not have separate service departments may have been excluded from coverage, contending further that excluding such dealers would put other dealers at a competitive disadvantage. Contrary to these commenters' assertions, the definition does not contain such exclusions. By its plain terms, the definition applies to dealers that meet its three enumerated components. Nowhere does the definition limit coverage of dealers based on CFPB jurisdictional considerations. Likewise, the definition does not condition coverage on whether a dealership has a service department or include any other requirement or limitation beyond those enumerated in § 463.2(f). By its plain meaning, the term "servicing" covers, for instance, "checking and repairing a vehicle, machine, etc. to keep it in good condition." [144] As the Commission has previously stated, the term "servicing" "captures activities undertaken by essentially all used car dealers." [145] Thus, the definition does not place dealers with separate servicing departments at a competitive disadvantage, and the Commission need

not remove the term "servicing of motor vehicles" from the Final Rule.

One such commenter further contended that the proposed definition did not cover certain entities, including certain direct sellers or manufacturers or others not licensed in a particular State, or lenders who offer add-on products such as GAP agreements and debt suspension products. As previously discussed, the Final Rule applies to all dealers that meet the three parts of this definition.[146] To the extent that the definition does not apply to specific entities, this reflects the scope and bounds of the rulemaking authority Congress delegated to the Commission under the Dodd-Frank Act.[147]

Finally, some industry and dealership association commenters posited that the proposal conflicted with Federal and State law or duplicated the regulatory authority of State enforcement agencies. These commenters did not provide information regarding how duplicative laws prohibiting misrepresentations, requiring disclosures, or prohibiting charges for items that would not benefit the consumer or for items without express, informed consent would create harmful consequences, and the Commission is not aware of any laws that allow such conduct by those that the Rule defines as "Covered Motor Vehicle Dealer[s]." Moreover, the Final Rule provides additional remedies that will benefit consumers who encounter conduct that is already illegal under State or Federal law, including by adding a mechanism for the Commission to redress consumers injured by a dealer's violation of the

Rule, and will assist law-abiding dealers that presently lose business to competitors that act unlawfully. To the extent the Rule may overlap with State law, dealers can comply with these laws and also with the requirements that follow from the operation, in the Rule, of the Commission's definition. To the extent there is truly an inconsistency between the provisions of the Final Rule and a State law, § 463.9 sets out the Rule's relation to State laws.

Thus, after careful consideration of the comments, the Commission is finalizing the definition of " 'Covered Motor Vehicle Dealer' or 'Dealer' " with modifications for clarity. The definition in the Final Rule incorporates the phrase "including any individual or entity" to confirm that the term "person," like all undefined terms in this part, is used according to its ordinary meaning and includes individuals and corporate entities and adds the word "Covered" to the definition to reflect the narrowed scope of "Covered Motor Vehicle." [148]

(g) Express, Informed Consent

The proposed rule defined the term "Express, Informed Consent" as "an affirmative act communicating unambiguous assent to be charged, made after receiving and in close proximity to a Clear and Conspicuous disclosure, in writing, and also orally for in-person transactions" of "(1) What the charge is for" and "(2) The amount of the charge, including, if the charge is for a product or service, all fees and costs to be charged to the consumer over the period of repayment with and without the product or service." The proposed rule also included in this definition three examples of what does not constitute express, informed consent: "(i) A signed or initialed document, by itself; (ii) Prechecked

---

[144] The Oxford Advanced American Dictionary defines "servicing" as "the act of checking and repairing a vehicle, machine, etc. to keep it in good condition"; *see also* 15 U.S.C. 5519(b)(3) (referring to "the sale, financing, leasing, rental, repair, refurbishment, maintenance, or other servicing of motor vehicles, motor vehicle parts, or any related or ancillary product or service").

[145] Used Motor Vehicle Trade Regulation Rule ("Used Car Rule"), 81 FR 81664, 81667 (Nov. 18, 2016).

[146] *See* 12 U.S.C. 5519(a), (f).

[147] Section 1029(d) of the Dodd-Frank Act defines "motor vehicle dealer" as "any person or resident in the United States, or any territory of the United States, who—(A) is licensed by a State, a territory of the United States, or the District of Columbia to engage in the sale of motor vehicles; and (b) takes title to, holds an ownership in, or takes physical custody of motor vehicles." 15 U.S.C. 5519(f)(2).

Parts (A) and (B) of this definition are identical to parts (1) and (2) of the definition of " 'Covered Motor Vehicle Dealer' or 'Dealer' " in the Final Rule.

Section 1029(d) of the Dodd-Frank Act states that the Commission "is authorized to prescribe rules under sections 5 and 18(a)(1)(B) of the Federal Trade Commission Act in accordance with section 553 of title 5, United States Code, with respect to a person described in subsection (a)." 15 U.S.C. 5519(d). Section 1029(a) in turn, provides the CFPB "may not exercise any rulemaking, supervisory, enforcement or any other authority . . . over a motor vehicle dealer that is predominantly engaged in the sale and servicing of motor vehicles, the leasing and servicing of motor vehicles, or both." 15 U.S.C. 5519(a). The last clause is identical to part (3) of the definition in the Final Rule.

Several commenters requested that the Commission allow consumers to buy vehicles directly from manufacturers. Nothing in the Rule prohibits consumers from doing so.

[148] *See, e.g., Person,* Black's Law Dictionary (11th ed. 2019) (defining "person" to include "[a] human being" and "[a]n entity (such as a corporation) that is recognized by law as having most of the rights and duties of a human being."); *Person,* Merriam-Webster.com Dictionary, *https://www.merriam-webster.com/dictionary/person* (last visited Dec. 5, 2023) (defining "person" to include "human" and "one (such as a human being, a partnership, or a corporation) that is recognized by law as the subject of rights and duties"); *see also* 12 U.S.C. 5481(19) (Dodd-Frank Act statutory authority for the Final Rule defining "person" as "an individual, partnership, company, corporation, association (incorporated or unincorporated), trust, estate, cooperative organization, or other entity"); 1 U.S.C. 1 (Dictionary Act defining "person" to include "corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals"). The application of covered motor vehicle dealer and dealer to entities also is consistent with these terms' use in the NPRM and commenter understanding of these terms in the course of public comment.

boxes; or (iii) An agreement obtained through any practice designed or manipulated with the substantial effect of subverting or impairing user autonomy, decision-making, or choice.'' In both the NPRM and in the provisions the Commission is finalizing, this definition is used exclusively in § 463.5(c). As such, comments regarding the definition are examined in the discussion of that provision in SBP III.E.2(c). As stated therein, the Commission is finalizing this definition substantively as proposed.

## (h) GAP Agreement

The proposed rule defined the term ''GAP Agreement'' as ''an agreement to indemnify a vehicle purchaser or lessee for any of the difference between the actual cash value of the insured's vehicle in the event of an unrecovered theft or total loss and the amount owed on the vehicle pursuant to the terms of a loan, lease agreement, or installment sales contract used to purchase or lease the vehicle, or to waive the unpaid difference between money received from the purchaser's or lessee's motor vehicle insurer and some or all of the amount owed on the vehicle at the time of the unrecovered theft or total loss.'' The proposed definition also noted that this included ''products or services otherwise titled 'Guaranteed Automobile Protection Agreement,' 'Guaranteed Asset Protection Agreement,' 'GAP insurance,' or 'GAP Waiver[].' '' This term appeared in two sections of the rule proposal: in the provision regarding dealer charges for add-ons from which the consumer would not benefit at proposed § 463.5(a), and in the recordkeeping provision at proposed § 463.6(a)(4). Comments regarding the proposed definition are examined in the discussion of § 463.5(a) in SBP III.E.2(a). As stated therein, the Commission is finalizing this definition substantively as proposed, with typographical modifications to correct a misplaced period in the original proposal and a modification removing the extraneous term ''insured's'' from the phrase ''actual cash value of the insured's Vehicle.'' In addition, the Final Rule capitalizes the defined term ''Vehicle'' to conform with the revised definition of '' 'Covered Motor Vehicle' or 'Vehicle' '' at § 463.2(e).

## (i) Government Charges

The proposed rule defined ''Government Charges'' as ''all fees or charges imposed by a Federal, State or local government agency, unit, or department, including taxes, license and registration costs, inspection or certification costs, and any other such fees or charges.'' This term appeared in two provisions of the rule proposal: in the proposed definition of ''Offering Price'' at § 463.2(k), which pertains to the proposed offering price disclosure provision at § 463.4(a); as well as in the proposed provision relating to undisclosed or unselected Add-ons at § 463.5(b). As explained in further detail in the paragraph-by-paragraph analysis of § 463.5(b) in SBP III.E.2(b), the Commission has determined not to finalize § 463.5(b), and as such will refrain from examining this proposed definition in relation to that provision. Comments regarding the proposed definition are examined in the discussion of § 463.4(a) in SBP III.D.2(a). As stated therein, the Commission is finalizing this definition substantively as proposed, with a typographical modification to include a serial comma for consistency.

## (j) Material or Materially

The proposed rule defined ''Material'' or ''Materially'' as ''likely to affect a person's choice of, or conduct regarding, goods or services.'' This term appeared in the prohibited misrepresentations provisions at § 463.3(b) and (g), and in the recordkeeping provision at § 463.6(a). As described in detail in the section-by-section analysis of § 463.3 in SBP III.C, the Final Rule modifies the introductory paragraph of § 463.3 from the Commission's original proposal to add the word ''Material,'' such that the Commission's materiality standard applies to all subparts of § 463.3. The Final Rule accordingly removes the word ''Material'' from § 463.3(b) and (g) so as to avoid duplication. Based on the following, the Commission is finalizing this definition, now at § 463.2(j), substantively as proposed.

A dealership association commenter noted that the proposed definition did not use the term ''significance,'' and asserted that ''Material'' information should be significant and not ''rooted in personal preference.'' [149] The Commission notes that this definition adopts the meaning of the term as articulated through decades of enforcement actions [150] instead of using a different term such as ''significance,'' and does not use the term ''personal preference'' or rely on ''personal preference'' any more than the phrase ''likely to affect'' or ''significant'' does. Thus, the Commission is finalizing this definition substantively as proposed.

## (k) Offering Price

The proposed rule defined ''Offering Price'' as ''the full cash price for which a Dealer will sell or finance the motor vehicle to any consumer, excluding only required Government Charges.'' This term appeared in two provisions of the rule proposal: in the proposed offering price disclosure provision at § 463.4(a), as well as in the proposed provision relating to undisclosed or unselected add-ons at § 463.5(b). As explained in further detail in the paragraph-by-paragraph analysis of § 463.5(b) in SBP III.E.2(b), the Commission has determined not to finalize § 463.5(b), and as such, will refrain from examining this proposed definition in relation to that provision. Comments regarding the proposed definition are examined in the discussion of § 463.4(a) in SBP III.D.2(a).[151] As stated therein, the Commission is finalizing this definition largely as proposed, with a modification to clarify that dealers may, but need not, exclude required government charges from a motor vehicle's offering price. In addition, the definition in the Final Rule substitutes ''Vehicle'' for ''motor vehicle'' to clarify that the term conforms with the revised definition of '' 'Covered Motor Vehicle' or 'Vehicle' '' at § 463.2(e).

## C. § 463.3: Prohibited Misrepresentations

### 1. General Comments

The proposed rule set forth prohibitions against certain misrepresentations by motor vehicle dealers. Based on the following, the Commission has determined to finalize these prohibitions, with minor revisions.

The following paragraphs discuss comments relating to § 463.3 generally and Commission responses to such comments, followed by comments relating to each paragraph of § 463.3 and Commission responses to such comments.

The NPRM proposed prohibiting dealers from making any misrepresentation, expressly or by implication, regarding specific listed categories. The Commission received many comments regarding this

---

[149] Comment of Ga. Auto. Dealers Ass'n, Doc. No. FTC–2022–0046–10806 at 4.

[150] *See* FTC Policy Statement on Deception, *supra* note 42, at 1–2, 5; *see also Fed. Trade Comm'n* v. *Fleetcor Techs., Inc.,* 620 F. Supp. 3d 1268, 1303 (N.D. Ga. 2022); *Fed. Trade Comm'n* v. *Crescent Pub. Grp., Inc.,* 129 F. Supp. 2d 311, 321 (S.D.N.Y. 2001); *Thompson Med. Co., Inc.,* 104 F.T.C. 648, 816 (1984).

[151] Some commenters, including certain industry associations, requested that the Rule include additional definitions, including for the terms ''charged,'' ''item,'' ''discount,'' ''rebate,'' ''trade-in value,'' and ''online service.'' In response, the Commission notes that for terms not defined in the Rule, the plain meaning of the terms apply.

proposal, including comments supporting such a provision, comments urging the Commission to broaden the provision, and comments urging the Commission to limit or forgo the provision.

Thousands of commenters expressed support for the proposed rule.[152] Many of these commenters specifically expressed concern about misleading advertisements and deceptive pricing. Many individual commenters cited examples of such conduct from their own experiences purchasing or leasing vehicles, and many commenters with experience operating or working for a dealership shared their observations or experiences. For example:

• I have been looking for a car at MSRP and most dealers['] websites will list it at that price. [T]hen when you drive there the[y] will say well there is a market adjustment from 5,000 to 20,000 dollars. [N]ow . . . you need a car and have wasted 3–4 hours and picked out what you thought was your next car.[153]

• I am currently in discussions with two dealerships for a new car. Both assure me there is absolutely no dealer markup, come to find out they are adding 3/5k of ''mandatory'' add-ons respectively once I get in the door.[154]

• The last vehicle I purchased 2 years ago was a nightmare. Drove 5 hrs[.] to a dealer in Southern California. I called the dealer and confirmed the price on their website was what I was going to pay. When I arrived there, they had a list of $2500 [i]n additional charges that were not disclosed when I called and before I started driving. Purchasing a vehicle shouldn't be such a stressful process.[155]

• Most recently I started looking myself for a new lease, and looked at the RAV 4 prime. Went to my local dealer after seeing an ad on their site for $450 a month. Not only did they not honor the deal, but wouldn't even discuss that it was on their own site. I was told the SE model was [$5000] over MSRP and the XSE was [$8000] over.[156]

• I have contacted 10 different car dealerships in the past month looking to purchase a new or used SUV. 9 out of the 10 dealerships I contacted online or visited in-person in California changed

or lied about the online advertised price of the vehicle I was inquiring about or said the car was sold or not available and tried to sell me a more expensive vehicle.[157]

• Once I was led to the F&I office I was told that I HAD to buy a $995 paint protection product that I didn[']t want or need. I asked to see the contract for this product which clearly stated in bold letters 'ACCEPTANCE OF THIS CONTRACT IS VOLUNTARY AND DOES NOT AFFECT THE FINANCING OF THE VEHICLE' I pointed this out to the salesman and told him that I didn't want this product[.] [H]e looked me in the eyes with my wife present and said ''You have to buy it[.]'' [158]

• At the dealership, the salesman offered a price of $38,000, over $8,000 more than the advertised price. When I challenged the extra cost, he said the advertisement included every possible rebate and discount and no one could receive them together (some were exclusionary with other discounts).[159]

• While there are good honorable dealerships, far too many play games. Rarely is the price of [a] car advertised online or via mail EVER the actual price. Far too often in the F&I office the finance manager tries to [gloss] over add[-]ons that they just arbitrarily added on without telling you OR state I cannot get your loan approved without an extended warranty as an example I experienced. . . . I worked for a Toyota dealership many years ago and left the industry because it made me sick seeing the games played taking advantage of people. Change is needed and sooner than later.[160]

• I work as a salesperson at a local Nissan dealership. . . . Currently, dealerships across the US, including the one I work for, have made the car buying process needlessly confusing, expensive, and frustrating by engaging in false advertising and hidden add-on products. While these practices are very unscrupulous, they are incredibly effective at what they are designed to do: drive revenue for the store. If these regulations are passed, they would certainly take a significant toll on my personal finances. But the longer I work in my position, the more I realize that no one should be allowed to engage in

such exploitative conduct in the course of running a business.[161]

• I am in the auto industry and work at a very transparent and honest dealership. I think most of these rules are great. I hear horror stories about honest people seeing a car advertised for one price, only to be told there are additional a[d]d-ons and markups once they arrive. I think this is unfair. I'm also shocked every time I hear about a dealership charging for mandatory window etching and nitrogen filled tires. I even know of reputable dealerships that add GPS tracking and theft recovery devices to every new car, even though these cars come with GPS theft recovery from the manufacturer. Stopping these practices will help restore consumers' faith in car dealerships, save them money, and lead to a more honest and ethical industry. . . .[162]

Other commenters expressed support for transparent pricing generally, stating, for example:

• A consumer should be able to see a price, walk into a dealership, and pay that price. Plain and simple, just like ANY OTHER RETAILER.'' [163]

• If I walk into Best Buy and see a price they HAVE to sell it to me for that price or cheaper. These rules are long over due.[164]

• I believe if they advertise a car, it should be available for sale—at the advertised price—just as a supermarket can't advertise a price for something they don't have, or add a 'coupon redemption fee' to it. I believe these rules are an extremely reasonable approach to a long-standing problem and urge you to adopt them.[165]

• I used to work in the retail auto industry and these proposed rules will help everyone (including the dealers who are fighting them). Consumers will benefit from the transaction transparency, and over the long term even the shady dealers will benefit by treating consumers fairly and developing long term relations.[166]

• These regulations would be the best thing to happen for consumer protection since the Mo[n]roney Label. I not only have had to navigate and negotiate erroneous fees at dealers, but I've also

[152] *See Motor Vehicle Dealers Trade Regulation Rule, Comment Docket, https:// www.regulations.gov/document/FTC-2022-0046-0001/comment.*

[153] Individual commenter, Doc. No. FTC–2022–0046–0036.

[154] Individual commenter, Doc. No. FTC–2022–0046–0099.

[155] Individual commenter, Doc. No. FTC–2022–0046–0906.

[156] Individual commenter, Doc. No. FTC–2022–0046–1878.

[157] Individual commenter, Doc. No. FTC–2022–0046–3686.

[158] Individual commenter, Doc. No. FTC–2022–0046–4752.

[159] Individual commenter, Doc. No. FTC–2022–0046–5580.

[160] Individual commenter, Doc. No. FTC–2022–0046–2378.

[161] Individual commenter, Doc. No. FTC–2022–0046–3693.

[162] Individual commenter, Doc. No. FTC–2022–0046–4959.

[163] Individual commenter, Doc. No. FTC–2022–0046–0017.

[164] Individual commenter, Doc. No. FTC–2022–0046–0034.

[165] Individual commenter, Doc. No. FTC–2022–0046–0005.

[166] Individual commenter, Doc. No. FTC–2022–0046–1935.

worked at dealers whose transparency and forthrightness put them at a disadvantage. Many dealers advertise vehicles that can not [sic] be purchased or leased at the advertised price due to deceptive adverts either not disclosed or in a print so fine it can't be read. Please pass this ruling. My grandma shouldn't have to pay more than someone else just because she's not a good negotiator.[167]

Consumer advocacy organization commenters and individual commenters urged the FTC to include additional specific provisions in § 463.3, including a prohibition against misrepresentations regarding the safety, mechanical or structural condition, odometer reading, or history of a vehicle. Similarly, commenters including a municipal regulator urged the Commission to specifically prohibit misrepresentations regarding certification of used vehicles, citing enforcement actions it brought against dealers that misrepresented used vehicles as "certified pre-owned" or "manufacturer certified." The FTC takes seriously deception relating to the safety or condition of a vehicle and the practice of charging consumers more based on false claims or reassurances.[168] Depending on the claim made by the dealership and the specific facts at issue, deceptive conduct in either of these areas may be covered by the enumerated misrepresentation paragraphs the Commission is finalizing, such as by § 463.3(a) if it relates to the terms of the purchase, lease, or financing. The FTC will continue to monitor dealer misrepresentations to determine whether additional action is needed.

In addition, a number of credit union commenters requested that the Commission explicitly address misrepresentations involving dealers' refusal to accept outside financing to purchase a vehicle. These commenters cited several examples of consumers being told that they could not use outside financing, that they would not receive a lower interest rate from an outside financial institution, or that a particular interest rate was the best rate the consumer can get. The Rule already covers such conduct. For example, § 463.3(a) of the Rule, which prohibits dealers from misrepresenting the cost or terms of financing a vehicle, covers these and other misrepresentations regarding financing, including the availability of outside or "indirect" financing terms, or the costs of such financing as compared to those of any dealer-provided financing.

Two individual commenters posited that any language prohibiting misrepresentations should explicitly include the word "omissions," in order to ensure that dealers do not sneak in additional costs without consumers' consent or understanding. The Commission appreciates this concern, and notes that the Rule has many provisions prohibiting such misconduct, including the required disclosures regarding price, add-ons, and total amount of payments in § 463.4 of the Final Rule, as well as the requirement in § 463.5(c) to obtain consumers' express, informed consent before charging for any items.

Other commenters, including dealership associations, individual commenters, and a United States Representative, questioned whether certain of the proposed misrepresentation provisions were duplicative of other laws, such as the Truth in Lending Act ("TILA"), the Consumer Leasing Act ("CLA"), or State regulations, and in some instances whether compliance with State regulations should act as a safe harbor. The Commission notes that another statute—the FTC Act—already prohibits misrepresentations in or affecting commerce, and to the extent there is duplication between the FTC Act and other existing statutes pertaining to deception, there is no evidence that duplicative misrepresentation prohibitions have harmed consumers or competition.[169] The Commission further notes that the Final Rule provides additional remedies that will benefit consumers who encounter conduct that is otherwise already illegal under Federal law, and will aid law-abiding dealers that lose business to competitors that act unlawfully.[170] State laws may provide more or less specific requirements as long as those requirements are not inconsistent with part 463, as set forth in § 463.9, and in the event of an inconsistency, the Rule only affects such State law to the extent of the inconsistency. Because dealers are already prohibited from engaging in "deceptive acts or practices" under the FTC Act, dealers should be able to comply with these provisions without the need for a safe harbor.

Industry association commenters also claimed that the prohibited misrepresentation proposal ignored the materiality prong of the Commission's deception standard, and further observed that some of the prohibited misrepresentations in the proposed rule explicitly included a materiality requirement,[171] while others did not. As the NPRM made clear, the Commission's proposed misrepresentation section, at § 463.3, addressed misrepresentations that are all material.[172] The Commission need not explicitly specify materiality in its description of these misrepresentations; indeed, the Commission has long considered certain categories of information, express claims, and intended implied claims to be presumptively material.[173] Nevertheless, rather than using the term "Material" in certain individual enumerated paragraphs, the Commission has determined to modify the introductory text of § 463.3 from the Commission's original proposal in order

---

[167] Individual commenter, Doc. No. FTC–2022–0046–10441.

[168] *See, e.g.,* Complaint, *CarMax, Inc.,* No. C–4605 (F.T.C. Mar. 22, 2017) (alleging Defendants misled consumers by representing that the used motor vehicles Defendants sold had been subject to rigorous inspection but omitting important safety information about recalls); Complaint, *West-Herr Auto. Grp., Inc.,* No. C–4607 (F.T.C. Mar. 22, 2017) (alleging Defendants failed to disclose, or disclose adequately, that used motor vehicles it sold were subject to open recalls for safety issues); Complaint, *Asbury Auto. Grp., Inc.,* No. C–4606 (F.T.C. Mar. 22, 2017) (alleging deceptive failure to disclose material information about the safety of used motor vehicles sold by Defendants); Complaint ¶¶ 20–24, *Fed. Trade Comm'n v. Passport Imports, Inc.,* No. 8:18–cv–03118 (D. Md. Oct. 10, 2018) (alleging Defendants misled consumers by mailing "Urgent Recall" notices that were similar to and had the same color scheme as notices manufacturers are required by the U.S. Department of Transportation's NHTSA to use when sending information about vehicle recalls, even though in the "vast majority of instances" the recipients' cars were not subject to an open recall).

[169] One commenter expressed concern that the prohibited misrepresentations would cause dealerships to provide less information, because discussing pricing and quotes would result in providing further documentation for every conversation. However, as the FTC Act already prohibits misrepresentations, and given that pricing and financing information are among the most salient aspects of a consumer's shopping for a vehicle, the Commission considers it unlikely that § 463.3 would result in less information or the creation of additional documentation.

[170] Under section 19(a)(1) of the FTC Act, the Commission may sue in Federal district court "any person, partnership, or corporation" that "violates any rule under [the FTC Act] respecting unfair or deceptive acts or practices." 15 U.S.C. 57b(a)(1). Where such liability is found, under section 19(b) a court may "grant such relief as [it] finds necessary to redress injury . . . resulting from the rule violation," including the "rescission or reformation of contracts, the refund of money or return of property, [or] the payment of damages." *Id.* 57b(b).

A few commenters requested that the Rule go further in providing remedies, including by allowing for a private right of action to enforce Rule violations. The Commission notes that, depending on State law, consumers may be able to use State statutes that prohibit unfair or deceptive practices to challenge conduct that violates this Rule.

There is nothing in the FTC Act or this Rule that would preclude consumers from exercising any such legal rights under State law. The Commission will continue to monitor the market to determine whether additional steps are needed.

[171] *See* NPRM at 42045 (proposed § 463.3(b), (g)).

[172] NPRM at 42019.

[173] FTC Policy Statement on Deception, *supra* note 42, at 5 & nn.47–55.

to specifically prohibit misrepresentations regarding material information about the enumerated paragraphs. As such, the Commission is also removing what would otherwise be redundant references to the term "Material" within paragraphs (b) and (g) of § 463.3.

A national dealership association incorrectly asserted that this section is problematic because there is no requirement that the representation or omission be material or be viewed from the perspective of a consumer acting reasonably under the circumstances. As adopted in the final rule, this section adds the term "Material," stating that it is an unfair or deceptive practice for any motor vehicle dealer to make any misrepresentation, expressly or by implication, regarding material information about the specific categories enumerated in § 463.3.[174] The Commission is not aware of situations where dealers have made misrepresentations expressly or by implication regarding material information about these specific categories that are not deceptive or unfair, nor did commenters describe any such situations.

The Commission further notes that, by the terms of this section, a court must find that the dealer made an express or implied misrepresentation regarding material information for § 463.3 to be violated. For an express or implied misrepresentation regarding material information to be made in violation of the FTC Act and this Rule, there must be a representation that misleads consumers acting reasonably under the circumstances regarding material information. Whether such a representation has occurred depends on the facts. In the case of implied representations, whether a representation has occurred is often evident from an examination of the representation itself, including, for example, an evaluation of the document in which a representation is made, the juxtaposition of language in that document, the nature of the representation, and the nature of the transaction.[175] In other situations,

extrinsic evidence that it is reasonable for consumers to reach the implied representation may be helpful, such as consumer testimony, surveys, or other reliable evidence of consumer interpretation.[176]

For example, if a dealer offers discounted coffee for customers who visit its dealership before 10 a.m. and honors that offer, but makes no representations, expressly or by implication, about discounted cars, the dealer will not have violated § 463.3(d), which prohibits express or implied misrepresentations regarding rebates and discounts, even if a consumer holds an unreasonable belief that the offer was for discounted cars. On the other hand, if a dealership's advertisement depicts a car with a consumer standing next to it holding a cup of coffee, and states, "10% discount available before 10 a.m.," such an advertisement can convey several representations that may mislead reasonable consumers,[177] including that the car is available at a 10% discount.

Commenters including industry associations opined on the term "implied," contending for example that the idea that a misrepresentation can be implied is overly broad, and a dealership association commenter expressed concern that the inclusion of "implied" creates too much uncertainty. As has been recognized under the law for decades, however, representations can mislead consumers, even without making express claims.[178] Take, for

example, an advertisement that shows a picture of a new sedan for sale. Even if the advertisement does not expressly state that consumers could use the vehicle to drive at speeds higher than 25 miles per hour, there is an implied representation that a product is fit for the purposes for which it is sold.[179] Thus, limiting the Rule to prohibit only express misrepresentations would significantly hamper its usefulness to consumers.

One industry association commenter further argued that the proposed rule created a new deception standard that ignored intent and reliance. This argument, however, misstates the law, which does not require intent[180] or reliance[181] to establish deception.

Thus, the Commission is finalizing the introductory paragraph of § 463.3 largely as proposed, with a modification stating that it applies to misrepresentations regarding material information. For consistency with other parts of the Rule, the Commission is also removing the shorthand "FTC Act" that appeared in parentheses after "the Federal Trade Commission Act" in the introductory paragraph of the proposed rule. For clarity and consistency with the revised definition of "Covered Motor Vehicle Dealer" (at § 463.2(f) and discussed in SBP III.B.2(f)), the Commission is adding the word "Covered" to "Motor Vehicle Dealer" in the introductory paragraph. Finally, without changing any substantive requirements for covered entities, the Commission is adding the following sentence to the end of § 463.3, at newly designated paragraph (q): "The requirements in this section also are prescribed for the purpose of preventing the unfair or deceptive acts or practices

---

[174] The Final Rule prohibits misrepresentations in specific categories. In contrast, some FTC rules go further by prohibiting misrepresentations of "any material aspect" of the transaction. *See, e.g.,* Mortgage Assistance Relief Services Rule, 16 CFR 322.3(b); Telemarketing Sales Rule, 16 CFR 310.3(a)(2)(x).

[175] FTC Policy Statement on Deception, *supra* note 42, at 2 (*citing Am. Home Prods.,* 98 F.T.C. 136, 374 (1981), *aff'd,* 695 F.2d 681, 687 (3d Cir. 1982) (evaluation of the entire document); *Warner Lambert,* 86 F.T.C. 1398, 1489–90 (1975), *aff'd* 562 F.2d 749 (D.C. Cir. 1977), *cert. denied,* 435 U.S. 950 (1978) (juxtaposition of phrases); *Firestone Tire &*

*Rubber Co.,* 81 F.T.C. 398, 456 (1972), *aff'd,* 481 F.2d 246 (6th Cir.), *cert. denied,* 414 U.S. 1112 (1973) (nature of the claim); *see also Kraft, Inc.* v. *Fed. Trade Comm'n,* 970 F.2d 311, 319 (7th Cir. 1992) ("Commission may rely on its own reasoned analysis to determine what claims, including implied ones, are conveyed in a challenged advertisement, so long as those claims are reasonably clear from the face of the advertisement.").

[176] FTC Policy Statement on Deception, *supra* note 42, at 2 n.8.

[177] The interpretation or reaction does not have to be the only one; when a seller's representation conveys more than one meaning to reasonable consumers, one of which is false, the seller is liable for the misleading interpretation. *See* FTC Policy Statement on Deception, *supra* note 42, at 3. Further, an interpretation will be presumed reasonable if it is the one the respondent intended to convey. *Id.*

[178] The FTC's Policy Statement on Deception and scores of FTC cases make clear that both express and implied claims can be deceptive. *See, e.g., ECM BioFilms, Inc.* v. *Fed. Trade Comm'n,* 851 F.3d 599 (6th Cir. 2017) (affirming Commission's finding that an additive manufacturer's unqualified biodegradability claim conveyed an implied claim that its plastic would completely biodegrade within five years); *POM Wonderful LLC,* No. C–9344 (F.T.C. Jan. 10, 2013) (Opinion of the Commission), *aff'd as modified, POM Wonderful, LLC* v. *Fed. Trade Comm'n,* 777 F.3d 478 (D.C. Cir. 2015) (finding that company's advertisements would reasonably be interpreted by consumers to contain

an implied claim that POM products treat, prevent, or reduce the risk of certain health conditions and for some ads that these effects were clinically proven); *Kraft, Inc.* v. *Fed. Trade Comm'n,* 970 F.2d 311 (7th Cir. 1992) (affirming finding of deception where Kraft ads juxtaposed references to the milk contained in Kraft singles and the calcium content of the milk, the combination of which implied that each Kraft single contained the same amount of calcium as five ounces of milk).

[179] FTC Policy Statement on Deception, *supra* note 42, at 2; *Int'l Harvester Co.,* 104 F.T.C. 949, 1057–58 (1984).

[180] *See Fed. Trade Comm'n* v. *Freecom Commc'ns,* 401 F.3d 1192, 1202 (10th Cir. 2005) ("Because the primary purpose of § 5 is to protect the consumer public rather than punish the wrongdoer, the intent to deceive the consumer is not an element of a § 5 violation.").

[181] *See Fed. Trade Comm'n* v. *Figgie Int'l, Inc.,* 994 F.2d 595, 605–06 (9th Cir. 1993) (holding that section 19 of the FTC Act does not require proof of individual consumer reliance; rather, there is a "presumption of actual reliance" that arises once the Commission has proved that a defendant made material misrepresentations, that they were widely disseminated, and that consumers purchased the defendant's product).

defined in this part, including those in §§ 463.4 and 463.5.''

The Commission examines each paragraph of § 463.3, including by examining related comments and Commission responses to those comments. The Commission then discusses the corresponding provisions of the Final Rule.

2. Paragraph-by-Paragraph Analysis of § 463.3

(a) The Costs or Terms of Purchasing, Financing, or Leasing a Vehicle

Proposed § 463.3(a) prohibited misrepresentations regarding the cost or terms of purchasing, financing, or leasing a vehicle. The Commission is finalizing this provision largely as proposed, with the minor modification of capitalizing the defined term "Vehicle" to conform with the revised definition at § 463.2(e) (explained in SBP III.B.2(e)). As previously discussed, the addition of "material" to the introductory paragraph of § 463.3 will apply to this paragraph and to all paragraphs of § 463.3 that follow.

A number of commenters expressed support for this proposed provision, contending, *inter alia*, that it would level the playing field for car buyers and address unfair and deceptive practices related to financing terms and conditions.

The Commission received a number of industry association comments requesting that the Commission clarify the operation of proposed § 463.3(a), including for example, by clarifying whether it would require dealers to discuss all purchase, finance, or lease terms, or whether it would require dealers to read aloud all the terms of the buyer's order and finance or lease agreement. Dealership association commenters expressed a related concern that this proposed provision lacked specific guidance on dealer compliance.

To begin, misrepresentations regarding "costs or terms of purchasing, financing, or leasing a vehicle" refer to the ordinary plain meaning of the words used in the provision.[182] Second, as the

language in the introductory paragraph of § 463.3 makes clear, its paragraphs—including paragraph (a) of § 463.3—prohibit misrepresentations regarding material information. By its terms, this paragraph requires no particular affirmative disclosures, whether written or oral; rather, this paragraph obligates dealers to refrain from misrepresentations regarding material information about the costs or terms of purchasing, financing, or leasing a vehicle.[183]

The Commission received comments from industry associations requesting that the Final Rule provide a safe harbor from liability stemming from dealers' violations of the Rule to vehicle credit contract assignees, who take or receive these contracts subject to all claims and defenses consumers could assert against the dealer under the Commission's Trade Regulation Rule Concerning Preservation of Consumers' Claims and Defenses, also known as the "Holder Rule."[184] The Rule, however, does not create liability for these entities under the Holder Rule where it did not previously exist; the Rule addresses conduct that is unfair or deceptive under the FTC Act. When enacting the Holder Rule, the Commission did not include a safe harbor or exceptions involving any specific deceptive or unfair conduct, and the Commission declines to do so through this Rule.

A comment from a motor vehicle industry association argued that this provision would likely be inapplicable, or less impactful, with regard to RV sales because the RV industry rarely offers leases, if at all, and because RV sales are usually not financed through RV manufacturer-controlled financing companies. To the extent that specific provisions do not apply to specific entities, such provisions do not impose

any obligations upon those entities. Nevertheless, as explained in the analysis of the "Covered Motor Vehicle" definition, § 463.2(e), the Commission is excluding recreational vehicle dealers from the definition of "Covered Motor Vehicle."

After carefully considering the comments, the Commission is finalizing paragraph (a) of § 463.3 with the minor modification of capitalizing "Vehicle." This provision prohibits misrepresentations regarding "[t]he costs or terms of purchasing, financing, or leasing a Vehicle." Misrepresentations of the price, discounts, or other terms are likely to cause consumers to waste time pursuing unavailable or inapplicable offers and to spend more money on a vehicle rather than undergoing the hours-long process to begin the vehicle search and shopping process anew at another dealership. Prohibiting these misrepresentations will save consumers time and money and ensure that dealers compete on a level playing field.[185]

(b) Any Costs, Limitation, Benefit, or Any Other Aspect of an Add-On Product or Service

Proposed § 463.3(b) prohibited misrepresentations concerning any costs, limitation, benefit, or any other material aspect of an add-on product or service. Section 463.3(b) of the Final Rule adopts this provision without substantive modification. As described in detail in SBP III.C.1, the Commission

---

[182] Examples of "costs or terms of purchasing, financing, or leasing a vehicle" include, among other things, express or implied representations regarding a vehicle's total cost, down payment, interest rates, repayment schedules, the price for added features, other charges, certainty or finality of terms, and the availability of discounts. The Commission has brought numerous enforcement actions where, for example, dealers have misrepresented the total price a consumer could pay for vehicles, or concealed a required down payment or other restrictions on the offer. *See, e.g.,* Complaint ¶¶ 10–11, *Fed. Trade Comm'n* v. *Liberty Chevrolet, Inc.,* No. 1:20–cv–03945 (S.D.N.Y. May 21, 2020) (alleging false ads stating a certain price but charging consumers higher prices); Complaint

¶¶ 38–46, *Fed. Trade Comm'n* v. *Tate's Auto Ctr. of Winslow, Inc.,* No. 3:18–cv–08176–DJH (D. Ariz. July 31, 2018) (alleging false ads touting attractive terms but concealing (i) ads were for lease offers only and required substantial initial payment, (ii) discounts were subject to material limitations, or (iii) other legally required disclosures); Complaint ¶¶ 7–16, *Cowboy AG, LLC,* No. C–4639 (F.T.C. Jan. 4, 2018) (alleging false ads touting attractive terms, but concealing substantial down payments, offers were for leases and not purchases, material eligibility restrictions, and other legally required disclosures).

[183] Some commenters repeat this and similar questions, regarding what types of disclosures are required, through provision (o); the same response applies—provisions (a) through (o) do not affirmatively require particular disclosures. As with all misrepresentations prohibited by the Rule, and under section 5 of the FTC Act, misrepresentations are barred whether they are made expressly or by implication.

[184] *See* Trade Regulation Rule Concerning Preservation of Consumers' Claims and Defenses, 16 CFR 433.2 [hereinafter Holder Rule].

[185] The National Automobile Dealers Association commissioned a survey, released in May of 2023, that asserted the Commission's proposed rule would lead to an increase in consumer transaction time. Edgar Faler et al., Ctr. for Auto. Rsch., "Assessment of Costs Associated with the Implementation of the Federal Trade Commission Notice of Proposed Rulemaking (RIN 2022—14214), CFR part 463" (2023), *https://www.cargroup.org/ wp-content/uploads/2023/05/CAR-Report_CFR-Part-463_Final_May-2023.pdf.* This survey was released more than seven months after the closure of the comment period for the notice of proposed rulemaking on September 12, 2022, and is not part of this rulemaking record. These facts notwithstanding, the Commission observes that each respondent to this survey was presented with a leading statement at the beginning of the survey asserting, *inter alia,* that the proposed rule would impose "new duties [that] are expected to create additional monitoring, training, forms, and compliance review responsibilities as well as a modification of record keeping systems and coordination with outside IT and other vendors" and "increase the time of a motor vehicle transaction, inhibit online sales, limit price disclosures, and increase customer confusion and frustration." *Id.* at 34, 36 (introductory instructions on the survey instrument sent to respondents). In addition, this survey did not explain its selection process or criteria for the 60 dealers it surveyed, nor why only 40 such dealerships provided fully completed survey responses. Moreover, the survey report attributed much of this estimated increase to proposed rule provisions that the Commission is not finalizing.

is modifying § 463.3 from the Commission's original proposal to include the term ''Material'' in the introductory paragraph rather than in paragraphs (b) or (g) of § 463.3. Section 463.3(b) of the Final Rule therefore deletes reference to the term ''Material.''

The Commission received a number of comments expressing support for prohibiting misrepresentations about add-ons, including comments that requested specific additional add-on-related misrepresentation prohibitions. For example, an auto dealer commenter expressed support for prohibiting misrepresentations about whether or not a car has add-ons already installed. Consumer advocacy organization commenters recommended that the Commission include a new paragraph in § 463.3 prohibiting misrepresentations regarding the consumer's right to cancel add-on products or services. This provision, however, already covers such conduct: It prohibits misrepresentations regarding material information about any costs, limitation, benefit, or any other aspect of an add-on product or service. ''Material'' means likely to affect a consumer's conduct or choices.[186] A consumer's right to cancel is likely to affect the consumer's conduct regarding an add-on product or service. Thus, § 463.3(b) includes representations about a consumer's right to cancel an add-on product or service.

A number of dealership association commenters argued that the language used in this provision is vague or confusing. The terms ''Material'' and ''Add-on Product or Service,'' however, are specifically defined in § 463.2. The remaining terms in this provision are commonly used and can be understood according to their plain meaning.[187] The NPRM examined misrepresentations regarding the coverage and costs of add-ons, and enforcement actions by the Commission and other agencies have documented many instances of such misrepresentations.[188] Examples of the

type of conduct prohibited include misrepresenting whether add-ons are required in order to purchase or lease a vehicle, including by representing that such charges are required when in fact they are not, or misrepresenting that advertised prices do not include fees beyond routine taxes and fees only to subsequently require the purchase of add-ons; misrepresenting what is, or is not, covered by, among others, an extended warranty, service or maintenance plan, or GAP agreement;[189] and misrepresenting that consumers have provided express, informed consent to be charged for add-ons.

Commenters including a number of motor vehicle dealership associations requested that the Commission clarify how extensive disclosures would need to be to satisfy this provision. One such commenter requested that the Commission explain what conduct would be required under this paragraph, and expressed concern that, if the paragraph required disclosures, such a requirement would affect the length of the transaction. Another industry association commenter suggested that, in the event dealers provide consumers with a verbal or written disclosure stating that such products have costs, limitations, or benefits, and stating information about other material aspects, the Commission modify its proposal to shift to consumers the burden of proving any relevant dealer misrepresentation. An individual commenter expressed support for applying § 463.3(a) and (b) to dealer

advertisements of free lifetime benefits programs and requiring dealers to make disclosures about any costs, limitations, benefits, or any other aspect of an add-on product or service. The Commission notes that paragraphs (a) and (b) of § 463.3 already apply to free lifetime benefits programs. Regarding disclosures, the Commission is concerned about including additional disclosure requirements beyond the few areas included in the Rule, or shifting the burden to consumers to hunt for and decipher disclosures, given that the auto finance and lease process is already lengthy, complex, document-heavy, and dense. Accordingly, as discussed in regard to § 463.3(a), these provisions do not mandate set disclosures or allow for disclosures to be used as a shield when there are misrepresentations to consumers; rather, they prohibit express or implied misrepresentations.[190]

Several dealership association commenters pointed to State laws that, they contended, may already prohibit misrepresentations about add-ons or may otherwise protect consumers. As discussed previously, to the extent there may be duplication between the provisions the Commission is finalizing and other laws, there is no evidence that duplicative misrepresentation prohibitions have harmed consumers or competition. Moreover, the Final Rule provides additional remedies that will benefit consumers who encounter conduct that is already illegal under State or Federal law and will assist law-abiding dealers that presently lose business to competitors that act unlawfully. Under § 463.9, States may provide more or less specific requirements relating to motor vehicle dealers so long as those requirements are not inconsistent with part 463, and in the event of an inconsistency, the Rule only affects such State law to the extent of the inconsistency.

Based on a review of the comments and the responses discussed, the Commission adopts paragraph (b) of § 463.3 without substantive modification. As discussed in SBP III.C.1, the Commission has determined to modify the introductory paragraph of § 463.3 from the Commission's original proposal so that each paragraph of § 463.3 prohibits misrepresentations regarding material information. As such, the Commission is finalizing a version of § 463.3(b) that removes what would

---

[186] See FTC Policy Statement on Deception, *supra* note 42, at 2, 5; *see also Fed. Trade Comm'n* v. *Crescent Publ'g Grp., Inc.,* 129 F. Supp. 2d 311, 321 (S.D.N.Y. 2001).

[187] *E.g., Cost,* Cambridge Dictionary, *https://dictionary.cambridge.org/us/dictionary/english/cost* (''Cost'' is defined as ''the amount of money needed to buy, do, or make something''); *Limitation,* Cambridge Dictionary, *https://dictionary.cambridge.org/us/dictionary/english/limitation* (''Limitation'' is defined as ''something that controls or reduces something''); *Benefit,* Cambridge Dictionary, *https://dictionary.cambridge.org/us/dictionary/english/benefit* (''Benefit'' is defined as ''a helpful or good effect, or something intended to help'').

[188] *See, e.g.,* Complaint ¶¶ 26–27, 70–71, *Fed. Trade Comm'n* v. *N. Am. Auto. Servs., Inc.,* No. 1:22-cv-01690 (N.D. Ill. Mar. 31, 2022) (alleging deceptive and unauthorized add-on charges; unfair

discrimination against minority consumers); Complaint ¶¶ 12–19, *Fed. Trade Comm'n* v. *Liberty Chevrolet, Inc.,* No. 1:20–cv–03945 (S.D.N.Y. May 21, 2020) (alleging deceptive and unauthorized add-on charges in consumers' transactions); Complaint ¶¶ 59–64, *Fed. Trade Comm'n* v. *Universal City Nissan, Inc.,* No. 2:16-cv-07329 (C.D. Cal. Sept. 29, 2016) (deceptive and unauthorized add-on charges in consumers' transactions); Complaint ¶¶ 4–14, *Nat'l Payment Network, Inc.,* No. C–4521 (F.T.C. May 4, 2015) (alleging failure to disclose fees associated with financing program; misleading savings claims in advertisements) Complaint ¶¶ 4–13, *Matt Blatt Inc.,* No. C–4532 (F.T.C. July 2, 2015) (alleging failure to disclose fees associated with financing program; misleading savings claims). *Cf.* Consent Order ¶¶ 10–16, *Santander Consumer USA, Inc.,* CFPB No. 2018–BCFP–0008 (Nov. 20, 2018) (finding defendant sold GAP product allegedly providing ''full coverage'' to consumers with loan-to-value ratios (''LTVs'') above 125%, when in fact coverage is limited to 125% of LTV).

[189] *See, e.g.,* Consumer Fin. Prot. Bureau, ''Supervisory Highlights: Issue 12, Summer 2016'' 5 (June 2016), *https://files.consumerfinance.gov/f/documents/Supervisory_Highlights_Issue_12.pdf* (finding that one or more auto lenders deceptively advertised the benefits of their GAP agreement products, leaving the impression that these products would fully cover the remaining balance of a consumer's loan in the event of vehicle loss when, in fact, the product only covered amounts below a certain loan to value ratio).

[190] It is well-settled that, if one makes a claim that, absent additional information, would mislead a consumer acting reasonably under the circumstances about a material fact, such conduct would violate the law. *See* FTC Policy Statement on Deception, *supra* note 42, at 2; *Int'l Harvester Co.,* 104 F.T.C. 949, 1057–58 (1984).

otherwise be redundant explicit reference to the term "Material." This provision prohibits misrepresentations regarding "[a]ny costs, limitation, benefit, or any other aspect of an Add-on Product or Service." Misrepresentations regarding add-ons are likely to affect a consumer's conduct, including the consumer's decision to purchase the product or service.

(c) Whether Terms Are, or Transaction Is, for Financing or a Lease

Proposed § 463.3(c) prohibited misrepresentations regarding whether the terms are, or the transaction is, for financing or a lease. Upon review and consideration of public comments, the Commission is finalizing paragraph (c) of § 463.3 without modification from the Commission's original proposal.

A few industry association and individual commenters posited that this proposed provision was unnecessary, either because other statutes or regulations, including TILA and some State regulations, address this issue, or because vehicle manufacturers already monitor such misrepresentations. As noted in SBP III.C.1, even given the possibility of overlap between this provision and existing Federal or State law, there is no evidence that duplicative misrepresentation prohibitions have harmed consumers or competition. Further, given that the conduct covered by this provision is already unlawful under the FTC Act and may duplicate other laws, or be prohibited by manufacturer rules, it should not be difficult to follow this provision.[191]

Accordingly, after careful consideration, the Commission adopts paragraph (c) of § 463.3 as proposed. Misrepresentations regarding whether terms are, or a transaction is, for financing or a lease are likely to affect a consumer's conduct, including by causing consumers to enter into a monetary transaction for a product they do not want, or, if the true circumstances are revealed prior to consummation of the transaction, to waste time traveling to, and potentially spending hours at, the dealership.

(d) The Availability of Any Rebates or Discounts That Are Factored Into the Advertised Price but Not Available to All Consumers

Proposed § 463.3(d) prohibited misrepresentations concerning the availability of any rebates or discounts that are factored into the advertised price but not available to all consumers. Upon review and consideration of public comments, the Commission is finalizing paragraph (d) of § 463.3 without modification from the Commission's original proposal.

Comments in support of this proposed provision, including those from a group of State attorneys general and from two United States Senators, generally contended that the proposed provision would increase the transparency of the purchase transaction by requiring dealers to be honest when they advertise the availability of discounts.

An individual commenter suggested that the Commission modify proposed § 463.3(d) to require dealers to disclose all representations regarding rebates or discounts in writing, in a clear and conspicuous manner. The Commission notes this paragraph prohibits misrepresentations regardless of the medium. Further, this paragraph focuses on misrepresentations; disclosures regarding price, add-ons, and total of payments are addressed in the discussion of § 463.4, as is a discussion of why the Commission has determined not to include additional disclosure requirements in this Final Rule. The same commenter also requested that the Final Rule text include examples of situations where discounts or rebates may not be available. The Commission describes examples here rather than adding them to the Final Rule text, as it would be difficult to anticipate all such examples and the text would become unwieldy. Examples include where an advertised rebate or discount applies only to the most expensive version of a particular vehicle make and model or is only available to consumers with high credit scores.

The Commission received comments from a dealership association and an individual commenter asking for additional detail about proposed § 463.3(d), pointing to a State regulation that includes disclosures and asking which types of rebates the provision covers. Here, the Commission notes that, as the language in § 463.3(d) states, this provision applies to "*any* rebates and discounts" advertised by dealers, and is not limited to any particular type of rebate or discount.[192] The terms in this provision may be interpreted according to their plain meaning, as they are commonly used and understood.[193] Additionally, the language of this provision, the NPRM, and Commission enforcement actions provide further context. In proposing § 463.3(d) to specifically address the availability of discounts and rebates, the Commission included additional language ("that are factored into the advertised price but not available to all consumers") to describe the manner in which such misrepresentations often occur: a dealer represents an advertised price which includes a discount or rebate that is not generally available to consumers.[194] The NPRM's discussion of proposed § 463.3(d) described both a scenario in which a dealer advertised a rebate or discount separately, and one in which rebates or discounts are factored into the advertised price but the rebates and discounts are not available to a typical consumer. The conduct in either such scenario would violate this provision and, depending on the circumstances, may violate other provisions the Commission is finalizing, such as paragraph (a) of § 463.3. Enforcement actions cited in the NPRM provide further illustration of deceptive practices involving rebates and discounts.[195] The Commission declines

---

[191] The FTC has alleged that misrepresentations that particular terms are available for financing or for a lease violate the FTC Act. *See* Complaint ¶¶ 38–39, *Fed. Trade Comm'n* v. *Tate's Auto Ctr.,* No. 3:18–cv–08176–DJH (D. Ariz. July 31, 2018) (alleging false ads touting attractive terms but concealing ads were for lease offers only); Complaint ¶¶ 10, 13, *TC Dealership, L.P.,* No. C–4536 (F.T.C. Aug. 13, 2015) (same); Complaint ¶¶ 9–12, *Cowboy AG, LLC,* No. C–4639 (F.T.C. Jan. 4, 2018) (same); Complaint ¶¶ 36–38, *United States* v. *New World Auto Imports, Inc.,* No. 3:16–cv–02401–K (N.D. Tex. Aug. 18, 2016) (alleging misrepresentation that terms were for financing instead of leasing); Complaint ¶¶ 28–37, 44, *Fed. Trade Comm'n* v. *Universal City Nissan, Inc.,* No. 2:16–cv–07329 (C.D. Cal. Sept. 29, 2016) (alleging advertisements with key terms that were not generally available).

[192] Section 463.3(d) (emphasis added).

[193] *See, e.g., Rebate,* Cambridge Dictionary, *https://dictionary.cambridge.org/us/dictionary/ english/rebate* (last visited Dec. 5, 2023) (defining "rebate" as "an amount of money that is returned to you, especially by the government, for example when you have paid too much tax" or "an amount of money that is paid back to you after you have paid too much"); *Discount,* Cambridge Dictionary, *https://dictionary.cambridge.org/us/dictionary/ english/discount* (last visited Dec. 5, 2023) ("[A] reduction in the usual price").

[194] *See* NPRM section IV.C, 87 FR at 42020 (proposed § 463.3(d) prohibited misrepresentations concerning "[t]he availability of any rebates or discounts that are factored into the advertised price but not available to all consumers," and the NPRM explained "[w]hen dealers advertise rebates and discounts, or offer prices that factor in such rebates and discounts, but in fact those rebates and discounts are not available to the typical consumer, but only a select set of customers, such conduct induces the consumer to select and transact with the dealer under false pretenses").

[195] *See, e.g.,* Complaint ¶¶ 6–13, *Jim Burke Auto., Inc.,* No. C–4523 (F.T.C. May 4, 2015) (alleging promises of prices and discounts not generally available to consumers); Complaint ¶¶ 6, 9, *TT of Longwood, Inc.,* No. C–4531 (F.T.C. July 2, 2015) (alleging promises of prices and discounts not generally available to consumers); Complaint ¶¶ 8–9, *JS Autoworld, Inc.,* No. C–4535 (F.T.C. Aug. 13, 2015) (alleging false ads touting prices but concealing discounts with material eligibility limitations); Complaint ¶¶ 7–9, *TC Dealership, L.P.,* No. C–4536 (F.T.C. Aug. 13, 2015) (alleging false ads touting attractive prices but concealing

Continued

to add additional requirements, such as disclosure requirements, to its Final Rule, given the already lengthy, complex, and document-heavy nature of auto transactions.

A number of dealership association commenters contended that the proposed paragraph would prohibit dealers from displaying beneficial information to consumers or would prohibit dealers from advertising rebates and incentives of limited availability. In addition, commenters including one such dealership association requested that the Commission adopt an approach the commenter contended is used in some States: allowing dealers to display, below the advertised sales price, a rebate or incentive that is not available to all purchasers. Moreover, a number of industry association and dealership association commenters argued that the proposed paragraph was more stringent than, and inconsistent with, the Commission's prior articulation of the deception standard, further noting the existence of Commission orders that prohibit defendants from representing that a price, discount, rebate, or other incentive is available, unless it is in fact available to all or unless a defendant provides a clear and conspicuous disclosure of any qualifications or restrictions. Section 463.3(d) prohibits misrepresentations; it does not prohibit a dealer from advertising, in a truthful manner, rebates or discounts with limitations. Thus, this paragraph allows for the representation of limited offers, as long as such representation is truthful, and any limitations are clear and conspicuous to consumers. The paragraph is also consistent with the Commission's prior enforcement order practice in this area, which both prohibits misrepresentations regarding rebates and prohibits representations regarding rebates without disclosing any material qualifications or restrictions.[196] The paragraph simply contains one of these prohibitions but not the second.

A dealership association commenter expressed concern that this proposed provision would penalize dealers if consumers were to confuse a rebate or discount offered for one vehicle with a

vehicle that does not contain such an offer. As under current law, dealers are prohibited under § 463.3(d) from both express and implied misrepresentations. If, for example, a dealer states or implies that a discount is available on several types of vehicles when, in truth, the discount is only available on one such type of vehicle, such conduct would violate this paragraph. If, alternatively, the dealer does not state or imply that a discount is available for several types of vehicles, and offers a discount for one type of vehicle, this conduct would not violate this paragraph, as long as the dealer makes no other express or implied misrepresentations.

After careful review of the comments, the Commission is adopting paragraph (d) of § 463.3 as proposed. When dealers advertise rebates or discounts in a misleading manner, including when such rebates or discounts are not available to the typical consumer, or apply only to the most expensive versions of the make and model,[197] such conduct induces consumers to select and transact with the dealer under false pretenses.[198]

**(e) The Availability of Vehicles at an Advertised Price**

Proposed § 463.3(e) prohibited misrepresentations regarding the availability of vehicles at an advertised price. Upon reviewing the comments pertaining to this provision, the Commission is finalizing paragraph (e) of § 463.3 largely as proposed, with the minor modification of capitalizing the defined term "Vehicles."

One individual commenter recommended that proposed § 463.3(e) be expanded to prohibit certain specific misrepresentations about advertised vehicle availability, including whether any specific vehicle is already reserved for another consumer; whether the availability is subject to a requirement that the consumer pay a deposit; and regarding the amount of time until the vehicle becomes available. Another individual commenter recommended that the Rule require disclosure of how long each vehicle has been in the dealer's inventory, to prevent dealers from misrepresenting that a vehicle recently became available. Here, the Commission notes that, to the extent any such misrepresentations regarding the availability of vehicles were made with express or implied reference to the price of the vehicle, each would be prohibited by § 463.3(e).[199] Furthermore, to the extent such misrepresentations included reference to the subject of another paragraph of § 463.3, they would be prohibited by the Final Rule. For example, if an advertisement were to make a claim about the monthly payment for a specific vehicle, but the vehicle is not actually available, it would be covered under the bar against misrepresentations regarding costs or terms in paragraph (a) of § 463.3. In addition, under the Final Rule, dealers are also subject to disclosure requirements under § 463.4, including the requirement at § 463.4(a) to disclose the vehicle's offering price in any advertisement that references a specific vehicle, or any monetary amount or financing term for any vehicle. And if a dealer discloses the offering price for a vehicle, but the vehicle is not available to consumers, § 463.3(e) applies. Beyond this, the Commission will continue to monitor whether other misrepresentations regarding availability are being made without reference to price, or to the subject of another paragraph of § 463.3, to determine whether additional action is warranted.

The Commission received comments from a number of dealership associations and individuals requesting that the Final Rule limit dealers' responsibility for unanticipated delays, or otherwise expressing concern about

---

[196] See, e.g., Decision and Order, *Timonium Chrysler, Inc.,* No. C–4429 (F.T.C. Jan. 28, 2014).

discounts were subject to material eligibility limitations and trade-in requirement); Complaint ¶¶ 4–5, *Timonium Chrysler, Inc.,* No. C–4429 (F.T.C. Jan. 28, 2014) (alleging dealership advertised internet prices and dealer discounts but failed to disclose consumer would have to qualify for multiple rebates not generally available to them); Complaint ¶¶ 4–5, *Ganley Ford West, Inc.,* No. C–4428 (F.T.C. Jan. 28, 2014) (alleging dealership advertised discounts on vehicle prices, but failed to disclose discounts were only available on the most expensive models).

[197] See Complaint ¶¶ 4–5, *Ganley Ford West, Inc.,* No. C–4428 (F.T.C. Jan. 28, 2014) (alleging false ads touting price discount but concealing offer was limited to certain high-end models).

[198] See Complaint ¶¶ 8–9, *JS Autoworld, Inc.,* No. C–4535 (F.T.C. Aug. 13, 2015) (alleging false ads touting prices but concealing discounts with material eligibility limitations); Complaint ¶¶ 7–9, *TC Dealership, L.P.,* No. C–4536 (F.T.C. Aug. 13, 2015) (alleging false ads touting attractive prices but concealing discounts were subject to material eligibility limitations and trade-in requirement); Complaint ¶ 14, *TXVT Ltd. P'ship,* No. C–4508 (F.T.C. Feb. 12, 2015) (alleging false ads failed to disclose that it would match consumers' income tax refunds only up to $1,000); Complaint ¶¶ 4–5, *Timonium Chrysler, Inc.,* No. C–4429 (F.T.C. Jan. 28, 2014) (alleging false ads touting pricing and discounts but concealing material qualifications and restrictions); Complaint ¶¶ 6, 9, *TT of Longwood, Inc.,* No. C–4531 (F.T.C. July 2, 2015) (alleging promises of prices and discounts not generally available to consumers); Complaint ¶¶ 6– 13, *Jim Burke Auto., Inc.,* No. C–4523 (F.T.C. May 4, 2015) (alleging promises of prices and discounts not generally available to consumers); *see also* Auto Buyer Study, *supra* note 25, at 8 ("A number of [study] participants were attracted by promotional offers in ads that they did not qualify for, but did not realize that they did not qualify until they got to the dealer. Some did not learn that they did not qualify until they got to the financing stage of the transaction.").

[199] The commenter also expressed concern about misrepresentations regarding the refundability of deposits and recommended that the Commission include language in § 463.3(e) addressing this issue. Because representations and practices regarding the refundability of deposits are related to the costs or terms of purchasing, financing, or leasing a vehicle, this issue is covered by § 463.3(a). Thus, the Commission declines to adopt the commenter's recommendation.

how dealers would be able to comply with this proposed provision. One industry association commenter stated that unanticipated delays could result from factors beyond the reasonable control of the dealer, such as shipping or production issues. Other dealership association commenters contended that, because of supply chain disruptions, adjustments to inventory and other information may not always be displayed on a retailer's website instantaneously.

As is the case under current law, under this provision, dealers may not make claims about the availability of vehicles at an advertised price without a reasonable basis at the time the claims are made.[200] Objective claims about products or services represent, explicitly or by implication, that an advertiser has a reasonable basis to support those claims.[201] Consumers would be less likely to be affected by claims for products and services if they knew the advertiser did not have a reasonable basis for believing them to be true.[202] If a dealer has a reasonable basis

to make a claim about the availability of vehicles at the time the claim is made, the dealer would not be in violation of the provision if a vehicle later becomes unavailable because of circumstances that a dealer could not reasonably anticipate or control.

A few dealership association commenters claimed that promulgation of § 463.3(e) would cause regulatory confusion because State guidelines or rules already address issues about the availability of vehicles, including, for example, by requiring dealers to note the location of the vehicle.[203] As described in SBP III.C.1, States may provide more or less specific requirements relating to motor vehicle dealers so long as those requirements are not inconsistent with part 463, and in the event of an inconsistency, the Rule only affects such State law to the extent of the inconsistency. To the extent there are actual inconsistencies, § 463.9 is clear that this Rule's prohibition against misrepresentations controls.

After careful consideration of the comments, the Commission is adopting paragraph (e) of § 463.3 largely as proposed, with the minor modification of capitalizing the defined term "Vehicles." This paragraph prohibits dealers from promoting low prices for specific vehicles, but then later misrepresenting, among other things, that the advertised vehicle is no longer available or no longer available at the advertised price. Such misrepresentations are likely to induce consumers to waste their time traveling to a particular dealership to pursue a specific offer on a specific vehicle when the offer or vehicle itself may not actually be available.

**(f) Whether Any Consumer Has Been or Will Be Preapproved or Guaranteed for Any Product, Service, or Term**

Proposed § 463.3(f) prohibited misrepresentations regarding whether a consumer has been or will be preapproved or guaranteed for any product, service, or term. Upon reviewing public comments, the Commission is finalizing paragraph (f)

of § 463.3 without modification from the Commission's original proposal.

One dealership association commenter recommended that compliance with a State law that prohibits certain misleading statements, such as "we finance anyone" and "no credit rejected" and similar statements, should function as a safe harbor against liability under this proposed paragraph.[204] Yet, while compliance with the State law cited may require dealers to refrain from using certain frequently misleading statements, as described by the commenter, that law does not generally prohibit all misrepresentations regarding material information about consumer preapprovals or guarantees; even if it did, there is no evidence that duplicative laws prohibiting misrepresentations harm consumers or competition, and no evidence of benefits to consumers or competition in allowing one such law to act as a safe harbor against another such law. Further, given that current law already prohibits deceptive conduct generally, dealers should be able to comply with the Commission's Rule, which provides further protections for consumers and law-abiding dealers. Thus, the Commission declines to adopt the recommended safe harbor.

Therefore, after careful consideration, the Commission is finalizing paragraph (f) of § 463.3. Misrepresentations regarding preapproval or guarantees for a product, service, or term—as with misrepresentations about availability and price, described previously—are likely to impact consumers' conduct with regard to motor vehicle sales, financing, or leasing transactions, including by inducing consumers to waste time pursuing illusory offers.

**(g) Any Information on or About a Consumer's Application for Financing**

Proposed § 463.3(g) prohibited dealers from misrepresenting any material information on or about a consumer's application for financing. After carefully reviewing public comments, the Commission is adopting paragraph (g) of § 463.3 without substantive modification. As with § 463.3(b), the only adopted modification is the deletion of the term "Material," which nonetheless applies to the operation of each of the misrepresentation paragraphs in § 463.3, including paragraph (g), through the addition of the term in the introductory paragraph of § 463.3.

---

[200] FTC Policy Statement on Deception, *supra* note 42, at 1 n.5 ("Advertising that lacks a reasonable basis is also deceptive.") (citing *Firestone Tire & Rubber Co.,* 81 F.T.C. 398, 451–52 (1972) (additional citations omitted)); *see Fed. Trade Comm'n* v. *US Sales Corp.,* 785 F. Supp. 737, 748 (N.D. Ill. 1992) ("Apart from challenging the truthfulness of an advertiser's representations, the FTC may challenge the representation as unsubstantiated if the advertiser lacked a reasonable basis for its claims."); *see also Fed. Trade Comm'n* v. *Am. Screening, LLC,* 4:20–CV–01021–RLW (E.D. Mo. July 14, 2022) (granting summary judgment for the FTC upon finding that American Screening's claim that its COVID–19 protective equipment was available and would ship quickly was false and lacked a reasonable basis); *Fed. Trade Comm'n* v. *John Beck Amazing Profits, LLC,* 865 F. Supp. 2d 1052 (C.D. Cal. 2012) (finding that the defendants' representations were unsubstantiated in violation of section 5, because Defendants conceded that during the time period in which their infomercial was aired they did not have evidence supporting their representations that consumers who purchased their product would be able to earn money easily and because survey results revealed that less than one percent of consumers actually generated any revenue or profits); *Fed. Trade Comm'n* v. *Elegant Sols., Inc.,* 8:19–cv–01333–JVS–KES (C.D. Cal., July 6, 2020) (finding that defendants made false or unsubstantiated representations, including representing that consumers would be enrolled in a repayment plan that may be forgiven after a specific number of years even though there were no Federal loan forgiveness programs with those repayment terms).

[201] Fed. Trade Comm'n, "FTC Policy Statement Regarding Advertising Substantiation," (appended to *In re Thompson Med. Co., Inc.,* 104 F.T.C. 648, 839 (1984)); *Fed. Trade Comm'n* v. *John Beck Amazing Profits, LLC,* 865 F. Supp. 2d 1052, 1067 (C.D. Cal. 2012).

[202] Fed. Trade Comm'n, "FTC Policy Statement Regarding Advertising Substantiation," (appended to *In re Thompson Med. Co., Inc.,* 104 F.T.C. 648, 839 (1984)); *see Fed. Trade Comm'n* v. *Am. Screening, LLC,* 4:20–CV–01021–RLW (E.D. Mo., July 14, 2022) (granting FTC's motion for summary

judgment and finding that Defendants' representations that it had protective equipment in stock and would ship it to consumers within seven to ten business days were material to consumers seeking such equipment during a global pandemic).

[203] This provision would not prohibit dealers from advertising a vehicle with limitations on availability in a truthful manner, such that any limitations are clear and conspicuous to the consumer. For example, dealers should not affirmatively represent that a vehicle is available on its lot without a reasonable basis that the vehicle is on the lot or without clearly and conspicuously noting that the vehicle will be made available after transfer from an affiliate's lot.

[204] Comment of Tex. Auto. Dealers Ass'n, Doc. No. FTC–2022–0046–8102 at 21; *see* 43 Tex. Admin. Code 215.247(2) (2023).

The Commission received a number of comments regarding this provision, including comments that expressed support for prohibiting misrepresentations about a consumer's application for financing.

A credit union commenter requested that, in addition to this proposal, the Commission consider implementing a requirement to clearly and conspicuously disclose any potential financing limitations prior to vehicle purchase negotiations, contending that such a measure would better enable consumers to choose a motor vehicle dealer and financing option that best serves their needs. To the extent a dealer misrepresents a consumer's financing options or limitations, including prior to or during the process of selling, leasing, or arranging financing for a vehicle, such conduct is prohibited by this provision, and depending on the circumstances, may also violate other provisions of the Rule. For example, as discussed in this paragraph-by-paragraph analysis, § 463.3(a) of the Final Rule prohibits misrepresentations regarding the cost or terms of financing a vehicle; this prohibition includes misrepresentations about available vehicle financing. Furthermore, this provision pertains to misrepresentations; comments pertaining to proposed disclosures regarding price, add-ons, and total of payments are examined in the Commission's discussion of § 463.4, wherein the Commission explains its determination not to finalize any additional disclosure requirements not included in its NPRM.

An individual commenter, while expressing support for regulation of such misrepresentations, also noted concern for the "grave consequences of falsifying information on a customer's application for financing," and urged the Commission to consult with other law enforcement agencies to further address such problems.[205] The Commission appreciates the concern and the seriousness of falsifying information on a consumer's application for financing, and coordinates regularly with other law enforcement agencies regarding areas of shared jurisdiction and responsibility, including motor vehicle sales and financing. The Commission will continue to monitor financing application falsification issues to determine whether any additional action, beyond § 463.3(g), is needed.

A number of dealership association commenters contended that the proposed language was vague and did not adequately explain the type of behavior this paragraph would prohibit. Relatedly, some dealership association commenters contended that this provision lacked specific guidance about what a motor vehicle dealer must or must not disclose. This provision, however, utilizes terms which are commonly used and understood, and which may be interpreted according to their plain meaning. Read together with the introductory paragraph of § 463.3, § 463.3(g) prohibits misrepresentation . . . regarding material information about "[a]ny information on . . . a consumer's application for financing." By its terms, this prohibition includes any misrepresentations of material information on a financing application. For example, dealers would make misrepresentations in violation of this provision by including, on a consumer's application that is submitted to a third-party financing institution, consumer income information that is different from what the consumers have stated to the dealer that the consumers actually earn, or by representing a different down payment amount than the amount the consumer has actually provided, or by misrepresenting that the vehicle is being sold or leased with certain add-on products.[206] Moreover, as described in detail with regard to other paragraphs of § 463.3, this provision does not require any particular affirmative disclosures, instead obligating dealers to refrain from certain misrepresentations.

One dealership association commenter questioned whether a dealer would be held responsible for a customer's false statement about his or her income. If a consumer falsely states they have a higher income, that consumer would not be misled into thinking he has a higher income. If, however, a consumer's application falsely states a higher income because a dealer has altered the information, that consumer would be misled into thinking that the application they are signing accurately reflects the information the consumer provided, and § 463.3(g) would be violated. Additionally, if a dealer advises a consumer to include other sources of payment as income or advises the consumer to list a higher income in other ways, such conduct may mislead the consumer into thinking that it is proper to calculate income for auto retail installment contracts in a particular way, and there may be a violation of § 463.3(g).

After careful review and consideration of the comments, the Commission adopts paragraph (g) of § 463.3 without substantive modification, prohibiting misrepresentations regarding material information about any information on or about a consumer's application for financing. It is likely to affect a consumer's choices if the consumer knows a dealer is misrepresenting the consumer's income, or other aspects of financing applications. If, for example, a consumer knew the truth—that the dealer is inflating the consumer's income such that the consumer would not otherwise obtain financing for a particular vehicle—the consumer might opt to finance a less expensive car, rather than risking repossession. Material misrepresentations on consumers' financing paperwork are also likely to cause consumers substantial injury, including by causing them to take on debt beyond that which the financing company would have approved, and increasing the risk of repossession and harmful consequences to consumers' credit. Consumers cannot avoid the injury from dealers misrepresenting the information consumers provide them, and this practice provides no countervailing benefits to consumers or competition.

(h) When the Transaction Is Final or Binding on All Parties

(i) Keeping Cash Down Payments or Trade-In Vehicles, Charging Fees, or Initiating Legal Process or Any Action If a Transaction Is Not Finalized or If the Consumer Does Not Wish To Engage in a Transaction

Proposed § 463.3(h) prohibited dealers from misrepresenting when the transaction is final or binding on all parties. Proposed § 463.3(i) prohibited dealers from making misrepresentations about keeping cash down payments or trade-in vehicles, charging fees, or initiating legal process or any action if a transaction is not finalized or if the consumer does not wish to engage in a transaction. After careful review and consideration of the comments, the Commission is finalizing paragraphs (h) and (i) of § 463.3 with the minor modification of capitalizing the defined term "Vehicles" in § 463.3(i) to conform with the revised definition at § 463.2(e).

Some commenters, including a group of State attorneys general and consumer

---

[205] Individual commenter, Doc. No. FTC–2022–0046–7445 at 12.

[206] *See* Complaint ¶¶ 18–36, *Fed. Trade Comm'n* v. *Tate's Auto Ctr. of Winslow, Inc.,* No. 3:18–cv–08176–DJH (D. Ariz. July 31, 2018); Consumer Fin. Prot. Bureau, "Supervisory Highlights: Issue 30, Summer 2023" 5 (July 2023), *https://files.consumerfinance.gov/f/documents/cfpb_supervisory-highlights_issue-30_2023-07.pdf* (finding that dealers "fraudulently included" in financing documents add-ons, such as undercoating, that were not actually present on the vehicle, creating "improperly inflated loan amounts" that caused consumers to pay improper additional interest).

advocacy organizations, generally supported prohibiting misrepresentations about when the transaction is final or binding on all parties but urged the Commission to include additional requirements or prohibitions. For instance, several commenters, including consumer advocacy organizations and individual commenters, requested that the Commission add to its Final Rule a provision requiring dealers to include, in every consumer credit contract, a finality clause stating that the transaction is final as soon as the consumer credit contract is signed, or alternatively, a provision requiring dealers to include in retail installment contracts a clause prohibiting financing-contingent sales. Commenters including a group of State attorneys general recommended that the Commission require any dealer that does not ultimately secure financing under previously presented terms to unwind the transaction, return any down payment in full, and return any traded-in vehicle. Such commenters also recommended that the Commission implement restrictions, such as requiring dealers to be reasonably certain that a consumer will qualify for quoted financing terms; requiring a written disclosure that the consumer must sign advising the consumer that financing is not final; or setting a short deadline by which the dealer must either arrange financing or cancel the transaction. Other commenters, including a State consumer protection agency, also supported requiring the contractual contingency to be disclosed conspicuously and limiting the contingency to a short period of time. A number of these commenters, including consumer advocacy organizations, provided examples of how spot delivery transactions can harm consumers.

The provision's prohibitions and requirements address many of these commenters' concerns regarding spot delivery and yo-yo financing. Spot delivery and yo-yo financing refer to situations where a dealer delivers a vehicle to a consumer on the spot before the financing or leasing has been finalized, leads a consumer to believe that the transaction is final, and then later directs the consumer to return the vehicle and engages in certain tactics, such as failing to return the consumer's trade-in vehicle while refusing to honor the finance or lease transaction, or pressuring the consumer to enter into a new transaction.[207] Paragraphs (h) and

(i) of § 463.3 prohibit misrepresentations regarding the finality of the transaction and return of down payments and trade-in vehicles. Under these provisions, if a consumer is under the impression that the transaction is final, and the dealer subsequently causes the consumer to return the vehicle to the lot because the transaction was not final, or the dealer takes or threatens to take possession of the vehicle but refuses to return the down payment or trade-in vehicle, the dealer has violated either § 463.3(h), by misrepresenting the finality of the transaction, or § 463.3(i), by falsely representing, expressly or by implication, that the dealer has a legal basis to keep the down payment or trade-in vehicle in the event the transaction is not finalized, or both.[208]

Regarding the recommendation to include a requirement that dealers be reasonably certain that consumers will

qualify for quoted financing terms, the Rule the Commission is finalizing already contains several provisions in addition to § 463.3(h) and (i) that address this conduct. For example, the Rule prohibits misrepresentations about material information about the costs or terms of financing (§ 463.3(a)), or about whether any consumer has been or will be preapproved or guaranteed for any product, service, or term (§ 463.3(f)). As explained in the paragraph-by-paragraph analysis of § 463.3(e) in SBP III.C.2(e), existing law requires dealers to have a reasonable basis for their claims. Objective claims about products or services represent, explicitly or by implication, that an advertiser has a reasonable basis to support those claims.[209] Thus, to avoid misrepresentation, dealers must reasonably believe that consumers will qualify for quoted financing terms, or that the transaction will be finalized on the terms presented, in order to represent such terms to consumers.

Regarding additional provisions that would require certain contractual measures, such as finality clauses or prohibitions against financing-contingent sales, the Commission is concerned that requiring specific contract provisions would obligate dealers that are not engaged in spot delivery to change their contracts even though their customers do not experience harm stemming from spot delivery practices. Before requiring any such changes, the Commission has determined to continue to monitor the market to evaluate whether additional steps are warranted.[210]

Some commenters, including dealership associations, requested that the Commission clarify how dealers could document compliance with these proposed provisions, such as how dealers could establish that appropriate disclosures had been made. One such commenter, for instance, asked whether written agreements required by State law were sufficient to satisfy the requirements of these provisions. As noted elsewhere in this paragraph-by-paragraph analysis of § 463.3 in SBP III.C.2, these provisions do not require any particular affirmative disclosures, instead obligating dealers to refrain from

---

[207] Complaint ¶¶ 67–72, *Fed. Trade Comm'n v. Universal City Nissan, Inc.,* No. 2:16–cv–07329 (C.D. Cal. Sept. 29, 2016); *State ex rel. Dewine v.*

*Dads Car Lot Inc.,* No. 13–cv–4036, 2014 BL 468717, at * 1 (Ohio Com. Pl. June 6, 2014) (finding defendant violated State consumer sales practices act by including "spot delivery" document that allowed defendant to keep "all funds on deposit"); Att'y Gen. of 31 States & DC, Comment Letter on Public Roundtables: Protecting Consumers in the Sale and Leasing of Motor Vehicles, Project No. P104811, Submission No. 558507–00112 at 4 (Apr. 13, 2012), *https://www.ftc.gov/sites/default/files/documents/public_comments/public-roundtables-protecting-consumers-sale-and-leasing-motor-vehicles-project-no.p104811-00112/00112-82927.pdf* (recommending, among other rules aimed at deterring yo-yo sales, FTC adopt rules that would require dealers to disclose the consumer's "right to walk away" if financing is rejected and, in the context of spot delivery, to disclose financing has not been finalized as well as the responsibilities and potential consequences for consumers); Legal Aid Just. Ctr., Comment Letter on Public Roundtables: Protecting Consumers in the Sale and Leasing of Motor Vehicles, Project No. P104811, Submission No. 558507–00066 at 26, 29 (Jan. 30, 2012), *https://downloads.regulations.gov/FTC-2022-0036-0062/attachment_2.pdf* (explaining that in a yo-yo sale the dealer misrepresents to the consumer that credit has been finalized, when in fact the dealer treats the sale as contingent, retaining the ability to call off or seize the vehicle later; a "yo-yo case can result in substantial distress to the person who has been tricked"; and "[t]he harm to the marketplace occurs when the consumer believes a credit sale has been completed and stops shopping for a car on credit"); Nat'l Consumer L. Ctr., "In Harm's Way—At Home: Consumer Scams and the Direct Targeting of America's Military and Veterans" 41 (May 2003), *https://filearchive.nclc.org/special_projects/military/report-scams-facing-military.pdf* (listing "Spot Delivery" or "yo-yo sales" among scams commonly aimed at military members).

[208] *See Orkin Exterminating Co., Inc.,* 108 F.T.C. 263 (1986), *aff'd sub nom. Orkin Exterminating Co. v. F.T.C.,* 849 F.2d 1354 (11th Cir. 1988) (finding that defendant's practice of unilaterally raising consumers' annual renewal fees where the consumers' contracts contained a "lifetime guarantee" as to the amount of the fee was unfair under section 5 of the FTC Act); *see also* First Amended Complaint ¶¶ 59–61, *Fed. Trade Comm'n v. BF Labs, Inc.,* No. 4:14–cv–00815 (W.D. Mo. May 14, 2015) (alleging as unfair defendants' practice of unilaterally failing to provide paid-for services while refusing to refund consumers' upfront payments).

[209] Fed. Trade Comm'n, "FTC Policy Statement Regarding Advertising Substantiation," (appended to *In re Thompson Med. Co., Inc.,* 104 F.T.C. 648, 839 (1984)); *Fed. Trade Comm'n v. John Beck Amazing Profits, LLC,* 865 F. Supp. 2d 1052, 1067 (C.D. Cal. 2012).

[210] On May 31, 2023, the Commission received a petition for rulemaking under 16 CFR 1.31 regarding yo-yo financing. Petition for Rulemaking Concerning the Finality of a Car Purchase (Yo-Yo Financing), Doc. No. FTC–2023–0035–0002. The Commission will address this petition separately.

certain misrepresentations. Section 463.6 discusses records dealers need to keep to demonstrate compliance with the requirements of the Final Rule, and enumerates five such categories of records, including copies of finance and lease documents signed by the consumer, whether or not final approval is received for a financing or lease transaction. The Commission declines to include in this Final Rule additional requirements regarding any specific documents dealers must keep in order to demonstrate compliance with § 463.3(h) or (i).

One individual commenter requested that the Commission include in the CFR the examples of harmful conduct related to yo-yo financing that it published in the NPRM.[211] The Commission has determined that each such example describes conduct that violates this rulemaking. Rather than adding them to the text of the Final Rule, the Commission repeats those examples in this paragraph-by-paragraph analysis of § 463.3(h) and (i), in order to avoid voluminous modifications to the Rule text itself.

Commenters including a dealership association asserted that the issue of when a contract is final or binding is one of State law, and thus it is within the purview of each State to determine when a contract is final or binding, arguing that § 463.3(h) therefore should be removed from the Final Rule. Another such commenter contended that even courts experienced in contract interpretation have difficulty determining when an agreement is final, and that dealers therefore are likely to transgress this prohibition in proposed § 463.5(h) accidentally. This provision, however, requires that a dealer's express or implied representations regarding material information be truthful, which is consistent with current law and with the Commission's authority to prohibit unfair or deceptive acts or practices. Moreover, under § 463.9, this Rule does not affect State law pertaining to contracts so long as State law is not inconsistent with part 463, and in the event of an inconsistency, the Rule only affects such State law to the extent of the inconsistency.[212] In the case of

§ 463.3(h), for example, an inconsistency would include State law allowing material misrepresentations regarding whether transactions are final; the Commission is unaware of any such law. Further, to the extent dealers are concerned they may transgress this prohibition because courts have had difficulty interpreting their contracts, then, as they should be doing under current law prohibiting misrepresentations, dealers should carefully consider the net impression they are conveying with the language they use, both in their contracts and in the context in which these contracts are presented, as such language may confuse consumers as well.

Several dealership association commenters claimed that State law already prohibits misrepresentations about spot delivery transactions or otherwise protects consumers in such transactions. One such commenter asserted that Massachusetts law prohibits spot deliveries, and cautioned the FTC not to create uncertainty with its Rule such that one might think spot deliveries are allowed in Massachusetts. Another such commenter asked whether this provision applies in addition to State law or instead of it. Other commenters, including consumer advocacy organizations, asserted that less than half of the States have statutes, regulations, or administrative pronouncements about yo-yo transactions; that there are significant variations in such law from State to State; and that State regulation often does not provide sufficient protections for consumers. As described throughout the paragraph-by-paragraph analysis of § 463.3 in SBP III.C.2, State law may provide more or less specific requirements than those under the Final Rule as long as those requirements are not inconsistent with part 463, and in the event of an inconsistency, the Rule only affects such State law to the extent of the inconsistency. As for any States that prohibit spot delivery, such prohibitions are consistent with the provisions of this Rule. Finally, as to whether additional provisions are warranted to protect consumers, the Commission will continue to monitor the market to make this determination.

Commenters including an industry association contended that the Commission should not take action to disrupt spot delivery transactions to consumers, stating that there may be reasons to keep down payments even when consumers are not permitted to keep the vehicle, or claiming that

although abusive spot deliveries have occurred, they are not a systemic problem in the marketplace. The Commission, however, need not show that abusive spot deliveries are systemic in order to finalize these provisions barring misrepresentations.[213] Further, these misrepresentation prohibitions do not alter requirements under current law prohibiting dealers from making express or implied misrepresentations.

After careful consideration of the recommendations and record, the Commission has determined to finalize paragraphs (h) and (i) of § 463.3 largely as proposed, with the minor modification of capitalizing the defined term "Vehicles" in § 463.3(i). The Commission notes, however, that it has significant concerns about consumer harm due to yo-yo financing and will continue to examine these issues even as it finalizes these prohibitions against certain misrepresentations. Misrepresentations about when the transaction is final or binding on all parties, as well as about keeping down payments or trade-in vehicles, charging fees, or initiating legal process or any action, are likely to affect consumer conduct, including regarding whether to enter into a new transaction with less beneficial terms for the consumer, and are likely to mislead consumers.

**(i) Keeping Cash Down Payments or Trade-In Vehicles, Charging Fees, or Initiating Legal Process or Any Action If a Transaction Is Not Finalized or If the Consumer Does Not Wish To Engage in a Transaction**

Proposed § 463.3(i) is discussed with § 463.3(h).

**(j) Whether or When a Dealer Will Pay Off Some or All of the Financing or Lease on a Consumer's Trade-in Vehicle**

Proposed § 463.3(j) prohibited misrepresentations regarding whether or when a motor vehicle dealer will pay off some or all of the financing or lease on a consumer's trade-in vehicle. The Commission is finalizing paragraph (j) of § 463.3 largely as proposed, with minor modifications—substituting "Dealer" for "Motor Vehicle Dealer" and capitalizing "Vehicle"—to conform with the revised definitions of " 'Covered Motor Vehicle' or 'Vehicle' " and " 'Covered Motor Vehicle Dealer' or 'Dealer' " at § 463.2(e) and (f).

The Commission received several comments in response to this paragraph, including from individual commenters who expressed support for prohibiting dealers from misrepresenting whether they would pay off outstanding balances

---

[211] See NPRM at 42020–21. Individual commenter, Doc. No. FTC–2022–0046–9469 at 5–6.

[212] One commenter questioned whether this section would prohibit a dealer from retaining a down payment on a special order vehicle where the customer refuses to take delivery of the vehicle. Comment of Minn. Auto. Dealers Ass'n, Doc. No. FTC–2022–0046–8670 at 10. Sections 463.3(h) and (i) prevent misrepresentations, including misrepresenting that a dealer can keep a down payment when a dealer does not have a legal basis to do so. If the dealer does not make a

misrepresentation, this provision would not be violated.

[213] See SBP I.A, n.3.

remaining on a trade-in vehicle.[214] Other commenters, including an industry association and dealership associations, requested that the Commission limit dealer responsibility under this provision for unanticipated delays stemming from circumstances beyond a dealer's reasonable control, arguing that proposed § 463.3(j) made no exception for unanticipated delays such as a previous financing source declining to accept a payoff or refusing to release the vehicle title after receiving a payoff.[215] The Commission notes that, as is the case under current law, under this provision, dealers are not permitted to make claims about whether or when they will pay off some or all of the financing or lease on a consumer's trade-in vehicle if the truth of those claims depends on circumstances outside their control and the dealer does not possess a reasonable basis for such claims.[216]

An individual commenter contended that requiring additional disclosures about this provision would confuse the consumer.[217] This provision, however, does not necessitate any affirmative disclosures from dealers. Instead, it prohibits dealers from misleading consumers about whether or when they will pay off some or all of the financing or lease on a consumer's trade-in vehicle.

One State consumer protection agency commenter requested that the Commission require, in situations where a buyer's credit information or trade-in vehicle are evidently insufficient to support a deal, that the dealer require additional down payment or other security, or affirmatively disclose that the dealer is not responsible for paying off liens.[218] Without further information

on the costs and benefits of such a proposal, the Commission declines to add such requirements to this Final Rule. The Commission notes, however, that the Rule prohibits dealers from misleading consumers regarding when trade-in vehicles have negative equity and from otherwise failing to obtain the consumer's express, informed consent prior to charging the consumer for any item, including any amounts associated with trading in a vehicle. The Commission will continue to monitor this area to determine whether any such additional measures are warranted to protect consumers or competition.

The Commission also received a number of comments from dealership associations arguing that existing State and Federal laws address dealers' obligations in connection with informing consumers how much each consumer is responsible for financing. The Commission notes that commenters presented no actual conflicts between this provision and other laws, and to the extent duplicative laws prohibit misrepresentations in this area, the Commission has not observed harmful consequences to consumers or competition. Further, as noted elsewhere in the section-by-section analysis, State laws may provide more or less specific requirements as long as those requirements are not inconsistent with part 463, under § 463.9, and in the event of an inconsistency, the Rule only affects such State law to the extent of the inconsistency.

After carefully considering the comments, the Commission is finalizing this provision with the two minor modifications to conform with the defined terms " 'Covered Motor Vehicle' or 'Vehicle' " and " 'Covered Motor Vehicle Dealer' or 'Dealer.' " This provision prohibits dealers from making misrepresentations about paying off the financing or lease on a trade-in vehicle. Such conduct includes misrepresenting to consumers who trade in a vehicle that the dealer will pay off any outstanding balance owed on the trade-in vehicle when the consumer purchases a vehicle from the dealer. For example, when such a dealer takes a trade-in, if the dealer remits payment to the entity to whom the trade-in payment is owed, as consumers would expect, but also adds this payment to the amount the consumer owes on the vehicle the consumer is purchasing from the dealer, the consumer is the party that has ultimately paid off the trade-in amount, contrary to the impression made by the dealer. This provision also prohibits dealers that are going out of business from representing expressly or by implication that they will pay off liens

if they do not, in fact, pay off the liens, or do not pay them off in a timely manner. Such misrepresentations are likely to affect a consumer's choice to visit a particular dealership or select a particular vehicle.

**(k) Whether Consumer Reviews or Ratings Are Unbiased, Independent, or Ordinary Consumer Reviews or Ratings of the Dealer or the Dealer's Products or Services**

Proposed § 463.3(k) prohibited misrepresentations about whether "consumer reviews or ratings are unbiased, independent, or ordinary consumer reviews or ratings of the Dealer or its products or services." Upon careful review and consideration of the comments, the Commission is finalizing paragraph (k) of § 463.3 with one technical clarification to replace "its" with "the Dealer's." The Rule's requirements apply to all individuals and entities that meet the definition of "Dealer."

An individual commenter recommended that the Commission modify this provision to include language explicitly prohibiting dealers from creating, editorializing, modifying, or removing consumer reviews.[219] Here, the Commission notes that if such acts or practices would result in reviews that are not independent or do not otherwise reflect ordinary consumer experience, they already would violate this provision. For example, if a dealer created a positive review, edited or modified negative reviews to make them sound positive, or removed negative reviews while keeping positive reviews, such practices would violate this provision.

A few individual commenters recommended that the Rule include additional provisions related to consumer reviews, including a requirement for the creation of an online database for consumer reviews and complaints about dealerships, and a requirement for dealers to post consumer reviews online and in the dealership location. The Commission notes that while some reviews are available online, additional information could assist consumers, and the Commission will consider whether such

---

[214] *See, e.g.*, Individual commenter, Doc. No. FTC–2022–0046–3770 ("I agree that these changes need to take place. No one should have to pay what was owed on a trade in after the dealership said they would pay off the trade in . . . .").

[215] For example, commenters stated that occasionally the previous finance or lease source will not provide a timely payoff for a traded vehicle or will refuse to accept a payoff claiming more money is due; or a previous finance or lease source may accept a payoff, but will refuse to credit its former customer's account and release the title promptly. In addition, an industry association commenter requested that the Commission narrow this prohibition to specifically address the fact patterns giving rise to it that the Commission sets forth in the NPRM, and, in so doing recognize that it is in a dealer's business interest to pay off the existing loan quickly so that the vehicle can be more easily and quickly retailed.

[216] *See* paragraph-by-paragraph analysis of § 463.3(e) in SBP III.C.2(e) (discussing deception and reasonable basis).

[217] *See* Individual commenter, Doc. No. FTC–2022–0046–7905 at 1.

[218] *See* Comment of State of S.C. Dep't of Consumer Affs., Doc. No. FTC–2022–0046–7891 at 6.

[219] Individual commenter, Doc. No. FTC–2022–0046–2364 ("Many favorable ([i.e.] 5 star) Dealer reviews I have read appear suspect with generic, similar wording (or no wording at all) seemingly provided to offset lower Dealer ([i.e.] 1 star) ratings. I recommend that for [§ 463.3(k)] the following (or similar) be appended: Additionally, consumer reviews may not be created, editorialized, modified or removed by any Dealer or third party acting at the direction of any Dealer. Consumer reviews should be modifiable or removable by the originating author.").

measures are needed as it continues to monitor the marketplace, including after the Rule goes into effect.

Several dealership associations asked what type or format of reviews or ratings would be covered by this proposed provision. As proposed, § 463.3(k) applied to all reviews or ratings, in any format or wherever displayed, that are likely to mislead consumers as to whether such reviews or ratings are unbiased, independent, or ordinary consumer reviews or ratings. Relatedly, industry and dealership associations contended that the language used in the proposed provision was vague and confusing, and requested that the Commission further define the phrase, "unbiased, independent, or ordinary consumer reviews or ratings." To begin, the operative terms in this phrase are commonly used and understood and may be interpreted according to their plain meaning without further definition. Moreover, the Commission has, for decades, provided information and guidance on avoiding deception through the use of endorsements, testimonials, and online reviews.[220] Enforcement actions by the Commission have documented examples of the types of misrepresentations that would be covered by this provision.[221] For example, dealerships and their employees have posted positive, five-star online reviews that falsely purport to be objective or independent.[222] As these sources make clear, a person who is unbiased, independent, and an ordinary consumer would be someone who was not paid or given something of value to write a review and who has no

employment or familial relationship or other unexpected material connection to the dealership.[223]

An industry association commenter expressed concern that this proposed provision did not appear to be limited to misrepresentations that may occur when a dealership, and not an unrelated third party, affirmatively publishes consumer reviews. To the extent an independent third party that does not have a material connection with the dealership makes any such claims, those claims would not be covered by this provision. This provision concerns situations where there is such a relationship between the third party and the dealer. For example, if a dealer were to pay a third party or consumer to post positive reviews that misrepresent their status as unbiased, independent, or ordinary consumer reviews, the dealer would be violating this provision.[224]

One industry association commenter contended that the Consumer Review Fairness Act[225] already prohibits the conduct covered by this provision. The Consumer Review Fairness Act makes it illegal for businesses to have form contracts that disallow or restrict consumers from posting negative reviews. Section 463.3(k) prohibits misrepresentations regarding the authenticity of consumer reviews generally. These provisions are not in conflict, and as discussed in SBP III.C.1, to the extent the Commission creates any duplication, the Commission has seen no harm to consumers or competition from duplicative prohibitions of deceptive conduct.

Whether reviews or ratings about a seller or the seller's products or services are from unbiased, independent, or ordinary consumers is material to consumers' decision-making because a consumer is more likely to interact with a particular dealership if the dealership

has positive reviews or ratings from unbiased, independent, or ordinary consumers. Thus, after careful review of all the comments, the Commission is finalizing paragraph (k) of § 463.3 without substantive modification from the Commission's original proposal.

(l) Whether the Dealer or Any of the Dealer's Personnel or Products or Services Is or Was Affiliated With, Endorsed or Approved by, or Otherwise Associated With the United States Government or Any Federal, State, or Local Government Agency, Unit, or Department, Including the United States Department of Defense or Its Military Departments

Proposed § 463.3(l) prohibited misrepresentations that "the Dealer or any of its personnel or products or services is or was affiliated with, endorsed or approved by, or otherwise associated with the United States government or any Federal, State, or local government agency, unit, or department, including the United States Department of Defense or its Military Departments." Upon careful review and consideration of the comments, the Commission is finalizing paragraph (l) of § 463.3 with one technical clarification to replace "its" with "the Dealer's." The Rule's requirements apply to all individuals and entities that meet the definition of "Dealer."

One individual commenter recommended that the Commission additionally prohibit dealers from "causing any person to impersonate a police officer for any purpose."[226] The commenter contended that such a prohibition would address a common yo-yo financing tactic, wherein dealers exert pressure on consumers to return vehicles by calling the consumers on the phone, falsely claiming to be police officers, and falsely representing that there is a warrant for the consumers' arrest or that the dealer has reported the consumers' vehicles as stolen. The Commission is likewise concerned about such conduct, and notes that it would be covered by the language in this paragraph, which applies broadly to misrepresentations of affiliation with, endorsement or approval by, or association with "any Federal, State, or local government agency, unit, or department," including State or local police officials.[227] By misrepresenting

---

[220] *See, e.g.,* Fed. Trade Comm'n, Notice of Proposed Rulemaking, Trade Regulation Rule on the Use of Consumer Reviews and Testimonials, 88 FR 49364 (July 31, 2023) (to be codified at 16 CFR 465), *https://www.govinfo.gov/content/pkg/FR-2023-07-31/pdf/2023-15581.pdf;* Fed. Trade Comm'n, Guides Concerning Use of Endorsements and Testimonials in Advertising, 16 CFR 255; Fed. Trade Comm'n, "FTC's Endorsement Guides: What People are Asking," *https://www.ftc.gov/business-guidance/resources/ftcs-endorsement-guides-what-people-are-asking;* Fed. Trade Comm'n, "Soliciting and Paying for Online Reviews: A Guide for Marketers," *https://www.ftc.gov/business-guidance/resources/soliciting-paying-online-reviews-guide-marketers;* Fed. Trade Comm'n, "Disclosures 101 for Social Media Influencers," *https://www.ftc.gov/business-guidance/resources/disclosures-101-social-media-influencers.*

[221] *See* Complaint ¶¶ 73–78, *Fed. Trade Comm'n v. Universal City Nissan, Inc.,* No. 2:16-cv-07329 (C.D. Cal. Sept. 29, 2016); *see also* Fed. Trade Comm'n, Notice of Proposed Rulemaking, Trade Regulation Rule on the Use of Consumer Reviews and Testimonials, 88 FR 49364, 49371–75 (July 31, 2023) (to be codified at 16 CFR 465), *https://www.govinfo.gov/content/pkg/FR-2023-07-31/pdf/2023-15581.pdf* (discussing such enforcement actions).

[222] *See* Complaint ¶¶ 73–78, *Fed. Trade Comm'n v. Universal City Nissan, Inc.,* No. 2:16-cv-07329 (C.D. Cal. Sept. 29, 2016).

[223] One consumer conducted a study of Google reviews of U.S. car dealerships from April 2008 to September 2022. The commenter found by examining a 2% sample of these reviews that consumers gave on average 4.47 stars out of 5 stars and made several other conclusions about consumer satisfaction with the auto transaction experience based on that methodology. Comment of Inst. for Regul. Analysis & Engagement, Doc. No. FTC–2022–0046–10164 at 2–5. The Commission notes that, consistent with its enforcement experience, there is no guarantee that those reviews are a genuine reflection of consumer experience. Moreover, the Commission notes that oftentimes consumers do not realize that they have been charged without their authorization. *See* SBP II.B. Thus, such a study that relies on Google star ratings is not conclusive of consumer experience.

[224] *See* § 463.1 ("It is an unfair or deceptive act or practice within the meaning of section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. 45(a)(1)) to violate any applicable provision of this part, directly or indirectly . . . .").

[225] *See* 15 U.S.C. 45b.

[226] Individual commenter, Doc. No. FTC–2022–0046–7445 at 17.

[227] The Commission discussed government impersonation scams in its Notice of Proposed Rulemaking for a Trade Regulation Rule on Impersonation of Government and Business. *See* 87 FR 62741 (Oct. 17, 2022). The Commission observed, *inter alia,* "ongoing widespread fraud

police involvement in potential vehicle repossession, such conduct would also violate paragraph (o) of § 463.3 of the Final Rule.

A number of dealership association commenters contended that some States address this type of deception.[228] As noted in response to similar commenter contentions regarding other proposed provisions, the Commission has seen no harm to consumers or competition from duplicative misrepresentation prohibitions, and overlap between the Commission's Rule provisions and existing law is indicative of dealers' ability to comply with these provisions. Moreover, including such a provision in the Final Rule additionally benefits consumers who encounter such conduct, and aids law-abiding dealers that otherwise lose business to competitors that act unlawfully. Further, § 463.9 discusses part 463's relation to State laws.

A dealership association commenter claimed that many dealerships in the commenter's State work with military personnel to promote charitable causes, and questioned whether a banner listing a dealership at a charitable military event would be considered a misrepresentation that the dealership is "associated" with the military.[229] Here, the Commission notes that a banner that conveys true participation in a charitable military event, and does not deceptively represent an affiliation with, endorsement or approval by, or association with the military, would not violate this provision. The Commission's law enforcement practice provides further guidance on this point: the Commission's many enforcement actions alleging misrepresentation of government affiliation provide examples of the types of conduct that would violate this provision.[230]

Representations about whether a seller or any of its personnel, products, or services is or was affiliated with, endorsed or approved by, or otherwise associated with the government are likely to affect consumers' conduct. Consumers are more likely to visit a dealership and select a vehicle or product if they believe that a specific dealer or a dealer's personnel, products, or services have been approved by a government entity. The Commission thus adopts paragraph (*l*) of § 463.3 without substantive modification from the Commission's original proposal.

(m) Whether Consumers Have Won a Prize or Sweepstakes

Proposed § 463.3(m) prohibited misrepresentations about whether consumers have won a prize or sweepstakes. Upon careful review and consideration of the comments, the Commission is finalizing paragraph (m) of § 463.3 without modification from its original proposal.

Comments from dealership associations contended that some States or municipalities address this type of deception. As discussed in SBP III.C.1, the Commission has not seen harm to consumers or competition from multiple prohibitions against misrepresentations. Furthermore, any significant overlap between the Commission's Rule provisions and existing law is indicative of dealers' ability to comply with these provisions. Finally, § 463.9 discusses part 463's relation to State laws.

Misrepresentations about whether consumers have won a prize or sweepstakes harm consumers by inducing consumers to choose and transact with a particular dealership under false pretenses. Thus, the Commission adopts paragraph (m) of § 463.3 without modification from the Commission's original proposal.

(n) Whether, or Under What Circumstances, a Vehicle May Be Moved, Including Across State Lines or Out of the Country

Proposed § 463.3(n) prohibited misrepresentations regarding whether, or under what circumstances, a vehicle may be moved, including across State lines or out of the country. Upon careful review and consideration of the comments, the Commission is finalizing paragraph (n) of § 463.3 largely as proposed, with the minor modification of capitalizing the word "State," as well as the defined term "Vehicle" to conform with the revised definition at § 463.2(e).

The Commission received comments including from dealership associations arguing that proposed § 463.3(n) would pose issues for dealers who must comply with limitations imposed by manufacturers or distributors on the export of new motor vehicles. These commenters requested clarification about liability under this provision in the event dealers communicate any such export limitations to consumers or take other steps to prevent the export of new vehicles. Section 463.3(n), however, does not prohibit dealers from accurately and non-deceptively communicating whether, or under what circumstances, a vehicle may be moved—it instead prohibits representations that mislead consumers about this information.

Commenters including a dealership association objected to this proposed provision by asserting that a State or insurance company may prescribe, and the parties to a contract may agree upon, whether a leased or purchased vehicle may be driven to a particular area. This provision, however, does not prevent parties from discussing and agreeing to whether a vehicle may be moved. Instead, § 463.3(n) prohibits misrepresentations about whether, or under what circumstances, a vehicle may be moved, including regarding any liens or other restrictions that would prevent or hinder consumers' ability to move the vehicle beyond certain boundaries. Furthermore, interaction with State laws is explained in the section-by-section analysis of § 463.9.

Representations about whether, and under what circumstances, a consumer may move a vehicle are material as they are likely to affect a reasonable consumer's decision to purchase a vehicle, including decisions of military consumers who may frequently need to move.[231]

---

schemes in which scammers impersonate law enforcement or government officials in attempts to extort money or steal personally identifiable information." *See id.* at 62742 (citing announcements on March 7, 2022, and May 20, 2022, by the Federal Bureau of Investigation and the Social Security Administration's Office of the Inspector General, in coordination with other Federal law enforcement agencies, respectively).

[228] One commenter further opined that "the Department of Defense has itself dealt with this situation in the case of military lending and sales." Comment of Kan. Auto. Dealers Ass'n, Doc. No. FTC–2022–0046–4510 at 7.

[229] Comment of N.C. Auto. Dealers Ass'n, Doc. No. FTC–2022–0046–11223 at 9.

[230] *See, e.g.,* Complaint ¶¶ 5–6, 9–11, 14, *Traffic Jam Events, LLC,* No. 9395 (F.T.C. Aug. 7, 2020) (alleging auto marketer misrepresented that it provided COVID–19 stimulus relief to consumers); Complaint ¶¶ 14–26, *Fed. Trade Comm'n* v. *Ponte Invs., LLC,* No. 1:20–cv–00177 (D.R.I. Apr. 17, 2020) (alleging misrepresentation of government affiliation by company that impersonated the U.S. Small Business Administration with business

names "SBA Loan Program" and "SBA Loan Program.com" and claimed to help businesses obtain access to coronavirus relief programs administered by the agency); Complaint ¶¶ 24–36, *Fed. Trade Comm'n* v. *DOTAuthority.com, Inc.,* No. 0:16–cv–62186 (S.D. Fla. Sept. 13, 2016) (alleging defendants misrepresented affiliation with U.S. Department of Transportation by claiming to be the "Compliance Unit" of "DOTAuthority" and providing a telephone number with a Washington, DC area code).

[231] *See, e.g.,* Fed. Trade Comm'n, "The Road Ahead: Selling, Financing, & Leasing Motor Vehicles," Public Roundtable, Panel 1: Military Consumers and the Auto Sales and Financing Process, Remarks by Hollister K. "Holly" Petraeus, Dir., Off. of Servicemember Affs., CFPB, Tr. at 11 (Aug. 2, 2011), *https://www.ftc.gov/system/files/documents/public_events/52654/080211_ftc_sess1.pdf* ("[S]ervicemembers don't always realize if they buy and finance a car here in the U.S., they can't take it out of the country unless they have a letter of permission from the lienholder to do so. And some of the lienholders won't give that permission. . . . [W]e [heard from] a JAG in Germany saying, 'I see a number of people who end
Continued

Based on a review of the comments and for the reasons previously discussed, the Commission is finalizing paragraph (n) of § 463.3 largely as proposed, with the minor modification of capitalizing "State" and the defined term "Vehicle."

## (o) Whether, or Under What Circumstances, a Vehicle May Be Repossessed

Proposed § 463.3(o) prohibited misrepresentations regarding whether, or under what circumstances, a vehicle may be repossessed. After careful review and consideration of the comments, the Commission is finalizing paragraph (o) of § 463.3 with the minor modification of capitalizing the defined term "Vehicle" to conform with the revised definition at § 463.2(e).

A number of commenters, including consumer advocacy organizations and a group of State attorneys general, expressed concern about electronic disablement of vehicles, including through the use of starter interrupt devices, which are sometimes utilized for vehicle repossession. Many of these commenters expressed concern about the potential for harm to consumers if such devices are activated without regard to the location or operational state of the vehicle, and recommended that the Commission restrict their use. Alternatively, one such commenter recommended that the Commission add a provision to part 463 that would require dealers to disclose any such technology, obtain the consumer's express, informed consent to its use, and limit its use to one time, not to exceed 30 days, once a consumer is in default. Finally, the comment from a group of State attorneys general recommended that the Commission require additional disclosures any time a starter interrupt device is installed, provide advance notice to consumers prior to activating such devices, and enable consumers to restart their vehicles in emergency or unsafe situations.[232]

The Commission recognizes the potential for abuse with regard to vehicle disablement technology.[233] It is

already illegal under section 5 of the FTC Act to engage in deception, including regarding vehicle disablement technology, and to unfairly cause substantial injury to consumers, such as by disabling a vehicle while it is being operated on the highway.[234] This provision will further provide protection for consumers from unfair or deceptive conduct surrounding the repossession of vehicles. Moving forward, the Commission will continue to monitor the motor vehicle marketplace for developments in this area to determine whether additional restrictions are warranted.

A number of dealership association commenters contended that this provision would inhibit dealers from making representations about their lawful rights to repossess vehicles, positing that, upon making any such representations, this provision might require dealers to carry out repossessions without exception or risk violating this provision. This provision, however, does not prevent dealers from providing accurate information to consumers about when a vehicle can, or will, be repossessed. Even where dealers have a lawful right to repossess a vehicle, current law, as well as this provision, prohibit dealers from misrepresenting whether or when they may take such action. Current law, including at the Federal level, imposes some such restrictions in this regard: for example, the Servicemembers Civil Relief Act prohibits repossession of vehicles during a servicemember's period of military service without a court order, as long as the servicemember either placed a deposit for the vehicle or made at least one installment payment on the contract before entering military service.[235] This provision prevents dealers from representing that they may repossess military consumers' vehicles under such circumstances. However, dealers may still accurately and non-deceptively

inform a consumer about the circumstances under which a vehicle can be repossessed or when the dealer may take action. In providing consumers with such information, however, dealers must refrain from representing, including by implication, that repossession is likely when in truth it is not.

After considering the comments, the Commission is finalizing paragraph (o) of § 463.3 largely as proposed, with the minor modification of capitalizing the defined term "Vehicle." This provision prohibits dealers from making misrepresentations regarding material information about repossession of a vehicle. Information about whether, or under what circumstances, a vehicle may be repossessed is likely to affect consumers' conduct, including by impacting military consumers' conduct regarding which payments to prioritize while serving our country.

## (p) Any of the Required Disclosures Identified in This Part

Proposed § 463.3(p) prohibited misrepresentations of any of the required disclosures identified in this part. As the Commission noted in its NPRM, this was including but not limited to representations that limit or contradict the required disclosures.[236] Upon careful review and consideration of the comments, the Commission is finalizing paragraph (p) of § 463.3 as proposed.

The Commission received a dealership association comment that contended generally that the proposed prohibited misrepresentations in this provision were already addressed in State statutes and regulations, and asserted that such State measures should suffice given that, according to the commenter, State regulators are more readily available to the public. As discussed in SBP III.C.1, the Commission has seen no harm to consumers or competition from duplicative prohibitions of deceptive conduct, and commenters did not cite State laws that permit misrepresentations or otherwise present a possible conflict with the Rule. Moreover, the Final Rule provides additional remedies that will benefit consumers who encounter conduct that is already illegal under State or Federal law, including by adding a mechanism for the Commission to redress consumers injured by a dealer's violation of the rule, and will assist law-abiding dealers that presently lose business to competitors that act unlawfully. Furthermore, State laws

---

up having to do what you would call "voluntary repossession" on their car because they bought this car, they're excited about it, and . . . the person who made them the loan didn't say "Oh, by the way, if you go overseas, we're not gonna let you take it with you.'" And . . . sometimes, they'll find that their warranty is no good overseas, either.").

[232] Comment of 18 State Att'ys Gen., Doc. No. FTC–2022–0046–8062 at 13.

[233] *See, e.g.,* Complaint ¶¶ 10–21, *CFPB* v. *USASF Servicing, LLC,* No. 1:23-cv-03433–VCM (N.D. Ga. Aug. 2, 2023); Consumer Fin. Prot. Bureau, "Supervisory Highlights: Issue 28, Fall 2022" 6–7 (Nov. 2022), *https://files.consumerfinance.gov/f/*

*documents/cfpb_supervisory-highlights_issue-28_2022-11.pdf* (finding that, in certain instances, auto servicers engaged in unfair acts or practices by activating vehicle disabling devices in consumers' vehicles when consumers were not past due on payment, contrary to relevant contracts and disclosures, including by causing the devices to sound late payment warning beeps and by preventing consumers from starting their vehicles).

[234] *See* 15 U.S.C. 45; *see also, e.g., Int'l Harvester Co.,* 104 F.T.C. 949, 1064–67 (1984) (finding that manufacturer's failure to adequately disclose that its tractors had a serious safety hazard constituted unfair conduct, where the hazard caused serious injury to a small number of consumers, consumers could not have reasonably avoided the harm because the respondent did not adequately disclose the serious risk, and the cost of the respondent disclosing the risk was very small in relation to the substantial injury).

[235] *See* 50 U.S.C. 3952(a).

[236] NPRM at 42022.

may provide more or less specific requirements, as long as those requirements are not inconsistent with part 463, and in the event of an inconsistency, the Rule only affects such State law to the extent of the inconsistency. Accordingly, the Commission adopts this provision without modification from its original proposal.

The Commission hereby determines it is an unfair or deceptive act in violation of the FTC Act for any dealer to make any misrepresentations, expressly or by implication, regarding material information about the subjects set forth in the paragraphs of § 463.3. Such misrepresentations are likely to cause consumers to waste significant time or money beyond what dealers led them to believe would be necessary to purchase or lease a vehicle. Thus, these misrepresentations are material and are likely to cause substantial injury to consumers. This injury is not reasonably avoidable by consumers themselves because information about the truth or falsity of the dealer's misrepresentations is within the control of the dealer, and there are no countervailing benefits to consumers or to competition from the illegal practice of making misrepresentations. Further, these provisions also serve to help prevent dealers from failing to make disclosures required by § 463.4, and from charging for add-ons that provide no benefit and from failing to obtain express, informed consent for charges, as required by § 463.5, including by prohibiting misrepresentations regarding costs and terms.[237] To reflect this, and without changing any substantive requirements for covered entities, the Commission is adding the following sentence to the end of § 463.3, at newly designated paragraph (q): "The requirements in this section also are prescribed for the purpose of preventing the unfair or deceptive acts or practices defined in this part, including those in §§ 463.4 and 463.5." Thus, this Rule requires dealers to refrain from making material misrepresentations about the topics enumerated in § 463.3. The prohibitions contained in § 463.3 help protect consumers from deceptive representations and promote the ability of honest dealers to compete on honest terms.

*D. § 463.4: Disclosure Requirements*

1. Overview

The proposed rule included five disclosure requirements for motor vehicle dealers regarding certain pricing and financing information (in proposed § 463.4(a) through (e)). These provisions proposed to require dealers to disclose a vehicle's offering price; an add-on list with each optional add-on for which the dealer charges consumers and the price of each such add-on; that such add-ons are not required and that the consumer can purchase or lease a vehicle without the add-ons; and information about a vehicle's total of payments when making certain representations about monthly payments.

In its NPRM, the Commission specifically requested comments regarding key aspects of the proposed disclosures. In response, various stakeholder groups and individuals provided comments regarding the proposed provisions. In this section, the Commission discusses the comments, responses to the comments, and any changes made to this section based on the comments.

The Commission received many comments in favor of its proposal, including from consumer groups, financial services groups, dealerships and dealership employees, individual consumers, and others. These comments supported the proposed disclosures as addressing bad actors and unlawful practices in the automotive marketplace while promoting transparency, reducing consumer confusion, and refraining from inhibiting consumer choice or materially increasing the time or paperwork required.

A number of such comments, however, urged the Commission to adopt additional disclosures, both in the areas covered by its proposal and elsewhere. Regarding disclosures covered in the proposal, for example, commenters suggested more detailed requirements, including regarding specific disclosure language and specific placement of disclosures. The Commission agrees with commenters that key information affecting pricing, add-ons, and costs must be disclosed clearly and conspicuously to consumers in order to address consumer deception and unauthorized charges during the motor vehicle buying and leasing process. To provide flexibility for dealers and room for disclosures to be made in a manner that is clear and conspicuous to consumers in particular circumstances, however, the Commission declines to include additional prescriptive language about the form of such disclosures. Further,

the Commission emphasizes that, in accordance with the provision being finalized at § 463.3(p), any material misrepresentations regarding the disclosures in the Final Rule violate section 5 of the FTC Act [238] and part 463.

The additional disclosures recommended by commenters included, *inter alia*: a disclosure regarding the installation and use of any electronic disabling devices; a disclosure explaining the fees certain lenders may charge to accept a consumer's loan application; a disclosure of the invoice price, or the price a dealer paid the manufacturer for the vehicle; a disclosure of any potential value gap between a vehicle's price and its appraised value; a disclosure, prior to purchase negotiations, of any potential financing limitations imposed by the dealer; a disclosure of credit characteristics relied upon by the dealer and certain terms; a disclosure that, as with a mortgage loan settlement statement, itemizes all the elements of the sale for car purchases; [239] and disclosure signage in dealership showrooms or on sales desks explaining that add-ons are not required. As for disclosures in additional areas, the Commission recognizes that vehicle purchase and lease transactions are lengthy and document-heavy, and while consumers may benefit from additional information, each additional disclosure requirement could increase the cost to comply with part 463 and would risk crowding out the information in the Commission's proposed disclosures. Accordingly, the Commission has determined not to expand § 463.4 of this Final Rule to include additional disclosures.[240] The Commission will

---

[237] *See* 15 U.S.C. 57a(a)(1)(B) (the Commission "may include requirements prescribed for the purpose of preventing" such unfair or deceptive acts or practices).

[238] 15 U.S.C. 45.

[239] Comment of Or. Consumer Just., Doc. No. FTC–2022–0046–8492 at 4; *cf.* Individual commenter, Doc. No. FTC–2022–0046–0144 (recommending the disclosed offering price separately list MSRP, markup, all fees, and add-on costs); Comment of Legal Aid Just. Ctr., Doc. No. FTC–2022–0046–7833 at 2 ("[D]ealers should be required to verbally disclose and explain in a language the customer understands the material terms of the contact [sic] (including APR, total number of monthly payments required, etc.) *before* customers sign[] the contract and receive the customers' consent that they understand these terms. After this verbal disclosure, a consent form should be required. This form should be provided in the language preferred by the customer, and should ensure that the customer was provided with accurate and agreed-upon terms prior to signing."); Individual commenter, Doc. No. FTC–2022–0046–1641 ("Mortgage lenders are required to give a borrower a disclosure document prior to closing to show all costs and expenses; car dealers should have to do the same thing.").

[240] In addition to the disclosures noted, a few commenters requested additional provisions to address concerns regarding transparency in pricing,
Continued

continue to monitor the marketplace to evaluate the efficacy and sufficiency of the present disclosures.

In addition, the Commission received a number of comments requesting that it publish forms for the disclosures proposed in this section. These comments requested either that the use of such forms be required or that the Commission provide a "safe harbor" from liability under part 463 for dealerships that utilize them.[241] The Commission did not receive, in the course of public comment, evidence sufficient to conclude that uniform formatting for the delivery of such disclosures would be necessary to make them effective. Nor has the Commission received evidence to establish that mandating use of a particular form disclosure would obviate deceptive and unfair conduct in all circumstances. For example, forms that were required or that provided a "safe harbor" from liability could be presented (1) with other elements that are distracting or confusing, (2) with information that modifies or contradicts the form disclosures, (3) with instructions, discouragement, or time pressure that causes consumers not to review the forms or that makes such review impracticable or impossible, or (4) through the use of forms that are pre-completed in whole or in part, to the extent this makes the information therein easy for consumers to miss. The end result of such an approach would be to enable deception while also making such deception more difficult to detect. Accordingly, the Commission declines to mandate particular disclosure forms as a requirement across all transactions or to shield against liability even where dealers otherwise engage in deceptive or unfair conduct. The Commission also notes that, because it is not mandating particular disclosure forms, dealers that are already complying with the law will avoid additional compliance costs associated with using a new form, and all dealers will have the flexibility to convey the disclosures in a manner that is clear and conspicuous under the particular circumstances of their transactions.

The Commission also received comments that expressed opposition to this section. Some individual commenters argued that the required disclosures were unduly extensive, prescriptive or untested, or that the substance of these disclosures is already conveyed to consumers before the consummation of the transaction. In response, the Commission stresses that this section is limited in both its scope and its requirements. Each of the disclosures in § 463.4 is focused on one key category of information: vehicle price, add-on optionality, or total of payments. This section requires the clear and conspicuous disclosure of this information but does not include prescriptive requirements. So, for example, a written disclosure would have to be in a size that stands out, but a specific font or font size is not mandated, nor are the specific terms or format used, nor are any particular uses of capitalization, punctuation, ink color, or paper color or size. The proposal refrained from additional formal mandates in order to provide dealers with flexibility, within the bounds of the law, to provide this essential information, including so that dealers already conveying this information in a non-deceptive manner may continue to do so. Accordingly, the Commission also finds that testing of these requirements is unnecessary. Furthermore, each of the disclosure requirements being finalized addresses the unfair or deceptive act or practice of withholding essential information from consumers or presenting such information to them in a deceptive manner. After reviewing comments, including those that contended the proposal was not prescriptive enough, the Commission concludes that this is the correct approach, and as such, has determined not to adopt any additional specifications dictating the form or manner in which the disclosures must be presented to consumers. Here, as elsewhere, the Commission will continue its long track record of working to assist with legal compliance.[242] Further, for dealers already conveying this information clearly and conspicuously, complying with this provision should not be burdensome.

Other commenters, including an industry association, contended that these disclosures would have the effect of limiting the products and services consumers are offered or otherwise restrict lawful sales practices. In response, the Commission reiterates that this section focuses on one of the most foundational pieces of information regarding the sale of vehicles, add-ons, and financing: their cost. Dealers already providing this information in a non-deceptive manner will need to make minimal, if any, changes to their disclosure practices. The Commission has seen no evidence that disclosing cost information has caused dealers to cease offering products.

Some commenters, including dealership associations, contended that the presence of some State standards in this area makes Federal regulation unnecessary or contradictory. In response, the Commission notes that it drew from several State statutory and regulatory provisions in formulating its proposal, and it observes that the existence and functioning of such standards demonstrates the practicability of such disclosure measures. Dealers can comply with any State laws requiring the same conduct as well as this section. Similarly, to the extent a State requires additional disclosures regarding vehicle price, add-ons, or total of payments, nothing prevents dealers from providing those disclosures as well as those required under § 463.4 so long as the State disclosures are not inconsistent with part 463. To the extent there is truly a conflict between this section and State law, § 463.9 provides that part 463 will govern, but only to the extent of the inconsistency, and only if the State statute, regulation, order, or interpretation affords consumers less protection than does the corresponding provision of part 463. Moreover, a number of States do not have existing standards in the areas covered by this part; in such States, the Commission's disclosures will operate as a key safeguard.

Other commenters, including an industry association, argued that requiring disclosures would increase the time and paperwork for consumers to

---

including related to interest rates, and that the Rule require dealers to maintain a fiduciary relationship to customers. The Commission recognizes the concerns regarding pricing transparency and deceptive conduct related to pricing, and will continue to monitor such issues, including after this provision (§ 463.4(a), offering price disclosure) and the misrepresentation provisions (§ 463.3) are in effect.

[241] Comment of Nat'l Auto. Dealers Ass'n, Doc. No. FTC–2022–0046–8368 at 104, 122; Comment of Ohio Auto. Dealers Ass'n, Doc. No. FTC–2022–0046–6657 at 6, 9; *see* Comment of Compliance Sys., Doc. No. FTC–2022–0046–7836 at 1.

[242] Each year since FY2002, the Small Business Administration's Office of the National Ombudsman has rated the Federal Trade Commission an "A" on its small business compliance assistance work. *See* U.S. Small Bus. Admin., "National Ombudsman's Annual Reports to Congress," *https://www.sba.gov/document/report—national-ombudsmans-annual-reports-congress* (providing reports from FY2013–FY2020); Letter from Edith Ramirez, Chairwoman, Fed. Trade Comm'n, to Senator David Vitter, Chairman, Comm. on Small Bus. and Entrepreneurship at 1 (Nov. 16, 2015), *https://www.ftc.gov/system/files/documents/reports/federal-trade-commission-rule-compliance-guides-small-businesses-other-small-entities-commission/eighth_section_212_report_to_congress_july_2014-june_2015.pdf* (citing Commission's "A" rating for "Compliance Assistance" by the Nat'l Ombudsman from FY2002–FY–2014).

buy or lease a vehicle. In response, the Commission notes that the section includes requirements for the disclosure of salient, material information early in the process, thus eliminating the time consumers would otherwise spend pursuing misleading offers—time which can then be spent pursuing truthful offers in the absence of deception. These measures will further allow consumers to compare dealerships in advance based on truthful terms; thus, dealerships will earn business based on the actual terms offered, and not lose business to dealers who compete by omitting or hiding actual terms. Moreover, the disclosures required by this section are limited to key information affecting pricing, add-ons, and total of payments, needed to address consumer deception and unauthorized charges during the vehicle-buying and leasing process, and are required to be in writing only where the dealer is responding to written consumer communications or already providing consumers with representations in writing.[243] As explained in detail in the paragraph-by-paragraph analysis of § 463.4(e) in SBP III.D.2(e), in order to avoid any additional written disclosure requirements, the Commission is declining to mandate that its required disclosures be made in writing in every instance.

An industry association commenter argued that the proposed disclosure requirements in § 463.4 of the NPRM violate the First Amendment. This commenter contended that the proposed disclosures constituted compelled speech; that they would be subject to intermediate judicial scrutiny were they to be challenged in court; and that, in the event of such a challenge, the Commission's actions would fail to satisfy that standard of scrutiny, or a less stringent one.

The Commission first addresses the applicable First Amendment standard of review for this rulemaking effort in the event of a judicial challenge. If so challenged, the disclosures in § 463.4 would not be subject to intermediate judicial scrutiny, but instead to the less rigorous review standard set forth in *Zauderer* v. *Office of Disciplinary Counsel,* 471 U.S. 626, 651 (1985). When, as is the case here, a regulation "impose[s] a disclosure requirement rather than an affirmative limitation on speech," and is "directed at *misleading*

commercial speech," *Zauderer* governs.[244]

Under that standard, a commercial speaker's rights "are adequately protected as long as disclosure requirements are reasonably related to the State's interest in preventing deception of consumers."[245] In *Zauderer,* the Court upheld a rule requiring attorneys who advertised on a contingency-fee basis to disclose that clients who did not prevail in litigation might nevertheless be liable for significant costs.[246] The Court found that "the possibility of deception is [] self-evident" when an advertisement discloses only one type of charge (fees) without mentioning another (costs).[247] In upholding the challenged rule as reasonable, the Court emphasized that the rule merely mandated disclosure of "purely factual and uncontroversial information about the terms under which . . . services will be available," and that the "constitutionally protected interest in *not* providing [such] information . . . is minimal."[248]

As in *Zauderer,* § 463.4 requires only "purely factual and uncontroversial information about the terms under which [commercial goods or services] will be available."[249] These material facts include the offering price of the motor vehicle; that add-on products or services are not required and the consumer can purchase or lease the vehicle without the add-on, if true; the total amount the consumer will pay to purchase or lease the vehicle and, if that amount assumes the consumer will provide consideration, the amount of such consideration; and when a lower monthly payment will increase the total amount the consumer will pay to purchase or lease the vehicle. As in *Zauderer,* any "constitutionally protected interest" a motor vehicle dealer might have "in *not* providing [this] factual information . . . is minimal."[250]

Courts applying *Zauderer* have repeatedly affirmed the constitutionality of regulations requiring disclosures of complete information about the cost of a purchase, which are similar to the required disclosures in § 463.4. For example, courts upheld a regulation requiring schools to "disclose the 'total cost' of . . . tuition, fees, books, and

supplies for its programs," finding that this information was "purely factual and uncontroversial."[251] In another instance, a court upheld under *Zauderer* a rule requiring airlines to prominently disclose the "total, final price" of airfare, finding it was "reasonably related to the government's interest in preventing deception of consumers."[252] In yet another case, a court upheld a rule requiring hospitals to disclose their rates to consumers, finding they were " 'factual and uncontroversial' and directly relevant to 'the terms under which [hospitals'] services will be available' to consumers."[253] The disclosure provisions the Commission is finalizing in § 463.4, like the provisions upheld in these cases, merely require factual and uncontroversial disclosures to provide consumers with accurate and timely pricing and financing information as they consider motor vehicle purchases and leases.[254]

As discussed, *Zauderer* applies here because § 463.4 would "impose a disclosure requirement rather than an affirmative limitation on speech."[255] The Commission notes, however, that disclosure requirements in § 463.4 likewise would pass muster even if, as the commenter suggested, they were evaluated under the intermediate scrutiny standard formulated in *Central Hudson Gas & Electric Corp.* v. *Public Service Commission of New York,* 447 U.S. 557 (1980), and subsequent cases applying that standard.[256] As an initial matter, *Central Hudson* applies not to *disclosure requirements,* such as those the commenter challenges, but to *affirmative limitations* on speech.[257] The *Central Hudson* test requires restrictions on lawful, non-misleading speech to satisfy three remaining criteria. First, there must be a substantial governmental interest in the restriction; second, the restriction must directly advance that interest; and third, the restriction may not be more

[243] *See* § 463.4(a) (stating that Offering Price must be disclosed in writing if the communication with the consumer, or the dealer's response, is in writing); § 463.4(c), (d), (e) (requiring that disclosures be in writing if the dealer's associated representation is in writing).

[244] *Milavetz, Gallop & Milavetz, P.A.* v. *United States,* 559 U.S. 229, 249 (2010) (emphasis original).

[245] *Zauderer* v. *Off. of Disciplinary Couns.,* 471 U.S. 626, 651 (1985).

[246] *Id.* at 652.

[247] *Id.* at 652–53.

[248] *Id.* at 651.

[249] *See id.* at 651.

[250] *Zauderer* v. *Off. of Disciplinary Couns.,* 471 U.S. 626, 651 (1985) (emphasis original).

[251] *Ass'n of Priv. Sector Colls. & Univs.* v. *Duncan,* 110 F. Supp. 3d 176, 199 (D.D.C. 2015), *aff'd,* 640 F. App'x 5 (D.C. Cir. 2016).

[252] *Spirit Airlines, Inc.* v. *U.S. Dep't of Transp.,* 687 F.3d 403, 412–15 (D.C. Cir. 2012) (internal brackets omitted).

[253] *Am. Hosp. Ass'n* v. *Azar,* 983 F.3d 528, 540 (D.C. Cir. 2020) (quoting *Zauderer* v. *Off. of Disciplinary Couns.,* 471 U.S. 626, 650–651 (1985)).

[254] Further, as explained in the paragraph-by-paragraph analysis of § 463.4 in SBP III.D.2, the failure to disclose this information is itself a deceptive or unfair practice.

[255] *Milavetz, Gallop & Milavetz, P.A.* v. *United States,* 559 U.S. 229, 249 (2010).

[256] The commenter attributes the intermediate scrutiny test to *Pagan* v. *Fruchey,* 492 F.3d 766, 771 (6th Cir. 2007), though it was in fact formulated by the Supreme Court in *Central Hudson.*

[257] *Milavetz, Gallop & Milavetz, P.A.* v. *United States,* 559 U.S. 229, 249 (2010).

extensive than necessary to advance the interest.[258] Under the *Central Hudson* test, it is not necessary that "the manner of restriction is absolutely the least severe that will achieve the desired end." [259] Rather, there merely must be a "'fit' between the [restriction's] ends and the means chosen to accomplish those ends—a fit that is not necessarily perfect, but reasonable." [260] In other words, the restriction should be "one whose scope is 'in proportion to the interest served.'" [261]

The disclosure provisions the Commission is finalizing in § 463.4 satisfy these criteria. First, the disclosure provisions serve a substantial governmental interest by requiring motor vehicle dealers to provide accurate terms, and in particular, accurate pricing information, in advertising and sales discussions.[262] As the Supreme Court has made clear, the government's "interest in ensuring the accuracy of commercial information in the marketplace is substantial." [263] And as explained in the paragraph-by-paragraph analysis of § 463.4 in SBP III.D.2, the disclosure requirements set forth there are aimed at ensuring that consumers receive accurate pricing information and other material transaction terms, and that dealers refrain from the unfair or deceptive act or practice of failing to provide this information.[264] The required disclosures directly advance, "fit" reasonably with, and are proportionate to, their intended ends of prohibiting and preventing unfair or deceptive conduct in motor vehicle transactions. They prevent dealers from luring consumers to dealerships with unfair or deceptive advertising tactics, from padding prices with unwanted add-on

products or services, and from misdirecting consumers about the true cost of a vehicle through discussions of monthly payment amounts. The disclosure requirements effectively "impose[] no burden on speech other than requiring [motor vehicle dealers] to disclose the total price consumers will have to pay. This the First Amendment plainly permits." [265]

After careful consideration of the comments, the Commission has determined to finalize the introductory paragraph of § 463.4 and certain of the disclosure requirements included in its NPRM, with some minor textual changes. The introductory paragraph of the NPRM proposed that it would be "a violation of this part and an unfair or deceptive act or practice in violation of section 5 of FTC Act for any Motor Vehicle Dealer to fail to make any disclosure required by this section, Clearly and Conspicuously." The Commission is finalizing this paragraph with the minor textual change of substituting "Federal Trade Commission Act" for "FTC Act" for clarity and conformity with other parts of the Rule. The Commission is also adding the word "Covered" to the defined term "Covered Motor Vehicle Dealer" to conform with the revised definition at § 463.2(f), discussed in SBP III.B.2(f).

The Commission is finalizing the specific disclosure requirements proposed at § 463.4(a), (c), (d), and (e), with modifications noted in the paragraph-by-paragraph analysis in SBP III.D.2(a), III.D.2(c), III.D.2(d), and III.D.2(e).

In the paragraphs that follow, the Commission discusses the disclosure requirements proposed in the NPRM, the comments relating to the specific disclosures, responses to the comments, and the disclosure requirements adopted in § 463.4.

2. Paragraph-by-Paragraph Analysis of § 463.4

(a) Offering Price

The offering price disclosure provision in proposed § 463.4(a) required dealers to disclose a vehicle's offering price in advertisements that reference a specific vehicle or represent a monetary amount or financing term for any vehicle, as well as upon receipt of a consumer communication about a specific vehicle or any monetary amount or financing term for any vehicle. The Commission proposed defining "Offering Price," in § 463.2(k), as "the full cash price for which a Dealer will sell or finance the motor vehicle to any consumer, excluding only required Government Charges." The Commission also proposed defining the term "Government Charges," then in § 463.2(h), to mean "all fees or charges imposed by a Federal, State or local government agency, unit, or department, including taxes, license and registration costs, inspection or certification costs, and any other such fees or charges." For the reasons discussed in the following paragraphs, the Commission is finalizing the offering price disclosure provision at § 463.4(a), as well as the corresponding "Offering Price" and "Government Charges" definitions in § 463.2 (finalized at § 463.2(k) and (i), respectively), largely as proposed. The Commission is including a modification to the offering price definition to clarify that dealers may, but need not, exclude required government charges from a motor vehicle's offering price, and is substituting "Vehicle" for "motor vehicle" to conform with the revised definition at § 463.2(e), discussed in SBP III.B.2(e). Additionally, the Commission is including a typographical modification to the "Government Charges" definition to include a serial comma for consistency. The Commission also is capitalizing the defined terms "Vehicle" throughout, in its singular, plural, and possessive forms, and is adding language to the end of § 463.4(a)(3)(ii) clarifying that the requirements in § 463.4(a) "also are prescribed for the purpose of preventing the unfair or deceptive acts or practices defined in this part, including those in §§ 463.3(a) and (b) and 463.5(c)."

The Commission received a significant number of comments on its

[258] *See Cent. Hudson Gas & Elec. Corp.* v. *Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 566 (1980). Although the Supreme Court in *Central Hudson* treated the question whether regulated speech is truthful and non-misleading as one of four criteria, it has alternately treated this question as a threshold inquiry, after which the three remaining criteria are evaluated. *See Fla. Bar* v. *Went For It, Inc.*, 515 U.S. 618, 623–24 (1995). Because the government is "free to prevent the dissemination of commercial speech that is false, deceptive, or misleading," *Zauderer* v. *Off. of Disciplinary Couns.*, 471 U.S. 626, 638 (1985), if a challenged restriction fails this threshold inquiry, *Central Hudson* does not apply.

[259] *Bd. of Trs. of State Univ. of N.Y.* v. *Fox*, 492 U.S. 469, 480 (1989).

[260] *Id.* (citation omitted).

[261] *Id.* (quoting *In re R.M.J.*, 455 U.S. 191, 203 (1982)).

[262] NPRM at 42012.

[263] *Edenfield* v. *Fane*, 507 U.S. 761, 769 (1993).

[264] Nothing could be more directly relevant to accurate pricing than disclosure of the actual price itself. *See Spirit Airlines, Inc.* v. *U.S. Dep't of Transp.*, 687 F.3d 403, 415 (D.C. Cir. 2012) (substantial governmental interest "is clearly and directly advanced by a regulation requiring that the total, final price be" prominently disclosed).

[265] *Id.* Further, the Commission has taken into account prior enforcement work and other initiatives. *See* NPRM at 42022–25 (explaining rationale behind disclosure requirements and extensively citing prior enforcement experience and record evidence); *see also Lorillard Tobacco Co.* v. *Reilly*, 533 U.S. 525, 555 (2001) ("We do not . . . require that empirical data come accompanied by a surfeit of background information. We have permitted litigants to justify speech restrictions by reference to studies and anecdotes . . . or even . . . based solely on history, consensus, and simple common sense." (internal quotation marks and alterations omitted)); *Fla. Bar* v. *Went For It, Inc.*, 515 U.S. 618, 628, (1995) (same); *Burson* v. *Freeman*, 504 U.S. 191, 211 (1992) (finding speech restrictions justified even under strict scrutiny based on a "long history, a substantial consensus, and simple common sense"); *Milavetz, Gallop & Milavetz, P.A.* v. *United States*, 559 U.S. 229, 251 (2010) ("When the possibility of deception is as self-evident as it is in this case, we need not require the State to conduct a survey of the public before it may determine that the advertisement had a tendency to mislead." (internal quotation marks and alterations omitted)); *Am. Hosp. Ass'n* v. *Azar*, 983 F.3d 528, 540 (D.C. Cir. 2020) (finding reasonable relationship between rule and governmental interests where "the Secretary, relying on complaints from consumers, studies of state initiatives, and analysis of industry practices, reasonably concluded that the rule's disclosure scheme will help the vast majority of consumers").

proposed offering price disclosures. Many commenters supported the Commission's proposal to require dealers to provide uniform, comprehensive, and accurate pricing information. These commenters noted, *inter alia,* that despite laws generally prohibiting unfair or deceptive acts or practices, present market conditions fail to balance the "playing field" of information between consumers and motor vehicle dealers, allowing dealers to take advantage of consumers by hiding information about pricing, imposing surprise price increases, or using pricing advertising tactics that systematically deceive consumers.[266] Many consumers also underscored the need for the proposed disclosure requirements. Commenters in support noted, for instance:

• Buying a car has always been a horrible experience for me. The endless driving to dealerships who advertise vehicles for a sale price only to find that the vehicle does not exist, or the price advertised for the specific vehicle is not what they had posted. The salespersons['] tactics, always attempting to put you in a vehicle based on a car payment, along with dancing around the simple question of the actual out the door price of the vehicle. . . . It is such a shame that the dealerships just do not give the customer the price of the vehicle without them wanting to start a "folder" and take all of your information, a copy of your drivers license, ect [sic] . . . . Please regulate the automobile dealerships, especially now when it seems they are at their worst with these ridiculous add on fees (paint and upholstery protector, ect [sic] which was not added at the manufacturer) along with adjustments on top of the MSRP.[267]

• Buying a car in the US is now akin to what I used to do in the Army: Before going into the dealership, I have to spend hours conducting "intelligence prep of the battlefield" to understand the tactics the dealership's sales and finance & incentives staff will throw at me. . . . It has been made increasingly worse by dealerships that advertise a false price to entice a buyer but "bait-and-switch" with Additional Dealer Mark-Ups (ADM), and bogus fees and charges for supposedly dealer-installed items tha[t] the consumer doesn't want in the first place. . . . Unless the FTC passes this proposed rule, things will get worse before they get better.[268]

• Though I am not usually a fan of adding layers of governmental regulations to what should be a simple transaction, there definitely needs to be a change in what is allowed in the car buying process. . . . As consumers we should not have to spend hours reading tiny print in obscure sections of a website in order to validate a posted price. The price should not be elevated at the last minute in a hidden line item such as a mandatory detailing package or service plan you do not want or need to the tune of thousands of dollars. . . . We should not have to spend hours at a dealer and go through mounds of paperwork with a fine tooth comb in order to simply see the ACTUAL price of the vehicle. It is a ridiculous ploy to confuse people into purchasing things they do not want or need.[269]

• I have been trying to buy a new car for the last two years but with unexpected costs I am not able to have a clear written contract on the car and its pricing. I have contacted several dealers in my area and many of them have issues that prevent me from commited [sic] to buying from them. This ranges from them not being able to give me a written sheet of the cost of the car, fees, ect [sic] showing me how much I will be paying in the end. . . . Most of the dealerships I spoke to would not give me a sales sheet of the vehicle I want to purchase to show me how much I will be paying in total. I would have to put a down payment and just trust them over the phone. If I can't get it in writing it is hard to commit to a down payment I could lose.[270]

• Vehicles are typically the second largest purchase made by people. Given the choices available according to respective needs/wants, purchasing a vehicle should be the same as going to any other mass-market retailer and picking that appliance with a set price. So why do we need to haggle or expend additional intellectual and emotional bandwidth towards ensuring that the transaction is as initially stated? There are instances where I'd rather be back conducting combat operations in Iraq than go through the dealer process, as it incenses me that this corrupt way of doing business is given a free pass. . . . If you are a reputable and honest dealership, then there should be no worry; it will be business as usual.[271]

• Think of us, the car buying public. We are mad as hell. Please start fixing this crooked business model where

nobody even knows what they are supposed to be paying.[272]

• As a consumer, I fully support this new proposed rules update. The dealership experience has been an anxiety provoking event everytime [sic] I attempt to purchase a car. I have multiple friends and family that all report shady practices, bait and switch, and up charging at point of sale during their car buying process. Please pass these regulations![273]

• I am writing in FULL support of the FTC rules and regulations. . . . Buyers deserve to know Out the door prices and not be hassled by nonsensical add-ons for the dealership's benefit. People should feel comfortable and excited to buy their 1st car rather than the dread I feel.[274]

• We find the vehicle we came to see and see a sticker beside the manufacture[r] one with added prices. These typically include car alarms, VIN etching, protection packages, floor mats, market adjustment, etc. We go to purchase the vehicle now and they say that none of these can be removed from the price of the car (even though they advertised them without them at a much lower price). We attempt to negotiate them off and find out their [sic] is an additional addon like reconditioning fee. We fail at getting the price of the vehicle down to the advertised price and leave.[275]

• I have financed all of my cars, and the total cost for the vehicle has always been hidden, either physically or through the dealer trying to move focus onto other numbers such as the monthly payment. Since monthly payments will vary due to credit history, down payments, interest rates, taxes, and more, it is not an effective tool for measuring a deal. $300 a month could be a great deal on one car, and a horrible deal on another. I would greatly benefit from the proposal[']s provision to clearly list and advertise the price of the car without additional add[-]ons. It would greatly reduce the work of finding the right car at the right dealership. In each of the 3 cases, I have gone to multiple dealers, wanting to purchase a specific vehicle on their lot, and walked away because of the hidden

[266] *See, e.g.,* Comment of Nat'l Consumer L. Ctr. et al., Doc. No. FTC–2022–0046–7607 at 17–20.

[267] Individual commenter, Doc. No. FTC–2022–0046–6649.

[268] Individual commenter, Doc. No. FTC–2022–0046–6225.

[269] Individual commenter, Doc. No. FTC–2022–0046–6089.

[270] Individual commenter, Doc. No. FTC–2022–0046–6656.

[271] Individual commenter, Doc. No. FTC–2022–0046–5238.

[272] Individual commenter, Doc. No. FTC–2022–0046–5227.

[273] Individual commenter, Doc. No. FTC–2022–0046–5228.

[274] Individual commenter, Doc. No. FTC–2022–0046–5219.

[275] Individual commenter, Doc. No. FTC–2022–0046–0900.

costs being added to the price of the car.[276]

• I work as a salesperson at a local Nissan dealership. . . . Currently, dealerships across the US, including the one I work for, have made the car buying process needlessly confusing, expensive, and frustrating by engaging in false advertising and hidden add-on products. While these practices are very unscrupulous, they are incredibly effective at what they are designed to do: drive revenue for the store. If these regulations are passed, they would certainly take a significant toll on my personal finances. But the longer I work in my position, the more I realize that no one should be allowed to engage in such exploitative conduct in the course of running a business. . . . Good, ethical dealers will not have to make any changes if these rules are put into place. I also happen to know that several of the comments in opposition to the proposed regulations are solicited by dealerships and their management. The dealership group I work for, for example, sent out a company-wide email encouraging employees to post comments on this site in opposition to these rules. But there's no question: The American people want these regulations. They need these regulations. The only ones that don't want them are crooked auto dealerships across the US. It's been far too long that such dealerships have run amuck with underhanded sales practices and deception. I would urge the FTC to stand strong against . . . dealership groups[]or any lobbyists and get these rules passed! I know there will be stiff resistance but it's of the utmost importance to good dealerships, transparent salespeople, and, most importantly, the average American consumer![277]

A number of commenters supported the offering price disclosure requirement and associated definitions; some expressed support while urging additional protections. A number of commenters, including consumer advocacy organizations as well as individual commenters, requested that the Commission require a vehicle's offering price to include additional items, such as charges for add-ons attached to the vehicle when it is offered, and charges for add-ons required by the dealer to be sold with the vehicle; to exclude rebate information, including rebates contingent upon the use of a certain

financing company or upon qualifying for any other rebate; and to prohibit the exclusion of certain charges, including the advertisement of an offering price that factors out a down payment amount.[278]

To begin, the Commission notes that by the terms of the proposed "Offering Price" definition, the only charges a dealer was permitted to exclude from a vehicle's offering price were required *government* charges. Thus, under the proposal, if a dealer were to charge any consumer for a preinstalled add-on, or require any consumer to pay for an add-on to purchase or finance the vehicle, then the charges for such add-ons would be required to be included in the vehicle's offering price.[279] In addition, while the proposed provision did not prevent dealers from presenting consumers with accurate and non-misleading additional information, including terms of limited availability, the required offering price disclosure needed to remain clearly and conspicuously presented to consumers, and could not be based on discounts or rebates that are not available to "any consumer," including rebates contingent upon the use of a certain financing company or upon qualifying for any other rebate. Similarly, under the proposal, if the dealer required a down payment amount to sell or finance the vehicle, the offering price could not factor out such an amount.

With respect to the proposed definition of "Government Charges," which is used in the definition of "Offering Price," a number of consumer advocacy organization commenters contended the definition should be narrow to accomplish the Commission's goal of ensuring that consumers have access to accurate pricing information before they enter a dealership, emphasizing that only charges that are imposed by, and payable to, a government entity should be permitted to be excluded from a vehicle's offering price, and that document fees that some States allow dealers to charge should

not be excluded from the offering price. The Commission notes that, as proposed, the term "Government Charges" is limited to those charges "imposed by a Federal, State or local government agency, unit, or department." The Commission specified in this proposed definition that such charges need be "imposed by" a government entity rather than, for instance, having merely been "authorized by" or "allowed by" such an entity. This language does not reach charges that are authorized by a government entity but not required, since such charges have not been "imposed"[280] by the government. This distinction therefore excludes from the definition of "Government Charges" fees, such as dealership document preparation fees that State or local law does not require consumers to pay. Furthermore, the definition of "Offering Price" at § 463.2(k) permits only "required" government charges to be excluded from a vehicle's offering price. Thus, charges the government does not require consumers to pay, but allows the dealer to charge or to pass along to the consumer, such as document fees, must be included in the disclosed offering price if the dealer requires such charges of any consumer.

Relatedly, an individual commenter suggested that the Commission delete the phrase "inspection or certification costs" from the definition of "Government Charges" in order to avoid confusion about the status of inspection or certification charges that "are NOT imposed by the Government," as well as explicitly state in the definition that the term does "not include dealer document or document processing fees ("doc fees"), or electronic titling and registration fees, which are not imposed by the Government."[281] Regarding the phrase "inspection or certification costs," such costs that are *not* "imposed" by the government are excluded from the definition of "Government Charges," as the plain language makes clear. Similarly, as noted, dealer document or document processing fees and any other fees that are not imposed by the government are excluded from the definition, as the plain language states.

Some commenters, including a group of State attorneys general, likewise recommended that a vehicle's offering price include "anticipated" or

---

[276] Individual commenter, Doc. No. FTC–2022–0046–6490.

[277] Individual commenter, Doc. No. FTC–2022–0046–3693.

[278] A number of these commenters further requested that the term "Offering Price" include additional dealer fees that are known to the dealer at the time they are advertised and imposed by the dealer rather than a government entity. These requests are addressed in the discussion of the Commission's definition of "Government Charges" in SBP III.B.2(i).

[279] If a dealer does not require any consumer to pay for an add-on, current law, as well as provisions in this Rule, require dealers to refrain from deception in this regard. *See, e.g.,* § 463.3(a), (b) (prohibiting material misrepresentations regarding the costs or terms of purchasing, financing, or leasing a vehicle, as well as any costs, limitation, benefit, or any other material aspect of add-ons); § 463.4(c) (requiring disclosures regarding optional add-ons).

[280] *See, e.g., Impose,* Cambridge Advanced Learner's Dictionary & Thesaurus, *https:// dictionary.cambridge.org/us/dictionary/english/ impose* ("to officially force a rule, tax, punishment, etc. to be obeyed or received").

[281] Individual commenter, Doc. No. FTC–2022–0046–7445 at 15–16.

"estimated" government charges.[282] The Commission agrees that consumers would benefit from knowing this information early on in their shopping experience, and notes that dealers are permitted under this Final Rule to provide additional, truthful information along with a vehicle's offering price. Rather than requiring that anticipated government charges be included in the offering price, the Commission is modifying the definition from its original proposal to make clear that dealers need not exclude any such charges from the offering price. The Commission will evaluate whether the definition, as finalized, as well as its associated disclosure, effectively address deceptive and unfair market conduct, and will consider future modifications as market practices evolve.

Thus, the Commission is finalizing a definition of "Offering Price" that clarifies that dealers may, but need not, exclude required government charges from a vehicle's offering price that meets the requirements of § 463.2(k). In particular, the Commission is finalizing a definition of "Offering Price" that removes the phrase "excluding only" and adds the phrase "provided that the Dealer may exclude only" in its place. The definition also substitutes "Vehicle" for "motor vehicle" to conform with the revised definition of "'Covered Motor Vehicle' or 'Vehicle'" at § 463.2(e), such that the definition reads as follows: "Offering Price means the full cash price for which a Dealer will sell or finance the Vehicle to any consumer, provided that the Dealer may exclude only required Government Charges."

Other commenters, including consumer advocacy organizations, proposed additional requirements to the disclosure at § 463.4(a): prescribing formatting, posting, and presentation requirements for offering price information, such as attaching a written offering price to each vehicle, providing written offering price information in response to consumer communications regardless of whether the communications are written, and requiring offering price to be the most conspicuous piece of information displayed to consumers. Regarding the manner in which the offering price must be presented, the Commission proposed that all disclosures under § 463.4,

including the offering price disclosure, be presented clearly and conspicuously. As previously discussed, the proposed disclosure provisions were directed at addressing unlawful conduct while providing dealers with flexibility to present such disclosures in a manner that is clear and conspicuous to their consumers under the particular circumstances. Thus, the Commission has determined not to adopt further formatting, posting, or presentation requirements for its offering price disclosure.

Some commenters, including consumer advocacy organizations and a consumer protection agency, proposed that the Commission adopt an additional requirement providing that dealers must accept an offer from a buyer of the offering price. In response, the Commission notes that, under its proposal, if a dealer were requiring any consumer to pay a price that was higher than the disclosed offering price, or adding other conditions—such as requiring the use of a particular finance company or the purchase of an add-on—to obtain the vehicle at the offering price, such practices would violate part 463, including the offering price provision, which requires disclosure of the full cash price for which the dealer will sell or finance the vehicle to any consumer,[283] and the related requirement the Commission is finalizing under § 463.3(p), which prohibits misrepresentations regarding the required disclosures in part 463.[284]

An individual commenter proposed that the Commission adopt additional requirements requiring dealers to itemize and disclose each sub-component of the offering price, including any applicable document fee. The Commission notes that it has not been presented with any evidence that the benefits of such additional disclosure requirements outweigh the

costs to consumers and competition. The Commission may consider additional such restrictions or additional guidance in the future, based on stakeholder experience with part 463 and whether it effectively remediates unlawful conduct.

Other individual commenters proposed that the Commission impose limitations on the price of the vehicle—for example, prohibiting dealers from charging more than MSRP for the vehicle—or prohibit or limit particular charges, such as dealer fees, document fees, and destination charges. The Commission notes that several Rule provisions will prohibit hidden charges and deception related to pricing, including § 463.4(a) (offering price disclosure) and § 463.3(a) (prohibition against misrepresenting the costs or terms of purchasing, financing, or leasing a vehicle). Before including additional provisions, the Commission will continue studying the market, including after the Rule is in effect, to determine whether additional steps are needed.

Other commenters opposed the offering price disclosure and related definitions. Commenters including an industry association contended that, by defining "Offering Price" in § 463.2(k) as the price "for which a Dealer will sell or finance the motor vehicle to any consumer," the Commission would prohibit dealers from changing vehicle prices as market conditions change, thereby making vehicle pricing less dynamic than under current industry practice.

Section 463.4 and the offering price definition in § 463.2(k), however, do not alter the current status quo on pricing accuracy or pricing changes. Consistent with the law, the offering price—as with a presently advertised price—must be truthful and non-misleading. If the offering price is only available for a certain period of time, the advertisement must convey that fact clearly and conspicuously, and if it is no longer available, the dealer must cease advertising the offering price.[285]

Some commenters expressed a related concern that the Commission's offering price disclosure requirement could require dealers to change their practices when an advertised vehicle is no longer available. For example, one industry commenter asked whether, under such circumstances, a dealer would somehow be obligated to sell some other vehicle

---

[282] *See, e.g.,* Comment of 18 State Att'ys Gen., Doc. No. FTC–2022–0046–8062 at 7; Comment of Consumer Att'ys & Advocs., Doc. No. FTC–2022–0046–7695 at 2–3 (requesting that the vehicle's offering price include "an estimate of government fees and charges such as sales tax and registration based on the dealer's location").

[283] *See* § 463.2(k) (defining "Offering Price" as "the full cash price for which a Dealer will sell or finance the Vehicle to any consumer, provided that the Dealer may exclude only required Government Charges").

[284] Some commenters described situations in which a dealer may decline to sell or finance a vehicle to a particular consumer, including due to legal requirements, irrespective of whether the dealer otherwise intends to honor its offering price disclosures. These situations include, for example, a consumer who presented identity theft indicia under the Commission's Red Flags Rule, 16 CFR 681; a consumer on the Specially Designated Nationals List maintained by the Office of Foreign Assets Control; a consumer who cannot produce the required proof of insurance or license to complete the transaction; or a consumer who is abusive or violent at the dealership. The Commission's offering price provision is a pricing disclosure; it will not otherwise alter the status quo on whether a given sale or financing transaction must be consummated.

[285] As is the case under current law, under part 463, any qualifying information necessary to prevent deception regarding a material fact must be conveyed clearly and conspicuously. *See* FTC Policy Statement on Deception, *supra* note 42, at 1 n.4, 4.

to that consumer at the offering price. Here, the offering price disclosure requirement does not alter the status quo: Under § 463.4(a), as under current law, if an offer is limited to a particular period of time, the offer must convey that fact, and once a price is no longer available, the dealer must cease advertising that price. Regarding which vehicles to sell at an advertised offering price, under the Commission's proposal, the dealer must disclose the offering price for the vehicles advertised. If the dealer charges a different price, then the dealer has not disclosed the offering price for which the dealer will sell or finance the vehicle, and the dealer has misrepresented the price of the vehicle, in violation of several provisions, including §§ 463.3(b) and (p) and 463.4(a). For example, if a dealer conveys that all vehicles of a certain nature or in a certain category are available at a particular offering price, but charges a higher offering price for any vehicle of that nature or in that category, the dealer has violated the Rule.

Other comments, including from a member of Congress and from dealership associations, raised concerns that the Commission's proposal would limit dealers from advertising rebates, discounts, or incentives of limited availability, including when qualifications for such rebates, discounts, or incentives are identified in the advertising, further contending that such a result would contradict prior FTC practice. Relatedly, commenters including an industry association questioned whether the Commission's proposal prohibited dealers from advertising additional vehicle prices, contending that such a result would conflict with the longstanding obligation under Federal law to disclose a vehicle's Manufacturer's Suggested Retail Price, or MSRP. The Commission notes, however, that the offering price disclosure requirement does not prevent dealers from presenting accurate and non-misleading additional information, including terms of limited availability, so long as the required offering price disclosure remains clearly and conspicuously presented to consumers.[286] If, however, a dealer's

disclosure were to give consumers a net pricing impression that is contrary to that which is actually available, then the disclosure would violate § 463.4(a), and the related requirement under § 463.3(p).[287]

Some commenters, including dealership associations, generally concluded the Commission's proposed offering price definition, or its associated disclosure provision, were unnecessary, confusing, burdensome, or likely to hinder comparison shopping. Some commenters, for instance, contended that their respective States already prohibit misrepresenting price terms, rendering the Commission's proposal redundant. The Commission notes, however, that a simple disclosure of the offering price, using the same definition across States, addresses multiple issues, including: the promotion of prices based on dealer discounts, rebates, or other price reductions when such benefits are in fact subject to hidden or undisclosed restrictions that render them unavailable to typical customers; the concealment or omission of additional dealer charges, such as for document preparation fees, amounting to several hundred dollars; the advertisement of a price without disclosing material limitations or additional charges required by the dealer that are fixed and thus can be readily included in the price at the outset; and the inducement to pursue pricing offers that are not actually available or to pay more for a vehicle due to inadequate or nonexistent disclosures. Moreover, this disclosure and the associated definitions should produce the corollary benefit of increasing price competition among dealers, who will be able to compete on truthful, standard terms.[288] The Commission also concludes that the claim that its offering price disclosure requirement would limit comparison shopping appears to follow from the mistaken notion that the offering price

disclosure prohibits dealerships from conveying accurate additional information to consumers, including information about rebates, discounts, or other limited-availability incentives.

Relatedly, some dealership association commenters contended there are areas of overlap, or potential conflict, with State law. Pursuant to § 463.9 of part 463, where it is possible for dealers to comply with both State law and the provisions of this regulation, or where State law affords greater consumer protection, part 463 will not displace existing State pricing or disclosure regimes. This addresses many of the commenters' concerns about State law. Some dealership associations, for instance, contend that their respective States require dealers to separately disclose a dealer document fee and not represent that the fee is required by the State, or that they allow dealers, with certain limitations, to incorporate rebates into an advertised price. Regarding document fees, dealers can simultaneously comply with part 463, which requires document fees to be included in the offering price unless they are "required" government charges, and with State law that permits but does not require document fees to be excluded from a vehicle's advertised price, or that requires disclosure of the amount of the document fee and that such a fee is not required by the State, by disclosing the offering price and any additional State-required information, such as the amount of the dealer document fee. Similarly, regarding rebates, in addition to the offering price, dealers may provide consumers with additional pricing information, including regarding rebates or other incentive pricing, so long as the offering price remains clear and conspicuous, and any additional information is truthful and non-misleading and otherwise complies with part 463 and existing law.

Another dealership association commenter urged the Commission to consider using an existing definition, including a State-law definition of "sales price" or the definition of "cash price" under the Truth in Lending Act's Regulation Z, in lieu of its proposed offering price definition.[289] The Commission notes that its offering price definition overlaps substantially with the commenter's suggested State-law "sales price" definition, which, according to the commenter, requires that a vehicle's advertised price be one at which "the dealer must be willing to sell the motor vehicle . . . to any retail

---

[286] A number of dealership associations expressed a related concern that the Commission, through its offering price proposal, was somehow seeking to restrict competition between dealers to being only about the price of vehicles. The associations described other areas, beyond vehicle price, by which dealerships currently distinguish themselves (*e.g.*, their range of products and services; their service availability; the convenience of their locations; and the nature of their sales staffing and process). In response, the Commission notes that it has long recognized the importance of protecting

competition across both price and quality metrics, including providing consumers with truthful, nondeceptive advertising. *See, e.g., Cal. Dental Ass'n v. Fed. Trade Comm'n,* 526 U.S. 756, 766–68 (1999) (affirming Commission exercise of law enforcement authority against industry guidelines that unlawfully restricted both price advertising and advertising relating to the quality of dental services). As noted, the offering price disclosure requirement does not prevent dealers from presenting accurate and non-misleading additional information, including information about any such distinguishing characteristics, so long as the offering price is presented clearly and conspicuously.

[287] For reference, § 463.3(p), which the Commission is finalizing, *see* SBP III.C.2(p), prohibits dealers from making material misrepresentations regarding "[a]ny of the required disclosures" under the Final Rule.

[288] *See* NPRM at 42023.

[289] Comment of Tex. Auto. Dealers Ass'n, Doc. No. FTC–2022–0046–8102 at 29–30.

buyer''; which ''must'' include certain additional charges that are fixed and thus can be readily included in the price at the outset, including ''[d]estination and dealer preparation charges''; and which permits only certain categories of costs and charges to be excluded.[290] Based on the commenter's description, unlike the Commission's definition, this State-law definition permits the exclusion of fees ''allowed'' by law or those which the law has ''prescribed.'' [291] Again, the Rule permits only charges that the government *requires* the consumer to pay to be excluded from a vehicle's offering price, by defining ''Offering Price'' to allow only ''required Government Charges'' to be excluded. This difference from the State law described by the commenter, however, creates no conflict—a dealer governed by that State law will be able to comply with both requirements by disclosing an offering price that excludes only required government charges and includes allowable government charges.

Similarly, commenters have not demonstrated any actual conflicts between the proposed offering price definition and TILA's definition of ''cash price.'' [292] Dealers can comply with both requirements by disclosing an offering price that excludes only required government charges. And the Rule's definition addresses specific unfair and deceptive conduct in the auto marketplace. Were offering prices to exclude additional categories, the resulting disclosure provision at § 463.4(a) would permit dealers to lure consumers to dealership lots based on a price that is not actually the price the dealer would require the consumer to pay, a result that would require consumers to spend time traveling to the dealership and time on the lot to attempt to discover the true price, and that would place dealerships that choose to advertise the price truthfully at a competitive disadvantage.

Relatedly, commenters including an industry association contended that no additional regulation of pricing or credit and lease advertising was necessary beyond that provided by existing practice or by the Truth in Lending Act, the Consumer Leasing Act, and their implementing Regulations Z and M, and relatedly, that the Commission's offering price disclosure requirement duplicated, modified, or ignored such existing law. The disclosure

requirement, however, is consistent with these existing legal obligations and does not disturb them; dealers can and should make the disclosures required under TILA and other laws as well as the offering price disclosure required by the Final Rule. The provision requires dealers to disclose simple and highly material pricing information under certain circumstances.[293] Providing consumers with accurate and timely pricing and financing information is critical, especially in the context of motor vehicle sales.[294]

Several commenters requested modifications to limit or expand the proposed definition of ''Government Charges,'' or clarification regarding this term's application to certain fees. For example, commenters, including a dealership association, urged the Commission to modify this proposed definition to include charges that are ''allowed to be charged but not required or imposed by a Federal, State, or local government agency, unit, or department.'' [295] One such commenter provided the example of certain registration and title charges, which it described as ''not necessarily imposed or mandatory fees'' and for which ''the amount may vary, depending on the county'' and the dealership, and within a governmentally determined range.[296] Regarding registration and title charges, to the extent such charges are required by a government agency, unit, or department, then they fall within the ''Government Charges'' definition as charges ''imposed by'' such agency, unit, or department. If, however, there are title, registration, or other fees beyond any title and registration fees required by the government, that dealers are allowed, but not required, to charge, such fees do not fall within the ''Government Charges'' definition, and

to the extent a dealer imposes such allowable charges on any consumer, such fees must be included in the offering price. Were the Commission to categorize such allowed, but not required, amounts as ''Government Charges,'' dealers would be allowed to exclude them from a vehicle's offering price but then require consumers to pay them anyway, thereby allowing dealers to lure consumers to their lots based on a price that is not actually the price the dealer would require the consumer to pay—a fact that consumers would not learn until they have spent time traveling to the dealership and time on the lot, if they learn this fact at all.[297] Further, under such circumstances, dealerships that choose to advertise the price truthfully would be at a competitive disadvantage. The Commission therefore declines to finalize the definition with such a modification.

Commenters, including a number of dealership associations, contended there were burdens associated with the Commission's offering price disclosure requirement, claiming it would cause dealers to require documenting every contact with a consumer in which a specific vehicle was mentioned, thereby lengthening the sales process and increasing the recordkeeping burden. Comments regarding recordkeeping requirements, including records that must be created and maintained under this Rule, are addressed in the section-by-section analysis of § 463.6. Here, the Commission notes that accurate pricing communication is already required by law. Section 463.4(a) does not require a complex or lengthy disclosure, is based on similar provisions already in operation in certain States,[298] will operate as a key safeguard in States without such provisions, and, as discussed in the following paragraphs, addresses deceptive and unfair conduct. Further, this offering price requirement will save consumers time when

---

[290] *Id.; see also* 43 Tex. Admin. Code 215.250(a), (b) (2023).

[291] Comment of Tex. Auto. Dealers Ass'n, Doc. No. FTC–2022–0046–8102 at 29–30; *see also* 43 Tex. Admin. Code 215.250(b)(3) (2023).

[292] *See* 12 CFR 226.2(a)(9).

[293] The industry association commenter further contended that this provision would apply to dealers based on whether they have a service department, but this is incorrect, as explained in the analysis of the definition of '' 'Covered Motor Vehicle Dealer' or 'Dealer' '' in SBP III.B.2(f).

[294] *See, e.g.,* Buckle Up, *supra* note 63, at 5 (noting consumer confusion about how the vehicle price they were offered was determined and that consumers did not understand they could negotiate price); *id.* at 9 (observing add-on products or services, which typically increase a vehicle's purchase price, were ''the single greatest area of confusion'' in the study); Att'ys Gen. of 31 States & DC, Comment Letter on Public Roundtables: Protecting Consumers in the Sale and Leasing of Motor Vehicles, Project No. P104811, Submission No. 558507–00112–1 at 5–6 (Apr. 13, 2012), *https:// www.ftc.gov/sites/default/files/documents/public_ comments/public-roundtables-protecting- consumers-sale-and-leasing-motor-vehicles-project- no.p104811-00112/00112-82927.pdf.*

[295] Comment of Tex. Auto. Dealers Ass'n, Doc. No. FTC–2022–0046–8102 at 14.

[296] *Id.*

[297] Indeed, as the Commission also noted in its NPRM, an entity that induces the first contact through false or misleading representation is liable under the FTC Act, regardless if the buyer later becomes fully informed. See, *e.g., Resort Car Rental Sys., Inc.* v. *Fed. Trade Comm'n,* 518 F.2d 962, 964 (9th Cir. 1975); *Fed. Trade Comm'n* v. *Gill,* 71 F. Supp. 2d 1030, 1046 (C.D. Cal. 1999), *aff'd,* 265 F.3d 944 (9th Cir. 2001).

[298] For example, California and Wisconsin have similarly enacted laws that make it unlawful for dealerships to advertise a total price without including additional costs to the purchaser outside the mandatory fees such as tax, title, and registration fees. Cal. Veh. Code 11713.1(b), (c) (2023); Wis. Admin. Code. Trans. 139.03(3) (2023). In Louisiana, the advertised price must be the full cash price for which a vehicle will be sold to any and all members of the buying public. La. Admin. Code tit. 46, pt. V, 719 (2023).

shopping for a vehicle by requiring the provision of salient, material information early in the process and eliminating time otherwise spent pursuing misleading offers. For dealers already disclosing accurate pricing information upfront, this provision allows them to compete on an even playing field.

Another industry association commenter contended that, by requiring offering price to be disclosed when an advertisement references a specific vehicle or represents a monetary amount or financing term "by implication," the Commission's disclosure requirement could apply to advertisements that merely list a dealer's website, on which specific vehicles and their prices appear. Under the Commission's proposal, an advertisement that does not expressly reference a specific vehicle or expressly refer to a monetary amount or financing term would not do so "by implication" solely by referring to a website, document, or other destination where such information may otherwise be available, absent evidence that the net impression of a reasonable consumer is that the advertisement implicitly references such terms.[299] The phrasing in the Commission's requirement—"expressly or by implication"—refers to the nature of the claims conveyed by a dealer's advertisement (*i.e.,* whether such claims are made expressly or by implication). For more than three decades, the Commission has explained express and implied claims as follows:

> Express claims directly state the representation at issue. Implied claims are any claims that are not express. They range on a continuum from claims that would be "virtually synonymous with an express claim through language that literally says one thing but strongly suggests another to language which relatively few consumers would interpret as making a particular representation."[300]

This same industry association commenter contended that its aforementioned concerns—that the disclosure requirement would prohibit dynamic pricing, and that the requirement would extend to advertisements simply by virtue of their referencing a dealer's website—would together cause dealers to curb their pricing representations in advertising, either by limiting such representations

to a vehicle's MSRP or by factoring out pricing altogether. As previously discussed, these concerns appear to misunderstand either existing legal requirements or the fact that an offering price disclosure would operate consistent with those requirements. The Commission's requirement simply requires dealers to disclose an offering price and does not alter the current status quo on pricing accuracy. To the extent there is a concern that requiring accurate pricing information limits dealers to advertising MSRP or forgoing advertising pricing information altogether, such concerns apply equally under current law—including in States with pricing disclosure requirements that resemble the Commission's offering price disclosure requirement. The Commission, however, has not been presented with evidence suggesting that dealers will not want to distinguish themselves from other dealers on price, and will instead default to advertising a price that is offered by all of their competitors.

Another concern raised by this same industry association commenter was that, by requiring an offering price "in the Dealer's first response" to a consumer communication that references a specific vehicle or a monetary amount or financing term for any vehicle, the requirement would prohibit dealers from explaining the offering price and why it is being provided, and that as a result, consumers may understand the offering price to be non-negotiable. Under § 463.4, however, dealers continue to be permitted to communicate accurate additional information, including the availability of discounts or the dealer's willingness to negotiate, as long as the offering price disclosure remains clear and conspicuous.

The same industry association commenter asserted that mandating the disclosure of the offering price in connection with "any communication with a consumer" would result in excessive and non-responsive disclosures. The commenter provided the example of a consumer who contacts a dealership to ask whether the dealership has "a silver [Ford] F–150 in stock," arguing that the Commission's proposal would require the dealer to respond with offering price information for each of the numerous (in the commenter's example, 40) silver F–150 vehicles the dealer has in stock. To begin, if the entire communication simply asks, "Do you have a silver Ford F–150 in stock?," it does not concern a "specific vehicle"; it concerns a group of vehicles—silver Ford F–150s—and, under § 463.4, the dealer is not required

to disclose an offering price, so long as the dealer's reply does not reference either (1) a specific vehicle or (2) a monetary amount or financing term for *any* vehicle, whether a specific vehicle or a group of vehicles.[301] If, however, the dealer chooses to respond by discussing a specific vehicle—whether by describing that vehicle, referring to a stock or VIN number, or using other means—the dealer is required to disclose the offering price for that specific vehicle. If the dealer chooses to respond by discussing several specific vehicles, the offering price disclosure requirement applies for each such vehicle. Finally, the offering price disclosure requirement applies if the dealer's response references a monetary amount or financing term, such as a down payment or monthly payment amount, for a specific vehicle or a group of vehicles. This requirement applies only to the dealer's first response regarding the specific vehicle. It does not apply to subsequent communications about that specific vehicle.

The failure to disclose a vehicle's offering price in an advertisement or other communication that references a specific vehicle, or a monetary amount or financing term for any vehicle, is likely to cause substantial injury to consumers who waste time and effort pursuing offers that are not actually available or end up paying more for a vehicle than they expected or being subject to hidden charges.

Buying or leasing a vehicle is time-consuming and often the most expensive purchase a consumer makes without knowing the actual price of the product at the outset. Consumers can spend hours driving to a dealership.[302] Once at the dealership, it can then take several hours to days to finalize a transaction [303] before the consumer learns the price of the vehicle. And many consumers never learn the true price at all; part of the finalization process includes signing dense paperwork, where information regarding the price of the vehicle and charges for

---

[299] *See* FTC Policy Statement on Deception, *supra* note 42, at 2, 5 (describing the Commission's "net impression" standard for determining the meaning of an advertisement).

[300] *Kraft, Inc.,* 114 F.T.C. 40, 120 (1991) (quoting *Thompson Med. Co., Inc.,* 104 F.T.C. 648, 788 (1984), *aff'd,* 791 F. 2d 189 (D.C. Cir. 1986), *cert. denied,* 479 U.S. 1086 (1987)).

[301] *See Any* (def. 1), Merriam-Webster.com Dictionary, *https://www.merriam-webster.com/dictionary/any* (defining "any" as "one or some indiscriminately of whatever kind").

[302] *See, e.g.,* Complaint ¶¶ 23–26, *Fed. Trade Comm'n v. N. Am. Auto. Servs., Inc.,* No. 1:22–cv–01690 (N.D. Ill. Mar. 31, 2022) (alleging that many consumers drive hours to dealerships).

[303] *See, e.g.,* Auto Buyer Study, *supra* note 25, at 15 (noting that the purchase transactions in the FTC's qualitative study often took 5 hours or more to complete, with some extending over several days); *Cf.* 2020 Cox Automotive Car Buyer Journey, *supra* note 25, at 6 (reporting average consumer time spent shopping for a vehicle at 14 hours, 53 minutes, including 1 hour, 49 minutes visiting dealerships/sellers).

other items is easily obscured, especially if consumers are not provided with baseline price information around which to anchor the lengthy, dense discussions and process. When consumers are not provided with such price information, they are susceptible to hidden charges such as "junk fees" or unnecessary add-ons that can cost consumers thousands of dollars and significantly increase their overall expense.[304] These hidden charges substantially injure consumers by increasing their total cost as well as their debt burden in the many instances where vehicle purchases are financed.[305]

Moreover, the consumer injury caused by the lack of price information is not reasonably avoidable. The dealer has sole control over pricing information and the timing of when it is provided to consumers. Even if the consumer learns of the price of the vehicle before finalizing the transaction, the consumer has already spent time and effort traveling to the dealer, on the dealership lot, and in the financing office, and for many, the immediate need for the vehicle for work, school, childcare, groceries, medical visits, and other vital household reasons makes it infeasible to start the process anew at a different dealership. Further, during the lengthy vehicle-buying process and in complex, dense paperwork, it is especially easy to hide or alter price information or include hidden charges when consumers are not provided with baseline price information around which to anchor the discussion of vehicles, monetary amounts, or financing terms.[306]

The injury to consumers from a lack of price information is not outweighed by benefits to consumers or competition from withholding this basic information. Instead, upfront information about the offering price protects consumers from lost time and effort, supracompetitive prices, and unexpected charges while increasing price competition among dealers, who should be able to compete on truthful, standard terms. The costs of providing price information—which the dealer determines and can calculate upfront— are minimal for dealers that are already advertising a specific vehicle, monetary amount, or financing term, especially when compared to the injury to consumers.

Thus, the failure to disclose a vehicle's offering price in an advertisement or other communication that references a specific vehicle, or a monetary amount or financing term for any vehicle is an unfair practice.

The Commission notes that § 463.4(a)(1) and (2) affects only dealers that are already advertising about specific vehicles or monetary amounts or financing terms; it does not affect businesses that do not expend funds on advertising specific vehicles, monetary amounts, or financing terms. The Commission will continue to monitor the market to assess whether this approach is sufficient to address the harms associated with a lack of price and charge information. If not, the Commission will revisit whether additional measures are necessary, such as requiring price information in all advertising, requiring total charge estimates, or prohibiting charges for additional items along with a vehicle sale.

Regarding deception, price is one of the most material pieces of information for a consumer in making an informed purchasing decision.[307] Yet, including as illustrated by the Commission's law enforcement efforts, it can be difficult for consumers to uncover the actual price for which a dealer will sell an advertised vehicle until visiting the dealership and spending hours on the

lot. When an advertisement or other communication references a monetary amount or financing term, it is reasonable for a consumer to expect that those amounts and terms are available at other standard terms. If instead, for example, a dealer advertises a low monthly payment based on an unexpectedly long financing term or an unexpectedly high interest rate that results in a higher price than standard terms would have, then the consumer is lured to the dealership based on a misimpression of what they reasonably expect the total price to be.

If a dealer advertises a specific vehicle, it is reasonable for a consumer to expect to learn the true offering price of the vehicle upon visiting the dealership. Consumers are misled when dealers misrepresent or otherwise obscure price information or charge for items beyond the advertised vehicle during the long and complex sales, financing, and leasing process.[308]

If consumers knew that the true price was beyond what was expected or that the prices and charges were for unwanted items, that would likely affect their choice to visit one dealership over another dealership. Thus, misleading consumers about price information is material. *See, e.g., Fed. Trade Comm'n v. Windward Mktg., Inc.,* No. Civ.A. 1:96–CV–615F, 1997 WL 33642380, at *10 (N.D. Ga. Sept. 30, 1997) ("[A]ny representations concerning the price of a product or service are presumptively material." (citing *Removatron Int'l Corp.,* 111 F.T.C. 206, 309 (1988));

[304] *See* Nat'l Consumer L. Ctr., "Auto Add-Ons Add Up: How Dealer Discretion Drives Excessive, Arbitrary and Discriminatory Pricing" (2017), *https://www.nclc.org/wp-content/uploads/2022/09/auto_add_on_charts.pdf;* Complaint ¶¶ 25, 27–28, *Fed. Trade Comm'n v. N. Am. Auto. Servs., Inc.,* No. 1:22–cv–01690 (N.D. Ill. Mar. 31, 2022) (alleging defendants charged thousands of consumers hundreds to thousands of dollars each for unauthorized add-ons, totaling in aggregate over $70 million since 2017); Complaint ¶¶ 59, 61, *Fed. Trade Comm'n v. Universal City Nissan, Inc.,* No. 2:16–cv–07329 (C.D. Cal. Sept. 29, 2016) (alleging unauthorized add-on charges costing thousands of dollars).

[305] According to public reports, 81% of new motor vehicle purchases, and nearly 35% of used vehicle purchases, are financed. *See* Melinda Zabritski, Experian Info. Sols., Inc., "Automotive Industry Insights: Finance Market Report Q4 2020" at 4, *https://www.autofinancenews.net/wp-content/uploads/2021/03/2020-Q4-Auto-Finance-News-Industry-Pulse.pdf.*

[306] *See, e.g.,* Complaint ¶¶ 17–19, 44, *Fed. Trade Comm'n v. Liberty Chevrolet, Inc.,* No. 1:20–cv–03945 (S.D.N.Y. May 21, 2020) (dealers inflated the car price on paperwork in the middle of the sale without the consumer's knowledge or authorization, a practice they internally referred to as adding "air money"); Complaint ¶¶ 24–27, *Fed.*

*Trade Comm'n v. N. Am. Auto. Servs., Inc.,* No. 1:22–cv–01690 (N.D. Ill. Mar. 31, 2022) (alleging that defendants buried charges for add-ons in voluminous paperwork, making it difficult to detect).

[307] *See, e.g., Fed. Trade Comm'n v. Windward Mktg., Inc.,* 1997 WL 33642380, at *10 (N.D. Ga. Sept. 30, 1997)) ("[A]ny representations concerning the price of a product or service are presumptively material."); *Thompson Med. Co., Inc.,* 104 F.T.C. 648, 817 (1984); *see also Fed. Trade Comm'n v. Crescent Pub. Grp., Inc.,* 129 F. Supp. 2d 311, 321 (S.D.N.Y. 2001) ("Information concerning prices or charges for goods or services is material, as it is 'likely to affect a consumer's choice of or conduct regarding a product.' ").

[308] Consumers who expect particular prices, based on the MSRP or Kelley Blue Book, are also misled when true pricing information is not disclosed upfront. *See, e.g.,* Individual commenter, Doc. No. FTC–2022–0046–1878 ("We ended up having to drive 3 hours to get the [vehicle we] wanted. Upon arriving to pickup the car we were told there was a 4300 increase over MSRP."); Individual commenter, Doc. No. FTC–2022–0046– 1690 ("It was only after five hours at the dealership that we discovered the dealer had added on a $3000 market adjustment and $3100 in other add-ons (nitrogen-filled tires, LoJack, paint protection) to MSRP."). The average transaction price of a new vehicle exceeded the average manufacturer's suggested retail price (MSRP) for twenty consecutive months between 2021 and 2023. *See* Cox Auto., "After Nearly Two Years, New-Vehicle Transaction Prices Fall Below Sticker Price in March, According to New Data from Kelley Blue Book" (Apr. 11, 2023), *https://www.coxautoinc.com/market-insights/kbb-atp-march-2023/; see also* Edmunds, "8 Out of 10 of Car Shoppers Paid Above Sticker Price for New Vehicles in January, According to Edmunds" (Feb. 15, 2022), *https://www.edmunds.com/industry/press/8-out-of-10-of-car-shoppers-paid-above-sticker-price-for-new-vehicles-in-january-according-to-edmunds.html;* iSeeCars, "10 New Cars Priced the Highest Over MSRP, Even as Peak Pricing Eases" (Mar. 19, 2023), *https://www.yourerie.com/news/10-new-cars-priced-the-highest-over-msrp-even-as-peak-pricing-eases/* (finding the average new car price was 8.8% over MSRP).

*Thompson Med. Co., Inc.,* 104 F.T.C. 648, 817 (1984)); *see also Fed. Trade Comm'n* v. *Crescent Pub. Grp., Inc.,* 129 F. Supp. 2d 311, 321 (S.D.N.Y. 2001) ("Information concerning prices or charges for goods or services is material, as it is 'likely to affect a consumer's choice of or conduct regarding a product.' ").[309]

Thus, it is an unfair or deceptive act or practice for dealers to fail to disclose the offering price in an advertisement or other communication that references, expressly or by implication, a specific vehicle or any monetary amount or financing term for any vehicle.

Furthermore, this provision also serves to prevent the misrepresentations prohibited by § 463.3—including misrepresentations regarding costs or add-ons—by requiring consumers to be told the true price of the vehicle in advertisements and other communications. It also helps prevent dealers from failing to obtain the express, informed consent of consumers for charges, as addressed by § 463.5(c).[310] Thus, the Commission is requiring dealers to disclose a vehicle's offering price when advertising or otherwise communicating about a specific vehicle or monetary amount or financing term for any vehicle. This provision allows consumers to compare offers based on the same price terms and to select dealers that truly offer the lowest price rather than dealers that advertise deceptively low prices but charge more. When price information in the market is distorted or concealed—especially in document- and time-intensive vehicle transactions—consumers are unable to effectively differentiate between sellers, and sellers trying to deal honestly with consumers are put at a competitive disadvantage.

For the foregoing reasons, and having considered the comments that it received on this proposed provision, the Commission is finalizing the offering price provision at § 463.4(a) with modifications to capitalize the defined term "Vehicle" in its singular, plural, and possessive forms, to correspond to the revised definition at § 463.2(e), and

to add language clarifying that the provision is also prescribed for the purpose of preventing unfair or deceptive acts or practices defined in this Rule. The Commission is finalizing the corresponding "Offering Price" and "Government Charges" definitions in § 463.2 largely as proposed, with modifications to the "Offering Price" definition to conform with the defined term "Vehicle" and to clarify that dealers may, but need not, exclude required government charges from a vehicle's offering price, and a typographical modification to the "Government Charges" definition to include a serial comma for consistency.

(b) Add-On List

The Commission's proposed add-on list disclosure provision (proposed § 463.4(b)) required the disclosure, both online and at each dealership, of a list of all optional add-ons for which the dealer charges consumers and the price of each such add-on.[311] As proposed, if the price of the add-on varies based on the specifics of the transaction, the add-on list would have to include the range the typical consumer will pay.[312] Due to space constraints, dealer advertisements presented not online but in another format—such as in print, radio, or television—would not be required to include the add-on list, disclosing instead the website, online service, or mobile application where consumers can access the add-on list.[313]

Many commenters, including consumer advocacy organizations, supported the proposal to require dealers to provide consumers with clear, accurate pricing information for add-on products or services altogether in one

list. Some commenters raised concerns that, without significant modification, the Commission's proposal to allow for the disclosure of price range information where the price of an add-on varies based on the specifics of the transaction would allow for significant abuses, including by permitting dealers to disclose ranges so broad they would be meaningless. Such commenters urged the Commission to modify its definition of "Add-on List" to require, where a price range is listed for a given add-on, the add-on list further indicate the low, median, and high prices charged to consumers for each such add-on over the preceding two years; or that the Commission require dealers to create individualized add-on lists for each vehicle sold, containing one fixed, non-negotiable price for each add-on. Relatedly, other commenters, including industry organizations, expressed concerns regarding the add-on list proposal, including that the proposal to allow for price range information was vague or confusing, and that certain aspects of the proposed definition, including the scope of add-ons covered, as well as the requirement to keep such add-on lists updated, would impose extensive economic burdens.

After careful review of the comments, the Commission has determined not to finalize its proposed add-on list provision (proposed § 463.4(b)). Here, the Commission believes its proposal would benefit from further review and refinement. The Commission nevertheless emphasizes that, under existing law, dealers are prohibited from misrepresentations regarding material information about any costs, limitation, benefit, or any other aspect of an add-on, and from charging for add-ons without obtaining the express, informed consent of the consumer—conduct which the Final Rule prohibits as well, including in §§ 463.3(b) and § 463.5(c). The Commission also emphasizes that, in addition to the Rule's prohibitions, industry guidance and effective self-regulatory efforts can serve a role in helping prevent problematic dealer behavior in this area. The Commission will continue to monitor the motor vehicle marketplace for issues pertaining to add-ons and will consider implementing additional measures in the future if it determines such measures are warranted to address deceptive or unfair acts or practices related to add-on products or services.

(c) Add-Ons Not Required

For optional add-on products or services, the Commission's proposed § 463.4(c) required dealers to disclose, when making any representation about

[309] Even if some consumers were not misled by the failure to disclose the offering price, to show deception under the FTC Act, "the FTC need not prove that every consumer was injured. The existence of some satisfied customers does not constitute a defense. . . ." *Fed. Trade Comm'n* v. *Amy Travel Serv., Inc.,* 875 F.2d 564, 572 (7th Cir. 1989), *vacated in part on other grounds, Fed. Trade Comm'n* v. *Credit Bureau Ctr., LLC,* 937 F.3d 764 (7th Cir. 2019); *accord Fed. Trade Comm'n* v. *Stefanchik,* 559 F.3d 924, 929 n.12 (9th Cir. 2009).

[310] *See* 15 U.S.C. 57a(a)(1)(B) (the Commission "may include requirements prescribed for the purpose of preventing" unfair or deceptive acts or practices).

[311] To the extent any add-on charges are required by a dealership, and thus are not optional, such charges would have to be included in the offering price, pursuant to §§ 463.2(k) and 463.4(a).

[312] *See* NPRM at 42044 (noting, in the definition of "Add-on List" at proposed § 463.2(b) that "[i]f the Add-on price varies, the disclosure must include the price range the typical consumer will pay instead of the price"); *see also Fed. Trade Comm'n* v. *Five-Star Auto Club, Inc.,* 97 F. Supp. 2d 502, 528 (S.D.N.Y. 2000) ("at the very least it would have been reasonable for consumers to have assumed that the promised rewards were achieved by the typical Five Star participant"); Complaint ¶¶ 28–50, *Fed. Trade Comm'n* v. *Universal City Nissan, Inc.,* No. 2:16–cv–07329 (C.D. Cal. Sept. 29, 2016) (alleging unlawful deception where a dealer's ads list prominent terms not generally available to consumers, including where those terms are subject to various qualifications or restrictions); Complaint ¶¶ 8–10, Progressive Chevrolet Co., No. C–4578 (F.T.C. June 13, 2016) (alleging advertised offer was deceptive because the typical consumer would not qualify for the offer).

[313] Working in tandem, proposed § 463.4(b)(1) and (2) would mean that dealers who engage in advertising and charge for optional add-ons must have a website, online service, or other mobile application by which to disclose an add-on list.

an optional add-on, that the add-on is not required and the consumer can purchase or lease the vehicle without the add-on. For the reasons discussed in the paragraphs that follow, the Commission is finalizing the required disclosure at § 463.4(c) largely as proposed. The Commission is capitalizing the defined term "Vehicle" to conform with the definition at § 463.2(e). The Commission also is adding language to the end of § 463.4(c) clarifying that the requirements in § 463.4(c) "also are prescribed for the purpose of preventing the unfair or deceptive acts or practices defined in this part, including those in §§ 463.3(a) and (b) and 463.5(c)."

A number of commenters, including a group of State attorneys general, supported this proposed requirement, contending that unscrupulous dealers have exploited the vehicle sales process to saddle consumers with unwanted add-on products or services, and that such a disclosure would importantly help consumers avoid discovering these additional charges only after completing the purchase, assenting to them because they believed the add-ons to be required in order to purchase the vehicle, or paying for them unknowingly because they never uncovered the charges. Many individual commenters also stressed the need for add-on disclosure requirements. For example:

• Salespeople such as myself are responsible for selling the car and all aftermarket/add-on products. This has put me in a unique position to see how these proposed regulations would impact automotive sales. I cannot stress enough my support for these new rules. . . . The payments calculated by management include add-ons, but the price of the add-ons and how they affect the payments are not shown. The add-ons "packed" in the first payment often include an extended warranty, GAP insurance, tire and wheel protection, an oil change package, a theft recovery device, and sometimes more depending on the situation.[314]

• Car buying is one of the most miserable consumer experiences in existence. Frankly, I'm disappointed that this issue hasn't been addressed decades ago. It's well past time that the deceptive practices that car dealers use to manipulate and take advantage of customers is made illegal. What other business can legally lie about the price of the product that they sell, and slip extra unwanted products into the deal that they don't reveal and won't remove upon request? These practices are arcane and unfair, especially considering the absurd cost of automobiles today. I wholeheartedly approve of what the proposed rules are attempting to accomplish. Please do not allow a powerful lobbying group to limit or change good legislation that benefits tens of millions of Americans who currently dread the car buying experience for far more reasons than just price.[315]

• . . . I am not against business making a profit, in fact most Americans understand businesses need to make money too, however most dealers will not disclose additional costs to the purchaser until it is time to sign paperwork for purchase. Rather than simply being upfront with what their desired price is and how much they make from the sale rather they are fed lines about "common practices", [sic] "these are normal fees" or simply not being forthright about additional costs on items only installed on location at the dealerships to drive the price up. Even more insulting is when buyer[s] ask to have options removed from the vehicle dealers stall or flat out refuse to do so.[316]

• It is about time something like this is brought up. This will have no effect on the honest dealers out there. . . . This will really help the consumer. . . . We will be able to compare apples to apples. You won't show up at the dealership with the lowest price only to find out that they have all these other fees that make them the least desirable of the choices. Also, adding stuff like pinstriping for large fees will come to an end. . . . I have no problem with a dealer making money. They are a business and have overhead. I have a problem when they try [to] gloss over everything they are trying to charge you for. This ruling needs to take effect. Anyone posting against it is someone working for a dealer. Like I mentioned before, if you are doing everything on the up and up, not only do you get good reviews and repeat business, but this ruling will not even effect [sic] you.[317]

• I also agree that Enhanced Informed Consent in F & I office is necessary. One of my cohort was almost coerced into non-equivalent decision-making scenarios in the finance office with their car purchases. The finance officer flat out ask[ed] them, "did you want the 2 year, 30[,000] mile extended warrant[y], or the 4 year 50[,000] mile extended warranty?'' The wife sat there and asked, "I'm confused. Do I HAVE to pick one of those?" Her husband said, "No, he's trying to trick you into buying one. You don't need any at all.'' They then promptly threatened to walk out and the finance manager came out and did their paperwork without further conflict.[318]

Several commenters offered support while also proposing that the Commission adopt additional measures to further ensure that consumers understand that optional add-ons are not required. One dealership group, for example, commenting in support of disclosures that optional add-ons are not required, recommended that dealers be required to include signage on their websites and in their showrooms or on their sales desks that set out both components of the Commission's proposal: that add-ons are not required, and that consumers may purchase or lease the vehicle without add-ons. Other commenters, including a consumer protection agency and a consumer advocacy organization, suggested that the Commission modify the language in proposed § 463.4(c) to strike the "if true'' language, asserting that all add-ons should be optional and not required to consummate the sale or lease of a vehicle. At least one individual commenter recommended that the Commission prohibit dealers from pre-installing add-ons.

In response to these comments, the Commission notes that, were it to require signage stating, generally, that add-ons are optional, or to strike the "if true'' language from this disclosure, it would cause consumers to be presented with information that may not be accurate in all circumstances. Some add-ons might already be installed on the vehicle or otherwise required by the dealer. As explained in SBP III.D.2(a) with regard to § 463.4(a), charges for such add-ons must be included in the vehicle's offering price. In such cases, representing that add-ons are categorically optional would mislead

---

[314] Individual commenter, Doc. No. FTC–2022–0046–3693.

[315] Individual commenter, Doc. No. FTC–2022–0046–5268.

[316] Individual commenter, Doc. No. FTC–2022–0046–1365.

[317] Individual commenter, Doc. No. FTC–2022–0046–9883; *see also* Individual commenter, Doc. No. FTC–2002–0046–9632 ("I was told that GAP insurance was required to be included. . . . I [later] contacted and asked for copies of my contracts. On September 5 [the dealer] sent me an email with a credit contract attached. I am including it here. It says my monthly payment is over \$370. It also shows the cash price as close to \$17,000.00. I can also see it says the GAP is optional. I never saw this contract. I never signed this contract.").

[318] Individual commenter, Doc. No. FTC–2022–0046–6816.

[319] In such cases, however, § 463.4(a) of the Final Rule requires these non-optional add-ons to be included in a vehicle's offering price; if the dealer requires the consumer to pay for them, they are part of the full cash price for which a dealer will sell or finance the vehicle to any consumer. *See* SBP III.D.2(a).

the consumer. Relatedly, by requiring that charges for mandatory items be included in the vehicle's offering price, the Final Rule allows dealers to customize the vehicles they are selling while protecting consumers by requiring dealers to disclose the offering price for such customized vehicles. Accordingly, the Commission declines to prohibit the practice of pre-installing add-ons in this Final Rule, but will continue to monitor the market to determine whether pre-installed add-ons require further regulation. At the same time, the Commission emphasizes that the protections contemplated here and elsewhere in this Final Rule prohibit dealers from obscuring price information and whether an add-on is optional, and further require dealers to obtain the express, informed consent of the consumer to charge a consumer for any add-on.

Additionally, several commenters indicated their support for the Commission's proposal while also recommending that the Commission consider further steps to protect consumers from deceptive or unfair practices pertaining to the inclusion of add-ons in consumer vehicle sales or leases. Some commenters, including a group of State attorneys general and a dealership association, requested that the Commission require dealers to disclose any mandatory add-ons and whether those add-ons are required in order to obtain financing, including by requiring such disclosure in an addendum sticker affixed to the motor vehicle. In response, the Commission notes that other provisions of the Final Rule prohibit misconduct in this area, including by requiring, at § 463.4(a), that charges for such add-ons must be included in the vehicle's offering price. While consumers may benefit from repeated or additional disclosures, each additional disclosure requirement would increase both the cost to comply with the regulation and the risk of crowding out other important information. Given these risks, the Commission declines to include additional requirements regarding the content or form of its add-on disclosure at § 463.4(c). The Commission will continue to monitor the market to gather additional information on this issue and will consider whether to modify or expand this or other sections in the future based on stakeholder experience with this provision and whether it effectively halts unlawful conduct.

Other commenters, including consumer advocacy organizations and consumer attorneys and advocates, urged the Commission to adopt a thirty-day "cooling-off" period for the sale of vehicle-related add-ons, similar to that required by the Commission for door-to-door and other off-premises sales,[320] which would grant consumers time to review the paperwork after the transaction, and to cancel unexpected or otherwise unwanted add-ons for a full refund. As explained in greater detail in the discussion of § 463.5(c), in SBP III.E.2(c), the Commission also has determined not to include in this Final Rule a "cooling-off" period in which add-on products or services may be canceled. In this regard, the Commission would benefit from additional information, including the length of time needed for such "cooling off" rights to be effective. The Commission may consider revisiting this decision in the future based on actual stakeholder experience with the provisions of the Final Rule and whether they effectively halt unlawful conduct.

Other commenters presented questions or critiques regarding this proposed disclosure. As with the Commission's proposed disclosures generally, some commenters, including an industry association and a dealership association, contended that existing requirements in a number of States to disclose that add-ons are optional make Federal regulation in this area unnecessary or contradictory. As described in detail in SBP III.D.1, the Commission first observes that the functioning of such standards demonstrates the practicability of its proposed disclosure that add-ons are not required. To the extent a State requires additional disclosures regarding add-ons, nothing prevents dealers from providing those disclosures as well as those required under part 463 so long as the State disclosures are not inconsistent with those required under part 463. To the extent there is truly an inconsistency between this part and State law, § 463.9 provides that part 463 will govern, but only to the extent of the inconsistency, and only if the State statute, regulation, order, or interpretation affords consumers less protection than does the corresponding provision of this part. Finally, a number of States do not have existing standards in this area; in such States, the Commission's disclosures operate as a key safeguard.

Commenters, including dealership associations, argued that dealers would develop and use an additional form to demonstrate compliance with this disclosure requirement, thereby burdening the vehicle sales and delivery process. The Commission begins by noting that any such steps are not required by part 463; on the contrary, the Commission structured this disclosure to provide dealers with flexibility, within the bounds of the law, to provide this essential information in a manner that is clear and conspicuous under the particular circumstances of their transactions. This requirement does not require a complex or lengthy disclosure, is based on similar provisions already in operation in certain States,[321] and for dealers already disclosing accurate add-on information, this provision requires no significant additional burden.

When making a representation about an add-on product or service, the failure to disclose that the add-on is not required and the consumer can purchase or lease the vehicle without the add-on, if true, is likely to cause substantial injury to consumers who end up paying more for a vehicle sales or lease transaction than they expected by being subject to charges of which they are not aware or which they believe are required because they were never told they could decline the charges.

Absent this information, consumers cannot reasonably avoid the injury of being charged for these products because they are not aware that they have an option to begin with. When consumers are presented with motor vehicle transaction documents that include a variety of charges, it is difficult to detect any charges that are added to the contract beyond those that are required or have been agreed upon, especially in a stack of lengthy, complex, highly technical, and often pre-populated documents, at the close of a long sales, financing or leasing process after an already-lengthy process of selecting the vehicle and negotiating over its price or payment terms. Consumers cannot reasonably avoid charges of which they are unaware, or regarding which they do not know they have a choice.

---

[320] *See* Rule Concerning Cooling-Off Period for Sales Made at Homes or at Certain Other Locations, 16 CFR 429.

[321] *See, e.g.,* California Car Buyer's Bill of Rights, Cal. Civ. Code 2981 (requiring dealers to provide a written list of specified items purchased and their effect on monthly payments, including GAP, theft deterrent devices, and surface protection products); Minn. Stat. 59D.06(b) (requiring any person offering a GAP waiver to disclose that the waiver is not required for a consumer to buy or lease the vehicle); Wash. Rev. Code. 48.160.050(9) (mandating that GAP waivers disclose that "neither the extension of credit, the terms of the credit, nor the terms of the related motor vehicle sale or lease, may be conditioned upon the purchase of the waiver."); La. Stat. Ann. 32:1261(A)(2)(a) (declaring it unlawful for a dealer to require, as a condition of sale and delivery, for a consumer to purchase "special features, appliances, accessories, or equipment not desired or requested by the purchaser.").

The injury to consumers from a lack of information about add-on optionality is not outweighed by benefits to consumers or competition from withholding this basic information. Instead, information about the optional nature of these products or services protects consumers from lost time and effort, supracompetitive transaction costs, and unexpected charges while increasing competition among dealers, who are able to compete on truthful, standard terms. Moreover, the cost of providing this threshold information is minimal, especially when compared to the injury to consumers, and providing such information is consistent with existing industry guidance.[322]

This provision addresses deceptive conduct as well. Throughout the lengthy vehicle sales, financing, or leasing process, dealers often discuss various different charges at various different times. Such charges include charges the government requires the consumers to pay and financing costs. Dealers then often present consumers a total amount to pay that differs from the advertised or sticker price. Given that some additional charges are required, if a dealer also discusses charges for items that are not required, such as optional add-ons, it is reasonable for consumers to believe that charges for such items are required. In the course of a lengthy transaction involving extensive negotiations, dealers can obscure such products and their associated charges in dense paperwork. Moreover, the omitted information is highly material: if consumers knew that a particular optional add-on was not required to purchase the vehicle, it would likely affect their choice about whether to purchase the add-on.[323]

Thus, it is an unfair or deceptive act or practice for dealers to fail to disclose, when making a representation about an add-on product or service, that the add-on is not required and the consumer can purchase or lease the vehicle without the add-on, if true. Further, this provision also serves to prevent the misrepresentations prohibited by § 463.3—including misrepresentations regarding material information about the costs or terms of purchasing, financing, or leasing a vehicle, or about any costs, limitations, benefits, or any other aspect of an add-on—by requiring consumers to be told whether represented add-ons are optional. It also helps prevent dealers from failing to obtain the express, informed consent of the consumer for charges, as addressed by § 463.5(c).[324] Thus, the Commission is requiring dealers to disclose, when making representations about add-ons, that the add-ons are not required and the consumer can purchase or lease the vehicle without the add-ons, if true.

For the foregoing reasons, and having considered all of the comments that it received on this proposal, the Commission is finalizing the required disclosure at § 463.4(c) largely as proposed, with the minor modifications of capitalizing the defined term "Vehicle" and clarifying that the requirements of § 463.4(c) also are "prescribed for the purpose of preventing the unfair or deceptive acts or practices defined in this part, including those in §§ 463.3(a) and (b) and 463.5(c)."

(d) Total of Payments and Consideration for a Financed or Lease Transaction

Section 463.4(d) of the Commission's proposed rule required dealers, when making any representation about a monthly payment for any vehicle, to disclose the total amount the consumer will pay to purchase or lease the vehicle at that monthly payment after making all payments as scheduled. If the total amount disclosed assumes the consumer will provide consideration, the proposed rule required dealers to disclose the amount of consideration to be provided by the consumer. For the reasons discussed in the following paragraphs, the Commission is finalizing the required disclosure at § 463.4(d) largely as proposed. The Commission is capitalizing the defined term "Vehicle" to conform with the definition at § 463.2(e), and making the minor grammatical correction of replacing the semicolon and the word "and" at the end of § 463.4(d)(1) with a period. The Commission also is adding language to the end of § 463.4(d), at newly designated (d)(3), clarifying that the requirements in § 463.4(d) "also are prescribed for the purpose of preventing the unfair or deceptive acts or practices defined in this part, including those in §§ 463.3(a) and 463.5(c)."

A number of commenters, including consumer advocacy organizations, supported this proposed requirement, contending it would provide essential information to the consumer while not contributing to information overload, and noting the information to be disclosed would have been calculated by the dealer in the process of determining the proposed monthly payment. Many individual commenters also stressed the need for the Commission's proposal:

• Small businesses are a cornerstone of our economy. Automotive dealers, like other retailers, deserve to make a reasonable profit in order to maintain their physical plants, to purchase inventory, and to pay their staff. That being said, some auto dealers have for years used misleading and often out-and-out deceptive sales tactics (*i.e.*, lies) to generate sales. . . . Sometimes the unwary consumer may not even realize that the actual price differs from the quoted price, because the automobile finance agent speaks only in terms of monthly payments rather than the total cost. The consumer may not even realize that he or she has been "taken" until a friend with an amortization table runs the numbers.[325]

• At most dealerships, including the one I work at, when a customer asks to see figures on a car after a test drive, management goes out of their way to make sure the customer only sees the monthly payment. The typical numbers presented to the customer initially show the price of the car, the trade-in value, the down payment, and the monthly payment options in bold numbers at the bottom. The payments calculated by management include add-ons, but the price of the add-ons and how they affect the payments are not shown. . . . Compounding this issue of hidden add-ons is that salespeople are instructed to figure out the customer's budget beforehand (*e.g.*, \$450 per month). If the monthly payment with the car and add-ons comes out to be less than \$450 per month, management will often raise the price of the add-ons to get the payment to \$450 or even slightly above.[326]

• I wholeheartedly support the proposed regulation changes for car dealerships and the car buying process.

---

[322] *See* Nat'l Auto. Dealers Ass'n et al., "Voluntary Protection Products: A Model Dealership Policy" 4 (2019), *https://www.nada.org/regulatory-compliance/voluntary-protection-products-model-dealership-policy* (stating dealerships should "prominently display to customers a poster stating that [add-on products or services] offered by the dealership are optional and are not required to purchase or lease a vehicle or obtain warranty coverage, financing, financing on particular terms, or any other product or service offered by the dealership. . . .").

[323] *See, e.g., Fed. Trade Comm'n. v. Windward Mktg., Inc.*, 1997 WL 33642380, at *10 (N.D. Ga. Sept. 30, 1997)) ("[A]ny representations concerning the price of a product or service are presumptively material."); *Thompson Med. Co., Inc.*, 104 F.T.C. 648, 817 (1984); *see also Fed. Trade Comm'n v. Crescent Pub. Grp., Inc.*, 129 F. Supp. 2d 311, 321 (S.D.N.Y. 2001) ("Information concerning prices or charges for goods or services is material, as it is 'likely to affect a consumer's choice of or conduct regarding a product.'").

[324] *See* 15 U.S.C. 57a(a)(1)(B) (the Commission "may include requirements prescribed for the purpose of preventing" unfair or deceptive acts or practices).

[325] Individual commenter, Doc. No. FTC–2022–0046–1216.

[326] Individual commenter, Doc. No. FTC–2022–0046–3693.

As an average consumer who has bought 3 vehicles with financing and 2 without, I can see the obvious benefit these proposed regulations would have on the car buying process. The vast quantities of paperwork and add [-]ons make it easy for car dealers to switch things around to their benefit. I had one dealership . . . change the term of my auto loan from 72 to 84 months in the middle of reprinting the final sales sheet because of another obvious error in the first copy. In the midst of all the distractions and misdirection going on, [I] didn't notice [']til[l] after the fact. I felt powerless and cheated. . . .[327]

• There is no reason that buying a car has to be a chore and so ambiguous on price. The dealer was also so twisted up on getting me to focus on the monthly payment and not the total price of the car and that is where they were able to sneak the price up. Practices like this are also why people have such a disdain for purchasing a new/used car.[328]

• I have experienced many of the ''typical'' tactics that one hears about when negotiati[ng] with an automobile dealership, like the salesperson always wanting to talk about the monthly payment and never the actual trade-in price and sales price. . . . I agree that the whole car buying process could be made easier and I see no reasons that any fair and honest car dealership would object to these proposed changes/rules as they, in my estimation are all things that a fair and honest car dealer should be doing anyway. The only car dealers that should be objecting to these new rules should be the unscrupulous dealers.[329]

• When buying a car dealers try to negotiate the monthly payment, so the actual total cost is hidden from the buyer until they get into the ''financing office'' where all kinds of unexpected add-ons are sprung on the consumer.[330]

• I am trying to buy a new car, from the factory, with no modifications or alterations, is it so much to ask for? The process of figuring out the price of the car is impossible. The sales people are all about the monthly payment, when I asked them what the car price is the answer is always what payment are you looking for.[331]

• They only want to gain the amount you can be ''comfortable'' on your monthly payment so that they can stretch out the term and hammer you with hidden fees and other expenses you won[']t be able to see right away.[332]

• Dealerships always want you to come in so they can manipulate you into a car you can[']t afford and pay for things you don't need by hiding them in a monthly payment.[333]

• If we had to do our grocery shopping the same way dealers want us to buy a car, most Americans would starve before sunset. ''What kind of monthly payment are you looking for in a banana?'' is a conversation I should never be forced to have. . . .[334]

One individual commenter requested that the Commission make clear that handwritten negotiation notes made by a dealer would trigger the requirement that this proposed disclosure be made in writing.[335] In response, the Commission affirms such representations have been made ''in writing,''[336] and thus, where dealers represent a monthly payment in such notes, this provision requires them to provide the disclosures in § 463.4(d) in writing.

Other commenters, including industry associations and individual commenters, questioned whether the proposal would require a disclosure in every place a monthly payment appears on a dealer's website, or otherwise would be difficult or infeasible given the frequency with which dealers provide consumers with monthly payment information, suggesting that such a requirement could either overwhelm consumers or dissuade dealers from providing monthly payment information, or arguing[337] that the proposal overlapped with other laws such as the Truth in Lending Act or the Consumer Leasing Act. Regarding monthly payment amounts appearing more than once or in multiple places, the Commission notes that, as proposed, this section would require disclosure of the total purchase or lease amount for a vehicle including any assumed consumer-provided consideration, and only when making a representation about the vehicle's monthly payment amount; it would not require a complex or lengthy disclosure. Consumers shop for vehicles and interact with online interfaces, and other advertising in many different ways; thus, it is important for this simple disclosure to accompany a monthly payment representation however a consumer might encounter it. Moreover, the Commission has taken into account existing disclosure obligations.[338] Monthly payment amounts for motor vehicle sales or leases constitute so-called ''triggering terms'' under the Truth in Lending Act, the Consumer Leasing Act, and their implementing Regulations Z and M. As such, dealers currently providing such information, including on their websites or other online interfaces, are bound by existing laws that require providing consumers with additional terms in a clear and conspicuous way: in the case of vehicle credit transaction offers, this includes the terms of repayment, which reflect the repayment obligations over the full term of the loan;[339] in the case of vehicle lease offers, this includes the number, amounts, and due dates or periods of scheduled payments under the lease.[340] The Commission's disclosure requirement takes into account these existing obligations, requiring, specifically: the total amount the consumer will pay to purchase or lease the vehicle at a represented monthly payment amount including any assumed consumer-provided consideration. Similarly, regarding the feasibility of providing this disclosure as often as dealers provide consumers with monthly payment information: once dealers choose to make a representation about a monthly payment, they are capable of disclosing a total of payments for the consumer based on the same inputs needed to arrive at that voluntary monthly payment representation.

The Commission further notes that, in the event a monthly payment is already being disclosed, the associated total of payment would be calculated with the same financing or leasing estimates used

---

[327] Individual commenter, Doc. No. FTC–2022–0046–5567.

[328] Individual commenter, Doc. No. FTC–2022–0046–2176.

[329] Individual commenter, Doc. No. FTC–2022–0046–4034.

[330] Individual commenter, Doc. No. FTC–2022–0046–4911.

[331] Individual commenter, Doc. No. FTC–2022–0046–5958.

[332] Individual commenter, Doc. No. FTC–2022–0046–8847.

[333] Individual commenter, Doc. No. FTC–2022–0046–6405.

[334] Individual commenter, Doc. No. FTC–2022–0046–3860.

[335] Individual commenter, Doc. No. FTC–2022–0046–9469 at 6–7.

[336] See, e.g., Writing, Black's Law Dictionary (11th ed. 2019) (defining ''writing'' as ''[a]ny intentional recording of words in a visual form, whether in handwriting, printing, typewriting, or any other tangible form that may be viewed or heard with or without mechanical aids.''); cf. Fed. R. Evid. 1001(a) (defining ''writing'' as letters, words, numbers, or their equivalent set down in any form'').

[337] These association commenters made these contentions regarding the monthly payment disclosures at both § 463.4(d) and (e). The Commission responds to these contentions in this section.

[338] One industry commenter, in expressing concern that § 463.4(d) and (e) may conflict with Regulations Z and M, questioned whether the FTC coordinated with the Federal Reserve Board. Several Senators similarly questioned whether the FTC consulted with the Federal Reserve Board, CFPB, or other agencies. Although the Commission cannot comment on specific interactions, it coordinates regularly with other Federal agencies, including the Federal Reserve Board and the CFPB.

[339] See 12 CFR 1026.24(b), (d)(2)(ii).

[340] See 12 CFR 1013.7(b), (d)(2)(iii).

to calculate the monthly payment. Dealers already must be prepared to calculate such a total to satisfy their obligations under TILA, the CLA, or their implementing regulations.[341]

Regarding § 463.4(d)'s similarity to existing laws, as discussed previously, this provision is indeed consistent with other laws, and commenters have not indicated how providing truthful information about total payment amounts along with information they already provide about monthly payment amounts would unduly burden them or harm consumers, or how providing such information in writing before providing consumers with the contract, if they are already providing monthly payment information in writing prior to the contract, would do so.

Some dealership associations described certain elements of the proposal as vague or unclear, requesting that the Commission clarify its use of the term ''by implication'' with regard to a monthly payment, or alternatively, that the Commission omit the terms ''any'' (as it pertains to ''any representation''), ''by implication,'' and ''indirectly'' from the proposed disclosure provision.[342] Regarding the use of the term ''by implication'' with regard to a monthly payment, as discussed in the section-by-section analysis of § 463.3 in SBP III.C with respect to the prohibition on express or implied misrepresentations, the Commission notes that such language is consistent with longstanding law, and given that representations can mislead reasonable consumers even without making express claims, the provision could be rendered meaningless without it.[343] Variations of the phrase ''expressly

or by implication'' appear frequently in existing Commission guides and regulations,[344] and implied claims are treated extensively in the longstanding FTC Policy Statement on Deception, which the Commission issued in 1983 to provide guidance to the public on the

meaning of deception.[345] Furthermore, this language serves to help ensure that dealers may not avoid this disclosure requirement by making only implied reference to monthly payments, including by referring to a monthly payment amount that is not explicitly identified as such, or by referring to a regular periodic payment made on a different installment basis (*e.g.,* a biweekly payment) to indirectly illustrate a consumer's monthly payment obligations.

These same reasons also counsel against deleting the terms ''any'' and ''indirectly'' from this proposed disclosure provision. To begin, one dealership association commenter suggested deleting these terms from the regulatory text, but did not explain the nature of its specific concern regarding its use of the term ''any,'' instead claiming generally that the terms with which the commenter took issue were ''broad,'' ''vague,'' and ''imprecise.'' As proposed, the Commission's total payments disclosure would be required when a dealer makes ''any representation . . . about a monthly payment for any vehicle.'' These disclosure circumstances are markedly similar to those under Regulation Z and Regulation M: Regulation Z requires the disclosure of additional payment terms when ''any'' of a number of terms is set forth, including ''[t]he amount of *any* payment'';[346] Regulation M similarly requires the disclosure of additional terms when ''any'' of a number of items is stated, including ''[t]he amount of *any* payment.''[347] The use of the term ''any'' is consistent with existing law, and thus is not confusing or impracticable. Furthermore, as with representations made ''by implication,'' the Commission has a longstanding practice of regulating representations made ''indirectly'' in the same manner as those made directly,[348]

---

[341] As is currently the case under Federal law and the Final Rule, the terms must be the terms available to the typical consumer. *See, e.g., Fed. Trade Comm'n* v. *Five Star Auto Club,* 97 F. Supp. 2d 502, 528 (S.D.N.Y. 2000) (''[A]t the very least it would have been reasonable for consumers to have assumed that the promised rewards were achieved by the typical Five Star participant.''). This is consistent with prior FTC enforcement actions. *See, e.g.,* Complaint ¶¶ 48–53, 82–84, *Fed. Trade Comm'n* v. *Universal City Nissan, Inc.,* No. 2:16–cv–07329 (C.D. Cal. Sept. 29, 2016) (alleging unlawful deception where a dealer's advertisements list prominent terms not generally available to consumers, including where those terms are subject to various qualifications or restrictions); Complaint ¶¶ 8–10, *Progressive Chevrolet Co.,* No. C–4578 (F.T.C. June 13, 2016) (alleging advertised offer was deceptive because the typical consumer did not qualify for the offer).

[342] One commenter requested clarification or deletion of ''any,'' ''by implication'' and ''indirectly'' from § 463.4(c) and (e) for the same reasons it articulated with regard to § 463.4(d): that the terms are too vague. The explanation provided in the text pertains to these sections as well.

[343] The FTC Policy Statement on Deception and FTC cases make clear that both express and implied claims can be deceptive. *See, e.g., ECM Biofilms,*

*Inc.* v. *Fed. Trade Comm'n,* 851 F.3d 599 (6th Cir. 2017) (affirming Commission's finding that an additive manufacturer's unqualified biodegradability claim conveyed an implied claim that its plastic would completely biodegrade within five years); *POM Wonderful LLC,* Doc. No. C–9344 (F.T.C. Jan. 10, 2013) (Opinion of the Commission), *generally aff'd by POM Wonderful, LLC* v. *Fed. Trade Comm'n,* 777 F.3d 478 (D.C. Cir. 2015) (finding that company's advertisements would reasonably be interpreted by consumers to contain an implied claim that POM products treat, prevent, or reduce the risk of certain health conditions and for some ads that these effects were clinically proven); *Kraft, Inc.* v. *Fed. Trade Comm'n,* 970 F.2d 311 (7th Cir. 1992) (affirming finding of deception where Kraft advertisements juxtaposed references to the milk contained in Kraft singles and the calcium content of the milk, the combination of which implied that each Kraft single contained the same amount of calcium as five ounces of milk). Further, to be considered reasonable, the interpretation or reaction does not have to be the only one; when a seller's representation conveys more than one meaning to reasonable consumers, one of which is false, the seller is liable for the misleading interpretation. *See* FTC Policy Statement on Deception, *supra* note 42, at 3. Further, an interpretation will be presumed reasonable if it is the one the respondent intended to convey. *Id.*

[344] *See, e.g.,* Telemarketing Sales Rule, 16 CFR 310.3(a)(2) (prohibiting ''[m]isrepresenting, directly or by implication, in the sale of goods or services'' a list of ten categories of material information); 16 CFR 310.2(o) (defining ''debt relief service'' as any program or service ''represented, directly or by implication, to renegotiate, settle, or in any way alter'' certain terms); 16 CFR 310.5(a)(2) (requiring telemarketers to keep records of certain prize and prize-recipient information ''for prizes that are represented, directly or by implication, to have a value of $25.00 or more''); Business Opportunity Rule, 16 CFR 437.1(c) (defining a ''(b)usiness opportunity'' as a commercial arrangement in which, among other criteria, ''[t]he seller, expressly or by implication, orally or in writing, represents that'' it will provide, *inter alia,* business locations, outlets, accounts, or customers); Disclosure Requirements and Prohibitions Concerning Franchising, 16 CFR 436.1(e) (defining ''(f)inancial performance representation'' as any representation to a prospective franchisee that states, ''expressly or by implication, a specific level or range'' of sales, income, or profits); Military Credit Monitoring Rule, 16 CFR 609.3(e) (describing as prohibited materials those that ''expressly or by implication'' represent certain ''interfering, detracting, inconsistent, and/or undermining'' information); Rules and Regulations Under Fur Products Labeling Act, 16 CFR 301.14 (requiring an ''unknown'' origin disclosure when ''no representations are made directly or by implication'' regarding the origin of used furs); 16 CFR 301.18 (regulating the ''passing off'' of domestic furs as imported by prohibiting labeling, invoicing, or advertising that ''represent[s] directly or by implication'' that such furs have been imported); 16 CFR 301.43 (regulating the use of deceptive trade or corporate names by prohibiting any ''representation which misrepresents directly or by implication'' certain information); Power Output Claims for Amplifiers Utilized in Home Entertainment Products, 16 CFR 432.1(a) (defining the regulation's scope when certain amplifier features or characteristics are ''represented, either expressly or by implication, in connection with the advertising, sale, or offering for sale'').

[345] *See* FTC Policy Statement on Deception, *supra* note 42, at 2.

[346] 12 CFR 1026.24(d) (emphasis added).

[347] 12 CFR 1013.7(d) (emphasis added).

[348] *See, e.g.,* Business Opportunity Rule, 16 CFR 437.6 (prohibiting ''any seller, directly or indirectly through a third party'' from engaging in certain prohibited practices); Credit Practices Rule, 16 CFR 444.2 (prohibiting as unfair ''a lender or retail installment seller directly or indirectly'' taking or receiving certain obligations from a consumer); 16 CFR 444.3 (prohibiting as deceptive ''a lender or retail installment seller, directly or indirectly'' misrepresenting cosigner liability, and prohibiting as unfair ''a lender or retail installment seller, directly or indirectly'' obligating a cosigner under certain circumstances); 16 CFR 444.4 (prohibiting as unfair the act or practice of ''a creditor, directly or indirectly'' levying or collecting certain late charges); Telemarketing Sales Rule, 16 CFR 310.3(a)(3) (prohibiting as deceptive the act or practice of ''[c]ausing billing information to be submitted for payment, or collecting or attempting

Continued

**642** **Federal Register**/Vol. 89, No. 3/Thursday, January 4, 2024/Rules and Regulations

and it does so to help ensure that its requirements are effective and not easily avoided. The Commission thus declines to modify their usage in § 463.4(d).

Some commenters, including a dealership association, questioned whether the disclosure requirement would require dealers to obtain individuals' consumer reports before providing monthly payment information. In response, the Commission notes that § 463.4(d) does not alter the status quo regarding the information a dealer must have in order to represent a monthly payment amount. As previously discussed, this provision does not require disclosure of a monthly payment; instead, if a dealer chooses to represent a monthly payment amount, § 463.4(d) requires a corresponding disclosure of "the total amount the consumer will pay to purchase or lease the vehicle *at that monthly payment*." As previously explained in detail, dealers are capable of disclosing a total of payments for the consumer based on such voluntary monthly payment representations. Furthermore, to the extent a dealer may be providing consumers with estimated monthly payment information, the dealer may use the same assumptions used for estimating the monthly payment in order to determine the total of payments. Further, as is required under other law and this Rule, the dealer must refrain from deception, including by avoiding assumptions that the consumer would not reasonably expect or for which the consumer would not reasonably qualify.[349]

When making a representation, expressly or by implication, directly or indirectly, about a monthly payment for any vehicle, the failure to disclose the total amount the consumer will pay, inclusive of any consideration, to purchase or lease the vehicle at that monthly payment after making all payments as scheduled is likely to cause substantial injury to consumers who waste time and effort pursuing offers that are not actually available at reasonably expected terms; or who pay more for a vehicle sales or lease transaction than they expected by being subject to hidden charges or an unexpected down payment or trade-in requirement; or who are subject to the higher financing or leasing costs and greater risk of default associated with an unexpectedly lengthy loan or lease term. Moreover, when a consumer pays for his or her vehicle over a longer period of time, there is an increased likelihood that negative equity will result when the consumer needs or wants to purchase or lease another vehicle, because a vehicle's value tends to decline faster than the amount owed.[350] Longer motor vehicle financing term lengths also have higher rates of default, potentially posing greater risks to both borrowers and financing companies.[351] Even if a consumer eventually learns the true total payment, or later learns that the terms being discussed are based on a previously undisclosed requirement that the consumer provide consideration, such as a down payment, the consumer cannot recover the time spent pursuing the offer that the consumer had expected.

The injury caused by the failure to disclose the total amount and consideration is not reasonably avoidable. As the Commission has observed previously, withholding total payment information enables dealers to focus consumers on the monthly payment amount in isolation. Under such circumstances, dealers may add

unwanted, undisclosed, or even fictitious add-on charges more easily, since consumers may not notice the relatively small changes an add-on charge makes when secreted within a monthly vehicle payment, despite the fact that such hidden charges can cost a consumer more than a thousand dollars over the course of an auto financing or lease term.[352] The absence of information concerning the total of payments—which is within the sole control of the dealership—also enables dealers to use claims regarding monthly payment amounts to falsely imply savings or parity between different offers where reduced monthly payments increase the total vehicle cost due to an increased payment term or annual percentage rate.

The injury to consumers from a lack of total payment information is not outweighed by benefits to consumers or competition from withholding this basic information. Instead, the burden of disclosing this information—which the dealer determines and can calculate upfront—is minimal for dealers who are already making representations about a monthly payment for a vehicle, especially when compared to the injury to consumers.

Regarding deception, as detailed in the NPRM and in this SBP, cost is one of the most material pieces of information for a consumer in making an informed purchasing decision.[353] Yet it can be difficult for consumers to uncover the actual costs, and their

---

to collect payment for goods or services or a charitable contribution, directly or indirectly" without express verifiable authorization); 16 CFR 310.4(a)(7) (prohibiting as abusive the act or practice of "[c]ausing billing information to be submitted for payment, directly or indirectly, without the express informed consent of the customer or donor"); Mail, internet, or Telephone Order Merchandise Rule, 16 CFR 435.1(f) (defining "Telephone" as "any direct or indirect use of the telephone to order merchandise. . . ."); Preservation of Consumers' Claims and Defenses, 16 CFR 433.2 (prohibiting as an unfair or deceptive act or practice "for a seller, directly or indirectly" to take or receive a consumer credit contract which does not contain the Commission's "Holder Rule" provision); Prohibition of Energy Market Manipulation Rule, 16 CFR 317.3 (declaring "[i]t shall be unlawful for any person, directly or indirectly" to engage in certain energy market manipulation practices); Trade Regulation Rule Pursuant to the Telephone Disclosure and Dispute Resolution Act of 1992, 16 CFR 308.7(i) (declaring that regulated persons may not "report or threaten directly or indirectly to report adverse information" on a consumer report under certain circumstances).

[349] Importantly, as is the case under current law, a dealer may not mislead the consumer about the likelihood of qualifying for any particular credit or leasing terms in the course of providing this disclosure. Generally speaking, such deception is less likely where the dealer communicates to the consumer any assumptions it may have made, along

with the basis for any such assumptions, in a manner in which the consumer understands this information.

[350] Buckle Up, *supra* note 63, at 7.

[351] Consumer Fin. Prot. Bureau, "Quarterly Consumer Credit Trends: Growth in Longer-Term Auto Loans" 7–8 (Nov. 2017), *https://files.consumerfinance.gov/f/documents/cfpb_consumer-credit-trends_longer-term-auto-loans_2017Q2.pdf; see also* Zhengfeng Guo et al., Off. of the Comptroller of the Currency, "A Puzzle in the Relation Between Risk and Pricing of Long-Term Auto Loans" 2, 4–5, 20 (June 2020), *https://www.occ.gov/publications-and-resources/publications/economics/working-papers-banking-perf-reg/pub-econ-working-paper-puzzle-long-term-auto-loans.pdf* (finding motor vehicle financing with six-plus-year terms have higher default rates than shorter-term financing during each year of their lifetimes, after controlling for borrower and loan-level risk factors).

[352] *See* Auto Buyer Study, *supra* note 25, at 14 ("[T]he dealer can extend the maturity of the financing to reduce the effect of the add-on on the monthly payment, obscuring the total cost of the add-on"); Auto Buyer Study: Appendix, *supra* note 66, at 229, 233 (Study participant 457481) (dealership pitching add-ons at the end of the negotiation, and in terms of consumer's monthly price); Auto Buyer Study: Appendix, *supra* note 66, at 701 (Study participant 437175) (dealership pitching add-ons in terms of monthly price); *see also* Complaint ¶¶ 12–19, *Fed. Trade Comm'n* v. *Liberty Chevrolet, Inc.,* No. 1:20–cv–03945 (S.D.N.Y. May 21, 2020) (alleging dealership included deceptive and unauthorized add-on charges in consumers' transactions); Complaint ¶¶ 21–28, *Fed. Trade Comm'n* v. *Ramey Motors,* No. 1:14–cv–29603 (S.D. W. Va. Dec. 11, 2014) (alleging dealer emphasized attractive terms such as low monthly payments but concealed substantial cash down payments or trade-in requirements); Complaint ¶¶ 38–46, *Fed. Trade Comm'n* v. *Billion Auto, Inc.,* No. 5:14–cv–04118–MWB (N.D. Iowa Dec. 11, 2014) (alleging dealer touted attractive terms such as low monthly payments but concealed significant extra costs).

[353] *See, e.g., Fed. Trade Comm'n* v. *Windward Mktg., Inc.,* No. Civ.A. 1:96–CV–615F, 1997 WL 33642380, at *10 (N.D. Ga. Sept. 30, 1997) ("[A]ny representations concerning the price of a product or service are presumptively material."); *Removatron Int'l Corp.,* 111 F.T.C. 206, 309 (1988) ("The Commission presumes as material express claims and implied claims pertaining to a product's . . . cost." (citing *Thompson Med. Co., Inc.,* 104 F.T.C. 648, 817 (1984)).

actual associated terms, for which a dealer will sell or lease an advertised vehicle until visiting the dealership and spending hours on the lot. When an advertisement or other communication references a monetary amount or financing term, it is reasonable for a consumer to expect that those amounts and terms are available for a vehicle at other standard terms, and, in the absence of information to the contrary, that no down payment or other consideration is required. If instead, for example, a dealer advertises a low monthly payment based on an unexpectedly long financing term or unexpectedly high interest rate that results in a higher total payment than standard terms would have yielded, or based on an expected but undisclosed down payment or other consideration to be provided by the consumer, the consumer will be induced to visit the dealership based on a misimpression of what they reasonably expect the total payment to be.

If consumers knew that the true terms were beyond what was expected, or their transaction included charges for unwanted items, that would likely affect their choice to visit a particular dealership over another dealership. Thus, misleading consumers about cost information is material. A lack of total payment information therefore is likely to affect a consumer's decision to purchase or lease a particular vehicle and is material, and paying an increased total cost causes substantial consumer injury.

Thus, it is an unfair or deceptive act or practice for dealers to fail to disclose when making any representation about a monthly payment for any vehicle, the total amount the consumer will pay to purchase or lease the vehicle at that monthly payment after making all payments as scheduled, inclusive of assumed consideration. Further, this provision also addresses the misrepresentations prohibited by § 463.3—including misrepresentations regarding material information about the costs or terms of purchasing, financing, or leasing a vehicle—by requiring consumers to be provided with the total payment amount associated with any represented monthly payment amount. It also helps prevent dealers from failing to obtain the express, informed consent of the consumer for charges, as required by § 463.5(c).[354] To address these unfair or deceptive acts or practices, the Commission is requiring dealers to

disclose, when making any representation about a monthly payment for any vehicle, the total amount the consumer will pay to purchase or lease the vehicle at that monthly payment after making all payments as scheduled, inclusive of assumed consideration. As with a vehicle's price, when cost information in the market is distorted or concealed—especially in document- and time-intensive vehicle transactions—consumers are unable to effectively differentiate between sellers, and sellers trying to deal honestly with consumers are put at a competitive disadvantage.

For the foregoing reasons, and having considered all of the comments that it received, the Commission is finalizing the required disclosure at § 463.4(d) largely as proposed, with the minor modifications of capitalizing the defined term "Vehicle," substituting a period for a semi-colon and the word "and" at the end of § 463.4(d)(1), and clarifying that the requirements of § 463.4(d) also are "prescribed for the purpose of preventing the unfair or deceptive acts or practices defined in this part, including those in §§ 463.3(a) and 463.5(c)."

(e) Monthly Payments Comparison

Proposed § 463.4(e) required dealers, when making any comparison between payment options that includes discussion of a lower monthly payment, to disclose that the lower monthly payment will increase the total amount the consumer will pay to purchase or lease the vehicle, if true. For the reasons discussed in the following paragraphs, the Commission is finalizing the required disclosure at § 463.4(e) largely as proposed. The Commission is capitalizing the defined term "Vehicle" to conform with the definition at § 463.2(e). The Commission also is adding language to the end of § 463.4(e) clarifying that the requirements in § 463.4(e) "also are prescribed for the purpose of preventing the unfair or deceptive acts or practices defined in this part, including those in §§ 463.3(a) and 463.5(c)."

A number of institutional commenters supported such a provision, emphasizing that it would provide an appropriate amount of helpful information and help make the true terms of a car deal much clearer to consumers. Many individual commenters also stressed the need for the Commission's proposal:

• My car buying experience involving dealers has include [sic] many of the issues identified, such as: . . . Negotiating a 4 year loan with a known loan payment (did math prior to final steps). Presented paperwork with a

similar but lesser monthly payment. Dealer had changed terms to 5 year loan without open disclosure. Happy to hear, "the bank gave you a better rate, you got a smaller payment," almost didn't catch what they'd done.[355]

• I have purchased about 10 new vehicles in my lifetime. . . . They prey on monthly payments as a tool, saying they can lower the monthly payment but not telling customers they added months or years to the term. Anything that forces them to be honest is a great justice for consumers![356]

• Sometimes, when you are in negotiations with a car dealer, they engage in deceptive practices by lowering your monthly payment amount without telling you how they lowered it. They may have increased your down payment or increased your interest rate or increased your term of the loan. This can lead [t]o much higher costs for the consumer. I had reached an agreement with a dealer to lower my monthly payments, but what they didn't tell me until I got into the F & I manager's office is that my deal [was] for 6 years, not 4, and they increased my interest rate.[357]

• . . . I was quoted a payment at 72 months with adding aftermarket warranty but come to find out they extended my term to 76 months in order to meet what I wanted to pay monthly. I did not find this out until after I bought the car. Very dishonest dealership. This last minute bait and switch has to stop.[358]

• I purchased a truck from a Tennessee truck dealer. After agreeing on a monthly payment of $920 for 72 months, I travelled to the dealership to complete the purchase, but the finance office changed the terms to 84 months with the same monthly payment, effectively adding $11,000 to their profit![359]

• I just want to walk in to a dealership, find a car that fits my needs and buy it. And what is up with these RIDUCULOUSLY [sic] long loan terms? 72 MONTHS? If someone cannot afford a car dealers shouldn't extend the loan, they should steer them to a more affordable car![360]

The Commission received numerous comments relating to the scope and

---

[354] *See* 15 U.S.C. 57a(a)(1)(B) (the Commission "may include requirements prescribed for the purpose of preventing" unfair or deceptive acts or practices).

[355] Individual commenter, Doc. No. FTC–2022–0046–0141.

[356] Individual commenter, Doc. No. FTC–2022–0046–0985.

[357] Individual commenter, Doc. No. FTC–2022–0046–1652.

[358] Individual commenter, Doc. No. FTC–2022–0046–7569.

[359] Individual commenter, Doc. No. FTC–2022–0046–0115.

[360] Individual commenter, Doc. No. FTC–2022–0046–0050.

terms of its proposed monthly payments comparison disclosure. A number of institutional and individual commenters urged the Commission to require that such disclosures uniformly be provided to consumers in writing. The Commission agrees with commenters that many monthly payment comparisons happen verbally, in the course of discussions with consumers. As proposed, the Commission's monthly payment comparison disclosure made clear that such discussions are covered, and that dealers would be required to inform consumers in the course of such discussions—"[w]hen making any comparison between payment options"—if a represented lower monthly payment will increase the total amount the consumer will pay to purchase or lease the vehicle. The Commission believes there are significant consumer benefits when such disclosures are made verbally, close in time to when monthly payment options are discussed. Given that car-buying and leasing transactions are already lengthy and paperwork-heavy, the Commission believes it must be judicious with any additional written disclosure requirements to avoid crowding out other disclosures or other important information. Accordingly, the Commission has determined not to modify § 463.4(e) from its original proposal in order to mandate that the required disclosure always be made in writing. The Commission will continue to monitor the market for any further developments in this area and will consider whether to modify this or other Final Rule provisions in the future.

Some commenters, including consumer advocacy organizations, urged the Commission to adopt specific proposed language rather than a general disclosure requirement, or a requirement that this disclosure include the total amount the consumer will pay at the lower monthly payment under discussion. Regarding the proposal to require particular, uniform disclosure language, the Commission did not receive, in the course of public comment, evidence sufficient to conclude that uniform formatting for the delivery of such disclosures would be necessary to make them effective. The Commission currently lacks information to evaluate whether any particular form disclosure would effectively communicate the required information to consumers in a manner that in all circumstances obviates deceptive or unfair conduct. Moreover, regarding the proposal to require that the monthly payment comparison disclosure additionally require dealers to disclose

the new total amount that the consumer will pay, the Commission emphasizes that part 463 will require such a disclosure without the need to modify this provision from the Commission's original proposal. As noted in the paragraph-by-paragraph analysis of § 463.4(d) in SBP III.D.2(d), the Commission is finalizing § 463.4(d), which requires dealers making any representation about a monthly payment for a vehicle to disclose the total amount the consumer will pay to purchase or lease the vehicle at a given monthly payment amount after making all payments as scheduled, inclusive of assumed consideration, largely as proposed. The monthly payment comparison discussions covered by § 463.4(e) are those that "include[] discussion of a lower monthly payment." To the extent a dealer, in the course of such discussions, makes a representation "about a monthly payment for any Vehicle," § 463.4(d) will require the dealer to disclose the total amount the consumer will pay at that monthly payment amount.

Comments, including those from a number of dealership associations [361] and an individual commenter, characterized the Commission's proposal as burdensome and likely to lead to excessive disclosures while providing little additional assistance to consumers. In response, the Commission emphasizes the streamlined nature of proposed § 463.4(e). In its proposal, the Commission refrained from additional formal mandates in order to provide dealers with flexibility, within the bounds of the law, to provide this essential information—that a given lower monthly payment will increase the total amount the consumer will pay—including so that dealers already conveying this information in a non-deceptive manner may continue to do so.

Thus, after careful review of the comments, the Commission has determined to finalize § 463.4(e) largely as proposed. When making any comparison between payment options, expressly or by implication, directly or indirectly, that includes discussion of a lower monthly payment, the failure to disclose that the lower monthly payment will increase the total amount the consumer will pay to purchase or lease the vehicle, if true, is likely to

mislead consumers regarding the total terms associated with the lower monthly payment amount. When a dealer elects to compare between different monthly payment options, if the lower monthly payment would result in a higher total transaction cost, discussion of this fact is necessary to prevent the comparison from being misleading. Absent this information, it is reasonable for a consumer who is presented with a monthly payment comparison to expect that the lower monthly payment amount would correspond to lower total transaction cost. This is because the opposite can only be true if the dealer has created a so-called "apples to oranges" comparison, in which an undisclosed element of the transaction—such as the length of the payment term, or the existence of a balloon payment—has not been kept constant across the two monthly payment scenarios being compared. Under such circumstances, without providing the consumer with further information, the dealer's claims regarding monthly payment amounts falsely imply saving or parity between different offers where reduced monthly payments increase the total vehicle cost. Thus, where a lower monthly payment amount represents a more expensive transaction, the dealer must, at a minimum, disclose this simple but counterintuitive fact to not deceive consumers.[362]

Furthermore, as explained in the NPRM and in the paragraph-by-paragraph discussion of § 463.4(d) in SBP III.D.2(d), cost is one of the most material pieces of information for a consumer in making an informed purchasing decision.[363]

Regarding unfairness, when making any comparison between payment options, expressly or by implication, directly or indirectly, that includes discussion of a lower monthly payment, the failure to disclose that the lower monthly payment will increase the total

---

[361] As previously indicated, some such association commenters contended generally that the proposed total of payments disclosures at § 463.4(d) and (e) overlapped with the Truth in Lending Act or other laws. The Commission responds to this point in the context of the discussion of § 463.4(d), in SBP III.D.2(d).

[362] Depending on the circumstances, a dealer may need to take additional measures, such as disclosing the specific basis for any increase in total costs, or amount of any such increase, in order to avoid deceiving consumers.

[363] *See, e.g., Fed. Trade Comm'n* v. *Windward Mktg., Inc.,* No. Civ.A. 1:96–CV–615F, 1997 WL 33642380, at *10 (N.D. Ga. Sept. 30, 1997) ("[A]ny representations concerning the price of a product or service are presumptively material."); *Removatron Int'l Corp.,* 111 F.T.C. 206, 309 (1988) ("The Commission presumes as material express claims and implied claims pertaining to a product's . . . cost." (citing *Thompson Med. Co., Inc.,* 104 F.T.C. 648, 817 (1984)); *see also Fed. Trade Comm'n* v. *Crescent Pub. Grp., Inc.,* 129 F. Supp. 2d 311, 321 (S.D.N.Y. 2001) ("Information concerning prices or charges for goods or services is material, as it is 'likely to affect a consumer's choice of or conduct regarding a product.' ").

amount the consumer will pay to purchase or lease the vehicle, if true, is likely to cause substantial injury to consumers who waste time and effort pursuing offers that are not actually available at the total payment amount they expect; or who pay more for a vehicle sales or lease transaction than they expected by being subject to hidden charges or an unexpected down payment or trade-in requirement; or who are subject to the higher financing costs and greater risk of default associated with an unexpectedly lengthy loan term.

Furthermore, the injury caused by withholding this information is not reasonably avoidable by consumers. During negotiations, if dealers agree to a lower monthly payment, consumers have no reason to expect that this apparent "concession" in fact means an increased total vehicle cost due to an increased payment term or annual percentage rate. Under such circumstances, dealers can also add unwanted, undisclosed, or even fictitious add-on charges more easily, by increasing the payment term enough that including add-on charges would still result in a lower monthly payment as a "concession" to the consumer. The injury to consumers from a lack of price information is not outweighed by any benefits to consumers or competition from withholding this basic information. Instead, information about increased cost protects consumers from lost time and effort, and unexpected charges while increasing competition among dealers, who would be able to compete on truthful, standard terms. The costs of stating that the total payment has increased—which the dealer determines and can calculate upfront—are minimal for dealers that are already making representations about a monthly payment for a vehicle, especially when compared to the injury to consumers.

Thus, it is an unfair or deceptive act or practice for dealers to fail to disclose, when making any comparison between payment options, expressly or by implication, directly or indirectly, that includes discussion of a lower monthly payment, that the lower monthly payment will increase the total amount the consumer will pay to purchase or lease the vehicle, if true. Further, this provision also serves to prevent the misrepresentations prohibited by § 463.3—including misrepresentations regarding material information about the costs or terms of purchasing, financing, or leasing a vehicle—by requiring consumers to be given accurate information that the total payment will increase when presented with a lower

monthly payment. It also helps prevent dealers from failing to obtain the express, informed consent of the consumer for charges, as addressed by § 463.5(c), including charges relating to the financing or lease of a vehicle.[364] Thus, the Commission is requiring dealers to disclose, when making any comparison between payment options, expressly or by implication, directly or indirectly, that includes discussion of a lower monthly payment, that the lower monthly payment will increase the total amount the consumer will pay to purchase or lease the vehicle, if true. As with a vehicle's price, when cost information in the market is distorted or concealed—especially in document- and time-intensive vehicle transactions—consumers are unable to effectively differentiate between sellers, and sellers trying to deal honestly with consumers are put at a competitive disadvantage.

For the foregoing reasons, and having considered all of the comments that it received on this proposed provision, the Commission is finalizing the required disclosure at § 463.4(e) largely as proposed, with the minor modifications of capitalizing the defined term "Vehicle" additional language clarifying that the requirements in § 463.4(e) "also are prescribed for the purpose of preventing the unfair or deceptive acts or practices defined in this part, including those in §§ 463.3(a) and 463.5(c)."

### E. § 463.5: Dealer Charges for Add-Ons and Other Items

#### 1. Overview

Proposed § 463.5 prohibited motor vehicle dealers from charging for add-on products or services from which the consumer would not benefit; from charging consumers for undisclosed or unselected add-ons unless certain requirements were met; and from charging for any item unless the dealer obtains the express, informed consent of the consumer for the item.

In response to the NPRM, various stakeholder groups and individuals submitted comments regarding these proposed provisions. Among these were comments in favor of the provisions; comments that urged the Commission to include additional restrictions on add-on charges; and comments questioning or recommending against the proposed provisions.

After careful consideration of the comments, the Commission has determined to finalize § 463.5(a) and (c)

without substantive modification and has determined not to finalize § 463.5(b) regarding undisclosed or unselected add-ons. The Commission also is making minor textual edits to the introductory language in § 463.5 for clarity and consistency: substituting "Federal Trade Commission Act" for "FTC Act"; adding "Covered" to "Motor Vehicle Dealer" to conform with the defined term at § 463.2(f) (" 'Covered Motor Vehicle Dealer' or 'Dealer' "), and capitalizing "Vehicles" to conform with the defined term at § 463.2(e) (" 'Covered Motor Vehicle' or 'Vehicle' ").

In the following analysis, the Commission examines each proposed provision in § 463.5; the substantive comments relating to each provision; responses to these comments; and the Commission's final determination with regard to each proposed provision.

#### 2. Paragraph-by-Paragraph Analysis of § 463.5

#### (a) Add-Ons That Provide No Benefit

Section 463.5(a) of the proposed rule prohibited motor vehicle dealers from charging for add-ons if the consumer would not benefit from such an add-on, including a pair of enumerated examples. For the following reasons, the Commission is finalizing this provision largely as proposed, with modifications to correct a misplaced hyphen; add the word "that" before "are duplicative of warranty coverage"; and capitalize the defined term "Vehicle" to conform with the revised definition at § 463.2(e). The Commission also is adding language to the end of § 463.5(a), at newly designated (a)(3), clarifying that the requirements in § 463.5(a) "also are prescribed for the purpose of preventing the unfair or deceptive acts or practices defined in this part, including those in § 463.3(a) and (b) and paragraph (c) of this section." Relatedly, the Commission is finalizing the definition of the term "GAP Agreement," which is referenced in this provision and defined in § 463.2(h) of the Final Rule, substantively as proposed, with minor modifications to correct a misplaced period, substitute "Vehicle" for both "vehicle" and "motor vehicle" to conform with the revised definition at § 463.2(e), and remove an extraneous term—"insured's"—without changing the definition's operation.

Many commenters, including a number of industry participants and associations, stated that products that provide no benefit to the consumer should not be sold in connection with the sale or financing of vehicles. Many commenters that supported the

---

[364] See 15 U.S.C. 57a(a)(1)(B) (the Commission "may include requirements prescribed for the purpose of preventing" unfair or deceptive acts or practices).

provision stated, *inter alia,* that the examples the Commission enumerated in this paragraph were obvious [365] and particularly helpful for less-experienced buyers who may be led to believe that a particular product or service would be beneficial.[366] Some individual commenters, for instance, noted that they had no way to confirm whether the ''nitrogen-filled'' tires they purchased with their vehicle actually had more nitrogen than naturally exists in the air, even though they were told the purchase of this service was mandatory.[367] At least one individual commenter described requesting to see the nitrogen tank after such a purchase and being denied by the dealer.

Examples of public comments about add-ons include the following:

• I would argue that this does not go far enough but it [is] a good start. As someone who is trying to purchase a new vehicle, there is a[n] endless supply of ''perk packages'' or ''Family deals'' that I ''must purchase'' if I would like to acquire a car from a dealer. These include a variety of dubious products such as insurance policies that pay out $3,500 if your car is stolen (and can't be found) in the first 90 days of ownership, if your car is totaled by your insurance company in the first 90 days they'll pay $3,500. Nitrogen in the tires (A $196 value). Vin Etching on the windows, plastic stickers on the door handles to prevent scratches. These items are a requirement to bundle with the vehicle and a deal that provides ''over $7,000 in value'' for $2,995. These tricks ignore the obvious, such as your car can not be both stolen (unrecovered) AND totaled so it's impossible to collect on both policies so the cumulative ''value'' of this package is overstated.[368]

• One of the latest scams is to force you to buy a $1,000 gps unit so they can recover the car if you miss payments. This shouldn't be allowed.[369]

• Second vehicle I purchased had a $1,650 ''protection pkg'' plus the usual nitrogen in the tires BS. This time I asked to be shown the nitrogen tank they fill the tires with, they refused saying due to insurance rules customers aren't allowed in the shop. I asked them to take off the paint and fabric protection charge also, they declined at first until I reminded them they just got

the vehicle the night before and there was still plastic factory coverings on the seats and strips of plastic on the vehicles body protecting certain areas. This time they mumbled some excuse about the addendum added to the price is put on the vehicle as soon as it arrives and they hadn't had ''time'' to apply all the overpriced add[-]ons.[370]

• I'm a former carsalesperson [sic]. . . . Dealers should be banned from selling . . . special paints to protect from rust . . . . No coatings are added.[371]

• I worked at a Dodge/Ram dealership for three years at the make ready (carwash) department. When new vehicles arrived their tires were rarely deflated and then filled with nitrogen. It is my understanding that the manufacture initially paid for the nitrogen fill and the customer was later charged.[372]

• [O]ne of my previous purchases almost ended . . . with GAP that was so unnecessary, the lender called us a few days later after we already had the car and told us we'd be experiencing a lower monthly payment unless we wanted the price of the product back in a check because of the price we negotiated and the sizable down payment, it was impossible for GAP to ever be required.[373]

A number of individual commenters indicated they did not consider nitrogen tires a valuable purchase and expressed no desire to purchase them. Many commented that, when they informed their respective dealers that they did not want these add-ons, the dealers would represent, *inter alia,* that nitrogen tires were required by law, that their insurance premium would increase without the add-on, that new foreign vehicles coming into the country must have nitrogen-filled tires under the law, or that the consumer needed to purchase nitrogen tires to meet fuel economy standards.

Other commenters supported this proposed provision while also recommending that the Commission broaden its scope to prohibit the sale of add-on products or services that provide only ''minimal'' benefit to consumers.[374] One such commenter, for instance, suggested the provision be expanded to prohibit dealers from

charging for an add-on unless it provides a ''substantial, material benefit'' to consumers.[375] Another commenter contended that there are a number of add-ons not meeting such standards being sold in connection with the sale or financing of vehicles, including future servicing packages for vehicle tune-ups and oil changes that are sold to remote or out-of-State consumers who are exceedingly unlikely to return to the dealership for such services; tracking devices that are used almost exclusively for electronic repossession; and ''vendor's single interest'' or ''VSI'' insurance, which protects the financing entity, but not the consumer, in the event that the vehicle is damaged or destroyed.[376]

The Commission acknowledges the considerable consumer harm that results from the sale of such add-ons and notes that several provisions in the Rule it is finalizing will address misconduct related to these and other add-ons, including many of the practices described by those commenters recommending further action. For example, to the extent that dealers make misrepresentations about any benefit of an add-on, such conduct would violate § 463.3(b) of the Final Rule. Thus, were a dealer, for instance, to promote the sale of an add-on—such as a tracking device that is used almost exclusively for electronic repossession—based on its supposed benefit to the consumer, when the product primarily benefits another party, such conduct would violate the Rule even if the product otherwise provides an ancillary or marginal benefit to consumers. And if the add-on provided no benefit to the consumer and only a benefit to another party, § 463.5(a) would prohibit the dealer from charging the consumer for it. Further, to the extent that dealers charge for add-ons without express, informed consumer consent for the charge, such conduct would violate § 463.5(c).

The Commission recognizes that there may be significant consumer benefits from implementing additional restrictions on the sale of add-on products or services. However, without additional information on costs and benefits to consumers or competition associated with such restrictions, the Commission has determined not to implement such restrictions in this Final Rule. The Commission will continue to monitor the motor vehicle

[365] *See, e.g.,* Individual commenter, Doc. No. FTC–2022–0046–1608 at 6.

[366] *See, e.g.,* Comment of 18 State Att'ys Gen., Doc No. FTC–2022–0046–8062 at 9.

[367] *See, e.g.,* Individual commenter, Doc. No. FTC–2022–0046–0565.

[368] Individual commenter, No. FTC–2002–0046–0565.

[369] Individual commenter, No. FTC–2002–0046–4552.

[370] Individual commenter, Doc. No. FTC–2022–0046–0854.

[371] Individual commenter, Doc. No. FTC–2022–0046–1393.

[372] Individual commenter, Doc. No. FTC–2022–0046–5493.

[373] Individual commenter, Doc. No. FTC–2022–0046–6816.

[374] *See, e.g.,* Legal Aid Just. Ctr., Doc. No. FTC–2022–0046–7833 at 3.

[375] Comment of Legal Action Chi., Doc. No. FTC–2022–0046–8097 at 10.

[376] *See also* Consumer Fin. Prot. Bureau, ''What Is Vendor's Single Interest (VSI) insurance?'' (Aug. 16, 2016), *https://www.consumerfinance.gov/ask-cfpb/what-is-vendors-single-interest-vsi-insurance-en-731/.*

marketplace to gather additional information on this issue and will consider whether to modify or expand § 463.5(a) in the future, including on the basis of stakeholder experience with this provision and whether it effectively addresses unlawful conduct.

Commenters also urged the Commission to adopt a number of additional measures regarding the sale of such add-ons. A consumer advocacy organization, for instance, proposed that the Commission require dealers to list coverage limitations for add-ons that may overlap with a vehicle's warranty coverage, observing that consumers commonly are not aware of important limitations until the add-on, such as a warranty or service contract, is needed, and only then does the consumer learn the add-on does not provide the anticipated benefits. A State consumer protection agency recommended that the Commission require affirmative disclosures for the sale of add-ons that may provide only "nominal" benefit, offering a list of what they characterized as such products for the Commission to consider in conjunction with this recommendation.

In response, the Commission notes that other provisions in part 463 address misconduct relating to these issues, including by prohibiting misrepresentations regarding material information about add-ons, by requiring disclosures about optional add-ons, and by requiring dealers to obtain the express, informed consent of the consumer for add-on charges. Thus, misrepresenting the coverage limitations of an add-on; making representations regarding an optional add-on without disclosing that it is not required and that the consumer can purchase or lease the vehicle without the add-on; and charging for an add-on under false pretenses or without the consumer's express, informed consent would violate other provisions the Commission is finalizing. The Commission is concerned that requiring additional disclosures may have the effect of reducing the saliency of key information in what is already a lengthy, paperwork-heavy transaction. Accordingly, the Commission has determined not to adopt additional such disclosure measures in this Final Rule.

In addition, at least one consumer protection agency commenter asked the Commission to consider deeming it an unfair or deceptive act or practice to sell any add-on product for a price greater than the value of the product itself. The Commission declines to restrict the sale of add-on products at a price higher than the value of the product itself, absent additional information, including

information regarding the costs and benefits to consumers and competition of such a restriction.[377]

A number of industry association commenters claimed the provision was vague and requested the Commission set forth how to calculate the loan-to-value ("LTV") ratio at which a GAP agreement would be non-beneficial, given that there could be fluctuation of the vehicle value in the future. Some suggested that the Commission adopt a presumption or safe harbor that dealers complying with an LTV calculation set by the Commission be deemed in compliance with the portion of the proposal related to GAP agreements.

Other industry association commenters argued against adopting a set LTV ratio as the basis for determining whether a consumer would benefit from a GAP agreement, claiming that the vehicle financing entity is best positioned to determine whether such an add-on would be beneficial. Relatedly, some industry association commenters contended that certain GAP agreements sold on a low-LTV loan, or that limit benefits based on a consumer's LTV ratio, could still provide additional benefits.

A financing association commenter contended that any final rule should not create rules around the calculation of the LTV ratio. Another financing group proposed that the Commission require dealers to provide disclosures that would inform consumers of any potential value gap between a vehicle's purchase price and its appraised value.

With regard to establishing LTV ratio parameters for the sale of GAP agreements, without further information from commenters regarding the costs and benefits of establishing a particular LTV ratio as the basis for determining whether a consumer would benefit from a GAP agreement, or a particular method for calculating the LTV ratio, and given the Commission's previously stated information saliency concerns about finalizing additional disclosures in an already lengthy transaction, the Commission has determined not to establish in this Final Rule a particular numeric threshold or calculation regarding the sale of GAP agreements to consumers, or to require additional associated disclosures. Regarding the benefits of certain GAP agreements, this

provision restricts sales of GAP agreements where the consumer would not benefit. If there are benefits to the consumer, dealers must abide by other provisions in the Final Rule, including the requirements that the dealer represents the extent of those benefits accurately (§ 463.3(b)) and obtains express, informed consent from the consumer for the charges for this item (§ 463.5(c)).

The Commission also received some industry association comments claiming that each State imposes differing requirements as to coverage, disclosures, exceptions, and product terms of GAP agreements. One such commenter asked for guidance on how a bright-line, State-law rule on LTV ratios would interact with the FTC's proposal. Another such commenter requested the FTC reconcile different State-law approaches to the sale of GAP agreements, particularly regarding how this proposed provision would interact with a State law that, according to the commenter, only requires a dealer to have a reasonable belief that the customer may be eligible for a benefit. In response, the Final Rule does not disturb State law unless it is inconsistent with part 463, and then only to the extent of the inconsistency. Where, for example, State laws restrict the sale of GAP agreements if the LTV ratio for the transaction is below a certain threshold, or require that dealers have a "reasonable belief" that the GAP agreement would benefit the consumer, dealers in that State can, and must, comply with the State law and with the Rule. Pursuant to such State law, dealers would be prohibited from selling the product if the LTV ratio is below the established threshold or if they do not reasonably believe the GAP agreement would benefit the consumer and, pursuant to the Final Rule, if the LTV ratio would result in the consumer not benefitting financially. To the extent there is an actual conflict between the Commission's Final Rule and a State law—and the Commission is skeptical that there is such a State law that explicitly allows for the sale of a product that does not benefit the consumer—the Commission refers commenters to § 463.9, which sets forth the Rule's relation to State laws.

With respect to the proposed definition of "GAP Agreement," an industry association commenter contended that the phrase "the actual cash value of the insured's vehicle in the event of an unrecovered theft or total loss" meant the value of the vehicle at some point in the future, and asserted that future vehicle values cannot be accurately determined at the

---

[377] One consumer attorney commenter requested that the Commission clarify that warranty disclaimers are not a valid defense to common law fraud and statutory consumer fraud, and that, if fraud is proven, warranty disclaimers are not an allowable defense to UCC actions. In response, the Commission notes that none of the provisions the Commission is finalizing state that warranty disclaimers are a defense to common law fraud or in UCC actions.

time of sale. The proposed definition, however, did not prescribe how dealers must calculate a vehicle's cash value; rather, it explains that the term "GAP Agreement" means an agreement to indemnify a vehicle purchaser for any difference between such value, however determined, in the event of an unrecovered theft or total loss, and the amount owed, regardless of what that difference may be. Upon examination of this phrase, however, the Commission has determined to remove the term "insured's" because it is extraneous and does not affect the operation of this definition: with or without the term, the phrase describes the manner in which a qualifying GAP agreement determines the amount to indemnify a vehicle purchaser or lessee. In context in this definition, it is clear without the term "insured's" that the applicable "Vehicle" is the one covered by the GAP agreement. Omitting this unnecessary term thus avoids confusion without substantively changing this definition.

One industry association commenter argued that reference to "GAP insurance" should be removed from the definition of "GAP Agreement" because of the McCarran-Ferguson Act's reverse-preemption of certain Federal laws that "invalidate, impair, or supersede" State laws enacted "for the purpose of regulating the business of insurance."[378] As previously discussed with regard to the definition of "Add-on," however, commenters have provided no evidence that the proposed or Final Rule would invalidate, impair, or supersede State laws enacted for the purpose of regulating insurance. Rather than affecting any State's regulation of insurance, the Final Rule prohibits dealers from making misrepresentations regarding add-ons, from failing to disclose when add-ons are not required, and from charging for add-ons that provide no benefit or for which the consumer has not provided express, informed consent. The Commission therefore finalizes the definition of "GAP Agreement" largely as proposed in its NPRM with minor modifications to correct a misplaced period, substitute "Vehicle" for both "vehicle" and "motor vehicle" to conform with the revised definition at § 463.2(e), and remove an extraneous term— "insured's"—without changing the definition's operation.

While acknowledging that products or services that provide no benefit to consumers should not be sold, commenters including an industry association also argued that the Commission's proposed provision was vague and required more research. Some industry association commenters expressed concern regarding how the Commission would determine whether the item would not benefit the consumer. In response, the Commission provides the following information. Proposed § 463.5(a) included enumerated examples of add-ons from which consumers would not benefit: (1) nitrogen-filled tires that contain no more nitrogen than normally found in the air, and (2) products or services that do not provide coverage for the vehicle, the consumer, or the transaction, or are duplicative of warranty coverage for the vehicle, including a GAP agreement if the consumer's vehicle or neighborhood is excluded from coverage or the LTV ratio would result in the consumer not benefitting financially.[379] As these examples illustrate, determining that a consumer would not benefit from an add-on involves analyzing objective standards under the circumstances, such as whether the add-on provides benefits; whether the consumer is eligible to use the add-on; whether the add-on's coverage excludes the vehicle at issue; and whether the add-on is incompatible with the vehicle at issue. Thus, additional examples of add-ons that would be prohibited by this provision include the following: purported rust-proofing add-ons that do not actually prevent rust; purported theft-prevention or theft-deterrent add-ons that do not prevent or deter theft; and add-ons that the vehicle itself cannot support, including engine oil-change services for a vehicle, such as an electric vehicle, that does not use engine oil, or software or audio subscription services for a vehicle that cannot support the software or utilize the subscription.[380]

One association commenter argued that the phrase "nitrogen-filled tire related-products or services that contain no more nitrogen than naturally exists in the air" in proposed § 463.5(a)(1) would create a standard with which it may be impossible to comply because "no individual set of tires could have a higher total quantity of nitrogen than that in 'the air' that stretches around the planet."[381] This commenter requested that the Commission clarify to avoid this possible reading. Here, the Commission notes that the phrase does not prohibit such tires if they do not contain a "higher total quantity of nitrogen than that in the air"; instead, charging for a nitrogen-filled tire would fail by this standard if it contains "no more nitrogen than" the proportion that "naturally exists in the air."

One industry association commenter requested more explanation from the Commission regarding what would be considered "duplicative of warranty coverage" under proposed § 463.5(a)(2), while another contended that vehicle service contracts that overlap with a manufacturer's warranty may still provide additional, beneficial coverage, such as after the manufacturer's warranty expires. In response, the Commission notes that this provision prohibits the sale of warranties that are duplicative. A dealer may offer a warranty add-on that has some overlap in coverage with existing warranty coverage for the vehicle, but the add-on must provide additional protection. Moreover, other provisions of the Final Rule address misconduct relating to warranties, including by prohibiting misrepresentations regarding material information about any costs, limitation, benefit, or any other aspect of the warranty product or service. For example, under the Final Rule, a dealer may not mislead a consumer as to the benefits or conditions of the warranty, including amount or length of coverage (§ 463.3(b)). In addition, under § 463.5(c), the dealer must obtain the express, informed consent of the consumer for the charge for the warranty (§ 463.5(c)).

Other commenters, including an industry association, asserted that this proposed provision would cause dealers to stop offering beneficial products or services. The Commission notes that its proposal did not require such a result and emphasizes that this provision would prevent charges to consumers for products or services that provide them

---

[378] 15 U.S.C. 1012(b).

[379] See Consumer Fin. Prot. Bureau, "Supervisory Highlights: Issue 19, Summer 2019" 3–4 (Sept. 2019), *https://files.consumerfinance.gov/f/ documents/cfpb_supervisory-highlights_issue-19_ 092019.pdf* (finding instances in which auto lenders sold "a GAP product to consumers whose low LTV meant that they would not benefit from the product").

[380] *See, e.g.,* Shannon Osaka, "Electric vehicles are hitting a road block: Car dealers," Wash. Post (Nov. 9, 2023), *https://www.washingtonpost.com/ climate-solutions/2023/11/09/car-dealerships-ev-sales* (describing a dealership salesperson offering an electric vehicle-buyer a plan for oil changes and an extended warranty for a gas-powered car); *see also* Consumer Fin. Prot. Bureau, "Supervisory Highlights: Issue 24, Summer 2021" 3–4 (June 2021), *https://files.consumerfinance.gov/f/ documents/cfpb_supervisory-highlights_issue-24_ 2021-06.pdf* (finding servicers added and maintained unnecessary collateral protection insurance (CPI) when consumers had adequate insurance and thus the CPI provided no benefit to the consumers, and also when consumers' vehicles had been repossessed even though no actual insurance protection was provided after repossession).

[381] Comment of Competitive Enter. Inst., Doc. No. FTC–2022–0046–7670 at 6.

no benefit. To the extent that a prohibition against charging consumers for items that provide no benefit to the consumer may cause some dealers to discontinue offering beneficial products, consumers would be free to instead visit other dealerships or to seek the same or similar offerings from other providers. Dealers, of course, continue to be free under the Final Rule to offer beneficial add-ons to consumers—consistent with existing law and with other provisions of this Rule.

Some commenters, including industry associations and a dealership association, raised concerns about compliance administrability for this proposed provision in the case of products attached to a vehicle by manufacturers that may provide no benefit, questioning whether, if this proposal went into effect, dealers would be prohibited from charging for such products. In response, the Commission refers commenters to the definition of "Add-on" or "Add-on Product(s) or Service(s)" in § 463.2(a). Notably, "Add-on" is defined, in relevant part, as any "product(s) or service(s) not provided to the consumer or installed on the Vehicle by the Vehicle manufacturer . . ." Thus, if an add-on product or service is installed on the vehicle by the motor vehicle manufacturer, it falls outside the scope of this definition, and concomitantly, outside the scope of the provision at § 463.5(a). Nonetheless, other provisions in the Final Rule address misconduct relating to this issue. For instance, as examined in additional detail in the discussion of § 463.4, in SBP III.D, the offering price for the vehicle would be required to incorporate the charges for any such items if the dealer requires the consumer to pay for them. In addition, as described in additional detail in the discussion of § 463.5(c), in SBP III.E.2(c), a dealer may not charge for any such item unless the dealer obtains the express, informed consent of the consumer for the charge.

Another industry association commenter incorrectly stated that this provision was beyond the FTC's authority and correctly noted that the Commission has the authority to see that products are marketed and advertised fairly and honestly. As the commenter acknowledged, the Commission has the authority to address unfair and deceptive conduct; that is precisely what this provision does. Dealerships charging consumers for add-ons from which the consumers would not benefit is both a deceptive and unfair act or practice in violation of the FTC Act, as discussed in the following paragraphs. To address this

deception or unfairness, the Commission is finalizing this provision with minor modifications, including one to correct a typographical error in the placement of a hyphen in a phrase in proposed § 463.5(a)(1). In the NPRM, the relevant phrase appeared as, "(1) Nitrogen-filled tire related-products or services"; in the Final Rule, the corrected phrase will now read as follows: "(1) Nitrogen-filled tire-related products or services." For clarity, the Commission is also adding the word "that" before "are duplicative of warranty coverage;" capitalizing the defined term "Vehicle" to conform with the revised definition at § 463.2(e); and adding language clarifying that the requirements of § 463.5(a) also are "prescribed for the purpose of preventing the unfair or deceptive acts or practices defined in this part, including those in § 463.3(a) and (b) and paragraph (c) of this section."

Dealerships charging consumers for add-ons from which the consumers would not benefit involves deceptive conduct. When a dealer charges consumers for add-ons that would not benefit the consumers, the dealer either (1) discusses the add-on charges or (2) is silent about these items. In the first scenario, if a dealer discusses add-on charges, consumers typically would not agree to pay such charges for additional products from which they could not benefit unless they are led to believe, directly or by omission, that these products would in fact be beneficial to them. Thus, the dealer would be misleading consumers, even in the event the dealer subsequently provides a disclaimer indicating the add-on would not benefit the consumer.[382] In the second scenario, it is reasonable for consumers to believe that the terms they have agreed to are what was negotiated, and do not include additional charges for optional, undisclosed items—particularly items that would not benefit the consumer. If a dealer charges consumers for such items under such circumstances, the dealer is misleading the consumer. Misleading consumers about cost information is material.[383] If

consumers knew that a dealership was charging them for items from which they would not benefit, such knowledge likely would affect their commercial choices, including whether to continue with, or ultimately consummate, the vehicle sale or financing transaction.[384]

Such charges are also unfair. When charges for any add-on accompany the already lengthy and complex car-buying process, it is difficult to obtain consent that is truly express and informed.[385] Rather than prohibiting all such charges or taking other measures, as specifically contemplated in the NPRM,[386] however, this provision focuses on charges for add-ons that would not benefit the consumer. Charges for add-ons that would not benefit the consumer can cost consumers thousands of dollars and significantly increase the overall cost to the consumer in the transaction, including by increasing the amount financed and total of payments, thereby increasing the risk the consumer will ultimately default on repayment

---

[382] *Removatron Int'l Corp.* v. *Fed. Trade Comm'n,* 884 F. 2d 1489, 1497 (1st Cir. 1989) ("Disclaimers or qualifications . . . are not adequate to avoid liability unless they are sufficiently prominent and unambiguous to change the apparent meaning of the claims and to leave an accurate impression. Anything less is only likely to cause confusion by creating contradictory double meanings.").

[383] *See, e.g., Fed. Trade Comm'n* v. *Windward Mktg., Ltd.,* No. Civ.A. 1:96–CV–615F, 1997 WL 33642380, at *10 (N.D. Ga. Sept. 30, 1997) ("[A]ny representations concerning the price of a product or service are presumptively material."); *Removatron Int'l Corp.,* 111 F.T.C. 206, 309 (1988) ("The Commission presumes as material express claims

and implied claims pertaining to a product's . . . cost." (citing *Thompson Med. Co., Inc.,* 104 F.T.C. 648, 817 (1984)); *see also Fed. Trade Comm'n* v. *Crescent Pub. Grp., Inc.,* 129 F. Supp. 2d 311, 321 (S.D.N.Y. 2001) ("Information concerning prices or charges for goods or services is material, as it is 'likely to affect a consumer's choice of or conduct regarding a product.' ").

[384] Even under a hypothetical scenario wherein a consumer understood an add-on would not benefit them but wanted to pay extra for the add-on anyway, in the case of an act or practice challenged by the agency as deceptive or unfair, "the FTC need not prove that every consumer was injured. The existence of some satisfied customers does not constitute a defense . . . ." *Fed. Trade Comm'n* v. *Amy Travel Serv., Inc.,* 875 F.2d 564, 572 (7th Cir. 1989), *vacated in part on other grounds, Fed. Trade Comm'n* v. *Credit Bureau Ctr., LLC,* 937 F.3d 764 (7th Cir. 2019); *accord Fed. Trade Comm'n* v. *Stefanchik,* 559 F.3d 924, 929 n.12 (9th Cir. 2009).

[385] *See, e.g.,* Consumer Fin. Prot. Bureau, "Supervisory Highlights: Issue 19, Summer 2019" 3–4 (Sept. 2019), *https://files.consumerfinance.gov/ f/documents/cfpb_supervisory-highlights_issue-19_ 092019.pdf* (describing findings, from supervisory examinations, of lenders selling GAP agreements to consumers whose low LTV meant that they would not benefit from the product: "By purchasing a product they would not benefit from, consumers demonstrated that they lacked an understanding of a material aspect of the product. The lenders had sufficient information to know that these consumers would not benefit from the product. These sales show that the lenders took unreasonable advantage of the consumers' lack of understanding of the material risks, costs, or conditions of the product.").

[386] *See, e.g.,* NPRM at 42030 (Question 33) ("In particular, the Commission is contemplating whether any final Rule should restrict dealers from selling add-ons (other than those already installed on the vehicle) in the same transaction, or on the same day, the vehicle is sold or leased."); *id.* (Question 38) (discussing proposed § 463.5(c) and asking "Does the proposal provide a meaningful way to obtain consent in an already disclosure-heavy transaction? If it would result in too many disclosures, what other measures could be taken to protect consumers from unauthorized charges?").

obligations.[387] This injury is not reasonably avoidable by consumers when dealers are silent about such charges and simply include them in dense, lengthy contracts, as explained in detail in SBP II.B.2.[388] If a dealer instead describes what the charges are for, such a description either deceptively states or implies that the add-on would benefit the consumer, or acknowledges the add-on would not benefit the consumer, the latter of which would create "contradictory double meanings"[389] and, if discovered, would still result in the dealer wasting the consumers' time.[390] Further, there are no benefits to consumers or to competition from charging consumers for add-ons that would not benefit them. Moreover, charging for non-beneficial products is inconsistent with industry guidance,[391] and dealerships that profit from such sales place dealerships that do not at a competitive disadvantage. Thus, it is an unfair or deceptive act or practice for dealers, in connection with the sale or financing of vehicles, to charge for an add-on product or service if the consumer would not benefit from such an add-on product or service. This provision also serves to prevent

misrepresentations prohibited by § 463.3 of the Final Rule, including misrepresentations regarding material information about the costs or terms of purchasing, financing, or leasing a vehicle, and about any costs, limitation, benefit, or other aspect of an add-on. This provision further helps prevent dealers from failing to obtain express, informed consent for charges, as prohibited by § 463.5(c).[392]

**(b) Undisclosed or Unselected Add-Ons**

The Commission's proposed provisions relating to undisclosed or unselected add-on products or services, at § 463.5(b), prohibited dealers from charging for optional add-ons before undertaking certain measures. Specifically, proposed § 463.5(b)(1) prohibited dealers from charging for optional add-ons unless the dealers disclosed, and offered to consummate the transaction for, the cash price at which a consumer may purchase the vehicle without such add-ons. This proposed provision also required the consumer to decline to purchase the vehicle for the cash price without the add-on by means of a written declination, with date and time recorded, and signed by the consumer and a manager of the motor vehicle dealer. The proposed requirements of § 463.5(b)(1) applied before the dealer referenced any aspect of financing for a specific vehicle, aside from the offering price, or before consummating a non-financed sale. Proposed § 463.5(b)(2) required similar steps before charging for any optional add-on in a financed transaction, including that the dealer disclose, and offer to consummate the transaction for, a vehicle's cash price without optional add-ons plus the finance charge for such transaction, separately itemizing the components of the offer. This proposed provision also required a written, dated, time-stamped, and signed declination. Finally, proposed § 463.5(b)(3) required dealers to disclose the cost of the transaction, whether financed or not, without any optional add-ons, as well as the charges for the optional add-ons selected by the consumer, separately itemized. Each proposed provision required clear and conspicuous disclosure of specific information relating to optional add-ons and their associated costs.

As discussed in the following paragraphs, the Commission has determined not to finalize the proposed provisions at § 463.5(b) regarding

undisclosed or unselected add-ons. Many commenters described the likely benefits of such proposed provisions, and a number of commenters indicated how such provisions would be feasible, including by reference to similar disclosure regimes already in effect at the State or local level. Commenters also credited the Commission's goals for such provisions.

However, other commenters opposed these proposed provisions, contending they would be burdensome and time-consuming. Others similarly expressed concern that, given the duration, complexity, and paperwork-heavy nature of motor vehicle sales and financing transactions, these provisions would not effectively resolve the problem of add-ons being sold without express, informed consumer consent.[393]

Having considered the comments, the Commission declines to include in this Final Rule the proposed provisions relating to undisclosed or unselected add-on products or services at § 463.5(b). The Commission notes that various commenters were concerned about the extent to which this proposal would add documents and time to the transaction. If finalized, this would have been the sole provision in the Final Rule that affirmatively requires the dealer and consumer, in all circumstances, to view and sign additional documentation during the purchase, finance, or lease process, in what is already a document-heavy, time-consuming, and complicated transaction. The Commission further notes that, as a matter of existing law, dealers are already prohibited from engaging in misrepresentations regarding add-ons and from charging for add-ons without express, informed consent—conduct which the Final Rule prohibits as well. Accordingly, the Commission has determined not to include this provision in its Final Rule.

The Commission will continue to monitor the motor vehicle marketplace for issues pertaining to unselected or undisclosed add-ons, and will consider implementing additional measures in the future if it determines such measures are necessary to address deceptive or unfair practices relating to add-ons.

[387] See, e.g., Complaint ¶¶ 25–28, Fed. Trade Comm'n v. N. Am. Auto. Servs., Inc., No. 1:22–cv–01690 (N.D. Ill. Mar. 31, 2022).

[388] See, e.g., Auto Buyer Study, supra note 25, at 13–15, 17–18.

[389] See Removatron Int'l Corp. v. Fed. Trade Comm'n, 884 F. 2d 1489, 1497 (1st Cir. 1989) ("Disclaimers or qualifications . . . are not adequate to avoid liability unless they are sufficiently prominent and unambiguous to change the apparent meaning of the claims and to leave an accurate impression. Anything less is only likely to cause confusion by creating contradictory double meanings.").

[390] Even in the hypothetical scenario where some consumers could have avoided the injury because they understood that an add-on would not benefit them but wanted to pay extra for the add-on anyway, the dealer's conduct in selling non-beneficial add-ons would still be unfair because it substantially injures other consumers who do not wish to pay for items that would not benefit them and, as discussed in the SBP text, cannot reasonably avoid the harm, and no countervailing benefits outweigh the costs. See FTC v. Amazon.com, Inc., 2016 U.S. Dist. LEXIS 55569, *15, *18–21 (W.D. Wash. Apr. 26, 2016) (finding unfairness even though some consumers could have avoided the charge). Additionally, consumers who truly wish to purchase add-ons that do not benefit them may still be able to do so directly from the add-on provider.

[391] See Nat'l Auto. Dealers Ass'n et al., "Voluntary Protection Products: A Model Dealership Policy" 5 (2019), https://www.nada.org/regulatory-compliance/voluntary-protection-products-model-dealership-policy (explaining that when determining which voluntary protection products to offer to customers, "the dealership should have confidence in the value that the product offers to customers," including that the dealership should understand "whether its coverage is already provided by another product being purchased by the customer," and stating "[i]t is essential that customers have a clearly defined path to receiving such benefits.").

[392] See 15 U.S.C. 57a(a)(1)(B) (the Commission "may include requirements prescribed for the purpose of preventing" unfair or deceptive acts or practices).

[393] See, e.g., Comment of Nat'l Consumer L. Ctr. et al., Doc. No. FTC–2022–0046–7607 at 30–31. Instead, advocates recommended that the Commission require a cooling-off period for add-ons, similar to that required by the Commission for door-to-door and other off-premises sales, which would grant consumers time to review the paperwork after the transaction, and to cancel unexpected or otherwise unwanted add-ons for a full refund. Id. This comment is addressed when discussing § 463.5(c) in SBP III.E.2(c).

(c) Any Item Without Express, Informed Consent

Section 463.5(c) of the proposed rule prohibited motor vehicle dealers, in connection with the sale or financing of vehicles, from charging consumers for any item unless the dealer obtains the express, informed consent of the consumer for the charge. Upon careful review and consideration of the comments, the Commission is finalizing this provision with one modification from its original proposal: the addition of language to the end of § 463.5(c) clarifying that the requirements in § 463.5(c) "also are prescribed for the purpose of preventing the unfair or deceptive acts or practices defined in this part, including those in §§ 463.3(a) and (b), 463.4, and paragraph (a) of this section." In addition, the Commission is finalizing the corresponding definition of "Express, Informed Consent," now at § 463.2(g).

Many commenters favored the proposed provision and expressed the need for such a provision. For example:

• In one instance a salesman who appeared busy and trying to help me efficiently navigate the process rushed me to sign a small paper, "just sign this quickly and we'll be on our way," I was told, without disclosure that they were selling me something that I did not want. I found it later and felt cheated.[394]

• They made me sign the sales bill on an electronic device, but the finance guy never pointed to me any number I was getting charge[d] for, and never pointed to me the total amount I was getting billed for. He seem[ed] to be in a hurry and he even told me he he had people waiting for him to see. I think it was all planned to push the buyer to blindly sign the bill of sale without explaining anything because he was scrolling the electronic pages in a hurry and going straight to the sign box line. I thought I signed the agreed amount, I trust them, but, instead, they charge me for things I never agreed on. I went back to the dealer in less than 48 hours when I discovered the fraud and asked them to remove the extra fees they charged me for, they refused and they forced me to pay for it, I asked them and requested them to take the car back, they refused it again, at the end, they gave me a little bit of a discount, but, not compared to what I got charged for. . . .[395]

• I am an attorney in private practice in NY representing consumers for 33 years. It never ceases to amaze me how car dealers defraud honest trusting consumers substantial sums of money through various common deceptive and fraudulent practices ranging from altering documents, concealing documents, having consumers sign blank documents, lying about the material terms of the deal, altering the prices, adding on other contracts or items never discussed and selling vehicles with undisclosed damages and defects.[396]

• I have worked in the automotive business for many year[s]. I realize there are plenty of dealers around the US that have deceptive business practices, however this isn't the case for all dealers. I believe there can be laws that can be put in place to help prevent dealers from adding additional backend products without consent or knowledge.[397]

Others supported the proposed provision and urged the Commission to include additional measures, such as a thirty-day "cooling-off" period within which consumers would be able to receive a full refund for any add-ons. A number of commenters, including consumer advocacy organizations, contended that such an additional time frame to review, and potentially cancel, any add-ons would counter the high-pressure, confusing environment of the dealership F&I office and undermine any efforts to misrepresent add-on charges and coverage. Such commenters also indicated that such a provision would allow consumers the opportunity to compare prices and providers, and ultimately help increase competition in the marketplace. A few individual commenters requested that the Commission provide a cooling-off period not only for add-ons, but for the full vehicle purchase, and a prohibition on charging non-refundable deposits.

The Commission agrees that a "cooling off" provision could offer consumers additional protection from unwanted add-ons; however, additional information would assist the Commission in evaluating the potential benefits of such a provision. Such information might include, for example, what length a cooling-off period would need to be in order to offer adequate protection to consumers and to competition, or how consumers would most effectively be made aware of such a cooling-off period in the course of the complicated, lengthy, and document-heavy vehicle sale or financing transaction. Such information would be particularly relevant given that, in the Commission's law enforcement experience, consumers have paid unauthorized charges on years-long contracts without learning of the charges.[398] Accordingly, the Commission will continue to monitor the market to determine whether, after adoption of this Rule, it appears that a cooling-off period or other measures would be warranted.

Other commenters, including consumer advocacy organizations, emphasized the importance of having disclosures and other documents available in the language used to negotiate the sale or lease. Here, the Commission notes that a dealer does not obtain the express, informed consent of the consumer if the consumer's assent to a charge is ambiguous or based on a disclosure the consumer does not easily understand.[399] Thus, if a dealer uses one language during negotiations and a different language in its contracts, and the consumer does not understand and assent to the charges, the dealer is violating § 463.5(c). Furthermore, the Commission notes that the definition of "Express, Informed Consent" it is finalizing at § 463.2(g) requires, *inter alia,* a clear and conspicuous disclosure of what the charge is for and the amount of the charge, and the Commission's definition of "Clear(ly) and Conspicuous(ly)," at § 463.2(d)(5), requires disclosures to appear "in each language in which the representation that requires the disclosure appears."

Other commenters, including a consumer advocacy organization and a consumer protection agency, recommended the Commission prescribe additional requirements for obtaining express, informed consent for charges, such as boxes for signatures and date-and-time recordings, and a requirement that dealers comply with the E-Sign Act. Other commenters also discussed obtaining consent through electronic signatures. Commenters including consumer advocacy organizations, for instance, reported cases wherein documents that were signed and supposedly provided electronically to consumers, were never actually delivered to the consumer, or delivered days later. According to these commenters, some consumers would sign on a small signature pad where they could not see the terms of the document being signed. Other practitioner commenters reported that

---

[394] Individual commenter, Doc. No. FTC–2022–0046–0794.

[395] Individual commenter, Doc. No. FTC–2022–0046–0671.

[396] Individual commenter, Doc. No. FTC–2022–0046–0073.

[397] Individual commenter, Doc. No. FTC–2022–0046–9917.

[398] *See* discussion in SBP II.B.2.

[399] *See* § 463.2(g) (defining "Express, Informed Consent" to include an affirmative act communicating "unambiguous assent to be charged"); § 463.2(d) (defining "Clear(ly) and Conspicuous(ly)" to include a manner that is "easily understandable").

consumers' electronic signatures were applied to contracts with very different terms from what the consumers believed they were accepting. An individual commenter recommended that dealers be required to provide paper documents where requested and consumers be allowed to consent on paper documents only, noting that elderly consumers or those for whom English is a second language may have difficulty with electronic signatures. Another individual commenter expressed the view that anyone needing assistance understanding the sales price or disclosures should be provided independent legal counsel at the dealership's expense.

While the Commission agrees that additional measures to promote express, informed consent could reduce the incidence of unauthorized charges and aid with enforcement efforts, the Commission has determined not to include in this Final Rule provisions that would require new forms during the vehicle sale or financing transaction. This way, law-abiding dealers would not have to change their practices for obtaining express, informed consent. Thus, the Commission declines to add further requirements, including those involving signature boxes or date-and-time recordings. Regarding the E-Sign Act, nothing in the Rule modifies compliance obligations under this Act. Instead, the Final Rule requires that, regardless of whether any given signature may have been obtained through electronic or other means, the dealer must obtain the express, informed consent of the consumer to any item for which the dealer charges the consumer. Furthermore, the Commission notes that a dealer has not obtained express, informed consent if a dealer has consumers sign an electronic keypad without seeing and understanding the terms, or applies their electronic signatures on contracts with terms different from those to which the consumer agreed.[400] In such circumstances, the consumer has not demonstrated informed consent, or unambiguous assent to be charged, including because the signatures are not in close proximity to clear and conspicuous disclosures regarding the charges.

Other commenters, including industry and dealership associations, claimed that the Commission did not provide enough information regarding what would constitute express, informed

consent to charges, contending that additional detail was needed, or that the provision and associated definition of "Express, Informed Consent" were too vague. The Commission notes, however, that the phrase "Express, Informed Consent" is consistent with existing legal standards.[401] Commission enforcement actions over the years have challenged as deceptive or unfair the failure to get express, informed consent to charges, including in actions involving motor vehicle dealers and others:

• Rushing consumers through stacks of auto paperwork more than 60 pages deep and requiring over a dozen signatures, where the paperwork included charges for unwanted add-ons.[402]

• Double charging certain fees without consumers' knowledge or consent in highly technical documents presented at the close of a long financing process after an already lengthy process of selecting a vehicle and negotiating over its price.[403]

• Presenting consumers with preprinted sales and financing forms that included add-ons consumers had not requested, and rushing consumers through the closing process while directing them where to sign forms, including forms that were blank.[404]

• Charging consumers more for a product or service than they agreed to pay.[405]

• Charging consumers for more products than they requested.[406]

• Cramming charges onto consumers' bills for services that the consumers did not request without the consumers' knowledge or consent.[407]

Courts have found the failure to obtain express, informed consent to be a violation of the FTC Act.[408] Other

statutes and rules enforced by the Commission include express, informed consent requirements for consumer purchases,[409] and similar provisions have appeared in Commission orders resolving charges that motor vehicle dealers or other sellers have levied unauthorized charges on consumers.[410] In short, the prohibition in § 463.5(c) against charging consumers for products or services without their express, informed consent, and the corresponding definition of "Express, Informed Consent" in § 463.2(g) are consistent with existing law in articulating what motor vehicle dealers must do—and already should be doing.

The Commission further notes that the proposed definition of "Express, Informed Consent" provided information regarding what was required by § 463.5(c): an affirmative act by the consumer communicating unambiguous assent to be charged, made after receiving and in close proximity to a clear and conspicuous disclosure, in writing, and also orally for in-person transactions, of the following: (1) what the charge is for; and (2) the amount of the charge, including, if the charge is for a product or service, all fees and costs to be charged to the consumer over the period of repayment with and without the product or service. As is evident from this language, there

[400] See § 463.2(g) (defining "Express, Informed Consent" to include requiring clear and conspicuous disclosures of what the charge is for and the amount of the charge).

[401] See, e.g., Fed. Trade Comm'n v. Amazon.com, Inc., 71 F. Supp. 3d 1158, 1163 (W.D. Wash. 2014).

[402] Complaint ¶¶ 24–25, 29–49, 76, Fed. Trade Comm'n v. North Am. Auto. Servs., Inc., No. 1:22–cv–01690 (N.D. Ill. Mar. 31, 2022).

[403] Complaint ¶¶ 17–19, 44, Fed. Trade Comm'n v. Liberty Chevrolet, No. 1:20–cv–03945 (S.D.N.Y. May 21, 2020).

[404] Complaint ¶¶ 59–64, 91, Fed. Trade Comm'n v. Universal City Nissan, No. 2:16–cv–07329 (C.D. Cal. Sept. 29, 2016).

[405] See, e.g., Complaint ¶¶ 29, 47, Fed. Trade Comm'n v. Yellowstone Cap. LLC, No. 1:20–cv–06023–LAK (S.D.N.Y. Aug. 3, 2020).

[406] See, e.g., Complaint ¶¶ 11–14, 21, Bionatrol Health, LLC, No. C–4733 (F.T.C. Mar. 5, 2021).

[407] See, e.g., Complaint ¶¶ 8–9, 42, Fed. Trade Comm'n v. T-Mobile USA, Inc., No. 2:14–cv–00967–JLR (W.D. Wash. July 1, 2014); Complaint ¶ 9, 49, Fed. Trade Comm'n v. AT&T Mobility, LLC, No. 1:14–cv–03227–HLM (N.D. Ga. Oct. 8, 2014).

[408] See, e.g., Fed. Trade Comm'n v. FleetCor Techs., Inc., 620 F. Supp. 3d 1268, 1333–38 (N.D. Ga. 2022); Fed. Trade Comm'n v. Amazon.com, Inc., No. C14–1038–JCC, 2016 WL 10654030, at *8 (W.D. Wash. July 22, 2016); Fed. Trade Comm'n v.

Inc21.com Corp., 745 F. Supp. 2d 975, 1005 (N.D. Cal. 2010), aff'd, 475 F. App'x 106 (9th Cir. 2012).

[409] 15 U.S.C. 8402(a)(2), 8403(2) (Restore Online Shoppers' Confidence Act); 16 CFR 310.4(a)(7) (Telemarketing Sales Rule).

[410] The Commission has required express, informed consent provisions in orders against motor vehicle dealers and others. See Stipulated Order at Art. IV, Fed. Trade Comm'n v. Passport Auto. Grp., Inc., No. 8:22–cv–02670–TDC (D. Md. Oct. 18, 2022); Stipulated Order at Art. II, Fed. Trade Comm'n v. North Am. Auto. Servs., Inc., No. 1:22–cv–01690 (N.D. Ill. Mar. 31, 2022) Stipulated Order at Art. II, Fed. Trade Comm'n v. Liberty Chevrolet, No. 1:20–cv–03945 (S.D.N.Y. May 22, 2020); Stipulated Order at Art. III, Fed. Trade Comm'n v. Consumer Portfolio Servs., No. 14–cv–00819 (C.D. Cal. June 11, 2014). Similarly, the Commission has required such provisions in orders in other contexts. See, e.g., Stipulated Order at Art. III, Fed. Trade Comm'n v. Yellowstone Cap. LLC, No. 1:20–cv–06023–LAK (S.D.N.Y. May 4, 2021); Stipulated Order at Art. IV, Fed. Trade Comm'n v. Prog. Leasing, No. 1:20–cv–1668–JPB (N.D. Ga. Apr. 22, 2020); Decision and Order at Art. VI, Bionatrol Health, LLC, No. C–4733 (F.T.C. Mar. 5, 2021); Stipulated Order at Art. I.E, Fed. Trade Comm'n v. BunZai Media Grp., Inc., No. CV 15–4527–GW (PLAx) (C.D. Cal. June 27, 2018); Stipulated Order at Art. I, Fed. Trade Comm'n v. T-Mobile USA, Inc., No. 2:14–cv–00967–JLR (W.D. Wash. Dec. 19, 2014); Stipulated Order at Art. I, Fed. Trade Comm'n v. AT&T Mobility, LLC, No. 1:14–cv–03227–HLM (N.D. Ga. Oct. 8, 2014); Decision and Order at Art. I, Google, Inc., No. C–4499 (F.T.C. Dec. 2, 2014); Consent Order, Apple Inc., No. C–4444 (F.T.C. Mar. 27, 2014); cf. Fed. Trade Comm'n v. Kennedy, 574 F. Supp. 2d 714, 720–21 (S.D. Tex. 2008) (consumers charged without express, informed consent for web services could not reasonably avoid harm when told that websites were "free").

must be an affirmative act that itself conveys the consumer's unambiguous assent to the specific charge: it must clearly and expressly communicate both that the consumer has been *informed* about the charge and *consents* to the charge. This act cannot be susceptible to alternative interpretations, *i.e.,* that the consumer meant to communicate something other than the consumer's authorization to be charged for the specific add-on or other item in question. For example, a consumer might ask, "how much would it cost to get the car with [a specific add-on]?" Such a statement does not convey unambiguous assent to be charged for the mentioned add-on; rather, it could merely convey curiosity, interest, or a desire to evaluate options. Similarly, if a consumer responds to a salesperson's description of an add-on by saying "OK," this response may merely confirm that the consumer had heard or understood information and does not indicate the consumer's unambiguous assent to purchase, let alone be charged for, such an item.

Relatedly, some commenters, including dealership associations, suggested that the addition, by the consumer, of a signature or set of initials, accompanied by a corresponding date can be partial evidence of an affirmative, or "Express," act. The Commission notes that the extent to which these, or other, acts indicate "Express, Informed Consent" depends on circumstances and context. A consumer signing a lengthy document with pre-checked boxes does not, by itself, demonstrate express, informed consent. This is particularly so at the end of an hours-long transaction, at which point actions that, under other circumstances, may indicate assent are increasingly less likely to do so unambiguously, given that at the close of a transaction, consumers expect to be finalizing previously agreed-upon terms instead of discussing new products or services hours into the deal. For express, informed consent to be effective, the consumer must understand what a charge is for and the amount of the charge, including all costs and fees over the length of the payment period. A signed and dated document would not satisfy the requirement for express, informed consent, for example, if the consumer was directed to sign the final page of a contract or an electronic signature pad and the signed and dated document did not reflect the terms to which the consumer had agreed. In such cases, the signed and dated document does not represent the consumer's unambiguous assent to be charged,

made after receiving, and in close proximity to, a clear and conspicuous disclosure of what the charges are for and the amount of the charges.

Some industry association commenters argued that the proposed definition was too prescriptive, and would require, for instance, video records to demonstrate compliance, or that the proposed language was overreaching, and requiring express, informed consent for every item on a contract would be complicated and time-consuming. The Commission notes again that, under current law, dealerships are already required to obtain consumers' express, informed consent to charges. If dealers are already obtaining such consent, as is required by law, they need not take additional steps, such as by using a separate disclosure form or videos, or by spending additional time during the transaction to comply with this provision.

A dealership association commenter requested examples of recordkeeping and best practices evidencing oral disclosures that would satisfy the requirement to obtain express, informed consent. The express, informed consent requirement and definition require the disclosure to be made in *writing* in addition to orally for in-person transactions. Furthermore, under other provisions of the Rule, such as the definition of "Clear(ly) and Conspicuous(ly)" at § 463.2(d)(7), dealers are prohibited from contradicting information that is required to be disclosed; thus, for example, dealers' oral representations must be consistent with the written disclosure required for obtaining express, informed consent. Best practices for satisfying the requirement to obtain express, informed consent include presenting key information and finalizing actual terms early in the transaction—for example, by including full cost information, such as estimated taxes, costs of any selections made by the consumer, and any other components of cost, on dealer websites—and maintaining records that this was done. The Commission notes that, as a transaction progresses, consumers expect to be finalizing previously agreed-upon terms instead of discussing new charges and new products or services. In lieu of finalizing additional formal mandates in the Rule regarding recordkeeping and best practices evidencing express, informed consent, the Commission recognizes that industry members and other stakeholders will have significant room to develop self-regulatory programs and guidance tailoring these and other

topics to the specifics of their business operations.

Some dealership association commenters expressed concern that such a provision would be inconsistent with State laws and would complicate the car buying experience. While the Commission is not aware of any laws that allow dealers to charge consumers without their express, informed consent, and thus is not aware of any inconsistences with this provision, § 463.9 of the Final Rule specifies what dealers must do in the case of actual conflicts with State law. State laws may provide more or less specific requirements—including requirements that provide greater protection—as long as they do not conflict with the Final Rule, as set forth in § 463.9. The Commission also notes that to the extent there is overlap with existing law, there is no evidence that duplicative prohibitions against deceptive and unfair conduct, including prohibitions against charging consumers without express, informed consent, have harmed consumers or competition.

Commenters, including an industry association, inquired whether the term "item," as used in this proposed provision, differed from the term "Add-on Product or Service" defined in § 463.2 of the Commission's proposal. The industry association also argued that requiring express, informed consent is beyond what is required under the Truth in Lending Act. The Commission responds as follows: Consistent with its plain meaning, the term "item" is broader than, and thereby encompasses, the term "Add-on Product(s) or Service(s)," which is limited by its definition in § 463.2 of the Final Rule.[411] As proposed, § 463.5 addressed "Dealer Charges for Add-ons and *Other Items.*"[412] It did so in recognition of the fact that add-ons are one type of "item," but that "*Other Items*" for which a dealer might charge exist as well. Thus, as proposed, § 463.5 applied to charges generally, whether such charges were for an add-on or for another item. As previously discussed, charging consumers without their express, informed consent to the charge has long been an unfair or deceptive practice under the FTC Act. This has been the case regardless of what the charge is for. Accordingly, dealers already should be obtaining consumers' express, informed

---

[411] *See* NPRM at 42046. The term "item" includes "a distinct part in an enumeration, account, or series" as well as "a separate piece of news or information." *See Item* (defs. 1, 3), Merriam-Webster.com Dictionary, *https://www.merriam-webster.com/dictionary/item* (last visited Sept. 14, 2023).

[412] *See* NPRM at 42046 (emphasis added).

consent for charges, whether it is for an Add-on or any other item, regardless of what may be required under other laws.

Commenters, including this same industry association commenter, also questioned how a dealership would calculate ''the amount of the charge . . . with and without the product or service'' as would be required under proposed § 463.2(g)(2), as well as how this proposed provision would work in a non-financed transaction.[413] Conversely, an individual commenter stated that current F&I practices already routinely disclose the proposed charges with and without the product or service. The Commission notes that its proposed definition of ''Express, Informed Consent'' plainly required disclosure of the ''amount of the charge, including, if the product is for a product or service, all fees and costs to be charged to the consumer over the period of repayment with and without the product or service.'' [414] The amount that the dealer will charge the consumer over the period of repayment with the product or service is the total charge for that product or service. In the event the charge is for an optional product or service, the amount the dealer will charge the consumer without the product or service is zero; in the event the charge is for a non-optional item, the dealer's disclosure must clearly indicate as such. Regarding non-financed transactions, as with a financed transaction, the amount the dealer will charge the consumer over the period of repayment with the product or service is the total charge for that product or service. If the period of repayment is such that full payment is due upon receipt of the vehicle, the amount required to be disclosed is the total charge for that product or service to be paid upon receipt of the vehicle. The amount the dealer will charge the consumer without the product or service, if it is optional, is zero; in the event the charge is for a non-optional item, the dealer's disclosure must clearly indicate such. Sharing this basic information with consumers—how much they will pay for the item and how much they will pay without it— addresses practices, such as hiding add-on charges, misrepresenting whether such charges are required in connection with the vehicle sale or financing transaction, or misrepresenting how such charges influence the total of payments for the transaction.

An industry association comment stated that, were the Commission's proposal to become final, the Commission would be able to obtain monetary relief from dealers for harmed consumers, and argued that Holder Rule protections for such consumers thus would be unnecessary.[415] Accordingly, it urged the Commission to modify its proposal to include a safe harbor for contract assignees, which it argued would be incapable of detecting deficiencies in sale or lease transactions, such as dealer misrepresentations or a lack of consumer consent, unless those deficiencies were apparent from the face of the contract. Here, the Commission emphasizes that no provision of the Final Rule changes the status quo regarding the responsibilities of assignees or other subsequent holders of motor vehicle financing under the Holder Rule. The Commission did not include, when enacting the Holder Rule, a safe harbor from liability for claims or defenses based on their capability of detection by such assignees or other subsequent holders, and the Commission does not believe on the basis of comments received in the course of this rulemaking that such a change would be warranted as a consequence of finalizing this Rule. The Holder Rule provides important protections for harmed consumers, even when there is law that allows the Commission or other law enforcers to obtain remedies for harmed consumers, including where the consumers are seeking recourse from, or defending themselves against, parties that have not been the subject of law enforcement actions.[416] Furthermore, while the Commission understands that dealers are often in the best position to ensure they have, in the first instance, obtained a consumer's express, informed consent for charges, there are steps an assignee or other subsequent holder of the consumer credit contract, such as a third-party financing entity, can take to address concerns about contracts obtained without express, informed consent. For example, if a financing entity receives complaints from consumers or others that specific charges were obtained without authorization or sees that charges for a particular item are occurring substantially more frequently at a given dealership than at others, the financing company can take steps to make sure the dealer is obtaining express, informed consent. Further, if a financing entity is concerned that a dealership may be acting in violation of the Final Rule, it may arrange its business relationships accordingly, including by altering or withdrawing its business from the dealership.[417]

Another industry association commenter asked for clarification regarding the extent to which particular rules are necessary to obtain customer authorization for charges, thus reflecting what is already necessary under State or Federal law, as opposed to preventative measures that the Commission otherwise deems necessary. The Commission notes that this provision is consistent with the requirements of the FTC Act, which already prohibits charging consumers without express, informed consent, and is needed to address unfair and deceptive conduct. As the Commission set forth in its NPRM, the length and complexity of motor vehicle transactions has created an environment rife with deceptive and unfair conduct. Consumer complaints and the Commission's extensive law enforcement experience, among other sources, indicate that some dealers have added thousands of dollars in unauthorized charges to motor vehicle transactions, including for add-ons consumers had already rejected.[418] Such issues are exacerbated when, for example, preprinted dealer contracts automatically include charges for optional add-ons that the consumer has not selected; when dealers rush consumers through stacks of paperwork with buried charges after a lengthy process; when dealers misinform consumers that the documents they are signing represent agreed-upon terms; or when dealers ask consumers to sign blank documents.

Charging consumers without their express, informed consent causes substantial injury to consumers in the amount of the unauthorized charge. This injury is not reasonably avoidable when dealers do not clearly and conspicuously disclose to the consumer what the charge is for and the amount of the charge, since this information is within the unilateral control of the

---

[413] This commenter also contended that this provision would result in many disclosures when combined with proposed § 463.5(b). Comment of Nat'l Auto. Dealers Ass'n, Doc. No. FTC–2022–0046–8368 at 98–99. As discussed previously, the Commission declines to finalize proposed § 463.5(b).

[414] See NPRM at 42045.

[415] See Holder Rule, 16 CFR 433.2.

[416] See Holder Rule, 16 CFR 433.2; see also Fed. Trade Comm'n, Advisory Opinion Regarding F.T.C. Trade Regulation Rule Concerning Preservation of Consumers' Claims and Defenses (May 3, 2012), *https://www.ftc.gov/system/files/documents/advisory_opinions/16-c.f.r.part-433-federal-trade-commission-trade-regulation-rule-concerning-preservation-consumers-claims/120510advisoryopinionholderrule.pdf* (last visited Dec. 5, 2023).

[417] See Complaint ¶¶ 29–32, *Fed. Trade Comm'n* v. *Tate's Auto Ctr. of Winslow, Inc.,* No. 3:18-cv-08176–DJH (D. Ariz. July 31, 2018) (alleging a financing entity ceased business with Tate's Auto Center after concerns about loan falsification and substantial losses).

[418] See SBP II.B.2.

dealer. There are no countervailing benefits to consumers or to competition that outweigh this injury. To the contrary, if all dealers obtained express, informed consent to charges, they would not lose business to dealers who do not do so.

Charging for an item without obtaining the consumer's express, informed consent is also a deceptive practice under section 5 of the FTC Act.[419] When a dealer presents a consumer with whom the dealer has negotiated a finalized sale or financing contract, the dealer is representing that the contract includes only charges that were negotiated and to which the consumer agreed. If the dealer failed to obtain the consumer's express, informed consent, however, such a representation is false or misleading. It is also material: if consumers knew that they had not, in fact, authorized a charge that the dealer nonetheless included in their sales or financing contract, this information likely would have affected the consumers' willingness to continue to engage with the dealership, as well as consumers' willingness to select and pay for any such item. The express, informed consent requirement also serves to prevent the misrepresentations prohibited by § 463.3 of the Final Rule—including misrepresentations regarding material information about the costs or terms of purchasing, financing, or leasing a vehicle, and about any costs, limitation, benefit, or other aspect of an add-on.[420] The requirement also serves to prevent violations of the disclosure requirements in § 463.4 and the prohibition against charging for non-beneficial add-ons in § 463.5(a). By operation of the definition of "Express, Informed Consent" at § 463.2(g), this requirement reduces the likelihood that dealers will fail to disclose what a given charge is for and the amount of the charge including all fees and costs to be charged to the consumer over the period of repayment with and without the charged item, thereby making the disclosures of information required by § 463.4 more likely. The same is true regarding the requirements of § 463.5(a): the requirement that dealers obtain informed and unambiguous assent to be charged for each product or service makes it less likely that dealers will charge consumers for items from which

they would not benefit; consumers typically do not provide informed, unambiguous assent to be charged for additional products from which they could not benefit unless they are led to believe, directly or by omission, that these products would be beneficial.

Thus, the Commission has determined to finalize proposed § 463.5(c), prohibiting dealers from charging a consumer for any item unless the dealer obtains the express, informed consent of the consumer for the charge, with the addition of language clarifying that the requirements in § 463.5(c) "also are prescribed for the purpose of preventing the unfair or deceptive acts or practices defined in this part, including those in §§ 463.3(a) and (b), 463.4, and paragraph (a) of this section." In addition, the Commission has determined to finalize its definition of "Express, Informed Consent," now at § 463.2(g), substantively as proposed.

*F. § 463.6: Recordkeeping*

Proposed § 463.6 required motor vehicle dealers to create and retain, for a period of twenty-four months from the date the record is created, all records necessary to demonstrate compliance with the Final Rule, including those in five enumerated paragraphs. This proposed section further provided that dealers may retain such records in any legible form, and in the same manner, format, or place as they may already keep such records in the ordinary course of business, and that failure to keep all required records required will be a violation of the Rule. As examined in additional detail in the following analysis, several commenters supported the proposal; several urged the Commission to adopt broader recordkeeping requirements; and several other commenters argued that the proposed requirements were too broad. After careful consideration, the Commission has determined to adopt these recordkeeping requirements largely as proposed, with two conforming modifications to remove references to proposed provisions not adopted in the Final Rule; one typographical modification to include a serial comma for consistency; and minor textual changes to ensure consistency with the defined terms at § 463.2(e) and (f) by replacing "Motor Vehicle Dealer" with "Covered Motor Vehicle Dealer" or "Dealer," replacing "Motor Vehicle" with "Vehicle," and capitalizing "vehicle." In the following paragraphs, the Commission discusses each proposed recordkeeping requirement, the comments the Commission received on each such requirement as well as the Commission's responses to such

comments, and the provisions the Commission is finalizing.

Section 463.6(a) of the proposed rule required motor vehicle dealers to create and retain, for a period of twenty-four months from the date the record is created, all records necessary to demonstrate compliance with the Final Rule, including (1) copies of materially different advertisements, sales scripts, training materials, and marketing materials regarding the price, financing, or lease of a motor vehicle that the dealer disseminated during the relevant time period; (2) copies of all materially different add-on lists and all documents describing such products or services that are offered to consumers; (3) copies of all purchase orders; financing and lease documents with the dealer signed by the consumer, whether or not final approval is received for a financing or lease transaction; and all written communications relating to sales, financing, or leasing between the dealer and any consumer who signs a purchase order or financing or lease contract with the dealer; (4) records demonstrating that add-ons in consumers' contracts meet the requirements of § 463.5, including copies of all service contracts, GAP agreements, and calculations of loan-to-value ratios in contracts including GAP agreements; and (5) copies of all written consumer complaints relating to sales, financing, or leasing, inquiries related to add-ons, and inquiries and responses about vehicles referenced in § 463.4.

Proposed § 463.6(b) provided that a motor vehicle dealer may keep the required records "in any legible form, and in the same manner, format, or place as they may already keep such records in the ordinary course of business." This proposed paragraph also specified that failure to keep all records required under paragraph (a) of this section would be a violation of the Final Rule.

Many commenters, including State regulators, legal aid groups, consumer advocacy organizations, and individual commenters, endorsed the Commission's proposed rule generally, without criticism of its proposed recordkeeping requirements. In addition, one such association commenter expressly stated that it supported each of the proposed recordkeeping provisions, explaining that these proposed provisions were needed to address "bait and switch" tactics, provide evidence of whether required disclosures are made, and identify consumers harmed by illegal

---

[419] *See, e.g., Fed. Trade Comm'n v. FleetCor Techs., Inc.*, 620 F. Supp. 3d 1268, 1334–39 (N.D. Ga. Aug. 9, 2022); *Fed. Trade Comm'n v. Inc21.com Corp.*, 745 F. Supp. 2d 975, 1001–03 (N.D. Cal. Sept. 21, 2010).

[420] *See* 15 U.S.C. 57a(a)(1)(B) (the Commission "may include requirements prescribed for the purpose of preventing" unfair or deceptive acts or practices).

practices.[421] Here, the Commission notes that record retention requirements are necessary to preserve written materials that reflect the transactions between the dealer and purchasing consumers, and to assist the Commission to enforce its Rule by enabling it to ascertain whether dealers are complying with its requirements; to identify persons who are involved in any challenged practices; and to identify consumers who may have been injured. Such requirements are particularly important in the case of complicated, lengthy, and document-heavy vehicle sale or financing transactions, in which law violations may be more difficult for consumers and others to detect. Indeed, the Commission routinely includes recordkeeping requirements in its rules.[422]

Several commenters, including consumer advocacy organizations, consumer protection agencies, a group of State attorneys general, and individual commenters, urged the Commission to consider expanding the proposed twenty-four-month record retention period, noting that the contract period for most retail installment contracts is much longer than twenty-four months, and that State limitations periods for claims relating to the subject matter of the Commission's proposed rule often extend well beyond this proposed timeframe. Numerous such commenters, for instance, recommended a record retention period of the longer of seven years or the length of the consumer's financing contract.

The Commission understands that there would be benefits to a longer period, especially given that vehicle financing repayment terms are often far longer than twenty-four months, and that many dealers likely already maintain, in the ordinary course of business, the types of records set forth in proposed § 463.6. The Commission, however, is also mindful that other commenters raised concerns about the costs associated with record retention, including costs that would increase with any extension of the retention period. Rather than limiting the types of records to be maintained, and thus hampering the Commission's ability to ensure compliance with the Final Rule, the Commission has determined to adopt a retention period that is shorter than the time period of many motor

vehicle financing contracts, in order to minimize burdens. In the event the Commission subsequently determines that a twenty-four-month retention period is insufficient to ensure compliance with this Rule, the Commission may consider other measures in the future.

In addition, a number of commenters, including consumer advocacy organizations, recommended additional provisions, including an explicit requirement to retain language-translated versions of required records, and a requirement to make retained records available to consumers upon request. Regarding language-translated versions of required records, § 463.6(a)(3), (a)(4), and (a)(5) require dealers to retain copies of "all" listed records, while § 463.6(a)(1) mandates that dealers retain "Materially different" copies of records. Thus, for the records listed in § 463.6(a)(3), (a)(4), and (a)(5), any translations are required to be retained; in the case of § 463.4(a)(1), the Rule requires materially different translations to be maintained.[423] The Commission therefore has determined not to add to the recordkeeping section of the Rule a standalone requirement to retain translated versions. The Commission will continue to monitor the marketplace to determine whether additional action or protections are warranted.

The Commission also declines to include in this Final Rule an additional requirement that dealers provide retained records to consumers upon request. Such a requirement may be beneficial; however, it is not clear to what extent dealers currently refuse to provide consumers with such records, and there is insufficient information in the rulemaking record to assess the impact of—or need for—such a modification of the existing requirement to retain and preserve materials in the Rule. The Commission will continue to monitor the motor vehicle marketplace, including issues relating to information access, to determine whether additional action or protections are warranted.

Other commenters—particularly auto industry participants—objected to the proposed recordkeeping requirements.[424] Several such

commenters contended that the proposed requirements were new obligations that went beyond specific State recordkeeping requirements. Some dealership associations argued that existing State recordkeeping requirements are sufficient and that a Commission rule was unnecessary. One such commenter argued that the existence of overlapping, but different, State and Federal standards may make compliance difficult for motor vehicle dealers.

In response, the Commission notes that the recordkeeping requirement is necessary to ensure motor vehicle dealer compliance with the Final Rule, and therefore may have different requirements than State standards. To provide dealers with flexibility and to minimize burden, however, the proposed rule permitted dealers to retain records "in any legible form," including "the same manner, format, or place" in which records are kept in the ordinary course of business. To the extent dealers have fashioned their ordinary record retention practices around State recordkeeping standards, the proposed rule thus allowed for record retention in the form required by State recordkeeping standards. Additionally, as discussed in the following paragraphs, the Commission is not finalizing recordkeeping requirements that dealers maintain Add-on Lists and Cash Price without Optional Add-ons disclosures and declinations, further reducing burdens.

One industry association commenter suggested that this requirement would increase risks of identity theft and raise privacy concerns. The Commission notes that many dealers already have obligations to retain customer records under State law.[425] Dealers are required to have systems in place to protect this information, given that the failure to adequately protect such information violates existing law, including section 5 of the FTC Act and the Commission's Standards for Safeguarding Customer Information, also known as the

[421] Comment of Nat'l Consumer L. Ctr. et al., Doc. No. FTC–2022–0046–7607 at 48–49; *see also* Comment of N.Y.C. Dep't of Consumer and Worker Prot., Doc. No. FTC–2022–0046–7564 at 6 (noting retention requirements are vital to investigations, particularly with respect to mandatory disclosures).

[422] *See, e.g.,* Telemarketing Sales Rule, 16 CFR 310.5; Business Opportunity Rule, 16 CFR 437.7.

[423] *See* § 463.2(j).

[424] One industry commentor questioned the utility of records in FTC actions. This commenter also stated that the FTC is not a supervisory agency and thus should not be seeking to create a records inspection scheme. As noted previously, recordkeeping requirements are necessary here to prevent unfair and deceptive practices by mandating preservation of written materials that reflect dealer transactions and to enable effective enforcement of the Rule. The Commission has the authority to prescribe rules for the purpose of

preventing unfair or deceptive acts or practices. *See* 15 U.S.C. 57a(a)(1)(B). The Commission routinely includes recordkeeping requirements in rules, *see, e.g.,* Telemarketing Sales Rule, 16 CFR 310.5; Business Opportunity Rule, 16 CFR 437.7, and courts have ordered companies to maintain records in FTC orders, *see, e.g.,* Final Judgment at 20–21, *Fed. Trade Comm'n v. Elegant Sols., Inc.,* No. 8:19–cv–01333–JVS–KES (C.D. Cal., July 17, 2020); Order for Permanent Injunction and Monetary Judgment at 27–28, *Fed. Trade Comm'n. v. Consumer Defense, LLC,* No. 2:18–cv–00030–JCM–BNW (D. Nev. Dec. 5, 2019).

[425] *See, e.g.,* Va. Code sec. 46.2–1529 (requiring retention for five years of "all dealer records" regarding, among other things, vehicle purchases, sales, trades, and transfers of ownership).

Safeguards Rule.[426] Thus, to the extent the Final Rule requires dealers to collect personal information beyond that which they are already collecting, they should already have systems in place to protect such information.

Some commenters raised concerns about the requirement in proposed § 463.6(a)(1) to preserve, *inter alia,* materially different advertisements, sales scripts, and marketing materials. One such dealership association commenter argued that dealers should not be required to retain sales scripts, training materials, and marketing materials, while another dealership association commenter argued that dealers should not be required to maintain advertisements, positing that these materials are publicly available and could be requested from advertisers as concerns arise with respect to particular ads. Commenters including two dealership organizations argued that digital advertisements would be difficult to retain, with one such commenter urging the Commission to adopt an approach that would permit dealers to retain a representative example of a vehicle advertisement and the underlying data used to populate vehicle ads. The other such commenter suggested that the proposed recordkeeping requirement could be unduly burdensome because "all materials" related to its online inventory "could be deemed some version of materially different advertisements and marketing materials regarding price or financing of a motor vehicle." Another dealership organization commenter raised a similar concern about website listings and questioned whether the term "advertisement" includes television ads and email campaigns.

After considering these comments, the Commission has determined that the proposed recordkeeping requirements in § 463.6(a)(1) strike an appropriate balance by requiring the retention of materials needed to enable effective enforcement while only requiring such records to be retained for twenty-four months and in any legible form. Advertisements and marketing materials regarding the price, financing, or lease of a motor vehicle are critical to determining compliance with virtually every provision in the Final Rule, as they are often consumers' first contact

in the vehicle-buying or -leasing process, and often contain key representations about pricing, payments, and other terms. Scripts and training materials are important evidence of a dealer's compliance program regarding the Final Rule's requirements, including of the information and instructions that dealership staff are given with respect to the areas that are addressed by the Final Rule. Furthermore, regarding the contention that advertisements are available publicly or could be requested separately, a core purpose of the recordkeeping requirement is to ensure that disseminated representations are preserved for a sufficient period of time to allow for compliance concerns to be addressed. A compliance regime that, contrary to the Commission's proposal, allowed the destruction of advertisements after they have been publicly presented, or that requires the Commission to try to obtain materials from advertisers or third parties, would not serve this purpose.

With respect to the scope of advertisements that must be retained, the recordkeeping requirement does not differ with respect to the form of the advertisement, since the same enforcement concerns are raised regardless of whether an ad is presented in digital, hardcopy, email, audio, televised, or other format. The recordkeeping requirement does not require all advertisements to be retained, however, as § 463.6(a)(1) specifically includes the proviso that "a typical example of a credit or lease advertisement may be retained for advertisements that include different Vehicles, or different amounts for the same credit or lease terms, where the advertisements are otherwise not Materially different." Regarding the commenter's proposal to allow dealers to retain a "representative" example of an advertisement with digital data that can recreate different versions of the advertisement, this provision, as proposed, permitted dealers to preserve typical examples of advertisements in this manner so long as such records are already kept in in the ordinary course of business, capture all differences that would be material to consumers, and accurately show how the offers have been presented to consumers. Materially different website listings, television advertisements, and email campaigns must be preserved, consistent with the plain meaning of the terms used in the section.

With respect to proposed § 463.6(a)(2)'s requirement to maintain copies of all materially different add-on lists, an industry association commenter

contended that retaining materially different add-on lists would be difficult, given the scope of the term "Add-on" and the consequent size of the list as well as its dynamic nature. One dealership association commenter argued that the proposed requirement to retain add-on lists was unnecessary, contending that concerns could be addressed as they arise, and requesting to replace this proposed requirement with a requirement to retain a master copy of each insurance product, service contract, or other add-on in the dealer's general business file. After carefully considering the comments, the Commission has determined not to finalize the proposed requirement at § 463.4(b) to disclose an add-on list, and consequently will not be finalizing the proposed requirement at § 463.6(a)(2) that dealers retain materially different add-on lists.

Several commenters, including industry associations, argued that certain of the proposed requirements to preserve written material, including written communications under proposed § 463.6(a)(3) and written consumer complaints, and inquiries and responses about vehicles referenced in § 463.4, under proposed § 463.6(a)(5), would be unduly burdensome. Generally, these commenters contended that the various ways consumers may communicate with dealers—including chat features on a dealer's website, emails and text messages with salespersons, and social media posts—would require the development of new and onerous preservation systems. A dealership organization commenter raised concerns about retaining text messages and emails, contending that salespeople may use their personal phones and email addresses, even if the dealership has policies against such use. One industry association commenter argued that third parties might have records related to add-ons and that this provision should only apply to "complaints" relating to add-ons instead of "inquiries" relating to add-ons. One dealership association commenter argued that dealers should not be required to retain consumer complaints, contending it should be the businesses' decision whether to maintain such materials, and also arguing that the Rule should not require, under proposed § 463.6(a)(4), the preservation of materials such as pricing options presented to consumers, contending that such materials should be limited to the two parties to the agreement.

After considering these comments, the Commission has determined to finalize requirements to retain written materials

[426] 15 U.S.C. 45; 16 CFR 314; *see also* Decision and Order, *LightYear Dealer Techs., LLC,* No. C–4687 (F.T.C. Sept. 3, 2019) (consent order); FTC Business Guidance, "FTC Safeguards Rule: What Your Business Needs to Know," *https://www.ftc.gov/business-guidance/resources/ftc-safeguards-rule-what-your-business-needs-know* (last visited Dec. 5, 2023).

under § 463.6(a)(3), (4), and (5), with a limiting modification to § 463.6(a)(4). These requirements are necessary to address unfair and deceptive practices by mandating that dealers preserve written materials that reflect the transactions between the dealer and purchasing consumers, and to assist the Commission in its enforcement of the Rule.[427] Such materials are particularly important given that the vast majority of consumers do not file a complaint, and with hidden charges, many consumers never know about the illegal conduct in the first place.[428] For instance, as explained in SBP II.B, a survey of one dealership group's customers showed that 83% of the respondents were subject to the dealer's unlawful practices related to add-ons. This equals 16,848 consumers—far more than the 391 complaints received against the dealer over the time period covered by the survey.

To minimize burden, as previously noted, the retention requirements are for a period of twenty-four months. Further, as stated previously, § 463.6(b) permits dealers to retain records "in any legible form," which could, for example, include using the backup and export features that already exist in many social media services, email platforms, chat platforms, and text systems, instead of creating entirely new systems. Regarding dealers that use third parties to administer add-ons, commenters did not explain why they cannot access records related to add-ons from these parties.[429] Further, altering the language in the provision to apply to "complaints" rather than "inquiries" related to add-ons could invite arguments that consumer statements, such as, "Why was I charged for this add-on that I did not know about?" are not "complaints," but simply "inquiries." With respect to the use of salespeople's personal devices to conduct motor vehicle dealer activities, including the sale, financing, or leasing

of vehicles, as with any business, dealers should ensure that their employees are communicating with consumers through appropriate channels that can be monitored and controlled by the dealership.

Some commenters, including an industry association and a dealership organization, also raised concerns about how to determine what would constitute "written consumer complaints" under proposed § 463.6(a)(5). For purposes of the Rule, the Commission refers commenters to the plain meaning of the terms used in the phrase, which terms are commonly used and understood.[430]

Two industry association commenters argued that the proposed requirement to retain written communications would be particularly burdensome for recreational vehicle dealers, contending that that this was particularly so given that many RV dealers are small businesses. In response, the Commission notes that, as explained in the paragraph-by-paragraph analysis of § 463.2(e) and (f) in SBP III.B.2(e) and (f), it has determined not to finalize the Rule with respect to dealers predominantly engaged in the sale, leasing, or servicing of RVs, but it will continue to monitor the marketplace to determine whether modifications or revisions may be warranted in the future.

Finally, one industry association commenter argued that the proposed recordkeeping requirements and costs were unwarranted given that the Commission has brought an average of fewer than four enforcement actions a year against motor vehicle dealers in the past decade. In response, the Commission notes that its experience indicates that the number of enforcement actions is not remotely reflective of the total violations of law in the auto marketplace. To uncover misconduct and bring actions, law enforcement agencies and officials often rely on complaints from affected parties. As previously discussed, however, consumer complaints typically represent just the "tip of the iceberg" in

terms of actual violations, and the vast majority of consumers who are subjected to unlawful practices in this area may not realize they are being victimized.[431] Further, the Commission has limited law enforcement resources and jurisdiction over a broad range of commerce.[432] The number of actions it brings relating to motor vehicle dealers—as with actions in any area—is necessarily limited by these resource constraints, even when there are ongoing, chronic problems that cause substantial consumer harm. Despite these constraints, the Commission and its law enforcement partners have taken significant action aimed at addressing unfair and deceptive practices in the motor vehicle marketplace, as explained in SBP II.C. Given that problems with bait-and-switch advertising, add-ons, and other aspects of vehicle-buying and -leasing have continued to be a source of consumer harm despite this action, additional measures are warranted. And the Commission has taken steps to minimize burden, including by declining to finalize the add-on list disclosure requirements in proposed § 463.4(b), as well as the itemized disclosures required in proposed § 463.5(b) and their corresponding proposed recordkeeping requirements. Moreover, the recordkeeping provisions permit dealers to retain records in any legible form, providing a flexible standard that permits the use of ordinary and standard forms of data and document retention.

The Commission adopts in the Final Rule recordkeeping requirements largely as they were set forth in the proposed rule, with two substantive modifications. After careful consideration, the Commission is removing the requirements to retain copies of add-on lists required by proposed § 463.6(a)(2) and records showing compliance with the cash price without optional add-on disclosures and declinations required by proposed § 463.6(a)(4). These changes will reduce record creation and retention burdens for dealers. As previously described, the Final Rule also contains one typographical modification of adding a serial comma and conforming edits for consistency with the defined terms in § 463.2(e) and (f).

The Commission adopts these recordkeeping requirements to promote effective and efficient enforcement of the Rule, thereby deterring and preventing deception and unfairness. As discussed throughout this SBP, the rulemaking record, including the

---

[427] As noted previously, a dealership association commenter argued that dealers should not be required to preserve complaints and certain add-on materials, contending that it should be a business decision whether to retain such records. The Commission declines to substantively modify these requirements from the Commission's original proposal, given the importance of these materials in ensuring compliance with the other requirements of the Rule.

[428] *See* SBP II.B (discussing how complaints represent the tip of the iceberg in terms of actual consumer harm).

[429] This is consistent with the Commission's prior enforcement order practice. *See, e.g.,* Stipulated Order at 25, *Fed. Trade Comm'n* v. *N. Am. Auto. Servs., Inc.,* No. 1:22–cv–0169 (N.D. Ill. Mar. 31, 2022) (requiring retention of "records of all consumer complaints and refund requests, whether received directly or indirectly, such as through a third party, and any response").

[430] The term "written" means "made or done in writing." *See Written,* Merriam-Webster.com Dictionary, *https://www.merriam-webster.com/dictionary/written* (last visited Dec. 5, 2023). The term "consumer" includes "one that utilizes economic goods." *See Consumer* (def. a), Merriam-Webster.com Dictionary, *https://www.merriam-webster.com/dictionary/consumer* (last visited Dec. 5, 2023). The term "complaint" includes an "expression of grief, pain, or dissatisfaction," "something that is the cause or subject of protest or outcry," and "a formal allegation against a party." *See Complaint* (defs. 1, 2a, 3), Merriam-Webster.com Dictionary, *https://www.merriam-webster.com/dictionary/complaint* (last visited Dec. 5, 2023).

[431] *See* SBP II.B.

[432] *See* 15 U.S.C. 45(a).

Commission's law enforcement experience, indicates that there are chronic problems confronting consumers in the motor vehicle sales, financing, and leasing process, which include advertising misrepresentations and unlawful practices related to add-ons and hidden charges.[433] The recordkeeping requirements in the Final Rule will assist the Commission in investigating and prosecuting law violations and help the Commission identify injured consumers for paying consumer redress. The recordkeeping requirements are flexible, allowing dealers to retain materials in any legible form, and are limited to a period of twenty-four months from the date the record is created. The recordkeeping requirements are consistent with, and similar to, the recordkeeping requirements in other Commission rules, as tailored to individual industries and markets.[434]

*G. § 463.7: Waiver Not Permitted*

Proposed § 463.7 prohibited waiver of the requirements of the Final Rule by providing that it constituted a violation of the Rule "for any person to obtain, or attempt to obtain, a waiver from any consumer of any protection provided by or any right of the consumer under" the Rule. Comments that addressed this proposed provision generally either supported it or expressed no opinion on it. Comments in support noted that the provision would help provide consistency in the protection it would provide to consumers and emphasized that it would prohibit unscrupulous dealers from causing consumers to sign away their rights. This proposed provision was modeled on a similar provision in the Mortgage Assistance Relief Services ("MARS") Rule, which was originally promulgated by the Commission and subsequently republished by the CFPB.[435] Moreover, at least one State has a similar waiver provision in its rule covering motor vehicle dealer practices.[436] The Commission concludes that this provision is necessary to prevent circumvention of the Rule, and, after review of the comments, adopts this prohibition as it was originally proposed.

*H. § 463.8: Severability*

Proposed § 463.8 provided that the provisions of the Final Rule "are separate and severable from one another. If any provision is stayed or determined to be invalid, it is the Commission's intention that the remaining provisions will continue in effect." This proposed provision was modeled on similar provisions in other rules, including the Commission's Telemarketing Sales Rule and the MARS Rule.[437] A number of commenters, including dealership associations, raised general concerns that the proposed provisions may be too integrated with each other for severability to be possible. Such commenters, however, did not provide examples of any such instances wherein they believed certain provisions could not remain in effect if other provisions were stayed or determined to be invalid. Upon consideration of the comments, the Commission concludes that severability is possible in the event any provision is stayed or determined to be invalid. The Rule the Commission is finalizing includes prohibitions against misrepresentations regarding material information (§ 463.3), required disclosures (§ 463.4), and prohibitions against charging for add-ons that provide no benefit or any item without express, informed consent (§ 463.5)—each of which dealers are capable of abiding by independently, as well as by the provisions that independently support their operation, including Authority (§ 463.1), Definitions (§ 463.2), Recordkeeping (§ 463.6), Waiver not permitted (§ 463.7), and Relation to State laws (§ 463.9). Thus, the Commission has determined to adopt this provision in the Final Rule as it was originally proposed.

*I. § 463.9: Relation to State Laws*

Proposed § 463.9 provided that the Rule does not supersede, alter, or affect "any other State statute, regulation, order, or interpretation relating to Motor Vehicle Dealer requirements, except to the extent that such statute, regulation, order, or interpretation is inconsistent with" the Rule, "and then only to the extent of the inconsistency." Proposed § 463.9 further provided that, for purposes of this provision, a State statute, regulation, order, or interpretation is not "inconsistent" if the protection such statute, regulation, order, or interpretation affords any consumer "is greater than the protection provided under" the Rule. After carefully considering the comments, the Commission adopts § 463.9 largely as proposed in the Final Rule.

Numerous State regulator commenters contended that the proposed rule would create a uniform baseline of protection that would complement State standards. A comment from a group of eighteen State attorneys general contended that many of the Proposed rule's requirements were similar to, or the same as, requirements that currently exist under State laws or regulations, and highlighted the benefit to law enforcement from establishing a consistent Federal baseline while providing States with flexibility to impose heightened consumer protections.[438]

One municipal licensing entity commenter that expressed general support of the Commission's proposed rule also posited that the Commission should broaden proposed § 463.9 to expressly include municipalities. With respect to the applicability of the provision to municipalities, the Commission notes that State political subdivisions exercise delegated power of their State, and as such, § 463.9 applies to municipal standards as well.[439]

Other commenters, including dealership associations, referred generally to potential conflicts between the Commission's proposed rule and State laws, but such commenters typically did not point to any specific purported conflicts with State law. To the extent some such commenters argued that certain proposed provisions would conflict with State laws, such arguments are addressed in the SBP's corresponding paragraph-by-paragraph analysis of the relevant Rule provision. Generally, the Commission is not aware of State laws that allow dealers to make misrepresentations regarding material information; prohibit the disclosure of

---

[433] Some enforcement actions have specifically alleged that a defendant failed to maintain documents required under a prior order with the FTC. Complaint ¶¶ 42–45, *Fed. Trade Comm'n* v. *Norm Reeves, Inc.*, No. 8:17–cv–01942 (C.D. Cal. Nov. 3, 2017) (alleging dealer failed to keep records of previous advertisements needed to demonstrate compliance with prior order); Complaint ¶¶ 32–35, *Fed. Trade Comm'n* v. *New World Auto Imports, Inc.*, No. 3:16–cv–22401 at (N.D. Tex. Aug. 18, 2016) (same).

[434] *See, e.g.,* 16 CFR 310.5 (Telemarketing Sales Rule); 16 CFR 437.7 (Business Opportunity Rule); 16 CFR 453.6 (Funeral Industry Practices Rule); 16 CFR 301.41 (Fur Products Labeling Rule).

[435] *See* MARS Rule (Regulation O), 12 CFR 1015.8, previously published by the Commission at 16 CFR 322.1.

[436] *See, e.g.,* Wis. Admin. Code Trans. 139.09 (similar waiver prohibition clause in Wisconsin's Motor Vehicle Trade Practices rule).

[437] *See* MARS Rule, 16 CFR 322.8 (Commission Rule), 12 CFR 1015.11 (CFPB Rule); Telemarketing Sales Rule, 16 CFR 310.9.

[438] Comment of 18 State Att'ys Gen., Doc. No. FTC–2022–0046–8062 at 11.

[439] *See City of Columbus* v. *Ours Garage & Wrecker Serv., Inc.,* 536 U.S. 424, 433 (2002) ("The principle is well settled that local governmental units are created as convenient agencies for exercising such of the governmental powers of the State as may be entrusted to them in its absolute discretion.") (quoting *Wis. Pub. Intervenor* v. *Mortier,* 501 U.S. 597, 607–08 (1991)).

accurate information regarding a vehicle's offering price, optional vehicle add-ons, or total payment information; or permit dealers to charge consumers for add-ons that provide no benefit to the consumer or to charge for items without consumers' express, informed consent. To the extent there truly are conflicts, as discussed in the following paragraphs, § 463.9 establishes the framework for addressing any such inconsistencies.

Commenters including dealership associations also argued that existing State standards are sufficient and identified State requirements that the commenters argued would be redundant with, or superior to, one or more provisions in the Commission's proposed rule. To the extent the Rule prohibits conduct that is already prohibited by State laws, the Commission has not seen evidence that State and Federal standards prohibiting the same misconduct has harmed consumers or competition. Moreover, such overlap is indicative of dealers' ability to comply with the relevant provisions in the Rule. To the extent State laws have additional requirements that provide greater protections or are not otherwise inconsistent with part 463, dealers must continue to follow those laws.

Several dealership association commenters expressed concern regarding how to determine whether a State statute, regulation, order, or interpretation affords "greater protection" than a provision in the Commission's proposed rule. One such commenter, for example, raised concerns that proposed § 463.5(a) may conflict with a pending California bill that would prohibit the sale of GAP when a vehicle has less than a 70% loan-to-value ratio. An industry association commenter claimed that the Commission's proposed definitions of "Dealer or Motor Vehicle Dealer" would conflict with analogous State definitions. In response, the Commission emphasizes that § 463.9 would be triggered only if there were an actual inconsistency between State law and the Final Rule, and in the event of an inconsistency, the Rule only affects such State law to the extent of the inconsistency. The commenter examples did not present any such inconsistencies because it is possible to comply with both the cited State law examples and with the Final Rule. For instance, a dealer operating in a State that prohibits the sale of a GAP agreement when a vehicle transaction involves a loan-to-value ratio below 70% would need to abide by the ratio set forth by State law and also by the

Rule's prohibition against charging for the product if the consumer would not benefit from it. Similarly, notwithstanding a commenter's claims that the proposed rule's definition of "Dealer or Motor Vehicle Dealer" would conflict with analogous State standards, the commenter did not identify any actual conflicts; nevertheless, to the extent State and Federal standards cover independent areas or actors, each actor must comply with the standards—whether State, Federal, or both—under which the actor is covered.[440] Further discussion of how State laws interact with specific sections of the Rule are explained in the corresponding section-by-section analysis for the relevant sections.

Some such commenters also questioned whether more coordination with States and Federal agencies was needed, without explaining what coordination was needed. In any event, the Commission coordinates regularly with States and Federal counterparts.

Many commenters' concerns focused on the written disclosures proposed in § 463.5(b), which the Commission has determined not to include in this Final Rule. For instance, a substantial number of commenters, including industry associations, argued that proposed § 463.5(b) would have created different Federal and State requirements for written disclosures that would result in duplicative paperwork. A dealership association specifically argued that proposed § 463.5(b) may have conflicted with a State pre-contract disclosure requirement pertaining to six categories of add-ons because it would have required an additional disclosure about a broader category of add-ons. An industry association similarly pointed to this State's pre-contract disclosure requirement as a reason that additional disclosures under this Rule, including those required by proposed § 463.5(b), could result in consumer confusion. At least four commenters, including industry associations and a dealership organization, argued that the proposed rule's requirement under § 463.5(b) to create new documentation may conflict with the "single document" requirements, in effect in many States, which mandate that the entire motor vehicle sale, financing, or lease agreement—including any add-on products or services—be within one document. As discussed in the

paragraph-by-paragraph analysis of § 463.5 in SBP III.E.2, the Commission has determined not to finalize the written disclosures requirement under this provision.

After carefully considering the comments regarding proposed § 463.9, the Commission is finalizing this section largely as proposed, with one minor modification: the Commission is adding "Covered" to the term "Motor Vehicle Dealer" in § 463.9(a) to conform with the revised definition in § 463.2(f). Section 463.9 provides a uniform floor of protection with the Commission's Final Rule, while also permitting States to enact stronger protections, using a standard that has been applied in other laws and regulations for several decades.[441] This provision is necessary to address unfair and deceptive practices and to enable the Commission to enforce the Rule.

## IV. Effective Date

The Final Rule becomes effective on July 30, 2024. One industry association commenter objected that the NPRM did not include an effective date or inquire into the timing for feasibly implementing the Rule. Another such commenter requested at least 18 months for stakeholders to prepare for Rule compliance, but did not explain why it would take 18 months to refrain from conduct that is already illegal, such as making misrepresentations. Rules are generally required to be published 30 to 60 days before their effective date, though in some circumstances, agencies may cite good cause for the rule to become effective sooner than 30 days from publication.[442] Given the significant harm to consumers and law-abiding dealers from deceptive or unfair acts or practices; and the fact that, for dealers already complying with the law, compliance with the Rule the Commission is finalizing should not be onerous; the NPRM did not propose or contemplate any additional delay. Nevertheless, after a review of comments, the Commission is providing dealers until July 30, 2024 to make

---

[440] *See, e.g., Pirouzian v. SLM Corp.,* 396 F. Supp. 2d 1124, 1131 (S.D. Cal. 2005) (reasoning that the more inclusive definition of "debt collector" under California law is not "inconsistent" with the Fair Debt Collection Practices Act because by "enlarging the pool of entities who can be sued" the State law offered greater protection).

[441] *See, e.g.,* 10 U.S.C. 987(d)(1) (Military Lending Act); 15 U.S.C. 1692n (Fair Debt Collection Practices Act); 12 CFR 1006.104 (Regulation F); 15 U.S.C. 1693q (Electronic Funds Transfer Act); *see also* 21 U.S.C. 387p(a)(1) (Family Smoking Prevention and Tobacco Control Act).

[442] *See* 5 U.S.C. 553(d) (requiring publication of a substantive APA rule "not less than 30 days before its effective date" except "as otherwise provided by the agency for good cause found and published with the rule"). Significant rules defined by Executive Order 12866 and major rules defined by the Small Business Regulatory Enforcement Fairness Act are required to have a 60-day delayed effective date. *See* E.O. 12866, 58 FR 51735 (Oct. 4, 1993); 5 U.S.C. 801(a)(3)).

changes to their operations, if needed, in light of the Rule's requirements.

## V. Paperwork Reduction Act

On July 13, 2022, the Commission submitted the NPRM and an accompanying Supporting Statement to the Office of Management and Budget ("OMB") for review under the Paperwork Reduction Act ("PRA"), 44 U.S.C. 3501–3521. On July 29, 2022, OMB directed the Commission to resubmit its request when the proposed rule was finalized.[443]

The Commission is now submitting the Final Rule and a Supplemental Supporting Statement to OMB. The disclosure and recordkeeping requirements of the Rule constitute "collection[s] of information" for purposes of the PRA.[444] The associated burden analysis follows.[445]

In the NPRM, the Commission provided estimates and solicited comments regarding the proposed rule, including regarding (1) the proposed add-on list disclosure requirement; (2)

the proposed cash price without optional add-ons disclosure requirement; (3) other proposed provisions prohibiting certain misrepresentations and requiring certain disclosures; (4) the proposed recordkeeping provisions; and (5) estimated capital and other non-labor costs. As previously discussed, after carefully reviewing the comments, the Commission has made certain changes to the relevant provisions in the Final Rule. Specifically, the Commission has determined not to finalize requirements, pursuant to proposed § 463.4(b), that dealers disclose an add-on list or, pursuant to proposed § 463.5(b), that dealers refrain from charging for optional add-ons unless enumerated requirements relating to the vehicle's cash price without optional add-ons are met.

In the NPRM, the Commission estimated that the disclosure and recordkeeping requirements would impact approximately 46,525 franchise, new motor vehicle and independent/used motor vehicle dealers in the U.S.[446] In the NPRM, the Commission explained that this figure was exclusive to automobile dealers, and invited comments regarding market information for dealers of other types of motor vehicles, such as boats, RVs, and motorcycles.[447] In response, one industry association commenter noted the absence of such other motor vehicle dealers from the Commission's estimate. Another commenter also noted the absence of such dealers in the estimate and argued that the Commission's estimate also erroneously included independent used motor dealers which the commenter contended do not perform any servicing work, but stated that the Commission's estimate was fairly accurate numerically. As discussed in the paragraph-by-paragraph analysis of § 463.2(e) in SBP III.B.2(e), the Commission has determined to expressly exclude "Recreational boats and marine equipment," "Motorcycles, scooters, and electric bicycles," "Motor homes, recreational vehicle trailers, and slide-in campers," and "Golf carts" from the Final Rule's definition of "Covered Motor Vehicle." Further, as examined in the paragraph-by-paragraph analysis of § 463.2(f) in SBP III.B.2(f), the plain meaning of the term "servicing" covers activities that are undertaken by independent used car dealers.[448] Thus,

the Commission bases its estimate of the entities covered by the Final Rule on the same North American Industry Classification System ("NAICS")[449] categories—"new car dealers" and "used car dealers"—as it did in the NPRM.[450] As with other figures in this section, the NAICS data assembled by the U.S. Census Bureau have been revised since the publication of the Commission's NPRM with more recent data. Based on these revisions, the Commission now estimates that the Final Rule's disclosure and recordkeeping requirements will impact approximately 47,271 franchise, new motor vehicle and independent/used motor vehicle dealers in the United States.[451]

The estimated overall annual hours burden for the Final Rule's collections of information is 1,595,085 hours. The estimated overall annual labor cost for the Final Rule's collections of information is $51,904,537. The estimated overall annual capital and other non-labor cost for the Final Rule's collections of information is $14,181,300.

### A. Add-On List Disclosures

Section 463.4(b) of the proposed rule required motor vehicle dealers that charge for optional add-on products or services to disclose clearly and conspicuously in advertisements and on any website, online service, or mobile application through which they market motor vehicles, and at any dealership, an itemized add-on list of such products

---

[443] OMB assigned the rulemaking control number 3084–0172 for PRA review purposes.

[444] 44 U.S.C. 3502(3); 5 CFR 1320.3(c).

[445] One commenter suggested the FTC did not comply with several provisions of the PRA, specifically those contained in 5 CFR 1320.5(a)(1)(iv), 1320.8(d)(1), 1320.11(a), 1320.11(b), and 1320.11(d). The commenter does not explain the basis for the purported deficiencies. These provisions generally relate to the submission of a collection of information to OMB, and solicitation and consideration of public comments. The FTC has complied with these provisions. The FTC submitted an Information Collection Request to Office of Management and Budget on July 13, 2022, concurrently with publication of the NPRM, in accordance with 5 CFR 1320.11(b). *See* Motor Vehicle Dealers Trade Regulation Rule, ICR 202202–3084–001, OMB 3084–0172, *https://omb.report/icr/202202-3084-001.* Because the FTC complied with this requirement, the collection of information proposed in the NPRM is not, as the commenter contends, subject to disapproval under 5 CFR 1320.11(d).

The Commission also did not violate 5 CFR 1320.5(a)(1)(iv) and 1320.11(a), providing for comments to be submitted to OMB, as the commenter contends. Those provisions are limited by 5 CFR 1320.8(d)(3), which provides that the agency need not direct comments to OMB "if the agency provides notice and comment through the notice of proposed rulemaking . . . for the same purposes as are listed under" 5 CFR 1320.8(d)(1). The Commission solicited comments in the NPRM on the subjects enumerated in 5 CFR 1320.8(d)(1), *see* NPRM at 42028–31, 42035–43, and it was not necessary for the Commission to also direct those same comments to OMB. The Commission thus did not violate 5 CFR 1320.5(a)(1)(iv) or 1320.11(a).

Further, contrary to the commenter's assertion, the Commission demonstrated throughout the NPRM that the information collection-related requirements it embodies are necessary, offer utility and public benefit, and minimize burdens. *See, e.g.,* NPRM at 42027, 42043. Moreover, the Commission requested comments on the necessity, utility, benefits, and burdens of the proposed rule, *see* NPRM at 42028–31, 42035–43, and has further taken into consideration and addressed comments in this SBP.

[446] NPRM at 42031.

[447] NPRM at 42031 n.154, 42036.

[448] *See also* Used Car Rule, 81 FR at 81668 (noting that the term "servicing" used in this same context "captures activities undertaken by essentially all

used car dealers," including by preparing vehicles for sale by addressing any obvious mechanical problems and by undertaking the general industry practice of appearance reconditioning).

[449] NAICS is the standard used by Federal statistical agencies in classifying business establishments for the purpose of collecting, analyzing, and publishing statistical data related to the U.S. business economy. North American Industry Classification System, U.S. Census Bureau, *https://www.census.gov/naics/.*

[450] U.S. Census Bureau, "All Sectors: County Business Patterns, including ZIP Code Business Patterns, by Legal Form of Organization and Employment Size Class for the U.S., States, and Selected Geographies: 2019," *https://data.census.gov/cedsci/table?q=CBP2019.CB1900CBP&n=44111%3A44112&tid=CBP2019.CB1900CBP&hidePreview=true&nkd=EMPSZES–001,LFO–001* (listing 21,427 establishments for "new car dealers," NAICS code 44111, and 25,098 establishments for "used car dealers," NAICS code 44112). *See* NPRM at 42031.

[451] U.S. Census Bureau, "All Sectors: County Business Patterns, including ZIP Code Business Patterns, by Legal Form of Organization and Employment Size Class for the U.S., States, and Selected Geographies: 2021," *https://data.census.gov/table?q=CB2100CBP&n=44111:44112&tid=CBP2021.CB2100CBP&nkd=EMPSZES–001,LFO–001* (listing 21,622 establishments for "new car dealers," NAICS code 44111, and 25,649 establishments for "used car dealers," NAICS code 44112).

or services and their prices. In the NPRM, the Commission estimated costs for the add-on list disclosure and solicited comments on its burden analysis.[452] One industry association made several arguments, including that the Commission underestimated the time and resources required because an add-on list can be lengthy, vary by vehicle and over time, and require working with several third parties. This commenter also argued that periodic revision of such lists would take more than the estimated one hour of clerical time per dealer, per year. The commenter, however, did not offer any specific estimates for such periodic revision activities.

As explained in the section-by-section analysis of § 463.4 in SBP III.D.2, after careful consideration, the Commission has determined not to finalize its proposed add-on list provision at § 463.4(b).

*B. Disclosures Relating to Cash Price Without Optional Add-Ons*

Section 463.5(b) of the proposed rule required motor vehicle dealers that charge for optional add-on products or services to provide certain itemized disclosures regarding pricing and cost information without such add-ons. In response to the Commission's estimates with respect to this proposed provision, one industry association argued that the Commission did not provide adequate explanation of the assumptions it used to arrive at its cost estimates for this proposed provision, and contended that the Commission underestimated the costs associated with developing, printing, and presenting the proposed disclosures. This commenter also contended that the proposed requirement would have required significant training costs; that multiple forms would have been required for each motor vehicle transaction; and that aspects of the required disclosures would be duplicative of information already provided by dealerships in the ordinary course of business. The commenter estimated that developing a disclosure form for this proposed provision would cost dealers at least $750 and suggested that other attendant costs would be in the hundreds of millions or billions of dollars, without explaining how it arrived at such estimated figures.

As explained in the section-by-section analysis of § 463.5 in SBP III.E, after careful consideration, the Commission has determined not to include in this Final Rule the itemized disclosure provisions at proposed § 463.5(b). The

Commission notes that imposing unauthorized charges—including charges buried in lengthy contracts or included in contracts that consumers are rushed through—is a violation of both the Final Rule's § 463.5(c) and of the FTC Act. The Commission will continue to monitor the market to determine whether additional steps are warranted to combat unauthorized charges for add-ons or other items in the motor vehicle marketplace.

*C. Prohibited Misrepresentations and Required Disclosures*

Section 463.3 of the Final Rule prohibits dealers from making any misrepresentation regarding material information about the categories enumerated in the section.

The provisions in this section have been adopted largely without modification from the NPRM, wherein the Commission estimated that any additional costs associated with the proposed misrepresentation prohibitions would be *de minimis.*[453] One industry association commenter argued that a bar on misrepresentations in the Final Rule would require increased training and compliance costs and result in longer transaction times and costs related to working with vehicle manufacturers about online advertisements. This section, however, does not require any additional disclosures or information collection. Thus, while dealers might elect to enhance their training and compliance,[454] refraining from making misrepresentations does not require additional training or compliance costs or transaction time. The Commission therefore affirms its prior estimate that any additional costs associated with the prohibitions in § 463.3 against making misrepresentations would be *de minimis.*

Section 463.4(a) of the Final Rule requires dealers to clearly and conspicuously disclose a vehicle's offering price in advertisements and other communications that reference a

specific vehicle, or any monetary amount or financing term for any vehicle. "Offering Price" is defined in § 463.2(k) of the Rule as "the full cash price for which a Dealer will sell or finance the Vehicle to any consumer, provided that the Dealer may exclude only required Government Charges." The information required by § 463.4(a) is necessary to address unfair or deceptive conduct associated with the failure to provide such price information and unfairly charging unexpected prices or for hidden items that can add hundreds or thousands of dollars to a vehicle sale.[455]

This provision is being adopted largely as proposed.[456] In response to the NPRM, one industry association commenter claimed there would be an average of three offering price disclosures per transaction, since, according to the commenter, consumers, on average discuss three specific motor vehicles per transaction. This commenter also contended that the number of required offering price disclosures would obligate dealers to incur additional training costs. As the Commission explained in its NPRM, vehicle pricing activities and representations are usually and customarily performed by dealers in the course of their regular business activities. While this provision may increase the importance of those activities, or alter when in the course of business they are undertaken, the Commission estimates that any additional attendant costs are *de minimis.*[457]

Section 463.4(d) of the Final Rule require dealers, when making any representation about a monthly payment for any vehicle, to disclose the total amount the consumer will pay to purchase or lease the vehicle at that monthly payment after making all

---

[452] NPRM at 42032–33, 40235, 42040.

[453] NPRM at 42033, 42039.

[454] The Commission produced and considered alternative cost estimate scenarios for the Rule provisions in its preliminary regulatory analysis, *see* NPRM at 42036–44, and its final regulatory analysis in section VII. The Commission also invited comments on the accuracy of its PRA burden estimates, including the validity of the methodology and assumptions used, *see* NPRM at 42035. The Commission provides a single estimate per Rule provision for this separate Paperwork Reduction Act burden analysis in conformity with the PRA. *See* 44 U.S.C. 3506(c)(1)(A)(iv) (providing, for each collection of information, including those arising from rules published as final rules in the **Federal Register**, that agencies shall conduct a review that includes "a specific, objectively supported estimate of burden").

[455] Some commenters suggested that providing an Offering Price may be difficult due to pricing changes over time. As explained in SBP III.D.2(a), limited-time offers should be clearly disclosed as such. Advertising prices without disclosing material limitations that would mislead consumers is a deceptive or unfair practice.

[456] As stated in SBP III.B.2(k) and SBP III.D.2(a), the Commission is finalizing this Offering Price definition at § 463.2(k) largely as proposed, with a modification to clarify that dealers may, but need not, exclude required government charges from a vehicle's offering price. In addition, this definition in the Final Rule substitutes "Vehicle" for "motor vehicle" to clarify that the term is consistent with the revised definition of "'Covered Motor Vehicle' or 'Vehicle'" at § 463.2(e). The Commission also added language to the end of § 463.4(a) clarifying that the requirements in § 463.4(a) "also are prescribed for the purpose of preventing the unfair or deceptive acts or practices defined in this part, including those in §§ 463.3(a) and (b) and § 463.5(c)."

[457] *See* NPRM at 42033, 42039–40.

payments as scheduled, as well as the amount of consideration to be provided by the consumer if the total amount disclosed assumes the consumer will provide consideration. Section 463.4(e) of the Final Rule requires dealers, when making any comparison between payment options that includes discussion of a lower monthly payment to disclose, if true, that a lower monthly payment will increase the total amount the consumer will pay to purchase or lease the vehicle.

These provisions have been adopted largely as proposed.[458] In response to the Commission's estimates with respect to these proposed provisions, one commenter raised concerns that these disclosures would intrude on existing disclosures, and that any associated paperwork burden would be confusing, duplicative, and unnecessary. The commenter also argued that these disclosures would add time to the transaction process and require additional staff training. No commenters provided alternative estimates of the costs associated with this provision.

Failing to disclose information about the total of payments for a vehicle when representing monthly payment information is deceptive or unfair, as set forth in SBP III.D.2(d). Dealers already generate the required information during the normal course of business, and disclosing this total of payments information provides consumers with fundamental information that is readily available to the dealer when making representations regarding monthly payments, at which time such disclosures are required. Nevertheless, there may be upfront labor costs associated with developing procedures to provide these disclosures consistently at the appropriate point in the transaction and with training employees. The Commission estimates such upfront costs as follows: 8 compliance manager hours per dealer on implementing a template disclosure script that contains the required information and on ensuring sales staff consistently deliver the disclosure at an appropriate time during the transaction, for an upfront hours burden of 378,168 (8 hours × 47,271). Applying labor cost-rates of $31.21 per hour yields $11,802,623.28 ($31.21 × 378,168

hours).[459] After a review of comments, the Commission is adding ongoing training costs. Specifically, the Commission estimates annual ongoing costs of 1 hour of training time for sales and related employees per year, for an annual hours burden of 417,110 (1 hour × 417,110 sales and related employees). Applying labor cost-rates of $29.43 per hour, the total estimated ongoing labor cost burden is $12,275,547.30 across the industry (417,110 sales and related employees × 1 hour × $29.43).

Further, § 463.4(c) of the Final Rule requires dealers that sell optional add-on products or services to disclose to consumers that these add-ons are not required, and that the consumer can purchase or lease the vehicle without these add-ons. This requirement has been adopted largely as proposed, and is necessary to address deceptive and unfair practices regarding these products or services, including misrepresentations that these products are required when they are not, and charging consumers for such products without the consumers' express, informed consent.[460] It requires a simple disclosure of information that is known to the dealer, and the Commission anticipates that the information collection burdens associated with this requirement is *de minimis*.[461]

Similarly, § 463.5(c) of the Final Rule requires dealers to refrain from charging consumers for any item unless the dealer obtains the express, informed

consent of the consumer for the charge.[462] In response to the Commission's estimates with respect to these proposed provisions, some commenters generally discussed burdens, as addressed in the section-by-section analysis in SBP III, that they contended would accompany this proposed provision, but none provided sufficient detail for cost estimates. The Commission notes that this provision addresses the unfair or deceptive practice of charging consumers for items they do not know about or to which they have not agreed, or in amounts beyond those to which the consumer has agreed. As dealers must currently have policies in place to prevent charges without consent in order to comply with current law, the Commission anticipates that any burdens associated with this provision will be *de minimis*.[463]

*D. Recordkeeping*

Section 463.6 of the Final Rule requires dealers to create and retain, for a period of twenty-four months from the date the record is created, all records necessary to demonstrate compliance with the Rule, including with its disclosure requirements. This provision has been adopted with revisions to account for other changes in the Final Rule, as explained in SBP III.F.[464] These recordkeeping provisions are necessary to promote effective and efficient enforcement of the Rule, thereby deterring dealers from engaging in deceptive or unfair acts or practices.

In the NPRM, the Commission provided cost estimates and solicited comment on its recordkeeping burden analysis.[465] The Commission anticipated that dealers would incur certain incremental costs related to: (i) recordkeeping systems; and (ii) calculations of loan-to-value ratios for contracts with GAP agreements.

Several commenters, including industry associations, dealership organizations, and a dealership

---

[458] These provisions in the Final Rule capitalize the defined term "Vehicle" to conform with the revised definition of "'Covered Motor Vehicle' or 'Vehicle'" at § 463.2(e). The Commission also substituted a period for a semi-colon and the word "and" at the end of § 463.4(d)(1), and added language to the end of § 463.4(d) and (e) clarifying that the requirements in these paragraphs "also are prescribed for the purpose of preventing the unfair or deceptive acts or practices defined in this part, including those in §§ 463.3(a) and § 463.5(c)."

[459] The estimates throughout this section have been updated with more recent data since the publication of the NPRM. Labor rates are based on new data from the Bureau of Labor Statistics. See U.S. Bureau of Labor Statistics, "May 2022 National Industry-Specific Occupational Employment and Wage Estimates NAICS 441100—Automobile Dealers" (Apr. 25, 2023), *https://www.bls.gov/oes/current/naics4_441100.htm.* The number of dealerships has been updated to reflect new data from Census County Business Patterns. See U.S. Census Bureau, "All Sectors: County Business Patterns, including ZIP Code Business Patterns, by Legal Form of Organization and Employment Size Class for the U.S., States, and Selected Geographies: 2021," *https://data.census.gov/table?q=CB2100CBP&n=44111:44112&tid=CBP2021.CB2100CBP&nkd=EMPSZES–001,LFO–001.*

[460] This provision in the Final Rule capitalizes the defined term "Vehicle" to conform with the revised definition of "'Covered Motor Vehicle' or 'Vehicle'" at § 463.2(e). The Commission also added language to the end of § 463.4(c) clarifying that the requirements in this paragraph "also are prescribed for the purpose of preventing the unfair or deceptive acts or practices defined in this part, including those in §§ 463.3(a) and (b) and § 463.5(c)."

[461] As with § 463.3, § 463.5(a) does not require any additional disclosures or information collection. Thus, while dealers might elect to enhance their training and compliance policies, or to take steps to document compliance with § 463.5(a), any such additional measures are not required by this provision.

[462] *See* SBP III.E.2(c).

[463] In its NPRM, the Commission noted that it anticipated this section would require dealers to provide readily available information to consumers in direct communications with customers, and that dealers complying with existing law have policies in place to prevent charges without consent, thereby estimating minimal additional resulting costs. *See* NRPM at 42033, 42036–44. The Commission did not receive comments discussing attendant burdens in sufficient detail for revised cost estimates, and thus affirms its prior estimate regarding additional costs associated with § 463.5(c).

[464] The Final Rule also contains one typographical modification to § 463.6—adding a serial comma—and minor textual changes to ensure consistency with the defined terms at § 463.2(e) and (f).

[465] NPRM at 42033–34, 42043.

association, generally contended that the Commission underestimated the burdens of compliance relating to the changes dealers would need to make to their existing recordkeeping systems. These commenters, however, did not provide the Commission with alternative estimates regarding such burdens. As explained in the section-by-section analysis of the Recordkeeping section, § 463.6, in SBP III.F, this provision gives dealers the flexibility to retain materials in any legible form, including in the same manner, format, and place as they may already keep such records in the ordinary course of business. The Commission nonetheless has determined, in response to comments, to revise its estimates regarding incremental storage expenses that may be associated with the recordkeeping requirements in the Final Rule, and, as provided in the capital and other non-labor costs discussion in the following paragraphs, the Commission is adding an estimate of incremental additional storage costs to its estimate.

Further, the Commission notes that its initial recordkeeping cost estimates were based on a proposal that required records regarding add-on list disclosures and cash price without optional add-on disclosures—records that the Rule the Commission is finalizing does not require dealers to retain. Given that the Commission is not finalizing these additional record-related requirements, the estimates provided in its NPRM may overestimate attendant costs resulting from the Rule's recordkeeping requirements. Notwithstanding this possibility, the Commission maintains its prior calculations of the time required to modify existing recordkeeping systems.[466] The Commission anticipates that it will take covered motor vehicle dealers approximately 15 hours to modify their existing recordkeeping systems to retain the required records for the 24-month period specified in the Rule. This yields a general recordkeeping burden of 709,065 hours annually (47,271 motor vehicle dealers × 15 hours per year).

The Commission anticipates that programming, administrative, compliance, and clerical staff are likely to perform the tasks necessary to comply with the recordkeeping requirements in § 463.6 of its Rule. In particular, the Commission estimates this 15-hour per-dealer labor hours burden to design, implement, or update

systems for record storage and create the templates necessary to accommodate retention of all relevant materials, as follows: 8 hours of time for a programmer, at a cost-rate of $40.24 per hour; 5 hours of additional clerical staff work, at a cost-rate of $20.16 per hour; 1 hour of sales manager review, at a cost-rate of $80.19 per hour; and 1 hour of review by a compliance officer, at a cost-rate of $31.21 per hour.[467] Applying these cost-rates to the estimated per-dealer hours burden described previously, the total estimated initial labor cost burden is $534.12 per average dealership (($40.24 per hour × 8 hours) + ($20.16 per hour × 5 hours) + ($80.19 per hour × 1 hour) + ($31.21 per hour × 1 hour)), totaling $25,248,386.52 across the industry ($534.12 per average dealership × 47,271 dealerships).

The Commission also received comments regarding its cost estimates relating to the records of loan-to-value ratios for transactions that include GAP agreement sales. One industry association commenter argued that this recordkeeping requirement would also require additional training, that creating a loan-to-value calculator template for GAP agreements would be difficult given the variation of loan-to-value ratios, and that this recordkeeping requirement would lengthen the time to conduct vehicle sale or financing transactions.[468] No commenter provided alternative estimates of the costs associated with the Commission's proposed recordkeeping requirements.

As explained in the paragraph-by-paragraph analysis of § 463.5 in SBP III.E.2, the Commission is not mandating a particular LTV threshold or method of calculation, but rather requiring that dealers not charge a consumer for GAP agreements or other products or services if the consumer would not benefit from the product or service. The Commission anticipates that, to the extent dealers do not currently retain any materials used to make such an assessment, dealers may incur certain additional costs. Specifically, the Commission anticipates that dealers will expend one minute per sales or financing transaction for a salesperson to perform the calculation contemplated by this requirement, at a cost rate of $28.41 per

hour. The Commission estimates that covered motor vehicle dealers sell approximately 31,562,959 vehicles each year, and that approximately 17% of such sales include GAP agreements, for an estimated total of 5,444,502 covered vehicle sales.[469] While the number of motor vehicles sold will vary by dealership, this yields an average sales volume of 115 sales transactions per average dealership per year that include a GAP agreement (5,444,502 covered vehicle sales/47,271 dealerships). This yields an estimated annual hours burden for all dealers of 90,742 hours (5,444,502 covered transactions × 1/60 hours). Applying the associated labor rates yields an estimated annual labor cost for all dealers of $2,577,980.22 (90,742 hours × $28.41 per hour).

*E. Capital and Other Non-Labor Costs*

The Commission anticipates that the Final Rule will impose limited capital and non-labor costs. The Commission presented estimates in the NPRM with respect to such costs and solicited comments on its burden analysis. Here, the Commission discusses its estimates for the capital and non-labor costs associated with the Rule's disclosure and recordkeeping requirements. While some commenters generally discussed burdens that they contended would accompany these proposed provisions, none provided any alternative cost estimates regarding capital and other non-labor costs.[470]

1. Disclosures

The Commission anticipates that the Rule's disclosure requirements will impose *de minimis* capital and other non-labor costs. As the Commission noted in the NPRM, dealers already have in place existing systems for providing sales- and contract-related disclosures to buyers and lessees, as well as to consumers seeking information during the vehicle-shopping process.[471] While the Final Rule's disclosure requirements may result in limited additions to the

---

[466] In its NPRM, the Commission estimated costs to create and implement a loan-to-value calculation process. NPRM at 42034. Such costs are already accounted for in the Commission's estimates for the time required to modify existing recordkeeping systems, and thus are not separately itemized here.

[467] Applicable wage rates are based on data from the Bureau of Labor Statistics. *See* U.S. Bureau of Labor Statistics, ''May 2022 National Industry-Specific Occupational Employment and Wage Estimates NAICS 441100—Automobile Dealers'' (Apr. 25, 2023), *https://www.bls.gov/oes/current/naics4_441100.htm.*

[468] These arguments are addressed in the section-by-section analysis of § 463.5. *See* SBP III.E.

[469] In response to comments, the Commission has revised the number of transactions across the industry from the NPRM to exclude private party and fleet transactions. The estimated percentage of sales including GAP agreements is derived from data provided by an industry commenter. Comment of Nat'l Auto. Dealers Ass'n, Doc. No. FTC–2022–0046–8368 at 12.

[470] One commenter claimed generally that the Commission underestimated these costs, referring to arguments the commenter made with respect to the Commission's burden analysis of specific disclosure and recordkeeping provisions. The Commission has responded to those arguments in the foregoing analysis, with the exception of the recordkeeping storage costs, which are addressed in the following discussion.

[471] NPRM at 42034.

information that must be provided during the transaction process, depending on a dealer's current business operations, the Commission anticipates that these changes will not require substantial investments in new systems.[472] Further, many dealers may elect to furnish some disclosures electronically, further reducing total costs.[473]

The Commission previously estimated non-labor costs for providing disclosures in written or electronic form. This estimate was based on proposed § 463.5(b), which required written disclosures in all transactions in which dealers charge for optional add-ons. As discussed in the paragraph-by-paragraph analysis of § 463.5 in SBP III.E.2, the Commission has determined not to finalize the proposed provision at § 463.5(b). While some commenters generally discussed burden with respect to disclosure requirements being finalized by the Commission, no commenter estimated non-labor costs associated with such requirements. The Commission estimates that the non-labor costs related to disclosures, which relate to fundamental information (the vehicle offering price, that optional add-ons are not required, and regarding the total amount to purchase or lease the vehicle), will be *de minimis.*

2. Recordkeeping

In the NPRM, the Commission observed that dealers already have in place existing recordkeeping systems for the storage of documentation they would retain in the ordinary course of business irrespective of the Rule's requirements.[474] Commenters including industry associations, a dealership organization, and a dealership association argued that the Commission underestimated the burdens associated with the Commission's proposed requirements to retain written communications, as well as the need to develop new systems to capture these materials. The Commission disagrees that the recordkeeping requirements in § 463.6 mandate the creation of new recordkeeping systems. As explained in the section-by-section analysis of § 463.6, this provision gives dealers the flexibility to retain materials in any legible form, including in the same manner, format, or place as they may already keep such records in the ordinary course of business.

The Commission is, however, revising its estimates regarding incremental storage expenses that may be associated

with the recordkeeping requirements in the Final Rule to add such recordkeeping storage costs to its estimate. The Commission previously noted, and continues to believe, that dealers that store records in hard copy are unlikely to require extensive additional storage for physical document retention, and, due to the low cost of electronic storage options, that expanding electronic storage capacity would impose minimal costs.[475] The Commission also invited comments on estimated storage costs; while some commenters generally discussed burdens, as addressed in the section-by-section analysis of the recordkeeping requirements in § 463.6, that they contended would accompany the proposed provisions, the Commission did not receive any comments that provided estimates. The Commission nevertheless has conducted additional research, and now estimates that each dealer will need to spend approximately $300 per year in investment in additional IT systems and hardware for additional storage (either on premises or electronically) to retain records, the annual cost for which would be $14,181,300 for all covered dealers ($300 × 47,271 covered dealers).[476]

**VI. Regulatory Flexibility Act**

The Regulatory Flexibility Act (''RFA''), as amended by the Small Business Regulatory Enforcement Fairness Act of 1996,[477] requires an agency to provide an Initial Regulatory Flexibility Analysis (''IRFA'') and Final Regulatory Flexibility Analysis (''FRFA'') of any rule subject to notice-and-comment requirements,[478] unless the agency head certifies that the regulatory action will not have a significant economic impact on a substantial number of small entities.[479] In the NPRM, the Commission provided

an IRFA, stated its belief that the proposal will not have a significant economic impact on small entities, and solicited comments on the burden on any small entities that would be covered.[480] In addition to publishing the NPRM in the **Federal Register**, the Commission announced the proposed rule through press releases, social media posts, and blog articles directed toward businesses and consumers, as well as through other outreach,[481] in keeping with the Commission's history of small business guidance and outreach.[482]

The Commission thereafter received over 27,000 public comments, many of which identified themselves as being from small dealers, industry associations that represent small dealers, and employees of small dealers.[483] The Commission greatly

[480] NPRM at 42035.

[481] *See, e.g.,* Press Release, Fed. Trade Comm'n, ''FTC Proposes Rule to Ban Junk Fees, Bait-and-Switch Tactics Plaguing Car Buyers'' (June 23, 2022), *https://www.ftc.gov/news-events/news/press-releases/2022/06/ftc-proposes-rule-ban-junk-fees-bait-switch-tactics-plaguing-car-buyers;* Lesley Fair, ''Proposed FTC Rule Looks Under the Hood at the Car Buying Process,'' Fed. Trade Comm'n Business Blog (June 23, 2022), *https://www.ftc.gov/business-guidance/blog/2022/06/proposed-ftc-rule-looks-under-hood-car-buying-process;* Alan S. Kaplinsky, A Close Look at The Federal Trade Commission's Proposed Rule for Motor Vehicle Dealers, with Special Guests Sanya Shahrasbi and Daniel Dwyer, Staff Attorneys, FTC Bureau of Consumer Protection, Division of Financial Practices, Consumer Finance Monitor (Aug. 11, 2022), *https://www.ballardspahr.com/Insights/Blogs/2022/08/Podcast-The-FTCs-Proposed-Rule-Motor-Vehicle-Dealer-Guests-Sanya-Shahrasbi-and-Daniel-Dwyer.*

[482] Each year since FY2002, the Small Business Administration's Office of the National Ombudsman has rated the Federal Trade Commission an ''A'' on its small business compliance assistance work. *See* U.S. Small Business Administration, ''2013–2020 SBA Nat'l Ombudsman's Ann. Reps. to Cong.,'' *https://www.sba.gov/document/report—national-ombudsmans-annual-reports-congress* (providing reports from FY2013–FY2020); Letter from Joseph J. Simons, Chairman of the Federal Trade Commission, to Senator James Risch, Chairman of the Committee on Small Business and Entrepreneurship, U.S. Senate, and to Congressman Steve Chabot, Chairman of the Committee on Small Business, U.S. House of Representatives, *https://www.ftc.gov/system/files/documents/reports/federal-trade-commission-rule-compliance-guides-small-businesses-other-small-entities-commission/tenth_section_212_report_to_congress_july_2016-june_2017_1_0.pdf* (citing Commission's ''A'' rating for ''Compliance Assistance'' by the National Ombudsman from FY2002–FY2016).

[483] The Commission received 27,349 comment submissions filed in response to its NPRM. *See* Gen. Servs. Admin., Doc. No. FTC–2022–0046–0001, Proposed Rule, Motor Vehicle Dealers Trade Regulation Rule (July 13, 2022), *https://www.regulations.gov/document/FTC-2022-0046-0001* (noting comments received). To facilitate public access, 11,232 such comments have been posted publicly at *www.regulations.gov. Id.* (noting posted comments). Posted comment counts reflect the number of comments that the agency has posted to *Regulations.gov* to be publicly viewable. Agencies may choose to redact or withhold certain

[475] NPRM at 42034–35.

[476] Our review of dealer transaction records suggests that a typical transaction generates 3.4 MB of data under the status quo. Given the average number of transactions per dealer, this suggests that storing all these records would require dedicated space of roughly 4.2 GB per year. With a two-year retention window, this corresponds to 8.4 GB of storage at any given time. We estimate that the (annual) amount budgeted here should be sufficient to maintain at least 1 TB of storage—either on premises or through a cloud storage vendor—which is sufficient for more than 100 times the data storage capacity necessary to retain all transaction files generated by a typical dealership in a year under the status quo. The Commission anticipates that this amount of data storage capacity will be more than sufficient to also allow for dealers to keep any necessary records of correspondence with consumers who ultimately do not complete transactions at the dealership.

[477] *See* Public Law 104–121 (1996).

[478] 5 U.S.C. 603(a), 604(a).

[479] 5 U.S.C. 605(b).

[472] *Id.*
[473] *Id.*
[474] *Id.*

appreciates, and thoroughly considered, the feedback it received from such stakeholders in developing the Final Rule; made changes from the proposed rule in response to such feedback; and will continue to engage with stakeholders moving forward to facilitate implementation of the Rule.

As previously discussed, after reviewing comments, the Commission has determined, as an alternative to finalizing the proposed rule in its entirety, to finalize a Rule that does not contain the proposed add-on list disclosure requirements at § 463.4(b), or the proposed disclosures and declinations pertaining to a vehicle's cash price without optional add-ons at § 463.5(b). Furthermore, as discussed in the paragraph-by-paragraph analysis of § 463.2(e) in SBP III.B.2(e), in response to public comments and after careful consideration, the Commission has determined to exclude recreational boats and marine equipment; motorcycles; and motor homes, recreational vehicle trailers, and slide-in campers from the Rule's definition of "Covered Motor Vehicle." After careful consideration of the comments and following its determination not to finalize the proposed rule in its entirety, the Commission is certifying that the Final Rule will not have a significant economic impact on a substantial number of small entities. In the following paragraphs, the Commission discusses comments from the public, as well as from the U.S. Small Business Administration Office of Advocacy ("SBA Advocacy"), and the reasons for the Commission's conclusion that the Rule will not have a significant economic impact on a substantial number of small entities.[484] Given,

however, that the Commission believes that the vast majority of covered entities are small entities and provided an IRFA in the NPRM, in the interest of thoroughness, the Commission has also performed an FRFA, as described in SBP VI.B.2.

*A. Significant Impact Analysis*

1. Comments on Significant Impact

In the NPRM, the Commission stated its belief that the proposed rule would not have a significant economic impact on a substantial number of small entities, and invited comments.[485]

Several commenters, including industry associations and a dealership association, generally argued that the Rule would impose substantial economic burdens on small entities, and some suggested that small entities may be disproportionately burdened by the Rule given limited legal and compliance staff. No commenters provided comprehensive alternative empirical cost or revenue data that could be used to put costs in context. Commenters, including an industry association and SBA Advocacy, argued that the Commission did not provide a sufficient factual basis for, or analysis of, the effects on small entities, and that the proposed rule would be unduly burdensome for smaller motor vehicle dealers.[486] The comment from SBA Advocacy further argued that the Commission provided no information about the economic impact of the proposed rule on small entities, but noted that if the total estimated cost of $1,360,694,552 were divided by the number of dealers estimated in the NPRM (46,525), the cost would be roughly $29,000 per such dealer.[487] The comment from SBA Advocacy also argued that the Commission failed to include familiarization and training costs or costs that the Commission could not quantify, such as investments in additional IT systems and hardware.[488]

The Commission has considered these comments carefully and has taken them into account in setting forth the factual basis for the certification in SBP VI.A.2, including by modifying its analysis to add an estimate of familiarization and training costs in response to such concerns.[489] The Commission notes, as

[484] The Office of Advocacy has emphasized that, while it is housed within SBA, it is an independent, stand-alone office that has its own statutory charter, leadership structure, and appropriations account. SBA Advocacy, "Background Paper: Office of Advocacy 2017–2020" 111–19 (Jan. 2021), *https://advocacy.sba.gov/wp-content/uploads/2021/02/Background-Paper-Office-of-Advocacy-2017-2020-web.pdf; see also* 15 U.S.C. 634a through 634g. SBA Advocacy's Chief Counsel is appointed from civilian life by the President, with the advice and consent of the Senate, and most of SBA Advocacy's professionals serve at the pleasure of the Chief Counsel. 15 U.S.C. 634a, 634d(1) (empowering Chief Counsel for Advocacy to employ and fix the compensation of additional staff personnel); SBA Advocacy, "Background Paper: Office of Advocacy 2017–2020" 95 (Jan. 2021), *https://advocacy.sba.gov/wp-content/uploads/2021/02/Background-Paper-Office-of-Advocacy-2017-2020-web.pdf.* SBA Advocacy does not circulate its work for clearance

submissions (or portions thereof) such as those containing private or proprietary information, inappropriate language, or duplicate/near duplicate examples of a mass-mail campaign. Gen. Servs. Admin., *Regulations.gov* Frequently Asked Questions, *https://regulations.gov/faq.*

[485] An industry association commenter argued that the Commission did not make a formal section 605(b) certification, publish the certification in the **Federal Register**, or provide the certification to the Chief Counsel for Advocacy of the Small Business Administration. This comment misunderstands the RFA. The RFA does not require certification when a rule is proposed. *See* 5 U.S.C. 605(b) (providing that the head of the agency may make the certification "at the time of publication of the final rule"). The Commission's NPRM stated its belief that the proposal would not have a significant economic impact on a substantial number of small entities, invited comment on this issue, and also provided an IRFA. The Commission has carefully reviewed the SBA's and others' comments, is making changes to the proposal, and is now publishing the Final Rule and making a formal certification, as is required by the RFA.

Although the Commission included the NPRM in its Fall 2022 Regulatory Agenda, and explained in its NPRM that the proposed rulemaking was not included in the Commission's Spring 2022 Regulatory Agenda because the Commission first considered the NPRM after the publication deadline for the Regulatory Agenda, *see* NPRM at 42031 n.153, the same commenter argued that the RFA and Executive Order 12866 required the Commission to include it in earlier Regulatory Agendas. As an initial matter, Executive Order 12866 does not apply to independent agencies such as the FTC. Regardless, as discussed in SBP II.C, Commission has engaged in a sustained effort over many years to engage with consumer and dealer groups, and other stakeholders, regarding the issues addressed in the Rule. *See supra* note 90. Neither the RFA nor Executive Order 12866 precludes the Commission from promulgating the Rule regardless of whether it was included in an earlier Regulatory Agenda (or even arguably could have been). Section 602(d) of the RFA explicitly provides that "[n]othing in this section precludes an agency from considering or acting on any matter not included in a regulatory flexibility agenda." *See Coastal Conservation Ass'n v. Locke,* No. 2:09–CV–641–FTM–29, 2011 WL 4530631, at *38 (M.D. Fla. Aug. 16, 2011), *report & recommendation adopted sub nom. Coastal Conservation Ass'n v. Blank,* No. 2:09–CV–641–FTM–29, 2011 WL 4530544 (M.D. Fla. Sept. 29, 2011) (denying request for injunction based on allegation of noncompliance with 5 U.S.C. 602(d)). Similarly, Executive Order 12866 explicitly provides that it "does not create any right or benefit, substantive or procedural, enforceable at law or equity by a party against the United States," let alone one that would preclude adoption of the Rule. *See* E.O. 12866, 58 FR 51735, 51744 (Sept. 30, 1993); *see also Trawler Diane Marie, Inc.* v. *Brown,* 918 F. Supp. 921, 932 (E.D.N.C. 1995), *aff'd sub nom. Trawler Diane Marie, Inc. v. Kantor,* 91 F.3d 134 (4th Cir. 1996) (denying request to invalidate regulation based on allegation of noncompliance with Executive Order 12866).

[486] *See* Comment of SBA Advocacy, Doc. No. FTC–2022–0046–6664 at 3.

[487] Comment of SBA Advocacy, Doc. No. FTC–2022–0046–6664 at 3.

[488] Comment of SBA Advocacy, Doc. No. FTC–2022–0046–6664 at 3.

[489] After additional research, the Commission estimates that each dealer will need to spend approximately $300 per year on storage (either on premises or in the cloud) to store the records the Rule requires them to maintain. Based on a review of the transaction records the Commission has received from dealers through investigations, this amount is likely to be more than sufficient. Commission review suggests that a typical vehicle transaction generates 3.4 MB of data under the status quo. Given the average number of transactions per dealer, this suggests that storing all these records would require dedicated space of roughly 4.2 GB per year. With a two-year retention window, this corresponds to 8.4 GB of storage at any given time. The Commission estimates that the $300 annual amount budgeted here should be sufficient to maintain at least 1 TB of storage—either on premises or through a cloud storage vendor—which is sufficient for more than 100 times the data storage capacity necessary to retain all transaction files generated by a typical dealership in a year under the status quo. The Commission

SBA Advocacy did in its comment, that the NPRM estimated a total cost for the proposed rule of $1,360,694,552. This estimate was for costs over a ten-year time period. Thus, dividing this estimate by the number of affected dealers estimated in the NPRM yields a cost of roughly $29,000 per dealer over a ten-year period—or approximately $2,900 per year per dealer.[490] This figure—$2,900—is slightly more than the average gross profit described in the NPRM for a single vehicle sale by a new vehicle dealer, and less than half of the average gross profit described in the NPRM for a single vehicle sale by an independent used vehicle dealer.[491]

After carefully reviewing the comments, the Commission does not conclude that the Final Rule will impose a substantial economic burden on a substantial number of smaller entities.[492] As described in SBP VI.A.2(b), the estimated economic impact of the Final Rule, controlling for firm size based on available census data, is less than or equal to 0.27% of annual sales, 1.49% of the gross margin, and 4.12% of the gross margin minus operating expense for dealerships of all sizes.[493] The Commission further notes that, in response to comments from SBA

anticipates that this amount of data storage capacity will be more than sufficient to also allow for dealers to keep any necessary records of correspondence with consumers who ultimately do not complete transactions at the dealership.

[490] NPRM at 42013.

[491] As noted in the NPRM, new vehicle dealers averaged a gross profit of about $2,444 per new vehicle, and about $2,675 per used vehicle, and independent used vehicle dealerships had an average gross profit of more than $6,000 per vehicle. *See* NPRM at 42014 (citing Nat'l Auto Dealers Ass'n, "Average Dealership Profile" 1 (2020), *https://www.nada.org/media/4136/download?attachment* [*http://web.archive.org/web/20220623204158/https://www.nada.org/media/4136/download?attachment*] (June 23, 2022) and Nat'l Indep. Auto Dealers Ass'n, "NIADA Used Car Industry Report 2020" at 21).

[492] Notably, while many industry commenters claimed that the burden of the Rule would be substantial, none provided data on revenue or profit.

[493] U.S. Census Bureau, "Annual Retail Trade Survey: 2021" (Dec. 15, 2022), *https://www.census.gov/data/tables/2021/econ/arts/annual-report.html*. Gross margin minus operating expenses was determined by deducting total 2021 operating expenses ($144,268 million) from 2021 gross margin ($226,118 million). Gross margin represents total sales less the cost of goods sold. Operating expenses include but are not limited to annual payroll, commissions, data processing, equipment, advertising, lease and rental payments, utilities, and repair and maintenance. *See Glossary*, U.S. Census Bureau, *https://www.census.gov/glossary* (last visited Dec. 5, 2023). Note that the operating expenses amount may include some costs—such as payments for deceptive advertising or commissions earned on unauthorized charges—that are not legitimate expenses. If these were excluded, the gross margin minus operating cost figures would be even lower than those described in the text.

Advocacy and others, the Paperwork Reduction Act analysis incorporates additional estimates for training and storage costs beyond those estimated in the NPRM.

## 2. Certification of the Final Rule

The Commission hereby certifies that the Final Rule will not have a significant economic impact on a substantial number of small entities.

As an initial matter, the Commission believes that a substantial number of small entities are covered by the Rule. New vehicle dealers (NAICS code 44111) are classified as small entities if they have an average of 200 or fewer employees, and used car dealers (NAICS code 44112) are classified as small entities if they have average annual revenues of $30.5 million or less.[494] Census data indicate that the vast majority of dealers classified into these NAICS codes are small entities.[495] There are approximately 47,271 covered dealers in the United States, of which over 93% have fewer than 100 employees. Thus, while the Commission cannot determine the precise number of small entities affected by the Rule, census data suggest that the vast majority of covered dealers are small entities.

The Commission certifies that the Rule will not have a significant economic impact on a substantial number of small entities. The Commission has analyzed the costs of the Rule (1) based on industry averages and (2) accounting for dealer size based on the number of employees. Under either measure, the Rule will not have a significant economic impact on a substantial number of small entities.

### (a) Industry Averages

The Commission estimates a total cost for the Final Rule, at the scenario reflecting the Commission's highest cost estimates, of $1.075 billion to $1.270 billion over a ten-year period.[496] Using

[494] *See* North American Industry Classification System, U.S. Census Bureau, *https://www.census.gov/naics/*. These standards are determined by the Small Business Size Standards component of the NAICS, which is available at *https://www.sba.gov/document/support-table-size-standards*.

[495] The census report does not provide sufficient detail to provide a precise numerical estimate of the number of small entities covered by the Rule. The census data provide the number of dealers with fewer than 250 employees, and also provide revenue and gross margin figures for the motor vehicle dealers industry, without further breakdown. For that reason, the census data do not provide sufficient information to calculate the specific number of dealers that are small entities. Nor did commenters provide comprehensive alternative firm size data.

[496] The $1.075 billion figure was determined by summing the unrounded total highest estimated

the highest end of this highest-cost scenario, the Rule will have an estimated cost of $1.270 billion over ten years using a 3% discount rate. This translates to an average estimated per-year cost of $127 million ($1.270 billion × 0.1). Census data show that, in 2021, automobile dealers had annual sales of $1.265 trillion, gross margin of $226.118 billion,[497] and gross margin minus operating expenses of $81.850 billion. Discounting these numbers over a 10-year period using a 3% discount rate equates to average annual sales of $1.079 trillion, gross margin of $192.883 billion, and gross margin minus operating expenses of $69.820 billion. The estimated yearly cost of the Rule therefore is approximately 0.01% of annual sales ($127 million/$1.079 trillion), 0.07% of gross margin ($127 million/$192.883 billion), and 0.18% of gross margin minus operating expenses ($127 million/$69.820 billion) across the industry.[498]

### (b) Dealer Size Based on the Number of Employees

In addition to considering industry averages, the Commission has analyzed the cost of the Rule accounting for dealer size based on the number of employees. Certain costs are fixed (*i.e.,* remain the same regardless of the number of employees) while other costs scale with dealer size. We consider both

costs associated with the Final Rule's total of payments disclosure requirements ($246 million), offering price disclosure requirements ($46 million), requirements regarding certain add-ons and express, informed consent ($406 million), prohibitions on misrepresentations ($130 million), and recordkeeping requirements ($248 million), using a 7% discount rate. The $1.270 billion figure was determined by summing the unrounded total highest estimated costs associated with the Final Rule's total of payments disclosure requirements ($296 million), offering price disclosure requirements ($46 million), requirements regarding certain add-ons and express, informed consent ($475 million), prohibitions on misrepresentations ($157 million), and recordkeeping requirements ($296 million), using a 3% discount rate.

[497] U.S. Census Bureau, "Annual Retail Trade Survey: 2021, Sales" (Dec. 15, 2022), *https://www2.census.gov/programs-surveys/arts/tables/2021/sales.xlsx* (showing $1,264,635 million in estimated annual sales in 2021 for automobile dealers, NAICS code 4411); U.S. Census Bureau, "Annual Retail Trade Survey: 2021, Gross Margin" (Dec. 15, 2022), *https://www2.census.gov/programs-surveys/arts/tables/2021/gm.xlsx* (showing $226,118 million in estimated annual gross margin in 2021 for automobile dealers, NAICS code 4411); U.S. Census Bureau, "Annual Retail Trade Survey: 2021, Total Operating Expenses" (Dec. 15, 2022), *https://www2.census.gov/programs-surveys/arts/tables/2021/exp.xlsx* (showing $144,268 million in estimated annual operating expenses in 2021 for automobile dealers, NAICS code 4411).

[498] The calculations in this analysis were performed using unrounded inputs in order to maintain accuracy. Nevertheless, for ease of reference, such inputs have been rounded where they are described in the text.

(1) first-year compliance costs and (2) costs in subsequent years.

*(1) First-year compliance costs.* First-year compliance costs are the sum of: (1) upfront fixed costs; (2) one year of annual ongoing costs that are fixed; and (3) one year of annual ongoing costs that scale.

The Commission estimates the upfront fixed costs per dealer under the highest-cost scenario as follows: $963.44 to update policies and procedures to provide the offering price disclosure required by § 463.4(a) ((8 estimated pricing hours [499] × $80.19 per hour) + (8 estimated programming hours × $40.24 per hour)); $249.68 to design disclosures required by § 463.4(d) and (e) and inform associates of their obligations to provide these disclosures (8 estimated compliance manager hours × $31.21 per hour); $1,783.56 to cull add-ons with no consumer benefit from offerings, develop policies regarding when certain add-ons may or may not be sold, and create nonmandatory disclosures, in response to the requirements of § 463.5 ((16 estimated compliance manager hours × $31.21 per hour) + (12 estimated sales manager hours × $80.19 per hour) + (8 estimated programmer hours × $40.24 per hour)); and $534.12 to upgrade recordkeeping systems and create the templates necessary to accommodate retention of all relevant material under § 463.6 ((8 estimated programmer hours × $40.24 per hour) + (5 estimated clerical hours × $20.16 per hour) + (1 estimated sales manager hour × $80.19 per hour) + (1 estimated compliance manager hour × $31.21 per hour)). These figures total $3,530.80 per dealer.[500]

The Commission estimates the annual fixed ongoing costs per dealer for the first year under the highest-cost scenario as follows: $390.13 to conduct a heightened compliance review of public-facing representations to ensure compliance with § 463.3 (150 estimated documents per year × 5 estimated minutes of review per document × $31.21 per hour of compliance officer review); and $300 estimated for expanded storage to retain records required under § 463.6. These figures total $690.13 per dealer per year.

The Commission estimates annual ongoing costs that scale with dealer size

based on number of employees as follows. The Commission estimates that annual costs that scale with dealer size are $76.86 per employee per year. Annual ongoing costs that scale with dealer size include: $26.53 per employee to provide the total of payments disclosures required by § 463.4(d) and (e) (((417,110 sales & related employees × 1 estimated hour for training × $29.43 per hour) + (19,228,256 total covered transactions involving monthly payments or financing × (2/60 estimated disclosure hours per transaction × $28.41 per hour + $0.15 printing costs per disclosure)))/ 1,257,877 total employees); $36.40 per employee for training and the delivery of a disclosure under a regime in which dealers choose to deliver an itemized disclosure to comply with § 463.5 (((417,110 sales & related employees × 1 estimated hour for training × $29.43 per hour) + ((10,343,319 new vehicle sales + 21,219,640 used vehicle sales) × (2/60 estimated disclosure hours per sale transaction × $28.41 per hour + $0.11 physical costs per disclosure)))/ 1,257,877 total employees); and $13.93 per employee to generate and store calculations required to be retained under § 463.6 ((31,562,959 vehicle sales × 1/60 estimated hours per transaction × $28.41 per hour/1,257,877 total employees) + (5,444,502 vehicle sales with GAP agreement × 1/60 estimated hours per transaction × $28.41 per hour/ 1,257,877 total employees)).

Next, the Commission uses census data on the average number of employees at dealerships within different dealer size cohorts to determine the per-dealer cost for each dealer cohort.[501] Multiplying the

estimated cost per employee ($76.86) by the average number of employees within different dealer size cohorts yields annual ongoing scaled costs per dealer of: $124.59 per dealer with fewer than 5 employees ($76.86 × 1.62 employees); $499.59 per dealer with between 5 and 9 employees ($76.86 × 6.50 employees); $1,058.73 per dealer with between 10 and 19 employees ($76.86 × 13.77 employees); $2,584.18 per dealer with between 20 and 49 employees ($76.86 × 33.62 employees); $5,343.19 per dealer with between 50 and 99 employees ($76.86 × 69.52 employees); $10,784.88 per dealer with between 100 and 249 employees ($76.86 × 140.31 employees); $24,384.79 per dealer with between 250 and 499 employees ($76.86 × 317.25 employees); $44,623.26 per dealer with between 500 and 999 employees ($76.86 × 580.56 employees); and $147,085.08 per dealer with 1,000 or more employees ($76.86 × 1,913.60 employees).

Thus, the total first-year compliance costs based on dealer size are $4,345.51 ($3,530.80 + $690.13 + $124.59) per dealer with fewer than 5 employees; $4,720.51 ($3,530.80 + $690.13 + $499.59) per dealer with between 5 and 9 employees; $5,279.66 ($3,530.80 + $690.13 + $1,058.73) per dealer with between 10 and 19 employees; $6,805.11 ($3,530.80 + $690.13 + $2,584.18) per dealer with between 20 and 49 employees; $9,564.12 ($3,530.80 + $690.13 + $5,343.19) per dealer with between 50 and 99 employees; $15,005.80 ($3,530.80 + $690.13 + $10,784.88) per dealer with between 100 and 249 employees; $28,605.72 ($3,530.80 + $690.13 + $24,384.79) per dealer with between 250 and 499 employees; $48,844.18 ($3,530.80 + $690.13 + $44,623.26) per dealer with between 500 and 999 employees; and $151,306.01 ($3,530.80 + $690.13 + $147,085.08) per dealer with 1,000 or more employees.

To analyze the economic effect of the costs of the Rule by dealer size, the Commission compares per-dealer costs to per-dealer sales, gross margin, and gross margin minus operating expenses. The Commission does not have data on how sales, gross margin, and operating expenses are apportioned to dealerships based on the number of employees. Accordingly, the Commission assumes that sales, gross margin, and operating expenses are apportioned to dealerships *pro rata* with the number of employees. Dividing the 2021 industry-wide figures for annual sales ($1.265 trillion), gross margin ($226.118 billion), and gross margin minus operating expenses ($81.850 billion) by the total number of

---

[499] As used here, "pricing hours" means time spent by a sales and marketing manager reviewing dealership policies and procedures for determining the public-facing prices of vehicles in inventory.

[500] Applicable wage rates throughout this section are based on data from the Bureau of Labor Statistics. *See* U.S. Bureau of Labor Statistics, "May 2022 National Industry-Specific Occupational Employment and Wage Estimates NAICS 441100—Automobile Dealers" (Apr. 25, 2023), *https://www.bls.gov/oes/current/naics4_441100.htm.*

[501] Based on 2021 census data, dealers with fewer than five employees have an average of 1.62 employees (34,616 employees at all dealerships with fewer than five employees)/21,356 dealers with fewer than five employees); dealers with 5–9 employees have an average of 6.50 employees (35,794 employees/5,507 dealers); dealers with 10–19 employees have an average of 13.77 employees (52,852 employees/3,837 dealers); dealers with 20–49 employees have an average of 33.62 employees (253,365 employees/7,536 dealers); dealers with 50–99 employees have an average of 69.52 employees (423,351 employees/6,090 dealers); dealers with 100–249 employees have an average of 140.31 employees (386,001 employees/2,751 dealers); dealers with 250–499 employees have an average of 317.25 employees (57,105 employees/180 dealers); dealers with 500–999 employees have an average of 580.56 employees (5,225 employees/9 dealers); and dealers with 1,000 or more employees have an average of 1,913.60 employees (9,568 employees/5 dealers). *See* U.S. Census Bureau, "All Sectors: County Business Patterns, Including ZIP Code Business Patterns, by Legal Form of Organization and Employment Size Class for the U.S., States, and Selected Geographies: 2021," *https://data.census.gov/table?q=CB2100CBP&n=44111:44112&tid=CBP2021.CB2100CBP&nkd=LFO–001.*

employees (1,257,877),[502] each employee represents an additional $1,005,372.54 in sales ($1.265 trillion/ 1,257,877 employees), $179,761.61 in gross margin ($226.118 billion/ 1,257,877 employees), and $65,069.96 in gross margin minus operating expenses ($81.850 billion/1,257,877 employees). Multiplying these per-employee figures by the average number of employees of dealers within different size cohorts provides per-dealer sales, gross margin, and gross margin minus operating expenses for each cohort. For instance, dealers with fewer than 5 employees have estimated annual sales of $1,629,611.16 (1.62 employees × $1,005,372.54 sales per employee), annual gross margin of $291,376.10 (1.62 employees × $179,761.61 gross margin per employee), and annual per-dealer gross margin minus operating expenses of $105,472.17 (1.62 employees × $65,069.96 gross margin minus operating expenses per employee).

The Commission then divides first-year compliance costs by these figures to yield cost as a percentage of sales, gross margin, and gross margin minus operating costs. Applying this method to each of the dealer size cohorts, first-year compliance costs are equivalent to: 0.27% of annual sales ($4,345.51/ $1,629,611.16), 1.49% of gross margin ($4,345.51/$291,376.10), and 4.12% of gross margin minus operating expenses ($4,345.51/$105,472.07) for dealers with fewer than 5 employees; 0.07% of annual sales ($4,720.51/$6,534,647.69), 0.40% of gross margin ($4,720.51/ $1,168,401.53), and 1.12% of gross margin minus operating expenses ($4,720.51/$422,936.98) for dealers with 5–9 employees; 0.04% of annual sales ($5,279.66/$13,848,305.89), 0.21% of gross margin ($5,279.66/$2,476,090.91), and 0.59% of gross margin minus operating expenses ($5,279.66/ $896,293.27) for dealers with 10–19 employees; and less than one-half of one percent of the annual sales, gross margin, and gross margin minus operating expenses for the remaining categories of dealers.

*(2) Costs in subsequent years.* The estimated cost of compliance with the Rule drops after the first year, given the absence of upfront costs, which are not incurred after the first year. Compliance costs in subsequent years—which are limited to annual ongoing costs (both fixed and those that scale with dealer size)—are therefore a smaller percentage of annual sales, gross margin, and gross margin minus operating expenses, equal to less than two percent of these metrics for dealers of all sizes.[503]

The Commission does not find that these compliance costs represent a significant economic burden. The Commission therefore certifies that the Final Rule will not have a significant economic impact on a substantial number of small entities.

## B. Initial and Final Regulatory Flexibility Analysis

The NPRM noted the Commission's belief that the proposed rule would not have a significant economic impact on small entities, but nevertheless examined the six IRFA factors, and invited comment on the proposed rule's burdens on small businesses. In the following paragraphs, the Commission discusses comments and then sets forth a FRFA.

### 1. Comments on the Initial Regulatory Flexibility Analysis

#### (a) Description of the Reasons Why Action by the Agency Is Being Considered

The IRFA explained that the Commission proposed the Rule to address misleading practices and unauthorized charges to consumers during the vehicle buying or leasing process, and to deter dealer misconduct and remedy consumer harm. The Commission further noted that its law enforcement, outreach and other engagement in this area, and the hundreds of thousands of consumer complaints received by the FTC, indicated that dealership misconduct and deceptive tactics persisted despite Federal and State law enforcement efforts. In response, the comments from SBA Advocacy and one industry group argued that the number of complaints received by the Commission is insufficient to support a rulemaking given the total number of vehicle transactions in the United States.[504]

Similarly, the industry group argued that the Commission has not filed enough law enforcement actions against motor vehicle dealers to justify the proposal, and that, where it has brought enforcement actions, the Commission has managed to obtain redress for harmed consumers without the need for an additional monetary remedy. As explained in SBP II.B and in the section-by-section analysis of the recordkeeping requirements in § 463.6 in SBP III.F,

a signed or initialed document, by itself, or prechecked boxes to establish express, informed consent. These arguments are addressed in the discussion of disclosures in §§ 463.4, 463.5 and the definition of "Express, Informed Consent" in § 463.2.

The industry group also argued that the number of complaints is overstated because it includes: (1) complaints that are not applicable to motor vehicle dealers or conduct addressed by the Rule, and (2) consumers who did not report a loss. This industry group also argued that the Commission failed to take notice of survey data indicating that the majority of consumers are satisfied with their vehicle purchases. *See, e.g.,* Cox Auto., "2021 Cox Automotive Car Buyer Journey Study" (2022) [hereinafter 2021 Cox Automotive Car Buyer Journey Study], *https://www.coxautoinc.com/wp-content/uploads/2022/01/2021-Car-Buyer-Journey-Study-Overview.pdf.* First, in the Commission's experience, complaints *understate* harm caused by unlawful conduct in a given category, notwithstanding any inclusion of complaints that may pertain to ancillary or related issues. *See* SBP II.B (discussing how complaints represent the tip of the iceberg in terms of actual consumer harm and citing case where prior to FTC action, there were 391 complaints about add-ons *and other issues* but survey results during the same period indicted that at least 16,848 customers were subject to unlawful practices related to add-ons alone). Moreover, the Commission's reported complaint numbers may be underinclusive of relevant complaints filed by consumers (*e.g.,* complaints about vehicle financing issues may be filed under the "Banks and Lenders" category; vehicle repossession issues may be filed under the "Debt Collection" category; and complaints about deceptive online vehicle shopping may be filed under the "Online Shopping and Negative Reviews" category). With regard to consumers who did not report a loss, the Commission disagrees that such consumers were not harmed or that their experience is not relevant to the Rule. For example, many consumers experience a law violation or other harmful conduct, but choose not to consummate the transaction, including consumers who waste time pursuing misleading offers. Further, survey data indicating that a majority of customers are "satisfied" do not indicate whether those customers had hidden charges in their contracts and whether they ever became aware of such charges. Surveys cited by the Commission have identified situations where customers are unaware of add-on charges in their contracts; indeed, in one case, 79% of consumers were unaware of such charges. *See* SBP II.B (discussing hidden charges in auto contracts). Consumers might be satisfied with a purchase until they later learn they are paying for items they did not authorize, if they learn this at all. Further, "the FTC need not prove that every consumer was injured. The existence of some satisfied customers does not constitute a defense . . . ." *Fed. Trade Comm'n v. Amy Travel Serv., Inc.,* 875 F.2d 564, 572 (7th Cir. 1989), *vacated in part on other grounds, Fed. Trade Comm'n v. Credit Bureau Ctr., LLC,* 937 F.3d 764 (7th Cir. 2019); *accord Fed. Trade Comm'n v. Stefanchik,* 559 F.3d 924, 929 n.12 (9th Cir. 2009).

---

[502] Data on the number of employees comes from the 2021 census. *See* U.S. Census Bureau, "All Sectors: County Business Patterns, Including ZIP Code Business Patterns, by Legal Form of Organization and Employment Size Class for the U.S., States, and Selected Geographies: 2021," *https://data.census.gov/table?q=CB2100CBP&n=44111:44112&tid=CBP2021.CB2100CBP&nkd=EMPSZES~001,LFO~001.*

[503] Average ongoing compliance costs after the first year equal: 0.05% of annual sales, 0.28% of gross margin, and 0.77% of gross margin minus operating expenses for dealers with fewer than 5 employees, and less than one-half of one percent of annual sales, gross margin, and gross margin minus operating expenses for the remaining categories of dealers.

[504] Comment of SBA Advocacy, Doc. No. FTC–2022–0046–6664 at 6. SBA Advocacy also raised concerns that the proposal could make the buying process more cumbersome and confusing, noting that the proposal requires additional disclosures, and the proposal prohibited dealers from relying on

consumer complaints represent the ''tip of the iceberg'' of actual misconduct, as many unlawful practices go undetected or unreported by consumers. Further, the Commission has taken significant action aimed at addressing law violations in the motor vehicle dealer marketplace, despite limited resources and a broad mandate to address unlawful practices across much of the nation's commercial activity,[505] and, particularly given the Supreme Court's 2021 ruling limiting the FTC's ability to obtain redress for consumers, it is difficult to get full redress for consumers.[506] Despite these Commission actions, as well as the hundreds of additional actions brought by other Federal and State regulators, the deceptive or unfair acts or practices addressed by the proposed rule persist.

(b) Succinct Statement of the Objectives of, and Legal Basis for, the Proposed Rule

The objectives of the Rule and its legal basis, including the specific grant of rulemaking authority under section 1029 of the Dodd-Frank Act, 12 U.S.C. 5519, were set forth in the IRFA.[507] The objectives and legal basis, and comments on these topics, additionally have been discussed throughout this SBP.

(c) Description of and, Where Feasible, Estimate of the Number of Small Entities to Which the Proposed Rule Will Apply

In its IRFA, the Commission estimated that there were approximately 46,525 franchise, new motor vehicle, and independent/used motor vehicle dealers.[508] As discussed in the

Paperwork Reduction Act analysis in SBP III.V, the Commission received comments from SBA Advocacy and others on this estimate, and the Commission has responded to those comments by making certain changes to the proposal in light of the comments received. The Commission has revised its estimate of covered dealers to 47,271 franchise, new motor vehicle, and independent/used motor vehicle dealers based on newly available NAICS data assembled by the U.S. Census Bureau.[509]

Regarding the estimate of the number of small entities affected by the Final Rule, as noted in the Certification of the Final Rule,[510] while the Commission cannot determine the precise number of small entities, the data the Commission does have reinforce the Commission's initial view that most covered entities are small entities.

(d) Description of the Projected Reporting, Recordkeeping, and Other Compliance Requirements of the Proposed Rule

An industry association commenter argued that the Commission did not ''accurately'' lay out the proposed rule's projected requirements. The commenter did not provide an explanation of what it alleged to be inaccurate in the Commission's description. This comment notwithstanding, the NPRM described the proposed rule's projected requirements, including by elaborating on the proposed recordkeeping requirements and providing estimates regarding the anticipated recordkeeping time and resource obligations for programmers, clerical staff, sales managers, and compliance officers.[511] The NPRM also provided a detailed

description of the recordkeeping requirements for entities to be covered by the Rule.[512]

(e) Duplicative, Overlapping, or Conflicting Federal Rules

An industry association commenter argued that the Commission failed to identify relevant Federal rules that may duplicate, overlap, or conflict with the proposal. This commenter's arguments that the proposed rule conflicts with Federal statutes are addressed in the section-by-section analysis in SBP III. Commenters provided no examples of actual conflicts between the proposals and Federal law. Further, there is no evidence that duplicative laws prohibiting misrepresentations or unfair acts or practices have harmed consumers or competition. Moreover, the additional remedies provided by the Final Rule will benefit consumers who encounter conduct that is already illegal and will assist law-abiding dealers that presently lose business to competitors that act unlawfully.

(f) Description of Any Significant Alternatives to the Proposed Rule Which Accomplish the Stated Objectives of Applicable Statutes and Which Minimize Any Significant Economic Impact of the Proposed Rule on Small Entities

Statutory examples of ''significant alternatives'' include different requirements or timetables that take into account the resources available to small entities; the clarification, consolidation, or simplification of compliance and reporting requirements under the Rule for small entities; the use of performance rather than design standards; and an exemption from coverage of the Rule, or any part thereof, for small entities.[513] Comments from SBA Advocacy and from a national industry association argued that the Commission did not set forth alternatives to the proposed rule.[514]

In its Regulatory Flexibility Act compliance guidance to Federal agencies, the SBA Office of Advocacy provides that, ''[i]f an agency is unable to analyze small business alternatives separately, then alternatives that reduce the impact for businesses of all sizes must be considered.'' [515] As the

---

[505] One industry group argued that the majority of the FTC's enforcement actions have pertained to deceptive advertising, and few have alleged unlawful conduct involving add-ons. The Commission agrees that many of its actions have alleged deceptive pricing. In focusing on certain actions that involved allegations that dealers placed unauthorized charges for add-ons, however, the commenter leaves out other unlawful conduct related to add-ons. Such conduct includes, for example, misrepresentations regarding the pricing of add-ons (Complaint ¶¶ 6–12, *TT of Longwood, Inc.,* No. C–4531 (F.T.C. July 2, 2015)), or failing to disclose that mandatory add-ons were included in the cost of credit (Consent Order ¶¶ 73–75, *Y King S Corp.,* CFPB No. 2016–CFPB–0001 (Jan. 21, 2016)). In addition, unauthorized charges are likely to go unnoticed by consumers, which can hamper enforcement efforts. *See, e.g.,* Auto Buyer Study, *supra* note 25, at 14 (describing several study participants who thought they had not purchased add-ons, or that add-ons were free, and only learned during the study that they were charged for add-ons).

[506] *See AMG Cap. Mgmt., LLC* v. *Fed. Trade Comm'n,* 141 S. Ct. 1341 (2021).

[507] NPRM at 42035.

[508] *Id.* at 42035. The Commission explained that, because of the relative size of the automobile

market compared to other types of motor vehicle dealers, and the greater availability of relevant information for this market, its NPRM analysis exclusively considered automobile dealers. The Commission invited submissions of market information for other types of motor vehicles such as boats, RVs, and motorcycles that would allow expansion of the scope of its analysis. *See* NPRM at 42035–36.

[509] U.S. Census Bureau, ''All Sectors: County Business Patterns, Including ZIP Code Business Patterns, by Legal Form of Organization and Employment Size Class for the U.S., States, and Selected Geographies: 2021,'' *https://data.census.gov/table?q=CB2100CBP&n=44111:44112&tid=CBP2021.CB2100CBP&nkd=EMPSZES–001,LFO–001* (listing 21,622 establishments for ''[n]ew car dealers,'' NAICS code 44111, and 25,649 establishments for ''[u]sed car dealers,'' NAICS code 44112).

[510] *See* SBP VI.A.2.

[511] NPRM at 42035; *see also id.* at 42033–34 (describing recordkeeping requirements and analyzing cost burden). To avoid duplicative or unnecessary analysis, the information required by the IRFA can be provided with or as part of any other analysis required by any other law. 5 U.S.C. 605(a).

[512] *See* NPRM at 42027, 42035 (enumerating records to be retained and time period for retention).

[513] *See* 5 U.S.C. 603(c)(1)–(4).

[514] Comment of SBA Advocacy, Doc. No. FTC–2022–0046–6664.

[515] Off. of Advoc., U.S. Small Bus. Admin., ''A Guide for Government Agencies: How to Comply with the Regulatory Flexibility Act'' 39 (2017), *https://advocacy.sba.gov/wp-content/uploads/2019/06/How-to-Comply-with-the-RFA.pdf.*

Commission explained in its NPRM, it "envisioned and drafted this Rule mindful that most motor vehicle dealers are small entities," and drafted its proposal in the first instance to minimize economic impact on all motor vehicle dealers.[516] For example, the Rule prohibits conduct that already violates the FTC Act, but still takes steps to minimize burdens for dealers of all sizes, by, for example, allowing records to be kept in any legible form already kept in the ordinary course of business, and by limiting recordkeeping requirements to twenty-four months from the date the record is created despite the fact that motor vehicle financing terms are generally years longer than this period. Commenters generally appear to understand the relevant market in a similar manner. For instance, the possible alternatives raised by the comment from SBA Advocacy would apply uniformly to both large and small businesses. These alternatives included excluding vehicle dealers that do not sell automobiles, regardless of the size of the dealer, and creating a carve-out for banks and other financing companies that would cover multi-billion dollar institutions.[517] Comments from SBA Advocacy and a national industry association also discussed the proposed rule's disclosure requirements in an industry-wide manner, not limiting their comments to businesses under any particular size threshold.[518] Nevertheless, the Commission has reviewed these comments carefully, has responded to comments on alternatives in the corresponding sections of its section-by-section analysis, and has determined to modify the definition of "Covered Motor Vehicle" at § 463.2(e) and not to finalize the requirements proposed in §§ 463.4(b) and 463.5(b).[519]

2. Final Regulatory Flexibility Analysis

Although the Commission is certifying that the Rule will not have a significant economic impact on a substantial number of small entities, the Commission has prepared the following FRFA with this Final Rule. In the following paragraphs, the Commission provides the information required for a FRFA: (1) a statement of the need for, and objectives of, the Rule; (2) a statement of the significant issues raised by public comments in response to the IRFA, including any comments filed by the Chief Counsel for Advocacy of the Small Business Administration in response to the proposed rule, the Commission's assessment and response, and any resulting changes; (3) a description of and an estimate of the number of small entities to which the Rule will apply or an explanation of why no such estimate is available; (4) a description of the projected reporting, recordkeeping, and other compliance requirements; and (5) a description of the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes, including a discussion of any significant alternatives for small entities.[520]

(a) Statement of the Need for, and Objectives of, the Rule

The FTC issues this Final Rule to address deceptive and unfair acts or practices during the vehicle buying or leasing process, and to provide an additional enforcement tool to remedy consumer harm and assist law-abiding dealers. As detailed in SBP II.B.1, these deceptive and unfair practices include bait-and-switch tactics, such as dealers advertising deceptively low prices or other deceptive terms to induce consumers to visit the dealership, and charging such consumers additional, unexpected amounts, including after the consumers have invested significant time and effort traveling to, and negotiating at, the dealership premises. At present, consumers may never learn that they are paying substantial unexpected charges, given the complexity and length of the motor vehicle sale, financing, or lease transaction and its attendant contracts and other documents. Law enforcement, outreach and other engagement in this area, as well as the number of consumer complaints each year regarding motor vehicle dealer practices, indicate that unlawful conduct persists despite Federal and State law enforcement efforts.

(b) Issues Raised by Comments, Including Comments by the Chief Counsel for Advocacy of the SBA, the Commission's Assessment and Response, and Any Changes Made as a Result

The comments regarding the IRFA are addressed in SBP VI.B, and the comments regarding the other provisions of the NPRM are discussed in the SBP's section-by-section analysis in SBP III. As noted, the Commission has made certain changes to the Rule after carefully reviewing the comments. These changes include modification of the definition of "Covered Motor Vehicle" at § 463.2(e), removal of the add-on list disclosure requirement in proposed § 463.4(b) and the requirements in proposed § 463.5(b), and removal of the corresponding recordkeeping requirements in proposed § 463.6(a)(2) and (a)(4).

(c) Description and Estimate of the Number of Small Entities to Which the Final Rule Will Apply or an Explanation of Why No Such Estimate Is Available

The Final Rule applies to covered motor vehicle dealers, as defined in § 463.2(f), of covered motor vehicles at § 463.2(e): "any self-propelled vehicle designed for transporting persons or property on a public street, highway, or

---

[516] NPRM at 42036–37; *see also id.* at 42029–30 (indicating, in Questions for Comment 26.b, 28.a, & 30 that the Commission was considering alternative approaches).

[517] *See* Comment of SBA Advocacy, Doc. No. FTC–2022–0046–6664 at 4–6. As addressed in SBP III.C.2(a) and SBP III.E.2(c), in responding to a similar comment by financial institutions, the Final Rule does not change the status quo regarding the responsibilities of contract assignees or other subsequent holders of motor vehicle financing under the Holder Rule, and the Commission declines to create a safe harbor for contract assignees where it did not previously exist.

Similarly, one comment recommended that the Commission add a rule provision authorizing an alternative compliance mechanism, stating that such a provision would aid not just smaller entities but larger entities as well. Under this alternative mechanism, independent accountability organizations could apply to the Commission for authorization to review and assess auto dealers' adherence to a set of rule compliance guidelines that would be created. *See* Comment of BBB Nat'l Programs, Doc. No. FTC–2022–0046–8452 at 1–3. This comment suggested that such an alternative compliance mechanism would have several benefits, including educating industry participants and allowing for industry oversight beyond the capacity of the FTC. The Commission agrees with the goals of educating stakeholders and maximizing resources used to ensure compliance with the Rule but notes that these goals can be furthered without adding alternate mechanisms with as-yet unknown guidelines, that may or may not be sufficient to protect consumers, to the Rule that the Commission is finalizing. The Commission notes that the Rule finalizes certain baseline protections that should already be in place under the law. The Commission encourages stakeholders, such as auto dealer trade associations, BBB, and others, to educate their members and the public about the Rule and encourage compliance, as such groups have done when issuing guidance on other aspects of the law.

[518] Comment of SBA Advocacy, Doc. No. FTC–2022–0046–6664 at 5–6; *see generally* Comment of Nat'l Auto. Dealers Ass'n, Doc. No. FTC–2022–0046–8368. The National Automobile Dealers Association also argues that the Commission should have considered whether to do a rule in the first instance. The NPRM provides a detailed explanation of why, more than a decade after Congress granted the FTC APA rulemaking authority with respect to motor vehicle dealers, and continued enforcement, outreach, and other initiatives, a rule is needed to address ongoing problems related to bait-and-switch tactics and hidden charges.

[519] Separately, the Commission notes that the NPRM identified and solicited comments on alternatives to every substantive requirement, including the areas specifically addressed by the commenters. *See, e.g.,* NPRM at 42028–30 (Q4–7, Q10, Q16, Q28, Q33, Q36–38); *id.* at 42040–41.

[520] 5 U.S.C. 604(a)(1)-(6).

road,'' and, in light of comments received, excludes specific categories as detailed in § 463.2(e).[521] As explained in the Certification,[522] the Commission cannot determine the precise number of small entities to which the Final Rule applies, but census data indicate that the vast majority of the estimated 47,271 dealers covered by the Rule are small entities according to the applicable U.S. Small Business Administrator's relevant size standards.

(d) Description of the Projected Reporting, Recordkeeping, and Other Compliance Requirements

The Final Rule prohibits certain unfair or deceptive acts or practices and contains recordkeeping requirements. The Final Rule contains no reporting requirements.

The Final Rule requires covered motor vehicle dealers to clearly and conspicuously disclose the offering price of a vehicle in certain advertisements and in response to consumer communications. It also requires dealers to make certain other disclosures during the sale, financing, or leasing process. To enforce the Rule and prevent the unfair or deceptive practices prohibited by the Rule, the Rule further requires dealers to retain records necessary to demonstrate compliance with the Rule. Such records include advertising materials and copies of purchase orders and financing and lease documents. The Rule requires such records to be retained for a period of twenty-four months from the date they are created and provides that they may be kept in any legible form, and in the same manner, format, or place as they may already be kept in the ordinary course of business. Further details on these provisions are discussed throughout this SBP, including in the section-by-section analysis of the recordkeeping requirements in § 463.6, as well as in the preceding Paperwork Reduction Act analysis.

(e) Description of the Steps the Commission Has Taken To Minimize the Significant Economic Impact on Small Entities Consistent With the Stated Objectives of Applicable Statutes

The Final Rule addresses certain unfair or deceptive acts or practices in motor vehicle sales, financing, and leasing. In drafting its NPRM, reviewing public comments, and modifying the Rule from its original proposal, the Commission has taken specific steps to avoid unduly burdensome requirements for small entities. The Commission believes that the Final Rule—including the prohibitions against making specific misrepresentations and against charging consumers for any item unless the dealer obtains the express, informed consent of the consumer for the charge—is necessary to protect consumers, including small-business consumers that purchase, finance, or lease motor vehicles. By addressing these practices, the Rule also will benefit competition by preventing law-abiding dealers, many of which are small businesses, from losing business due to unlawful practices by other dealers.

For each provision in the Rule, the Commission has attempted to reduce the burden on businesses, including small entities. For example, the Commission limited the number of disclosures that dealers are required to make under the Final Rule, and in response to comments, further limited such disclosures by determining not to finalize the disclosures in proposed §§ 463.4(b) and 463.5(b). Similarly, the Commission has limited the duration of the Rule's recordkeeping requirements to twenty-four months from the date the relevant record is created, even though this period is far shorter than the length of many financing contracts.

As previously noted, the Commission does not believe the Final Rule imposes a significant economic impact on a substantial number of small entities. Nonetheless, the Commission has taken care to avoid extensive requirements related to form. For example, the Commission does not specify the form in which records required by the Final Rule must be kept. Moreover, the Rule's disclosure requirements do not mandate specific font sizes. In sum, the Commission has worked to minimize any significant economic impact on small businesses.

## VII. Final Regulatory Analysis Under Section 22 of the FTC Act

### A. Introduction

The Federal Trade Commission (FTC) is finalizing a Rule to address unfair or deceptive acts or practices by covered motor vehicle dealers when engaging with consumers who are shopping for covered motor vehicles. The Rule contains several provisions targeted at addressing price-related deception and unfairness for consumers with respect to purchasing, leasing, and financing new and used motor vehicles. The Final Rule prohibits misrepresentations regarding material information about certain aspects of motor vehicles and motor vehicle financing. The Final Rule also mandates certain disclosures about vehicle price, payments, and add-ons, while prohibiting charges for add-on products and services that would not benefit the consumer or for any item unless the dealer obtains the express, informed consent of the consumer for the charge.

Section 22 of the FTC Act, 15 U.S.C. 57b–3, requires the Commission to issue a final regulatory analysis when publishing a final rule. The final regulatory analysis must contain (1) a concise statement of the need for, and objectives of, the final rule; (2) a description of any alternatives to the final rule which were considered by the Commission; (3) an analysis of the projected benefits, any adverse economic effects, and any other effects of the final rule; (4) an explanation of the reasons for the determination of the Commission that the final rule will attain its objectives in a manner consistent with applicable law and the reasons the particular alternative was chosen; and (5) a summary of any significant issues raised by the comments submitted during the public comment period in response to the preliminary regulatory analysis, and a summary of the assessment by the Commission of such issues.

As discussed previously, the FTC issues this Final Rule to address deceptive and unfair acts or practices during the vehicle buying or leasing process, and to provide an additional enforcement tool to remedy consumer harm and assist law-abiding dealers. These deceptive and unfair practices include bait-and-switch tactics, such as dealers advertising deceptively low prices or other deceptive terms to induce consumers to visit the dealership; and charging such consumers additional, unexpected amounts, including after the consumers have invested significant time and effort traveling to, and negotiating at, the dealership premises. At present, consumers may never learn that they are paying substantial unexpected charges, given the complexity and length of the motor vehicle sale, financing, or lease transaction and its attendant contracts and other documents. Law enforcement, outreach, and other engagement in this area, as well as the number of consumer complaints each year regarding motor vehicle dealer practices, indicate that unlawful conduct persists despite Federal and State law enforcement efforts.

In response to public comments, the Commission considered and made a number of revisions from the proposed

---

[521] The Commission is authorized to prescribe rules with respect to a motor vehicle dealer that is predominantly engaged in the sale and servicing of motor vehicles, the leasing and servicing of motor vehicles, or both, as defined in 12 U.S.C. 5519(a).

[522] See SBP VI.A.2.

rule, which in turn have necessitated revisions to the regulatory analysis, resulting in this final regulatory analysis.[523] The most significant revisions to the proposed rule impacting the regulatory analysis are the removal of proposed §§ 463.4(b) (requiring the disclosure of add-on lists) and 463.5(b) (requiring various itemized disclosures relating to undisclosed or unselected add-ons). As a result of the Commission's determination not to finalize these sections of the proposed rule, costs and benefits associated with those provisions have been excluded from the final regulatory analysis. The Commission also has made revisions in response to public comments, the availability of newer data, the identification of additional relevant data, and the application of newer scholarly research. The final regulatory analysis thus builds upon the preliminary regulatory analysis, while incorporating several updates:

• The analysis of consumer time savings has been revised in response to public comments and changes following the NPRM.

• A section quantifying the reduction in deadweight loss resulting from the Rule has been added, based upon recent research that allows the Commission to quantify both how dealer markups will respond to price transparency and how new and used vehicle quantities will respond to changes in price.

• Training costs have been added for some provisions in response to public comments.

• Information systems costs have been added to the Recordkeeping section in response to public comments, based on estimates of how much data

would be required and the cost of cloud or on-premises data storage.

• Wages used to monetize labor costs have been updated to reflect new data from the Bureau of Labor Statistics.

• The number of dealers has been updated to reflect new data from Census County Business Patterns.

• The number of transactions subject to the Rule has been revised in response to public comments, and the Commission's identification of additional data sources that can be used to exclude private party and fleet transactions.

The Final Rule contains requirements in the following areas:

1. Prohibited misrepresentations;

2. Required disclosure of offering price in certain advertisements and in response to inquiry;

3. Required disclosure of total of payments for financing and leasing transactions;

4. Prohibition on charging for add-ons in certain circumstances;

5. Requirement to obtain express, informed consent before any charges; and

6. Recordkeeping.

In the following analysis, we describe the anticipated impacts of the Final Rule. Where possible, we quantify the benefits and costs and present them separately by provision. If a benefit or cost is quantified, we indicate the sources of the data relied upon. If an assumption is needed, the text makes clear which quantities are being assumed.

A period of 10 years is used in the baseline scenario because FTC rules are generally subject to review every 10 years.[524] Quantifiable aggregate benefits

and costs across three different sets of assumptions are summarized as the net present value over this 10-year time frame in Table 1.1. Quantifiable benefits include time savings from a more efficient shopping and sales process and a reduction in deadweight loss, both of which ultimately result from greater transparency under the Rule. Quantifiable costs primarily reflect the resources expended by automobile dealers in developing the systems necessary to comply with the provisions of the Rule. In addition, we expect additional benefits and costs that we are presently unable to quantify. Among the unquantified benefits are time savings that accrue to individuals who abandon vehicle transactions entirely; additional time savings on activities that individuals engage in digitally under the status quo; reductions in deadweight loss resulting from direct price effects in the markets for used vehicles or vehicle add-ons; and the benefit of reduced stress, discomfort, and unpleasantness experienced by motor vehicle consumers under the status quo. Among the unquantified costs would be any potential reductions in consumer information resulting from changes in dealers' policies regarding marketing and advertisements. The discount rate reflects society's preference for receiving benefits earlier rather than later; a higher discount rate is associated with a greater preference for benefits in the present. The present value is obtained by multiplying each year's net benefit by a discount factor a number of times equal to the number of years in the future the net benefit accrues.[525]

TABLE 1.1—PRESENT VALUE OF NET BENEFITS (IN MILLIONS), 2024–2033

| | Low estimate | | Base case | | High estimate | |
|---|---|---|---|---|---|---|
| | 3% Discount rate | 7% Discount rate | 3% Discount rate | 7% Discount rate | 3% Discount rate | 7% Discount rate |
| *Benefits:* | | | | | | |
| Time Savings .................................... | $7,463 | $6,145 | $14,926 | $12,290 | $24,036 | $19,790 |
| Deadweight Loss Reduction ............. | 568 | 468 | 1,298 | 1,069 | 2,307 | 1,899 |
| Total Benefits .............................. | 8,031 | 6,613 | 16,224 | 13,359 | 26,343 | 21,690 |
| *Costs:* | | | | | | |
| Finance/Lease Total of Payments Disclosure ..................................... | 296 | 246 | 296 | 246 | 117 | 98 |
| Offering Price Disclosure .................. | 46 | 46 | 46 | 46 | 0 | 0 |
| Prohibition re: Certain Add-ons & Express, Informed Consent .......... | 475 | 406 | 475 | 406 | 147 | 128 |

[523] These revisions and alternatives the Commission considered are described in detail in the Commission's Statement of Basis and Purpose, as is the Commission's explanation why the Final Rule will attain its objectives in a manner consistent with applicable law.

[524] *See* Fed. Trade Comm'n, Notification of Intent to Request Public Comment, Regulatory Review

Schedule, 87 FR 47947 (Aug. 5, 2022), *https:// www.govinfo.gov/content/pkg/FR-2022-08-05/pdf/ 2022-16863.pdf*.

[525] While whole calendar years are used here for ease of reference, this analysis estimates costs and benefits over a ten-year period running from the Rule's effective date. For the purposes of discounting, the Commission assumes that any

upfront costs or benefits occur immediately upon the effective date of the Rule and are therefore not discounted. The Commission further assumes that ongoing costs and benefits occur at the end of each period, such that even ongoing costs/benefits that occur in year 1 are discounted.

TABLE 1.1—PRESENT VALUE OF NET BENEFITS (IN MILLIONS), 2024–2033—Continued

|  | Low estimate | | Base case | | High estimate | |
|---|---|---|---|---|---|---|
|  | 3% Discount rate | 7% Discount rate | 3% Discount rate | 7% Discount rate | 3% Discount rate | 7% Discount rate |
| Prohibition on Misrepresentations .... | 157 | 130 | 157 | 130 | 0 | 0 |
| Recordkeeping ................................. | 296 | 248 | 296 | 248 | 296 | 248 |
| Total Costs .................................. | 1,270 | 1,075 | 1,270 | 1,075 | 559 | 474 |
| Net Benefits .............................. | 6,761 | 5,538 | 14,954 | 12,284 | 25,784 | 21,216 |

**Note:** ''Low Estimate'' reflects all lowest benefit estimates and high cost scenarios and ''High Estimate'' reflects all highest benefit estimates and low cost scenarios. ''Base Case'' reflects base case benefit estimates and high cost scenarios. Not all impacts can be quantified; estimates only reflect quantified costs and benefits.

*B. Estimated Benefits of Final Rule*

In this section, we describe the beneficial impacts of the Rule, by (1) providing quantitative estimates where possible, (2) identifying quantitative benefits that cannot be estimated at this time due to a lack of data, and (3) describing benefits that can only be assessed qualitatively. The benefits cut across multiple areas addressed by the Rule and these benefits are impossible to identify separately by area. As a result, we enumerate the benefits of the Rule not by provision, but by category.

1. Consumer Time Savings When Shopping for Motor Vehicles

Several provisions of the Rule would benefit consumers by saving them time as they complete motor vehicle transactions. Required disclosures of relevant prices and prohibitions of misrepresentations, *inter alia*, would save consumers time when shopping for a vehicle by requiring the provision of salient, material information early in the process and eliminating time spent pursuing misleading offers. The Commission's enforcement record shows that consumer search and shopping is sometimes influenced by unfair or deceptive advertising that draws consumers to a dealership in pursuit of an advertised deal, only to find out at some point later in the process (if at all) that the advertised deal is not actually available to them.[526] This bait-and-switch advertising has the effect of wasting consumers' time traveling to and negotiating with unscrupulous dealerships, time which would otherwise be spent pursuing truthful offers in the absence of deception and unfairness. If consumers are faced with hard constraints on their time or other resources, this wasted time may mean that they are unable to find the deal that best fits their needs and preferences. Additionally, motor vehicle consumers frequently begin the process

of shopping for a motor vehicle (*e.g.,* by visiting a dealership in response to an ad or initiating negotiations in response to a quoted price that is incomplete) and then later abandon the nascent transaction entirely when additional information is revealed. In these instances, consumers do not purchase or lease a vehicle at all. The Rule would also save consumers time by avoiding these abandoned transactions. However, because the Commission has been unable to identify data to determine the quantity of such abandoned transactions and the amount of time spent pursuing them, this benefit remains unquantified in the analysis.

Obviously, many consumers end up purchasing and leasing vehicles under the status quo—either because full revelation of prices and terms still results in a mutually beneficial transaction or because full revelation never occurs and consumers are deceived into completing a transaction that is not mutually beneficial. These consumers also spend additional, unnecessary time discovering information that dealers would be required to disclose earlier once the Rule is in effect. The Commission expects the Rule's required disclosures and prohibitions against misrepresentations to improve information flows and consumer search efficiency, including but not limited to, addressing the influence of deception and unfairness on consumer search and shopping behavior.

The Commission's preliminary analysis estimated that the proposed rule would allow consumers to spend 3 fewer hours completing each motor vehicle transaction and result in (quantifiable) overall time savings valued at between $30 billion and $35 billion. In this final regulatory analysis, the Commission takes into account the effects of revisions to the proposed rule and additional data, addresses industry comments, and employs an alternative analytical approach with a sensitivity

analysis. This sensitivity analysis reflects a ''high-end'' estimate that consumers will save as many as 3.3 hours per completed transaction; a ''base case'' estimate—representing the most likely scenario—that consumers will save 2.05 hours per transaction; and a possible ''low-end'' savings estimate of 1.02 hours. Using a 7% discount rate, these time savings estimates result in a range of between $6.1 billion and $19.8 billion in total savings, with a base case of $12.3 billion.

In its preliminary analysis, the Commission relied on results from the 2020 Cox Automotive Car Buyer Journey study, which showed that consumers spent roughly 15 hours researching, shopping, and visiting dealerships for each motor vehicle transaction.[527] Based on the proposed rule provisions prohibiting misrepresentations and requiring price transparency, the Commission assumed each consumer who consummated a vehicle transaction would spend 3 fewer hours shopping online, corresponding with dealerships, visiting dealer locations, and negotiating with dealer employees. The 3 hours corresponded to 20% of an average consumer's time spent on such activities in 2019 (pre-COVID).

The Commission received a number of comments emphasizing the unnecessary time consumers must spend to ascertain the price and terms when attempting to consummate a vehicle transaction. One group of commenters, for example, asserted that ''[t]he most important factor for consumers purchasing a vehicle is its price, yet the price is almost impossible to ascertain without spending hours at the dealership.''[528] Another group of commenters provided a compilation of numerous consumer complaints, including many that described consumers spending hours at a

---

[526] *See* SBP II.B–C.

[527] NPRM at 42037 & n.180.

[528] Comment of Am. for Fin. Reform et al., Doc. No. FTC–2022–0046–7607.

dealership trying to ascertain the final price and terms of the transaction.[529] The improved information flow under the Final Rule will provide quantifiable benefits for consumers by reducing or eliminating this unnecessary need to spend time penetrating opaque pricing and terms, and will provide qualitative benefits by reducing frustration and stress in the car buying process.

Some industry commenters questioned the appropriateness of the data and assumptions used to quantify the time savings benefit. A number of industry association commenters argued that the 15-hour figure did not represent a reasonable base from which time savings attributable to the Rule could be derived. One such commenter criticism asserted that the publication from which it was sourced only surveyed consumers who used the internet during research and shopping and therefore could not be representative of the time spent by consumers who do not use the internet. Still other commenters noted that additional data from the same organization were available. The Commission disagrees that the 15-hour estimate is an unreasonable base from which to derive time savings from the Rule. While the Cox Automotive Study acknowledges only internet users were surveyed, the study also indicates its ''[r]esults are weighted to be representative of the buyer population.'' [530] Also, while more recent data were available at the time of the analysis for the NPRM, those data were from an extraordinary period (the COVID–19 pandemic). The Commission expects that the data used for the preliminary analysis are more representative of consumer experiences over the analysis window than the more recent data. While not dispositive, the limited data available since the NPRM was published bears this hypothesis out. In the 2021 Cox Automotive Car Buyer Journey Study, consumers spent roughly

12-and-a-half hours researching, shopping, and visiting dealerships for each motor vehicle transaction.[531] In contrast, in the 2022 Car Buyer Journey study, consumers spent roughly 14-and-a-half hours researching, shopping, and visiting dealerships for each motor vehicle transaction.[532] This admittedly short trend suggests that the COVID–19 pandemic had a significant effect on motor vehicle shopping, reducing the amount of time the typical consumer spent on these activities, and that time spent on these activities has already rebounded to previous levels.[533]

Another industry association commenter suggested that the figure included categories of time use that could not conceivably be affected by the proposed rule, such as online research into vehicle features, and that attention should be restricted to time spent shopping. The Commission finds that several provisions in the Rule clearly have the potential to reduce time spent across most categories covered by the 15-hour figure, including the largest category (''Researching and Shopping Online''). This category of time use would include comparing listed vehicle prices across dealerships that, under the Rule, would be transparent and comparable in a way that they were not in the status quo, thus saving consumers time.

Some commenters also noted that the total base of transactions reported in the preliminary analysis appeared to overstate the number of transactions to which the proposed rule would apply. First, commenters asserted that the 62.1 million transactions double-counted new vehicle leases in the data source from which it was obtained (2019 National Transportation Statistics, Table 1–17). Second, commenters asserted that the number included private party transactions that would be entirely unaffected by the proposed rule. Finally, commenters argued that the transactions number contained wholesale and fleet transactions, where the amount of time spent researching, shopping, and visiting dealers is likely to be substantially different relative to a household consumer.

The Commission has verified that the source data were revised to fix the erroneous double-counting of leases

between the time they were accessed by the Commission for the drafting of the preliminary analysis and the time that comments were received. The final analysis uses the revised data. In addition, in response to comments that private party transactions should be excluded from the analysis, the Commission is revising its analysis. Additional data would be necessary to quantify any time savings benefits for wholesale and fleet transactions. Accordingly, the Commission has excluded all transactions occurring through non-retail channels from the final analysis.[534]

A number of comments raised concerns about the foundations of the 3-hour time-savings assumption. One industry organization noted that the Cox Automotive study cited in the NPRM does not itself address the proposals in the NPRM (which the survey, of course, predated) and does not estimate time savings.[535] Another organization

[529] Comment of Consumer Reps. et al., Doc. No. FTC–2022–0046–7520 at 3, 11, 12, 16, 38 (including story from Illinois consumer describing ''[spending] about 4 hours at the dealership while the salesman kept changing the terms of the deal . . . .''; story from Connecticut consumer describing how, ''[a]fter nearly three hours of paperwork . . . I was finally presented with the official bill to pay the balance. The price was now higher than the original adjusted sticker.''; story from New Jersey consumer describing how, ''[a]fter 4 hours of negotiations . . . I finally got nearly the same price as the verified offer [for the vehicle] but about $1000 less on my trade-in[ ] (that was also part of the verified offer). The [dealer] also added on Accessories 'other products' [of] $474.00 . . . .''; story from Texas consumer describing how ''[t]he [dealership] finance manager kept me there for two hours, and said the deal was done. I went to get my wife, when we got back the price had gone up $3,000.00.'').

[530] 2020 Cox Automotive Car Buyer Journey, *supra* note 25, at 1.

[531] *See* 2021 Cox Automotive Car Buyer Journey Study, *supra* note 504, at 16.

[532] *See* 2022 Car Buyer Journey, *supra* note 25, at 6.

[533] Interestingly, consumer satisfaction with the car buying process, as measured by this same survey, was highest during the COVID–19 pandemic when the time spent on research, shopping, and visiting dealerships was lowest, and has since dropped back to pre-pandemic levels. 2022 Car Buyer Journey, *supra* note 25, at 5.

[534] When the transaction volume from the preliminary analysis is applied to the Commission's current methodology and sensitivity analysis, time savings under the Final Rule ranges from a high-end of $35 billion to a low-end of $11 billion, with a base case of $22 billion (assuming a 7% discount rate). In comparison, the preliminary analysis computed savings under the proposed rule as approximately $31 billion (also assuming a 7% discount rate). The residual difference in base case savings is attributable to less time saved per transaction—partially explained by additional provisions in the NPRM that the Commission is not finalizing—as well as to updates to the underlying wages used to monetize the consumer time savings.

[535] This same organization commissioned a study that was recently released asserting the proposed rule would lead to an increase in consumer transaction time. This survey, however, had numerous methodological shortcomings rendering its results unreliable. For example, the survey presented each respondent at the outset with a leading statement telling them the rule would impose ''new duties [that] are expected to create additional monitoring, training, forms, and compliance review responsibilities as well as a modification of record keeping systems and coordination with outside IT and other vendors'' and ''increase the time of a motor vehicle transaction, inhibit online sales, limit price disclosures, and increase customer confusion and frustration.'' Edgar Faler et al., Ctr. for Auto. Rsch., ''Assessment of Costs Associated with the Implementation of the Federal Trade Commission Notice of Proposed Rulemaking (RIN 2022–14214), CFR part 463'' 34–36 (2023), *https:// www.cargroup.org/wp-content/uploads/2023/05/ CAR-Report_CFR-Part-463_Final_May-2023.pdf* (introductory instructions on the survey instrument sent to respondents). Moreover, the survey started with a sample size of 60 dealers (*id.* at 7) in an industry with an estimated 46,525 dealers, NPRM at 42,031 & n.154, but only 40 dealers actually completed responses to many key questions (*id.* at 29). The survey does not describe how these 40–60 dealers were chosen. Although the survey estimates that the proposed rule would require consumers to spend additional time on motor vehicle transactions, this conclusion is based on the responses of just 40 dealers and included no consumers. *Id.* at 29–32. Moreover, the survey report attributed much of this estimated increase to

Continued

expressed confusion as to whether the assumption was intended as a flat 3-hour time savings or a 20% time savings, asserting that dynamism in automotive retailing will likely lead to evolution in the total amount of time spent shopping.

While the Commission believes its 3-hour time-saving assumption in the NPRM remains reasonable, the Commission has conducted additional analyses, the results of which demonstrate the positive net benefits of the Rule even when applying more conservative assumptions around time savings and adjusting for the removal of certain proposed provisions from the NPRM.[536] Using recent figures from Cox Automotive's Car Buyer Journey 2019 study, the Commission notes that consumers who do various activities in the vehicle buying process digitally ("digital consumers") save time at the dealership relative to those who do not ("non-digital consumers").[537] The Commission's revised base case time savings calculation assumes that only the fraction of consumers who are not currently shopping digitally will experience time savings, and that these savings will be proportional to the time savings found in the Car Buyer Journey 2019 study for digital consumers.[538] Because the Commission expects the provisions of the Rule to emulate some of the time-saving features of completing these activities digitally, the time savings benefits of the Rule are assumed to be a proportion of the time saved by status quo digital consumers, with the proportion determined by how closely the status quo digital shopping experience is expected to resemble the shopping experience for all consumers once the Rule is in effect. Additionally, because these numbers only reflect time saved at the dealership of purchase, we assume that these same consumers will also save time on these activities to the extent that they are initiated at dealerships visited prior to the dealership at which they purchase ("non-purchase dealerships"). Based on 2020 data from Cox Automotive, the average consumer visits 1 non-purchase dealership for each transaction.[539] Table 2.1 documents both the fraction of consumers performing activities digitally under the status quo and the time saved at the dealership by these consumers on each activity.

TABLE 2.1—COMPLETING ACTIVITIES DIGITALLY

| Activity | % of Consumers digital (2020 digitization) | Time saved at dealership (2019 journey) (minutes) |
|---|---|---|
| Negotiating the Purchase Price | 20 | 43 |
| Select F&I Add-Ons | 18 | 33 |
| Discussing and Signing Paperwork | 13 | 45 |
| Get a Trade-In Offer | 31 | 26 |

Source: Car Buyer Journey 2019 and Digitization of End-to-End Retail.

Based on the description of these activities and the anticipated effects of the Rule, our base case estimates assume that non-digital consumers will save an amount of time negotiating a vehicle purchase price equal to the amount of time saved by those negotiating purchase price digitally under the status quo (43 minutes). For non-digital consumers, it is currently time-consuming to obtain comparable price quotes from dealerships. Many dealerships will not initiate price negotiations in earnest without a competing price quote in writing, which can only be obtained by visiting a dealership for the non-digital consumer. Mandating offering price disclosures—which are comparable across dealerships by definition—early in the shopping process will emulate the price discovery function of negotiating prices online, in which comparable price quotes can be obtained (with effort) via email.[540]

The Commission anticipates that the impact of the Rule on time spent selecting F&I add-ons and discussing and signing paperwork will be moderate. In our base case estimates, non-digital consumers will save an amount of time doing these activities equal to the half the amount of time saved by those doing these activities digitally under the status quo ($33 \times 0.5 = 16.5$ minutes and $45 \times 0.5 = 22.5$ minutes, respectively). Time saved selecting add-ons flows primarily from the prohibitions on various misrepresentations, the mandatory disclosures regarding whether add-ons are required, and the prohibition on charging for add-ons under certain circumstances.[541] Time saved discussing and signing paperwork also flows from the prohibitions on various misrepresentations, several disclosures mandated by the Rule, and the

---

proposed rule provisions that are not in the Final Rule. *Id.* at 25.

[536] In fact, the sensitivity analysis in Table 2.3 of this final regulatory analysis presents a range of reasonable estimates for time savings that includes the 3-hour time-saving assumption from the preliminary analysis in the NPRM.

[537] Cox Auto. et al., "Car Buyer Journey 2019" (2019) [hereinafter Car Buyer Journey 2019], *https://www.coxautoinc.com/wp-content/uploads/2019/06/2019-Car-Buyer-Journey-Study-FINAL-6-11-19.pdf.* While Cox Automotive has released subsequent Car Buyer Journey studies, none of these subsequent studies quantify time savings from shopping digitally. In addition, to the extent that shoppers compensate by spending more time at home on these activities, these time savings should be reduced to reflect *net* time savings from performing these activities digitally. We believe that the nature of performing these activities digitally vs. at the dealership suggests these offsets should be small.

[538] The 2020 Cox Automotive Digitization of End-to-End Retail study reports the fraction of consumers who are already engaging in various activities online under the status quo. Cox Auto., "Digitization of End-to-End Retail" (2021) [hereinafter Digitization of End-to-End Retail], *https://www.coxautoinc.com/wp-content/uploads/2021/01/2020-Digitization-of-End-to-End-Retail-Study-FINAL.pdf.* While the activities listed across studies do not match perfectly, we map the activity categories to the closest corresponding activity in the other study and, in our final analysis, exclude from the time savings calculation the percentage of transactions corresponding to the fraction of consumers already engaging in that activity online. While it is likely that consumers shopping digitally under the status quo will also experience some additional time savings under the Rule, there is insufficient data to estimate this marginal savings and so we leave this benefit unquantified in the analysis.

[539] 2020 Cox Automotive Car Buyer Journey, *supra* note 25, at 15 (noting an average of 2.2 dealerships visited among new car buyers).

[540] Shoppers who negotiate purchase price digitally under the status quo will likely also obtain time savings from mandatory offering price disclosures, corresponding to the time and effort they put into contacting and exchanging email with dealerships. We lack sufficient data on the time spent on these activities to quantify these benefits, however.

[541] *See* §§ 463.3(a), (b), and (f); 463.4(c); and 463.5(a) and (c). The Commission notes that time savings would likely be higher in this category had it determined to finalize proposed § 463.4(b), which would have required disclosure of an add-on list.

prohibition on charging for items without express, informed consent.[542] For non-digital consumers, considerable time must be spent at the dealership both closely reviewing paperwork (*e.g.,* to ensure that unwanted optional add-ons are not being added to the transaction; to ensure that the financing terms, including monthly payments, total payments, and term length, are as expected; and to confirm that terms in the contract generally conform to what was discussed) and waiting for sales and F&I staff at the dealership to consult with managers and revise paperwork as needed. Digital consumers, however, may have access outside the dealership to add-on menus where they can select their desired F&I products affirmatively without worry that dealership staff will misrepresent the products or pressure them into selecting something unwanted. In addition, digital consumers may receive and review paperwork before arriving at the dealership. This way, any necessary revisions can be performed by the dealership asynchronously so that the consumer is free to spend that time as they wish instead of being stuck in an F&I office. The noted Rule provisions will give consumers confidence that the add-on options presented to them are non-deceptive and the contract paperwork they are asked to review will not yield any unpleasant surprises. As a result, on average they will neither need to engage in such close scrutiny of their contract documents, nor spend as much time waiting for dealership staff to speak to managers or make changes as the first draft will be more likely to conform to their expectations.[543]

The Commission assumes that the Rule will likely not assist consumers much (if at all) in reducing time spent obtaining a trade-in offer. In our base case estimates, we assume non-digital consumers will not save additional time on obtaining a trade-in offer under the Rule. There are various provisions in the Rule that touch trade-in offers made by dealerships [544] and may increase consumer confidence in dealer contracts as discussed previously. In addition, trade-in values are an important piece of transaction pricing, so greater price transparency may save consumers time on the trade-in aspect of transactions

that involve them. There is a concern, however, that dealers may spend more time trying to extract maximum value out of any given trade-in opportunity once the Rule is in effect. Because the Commission believes that greater transparency in vehicle pricing and add-ons will lead to reduced markups on these products (*see* ''Reductions in Deadweight Loss''), it is possible that dealers will attempt to make up these lost profits by maximizing trade-in margins, which may lead to increased time spent on negotiations. Since we do not have sufficient data to determine the balance of these two effects, we assume in the base case that they offset. In sensitivity analyses where we explore alternative assumptions, note that time savings from this activity only apply to the roughly 50% (by one estimate) of vehicle purchase transactions at dealerships where consumers trade in a vehicle.[545]

Finally, data from the 2021 Cox Automotive Car Buyer Journey Study reveal that consumer time spent at non-purchase dealerships is roughly 82% of the time spent at the dealership of purchase.[546] Additionally, the average consumer visits 1 non-purchase dealership for each transaction, so under the dual assumptions that (1) the proportions of time spent at dealerships across these activities is consistent across purchase and non-purchase dealerships and (2) the noted time savings are constant as a fraction of time spent, we multiply the time savings numbers by this ratio to obtain the additional time saved at non-purchase dealerships.

Proceeding as in the preliminary analysis, we assume that motor vehicle purchase, financing, and lease transactions will be stable at the 2019 level of 57.9 million transactions per year.[547] As discussed previously, the final analysis excludes private party, fleet, and wholesale transactions. According to Edmunds Automotive Industry Trends 2020, 19.3% of new

vehicle sales in 2019 were fleet sales.[548] This fraction of the 17.1 million new vehicle sales and leases in the data are excluded from the analysis. An Automotive News article from January 2023 (citing data from Cox Automotive) states that 48% of all used vehicle sales occurred outside of the retail channel.[549] As with new vehicle sales, this fraction of the 40.8 million used vehicle transactions in the data are excluded from the analysis. Adding up the covered transactions (35 million) [550] and applying the time savings calculated from the base case assumptions, we anticipate that the Rule will generate a total time savings of more than 72 million hours per year. According to the Bureau of Labor Statistics Occupational Employment Statistics, the average hourly wage of U.S. workers in 2021 was $29.76, and recent research suggests that individuals living in the U.S. value their non-work time at 82% of average hourly earnings.[551] Thus, the value of non-work time for the average U.S. worker would be $24.4 per hour. As a result, our final analysis refines the estimate to a present value of between $12.3 billion and $14.9 billion as described in Table 2.2, which translates to savings of roughly $1.75 billion per year.[552]

---

[542] *See* §§ 463.3; 463.4(c), (d), and (e); and § 463.5(c).

[543] Again, status quo digital shoppers will likely obtain time savings on these activities as well, to the extent that their paperwork will also be less likely to require close scrutiny and revisions. We lack sufficient data on the time spent on these activities to quantify these benefits, however.

[544] *See* § 463.3(i) and (j); 463.4(d).

[545] *See* Progressive, ''Consumers embrace online car buying,'' *http://www.progressive.com/resources/insights/online-car-buying-trends/* (last visited Dec. 5, 2023).

[546] *See* 2021 Cox Automotive Car Buyer Journey Study, *supra* note 504, at 16 (noting total time of 2:09 spent ''Visiting Other Dealerships/Sellers'' and total time of 2:37 spent ''With the Dealership/Seller Where Purchased'').

[547] *See* U.S. Dep't. of Transp., Off. of the Sec'y of Transp., Bureau of Transp. Stat., ''National Transportation Statistics 2021, 50th Anniversary Edition'' 21 (2021), *https://www.bts.dot.gov/sites/bts.dot.gov/files/2021-12/NTS-50th-complete-11-30-2021.pdf* (Table 1–17).

[548] *See* Edmunds, ''Automotive Industry Trends 2020'' 7 (2020), *https://static.ed.edmunds-media.com/unversioned/img/industry-center/insights/2020-automotive-trends.pdf.*

[549] *See* Auto. News, ''Used-vehicle volume hits lowest mark in nearly a decade'' (Jan. 13, 2023), *https://www.autonews.com/used-cars/used-car-volume-hits-lowest-mark-nearly-decade* (estimating 19,100,000 of used vehicle sales in the year 2022 occurred within the retail channel). The same Automotive News source reports a total used vehicle sales number of approximately 40 million for 2019. *Id.* The conclusions of the analysis are robust to using this total figure instead.

[550] A recent report by the Center for Automotive Research estimates that there approximately 43 million non-fleet, non-private party sales in 2019 based on privately sourced data. Edgar Faler et al., Ctr. for Auto. Rsch., ''Assessment of Costs Associated with the Implementation of the Federal Trade Commission Notice of Proposed Rulemaking (RIN 2022–14214), CFR part 463'' 5 (2023), *https://www.cargroup.org/wp-content/uploads/2023/05/CAR-Report_CFR-Part-463_Final_May-2023.pdf.* While this would result in a savings estimate approximately 22% higher, the Commission relies on its analysis of the publicly available data described herein.

[551] Daniel S. Hamermesh, ''What's to Know About Time Use?'' 30 J. Econ. Survs. 198, 201 (2016), *https://onlinelibrary.wiley.com/doi/epdf/10.1111/joes.12107.*

[552] Note that we assume only one consumer is involved in each transaction; to the extent that multiple members of a household may visit dealerships for each transaction, these calculations are likely to underestimate the total time savings.

TABLE 2.2—ESTIMATED BENEFITS OF TIME SAVINGS FOR COMPLETED TRANSACTIONS

|  |  | 2024–2033 |
|---|---|---|
| Completed Transactions |  |  |
| *Avg. minutes saved at dealership of purchase/other dealers (by activity):*[a] |  |  |
| Negotiating the Purchase Price | | 34/28 |
| Select F&I Add-Ons | | 14/11 |
| Discussing and Signing Paperwork | | 20/16 |
| Get a Trade-In Offer | | 0/0 |
| Hours saved per transaction | | 2.05 |
| Number of covered vehicle transactions per year[b] | | 34,986,253 |
| Value of time for vehicle-shopping consumers[c] | | $24.40 |
| Abandoned Transactions |  | *Unquantified* |
| Total Quantified Benefits (in millions) | 3% discount rate | $14,926 |
| Total Quantified Benefits | 7% discount rate | $12,290 |

**Note:** Benefits have been discounted to the present at both 3% and 7% rates.

[a] Averages are across all retail transactions; transactions where consumers performed activity digitally under the status quo will have a time savings of 0 for that activity.

[b] For total volume, National Transportation Statistics Table 1–17. For retail/non-fleet fraction, Edmunds Automotive Industry Trends 2020 (for new vehicles), *supra* note 548548, and Cox Automotive via Automotive News (for used vehicles), *supra* note 549549.

[c] BLS Occupational Employment Statistics (May 2022) and Hamermesh (2016).

Due to the uncertainty surrounding how the Rule will translate into time savings for consumers and to which activities it will most strongly apply, we explore a range of alternative assumptions regarding what fraction of the documented time savings digital consumers experience will be received by non-digital consumers under the Rule. In our low-end scenario, we assume that the Rule will result in half the consumer time savings of the base case. In our high-end scenario, we assume that all the time savings experienced by digital consumers under the status quo—including time saved getting a trade-in offer—will be received by non-digital consumers under the Rule. The low-end assumptions correspond to a total time savings of more than 35.85 million hours per year while the upper bound assumptions correspond to a total time savings of more than 115.47 million hours per year. The results of this analysis are presented in Table 2.3. Importantly, over the whole range of these alternative assumptions we find that benefits exceed costs. In fact, holding other benefit and cost estimates constant, the time savings generated by the Rule could be *de minimis* and the implied benefits would still exceed the costs. While there are some activities in the car buying process that the Rule may not affect (*e.g.,* test driving vehicles, etc.), the data discussed suggest that there is ample room for the Rule to eliminate unnecessary time across various activities. And even though digital consumers spend less time on these activities, results across several studies suggest that this reduction in time leads to a better experience for consumers.[553]

TABLE 2.3—SENSITIVITY ANALYSIS OF TIME SAVINGS

|  |  | Low end | Base case | High end |
|---|---|---|---|---|
| *Avg. minutes saved at dealership of purchase/other dealers (by activity):*[a] |  |  |  |  |
| Negotiating the Purchase Price | | 17/14 | 34/28 | 34/28 |
| Selecting F&I Add-Ons | | 7/6 | 14/11 | 27/22 |
| Discussing and Signing Paperwork | | 10/8 | 20/16 | 39/32 |
| Get a Trade-In Offer | | 0/0 | 0/0 | 18/15 |
| Hours saved per transaction[b] | | 1.02 | 2.05 | 3.3 |
| Total Quantified Benefits (in millions) | 3% discount rate | $7,463 | $14,926 | $24,036 |
| Total Quantified Benefits | 7% discount rate | $6,145 | $12,290 | $19,790 |

**Note:** Benefits have been discounted to the present at both 3% and 7% rates.

[a] Averages are across all retail transactions; transactions where consumers performed activity digitally under the status quo will have a time savings of 0 for that activity.

[b] Time savings for "Get a Trade-In Offer" assumed to be zero for lease transactions or sales without trade-ins (estimated at 50%).

## 2. Reductions in Deadweight Loss

The status quo in this industry features consumer search frictions, shrouded prices, deception, and obfuscation. As a result, dealers likely charge higher prices for a number of products and services than could be supported once the Rule is in effect. Recent research suggests that when

[553] *See* Car Buyer Journey 2019, *supra* note 537, at 9 (Consumers who negotiate (88% vs. 64%) and complete paperwork online (74% vs. 65%) are more satisfied with their dealership experience.); 2022 Car Buyer Journey, *supra* note 25, at 22 ("More

[financing] steps completed online = higher satisfaction & less time at the dealership"); Cox Auto., "Cox Automotive Car Buyer Journey Study: Pandemic Edition" 22 (2021), *https:// www.coxautoinc.com/wp-content/uploads/2021/02/*

*Cox-Automotive-Car-Buyer-Journey-Study-Pandemic-Edition-Summary.pdf* ("Heavy Digital Buyers were the Most Satisfied").

consumers are able to observe prices for vehicles before visiting dealerships—as is intended by the Rule—prices and dealer profits are likely to fall.[554] When not accompanied by changes in quantity (due to a fixed supply of the good), price adjustments serve to transfer welfare from one side of the market (*e.g.,* dealers) to the other (*e.g.,* consumers), which typically have no net effect on the outcome in a regulatory analysis.[555] A decrease in vehicle prices, however, will likely also lead to an increase in the number sold as the supply is not fixed. As a result, this quantity expansion effect unambiguously increases welfare by reducing the deadweight loss that occurs when firms can charge prices that are marked up over marginal costs.

### 3. Framework

When a policy reduces the price of a good—either through a reduction in firm costs or, as in this case, a reduction in firm market power—the quantity of the good sold will typically increase. If a distortion exists in the market causing the product in question to be sold at a price above the marginal (social) cost of production (*e.g.,* a tax, an externality, or a markup enabled by market power), this quantity expansion has the effect of reducing deadweight loss in that market. In the simple case where there is one good subject to the policy and that good has no close substitutes or complements, this welfare effect can be easily illustrated as in Figure 1.



## Figure 1

The solid line reflects the demand for the good, where some quantity is purchased at a market price of $p_0$ (point A), which is higher than marginal costs (MC). Because of this wedge between price and marginal costs, there is a reduction in welfare relative to the outcome where prices equal marginal costs; this deadweight loss is illustrated on the graph by the bordered triangle (ACD). Holding everything else constant, when prices fall from $p_0$ to $p_1$, this deadweight loss is reduced to some extent. Part of this increase in welfare will go to consumers, and part will go to producers.

Imagine that this graph depicts the market for new automobiles. The Final Rule will increase price competition, thus reducing market power and shifting prices closer to marginal costs in the new automobile market. If this market satisfied the criteria for the simple case described herein (*i.e.,* no close substitutes or complements), the only data we would need to estimate this change in total welfare would be the predicted change in price, the predicted change in quantity (which can be calculated from an estimate of the slope or elasticity of the demand curve for new vehicles), and some information or assumption about the shape of the demand curve between points A and B. Of course, the new automobile market is closely linked to the used automobile market, so this simple picture does not capture the entire story.

When a good has a close substitute (like used versus new vehicles), a price decrease for that good will cause demand for the related good to decrease. Also, in the case of automobiles, there is a long-run link between the new and

[554] Marco A. Haan et al., "A Model of Directed Consumer Search," 61 Int'l J. Indus. Org. 223, 223–55 (2018), *https://doi.org/10.1016/j.jindorg.2018.09.001;* José Luis Moraga-Gonzalez et al., "Consumer Search and Prices in the Automobile Market." 90 Rev. Econ. Stud. 1394–1440 (2023), *https://doi.org/10.1093/restud/rdac047.*

[555] *See* Off. of Mgmt. & Budget, Exec. Off. of the President, "Circular A–4" 38 (2003), *https://*

*www.transportation.gov/sites/dot.gov/files/docs/OMB%20Circular%20No.%20A-4_0.pdf:* "A regulation that restricts the supply of a good, causing its price to rise, produces a transfer from buyers to sellers. The net reduction in the total surplus (consumer plus producer) is a real cost to society, but the transfer from buyers to sellers resulting from a higher price is not a real cost since the net reduction automatically accounts for the

transfer from buyers to sellers." To the extent any price changes caused by the Rule result in transfers to consumers from dealers who were in violation of existing laws, such transfers would be consistent with the agency's mission of providing redress to injured consumers and its history of doing so in enforcement actions.

used vehicle markets as a new vehicle purchased today becomes a potentially available used vehicle tomorrow. These linkages between the markets will dampen the demand response to any given price change in the primary market. In practice, this means that our estimates of the responsiveness of new vehicle purchases to price changes (*i.e.,* the price elasticity of demand for new vehicles) will overstate the change in quantity resulting from a change in prices, because such estimates typically assume that all other prices remain constant. In addition, if there are distortions present in the market for related goods (*i.e.,* used vehicles are also sold at a markup over marginal costs) only examining the welfare effect in the primary market will understate the total welfare effect, as there will be an analogous reduction in deadweight loss in the market for the related good. These linkages between markets for related goods become difficult to explain graphically. However, we have included in the technical appendix an algebraic derivation of the total welfare effect in new and used vehicle markets resulting from the finalization of the Rule. The resulting formula requires estimates of seven parameters in order to compute the welfare effect: two ''policy elasticities'' that reflect the responsiveness of quantities of new and used vehicles sold to a change in prices in the new vehicle market after all adjustments have occurred in both markets, two baseline markups that represent the differences between prices and marginal costs for new and used vehicles, two quantities that reflect the aggregate costs of all new and used vehicles sold under the status quo, and the predicted change in prices due to the Rule.

### 4. Estimation

To obtain ''policy elasticities'' we reference a U.S. Environmental Protection Agency report titled ''The Effects of New-Vehicle Price Changes on New- and Used-Vehicle Markets and Scrappage'' (''EPA Report'').[556] In this report, the authors ''developed a theoretical model of the relationships between new- and used-vehicle markets, scrappage, and total vehicle inventory'' that allows for simulation of prices and quantities in these markets. The model is calibrated using a range of demand elasticity estimates from a review of the relevant literature on auto markets. The

resulting simulations examine the long-run ''steady state'' of vehicle inventories and demand, accounting for cross-market demand effects as well as the endogenous supply of used vehicles resulting from changes in demand for new vehicles in previous periods. Importantly, among the outputs of their simulations are the ''policy price elasticities'' required by our welfare change formula. Our base case estimates of deadweight loss reduction use the long-run policy price elasticities that result from calibrating the model with the EPA Report's intermediate values for the aggregate new vehicle and outside option demand elasticities, but we explore sensitivity to other calibration scenarios.

To obtain baseline estimates of new-vehicle markups, we refer to a recent paper entitled ''The Evolution of Market Power in the US Automobile Industry'' by Paul Grieco, Charles Murry, and Ali Yurukoglu.[557] The authors specify a model of the U.S. new car industry to explore trends in concentration and markups. The authors find that markups in the industry have been falling over time generally, but have been fairly stable since the early 2000s.[558] As our baseline, we use their most recent estimate of industry markups, which was 15% in 2018.[559] While this estimate reflects markups over production costs by manufacturers and not markups over wholesale prices paid by dealers, it is the wedge between retail price and production cost that matters for welfare. As we are unaware of any publicly available data measuring used-vehicle markups, we explore two alternatives that we believe reflect the limiting cases: (1) used vehicles have no markup and (2) used-vehicle markups are the same as new-vehicle markups.

We obtain both quantities of new- and used-vehicles sold as well as average prices from National Transportation Statistics, Table 1–17. As before, we exclude private party, fleet, and wholesale transactions. This exclusion is likely to bias our estimate of the total welfare effect downward because, unlike the time savings benefits of the Rule which may be restricted to dealer-consumer transactions, the price effects of the Rule are likely to carry over to private party and fleet transactions. Using these aggregate figures along with

an estimate of baseline markups, we estimate the aggregate cost of new- and used-vehicles sold in 2019.[560]

Finally, based on the academic literature on search costs in the automobile market, the Rule is expected to reduce prices of new vehicles by reducing the markup that dealers are able to charge over marginal costs. We have identified two papers that empirically estimate the effect of price transparency or reduced search frictions on auto markups by specifying a structural model of the new-vehicle market, estimating the structural parameters, and then conducting counterfactual simulations where search frictions are reduced. Murry and Zhou (2020) simulate a full information counterfactual in the Ohio automobile market where search frictions are eliminated entirely and find that markups are reduced by $333.[561] Moraga-Gonzalez et al. (2022) simulate a counterfactual in the Dutch automobile market where prices are observed prior to costly consumer search (*i.e.,* visiting dealerships) and find that markups are reduced from 40.52% to 32.59%.[562] For our base case estimates, we use the smaller Murry and Zhou (2020) estimate, primarily because their model is estimated using U.S. data consistent with our setting. However, we note that Moraga-Gonzalez et al. offers evidence to suggest that significantly larger changes in markups may result from the Rule.

Using these parameters obtained from the literature in combination, we implement the formula for the change in total welfare given in the technical appendix. For each market—new and used—the formula multiplies the policy price elasticity by the percent change in price to get the percent change in quantity, and then multiplies this by the aggregate markup (as given by the price-cost markup[563] at baseline times the aggregate cost of baseline transactions) to get the approximate change in total welfare per year. As an example, our base case estimate assumes a policy

[556] Assmt. & Standards Div., Ofc. of Transp. & Air Quality, U.S. Env't Prot. Agency, ''The Effects of New-Vehicle Price Changes on New- and Used-Vehicle Markets and Scrappage'' (2021), *https:// cfpub.epa.gov/si/si_public_file_download.cfm?p_ download_id=543273&Lab=OTAQ.*

[557] *See* Paul L. E. Grieco et al., ''The Evolution of Market Power in the US Automobile Industry'' (2022), mimeo.

[558] Paul L. E. Grieco et al., ''The Evolution of Market Power in the US Automobile Industry'' 19 (2022), mimeo.

[559] Paul L. E. Grieco et al., ''The Evolution of Market Power in the US Automobile Industry'' 19 (2022), mimeo.

[560] Aggregate cost of good $i$ is equal to $(1-\mu_i) \times p_i \times Q_i$, where $\mu_i$, $p_i$, and $Q_i$ are the markup, price, and quantity sold of good $i$, respectively.

[561] Charles Murry & Yiyi Zhou, ''Consumer Search and Automobile Dealer Colocation,'' 66 Mgmt. Sci. 1909–1934 (2020), *https://doi.org/ 10.1287/mnsc.2019.3307.*

[562] José Luis Moraga-Gonzalez et al., ''Consumer Search and Prices in the Automobile Market,'' 90 Rev. Econ. Stud. 1394–1440 (2022), *https://doi.org/ 10.1093/restud/rdac047.*

[563] The baseline new vehicle markup estimate of 15% is defined as the ratio of the price-cost margin to unit price, *i.e.* $(p_i - MC_i)/p_i$, and is sometimes referred to as the Lerner index. With knowledge of either price or marginal cost, this can be rearranged to express the price-cost markup, *i.e.* $(p_i - MC_i)/MC_i$, which is used in the formula referenced here.

price elasticity of new-vehicle demand of −0.25, a policy price elasticity of used-vehicle demand (with respect to new-vehicle price) of −0.04, and used car markups equal to new car markups (15%), resulting in the following calculation:

$$\frac{dW(\theta)/d\theta}{\mu} = X_N \tau_N \hat{\varepsilon}_{NN} \frac{d\tau_N/d\theta}{1 + \tau_N} + X_U \tau_U \hat{\varepsilon}_{UN} \frac{d\tau_N/d\theta}{1 + \tau_N}$$

$$= 18\% \times \$334{,}115{,}569{,}664 \times \text{-}0.25 \times \text{-}1\% + 18\% \times \$371{,}555{,}893{,}248 \times \text{-}0.04 \times \text{-}1\%$$

$$= \$152{,}143{,}550 \text{ per year}$$

This annual reduction in deadweight loss is then applied to each year of the 10-year analysis period and discounted to the present to yield the total benefit. We highlight this base case (bolded in Table 2.4) but explore several scenarios that vary along two dimensions: (1) the ''policy elasticity'' of new- and used-

vehicle demand with respect to the change in price and (2) the existence of baseline markups in the used-vehicle market. In Table 2.4, baseline markups for used vehicles vary across columns while the relevant policy price elasticities vary across rows: Scenario A corresponds to new-/used-vehicle

elasticities of −0.14 and 0.01, Scenario B corresponds to new-/used-vehicle elasticities of −0.17 and −0.04, Scenario C corresponds to new-/used-vehicle elasticities of −0.23 and −0.10, and Scenario E corresponds to new-/used-vehicle elasticities of −0.39 and −0.12.

TABLE 2.4—REDUCTION IN DEADWEIGHT LOSS (IN MILLIONS), 2024–2033

| Scenario | No used-vehicle markups | | Symmetric markups | |
|---|---|---|---|---|
| | Total @ 3% discount | Total @ 7% discount | Total @ 3% discount | Total @ 7% discount |
| A | $617 | $508 | $568 | $468 |
| B | 749 | 617 | 945 | 778 |
| C | 1,014 | 835 | 1,504 | 1,238 |
| D | 1,102 | 907 | 1,298 | 1,069 |
| E | 1,719 | 1,415 | 2,307 | 1,899 |

**Note:** Benefits have been discounted to the present at both 3% and 7% rates. Scenarios correspond to those in Table 7–2 of "The Effects of New-Vehicle Price Changes on New- and Used-Vehicle Markets and Scrappage." New-vehicle demand elasticities range from −0.4 (Scenarios A, B, and C) to −0.8 (Scenario D) to −1.27 (Scenario E). Outside option elasticities vary from 0 (Scenario A) to −0.05 (Scenarios B and D) to −0.14 (Scenarios C and E). New/Used cross-price elasticities are set such that substitution away from new vehicles flows almost entirely to used-vehicles, with only small effects on the total number of vehicles. All scenarios hold scrappage elasticity fixed at −0.7.

5. Benefits Related to More Transparent Negotiation

An additional, albeit difficult to quantify, benefit is the reduction in discomfort and unpleasantness that consumers associate with negotiating motor vehicle transactions under the status quo. According to the 2020 Cox Automotive Car Buyer Journey study, filling out paperwork, negotiating vehicle price, and dealing with salespeople are three of the top four frustrations for consumers at car dealerships.[564] Once the Rule is in effect, all three of these issues will be mitigated somewhat by the transparency facilitated by the Rule's required disclosures and the time that consumers spend shopping and negotiating motor vehicle transactions will be less stressful. While we expect an increase in social welfare through this channel, due to a lack of data allowing this more qualitative benefit to be translated into

a quantitative gain, these benefits are left unquantified in the analysis.

*C. Estimated Costs of Final Rule*

In this section, we describe the costs of the Rule provisions as enumerated in SBP VII.A, provide quantitative estimates where possible, and describe costs that we can only assess qualitatively. Some industry commenters questioned the appropriateness of the data and assumptions used in the NPRM, including the discussion of costs in the preliminary regulatory analysis. The Commission used a variety of data sources in its calculations for the NPRM and in the Rule, including wage data from the Bureau of Labor Statistics Occupational Employment Statistics, establishment counts from U.S. Census County Business Patterns, transaction counts from National Transportation Statistics, and breakdowns of motor vehicle transactions (*e.g.*, by financing, GAP agreement, F&I add-ons) from numerous industry sources. Where such

data was not available (*e.g.*, regarding time devoted to compliance tasks), the Commission made assumptions based on a review of previous regulatory analyses that featured similar requirements, with adjustments made based on our understanding of the particulars of motor vehicle dealer operations.[565]

Throughout this section, the cost of employee time is monetized using wages obtained from the Bureau of Labor Statistics Industry-Specific Occupational Employment and Wage Estimates for Automobile Dealers.[566]

---

[564] 2020 Cox Automotive Car Buyer Journey, *supra* note 25, at 37.

[565] *See, e.g.*, Off. of the Sec'y, Dep't of Transp., Dkt. No. DOT–OST–2010–0140, ''Enhancing Airline Passenger Protections II—Final Regulatory Analysis'' (Apr. 20, 2011), *https://www.regulations.gov/document/DOT-OST-2010-0140-2046.*

[566] Applicable wage rates for the Commission's preliminary regulatory analysis, which was published in its NPRM, were based on data from the Bureau of Labor Statistics' May 2020 National Industry-Specific Occupational Employment and Wage Estimates for NAICS industry category 441100—Automobile Dealers, which is available at

Continued

This is valid under the assumption that the opportunity cost of hours spent in compliance activities is hours spent in other productive activities, the social value of which is summarized by the employee's wage.[567] To the extent that these activities can be accomplished using time during which employees would otherwise be idle under the status quo, our estimates will overstate the welfare costs of the Rule.

1. Prohibited Misrepresentations

In its preliminary analysis, the Commission presented two scenarios that estimated the costs associated with the Rule provisions prohibiting misrepresentations. First, as all the misrepresentations prohibited by the Rule are material and therefore deceptive under section 5 of the FTC Act, one scenario assumed that all motor vehicle dealers are compliant with section 5 under the status quo and will therefore conduct no additional review.

The second scenario allowed for costs incurred by firms because of the enhanced penalty associated with violating the Rule (relative to a *de novo* violation of section 5 of the FTC Act) under the assumption that dealers may expend additional resources to ensure compliance. This "heightened compliance review" scenario assumed that each of the 46,525 dealers would have a professional spend 5 additional minutes reviewing each public-facing representation (assumed to be 150 per year on average). At a labor rate of $26.83 per hour for compliance officers employed at auto dealers, this cost was estimated to be $15.6 million per year.

The Commission received comments about the appropriateness of the data and assumptions used to estimate the cost of complying with this provision of the Rule. The most specific criticism contended that the number of documents dealers would need to review would be "several times" the

150 assumed and that review would require at least 15 minutes per document because "dealers typically do not fully control the advertising platforms they use given the direct involvement of the vehicle OEMs . . . and that of other third parties. Also, many dealers, and especially small business dealers do not employ internal compliance officers or attorneys who could conduct marketing reviews." [568]

As there is scant empirical evidence provided for these assertions, the Commission's preliminary estimates remain unchanged (with the exception of updates to more recent data where available). However, we have conducted a sensitivity analysis in which all labor hours in the base case analysis are increased by an order of magnitude, in keeping with the spirit of the comments discussed; *see* SBP VII.G. As can be seen in the results from that analysis, the Rule clearly still generates net benefits for society.

TABLE 3.1—ESTIMATED COMPLIANCE COSTS FOR PROHIBITED MISREPRESENTATIONS

| | | 2024–2033 |
| --- | --- | --- |
| Scenario 1—No Review: | | |
| No Cost ........................................................ | ............................................................... | $0 |
| Total Cost .................................................... | ............................................................... | $0 |
| Scenario 2—Heightened Compliance Review: | | |
| Number of dealers [a] ................................... | ............................................................... | 47,271 |
| Number of documents per dealer per year ...... | ............................................................... | 150 |
| Minutes of review per document ..................... | ............................................................... | 5 |
| Cost per hour of review ................................. | ............................................................... | $31.21 |
| | | |
| Total Cost ........................................................ | 3% discount rate ............................................ | $157,310,579 |
| Total Cost ........................................................ | 7% discount rate ............................................ | $129,526,073 |

**Note:** In scenarios with ongoing expenses, costs have been discounted to the present at both 3% and 7% rates.
[a] County Business Patterns 2021, NAICS Code 4411 (Automobile Dealers, used and new).

2. Required Disclosure of Offering Price in Advertisements and in Response to Inquiry

The Rule requires all dealers to disclose an offering price in any advertisement that references an individual vehicle or in response to any consumer inquiry about an individual vehicle. For this provision, the Commission's preliminary analysis presented two cost scenarios for dealers when complying with the Rule. First, because dealers already price all vehicles in inventory under the status quo, one scenario assumed that there would be no additional cost of complying with this provision. This scenario assumes that the initial pricing

and any subsequent re-pricing of vehicles in inventory would take no (or minimal) additional time under the Rule.

As with the prohibition on misrepresentations, the second scenario considers the enhanced penalty associated with violating the Rule and allows for costs given that dealers may expend additional resources to ensure that the prices they disclose conform to the Rule's definition of offering price, thus minimizing the risk of penalties should they fail to conform to that definition. The latter scenario assumed that, in the first year under the Rule, each of the 46,525 dealers would have a sales and marketing manager spend 8 hours reviewing their policies and

procedures for determining the public-facing prices of vehicles in inventory. In addition, each dealer would employ a programmer for 8 hours to update any automated systems that need to be updated in accordance with these new policies and procedures. At labor rates of $63.93 per hour and $28.90, respectively, this cost was estimated at $34.5 million. Both scenarios assume that, once calculated, the time required to train employees to include prices in response to consumer inquiries about specific vehicles will either be negligible or be subsumed by training costs included under other provisions. Finally, the time required to deliver the disclosures is also negligible, as prices are already typically disclosed in

---

*https://www.bls.gov/oes/2020/may/oes_nat.htm.* Labor rates in the present analysis have been updated based on data from the Bureau of Labor Statistics' May 2022 National Industry-Specific Occupational Employment and Wage Estimates for

NAICS industry category 441100—Automobile Dealers, which is available at *https://www.bls.gov/oes/current/naics4_441100.htm.*

[567] This assumption would hold, for example, if both the product and labor markets in this industry were competitive.

[568] Comment of Nat'l Auto. Dealers Ass'n, Doc. No. FTC–2022–0046–8368 at 299–300.

advertisements and in interactions with consumers under the status quo; the Rule just requires the price to conform to a specific definition.

Some commenters raised issues with the assumptions regarding the time and resources necessary to determine compliant prices as well as deliver the required disclosures. The comments asserted that vehicle prices change frequently in response to market conditions, which would make it difficult to ensure that offering prices are accurate. Additionally, comments disputed the notion that delivery of the information to consumers in accordance with the Rule's provisions would not be costly, in terms of employee time and consumer time. One comment suggested that ''there would be an average of three Offering Price disclosures based there [sic] being an average of three dealer-customer discussions regarding three specific motor vehicles, per transaction,'' [569] asserting that the frequency of these disclosures would have implications for the cost estimates

that had not been considered in the preliminary analysis.

If indeed the Rule required significant additional employee time spent per transaction, that would have implications for the cost estimates. However, as previously discussed, it is the understanding of the Commission that virtually all dealer-customer discussions regarding specific motor vehicles that occur under the status quo already include time devoted to a discussion of the vehicle's price. The only change under the Rule is that, within that price discussion an offering price (as defined by the Rule) must be provided. The cost of determining this price is included under the second scenario in our preliminary analysis, and sensitivity to the specific assumptions of that scenario have been explored in the Appendix. The results from our analysis indicate that the Rule generates net benefits for society under a wide range of plausible assumptions about the inputs to our cost calculations.

Commenters also raised concerns about the potential for behavioral adjustment by dealerships, choosing to refrain from advertising individual vehicles or responding to consumer inquiries about specific vehicles and thus increasing consumers' costs of search. The Commission, however, has not been presented with compelling evidence that dealers will forego competition with other dealers on price, choosing instead to default to advertising a focal price (such as MSRP). Indeed, the Commission's offering price disclosure requirement is similar to existing requirements in a number of States, and the Commission is not aware of any such behavioral adjustments (*e.g.*, eliminating prices from advertisements, refusing to respond to consumer inquiries, etc.) having occurred in those States. As a result, the Commission's preliminary estimates remain unchanged (with the exception of updates to more recent data where available).

TABLE 3.2—ESTIMATED COMPLIANCE COSTS FOR OFFERING PRICE DISCLOSURES

|  | 2024 |
|---|---|
| Scenario 1—No Review: | |
| No Cost | $0 |
| | |
| Total Cost | $0 |
| Scenario 2—Calculation of Offering Price: | |
| Number of dealers [a] | 47,271 |
| Pricing hours per dealer | 8 |
| Cost per hour of pricing | $80.19 |
| Programming hours per dealer | 8 |
| Cost per hour of programming | $40.24 |
| | |
| Total Cost | $45,542,772 |

[a] County Business Patterns 2021, NAICS Code 4411 (Automobile Dealers, used and new).

3. Disclosure of Add-On List and Associated Prices

In the NPRM, the proposed rule would have required all dealers to disclose an itemized menu of all optional add-on products and services along with prices, or price ranges, on all dealer-operated websites, online services, and mobile applications as well as at all dealership locations. Various commenters expressed concern that the add-on list requirement would have been too complex and potentially confusing, as discussed in the paragraph-by-paragraph analysis in SBP III.D.2(b). As a result, the Commission has determined not to finalize § 463.4(b) of the proposed rule. While the preliminary analysis estimated compliance costs between

approximately $42 million and $43 million for the disclosure of add-on lists and associated prices, those costs are not included in the final analysis.

4. Required Disclosure of Total of Payments for Financing/Leasing Transactions

The Rule requires all dealers to disclose, when representing a monthly payment, the total of payments for the financing or leasing contract. In addition, in any comparison of two payment options with different monthly payments, the dealer is required to disclose that the option with the lower monthly payment features a higher total of payments (if true).

The Commission's preliminary analysis presented two cost scenarios,

corresponding to different methods by which dealers may choose to comply with the Rule. In the first scenario, we assumed that dealers would incur a one-time, upfront cost of both designing the required disclosures and informing associates of their obligations to provide the disclosures. Importantly, ongoing costs on a per transaction basis were assumed to be negligible, reflecting a compliance regime where dealers already generate the required information during the normal course of business and must only convey it to consumers at an appropriate point in the transaction. In the second scenario, we assumed that dealers incur an additional ongoing cost per financed or leased transaction in order to communicate the required disclosures

to consumers in writing, reflecting a compliance regime where dealers find it necessary to maintain a documentary record of compliance with the Rule.[570]

The upfront costs (and total costs under Scenario 1) of complying with this provision as estimated by the preliminary analysis were limited to 8 hours spent by a compliance manager (at a rate of $26.83) on the creation of a template disclosure script that contains the required information and informing sales staff of their obligations to deliver the disclosure at an appropriate time during the transaction. This cost was estimated at $10 million.

The preliminary estimates of additional ongoing costs—as in Scenario 2—included 2 minutes of sales associate time per financed/leased transaction (at a rate of $21.84) spent on the process of populating and delivering a printed version of the disclosure, with $0.15 per disclosure spent on printing costs. The total additional cost under this scenario is estimated at $213.4 to $249.5 million.

Comments from industry groups asserted that the preliminary analysis underestimated training costs and that it would be difficult to determine the total of payments for financing prior to knowing the details of the transaction. One comment contended that "these mandates . . . necessarily would involve significant annual training requirements for new employees given

that . . . the average dealer experiences an annual sales consultant turnover rate of 67%." [571] The comment further asserted that dealers cannot determine the total cost of a financing or leasing agreement without knowing the terms for which consumers qualify and what terms they want. The comment argued that as a result, only the scenario with costs incurred on a per transaction basis should be considered. Finally, the comment argued that the per-transaction costs in Scenario 2 are too low, both because the Commission underestimates the time required to deliver, discuss, and review disclosures and because multiple disclosures would have to be made per transaction (as terms are changed).

These comments misunderstand the Commission's analysis with respect to the costs of complying with this provision. Scenario 1 does not anticipate that the dealer presents a consumer with the total of payments for a financing or leasing contract at the outset of the transaction. It requires only that, at the point where the dealer engages in discussions regarding different monthly payments for financing or leasing arrangements, the information that must be disclosed (*i.e.,* the total of payments and a comparison of these totals across differing monthly payments) is already available to the

dealer under the status quo. The only additional cost incurred per transaction would be the delivery of this information to the consumer (the determination of which is contemplated in the costs estimated under Scenario 1).

With respect to the comment regarding insufficient allowance for training costs in light of employee churn in the industry, the Commission has determined this to be a valid critique of the preliminary analysis. As a result, the final regulatory analysis includes an additional ongoing cost for both Scenarios. This ongoing cost includes training for sales staff and budgets 1 hour of training for each of the 417,110 sales and related employees across the industry, at an (average) cost of $29.43 per hour. The resulting additional ongoing costs in both scenarios amounts to $12.3 million per year. Further, as discussed in a previous section, the final analysis excludes private party, fleet, and wholesale transactions.[572] The remainder of the Commission's preliminary estimates remain unchanged (with the exception of updates to more recent data where available). Concerns about underestimates of the time required to review disclosures on a per-transaction basis are addressed by the Commission's sensitivity analyses conducted in the Appendix.

TABLE 3.4—ESTIMATED COMPLIANCE COSTS FOR FINANCING COSTS

| | | 2024 only | 2024–2033 |
|---|---|---|---|
| Scenario 1—Creation of disclosure and training only: | | | |
| *Upfront costs:* | | | |
| Number of dealers | | 47,271 | |
| Compliance manager hours per dealer | | 8 | |
| Cost per hour of disclosure creation | | $31.21 | |
| Subtotal | | $11,802,623 | |
| *Ongoing costs:* | | | |
| Number of sales and related employees [a] | | | 417,110 |
| Training hours per employee | | | 1 |
| Cost per hour of training | | | $29.43 |
| Subtotal | 3% discount rate | | $104,712,908 |
| | 7% discount rate | | $86,218,307 |
| Scenario 1—Total Cost | 3% discount rate | | $116,515,532 |
| | 7% discount rate | | $98,020,931 |
| Scenario 2—Disclosures per transaction: | | | |
| Covered new vehicle sales per year [b] | | | 10,343,319 |
| % New vehicle sales involving financing [c] | | | 81% |
| Covered used vehicle sales per year | | | 21,219,640 |
| % Used vehicle sales involving financing | | | 35% |
| Covered new vehicle leases per year | | | 3,423,294 |

[570] While disclosures of this nature are already required to be present in the financing contract by the Truth in Lending Act (TILA), the Rule would change the timing of a subset of those disclosures. As a result, the dealer may have to develop and deliver a separate document in the event that the

standard TILA disclosure has not yet been generated at the point where disclosure is required under the Rule.

[571] Comment of Nat'l Auto Dealers Ass'n, Doc. No. FTC–2022–0046–8368 at 301.

[572] Without cross-tabulations of fleet sales and sales involving financing, we assume that these are independent such that the fraction of covered transactions involving financing is equal to the fraction of covered transaction times the fraction of financed transactions.

TABLE 3.4—ESTIMATED COMPLIANCE COSTS FOR FINANCING COSTS—Continued

|  |  | 2024 only | 2024–2033 |
|---|---|---|---|
| Total transactions involving monthly payments/financing. | ............................... | ............................... | 19,228,256 |
| Disclosure minutes per transaction ................. | ............................... | ............................... | 2 |
| Cost per hour of disclosure ............................. | ............................... | ............................... | $28.41 |
| Printing cost per disclosure ............................. | ............................... | ............................... | $0.15 |
| Subtotal ........................................................... | 3% discount rate .......................... | ............................... | $179,930,957 |
|  | 7% discount rate .......................... | ............................... | $148,151,196 |
| Total Cost ........................................................ | 3% discount rate .......................... | ............................... | $296,446,489 |
|  | 7% discount rate .......................... | ............................... | $246,172,126 |

**Note:** In scenarios with ongoing expenses, costs have been discounted to the present at both 3% and 7% rates.

ᵃ Bureau of Labor Statistics Industry-Specific Occupational Employment and Wage Estimates for NAICS Code 441100—Automobile Dealers, May 2021.

ᵇ For total volume, National Transportation Statistics Table 1–17. For retail/non-fleet fraction, Edmunds Automotive Industry Trends 2020 (for new vehicle) and Cox Automotive via Automotive News (for used vehicles).

ᶜ Melinda Zabritski, Experian Info. Sols. Inc., "State of the Automotive Finance Market Q4 2020".

## 5. Prohibition on Charging for Add-Ons That Provide No Benefit

The Rule prohibits dealers from charging for add-on products or services from which the targeted consumer would not benefit. Compliance with this provision will require dealers to develop policies and transaction-level rules about when consumers can be charged for add-on products and services. The Rule as proposed in the NPRM also would have included additional provisions relating to add-ons that have not been finalized. These included a prohibition on charging for optional add-on products or services unless dealership employees made a number of disclosures at various points before finalizing a transaction. This provision would have required each dealer to design form disclosures, create a system for populating these forms, train their sales staff on the disclosure requirements, and provide the disclosures in writing, with the appropriate information filled in, to each consumer prior to completing the transaction.

The Commission's preliminary analysis relating to the cost of complying with these disclosure requirements budgeted for 8 hours of compliance manager time at a cost of $26.83 per hour) and 4 hours of sales manager time (at a cost of $63.93 per hour) to design disclosure forms, and an additional 8 hours of programmer time (at a cost of $28.90) to create a system to populate these forms. The preliminary analysis also budgeted for 2 minutes of sales associate time (at a rate of $21.84 per hour) and $0.11 in printing/electronic delivery costs per disclosure, with the number of disclosures determined by the fraction of transactions involving optional add-ons and/or financing.

In response to numerous comments, the Commission has determined not to finalize the proposal in § 463.5(b), which would have required the delivery of written disclosures and acknowledgement via signature of those disclosures by consumers. Various commenters were concerned that the add-on disclosures would add documents and time to the transaction. In response to these comments, the Commission has determined to omit what would have been the only provision affirmatively requiring the dealer and consumer to review additional documentation during a transaction. As a result, while the preliminary analysis estimated compliance costs between approximately $883 million and $1 billion for the disclosure of total costs for cash and financed transactions with optional add-on products, the cost estimate in the final analysis is on the order of one-tenth to one-half of the preliminary estimate (depending on the scenario).

As a result, the Commission has substantially revised the cost analysis in this section. First, the Commission assumes that each dealer will employ 8 hours of compliance manager time (at a rate of $31.21) and 8 hours of sales manager time (at a rate of $80.19) in the first year under the Rule, to cull add-ons with no value from their offerings and develop policies regarding when certain add-ons may or may not be sold. Second, the Commission budgets for 1 hour of training per year for each of the 417,110 sales and related employees across the industry, to apprise them of

these policies and their obligations under the Rule. Finally, the Commission includes a second cost scenario in which dealers will choose to deliver one itemized disclosure to each customer before the finalization of each transaction. Although this is not required under the Final Rule, dealers may wish to have documentation of compliance with the provisions of the Rule. As in the preliminary analysis, the Commission assumes that each dealer will employ 8 hours of compliance manager time and 4 hours of sales manager time creating this disclosure and 8 hours of programmer time creating a system to populate these forms when provided inputs by sales staff. The same occupational wage data have been used, but the rates have been updated to match the most recent data available. We further assume, as in the preliminary analysis, that sales staff will spend 2 minutes per disclosure (at a rate of $28.41 per hour) updating, printing, and delivering these forms to consumers and that the physical costs of delivering the disclosure are roughly $.11 per disclosure.[573] Finally, as discussed in a previous section, the final analysis excludes private party, fleet, and wholesale transactions.

[573] The physical costs are $.15 per paper disclosure and $.02 per electronic disclosure, assuming that 27% are made electronically. This assumption is informed by a consumer survey that indicates 73% of consumers with motor vehicles prefer to receive registration renewal notices by mail as opposed to electronically. *See* Consumer Action, "Your opinion wanted: Paper vs. electronic bills, statements and other communications" 4 (2018–2019), *https://www.consumer-action.org/downloads/Consumer_Action_Paper_v_electronic_survey.pdf* (showing that 1800 of 2456 respondents who owned and needed to periodically register a motor vehicle preferred mail notices).

TABLE 3.5—ESTIMATED COMPLIANCE COSTS FOR PROHIBITION ON CERTAIN ADD-ONS

|  |  | 2024 only | 2024–2033 |
|---|---|---|---|
| Scenario 1—Policies and Training Only: |  |  |  |
| *Upfront costs:* |  |  |  |
| Number of dealers | | 47,271 | |
| Compliance manager hours per dealer | | 8 | |
| Cost per hour of compliance manager | | $31.21 | |
| Sales manager hours per dealer | | 8 | |
| Cost per hour of sales manager | | $80.19 | |
| Subtotal | | $42,127,915 | |
| *Ongoing costs:* |  |  |  |
| Number of sales and related employees | | | 417,110 |
| Training hours per employee | | | 1 |
| Cost per hour of training | | | $29.43 |
| Scenario 1—Subtotal | 3% discount rate | | $146,840,824 |
|  | 7% discount rate | | $128,346,223 |
| Scenario 2—Disclosure creation and delivery: |  |  |  |
| Number of dealers | | 47,271 | |
| Compliance manager hours per dealer | | 8 | |
| Cost per hour of compliance manager | | $31.21 | |
| Sales manager hours per dealer | | 4 | |
| Cost per hour of sales manager | | $80.19 | |
| Programmer hours per dealer | | 8 | |
| Cost per hour of programmer | | $40.24 | |
| Subtotal | | $42,182,750 | |
| Disclosure delivery (per transaction): |  |  |  |
| New vehicle sales per year | | | 10,343,319 |
| Used vehicle sales per year | | | 21,219,640 |
| Minutes per disclosure | | | 2 |
| Cost per hour of disclosure | | | $28.41 |
| Physical costs per disclosure | | | $0.11 |
| Subtotal | 3% discount rate | | $285,904,302 |
|  | 7% discount rate | | $235,407,319 |
| Scenario 2—Total Cost | 3% discount rate | | $474,927,875 |
|  | 7% discount rate | | $405,936,291 |

**Note:** In scenarios with ongoing expenses, costs have been discounted to the present at both 3% and 7% rates.

## 6. Requirement To Obtain Express, Informed Consent Before Any Charges

The Rule requires dealers to obtain express, informed consent before charging any consumer for any product or service in association with the sale, financing, or lease of a vehicle. Because we presume that all dealers who are complying with the law currently have policies in place to prevent charges without consent, we assume that there will be no additional costs imposed by this provision.

## 7. Recordkeeping

The Final Rule requires dealers to retain records of all documents pertaining to Rule compliance. These recordkeeping requirements include:

• Copies of all materially different marketing materials, sales scripts, and training materials that discuss sales prices and financing or lease terms.

• Records demonstrating that all add-ons charged for meet the requirements stated in the Rule, including

calculations of loan-to-value ratios in contracts including GAP agreements.

• Copies of all purchase orders, financing and lease contracts signed by the consumer (whether or not final approval is received), and all written communications with any consumer who signs a purchase order or financing or lease contract.

• Copies of all written consumer complaints, inquiries related to add-ons, and inquiries and responses about individual vehicles.

Most of these documents are already produced in the normal course of business under the status quo, or the costs of creating them have already been accounted for in previous sections. In its preliminary analysis, the Commission assumed that each dealer would incur an upfront cost, employing 8 hours of programmer time, 5 hours of clerical time, 1 hour of sales manager time, and 1 hour of compliance officer time, at hourly rates of $28.90, $18.37, $63.93, and $26.83, respectively, in order to

upgrade their systems and create the templates necessary to accommodate retention of all relevant materials. The Commission also assumed that each dealer would employ 1 additional minute of sales staff time per transaction to populate forms and store relevant materials.

One industry commenter contended that the proposed rule would impose substantial and costly recordkeeping mandates, citing primarily the various channels through which dealers would be required to capture and retain communications. The Commission believes the recordkeeping requirements strike an appropriate balance, requiring the retention of materials needed to allow effective enforcement while being mindful of dealer burden. In addition, the recordkeeping requirements are similar to analogous requirements in other Commission disclosure rules, as

tailored to individual industries and markets.[574]

As such, the Commission's final analysis retains its preliminary estimates—appropriately updated where more recent data were available—with a few changes. First, we made adjustments to the cost estimates associated with the required loan-to-value calculations for all transactions with GAP agreements. Based on a comment from one industry group, we revised down the share of covered new

and used vehicle sales with a GAP agreement to 17%.[575] As in the preliminary analysis, for these transactions sales staff will spend an additional minute to generate and store the relevant calculations. As discussed in a previous section, the final analysis excludes private party, fleet, and wholesale transactions. In addition, the expansion of the volume of records that dealers are required to retain and manage will likely require investment in additional IT systems and hardware,

which was left unquantified in the preliminary analysis. After additional research, the Commission estimates that each dealer will need to spend approximately $300 per year on storage (either on premises or in the cloud) to house the records that the Rule requires them to maintain. Based on a review of the transaction records we have received from dealers through investigations, this amount is likely to be more than sufficient for compliance.[576]

TABLE 3.6—ESTIMATED COMPLIANCE COSTS FOR RECORDKEEPING

|  |  | 2024 only | 2024–2033 |
|---|---|---|---|
| Updating systems: |  |  |  |
| Number of dealers | | 47,271 | |
| Programming hours per dealer | | 8 | |
| Cost per hour of programming | | $40.24 | |
| Clerical hours per dealer | | 5 | |
| Cost per hour of clerical work | | $20.16 | |
| Sales manager hours per dealer | | 1 | |
| Cost per hour of sales manager review | | $80.19 | |
| Compliance manager hours per dealer | | 1 | |
| Cost per hour of compliance review | | $31.21 | |
| Subtotal | | $25,248,387 | |
| Hardware and Storage (per year): |  |  |  |
| Number of dealers | | | 47,271 |
| Cost of hardware/storage | | | $300 |
| Recordkeeping (per transaction): |  |  |  |
| Number of covered motor vehicle sales | | | 31,562,959 |
| % of sales with GAP agreement [a] | | | 17% |
| Number of motor vehicle sales with GAP agreement. | | | 5,444,502 |
| Sales staff minutes per transaction | | | 1 |
| Cost per hour of recordkeeping | | | $28.41 |
| Subtotal | 3% discount rate | | $270,444,391 |
| Subtotal | 7% discount rate | | $222,677,967 |
| Total Cost | 3% discount rate | | $295,692,777 |
| Total Cost | 7% discount rate | | $247,926,354 |

**Note:** In scenarios with ongoing expenses, costs have been discounted to the present at both 3% and 7% rates.

[a] Comment of Nat'l Auto. Dealers Ass'n, Doc. No. FTC–2022–0046–8368 at 12 n.43.

*D. Other Impacts of Final Rule*

As the status quo in this industry features consumer search frictions, shrouded prices, deception, and obfuscation, dealers likely charge higher prices for a number of products and services than could be supported once the Rule is in effect. SBP VII.B discussed the Commission's expectation that prices are likely to adjust in

response to the transparency facilitated by the Rule, and quantified the benefits that result when vehicle quantities increase in response to a more transparent and less deceptive equilibrium. The price changes in the new vehicle market discussed in SBP VII.B will also have the effect of transferring $3.4 billion per year from dealers whose conduct under the status

quo would not have complied with the Rule to consumers. In addition, other prices may be impacted by the Rule, such as used vehicle prices and add-on prices. As we have insufficient data to predict these price effects, neither the transfers associated with these potential price changes nor the resulting quantity adjustments and deadweight loss reductions are quantified in the current

---

[574] 16 CFR 310.5 (Telemarketing Sales Rule); 16 CFR 437.7 (Business Opportunity Rule); 16 CFR 453.6 (Funeral Industry Practices Rule); 16 CFR 301.41 (Fur Products Labeling).

[575] Comment of Nat'l Auto. Dealers Ass'n, Doc. No. FTC–2022–0046–8368 at 12 n.43 (indicating 15.3% (18.2%) for new (used) vehicles). These rates were weighted by transactions counts to calculate an overall rate of 17%.

[576] Our review of dealer transaction records suggests that a typical transaction generates 3.4 MB of data under the status quo. Given the average number of transactions per dealer, this suggests that storing all these records would require dedicated space of roughly 4.2 GB per year. With a two-year retention window, this corresponds to 8.4 GB of storage at any given time. We estimate that the (annual) amount budgeted here should be sufficient to maintain at least 1 TB of storage—either on

premises or through a cloud storage vendor—which is sufficient for more than 100 times the data storage capacity necessary to retain all transaction files generated by a typical dealership in a year under the status quo. The Commission anticipates that this amount of data storage capacity will be more than sufficient to also allow for dealers to keep any necessary records of correspondence with consumers who ultimately do not complete transactions at the dealership.

analysis. Finally, it may be the case that enhanced transparency of the Rule leads to *fewer* of certain types of transactions relative to the status quo. Recent evidence suggests that price shrouding of the kind that is prevalent in the motor vehicle market results in consumers spending more than they would otherwise.[577] We expect that this phenomenon may extend especially to the motor vehicle add-on market, where the Commission has compiled substantial evidence that individuals frequently inadvertently purchase add-ons that they did not want and ultimately will not use.[578] While much of this effect may ultimately be transfers, we reiterate that to the extent they represent transfers from dishonest dealers to consumers, this may be considered a benefit of the Rule.

In addition, deceptive practices by dishonest dealers lead consumers to engage with those dealers instead of honest dealerships. Once the Rule is in effect, some business that would

otherwise have gone to dealers using bait-and-switch tactics or deceptive door opening advertisements will now go to honest dealerships. Again, assuming that the costs of the firms are similar, any one-for-one diversion of sales from one set of businesses to another is generally characterized as a transfer under OMB guidelines. However, in this case, it would represent a transfer from the set of dishonest dealers to honest dealers, which may weigh differently if profits from law violations are not counted towards social welfare in the regulatory analysis.

### E. Conclusion

The Commission has attempted to catalog and quantify the incremental benefits and costs of the provisions included in the Final Rule. Extrapolating these benefits over the 10-year assessment period and discounting to the present provides an estimate of the present value for total benefits and costs of the Rule, with the difference—

net benefits—providing one measure of the value of regulation.

Using our base case estimates, the present value of quantified benefits for consumers from the Rule's requirements over a 10-year period using a 7% discount rate is estimated at $13.4 billion. The present value of quantified costs for covered motor vehicle dealers of complying with the Rule's requirements over a 10-year period using a 7% discount rate is estimated at $1.1 billion. This generates an estimate of the present value of quantified net benefits equal to $12.3 billion using a discount rate of 7%. Using the best (or worst) case assumptions discussed in the preceding analysis results in net benefits of $21.2 billion (or $5.5 billion) using a discount rate of 7%.

Given that we expect unquantified benefits to outweigh unquantified costs for this Rule, this regulatory analysis indicates that adoption of the Rule would result in benefits to the public that outweigh the costs.

### PRESENT VALUE OF NET BENEFITS (IN MILLIONS), 2024–2033

| | Low estimate | | Base case | | High estimate | |
|---|---|---|---|---|---|---|
| | 3% Discount rate | 7% Discount rate | 3% Discount rate | 7% Discount rate | 3% Discount rate | 7% Discount rate |
| *Benefits:* | | | | | | |
| Time Savings | $7,463 | $6,145 | $14,926 | $12,290 | $24,036 | $19,790 |
| Deadweight Loss Reduction | 568 | 468 | 1,298 | 1,069 | 2,307 | 1,899 |
| Total Benefits | 8,031 | 6,613 | 16,224 | 13,359 | 26,343 | 21,690 |
| *Costs:* | | | | | | |
| Finance/Lease Total of Payments Disclosure | 296 | 246 | 296 | 246 | 117 | 98 |
| Offering Price Disclosure | 46 | 46 | 46 | 46 | 0 | 0 |
| Prohibition Re Certain Add-ons & Express, Informed Consent | 475 | 406 | 475 | 406 | 147 | 128 |
| Prohibition on Misrepresentations | 157 | 130 | 157 | 130 | 0 | 0 |
| Recordkeeping | 296 | 248 | 296 | 248 | 296 | 248 |
| Total Costs | 1,270 | 1,075 | 1,270 | 1,075 | 559 | 474 |
| Net Benefits | 6,761 | 5,538 | 14,954 | 12,284 | 25,784 | 21,216 |

**Note:** "Low Estimate" reflects all lowest benefit estimates and high cost scenarios and "High Estimate" reflects all highest benefit estimates and low cost scenarios. "Base Case" reflects base case benefit estimates and high cost scenarios. Not all impacts can be quantified; estimates only reflect quantified costs and benefits.

---

[577] *See* Tom Blake et al., "Price Salience and Product Choice," 40 Mktg. Sci. 619–36 (2021), *https://doi.org/10.1287/mksc.2020.1261.*

[578] *See* Nat'l Consumer Law Ctr., "Auto Add-ons Add Up: How Dealer Discretion Drives Excessive, Inconsistent, and Discriminatory Pricing" (Oct. 1, 2017), *https://www.nclc.org/images/pdf/car_sales/report-auto-add-on.pdf*; Consumers for Auto Reliability and Safety, Comment Letter on Motor Vehicle Roundtables, Project No. P104811 at 2–3 (Apr. 1, 2012), *https://www.ftc.gov/sites/default/files/documents/public_comments/public-roundtables-protecting-consumers-sale-and-leasing-motor-vehicles-project-no.p104811-00108/00108-82875.pdf* (citing a U.S. Department of Defense data call summary that found that the vast majority of military counselors have clients with auto financing

problems and cited "loan packing" and yo-yo financing as the most frequent auto lending abuses affecting servicemembers); Adam J. Levitin, "The Fast and the Usurious: Putting the Brakes on Auto Lending Abuses," 108 Geo. L.J. 1257, 1265–66 (2020), *https://www.law.georgetown.edu/georgetown-law-journal/wp-content/uploads/sites/26/2020/05/Levitin_The-Fast-and-the-Usurious-Putting-the-Brakes-on-Auto-Lending-Abuses.pdf* (discussing "loan packing" as the sale of add-on products that are falsely represented as being required in order to obtain financing.); Complaint ¶¶ 12–19, *Fed. Trade Comm'n v. Liberty Chevrolet, Inc.,* No. 1:20–cv–03945 (S.D.N.Y. May 21, 2020) (alleging deceptive and unauthorized add-on charges in consumers' transactions); Complaint ¶¶ 59–64, *Fed. Trade. Comm'n v. Universal City

Nissan,* No. 2:16–cv–07329 (C.D. Cal. Sept. 29, 2016) (alleging deceptive and unauthorized add-on charges in consumers' transactions); Complaint ¶¶ 6, 9, *TT of Longwood, Inc.,* No. C–4531 (F.T.C. July 2, 2015) (alleging misrepresentations regarding prices for added features); *see also* Auto Buyer Study, *supra* note 25, at 14 ("Several participants who thought that they had not purchased add-ons, or that the add-ons were included at no additional charge, were surprised to learn, when going through the paperwork, that they had in fact paid extra for add-ons. This is consistent with consumers' experiencing fatigue during the buying process or confusion with a financially complex transaction, but would also be consistent with dealer misrepresentations.").

*F. Appendix: Derivation of Deadweight Loss Reduction*

The derivation of the formula for the reduction in deadweight loss from the Rule follows from ''Sufficient Statistics Revisited'' by Henrik Kleven.[579] In the source article, the wedge between costs and prices is tax rates, but here we consider producer markups; the fundamental principles are unchanged.

We have a mass of consumers $i$ with utility function $u^i(x^i_O, x^i_N, x^i_U)$ over new cars, used cars, and the numeraire (good 0) who face the following budget constraint:

$$\sum_j (1 + \tau^i_j) x^i_j = Y^i$$

given markups $T^i_j$ for good $j$ and consumer $i$ and income $Y^i$ for consumer $i$. Pre-markup prices are normalized to one so $x i_j$ is the cost of consumer $i$'s purchase of good $j$. Total profits from the consumption of consumer $i$ are $T^i = \Sigma_j T^i_j x^i_j$.

Define a policy to be evaluated as $\theta$. Total welfare is defined as:

$$W(\theta) = \int_i v^i(\theta)\, di + \mu \int_i T^i(\theta)\, di$$

Here, $v^i(\theta)$ is the indirect utility function for consumer $i$, so the first term is consumer surplus and the second term is producer surplus, while $\mu$ is the value of a dollar of profit. The change in welfare from policy $\theta$, translated into dollars by dividing by $\mu$, is:

$$\frac{dW(\theta)/d\theta}{\mu} = \int_i \frac{dT^i}{d\theta} - \frac{\partial T^i}{\partial \theta}$$

The first term is the total effect on profit from the reform and the second term is the ''mechanical'' effect;

assuming quantities stay constant, how much profits will fall if the policy goes into effect. We can rewrite this as follows:

$$\frac{dW(\theta)/d\theta}{\mu} = \int_i \left[\sum_{j=0}^{J} \tau^i_j x^i_j \frac{d \log x^i_j}{d\theta}\right] di$$

Where

$$\frac{d \log x^i_j}{d\theta}$$

is labelled the ''policy elasticity'' for good and consumer with respect to

policy . We make the following additional assumptions/simplifications:

1. The outside good is priced at cost.
2. All consumers face the same markups so $T_k = T_k$.
3. For simplicity, all elasticities are assumed to be cost share-weighted averages of individual effects, so

$X_j = \int_i x^i_j$ and $\epsilon_{jk} = \int_i \epsilon^i_{jk} \frac{x^i_j}{X_j}$.

As a result, the welfare change from the Auto Rule ($\theta$) is:

$$\frac{dW(\theta)/d\theta}{\mu} = X_N \tau_N \frac{d \log X_N}{d\theta} + X_U \tau_U \frac{d \log X_U}{d\theta}$$

Assuming that the Rule affects only markups for new vehicles, we can

rewrite the ''policy elasticities'' as a product of a price elasticity and the

elasticity of price with respect to the Rule, as follows:

$$\frac{dW(\theta)/d\theta}{\mu} = X_N \tau_N \hat{\varepsilon}_{NN} \frac{d\tau_N/d\theta}{1 + \tau_N} + X_U \tau_U \hat{\varepsilon}_{UN} \frac{d\tau_N/d\theta}{1 + \tau_N}$$

where

$$\hat{\varepsilon}_{jk} = \frac{d \log X_j}{d \log(1 + \tau_k)}$$

is the long-run ''policy price elasticity'' of demand for good w.r.t. the price of good , including the effects that a price change has on the prices of related goods. The formula accounts for demand feedback effects between the new and used car markets but assumes

no dynamics in the path from the policy to the long-run steady-state. Computing this formula requires estimates of seven parameters: two ''policy price elasticities'' that reflect the responsiveness of quantities of new and used vehicles sold to a change in prices in the new vehicle market after all adjustments have occurred in both markets, two baseline markups that represent the differences between prices

and marginal costs for new/used vehicles, two quantities that reflect the aggregate cost of all new/used vehicles sold under the status quo, and the predicted change in prices due to the Rule. Calibration of these parameters is discussed in the main text.

*G. Appendix: Uncertainty Analysis*

While the main text uses alternative assumptions to explore sensitivity to a

[579] *See* Henrik J. Kleven, ''Sufficient Statistics Revisited.'' 13 *Annual Rev. Econ.* 515–38. (2021), https://doi.org/10.1146/annurev-economics-060220-023547.

number of discrete scenarios, in this appendix we allow variation in most of the assumptions that underlie our model. This Monte Carlo analysis procedure allows us to more fully characterize the uncertainty around our central estimate of net benefits, under the assumption that our basic model is specified correctly. Most of the assumptions in our analysis refer to amounts of time, either amounts of time dealerships employees must spend on a compliance task or amounts of time that consumers save on various activities related to the automobile shopping process. Deviations for these assumptions are centered on the parameters used in the main text. Elsewhere, as with assumptions regarding fractions or proportions, our base case is often an extreme case (*i.e.,* 0 or 1). In these cases, deviations are typically not centered on the base case and are allowed to vary across the whole range as dictated by the

parameter. Still, we can expect the average results from this sensitivity analysis to be similar to the result in the main text. The object of interest here is the distribution of estimates, which indicates the expected variation in net benefits if the true parameters deviate from our predictions (with errors of the form modeled).

For most assumptions, we draw from a symmetric, triangular distribution around the base case assumption with a specified upper and lower bound. In this distribution, the probability of drawing particular parameter value increases linearly from the lower bound to the base case assumption before decreasing linearly to the upper bound, such that the area inscribed by the triangle is equal to 1. We emphasize this distribution because it is a parsimonious way to incorporate variation in parameter values over a finite range and incorporates our preferred estimates as the most likely outcome. For a few

parameters where we think it is appropriate to de-emphasize the main estimate parameter, we draw from a uniform distribution. Importantly, all draws are independent; there is no correlation between the deviations drawn in any given Monte Carlo trial. An additional sensitivity analysis considers a situation where our errors across all labor time parameters are correlated; specifically, that all of our estimates of the time required for compliance tasks are 1/10th of the true time required.

To incorporate uncertainty in time savings benefits to consumers, we allow the time saved by digital consumers to vary by up to ten minutes more or less than the main analysis parameters. The share of these time savings received by non-digital consumers under the Rule is modeled as uniformly distributed between zero (no savings) and one (savings equivalent to what digital consumers receive in the status quo).

### TABLE A.1—ALTERNATIVE PARAMETERS: BENEFITS OF TIME SAVINGS FOR COMPLETED TRANSACTIONS

| | Base case | Monte Carlo | | |
|---|---|---|---|---|
| Parameter | Parameter value | Modeled distribution | Distribution lower bound | Distribution upper bound |
| Price Negotiation Time Savings ................................... | 43 | Triangular ........................ | 33 | 53 |
| Add-on Negotiation Time Savings ............................... | 33 | Triangular ........................ | 23 | 43 |
| Paperwork Time Savings ............................................. | 45 | Triangular ........................ | 35 | 55 |
| Trade-In Negotiation Time Savings ............................. | 26 | Triangular ........................ | 16 | 36 |
| Fraction of Price Time Savings Under Rule ................. | 1.0 | Uniform ............................ | 0 | 1 |
| Fraction of Add-on Time Savings Under Rule .............. | 0.5 | Uniform ............................ | 0 | 1 |
| Fraction of Paperwork Time Savings Under Rule ......... | 0.5 | Uniform ............................ | 0 | 1 |
| Fraction of Trade-In Time Savings Under Rule ........... | 0.0 | Uniform ............................ | 0 | 1 |

For the deadweight loss reduction component of benefits, we explore sensitivity only to baseline used-vehicle markups, allowing them to vary from 0 to the baseline new-vehicle markup of

15%. In the main text, we explore a number of scenarios for deadweight loss reduction corresponding to greater and lesser demand elasticities as well.

The following tables describe the distributions we model for cost

parameters in the simulation exercise. All cost parameters are assumed to be drawn from triangular distributions. The tables follow the same order as the discussion in the main text.

### TABLE A.2—ALTERNATIVE PARAMETERS: COSTS OF MISREPRESENTATION PROHIBITION COMPLIANCE

| | Base case | Monte Carlo | | |
|---|---|---|---|---|
| Parameter | Parameter value | Modeled distribution | Distribution lower bound | Distribution upper bound |
| Document Review Minutes ........................................... | 5 | Triangular ........................ | 0 | 10 |
| Documents Reviewed .................................................. | 150 | Triangular ........................ | 100 | 200 |

### TABLE A.3—ALTERNATIVE PARAMETERS: COSTS OF OFFERING PRICE DISCLOSURES

| | Base case | Monte Carlo | | |
|---|---|---|---|---|
| Parameter | Parameter value | Modeled distribution | Distribution lower bound | Distribution upper bound |
| Template Creation Sales Manager Hours .................... | 8 | Triangular ........................ | 4 | 12 |
| Template Creation Web Developer Hours .................... | 8 | Triangular ........................ | 4 | 12 |

TABLE A.5—ALTERNATIVE PARAMETERS: COSTS OF FINANCING DISCLOSURES

| | Base case | Monte Carlo | | |
|---|---|---|---|---|
| Parameter | Parameter value | Modeled distribution | Distribution lower bound | Distribution upper bound |
| Disclosure Creation Compliance Manager Hours ...... | 8 | Triangular ......................... | 4 | 12 |
| Disclosure Training Hours ............................................ | 1 | Triangular ......................... | 0 | 2 |
| Disclosure Delivery Time Minutes ............................. | 2 | Triangular ......................... | 0 | 4 |
| Printing Costs ............................................................. | 0.15 | Triangular ......................... | 0.10 | 0.20 |

TABLE A.6—ALTERNATIVE PARAMETERS: COSTS OF ITEMIZED DISCLOSURES

| | Base case | Monte Carlo | | |
|---|---|---|---|---|
| Parameter | Parameter value | Modeled distribution | Distribution lower bound | Distribution upper bound |
| Electronic Disclosure Share (Scenario 2 only) ........... | 0.27 | Triangular ......................... | 0.04 | 0.50 |
| Upfront Sales Manager Hours (Scenario 1) ............... | 8 | Triangular ......................... | 4 | 12 |
| Upfront Compliance Manager Hours (Scenario 1) ..... | 8 | Triangular ......................... | 4 | 12 |
| Disclosure Training Hours (Scenario 1) ...................... | 1 | Triangular ......................... | 0 | 2 |
| Disclosure Creation Sales Manager Hours (Scenario 2 only). | 4 | Triangular ......................... | 2 | 6 |
| Disclosure Creation Compliance Manager Hours (Scenario 2 only). | 8 | Triangular ......................... | 4 | 12 |
| Disclosure Creation Web Developer Hours (Scenario 2 only). | 8 | Triangular ......................... | 4 | 12 |
| Disclosure Delivery Minutes (Scenario 2 only) ........... | 2 | Triangular ......................... | 0 | 4 |
| Printing Costs (Scenario 2 only) ................................ | 0.15 | Triangular ......................... | 0.10 | 0.20 |
| Electronic Disclosure Costs (Scenario 2 only) ........... | 0.02 | Triangular ......................... | 0 | 0.04 |

TABLE A.7—ALTERNATIVE PARAMETERS: RECORDKEEPING COSTS

| | Base case | Monte Carlo | | |
|---|---|---|---|---|
| Parameter | Parameter value | Modeled distribution | Distribution lower bound | Distribution upper bound |
| GAP Sales Share ........................................................ | 0.17 | Triangular ......................... | 0.07 | 0.27 |
| GAP Sale Minutes ....................................................... | 1 | Triangular ......................... | 0 | 2 |
| Upfront Web Developer Hours .................................... | 8 | Triangular ......................... | 4 | 12 |
| Upfront Clerical Hours ................................................ | 5 | Triangular ......................... | 2 | 8 |
| Upfront Sales Manager Hours .................................... | 1 | Triangular ......................... | 0 | 2 |
| Upfront Compliance Manager Hours .......................... | 1 | Triangular ......................... | 0 | 2 |
| IT Hardware Costs ...................................................... | 300 | Triangular ......................... | 100 | 500 |

We simulate 1,000 scenarios drawing from these parameter distributions, recording the costs and benefits of each potential outcome. The distribution of costs and benefits is plotted in the following table for discount rates of 3% and 7%.



Differencing the costs and benefits from each simulation iteration yields a distribution of net benefits under the various parameter draws. We again plot this distribution under 3% and 7% discount rates.



This exercise finds heterogeneity in net benefits under the alternative parameter distributions, but the Rule still yields positive net benefits in all simulated outcomes.

Finally, to examine the sensitivity of the net benefits conclusions to the possibility of systematic underestimating of labor costs, we calculate costs and benefits in a scenario where all labor costs turn out to be ten

times larger than the parameter values in the main text. All non-labor hours costs (including benefits hours, wage rates, and prevalence counts) are unchanged in this analysis.

TABLE A.8—PRESENT VALUE OF NET BENEFITS (IN MILLIONS), LABOR COSTS × 10, 2024–2033

|  | Base case | |
|---|---|---|
|  | 3% Discount rate | 7% Discount rate |
| *Benefits:* | | |
| Time savings | $14,926 | $12,290 |
| Deadweight Loss Reduction | 1,298 | 1,069 |
| Total Benefits | 16,224 | 13,359 |
| *Costs:* | | |
| Prohibition on Misrepresentations | 1,573 | 1,295 |
| Offering Price Disclosure | 455 | 455 |
| Finance/Lease Total of Payments Disclosure | 2,743 | 2,279 |
| Prohibition re: Certain Add-ons & Express, Informed Consent | 4,471 | 3,830 |
| Recordkeeping | 1,868 | 1,583 |
| Total Costs | 11,111 | 9,443 |
| Net Benefits | 5,114 | 3,916 |

**Note:** "Base Case" reflects base case benefit estimates and high cost scenarios with ten times the labor costs as in the main analysis. Not all impacts can be quantified; estimates only reflect quantified costs and benefits.

## VIII. Other Matters

Pursuant to the Congressional Review Act (5 U.S.C. 801 *et seq.*), the Office of Information and Regulatory Affairs designated this Rule as a "major rule," as defined by 5 U.S.C. 804(2).

### List of Subjects in 16 CFR Part 463

Consumer protection, Motor vehicles, Reporting and recordkeeping requirements, Trade practices.

■ For the reasons stated in the preamble, the Federal Trade Commission adds part 463 to subchapter D of Title 16 of the Code of Federal Regulations to read as follows:

## PART 463—COMBATING AUTO RETAIL SCAMS TRADE REGULATION RULE

Sec.
463.1   Authority.
463.2   Definitions.
463.3   Prohibited misrepresentations.
463.4   Disclosure requirements.
463.5   Dealer charges for Add-ons and other items.
463.6   Recordkeeping.
463.7   Waiver not permitted.
463.8   Severability.
463.9   Relation to State laws.

**Authority:** 15 U.S.C. 41 *et seq.;* 12 U.S.C. 5519.

### §463.1   Authority.

This part is promulgated pursuant to section 1029 of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, 12 U.S.C. 5519(d). It is an unfair or deceptive act or practice within the meaning of section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. 45(a)(1)) to violate any applicable provision of this part, directly or indirectly, including the recordkeeping requirements which are necessary to prevent such unfair or deceptive acts or practices and to enforce this part.

### §463.2   Definitions.

(a) "Add-on" or "Add-on product(s) or Service(s)" means any product(s) or service(s) not provided to the consumer or installed on the Vehicle by the Vehicle manufacturer and for which the Dealer, directly or indirectly, charges a consumer in connection with a Vehicle sale, lease, or financing transaction.

(b)–(c) [Reserved]

(d) "Clear(ly) and Conspicuous(ly)" means in a manner that is difficult to miss (*i.e.,* easily noticeable) and easily understandable, including in all of the following ways:

(1) In any communication that is solely visual or solely audible, the disclosure must be made through the same means through which the communication is presented. In any communication made through both visual and audible means, such as a television advertisement, the disclosure must be presented simultaneously in both the visual and audible portions of the communication even if the representation requiring the disclosure is made in only one means.

(2) A visual disclosure, by its size, contrast, location, the length of time it appears, and other characteristics, must stand out from any accompanying text or other visual elements so that it is easily noticed, read, and understood.

(3) An audible disclosure, including by telephone or streaming video, must be delivered in a volume, speed, and cadence sufficient for ordinary consumers to easily hear and understand it.

(4) In any communication using an interactive electronic medium, such as the internet or software, the disclosure must be unavoidable.

(5) The disclosure must use diction and syntax understandable to ordinary consumers and must appear in each language in which the representation that requires the disclosure appears.

(6) The disclosure must comply with these requirements in each medium through which it is received.

(7) The disclosure must not be contradicted or mitigated by, or inconsistent with, anything else in the communication.

(e) "Covered Motor Vehicle" or "Vehicle" means any self-propelled vehicle designed for transporting persons or property on a public street, highway, or road. For purposes of this part, the term Covered Motor Vehicle does not include the following:

(1) Recreational boats and marine equipment;

(2) Motorcycles, scooters, and electric bicycles;

(3) Motor homes, recreational vehicle trailers, and slide-in campers; or

(4) Golf carts.

(f) "Covered Motor Vehicle Dealer" or "Dealer" means any person, including any individual or entity, or resident in the United States, or any territory of the United States, that:

(1) Is licensed by a State, a territory of the United States, or the District of Columbia to engage in the sale of Covered Motor Vehicles;

(2) Takes title to, holds an ownership interest in, or takes physical custody of Covered Motor Vehicles; and

(3) Is predominantly engaged in the sale and servicing of Covered Motor Vehicles, the leasing and servicing of Covered Motor Vehicles, or both.

(g) "Express, Informed Consent" means an affirmative act communicating unambiguous assent to be charged, made after receiving and in close proximity to a Clear and Conspicuous disclosure, in writing, and also orally for in-person transactions, of the following:

(1) What the charge is for; and

(2) The amount of the charge, including, if the charge is for a product or service, all fees and costs to be charged to the consumer over the period of repayment with and without the product or service. The following are examples of what does not constitute Express, Informed Consent:

(i) A signed or initialed document, by itself;

(ii) Prechecked boxes; or

(iii) An agreement obtained through any practice designed or manipulated with the substantial effect of subverting or impairing user autonomy, decision-making, or choice.

(h) "GAP Agreement" means an agreement to indemnify a Vehicle purchaser or lessee for any of the difference between the actual cash value of the Vehicle in the event of an unrecovered theft or total loss and the amount owed on the Vehicle pursuant to the terms of a loan, lease agreement, or installment sales contract used to purchase or lease the Vehicle, or to waive the unpaid difference between money received from the purchaser's or lessee's Vehicle insurer and some or all of the amount owed on the Vehicle at the time of the unrecovered theft or total loss, including products or services otherwise titled "Guaranteed Automobile Protection Agreement," "Guaranteed Asset Protection Agreement," "GAP insurance," or "GAP Waiver."

(i) "Government Charges" means all fees or charges imposed by a Federal, State, or local government agency, unit, or department, including taxes, license and registration costs, inspection or certification costs, and any other such fees or charges.

(j) "Material" or "Materially" means likely to affect a person's choice of, or conduct regarding, goods or services.

(k) "Offering Price" means the full cash price for which a Dealer will sell or finance the Vehicle to any consumer, provided that the Dealer may exclude only required Government Charges.

**§ 463.3  Prohibited misrepresentations.**

It is a violation of this part and an unfair or deceptive act or practice in violation of section 5 of the Federal Trade Commission Act for any Covered Motor Vehicle Dealer to make any misrepresentation, expressly or by implication, regarding Material information about the following:

(a) The costs or terms of purchasing, financing, or leasing a Vehicle.

(b) Any costs, limitation, benefit, or any other aspect of an Add-on Product or Service.

(c) Whether the terms are, or transaction is, for financing or a lease.

(d) The availability of any rebates or discounts that are factored into the advertised price but not available to all consumers.

(e) The availability of Vehicles at an advertised price.

(f) Whether any consumer has been or will be preapproved or guaranteed for any product, service, or term.

(g) Any information on or about a consumer's application for financing.

(h) When the transaction is final or binding on all parties.

(i) Keeping cash down payments or trade-in Vehicles, charging fees, or initiating legal process or any action if a transaction is not finalized or if the consumer does not wish to engage in a transaction.

(j) Whether or when a Dealer will pay off some or all of the financing or lease on a consumer's trade-in Vehicle.

(k) Whether consumer reviews or ratings are unbiased, independent, or ordinary consumer reviews or ratings of the Dealer or the Dealer's products or services.

(l) Whether the Dealer or any of the Dealer's personnel or products or services is or was affiliated with, endorsed or approved by, or otherwise associated with the United States government or any Federal, State, or local government agency, unit, or department, including the United States Department of Defense or its Military Departments.

(m) Whether consumers have won a prize or sweepstakes.

(n) Whether, or under what circumstances, a Vehicle may be moved, including across State lines or out of the country.

(o) Whether, or under what circumstances, a Vehicle may be repossessed.

(p) Any of the required disclosures identified in this part.

(q) The requirements in this section also are prescribed for the purpose of preventing the unfair or deceptive acts or practices defined in this part, including those in §§ 463.4 and 463.5.

**§ 463.4  Disclosure requirements.**

It is a violation of this part and an unfair or deceptive act or practice in violation of section 5 of the Federal Trade Commission Act for any Covered Motor Vehicle Dealer to fail to make any disclosure required by this section, Clearly and Conspicuously.

(a) *Offering Price.* In connection with the sale or financing of Vehicles, a Vehicle's Offering Price must be disclosed:

(1) In any advertisement that references, expressly or by implication, a specific Vehicle;

(2) In any advertisement that represents, expressly or by implication, any monetary amount or financing term for any Vehicle; and

(3) In any communication with a consumer that includes a reference, expressly or by implication, regarding a specific Vehicle, or any monetary amount or financing term for any Vehicle. With respect to such communications:

(i) The Offering Price for the Vehicle must be disclosed in the Dealer's first response regarding that specific Vehicle to the consumer; and

(ii) If the communication or response is in writing, the Offering Price must be disclosed in writing. The requirements in this paragraph (a) also are prescribed for the purpose of preventing the unfair or deceptive acts or practices defined in this part, including those in §§ 463.3(a) and (b) and 463.5(c).

(b) [Reserved]

(c) *Add-ons not required.* When making any representation, expressly or by implication, directly or indirectly, about an Add-on Product or Service, the Dealer must disclose that the Add-on is not required and the consumer can purchase or lease the Vehicle without the Add-on, if true. If the representation is in writing, the disclosure must be in writing. The requirements in this paragraph (c) also are prescribed for the purpose of preventing the unfair or deceptive acts or practices defined in this part, including those in §§ 463.3(a) and (b) and 463.5(c).

(d) *Total of payments and consideration for a financed or lease transaction.* (1) When making any representation, expressly or by implication, directly or indirectly, about a monthly payment for any Vehicle, the Dealer must disclose the total amount the consumer will pay to purchase or lease the Vehicle at that monthly payment after making all payments as scheduled. If the representation is in

writing, the disclosure must be in writing.

(2) If the total amount disclosed assumes the consumer will provide consideration (for example, in the form of a cash down payment or trade-in valuation), the Dealer must disclose the amount of consideration to be provided by the consumer. If the representation is in writing, the disclosure must be in writing.

(3) The requirements in this paragraph (d) also are prescribed for the purpose of preventing the unfair or deceptive acts or practices defined in this part, including those in §§ 463.3(a) and 463.5(c).

(e) *Monthly payments comparison.* When making any comparison between payment options, expressly or by implication, directly or indirectly, that includes discussion of a lower monthly payment, the Dealer must disclose that the lower monthly payment will increase the total amount the consumer will pay to purchase or lease the Vehicle, if true. If the representation is in writing, the disclosure must be in writing. The requirements in this paragraph (e) also are prescribed for the purpose of preventing the unfair or deceptive acts or practices defined in this part, including those in §§ 463.3(a) and 463.5(c).

### § 463.5 Dealer charges for Add-ons and other items.

It is a violation of this part and an unfair or deceptive act or practice in violation of section 5 of the Federal Trade Commission Act for any Covered Motor Vehicle Dealer, in connection with the sale or financing of Vehicles, to charge for any of the following.

(a) *Add-ons that provide no benefit.* A Dealer may not charge for an Add-on Product or Service if the consumer would not benefit from such an Add-on Product or Service, including:

(1) Nitrogen-filled tire-related products or services that contain no more nitrogen than naturally exists in the air; or

(2) Products or services that do not provide coverage for the Vehicle, the consumer, or the transaction or that are duplicative of warranty coverage for the Vehicle, including a GAP Agreement if the consumer's Vehicle or neighborhood is excluded from coverage or the loan-

to-value ratio would result in the consumer not benefiting financially from the product or service.

(3) The requirements in this paragraph (a) also are prescribed for the purpose of preventing the unfair or deceptive acts or practices defined in this part, including those in § 463.3(a) and (b) and paragraph (c) of this section.

(b) [Reserved]

(c) *Any item without Express, Informed Consent.* A Dealer may not charge a consumer for any item unless the Dealer obtains the Express, Informed Consent of the consumer for the charge. The requirements in this paragraph (c) also are prescribed for the purpose of preventing the unfair or deceptive acts or practices defined in this part, including those in §§ 463.3(a) and (b), 463.4, and paragraph (a) of this section.

### § 463.6 Recordkeeping.

(a) Any Covered Motor Vehicle Dealer subject to this part must create and retain, for a period of twenty-four months from the date the record is created, all records necessary to demonstrate compliance with this part, including the following records:

(1) Copies of all Materially different advertisements, sales scripts, training materials, and marketing materials regarding the price, financing, or lease of a Vehicle, that the Dealer disseminated during the relevant time period; *Provided that* a typical example of a credit or lease advertisement may be retained for advertisements that include different Vehicles, or different amounts for the same credit or lease terms, where the advertisements are otherwise not Materially different;

(2) [Reserved]

(3) Copies of all purchase orders; financing and lease documents with the Dealer signed by the consumer, whether or not final approval is received for a financing or lease transaction; and all written communications relating to sales, financing, or leasing between the Dealer and any consumer who signs a purchase order or financing or lease contract with the Dealer;

(4) Records demonstrating that Add-ons in consumers' contracts meet the requirements of § 463.5, including copies of all service contracts, GAP Agreements and calculations of loan-to-

value ratios in contracts including GAP Agreements; and

(5) Copies of all written consumer complaints relating to sales, financing, or leasing, inquiries related to Add-ons, and inquiries and responses about Vehicles referenced in § 463.4.

(b) Any Dealer subject to this part may keep the records required by paragraph (a) of this section in any legible form, and in the same manner, format, or place as they may already keep such records in the ordinary course of business. Failure to keep all records required under paragraph (a) of this section will be a violation of this part.

### § 463.7 Waiver not permitted.

It is a violation of this part for any person to obtain, or attempt to obtain, a waiver from any consumer of any protection provided by or any right of the consumer under this part.

### § 463.8 Severability.

The provisions of this part are separate and severable from one another. If any provision is stayed or determined to be invalid, it is the Commission's intention that the remaining provisions will continue in effect.

### § 463.9 Relation to State laws.

(a) *In general.* This part will not be construed as superseding, altering, or affecting any other State statute, regulation, order, or interpretation relating to Covered Motor Vehicle Dealer requirements, except to the extent that such statute, regulation, order, or interpretation is inconsistent with the provisions of this part, and then only to the extent of the inconsistency.

(b) *Greater protection under State law.* For purposes of this section, a State statute, regulation, order, or interpretation is not inconsistent with the provisions of this part if the protection such statute, regulation, order, or interpretation affords any consumer is greater than the protection provided under this part.

By direction of the Commission.

**Joel Christie,**

*Acting Secretary.*

[FR Doc. 2023–27997 Filed 12–28–23; 8:45 am]

**BILLING CODE P**