No. 24-60013

**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

NATIONAL AUTOMOBILE DEALERS ASSOCIATION, AND
TEXAS AUTOMOBILE DEALERS ASSOCIATION,
*Petitioners*,

v.

FEDERAL TRADE COMMISSION,
*Respondent*.

On Petition for Review of a Final Trade Regulation Rule
of the Federal Trade Commission

# PETITIONERS' OPPOSED MOTION FOR STAY OF FINAL RULE AND FOR EXPEDITED CONSIDERATION

Andrew D. Koblenz
General Counsel
NATIONAL AUTOMOBILE DEALERS ASSOCIATION
8484 Westpark Drive, Suite 500
Tysons, VA 22102

Karen Phillips
General Counsel
TEXAS AUTOMOBILE DEALERS ASSOCIATION
1108 Lavaca Street, Suite 800
Austin, TX 78701

Jeffrey M. Harris
Seanhenry VanDyke*
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
jeff@consovoymccarthy.com

*Supervised by principals of the firm who are members of the Virginia bar.

*Counsel for Petitioners*

## CERTIFICATE OF INTERESTED PERSONS

1. No. 24-60013, *Nat'l Automobile Dealers Ass'n v. FTC*

2. The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made so that the judges of this court can evaluate possible disqualification or recusal:

Consovoy McCarthy PLLC

Federal Trade Commission

Jeffrey M. Harris

National Automobile Dealers Association[1]

Texas Automobile Dealers Association[2]

Seanhenry VanDyke

*/s/ Jeffrey M. Harris*
Attorney of Record for Petitioners

---

[1] NADA has no parent corporation, and no corporation owns 10% or more of its stock.

[2] TADA has no parent corporation, and no corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS .......... i

TABLE OF CONTENTS .......... ii

TABLE OF AUTHORITIES .......... iii

INTRODUCTION .......... 1

STATEMENT .......... 3

- I. Auto dealers are subject to, and overwhelmingly compliant with, a comprehensive scheme of state and federal regulation. .......... 3
- II. In 2011-2012, the FTC considers a rule regulating auto dealers but then sits on its hands for over a decade. .......... 4
- III. In 2022, the FTC initiates a rulemaking without the advance notice required by its own regulations. .......... 5
- IV. The FTC finalizes its trade regulation rule, ignoring critical defects identified by commenters and introducing new ones. .......... 5

ARGUMENT .......... 7

- I. Petitioners are likely to succeed on the merits. .......... 9
  - A. The FTC unlawfully issued the "CARS" Rule without the advance notice required by its own regulations. .......... 9
  - B. The Rule is arbitrary and capricious because the FTC unreasonably evaluated the rule's costs and benefits. .......... 13
  - C. The Rule is arbitrary and capricious because the FTC did not articulate a rational connection between its factual findings and its decision to impose a far-reaching, industry-wide rule. .......... 15
- II. Petitioners face irreparable harm absent a stay. .......... 18
- III. A stay would not harm the FTC and would serve the public interest. .......... 20

CONCLUSION .......... 21

# TABLE OF AUTHORITIES

## Cases

*Backcountry Against Dumps v. FAA*, 77 F.4th 1260 (9th Cir. 2023) .................................. 12

*Barber v. Bryant*, 833 F.3d 510 (5th Cir. 2016) .................................................................. 20

*Breeze Smoke, LLC v. FDA*, 18 F.4th 499 (6th Cir. 2021) ....................................................8

*Business Roundtable v. SEC*, 647 F.3d 1144 (D.C. Cir. 2011) ............................................ 13

*Cargill, Inc. v. United States*, 173 F.3d 323 (5th Cir. 1999).................................................. 11

*Chamber of Commerce v. SEC*, 85 F.4th 760 (5th Cir. 2023) ........................................13, 15

*Chevron Oil Co. v. Andrus*, 588 F.2d 1383 (5th Cir. 1979) ....................................................9

*IMS, P.C. v. Alvarez*, 129 F.3d 618 (D.C. Cir. 1997)........................................................ 12

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983).........16, 18

*Prometheus Radio Proj. v. FCC*, No. 03-3388, 2003 WL 22052896 (3d Cir. Sept. 3, 2003) ..................................................................................8

*SEC v. Barton*, 79 F.4th 573 (5th Cir. 2023) ........................................................................8

*Texas v. EPA*, 829 F.3d 405 (5th Cir. 2016) ...............................................................18, 19

*U.S. ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954) ........................................................9

*Wages and White Lion Investments, LLC v. FDA*, 16 F.4th 1130 (5th Cir. 2021).......... 8, 18

*Window Covering Mfrs. Ass'n v. CPSC*, 82 F.4th 1273 (D.C. Cir. 2023) ........................... 15

## Statutes

12 U.S.C. §5519(d)............................................................................................................ 11

15 U.S.C. §46(g) ................................................................................................................ 11

15 U.S.C. §57a(a)(1)(B) ..................................................................................................... 10

15 U.S.C. §57a(b)(2) ............................................................................................................9

Dodd-Frank Act of 2010, Pub. L. 111-203, 124 Stat. 1376, §1029(d) ........................ 4, 9

## Rules

Fed. R. App. P. 18(a)(2)(A)(i) ...............................................................................................8

**Regulations**

16 C.F.R. §1.10 .......... 2, 5, 9

16 C.F.R. §1.31 .......... 8

16 C.F.R. §1.7 .......... 9

**Other Authorities**

FTC, *Consumer Sentinel Network*, *Data Book 2022* (Feb. 2023) .......... 18

*Miscellaneous Revisions and Corrections*, 50 Fed. Reg. 53,302 (Dec. 31, 1985) .......... 11

*Motor Vehicle Dealers Trade Regulation Rule*, 87 Fed. Reg. 42,012 (July 13, 2022) .......... 5, 7, 10, 12, 13

*Public Roundtables: Protecting Consumers in the Sale and Leasing of Motor Vehicles*, 76 Fed. Reg. 14,014 (Mar. 15, 2011) .......... 4, 16

*Revisions to Rules of Practice*, 86 Fed. Reg. 38,542 (July 22, 2021) .......... 11

## INTRODUCTION

American automobile dealerships employ more than a million workers and sell more than 40 million new and used vehicles per year. These dealerships must comply with numerous overlapping schemes of federal and state regulation addressing their advertising, pricing, financing, disclosures, fees, recordkeeping, and more. But that was not enough for the Federal Trade Commission, which recently finalized an additional trade regulation rule addressing purportedly unfair and deceptive acts by auto dealers. The "CARS" Rule adds a new regulatory overlay that will impose significant compliance costs on auto dealers—and confuse and frustrate customers—by injecting numerous new disclosure, paperwork, and recordkeeping requirements into the already lengthy and paperwork-intensive process of purchasing and financing a vehicle.

The Rule: (1) prohibits 16 redundant or poorly defined categories of misrepresentations; (2) imposes several new affirmative disclosure requirements; (3) imposes various complicated requirements governing charges for add-on and other products and services; and (4) imposes significant new recordkeeping requirements. These requirements would overhaul the way dealerships communicate with their customers and add time and complexity to *every stage* of motor vehicle transactions—from advertising a vehicle, to selling it, processing any trade-in vehicle, financing the vehicle, and protecting the customer's investment.

The Rule's new requirements are certain to frustrate and confuse vehicle shoppers. To give just one example, under the Rule, dealership employees must

calculate and disclose a defined (and potentially confusing) "Offering Price" to customers in their first communication about any specific vehicle. Thus, if a customer visits a lot and in their first inquiry about a specific vehicle asks about some characteristic of that vehicle—say, fuel economy or towing capacity—a dealership employee cannot answer that question without confirming and stating the "Offering Price," injecting an unasked-for discussion of the vehicle's price into the conversation before answering the customer's seemingly straightforward question.

In promulgating the Rule, the FTC flouted both its own procedural regulations and the Administrative Procedure Act's mandate of reasoned decisionmaking. The FTC unlawfully promulgated the rule by issuing its Notice of Proposed Rulemaking without the advance notice expressly required by its own regulations. *See* 16 C.F.R. §1.10. And it acted arbitrarily and capriciously by failing to adequately substantiate the Rule's benefits and costs or rationally connect the evidence before it to its decision to impose a convoluted, far-reaching, industry-wide rule.

Unless stayed, the Rule will irreparably injure Petitioners' members by requiring them to incur significant unrecoverable compliance costs well in advance of the July 30, 2024 effective date. Petitioners therefore respectfully request that the Court stay the Rule pending resolution of their petition for review and expedite consideration of the petition on the merits. Pursuant to 5th Circuit Rule 27.4, Petitioners further request that the Court act on this motion as soon as practicable but no later than March 31, 2024, to ensure that Petitioners' members will have clear guidance about whether they need

to overhaul their operations in an effort to comply with the Rule's vague and burdensome new mandates.

## STATEMENT

### I. Auto dealers are subject to, and overwhelmingly compliant with, a comprehensive scheme of state and federal regulation.

American automobile dealerships sell more than 40 million new and used vehicles every year. Every stage of these transactions is heavily regulated by overlapping schemes of federal and state regulation. Among other laws, dealerships must comply with obligations under the FTC Act, the Fair Credit Reporting Act, the Gramm-Leach-Bliley Act, the Truth in Lending Act, the Consumer Leasing Act, and the Equal Credit Opportunity Act, not to mention consumer protection statutes that exist in every state and already prohibit unfair or deceptive trade practices. These laws govern every stage of a motor vehicle transaction, from advertising a vehicle, to selling it, financing it, processing any trade-in vehicle, and protecting the customer's investment.

Data from both the FTC and the public record indicate overwhelming industry regulatory compliance and customer satisfaction. For example, an FTC "compliance sweep" of auto dealers' compliance with one FTC rule found "broad compliance" in the industry, and the FTC's complaint database contains complaints regarding far less than 1% of automobile purchases. A139 n.38; A178. Additionally, studies by renowned market research firms like J.D. Power and Cox Automotive have consistently shown widespread (and increasing) consumer satisfaction with automobile dealerships, which

is unsurprising as the Internet has given consumers unprecedented ability to find the best vehicle for their needs at the best price. A143-47.

## II. In 2011-2012, the FTC considers a rule regulating auto dealers but then sits on its hands for over a decade.

The Dodd-Frank Act of 2010 exempted auto dealers from the Consumer Financial Protection Bureau's reach but, at the same time, relaxed some of the procedural requirements that the FTC must follow when exercising its preexisting authority to prescribe rules under Section 18(a)(1)(B) of the FTC Act that define with specificity unfair or deceptive acts or practices by auto dealers. *See* Pub. L. 111-203, 124 Stat. 1376, 2004-05, §1029(d).

In 2011, the FTC considered whether to exercise this authority by hosting a series of "Motor Vehicle Roundtables" to determine "what consumer protection issues, if any, exist that could be addressed through a possible rulemaking or other initiatives." 76 Fed. Reg. 14,014, 14,015 (Mar. 15, 2011). The FTC specifically asked participants whether there was any "data and empirical evidence" showing widespread bad "practice[s] in the industry as a whole or in any subset of the industry." *Id.* at 14,015-16. Despite generating over 21 hours of testimony, 500 pages of written transcripts, and 100 supplemental comments, the roundtables did not yield any credible data suggesting deceptive or unfair practices were prevalent in the marketplace. The FTC accordingly declined to initiate a rulemaking in the decade that followed.

## III. In 2022, the FTC initiates a rulemaking without the advance notice required by its own regulations.

Ten years later, the FTC issued a sweeping notice of proposed rulemaking (NPRM) that would overhaul how auto dealers communicate and interact with potential customers. *See Motor Vehicle Dealers Trade Regulation Rule*, 87 Fed. Reg. 42,012 (July 13, 2022). Under the proposed rule, virtually all written communications and many oral communications between dealership employees and potential customers concerning the sale, financing, or lease of a vehicle would be effectively regulated by the FTC. Many of those communications would now be required to include confusing and potentially misleading disclosures (such as an "Offering Price" that would usually not match the actual vehicle price to be paid by the customer because the final price is often negotiated down by the customer). And the proposal further added burdensome new paperwork and recordkeeping requirements.

The FTC issued this NPRM without the advance notice required by its own regulations, which state: "Prior to the commencement of any trade regulation rule proceeding, the Commission must publish in the Federal Register an advance notice of such proposed proceeding." 16 C.F.R. §1.10(a). Thus, the FTC failed to follow its own advance notice requirement before launching the rulemaking process.

## IV. The FTC finalizes its trade regulation rule, ignoring critical defects identified by commenters and introducing new ones.

The FTC provided a 60-day comment period for the proposed rule. Multiple organizations requested an extension to allow for the preparation and submission of

quantitative data on the rule's likely effects. NADA, for example, commissioned a study by the Center for Automotive Research, a neutral third-party research organization, regarding the proposed rule's implementation costs and benefits, but this research could not be completed in the two months allotted for comment. The FTC declined to extend the comment period, which closed on September 12, 2022.[3]

Even so, numerous organizations and dealers submitted comments highlighting pervasive flaws in the proposed rule. Many commenters pointed out that the NPRM was premised largely on anecdotes, unverified consumer complaints, and a handful of FTC enforcement actions—and included no quantitative evidence suggesting that the conduct targeted by the proposed rule was widespread in the marketplace. For example, the U.S. Small Business Administration's Office of Advocacy "encourage[d] the FTC to determine if there is a way to target the bad actors rather than this rulemaking which targets an entire industry for behavior that impacts less than one percent of the market." A500.

Commenters also explained that the proposed rule would confuse customers, increase prices, and add significant time and complexity to the already time- and paperwork-intensive process of purchasing a vehicle. Indeed, the proposal merely sought to overlay yet another layer of red tape atop a process that was already comprehensively regulated under other state and federal laws. Unsurprisingly, the

[3] NADA submitted this study to the FTC once it was completed, but the FTC insisted that it "is not part of this rulemaking record" and dismissed it in a footnote. A24 n.185.

FTC's estimate as to the benefit of this regulatory scheme was simply pulled from thin air. The FTC assumed, with no evidence whatsoever, that the rule would make vehicle shopping 20% more efficient, and then quantified the rule's purported benefits using that *ipse dixit*. 87 Fed. Reg. at 42,037.

Despite its refusal to extend the comment period, the FTC sat on the proposed rule for an additional 15 months after the comment period closed. On December 12, 2023, the FTC announced a final rule that modified its proposal in some respects but failed to address critical defects identified by stakeholders' comments. Of note, the FTC still failed to provide any quantitative data showing the conduct targeted by the Rule was widespread in the market or was not adequately regulated by preexisting state and federal laws. The final rule deleted some of the proposal's most burdensome disclosure requirements, but left multiple other affirmative disclosure requirements in place. In its final cost-benefit analysis, the FTC removed the made-up 20%-efficiency assumption from the NPRM. But it replaced that assumption with an equally baseless assumption: that its rule would make in-person car shopping comparably efficient to online car shopping. A87-89.

The FTC set the rule's effective date as July 30, 2024.

## ARGUMENT

For a stay pending review, the Court considers "four factors: (1) whether the requester makes a strong showing that it's likely to succeed on the merits; (2) whether the requester will be irreparably injured without a stay; (3) whether other interested

parties will be irreparably injured by a stay; and (4) where the public interest lies." *Wages and White Lion Investments, LLC v. FDA*, 16 F.4th 1130, 1135 (5th Cir. 2021). The first two factors are most important. *Id.*

A stay also requires Petitioners to "show that moving first before the agency would be impracticable." Fed. R. App. P. 18(a)(2)(A)(i). That is plainly the case here. In the final rule, the FTC expressly considered, and rejected, comments requesting a later effective date. A71. In these circumstances, presenting the same arguments to the agency again in the form of a stay motion would be pointless and futile. *See SEC v. Barton*, 79 F.4th 573, 581 (5th Cir. 2023) (a "clear indication that the district court would have denied [a stay] motion" satisfies analogous impracticability requirement of Rule 8); *Prometheus Radio Project v. FCC*, No. 03-3388, 2003 WL 22052896, at *1 n.2 (3d Cir. Sept. 3, 2003) ("it appears virtually certain that the Commission would not grant a stay in this matter").

Moreover, because there is no limit to how long the FTC could take to consider a stay motion, *see* 16 C.F.R. §1.31, moving first before the agency would prejudice Petitioners' ability to obtain relief before they are irreparably injured by the FTC's rule. *See infra* Part II. This Court has found that moving for a stay before the agency is impracticable in such circumstances. *See Wages and White Lion*, 16 F.4th at 1135 n.1; *accord Breeze Smoke, LLC v. FDA*, 18 F.4th 499, 503 (6th Cir. 2021).

## I. Petitioners are likely to succeed on the merits.

### A. The FTC unlawfully issued the "CARS" Rule without the advance notice required by its own regulations.

It is black-letter administrative law that agencies must follow their own regulations. *See, e.g.*, *U.S. ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954); *Chevron Oil Co. v. Andrus*, 588 F.2d 1383, 1386 (5th Cir. 1979). Here, the FTC violated the unequivocal text of 16 C.F.R. §1.10, which provides: "Prior to the commencement of any trade regulation rule proceeding, the Commission must publish in the Federal Register an advance notice of such proposed proceeding." *See also* 16 C.F.R. §1.7 ("The rules in this subpart"—including Section 1.10—"apply to and govern proceedings for the promulgation of" trade regulation rules).

In 1980, Congress amended Section 18 of the FTC Act to require the Commission to begin the rulemaking process with an advance notice of proposed rulemaking (ANPRM) when it promulgates trade regulation rules defining unfair or deceptive acts. *See* 15 U.S.C. §57a(b)(2). The next year, the FTC promulgated Section 1.10, at which point the agency was subject to two distinct obligations to begin the rulemaking process with an ANPRM—a statutory one imposed by Congress and a regulatory one imposed by the agency itself.

In 2010, Section 1029(d) of Dodd-Frank repealed the statutory ANPRM requirement for trade regulation rules for auto dealers. *See* 124 Stat. at 2004-05 ("Notwithstanding section 18 of the Federal Trade Commission Act, the Federal Trade Commission is authorized to prescribe rules under sections 5 and 18(a)(1)(B) of the

Federal Trade Commission Act in accordance with [the APA] with respect to [auto dealers].") (codified at 12 U.S.C. §5519(d)). But nothing in Dodd-Frank repealed the *separate* ANPRM obligation in Section 1.10 or purported to limit the FTC's authority to impose additional regulatory procedures on itself beyond the statutory baseline. Section 1.10 remains valid and effective, and applies by its terms to "any" trade regulation rule proceeding, including this one.

"Trade regulation rules" are rules under Section 18(a)(1)(B) of the FTC Act that "define with specificity acts or practices which are unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. §57a(a)(1)(B). There is no question the Rule is a trade regulation rule, as its entire purpose is to define specific acts or practices by dealerships that are purportedly unfair or deceptive. The FTC concedes as much by characterizing the Rule as a trade regulation rule in both the NPRM and final rule. *See* A1 ("Combating Auto Retail Scams Trade Regulation Rule"); 87 Fed. Reg. at 42,012.

The FTC nonetheless insisted that it need not follow §1.10 because it is "acting under statutory authority under §1029(d) of the Dodd-Frank Act … which authorizes the Commission to promulgate rules using the APA's informal notice-and-comment procedure, *see* 5 U.S.C. 553, notwithstanding the additional procedural requirements set forth in section 18." A.12 n.115. This misses the point. No one disputes that Dodd-Frank exempted the FTC from the statutory ANPRM requirement in Section 18 of the FTC Act. But nothing in Dodd-Frank repealed or otherwise rendered inapplicable the distinct and independent ANPRM requirement in the FTC's *own regulations*. Indeed,

Dodd-Frank itself confirms that any FTC rulemaking regulating auto dealers is "under sections 45 and 57a(a)(1)(B) of Title 15," 12 U.S.C. §5519(d), meaning that it would qualify as a trade regulation rule subject to 16 C.F.R. §§1.7 and 1.10.

The FTC also suggested that §1.10 merely "implements section 18(b)(2) of the FTC Act," implying that because Section 18's ANPRM requirement does not apply per Dodd-Frank, §1.10 does not apply either. A.12 n.115. But the FTC has not limited §1.10 to rulemaking proceedings where Section 18(b)(2)'s statutory ANPRM requirement applies. Rather, the FTC has promulgated and amended §1.10 pursuant to its general rulemaking authority under Section 6 of the FTC Act, 15 U.S.C. §46(g). *See, e.g.*, *Miscellaneous Revisions and Corrections*, 50 Fed. Reg. 53,302, 53,303 (Dec. 31, 1985).

Notably, the FTC recently revisited—and significantly overhauled—its procedural regulations for unfair and deceptive acts rulemakings, in part to eliminate "unnecessary" rules that are not "statutorily required." *Revisions to Rules of Practice*, 86 Fed. Reg. 38,542, 38,544 (July 22, 2021). In doing so, the FTC considered whether to amend or repeal §1.10 and decided not to. *See id.* at 38,547-38,548 (making minor revisions). And even while it comprehensively reconsidered its procedural rules, the FTC neither proposed nor adopted any carve-out from §1.10 for rulemaking proceedings involving automobile dealerships.

"Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures." *Cargill, Inc. v. United States*, 173 F.3d 323, 340 n.34 (5th Cir. 1999) (citation omitted). When they do not, "it is a 'well-settled rule that an agency's

failure to follow its own regulations is fatal to the deviant action.'" *IMS, P.C. v. Alvarez*, 129 F.3d 618, 621 (D.C. Cir. 1997). An agency's violation of "procedural rules that allow interested parties to comment on and engage with administrative processes" is generally prejudicial to regulated parties who were denied the benefit of the process guaranteed by the rule. *Backcountry Against Dumps v. FAA*, 77 F.4th 1260, 1270 (9th Cir. 2023).

The FTC's violation of §1.10 was not merely a foot-fault; rather, it undermined the integrity of the rulemaking and prejudiced Petitioners' ability to meaningfully participate. The Commission's conduct throughout the rulemaking process suggests it was working with an incomplete understanding of the relevant market and would have benefitted from greater stakeholder participation. For example, in addition to proposing specific new rules, the NPRM requested comment on a wide-ranging, open-ended set of 49 questions, including questions regarding market effects and compliance burdens that could only be answered with extensive research and further study about the broader vehicle market and the rule's likely effects. *See* 87 Fed. Reg. at 42,028-42,031. These are precisely the sorts of issues that should be subject to comprehensive study, research, and public input *before* the FTC begins drafting specific new regulatory text—*i.e.*, subjects appropriate to address through an ANPRM. The FTC's failure to follow the process dictated by its own regulations was prejudicial to Petitioners and is "fatal to" its rule. *Alvarez*, 129 F.3d at 621.

### B. The Rule is arbitrary and capricious because the FTC unreasonably evaluated the rule's costs and benefits.

"A regulation is arbitrary and capricious if the agency 'failed to consider an important aspect of the problem,'" which "includes, of course, considering the costs and benefits associated with the regulation." *Chamber of Commerce v. SEC*, 85 F.4th 760, 777 (5th Cir. 2023). Thus, a rule flunks arbitrary-and-capricious review if the agency "failed adequately to substantiate the rule's benefits and costs." *Id.*; *see also, e.g.*, *Business Roundtable v. SEC*, 647 F.3d 1144, 1148-49 (D.C. Cir. 2011) (agency "inconsistently and opportunistically framed the costs and benefits of the rule; [and] failed adequately to quantify the certain costs or to explain why those costs could not be quantified").

In the NPRM, the FTC computed the Rule's benefits by *assuming* its proposal would save each consumer an average of 3 hours shopping for a vehicle. *See* 87 Fed. Reg. at 42,037. The 3-hour number was pulled from thin air—the FTC offered no data, study, survey, or analysis justifying the 3-hour estimate. *See id.*

To its credit, the FTC declined to rely on those benefit calculations in its final rule. But its new approach may be even worse. The FTC ultimately estimated consumer benefits by simply *assuming* that the Rule would make various aspects of in-person car shopping comparably efficient to online car shopping. A87-89. The agency then "quantified" the Rule's benefits by comparing the average time that in-person versus online car shoppers spend on these aspects of the car-buying process. For example, the FTC "assume[d] that non-digital consumers will save an amount of time negotiating a

vehicle purchase price equal to the amount of time saved by those negotiating purchase price digitally under the status quo (43 minutes).” A87.

This reasoning is unsupported and nonsensical. Unlike the NPRM’s approach, it allows the FTC to avoid having to pluck round numbers (“3 hours saved”) from thin air. But the singular assumption underlying the FTC’s new approach to quantifying benefits—the notion that the Rule’s effect will be to make in-person car shopping comparably efficient to online car shopping—has no support whatsoever. Zero. That’s because any purported time-saving benefits that could theoretically flow from the Rule have *nothing* to do with the typical time-saving benefits of online shopping, such as dispensing with face-to-face conversation, digitizing disclosures and paperwork, and automating steps in the transaction. As before, the critical assumption underlying the Rule’s estimated benefits is mere *ipse dixit* without any data, study, survey, consumer testing, or other substantiation.

The FTC’s analysis of the Rule’s likely costs is also fundamentally flawed. The FTC concedes the Rule will impose tens of millions of dollars in compliance costs on auto dealers every year. *E.g.*, A94. But the FTC nowhere acknowledges that at least some of those costs would likely be passed through to consumers, exerting upward pressure on automobile prices. To the contrary, the FTC again *assumes* with no evidence that “motor vehicle purchase, financing, and lease transactions will be stable at the [pre-rule] level,” without addressing the significant new compliance costs and the need for dealerships to factor those costs into pricing. A88.

This omission is critical because a substantial portion of the Rule's claimed benefits come from "reductions in deadweight loss"; *i.e.*, benefits flowing from decreased prices due to less "consumer search frictions, shrouded prices, deception, and obfuscation." A89, 92. But even assuming the Rule would increase transparency—and in turn increase competition and exert downward pressure on automobile prices[4]—the FTC's deadweight loss analysis ignores that dealers' compliance costs would exert a countervailing upward pressure on automobile prices. The FTC "failed to consider an important aspect of the problem" by neglecting to address at all the upward price pressure from substantial new compliance costs. *Chamber of Commerce*, 85 F.4th at 777.

In sum, the FTC's assessment of both benefits and costs rested on baseless assumptions and fundamentally flawed reasoning. These "serious flaw[s] in [the] cost-benefit analysis … render the resulting rule unreasonable and warrant vacatur on arbitrary and capricious grounds." *Window Covering Mfrs. Ass'n v. CPSC*, 82 F.4th 1273, 1288 (D.C. Cir. 2023) (cleaned up).

### C. The Rule is arbitrary and capricious because the FTC did not articulate a rational connection between its factual findings and its decision to impose a far-reaching, industry-wide rule.

To meet its obligation of "reasoned decisionmaking," an agency "must explain the evidence which is available, and must offer a 'rational connection between the facts

[4] It is at least as likely that the Rule's required pricing disclosures would lead to *higher* prices because of consumer confusion, reduced price advertising, and a move to "one price" selling that eliminates price negotiation and discounting. *E.g.*, A203.

found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983). The FTC has never explained why the available evidence regarding alleged deception and fraud in the motor vehicle marketplace requires layering burdensome new disclosure, paperwork, and recordkeeping requirements atop a comprehensive array of preexisting state and federal laws that already address the very same issues.

In 2010, Dodd-Frank relaxed some of the procedural requirements that the FTC must follow when exercising its preexisting authority under the FTC Act to promulgate unfair and deceptive acts rules regulating auto dealers. Since then, the FTC has used various limited fact-finding mechanisms to attempt to determine the extent of any misrepresentations or fraud. The FTC has expressly focused on determining whether there is "data and empirical evidence" suggesting that unfair or deceptive trade practices are widespread throughout the industry. 76 Fed. Reg. at 14,015.

Despite the FTC's emphasis on empirical data, it has never identified *any* comprehensive or reliable data indicating that unfair or deceptive acts are widespread in the vehicle marketplace. For example, the FTC's 2011 roundtables did not yield credible evidence showing widespread unfair trade practices, prompting the FTC to delay any rulemaking for over a decade. *See* A173. And the FTC's own complaint data show that customers complain about auto dealers' conduct after only a miniscule fraction of interactions with them. *See* A178-81; *infra* 18 n.5. Multiple commenters thus highlighted the absence of any quantitative data suggesting a *problem* or *regulatory gap* that

could justify the FTC's decision to issue an industry-wide rule imposing significant new burdens on auto dealers. *E.g.*, A170-74; A500.

The FTC responded to those comments about the lack of meaningful data supporting the Rule by ignoring them or offering more *ipse dixit*. For example, in response to a comment by the SBA's Office of Advocacy stressing that the conduct addressed by the Rule affects less than 1% of transactions and urging the FTC to adopt a more targeted approach, the FTC simply repeated its conclusory assertion that "a rule is needed to address ongoing problems related to bait-and-switch tactics and hidden charges." A82 n.518.

Instead of relying on comprehensive empirical data or research to justify the Rule, the FTC primarily relied on past enforcement actions, a "qualitative study of consumer experiences," and consumer complaint data. A9-10. The FTC cited 53 past enforcement actions to justify the rule, but 16 of those (nearly one-third) did not even involve auto dealerships. A182. That left just 37 actions over a decade against auto dealerships, an average of fewer than four per year—hardly justifying a sweeping industry-wide intervention. A182-83. And the FTC gave no reason to think its new rules would have prevented the misconduct in those cases, which already violated other federal laws. *See* A9.

The "qualitative" consumer study cited by the FTC involved a flawed and outdated 2017 survey of 38 consumers in a single market (out of over 40 million annual vehicle sales). A9-10; *see* A175-78 (explaining flaws in this survey). And the

Commission's passing invocation of consumer complaint data, *see* A5, did not address comments showing that the FTC has inflated the number of relevant complaints and that, even not adjusting for this inflation, customers complained about their interactions with auto dealers in only a miniscule fraction of cases, *see* A178-81.[5]

At bottom, after stressing the importance of quantitative data, the FTC finalized the proposed rule without making any meaningful effort to show that a significant industry-wide problem exists that would justify a disruptive and burdensome industry-wide regulatory response. Its failure to do so means that the agency "failed to consider an important aspect of the problem" and did not engage in "reasoned decisionmaking." *State Farm*, 463 U.S. at 43, 52.

## II. Petitioners face irreparable harm absent a stay.

Petitioners face irreparable harm because their members will need to spend substantial sums of unrecoverable costs to comply with the Rule by its July 30, 2024 effective date. "[C]omplying with a regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs." *Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016). That is because "federal agencies generally enjoy sovereign immunity for any monetary damages," *Wages and White Lion*, 16 F.4th at 1142, and "[n]o

[5] The FTC has recorded around 150,000 "auto related" complaints annually, which would seem to indicate approximately 1 complaint per 300 vehicles sales (0.33%). But even that figure is significantly inflated. Nearly half of the FTC's "auto related" complaints concern "Auto Parts & Repairs", "Auto Renting & Leasing," "Auto Service & Warranties," or "Gasoline," categories with little or no connection to the Rule. FTC, *Consumer Sentinel Network*, *Data Book 2022*, at Appendix B3 (Feb. 2023), https://perma.cc/KXQ8-52T3.

mechanism here exists for [Petitioners] to recover the compliance costs they will incur if the final rule is invalidated on the merits." *Texas v. EPA*, 829 F.3d at 434.

The Rule imposes new burdens on every stage of the vehicle buying process: advertising a vehicle, selling it, processing any trade-in vehicle, financing, and protecting the customer's investment. Even the FTC's flawed assessment of the Rule's costs estimates that dealers will incur over $120 million in unrecoverable compliance costs in 2024 alone. A93-98.

In the attached declarations, Joseph Street of Street Automotive in Amarillo, Texas discusses how the Rule is likely to impact the dealership he has owned for four decades, and Paul Metrey of NADA discusses the industry-wide impact of the Rule. Full compliance across the nation's 16,000 franchised new-car dealerships would require dealerships to make extensive changes to IT systems, websites, advertising practices, consumer communications and systems, training, new and used vehicle pricing disclosures, forms, and recordkeeping procedures and capabilities. A108-10 ¶¶7-10; A115 ¶7. This would require dealers to overhaul their existing systems and practices and spend substantial resources and employee time on training and compliance well in advance of the Rule's effective date. A110-11 ¶¶11-17; A115 ¶¶8-9. For example, Mr. Street estimates that to implement the Rule at his dealership alone would require hundreds of hours of upfront employee training (8 hours of initial training for approximately 60 affected employees in sales, marketing, finance, and recordkeeping),

plus ongoing monitoring and supervision, resulting in a considerable diversion of employee time. A110-11 ¶¶12-15.

Dealers also typically rely on outside vendors to develop forms and disclosures in compliance with federal and state consumer protection and credit laws. A115 ¶9. Dealers such as Street Automotive would need to revise their forms and disclosures and train employees accordingly, in addition to developing new recordkeeping procedures. A108-10 ¶¶7-8, 10. Absent a stay, dealerships would likely need to begin devoting significant resources to compliance and training efforts by March 2024, if not sooner, to ensure full compliance by the Rule's July 30, 2024 effective date. A111 ¶17.

Finally, it would be similarly difficult, expensive, and time-consuming to suddenly revert back to the pre-rule status quo if the Rule were later set aside by this Court after going into force. A116 ¶10. For all these reasons, Petitioners would suffer the irreparable harm of substantial unrecoverable compliance costs if denied a stay.

## III. A stay would not harm the FTC and would serve the public interest.

Neither the FTC nor the public would be harmed by a stay pending judicial review. A stay would simply preserve the status quo, and "the maintenance of the status quo is an important consideration in granting a stay." *Barber v. Bryant*, 833 F.3d 510, 511 (5th Cir. 2016).

Moreover, staying this rule will not result in a regulatory void; there are already numerous preexisting federal and state regulatory regimes that ensure price transparency and prevent unfair or deceptive practices in vehicle sales and financing.

*See* A118-28. In addition to state consumer-protection statutes and the numerous federal statutes discussed above, the FTC itself may target any isolated unfair or deceptive acts using its enforcement authority under Section 5 of the FTC Act.

Finally, the lack of countervailing harm to the FTC or the public is reinforced by the agency's own lack of urgency in this area. In the wake of Dodd-Frank, the FTC sat on its hands for over a decade after first considering a trade regulation rule for automobile dealerships. The agency then took 15 months after comments closed to finalize the Rule. Given the FTC's own lengthy delays in issuing this Rule, there is no plausible argument that the agency or the public would be harmed by a short stay of the effective date pending judicial review.

## CONCLUSION

This Court should stay the effective date of the Rule pending disposition of this petition for review and expedite its consideration of the merits.

Respectfully submitted,

*/s/ Jeffrey M. Harris*
Jeffrey M. Harris
Seanhenry VanDyke*
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
jeff@consovoymccarthy.com

*Counsel for Petitioners*

*Supervised by principals of the firm who are members of the Virginia bar.

Andrew D. Koblenz
General Counsel
NATIONAL AUTOMOBILE DEALERS ASSOCIATION
8484 Westpark Drive, Suite 500
Tysons, VA 22102

Karen Phillips
General Counsel
TEXAS AUTOMOBILE DEALERS ASSOCIATION
1108 Lavaca Street, Suite 800
Austin, TX 78701

## CERTIFICATE OF COMPLIANCE

This motion complies with Rule 27(d)(2)(A) because it contains 5195 words, excluding the parts that can be excluded under Rule 32(f). This motion also complies with Rule 32(a)(5)-(6) because it has been prepared in a proportionally spaced face using Microsoft Word in 14-point Garamond font.

*/s/ Jeffrey M. Harris*
Counsel for Petitioners

## CERTIFICATE OF CONFERENCE

Pursuant to Circuit Rule 27.4, I have notified counsel for Respondent of Petitioners' intent to file this motion. Respondent stated that it opposes this motion.

*/s/ Jeffrey M. Harris*
Counsel for Petitioners

## CERTIFICATE OF SERVICE

I filed a true and correct copy of this motion with the Clerk of this Court via the CM/ECF system, thereby serving all counsel of record.

/s/ *Jeffrey M. Harris*
Counsel for Petitioners