No. 24-60013

# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

NATIONAL AUTOMOBILE DEALERS ASSOCIATION, AND
TEXAS AUTOMOBILE DEALERS ASSOCIATION,
*Petitioners*,

v.

FEDERAL TRADE COMMISSION,
*Respondent*.

On Petition for Review of a Final Trade Regulation Rule
of the Federal Trade Commission

## APPENDIX TO PETITIONERS' MOTION FOR STAY AND FOR EXPEDITED CONSIDERATION

Andrew D. Koblenz
General Counsel
NATIONAL AUTOMOBILE DEALERS
ASSOCIATION
8484 Westpark Drive, Suite 500
Tysons, VA 22102

Karen Phillips
General Counsel
TEXAS AUTOMOBILE DEALERS
ASSOCIATION
1108 Lavaca Street, Suite 800
Austin, TX 78701

Jeffrey M. Harris
Seanhenry VanDyke*
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
jeff@consovoymccarthy.com

*Supervised by principals of the firm who
are members of the Virginia bar.

*Counsel for Petitioners*

# TABLE OF CONTENTS

FTC, *Combating Auto Retail Scams Trade Regulation Rule*, 89 Fed. Reg. 590
(Jan. 4, 2024) ........................................................................................ A1

Declaration of Joseph Street in Support of Petitioners' Motion for Stay ............... A107

Declaration of Paul Metrey in Support of Petitioners' Motion for Stay ................. A113

NADA, Comments to FTC (Sept. 12, 2022) ................................................. A130

U.S. Small Business Administration Office of Advocacy, Comments to FTC
(Sept. 8, 2022) .................................................................................... A494

**FEDERAL TRADE COMMISSION**

**16 CFR Part 463**

**RIN 3084–AB72**

**Combating Auto Retail Scams Trade Regulation Rule**

**AGENCY:** Federal Trade Commission.

**ACTION:** Final rule.

**SUMMARY:** The Federal Trade Commission ("FTC" or "Commission") is issuing this Combating Auto Retail Scams Trade Regulation Rule ("CARS Rule," "Rule," or "Final Rule") and Statement of Basis and Purpose ("SBP") related to the sale, financing, and leasing of covered motor vehicles by covered motor vehicle dealers. The Final Rule, among other things, prohibits motor vehicle dealers from making certain misrepresentations in the course of selling, leasing, or arranging financing for motor vehicles, requires accurate pricing disclosures in dealers' advertising and sales communications, requires dealers to obtain consumers' express, informed consent for charges, prohibits the sale of any add-on product or service that confers no benefit to the consumer, and requires dealers to keep records of certain advertisements and customer transactions.

**DATES:** This rule is effective July 30, 2024.

**ADDRESSES:** Copies of this document are available on the Commission's website, *www.ftc.gov*.

**FOR FURTHER INFORMATION CONTACT:** Daniel Dwyer or Sanya Shahrasbi, Division of Financial Practices, Bureau of Consumer Protection, Federal Trade Commission, 202–326–2957 (Dwyer), 202–326–2709 (Shahrasbi), *ddwyer@ftc.gov, sshahrasbi@ftc.gov*.

**SUPPLEMENTARY INFORMATION:**

## Table of Contents

I. Background
  A. Statutory Authority
  B. Commission Actions Following the Dodd-Frank Act and the Rulemaking Process
II. Motor Vehicle Financing and Leasing
  A. Overview of the Motor Vehicle Marketplace
  B. Deceptive and Unfair Practices in the Motor Vehicle Marketplace
  1. Bait-and-Switch Tactics
  2. Unlawful Practices Relating to Add-On Products or Services and Hidden Charges
  C. Law Enforcement and Other Responses
III. Section-by-Section Analysis
  A. § 463.1: Authority
  B. § 463.2: Definitions
  1. Overview
  2. Definition-by-Definition Analysis
  (a) Add-On or Add-On Product(s) or Service(s)
  (b) Add-On List
  (c) Cash Price Without Optional Add-Ons
  (d) Clearly and Conspicuously
  (e) Motor Vehicle (finalized as "'Covered Motor Vehicle' or 'Vehicle'")
  (f) Dealer or Motor Vehicle Dealer (finalized as "'Covered Motor Vehicle Dealer' or 'Dealer'")
  (g) Express, Informed Consent
  (h) GAP Agreement
  (l) Government Charges
  (j) Material or Materially
  (k) Offering Price
  C. § 463.3: Prohibited Misrepresentations
  1. General Comments
  2. Paragraph-by-Paragraph Analysis of § 463.3
  (a) The Costs or Terms of Purchasing, Financing, or Leasing a Vehicle
  (b) Any Costs, Limitation, Benefit, or Any Other Aspect of an Add-On Product or Service
  (c) Whether Terms Are, or Transaction Is, for Financing or a Lease
  (d) The Availability of Any Rebates or Discounts That Are Factored Into the Advertised Price but Not Available to All Consumers
  (e) The Availability of Vehicles at an Advertised Price
  (f) Whether Any Consumer Has Been or Will Be Preapproved or Guaranteed for Any Product, Service, or Term
  (g) Any Information on or About a Consumer's Application for Financing
  (h) When the Transaction Is Final or Binding on All Parties
  (i) Keeping Cash Down Payments or Trade-in Vehicles, Charging Fees, or Initiating Legal Process or Any Action If a Transaction Is Not Finalized or If the Consumer Does Not Wish To Engage in a Transaction
  (i) Keeping Cash Down Payments or Trade-in Vehicles, Charging Fees, or Initiating Legal Process or Any Action If a Transaction Is Not Finalized or If the Consumer Does Not Wish To Engage in a Transaction
  (j) Whether or When a Dealer Will Pay Off Some or All of the Financing or Lease on a Consumer's Trade-in Vehicle
  (k) Whether Consumer Reviews or Ratings Are Unbiased, Independent, or Ordinary Consumer Reviews or Ratings of the Dealer or the Dealer's Products or Services
  (l) Whether the Dealer or Any of the Dealer's Personnel or Products or Services Is or Was Affiliated With, Endorsed or Approved by, or Otherwise Associated With the United States Government or Any Federal, State, or Local Government Agency, Unit, or Department, Including the United States Department of Defense or Its Military Departments
  (m) Whether Consumers Have Won a Prize or Sweepstakes
  (n) Whether, or Under What Circumstances, a Vehicle May Be Moved, Including Across State Lines or Out of the Country
  (o) Whether, or Under What Circumstances, a Vehicle May Be Repossessed
  (p) Any of the Required Disclosures Identified in This Part
  D. § 463.4: Disclosure Requirements
  1. Overview
  2. Paragraph-by-Paragraph Analysis of § 463.4
  (a) Offering Price
  (b) Add-On List
  (c) Add-Ons Not Required
  (d) Total of Payments and Consideration for a Financed or Lease Transaction
  (e) Monthly Payments Comparison
  E. § 463.5: Dealer Charges for Add-Ons and Other Items
  1. Overview
  2. Paragraph-by-Paragraph Analysis of § 463.5
  (a) Add-Ons That Provide No Benefit
  (b) Undisclosed or Unselected Add-Ons
  (c) Any Item Without Express, Informed Consent
  F. § 463.6: Recordkeeping
  G. § 463.7: Waiver Not Permitted
  H. § 463.8: Severability
  I. § 463.9: Relation to State Laws
IV. Effective Date
V. Paperwork Reduction Act
  A. Add-On List Disclosures
  B. Disclosures Relating to Cash Price Without Optional Add-Ons
  C. Prohibited Misrepresentations and Required Disclosures
  D. Recordkeeping
  E. Capital and Other Non-Labor Costs
  1. Disclosures
  2. Recordkeeping
VI. Regulatory Flexibility Act
  A. Significant Impact Analysis
  1. Comments on Significant Impact
  2. Certification of the Final Rule
  (a) Industry Averages
  (b) Dealer Size Based on the Number of Employees
  B. Initial and Final Regulatory Flexibility Analysis
  1. Comments on the Initial Regulatory Flexibility Analysis
  (a) Description of the Reasons Why Action by the Agency Is Being Considered
  (b) Succinct Statement of the Objectives of, and Legal Basis for, the Proposed Rule
  (c) Description of and, Where Feasible, Estimate of the Number of Small Entities to Which the Proposed Rule Will Apply
  (d) Description of the Projected Reporting, Recordkeeping, and Other Compliance Requirements of the Proposed Rule
  (e) Duplicative, Overlapping, or Conflicting Federal Rules
  (f) Description of Any Significant Alternatives to the Proposed Rule Which Accomplish the Stated Objectives of Applicable Statutes and Which Minimize Any Significant Economic Impact of the Proposed Rule on Small Entities
  2. Final Regulatory Flexibility Analysis
  (a) Statement of the Need for, and Objectives of, the Rule
  (b) Issues Raised by Comments, Including Comments by the Chief Counsel for Advocacy of the SBA, the Commission's Assessment and Response, and Any Changes Made as a Result

(c) Description and Estimate of the Number of Small Entities to Which the Final Rule Will Apply or an Explanation of Why No Such Estimate Is Available

(d) Description of the Projected Reporting, Recordkeeping, and Other Compliance Requirements

(e) Description of the Steps the Commission Has Taken To Minimize the Significant Economic Impact on Small Entities Consistent With the Stated Objectives of Applicable Statutes

VII. Final Regulatory Analysis Under Section 22 of the FTC Act
  A. Introduction
  B. Estimated Benefits of Final Rule
  1. Consumer Time Savings When Shopping for Motor Vehicles
  2. Reductions in Deadweight Loss
  3. Framework
  4. Estimation
  5. Benefits Related to More Transparent Negotiation
  C. Estimated Costs of Final Rule
  1. Prohibited Misrepresentations
  2. Required Disclosure of Offering Price in Advertisements and in Response to Inquiry
  3. Disclosure of Add-On List and Associated Prices
  4. Required Disclosure of Total of Payments for Financing/Leasing Transactions
  5. Prohibition on Charging for Add-Ons that Provide No Benefit
  6. Requirement to Obtain Express, Informed Consent Before Any Charges
  7. Recordkeeping
  D. Other Impacts of Final Rule
  E. Conclusion
  F. Appendix: Derivation of Deadweight Loss Reduction
  G. Appendix: Uncertainty Analysis
VIII. Other Matters

# I. Background

## A. Statutory Authority

The Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank Act") was signed into law in 2010.[1] Section 1029 of the Dodd-Frank Act authorizes the FTC to prescribe rules with respect to unfair or deceptive acts or practices by motor vehicle dealers.[2] The FTC is authorized to do so under the FTC Act and in accordance with section 553 of the Administrative Procedure Act ("APA").[3] The grant of APA rulemaking authority set forth in section 1029 of the Dodd-Frank Act became effective as of July 21, 2011—the designated "transfer date" established by the Treasury Department.[4]

## B. Commission Actions Following the Dodd-Frank Act and the Rulemaking Process

Following enactment of the Dodd-Frank Act, the Commission published in the **Federal Register** a notice discussing its authority to prescribe rules with respect to unfair or deceptive acts or practices by motor vehicle dealers and announcing that it would be hosting a series of public roundtables to explore consumer protection issues pertaining to motor vehicle sales and leasing, including what consumer protection issues, if any, exist that could be addressed through a possible rulemaking.[5] The Commission sought participation from regulators, consumer advocates, industry participants, and other interested parties and ultimately held three such public roundtables.[6]

The Commission subsequently focused on enforcement and business guidance in the motor vehicle dealer marketplace. As discussed in SBP II.C,[7] however, certain unfair and deceptive acts or practices have persisted, despite more than a decade of enforcement and education. Accordingly, on June 23, 2022, the Commission announced a notice of proposed rulemaking ("NPRM") addressing unfair or deceptive acts or practices by motor vehicle dealers.[8] That notice was published in the **Federal Register** on July 13, 2022.[9] The NPRM, among other things, proposed to (i) prohibit motor vehicle dealers from making certain misrepresentations, (ii) require accurate pricing disclosures, (iii) prohibit the sale of any add-on product or service that confers no benefit to the consumer, (iv) require express, informed consent for add-ons and other charges, and (v) impose certain recordkeeping requirements. The comment period for the NPRM closed on September 12, 2022.

In response to the NPRM and proposed rule, the Commission received more than 27,000 comments from stakeholders representing a wide range of viewpoints.[10] These stakeholders included numerous individual consumers who described deceptive practices during recent car purchases and many who discussed current or former military service and deceptive and predatory practices common near military installations.[11] Commenters

---

[1] Public Law 111–203, 124 Stat. 1376 (2010).

[2] 12 U.S.C. 5519(d). *See* 12 U.S.C. 5519(f)(1) and (2) for definitions of the terms "motor vehicle" and "motor vehicle dealer" under section 1029 of the Dodd-Frank Act, respectively.

[3] *See* 12 U.S.C. 5519(a) (discussing the authority over "motor vehicle dealer[s] that [are] predominantly engaged in the sale and servicing of motor vehicles, the leasing and servicing of motor vehicles, or both"); 12 U.S.C. 5519(d) ("Notwithstanding section 57a of title 15, the Federal Trade Commission is authorized to prescribe rules under sections 45 and 57a(a)(1)(B) of title 15[ ] in accordance with section 553 of title 5, with respect to a person described in subsection (a)."); 5 U.S.C. 553. Because the Commission has authority to promulgate this Rule in accordance with the APA, it is not required to include a statement as to the prevalence of the acts or practices treated by the Rule under section 18(d) of the FTC Act. *Compare* 12 U.S.C. 5519(d) and (a) (providing the FTC with APA rulemaking authority for purposes of section 1029 of the Dodd-Frank Act), *with* 15 U.S.C. 57a(b)(3) (requiring a statement as to prevalence for certain rulemaking proceedings by the Commission under non-APA procedures), *and* 15 U.S.C. 57a(b)(1) (establishing that certain rulemaking proceedings by the Commission under non-APA procedures are subject to requirements in addition to those under the APA).

[4] *See* 12 U.S.C. 5411(a).

[5] 76 FR 14014, 14015 (Mar. 15, 2011).

[6] *See* Fed. Trade Comm'n, "The Road Ahead: Selling, Financing & Leasing Motor Vehicles" (Apr. 12, 2011), *https://www.ftc.gov/news-events/events/2011/04/road-ahead-selling-financing-leasing-motor-vehicles* (providing materials from roundtable in Detroit, Michigan); Fed. Trade Comm'n, "The Road Ahead: Selling, Financing & Leasing Motor Vehicles" (Aug. 2, 2011), *https://www.ftc.gov/news-events/events/2011/08/road-ahead-selling-financing-leasing-motor-vehicles* (providing materials from roundtable in San Antonio, Texas); Fed. Trade Comm'n, "The Road Ahead: Selling, Financing & Leasing Motor Vehicles" (Nov. 17, 2011), *https://www.ftc.gov/news-events/events/2011/11/road-ahead-selling-financing-leasing-motor-vehicles* (providing materials from roundtable in Washington, District of Columbia).

[7] As used herein, references to the "Statement of Basis and Purpose" or "SBP" refer to the portions of this document that precede the regulatory text of the Final Rule. References to the "Rule," "Final Rule," or "CARS Rule" refer to the text in part 463—Combating Auto Retail Scams ("CARS") Trade Regulation Rule. Because the Final Rule is narrower than the proposed Motor Vehicle Dealers Trade Regulation Rule in the NPRM, the Commission has modified the Rule title to reflect the more limited scope.

[8] *See* Press Release, Fed. Trade Comm'n, "FTC Proposes Rule to Ban Junk Fees, Bait-and-Switch Tactics Plaguing Car Buyers" (June 23, 2022), *https://www.ftc.gov/news-events/news/press-releases/2022/06/ftc-proposes-rule-ban-junk-fees-bait-switch-tactics-plaguing-car-buyers.*

[9] *See* Fed. Trade Comm'n, Notice of Proposed Rulemaking, Motor Vehicle Dealers Trade Regulation Rule, 87 FR 42012 (released June 23, 2022; published July 13, 2022) [hereinafter NPRM], *https://www.govinfo.gov/content/pkg/FR-2022-07-13/pdf/2022-14214.pdf.*

[10] The Commission received 27,349 comment submissions filed online in response to its NPRM. *See* Gen. Servs. Admin., Dkt. No. FTC–2022–0046, Proposed Rule, Motor Vehicle Dealers Trade Regulation Rule (July 13, 2022), *https://www.regulations.gov/document/FTC-2022-0046-0001* (noting comments received). To facilitate public access, over 11,000 such comments have been posted publicly on *Regulations.gov* at *https://www.regulations.gov/document/FTC-2022-0046-0001/comment* (noting posted comments). As explained at *Regulations.gov*, agencies may choose to redact or withhold certain submissions (or portions thereof) such as those containing private or proprietary information, inappropriate language, or duplicate/near duplicate examples of a mass-mail campaign. *See* Gen. Servs. Admin., *Regulations.gov* Frequently Asked Questions, Find Dockets, Documents, and Comments FAQs, "How are comments counted and posted to *Regulations.gov?*," *https://www.regulations.gov/faq?anchor=downloadingdata* (last visited Dec. 5, 2023). The Commission has considered all timely and responsive public comments it received in response to its NPRM.

[11] *See, e.g.,* Individual commenter, Doc. No. FTC–2022–0046–4648 ("As a young Marine stationed in

Continued

also included dealerships and their employees, industry groups, consumer and community groups, and Federal and State lawmakers and law enforcement agencies. Many commenters, such as consumers, some dealers and dealer employees, consumer groups, and lawmakers and enforcers, were supportive of the proposed rule in whole or in part. Many of these commenters also urged the FTC to include additional protections for consumers and law-abiding businesses, while others, such as industry groups, dealers, and dealer employees, asked questions or criticized the proposal.[12] These comments and responses to comments are discussed primarily in the discussion of the Final Rule in SBP III.

The Commission notes that it has undertaken careful review and consideration of each of the comments it received in response to its NPRM. The Commission has dedicated the majority of its section-by-section analysis to descriptions of, and responses to, comments or portions thereof that were

critical of the Commission's proposal or that urged the Commission to adopt additional requirements. Thus, to ensure that this document also reflects the many comments in the public record from stakeholders who supported the proposal as is, the Commission has excerpted a number of such comments in portions of its SBP.

## II. Motor Vehicle Financing and Leasing

### A. Overview of the Motor Vehicle Marketplace

For many consumers, buying or leasing a motor vehicle is essential, expensive, and time-consuming.[13] Americans rely on their vehicles for work, school, childcare, groceries, medical visits, and many other important tasks in their daily lives.[14] These vehicles have become increasingly costly: the average price of a new vehicle sold at a new car dealership in 2022 was more than $46,000,[15] while the average price of a used vehicle sold at such dealerships was more than $30,000.[16] By the second quarter of 2023, the average monthly payment for used cars reached $533, and the average monthly payment for new cars reached $741—both record highs.[17] Vehicles are now many

consumers' largest expense—on a par with housing, child care and food, and accounting for 16% of the median annual household income before taxes.[18] In 2022 alone, Americans spent more than $720 billion on motor vehicles and vehicle parts.[19]

Given these costs, many consumers who purchase a motor vehicle rely on financing to complete their purchases. According to public reports, 81% of new motor vehicle purchases, and nearly 35% of used vehicle purchases, are financed.[20] By the first quarter of 2023, Americans had more than 107 million outstanding auto financing accounts and owed more than $1.56 trillion thereon,[21] making auto finance the third-largest source of debt for U.S. consumers, and the second-largest for U.S. consumers ages 40 and over.[22] Servicemembers have an average of twice as much auto debt as civilians— particularly young servicemembers, who generally require vehicles for transportation while living on military bases.[23] By the age of 24, around 20

a military town I was taken advantage of by a dealership when purchasing my first car. It set me back financially for years. I know of many young military people who purchased vehicle[ ]s and we[ ]re instantly so far upside down after leaving the dealership with thousands of dollars in add on junk charges . . . ."); Individual commenter, Doc. No. FTC–2022–0046–0542 ("As a former member of the Military, the amount of scams and horror stories I have heard regarding young service members buying cars is absurd. . . . Someone shouldn't have to do hours of research on how to buy a car so they don't get taken advantage of."); Individual commenter, Doc. No. FTC–2022–0046–0637 ("As a small business owner and active duty military member I have played the role of both a buyer, toiling for hours to just reach fair deals on vehicles, as well as that of an advocate for my Sailors who have been preyed upon by local dealerships. Nowhere else in our society do so many average citizens have to mentally prepare for a battle over fair pricing and treatment for something that is realistically a modern necessity."); Individual commenter, Doc. No. FTC–2022–0046–9840 ("I can't list the number of times I have either seen, or have stepped in a situation, where car dealers have either attempted to take, or have successfully taken, advantage of a young military member or their family by baiting and switching when it came to the price of a car, or stated that the price was one amount, only to be charged, and over-charged a higher amount. These dealers have even attempted to pull unethical tricks on me and my wife, even after they found out that I was a military member, a combat veteran, that was serving this great nation."); Individual commenter, Doc. No. FTC–2022–0046–0845 ("Predatory practices like [bait-and-switch pricing] are common near military installations . . . .").

[12] Industry commenters claimed that many of the areas covered by the proposed rule are already addressed in industry guidance. The Commission notes that, although industry guidance can provide helpful information to dealers, dealers who choose not to follow such guidance, or who engage in deceptive or unfair practices, subject their customers to significant harm. The Rule addresses such practices, thus protecting consumers and law-abiding dealers.

[13] Unless otherwise indicated, the terms "auto," "automobile," "car," "motor vehicle," and "vehicle," as used in this SBP and the Commission's final regulatory analysis, refer to "Covered Motor Vehicle" as defined in this part.

[14] During 2017 to 2022, an average of 91% of American workers who did not work from home drove to work. *See* U.S. Census Bureau, "American Community Survey: Means of Transportation to Work by Selected Characteristics, 2022: ACS 1-Year Estimates Subject Tables" (2023), *https://data. census.gov/table?q=Commuting&tid= ACSST1Y2022.S0802* (reporting 110,245,368 workers 16 years and over who drove alone to work in a car, truck, or van, and 13,881,067 workers 16 years and over who drove by carpool to work in a car, truck or van, together accounting for 91% of the total of 136,196,004 workers 16 years and over who did not work from home); U.S. Census Bureau, "American Community Survey: Means of Transportation to Work by Selected Characteristics, 2021: 2017–2021 ACS 5-Year Estimates Subject Tables" (2022), *https://data.census.gov/ table?q=Commuting&tid=ACSST5Y2021.S0802* (reporting 113,724,271 workers 16 years and over who drove alone to work in a car, truck, or van, and 13,340,838 workers 16 years and over who drove by carpool to work in a car, truck or van, together accounting for 91% of the total of 140,223,271 workers 16 years and over who did not work from home).

[15] Nat'l Auto. Dealers Ass'n, "NADA Data 2022" 7, *https://www.nada.org/media/4695/download ?inline* (noting average retail selling price of $46,287 for new vehicles sold by dealerships in 2022).

[16] *Id.* at 10 (noting average retail selling price of $30,736 for used vehicles sold by new-vehicle dealerships in 2022).

[17] Lydia DePillis, "How the Costs of Car Ownership Add Up," N.Y. Times (Oct. 6, 2023), *https://www.nytimes.com/interactive/2023/10/07/*

*business/car-ownership-costs.html* (citing average monthly payment figures from TransUnion).

[18] *Id.* (citing data from AAA and the U.S. Census Bureau).

[19] Bureau of Econ. Analysis, "National Data: National Income and Product Accounts, Personal Consumption Expenditures by Major Type of Product" tbl. 2.3.5, *https://apps.bea.gov/iTable/ ?reqid=19&step=2&isuri=1&categories=survey #eyJhcHBpZCI6MTksInN0ZXBzIjpbMSwyLDNd LCJkYXRhIjpbWyJjYXRlZ29yaWVzIiwiU3VydmV5I l0sWyJOSVBBX1RhYmxlX0xpc3QiLCI2NSJdXX0=* (last revised July 27, 2023) (listing estimated annual expenditure rates of between $713.1 billion and $737.1 billion in 2022).

[20] Melinda Zabritski, Experian Info. Sols., Inc., "State of the Automotive Finance Market Q4 2020" 5, *https://www.experian.com/content/dam/ marketing/na/automotive/quarterly-webinars/ credit-trends/2020-quarterly-trends/v2-2020-q4-state-automotive-market.pdf* (on file with the Commission).

[21] Fed. Rsrv. Bank of N.Y., "Quarterly Report on Household Debt and Credit, 2023: Q1" 3–4 (May 2023), *https://www.newyorkfed.org/medialibrary/ interactives/householdcredit/data/pdf/HHDC_ 2023Q1*; Fed. Rsrv. Bank of N.Y., "Data Underlying Report" on "Page 3 Data" and "Page 4 Data" tabs, *https://www.newyorkfed.org/medialibrary/ interactives/householdcredit/data/xls/HHD_C_ Report_2023Q1* (last visited Dec. 5, 2023) (listing number of open "Auto Loan" accounts and total outstanding balance in such accounts).

[22] Fed. Rsrv. Bank of N.Y., "Quarterly Report on Household Debt and Credit, 2023: Q1" 3, 21 (May 2023), *https://www.newyorkfed.org/medialibrary/ interactives/householdcredit/data/pdf/HHDC_ 2023Q1*; Fed. Rsrv. Bank of N.Y., "Data Underlying Report" on "Page 3 Data" and "Page 21 Data" tabs, *https://www.newyorkfed.org/medialibrary/ interactives/householdcredit/data/xls/HHD_C_ Report_2023Q1* (last visited Dec. 5, 2023) (listing total "Auto Loan" debt balance compared to other product type categories).

[23] *See* Consumer Fin. Prot. Bureau, "Financially Fit? Comparing the Credit Records of Young Servicemembers and Civilians" 27 (July 2020), *https://files.consumerfinance.gov/f/documents/ cfpb_financially-fit_credit-young-servicemembers-civilians_report_2020-07.pdf*.

percent of young servicemembers have at least $20,000 in auto debt, which equates to nearly two-thirds of an enlisted soldier's typical base salary at that age.[24]

In addition to the expense, the process of buying or leasing a vehicle is often time-consuming and arduous. It can take several hours or days to finalize a transaction,[25] on top of the hours it can take, particularly in rural areas, to drive to a dealership.[26] Consumers may need to take time off work or arrange childcare, and families with a single vehicle may be forced to delay other important appointments due to the length of the vehicle-buying or -leasing process.

Most consumers—approximately 70%—finance vehicle purchases through a motor vehicle dealer,[27] using what is known as dealer-provided "indirect" financing.[28] This financing is

typically offered through dealers' financing and insurance ("F&I") offices, which may also offer leasing and add-on products or services. In the dealer-provided financing scenario, the dealer collects financial information about the consumer and forwards that information to prospective motor vehicle financing entities. These financing entities evaluate this information and, in the process, determine whether, and on what terms, to provide credit.[29] These terms include the "buy rate": a risk-based finance charge that reflects the interest rate at which the entity will finance the deal.[30] Dealers often add a finance charge called a "dealer reserve" or "markup" to the buy rate.[31] Unlike the buy rate, the markup is not based on the underwriting risk or credit characteristics of the applicant, and dealers retain the markup as profit.[32] New vehicle dealers average a gross profit of about $2,444 per vehicle,[33] more than half of which comes from the dealers' F&I offices. Independent used vehicle dealers averaged a gross profit of more than $6,000 per vehicle, as of 2019.[34] While some used vehicle dealerships do not have a separate F&I office, more than half of such dealerships sell add-on products.[35]

Six to eight percent of financed vehicle purchases use what is called

"buy here, pay here" dealers.[36] In this scenario, consumers typically borrow from, and make their payments directly to, the dealership.

The remainder of financed vehicle transactions use what is commonly referred to as "direct" financing, provided by a credit union, bank, or other financing entity.[37] In this scenario, consumers typically receive an interest rate quote from the financing entity prior to arriving at a dealership to purchase a vehicle, and use the financing to pay for their chosen vehicle.[38] Dealerships do not profit on the financing portion of the vehicle sale transaction when a consumer arranges financing directly.

Finally, consumers may choose to lease a vehicle from a dealership rather than purchase one. In this scenario, consumers may drive a vehicle for a set period of time—typically around three years [39]—and for a certain maximum number of miles—typically 10,000–15,000 miles per year—in exchange for an upfront payment, a monthly payment, and fees before, during, and at the end of the lease, including for excess wear and usage over the mileage limit.[40] When consumers lease a vehicle, they do not own it, and they must return the vehicle when the lease expires, though they may have the option to purchase

[24] *See* Consumer Fin. Prot. Bureau, "Protecting Servicemembers from Costly Auto Loans and Wrongful Repossessions" (July 18, 2022), *https://www.consumerfinance.gov/about-us/blog/protecting-servicemembers-from-costly-auto-loans-and-wrongful-repossessions/.*

[25] Mary W. Sullivan, Matthew T. Jones & Carole L. Reynolds, Fed. Trade Comm'n, "The Auto Buyer Study: Lessons from In-Depth Consumer Interviews and Related Research" 15 (July 2020) [hereinafter Auto Buyer Study], *https://www.ftc.gov/system/files/documents/reports/auto-buyer-study-lessons-depth-consumer-interviews-related-research/bcpreportautobuyerstudy.pdf* (noting that the purchase transactions in the FTC's qualitative study often took 5 hours or more to complete, with some extending over several days); *Cf.* Cox Auto., "2020 Cox Automotive Car Buyer Journey" 6 (2020) [hereinafter 2020 Cox Automotive Car Buyer Journey], *https://b2b.autotrader.com/app/uploads/2020-Car-Buyer-Journey-Study.pdf* (reporting average consumer time spent shopping for a vehicle at 14 hours, 53 minutes); Cox Auto., "2022 Car Buyer Journey: Top Trends Edition" 6 (2023) [hereinafter 2022 Car Buyer Journey], *https://www.coxautoinc.com/wp-content/uploads/2023/01/2022-Car-Buyer-Journey-Top-Trends.pdf* (reporting average consumer time spent shopping for a vehicle at 14 hours, 39 minutes).

[26] For example, consumers have complained about going to a dealership based on an offer that the dealer refuses to honor only after they have spent hours driving there and additional time on the lot. *See, e.g.,* Complaint ¶¶ 23–26, *Fed. Trade Comm'n v. N. Am. Auto. Servs., Inc.,* No. 1:22–cv–0169 (N.D. Ill. Mar. 31, 2022) (alleging that many consumers drive hours to dealerships based on the advertised prices; that test-driving and selecting a vehicle, and negotiating the price and financing terms, is an often hours-long process; and that, after this time, dealers falsely told consumers that add-on products or packages were required to purchase or finance the vehicle, even though they were not included in the low prices advertised or disclosed to consumers who called to confirm prices).

[27] Unless otherwise indicated, the terms "dealer," "dealership," and "motor vehicle dealer" as used in this SBP and the Commission's final regulatory analysis refer to " 'Covered Motor Vehicle Dealer' or 'Dealer' " as defined in this part.

[28] *See* Nat'l Auto. Dealers Ass'n, "Dealer-Assisted Financing Benefits Consumers," *https://www.nada.org/autofinance/[https://web.archive.org/web/20220416151718/https://www.nada.org/autofinance/]* (Apr. 16, 2022) (noting

that 7 out of 10 consumers finance through their dealership). This is also known as "dealer financing," because consumers obtain financing through the dealer that partners with other entities in the financing process.

[29] Dealers often originate the contract governing the extension of retail credit or retail leases and then sell, or otherwise assign, these contracts to unaffiliated third-party finance or leasing sources, including such third parties the dealer may have contacted in the course of arranging dealer-provided "indirect" financing. *See* Consumer Fin. Prot. Bureau, "Automobile Finance Examination Procedures" 3 (Aug. 2019), *https://files.consumerfinance.gov/f/documents/201908_cfpb_automobile-finance-examination-procedures.pdf.*

[30] *See* Nat'l Auto. Dealers Ass'n, Nat'l Ass'n of Minority Auto. Dealers & Am. Int'l Auto. Dealers Ass'n, "Fair Credit Compliance Policy & Program" 2 (2015), *https://www.nada.org/media/4558/download?inline.* (defining "buy rate" as "the rate at which the finance source will purchase the credit contract from the dealer").

[31] *See, e.g., id.* at 1 n.4 & accompanying text.

[32] *Id.* (describing this as the amount dealers earn for arranging financing, measured as the difference between the consumer's annual percentage rate ("APR") and the wholesale "buy rate" at which a finance source buys the finance contract from the dealer, and noting that finance sources typically permit dealers to retain the dealer participation).

[33] Nat'l Auto. Dealers Ass'n, "Average Dealership Profile" 1 (2020), *https://www.nada.org/media/4136/download?attachment[http://web.archive.org/web/20220622204158/https://www.nada.org/media/4136/download?attachment]* (June 23, 2022).

[34] Nat'l Indep. Auto. Dealers Ass'n, "NIADA Used Car Industry Report 2020" 21 (2020).

[35] *Id.* at 8, 10.

[36] Melinda Zabritski, Experian Info. Sols., Inc., "State of the Automotive Finance Market Q2 2020" 8 (2020), *https://www.experian.com/content/dam/marketing/na/automotive/quarterly-webinars/credit-trends/2020-q2-safm-final.pdf [http://web.archive.org/web/20201106002015/https://www.experian.com/content/dam/marketing/na/automotive/quarterly-webinars/credit-trends/2020-q2-safm-final.pdf]* (Mar. 6, 2023).

[37] Consumer Fin. Prot. Bureau, "Automobile Finance Examination Procedures" 4 (Aug. 2019), *https://files.consumerfinance.gov/f/documents/201908_cfpb_automobile-finance-examination-procedures.pdf.*

[38] Consumer Fin. Prot. Bureau, "Consumer Voices on Automobile Financing" 5 (June 2016), *https://files.consumerfinance.gov/f/documents/201606_cfpb_consumer-voices-on-automobile-financing.pdf.*

[39] Melinda Zabritski, Experian Info. Sols., Inc., "State of the Automotive Finance Market Q4 2020" 26 (2020), *https://www.experian.com/content/dam/marketing/na/automotive/quarterly-webinars/credit-trends/2020-quarterly-trends/v2-2020-q4-state-automotive-market.pdf [http://web.archive.org/web/20210311174922/https://www.experian.com/content/dam/marketing/na/automotive/quarterly-webinars/credit-trends/2020-quarterly-trends/v2-2020-q4-state-automotive-market.pdf]* (Mar. 6, 2023).

[40] *See* Fed. Trade Comm'n, "Financing or Leasing a Car," *https://www.consumer.ftc.gov/articles/0056-financing-or-leasing-car* (last visited Dec. 5, 2023) ("The annual mileage limit in most standard leases is 15,000 or less."); Consumer Fin. Prot. Bureau, "What should I know about the differences between leasing and buying a vehicle?," *https://www.consumerfinance.gov/ask-cfpb/what-should-i-know-about-the-differences-between-leasing-and-buying-a-vehicle-en-815/* (last visited Aug. 24, 2023) ("Most leases restrict your mileage to 10,000–15,000 miles per year.").

the vehicle at the end of the lease period. Nearly 27% of new vehicles are leased, as are just over 8% of used vehicles.[41]

## B. Deceptive and Unfair Practices in the Motor Vehicle Marketplace

Section 5 of the Federal Trade Commission Act ("FTC Act"), as amended (15 U.S.C. 45), authorizes the FTC to address deceptive or unfair acts or practices in or affecting commerce, including in the motor vehicle marketplace.

An act or practice is deceptive if there is a representation, omission, or other practice that is likely to mislead consumers acting reasonably under the circumstances and is material to consumers—that is, it is likely to affect consumers' conduct or decisions with regard to a product or service.[42] Deceptive conduct can involve omission of material information, the disclosure of which is necessary to prevent the claim, practice, or sale from being misleading.[43]

An act or practice is considered unfair under section 5 of the FTC Act if: (1) it causes, or is likely to cause, substantial injury to consumers; (2) the injury is not reasonably avoidable by consumers; and (3) the injury is not outweighed by countervailing benefits to consumers or to competition.[44]

In each of the past four years, the FTC received more than 100,000 complaints regarding motor vehicle sales, financing, service and warranties, and rentals and leasing.[45] This industry is also

consistently at or near the top of private sources of consumer complaints.[46] Many of these complaints concerned deceptive or unfair acts or practices affecting U.S. consumers. Complaints about motor vehicle transactions are regularly in the top ten complaint categories tracked by the FTC.[47] For military consumers as well, auto-related complaints are among the top 10 complaint categories outside of identity theft.[48]

Moreover, law enforcement experience shows that complaints are just the tip of the iceberg.[49] The Commission's recent enforcement action against a large, multistate dealership group is illustrative of this point in the motor vehicle marketplace: in that

matter, the Commission received 391 complaints—about add-ons and other issues—over a several-month period prior to filing a complaint against the thirteenth largest dealership group in the country by revenue as of 2020.[50] However, in a survey of the dealer's customers over the same time period, 83% of respondents—or at least 16,848 customers—indicated they were subject to the dealer's unlawful practices related to add-ons alone.[51]

Similarly, in other contexts where companies were charged with making misrepresentations or engaging in misconduct regarding add-on products, information obtained after filing has shown widespread harm far beyond the initial consumer complaint volumes reported prior to filing.[52]

As examined in greater detail in the paragraphs that follow, consumers in the motor vehicle marketplace are confronted with chronic deceptive or unfair practices, including bait-and-switch tactics and hidden charges.[53]

### 1. Bait-and-Switch Tactics

Advertisements for motor vehicles are often consumers' first contact in the vehicle-buying or -leasing process. Dealers utilize a variety of means to

---

[41] Melinda Zabritski, Experian Info. Sols., Inc., "State of the Automotive Finance Market Q4 2020" 5 (2020), *https://www.experian.com/content/dam/ marketing/na/automotive/quarterly-webinars/ credit-trends/2020-quarterly-trends/v2-2020-q4- state-automotive-market.pdf* [*https:// www.experian.com/content/dam/marketing/na/ automotive/quarterly-webinars/credit-trends/2020- quarterly-trends/v2-2020-q4-state-automotive- market.pdf*] (Mar. 6, 2023).

[42] *See* Fed. Trade Comm'n, "FTC Policy Statement on Deception" 2, 5, 103 F.T.C. 174 (1984) [hereinafter FTC Policy Statement on Deception] (*appended to Cliffdale Assocs., Inc.*, 103 F.T.C. 110, 183 (1984)), *https://www.ftc.gov/system/files/ documents/public_statements/410531/831014 deceptionstmt.pdf*.

[43] *Id.*

[44] 15 U.S.C. 45(n).

[45] *See, e.g.,* Fed. Trade Comm'n, "Consumer Sentinel Network Data Book 2022" app. B3 at 85 (Feb. 2023) [hereinafter Consumer Sentinel Network Data Book 2022], *https://www.ftc.gov/system/files/ ftc_gov/pdf/CSN-Data-Book-2022.pdf* (reporting complaints about new and used motor vehicle sales, financing, service & warranties, and rentals & leasing, collectively, of more than 100,000 in 2020, 2021, and 2022); Fed. Trade Comm'n, "Consumer Sentinel Network Data Book 2021" app. B3 at 85 (Feb. 2022) [hereinafter Consumer Sentinel Network Data Book 2021], *https://www.ftc.gov/system/files/ ftc_gov/pdf/CSN%20Annual%20Data%20 Book%202021%20Final%20PDF.pdf* (reporting complaints about new and used motor vehicle sales,

financing, service & warranties, and rentals & leasing, collectively, of more than 100,000 in 2019, 2020, and 2021).

[46] According to commenters, complaints to the Better Business Bureau about new and used auto dealers, when combined, have been either the first or second highest regarding any industry in the U.S. for the past twenty years. *See* Comment of Nat'l Consumer L. Ctr. et al., Doc. No. FTC–2022–0046– 7607 at ii; *see also* Better Bus. Bureau, "BBB Complaint and Inquiry Statistics," *https:// www.bbb.org/all/bbb-complaint-statistics* (last visited Dec. 5, 2023) (listing complaint statistics from 2010 through 2022, sorted by industry). In addition, for the past seven years annual surveys of State and local consumer protection agencies have reported that auto-related complaints were the top complaint received from consumers. *See* Comment of Nat'l Consumer L. Ctr. et al., Doc. No. FTC–2022– 0046–7607 at 13; Consumer Fed'n of Am., "2022 Consumer Complaint Survey Report" 4–5 (May 2023), *https://consumerfed.org/wp-content/ uploads/2023/05/2022-Consumer-Complaint- Survey-Report.pdf* ("For the seventh year in a row, auto sales, leases and repairs are the #1 complaint category. Consumers filed complaints about add-on products and services, bait and switch pricing, and mechanical condition issues.").

[47] *See* Consumer Sentinel Network Data Book 2021, *supra* note 45, at 8 (listing vehicle-related complaints as the seventh most common report category, outside of identity theft, in 2021); Consumer Sentinel Network Data Book 2022, *supra* note 45, at 8 (listing motor vehicle-related complaints as the fifth most common report category, outside of identity theft, in 2022).

[48] *See* Consumer Sentinel Network Data Book 2021, *supra* note 45, at 18 (listing vehicle-related complaints as the eighth most common complaint category for military consumers, outside of identity theft categories, in 2021); Consumer Sentinel Network Data Book 2022, *supra* note 45, at 18 (listing vehicle-related complaints as the ninth most common complaint category for military consumers, outside of identity theft categories, in 2022).

[49] *See, e.g., United States* v. *Brien,* 617 F.2d 299, 308 (1st Cir. 1980); *United States* v. *Offs. Known as 50 State Distrib. Co.,* 708 F.2d 1371, 1374–75 (9th Cir. 1983); Keith B. Anderson, Fed. Trade Comm'n, "Consumer Fraud in the United States: An FTC Survey" 80 (2004), *https://www.ftc.gov/sites/ default/files/documents/reports/consumer-fraud- united-states-ftc-survey/040805confraudrpt.pdf* (staff report noting consumers who reported they were victims of fraud complained to an official source only 8.4 percent of the time, filing complaints with the BBB in 3.5 percent of incidents and to a Federal agency, including the FTC, in only 1.4 percent of cases).

[50] *See* Complaint, *Fed. Trade Comm'n* v. *N. Am. Auto. Servs., Inc.,* No. 1:22–cv–0169 (N.D. Ill. Mar. 31, 2022); *see also* WardsAuto, "WardsAuto 2020 Megadealer 100," *https://www.wardsauto.com/ dealers/wardsauto-2020-megadealer-100-industry- force* (last visited Dec. 5, 2023) (listing Napleton Automotive Group as the 13th-ranked dealership group by total revenue).

[51] Complaint ¶ 27, *Fed. Trade Comm'n* v. *N. Am. Auto. Servs., Inc.,* No. 1:22–cv–0169 (N.D. Ill. Mar. 31, 2022) (alleging that defendants buried charges for add-ons in voluminous paperwork, making them difficult to detect); *see* Press Release, Fed. Trade Comm'n, "FTC Returns Additional $857,000 To Consumers Harmed by Napleton Auto's Junk Fees and Discriminatory Practices" (Nov. 20, 2023), *https://www.ftc.gov/news-events/news/press- releases/2023/11/ftc-returns-additional-857000- consumers-harmed-napleton-autos-junk-fees- discriminatory-practices*.

[52] For example, in a recent action involving deceptive pre-approval claims, the FTC had received roughly 30 complaints about the company's pre-approval conduct in the five-year period prior to announcing its action. But in the five months following announcement of the action, more than 900 additional consumers came forward with complaints about the conduct. *See* Press Release, Fed. Trade Comm'n, "FTC Announces Claims Process for Consumers Harmed by Credit Karma 'Pre-Approved' Offers for Which They Were Denied" (Dec. 5, 2023), *https://www.ftc.gov/news- events/news/press-releases/2023/12/ftc-announces- claims-process-consumers-harmed-credit-karma- pre-approved-offers-which-they-were* ("[W]ithin five months of that announcement, the agency received nearly 900 more such complaints").

[53] While other issues exist in the motor vehicle sales, financing, and leasing space, including issues involving discrimination, financing application falsification, data privacy and security, and yo-yo financing, this Rule's core focus is on misrepresentations and add-on and pricing practices.

reach consumers, including social media and online advertisements, television and radio commercials, and direct mail marketing. New vehicle dealers spend an average of more than $700 on advertising per vehicle sold [54]—more than two-thirds of which goes toward online advertising.[55]

The FTC has brought many law enforcement actions involving motor vehicle dealers' deceptive advertising and other unlawful tactics. Such actions have charged dealers with, *inter alia*, making misrepresentations regarding the price of a vehicle, the availability of discounts and rebates, the monthly payment amount for a financed purchase or lease, the amount due at signing, and whether an offer pertains to a purchase or a lease.[56] Other such actions have charged dealers with misrepresentations regarding whether the dealer or consumer is responsible for paying off "negative equity," *i.e.*, the outstanding debt on a vehicle that is being "traded in" as part of another vehicle purchase.[57] And in other FTC actions, some dealers have lured

potential buyers through financial incentives incidental to the purchase, such as deceptive promises of a valuable prize that is redeemable only by visiting the dealership.[58]

Deceptive tactics can cause significant consumer harm and impede competition, competitively disadvantaging law-abiding dealers. When dealerships advertise prices, discounts, or other terms that are not actually available to typical consumers, consumers who select that dealership instead of others spend time visiting the dealership or otherwise interacting with the dealership under false pretenses.

### 2. Unlawful Practices Relating to Add-On Products or Services and Hidden Charges

Another key consumer protection concern is the sale of add-on products or services in a deceptive or unfair manner. Add-ons in connection with the sale or financing of motor vehicles include extended warranties, service and maintenance plans, payment programs, guaranteed automobile or asset protection ("GAP") agreements, emergency road service, VIN etching and other theft protection devices, and undercoating. Individual add-ons can cost consumers thousands of dollars and can significantly increase the overall cost to the consumer in the transaction.[59] Moreover, in the past two years, dealers have substantially increased prices for these add-ons, notwithstanding that such products or services largely are not constrained by supply.[60]

A significant consumer protection concern is consumers paying for add-ons without knowing about, or expressly agreeing to, these products or services.[61] This type of payment

packing has been a particular concern in the military community.[62] The protracted and paperwork-heavy vehicle-buying or -leasing process can make it difficult for consumers to spot add-on charges, particularly when advertised prices or payment terms do not mention add-ons.[63] If consumers are financing or leasing the vehicle, they undergo a separate financing process after selecting a vehicle, which can include wading through a thick stack of dense paperwork filled with fine print.[64] For example, according to an FTC law enforcement action, consumers visiting one large dealership group were required to complete a stack of paperwork that ran more than sixty pages and required more than a dozen signatures.[65] This paperwork can include hidden charges for add-on products or services, causing consumers

[54] Nat'l Auto. Dealers Ass'n, "NADA Data 2022" 15, *https://www.nada.org/media/4695/download? inline* (listing average dealership advertising per new vehicle sold of $718 in 2022, and $602 in 2021).

[55] *Id.* at 16 (listing 68.2% of estimated advertising expenditures by medium as internet expenditures).

[56] *See, e.g.*, Complaint, *Timonium Chrysler, Inc.*, No. C–4429 (F.T.C. Jan. 28, 2014) (alleging dealership advertised internet prices and dealer discounts that were only available through rebates not applicable to the typical consumer); Complaint, *Ganley Ford West, Inc.*, No. C–4428 (F.T.C. Jan. 28, 2014) (alleging dealership advertised discounts on vehicle prices, but failed to disclose that discounts were only available on the most expensive models); Complaint, *Progressive Chevrolet Co.*, No. C–4578 (F.T.C. June 13, 2016) (alleging deceptive failure to disclose material conditions of obtaining the lease monthly payment in their online and print advertising); Complaint ¶¶ 38–46, *Fed. Trade Comm'n* v. *Tate's Auto Ctr. of Winslow, Inc.*, No. 3:18–cv–08176–DJH (D. Ariz. July 31, 2018) (alleging that company issued advertisements for attractive terms but concealed that the terms were only applicable to lease offers); Complaint ¶¶ 36–38, *United States* v. *New World Auto Imports, Inc.*, No. 3:16–cv–02401–K (N.D. Tex. Aug. 18, 2016) (alleging misrepresentation that terms were for financing instead of leasing); Complaint ¶¶ 85–87, *Fed. Trade Comm'n* v. *Universal City Nissan, Inc.*, No. 2:16–cv–07329 (C.D. Cal. Sept. 29, 2016) (alleging that dealerships claimed consumers could finance the purchase of vehicles with attractive terms and buried disclosures indicating that such terms were applicable to leases only).

[57] Complaint ¶¶ 82–84, *Fed. Trade Comm'n* v. *Universal City Nissan, Inc.*, No. 2:16–cv–07329 (C.D. Cal. Sept. 29, 2016) (alleging misrepresentation that dealer would pay off a consumer's trade-in when in fact consumers were still responsible for outstanding debt on trade-in vehicles); Complaint ¶¶ 17–19, *TXVT Ltd. P'ship*, No. C–4508 (F.T.C. Feb. 12, 2015) (alleging misrepresentation in leasing advertising that the dealership would pay off the negative equity of a consumer's trade in vehicle, when in fact, it was merely rolled into the financed amount for the consumer's newly financed vehicle).

[58] *See, e.g.*, Complaint ¶¶ 12, 17–19, *Traffic Jam Events, LLC*, No. 9395 (F.T.C. Aug. 7, 2020); Complaint ¶¶ 4, 7–9, *Fowlerville Ford, Inc.*, No. C–4433 (F.T.C. Feb. 20, 2014).

[59] *See, e.g.*, Complaint ¶¶ 25, 27–28, *Fed. Trade Comm'n* v. *N. Am. Auto. Servs., Inc.*, No. 1:22–cv–0169 (N.D. Ill. Mar. 31, 2022).

[60] *See* Ben Eisen, "Car Dealer Markups Helped Drive Inflation, Study Finds," Wall St. J., Apr. 23, 2023, *https://www.wsj.com/articles/car-dealer-markups-helped-drive-inflation-study-finds-7c1d5a2d*; U.S. Bureau of Labor Statistics, "Automotive Dealerships 2019–2022: Dealer Markup Increases Drive New-Vehicle Consumer Inflation" (Apr. 2023), *https://www.bls.gov/opub/mlr/2023/article/automotive-dealerships-markups.htm*.

[61] *See* Nat'l Consumer L. Ctr., "Auto Add-ons Add Up: How Dealer Discretion Drives Excessive, Arbitrary, and Discriminatory Pricing" (Oct. 1, 2017), *https://www.nclc.org/images/pdf/car_sales/report-auto-add-on.pdf*; Adam J. Levitin, "The Fast and the Usurious: Putting the Brakes on Auto Lending Abuses," 108 Geo. L.J. 1257, 1265–66 (2020), *https://www.law.georgetown.edu/georgetown-law-journal/wp-content/uploads/sites/26/2020/05/Levitin_The-Fast-and-the-Usurious-*

*Putting-the-Brakes-on-Auto-Lending-Abuses.pdf* (discussing "loan packing" as the sale of add-on products that are falsely represented as being required in order to obtain financing); Complaint ¶¶ 12–19, *Fed. Trade Comm'n* v. *Liberty Chevrolet, Inc.*, No. 1:20–cv–03945 (S.D.N.Y. May 21, 2020) (alleging deceptive and unauthorized add-on charges in consumers' transactions); Complaint ¶¶ 59–64, *Fed. Trade Comm'n* v. *Universal City Nissan, Inc.*, No. 2:16–cv–07329 (C.D. Cal. Sept. 29, 2016) (alleging deceptive and unauthorized add-on charges in consumers' transactions); Complaint ¶ 6, 9, *TT of Longwood, Inc.*, No. C–4531 (F.T.C. July 2, 2015) (alleging misrepresentations regarding prices for added features); *see also* Auto Buyer Study, *supra* note 25, at 14 ("Several participants who thought that they had not purchased add-ons, or that the add-on were included at no additional charge, were surprised to learn, when going through the paperwork, that they had in fact paid extra for add-ons. This is consistent with consumers' experiencing fatigue during the buying process or confusion with a financially complex transaction, but would also be consistent with dealer misrepresentations.").

[62] Consumers for Auto Reliability and Safety, Comment Letter on Motor Vehicle Roundtables, Project No. P104811 at 2–3 (Apr. 1, 2012), *https://www.ftc.gov/sites/default/files/documents/public_comments/public-roundtables-protecting-consumers-sale-and-leasing-motor-vehicles-project-no.p104811-00108/00108-82875.pdf* (citing a U.S. Department of Defense data call summary that found that the vast majority of military counselors have clients with auto financing problems and cited "loan packing" and yo-yo financing as the most frequent auto lending abuses affecting servicemembers).

[63] Complaint ¶¶ 17–19, *Fed. Trade Comm'n* v. *Liberty Chevrolet, Inc.*, No. 1:20–cv–03945 (S.D.N.Y. May 21, 2020); Complaint ¶ 60, *Fed. Trade Comm'n* v. *Universal City Nissan, Inc.*, No. 2:16–cv–07329 (C.D. Cal. Sept. 29, 2016); Carole L. Reynolds & Stephanie E. Cox, Fed. Trade Comm'n, "Buckle Up: Navigating Auto Sales and Financing" (2020) [hereinafter Buckle Up], *https://www.ftc.gov/reports/buckle-navigating-auto-sales-financing*.

[64] *See, e.g.*, Buckle Up, *supra* note 63, at 10–11 (noting the long, complex transaction process); Complaint ¶¶ 23–28, *Fed. Trade Comm'n* v. *N. Am. Auto. Servs., Inc.*, No. 1:22–cv–01690 (N.D. Ill. Mar. 31, 2022) (same).

[65] Complaint ¶ 24, *Fed. Trade Comm'n* v. *N. Am. Auto. Servs., Inc.*, No. 1:22–cv–01690 (N.D. Ill. Mar. 31, 2022); *see also* Buckle Up, *supra* note 63, at 10–11.

to purchase those add-ons without knowing about or agreeing to them, or without knowing or agreeing to their costs or other key terms.[66] Unscrupulous dealers are able to slip the often considerable additional costs for these items past consumers unnoticed and into purchase contracts through a variety of means, including by not mentioning them at all,[67] or by focusing consumers' attention on other aspects of the complex transaction, such as monthly payments, which might increase only marginally with the addition of prorated add-on costs, or may even be made to decrease if the financing term is extended.[68] This type of conduct can target immigrants, communities of color, and servicemembers.[69] In other instances, dealers might wait until late in the transaction to mention add-ons, and then do so in a misleading manner. For example, participants in an FTC qualitative study on consumers' car-buying experiences cited situations where dealers waited until the financing stage to mention add-ons, after consumers believed they had agreed on terms, and even though many add-ons have nothing to do with financing and were not mentioned at all during the sales process or when prices were initially negotiated.[70] According to FTC enforcement actions, dealers also have represented that add-ons are required when in fact they are not,[71] have misrepresented the purported benefits of add-ons, and have failed to disclose material limitations.[72]

[66] Complaint ¶¶ 25, 27, 29–32, *Fed. Trade Comm'n* v. *N. Am. Auto. Servs., Inc.*, No. 1:22–cv–01690 (N.D. Ill. Mar. 31, 2022); *see also* Complaint ¶¶ 17–19, *Fed. Trade Comm'n* v. *Liberty Chevrolet, Inc.*, No. 1:20–cv–03945 (S.D.N.Y. May 21, 2020); Dale Irwin, Slough Connealy Irwin & Madden LLC, Comment Letter on Public Roundtables: Protecting Consumers in the Sale and Leasing of Motor Vehicles, Project No. P104811, Submission No. 558507–00060 (Dec. 29, 2011), *https://www.regulations.gov/comment/FTC-2022-0036-0051* (consumer protection lawyer noting "payment packing" among problems "that cry out for scrutiny and regulation"); Michael Archer, Comment Letter on Public Roundtables: Protecting Consumers in the Sale and Leasing of Motor Vehicles, Project No. P104811, Submission No. 558507–00041 at 3 (Aug. 6, 2011), *https://www.regulations.gov/comment/FTC-2022-0036-0014* (workshop panelist stating, "I have seen cases wherein the dealer uses financing to pack in extra costs or to wipe out trade-in value."); Dawn Smith, Comment Letter on Public Roundtables: Protecting Consumers in the Sale and Leasing of Motor Vehicles, Project No. P104811, Submission No. 558507–00027 (July 27, 2011), *https://www.regulations.gov/comment/FTC-2022-0036-0043* ("Confusing or misleading sales terms[.] Extra fees was [sic] added at the time of purchase and to this day I still do not understand what the fee was for; it made the payment higher."); Carrie Ferraro, Legal Servs. of N.J., Comment Letter on Public Roundtables: Protecting Consumers in the Sale and Leasing of Motor Vehicles, Project No. P104811, Submission No. 558507–00061 (Dec. 29, 2011), *https://www.regulations.gov/comment/FTC-2022-0036-0059* (citing "[d]ealers engage[d] in packing" as an example of the common consumer complaints of car-sales-related fraud received by LSNJ's legal advice hotline); Rosemary Shahan, Consumers for Auto Reliability and Safety, Comment Letter on Public Roundtables: Protecting Consumers in the Sale and Leasing of Motor Vehicles, Project No. P104811, Submission No. 558507–00069 at 3 (Jan. 31, 2012), *https://www.regulations.gov/comment/FTC-2022-0036-0069* (noting that "[m]any common auto scams do not generate complaints in proportion to how pervasive or costly the practices are, simply because the consumers generally remain unaware they have been scammed," including as a result of "[l]oan packing"); Mary W. Sullivan, Matthew T. Jones & Carole L. Reynolds, Fed. Trade Comm'n, "The Auto Buyer Study: Lessons from In-Depth Consumer Interviews and Related Research," Supplemental Appendix: Redacted Interview Transcripts at 525 (2020) [hereinafter Auto Buyer Study: Appendix], *https://www.ftc.gov/system/files/documents/reports/buckle-navigating-auto-sales-financing/bcpstaffreportautobuyerstudysuppappendix.pdf* (Study participant 169810: consumer had "additional items" charges on contract that consumer could not identify); *id.* at 730, 740–42 (Study participant 188329: dealer did not tell consumer about GAP or service contract but consumer was charged $599 and $1,950 for those add-ons, respectively); Press Release, N.Y. State Att'y Gen., "A.G. Schneiderman Announces Nearly $14 Million Settlement with NYC and Westchester Auto Dealerships for Deceptive Practices that Resulted in Inflated Car Prices" (June 17, 2015), *https://ag.ny.gov/press-release/2015/ag-schneiderman-announces-nearly-14-million-settlement-nyc-and-westchester-auto* ("This settlement is part of the [New York] attorney general's wider initiative to end the practice of 'jamming,' unlawfully charging consumers for hidden purchases by car dealerships.").

[67] Under the Truth in Lending Act ("TILA") and its implementing Regulation Z, required add-on products or services must be factored into the APR and the finance charge disclosed during the transaction. *See* 15 U.S.C. 1605, 1606, 1638; 12 CFR 226.4, 226.18(b), (d), (e), and 226.22. It is legally impermissible for dealers to include charges for such products in a consumer's contract without disclosing them. *See, e.g.,* Complaint ¶¶ 57–60, *Fed. Trade Comm'n* v. *Stewart Fin. Co. Holdings, Inc.*, No. 1:03–CV–2648 (N.D. Ga. Sept. 4, 2003) (alleging violations for failure to include the cost of required add-on products in the finance charge and annual percentage rate disclosed to consumers).

[68] *See, e.g.,* Buckle Up, *supra* note 63, at 6; Fed. Trade Comm'n, Military Consumer Financial Workshop, Panel 1, Tr. 19:25–41 (July 19, 2017), *https://www.ftc.gov/news-events/events-calendar/military-consumer-workshop*; Fed. Trade Comm'n, "The Road Ahead: Selling, Financing & Leasing Motor Vehicles," Public Roundtable, Session 2, Tr. at 40–41 (Aug. 2 2011), *https://www.ftc.gov/news-events/events/2011/08/road-ahead-selling-financing-leasing-motor-vehicles* (noting that optional products and services are often already included in the monthly payment prices advertised or quoted); Christopher Kukla, Ctr. for Responsible Lending, Comment Letter on Public Roundtables: Protecting Consumers in the Sale and Leasing of Motor Vehicles, Project No. P104811, Submission No. 558507–00071 at 10 (Feb. 1, 2012), *https://www.regulations.gov/comment/FTC-2022-0036-0068* (discussing how dealers conceal packing by expressing an increase in price in terms of monthly payment); Att'y General of 31 States & DC, Comment Letter on Public Roundtables: Protecting Consumers in the Sale and Leasing of Motor Vehicles, Project No. P104811, Submission No. 558507–00112 at 5 (Apr. 13, 2012), *https://www.regulations.gov/comment/FTC-2022-0036-0124* (discussing the "age-old auto salesperson's trick" of quoting monthly payment prices without disclosing that the quote includes the cost of optional items that the customer has not yet agreed to purchase).

[69] *See, e.g.,* Complaint ¶¶ 9, 26, *Fed. Trade Comm'n* v. *Liberty Chevrolet, Inc.*, No. 1:20–cv–03945 (S.D.N.Y. May 21, 2020) (charging defendants with discriminating on the basis of race, color, and national origin by charging higher interest rates and inflated fees); Press Release, N.Y. State Att'y Gen., "Attorney General James Delivers Restitution to New Yorkers Cheated by Auto Dealership" (Nov. 17, 2020), *https://ag.ny.gov/press-release/2020/attorney-general-james-delivers-restitution-new-yorkers-cheated-auto-dealership* (dealership targeted Chinese speakers for unlawful payment packing or "jamming"); Military Consumer Financial Workshop, Tr. 19:21 (July 19, 2017), *https://www.ftc.gov/news-events/events/2017/07/military-consumer-workshop* (panelist discussing servicemembers experiencing payment packing); *see also* Fed. Trade Comm'n, "Staff Perspective: A Closer Look at the Military Consumer Financial Workshop" 2–3 (Feb. 2018), *https://www.ftc.gov/system/files/documents/reports/closer-look-military-consumer-financial-workshop-federal-*

*trade-commission-staff-perspective/military_consumer_workshop_-_staff_perspective_2-2-18.pdf* (explaining the unique situation of servicemembers whose steady paychecks make them attractive customers for dealers, while having no or minimal credit history, meaning they qualify for less advantageous credit terms and higher interest rate financing).

[70] *See, e.g.,* Buckle Up, *supra* note 63, at 6 (observing that the introduction of "add-ons during financing discussions caused several participants' total sale price to balloon from the cash price"); *id.* at 9 (observing that, for most consumers in the study, "add-ons did not come up until the financing process, if at all, after a long car-buying process and at a time when the consumer often felt pressure to close the deal"); *id.* (noting that most study participants' contracts included add-ons charges, but that many "were unclear what those add-ons included, and sometimes did not realize they had purchased any add-ons at all"); *id.* at 7 (explaining situations where the consumer reached the financing office after negotiating with the sales staff and were then told that the agreed upon price was not compatible with key financing terms—for example, a promised rebate or discount could not be combined with an advertised interest rate).

[71] Complaint ¶¶ 12–19, *Fed. Trade Comm'n* v. *Liberty Chevrolet, Inc.*, No. 1:20–cv–03945 (S.D.N.Y. May 21, 2020) (alleging deceptive and unauthorized add-on charges in consumers' transactions); Complaint ¶¶ 59–64, *Fed. Trade Comm'n* v. *Universal City Nissan, Inc.*, No. 2:16–cv–07329 (C.D. Cal. Sept. 29, 2016) (alleging deceptive and unauthorized add-on charges in consumers' transactions); Complaint ¶ 6, 9, *TT of Longwood*, No. C–4531 (F.T.C. July 2, 2015) (alleging misrepresentations regarding prices for added features); *see also* Auto Buyer Study, *supra* note 25, at 14.

[72] Complaint ¶¶ 4–14, *Nat'l Payment Network, Inc.*, No. C–4521 (F.T.C. May 4, 2015) (alleging failure to disclose fees associated with financing program; misleading savings claims in advertisements); Complaint ¶¶ 4–13, *Matt Blatt Inc.*, No. C–4532 (F.T.C. July 2, 2015) (alleging failure to disclose fees associated with financing program; misleading savings claims); Buckle Up, *supra* note 63, at 10 (noting that some Auto Buyer Study participants did not fully understand material aspects of extended warranties or service plans they purchased and "were surprised to discover during the interview that their plans had unexpected limitations" or that "they had to pay out-of-pocket for repairs or services that were not covered"; for example, one "consumer purchased a 'Lifetime' maintenance plan, only to discover later that he received a one-year plan that covered periodic oil changes"). *Cf.* Consent Order ¶¶ 10–16, *Santander*

Indeed, as previously noted, in a recent FTC enforcement action, the Commission cited a survey finding that 83% of consumers from the named dealers were charged for add-on products or services that they did not authorize or as a result of deceptive claims.[73]

One participant in an FTC qualitative study of consumers' car-buying experiences summed up these issues during an interview after having purchased a vehicle.[74] The consumer purchased a $2,000 service contract that the dealer falsely said was free, and a $900 GAP agreement that the dealer falsely said was mandatory. The consumer only learned about these purchases during the study interview. This consumer remarked:

I feel I've been taken advantage of, to be honest with you. Even though I thought that I was getting a great deal with the interest rate, but I know [sic] see that they're also very sneaky about putting stuff on your paperwork. They only let you skim through the paperwork that you have to sign and they just kind of tell you what it is. This is this, this is that, this is this, and then you just sign it away. You're so tired, you're so worn down, you don't want to be there no more. You just want to get it done and over with. They take advantage of that. Yes, they still play this friendly card, you know, thank you for your business card kind of thing. Like I said, they never lose. They never lose.[75]

Similarly, in response to the Commission's notice of proposed rulemaking, thousands of commenters described issues they faced when purchasing, financing, or leasing a vehicle. Many comments the Commission received in support of the NPRM were from self-identified military

consumers and dealership employees. Examples of supportive comments include the following:

• As a young Marine stationed in a military town I was taken advantage of by a dealership when purchasing my first car. It set me back financially for years. I know of many young military people who purchased vehicle[]s and we[]re instantly so far upside down after leaving the dealership with thousands of dollars in add on junk charges . . . . Please make it more difficult for dishonest dealers like these to financially burden young Americans and Americans of any age for that matter.[76]

• Imagine going to a restaurant franchise and order[ing] a burger and fries for $10 and the franchise employees say[,] 'Sorry that will be $25 dollars, there is a $10 restaurant adjustment price due to market conditions and $5 for us to place and document your order.' You would walk away without hesitation because that would [be] absolutely ridiculous. Yet, dealerships are allowed to do exactly that. . . . IT IS TIME TO CHANGE AND PROTECT CONSUMERS[.]' [77]

• As in many other areas, it is the vulnerable in our society who are probably most affected by such deceptive practices. . . . Sadly, it is often these very people who desperately need a dependable, affordable car for transportation to work, school, shopping, or medical care. To entice, pressure, or trick people into buying a car that is more than they can afford sets them up for financial failure, not only in possibly having a needed car repossessed, but in long-term damage to their credit. . . . In closing, I would be extremely happy to see rules such as those described above enacted, and don't think these could come a day too soon. It's a step in the right direction for the protection of the consumer.[78]

• None of us working here at the dealership in sales benefit from [unfair and deceptive practices]. We cringe as much as every customer and have to show up to work every[ ]day and hope we are not forced to screw someone with these BS products. . . . I would hope when [t]he regulators are making their decisions, they understand the positive implications this would have for dealership employees both financially and mentally.[79]

• Generally, I'm not a person in favor of government regulation. However, as a potential customer and cash buyer, I feel there is certainly a need to bring car dealers back into check. I'm just looking for a more honest and transparent process. I don't want to be taken advantage of. I certainly don't want my family members or [s]oldiers to be taken advantage of. Therefore, I feel it is in the best interest of future customers to support this regulation.[80]

• I cannot stress enough my support for these new rules. Currently, dealerships across the US, including the one I work for, have made the car buying process needlessly confusing, expensive, and frustrating by engaging in false advertising and hidden add-on products.[81]

• I can tell you after many years of car buying I have NEVER walked out of a dealership feeling good. Even worse, I've never purchased a car feeling like I fully understood what I was getting. . . . Looking forward to seeing the change happen SOON! [82]

• When I buy a gallon of milk from the store, the price is written next to the milk. When I go pay, I pay the price advertised next to the milk. Would it be OK if I go up to pay and that gallon of milk had anywhere between 1% and 1,200% markup depending on the day, what you look like, what you drove to the store in, if you're a man or a woman? [83]

• We ended up having to drive 3 hours to the [vehicle we] wanted. Upon arriving to pick[ ]up the car we were told there was a [$]4,300 increase over MSRP. We were told if we didn't take it they had someone else waiting to purchase it. We needed the car and didn't have time to hunt down another one so ended up purchasing it. Very disappointed in the long and awful process.[84]

• The worst is dealing with car dealers. You never know what the real price is on a vehicle until you spend a few hours with them. Mandatory add[-] on[ ]s, market availability surcharges, doc fees that vary from dealer to dealer. . . . Then dealing with the finance manager who tr[ie]s to sell you everything you don't[ ]need. They high pressure the consumer on purchasing extend[ed] warranties. There

---

*Consumer USA, Inc.,* CFPB No. 2018–BCFP–0008 (Nov. 20, 2018) (finding that defendant sold GAP product allegedly providing "full coverage" to consumers with loan-to-value ratios ("LTVs") above 125%, when in fact coverage was limited to 125% of LTV).

[73] Complaint ¶ 27, *Fed. Trade Comm'n v. N. Am. Auto. Servs., Inc.,* No. 1:22–cv–01690 (N.D. Ill. Mar. 31, 2022).

[74] The study is described in the Commission's reports: Auto Buyer Study, *supra* note 25, and Buckle Up, *supra* note 63. Some industry commenters critiqued the FTC's reliance on this qualitative study. The Commission notes that the study provides helpful qualitative insight from consumer interviews regarding their recent motor vehicle purchases and is one of the many sources the Commission has considered, including consumer complaints, enforcement actions, outreach and dialogue with stakeholders and consumer groups, among others, as described in this SBP and in the NPRM.

[75] Auto Buyer Study: Appendix, *supra* note 66, at 130 (Study participant 152288); *see also id.* at 202–03 (Study participant 180267: dealership included a charge for GAP in the final paperwork but not in retail sales contract); *id.* at 296 (Study participant 146748: consumer learned during interview with FTC that consumer purchased GAP: "maybe they're just throwing that in there without telling you").

[76] Individual commenter, Doc. No. FTC–2022–0046–4648.

[77] Individual commenter, Doc. No. FTC–2022–0046–0016.

[78] Individual commenter, Doc. No. FTC–2022–0046–1216.

[79] Individual commenter, Doc. No. FTC–2022–0046–3615.

[80] Individual commenter, Doc. No. FTC–2022–0046–7366.

[81] Individual commenter, Doc. No. FTC–2022–0046–3693.

[82] Individual commenter, Doc. No. FTC–2022–0046–3678.

[83] Individual commenter, Doc. No. FTC–2022–0046–1479.

[84] Individual commenter, Doc. No. FTC–2022–0046–1878.

needs [to be] some sort of policing [of] these unscrupulous car dealers to protect the buyers.[85]

• This is a good start to making car purchasing a better experience. . . . I remember looking at a Lexus and being told by the dealership, the only one in the state, that [S]cotchguard and undercoating were mandatory and they refused to sell any vehicles without them. There were two Acura dealerships in town and one of them included 'free' lifetime oil changes that I didn't learn about until negotiating the price and had already spent two hours in negotiations. All of these services/price adjustments were not disclosed at the start of the negotiation and were only revealed either in the manager's office or when the purchase agreement was presented to me by the salesperson. After spending time on the test drive and negotiating the price, it felt that these last minute price adjustments were being revealed that late in the process so that I wouldn't leave.[86]

• Please enact and enforce these regulations to protect vulnerable consumers from predatory business practices enjoyed by dealers. Our family experienced such practices when trying to purchase a vehicle in early 2022. It was only after five hours at the dealership that we discovered the dealer had added on a $3,000 market adjustment and $3,100 in other add-ons (nitrogen-filled tires, LoJack, paint protection) to MSRP. This raised the price by about $6,000 and caused us to use extra PTO over that week to find a new vehicle at a price within our budget. Greater transparency in the car-buying process is desperately needed to protect vulnerable consumers—who usually lack any bargaining power— against power dealer networks and their special interest groups. . . .[87]

## C. Law Enforcement and Other Responses

The Commission has taken action to protect consumers from deceptive and unfair acts or practices in the motor vehicle marketplace. As noted in the NPRM, the Commission has brought more than 50 auto law enforcement actions;[88] led two law enforcement

[85] Individual commenter, Doc. No. FTC–2022–0046–0825.

[86] Individual commenter, Doc. No. FTC–2022–0046–4833.

[87] Individual commenter, Doc. No. FTC–2022–0046–1690.

[88] Complaint, *Fed. Trade Comm'n* v. *Rhinelander Auto Ctr., Inc.,* No. 3:23–cv–00737 (W.D. Wis. Oct. 24, 2023); Complaint, *Fed. Trade Comm'n* v. *Passport Auto. Grp., Inc.,* No. 8:22–cv–02670–GLS (D. Md. Oct. 18, 2022); Complaint, *Fed. Trade Comm'n* v. *N. Am. Auto. Servs., Inc.,* No. 1:22–cv–01690 (N.D. Ill. Mar. 31, 2022); Complaint, *Traffic*

*Jam Events, LLC,* No. 9395 (F.T.C. Aug. 7, 2020); Complaint, *Fed. Trade Comm'n* v. *Liberty Chevrolet, Inc.,* No. 1:20–cv–03945 (S.D.N.Y. May 21, 2020); Complaint, *Federal-Mogul Motorparts LLC,* No. C–4717 (F.T.C. May 12, 2020); Complaint, *LightYear Dealer Techs., LLC,* No. C–4687 (F.T.C. Sept. 3, 2019); Complaint, *Fed. Trade Comm'n* v. *Passport Imports, Inc.,* No. 8:18–cv–03118 (D. Md. Oct. 10, 2018); Complaint, *Fed. Trade Comm'n* v. *Tate's Auto Ctr. of Winslow, Inc.,* No. 3:18–cv–08176–DJH (D. Ariz. July 31, 2018); Complaint, *Cowboy AG, LLC,* No. C–4639 (F.T.C. Jan. 4, 2018); Complaint, *Fed. Trade Comm'n* v. *Norm Reeves, Inc.,* No. 8:17–cv–01942 (C.D. Cal. Nov. 3, 2017); Complaint, *Asbury Auto. Grp., Inc.,* No. C–4606 (F.T.C. Mar. 22, 2017); Complaint, *CarMax, Inc.,* No. C–4605 (F.T.C. Mar. 22, 2017); Complaint, *West-Herr Auto. Grp., Inc.,* No. C–4607 (F.T.C. Mar. 22, 2017); Complaint, *Fed. Trade Comm'n* v. *Volkswagen Grp. of Am., Inc.,* No. 3:16–cv–01534 (N.D. Cal. Jan. 31, 2017); Complaint, *Fed. Trade Comm'n* v. *Uber Techs., Inc.,* No. 3:17–cv–00261 (N.D. Cal. Jan. 19, 2017); Complaint, *Gen. Motors LLC,* No. C–4596 (F.T.C. Dec. 8, 2016); Complaint, *Jim Koons Mgmt. Co.,* No. C–4598 (F.T.C. Dec. 8, 2016); Complaint, *Lithia Motors, Inc.,* No. C–4597 (F.T.C. Dec. 8, 2016); Complaint, *Fed. Trade Comm'n* v. *Universal City Nissan, Inc.,* No. 2:16–cv–07329 (C.D. Cal. Sep. 29, 2016); Complaint, *United States* v. *New World Auto Imports, Inc.,* No. 3:16–cv–02401–K (N.D. Tex. Aug. 18, 2016); Complaint, *Progressive Chevrolet Co.,* No. C–4578 (F.T.C. June 13, 2016); Complaint, *BMW of N. Am., LLC,* No. C–4555 (F.T.C. Oct. 21, 2015); Complaint, *United States* v. *Tricolor Auto Acceptance, LLC,* No. 3:15–cv–3002 (N.D. Tex. Sept. 15, 2015); Complaint, *JS Autoworld, Inc.,* No. C–4535 (F.T.C. Aug. 13, 2015); Complaint, *TC Dealership, L.P.,* No. C–4536 (F.T.C. Aug. 13, 2015); Complaint, *Matt Blatt Inc.,* No. C–4532 (F.T.C. July 2, 2015); Complaint, *TT of Longwood, Inc.,* No. C–4531 (F.T.C. July 2, 2015); Complaint, *Fin. Select, Inc.,* No. C–4528 (F.T.C. June 2, 2015); Complaint, *First Am. Title Lending of Ga., LLC,* No. C–4529 (F.T.C. June 2, 2015); Complaint, *City Nissan Inc.,* No. C–4524 (F.T.C. May 4, 2015); Complaint, *Jim Burke Auto., Inc.,* No. C–4523 (F.T.C. May 4, 2015); Complaint, *Nat'l Payment Network, Inc.,* No. C–4521 (F.T.C. May 4, 2015); Complaint, *TXVT Ltd. P'ship,* No. C–4508 (F.T.C. Feb. 12, 2015); Complaint, *Fed. Trade Comm'n* v. *Regency Fin. Servs., LLC,* No. 1:15–cv–20270–DPG (S.D. Fla. Jan. 26, 2015); Complaint, *United States* v. *Billion Auto, Inc.,* No. 5:14–cv–04118–MWB (N.D. Iowa Dec. 11, 2014); Complaint, *Fed. Trade Comm'n* v. *Ramey Motors, Inc.,* No. 1:14–cv–29603 (S.D. W. Va. Dec. 11, 2014); Complaint, *Fed. Trade Comm'n* v. *Consumer Portfolio Servs., Inc.,* No. 14–cv–00819 (C.D. Cal. May 28, 2014); Complaint, *Nissan N. Am., Inc.,* No. C–4454 (F.T.C. May 1, 2014); Complaint, *TBWA Worldwide, Inc.,* No. C–4455 (F.T.C. May 1, 2014); Complaint, *Bill Robertson & Sons, Inc.,* No. C–4451 (F.T.C. Apr. 11, 2014); Complaint, *Paramount Kia of Hickory, LLC,* No. C–4450 (F.T.C. Apr. 11, 2014); Complaint, *Fed. Trade Comm'n* v. *Abernathy Motor Co.,* No. 3:14–cv–00063–BRW (E.D. Ark. Mar. 12, 2014); Complaint, *Fowlerville Ford, Inc.,* No. C–4433 (F.T.C. Feb. 20, 2014); Complaint, *Infiniti of Clarendon Hills, Inc.,* No. C–4438 (F.T.C. Feb. 20, 2014); Complaint, *Luis Alfonso Sierra,* No. C–4434 (F.T.C. Feb. 20, 2014); Complaint, *Mohammad Sabha,* No. C–4435 (F.T.C. Feb. 20, 2014); Complaint, *Norm Reeves, Inc.,* No. C–4436 (F.T.C. Feb. 20, 2014); Complaint, *Ganley Ford West, Inc.,* No. C–4428 (F.T.C. Jan. 28, 2014); Complaint, *Timonium Chrysler, Inc.,* No. C–4429 (F.T.C. Jan. 28, 2014); Complaint, *Courtesy Auto Grp., Inc.,* No. 9359 (F.T.C. Jan. 7, 2014); Complaint, *Franklin's Budget Car Sales, Inc.,* No. C–4371 (F.T.C. Oct. 3, 2012); Complaint, *Fed. Trade Comm'n* v. *Matthew J. Loewen,* No. 2:12–cv–01207–MJP (W.D. Wash. July 13, 2012); Complaint, *Key Hyundai of Manchester, LLC,* No. C–4358 (F.T.C. May 4, 2012); Complaint, *Billion Auto, Inc.,* No. C–

sweeps, including one that involved 181 State enforcement actions;[89] published two reports on a qualitative study of consumer experiences while purchasing motor vehicles; and held workshops with various stakeholders to discuss the motor vehicle marketplace.[90]

4356 (F.T.C. May 1, 2012); Complaint, *Frank Myers AutoMaxx, LLC,* No. C–4353 (F.T.C. Apr. 19, 2012); Complaint, *Ramey Motors, Inc.,* No. C–4354 (F.T.C. Apr. 19, 2012); Complaint, *Fed. Trade Comm'n* v. *Hope for Car Owners, LLC,* No. 2:12–cv–00778–GEB–EFB (E.D. Cal. Mar. 27, 2012); Complaint, *Fed. Trade Comm'n* v. *NAFSO VLM, Inc.,* No. 2:12–cv–00781–KJM–EFB (E.D. Cal. Mar. 27, 2012); Complaint, *Fed. Trade Comm'n* v. *Stewart Fin. Co. Holdings, Inc.,* No. 1:03–CV–2648 (N.D. Ga. Sept. 4, 2003); Complaint, *Pacifico Ardmore, Inc.,* No. C–3920 (F.T.C. Feb. 7, 2000).

[89] Operation Steer Clear and Operation Ruse Control, brought with State law enforcement partners around the nation and Canada, encompassed 252 enforcement actions. *See* Press Release, Fed. Trade Comm'n, "Multiple Law Enforcement Partners Announce Crackdown on Deception, Fraud in Auto Sales, Financing and Leasing" (Mar. 26, 2015), *https://www.ftc.gov/news-events/press-releases/2015/03/ftc-multiple-law-enforcement-partners-announce-crackdown.*

[90] For example, the FTC has held public workshops: (1) in conjunction with the National Highway Traffic Safety Administration to examine the consumer privacy and security issues posed by automated and connected motor vehicles, *see* Fed. Trade Comm'n, "Connected Cars: Privacy, Security Issues Related to Connected, Automated Vehicles" (June 28, 2017), *https://www.ftc.gov/news-events/events-calendar/2017/06/connected-cars-privacy-security-issues-related-connected;* (2) to explore competition and related issues in the U.S. motor vehicle distribution system including how consumers and businesses may be affected by State regulations and emerging trends in the industry, *see* Fed. Trade Comm'n, "Auto Distribution: Current Issues & Future Trends" (Jan. 19, 2016), *https://www.ftc.gov/news-events/events-calendar/2016/01/auto-distribution-current-issues-future-trends;* (3) on military consumer financial issues, including automobile purchases, financing, and leasing, *see* Fed. Trade Comm'n, "Military Consumer Workshop" (July 19, 2017), *https://www.ftc.gov/news-events/events-calendar/military-consumer-workshop;* and (4) through a series of three roundtables on numerous issues in selling, financing, and leasing automobiles, *see* Fed. Trade Comm'n, "The Road Ahead: Selling, Financing & Leasing Motor Vehicles" (Apr. 12, 2011), *https://www.ftc.gov/news-events/events-calendar/2011/04/road-ahead-selling-financing-leasing-motor-vehicles;* Fed. Trade Comm'n, "The Road Ahead: Selling, Financing & Leasing Motor Vehicles" (Aug. 2, 2011), *https://www.ftc.gov/news-events/events-calendar/2011/08/road-ahead-selling-financing-leasing-motor-vehicles;* Fed. Trade Comm'n, "The Road Ahead: Selling, Financing & Leasing Motor Vehicles" (Nov. 17, 2011), *https://www.ftc.gov/news-events/events-calendar/2011/11/road-ahead-selling-financing-leasing-motor-vehicles; see also* Consumers for Auto Reliability and Safety, Comment Letter on Motor Vehicle Roundtables, Project No. P104811, at 6 (Apr. 1, 2012), *https://www.ftc.gov/sites/default/files/documents/public_comments/public-roundtables-protecting-consumers-sale-and-leasing-motor-vehicles-project-no.p104811-00108/00108-82875.pdf* (stating that the Director of the Navy-Marine Corps Relief Society in San Diego indicated before the California Assembly Committee on Banking and Finance that "the number one issue they are confronted with is used car dealers who are taking advantage of military personnel"). These events, and others, have included speakers representing consumers, dealers, regulators, and other industry stakeholders.

As discussed in the NPRM, the Commission's law enforcement partners have also brought actions addressing unfair, abusive, and deceptive practices in the motor vehicle industry. For example, the Consumer Financial Protection Bureau ("CFPB") has taken action against third-party motor vehicle financing entities in matters that raise similar, and sometimes identical, claims of deceptive and unfair acts or practices as have been at issue in FTC enforcement actions.[91]

In addition, States have engaged in enforcement actions alleging similar dealer misconduct in the motor vehicle dealer marketplace, and have implemented legislative and regulatory measures to address corresponding consumer protection issues. With regard to law enforcement, State regulators and Attorneys General have participated in law enforcement sweeps with the FTC, and have filed hundreds of actions alleging unlawful conduct by motor vehicle dealerships across the country.[92] Furthermore, with regard to

legislative and regulatory efforts, at least four States have enacted consumer protection measures relating to pricing or add-ons by motor vehicle dealers.[93] For example, to "ensure that dealers do not add in hidden or undisclosed costs after the price for a vehicle has been advertised," Oregon promulgated a rule that requires dealerships to state an "offering price" that is the actual offer and amount the consumer can pay to own the vehicle, excluding only taxes and other specific items.[94] California and Wisconsin have similarly enacted laws that make it unlawful for dealerships to advertise a total price without including additional costs to the purchaser outside the mandatory tax, title, and registration costs.[95] Other States, such as Indiana, have enacted codes that prohibit the sale of add-ons in certain circumstances.[96]

The Commission and its law enforcement partners also regularly provide business guidance and consumer education regarding the motor vehicle marketplace. The Commission has compiled its motor vehicle business guidance into a portal on its website, with links to guidance documents, frequently asked questions, and legal resources.[97] Likewise, the Commission provides a web page for consumers to learn more about buying, financing, and leasing motor vehicles.[98] Several States have published similar such guidance manuals for motor vehicle dealers,[99]

---

[91] The CFPB has brought at least 23 enforcement actions involving motor vehicles, financing, or add-on products or services. *See* Consent Order ¶¶ 3, 13–57, *Toyota Motor Credit Corp.*, CFPB No. 2023–CFPB–0015 (Nov. 20, 2023) (finding auto lender engaged in unfair or abusive acts or practices by making it unreasonably difficult for consumers to cancel unwanted add-ons; failing to ensure consumers received refunds of payments they had made for certain add-ons that had become void and worthless; and failing to provide refunds owed to consumers who canceled their vehicle service agreements);

Complaint ¶¶ 75–104, *CFPB* v. *USASF Servicing, LLC*, No. 1:23–cv–03433–VMC (N.D. Ga. Aug. 2, 2023) (alleging auto loan servicer illegally disabled and repossessed consumers' vehicles, wrongfully double-billed consumers, misapplied payments, and failed to ensure refunds of unearned GAP premiums to which consumers were entitled); Consent Order ¶¶ 7–33, *TMX Finance LLC*, CFPB No. 2023–CFPB–0001 (Feb. 23, 2023) (finding auto lender understated and inaccurately disclosed the finance charge and annual percentage rate on loans and unfairly charged borrowers for a product that provided no benefit); Complaint ¶¶ 33–135, 171–226, *CFPB* v. *Credit Acceptance Corp.*, No. 1:23–cv–00038 (S.D.N.Y. Jan. 4, 2023) (alleging indirect auto lender misrepresented key terms of loans provided to subprime and deep-subprime consumers and substantially assisted dealers in the deceptive sale of add-on products); Consent Order ¶¶ 7–22, *Wells Fargo Bank, N.A.*, CFPB No. 2022–CFPB–0011 (Dec. 20, 2022) (finding bank incorrectly applied borrowers' auto loan payments, erroneously assessed fees and interest, wrongly repossessed borrowers' vehicles, and failed to ensure borrowers received refunds of unearned GAP fees at early payoff); Consent Order ¶¶ 4–55, *Hyundai Capital America*, CFPB No. 2022–CFPB–0005 (July 26, 2022) (finding auto finance company furnished inaccurate information about consumers to credit reporting agencies); Consent Order ¶¶ 4–14, *3rd Generation, Inc.*, CFPB No. 2021–CFPB–0003 (May 21, 2021) (finding subprime auto loan servicer charged interest on late payments of fees without the knowledge or consent of consumers); Consent Order ¶¶ 8–50, *Santander Consumer USA Inc.*, CFPB No. 2020–BCFP–0027 (Dec. 22, 2020) (finding auto finance company provided inaccurate records to credit reporting agencies); Consent Order ¶¶ 11–52, *Nissan Motor Acceptance Corp.*, CFPB No. 2020–BCFP–0017 (Oct. 13, 2020) (finding auto finance company misrepresented financing extension agreements, repossessions, and limitations to consumer bankruptcy protections); Consent Order ¶¶ 8–22, *Lobel Fin. Corp.*, CFPB No. 2020–BCFP–0016 (Sept. 21, 2020) (finding auto-loan servicer unfairly charged delinquent consumers add-on charges in the form of Loss Damage Waiver premiums); Consent Order ¶¶ 6–30, *Santander Consumer USA Inc.*, CFPB No. 2018–BCFP–0008 (Nov. 20, 2018) (finding auto finance company sold GAP to consumers with LTV over 125%, misrepresenting that such consumers would be fully covered with total loss);

Consent Order ¶¶ 27–39, *Wells Fargo Bank, N.A.*, CFPB No. 2018–BCFP–0001 (Apr. 20, 2018) (finding

bank imposed duplicative or unnecessary forced-placed auto loan insurance on consumers); Consent Order ¶¶ 12–23, *Toyota Motor Credit Corp.*, CFPB No. 2016–CFPB–0002 (Feb. 2, 2016) (finding auto finance company engaged in discriminatory pricing markup for motor vehicle financing, without regard to creditworthiness); Consent Order ¶¶ 73–75, *Y King S Corp.*, CFPB No. 2016–CFPB–0001 (Jan. 21, 2016) (finding used car dealer failed to disclose mandatory add-ons as financing charges); Consent Order ¶¶ 12–51, *Interstate Auto Grp., Inc.*, CFPB No. 2015–CFPB–0032 (Dec. 17, 2015) (finding dealership and financing company reported information they knew or had reasonable cause to believe was inaccurate to credit reporting entities, harming consumer credit); Consent Order ¶¶ 7–90, *Westlake Servs., LLC*, CFPB No. 2015–CFPB–0026 (Sept. 30, 2015) (finding indirect auto financing entity used illegal debt collection tactics); Consent Order ¶¶ 8–23, *Fifth Third Bank*, CFPB No. 2015–CFPB–0024 (Sept. 28, 2015) (finding discrimination against loan applicants in credit applications based on characteristics such as race and national origin); Consent Order ¶¶ 9–24, *Am. Honda Fin. Corp.*, CFPB No. 2015–CFPB–0014 (July 14, 2015) (same);

Consent Order ¶¶ 4–60, *DriveTime Auto. Grp., Inc.*, CFPB No. 2014–CFPB–0017 (Nov. 19, 2014) (finding buy-here-pay-here dealership made harassing debt collection calls and provided inaccurate credit information to credit reporting agencies); Consent Order ¶¶ 4–37, *First Investors Fin. Servs. Grp., Inc.*, CFPB No. 2014–CFPB–0012 (Aug. 20, 2014) (finding auto financing company provided inaccurate records to credit reporting agencies); Consent Order ¶¶ 7–27, *Ally Fin. Inc.*, CFPB No. 2013–CFPB–0010 (Dec. 20, 2013) (finding auto lender engaged in discriminatory pricing); Consent Order ¶¶ 14–29, *U.S. Bank Nat'l Ass'n*, CFPB No. 2013–CFPB–0004 (June 26, 2013) (finding bank failed to properly disclose all the fees charged to participants in the companies' Military Installment Loans and Educational Services auto loans program, and misrepresented the true cost and coverage of add-on products financed along with the auto loans); Consent Order ¶¶ 10–22, *Dealers' Fin. Servs., LLC*, CFPB No. 2013–CFPB–0004 (June 26, 2013) (finding financing company made deceptive statements regarding the cost of add-on products and the scope of coverage of the vehicle service contract).

[92] Operation Steer Clear and Operation Ruse Control, brought with State law enforcement partners around the nation and Canada, encompassed 252 enforcement actions. *See* Press Release, Fed. Trade Comm'n, "Multiple Law Enforcement Partners Announce Crackdown on Deception, Fraud in Auto Sales, Financing and Leasing" (Mar. 26, 2015), *https://www.ftc.gov/news-events/press-releases/2015/03/ftc-multiple-law-enforcement-partners-announce-crackdown*. Separately, the California Attorney General's office sued a dealership chain under State consumer protection laws for deceiving consumers about add-on product charges and misrepresenting consumers' income on credit applications; the alleged practices specifically targeted low-income consumers with subprime credit. Complaint ¶¶ 37–86, *People* v.

[93] *See, e.g.*, Cal. Veh. Code 11713.1(b), (c); Or. Admin. R. 137–020–0020(3)(c); Wis. Admin. Code Trans. 139.03(3); Ind. Code 24–4.5–3–202.

[94] Or. Admin R. 137–020–0020(3)(c); Official Commentary, Or. Admin. R. 137–020–0020(3)(c).

[95] Cal. Veh. Code 11713.1(b), (c); Wis. Admin. Code Trans. 139.03(3).

[96] Ind. Code 24–4.5–3–202(3)(e)(ix) (prohibiting the sale of any GAP coverage when the LTV is less than 80%); Cal. Civ. Code 2982.12(a)(5)(B) (prohibiting the sale of any GAP waiver in three scenarios, including when the amount financed for the vehicle exceeds the amount covered by the GAP waiver).

[97] *See* Fed. Trade Comm'n, Business Guidance, "Automobiles," *https://www.ftc.gov/business-guidance/industry/automobiles* (last visited Dec. 5, 2023).

[98] *See* Fed. Trade Comm'n, "Buying and Owning a Car," *https://consumer.ftc.gov/shopping-and-donating/buying-and-owning-a-car* (last visited Dec. 5, 2023).

[99] *See, e.g.*, Ill. Sec'y of State Police, Dealer Handbook (Apr. 2022), *https://www.ilsos.gov/publications/pdf_publications/sos_dop66.pdf*; Wis. DOT—Div. of Motor Vehicles, Motor Vehicle Salesperson Manual—2020, *https://wisconsindot.gov/Documents/dmv/shared/salesmanual-20.pdf*; Enf't Div. of the Tex. Dep't of Motor Vehicles, Motor Vehicle Dealer Manual (2017), *https://www.txdmv.gov/sites/default/files/body-files/Motor_Vehicle_Dealer_Manual.pdf*.

*Paul Blanco's Good Car Co. Auto Grp.*, No. RG–19036081 (Cal. Super. Ct. Sept. 23, 2019).

while others have provided online consumer education resources.[100]

While some commenters stated that existing Federal and State efforts are sufficient, recent Commission and partner actions indicate that misconduct has persisted despite prior law enforcement and other efforts, and despite the NPRM's detailed description of chronic problems relating to bait-and-switch tactics and hidden add-on and other charges. For example, in a recent enforcement action, filed after publication of the NPRM, the Commission charged several auto dealer locations in an auto dealership group with misrepresenting the price of vehicles. According to the complaint, the dealers advertised one price to lure consumers to their dealerships, then charged them hundreds to thousands of dollars more than the advertised price by tacking on bogus extra fees for inspection, reconditioning, preparation, and certification.[101] The action also addressed the practice of dealers charging Black and Latino consumers these fees more often and in higher amounts.[102]

Multiple actions by partners since publication of the Commission's NPRM have involved auto add-ons. The Commission and the State of Wisconsin alleged that a dealership group, its current and former owners, and its general manager deceived consumers by tacking on hundreds or even thousands of dollars for add-ons without those consumers' authorization or by leading the consumers to believe the add-ons were mandatory, and doing so disproportionately more frequently with American Indian customers.[103] The CFPB and the New York State Office of the Attorney General alleged that a subprime auto lender knew or recklessly disregarded that dealers were tricking borrowers into purchasing add-on products without their knowledge or consent and had incentivized such behavior.[104] In addition, the Commonwealth of Massachusetts has brought two recent cases involving unfair add-on pricing practices.[105] In one such case, Massachusetts emphasized the dynamics of auto transactions that frequently lead to deceptive and unfair practices, particularly with respect to add-ons, noting that add-on products "are often sprung on consumers in the final steps of completing a transaction" after "multiple rounds of negotiation on the price of a car and/or car financing."[106]

Efforts to combat deceptive and unfair practices in the motor vehicle industry since the NPRM have gone beyond enforcement actions. The CFPB announced that it uncovered several unlawful practices through supervisory examinations, including auto loan servicers charging for add-ons that provide no benefit to the consumer[107]

and failing to ensure consumers received refunds for add-on products that no longer offered any benefits.[108] In addition, the State of California enacted new legislation that regulates a particular type of add-on product—GAP agreements.[109] A press release introducing the legislation cited concerns about unfair practices in the sale of GAP agreements, stating that this add-on has little value and is often targeted at consumers with lower incomes and subprime credit.[110] California's law requires several disclosures related to GAP agreements, including disclosures pertaining to their financed cost and informing consumers that such products are optional.[111] The law also prohibits the sale of GAP agreements that will not actually cover consumers' debt.[112]

Despite the array of actions by the Commission and its partners, unfairness and deception continue in the motor vehicle marketplace, including (1) deceptive or unfair sales and advertising tactics and (2) hidden charges, particularly with respect to add-on products or services. To address the harms these issues inflict on consumers and on law-abiding dealers, the Final Rule, in general:

• Prohibits dealers from making misrepresentations regarding material information, including about the cost of the vehicle, the financing terms, and the availability of rebates or discounts;

• Requires dealers to disclose the offering price of the vehicle—its full cash price, provided that dealers may exclude required government charges; that optional add-ons are not required; the total of payments for the vehicle when making a representation about monthly payment; and that a discussed lower monthly payment will increase

---

[100] See, e.g., Cal. Dept. of Just., "Buying and Maintaining a Car," https://oag.ca.gov/consumers/general/cars (last visited Dec. 5, 2023); Fla. Highway Safety & Motor Vehicles, "Buying from a Licensed Dealer," https://www.flhsmv.gov/safety-center/consumer-education/buying-vehicle-florida/buying-licensed-dealer (last visited Dec. 5, 2023); Or. Dep't of Just., "Buying a Vehicle," https://www.doj.state.or.us/consumer-protection/motor-vehicles/buying-a-vehicle/ (last visited Dec. 5, 2023).

[101] Complaint ¶ 17, Fed. Trade Comm'n v. Passport Auto. Grp., Inc., No. 8:22–cv–2670 (D. Md. Oct. 18, 2022).

[102] Id. ¶ 18. Recent actions outside the auto marketplace, even in transactions that may not be as complex and time consuming as motor vehicle transactions, further illustrate unfair and deceptive practices related to advertising, add-ons, and hidden charges. In one such action, the court noted "the realities of the disparate bargaining power" between the corporate defendant and its customers, adding that customers "might have believed the [add-on] fees were mandatory," and "might not have had the time" to negotiate or complain about them. Fed. Trade Comm'n v. FleetCor Techs., Inc., 1:19–cv–5727, 2022 WL 3350066, at *13 (N.D. Ga. Aug. 9, 2022) (granting the Commission's motion to exclude the defendant's expert testimony); see also Fed. Trade Comm'n v. FleetCor Techs., Inc., 620 F. Supp. 3d 1268, 1337 (N.D. Ga. 2022) (finding on summary judgment that (1) defendants did not tell consumers about fees at sign-up; (2) disclosures about fees in contractual documents were inadequate; and (3) defendants failed to get consent to add-on charges); id. at 1334 (concluding that defendants had "charged a slew of fees that: were never discoverable to customers [and] were obscured by undecipherable language"); Complaint ¶¶ 41–43, Fed. Trade Comm'n v. Harris Originals of NY, Inc., No. 2:22–cv–4260 (E.D.N.Y. July 20, 2022) (alleging that a jewelry company charged military consumers for add-on products without their consent or under false pretenses); Complaint ¶¶ 61–73, Fed. Trade Comm'n v. Benefytt Techs., Inc., No. 8:22–cv–1794 (M.D. Fla. Aug. 4, 2022) (alleging illegal add-on charges by healthcare companies); Complaint ¶¶ 1–4, Fed. Trade Comm'n v. First Am.

Payment Sys., LP, No. 4:22–cv–654 (E.D. Tex. July 29, 2022) (alleging that a payment processing company misrepresented the terms and costs of its services, resulting in unexpected and unauthorized fees); Fed. Trade Comm'n, Notice of Proposed Rulemaking, Trade Regulation Rule on Unfair or Deceptive Fees, 88 FR 77420, 77435–37 (released Oct. 11, 2023; published Nov. 9, 2023), https://www.govinfo.gov/content/pkg/FR-2023-11-09/pdf/2023-24234.pdf.

[103] Complaint ¶¶ 3–5, 11–18, 33–43, 48–51, Fed. Trade Comm'n v. Rhinelander Auto Ctr., Inc., No. 3:23–cv–00737 (W.D. Wis. Oct. 24, 2023).

[104] Complaint ¶¶ 128–30, CFPB v. Credit Acceptance Corp., No. 1:23–cv–38 (S.D.N.Y. Jan. 4, 2023).

[105] Complaint ¶ 3, Massachusetts v. Jaffarian's Serv., Inc., No. 2277–cv–881 (Mass. Super. Ct. Sept. 15, 2022); Assurance of Discontinuance ¶¶ 7–9, In re Hometown Auto Framingham, Inc., No. 2384–cv–116 (Mass. Super. Ct. Jan. 17, 2023).

[106] Complaint ¶ 5, Massachusetts v. Jaffarian's Serv., Inc., No. 2277–cv–881 (Mass. Super. Ct. Jan. 17, 2023).

[107] Consumer Fin. Prot. Bureau, "Supervisory Highlights: Issue 24, Summer 2021" 3–4 (June 2021), https://files.consumerfinance.gov/f/documents/cfpb_supervisory-highlights_issue-24_2021-06.pdf (finding servicers added and

[108] Consumer Fin. Prot. Bureau, "Supervisory Highlights: Issue 28, Fall 2022" 4–5 (Nov. 2022), https://files.consumerfinance.gov/f/documents/cfpb_supervisory-highlights_issue-28_2022-11.pdf (finding consumers paid off their vehicle financing early but servicers failed to ensure consumers received refunds for unearned fees related to add-on products which no longer offered any possible benefit to consumers after payoff).

[109] Cal. Civ. Code 2982.12.

[110] Press Release, Off. of the Att'y Gen. of Cal., "Attorney General Bonta and Assemblymember Maienschein Announce Legislation to Strengthen Protections for Car Buyers" (Feb. 16, 2022), https://oag.ca.gov/news/press-releases/attorney-general-bonta-and-assemblymember-maienschein-announce-legislation.

[111] Cal. Civ. Code 2982.12.

[112] Id.

the total amount the consumer will pay, if true;

• Prohibits dealers from charging for add-on products or services that provide no benefit to the consumer; and

• Requires dealers to obtain express, informed consent from the consumer for any charge.

As discussed in the section-by section analysis in SBP III and in response to comments, the Commission is declining to finalize certain provisions proposed in the NPRM, including the provision that dealers must disclose a list of prices for all optional add-on products or services, and the provision that dealers must obtain certain signed declinations from consumers prior to charging for optional add-on products or services. The Commission also is finalizing the defined terms "Covered Motor Vehicle" and "Covered Motor Vehicle Dealer" to reflect edits to narrow the scope of these definitions compared to the scope of the terms "Motor Vehicle" and "Motor Vehicle Dealer" in the NPRM.

## III. Section-by-Section Analysis

The following discussion provides a section-by-section analysis that states the provisions proposed in the NPRM, and discusses the comments received, the Commission's responses to comments, and the provisions adopted in the Final Rule.[113]

### A. § 463.1: Authority

Section 463.1 states that the Final Rule is promulgated pursuant to section 1029 of the Dodd-Frank Act, and that it is an unfair or deceptive act or practice within the meaning of section 5(a)(1) of the FTC Act to violate, directly or indirectly, any provision of the Final Rule, including the recordkeeping requirements, which are necessary to prevent such unfair or deceptive acts or practices and to enforce this Rule.[114] The prohibition against violating any applicable provision "directly or indirectly" applies to each section of part 463. As discussed in SBP I.A,

[113] Regarding the thousands of comments received, the Commission notes that many commenters raised similar concerns or addressed overlapping issues. To avoid repetition, the Commission has endeavored to respond to issues raised in similar comments together. Responses provided in any given section apply equally to comments addressing the same subject in the context of other sections. Moreover, throughout the SBP, the Commission discusses justifications for the Final Rule that are informed by its careful consideration of all comments received, even where that discussion is not linked to a particular comment.

[114] The proposed authority provision in the NPRM omitted the second reference to "unfair" acts or practices with regard to the proposed recordkeeping requirements; the Final Rule consistently refers to both "unfair" and "deceptive" acts or practices together.

section 1029 authorizes the FTC to prescribe rules under Sections 5 and 18(a)(1)(B) of the FTC Act with respect to motor vehicle dealers predominantly engaged in the sale and servicing of motor vehicles, the leasing and servicing of motor vehicles, or both.[115]

[115] One industry group argued that the proposed rule violated the APA because it did not comply with the FTC's rule requiring publication of an Advance Notice of Proposed Rulemaking ("ANPR"), 16 CFR 1.10. Section 1.10, however, like the rest of subpart B of part 1 of the Commission's Rules of Practice, applies only to "proceedings for the promulgation of rules as provided in section 18(a)(1)(B) of the Federal Trade Commission Act." 16 CFR 1.7. The ANPR requirement in section 1.10 implements section 18(b)(2) of the FTC Act, which requires an ANPR when the Commission promulgates rules under the procedures set forth in that section. In this case, the FTC is acting under statutory authority under section 1029(d) of the Dodd-Frank Act, *see* NPRM at 42031, which authorizes the Commission to promulgate rules using the APA's informal notice-and-comment procedure, *see* 5 U.S.C. 553, notwithstanding the additional procedural requirements set forth in section 18. Accordingly, this rulemaking is governed by subpart C of part 1 of the Commission's Rules of Practice, which "sets forth procedures for the promulgation of rules under authority other than section 18(a)(1)(B) of the FTC Act." 16 CFR 1.21. Neither subpart C nor the APA requires publication of an ANPR.

This is consistent with Commission practice in prior notices to issue or amend regulations, including with the Made in USA Labeling Rule, the Children's Online Privacy Protection Rule, and the Telemarketing Sales Rule. *See, e.g.,* Fed. Trade Comm'n, Notice of Proposed Rulemaking, Made in USA Labeling Rule, 85 FR 43162 (July 16, 2020), *https://www.govinfo.gov/content/pkg/FR-2020-07-16/pdf/2020-13902.pdf* (issuing original notice of proposed rulemaking that was not preceded by an advance notice of proposed rulemaking); Fed. Trade Comm'n, Notice of Proposed Rulemaking, Children's Online Privacy Protection Rule, 64 FR 22750 (Apr. 27, 1999), *https://www.govinfo.gov/content/pkg/FR-1999-04-27/pdf/99-10250.pdf* (same); Fed. Trade Comm'n, Notice of Proposed Rulemaking, Telemarketing Sales Rule, 60 FR 8313 (Feb. 14, 1995), *https://www.govinfo.gov/content/pkg/FR-1995-02-14/pdf/95-3537.pdf* (same); Fed. Trade Comm'n, Notice of Proposed Rulemaking, Telemarketing Sales Rule, 78 FR 41200 (July 19, 2013), *https://www.govinfo.gov/content/pkg/FR-2013-07-09/pdf/2013-12886.pdf* (issuing notice of proposed rulemaking for rule amendment that was not preceded by an advance notice of proposed rulemaking); Fed. Trade Comm'n, Proposed Rule, Children's Online Privacy Protection Rule, 76 FR 59804 (Sept. 27, 2011), *https://www.govinfo.gov/content/pkg/FR-2011-09-27/pdf/2011-24314.pdf* (same); Fed. Trade Comm'n, Notice of Proposed Rulemaking, Telemarketing Sales Rule, 74 FR 41988 (Aug. 19, 2009), *https://www.govinfo.gov/content/pkg/FR-2009-08-19/pdf/E9-19749.pdf* (same); Fed. Trade Comm'n, Notice of Proposed Rulemaking, Children's Online Privacy Protection Rule, 70 FR 2580 (Jan. 14, 2005), *https://www.govinfo.gov/content/pkg/FR-2005-01-14/pdf/05-877.pdf* (same); Fed. Trade Comm'n, Notice of Proposed Rulemaking, Telemarketing Sales Rule, 69 FR 67287 (Nov. 17, 2004), *https://www.govinfo.gov/content/pkg/FR-2004-11-17/pdf/04-25470.pdf* (same); Fed. Trade Comm'n, Notice of Proposed Rulemaking, Telemarketing Sales Rule, 69 FR 7330 (Feb. 13, 2004), *https://www.govinfo.gov/content/pkg/FR-2004-02-13/pdf/04-3287.pdf* (same); Fed. Trade Comm'n, Notice of Proposed Rulemaking, Telemarketing Sales Rule, 67 FR 4492 (Jan. 30, 2002), *https://www.govinfo.gov/content/pkg/FR-*

*2002-01-30/pdf/02-1998.pdf* (same); Fed. Trade Comm'n, Notice of Proposed Rulemaking, Children's Online Privacy Protection Rule, 66 FR 54963 (Oct. 31, 2001), *https://www.govinfo.gov/content/pkg/FR-2001-10-31/pdf/01-27390.pdf* (same). This is also true of regulation amendments pursuant to the authority under which this Final Rule is promulgated—that which Congress granted to the Commission under section 1029 of the Dodd-Frank Act, 15 U.S.C. 5519, pertaining to motor vehicle dealers. *See, e.g.,* Fed. Trade Comm'n, Notice of Proposed Rulemaking, Used Motor Vehicle Trade Regulation Rule, 77 FR 74746, 74748 (Dec. 17, 2012), *https://www.govinfo.gov/content/pkg/FR-2012-12-17/pdf/2012-29920.pdf* ("Because the Dodd-Frank Act authorized the Commission to use APA procedures for notice and public comment in issuing or amending rules with respect to motor vehicle dealers, the FTC will not use the procedures set forth in Section 18 of the FTC Act, 15 U.S.C. 57a, with respect to these proposed revisions to the Used Car Rule and the Used Car Buyers Guide. Accordingly, the Commission is publishing this Notice of Proposed Rulemaking pursuant to Section 553 of the APA."); *see also* Fed. Trade Comm'n, Notice of Proposed Rulemaking, Privacy of Consumer Financial Information Rule Under the Gramm-Leach-Bliley Act ("Privacy Rule"), 84 FR 13150 (Apr. 4, 2019), *https://www.govinfo.gov/content/pkg/FR-2019-04-04/pdf/2019-06039.pdf* (issuing notice of proposed rulemaking for rule amendment that was not preceded by an advance notice of proposed rulemaking).

This same commenter argued the FTC had not complied with the "Principles of Regulation" enumerated in section 1(b) of Executive Order 12866. *See* Comment of Nat'l Auto. Dealers Ass'n, Doc. No. FTC–2022–0046–8368 at 34–36 & n.123; E.O. 12866 3(b) (defining "Agency" to mean an authority of the United States "other than those considered to be independent regulatory agencies"). This provision of the Executive Order does not apply to independent agencies such as the FTC. Regardless, the Commission did take into account the principles set forth in section 1(b), as is evident throughout the NPRM. *See, e.g.,* NPRM at 42015–17 (identifying problems in the marketplace); *id.* at 42028–42031 (soliciting comments on alternative approaches); *id.* at 42036–42044 (assessing costs and benefits).

The same commenter also argued that the Commission's denial of its request to extend the comment period prejudiced the commenter's ability to collect and provide data pertaining to the proposed rule and was inconsistent with the Commission's grant of extensions in other rulemakings. As described in its letter, the Commission also received requests opposing an extension of the comment period. *See* Letter, Fed. Trade Comm'n, "Duration of the Public Comment Period in Matter No. P204800" (Aug. 23, 2022), *https://www.ftc.gov/system/files/ftc_gov/pdf/Matter%20No.%20204800%20-%20Letter%20re%20Extension%20for%20publication.pdf*. In the letter, the Commission noted its ongoing engagement with stakeholders on issues relating to the sale, financing, and lease of motor vehicles, since before its 2011 **Federal Register** notice inviting stakeholder feedback on these issues and continuing since that time. *See* Fed. Trade Comm'n, Public Roundtables: Protecting Consumers in the Sale and Leasing of Motor Vehicles, 76 FR 14014 (Mar. 15, 2011), *https://www.federalregister.gov/documents/2011/03/15/2011-5873/public-roundtables-protecting-consumers-in-the-sale-and-leasing-of-motor-vehicles*. The Commission determined that a sixty-day comment period, along with an additional twenty days following the public announcement and release of the NPRM and prior to its publication in the **Federal Register**, provided meaningful opportunity to comment. *See also* Steven J. Balla, "Public Commenting on Federal Agency Regulations: Research on Current Practices

Continued

The Final Rule defines with specificity certain unfair or deceptive acts or practices; the Final Rule provisions are also "prescribed for the purpose of preventing such acts or practices." [116]

### B. § 463.2: Definitions

#### 1. Overview

The proposed rule included definitions for the following terms: "Add-on" or "Add-on Product(s) or Service(s)"; "Add-on List"; "Cash Price without Optional Add-ons"; "Clearly and Conspicuously"; "Dealer" or "Motor Vehicle Dealer"; "Express, Informed Consent"; "GAP Agreement"; "Government Charges"; "Material" or "Materially"; "Motor Vehicle"; and "Offering Price." In the definition-by-definition analysis in SBP III.B.2, the Commission discusses each definition proposed in the NPRM, relevant comments that are not otherwise addressed in the discussion of the corresponding substantive provisions of the Final Rule, and the definition the Commission is finalizing.

#### 2. Definition-by-Definition Analysis

(a) Add-On or Add-On Product(s) or Service(s)

The proposed rule defined "Add-on" or "Add-on Product(s) or Service(s)" as "any product(s) or service(s) not provided to the consumer or installed on the vehicle by the motor vehicle manufacturer and for which the Motor Vehicle Dealer, directly or indirectly, charges a consumer in connection with a vehicle sale, lease, or financing transaction." This term appeared in the following definitions and substantive provisions of the rule proposal: the definitions of "Add-on List" and "Cash Price without Optional Add-ons"; the Prohibited Misrepresentations provision at proposed § 463.3(b); the add-on list disclosure provision at proposed § 463.4(b); the requirement to disclose that add-ons are not required at proposed § 463.4(c); the prohibition against charging for add-ons that provide the consumer no benefit at proposed § 463.5(a); and the proposal provision relating to undisclosed or unselected add-ons at § 463.5(b). As

discussed in the following paragraphs, in response to stakeholder comments, the Commission declines to finalize certain of these provisions; in the Final Rule, this term appears in paragraph (a) of the Prohibited Misrepresentations section (§ 463.3); the Disclosure Requirements provision in paragraph (c) of § 463.4; and the provision in § 463.5(a) titled "Dealer Charges for Add-ons and Other Items" and subtitled "Add-ons that provide no benefit."

For the following reasons, the Commission adopts the definition of "Add-on" or "Add-on Product(s) or Service(s)" largely as proposed, with conforming modifications to reflect changes to the defined terms "'Covered Motor Vehicle' or 'Vehicle'" and "'Covered Motor Vehicle Dealer' or 'Dealer'" as described in more detail in the discussion of § 463.2(e) and (f), in SBP III.B.2(e) and (f).

The Commission received several comments relating to the scope of its proposed definition for "Add-on" or "Add-on Product(s) or Service(s)." Industry association and other commenters recommended that the Commission broaden the definition to include manufacturer-provided products or services, expressing concern that exclusion of such products or services would put other companies that provide such items at a competitive disadvantage. Products or services provided by manufacturers, however, are already covered by several provisions of the Final Rule. Under the substantive provisions the Commission is finalizing, dealers are prohibited from making misrepresentations regarding material information, including about the "costs or terms of purchasing, financing, or leasing a Vehicle" (§ 463.3(a)); must disclose the vehicle's true "Offering Price," which includes any amounts dealers charge for items already installed or provided by the manufacturer (§§ 463.4(a) and 463.2(k)); and are required to obtain "Express, Informed Consent" for charges for any item (§§ 463.5(c) and 462.2(g)). The additional substantive add-on-specific provisions [117] address harms associated with products or services not provided to the consumer or installed on the vehicle by the motor vehicle manufacturer. Commenters did not provide evidence that the proposed provisions covering manufacturer-provided products or services would be insufficient to address consumer harm. Accordingly, the Commission has determined not to include manufacturer-provided products or services within this defined term. The

Commission will continue to monitor this issue to determine whether additional action is warranted.

One individual commenter expressed concern that, under the Commission's proposed definition, dealers could raise the price of a vehicle by advertising additional products or services, such as "free lifetime benefits" with the vehicle, and that dealers could mislead consumers by charging more for the vehicle based on a supposedly "free" add-on. [118] The Commission notes that the Rule the Commission is finalizing contains several provisions relating to this concern. For example, dealers are prohibited from making misrepresentations under § 463.3, including misrepresentations regarding "*costs*, limitation, benefit, or any other aspect" of add-ons. [119] Furthermore, dealers are required to disclose a vehicle's offering price, which must include charges for required add-ons; this disclosure will allow consumers to know the true price of the vehicle and comparison shop before selecting and visiting a particular dealership. [120]

Several dealership association commenters expressed concern that the proposed definition was too broad, contending that it might apply to hundreds of items and include fees, such as a processing or document fee, that a dealer charges a consumer. As discussed in SBP III.B.2(b), III.D.2(b), and III.E.2(b), upon careful review of comments, including comments regarding the breadth of this requirement, the Commission has determined not to finalize the provision that would have required listing all optional add-ons—the "Add-on List" definition and the associated requirement that dealers disclose such a list—as well as proposed § 463.5(b) relating to undisclosed or unselected add-ons. [121] The remaining substantive provisions that use the term "Add-ons" prohibit misrepresentations (§ 463.3(b)); require dealers to disclose, if true, that add-ons are not required (§ 463.4(c)); and prohibit charges for add-ons that provide the consumer no benefit (§ 463.5(a)). The law already prohibits misrepresentations, regardless of the product or service at issue; dealers that offer consumers additional products or services are already required to ask

---

[116] 15 U.S.C. 57a(a)(1)(B) (the Commission "may include requirements prescribed for the purpose of preventing" unfair or deceptive acts or practices).

and Recommendations to the Administrative Conference of the United States" App. A (2011), *https://www.acus.gov/sites/default/files/documents/Consolidated-Reports-%2B-Memoranda.pdf* (reporting data from a pool of 703 comment periods associated with actions by dozens of Federal agencies, and finding that the average duration of comment periods for proposed agency actions was 38.7 days, and 45.1 days for actions that are economically significant).

[117] §§ 463.3(b), 463.4(c), 463.5(a).

[118] Individual commenter, Doc. No. FTC–2022–0046–7445 at 10–11.

[119] § 463.3(b) (emphasis added).

[120] *See* § 463.2(k) (defining Offering Price), 463.4(a) (requiring disclosure of Offering Price); *see also* § 463.3(p) (prohibiting misrepresentations regarding the disclosures required by the Final Rule).

[121] *See* NPRM at 42044, 42046 (proposed §§ 463.2(b), 463.4(b), 463.5(b)).

consumers if they want such products, rather than suggesting that such products or services are mandatory, when they are not; and any hardship associated with refraining from charging for products or services that provide consumers no benefits are outweighed by the harms to consumers and competition from permitting this practice, as explained in the analysis of § 463.5(a).

Commenters including an industry association suggested limiting the definition to products or services sold at the "point of vehicle purchase" to clarify that indirect charges, such as the inclusion of a one-year subscription to a satellite radio service, need not be separately itemized.[122] The industry association commenter suggested that, as proposed, the definition would include charges for which dealers and consumers "would otherwise not account." [123] The Commission has determined not to finalize the add-on list and form requirements in proposed §§ 463.4(b) and 463.5(b). For the provisions being finalized, excluding subscription charges, or including only items added to the vehicle at the "point of vehicle purchase," would narrow the definition of "Add-on" and the corresponding requirements in a manner that would allow for deceptive or unfair practices, including by allowing dealers to represent a price that is not the offering price, or to deceptively state that add-ons are required. In the example provided by the commenter, if the satellite radio subscription service is mandatory, it needs to be included in the offering price of the vehicle, as required by § 463.4(a) of the Final Rule; if it is not mandatory, the dealer needs to disclose, when making any representations about the service, that it is not required under § 463.4(c). Further, regardless of whether such a product or service is mandatory or optional, dealers must follow other aspects of the Final Rule, including by not making any misrepresentations about the subscription under § 463.3 and by obtaining the express, informed consent of the consumer for the associated charges under § 463.5(c).

Another industry association commenter contended that add-ons sold in the marine industry are typically different than those offered in the context of automobile sales and described in the NPRM. While all motor vehicle dealers must refrain from engaging in deceptive or unfair conduct relating to add-ons, the Commission is excluding recreational boats and marine equipment from the Final Rule's definition of "'Covered Motor Vehicle' or 'Vehicle,'" as discussed in additional detail in the definition-by-definition analysis of § 463.2(e) in SBP III.B.2(e).

An industry association commenter and comments from a number of dealership associations noted that certain State laws already regulate the sale of add-ons, including, for example, laws in many States that regulate vehicle sales contracts or deceptive sales practices generally or that regulate insurance products. To the extent that the Final Rule's add-on provisions may duplicate State law, commenters have provided no evidence that any such duplication in the provisions that incorporate this defined term—which prohibit misrepresentations, require disclosures in the event add-ons are not required, and prohibit charges for add-ons from which the consumer would not benefit—will harm consumers or competition. Moreover, the Final Rule provides additional remedies that will benefit consumers who encounter conduct that is already illegal under State or Federal law, including by adding a mechanism for the Commission to redress consumers injured by a dealer's violation of the rule, and will assist law-abiding dealers that presently lose business to competitors that act unlawfully. Under the Final Rule, State laws may provide more or less specific requirements as long as such requirements are not inconsistent with part 463, as set forth at § 463.9, and in the event of an inconsistency, the Rule only affects such State law to the extent of the inconsistency.[124]

A few dealership association commenters expressed concern that the proposed definition of "Add-on Products or Services" would include insurance-related products, such as credit life and credit disability insurance, and as such, could implicate the McCarran-Ferguson Act's reverse-preemption of certain Federal laws that "invalidate, impair, or supersede" State laws enacted "for the purpose of regulating the business of insurance." [125] Commenters have provided no evidence that the Rule will invalidate, impair, or supersede State laws enacted for the purpose of regulating the business of insurance.[126] To the contrary, the Final Rule addresses deceptive or unfair conduct—it prohibits dealers, *inter alia*, from making misrepresentations regarding material information about add-ons, from failing to disclose when add-ons are not required, and from charging for add-ons from which the consumer would not benefit. Nor has the Commission been presented with evidence that the Rule's other substantive provisions (prohibiting misrepresentations; requiring disclosures of a vehicle's offering price and about total of payments; and requiring consumers' express, informed consent before charging them) invalidate, impair, or supersede State laws enacted for the purpose of regulating insurance.[127]

A number of industry and dealership association commenters contended that, as proposed, this definition may extend to products or services that are provided by the manufacturer but that are installed by a distributor of motor vehicles, or alternatively, by the dealer, at the instruction of the manufacturer. Relatedly, a State governmental association commenter expressed concern that the proposed definition could create confusion with regard to the sale of used vehicles, where a prior owner of a vehicle may have added a product to the vehicle. The commenter contended that a motor vehicle dealer selling the used vehicle may be unaware of the added product, and further, that listing any such items may confuse buyers.

To the extent the commenters' concerns stem from the proposed provisions related to add-on lists and proposed § 463.5(b)'s provisions related to separate disclosures, the Commission is not finalizing those provisions. Under the provisions being finalized, if a product is provided to the dealer by the manufacturer or another entity, and a consumer chooses to have the product

[122] Comment of Serv. Cont. Indus. Council, Guaranteed Asset Prot. All., & Motor Vehicle Prot. Prods. Ass'n, Doc. No. FTC–2022–0046–8113 at 13–14.

[123] *Id.* at 13.

[124] *See, e.g., English* v. *Gen. Elec. Co.,* 496 U.S. 72, 79 (1990).

[125] *See* 15 U.S.C. 1012(b).

[126] *See Union Labor Life Ins. Co.* v. *Pireno,* 458 U.S. 119, 129 (1982) (setting forth test for whether an activity constitutes the "business of insurance"; *Humana Inc.* v. *Forsyth,* 525 U.S. 299, 307–08 (1999) (establishing criteria for whether a Federal law operates to "invalidate, impair, or supersede" State law).

[127] The Supreme Court has refused to interpret the McCarran Ferguson Act to invalidate Federal law when applied to remedy a misrepresentation and undo the harm caused by alleged deception. *See SEC* v. *Nat'l Sec., Inc.,* 393 U.S. 453, 462 (1969). Moreover, lower courts have rejected precisely the concern raised by the commenter about credit life insurance. *See Fed. Trade Comm'n* v. *Dixie Fin. Co.,* 695 F.2d 926, 930 (5th Cir. 1983) (McCarran Ferguson Act does not preclude FTC investigation of "whether the sale of insurance is a precondition to the arrangement of credit"); *Fed. Trade Comm'n* v. *Mfrs. Hanover Consumer Servs., Inc.,* 567 F. Supp. 992, 94 (E.D. Pa. 1983) (same).

installed and pay for it, the dealer may install it and charge for it, as long as the dealer complies with the provisions of the Final Rule, including by disclosing that the product is not required and by obtaining the consumer's express, informed consent for the charge. If the manufacturer requires the dealer to install the product or if the dealer chooses to install the product, and the dealer requires any consumer to pay charges for it, the amount of the charge must be included in the vehicle's offering price, and the dealer must comply with other aspects of the Final Rule, including the express, informed consent requirement. Relatedly, regarding used vehicles, if a prior owner of such a vehicle installed an add-on, and the dealer that subsequently sells such a vehicle requires any consumer to pay charges for the add-on, the amount of those charges must be included in the vehicle's offering price and the dealer must comply with other aspects of the Final Rule, including the express, informed consent requirement at § 463.5(c). If, alternatively, the dealer does not require any consumers to pay for the pre-installed add-on, then the dealer does not have to add that amount to the vehicle's offering price, and there is no charge for that add-on for which the dealer must obtain express, informed consent. Thus, the definition of "Add-on" and the Rule requirements being finalized address deceptive or unfair price and add-on disclosures and hidden charges without requiring dealers to list or itemize charges that they do not impose on consumers. For the reasons explained in this section, the Commission is finalizing the definition of "Add-on" or "Add-on Product(s) or Service(s)" largely as proposed, with conforming modifications to reflect changes to the defined terms "'Covered Motor Vehicle' or 'Vehicle'" and "'Covered Motor Vehicle Dealer' or 'Dealer'" as described in more detail in the discussion of § 463.2(e) and (f), in SBP III.B.2(e) and (f).

(b) Add-On List

The NPRM proposed defining the term "Add-on List," which appeared in the associated Add-on List disclosure provision at proposed § 463.4(b), as well as in the recordkeeping provision at proposed § 463.6(a)(2). Based on the following, the Commission has determined not to include this definition in its Final Rule.

Several commenters supported the substantive add-on list proposal and its associated definition, and commenters including consumer advocacy organizations urged the Commission to finalize additional related restrictions or disclosures, such as requiring add-on prices to be fixed and non-negotiable, or requiring a distinct add-on list for each vehicle sold. Other commenters, including dealership associations, raised concerns that, as proposed, the add-on list definition could impose significant economic burdens on dealerships for a disclosure that, in some circumstances, might be too voluminous to be optimally meaningful to consumers, or permit price ranges that could be too broad to prevent abuses and effectively inform consumers.

After careful consideration, and in light of the concerns raised by commenters, the Commission has determined not to include the add-on list disclosure provision at proposed § 463.4(b) or the recordkeeping provision at proposed § 463.6(a)(2) in its Final Rule, and therefore will not include a definition of the term "Add-on List" in its Final Rule. Here, as elsewhere, the Commission remains committed to promoting fair, non-deceptive, and competitive markets for consumer products and services; it will continue to monitor the marketplace for add-on-related acts or practices that are unfair or deceptive, and will evaluate whether to propose additional measures pertaining to such products and services.

(c) Cash Price Without Optional Add-Ons

The NPRM proposed defining the term "Cash Price without Optional Add-ons," which appeared in the proposed provision addressing undisclosed or unselected add-ons at § 463.5(b). Based on the following, the Commission is declining to finalize this definition.

A number of commenters favored the proposed provision and definition, and several, including consumer advocacy organizations, urged the Commission to include additional requirements, such as requiring the proposed disclosure documents associated with this proposed definition to be available in different languages, while others, including a dealership association, raised concerns that the definition and relevant provision were burdensome or confusing for dealers.

As explained in additional detail in SBP III.E.2(b) with respect to § 463.5(b), in light of commenter concerns that the proposed provision using this term would increase costs for legitimate dealers and add to the time and paperwork for consumers in an already lengthy, paperwork-heavy transaction, the Commission has elected not to include a Cash Price without Optional Add-ons disclosure requirement in its Final Rule. Thus, after careful consideration, and in light of the concerns raised by commenters, the Commission has determined not to include a definition of "Cash Price without Optional Add-ons" in its Final Rule.

(d) Clearly and Conspicuously

The proposed rule defined the term "Clearly and Conspicuously" as "in a manner that is difficult to miss (i.e., easily noticeable) and easily understandable," including in all of seven enumerated ways, listing proposed requirements for "any communication that is solely visual or solely audible," "[a] visual disclosure," "[a]n audible disclosure," and "any communication using an interactive electronic medium," and providing, inter alia, that such disclosures "must use diction and syntax understandable to ordinary consumers and must appear in each language in which the representation that requires the disclosure appears" and "must not be contradicted or mitigated by, or inconsistent with, anything else in the communication." Based on the following, the Commission is finalizing this definition largely as proposed, with a modification to clarify that the definition applies whether the term appears as an adjective or an adverb, by adding the parentheses in the following manner to the defined term: "Clear(ly) and Conspicuous(ly)."

Some consumer advocacy organization commenters favored the Commission's proposed definition while also suggesting that the Commission include a provision requiring translation of any deal consummating documents, including buyer's orders and retail installment sales contracts, into the language in which the negotiations were conducted. This issue, however, is addressed by § 463.5(c) of the Rule, which requires express, informed consent for each item charged.[128] As explained in additional detail in the paragraph-by-paragraph analysis of § 463.5(c) in SBP III.E.2(c), if a deal-consummating document is provided in a language that the consumer does not understand, and the document's contents are not otherwise clearly understood by the consumer, then the consumer is in no position to give unambiguous assent to the charges described therein. The Commission therefore has determined not to add

---

[128] The language requirements, as they relate to obtaining express, informed consent, are further explained in the discussion of § 463.5(c) in SBP III.E.2(c).

such a provision to its "Clear(ly) and Conspicuous(ly)" definition. However, the Commission will continue to monitor the marketplace and determine whether further language requirements or additional measures are warranted to address deceptive or unfair practices—particularly those that target or otherwise disproportionately impact language-minority communities.

Commenters, including consumer advocacy organizations, expressed concern that proposed § 463.2(d)(5) may be read to apply only to certain disclosures with triggering representations and only to disclosures that are in writing. These commenters also requested that the Commission incorporate into its Final Rule the FTC's policy statement regarding foreign language advertising and sales materials, which is separately codified at 16 CFR 14.9.[129] In response, the Commission notes that to be clear and conspicuous, the disclosure must be "easily understandable," as stated in the definition. If a disclosure is being made in a language the consumer does not understand, it does not meet this requirement. Further, the disclosures highlighted by the commenters are indeed subject to the language requirements of § 463.2(d)(5), which requires that disclosures "appear in each language in which the representation that requires the disclosure appears." With regard to the offering price disclosure in § 463.4(a)(1), the applicable "representation that requires the disclosure" is the "advertisement that references . . . a specific Vehicle"; thus, for example, if an advertisement that references a specific vehicle is in Spanish, the offering price disclosure must also be in Spanish. Similarly, in § 463.4(a)(2), the applicable representation that requires the disclosure is an "advertisement that represents . . . any monetary amount or financing term for any Vehicle." In § 463.4(a)(3), the applicable representation is "any communication . . . that includes a reference . . . regarding a specific Vehicle, or any monetary amount or financing term for any Vehicle." In § 463.4(c) and (d), "any representation" regarding an add-on product or service or a monthly payment for any vehicle, respectively, triggers the language requirement of § 463.2(d)(5). The monthly payments comparison disclosure in § 463.4(e) is required when there is a "comparison

between payment options . . . that includes discussion of a lower monthly payment." Thus, the language requirements in § 463.2(d)(5) apply.

In response to this concern regarding the applicability of § 463.2(d)(5) to disclosures that are not in writing, the Commission notes that its use of the word "appear" in § 463.2(d)(5) incorporates common meanings, such as "to show up," "to come into existence," or "to become evident or manifest," which cause this provision to apply whether the representation requiring the disclosure appears visually, orally, or otherwise.[130] Where the Commission instead intended a provision to be limited to a visual disclosure, as in § 463.2(d)(2), the Rule states so explicitly.

In response to the request that the Commission incorporate into this Rule its policy statement regarding foreign language advertising and sales materials, separately codified at 16 CFR 14.9, the Commission emphasizes that the enforcement statement sets out what is already impermissible under current law and is consistent with the requirements the Commission is finalizing. To the extent dealers take actions that are inconsistent with Commission statements about such law, they are risking enforcement proceedings by the Commission or others. Accordingly, the Commission has determined not to add to the Rule further requirements regarding foreign language advertising. The Commission will continue to monitor the market to determine whether further action is warranted.

Industry association commenters raised concerns about how the Commission's proposed definition interacts with other Federal laws, such as Regulations Z and M, which implement the Truth in Lending Act and the Consumer Leasing Act, respectively, and contended that it conflicts with a clear and conspicuous definition in Commodity Futures Trading Commission regulations.[131] Industry and dealership association commenters contended that State advertising standards already address what constitutes "clear and conspicuous" advertising and provide guidance on disclosures, such that the

FTC's proposal will cause confusion or possible conflict with State law.

The Commission's definition of "Clear(ly) and Conspicuous(ly)" is not inconsistent with the existing Federal legal requirements raised by these commenters. Dealers can comply with these laws to the extent they apply as well as with the requirements that follow from the Commission's definition. Regarding State law, commenters did not provide examples of actual conflicts. Further, to the extent there is truly an inconsistency between the operation of the Commission's definition and any State law, the Commission notes that the definition is based on decades of Commission experience policing deceptive and unfair conduct; addresses harmful practices including those related to hidden disclosures and charges; and that § 463.9 of the Final Rule sets out the Rule's relation to State laws.

Other industry association commenters also contended that the proposed definition of "Clearly and Conspicuously" would be overly broad and challenging for compliance, but did not explain why or suggest alternative language. In addition, some dealership association commenters requested more guidance to understand the definition. The Commission's definition spells out, in seven subparts, what clear and conspicuous means, using simple terms that provide additional information about how dealers can make a disclosure in a manner that is easily understandable and easily noticeable to the consumer. The definition elaborates basic, common-sense principles, including that visual disclosures be in a size that consumers will easily notice and that audible disclosures be in a volume, speed, and cadence such that consumers will easily hear it. Thus, for example, disclosures in an illegible font, or that consumers cannot hear, are not clear and conspicuous. The Commission also notes that it did not mandate specific fonts, volumes, or other prescriptive measures. Thus, dealers have the flexibility to determine the best way to meet the definition's requirements for their consumers under the circumstances.

A dealership association commenter contended that the proposed definition does not include a reasonableness standard and may be interpreted as prohibiting any limitations and exclusions, given the requirement in proposed § 462.3(d)(7) that a disclosure must not be contradicted or mitigated by or inconsistent with anything else in the communication. The commenter further asked whether a statement such as "with approved credit" would

---

[129] 16 CFR 14.9 is an enforcement policy statement that provides information to advertisers about clear and conspicuous disclosures in foreign language advertisings and sales materials, including ensuring the language of the disclosure matches the language in the publication. *See* 16 CFR 14.9.

[130] *See Appear* (defs. 1b, 4, 6), Merriam-Webster.com Dictionary, *https://www.merriam-webster.com/dictionary/appear* (last visited Dec. 5, 2023); *see also* Order ¶¶ 2–3, *Asbury Auto. Grp., Inc.,* No. C–4606 (F.T.C. Mar. 22, 2017) (identical usage in definition provision); Order ¶ 2, *Lithia Motors, Inc.,* No. C–4597 (F.T.C. Dec. 8, 2016) (same); Order ¶¶ 2–3, *Jim Koons Mgmt. Co.,* No. C–4598 (F.T.C. Dec. 8, 2016) (same).

[131] 17 CFR 162.2.

impermissibly mitigate an offer of low financing under this proposed definition.[132] The Commission responds as follows. The standard is an objective one, evaluated from the perspective of a reasonable consumer.[133] The definition does not prohibit all advertising that contains limitations and exclusions, but it does provide that if dealers are advertising offers that are limited in some way, they may not misrepresent such offers. Thus, if a dealer presents consumers with an unqualified representation of low financing terms, those terms must be available to typical consumers. Alternatively, a dealer may offer low financing terms to consumers with particular credit characteristics if that requirement is presented in a manner that does not deceive reasonable consumers. For example, a dealer may offer "0% annual percentage rate (APR) for consumers with a credit score above 800." By contrast, it would be deceptive if the dealer offered "0% APR," and then separately disclosed in fine print that such terms are only available to consumers with a credit score above 800, because the qualifying disclosure is inconsistent with an offer of "0% APR" that contained no limitations and thus indicated that 0% APR is available to the typical consumer regardless of credit score.[134] Further, the Commission notes that to qualify as clear and conspicuous, "disclaimers or qualifications in any particular ad are not adequate to avoid liability unless they are sufficiently prominent and unambiguous to change the apparent meaning of the claims and to leave an accurate impression. Anything less is only likely to cause confusion by creating contradictory double meanings." [135]

Lastly, another dealership association commenter asked how the proposed definition translates to visual, audible, and electronic media disclosures and expressed concern about subjectivity, characterizing the terms "easily" understood and "unavoidable" within the proposed definition as subjective and open to different interpretations, particularly in the context of websites and internet promotions. Here, the Commission declines to mandate more prescriptive language regarding, for example, font sizes, what volumes are to be used, and where exactly the language should appear on a website, such as on an overlay with mandated color, size, and location.[136] As courts [137] have recognized, whether a disclosure is clear and conspicuous is an objective standard rather than a subjective one. While more prescriptive language would provide additional objective criteria, the Commission is concerned such language might constrain dealers from determining the best way to meet the definition's requirements for their consumers under the circumstances involved, and might require dealers that are already making clear and conspicuous disclosures to change their existing disclosure materials.

The Commission reiterates that the definition of "Clear(ly) and Conspicuous(ly)" elaborates basic, common-sense principles, such as requiring visual disclosures in a size consumers can see and audible disclosures in a volume they can hear. Regarding the requirement that internet disclosures be unavoidable, this language requires evaluating an objective standard—whether or not

consumers could have avoided the disclosure. In addition, the disclosure must be easily noticeable and easily understandable, as set forth expressly in the definition. Disclosures that do not meet this standard include those that are buried in other text, including as illustrated by many FTC actions against dealers.[138] Regarding the requirement that disclosures be "easily" noticeable and understandable, the standard is also an objective one, evaluated from the perspective of a reasonable consumer. Determining how reasonable consumers are likely to respond may be resolved on the basis of the advertisement, context, or disclosure itself, or based on extrinsic evidence, such as consumer complaints.[139] To this end, as noted previously, the definition enumerates in seven subparts the meaning of clear and conspicuous using simple terms that provide additional guidance on how dealers may make disclosures that are easily understandable and easily noticeable to the consumer.

After carefully considering the comments, the Commission adopts § 463.2(d) with a modification to clarify, through the addition of parentheses— "Clear(ly) and Conspicuous(ly)"—that the definition applies whether the term is used as an adjective or adverb. Consistent with the Commission's experience addressing unfair or deceptive conduct, the Commission has defined the term "Clear(ly) and Conspicuous(ly)" to include disclosures that are easily understandable and easily noticeable, while also providing dealers with additional information on how to meet those requirements.[140]

[132] Comment of Ohio Auto. Dealers Ass'n, Doc. No. FTC–2022–0046–6657 at 4.

[133] See FTC Policy Statement on Deception, *supra* note 42, at 2–5.

[134] Complaint ¶¶ 5–7, *Progressive Chevrolet Co.,* No. C–4578 (F.T.C. June 13, 2016) (alleging ads touting attractive terms deceptively failed to disclose high credit score requirement).

[135] *Removatron Int'l Corp.* v. *Fed. Trade Comm'n,* 884 F.2d 1489, 1496–97 (1st Cir. 1989); *see also Fed. Trade Comm'n v. Brown & Williamson Tobacco Corp.,* 778 F.2d 35, 42–43 (D.C. Cir. 1985) (finding that a disclosure in virtually illegible form, placed in an inconspicuous corner of Barclay advertisements, did not eliminate deception); *see Fed. Trade Comm'n* v. *Cap. Choice Consumer Credit, Inc.,* 2003 U.S. Dist. LEXIS 29086, at *5 (S.D. Fla. June 2, 2003) (finding that, where advertisements promised a general purpose credit card, such as VISA or MasterCard, "fine print on reverse side" of ad clarifying that the credit card was a "merchandise card and not a major bank card" was inadequate to modify net impression); *Fed. Trade Comm'n* v. *Cyberspace.com LLC,* 453 F.3d 1196, 1200 (9th Cir. 2006) (rejecting defendant's argument that truthful fine print notices on reverse side of checks, invoices, and marketing inserts cured deception that check/invoice was a refund rather than offer for services); *Fed. Trade*

*Comm'n* v. *Alcoholism Cure Corp.,* No. 3:10–cv–266–J–34JBT, 2011 WL 13137951, at * 51 (M.D. Fla. Sept. 16, 2011) (finding that "not MD" disclaimers were inadequate to dispel net impression regarding professional qualifications of defendant and other employees as advertised); *Fed. Trade Comm'n* v. *Wash. Data Res.,* 856 F. Supp. 2d 1247, 1274–75 (M.D. Fla. 2012) (rejecting defendants' argument that retainer agreement contained sufficient disclaimer to dispel a misrepresentation about whether a home loan was guaranteed).

[136] The Commission has included such requirements elsewhere. *See, e.g.,* Order ¶ 6, *United States* v. *Sunkey Publ'g, Inc.,* No: 3:18–cv–1444– HNJ (N.D. Ala. Sept. 6, 2018).

[137] *See. e.g., Palmer* v. *Champion Mortg.,* 465 F.3d 24, 28 (1st Cir. 2006) (applying an objective standard in evaluating Truth in Lending Act claim regarding clear and conspicuous disclosure); *Smith* v. *Check-N-Go of Ill., Inc.,* 200 F.3d 511, 515 (7th Cir. 1999) (same); *Zamarippa* v. *Cy's Car Sales, Inc.,* 674 F.2d 877, 879 (11th Cir. 1982) (same); *Bustamante* v. *First Fed. Sav. & Loan Ass'n,* 619 F.2d 360, 364 (5th Cir. 1980) (same); *see also Herrera* v. *First N. Sav. & Loan Ass'n,* 805 F.2d 896, 900 (10th Cir. 1986) (resolving question of clear and conspicuous disclosure under Truth in Lending Act as a legal, rather than factual, matter); *Dixey* v. *Idaho First Nat'l Bank,* 677 F.2d 749 (9th Cir. 1982) (same).

[138] Complaint ¶¶ 6–14, *Jim Burke Auto., Inc.,* No. C–4523 (F.T.C. May 4, 2015); Complaint ¶¶ 6, 9, *TT of Longwood, Inc.,* No. C–4531 (F.T.C. July 2, 2015); Complaint ¶ 13, *City Nissan Inc.,* No. C–4524 (F.T.C. May 4, 2015); Complaint ¶¶ 17–19, *Fed. Trade Comm'n* v. *Liberty Chevrolet, Inc.,* No. 1:20–cv–03945 (S.D.N.Y. May 21, 2020); Complaint ¶¶ 4–9, 12–15, 18–20, *Billion Auto, Inc.,* No. C–4356 (F.T.C. May 1, 2012) (alleging false ads promising to pay off consumers' existing motor vehicle debt and failing to disclose legally required financing and leasing terms); *see also* Complaint ¶¶ 57–60, *Fed. Trade Comm'n* v. *Stewart Fin. Co. Holdings, Inc.,* No. 1:03–CV–2648 (N.D. Ga. Sept. 4, 2003) (alleging violations for failure to include the cost of required add-on products in the finance charge and annual percentage rate disclosed to consumers).

[139] *See* FTC Policy Statement on Deception, *supra* note 42, at 2–5 (describing application of reasonable consumer standard).

[140] *See, e.g.,* Decision and Order, JS Autoworld, Inc., No. C–4535 (F.T.C. Aug. 13, 2015); Decision and Order, Nat'l Payment Network, Inc., No. C–4521 (F.T.C. May 4, 2015); Decision and Order, Matt Blatt Inc., No. C–4532 (F.T.C. July 2, 2015); Decision and Order, Ganley Ford West, Inc., No. C–4428 (F.T.C. Jan. 28, 2014).

(e) Motor Vehicle (Finalized as '' 'Covered Motor Vehicle' or 'Vehicle' '')

The proposed rule defined the term ''Motor Vehicle'' as ''(1) any self-propelled vehicle designed for transporting persons or property on a street, highway, or other road; (2) Recreational boats and marine equipment; (3) Motorcycles; (4) Motor homes, recreational vehicle trailers, and slide-in campers, as those terms are defined in §§ 571.3(b) and 575.103(d) of title 49, Code of Federal Regulations, or any successor thereto; and (5) Other vehicles that are titled and sold through Dealers.'' The Commission has determined to finalize the definition with the modifications discussed in the following paragraphs.

The Commission received several comments regarding the substance and scope of this proposed definition. A number of industry association commenters requested that certain vehicle types, including marine vehicles, motorcycles, RVs, and other recreational vehicles be excluded from coverage. These commenters contended that the dealerships that sell such vehicles function differently from automobile dealerships, and that recreational vehicles are discretionary, rather than essential, purchases. After careful consideration, the Commission is excluding recreational boats and marine equipment; motorcycles; and motor homes, recreational vehicle trailers, and slide-in campers from the definition of '' 'Covered Motor Vehicle' or 'Vehicle.' '' Moving forward, the Commission will continue to monitor for unfair and deceptive practices to determine whether further action is warranted to protect consumers, through law enforcement, a future rulemaking, or other measures. The Commission notes that no dealer may misrepresent material terms; deceive customers about prices, add-ons, or payments; charge for products that provide no benefit; or charge consumers without express, informed consent. To the extent that dealers engage in such conduct, they are in violation of the FTC Act.

Another commenter contended it was unclear whether all-terrain vehicles, go-carts, snowmobiles, scooters, electric bicycles, and golf carts were covered by the proposed definition. In response, the Commission has modified the first enumerated subpart of the definition to refer only to vehicles designed for use on a ''public'' street, highway, or road, and to expressly exclude scooters, electric bicycles, and golf carts. The definition of '' 'Covered Motor Vehicle' or 'Vehicle' '' in the Final Rule does not cover all-terrain vehicles, go-carts, or snowmobiles because such vehicles are not designed for use on a ''public'' street, highway, or road.[141]

A number of industry association commenters claimed that the proposed definition conflicts with definitions of motor vehicle under various State laws, and one such commenter requested that, rather than finalize a definition of ''Motor Vehicle,'' the Commission defer to the definitions promulgated by each State's department of motor vehicles. The commenters did not explain how the Rule's definition may actually conflict with any laws, or how any alleged duplication would harm consumers or competition. To the extent that States have broader or narrower definitions, it is not clear why motor vehicle dealers covered by the Rule cannot comply with the Rule's provisions and applicable State laws. Moreover, the Final Rule provides additional remedies that will benefit consumers who encounter conduct that is already illegal under State or Federal law, including by adding a mechanism for the Commission to redress consumers injured by a dealer's violation of the rule, and will assist law-abiding dealers that presently lose business to competitors that act unlawfully. Section 463.9 provides further discussion of State laws.

Thus, after careful consideration of the comments, the Commission is finalizing the definition of ''Motor Vehicle'' with modifications, including adding the word ''Covered'' to the definition to reflect the fact that the definition is narrower than the term ''Motor Vehicle'' in the NPRM and adding ''or Vehicle'' to the definition to clarify that all references in the Rule to the term ''Covered Motor Vehicle'' and ''Vehicle'' refer to the defined term.

(f) Dealer or Motor Vehicle Dealer (Finalized as '' 'Covered Motor Vehicle Dealer' or 'Dealer' '')

The proposed rule defined the term ''Dealer'' or ''Motor Vehicle Dealer'' as ''any person or resident in the United States, or any territory of the United States, that: (1) Is licensed by a State, a territory of the United States, or the District of Columbia to engage in the sale of motor vehicles; (2) Takes title to, holds an ownership interest in, or takes physical custody of motor vehicles; and (3) Is predominantly engaged in the sale and servicing of motor vehicles, the leasing and servicing of motor vehicles, or both.'' Based on the following, the Commission is finalizing this definition in the Final Rule with modifications for clarity.

Many stakeholders commented in support of the proposed rule and expressed no concern over this definition. Other commenters expressed views that the Commission examines in the following paragraphs.

A few industry association commenters contended that parts of the proposed definition may have captured certain financial entities, such as financial entities that maintain licenses to engage in the sale of motor vehicles, and requested that the Commission make clear that any rule does not apply to such entities. In response, the Commission notes that only entities that meet all three components of the definition are covered ''Dealers.'' Thus, an entity that maintains an applicable license to engage in the sale of Covered Motor Vehicles but is not, for example, predominantly engaged in the sale or leasing of motor vehicles would not be a covered ''Dealer.''

Another industry association commenter similarly requested a ''carve-out'' from any definition of ''Dealer'' for trusts and trusts' investors.[142] This commenter asserted that trusts and their investors do not satisfy two of the definition's components and did not describe how any part of the definition creates concerns or is unclear. The Commission reiterates that if an entity meets the three parts of the ''Covered Motor Vehicle Dealer'' definition, then it is covered; if an entity does not meet these three parts, it is not covered. The Commission sees no benefit to adding language stating that entities that do not meet the definition are not covered.

Other commenters, including vehicle association commenters, claimed that dealerships specializing in RV, marine, motorcycles, and other recreational vehicles, including certain high-end recreational vehicles,[143] should be excluded from coverage, generally contending that such dealerships operate differently from automobile dealerships, and that these types of vehicles are used for different purposes than are automobiles. As explained in the section-by-section analysis of the definition of ''Covered Motor Vehicle'' in SBP III.B.2(e), after considering stakeholder comments, the Commission

[141] According to the National Highway Traffic Safety Administration, ''Public road means any road under the jurisdiction of and maintained by a public authority and open to public travel.'' 23 CFR 1300.3.

[142] Comment of Structured Fin. Ass'n, Doc. No. FTC–2022–0046–7646 at 3.

[143] The Marine Retailers Association of the Americas requested that transactions in excess of $70,000 be excluded from coverage, as an alternative to excluding marine transactions altogether. *See* Comment of Marine Retailers Ass'n of the Ams., Doc. No. FTC–2022–046–9291 at 4.

is removing marine, motorcycle, RV, and certain other vehicles from the definition in § 463.2(e), and to reflect this change, finalizing the defined term as " 'Covered Motor Vehicle' or 'Vehicle,' " thereby excluding from the Final Rule entities who otherwise would have qualified as "Dealers" solely based on their sale and servicing, or leasing and servicing, of such vehicles. The Commission underscores that, regardless of the definition of "Covered Motor Vehicle" under the Final Rule, unfair and deceptive practices remain unlawful under the FTC Act. The Commission will continue to monitor all vehicle markets to determine whether additional action is warranted to protect consumers.

Some dealership association commenters argued that, under the Commission's proposal, this definition exempted dealers subject to the jurisdiction of the CFPB. Other such commenters similarly contended that, under the proposal, used car dealers that do not engage in extensive post-sale repairs do not "service" vehicles or that do not have separate service departments may have been excluded from coverage, contending further that excluding such dealers would put other dealers at a competitive disadvantage. Contrary to these commenters' assertions, the definition does not contain such exclusions. By its plain terms, the definition applies to dealers that meet its three enumerated components. Nowhere does the definition limit coverage of dealers based on CFPB jurisdictional considerations. Likewise, the definition does not condition coverage on whether a dealership has a service department or include any other requirement or limitation beyond those enumerated in § 463.2(f). By its plain meaning, the term "servicing" covers, for instance, "checking and repairing a vehicle, machine, etc. to keep it in good condition." [144] As the Commission has previously stated, the term "servicing" "captures activities undertaken by essentially all used car dealers." [145] Thus, the definition does not place dealers with separate servicing departments at a competitive disadvantage, and the Commission need

not remove the term "servicing of motor vehicles" from the Final Rule.

One such commenter further contended that the proposed definition did not cover certain entities, including certain direct sellers or manufacturers or others not licensed in a particular State, or lenders who offer add-on products such as GAP agreements and debt suspension products. As previously discussed, the Final Rule applies to all dealers that meet the three parts of this definition. [146] To the extent that the definition does not apply to specific entities, this reflects the scope and bounds of the rulemaking authority Congress delegated to the Commission under the Dodd-Frank Act. [147]

Finally, some industry and dealership association commenters posited that the proposal conflicted with Federal and State law or duplicated the regulatory authority of State enforcement agencies. These commenters did not provide information regarding how duplicative laws prohibiting misrepresentations, requiring disclosures, or prohibiting charges for items that would not benefit the consumer or for items without express, informed consent would create harmful consequences, and the Commission is not aware of any laws that allow such conduct by those that the Rule defines as "Covered Motor Vehicle Dealer[s]." Moreover, the Final Rule provides additional remedies that will benefit consumers who encounter conduct that is already illegal under State or Federal law, including by adding a mechanism for the Commission to redress consumers injured by a dealer's violation of the

Rule, and will assist law-abiding dealers that presently lose business to competitors that act unlawfully. To the extent the Rule may overlap with State law, dealers can comply with these laws and also with the requirements that follow from the operation, in the Rule, of the Commission's definition. To the extent there is truly an inconsistency between the provisions of the Final Rule and a State law, § 463.9 sets out the Rule's relation to State laws.

Thus, after careful consideration of the comments, the Commission is finalizing the definition of " 'Covered Motor Vehicle Dealer' or 'Dealer' " with modifications for clarity. The definition in the Final Rule incorporates the phrase "including any individual or entity" to confirm that the term "person," like all undefined terms in this part, is used according to its ordinary meaning and includes individuals and corporate entities and adds the word "Covered" to the definition to reflect the narrowed scope of "Covered Motor Vehicle." [148]

(g) Express, Informed Consent

The proposed rule defined the term "Express, Informed Consent" as "an affirmative act communicating unambiguous assent to be charged, made after receiving and in close proximity to a Clear and Conspicuous disclosure, in writing, and also orally for in-person transactions" of "(1) What the charge is for" and "(2) The amount of the charge, including, if the charge is for a product or service, all fees and costs to be charged to the consumer over the period of repayment with and without the product or service." The proposed rule also included in this definition three examples of what does not constitute express, informed consent: "(i) A signed or initialed document, by itself; (ii) Prechecked

---

[144] The Oxford Advanced American Dictionary defines "servicing" as "the act of checking and repairing a vehicle, machine, etc. to keep it in good condition"; *see also* 15 U.S.C. 5519(b)(3) (referring to "the sale, financing, leasing, rental, repair, refurbishment, maintenance, or other servicing of motor vehicles, motor vehicle parts, or any related or ancillary product or service").

[145] Used Motor Vehicle Trade Regulation Rule ("Used Car Rule"), 81 FR 81664, 81667 (Nov. 18, 2016).

[146] *See* 12 U.S.C. 5519(a), (f).

[147] Section 1029(d) of the Dodd-Frank Act defines "motor vehicle dealer" as "any person or resident in the United States, or any territory of the United States, who—(A) is licensed by a State, a territory of the United States, or the District of Columbia to engage in the sale of motor vehicles; and (b) takes title to, holds an ownership of, or takes physical custody of motor vehicles." 15 U.S.C. 5519(f)(2).

Parts (A) and (B) of this definition are identical to parts (1) and (2) of the definition of " 'Covered Motor Vehicle Dealer' or 'Dealer' " in the Final Rule.

Section 1029(d) of the Dodd-Frank Act states that the Commission "is authorized to prescribe rules under sections 5 and 18(a)(1)(B) of the Federal Trade Commission Act in accordance with section 553 of title 5, United States Code, with respect to a person described in subsection (a)." 15 U.S.C. 5519(d). Section 1029(a) in turn, provides the CFPB "may not exercise any rulemaking, supervisory, enforcement or any other authority . . . over a motor vehicle dealer that is predominantly engaged in the sale and servicing of motor vehicles, the leasing and servicing of motor vehicles, or both." 15 U.S.C. 5519(a). The last clause is identical to part (3) of the definition in the Final Rule.

Several commenters requested that the Commission allow consumers to buy vehicles directly from manufacturers. Nothing in the Rule prohibits consumers from doing so.

[148] *See, e.g., Person,* Black's Law Dictionary (11th ed. 2019) (defining "person" to include "[a] human being" and "[a]n entity (such as a corporation) that is recognized by law as having most of the rights and duties of a human being."); *Person,* Merriam-Webster.com Dictionary, *https://www.merriam-webster.com/dictionary/person* (last visited Dec. 5, 2023) (defining "person" to include "human" and "one (such as a human being, a partnership, or a corporation) that is recognized by law as the subject of rights and duties"); *see also* 12 U.S.C. 5481(19) (Dodd-Frank Act statutory authority for the Final Rule defining "person" as "an individual, partnership, company, corporation, association (incorporated or unincorporated), trust, estate, cooperative organization, or other entity"); 1 U.S.C. 1 (Dictionary Act defining "person" to include "corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals"). The application of covered motor vehicle dealer and dealer to entities also is consistent with these terms' use in the NPRM and commenter understanding of these terms in the course of public comment.

boxes; or (iii) An agreement obtained through any practice designed or manipulated with the substantial effect of subverting or impairing user autonomy, decision-making, or choice.'' In both the NPRM and in the provisions the Commission is finalizing, this definition is used exclusively in § 463.5(c). As such, comments regarding the definition are examined in the discussion of that provision in SBP III.E.2(c). As stated therein, the Commission is finalizing this definition substantively as proposed.

### (h) GAP Agreement

The proposed rule defined the term ''GAP Agreement'' as ''an agreement to indemnify a vehicle purchaser or lessee for any of the difference between the actual cash value of the insured's vehicle in the event of an unrecovered theft or total loss and the amount owed on the vehicle pursuant to the terms of a loan, lease agreement, or installment sales contract used to purchase or lease the vehicle, or to waive the unpaid difference between money received from the purchaser's or lessee's motor vehicle insurer and some or all of the amount owed on the vehicle at the time of the unrecovered theft or total loss.'' The proposed definition also noted that this included ''products or services otherwise titled 'Guaranteed Automobile Protection Agreement,' 'Guaranteed Asset Protection Agreement,' 'GAP insurance,' or 'GAP Waiver[ ].' '' This term appeared in two sections of the rule proposal: in the provision regarding dealer charges for add-ons from which the consumer would not benefit at proposed § 463.5(a), and in the recordkeeping provision at proposed § 463.6(a)(4). Comments regarding the proposed definition are examined in the discussion of § 463.5(a) in SBP III.E.2(a). As stated therein, the Commission is finalizing this definition substantively as proposed, with typographical modifications to correct a misplaced period in the original proposal and a modification removing the extraneous term ''insured's'' from the phrase ''actual cash value of the insured's Vehicle.'' In addition, the Final Rule capitalizes the defined term ''Vehicle'' to conform with the revised definition of '' 'Covered Motor Vehicle' or 'Vehicle' '' at § 463.2(e).

### (i) Government Charges

The proposed rule defined ''Government Charges'' as ''all fees or charges imposed by a Federal, State or local government agency, unit, or department, including taxes, license and registration costs, inspection or

certification costs, and any other such fees or charges.'' This term appeared in two provisions of the rule proposal: in the proposed definition of ''Offering Price'' at § 463.2(k), which pertains to the proposed offering price disclosure provision at § 463.4(a); as well as in the proposed provision relating to undisclosed or unselected Add-ons at § 463.5(b). As explained in further detail in the paragraph-by paragraph analysis of § 463.5(b) in SBP III.E.2(b), the Commission has determined not to finalize § 463.5(b), and as such will refrain from examining this proposed definition in relation to that provision. Comments regarding the proposed definition are examined in the discussion of § 463.4(a) in SBP III.D.2(a). As stated therein, the Commission is finalizing this definition substantively as proposed, with a typographical modification to include a serial comma for consistency.

### (j) Material or Materially

The proposed rule defined ''Material'' or ''Materially'' as ''likely to affect a person's choice of, or conduct regarding, goods or services.'' This term appeared in the prohibited misrepresentations provisions at § 463.3(b) and (g), and in the recordkeeping provision at § 463.6(a). As described in detail in the section-by-section analysis of § 463.3 in SBP III.C, the Final Rule modifies the introductory paragraph of § 463.3 from the Commission's original proposal to add the word ''Material,'' such that the Commission's materiality standard applies to all subparts of § 463.3. The Final Rule accordingly removes the word ''Material'' from § 463.3(b) and (g) so as to avoid duplication. Based on the following, the Commission is finalizing this definition, now at § 463.2(j), substantively as proposed.

A dealership association commenter noted that the proposed definition did not use the term ''significance,'' and asserted that ''Material'' information should be significant and not ''rooted in personal preference.'' [149] The Commission notes that this definition adopts the meaning of the term as articulated through decades of enforcement actions [150] instead of using a different term such as ''significance,'' and does not use the term ''personal preference'' or rely on ''personal

preference'' any more than the phrase ''likely to affect'' or ''significant'' does. Thus, the Commission is finalizing this definition substantively as proposed.

### (k) Offering Price

The proposed rule defined ''Offering Price'' as ''the full cash price for which a Dealer will sell or finance the motor vehicle to any consumer, excluding only required Government Charges.'' This term appeared in two provisions of the rule proposal: in the proposed offering price disclosure provision at § 463.4(a), as well as in the proposed provision relating to undisclosed or unselected add-ons at § 463.5(b). As explained in further detail in the paragraph-by paragraph analysis of § 463.5(b) in SBP III.E.2(b), the Commission has determined not to finalize § 463.5(b), and as such, will refrain from examining this proposed definition in relation to that provision. Comments regarding the proposed definition are examined in the discussion of § 463.4(a) in SBP III.D.2(a).[151] As stated therein, the Commission is finalizing this definition largely as proposed, with a modification to clarify that dealers may, but need not, exclude required government charges from a motor vehicle's offering price. In addition, the definition in the Final Rule substitutes ''Vehicle'' for ''motor vehicle'' to clarify that the term conforms with the revised definition of '' 'Covered Motor Vehicle' or 'Vehicle' '' at § 463.2(e).

### C. § 463.3: Prohibited Misrepresentations

#### 1. General Comments

The proposed rule set forth prohibitions against certain misrepresentations by motor vehicle dealers. Based on the following, the Commission has determined to finalize these prohibitions, with minor revisions.

The following paragraphs discuss comments relating to § 463.3 generally and Commission responses to such comments, followed by comments relating to each paragraph of § 463.3 and Commission responses to such comments.

The NPRM proposed prohibiting dealers from making any misrepresentation, expressly or by implication, regarding specific listed categories. The Commission received many comments regarding this

---

[149] Comment of Ga. Auto. Dealers Ass'n, Doc. No. FTC–2022–0046–10806 at 4.

[150] *See* FTC Policy Statement on Deception, *supra* note 42, at 1–2, 5; *see also Fed. Trade Comm'n v. Fleetcor Techs., Inc.,* 620 F. Supp. 3d 1268, 1303 (N.D. Ga. 2022); *Fed. Trade Comm'n v. Crescent Pub. Grp., Inc.,* 129 F. Supp. 2d 311, 321 (S.D.N.Y. 2001); *Thompson Med. Co., Inc.,* 104 F.T.C. 648, 816 (1984).

[151] Some commenters, including certain industry associations, requested that the Rule include additional definitions, including for the terms ''charged,'' ''item,'' ''discount,'' ''rebate,'' ''trade-in value,'' and ''online service.'' In response, the Commission notes that for terms not defined in the Rule, the plain meaning of the terms apply.

proposal, including comments supporting such a provision, comments urging the Commission to broaden the provision, and comments urging the Commission to limit or forgo the provision.

Thousands of commenters expressed support for the proposed rule.[152] Many of these commenters specifically expressed concern about misleading advertisements and deceptive pricing. Many individual commenters cited examples of such conduct from their own experiences purchasing or leasing vehicles, and many commenters with experience operating or working for a dealership shared their observations or experiences. For example:

• I have been looking for a car at MSRP and most dealers['] websites will list it at that price. [T]hen when you drive there the[y] will say well there is a market adjustment from 5,000 to 20,000 dollars. [N]ow . . . you need a car and have wasted 3–4 hours and picked out what you thought was your next car.[153]

• I am currently in discussions with two dealerships for a new car. Both assure me there is absolutely no dealer markup, come to find out they are adding 3/5k of ''mandatory'' add-ons respectively once I get in the door.[154]

• The last vehicle I purchased 2 years ago was a nightmare. Drove 5 hrs[.] to a dealer in Southern California. I called the dealer and confirmed the price on their website was what I was going to pay. When I arrived there, they had a list of $2500 [i]n additional charges that were not disclosed when I called and before I started driving. Purchasing a vehicle shouldn't be such a stressful process.[155]

• Most recently I started looking myself for a new lease, and looked at the RAV 4 prime. Went to my local dealer after seeing an ad on their site for $450 a month. Not only did they not honor the deal, but wouldn't even discuss that it was on their own site. I was told the SE model was [$5000] over MSRP and the XSE was [$8000] over.[156]

• I have contacted 10 different car dealerships in the past month looking to purchase a new or used SUV. 9 out of the 10 dealerships I contacted online or visited in-person in California changed

or lied about the online advertised price of the vehicle I was inquiring about or said the car was sold or not available and tried to sell me a more expensive vehicle.[157]

• Once I was led to the F&I office I was told that I HAD to buy a $995 paint protection product that I didn[']t want or need. I asked to see the contract for this product which clearly stated in bold letters 'ACCEPTANCE OF THIS CONTRACT IS VOLUNTARY AND DOES NOT AFFECT THE FINANCING OF THE VEHICLE' I pointed this out to the salesman and told him that I didn't want this product[.] [H]e looked me in the eyes with my wife present and said "You have to buy it[.]" [158]

• At the dealership, the salesman offered a price of $38,000, over $8,000 more than the advertised price. When I challenged the extra cost, he said the advertisement included every possible rebate and discount and no one could receive them together (some were exclusionary with other discounts).[159]

• While there are good honorable dealerships, far too many play games. Rarely is the price of [a] car advertised online or via mail EVER the actual price. Far too often in the F&I office the finance manager tries to [gloss] over add[-]ons that they just arbitrarily added on without telling you OR state I cannot get your loan approved without an extended warranty as an example I experienced. . . . I worked for a Toyota dealership many years ago and left the industry because it made me sick seeing the games played taking advantage of people. Change is needed and sooner than later.[160]

• I work as a salesperson at a local Nissan dealership. . . . Currently, dealerships across the US, including the one I work for, have made the car buying process needlessly confusing, expensive, and frustrating by engaging in false advertising and hidden add-on products. While these practices are very unscrupulous, they are incredibly effective at what they are designed to do: drive revenue for the store. If these regulations are passed, they would certainly take a significant toll on my personal finances. But the longer I work in my position, the more I realize that no one should be allowed to engage in

such exploitative conduct in the course of running a business.[161]

• I am in the auto industry and work at a very transparent and honest dealership. I think most of these rules are great. I hear horror stories about honest people seeing a car advertised for one price, only to be told there are additional a[d]d-ons and markups once they arrive. I think this is unfair. I'm also shocked every time I hear about a dealership charging for mandatory window etching and nitrogen filled tires. I even know of reputable dealerships that add GPS tracking and theft recovery devices to every new car, even though these cars come with GPS theft recovery from the manufacturer. Stopping these practices will help restore consumers' faith in car dealerships, save them money, and lead to a more honest and ethical industry. . . .[162]

Other commenters expressed support for transparent pricing generally, stating, for example:

• A consumer should be able to see a price, walk into a dealership, and pay that price. Plain and simple, just like ANY OTHER RETAILER.'' [163]

• If I walk into Best Buy and see a price they HAVE to sell it to me for that price or cheaper. These rules are long over due.[164]

• I believe if they advertise a car, it should be available for sale—at the advertised price—just as a supermarket can't advertise a price for something they don't have, or add a 'coupon redemption fee' to it. I believe these rules are an extremely reasonable approach to a long-standing problem and urge you to adopt them.[165]

• I used to work in the retail auto industry and these proposed rules will help everyone (including the dealers who are fighting them). Consumers will benefit from the transaction transparency, and over the long term even the shady dealers will benefit by treating consumers fairly and developing long term relations.[166]

• These regulations would be the best thing to happen for consumer protection since the Mo[n]roney Label. I not only have had to navigate and negotiate erroneous fees at dealers, but I've also

---

[152] See Motor Vehicle Dealers Trade Regulation Rule, Comment Docket, *https://www.regulations.gov/document/FTC-2022-0046-0001/comment.*

[153] Individual commenter, Doc. No. FTC–2022–0046–0036.

[154] Individual commenter, Doc. No. FTC–2022–0046–0099.

[155] Individual commenter, Doc. No. FTC–2022–0046–0906.

[156] Individual commenter, Doc. No. FTC–2022–0046–1878.

[157] Individual commenter, Doc. No. FTC–2022–0046–3686.

[158] Individual commenter, Doc. No. FTC–2022–0046–4752.

[159] Individual commenter, Doc. No. FTC–2022–0046–5580.

[160] Individual commenter, Doc. No. FTC–2022–0046–2378.

[161] Individual commenter, Doc. No. FTC–2022–0046–3693.

[162] Individual commenter, Doc. No. FTC–2022–0046–4959.

[163] Individual commenter, Doc. No. FTC–2022–0046–0017.

[164] Individual commenter, Doc. No. FTC–2022–0046–0034.

[165] Individual commenter, Doc. No. FTC–2022–0046–0005.

[166] Individual commenter, Doc. No. FTC–2022–0046–1935.

worked at dealers whose transparency and forthrightness put them at a disadvantage. Many dealers advertise vehicles that can not [sic] be purchased or leased at the advertised price due to deceptive adverts either not disclosed or in a print so fine it can't be read. Please pass this ruling. My grandma shouldn't have to pay more than someone else just because she's not a good negotiator.[167]

Consumer advocacy organization commenters and individual commenters urged the FTC to include additional specific provisions in § 463.3, including a prohibition against misrepresentations regarding the safety, mechanical or structural condition, odometer reading, or history of a vehicle. Similarly, commenters including a municipal regulator urged the Commission to specifically prohibit misrepresentations regarding certification of used vehicles, citing enforcement actions it brought against dealers that misrepresented used vehicles as "certified pre-owned" or "manufacturer certified." The FTC takes seriously deception relating to the safety or condition of a vehicle and the practice of charging consumers more based on false claims or reassurances.[168] Depending on the claim made by the dealership and the specific facts at issue, deceptive conduct in either of these areas may be covered by the enumerated misrepresentation paragraphs the Commission is finalizing, such as by § 463.3(a) if it relates to the terms of the purchase, lease, or financing. The FTC will continue to monitor dealer misrepresentations to determine whether additional action is needed.

In addition, a number of credit union commenters requested that the Commission explicitly address misrepresentations involving dealers' refusal to accept outside financing to purchase a vehicle. These commenters cited several examples of consumers being told that they could not use outside financing, that they would not receive a lower interest rate from an outside financial institution, or that a particular interest rate was the best rate the consumer can get. The Rule already covers such conduct. For example, § 463.3(a) of the Rule, which prohibits dealers from misrepresenting the cost or terms of financing a vehicle, covers these and other misrepresentations regarding financing, including the availability of outside or "indirect" financing terms, or the costs of such financing as compared to those of any dealer-provided financing.

Two individual commenters posited that any language prohibiting misrepresentations should explicitly include the word "omissions," in order to ensure that dealers do not sneak in additional costs without consumers' consent or understanding. The Commission appreciates this concern, and notes that the Rule has many provisions prohibiting such misconduct, including the required disclosures regarding price, add-ons, and total amount of payments in § 463.4 of the Final Rule, as well as the requirement in § 463.5(c) to obtain consumers' express, informed consent before charging for any items.

Other commenters, including dealership associations, individual commenters, and a United States Representative, questioned whether certain of the proposed misrepresentation provisions were duplicative of other laws, such as the Truth in Lending Act ("TILA"), the Consumer Leasing Act ("CLA"), or State regulations, and in some instances whether compliance with State regulations should act as a safe harbor. The Commission notes that another statute—the FTC Act—already prohibits misrepresentations in or affecting commerce, and to the extent there is duplication between the FTC Act and other existing statutes pertaining to deception, there is no evidence that duplicative misrepresentation prohibitions have harmed consumers or competition.[169] The Commission further notes that the Final Rule provides additional remedies that will benefit consumers who encounter conduct that is otherwise already illegal under Federal law, and will aid law-abiding dealers that lose business to competitors that act unlawfully.[170] State laws may provide more or less specific requirements as long as those requirements are not inconsistent with part 463, as set forth in § 463.9, and in the event of an inconsistency, the Rule only affects such State law to the extent of the inconsistency. Because dealers are already prohibited from engaging in "deceptive acts or practices" under the FTC Act, dealers should be able to comply with these provisions without the need for a safe harbor.

Industry association commenters also claimed that the prohibited misrepresentation proposal ignored the materiality prong of the Commission's deception standard, and further observed that some of the prohibited misrepresentations in the proposed rule explicitly included a materiality requirement,[171] while others did not. As the NPRM made clear, the Commission's proposed misrepresentation section, at § 463.3, addressed misrepresentations that are all material.[172] The Commission need not explicitly specify materiality in its description of these misrepresentations; indeed, the Commission has long considered certain categories of information, express claims, and intended implied claims to be presumptively material.[173] Nevertheless, rather than using the term "Material" in certain individual enumerated paragraphs, the Commission has determined to modify the introductory text of § 463.3 from the Commission's original proposal in order

---

[167] Individual commenter, Doc. No. FTC–2022–0046–10441.

[168] See, e.g., Complaint, *CarMax, Inc.*, No. C–4605 (F.T.C. Mar. 22, 2017) (alleging Defendants misled consumers by representing that the used motor vehicles Defendants sold had been subject to rigorous inspection but omitting important safety information about recalls); Complaint, *West-Herr Auto. Grp., Inc.*, No. C–4607 (F.T.C. Mar. 22, 2017) (alleging Defendants failed to disclose, or disclose adequately, that used motor vehicles it sold were subject to open recalls for safety issues); Complaint, *Asbury Auto. Grp., Inc.*, No. C–4606 (F.T.C. Mar. 22, 2017) (alleging deceptive failure to disclose material information about the safety of used motor vehicles sold by Defendants); Complaint ¶¶ 20–24, *Fed. Trade Comm'n v. Passport Imports, Inc.*, No. 8:18–cv–03118 (D. Md. Oct. 10, 2018) (alleging Defendants misled consumers by mailing "Urgent Recall" notices that were similar to and had the same color scheme as notices manufacturers are required by the U.S. Department of Transportation's NHTSA to use when sending information about vehicle recalls, even though in the "vast majority of instances" the recipients' cars were not subject to an open recall).

[169] One commenter expressed concern that the prohibited misrepresentations would cause dealerships to provide less information, because discussing pricing and quotes would result in providing further documentation for every conversation. However, as the FTC Act already prohibits misrepresentations, and given that pricing and financing information are among the most salient aspects of a consumer's shopping for a vehicle, the Commission considers it unlikely that § 463.3 would result in less information or the creation of additional documentation.

[170] Under section 19(a)(1) of the FTC Act, the Commission may sue in Federal district court "any person, partnership, or corporation" that "violates any rule under [the FTC Act] respecting unfair or deceptive acts or practices." 15 U.S.C. 57b(a)(1). Where such liability is found, under section 19(b) a court may "grant such relief as [it] finds necessary to redress injury . . . resulting from the rule violation," including the "rescission or reformation of contracts, the refund of money or return of property, [or] the payment of damages." *Id.* 57b(b).

A few commenters requested that the Rule go further in providing remedies, including by allowing for a private right of action to enforce Rule violations. The Commission notes that, depending on State law, consumers may be able to use State statutes that prohibit unfair or deceptive practices to challenge conduct that violates this Rule.

There is nothing in the FTC Act or this Rule that would preclude consumers from exercising any such legal rights under State law. The Commission will continue to monitor the market to determine whether additional steps are needed.

[171] *See* NPRM at 42045 (proposed § 463.3(b), (g)).

[172] NPRM at 42019.

[173] FTC Policy Statement on Deception, *supra* note 42, at 5 & nn.47–55.

to specifically prohibit misrepresentations regarding material information about the enumerated paragraphs. As such, the Commission is also removing what would otherwise be redundant references to the term "Material" within paragraphs (b) and (g) of § 463.3.

A national dealership association incorrectly asserted that this section is problematic because there is no requirement that the representation or omission be material or be viewed from the perspective of a consumer acting reasonably under the circumstances. As adopted in the final rule, this section adds the term "Material," stating that it is an unfair or deceptive practice for any motor vehicle dealer to make any misrepresentation, expressly or by implication, regarding material information about the specific categories enumerated in § 463.3.[174] The Commission is not aware of situations where dealers have made misrepresentations expressly or by implication regarding material information about these specific categories that are not deceptive or unfair, nor did commenters describe any such situations.

The Commission further notes that, by the terms of this section, a court must find that the dealer made an express or implied misrepresentation regarding material information for § 463.3 to be violated. For an express or implied misrepresentation regarding material information to be made in violation of the FTC Act and this Rule, there must be a representation that misleads consumers acting reasonably under the circumstances regarding material information. Whether such a representation has occurred depends on the facts. In the case of implied representations, whether a representation has occurred is often evident from an examination of the representation itself, including, for example, an evaluation of the document in which a representation is made, the juxtaposition of language in that document, the nature of the representation, and the nature of the transaction.[175] In other situations,

extrinsic evidence that it is reasonable for consumers to reach the implied representation may be helpful, such as consumer testimony, surveys, or other reliable evidence of consumer interpretation.[176]

For example, if a dealer offers discounted coffee for customers who visit its dealership before 10 a.m. and honors that offer, but makes no representations, expressly or by implication, about discounted cars, the dealer will not have violated § 463.3(d), which prohibits express or implied misrepresentations regarding rebates and discounts, even if a consumer holds an unreasonable belief that the offer was for discounted cars. On the other hand, if a dealership's advertisement depicts a car with a consumer standing next to it holding a cup of coffee, and states, "10% discount available before 10 a.m.," such an advertisement can convey several representations that may mislead reasonable consumers,[177] including that the car is available at a 10% discount.

Commenters including industry associations opined on the term "implied," contending for example that the idea that a misrepresentation can be implied is overly broad, and a dealership association commenter expressed concern that the inclusion of "implied" creates too much uncertainty. As has been recognized under the law for decades, however, representations can mislead consumers, even without making express claims.[178] Take, for

example, an advertisement that shows a picture of a new sedan for sale. Even if the advertisement does not expressly state that consumers could use the vehicle to drive at speeds higher than 25 miles per hour, there is an implied representation that a product is fit for the purposes for which it is sold.[179] Thus, limiting the Rule to prohibit only express misrepresentations would significantly hamper its usefulness to consumers.

One industry association commenter further argued that the proposed rule created a new deception standard that ignored intent and reliance. This argument, however, misstates the law, which does not require intent[180] or reliance[181] to establish deception.

Thus, the Commission is finalizing the introductory paragraph of § 463.3 largely as proposed, with a modification stating that it applies to misrepresentations regarding material information. For consistency with other parts of the Rule, the Commission is also removing the shorthand "FTC Act" that appeared in parentheses after "the Federal Trade Commission Act" in the introductory paragraph of the proposed rule. For clarity and consistency with the revised definition of "Covered Motor Vehicle Dealer" (at § 463.2(f) and discussed in SBP III.B.2(f)), the Commission is adding the word "Covered" to "Motor Vehicle Dealer" in the introductory paragraph. Finally, without changing any substantive requirements for covered entities, the Commission is adding the following sentence to the end of § 463.3, at newly designated paragraph (q): "The requirements in this section also are prescribed for the purpose of preventing the unfair or deceptive acts or practices

[174] The Final Rule prohibits misrepresentations in specific categories. In contrast, some FTC rules go further by prohibiting misrepresentations of "any material aspect" of the transaction. *See, e.g.,* Mortgage Assistance Relief Services Rule, 16 CFR 322.3(b); Telemarketing Sales Rule, 16 CFR 310.3(a)(2)(x).

[175] FTC Policy Statement on Deception, *supra* note 42, at 2 (*citing Am. Home Prods.,* 98 F.T.C. 136, 374 (1981), *aff'd,* 695 F.2d 681, 687 (3d Cir. 1982) (evaluation of the entire document); *Warner Lambert,* 86 F.T.C. 1398, 1489–90 (1975), *aff'd* 562 F.2d 749 (D.C. Cir. 1977), *cert. denied,* 435 U.S. 950 (1978) (juxtaposition of phrases); *Firestone Tire &*

*Rubber Co.,* 81 F.T.C. 398, 456 (1972), *aff'd,* 481 F.2d 246 (6th Cir.), *cert. denied,* 414 U.S. 1112 (1973) (nature of the claim); *see also Kraft, Inc.* v. *Fed. Trade Comm'n,* 970 F.2d 311, 319 (7th Cir. 1992) ("Commission may rely on its own reasoned analysis to determine what claims, including implied ones, are conveyed in a challenged advertisement, so long as those claims are reasonably clear from the face of the advertisement.").

[176] FTC Policy Statement on Deception, *supra* note 42, at 2 n.8.

[177] The interpretation or reaction does not have to be the only one; when a seller's representation conveys more than one meaning to reasonable consumers, one of which is false, the seller is liable for the misleading interpretation. *See* FTC Policy Statement on Deception, *supra* note 42, at 3. Further, an interpretation will be presumed reasonable if it is the one the respondent intended to convey. *Id.*

[178] The FTC's Policy Statement on Deception and scores of FTC cases make clear that both express and implied claims can be deceptive. *See, e.g., ECM BioFilms, Inc.* v. *Fed. Trade Comm'n,* 851 F.3d 599 (6th Cir. 2017) (affirming Commission's finding that an additive manufacturer's unqualified biodegradability claim conveyed an implied claim that its plastic would completely biodegrade within five years); *POM Wonderful LLC,* No. C–9344 (F.T.C. Jan. 10, 2013) (Opinion of the Commission), *aff'd as modified, POM Wonderful, LLC* v. *Fed. Trade Comm'n,* 777 F.3d 478 (D.C. Cir. 2015) (finding that company's advertisements would reasonably be interpreted by consumers to contain

an implied claim that POM products treat, prevent, or reduce the risk of certain health conditions and for some ads that these effects were clinically proven); *Kraft, Inc.* v. *Fed. Trade Comm'n,* 970 F.2d 311 (7th Cir. 1992) (affirming finding of deception where Kraft ads juxtaposed references to the milk contained in Kraft singles and the calcium content of the milk, the combination of which implied that each Kraft single contained the same amount of calcium as five ounces of milk).

[179] FTC Policy Statement on Deception, *supra* note 42, at 2; *Int'l Harvester Co.,* 104 F.T.C. 949, 1057–58 (1984).

[180] *See Fed. Trade Comm'n* v. *Freecom Commc'ns,* 401 F.3d 1192, 1202 (10th Cir. 2005) ("Because the primary purpose of § 5 is to protect the consumer public rather than punish the wrongdoer, the intent to deceive the consumer is not an element of a § 5 violation.").

[181] *See Fed. Trade Comm'n* v. *Figgie Int'l, Inc.,* 994 F.2d 595, 605–06 (9th Cir. 1993) (holding that section 19 of the FTC Act does not require proof of individual consumer reliance; rather, there is a "presumption of actual reliance" that arises once the Commission has proved that a defendant made material misrepresentations, that they were widely disseminated, and that consumers purchased the defendant's product).

defined in this part, including those in §§ 463.4 and 463.5.''

The Commission examines each paragraph of § 463.3, including by examining related comments and Commission responses to those comments. The Commission then discusses the corresponding provisions of the Final Rule.

2. Paragraph-by-Paragraph Analysis of § 463.3

(a) The Costs or Terms of Purchasing, Financing, or Leasing a Vehicle

Proposed § 463.3(a) prohibited misrepresentations regarding the cost or terms of purchasing, financing, or leasing a vehicle. The Commission is finalizing this provision largely as proposed, with the minor modification of capitalizing the defined term ''Vehicle'' to conform with the revised definition at § 463.2(e) (explained in SBP III.B.2(e)). As previously discussed, the addition of ''material'' to the introductory paragraph of § 463.3 will apply to this paragraph and to all paragraphs of § 463.3 that follow.

A number of commenters expressed support for this proposed provision, contending, *inter alia,* that it would level the playing field for car buyers and address unfair and deceptive practices related to financing terms and conditions.

The Commission received a number of industry association comments requesting that the Commission clarify the operation of proposed § 463.3(a), including for example, by clarifying whether it would require dealers to discuss all purchase, finance, or lease terms, or whether it would require dealers to read aloud all the terms of the buyer's order and finance or lease agreement. Dealership association commenters expressed a related concern that this proposed provision lacked specific guidance on dealer compliance.

To begin, misrepresentations regarding ''costs or terms of purchasing, financing, or leasing a vehicle'' refer to the ordinary plain meaning of the words used in the provision.[182] Second, as the

language in the introductory paragraph of § 463.3 makes clear, its paragraphs—including paragraph (a) of § 463.3—prohibit misrepresentations regarding material information. By its terms, this paragraph requires no particular affirmative disclosures, whether written or oral; rather, this paragraph obligates dealers to refrain from misrepresentations regarding material information about the costs or terms of purchasing, financing, or leasing a vehicle.[183]

The Commission received comments from industry associations requesting that the Final Rule provide a safe harbor from liability stemming from dealers' violations of the Rule to vehicle credit contract assignees, who take or receive these contracts subject to all claims and defenses consumers could assert against the dealer under the Commission's Trade Regulation Rule Concerning Preservation of Consumers' Claims and Defenses, also known as the ''Holder Rule.''[184] The Rule, however, does not create liability for these entities under the Holder Rule where it did not previously exist; the Rule addresses conduct that is unfair or deceptive under the FTC Act. When enacting the Holder Rule, the Commission did not include a safe harbor or exceptions involving any specific deceptive or unfair conduct, and the Commission declines to do so through this Rule.

A comment from a motor vehicle industry association argued that this provision would likely be inapplicable, or less impactful, with regard to RV sales because the RV industry rarely offers leases, if at all, and because RV sales are usually not financed through RV manufacturer-controlled financing companies. To the extent that specific provisions do not apply to specific entities, such provisions do not impose

any obligations upon those entities. Nevertheless, as explained in the analysis of the ''Covered Motor Vehicle'' definition, § 463.2(e), the Commission is excluding recreational vehicle dealers from the definition of ''Covered Motor Vehicle.''

After carefully considering the comments, the Commission is finalizing paragraph (a) of § 463.3 with the minor modification of capitalizing ''Vehicle.'' This provision prohibits misrepresentations regarding ''[t]he costs or terms of purchasing, financing, or leasing a Vehicle.'' Misrepresentations of the price, discounts, or other terms are likely to cause consumers to waste time pursuing unavailable or inapplicable offers and to spend more money on a vehicle rather than undergoing the hours-long process to begin the vehicle search and shopping process anew at another dealership. Prohibiting these misrepresentations will save consumers time and money and ensure that dealers compete on a level playing field.[185]

(b) Any Costs, Limitation, Benefit, or Any Other Aspect of an Add-On Product or Service

Proposed § 463.3(b) prohibited misrepresentations concerning any costs, limitation, benefit, or any other material aspect of an add-on product or service. Section 463.3(b) of the Final Rule adopts this provision without substantive modification. As described in detail in SBP III.C.1, the Commission

---

[182] Examples of ''costs or terms of purchasing, financing, or leasing a vehicle'' include, among other things, express or implied representations regarding a vehicle's total cost, down payment, interest rates, repayment schedules, the price for added features, other charges, certainty or finality of terms, and the availability of discounts. The Commission has brought numerous enforcement actions where, for example, dealers have misrepresented the total price a consumer could pay for vehicles, or concealed a required down payment or other restrictions on the offer. *See, e.g.,* Complaint ¶¶ 10–11, *Fed. Trade Comm'n* v. *Liberty Chevrolet, Inc.,* No. 1:20–cv–03945 (S.D.N.Y. May 21, 2020) (alleging false ads stating a certain price but charging consumers higher prices); Complaint

¶¶ 38–46, *Fed. Trade Comm'n* v. *Tate's Auto Ctr. of Winslow, Inc.,* No. 3:18–cv–08176–DJH (D. Ariz. July 31, 2018) (alleging false ads touting attractive terms but concealing (i) ads were for lease offers only and required substantial initial payment, (ii) discounts were subject to material limitations, or (iii) other legally required disclosures); Complaint ¶¶ 7–16, *Cowboy AG, LLC,* No. C–4639 (F.T.C. Jan. 4, 2018) (alleging false ads touting attractive terms, but concealing substantial down payments, offers were for leases and not purchases, material eligibility restrictions, and other legally required disclosures).

[183] Some commenters repeat this and similar questions, regarding what types of disclosures are required, through provision (o); the same response applies—provisions (a) through (o) do not affirmatively require particular disclosures. As with all misrepresentations prohibited by the Rule, and under section 5 of the FTC Act, misrepresentations are barred whether they are made expressly or by implication.

[184] *See* Trade Regulation Rule Concerning Preservation of Consumers' Claims and Defenses, 16 CFR 433.2 [hereinafter Holder Rule].

[185] The National Automobile Dealers Association commissioned a survey, released in May of 2023, that asserted the Commission's proposed rule would lead to an increase in consumer transaction time. Edgar Faler et al., Ctr. for Auto. Rsch., ''Assessment of Costs Associated with the Implementation of the Federal Trade Commission Notice of Proposed Rulemaking (RIN 2022—14214), CFR part 463'' (2023), *https://www.cargroup.org/wp-content/uploads/2023/05/CAR-Report_CFR-Part-463_Final_May-2023.pdf.* This survey was released more than seven months after the closure of the comment period for the notice of proposed rulemaking on September 12, 2022, and is not part of this rulemaking record. These facts notwithstanding, the Commission observes that each respondent to this survey was presented with a leading statement at the beginning of the survey asserting, *inter alia,* that the proposed rule would impose ''new duties [that] are expected to create additional monitoring, training, forms, and compliance review responsibilities as well as a modification of record keeping systems and coordination with outside IT and other vendors'' and ''increase the time of a motor vehicle transaction, inhibit online sales, limit price disclosures, and increase customer confusion and frustration.'' *Id.* at 34, 36 (introductory instructions on the survey instrument sent to respondents). In addition, this survey did not explain its selection process or criteria for the 60 dealers it surveyed, nor why only 40 such dealerships provided fully completed survey responses. Moreover, the survey report attributed much of this estimated increase to proposed rule provisions that the Commission is not finalizing.

is modifying § 463.3 from the Commission's original proposal to include the term ''Material'' in the introductory paragraph rather than in paragraphs (b) or (g) of § 463.3. Section 463.3(b) of the Final Rule therefore deletes reference to the term ''Material.''

The Commission received a number of comments expressing support for prohibiting misrepresentations about add-ons, including comments that requested specific additional add-on-related misrepresentation prohibitions. For example, an auto dealer commenter expressed support for prohibiting misrepresentations about whether or not a car has add-ons already installed. Consumer advocacy organization commenters recommended that the Commission include a new paragraph in § 463.3 prohibiting misrepresentations regarding the consumer's right to cancel add-on products or services. This provision, however, already covers such conduct: It prohibits misrepresentations regarding material information about any costs, limitation, benefit, or any other aspect of an add-on product or service. ''Material'' means likely to affect a consumer's conduct or choices.[186] A consumer's right to cancel is likely to affect the consumer's conduct regarding an add-on product or service. Thus, § 463.3(b) includes representations about a consumer's right to cancel an add-on product or service.

A number of dealership association commenters argued that the language used in this provision is vague or confusing. The terms ''Material'' and ''Add-on Product or Service,'' however, are specifically defined in § 463.2. The remaining terms in this provision are commonly used and can be understood according to their plain meaning.[187] The NPRM examined misrepresentations regarding the coverage and costs of add-ons, and enforcement actions by the Commission and other agencies have documented many instances of such misrepresentations.[188] Examples of the

type of conduct prohibited include misrepresenting whether add-ons are required in order to purchase or lease a vehicle, including by representing that such charges are required when in fact they are not, or misrepresenting that advertised prices do not include fees beyond routine taxes and fees only to subsequently require the purchase of add-ons; misrepresenting what is, or is not, covered by, among others, an extended warranty, service or maintenance plan, or GAP agreement;[189] and misrepresenting that consumers have provided express, informed consent to be charged for add-ons.

Commenters including a number of motor vehicle dealership associations requested that the Commission clarify how extensive disclosures would need to be to satisfy this provision. One such commenter requested that the Commission explain what conduct would be required under this paragraph, and expressed concern that, if the paragraph required disclosures, such a requirement would affect the length of the transaction. Another industry association commenter suggested that, in the event dealers provide consumers with a verbal or written disclosure stating that such products have costs, limitations, or benefits, and stating information about other material aspects, the Commission modify its proposal to shift to consumers the burden of proving any relevant dealer misrepresentation. An individual commenter expressed support for applying § 463.3(a) and (b) to dealer

advertisements of free lifetime benefits programs and requiring dealers to make disclosures about any costs, limitations, benefits, or any other aspect of an add-on product or service. The Commission notes that paragraphs (a) and (b) of § 463.3 already apply to free lifetime benefits programs. Regarding disclosures, the Commission is concerned about including additional disclosure requirements beyond the few areas included in the Rule, or shifting the burden to consumers to hunt for and decipher disclosures, given that the auto finance and lease process is already lengthy, complex, document-heavy, and dense. Accordingly, as discussed in regard to § 463.3(a), these provisions do not mandate set disclosures or allow for disclosures to be used as a shield when there are misrepresentations to consumers; rather, they prohibit express or implied misrepresentations.[190]

Several dealership association commenters pointed to State laws that, they contended, may already prohibit misrepresentations about add-ons or may otherwise protect consumers. As discussed previously, to the extent there may be duplication between the provisions the Commission is finalizing and other laws, there is no evidence that duplicative misrepresentation prohibitions have harmed consumers or competition. Moreover, the Final Rule provides additional remedies that will benefit consumers who encounter conduct that is already illegal under State or Federal law and will assist law-abiding dealers that presently lose business to competitors that act unlawfully. Under § 463.9, States may provide more or less specific requirements relating to motor vehicle dealers so long as those requirements are not inconsistent with part 463, and in the event of an inconsistency, the Rule only affects such State law to the extent of the inconsistency.

Based on a review of the comments and the responses discussed, the Commission adopts paragraph (b) of § 463.3 without substantive modification. As discussed in SBP III.C.1, the Commission has determined to modify the introductory paragraph of § 463.3 from the Commission's original proposal so that each paragraph of § 463.3 prohibits misrepresentations regarding material information. As such, the Commission is finalizing a version of § 463.3(b) that removes what would

[186] See FTC Policy Statement on Deception, *supra* note 42, at 2, 5; *see also Fed. Trade Comm'n* v. *Crescent Publ'g Grp., Inc.,* 129 F. Supp. 2d 311, 321 (S.D.N.Y. 2001).

[187] *E.g., Cost,* Cambridge Dictionary, *https://dictionary.cambridge.org/us/dictionary/english/cost* (''Cost'' is defined as ''the amount of money needed to buy, do, or make something''); *Limitation,* Cambridge Dictionary, *https://dictionary.cambridge.org/us/dictionary/english/limitation* (''Limitation'' is defined as ''something that controls or reduces something''); *Benefit,* Cambridge Dictionary, *https://dictionary.cambridge.org/us/dictionary/english/benefit* (''Benefit'' is defined as ''a helpful or good effect, or something intended to help'').

[188] *See, e.g.,* Complaint ¶¶ 26–27, 70–71, *Fed. Trade Comm'n v. N. Am. Auto. Servs., Inc.,* No. 1:22-cv-01690 (N.D. Ill. Mar. 31, 2022) (alleging deceptive and unauthorized add-on charges; unfair

discrimination against minority consumers); Complaint ¶¶ 12–19, *Fed. Trade Comm'n v. Liberty Chevrolet, Inc.,* No. 1:20–cv–03945 (S.D.N.Y. May 21, 2020) (alleging deceptive and unauthorized add-on charges in consumers' transactions); Complaint ¶¶ 59–64, *Fed. Trade Comm'n v. Universal City Nissan, Inc.,* No. 2:16-cv-07329 (C.D. Cal. Sept. 29, 2016) (deceptive and unauthorized add-on charges in consumers' transactions); Complaint ¶¶ 4–14, *Nat'l Payment Network, Inc.,* No. C–4521 (F.T.C. May 4, 2015) (alleging failure to disclose fees associated with financing program; misleading savings claims in advertisements); Complaint ¶¶ 4–13, *Matt Blatt Inc.,* No. C–4532 (F.T.C. July 2, 2015) (alleging failure to disclose fees associated with financing program; misleading savings claims). *Cf.* Consent Order ¶¶ 10–16, *Santander Consumer USA, Inc.,* CFPB No. 2018–BCFP–0008 (Nov. 20, 2018) (finding defendant sold GAP product allegedly providing ''full coverage'' to consumers with loan-to-value ratios (''LTVs'') above 125%, when in fact coverage is limited to 125% of LTV).

[189] *See, e.g.,* Consumer Fin. Prot. Bureau, ''Supervisory Highlights: Issue 12, Summer 2016'' 5 (June 2016), *https://files.consumerfinance.gov/f/documents/Supervisory_Highlights_Issue_12.pdf* (finding that one or more auto lenders deceptively advertised the benefits of their GAP agreement products, leaving the impression that these products would fully cover the remaining balance of a consumer's loan in the event of vehicle loss when, in fact, the product only covered amounts below a certain loan to value ratio).

[190] It is well-settled that, if one makes a claim that, absent additional information, would mislead a consumer acting reasonably under the circumstances about a material fact, such conduct would violate the law. *See* FTC Policy Statement on Deception, *supra* note 42, at 2; *Int'l Harvester Co.,* 104 F.T.C. 949, 1057–58 (1984).

otherwise be redundant explicit reference to the term "Material." This provision prohibits misrepresentations regarding "[a]ny costs, limitation, benefit, or any other aspect of an Add-on Product or Service." Misrepresentations regarding add-ons are likely to affect a consumer's conduct, including the consumer's decision to purchase the product or service.

(c) Whether Terms Are, or Transaction Is, for Financing or a Lease

Proposed § 463.3(c) prohibited misrepresentations regarding whether the terms are, or the transaction is, for financing or a lease. Upon review and consideration of public comments, the Commission is finalizing paragraph (c) of § 463.3 without modification from the Commission's original proposal.

A few industry association and individual commenters posited that this proposed provision was unnecessary, either because other statutes or regulations, including TILA and some State regulations, address this issue, or because vehicle manufacturers already monitor such misrepresentations. As noted in SBP III.C.1, even given the possibility of overlap between this provision and existing Federal or State law, there is no evidence that duplicative misrepresentation prohibitions have harmed consumers or competition. Further, given that the conduct covered by this provision is already unlawful under the FTC Act and may duplicate other laws, or be prohibited by manufacturer rules, it should not be difficult to follow this provision.[191]

Accordingly, after careful consideration, the Commission adopts paragraph (c) of § 463.3 as proposed. Misrepresentations regarding whether terms are, or a transaction is, for financing or a lease are likely to affect a consumer's conduct, including by causing consumers to enter into a monetary transaction for a product they do not want, or, if the true circumstances are revealed prior to consummation of the transaction, to waste time traveling to, and potentially spending hours at, the dealership.

(d) The Availability of Any Rebates or Discounts That Are Factored Into the Advertised Price but Not Available to All Consumers

Proposed § 463.3(d) prohibited misrepresentations concerning the availability of any rebates or discounts that are factored into the advertised price but not available to all consumers. Upon review and consideration of public comments, the Commission is finalizing paragraph (d) of § 463.3 without modification from the Commission's original proposal.

Comments in support of this proposed provision, including those from a group of State attorneys general and from two United States Senators, generally contended that the proposed provision would increase the transparency of the purchase transaction by requiring dealers to be honest when they advertise the availability of discounts.

An individual commenter suggested that the Commission modify proposed § 463.3(d) to require dealers to disclose all representations regarding rebates or discounts in writing, in a clear and conspicuous manner. The Commission notes this paragraph prohibits misrepresentations regardless of the medium. Further, this paragraph focuses on misrepresentations; disclosures regarding price, add-ons, and total of payments are addressed in the discussion of § 463.4, as is a discussion of why the Commission has determined not to include additional disclosure requirements in this Final Rule. The same commenter also requested that the Final Rule text include examples of situations where discounts or rebates may not be available. The Commission describes examples here rather than adding them to the Final Rule text, as it would be difficult to anticipate all such examples and the text would become unwieldy. Examples include where an advertised rebate or discount applies only to the most expensive version of a particular vehicle make and model or is only available to consumers with high credit scores.

The Commission received comments from a dealership association and an individual commenter asking for additional detail about proposed § 463.3(d), pointing to a State regulation that includes disclosures and asking which types of rebates the provision covers. Here, the Commission notes that, as the language in § 463.3(d) states, this provision applies to "*any* rebates and discounts" advertised by dealers, and is not limited to any particular type of rebate or discount.[192] The terms in this provision may be interpreted according to their plain meaning, as they are commonly used and understood.[193] Additionally, the language of this provision, the NPRM, and Commission enforcement actions provide further context. In proposing § 463.3(d) to specifically address the availability of discounts and rebates, the Commission included additional language ("that are factored into the advertised price but not available to all consumers") to describe the manner in which such misrepresentations often occur: a dealer represents an advertised price which includes a discount or rebate that is not generally available to consumers.[194] The NPRM's discussion of proposed § 463.3(d) described both a scenario in which a dealer advertised a rebate or discount separately, and one in which rebates or discounts are factored into the advertised price but the rebates and discounts are not available to a typical consumer. The conduct in either such scenario would violate this provision and, depending on the circumstances, may violate other provisions the Commission is finalizing, such as paragraph (a) of § 463.3. Enforcement actions cited in the NPRM provide further illustration of deceptive practices involving rebates and discounts.[195] The Commission declines

---

[191] The FTC has alleged that misrepresentations that particular terms are available for financing or for a lease violate the FTC Act. *See* Complaint ¶¶ 38–39, *Fed. Trade Comm'n v. Tate's Auto Ctr.,* No. 3:18–cv–08176–DJH (D. Ariz. July 31, 2018) (alleging false ads touting attractive terms but concealing ads were for lease offers only); Complaint ¶¶ 10, 13, *TC Dealership, L.P.,* No. C–4536 (F.T.C. Aug. 13, 2015) (same); Complaint ¶¶ 9–12, *Cowboy AG, LLC,* No. C–4639 (F.T.C. Jan. 4, 2018) (same); Complaint ¶¶ 36–38, *United States v. New World Auto Imports, Inc.,* No. 3:16–cv–02401–K (N.D. Tex. Aug. 18, 2016) (alleging misrepresentation that terms were for financing instead of leasing); Complaint ¶¶ 28–37, 44, *Fed. Trade Comm'n v. Universal City Nissan, Inc.,* No. 2:16–cv–07329 (C.D. Cal. Sept. 29, 2016) (alleging advertisements with key terms that were not generally available).

[192] Section 463.3(d) (emphasis added).

[193] *See, e.g., Rebate,* Cambridge Dictionary, *https://dictionary.cambridge.org/us/dictionary/ english/rebate* (last visited Dec. 5, 2023) (defining "rebate" as "an amount of money that is returned to you, especially by the government, for example when you have paid too much tax" or "an amount of money that is paid back to you after you have paid too much"); *Discount,* Cambridge Dictionary, *https://dictionary.cambridge.org/us/dictionary/ english/discount* (last visited Dec. 5, 2023) ("[A] reduction in the usual price").

[194] *See* NPRM section IV.C, 87 FR at 42020 (proposed § 463.3(d) prohibited misrepresentations concerning "[t]he availability of any rebates or discounts that are factored into the advertised price but not available to all consumers," and the NPRM explained "[w]hen dealers advertise rebates and discounts, or offer prices that factor in such rebates and discounts, but in fact those rebates and discounts are not available to the typical consumer, such conduct induces the consumer to select and transact with the dealer under false pretenses").

[195] *See, e.g.,* Complaint ¶¶ 6–13, *Jim Burke Auto., Inc.,* No. C–4523 (F.T.C. May 4, 2015) (alleging promises of prices and discounts not generally available to consumers); Complaint ¶¶ 6, 9, *TT of Longwood, Inc.,* No. C–4531 (F.T.C. July 2, 2015) (alleging promises of prices and discounts not generally available to consumers); Complaint ¶¶ 8–9, *JS Autoworld, Inc.,* No. C–4535 (F.T.C. Aug. 13, 2015) (alleging false ads touting prices but concealing discounts with material eligibility limitations); Complaint ¶¶ 7–9, *TC Dealership, L.P.,* No. C–4536 (F.T.C. Aug. 13, 2015) (alleging false ads touting attractive prices but concealing

Continued

to add additional requirements, such as disclosure requirements, to its Final Rule, given the already lengthy, complex, and document-heavy nature of auto transactions.

A number of dealership association commenters contended that the proposed paragraph would prohibit dealers from displaying beneficial information to consumers or would prohibit dealers from advertising rebates and incentives of limited availability. In addition, commenters including one such dealership association requested that the Commission adopt an approach the commenter contended is used in some States: allowing dealers to display, below the advertised sales price, a rebate or incentive that is not available to all purchasers. Moreover, a number of industry association and dealership association commenters argued that the proposed paragraph was more stringent than, and inconsistent with, the Commission's prior articulation of the deception standard, further noting the existence of Commission orders that prohibit defendants from representing that a price, discount, rebate, or other incentive is available, unless it is in fact available to all or unless a defendant provides a clear and conspicuous disclosure of any qualifications or restrictions. Section 463.3(d) prohibits misrepresentations; it does not prohibit a dealer from advertising, in a truthful manner, rebates or discounts with limitations. Thus, this paragraph allows for the representation of limited offers, as long as such representation is truthful, and any limitations are clear and conspicuous to consumers. The paragraph is also consistent with the Commission's prior enforcement order practice in this area, which both prohibits misrepresentations regarding rebates and prohibits representations regarding rebates without disclosing any material qualifications or restrictions.[196] The paragraph simply contains one of these prohibitions but not the second.

A dealership association commenter expressed concern that this proposed provision would penalize dealers if consumers were to confuse a rebate or discount offered for one vehicle with a vehicle that does not contain such an offer. As under current law, dealers are prohibited under § 463.3(d) from both express and implied misrepresentations. If, for example, a dealer states or implies that a discount is available on several types of vehicles when, in truth, the discount is only available on one such type of vehicle, such conduct would violate this paragraph. If, alternatively, the dealer does not state or imply that a discount is available for several types of vehicles, and offers a discount for one type of vehicle, this conduct would not violate this paragraph, as long as the dealer makes no other express or implied misrepresentations.

After careful review of the comments, the Commission is adopting paragraph (d) of § 463.3 as proposed. When dealers advertise rebates or discounts in a misleading manner, including when such rebates or discounts are not available to the typical consumer, or apply only to the most expensive versions of the make and model,[197] such conduct induces consumers to select and transact with the dealer under false pretenses.[198]

**(e) The Availability of Vehicles at an Advertised Price**

Proposed § 463.3(e) prohibited misrepresentations regarding the availability of vehicles at an advertised price. Upon reviewing the comments pertaining to this provision, the Commission is finalizing paragraph (e) of § 463.3 largely as proposed, with the minor modification of capitalizing the defined term "Vehicles."

One individual commenter recommended that proposed § 463.3(e) be expanded to prohibit certain specific misrepresentations about advertised vehicle availability, including whether any specific vehicle is already reserved for another consumer; whether the availability is subject to a requirement that the consumer pay a deposit; and regarding the amount of time until the vehicle becomes available. Another individual commenter recommended that the Rule require disclosure of how long each vehicle has been in the dealer's inventory, to prevent dealers from misrepresenting that a vehicle recently became available. Here, the Commission notes that, to the extent any such misrepresentations regarding the availability of vehicles were made with express or implied reference to the price of the vehicle, each would be prohibited by § 463.3(e).[199] Furthermore, to the extent such misrepresentations included reference to the subject of another paragraph of § 463.3, they would be prohibited by the Final Rule. For example, if an advertisement were to make a claim about the monthly payment for a specific vehicle, but the vehicle is not actually available, it would be covered under the bar against misrepresentations regarding costs or terms in paragraph (a) of § 463.3. In addition, under the Final Rule, dealers are also subject to disclosure requirements under § 463.4, including the requirement at § 463.4(a) to disclose the vehicle's offering price in any advertisement that references a specific vehicle, or any monetary amount or financing term for any vehicle. And if a dealer discloses the offering price for a vehicle, but the vehicle is not available to consumers, § 463.3(e) applies. Beyond this, the Commission will continue to monitor whether other misrepresentations regarding availability are being made without reference to price, or to the subject of another paragraph of § 463.3, to determine whether additional action is warranted.

The Commission received comments from a number of dealership associations and individuals requesting that the Final Rule limit dealers' responsibility for unanticipated delays, or otherwise expressing concern about

---

discounts were subject to material eligibility limitations and trade-in requirement); Complaint ¶¶ 4–5, *Timonium Chrysler, Inc.,* No. C–4429 (F.T.C. Jan. 28, 2014) (alleging dealership advertised internet prices and dealer discounts but failed to disclose consumer would have to qualify for multiple rebates not generally available to them); Complaint ¶¶ 4–5, *Ganley Ford West, Inc.,* No. C– 4428 (F.T.C. Jan. 28, 2014) (alleging dealership advertised discounts on vehicle prices, but failed to disclose discounts were only available on the most expensive models).

[196] *See, e.g., Decision and Order, Timonium Chrysler, Inc.,* No. C–4429 (F.T.C. Jan. 28, 2014).

[197] *See* Complaint ¶¶ 4–5, *Ganley Ford West, Inc.,* No. C–4428 (F.T.C. Jan. 28, 2014) (alleging false ads touting price discount but concealing offer was limited to certain high-end models).

[198] *See* Complaint ¶¶ 8–9, *JS Autoworld, Inc.,* No. C–4535 (F.T.C. Aug. 13, 2015) (alleging false ads touting prices but concealing discounts with material eligibility limitations); Complaint ¶¶ 7–9, *TC Dealership, L.P.,* No. C–4536 (F.T.C. Aug. 13, 2015) (alleging false ads touting attractive prices but concealing discounts were subject to material eligibility limitations and trade-in requirement); Complaint ¶ 14, *TXVT Ltd. P'ship,* No. C–4508 (F.T.C. Feb. 12, 2015) (alleging false ads failed to disclose that it would match consumers' income tax refunds only up to $1,000); Complaint ¶¶ 4–5, *Timonium Chrysler, Inc.,* No. C–4429 (F.T.C. Jan. 28, 2014) (alleging false ads touting pricing and discounts but concealing material qualifications and restrictions); Complaint ¶¶ 6, 9, *TT of Longwood, Inc.,* No. C–4531 (F.T.C. July 2, 2015) (alleging promises of prices and discounts not generally available to consumers); Complaint ¶¶ 6– 13, *Jim Burke Auto., Inc.,* No. C–4523 (F.T.C. May 4, 2015) (alleging promises of prices and discounts not generally available to consumers); *see also* Auto Buyer Study, *supra* note 25, at 8 ("A number of [study] participants were attracted by promotional offers in ads that they did not qualify for, but did not realize that they did not qualify until they got to the dealer. Some did not learn that they did not qualify until they got to the financing stage of the transaction.").

[199] The commenter also expressed concern about misrepresentations regarding the refundability of deposits and recommended that the Commission include language in § 463.3(e) addressing this issue. Because representations and practices regarding the refundability of deposits are related to the costs or terms of purchasing, financing, or leasing a vehicle, this issue is covered by § 463.3(a). Thus, the Commission declines to adopt the commenter's recommendation.

how dealers would be able to comply with this proposed provision. One industry association commenter stated that unanticipated delays could result from factors beyond the reasonable control of the dealer, such as shipping or production issues. Other dealership association commenters contended that, because of supply chain disruptions, adjustments to inventory and other information may not always be displayed on a retailer's website instantaneously.

As is the case under current law, under this provision, dealers may not make claims about the availability of vehicles at an advertised price without a reasonable basis at the time the claims are made.[200] Objective claims about products or services represent, explicitly or by implication, that an advertiser has a reasonable basis to support those claims.[201] Consumers would be less likely to be affected by claims for products and services if they knew the advertiser did not have a reasonable basis for believing them to be true.[202] If a dealer has a reasonable basis

to make a claim about the availability of vehicles at the time the claim is made, the dealer would not be in violation of the provision if a vehicle later becomes unavailable because of circumstances that a dealer could not reasonably anticipate or control.

A few dealership association commenters claimed that promulgation of § 463.3(e) would cause regulatory confusion because State guidelines or rules already address issues about the availability of vehicles, including, for example, by requiring dealers to note the location of the vehicle.[203] As described in SBP III.C.1, States may provide more or less specific requirements relating to motor vehicle dealers so long as those requirements are not inconsistent with part 463, and in the event of an inconsistency, the Rule only affects such State law to the extent of the inconsistency. To the extent there are actual inconsistencies, § 463.9 is clear that this Rule's prohibition against misrepresentations controls.

After careful consideration of the comments, the Commission is adopting paragraph (e) of § 463.3 largely as proposed, with the minor modification of capitalizing the defined term "Vehicles." This paragraph prohibits dealers from promoting low prices for specific vehicles, but then later misrepresenting, among other things, that the advertised vehicle is no longer available or no longer available at the advertised price. Such misrepresentations are likely to induce consumers to waste their time traveling to a particular dealership to pursue a specific offer on a specific vehicle when the offer or vehicle itself may not actually be available.

**(f) Whether Any Consumer Has Been or Will Be Preapproved or Guaranteed for Any Product, Service, or Term**

Proposed § 463.3(f) prohibited misrepresentations regarding whether a consumer has been or will be preapproved or guaranteed for any product, service, or term. Upon reviewing public comments, the Commission is finalizing paragraph (f)

of § 463.3 without modification from the Commission's original proposal.

One dealership association commenter recommended that compliance with a State law that prohibits certain misleading statements, such as "we finance anyone" and "no credit rejected" and similar statements, should function as a safe harbor against liability under this proposed paragraph.[204] Yet, while compliance with the State law cited may require dealers to refrain from using certain frequently misleading statements, as described by the commenter, that law does not generally prohibit all misrepresentations regarding material information about consumer preapprovals or guarantees; even if it did, there is no evidence that duplicative laws prohibiting misrepresentations harm consumers or competition, and no evidence of benefits to consumers or competition in allowing one such law to act as a safe harbor against another such law. Further, given that current law already prohibits deceptive conduct generally, dealers should be able to comply with the Commission's Rule, which provides further protections for consumers and law-abiding dealers. Thus, the Commission declines to adopt the recommended safe harbor.

Therefore, after careful consideration, the Commission is finalizing paragraph (f) of § 463.3. Misrepresentations regarding preapproval or guarantees for a product, service, or term—as with misrepresentations about availability and price, described previously—are likely to impact consumers' conduct with regard to motor vehicle sales, financing, or leasing transactions, including by inducing consumers to waste time pursuing illusory offers.

**(g) Any Information on or About a Consumer's Application for Financing**

Proposed § 463.3(g) prohibited dealers from misrepresenting any material information on or about a consumer's application for financing. After carefully reviewing public comments, the Commission is adopting paragraph (g) of § 463.3 without substantive modification. As with § 463.3(b), the only adopted modification is the deletion of the term "Material," which nonetheless applies to the operation of each of the misrepresentation paragraphs in § 463.3, including paragraph (g), through the addition of the term in the introductory paragraph of § 463.3.

---

[200] FTC Policy Statement on Deception, *supra* note 42, at 1 n.5 ("Advertising that lacks a reasonable basis is also deceptive.") (citing *Firestone Tire & Rubber Co.*, 81 F.T.C. 398, 451–52 (1972) (additional citations omitted)); *see Fed. Trade Comm'n v. US Sales Corp.*, 785 F. Supp. 737, 748 (N.D. Ill. 1992) ("Apart from challenging the truthfulness of an advertiser's representations, the FTC may challenge the representation as unsubstantiated if the advertiser lacked a reasonable basis for its claims."); *see also Fed. Trade Comm'n v. Am. Screening, LLC*, 4:20–CV–01021–RLW (E.D. Mo. July 14, 2022) (granting summary judgment for the FTC upon finding that American Screening's claim that its COVID–19 protective equipment was available and would ship quickly was false and lacked a reasonable basis); *Fed. Trade Comm'n v. John Beck Amazing Profits, LLC*, 865 F. Supp. 2d 1052 (C.D. Cal. 2012) (finding that the defendants' representations were unsubstantiated in violation of section 5, because Defendants conceded that during the time period in which their infomercial was aired they did not have evidence supporting their representations that consumers who purchased their product would be able to earn money easily and because survey results revealed that less than one percent of consumers actually generated any revenue or profits); *Fed. Trade Comm'n v. Elegant Sols., Inc.*, 8:19–cv–01333–JVS–KES (C.D. Cal., July 6, 2020) (finding that defendants made false or unsubstantiated representations, including representing that consumers would be enrolled in a repayment plan that may be forgiven after a specific number of years even though there were no Federal loan forgiveness programs with those repayment terms).

[201] Fed. Trade Comm'n, "FTC Policy Statement Regarding Advertising Substantiation," (appended to *In re Thompson Med. Co., Inc.*, 104 F.T.C. 648, 839 (1984)); *Fed. Trade Comm'n v. John Beck Amazing Profits, LLC*, 865 F. Supp. 2d 1052, 1067 (C.D. Cal. 2012).

[202] Fed. Trade Comm'n, "FTC Policy Statement Regarding Advertising Substantiation," (appended to *In re Thompson Med. Co., Inc.*, 104 F.T.C. 648, 839 (1984)); *see Fed. Trade Comm'n v. Am. Screening, LLC*, 4:20–CV–01021–RLW (E.D. Mo., July 14, 2022) (granting FTC's motion for summary

judgment and finding that Defendants' representations that it had protective equipment in stock and would ship it to consumers within seven to ten business days were material to consumers seeking such equipment during a global pandemic).

[203] This provision would not prohibit dealers from advertising a vehicle with limitations on availability in a truthful manner, such that any limitations are clear and conspicuous to the consumer. For example, dealers should not affirmatively represent that a vehicle is available on its lot without a reasonable basis that the vehicle is on the lot or without clearly and conspicuously noting that the vehicle will be made available after transfer from an affiliate's lot.

[204] Comment of Tex. Auto. Dealers Ass'n, Doc. No. FTC–2022–0046–8102 at 21; *see* 43 Tex. Admin. Code 215.247(2) (2023).

The Commission received a number of comments regarding this provision, including comments that expressed support for prohibiting misrepresentations about a consumer's application for financing.

A credit union commenter requested that, in addition to this proposal, the Commission consider implementing a requirement to clearly and conspicuously disclose any potential financing limitations prior to vehicle purchase negotiations, contending that such a measure would better enable consumers to choose a motor vehicle dealer and financing option that best serves their needs. To the extent a dealer misrepresents a consumer's financing options or limitations, including prior to or during the process of selling, leasing, or arranging financing for a vehicle, such conduct is prohibited by this provision, and depending on the circumstances, may also violate other provisions of the Rule. For example, as discussed in this paragraph-by-paragraph analysis, § 463.3(a) of the Final Rule prohibits misrepresentations regarding the cost or terms of financing a vehicle; this prohibition includes misrepresentations about available vehicle financing. Furthermore, this provision pertains to misrepresentations; comments pertaining to proposed disclosures regarding price, add-ons, and total of payments are examined in the Commission's discussion of § 463.4, wherein the Commission explains its determination not to finalize any additional disclosure requirements not included in its NPRM.

An individual commenter, while expressing support for regulation of such misrepresentations, also noted concern for the "grave consequences of falsifying information on a customer's application for financing," and urged the Commission to consult with other law enforcement agencies to further address such problems.[205] The Commission appreciates the concern and the seriousness of falsifying information on a consumer's application for financing, and coordinates regularly with other law enforcement agencies regarding areas of shared jurisdiction and responsibility, including motor vehicle sales and financing. The Commission will continue to monitor financing application falsification issues to determine whether any additional action, beyond § 463.3(g), is needed.

A number of dealership association commenters contended that the proposed language was vague and did not adequately explain the type of behavior this paragraph would prohibit. Relatedly, some dealership association commenters contended that this provision lacked specific guidance about what a motor vehicle dealer must or must not disclose. This provision, however, utilizes terms which are commonly used and understood, and which may be interpreted according to their plain meaning. Read together with the introductory paragraph of § 463.3, § 463.3(g) prohibits misrepresentation . . . regarding material information about "[a]ny information on . . . a consumer's application for financing." By its terms, this prohibition includes any misrepresentations of material information on a financing application. For example, dealers would make misrepresentations in violation of this provision by including, on a consumer's application that is submitted to a third-party financing institution, consumer income information that is different from what the consumers have stated to the dealer that the consumers actually earn, or by representing a different down payment amount than the amount the consumer has actually provided, or by misrepresenting that the vehicle is being sold or leased with certain add-on products.[206] Moreover, as described in detail with regard to other paragraphs of § 463.3, this provision does not require any particular affirmative disclosures, instead obligating dealers to refrain from certain misrepresentations.

One dealership association commenter questioned whether a dealer would be held responsible for a customer's false statement about his or her income. If a consumer falsely states they have a higher income, that consumer would not be misled into thinking he has a higher income. If, however, a consumer's application falsely states a higher income because a dealer has altered the information, that consumer would be misled into thinking that the application they are signing accurately reflects the information the consumer provided, and § 463.3(g) would be violated. Additionally, if a dealer advises a consumer to include other sources of payment as income or advises the consumer to list a higher income in other ways, such conduct may mislead the consumer into thinking that it is proper to calculate income for auto retail installment contracts in a particular way, and there may be a violation of § 463.3(g).

After careful review and consideration of the comments, the Commission adopts paragraph (g) of § 463.3 without substantive modification, prohibiting misrepresentations regarding material information about any information on or about a consumer's application for financing. It is likely to affect a consumer's choices if the consumer knows a dealer is misrepresenting the consumer's income, or other aspects of financing applications. If, for example, a consumer knew the truth—that the dealer is inflating the consumer's income such that the consumer would not otherwise obtain financing for a particular vehicle—the consumer might opt to finance a less expensive car, rather than risking repossession. Material misrepresentations on consumers' financing paperwork are also likely to cause consumers substantial injury, including by causing them to take on debt beyond that which the financing company would have approved, and increasing the risk of repossession and harmful consequences to consumers' credit. Consumers cannot avoid the injury from dealers misrepresenting the information consumers provide them, and this practice provides no countervailing benefits to consumers or competition.

(h) When the Transaction Is Final or Binding on All Parties

(i) Keeping Cash Down Payments or Trade-In Vehicles, Charging Fees, or Initiating Legal Process or Any Action If a Transaction Is Not Finalized or If the Consumer Does Not Wish To Engage in a Transaction

Proposed § 463.3(h) prohibited dealers from misrepresenting when the transaction is final or binding on all parties. Proposed § 463.3(i) prohibited dealers from making misrepresentations about keeping cash down payments or trade-in vehicles, charging fees, or initiating legal process or any action if a transaction is not finalized or if the consumer does not wish to engage in a transaction. After careful review and consideration of the comments, the Commission is finalizing paragraphs (h) and (i) of § 463.3 with the minor modification of capitalizing the defined term "Vehicles" in § 463.3(i) to conform with the revised definition at § 463.2(e).

Some commenters, including a group of State attorneys general and consumer

---

[205] Individual commenter, Doc. No. FTC–2022–0046–7445 at 12.

[206] *See* Complaint ¶¶ 18–36, *Fed. Trade Comm'n v. Tate's Auto Ctr. of Winslow, Inc.*, No. 3:18–cv–08176–DJH (D. Ariz. July 31, 2018); Consumer Fin. Prot. Bureau, "Supervisory Highlights: Issue 30, Summer 2023'' 5 (July 2023), *https://files.consumerfinance.gov/f/documents/cfpb_supervisory-highlights_issue-30_2023-07.pdf* (finding that dealers "fraudulently included" in financing documents add-ons, such as undercoating, that were not actually present on the vehicle, creating "improperly inflated loan amounts" that caused consumers to pay improper additional interest).

advocacy organizations, generally supported prohibiting misrepresentations about when the transaction is final or binding on all parties but urged the Commission to include additional requirements or prohibitions. For instance, several commenters, including consumer advocacy organizations and individual commenters, requested that the Commission add to its Final Rule a provision requiring dealers to include, in every consumer credit contract, a finality clause stating that the transaction is final as soon as the consumer credit contract is signed, or alternatively, a provision requiring dealers to include in retail installment contracts a clause prohibiting financing-contingent sales. Commenters including a group of State attorneys general recommended that the Commission require any dealer that does not ultimately secure financing under previously presented terms to unwind the transaction, return any down payment in full, and return any traded-in vehicle. Such commenters also recommended that the Commission implement restrictions, such as requiring dealers to be reasonably certain that a consumer will qualify for quoted financing terms; requiring a written disclosure that the consumer must sign advising the consumer that financing is not final; or setting a short deadline by which the dealer must either arrange financing or cancel the transaction. Other commenters, including a State consumer protection agency, also supported requiring the contractual contingency to be disclosed conspicuously and limiting the contingency to a short period of time. A number of these commenters, including consumer advocacy organizations, provided examples of how spot delivery transactions can harm consumers.

The provision's prohibitions and requirements address many of these commenters' concerns regarding spot delivery and yo-yo financing. Spot delivery and yo-yo financing refer to situations where a dealer delivers a vehicle to a consumer on the spot before the financing or leasing has been finalized, leads a consumer to believe that the transaction is final, and then later directs the consumer to return the vehicle and engages in certain tactics, such as failing to return the consumer's trade-in vehicle while refusing to honor the finance or lease transaction, or pressuring the consumer to enter into a new transaction.[207] Paragraphs (h) and

(i) of § 463.3 prohibit misrepresentations regarding the finality of the transaction and return of down payments and trade-in vehicles. Under these provisions, if a consumer is under the impression that the transaction is final, and the dealer subsequently causes the consumer to return the vehicle to the lot because the transaction was not final, or the dealer takes or threatens to take possession of the vehicle but refuses to return the down payment or trade-in vehicle, the dealer has violated either § 463.3(h), by misrepresenting the finality of the transaction, or § 463.3(i), by falsely representing, expressly or by implication, that the dealer has a legal basis to keep the down payment or trade-in vehicle in the event the transaction is not finalized, or both.[208]

Regarding the recommendation to include a requirement that dealers be reasonably certain that consumers will

qualify for quoted financing terms, the Rule the Commission is finalizing already contains several provisions in addition to § 463.3(h) and (i) that address this conduct. For example, the Rule prohibits misrepresentations about material information about the costs or terms of financing (§ 463.3(a)), or about whether any consumer has been or will be preapproved or guaranteed for any product, service, or term (§ 463.3(f)). As explained in the paragraph-by-paragraph analysis of § 463.3(e) in SBP III.C.2(e), existing law requires dealers to have a reasonable basis for their claims. Objective claims about products or services represent, explicitly or by implication, that an advertiser has a reasonable basis to support those claims.[209] Thus, to avoid misrepresentation, dealers must reasonably believe that consumers will qualify for quoted financing terms, or that the transaction will be finalized on the terms presented, in order to represent such terms to consumers.

Regarding additional provisions that would require certain contractual measures, such as finality clauses or prohibitions against financing-contingent sales, the Commission is concerned that requiring specific contract provisions would obligate dealers that are not engaged in spot delivery to change their contracts even though their customers do not experience harm stemming from spot delivery practices. Before requiring any such changes, the Commission has determined to continue to monitor the market to evaluate whether additional steps are warranted.[210]

Some commenters, including dealership associations, requested that the Commission clarify how dealers could document compliance with these proposed provisions, such as how dealers could establish that appropriate disclosures had been made. One such commenter, for instance, asked whether written agreements required by State law were sufficient to satisfy the requirements of these provisions. As noted elsewhere in this paragraph-by-paragraph analysis of § 463.3 in SBP III.C.2, these provisions do not require any particular affirmative disclosures, instead obligating dealers to refrain from

---

[207] Complaint ¶¶ 67–72, *Fed. Trade Comm'n v. Universal City Nissan, Inc.,* No. 2:16–cv–07329 (C.D. Cal. Sept. 29, 2016); *State ex rel. Dewine v.*

*Dads Car Lot Inc.,* No. 13–cv–4036, 2014 BL 468717, at * 1 (Ohio Com. Pl. June 6, 2014) (finding defendant violated State consumer sales practices act by including "spot delivery" document that allowed defendant to keep "all funds on deposit"); Att'y Gen. of 31 States & DC, Comment Letter on Public Roundtables: Protecting Consumers in the Sale and Leasing of Motor Vehicles, Project No. P104811, Submission No. 558507–00112 at 4 (Apr. 13, 2012), *https://www.ftc.gov/sites/default/files/documents/public_comments/public-roundtables-protecting-consumers-sale-and-leasing-motor-vehicles-project-no.p104811-00112/00112-82927.pdf* (recommending, among other rules aimed at deterring yo-yo sales, FTC adopt rules that would require dealers to disclose the consumer's "right to walk away" if financing is rejected and, in the context of spot delivery, to disclose financing has not been finalized as well as the responsibilities and potential consequences for consumers); Legal Aid Just. Ctr., Comment Letter on Public Roundtables: Protecting Consumers in the Sale and Leasing of Motor Vehicles, Project No. P104811, Submission No. 558507–00066 at 26, 29 (Jan. 30, 2012), *https://downloads.regulations.gov/FTC-2022-0036-0062/attachment_2.pdf* (explaining that in a yo-yo sale the dealer misrepresents to the consumer that credit has been finalized, when in fact the dealer treats the sale as contingent, retaining the ability to call off or seize the vehicle later; a "yo-yo case can result in substantial distress to the person who has been tricked"; and "[t]he harm to the marketplace occurs when the consumer believes a credit sale has been completed and stops shopping for a car on credit"); Nat'l Consumer L. Ctr., "In Harm's Way—At Home: Consumer Scams and the Direct Targeting of America's Military and Veterans" 41 (May 2003), *https://filearchive.nclc.org/special_projects/military/report-scams-facing-military.pdf* (listing "Spot Delivery" or "yo-yo sales" among scams commonly aimed at military members).

[208] *See Orkin Exterminating Co., Inc.,* 108 F.T.C. 263 (1986), *aff'd sub nom. Orkin Exterminating Co. v. F.T.C.,* 849 F.2d 1354 (11th Cir. 1988) (finding that defendant's practice of unilaterally raising consumers' annual renewal fees where the consumers' contracts contained a "lifetime guarantee" as to the amount of the fee was unfair under section 5 of the FTC Act); *see also* First Amended Complaint ¶¶ 59–61, *Fed. Trade Comm'n v. BF Labs, Inc.,* No. 4:14–cv–00815 (W.D. Mo. May 14, 2015) (alleging as unfair defendants' practice of unilaterally failing to provide paid-for services while refusing to refund consumers' upfront payments).

[209] Fed. Trade Comm'n, "FTC Policy Statement Regarding Advertising Substantiation," (appended to *In re Thompson Med. Co., Inc.,* 104 F.T.C. 648, 839 (1984)); *Fed. Trade Comm'n v. John Beck Amazing Profits, LLC,* 865 F. Supp. 2d 1052, 1067 (C.D. Cal. 2012).

[210] On May 31, 2023, the Commission received a petition for rulemaking under 16 CFR 1.31 regarding yo-yo financing. Petition for Rulemaking Concerning the Finality of a Car Purchase (Yo-Yo Financing), Doc. No. FTC–2023–0035–0002. The Commission will address this petition separately.

certain misrepresentations. Section 463.6 discusses records dealers need to keep to demonstrate compliance with the requirements of the Final Rule, and enumerates five such categories of records, including copies of finance and lease documents signed by the consumer, whether or not final approval is received for a financing or lease transaction. The Commission declines to include in this Final Rule additional requirements regarding any specific documents dealers must keep in order to demonstrate compliance with § 463.3(h) or (i).

One individual commenter requested that the Commission include in the CFR the examples of harmful conduct related to yo-yo financing that it published in the NPRM.[211] The Commission has determined that each such example describes conduct that violates this rulemaking. Rather than adding them to the text of the Final Rule, the Commission repeats these examples in this paragraph-by-paragraph analysis of § 463.3(h) and (i), in order to avoid voluminous modifications to the Rule text itself.

Commenters including a dealership association asserted that the issue of when a contract is final or binding is one of State law, and thus it is within the purview of each State to determine when a contract is final or binding, arguing that § 463.3(h) therefore should be removed from the Final Rule. Another such commenter contended that even courts experienced in contract interpretation have difficulty determining when an agreement is final, and that dealers therefore are likely to transgress this prohibition in proposed § 463.5(h) accidentally. This provision, however, requires that a dealer's express or implied representations regarding material information be truthful, which is consistent with current law and with the Commission's authority to prohibit unfair or deceptive acts or practices. Moreover, under § 463.9, this Rule does not affect State law pertaining to contracts so long as State law is not inconsistent with part 463, and in the event of an inconsistency, the Rule only affects such State law to the extent of the inconsistency.[212] In the case of

§ 463.3(h), for example, an inconsistency would include State law allowing material misrepresentations regarding whether transactions are final; the Commission is unaware of any such law. Further, to the extent dealers are concerned they may transgress this prohibition because courts have had difficulty interpreting their contracts, then, as they should be doing under current law prohibiting misrepresentations, dealers should carefully consider the net impression they are conveying with the language they use, both in their contracts and in the context in which these contracts are presented, as such language may confuse consumers as well.

Several dealership association commenters claimed that State law already prohibits misrepresentations about spot delivery transactions or otherwise protects consumers in such transactions. One such commenter asserted that Massachusetts law prohibits spot deliveries, and cautioned the FTC not to create uncertainty with its Rule such that one might think spot deliveries are allowed in Massachusetts. Another such commenter asked whether this provision applies in addition to State law or instead of it. Other commenters, including consumer advocacy organizations, asserted that less than half of the States have statutes, regulations, or administrative pronouncements about yo-yo transactions; that there are significant variations in such law from State to State; and that State regulation often does not provide sufficient protections for consumers. As described throughout the paragraph-by-paragraph analysis of § 463.3 in SBP III.C.2, State law may provide more or less specific requirements than those under the Final Rule as long as those requirements are not inconsistent with part 463, and in the event of an inconsistency, the Rule only affects such State law to the extent of the inconsistency. As for any States that prohibit spot delivery, such prohibitions are consistent with the provisions of this Rule. Finally, as to whether additional provisions are warranted to protect consumers, the Commission will continue to monitor the market to make this determination.

Commenters including an industry association contended that the Commission should not take action to disrupt spot delivery transactions to consumers, stating that there may be reasons to keep down payments even when consumers are not permitted to keep the vehicle, or claiming that

although abusive spot deliveries have occurred, they are not a systemic problem in the marketplace. The Commission, however, need not show that abusive spot deliveries are systemic in order to finalize these provisions barring misrepresentations.[213] Further, these misrepresentation prohibitions do not alter requirements under current law prohibiting dealers from making express or implied misrepresentations.

After careful consideration of the recommendations and record, the Commission has determined to finalize paragraphs (h) and (i) of § 463.3 largely as proposed, with the minor modification of capitalizing the defined term "Vehicles" in § 463.3(i). The Commission notes, however, that it has significant concerns about consumer harm due to yo-yo financing and will continue to examine these issues even as it finalizes these prohibitions against certain misrepresentations. Misrepresentations about when the transaction is final or binding on all parties, as well as about keeping down payments or trade-in vehicles, charging fees, or initiating legal process or any action, are likely to affect consumer conduct, including regarding whether to enter into a new transaction with less beneficial terms for the consumer, and are likely to mislead consumers.

**(i) Keeping Cash Down Payments or Trade-In Vehicles, Charging Fees, or Initiating Legal Process or Any Action If a Transaction Is Not Finalized or If the Consumer Does Not Wish To Engage in a Transaction**

Proposed § 463.3(i) is discussed with § 463.3(h).

**(j) Whether or When a Dealer Will Pay Off Some or All of the Financing or Lease on a Consumer's Trade-in Vehicle**

Proposed § 463.3(j) prohibited misrepresentations regarding whether or when a motor vehicle dealer will pay off some or all of the financing or lease on a consumer's trade-in vehicle. The Commission is finalizing paragraph (j) of § 463.3 largely as proposed, with minor modifications—substituting "Dealer" for "Motor Vehicle Dealer" and capitalizing "Vehicle"—to conform with the revised definitions of " 'Covered Motor Vehicle' or 'Vehicle' " and " 'Covered Motor Vehicle Dealer' or 'Dealer' " at § 463.2(e) and (f).

The Commission received several comments in response to this paragraph, including from individual commenters who expressed support for prohibiting dealers from misrepresenting whether they would pay off outstanding balances

---

[211] *See* NPRM at 42020–21. Individual commenter, Doc. No. FTC–2022–0046–9469 at 5–6.

[212] One commenter questioned whether this section would prohibit a dealer from retaining a down payment on a special order vehicle where the customer refuses to take delivery of the vehicle. Comment of Minn. Auto. Dealers Ass'n, Doc. No. FTC–2022–0046–8670 at 10. Sections 463.3(h) and (i) prevent misrepresentations, including misrepresenting that a dealer can keep a down payment when a dealer does not have a legal basis to do so. If the dealer does not make a

misrepresentation, this provision would not be violated.

[213] *See* SBP I.A, n.3.

remaining on a trade-in vehicle.[214] Other commenters, including an industry association and dealership associations, requested that the Commission limit dealer responsibility under this provision for unanticipated delays stemming from circumstances beyond a dealer's reasonable control, arguing that proposed § 463.3(j) made no exception for unanticipated delays such as a previous financing source declining to accept a payoff or refusing to release the vehicle title after receiving a payoff.[215] The Commission notes that, as is the case under current law, under this provision, dealers are not permitted to make claims about whether or when they will pay off some or all of the financing or lease on a consumer's trade-in vehicle if the truth of those claims depends on circumstances outside their control and the dealer does not possess a reasonable basis for such claims.[216]

An individual commenter contended that requiring additional disclosures about this provision would confuse the consumer.[217] This provision, however, does not necessitate any affirmative disclosures from dealers. Instead, it prohibits dealers from misleading consumers about whether or when they will pay off some or all of the financing or lease on a consumer's trade-in vehicle.

One State consumer protection agency commenter requested that the Commission require, in situations where a buyer's credit information or trade-in vehicle are evidently insufficient to support a deal, that the dealer require additional down payment or other security, or affirmatively disclose that the dealer is not responsible for paying off liens.[218] Without further information

on the costs and benefits of such a proposal, the Commission declines to add such requirements to this Final Rule. The Commission notes, however, that the Rule prohibits dealers from misleading consumers regarding when trade-in vehicles have negative equity and from otherwise failing to obtain the consumer's express, informed consent prior to charging the consumer for any item, including any amounts associated with trading in a vehicle. The Commission will continue to monitor this area to determine whether any such additional measures are warranted to protect consumers or competition.

The Commission also received a number of comments from dealership associations arguing that existing State and Federal laws address dealers' obligations in connection with informing consumers how much each consumer is responsible for financing. The Commission notes that commenters presented no actual conflicts between this provision and other laws, and to the extent duplicative laws prohibit misrepresentations in this area, the Commission has not observed harmful consequences to consumers or competition. Further, as noted elsewhere in the section-by-section analysis, State laws may provide more or less specific requirements as long as those requirements are not inconsistent with part 463, under § 463.9, and in the event of an inconsistency, the Rule only affects such State law to the extent of the inconsistency.

After carefully considering the comments, the Commission is finalizing this provision with the two minor modifications to conform with the defined terms " 'Covered Motor Vehicle' or 'Vehicle' " and " 'Covered Motor Vehicle Dealer' or 'Dealer.' " This provision prohibits dealers from making misrepresentations about paying off the financing or lease on a trade-in vehicle. Such conduct includes misrepresenting to consumers who trade in a vehicle that the dealer will pay off any outstanding balance owed on the trade-in vehicle when the consumer purchases a vehicle from the dealer. For example, when such a dealer takes a trade-in, if the dealer remits payment to the entity to whom the trade-in payment is owed, as consumers would expect, but also adds this payment to the amount the consumer owes on the vehicle the consumer is purchasing from the dealer, the consumer is the party that has ultimately paid off the trade-in amount, contrary to the impression made by the dealer. This provision also prohibits dealers that are going out of business from representing expressly or by implication that they will pay off liens

if they do not, in fact, pay off the liens, or do not pay them off in a timely manner. Such misrepresentations are likely to affect a consumer's choice to visit a particular dealership or select a particular vehicle.

(k) Whether Consumer Reviews or Ratings Are Unbiased, Independent, or Ordinary Consumer Reviews or Ratings of the Dealer or the Dealer's Products or Services

Proposed § 463.3(k) prohibited misrepresentations about whether "consumer reviews or ratings are unbiased, independent, or ordinary consumer reviews or ratings of the Dealer or its products or services." Upon careful review and consideration of the comments, the Commission is finalizing paragraph (k) of § 463.3 with one technical clarification to replace "its" with "the Dealer's." The Rule's requirements apply to all individuals and entities that meet the definition of "Dealer."

An individual commenter recommended that the Commission modify this provision to include language explicitly prohibiting dealers from creating, editorializing, modifying, or removing consumer reviews.[219] Here, the Commission notes that if such acts or practices would result in reviews that are not independent or do not otherwise reflect ordinary consumer experience, they already would violate this provision. For example, if a dealer created a positive review, edited or modified negative reviews to make them sound positive, or removed negative reviews while keeping positive reviews, such practices would violate this provision.

A few individual commenters recommended that the Rule include additional provisions related to consumer reviews, including a requirement for the creation of an online database for consumer reviews and complaints about dealerships, and a requirement for dealers to post consumer reviews online and in the dealership location. The Commission notes that while some reviews are available online, additional information could assist consumers, and the Commission will consider whether such

---

[214] *See, e.g.,* Individual commenter, Doc. No. FTC–2022–0046–3770 ("I agree that these changes need to take place. No one should have to pay what was owed on a trade in after the dealership said they would pay off the trade in . . . .").

[215] For example, commenters stated that occasionally the previous finance or lease source will not provide a timely payoff for a traded vehicle or will refuse to accept a payoff claiming more money is due; or a previous finance or lease source may accept a payoff, but will refuse to credit its former customer's account and release the title promptly. In addition, an industry association commenter requested that the Commission narrow this prohibition to specifically address the fact patterns giving rise to it that the Commission sets forth in the NPRM, and, in so doing recognize that it is in a dealer's business interest to pay off the existing loan quickly so that the vehicle can be more easily and quickly retailed.

[216] *See* paragraph-by-paragraph analysis of § 463.3(e) in SBP III.C.2(e) (discussing deception and reasonable basis).

[217] *See* Individual commenter, Doc. No. FTC–2022–0046–7905 at 1.

[218] *See* Comment of State of S.C. Dep't of Consumer Affs., Doc. No. FTC–2022–0046–7891 at 6.

[219] Individual commenter, Doc. No. FTC–2022–0046–2364 ("Many favorable ([*i.e.*] 5 star) Dealer reviews I have read appear suspect with generic, similar wording (or no wording at all) seemingly provided to offset lower Dealer ([*i.e.*] 1 star) ratings. I recommend that for [§ 463.3(k)] the following (or similar) be appended: Additionally, consumer reviews may not be created, editorialized, modified or removed by any Dealer or third party acting at the direction of any Dealer. Consumer reviews should be modifiable or removable by the originating author.").

measures are needed as it continues to monitor the marketplace, including after the Rule goes into effect.

Several dealership associations asked what type or format of reviews or ratings would be covered by this proposed provision. As proposed, § 463.3(k) applied to all reviews or ratings, in any format or wherever displayed, that are likely to mislead consumers as to whether such reviews or ratings are unbiased, independent, or ordinary consumer reviews or ratings. Relatedly, industry and dealership associations contended that the language used in the proposed provision was vague and confusing, and requested that the Commission further define the phrase, "unbiased, independent, or ordinary consumer reviews or ratings." To begin, the operative terms in this phrase are commonly used and understood and may be interpreted according to their plain meaning without further definition. Moreover, the Commission has, for decades, provided information and guidance on avoiding deception through the use of endorsements, testimonials, and online reviews.[220] Enforcement actions by the Commission have documented examples of the types of misrepresentations that would be covered by this provision.[221] For example, dealerships and their employees have posted positive, five-star online reviews that falsely purport to be objective or independent.[222] As these sources make clear, a person who is unbiased, independent, and an ordinary consumer would be someone who was not paid or given something of value to write a review and who has no

employment or familial relationship or other unexpected material connection to the dealership.[223]

An industry association commenter expressed concern that this proposed provision did not appear to be limited to misrepresentations that may occur when a dealership, and not an unrelated third party, affirmatively publishes consumer reviews. To the extent an independent third party that does not have a material connection with the dealership makes any such claims, those claims would not be covered by this provision. This provision concerns situations where there is such a relationship between the third party and the dealer. For example, if a dealer were to pay a third party or consumer to post positive reviews that misrepresent their status as unbiased, independent, or ordinary consumer reviews, the dealer would be violating this provision.[224]

One industry association commenter contended that the Consumer Review Fairness Act[225] already prohibits the conduct covered by this provision. The Consumer Review Fairness Act makes it illegal for businesses to have form contracts that disallow or restrict consumers from posting negative reviews. Section 463.3(k) prohibits misrepresentations regarding the authenticity of consumer reviews generally. These provisions are not in conflict, and as discussed in SBP III.C.1, to the extent the provision creates any duplication, the Commission has seen no harm to consumers or competition from duplicative prohibitions of deceptive conduct.

Whether reviews or ratings about a seller or the seller's products or services are from unbiased, independent, or ordinary consumers is material to consumers' decision-making because a consumer is more likely to interact with a particular dealership if the dealership

has positive reviews or ratings from unbiased, independent, or ordinary consumers. Thus, after careful review of all the comments, the Commission is finalizing paragraph (k) of § 463.3 without substantive modification from the Commission's original proposal.

(l) Whether the Dealer or Any of the Dealer's Personnel or Products or Services Is or Was Affiliated With, Endorsed or Approved by, or Otherwise Associated With the United States Government or Any Federal, State, or Local Government Agency, Unit, or Department, Including the United States Department of Defense or Its Military Departments

Proposed § 463.3(l) prohibited misrepresentations that "the Dealer or any of its personnel or products or services is or was affiliated with, endorsed or approved by, or otherwise associated with the United States government or any Federal, State, or local government agency, unit, or department, including the United States Department of Defense or its Military Departments." Upon careful review and consideration of the comments, the Commission is finalizing paragraph (l) of § 463.3 with one technical clarification to replace "its" with "the Dealer's." The Rule's requirements apply to all individuals and entities that meet the definition of "Dealer."

One individual commenter recommended that the Commission additionally prohibit dealers from "causing any person to impersonate a police officer for any purpose."[226] The commenter contended that such a prohibition would address a common yo-yo financing tactic, wherein dealers exert pressure on consumers to return vehicles by calling the consumers on the phone, falsely claiming to be police officers, and falsely representing that there is a warrant for the consumers' arrest or that the dealer has reported the consumers' vehicles as stolen. The Commission is likewise concerned about such conduct, and notes that it would be covered by the language in this paragraph, which applies broadly to misrepresentations of affiliation with, endorsement or approval by, or association with "any Federal, State, or local government agency, unit, or department," including State or local police officials.[227] By misrepresenting

---

[220] *See, e.g.,* Fed. Trade Comm'n, Notice of Proposed Rulemaking, Trade Regulation Rule on the Use of Consumer Reviews and Testimonials, 88 FR 49364 (July 31, 2023) (to be codified at 16 CFR 465), *https://www.govinfo.gov/content/pkg/FR-2023-07-31/pdf/2023-15581.pdf;* Fed. Trade Comm'n, Guides Concerning Use of Endorsements and Testimonials in Advertising, 16 CFR 255; Fed. Trade Comm'n, "FTC's Endorsement Guides: What People are Asking," *https://www.ftc.gov/business-guidance/resources/ftcs-endorsement-guides-what-people-are-asking;* Fed. Trade Comm'n, "Soliciting and Paying for Online Reviews: A Guide for Marketers," *https://www.ftc.gov/business-guidance/resources/soliciting-paying-online-reviews-guide-marketers;* Fed. Trade Comm'n, "Disclosures 101 for Social Media Influencers," *https://www.ftc.gov/business-guidance/resources/disclosures-101-social-media-influencers.*

[221] *See* Complaint ¶¶ 73–78, *Fed. Trade Comm'n v. Universal City Nissan, Inc.,* No. 2:16-cv-07329 (C.D. Cal. Sept. 29, 2016); *see also* Fed. Trade Comm'n, Notice of Proposed Rulemaking, Trade Regulation Rule on the Use of Consumer Reviews and Testimonials, 88 FR 49364, 49371–75 (July 31, 2023) (to be codified at 16 CFR 465), *https://www.govinfo.gov/content/pkg/FR-2023-07-31/pdf/2023-15581.pdf* (discussing such enforcement actions).

[222] *See* Complaint ¶¶ 73–78, *Fed. Trade Comm'n v. Universal City Nissan, Inc.,* No. 2:16-cv-07329 (C.D. Cal. Sept. 29, 2016).

[223] One commenter conducted a study of Google reviews of U.S. car dealerships from April 2008 to September 2022. The commenter found by examining a 2% sample of these reviews that consumers gave on average 4.47 stars out of 5 stars and made several other conclusions about consumer satisfaction with the auto transaction experience based on that methodology. Comment of Inst. for Regul. Analysis & Engagement, Doc. No. FTC–2022–0046–10164 at 2–5. The Commission notes that, consistent with its enforcement experience, there is no guarantee that those reviews are a genuine reflection of consumer experience. Moreover, the Commission notes that oftentimes consumers do not realize that they have been charged without their authorization. *See* SBP II.B. Thus, such a study that relies on Google star ratings is not conclusive of consumer experience.

[224] *See* § 463.1 ("It is an unfair or deceptive act or practice within the meaning of section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. 45(a)(1)) to violate any applicable provision of this part, directly or indirectly . . . .").

[225] *See* 15 U.S.C. 45b.

[226] Individual commenter, Doc. No. FTC–2022–0046–7445 at 17.

[227] The Commission discussed government impersonation scams in its Notice of Proposed Rulemaking for a Trade Regulation Rule on Impersonation of Government and Business. *See* 87 FR 62741 (Oct. 17, 2022). The Commission observed, *inter alia,* "ongoing widespread fraud

police involvement in potential vehicle repossession, such conduct would also violate paragraph (o) of § 463.3 of the Final Rule.

A number of dealership association commenters contended that some States address this type of deception.[228] As noted in response to similar commenter contentions regarding other proposed provisions, the Commission has seen no harm to consumers or competition from duplicative misrepresentation prohibitions, and overlap between the Commission's Rule provisions and existing law is indicative of dealers' ability to comply with these provisions. Moreover, including such a provision in the Final Rule additionally benefits consumers who encounter such conduct, and aids law-abiding dealers that otherwise lose business to competitors that act unlawfully. Further, § 463.9 discusses part 463's relation to State laws.

A dealership association commenter claimed that many dealerships in the commenter's State work with military personnel to promote charitable causes, and questioned whether a banner listing a dealership at a charitable military event would be considered a misrepresentation that the dealership is "associated" with the military.[229] Here, the Commission notes that a banner that conveys true participation in a charitable military event, and does not deceptively represent an affiliation with, endorsement or approval by, or association with the military, would not violate this provision. The Commission's law enforcement practice provides further guidance on this point: the Commission's many enforcement actions alleging misrepresentation of government affiliation provide examples of the types of conduct that would violate this provision.[230]

Representations about whether a seller or any of its personnel, products, or services is or was affiliated with, endorsed or approved by, or otherwise associated with the government are likely to affect consumers' conduct. Consumers are more likely to visit a dealership and select a vehicle or product if they believe that a specific dealer or a dealer's personnel, products, or services have been approved by a government entity. The Commission thus adopts paragraph (*l*) of § 463.3 without substantive modification from the Commission's original proposal.

(m) Whether Consumers Have Won a Prize or Sweepstakes

Proposed § 463.3(m) prohibited misrepresentations about whether consumers have won a prize or sweepstakes. Upon careful review and consideration of the comments, the Commission is finalizing paragraph (m) of § 463.3 without modification from its original proposal.

Comments from dealership associations contended that some States or municipalities address this type of deception. As discussed in SBP III.C.1, the Commission has not seen harm to consumers or competition from multiple prohibitions against misrepresentations. Furthermore, any significant overlap between the Commission's Rule provisions and existing law is indicative of dealers' ability to comply with these provisions. Finally, § 463.9 discusses part 463's relation to State laws.

Misrepresentations about whether consumers have won a prize or sweepstakes harm consumers by inducing consumers to choose and transact with a particular dealership under false pretenses. Thus, the Commission adopts paragraph (m) of § 463.3 without modification from the Commission's original proposal.

(n) Whether, or Under What Circumstances, a Vehicle May Be Moved, Including Across State Lines or Out of the Country

Proposed § 463.3(n) prohibited misrepresentations regarding whether, or under what circumstances, a vehicle may be moved, including across State lines or out of the country. Upon careful review and consideration of the comments, the Commission is finalizing paragraph (n) of § 463.3 largely as proposed, with the minor modification of capitalizing the word "State," as well as the defined term "Vehicle" to conform with the revised definition at § 463.2(e).

The Commission received comments including from dealership associations arguing that proposed § 463.3(n) would pose issues for dealers who must comply with limitations imposed by manufacturers or distributors on the export of new motor vehicles. These commenters requested clarification about liability under this provision in the event dealers communicate any such export limitations to consumers or take other steps to prevent the export of new vehicles. Section 463.3(n), however, does not prohibit dealers from accurately and non-deceptively communicating whether, or under what circumstances, a vehicle may be moved—it instead prohibits representations that mislead consumers about this information.

Commenters including a dealership association objected to this proposed provision by asserting that a State or insurance company may prescribe, and the parties to a contract may agree upon, whether a leased or purchased vehicle may be driven to a particular area. This provision, however, does not prevent parties from discussing and agreeing to whether a vehicle may be moved. Instead, § 463.3(n) prohibits misrepresentations about whether, or under what circumstances, a vehicle may be moved, including regarding any liens or other restrictions that would prevent or hinder consumers' ability to move the vehicle beyond certain boundaries. Furthermore, interaction with State laws is explained in the section-by-section analysis of § 463.9.

Representations about whether, and under what circumstances, a consumer may move a vehicle are material as they are likely to affect a reasonable consumer's decision to purchase a vehicle, including decisions of military consumers who may frequently need to move.[231]

---

schemes in which scammers impersonate law enforcement or government officials in attempts to extort money or steal personally identifiable information." *See id.* at 62742 (citing announcements on March 7, 2022, and May 20, 2022, by the Federal Bureau of Investigation and the Social Security Administration's Office of the Inspector General, in coordination with other Federal law enforcement agencies, respectively).

[228] One commenter further opined that "the Department of Defense has itself dealt with this situation in the case of military lending and sales." Comment of Kan. Auto. Dealers Ass'n, Doc. No. FTC–2022–0046–4510 at 7.

[229] Comment of N.C. Auto. Dealers Ass'n, Doc. No. FTC–2022–0046–11223 at 9.

[230] *See, e.g.,* Complaint ¶¶ 5–6, 9–11, 14, *Traffic Jam Events, LLC,* No. 9395 (F.T.C. Aug. 7, 2020) (alleging auto marketer misrepresented that it provided COVID–19 stimulus relief to consumers); Complaint ¶¶ 14–26, *Fed. Trade Comm'n v. Ponte Invs., LLC,* No. 1:20–cv–00177 (D.R.I. Apr. 17, 2020) (alleging misrepresentation of government affiliation by company that impersonated the U.S. Small Business Administration with business

names "SBA Loan Program" and "SBA Loan Program.com" and claimed to help businesses obtain access to coronavirus relief programs administered by the agency); Complaint ¶¶ 24–36, *Fed. Trade Comm'n v. DOTAuthority.com, Inc.,* No. 0:16–cv–62186 (S.D. Fla. Sept. 13, 2016) (alleging defendants misrepresented affiliation with U.S. Department of Transportation by claiming to be the "Compliance Unit" of "DOTAuthority" and providing a telephone number with a Washington, DC area code).

[231] *See, e.g.,* Fed. Trade Comm'n, "The Road Ahead: Selling, Financing, & Leasing Motor Vehicles," Public Roundtable, Panel 1: Military Consumers and the Auto Sales and Financing Process, Remarks by Hollister K. "Holly" Petraeus, Dir., Off. of Servicemember Affs., CFPB, Tr. at 11 (Aug. 2, 2011), *https://www.ftc.gov/system/files/documents/public_events/52654/080211_ftc_sess1.pdf* ("[S]ervicemembers don't always realize if they buy and finance a car here in the U.S., they can't take it out of the country unless they have a letter of permission from the lienholder to do so. And some of the lienholders won't give that permission. . . . [W]e [heard from] a JAG in Germany saying, 'I see a number of people who end
Continued

Based on a review of the comments and for the reasons previously discussed, the Commission is finalizing paragraph (n) of § 463.3 largely as proposed, with the minor modification of capitalizing "State" and the defined term "Vehicle."

## (o) Whether, or Under What Circumstances, a Vehicle May Be Repossessed

Proposed § 463.3(o) prohibited misrepresentations regarding whether, or under what circumstances, a vehicle may be repossessed. After careful review and consideration of the comments, the Commission is finalizing paragraph (o) of § 463.3 with the minor modification of capitalizing the defined term "Vehicle" to conform with the revised definition at § 463.2(e).

A number of commenters, including consumer advocacy organizations and a group of State attorneys general, expressed concern about electronic disablement of vehicles, including through the use of starter interrupt devices, which are sometimes utilized for vehicle repossession. Many of these commenters expressed concern about the potential for harm to consumers if such devices are activated without regard to the location or operational state of the vehicle, and recommended that the Commission restrict their use. Alternatively, one such commenter recommended that the Commission add a provision to part 463 that would require dealers to disclose any such technology, obtain the consumer's express, informed consent to its use, and limit its use to one time, not to exceed 30 days, once a consumer is in default. Finally, the comment from a group of State attorneys general recommended that the Commission require additional disclosures any time a starter interrupt device is installed, provide advance notice to consumers prior to activating such devices, and enable consumers to restart their vehicles in emergency or unsafe situations.[232]

The Commission recognizes the potential for abuse with regard to vehicle disablement technology.[233] It is already illegal under section 5 of the FTC Act to engage in deception, including regarding vehicle disablement technology, and to unfairly cause substantial injury to consumers, such as by disabling a vehicle while it is being operated on the highway.[234] This provision will further provide protection for consumers from unfair or deceptive conduct surrounding the repossession of vehicles. Moving forward, the Commission will continue to monitor the motor vehicle marketplace for developments in this area to determine whether additional restrictions are warranted.

A number of dealership association commenters contended that this provision would inhibit dealers from making representations about their lawful rights to repossess vehicles, positing that, upon making any such representations, this provision might require dealers to carry out repossessions without exception or risk violating this provision. This provision, however, does not prevent dealers from providing accurate information to consumers about when a vehicle can, or will, be repossessed. Even where dealers have a lawful right to repossess a vehicle, current law, as well as this provision, prohibit dealers from misrepresenting whether or when they may take such action. Current law, including at the Federal level, imposes some such restrictions in this regard: for example, the Servicemembers Civil Relief Act prohibits repossession of vehicles during a servicemember's period of military service without a court order, as long as the servicemember either placed a deposit for the vehicle or made at least one installment payment on the contract before entering military service.[235] This provision prevents dealers from representing that they may repossess military consumers' vehicles under such circumstances. However, dealers may still accurately and non-deceptively inform a consumer about the circumstances under which a vehicle can be repossessed or when the dealer may take action. In providing consumers with such information, however, dealers must refrain from representing, including by implication, that repossession is likely when in truth it is not.

After considering the comments, the Commission is finalizing paragraph (o) of § 463.3 largely as proposed, with the minor modification of capitalizing the defined term "Vehicle." This provision prohibits dealers from making misrepresentations regarding material information about repossession of a vehicle. Information about whether, or under what circumstances, a vehicle may be repossessed is likely to affect consumers' conduct, including by impacting military consumers' conduct regarding which payments to prioritize while serving our country.

## (p) Any of the Required Disclosures Identified in This Part

Proposed § 463.3(p) prohibited misrepresentations of any of the required disclosures identified in this part. As the Commission noted in its NPRM, this was including but not limited to representations that limit or contradict the required disclosures.[236] Upon careful review and consideration of the comments, the Commission is finalizing paragraph (p) of § 463.3 as proposed.

The Commission received a dealership association comment that contended generally that the proposed prohibited misrepresentations in this provision were already addressed in State statutes and regulations, and asserted that such State measures should suffice given that, according to the commenter, State regulators are more readily available to the public. As discussed in SBP III.C.1, the Commission has seen no harm to consumers or competition from duplicative prohibitions of deceptive conduct, and commenters did not cite State laws that permit misrepresentations or otherwise present a possible conflict with the Rule. Moreover, the Final Rule provides additional remedies that will benefit consumers who encounter conduct that is already illegal under State or Federal law, including by adding a mechanism for the Commission to redress consumers injured by a dealer's violation of the rule, and will assist law-abiding dealers that presently lose business to competitors that act unlawfully. Furthermore, State laws

---

[232] Comment of 18 State Att'ys Gen., Doc. No. FTC–2022–0046–8062 at 13.

[233] See, e.g., Complaint ¶¶ 10–21, CFPB v. USASF Servicing, LLC, No. 1:23-cv-03433–VCM (N.D. Ga. Aug. 2, 2023); Consumer Fin. Prot. Bureau, "Supervisory Highlights: Issue 28, Fall 2022" 6–7 (Nov. 2022), https://files.consumerfinance.gov/f/documents/cfpb_supervisory-highlights_issue-28_2022-11.pdf (finding that, in certain instances, auto servicers engaged in unfair acts or practices by activating vehicle disabling devices in consumers' vehicles when consumers were not past due on payment, contrary to relevant contracts and disclosures, including by causing the devices to sound late payment warning beeps and by preventing consumers from starting their vehicles).

[234] See 15 U.S.C. 45; see also, e.g., Int'l Harvester Co., 104 F.T.C. 949, 1064–67 (1984) (finding that manufacturer's failure to adequately disclose that its tractors had a serious safety hazard constituted unfair conduct, where the hazard caused serious injury to a small number of consumers, consumers could not have reasonably avoided the harm because the respondent did not adequately disclose the serious risk, and the cost of the respondent disclosing the risk was very small in relation to the substantial injury).

[235] See 50 U.S.C. 3952(a).

[236] NPRM at 42022.

may provide more or less specific requirements, as long as those requirements are not inconsistent with part 463, and in the event of an inconsistency, the Rule only affects such State law to the extent of the inconsistency. Accordingly, the Commission adopts this provision without modification from its original proposal.

The Commission hereby determines it is an unfair or deceptive act in violation of the FTC Act for any dealer to make any misrepresentations, expressly or by implication, regarding material information about the subjects set forth in the paragraphs of § 463.3. Such misrepresentations are likely to cause consumers to waste significant time or money beyond what dealers led them to believe would be necessary to purchase or lease a vehicle. Thus, these misrepresentations are material and are likely to cause substantial injury to consumers. This injury is not reasonably avoidable by consumers themselves because information about the truth or falsity of the dealer's misrepresentations is within the control of the dealer, and there are no countervailing benefits to consumers or to competition from the illegal practice of making misrepresentations. Further, these provisions also serve to help prevent dealers from failing to make disclosures required by § 463.4, and from charging for add-ons that provide no benefit and from failing to obtain express, informed consent for charges, as required by § 463.5, including by prohibiting misrepresentations regarding costs and terms.[237] To reflect this, and without changing any substantive requirements for covered entities, the Commission is adding the following sentence to the end of § 463.3, at newly designated paragraph (q): "The requirements in this section also are prescribed for the purpose of preventing the unfair or deceptive acts or practices defined in this part, including those in §§ 463.4 and 463.5." Thus, this Rule requires dealers to refrain from making material misrepresentations about the topics enumerated in § 463.3. The prohibitions contained in § 463.3 help protect consumers from deceptive representations and promote the ability of honest dealers to compete on honest terms.

---

[237] *See* 15 U.S.C. 57a(a)(1)(B) (the Commission "may include requirements prescribed for the purpose of preventing" such unfair or deceptive acts or practices).

## D. § 463.4: Disclosure Requirements

### 1. Overview

The proposed rule included five disclosure requirements for motor vehicle dealers regarding certain pricing and financing information (in proposed § 463.4(a) through (e)). These provisions proposed to require dealers to disclose a vehicle's offering price; an add-on list with each optional add-on for which the dealer charges consumers and the price of each such add-on; that such add-ons are not required and that the consumer can purchase or lease a vehicle without the add-ons; and information about a vehicle's total of payments when making certain representations about monthly payments.

In its NPRM, the Commission specifically requested comments regarding key aspects of the proposed disclosures. In response, various stakeholder groups and individuals provided comments regarding the proposed provisions. In this section, the Commission discusses the comments, responses to the comments, and any changes made to this section based on the comments.

The Commission received many comments in favor of its proposal, including from consumer groups, financial services groups, dealerships and dealership employees, individual consumers, and others. These comments supported the proposed disclosures as addressing bad actors and unlawful practices in the automotive marketplace while promoting transparency, reducing consumer confusion, and refraining from inhibiting consumer choice or materially increasing the time or paperwork required.

A number of such comments, however, urged the Commission to adopt additional disclosures, both in the areas covered by its proposal and elsewhere. Regarding disclosures covered in the proposal, for example, commenters suggested more detailed requirements, including regarding specific disclosure language and specific placement of disclosures. The Commission agrees with commenters that key information affecting pricing, add-ons, and costs must be disclosed clearly and conspicuously to consumers in order to address consumer deception and unauthorized charges during the motor vehicle buying and leasing process. To provide flexibility for dealers and room for disclosures to be made in a manner that is clear and conspicuous to consumers in particular circumstances, however, the Commission declines to include additional prescriptive language about the form of such disclosures. Further,

the Commission emphasizes that, in accordance with the provision being finalized at § 463.3(p), any material misrepresentations regarding the disclosures in the Final Rule violate section 5 of the FTC Act[238] and part 463.

The additional disclosures recommended by commenters included, *inter alia*: a disclosure regarding the installation and use of any electronic disabling devices; a disclosure explaining the fees certain lenders may charge to accept a consumer's loan application; a disclosure of the invoice price, or the price a dealer paid the manufacturer for the vehicle; a disclosure of any potential value gap between a vehicle's price and its appraised value; a disclosure, prior to purchase negotiations, of any potential financing limitations imposed by the dealer; a disclosure of credit characteristics relied upon by the dealer and certain terms; a disclosure that, as with a mortgage loan settlement statement, itemizes all the elements of the sale for car purchases;[239] and disclosure signage in dealership showrooms or on sales desks explaining that add-ons are not required. As for disclosures in additional areas, the Commission recognizes that vehicle purchase and lease transactions are lengthy and document-heavy, and while consumers may benefit from additional information, each additional disclosure requirement could increase the cost to comply with part 463 and would risk crowding out the information in the Commission's proposed disclosures. Accordingly, the Commission has determined not to expand § 463.4 of this Final Rule to include additional disclosures.[240] The Commission will

---

[238] 15 U.S.C. 45.

[239] Comment of Or. Consumer Just., Doc. No. FTC–2022–0046–8492 at 4; *cf.* Individual commenter, Doc. No. FTC–2022–0046–0144 (recommending the disclosed offering price separately list MSRP, markup, all fees, and add-on costs); Comment of Legal Aid Just. Ctr., Doc. No. FTC–2022–0046–7833 at 2 ("[D]ealers should be required to verbally disclose and explain in a language the customer understands the material terms of the contact [sic] (including APR, total number of monthly payments required, etc.) *before* customers sign[] the contract and receive the customers' consent that they understand these terms. After this verbal disclosure, a consent form should be required. This form should be provided in the language preferred by the customer, and should ensure that the customer was provided with accurate and agreed-upon terms prior to signing."); Individual commenter, Doc. No. FTC–2022–0046–1641 ("Mortgage lenders are required to give a borrower a disclosure document prior to closing to show all costs and expenses; car dealers should have to do the same thing.").

[240] In addition to the disclosures noted, a few commenters requested additional provisions to address concerns regarding transparency in pricing,
Continued

continue to monitor the marketplace to evaluate the efficacy and sufficiency of the present disclosures.

In addition, the Commission received a number of comments requesting that it publish forms for the disclosures proposed in this section. These comments requested either that the use of such forms be required or that the Commission provide a "safe harbor" from liability under part 463 for dealerships that utilize them.[241] The Commission did not receive, in the course of public comment, evidence sufficient to conclude that uniform formatting for the delivery of such disclosures would be necessary to make them effective. Nor has the Commission received evidence to establish that mandating use of a particular form disclosure would obviate deceptive and unfair conduct in all circumstances. For example, forms that were required or that provided a "safe harbor" from liability could be presented (1) with other elements that are distracting or confusing, (2) with information that modifies or contradicts the form disclosures, (3) with instructions, discouragement, or time pressure that causes consumers not to review the forms or that makes such review impracticable or impossible, or (4) through the use of forms that are pre-completed in whole or in part, to the extent this makes the information therein easy for consumers to miss. The end result of such an approach would be to enable deception while also making such deception more difficult to detect. Accordingly, the Commission declines to mandate particular disclosure forms as a requirement across all transactions or to shield against liability even where dealers otherwise engage in deceptive or unfair conduct. The Commission also notes that, because it is not mandating particular disclosure forms, dealers that are already complying with the law will avoid additional compliance costs associated with using a new form, and all dealers will have the flexibility to convey the disclosures in a manner that is clear and conspicuous under the

particular circumstances of their transactions.

The Commission also received comments that expressed opposition to this section. Some individual commenters argued that the required disclosures were unduly extensive, prescriptive or untested, or that the substance of these disclosures is already conveyed to consumers before the consummation of the transaction. In response, the Commission stresses that this section is limited in both its scope and its requirements. Each of the disclosures in § 463.4 is focused on one key category of information: vehicle price, add-on optionality, or total of payments. This section requires the clear and conspicuous disclosure of this information but does not include prescriptive requirements. So, for example, a written disclosure would have to be in a size that stands out, but a specific font or font size is not mandated, nor are the specific terms or format used, nor are any particular uses of capitalization, punctuation, ink color, or paper color or size. The proposal refrained from additional formal mandates in order to provide dealers with flexibility, within the bounds of the law, to provide this essential information, including so that dealers already conveying this information in a non-deceptive manner may continue to do so. Accordingly, the Commission also finds that testing of these requirements is unnecessary. Furthermore, each of the disclosure requirements being finalized addresses the unfair or deceptive act or practice of withholding essential information from consumers or presenting such information to them in a deceptive manner. After reviewing comments, including those that contended the proposal was not prescriptive enough, the Commission concludes that this is the correct approach, and as such, has determined not to adopt any additional specifications dictating the form or manner in which the disclosures must be presented to consumers. Here, as elsewhere, the Commission will continue its long track record of working to assist with legal compliance.[242] Further, for dealers

already conveying this information clearly and conspicuously, complying with this provision should not be burdensome.

Other commenters, including an industry association, contended that these disclosures would have the effect of limiting the products and services consumers are offered or otherwise restrict lawful sales practices. In response, the Commission reiterates that this section focuses on one of the most foundational pieces of information regarding the sale of vehicles, add-ons, and financing: their cost. Dealers already providing this information in a non-deceptive manner will need to make minimal, if any, changes to their disclosure practices. The Commission has seen no evidence that disclosing cost information has caused dealers to cease offering products.

Some commenters, including dealership associations, contended that the presence of some State standards in this area makes Federal regulation unnecessary or contradictory. In response, the Commission notes that it drew from several State statutory and regulatory provisions in formulating its proposal, and it observes that the existence and functioning of such standards demonstrates the practicability of such disclosure measures. Dealers can comply with any State laws requiring the same conduct as well as this section. Similarly, to the extent a State requires additional disclosures regarding vehicle price, add-ons, or total of payments, nothing prevents dealers from providing those disclosures as well as those required under § 463.4 so long as the State disclosures are not inconsistent with part 463. To the extent there is truly a conflict between this section and State law, § 463.9 provides that part 463 will govern, but only to the extent of the inconsistency, and only if the State statute, regulation, order, or interpretation affords consumers less protection than does the corresponding provision of part 463. Moreover, a number of States do not have existing standards in the areas covered by this part; in such States, the Commission's disclosures will operate as a key safeguard.

Other commenters, including an industry association, argued that requiring disclosures would increase the time and paperwork for consumers to

including related to interest rates, and that the Rule require dealers to maintain a fiduciary relationship to customers. The Commission recognizes the concerns regarding pricing transparency and deceptive conduct related to pricing, and will continue to monitor such issues, including after this provision (§ 463.4(a), offering price disclosure) and the misrepresentation provisions (§ 463.3) are in effect.

[241] Comment of Nat'l Auto. Dealers Ass'n, Doc. No. FTC–2022–0046–8368 at 104, 122; Comment of Ohio Auto. Dealers Ass'n, Doc. No. FTC–2022–0046–6657 at 6, 9; *see* Comment of Compliance Sys., Doc. No. FTC–2022–0046–7836 at 1.

[242] Each year since FY2002, the Small Business Administration's Office of the National Ombudsman has rated the Federal Trade Commission an "A" on its small business compliance assistance work. *See* U.S. Small Bus. Admin., "National Ombudsman's Annual Reports to Congress," *https://www.sba.gov/document/report—national-ombudsmans-annual-reports-congress* (providing reports from FY2013–FY2020); Letter from Edith Ramirez, Chairwoman, Fed. Trade Comm'n, to Senator David Vitter, Chairman, Comm. on Small Bus. and Entrepreneurship at 1 (Nov. 16, 2015), *https://www.ftc.gov/system/files/documents/*

*reports/federal-trade-commission-rule-compliance-guides-small-businesses-other-small-entities-commission/eighth_section_212_report_to_congress_july_2014-june_2015.pdf* (citing Commission's "A" rating for "Compliance Assistance" by the Nat'l Ombudsman from FY2002–FY–2014).

buy or lease a vehicle. In response, the Commission notes that the section includes requirements for the disclosure of salient, material information early in the process, thus eliminating the time consumers would otherwise spend pursuing misleading offers—time which can then be spent pursuing truthful offers in the absence of deception. These measures will further allow consumers to compare dealerships in advance based on truthful terms; thus, dealerships will earn business based on the actual terms offered, and not lose business to dealers who compete by omitting or hiding actual terms. Moreover, the disclosures required by this section are limited to key information affecting pricing, add-ons, and total of payments, needed to address consumer deception and unauthorized charges during the vehicle-buying and leasing process, and are required to be in writing only where the dealer is responding to written consumer communications or already providing consumers with representations in writing.[243] As explained in detail in the paragraph-by-paragraph analysis of § 463.4(e) in SBP III.D.2(e), in order to avoid any additional written disclosure requirements, the Commission is declining to mandate that its required disclosures be made in writing in every instance.

An industry association commenter argued that the proposed disclosure requirements in § 463.4 of the NPRM violate the First Amendment. This commenter contended that the proposed disclosures constituted compelled speech; that they would be subject to intermediate judicial scrutiny were they to be challenged in court; and that, in the event of such a challenge, the Commission's actions would fail to satisfy that standard of scrutiny, or a less stringent one.

The Commission first addresses the applicable First Amendment standard of review for this rulemaking effort in the event of a judicial challenge. If so challenged, the disclosures in § 463.4 would not be subject to intermediate judicial scrutiny, but instead to the less rigorous review standard set forth in *Zauderer* v. *Office of Disciplinary Counsel,* 471 U.S. 626, 651 (1985). When, as is the case here, a regulation "impose[s] a disclosure requirement rather than an affirmative limitation on speech," and is "directed at *misleading*

commercial speech," *Zauderer* governs.[244]

Under that standard, a commercial speaker's rights "are adequately protected as long as disclosure requirements are reasonably related to the State's interest in preventing deception of consumers."[245] In *Zauderer,* the Court upheld a rule requiring attorneys who advertised on a contingency-fee basis to disclose that clients who did not prevail in litigation might nevertheless be liable for significant costs.[246] The Court found that "the possibility of deception is [] self-evident" when an advertisement discloses only one type of charge (fees) without mentioning another (costs).[247] In upholding the challenged rule as reasonable, the Court emphasized that the rule merely mandated disclosure of "purely factual and uncontroversial information about the terms under which . . . services will be available," and that the "constitutionally protected interest in *not* providing [such] information . . . is minimal."[248]

As in *Zauderer,* § 463.4 requires only "purely factual and uncontroversial information about the terms under which [commercial goods or services] will be available."[249] These material facts include the offering price of the motor vehicle; that add-on products or services are not required and the consumer can purchase or lease the vehicle without the add-on, if true; the total amount the consumer will pay to purchase or lease the vehicle and, if that amount assumes the consumer will provide consideration, the amount of such consideration; and when a lower monthly payment will increase the total amount the consumer will pay to purchase or lease the vehicle. As in *Zauderer,* any "constitutionally protected interest" a motor vehicle dealer might have "in *not* providing [this] factual information . . . is minimal."[250]

Courts applying *Zauderer* have repeatedly affirmed the constitutionality of regulations requiring disclosures of complete information about the cost of a purchase, which are similar to the required disclosures in § 463.4. For example, courts upheld a regulation requiring schools to "disclose the 'total cost' of . . . tuition, fees, books, and

supplies for its programs," finding that this information was "purely factual and uncontroversial."[251] In another instance, a court upheld under *Zauderer* a rule requiring airlines to prominently disclose the "total, final price" of airfare, finding it was "reasonably related to the government's interest in preventing deception of consumers."[252] In yet another case, a court upheld a rule requiring hospitals to disclose their rates to consumers, finding they were "'factual and uncontroversial' and directly relevant to 'the terms under which [hospitals'] services will be available' to consumers."[253] The disclosure provisions the Commission is finalizing in § 463.4, like the provisions upheld in these cases, merely require factual and uncontroversial disclosures to provide consumers with accurate and timely pricing and financing information as they consider motor vehicle purchases and leases.[254]

As discussed, *Zauderer* applies here because § 463.4 would "impose a disclosure requirement rather than an affirmative limitation on speech."[255] The Commission notes, however, that disclosure requirements in § 463.4 likewise would pass muster even if, as the commenter suggested, they were evaluated under the intermediate scrutiny standard formulated in *Central Hudson Gas & Electric Corp.* v. *Public Service Commission of New York,* 447 U.S. 557 (1980), and subsequent cases applying that standard.[256] As an initial matter, *Central Hudson* applies not to *disclosure requirements,* such as those the commenter challenges, but to *affirmative limitations* on speech.[257] The *Central Hudson* test requires restrictions on lawful, non-misleading speech to satisfy three remaining criteria. First, there must be a substantial governmental interest in the restriction; second, the restriction must directly advance that interest; and third, the restriction may not be more

---

[243] *See* § 463.4(a) (stating that Offering Price must be disclosed in writing if the communication with the consumer, or the dealer's response, is in writing); § 463.4(c), (d), (e) (requiring that disclosures be in writing if the dealer's associated representation is in writing).

[244] *Milavetz, Gallop & Milavetz, P.A.* v. *United States,* 559 U.S. 229, 249 (2010) (emphasis original).

[245] *Zauderer* v. *Off. of Disciplinary Couns.,* 471 U.S. 626, 651 (1985).

[246] *Id.* at 652.

[247] *Id.* at 652–53.

[248] *Id.* at 651.

[249] *See id.* at 651.

[250] *Zauderer* v. *Off. of Disciplinary Couns.,* 471 U.S. 626, 651 (1985) (emphasis original).

[251] *Ass'n of Priv. Sector Colls. & Univs.* v. *Duncan,* 110 F. Supp. 3d 176, 199 (D.D.C. 2015), *aff'd,* 640 F. App'x 5 (D.C. Cir. 2016).

[252] *Spirit Airlines, Inc.* v. *U.S. Dep't of Transp.,* 687 F.3d 403, 412–15 (D.C. Cir. 2012) (internal brackets omitted).

[253] *Am. Hosp. Ass'n* v. *Azar,* 983 F.3d 528, 540 (D.C. Cir. 2020) (quoting *Zauderer* v. *Off. of Disciplinary Couns.,* 471 U.S. 626, 650–651 (1985)).

[254] Further, as explained in the paragraph-by-paragraph analysis of § 463.4 in SBP III.D.2, the failure to disclose this information is itself a deceptive or unfair practice.

[255] *Milavetz, Gallop & Milavetz, P.A.* v. *United States,* 559 U.S. 229, 249 (2010).

[256] The commenter attributes the intermediate scrutiny test to *Pagan* v. *Fruchey,* 492 F.3d 766, 771 (6th Cir. 2007), though it was in fact formulated by the Supreme Court in *Central Hudson.*

[257] *Milavetz, Gallop & Milavetz, P.A.* v. *United States,* 559 U.S. 229, 249 (2010).

extensive than necessary to advance the interest.[258] Under the *Central Hudson* test, it is not necessary that "the manner of restriction is absolutely the least severe that will achieve the desired end." [259] Rather, there merely must be a "'fit' between the [restriction's] ends and the means chosen to accomplish those ends—a fit that is not necessarily perfect, but reasonable." [260] In other words, the restriction should be "one whose scope is 'in proportion to the interest served.'" [261]

The disclosure provisions the Commission is finalizing in § 463.4 satisfy these criteria. First, the disclosure provisions serve a substantial governmental interest by requiring motor vehicle dealers to provide accurate terms, and in particular, accurate pricing information, in advertising and sales discussions.[262] As the Supreme Court has made clear, the government's "interest in ensuring the accuracy of commercial information in the marketplace is substantial." [263] And as explained in the paragraph-by-paragraph analysis of § 463.4 in SBP III.D.2, the disclosure requirements set forth there are aimed at ensuring that consumers receive accurate pricing information and other material transaction terms, and that dealers refrain from the unfair or deceptive act or practice of failing to provide this information.[264] The required disclosures directly advance, "fit" reasonably with, and are proportionate to, their intended ends of prohibiting and preventing unfair or deceptive conduct in motor vehicle transactions. They prevent dealers from luring consumers to dealerships with unfair or deceptive advertising tactics, from padding prices with unwanted add-on

products or services, and from misdirecting consumers about the true cost of a vehicle through discussions of monthly payment amounts. The disclosure requirements effectively "impose[] no burden on speech other than requiring [motor vehicle dealers] to disclose the total price consumers will have to pay. This the First Amendment plainly permits." [265]

After careful consideration of the comments, the Commission has determined to finalize the introductory paragraph of § 463.4 and certain of the disclosure requirements included in its NPRM, with some minor textual changes. The introductory paragraph of the NPRM proposed that it would be "a violation of this part and an unfair or deceptive act or practice in violation of section 5 of FTC Act for any Motor Vehicle Dealer to fail to make any disclosure required by this section, Clearly and Conspicuously." The Commission is finalizing this paragraph with the minor textual change of substituting "Federal Trade Commission Act" for "FTC Act" for clarity and conformity with other parts of the Rule. The Commission is also adding the word "Covered" to the defined term "Covered Motor Vehicle Dealer" to conform with the revised definition at § 463.2(f), discussed in SBP III.B.2(f).

The Commission is finalizing the specific disclosure requirements proposed at § 463.4(a), (c), (d), and (e), with modifications noted in the paragraph-by-paragraph analysis in SBP III.D.2(a), III.D.2(c), III.D.2(d), and III.D.2(e).

In the paragraphs that follow, the Commission discusses the disclosure requirements proposed in the NPRM, the comments relating to the specific disclosures, responses to the comments, and the disclosure requirements adopted in § 463.4.

**2. Paragraph-by-Paragraph Analysis of § 463.4**

*(a) Offering Price*

The offering price disclosure provision in proposed § 463.4(a) required dealers to disclose a vehicle's offering price in advertisements that reference a specific vehicle or represent a monetary amount or financing term for any vehicle, as well as upon receipt of a consumer communication about a specific vehicle or any monetary amount or financing term for any vehicle. The Commission proposed defining "Offering Price," in § 463.2(k), as "the full cash price for which a Dealer will sell or finance the motor vehicle to any consumer, excluding only required Government Charges." The Commission also proposed defining the term "Government Charges," then in § 463.2(h), to mean "all fees or charges imposed by a Federal, State or local government agency, unit, or department, including taxes, license and registration costs, inspection or certification costs, and any other such fees or charges." For the reasons discussed in the following paragraphs, the Commission is finalizing the offering price disclosure provision at § 463.4(a), as well as the corresponding "Offering Price" and "Government Charges" definitions in § 463.2 (finalized at § 463.2(k) and (i), respectively), largely as proposed. The Commission is including a modification to the offering price definition to clarify that dealers may, but need not, exclude required government charges from a motor vehicle's offering price, and is substituting "Vehicle" for "motor vehicle" to conform with the revised definition at § 463.2(e), discussed in SBP III.B.2(e). Additionally, the Commission is including a typographical modification to the "Government Charges" definition to include a serial comma for consistency. The Commission also is capitalizing the defined terms "Vehicle" throughout, in its singular, plural, and possessive forms, and is adding language to the end of § 463.4(a)(3)(ii) clarifying that the requirements in § 463.4(a) "also are prescribed for the purpose of preventing the unfair or deceptive acts or practices defined in this part, including those in §§ 463.3(a) and (b) and 463.5(c)."

The Commission received a significant number of comments on its

---

[258] See *Cent. Hudson Gas & Elec. Corp.* v. *Pub. Serv. Comm'n of N.Y.,* 447 U.S. 557, 566 (1980). Although the Supreme Court in *Central Hudson* treated the question whether regulated speech is truthful and non-misleading as one of four criteria, it has alternately treated this question as a threshold inquiry, after which the three remaining criteria are evaluated. See *Fla. Bar* v. *Went For It, Inc.,* 515 U.S. 618, 623–24 (1995). Because the government is "free to prevent the dissemination of commercial speech that is false, deceptive, or misleading," *Zauderer* v. *Off. of Disciplinary Couns.,* 471 U.S. 626, 638 (1985), if a challenged restriction fails this threshold inquiry, *Central Hudson* does not apply.

[259] *Bd. of Trs. of State Univ. of N.Y.* v. *Fox,* 492 U.S. 469, 480 (1989).

[260] *Id.* (citation omitted).

[261] *Id.* (quoting *In re R.M.J.,* 455 U.S. 191, 203 (1982)).

[262] NPRM at 42012.

[263] *Edenfield* v. *Fane,* 507 U.S. 761, 769 (1993).

[264] Nothing could be more directly relevant to accurate pricing than disclosure of the actual price itself. See *Spirit Airlines, Inc.* v. *U.S. Dep't of Transp.,* 687 F.3d 403, 415 (D.C. Cir. 2012) (substantial governmental interest "is clearly and directly advanced by a regulation requiring that the total, final price be" prominently disclosed).

[265] *Id.* Further, the Commission has taken into account prior enforcement work and other initiatives. See NPRM at 42022–25 (explaining rationale behind disclosure requirements and extensively citing prior enforcement experience and record evidence); *see also Lorillard Tobacco Co.* v. *Reilly,* 533 U.S. 525, 555 (2001) ("We do not . . . require that empirical data come accompanied by a surfeit of background information. We have permitted litigants to justify speech restrictions by reference to studies and anecdotes . . . or even . . . based solely on history, consensus, and simple common sense." (internal quotation marks and alterations omitted)); *Fla. Bar* v. *Went For It, Inc.,* 515 U.S. 618, 628, (1995) (same); *Burson* v. *Freeman,* 504 U.S. 191, 211 (1992) (finding speech restrictions justified even under strict scrutiny based on a "long history, a substantial consensus, and simple common sense"); *Milavetz, Gallop & Milavetz, P.A.* v. *United States,* 559 U.S. 229, 251 (2010) ("When the possibility of deception is as self-evident as it is in this case, we need not require the State to conduct a survey of the public before it may determine that the advertisement had a tendency to mislead." (internal quotation marks and alterations omitted)); *Am. Hosp. Ass'n* v. *Azar,* 983 F.3d 528, 540 (D.C. Cir. 2020) (finding reasonable relationship between rule and governmental interests where "the Secretary, relying on complaints from consumers, studies of state initiatives, and analysis of industry practices, reasonably concluded that the rule's disclosure scheme will help the vast majority of consumers").

proposed offering price disclosures. Many commenters supported the Commission's proposal to require dealers to provide uniform, comprehensive, and accurate pricing information. These commenters noted, *inter alia,* that despite laws generally prohibiting unfair or deceptive acts or practices, present market conditions fail to balance the "playing field" of information between consumers and motor vehicle dealers, allowing dealers to take advantage of consumers by hiding information about pricing, imposing surprise price increases, or using pricing advertising tactics that systematically deceive consumers.[266] Many consumers also underscored the need for the proposed disclosure requirements. Commenters in support noted, for instance:

• Buying a car has always been a horrible experience for me. The endless driving to dealerships who advertise vehicles for a sale price only to find that the vehicle does not exist, or the price advertised for the specific vehicle is not what they had posted. The salespersons['] tactics, always attempting to put you in a vehicle based on a car payment, along with dancing around the simple question of the actual out the door price of the vehicle. . . . It is such a shame that the dealerships just do not give the customer the price of the vehicle without them wanting to start a "folder" and take all of your information, a copy of your drivers license, ect [sic] . . . . Please regulate the automobile dealerships, especially now when it seems they are at their worst with these ridiculous add on fees (paint and upholstery protector, ect [sic] which was not added at the manufacturer) along with adjustments on top of the MSRP.[267]

• Buying a car in the US is now akin to what I used to do in the Army: Before going into the dealership, I have to spend hours conducting "intelligence prep of the battlefield" to understand the tactics the dealership's sales and finance & incentives staff will throw at me. . . . It has been made increasingly worse by dealerships that advertise a false price to entice a buyer but "bait-and-switch" with Additional Dealer Mark-Ups (ADM), and bogus fees and charges for supposedly dealer-installed items tha[t] the consumer doesn't want in the first place. . . . Unless the FTC passes this proposed rule, things will get worse before they get better.[268]

• Though I am not usually a fan of adding layers of governmental regulations to what should be a simple transaction, there definitely needs to be a change in what is allowed in the car buying process. . . . As consumers we should not have to spend hours reading tiny print in obscure sections of a website in order to validate a posted price. The price should not be elevated at the last minute in a hidden line item such as a mandatory detailing package or service plan you do not want or need to the tune of thousands of dollars. . . . We should not have to spend hours at a dealer and go through mounds of paperwork with a fine tooth comb in order to simply see the ACTUAL price of the vehicle. It is a ridiculous ploy to confuse people into purchasing things they do not want or need.[269]

• I have been trying to buy a new car for the last two years but with unexpected costs I am not able to have a clear written contract on the car and its pricing. I have contacted several dealers in my area and many of them have issues that prevent me from commited [sic] to buying from them. This ranges from them not being able to give me a written sheet of the cost of the car, fees, ect [sic] showing me how much I will be paying in the end. . . . Most of the dealerships I spoke to would not give me a sales sheet of the vehicle I want to purchase to show me how much I will be paying in total. I would have to put a down payment and just trust them over the phone. If I can't get it in writing it is hard to commit to a down payment I could lose.[270]

• Vehicles are typically the second largest purchase made by people. Given the choices available according to respective needs/wants, purchasing a vehicle should be the same as going to any other mass-market retailer and picking that appliance with a set price. So why do we need to haggle or expend additional intellectual and emotional bandwidth towards ensuring that the transaction is as initially stated? There are instances where I'd rather be back conducting combat operations in Iraq than go through the dealer process, as it incenses me that this corrupt way of doing business is given a free pass. . . . If you are a reputable and honest dealership, then there should be no worry; it will be business as usual.[271]

• Think of us, the car buying public. We are mad as hell. Please start fixing this crooked business model where

nobody even knows what they are supposed to be paying.[272]

• As a consumer, I fully support this new proposed rules update. The dealership experience has been an anxiety provoking event everytime [sic] I attempt to purchase a car. I have multiple friends and family that all report shady practices, bait and switch, and up charging at point of sale during their car buying process. Please pass these regulations![273]

• I am writing in FULL support of the FTC rules and regulations. . . . Buyers deserve to know Out the door prices and not be hassled by nonsensical add-ons for the dealership's benefit. People should feel comfortable and excited to buy their 1st car rather than the dread I feel.[274]

• We find the vehicle we came to see and see a sticker beside the manufacture[r] one with added prices. These typically include car alarms, VIN etching, protection packages, floor mats, market adjustment, etc. We go to purchase the vehicle now and they say that none of these can be removed from the price of the car (even though they advertised them without them at a much lower price). We attempt to negotiate them off and find out their [sic] is an additional addon like reconditioning fee. We fail at getting the price of the vehicle down to the advertised price and leave.[275]

• I have financed all of my cars, and the total cost for the vehicle has always been hidden, either physically or through the dealer trying to move focus onto other numbers such as the monthly payment. Since monthly payments will vary due to credit history, down payments, interest rates, taxes, and more, it is not an effective tool for measuring a deal. $300 a month could be a great deal on one car, and a horrible deal on another. I would greatly benefit from the proposal['']s provision to clearly list and advertise the price of the car without additional add[-]ons. It would greatly reduce the work of finding the right car at the right dealership. In each of the 3 cases, I have gone to multiple dealers, wanting to purchase a specific vehicle on their lot, and walked away because of the hidden

---

[266] *See, e.g.,* Comment of Nat'l Consumer L. Ctr. et al., Doc. No. FTC–2022–0046–7607 at 17–20.

[267] Individual commenter, Doc. No. FTC–2022–0046–6649.

[268] Individual commenter, Doc. No. FTC–2022–0046–6225.

[269] Individual commenter, Doc. No. FTC–2022–0046–6089.

[270] Individual commenter, Doc. No. FTC–2022–0046–6656.

[271] Individual commenter, Doc. No. FTC–2022–0046–5238.

[272] Individual commenter, Doc. No. FTC–2022–0046–5227.

[273] Individual commenter, Doc. No. FTC–2022–0046–5228.

[274] Individual commenter, Doc. No. FTC–2022–0046–5219.

[275] Individual commenter, Doc. No. FTC–2022–0046–0900.

costs being added to the price of the car.[276]

• I work as a salesperson at a local Nissan dealership. . . . Currently, dealerships across the US, including the one I work for, have made the car buying process needlessly confusing, expensive, and frustrating by engaging in false advertising and hidden add-on products. While these practices are very unscrupulous, they are incredibly effective at what they are designed to do: drive revenue for the store. If these regulations are passed, they would certainly take a significant toll on my personal finances. But the longer I work in my position, the more I realize that no one should be allowed to engage in such exploitative conduct in the course of running a business. . . . Good, ethical dealers will not have to make any changes if these rules are put into place. I also happen to know that several of the comments in opposition to the proposed regulations are solicited by dealerships and their management. The dealership group I work for, for example, sent out a company-wide email encouraging employees to post comments on this site in opposition to these rules. But there's no question: The American people want these regulations. They need these regulations. The only ones that don't want them are crooked auto dealerships across the US. It's been far too long that such dealerships have run amuck with underhanded sales practices and deception. I would urge the FTC to stand strong against . . . dealership groups[]or any lobbyists and get these rules passed! I know there will be stiff resistance but it's of the utmost importance to good dealerships, transparent salespeople, and, most importantly, the average American consumer![277]

A number of commenters supported the offering price disclosure requirement and associated definitions; some expressed support while urging additional protections. A number of commenters, including consumer advocacy organizations as well as individual commenters, requested that the Commission require a vehicle's offering price to include additional items, such as charges for add-ons attached to the vehicle when it is offered, and charges for add-ons required by the dealer to be sold with the vehicle; to exclude rebate information, including rebates contingent upon the use of a certain

financing company or upon qualifying for any other rebate; and to prohibit the exclusion of certain charges, including the advertisement of an offering price that factors out a down payment amount.[278]

To begin, the Commission notes that by the terms of the proposed "Offering Price" definition, the only charges a dealer was permitted to exclude from a vehicle's offering price were required *government* charges. Thus, under the proposal, if a dealer were to charge any consumer for a preinstalled add-on, or require any consumer to pay for an add-on to purchase or finance the vehicle, then the charges for such add-ons would be required to be included in the vehicle's offering price.[279] In addition, while the proposed provision did not prevent dealers from presenting consumers with accurate and non-misleading additional information, including terms of limited availability, the required offering price disclosure needed to remain clearly and conspicuously presented to consumers, and could not be based on discounts or rebates that are not available to "any consumer," including rebates contingent upon the use of a certain financing company or upon qualifying for any other rebate. Similarly, under the proposal, if the dealer required a down payment amount to sell or finance the vehicle, the offering price could not factor out such an amount.

With respect to the proposed definition of "Government Charges," which is used in the definition of "Offering Price," a number of consumer advocacy organization commenters contended the definition should be narrow to accomplish the Commission's goal of ensuring that consumers have access to accurate pricing information before they enter a dealership, emphasizing that only charges that are imposed by, and payable to, a government entity should be permitted to be excluded from a vehicle's offering price, and that document fees that some States allow dealers to charge should

not be excluded from the offering price. The Commission notes that, as proposed, the term "Government Charges" is limited to those charges "imposed by a Federal, State or local government agency, unit, or department." The Commission specified in this proposed definition that such charges need be "imposed by" a government entity rather than, for instance, having merely been "authorized by" or "allowed by" such an entity. This language does not reach charges that are authorized by a government entity but not required, since such charges have not been "imposed"[280] by the government. This distinction therefore excludes from the definition of "Government Charges" fees, such as dealership document preparation fees that State or local law does not require consumers to pay. Furthermore, the definition of "Offering Price" at § 463.2(k) permits only "required" government charges to be excluded from a vehicle's offering price. Thus, charges the government does not require consumers to pay, but allows the dealer to charge or to pass along to the consumer, such as document fees, must be included in the disclosed offering price if the dealer requires such charges of any consumer.

Relatedly, an individual commenter suggested that the Commission delete the phrase "inspection or certification costs" from the definition of "Government Charges" in order to avoid confusion about the status of inspection or certification charges that "are NOT imposed by the Government," as well as explicitly state in the definition that the term does "not include dealer document or document processing fees ("doc fees"), or electronic titling and registration fees, which are not imposed by the Government."[281] Regarding the phrase "inspection or certification costs," such costs that are *not* "imposed" by the government are excluded from the definition of "Government Charges," as the plain language makes clear. Similarly, as noted, dealer document or document processing fees and any other fees that are not imposed by the government are excluded from the definition, as the plain language states.

Some commenters, including a group of State attorneys general, likewise recommended that a vehicle's offering price include "anticipated" or

---

[276] Individual commenter, Doc. No. FTC–2022–0046–6490.

[277] Individual commenter, Doc. No. FTC–2022–0046–3693.

[278] A number of these commenters further requested that the term "Offering Price" include additional dealer fees that are known to the dealer at the time they are advertised and imposed by the dealer rather than a government entity. These requests are addressed in the discussion of the Commission's definition of "Government Charges" in SBP III.B.2(i).

[279] If a dealer does not require any consumer to pay for an add-on, current law, as well as provisions in this Rule, require dealers to refrain from deception in this regard. *See, e.g.,* § 463.3(a), (b) (prohibiting material misrepresentations regarding the costs or terms of purchasing, financing, or leasing a vehicle, as well as any costs, limitation, benefit, or any other material aspect of add-ons); § 463.4(c) (requiring disclosures regarding optional add-ons).

[280] *See, e.g., Impose,* Cambridge Advanced Learner's Dictionary & Thesaurus, *https://dictionary.cambridge.org/us/dictionary/english/impose* ("to officially force a rule, tax, punishment, etc. to be obeyed or received").

[281] Individual commenter, Doc. No. FTC–2022–0046–7445 at 15–16.

"estimated" government charges.[282] The Commission agrees that consumers would benefit from knowing this information early on in their shopping experience, and notes that dealers are permitted under this Final Rule to provide additional, truthful information along with a vehicle's offering price. Rather than requiring that anticipated government charges be included in the offering price, the Commission is modifying the definition from its original proposal to make clear that dealers need not exclude any such charges from the offering price. The Commission will evaluate whether the definition, as finalized, as well as its associated disclosure, effectively address deceptive and unfair market conduct, and will consider future modifications as market practices evolve.

Thus, the Commission is finalizing a definition of "Offering Price" that clarifies that dealers may, but need not, exclude required government charges from a vehicle's offering price that meets the requirements of § 463.2(k). In particular, the Commission is finalizing a definition of "Offering Price" that removes the phrase "excluding only" and adds the phrase "provided that the Dealer may exclude only" in its place. The definition also substitutes "Vehicle" for "motor vehicle" to conform with the revised definition of "'Covered Motor Vehicle' or 'Vehicle'" at § 463.2(e), such that the definition reads as follows: "Offering Price means the full cash price for which a Dealer will sell or finance the Vehicle to any consumer, provided that the Dealer may exclude only required Government Charges."

Other commenters, including consumer advocacy organizations, proposed additional requirements to the disclosure at § 463.4(a): prescribing formatting, posting, and presentation requirements for offering price information, such as attaching a written offering price to each vehicle, providing written offering price information in response to consumer communications regardless of whether the communications are written, and requiring offering price to be the most conspicuous piece of information displayed to consumers. Regarding the manner in which the offering price must be presented, the Commission proposed that all disclosures under § 463.4,

including the offering price disclosure, be presented clearly and conspicuously. As previously discussed, the proposed disclosure provisions were directed at addressing unlawful conduct while providing dealers with flexibility to present such disclosures in a manner that is clear and conspicuous to their consumers under the particular circumstances. Thus, the Commission has determined not to adopt further formatting, posting, or presentation requirements for its offering price disclosure.

Some commenters, including consumer advocacy organizations and a consumer protection agency, proposed that the Commission adopt an additional requirement providing that dealers must accept an offer from a buyer of the offering price. In response, the Commission notes that, under its proposal, if a dealer were requiring any consumer to pay a price that was higher than the disclosed offering price, or adding other conditions—such as requiring the use of a particular finance company or the purchase of an add-on—to obtain the vehicle at the offering price, such practices would violate part 463, including the offering price provision, which requires disclosure of the full cash price for which the dealer will sell or finance the vehicle to any consumer,[283] and the related requirement the Commission is finalizing under § 463.3(p), which prohibits misrepresentations regarding the required disclosures in part 463.[284]

An individual commenter proposed that the Commission adopt additional requirements requiring dealers to itemize and disclose each sub-component of the offering price, including any applicable document fee. The Commission notes that it has not been presented with any evidence that the benefits of such additional disclosure requirements outweigh the

costs to consumers and competition. The Commission may consider additional such restrictions or additional guidance in the future, based on stakeholder experience with part 463 and whether it effectively remediates unlawful conduct.

Other individual commenters proposed that the Commission impose limitations on the price of the vehicle—for example, prohibiting dealers from charging more than MSRP for the vehicle—or prohibit or limit particular charges, such as dealer fees, document fees, and destination charges. The Commission notes that several Rule provisions will prohibit hidden charges and deception related to pricing, including § 463.4(a) (offering price disclosure) and § 463.3(a) (prohibition against misrepresenting the costs or terms of purchasing, financing, or leasing a vehicle). Before including additional provisions, the Commission will continue studying the market, including after the Rule is in effect, to determine whether additional steps are needed.

Other commenters opposed the offering price disclosure and related definitions. Commenters including an industry association contended that, by defining "Offering Price" in § 463.2(k) as the price "for which a Dealer will sell or finance the motor vehicle to any consumer," the Commission would prohibit dealers from changing vehicle prices as market conditions change, thereby making vehicle pricing less dynamic than under current industry practice.

Section 463.4 and the offering price definition in § 463.2(k), however, do not alter the current status quo on pricing accuracy or pricing changes. Consistent with the law, the offering price—as with a presently advertised price—must be truthful and non-misleading. If the offering price is only available for a certain period of time, the advertisement must convey that fact clearly and conspicuously, and if it is no longer available, the dealer must cease advertising the offering price.[285]

Some commenters expressed a related concern that the Commission's offering price disclosure requirement could require dealers to change their practices when an advertised vehicle is no longer available. For example, one industry commenter asked whether, under such circumstances, a dealer would somehow be obligated to sell some other vehicle

---

[282] *See, e.g.,* Comment of 18 State Att'ys Gen., Doc. No. FTC–2022–0046–8062 at 7; Comment of Consumer Att'ys & Advocs., Doc. No. FTC–2022–0046–7695 at 2–3 (requesting that the vehicle's offering price include "an estimate of government fees and charges such as sales tax and registration based on the dealer's location").

[283] *See* § 463.2(k) (defining "Offering Price" as "the full cash price for which a Dealer will sell or finance the Vehicle to any consumer, provided that the Dealer may exclude only required Government Charges").

[284] Some commenters described situations in which a dealer may decline to sell or finance a vehicle to a particular consumer, including due to legal requirements, irrespective of whether the dealer otherwise intends to honor its offering price disclosures. These situations include, for example, a consumer who presented identity theft indicia under the Commission's Red Flags Rule, 16 CFR 681; a consumer on the Specially Designated Nationals List maintained by the Office of Foreign Assets Control; a consumer who cannot produce the required proof of insurance or license to complete the transaction; or a consumer who is abusive or violent at the dealership. The Commission's offering price provision is a pricing disclosure; it will not otherwise alter the status quo on whether a given sale or financing transaction must be consummated.

[285] As is the case under current law, under part 463, any qualifying information necessary to prevent deception regarding a material fact must be conveyed clearly and conspicuously. *See* FTC Policy Statement on Deception, *supra* note 42, at 1 n.4, 4.

to that consumer at the offering price. Here, the offering price disclosure requirement does not alter the status quo: Under § 463.4(a), as under current law, if an offer is limited to a particular period of time, the offer must convey that fact, and once a price is no longer available, the dealer must cease advertising that price. Regarding which vehicles to sell at an advertised offering price, under the Commission's proposal, the dealer must disclose the offering price for the vehicles advertised. If the dealer charges a different price, then the dealer has not disclosed the offering price for which the dealer will sell or finance the vehicle, and the dealer has misrepresented the price of the vehicle, in violation of several provisions, including §§ 463.3(b) and (p) and 463.4(a). For example, if a dealer conveys that all vehicles of a certain nature or in a certain category are available at a particular offering price, but charges a higher offering price for any vehicle of that nature or in that category, the dealer has violated the Rule.

Other comments, including from a member of Congress and from dealership associations, raised concerns that the Commission's proposal would limit dealers from advertising rebates, discounts, or incentives of limited availability, including when qualifications for such rebates, discounts, or incentives are identified in the advertising, further contending that such a result would contradict prior FTC practice. Relatedly, commenters including an industry association questioned whether the Commission's proposal prohibited dealers from advertising additional vehicle prices, contending that such a result would conflict with the longstanding obligation under Federal law to disclose a vehicle's Manufacturer's Suggested Retail Price, or MSRP. The Commission notes, however, that the offering price disclosure requirement does not prevent dealers from presenting accurate and non-misleading additional information, including terms of limited availability, so long as the required offering price disclosure remains clearly and conspicuously presented to consumers.[286] If, however, a dealer's

disclosure were to give consumers a net pricing impression that is contrary to that which is actually available, then the disclosure would violate § 463.4(a), and the related requirement under § 463.3(p).[287]

Some commenters, including dealership associations, generally concluded the Commission's proposed offering price definition, or its associated disclosure provision, were unnecessary, confusing, burdensome, or likely to hinder comparison shopping. Some commenters, for instance, contended that their respective States already prohibit misrepresenting price terms, rendering the Commission's proposal redundant. The Commission notes, however, that a simple disclosure of the offering price, using the same definition across States, addresses multiple issues, including: the promotion of prices based on dealer discounts, rebates, or other price reductions when such benefits are in fact subject to hidden or undisclosed restrictions that render them unavailable to typical customers; the concealment or omission of additional dealer charges, such as for document preparation fees, amounting to several hundred dollars; the advertisement of a price without disclosing material limitations or additional charges required by the dealer that are fixed and thus can be readily included in the price at the outset; and the inducement to pursue pricing offers that are not actually available or to pay more for a vehicle due to inadequate or nonexistent disclosures. Moreover, this disclosure and the associated definitions should produce the corollary benefit of increasing price competition among dealers, who will be able to compete on truthful, standard terms.[288] The Commission also concludes that the claim that its offering price disclosure requirement would limit comparison shopping appears to follow from the mistaken notion that the offering price

disclosure prohibits dealerships from conveying accurate additional information to consumers, including information about rebates, discounts, or other limited-availability incentives.

Relatedly, some dealership association commenters contended there are areas of overlap, or potential conflict, with State law. Pursuant to § 463.9 of part 463, where it is possible for dealers to comply with both State law and the provisions of this regulation, or where State law affords greater consumer protection, part 463 will not displace existing State pricing or disclosure regimes. This addresses many of the commenters' concerns about State law. Some dealership associations, for instance, contend that their respective States require dealers to separately disclose a dealer document fee and not represent that the fee is required by the State, or that they allow dealers, with certain limitations, to incorporate rebates into an advertised price. Regarding document fees, dealers can simultaneously comply with part 463, which requires document fees to be included in the offering price unless they are "required" government charges, and with State law that permits but does not require document fees to be excluded from a vehicle's advertised price, or that requires disclosure of the amount of the document fee and that such a fee is not required by the State, by disclosing the offering price and any additional State-required information, such as the amount of the dealer document fee. Similarly, regarding rebates, in addition to the offering price, dealers may provide consumers with additional pricing information, including regarding rebates or other incentive pricing, so long as the offering price remains clear and conspicuous, and any additional information is truthful and non-misleading and otherwise complies with part 463 and existing law.

Another dealership association commenter urged the Commission to consider using an existing definition, including a State-law definition of "sales price" or the definition of "cash price" under the Truth in Lending Act's Regulation Z, in lieu of its proposed offering price definition.[289] The Commission notes that its offering price definition overlaps substantially with the commenter's suggested State-law "sales price" definition, which, according to the commenter, requires that a vehicle's advertised price be one at which "the dealer must be willing to sell the motor vehicle . . . to any retail

---

[286] A number of dealership associations expressed a related concern that the Commission, through its offering price proposal, was somehow seeking to restrict competition between dealers to being only about the price of vehicles. The associations described other areas, beyond vehicle price, by which dealerships currently distinguish themselves (*e.g.,* their range of products and services; their service availability; the convenience of their locations; and the nature of their sales staffing and process). In response, the Commission notes that it has long recognized the importance of protecting

competition across both price and quality metrics, including providing consumers with truthful, nondeceptive advertising. *See, e.g., Cal. Dental Ass'n v. Fed. Trade Comm'n,* 526 U.S. 756, 766–68 (1999) (affirming Commission exercise of law enforcement authority against industry guidelines that unlawfully restricted both price advertising and advertising relating to the quality of dental services). As noted, the offering price disclosure requirement does not prevent dealers from presenting accurate and non-misleading additional information, including information about any such distinguishing characteristics, so long as the offering price is presented clearly and conspicuously.

[287] For reference, § 463.3(p), which the Commission is finalizing, *see* SBP III.C.2(p), prohibits dealers from making material misrepresentations regarding "[a]ny of the required disclosures" under the Final Rule.

[288] *See* NPRM at 42023.

[289] Comment of Tex. Auto. Dealers Ass'n, Doc. No. FTC–2022–0046–8102 at 29–30.

buyer''; which ''must'' include certain additional charges that are fixed and thus can be readily included in the price at the outset, including ''[d]estination and dealer preparation charges''; and which permits only certain categories of costs and charges to be excluded.[290] Based on the commenter's description, unlike the Commission's definition, this State-law definition permits the exclusion of fees ''allowed'' by law or those which the law has ''prescribed.'' [291] Again, the Rule permits only charges that the government *requires* the consumer to pay to be excluded from a vehicle's offering price, by defining ''Offering Price'' to allow only ''required Government Charges'' to be excluded. This difference from the State law described by the commenter, however, creates no conflict—a dealer governed by that State law will be able to comply with both requirements by disclosing an offering price that excludes only required government charges and includes allowable government charges.

Similarly, commenters have not demonstrated any actual conflicts between the proposed offering price definition and TILA's definition of ''cash price.'' [292] Dealers can comply with both requirements by disclosing an offering price that excludes only required government charges. And the Rule's definition addresses specific unfair and deceptive conduct in the auto marketplace. Were offering prices to exclude additional categories, the resulting disclosure provision at § 463.4(a) would permit dealers to lure consumers to dealership lots based on a price that is not actually the price the dealer would require the consumer to pay, a result that would require consumers to spend time traveling to the dealership and time on the lot to attempt to discover the true price, and that would place dealerships that choose to advertise the price truthfully at a competitive disadvantage.

Relatedly, commenters including an industry association contended that no additional regulation of pricing or credit and lease advertising was necessary beyond that provided by existing practice or by the Truth in Lending Act, the Consumer Leasing Act, and their implementing Regulations Z and M, and relatedly, that the Commission's offering price disclosure requirement duplicated, modified, or ignored such existing law. The disclosure

requirement, however, is consistent with these existing legal obligations and does not disturb them; dealers can and should make the disclosures required under TILA and other laws as well as the offering price disclosure required by the Final Rule. The provision requires dealers to disclose simple and highly material pricing information under certain circumstances.[293] Providing consumers with accurate and timely pricing and financing information is critical, especially in the context of motor vehicle sales.[294]

Several commenters requested modifications to limit or expand the proposed definition of ''Government Charges,'' or clarification regarding this term's application to certain fees. For example, commenters, including a dealership association, urged the Commission to modify this proposed definition to include charges that are ''allowed to be charged but not required or imposed by a Federal, State, or local government agency, unit, or department.'' [295] One such commenter provided the example of certain registration and title charges, which it described as ''not necessarily imposed or mandatory fees'' and for which ''the amount may vary, depending on the county'' and the dealership, and within a governmentally determined range.[296] Regarding registration and title charges, to the extent such charges are required by a government agency, unit, or department, then they fall within the ''Government Charges'' definition as charges ''imposed by'' such agency, unit, or department. If, however, there are title, registration, or other fees, beyond any title and registration fees required by the government, that dealers are allowed, but not required, to charge, such fees do not fall within the ''Government Charges'' definition, and

to the extent a dealer imposes such allowable charges on any consumer, such fees must be included in the offering price. Were the Commission to categorize such allowed, but not required, amounts as ''Government Charges,'' dealers would be allowed to exclude them from a vehicle's offering price but then require consumers to pay them anyway, thereby allowing dealers to lure consumers to their lots based on a price that is not actually the price the dealer would require the consumer to pay—a fact that consumers would not learn until they have spent time traveling to the dealership and time on the lot, if they learn this fact at all.[297] Further, under such circumstances, dealerships that choose to advertise the price truthfully would be at a competitive disadvantage. The Commission therefore declines to finalize the definition with such a modification.

Commenters, including a number of dealership associations, contended there were burdens associated with the Commission's offering price disclosure requirement, claiming it would cause dealers to require documenting every contact with a consumer in which a specific vehicle was mentioned, thereby lengthening the sales process and increasing the recordkeeping burden. Comments regarding recordkeeping requirements, including records that must be created and maintained under this Rule, are addressed in the section-by-section analysis of § 463.6. Here, the Commission notes that accurate pricing communication is already required by law. Section 463.4(a) does not require a complex or lengthy disclosure, is based on similar provisions already in operation in certain States,[298] will operate as a key safeguard in States without such provisions, and, as discussed in the following paragraphs, addresses deceptive and unfair conduct. Further, this offering price requirement will save consumers time when

---

[290] *Id.; see also* 43 Tex. Admin. Code 215.250(a), (b) (2023).

[291] Comment of Tex. Auto. Dealers Ass'n, Doc. No. FTC–2022–0046–8102 at 29–30; *see also* 43 Tex. Admin. Code 215.250(b)(3) (2023).

[292] *See* 12 CFR 226.2(a)(9).

[293] The industry association commenter further contended that this provision would apply to dealers based on whether they have a service department, but this is incorrect, as explained in the analysis of the definition of '' 'Covered Motor Vehicle Dealer' or 'Dealer' '' in SBP III.B.2(f).

[294] *See, e.g.,* Buckle Up, *supra* note 63, at 5 (noting consumer confusion about how the vehicle price they were offered was determined and that consumers did not understand they could negotiate price); *id.* at 9 (observing add-on products or services, which typically increase a vehicle's purchase price, were ''the single greatest area of confusion'' in the study); Att'ys Gen. of 31 States & DC, Comment Letter on Public Roundtables: Protecting Consumers in the Sale and Leasing of Motor Vehicles, Project No. P104811, Submission No. 558507–00112–1 at 5–6 (Apr. 13, 2012), *https:// www.ftc.gov/sites/default/files/documents/public_ comments/public-roundtables-protecting-consumers-sale-and-leasing-motor-vehicles-project-no.p104811-00112/00112-82927.pdf*.

[295] Comment of Tex. Auto. Dealers Ass'n, Doc. No. FTC–2022–0046–8102 at 14.

[296] *Id.*

[297] Indeed, as the Commission also noted in its NPRM, an entity that induces the first contact through false or misleading representation is liable under the FTC Act, regardless of whether the buyer later becomes fully informed. See, *e.g., Resort Car Rental Sys., Inc.* v. *Fed. Trade Comm'n,* 518 F.2d 962, 964 (9th Cir. 1975); *Fed. Trade Comm'n* v. *Gill,* 71 F. Supp. 2d 1030, 1046 (C.D. Cal. 1999), *aff'd,* 265 F.3d 944 (9th Cir. 2001).

[298] For example, California and Wisconsin have similarly enacted laws that make it unlawful for dealerships to advertise a total price without including additional costs to the purchaser outside the mandatory fees such as tax, title, and registration fees. Cal. Veh. Code 11713.1(b), (c) (2023); Wis. Admin. Code. Trans. 139.03(3) (2023). In Louisiana, the advertised price must be the full cash price for which a vehicle will be sold to any and all members of the buying public. La. Admin. Code tit. 46, pt. V, 719 (2023).

shopping for a vehicle by requiring the provision of salient, material information early in the process and eliminating time otherwise spent pursuing misleading offers. For dealers already disclosing accurate pricing information upfront, this provision allows them to compete on an even playing field.

Another industry association commenter contended that, by requiring offering price to be disclosed when an advertisement references a specific vehicle or represents a monetary amount or financing term "by implication," the Commission's disclosure requirement could apply to advertisements that merely list a dealer's website, on which specific vehicles and their prices appear. Under the Commission's proposal, an advertisement that does not expressly reference a specific vehicle or expressly refer to a monetary amount or financing term would not do so "by implication" solely by referring to a website, document, or other destination where such information may otherwise be available, absent evidence that the net impression of a reasonable consumer is that the advertisement implicitly references such terms.[299] The phrasing in the Commission's requirement—"expressly or by implication"—refers to the nature of the claims conveyed by a dealer's advertisement (*i.e.,* whether such claims are made expressly or by implication). For more than three decades, the Commission has explained express and implied claims as follows:

Express claims directly state the representation at issue. Implied claims are any claims that are not express. They range on a continuum from claims that would be "virtually synonymous with an express claim through language that literally says one thing but strongly suggests another to language which relatively few consumers would interpret as making a particular representation."[300]

This same industry association commenter contended that its aforementioned concerns—that the disclosure requirement would prohibit dynamic pricing, and that the requirement would extend to advertisements simply by virtue of their referencing a dealer's website—would together cause dealers to curb their pricing representations in advertising, either by limiting such representations

to a vehicle's MSRP or by factoring out pricing altogether. As previously discussed, these concerns appear to misunderstand either existing legal requirements or the fact that an offering price disclosure would operate consistent with those requirements. The Commission's requirement simply requires dealers to disclose an offering price and does not alter the current status quo on pricing accuracy. To the extent there is a concern that requiring accurate pricing information limits dealers to advertising MSRP or forgoing advertising pricing information altogether, such concerns apply equally under current law—including in States with pricing disclosure requirements that resemble the Commission's offering price disclosure requirement. The Commission, however, has not been presented with evidence suggesting that dealers will not want to distinguish themselves from other dealers on price, and will instead default to advertising a price that is offered by all of their competitors.

Another concern raised by this same industry association commenter was that, by requiring an offering price "in the Dealer's first response" to a consumer communication that references a specific vehicle or a monetary amount or financing term for any vehicle, the requirement would prohibit dealers from explaining the offering price and why it is being provided, and that as a result, consumers may understand the offering price to be non-negotiable. Under § 463.4, however, dealers continue to be permitted to communicate accurate additional information, including the availability of discounts or the dealer's willingness to negotiate, as long as the offering price disclosure remains clear and conspicuous.

The same industry association commenter asserted that mandating the disclosure of the offering price in connection with "any communication with a consumer" would result in excessive and non-responsive disclosures. The commenter provided the example of a consumer who contacts a dealership to ask whether the dealership has "a silver [Ford] F–150 in stock," arguing that the Commission's proposal would require the dealer to respond with offering price information for each of the numerous (in the commenter's example, 40) silver F–150 vehicles the dealer has in stock. To begin, if the entire communication simply asks, "Do you have a silver Ford F–150 in stock?," it does not concern a "specific vehicle"; it concerns a group of vehicles—silver Ford F–150s—and, under § 463.4, the dealer is not required

to disclose an offering price, so long as the dealer's reply does not reference either (1) a specific vehicle or (2) a monetary amount or financing term for *any* vehicle, whether a specific vehicle or a group of vehicles.[301] If, however, the dealer chooses to respond by discussing a specific vehicle—whether by describing that vehicle, referring to a stock or VIN number, or using other means—the dealer is required to disclose the offering price for that specific vehicle. If the dealer chooses to respond by discussing several specific vehicles, the offering price disclosure requirement applies for each such vehicle. Finally, the offering price disclosure requirement applies if the dealer's response references a monetary amount or financing term, such as a down payment or monthly payment amount, for a specific vehicle or a group of vehicles. This requirement applies only to the dealer's first response regarding the specific vehicle. It does not apply to subsequent communications about that specific vehicle.

The failure to disclose a vehicle's offering price in an advertisement or other communication that references a specific vehicle, or a monetary amount or financing term for any vehicle, is likely to cause substantial injury to consumers who waste time and effort pursuing offers that are not actually available or end up paying more for a vehicle than they expected or being subject to hidden charges.

Buying or leasing a vehicle is time-consuming and often the most expensive purchase a consumer makes without knowing the actual price of the product at the outset. Consumers can spend hours driving to a dealership.[302] Once at the dealership, it can then take several hours to days to finalize a transaction [303] before the consumer learns the price of the vehicle. And many consumers never learn the true price at all; part of the finalization process includes signing dense paperwork, where information regarding the price of the vehicle and charges for

---

[299] *See* FTC Policy Statement on Deception, *supra* note 42, at 2, 5 (describing the Commission's "net impression" standard for determining the meaning of an advertisement).

[300] *Kraft, Inc.,* 114 F.T.C. 40, 120 (1991) (quoting *Thompson Med. Co., Inc.,* 104 F.T.C. 648, 788 (1984), *aff'd,* 791 F. 2d 189 (D.C. Cir. 1986), *cert. denied,* 479 U.S. 1086 (1987)).

[301] *See Any* (def. 1), Merriam-Webster.com Dictionary, *https://www.merriam-webster.com/dictionary/any* (defining "any" as "one or some indiscriminately of whatever kind").

[302] *See, e.g.,* Complaint ¶¶ 23–26, *Fed. Trade Comm'n v. N. Am. Auto. Servs., Inc.,* No. 1:22–cv–01690 (N.D. Ill. Mar. 31, 2022) (alleging that many consumers drive hours to dealerships).

[303] *See, e.g.,* Auto Buyer Study, *supra* note 25, at 15 (noting that the purchase transactions in the FTC's qualitative study often took 5 hours or more to complete, with some extending over several days); *Cf.* 2020 Cox Automotive Car Buyer Journey, *supra* note 25, at 6 (reporting average consumer time spent shopping for a vehicle at 14 hours, 53 minutes, including 1 hour, 49 minutes visiting dealerships/sellers).

other items is easily obscured, especially if consumers are not provided with baseline price information around which to anchor the lengthy, dense discussions and process. When consumers are not provided with such price information, they are susceptible to hidden charges such as "junk fees" or unnecessary add-ons that can cost consumers thousands of dollars and significantly increase their overall expense.[304] These hidden charges substantially injure consumers by increasing their total cost as well as their debt burden in the many instances where vehicle purchases are financed.[305]

Moreover, the consumer injury caused by the lack of price information is not reasonably avoidable. The dealer has sole control over pricing information and the timing of when it is provided to consumers. Even if the consumer learns of the price of the vehicle before finalizing the transaction, the consumer has already spent time and effort traveling to the dealer, on the dealership lot, and in the financing office, and for many, the immediate need for the vehicle for work, school, childcare, groceries, medical visits, and other vital household reasons makes it infeasible to start the process anew at a different dealership. Further, during the lengthy vehicle-buying process and in complex, dense paperwork, it is especially easy to hide or alter price information or include hidden charges when consumers are not provided with baseline price information around which to anchor the discussion of vehicles, monetary amounts, or financing terms.[306]

The injury to consumers from a lack of price information is not outweighed by benefits to consumers or competition from withholding this basic information. Instead, upfront information about the offering price protects consumers from lost time and effort, supracompetitive prices, and unexpected charges while increasing price competition among dealers, who should be able to compete on truthful, standard terms. The costs of providing price information—which the dealer determines and can calculate upfront— are minimal for dealers that are already advertising a specific vehicle, monetary amount, or financing term, especially when compared to the injury to consumers.

Thus, the failure to disclose a vehicle's offering price in an advertisement or other communication that references a specific vehicle, or a monetary amount or financing term for any vehicle is an unfair practice.

The Commission notes that § 463.4(a)(1) and (2) affects only dealers that are already advertising about specific vehicles or monetary amounts or financing terms; it does not affect businesses that do not expend funds on advertising specific vehicles, monetary amounts, or financing terms. The Commission will continue to monitor the market to assess whether this approach is sufficient to address the harms associated with a lack of price and charge information. If not, the Commission will revisit whether additional measures are necessary, such as requiring price information in all advertising, requiring total charge estimates, or prohibiting charges for additional items along with a vehicle sale.

Regarding deception, price is one of the most material pieces of information for a consumer in making an informed purchasing decision.[307] Yet, including as illustrated by the Commission's law enforcement efforts, it can be difficult for consumers to uncover the actual price for which a dealer will sell an advertised vehicle until visiting the dealership and spending hours on the

lot. When an advertisement or other communication references a monetary amount or financing term, it is reasonable for a consumer to expect that those amounts and terms are available at other standard terms. If instead, for example, a dealer advertises a low monthly payment based on an unexpectedly long financing term or an unexpectedly high interest rate that results in a higher price than standard terms would have, then the consumer is lured to the dealership based on a misimpression of what they reasonably expect the total price to be.

If a dealer advertises a specific vehicle, it is reasonable for a consumer to expect to learn the true offering price of the vehicle upon visiting the dealership. Consumers are misled when dealers misrepresent or otherwise obscure price information or charge for items beyond the advertised vehicle during the long and complex sales, financing, and leasing process.[308]

If consumers knew that the true price was beyond what was expected or that the prices and charges were for unwanted items, that would likely affect their choice to visit one dealership over another dealership. Thus, misleading consumers about price information is material. *See, e.g., Fed. Trade Comm'n v. Windward Mktg., Inc.,* No. Civ.A. 1:96–CV–615F, 1997 WL 33642380, at *10 (N.D. Ga. Sept. 30, 1997) ("[A]ny representations concerning the price of a product or service are presumptively material." (citing *Removatron Int'l Corp.,* 111 F.T.C. 206, 309 (1988));

---

[304] *See* Nat'l Consumer L. Ctr., "Auto Add-Ons Add Up: How Dealer Discretion Drives Excessive, Arbitrary and Discriminatory Pricing" (2017), *https://www.nclc.org/wp-content/uploads/2022/09/auto_add_on_charts.pdf;* Complaint ¶¶ 25, 27–28, *Fed. Trade Comm'n v. N. Am. Auto. Servs., Inc.,* No. 1:22–cv–01690 (N.D. Ill. Mar. 31, 2022) (alleging defendants charged thousands of consumers hundreds to thousands of dollars each for unauthorized add-ons, totaling in aggregate over $70 million since 2017); Complaint ¶¶ 59, 61, *Fed. Trade Comm'n v. Universal City Nissan, Inc.,* No. 2:16–cv–07329 (C.D. Cal. Sept. 29, 2016) (alleging unauthorized add-on charges costing thousands of dollars).

[305] According to public reports, 81% of new motor vehicle purchases, and nearly 35% of used vehicle purchases, are financed. *See* Melinda Zabritski, Experian Info. Sols., Inc., "Automotive Industry Insights: Finance Market Report Q4 2020" at 4, *https://www.autofinancenews.net/wp-content/uploads/2021/03/2020-Q4-Auto-Finance-News-Industry-Pulse.pdf.*

[306] *See, e.g.,* Complaint ¶¶ 17–19, 44, *Fed. Trade Comm'n v. Liberty Chevrolet, Inc.,* No. 1:20–cv–03945 (S.D.N.Y. May 21, 2020) (dealers inflated the car price on paperwork in the middle of the sale without the consumer's knowledge or authorization, a practice they internally referred to as adding "air money"); Complaint ¶¶ 24–27, *Fed.*

*Trade Comm'n v. N. Am. Auto. Servs., Inc.,* No. 1:22–cv–01690 (N.D. Ill. Mar. 31, 2022) (alleging that defendants buried charges for add-ons in voluminous paperwork, making it difficult to detect).

[307] *See, e.g., Fed. Trade Comm'n v. Windward Mktg., Inc.,* 1997 WL 33642380, at *10 (N.D. Ga. Sept. 30, 1997)) ("[A]ny representations concerning the price of a product or service are presumptively material."); *Thompson Med. Co., Inc.,* 104 F.T.C. 648, 817 (1984); *see also Fed. Trade Comm'n v. Crescent Pub. Group, Inc.,* 129 F. Supp. 2d 311, 321 (S.D.N.Y. 2001) ("Information concerning prices or charges for goods or services is material, as it is 'likely to affect a consumer's choice of or conduct regarding a product.' ").

[308] Consumers who expect particular prices, based on the MSRP or Kelley Blue Book, are also misled when true pricing information is not disclosed upfront. *See, e.g.,* Individual commenter, Doc. No. FTC–2022–0046–1878 ("We ended up having to drive 3 hours to get the [vehicle we] wanted. Upon arriving to pickup the car we were told there was a 4300 increase over MSRP."); Individual commenter, Doc. No. FTC–2022–0046– 1690 ("It was only after five hours at the dealership that we discovered the dealer had added on a $3000 market adjustment and $3100 in other add-ons (nitrogen-filled tires, LoJack, paint protection) to MSRP."). The average transaction price of a new vehicle exceeded the average manufacturer's suggested retail price (MSRP) for twenty consecutive months between 2021 and 2023. *See* Cox Auto., "After Nearly Two Years, New-Vehicle Transaction Prices Fall Below Sticker Price in March, According to New Data from Kelley Blue Book" (Apr. 11, 2023), *https://www.coxautoinc.com/market-insights/kbb-atp-march-2023/; see also* Edmunds, "8 Out of 10 of Car Shoppers Paid Above Sticker Price for New Vehicles in January, According to Edmunds" (Feb. 15, 2022), *https://www.edmunds.com/industry/press/8-out-of-10-of-car-shoppers-paid-above-sticker-price-for-new-vehicles-in-january-according-to-edmunds.html;* iSeeCars, "10 New Cars Priced the Highest Over MSRP, Even as Peak Pricing Eases" (Mar. 19, 2023), *https://www.yourerie.com/news/10-new-cars-priced-the-highest-over-msrp-even-as-peak-pricing-eases/* (finding the average new car price was 8.8% over MSRP).

*Thompson Med. Co., Inc.,* 104 F.T.C. 648, 817 (1984)); *see also Fed. Trade Comm'n* v. *Crescent Pub. Grp., Inc.,* 129 F. Supp. 2d 311, 321 (S.D.N.Y. 2001) ("Information concerning prices or charges for goods or services is material, as it is 'likely to affect a consumer's choice of or conduct regarding a product.' ").[309]

Thus, it is an unfair or deceptive act or practice for dealers to fail to disclose the offering price in an advertisement or other communication that references, expressly or by implication, a specific vehicle or any monetary amount or financing term for any vehicle.

Furthermore, this provision also serves to prevent the misrepresentations prohibited by § 463.3—including misrepresentations regarding costs or add-ons—by requiring consumers to be told the true price of the vehicle in advertisements and other communications. It also helps prevent dealers from failing to obtain the express, informed consent of consumers for charges, as addressed by § 463.5(c).[310] Thus, the Commission is requiring dealers to disclose a vehicle's offering price when advertising or otherwise communicating about a specific vehicle or monetary amount or financing term for any vehicle. This provision allows consumers to compare offers based on the same price terms and to select dealers that truly offer the lowest price rather than dealers that advertise deceptively low prices but charge more. When price information in the market is distorted or concealed—especially in document- and time-intensive vehicle transactions—consumers are unable to effectively differentiate between sellers, and sellers trying to deal honestly with consumers are put at a competitive disadvantage.

For the foregoing reasons, and having considered the comments that it received on this proposed provision, the Commission is finalizing the offering price provision at § 463.4(a) with modifications to capitalize the defined term "Vehicle" in its singular, plural, and possessive forms, to correspond to the revised definition at § 463.2(e), and

to add language clarifying that the provision is also prescribed for the purpose of preventing unfair or deceptive acts or practices defined in this Rule. The Commission is finalizing the corresponding "Offering Price" and "Government Charges" definitions in § 463.2 largely as proposed, with modifications to the "Offering Price" definition to conform with the defined term "Vehicle" and to clarify that dealers may, but need not, exclude required government charges from a vehicle's offering price, and a typographical modification to the "Government Charges" definition to include a serial comma for consistency.

(b) Add-On List

The Commission's proposed add-on list disclosure provision (proposed § 463.4(b)) required the disclosure, both online and at each dealership, of a list of all optional add-ons for which the dealer charges consumers and the price of each such add-on.[311] As proposed, if the price of the add-on varies based on the specifics of the transaction, the add-on list would have to include the range the typical consumer will pay.[312] Due to space constraints, dealer advertisements presented not online but in another format—such as in print, radio, or television—would not be required to include the add-on list, disclosing instead the website, online service, or mobile application where consumers can access the add-on list.[313]

Many commenters, including consumer advocacy organizations, supported the proposal to require dealers to provide consumers with clear, accurate pricing information for add-on products or services altogether in one

list. Some commenters raised concerns that, without significant modification, the Commission's proposal to allow for the disclosure of price range information where the price of an add-on varies based on the specifics of the transaction would allow for significant abuses, including by permitting dealers to disclose ranges so broad they would be meaningless. Such commenters urged the Commission to modify its definition of "Add-on List" to require, where a price range is listed for a given add-on, the add-on list further indicate the low, median, and high prices charged to consumers for each such add-on over the preceding two years; or that the Commission require dealers to create individualized add-on lists for each vehicle sold, containing one fixed, non-negotiable price for each add-on. Relatedly, other commenters, including industry organizations, expressed concerns regarding the add-on list proposal, including that the proposal to allow for price range information was vague or confusing, and that certain aspects of the proposed definition, including the scope of add-ons covered, as well as the requirement to keep such add-on lists updated, would impose extensive economic burdens.

After careful review of the comments, the Commission has determined not to finalize its proposed add-on list provision (proposed § 463.4(b)). Here, the Commission believes its proposal would benefit from further review and refinement. The Commission nevertheless emphasizes that, under existing law, dealers are prohibited from misrepresentations regarding material information about any costs, limitation, benefit, or any other aspect of an add-on, and from charging for add-ons without obtaining the express, informed consent of the consumer—conduct which the Final Rule prohibits as well, including in §§ 463.3(b) and § 463.5(c). The Commission also emphasizes that, in addition to the Rule's prohibitions, industry guidance and effective self-regulatory efforts can serve a role in helping prevent problematic dealer behavior in this area. The Commission will continue to monitor the motor vehicle marketplace for issues pertaining to add-ons and will consider implementing additional measures in the future if it determines such measures are warranted to address deceptive or unfair acts or practices related to add-on products or services.

(c) Add-Ons Not Required

For optional add-on products or services, the Commission's proposed § 463.4(c) required dealers to disclose, when making any representation about

---

[309] Even if some consumers were not misled by the failure to disclose the offering price, to show deception under the FTC Act, "the FTC need not prove that every consumer was injured. The existence of some satisfied customers does not constitute a defense. . . ." *Fed. Trade Comm'n* v. *Amy Travel Serv., Inc.,* 875 F.2d 564, 572 (7th Cir. 1989), *vacated in part on other grounds, Fed. Trade Comm'n* v. *Credit Bureau Ctr., LLC,* 937 F.3d 764 (7th Cir. 2019); *accord Fed. Trade Comm'n* v. *Stefanchik,* 559 F.3d 924, 929 n.12 (9th Cir. 2009).

[310] *See* 15 U.S.C. 57a(a)(1)(B) (the Commission "may include requirements prescribed for the purpose of preventing" unfair or deceptive acts or practices).

[311] To the extent any add-on charges are required by a dealership, and thus are not optional, such charges would have to be included in the offering price, pursuant to §§ 463.2(k) and 463.4(a).

[312] *See* NPRM at 42044 (noting, in the definition of "Add-on List" at proposed § 463.2(b) that "[i]f the Add-on price varies, the disclosure must include the price range the typical consumer will pay instead of the price"); *see also Fed. Trade Comm'n* v. *Five-Star Auto Club, Inc.,* 97 F. Supp. 2d 502, 528 (S.D.N.Y. 2000) ("at the very least it would have been reasonable for consumers to have assumed that the promised rewards were achieved by the typical Five Star participant"); Complaint ¶¶ 28–50, *Fed. Trade Comm'n* v. *Universal City Nissan, Inc.,* No. 2:16–cv–07329 (C.D. Cal. Sept. 29, 2016) (alleging unlawful deception where a dealer's ads list prominent terms not generally available to consumers, including where those terms are subject to various qualifications or restrictions); Complaint ¶¶ 8–10, Progressive Chevrolet Co., No. C–4578 (F.T.C. June 13, 2016) (alleging advertised offer was deceptive because the typical consumer would not qualify for the offer).

[313] Working in tandem, proposed § 463.4(b)(1) and (2) would mean that dealers who engage in advertising and charge for optional add-ons must have a website, online service, or other mobile application by which to disclose an add-on list.

an optional add-on, that the add-on is not required and the consumer can purchase or lease the vehicle without the add-on. For the reasons discussed in the paragraphs that follow, the Commission is finalizing the required disclosure at § 463.4(c) largely as proposed. The Commission is capitalizing the defined term ''Vehicle'' to conform with the definition at § 463.2(e). The Commission also is adding language to the end of § 463.4(c) clarifying that the requirements in § 463.4(c) ''also are prescribed for the purpose of preventing the unfair or deceptive acts or practices defined in this part, including those in §§ 463.3(a) and (b) and 463.5(c).''

A number of commenters, including a group of State attorneys general, supported this proposed requirement, contending that unscrupulous dealers have exploited the vehicle sales process to saddle consumers with unwanted add-on products or services, and that such a disclosure would importantly help consumers avoid discovering these additional charges only after completing the purchase, assenting to them because they believed the add-ons to be required in order to purchase the vehicle, or paying for them unknowingly because they never uncovered the charges. Many individual commenters also stressed the need for add-on disclosure requirements. For example:

• Salesperson such as myself are responsible for selling the car and all aftermarket/add-on products. This has put me in a unique position to see how these proposed regulations would impact automotive sales. I cannot stress enough my support for these new rules. . . . The payments calculated by management include add-ons, but the price of the add-ons and how they affect the payments are not shown. The add-ons ''packed'' in the first payment often include an extended warranty, GAP insurance, tire and wheel protection, an oil change package, a theft recovery device, and sometimes more depending on the situation.[314]

• Car buying is one of the most miserable consumer experiences in existence. Frankly, I'm disappointed that this issue hasn't been addressed decades ago. It's well past time that the deceptive practices that car dealers use to manipulate and take advantage of customers is made illegal. What other business can legally lie about the price of the product that they sell, and slip extra unwanted products into the deal that they don't reveal and won't remove upon request? These practices are

arcane and unfair, especially considering the absurd cost of automobiles today. I wholeheartedly approve of what the proposed rules are attempting to accomplish. Please do not allow a powerful lobbying group to limit or change good legislation that benefits tens of millions of Americans who currently dread the car buying experience for far more reasons than just price.[315]

• . . . I am not against business making a profit, in fact most Americans understand businesses need to make money too, however most dealers will not disclose additional costs to the purchaser until it is time to sign paperwork for purchase. Rather than simply being upfront with what their desired price is and how much they make from the sale rather they are fed lines about ''common practices'', [sic] ''these are normal fees'' or simply not being forthright about additional costs on items only installed on location at the dealerships to drive the price up. Even more insulting is when buyer[s] ask to have options removed from the vehicle dealers stall or flat out refuse to do so.[316]

• It is about time something like this is brought up. This will have no effect on the honest dealers out there. . . . This will really help the consumer. . . . We will be able to compare apples to apples. You won't show up at the dealership with the lowest price only to find out that they have all these other fees that make them the least desirable of the choices. Also, adding stuff like pinstriping for large fees will come to an end. . . . I have no problem with a dealer making money. They are a business and have overhead. I have a problem when they try [to] gloss over everything they are trying to charge you for. This ruling needs to take effect. Anyone posting against it is someone working for a dealer. Like I mentioned before, if you are doing everything on the up and up, not only do you get good reviews and repeat business, but this ruling will not even effect [sic] you.[317]

• I also agree that Enhanced Informed Consent in F & I office is necessary. One

of my cohort was almost coerced into non-equivalent decision-making scenarios in the finance office with their car purchases. The finance officer flat out ask[ed] them, ''did you want the 2 year, 30[,000] mile extended warrant[y], or the 4 year 50[,000] mile extended warranty?'' The wife sat there and asked, ''I'm confused. Do I HAVE to pick one of those?'' Her husband said, ''No, he's trying to trick you into buying one. You don't need any at all.'' They then promptly threatened to walk out and the finance manager came out and did their paperwork without further conflict.[318]

Several commenters offered support while also proposing that the Commission adopt additional measures to further ensure that consumers understand that optional add-ons are not required. One dealership group, for example, commenting in support of disclosures that optional add-ons are not required, recommended that dealers be required to include signage on their websites and in their showrooms or on their sales desks that set out both components of the Commission's proposal: that add-ons are not required, and that consumers may purchase or lease the vehicle without add-ons. Other commenters, including a consumer protection agency and a consumer advocacy organization, suggested that the Commission modify the language in proposed § 463.4(c) to strike the ''if true'' language, asserting that all add-ons should be optional and not required to consummate the sale or lease of a vehicle. At least one individual commenter recommended that the Commission prohibit dealers from pre-installing add-ons.

In response to these comments, the Commission notes that, were it to require signage stating, generally, that add-ons are optional, or to strike the ''if true'' language from this disclosure, it would cause consumers to be presented with information that may not be accurate in all circumstances. Some add-ons might already be installed on the vehicle or otherwise required by the dealer. As explained in SBP III.D.2(a) with regard to § 463.4(a), charges for such add-ons must be included in the vehicle's offering price. In such cases, representing that add-ons are categorically optional would mislead

---

[314] Individual commenter, Doc. No. FTC–2022–0046–3693.

[315] Individual commenter, Doc. No. FTC–2022–0046–5268.

[316] Individual commenter, Doc. No. FTC–2022–0046–1365.

[317] Individual commenter, Doc. No. FTC–2022–0046–9883; *see also* Individual commenter, Doc. No. FTC–2002–0046–9632 (''I was told that GAP insurance was required to be included. . . . I [later] contacted and asked for copies of my contracts. On September 5 [the dealer] sent me an email with a credit contract attached. I am including it here. It says my monthly payment is over $370. It also shows the cash price as close to $17,000.00. I can also see it says the GAP is optional. I never saw this contract. I never signed this contract.'').

[318] Individual commenter, Doc. No. FTC–2022–0046–6816.

[319] In such cases, however, § 463.4(a) of the Final Rule requires these non-optional add-ons to be included in a vehicle's offering price; if the dealer requires the consumer to pay for them, they are part of the full cash price for which a dealer will sell or finance the vehicle to any consumer. *See* SBP III.D.2(a).

the consumer. Relatedly, by requiring that charges for mandatory items be included in the vehicle's offering price, the Final Rule allows dealers to customize the vehicles they are selling while protecting consumers by requiring dealers to disclose the offering price for such customized vehicles. Accordingly, the Commission declines to prohibit the practice of pre-installing add-ons in this Final Rule, but will continue to monitor the market to determine whether pre-installed add-ons require further regulation. At the same time, the Commission emphasizes that the protections contemplated here and elsewhere in this Final Rule prohibit dealers from obscuring price information and whether an add-on is optional, and further require dealers to obtain the express, informed consent of the consumer to charge a consumer for any add-on.

Additionally, several commenters indicated their support for the Commission's proposal while also recommending that the Commission consider further steps to protect consumers from deceptive or unfair practices pertaining to the inclusion of add-ons in consumer vehicle sales or leases. Some commenters, including a group of State attorneys general and a dealership association, requested that the Commission require dealers to disclose any mandatory add-ons and whether those add-ons are required in order to obtain financing, including by requiring such disclosure in an addendum sticker affixed to the motor vehicle. In response, the Commission notes that other provisions of the Final Rule prohibit misconduct in this area, including by requiring, at § 463.4(a), that charges for such add-ons must be included in the vehicle's offering price. While consumers may benefit from repeated or additional disclosures, each additional disclosure requirement would increase both the cost to comply with the regulation and the risk of crowding out other important information. Given these risks, the Commission declines to include additional requirements regarding the content or form of its add-on disclosure at § 463.4(c). The Commission will continue to monitor the market to gather additional information on this issue and will consider whether to modify or expand this or other sections in the future based on stakeholder experience with this provision and whether it effectively halts unlawful conduct.

Other commenters, including consumer advocacy organizations and consumer attorneys and advocates, urged the Commission to adopt a thirty-day "cooling-off" period for the sale of

vehicle-related add-ons, similar to that required by the Commission for door-to-door and other off-premises sales,[320] which would grant consumers time to review the paperwork after the transaction, and to cancel unexpected or otherwise unwanted add-ons for a full refund. As explained in greater detail in the discussion of § 463.5(c), in SBP III.E.2(c), the Commission also has determined not to include in this Final Rule a "cooling-off" period in which add-on products or services may be canceled. In this regard, the Commission would benefit from additional information, including the length of time needed for such "cooling off" rights to be effective. The Commission may consider revisiting this decision in the future based on actual stakeholder experience with the provisions of the Final Rule and whether they effectively halt unlawful conduct.

Other commenters presented questions or critiques regarding this proposed disclosure. As with the Commission's proposed disclosures generally, some commenters, including an industry association and a dealership association, contended that existing requirements in a number of States to disclose that add-ons are optional make Federal regulation in this area unnecessary or contradictory. As described in detail in SBP III.D.1, the Commission first observes that the functioning of such standards demonstrates the practicability of its proposed disclosure that add-ons are not required. To the extent a State requires additional disclosures regarding add-ons, nothing prevents dealers from providing those disclosures as well as those required under part 463 so long as the State disclosures are not inconsistent with those required under part 463. To the extent there is truly an inconsistency between this part and State law, § 463.9 provides that part 463 will govern, but only to the extent of the inconsistency, and only if the State statute, regulation, order, or interpretation affords consumers less protection than does the corresponding provision of this part. Finally, a number of States do not have existing standards in this area; in such States, the Commission's disclosures operate as a key safeguard.

Commenters, including dealership associations, argued that dealers would develop and use an additional form to demonstrate compliance with this disclosure requirement, thereby

burdening the vehicle sales and delivery process. The Commission begins by noting that any such steps are not required by part 463; on the contrary, the Commission structured this disclosure to provide dealers with flexibility, within the bounds of the law, to provide this essential information in a manner that is clear and conspicuous under the particular circumstances of their transactions. This requirement does not require a complex or lengthy disclosure, is based on similar provisions already in operation in certain States,[321] and for dealers already disclosing accurate add-on information, this provision requires no significant additional burden.

When making a representation about an add-on product or service, the failure to disclose that the add-on is not required and the consumer can purchase or lease the vehicle without the add-on, if true, is likely to cause substantial injury to consumers who end up paying more for a vehicle sales or lease transaction than they expected by being subject to charges of which they are not aware or which they believe are required because they were never told they could decline the charges.

Absent this information, consumers cannot reasonably avoid the injury of being charged for these products because they are not aware that they have an option to begin with. When consumers are presented with motor vehicle transaction documents that include a variety of charges, it is difficult to detect any charges that are added to the contract beyond those that are required or have been agreed upon, especially in a stack of lengthy, complex, highly technical, and often pre-populated documents, at the close of a long sales, financing or leasing process after an already-lengthy process of selecting the vehicle and negotiating over its price or payment terms. Consumers cannot reasonably avoid charges of which they are unaware, or regarding which they do not know they have a choice.

---

[320] *See* Rule Concerning Cooling-Off Period for Sales Made at Homes or at Certain Other Locations, 16 CFR 429.

[321] *See, e.g.,* California Car Buyer's Bill of Rights, Cal. Civ. Code 2981 (requiring dealers to provide a written list of specified items purchased and their effect on monthly payments, including GAP, theft deterrent devices, and surface protection products); Minn. Stat. 59D.06(b) (requiring any person offering a GAP waiver to disclose that the waiver is not required for a consumer to buy or lease the vehicle); Wash. Rev. Code. 48.160.050(9) (mandating that GAP waivers disclose that "neither the extension of credit, the terms of the credit, nor the terms of the related motor vehicle sale or lease, may be conditioned upon the purchase of the waiver."); La. Stat. Ann. 32:1261(A)(2)(a) (declaring it unlawful for a dealer to require, as a condition of sale and delivery, for a consumer to purchase "special features, appliances, accessories, or equipment not desired or requested by the purchaser.").

The injury to consumers from a lack of information about add-on optionality is not outweighed by benefits to consumers or competition from withholding this basic information. Instead, information about the optional nature of these products or services protects consumers from lost time and effort, supracompetitive transaction costs, and unexpected charges while increasing competition among dealers, who are able to compete on truthful, standard terms. Moreover, the cost of providing this threshold information is minimal, especially when compared to the injury to consumers, and providing such information is consistent with existing industry guidance.[322]

This provision addresses deceptive conduct as well. Throughout the lengthy vehicle sales, financing, or leasing process, dealers often discuss various different charges at various different times. Such charges include charges the government requires the consumers to pay and financing costs. Dealers then often present consumers a total amount to pay that differs from the advertised or sticker price. Given that some additional charges are required, if a dealer also discusses charges for items that are not required, such as optional add-ons, it is reasonable for consumers to believe that charges for such items are required. In the course of a lengthy transaction involving extensive negotiations, dealers can obscure such products and their associated charges in dense paperwork. Moreover, the omitted information is highly material: if consumers knew that a particular optional add-on was not required to purchase the vehicle, it would likely affect their choice about whether to purchase the add-on.[323]

Thus, it is an unfair or deceptive act or practice for dealers to fail to disclose, when making a representation about an add-on product or service, that the add-on is not required and the consumer can purchase or lease the vehicle without the add-on, if true. Further, this provision also serves to prevent the misrepresentations prohibited by § 463.3—including misrepresentations regarding material information about the costs or terms of purchasing, financing, or leasing a vehicle, or about any costs, limitations, benefits, or any other aspect of an add-on—by requiring consumers to be told whether represented add-ons are optional. It also helps prevent dealers from failing to obtain the express, informed consent of the consumer for charges, as addressed by § 463.5(c).[324] Thus, the Commission is requiring dealers to disclose, when making representations about add-ons, that the add-ons are not required and the consumer can purchase or lease the vehicle without the add-ons, if true.

For the foregoing reasons, and having considered all of the comments that it received on this proposal, the Commission is finalizing the required disclosure at § 463.4(c) largely as proposed, with the minor modifications of capitalizing the defined term "Vehicle" and clarifying that the requirements of § 463.4(c) also are "prescribed for the purpose of preventing the unfair or deceptive acts or practices defined in this part, including those in §§ 463.3(a) and (b) and 463.5(c)."

(d) Total of Payments and Consideration for a Financed or Lease Transaction

Section 463.4(d) of the Commission's proposed rule required dealers, when making any representation about a monthly payment for any vehicle, to disclose the total amount the consumer will pay to purchase or lease the vehicle at that monthly payment after making all payments as scheduled. If the total amount disclosed assumes the consumer will provide consideration, the proposed rule required dealers to disclose the amount of consideration to be provided by the consumer. For the reasons discussed in the following paragraphs, the Commission is finalizing the required disclosure at § 463.4(d) largely as proposed. The Commission is capitalizing the defined term "Vehicle" to conform with the definition at § 463.2(e), and making the minor grammatical correction of replacing the semicolon and the word "and" at the end of § 463.4(d)(1) with a period. The Commission also is adding language to the end of § 463.4(d), at newly designated (d)(3), clarifying that the requirements in § 463.4(d) "also are prescribed for the purpose of preventing the unfair or deceptive acts or practices defined in this part, including those in §§ 463.3(a) and 463.5(c)."

A number of commenters, including consumer advocacy organizations, supported this proposed requirement, contending it would provide essential information to the consumer while not contributing to information overload, and noting the information to be disclosed would have been calculated by the dealer in the process of determining the proposed monthly payment. Many individual commenters also stressed the need for the Commission's proposal:

• Small businesses are a cornerstone of our economy. Automotive dealers, like other retailers, deserve to make a reasonable profit in order to maintain their physical plants, to purchase inventory, and to pay their staff. That being said, some auto dealers have for years used misleading and often out-and-out deceptive sales tactics (*i.e.*, lies) to generate sales. . . . Sometimes the unwary consumer may not even realize that the actual price differs from the quoted price, because the automobile finance agent speaks only in terms of monthly payments rather than the total cost. The consumer may not even realize that he or she has been "taken" until a friend with an amortization table runs the numbers.[325]

• At most dealerships, including the one I work at, when a customer asks to see figures on a car after a test drive, management goes out of their way to make sure the customer only sees the monthly payment. The typical numbers presented to the customer initially show the price of the car, the trade-in value, the down payment, and the monthly payment options in bold numbers at the bottom. The payments calculated by management include add-ons, but the price of the add-ons and how they affect the payments are not shown. . . . Compounding this issue of hidden add-ons is that salespeople are instructed to figure out the customer's budget beforehand (*e.g.*, $450 per month). If the monthly payment with the car and add-ons comes out to be less than $450 per month, management will often raise the price of the add-ons to get the payment to $450 or even slightly above.[326]

• I wholeheartedly support the proposed regulation changes for car dealerships and the car buying process.

[322] *See* Nat'l Auto. Dealers Ass'n et al., "Voluntary Protection Products: A Model Dealership Policy" 4 (2019), *https://www.nada.org/regulatory-compliance/voluntary-protection-products-model-dealership-policy* (stating dealerships should "prominently display to customers a poster stating that [add-on products or services] offered by the dealership are optional and are not required to purchase or lease a vehicle or obtain warranty coverage, financing, financing on particular terms, or any other product or service offered by the dealership. . . .").

[323] *See, e.g., Fed. Trade Comm'n. v. Windward Mktg., Inc.*, 1997 WL 33642380, at *10 (N.D. Ga. Sept. 30, 1997)) ("[A]ny representations concerning the price of a product or service are presumptively material."); *Thompson Med. Co., Inc.*, 104 F.T.C. 648, 817 (1984); *see also Fed. Trade Comm'n v. Crescent Pub. Grp., Inc.*, 129 F. Supp. 2d 311, 321 (S.D.N.Y. 2001) ("Information concerning prices or charges for goods or services is material, as it is 'likely to affect a consumer's choice of or conduct regarding a product.'").

[324] *See* 15 U.S.C. 57a(a)(1)(B) (the Commission "may include requirements prescribed for the purpose of preventing" unfair or deceptive acts or practices).

[325] Individual commenter, Doc. No. FTC–2022–0046–1216.

[326] Individual commenter, Doc. No. FTC–2022–0046–3693.

As an average consumer who has bought 3 vehicles with financing and 2 without, I can see the obvious benefit these proposed regulations would have on the car buying process. The vast quantities of paperwork and add [-]ons make it easy for car dealers to switch things around to their benefit. I had one dealership . . . change the term of my auto loan from 72 to 84 months in the middle of reprinting the final sales sheet because of another obvious error in the first copy. In the midst of all the distractions and misdirection going on, [I] didn't notice [']til[l] after the fact. I felt powerless and cheated. . . .[327]

• There is no reason that buying a car has to be a chore and so ambiguous on price. The dealer was also so twisted up on getting me to focus on the monthly payment and not the total price of the car and that is where they were able to sneak the price up. Practices like this are also why people have such a disdain for purchasing a new/used car.[328]

• I have experienced many of the "typical" tactics that one hears about when negotiati[ng] with an automobile dealership, like the salesperson always wanting to talk about the monthly payment and never the actual trade-in price and sales price. . . . I agree that the whole car buying process could be made easier and I see no reasons that any fair and honest car dealership would object to these proposed changes/rules as they, in my estimation are all things that a fair and honest car dealer should be doing anyway. The only car dealers that should be objecting to these new rules should be the unscrupulous dealers.[329]

• When buying a car dealers try to negotiate the monthly payment, so the actual total cost is hidden from the buyer until they get into the "financing office" where all kinds of unexpected add-ons are sprung on the consumer.[330]

• I am trying to buy a new car, from the factory, with no modifications or alterations, is it so much to ask for? The process of figuring out the price of the car is impossible. The sales people are all about the monthly payment, when I asked them what the car price is the answer is always what payment are you looking for.[331]

• They only want to gain the amount you can be "comfortable" on your monthly payment so that they can stretch out the term and hammer you with hidden fees and other expenses you won[']t be able to see right away.[332]

• Dealerships always want you to come in so they can manipulate you into a car you can[']t afford and pay for things you don't need by hiding them in a monthly payment.[333]

• If we had to do our grocery shopping the same way dealers want us to buy a car, most Americans would starve before sunset. "What kind of monthly payment are you looking for in a banana?" is a conversation I should never be forced to have. . . .[334]

One individual commenter requested that the Commission make clear that handwritten negotiation notes made by a dealer would trigger the requirement that this proposed disclosure be made in writing.[335] In response, the Commission affirms that such representations have been made "in writing," [336] and thus, where dealers represent a monthly payment in such notes, this provision requires them to provide the disclosures in § 463.4(d) in writing.

Other commenters, including industry associations and individual commenters, questioned whether the proposal would require a disclosure in every place a monthly payment appears on a dealer's website, or otherwise would be difficult or infeasible given the frequency with which dealers provide consumers with monthly payment information, suggesting that such a requirement could either overwhelm consumers or dissuade dealers from providing monthly payment information, or arguing [337] that the proposal overlapped with other laws such as the Truth in Lending Act or the Consumer Leasing Act. Regarding monthly payment amounts appearing more than once or in multiple places, the Commission notes that, as proposed, this section would require disclosure of the total purchase or lease amount for a vehicle including any assumed consumer-provided consideration, and only when making a representation about the vehicle's monthly payment amount; it would not require a complex or lengthy disclosure. Consumers shop for vehicles and interact with online interfaces, and other advertising in many different ways; thus, it is important for this simple disclosure to accompany a monthly payment representation however a consumer might encounter it. Moreover, the Commission has taken into account existing disclosure obligations.[338] Monthly payment amounts for motor vehicle sales or leases constitute so-called "triggering terms" under the Truth in Lending Act, the Consumer Leasing Act, and their implementing Regulations Z and M. As such, dealers currently providing such information, including on their websites or other online interfaces, are bound by existing laws that require providing consumers with additional terms in a clear and conspicuous way: in the case of vehicle credit transaction offers, this includes the terms of repayment, which reflect the repayment obligations over the full term of the loan; [339] in the case of vehicle lease offers, this includes the number, amounts, and due dates or periods of scheduled payments under the lease.[340] The Commission's disclosure requirement takes into account these existing obligations, requiring, specifically: the total amount the consumer will pay to purchase or lease the vehicle at a represented monthly payment amount including any assumed consumer-provided consideration. Similarly, regarding the feasibility of providing this disclosure as often as dealers provide consumers with monthly payment information: once dealers choose to make a representation about a monthly payment, they are capable of disclosing a total of payments for the consumer based on the same inputs needed to arrive at that voluntary monthly payment representation.

The Commission further notes that, in the event a monthly payment is already being disclosed, the associated total of payment would be calculated with the same financing or leasing estimates used

---

[327] Individual commenter, Doc. No. FTC–2022–0046–5567.

[328] Individual commenter, Doc. No. FTC–2022–0046–2176.

[329] Individual commenter, Doc. No. FTC–2022–0046–4034.

[330] Individual commenter, Doc. No. FTC–2022–0046–4911.

[331] Individual commenter, Doc. No. FTC–2022–0046–5958.

[332] Individual commenter, Doc. No. FTC–2022–0046–8847.

[333] Individual commenter, Doc. No. FTC–2022–0046–6405.

[334] Individual commenter, Doc. No. FTC–2022–0046–3860.

[335] Individual commenter, Doc. No. FTC–2022–0046–9469 at 6–7.

[336] See, e.g., Writing, Black's Law Dictionary (11th ed. 2019) (defining "writing" as "[a]ny intentional recording of words in a visual form, whether in handwriting, printing, typewriting, or any other tangible form that may be viewed or heard with or without mechanical aids."); cf. Fed. R. Evid. 1001(a) (defining "writing" as letters, words, numbers, or their equivalent set down in any form").

[337] These association commenters made these contentions regarding the monthly payment disclosures at both § 463.4(d) and (e). The Commission responds to these contentions in this section.

[338] One industry commenter, in expressing concern that § 463.4(d) and (e) may conflict with Regulations Z and M, questioned whether the FTC coordinated with the Federal Reserve Board. Several Senators similarly questioned whether the FTC consulted with the Federal Reserve Board, CFPB, or other agencies. Although the Commission cannot comment on specific interactions, it coordinates regularly with other Federal agencies, including the Federal Reserve Board and the CFPB.

[339] See 12 CFR 1026.24(b), (d)(2)(ii).

[340] See 12 CFR 1013.7(b), (d)(2)(iii).

to calculate the monthly payment. Dealers already must be prepared to calculate such a total to satisfy their obligations under TILA, the CLA, or their implementing regulations.[341]

Regarding § 463.4(d)'s similarity to existing laws, as discussed previously, this provision is indeed consistent with other laws, and commenters have not indicated how providing truthful information about total payment amounts along with information they already provide about monthly payment amounts would unduly burden them or harm consumers, or how providing such information in writing before providing consumers with the contract, if they are already providing monthly payment information in writing prior to the contract, would do so.

Some dealership associations described certain elements of the proposal as vague or unclear, requesting that the Commission clarify its use of the term "by implication" with regard to a monthly payment, or alternatively, that the Commission omit the terms "any" (as it pertains to "any representation"), "by implication," and "indirectly" from the proposed disclosure provision.[342] Regarding the use of the term "by implication" with regard to a monthly payment, as discussed in the section-by-section analysis of § 463.3 in SBP III.C with respect to the prohibition on express or implied misrepresentations, the Commission notes that such language is consistent with longstanding law, and given that representations can mislead reasonable consumers even without making express claims, the provision could be rendered meaningless without it.[343] Variations of the phrase "expressly

or by implication" appear frequently in existing Commission guides and regulations,[344] and implied claims are treated extensively in the longstanding FTC Policy Statement on Deception, which the Commission issued in 1983 to provide guidance to the public on the

meaning of deception.[345] Furthermore, this language serves to help ensure that dealers may not avoid this disclosure requirement by making only implied reference to monthly payments, including by referring to a monthly payment amount that is not explicitly identified as such, or by referring to a regular periodic payment made on a different installment basis (*e.g.,* a biweekly payment) to indirectly illustrate a consumer's monthly payment obligations.

These same reasons also counsel against deleting the terms "any" and "indirectly" from this proposed disclosure provision. To begin, one dealership association commenter suggested deleting these terms from the regulatory text, but did not explain the nature of its specific concern regarding its use of the term "any," instead claiming generally that the terms with which the commenter took issue were "broad," "vague," and "imprecise." As proposed, the Commission's total payments disclosure would be required when a dealer makes "any representation . . . about a monthly payment for any vehicle." These disclosure circumstances are markedly similar to those under Regulation Z and Regulation M: Regulation Z requires the disclosure of additional payment terms when "any" of a number of terms is set forth, including "[t]he amount of *any* payment";[346] Regulation M similarly requires the disclosure of additional terms when "any" of a number of items is stated, including "[t]he amount of *any* payment."[347] The use of the term "any" is consistent with existing law, and thus is not confusing or impracticable. Furthermore, as with representations made "by implication," the Commission has a longstanding practice of regulating representations made "indirectly" in the same manner as those made directly,[348]

---

[341] As is currently the case under Federal law and the Final Rule, the terms must be the terms available to the typical consumer. *See, e.g., Fed. Trade Comm'n* v. *Five Star Auto Club,* 97 F. Supp. 2d 502, 528 (S.D.N.Y. 2000) ("[A]t the very least it would have been reasonable for consumers to have assumed that the promised rewards were achieved by the typical Five Star participant."). This is consistent with prior FTC enforcement actions. *See, e.g.,* Complaint ¶¶ 48–53, 82–84, *Fed. Trade Comm'n* v. *Universal City Nissan, Inc.,* No. 2:16–cv–07329 (C.D. Cal. Sept. 29, 2016) (alleging unlawful deception where a dealer's advertisements list prominent terms not generally available to consumers, including where those terms are subject to various qualifications or restrictions); Complaint ¶¶ 8–10, *Progressive Chevrolet Co.,* No. C–4578 (F.T.C. June 13, 2016) (alleging advertised offer was deceptive because the typical consumer did not qualify for the offer).

[342] One commenter requested clarification or deletion of "any," "by implication" and "indirectly" from § 463.4(c) and (e) for the same reasons it articulated with regard to § 463.4(d): that the terms are too vague. The explanation provided in the text pertains to these sections as well.

[343] The FTC Policy Statement on Deception and FTC cases make clear that both express and implied claims can be deceptive. *See, e.g., ECM Biofilms,*

*Inc.* v. *Fed. Trade Comm'n,* 851 F.3d 599 (6th Cir. 2017) (affirming Commission's finding that an additive manufacturer's unqualified biodegradability claim conveyed an implied claim that its plastic would completely biodegrade within five years); *POM Wonderful LLC,* Doc. No. C–9344 (F.T.C. Jan. 10, 2013) (Opinion of the Commission), *generally aff'd by POM Wonderful, LLC* v. *Fed. Trade Comm'n,* 777 F.3d 478 (D.C. Cir. 2015) (finding that company's advertisements would reasonably be interpreted by consumers to contain an implied claim that POM products treat, prevent, or reduce the risk of certain health conditions and for some ads that these effects were clinically proven); *Kraft, Inc.* v. *Fed. Trade Comm'n,* 970 F.2d 311 (7th Cir. 1992) (affirming finding of deception where Kraft advertisements juxtaposed references to the milk contained in Kraft singles and the calcium content of the milk, the combination of which implied that each Kraft single contained the same amount of calcium as five ounces of milk). Further, to be considered reasonable, the interpretation or reaction does not have to be the only one; when a seller's representation conveys more than one meaning to reasonable consumers, one of which is false, the seller is liable for the misleading interpretation. *See* FTC Policy Statement on Deception, *supra* note 42, at 3. Further, an interpretation will be presumed reasonable if it is the one the respondent intended to convey. *Id.*

[344] *See, e.g.,* Telemarketing Sales Rule, 16 CFR 310.3(a)(2) (prohibiting "[m]isrepresenting, directly or by implication, in the sale of goods or services" a list of ten categories of material information); 16 CFR 310.2(o) (defining "debt relief service" as any program or service "represented, directly or by implication, to renegotiate, settle, or in any way alter" certain terms); 16 CFR 310.5(a)(2) (requiring telemarketers to keep records of certain prize and prize-recipient information "for prizes that are represented, directly or by implication, to have a value of $25.00 or more"); Business Opportunity Rule, 16 CFR 437.1(c) (defining a "(b)usiness opportunity" as a commercial arrangement in which, among other criteria, "[t]he seller, expressly or by implication, orally or in writing, represents that" it will provide, *inter alia,* business locations, outlets, accounts, or customers); Disclosure Requirements and Prohibitions Concerning Franchising, 16 CFR 436.1(e) (defining "(f)inancial performance representation" as any representation to a prospective franchisee that states, "expressly or by implication, a specific level or range" of sales, income, or profits); Military Credit Monitoring Rule, 16 CFR 609.3(e) (describing as prohibited materials those that "expressly or by implication" represent certain "interfering, detracting, inconsistent, and/or undermining" information); Rules and Regulations Under Fur Products Labeling Act, 16 CFR 301.14 (requiring an "unknown" origin disclosure when "no representations are made directly or by implication" regarding the origin of used furs); 16 CFR 301.18 (regulating the "passing off" of domestic furs as imported by prohibiting labeling, invoicing, or advertising that "represent[s] directly or by implication" that such furs have been imported); 16 CFR 301.43 (regulating the use of deceptive trade or corporate names by prohibiting any "representation which misrepresents directly or by implication" certain information); Power Output Claims for Amplifiers Utilized in Home Entertainment Products, 16 CFR 432.1(a) (defining the regulation's scope when certain amplifier features or characteristics are "represented, either expressly or by implication, in connection with the advertising, sale, or offering for sale").

[345] *See* FTC Policy Statement on Deception, *supra* note 42, at 2.

[346] 12 CFR 1026.24(d) (emphasis added).

[347] 12 CFR 1013.7(d) (emphasis added).

[348] *See, e.g.,* Business Opportunity Rule, 16 CFR 437.6 (prohibiting "any seller, directly or indirectly through a third party" from engaging in certain prohibited practices); Credit Practices Rule, 16 CFR 444.2 (prohibiting as unfair "a lender or retail installment seller directly or indirectly" taking or receiving certain obligations from a consumer); 16 CFR 444.3 (prohibiting as deceptive "a lender or retail installment seller, directly or indirectly" misrepresenting cosigner liability, and prohibiting as unfair "a lender or retail installment seller, directly or indirectly" obligating a cosigner under certain circumstances); 16 CFR 444.4 (prohibiting as unfair the act or practice of "a creditor, directly or indirectly" levying or collecting certain late charges); Telemarketing Sales Rule, 16 CFR 310.3(a)(3) (prohibiting as deceptive the act or practice of "[c]ausing billing information to be submitted for payment, or collecting or attempting

Continued

and it does so to help ensure that its requirements are effective and not easily avoided. The Commission thus declines to modify their usage in § 463.4(d).

Some commenters, including a dealership association, questioned whether the disclosure requirement would require dealers to obtain individuals' consumer reports before providing monthly payment information. In response, the Commission notes that § 463.4(d) does not alter the status quo regarding the information a dealer must have in order to represent a monthly payment amount. As previously discussed, this provision does not require disclosure of a monthly payment; instead, if a dealer chooses to represent a monthly payment amount, § 463.4(d) requires a corresponding disclosure of "the total amount the consumer will pay to purchase or lease the vehicle *at that monthly payment.*" As previously explained in detail, dealers are capable of disclosing a total of payments for the consumer based on such voluntary monthly payment representations. Furthermore, to the extent a dealer may be providing consumers with estimated monthly payment information, the dealer may use the same assumptions used for estimating the monthly payment in order to determine the total of payments. Further, as is required under other law and this Rule, the dealer must refrain from deception, including by avoiding assumptions that the consumer would not reasonably expect or for which the consumer would not reasonably qualify.[349]

When making a representation, expressly or by implication, directly or indirectly, about a monthly payment for any vehicle, the failure to disclose the total amount the consumer will pay, inclusive of any consideration, to purchase or lease the vehicle at that monthly payment after making all payments as scheduled is likely to cause substantial injury to consumers who waste time and effort pursuing offers that are not actually available at reasonably expected terms; or who pay more for a vehicle sales or lease transaction than they expected by being subject to hidden charges or an unexpected down payment or trade-in requirement; or who are subject to the higher financing or leasing costs and greater risk of default associated with an unexpectedly lengthy loan or lease term. Moreover, when a consumer pays for his or her vehicle over a longer period of time, there is an increased likelihood that negative equity will result when the consumer needs or wants to purchase or lease another vehicle, because a vehicle's value tends to decline faster than the amount owed.[350] Longer motor vehicle financing term lengths also have higher rates of default, potentially posing greater risks to both borrowers and financing companies.[351] Even if a consumer eventually learns the true total payment, or later learns that the terms being discussed are based on a previously undisclosed requirement that the consumer provide consideration, such as a down payment, the consumer cannot recover the time spent pursuing the offer that the consumer had expected.

The injury caused by the failure to disclose the total amount and consideration is not reasonably avoidable. As the Commission has observed previously, withholding total payment information enables dealers to focus consumers on the monthly payment amount in isolation. Under such circumstances, dealers may add

unwanted, undisclosed, or even fictitious add-on charges more easily, since consumers may not notice the relatively small changes an add-on charge makes when secreted within a monthly vehicle payment, despite the fact that such hidden charges can cost a consumer more than a thousand dollars over the course of an auto financing or lease term.[352] The absence of information concerning the total of payments—which is within the sole control of the dealership—also enables dealers to use claims regarding monthly payment amounts to falsely imply savings or parity between different offers where reduced monthly payments increase the total vehicle cost due to an increased payment term or annual percentage rate.

The injury to consumers from a lack of total payment information is not outweighed by benefits to consumers or competition from withholding this basic information. Instead, the burden of disclosing this information—which the dealer determines and can calculate upfront—is minimal for dealers who are already making representations about a monthly payment for a vehicle, especially when compared to the injury to consumers.

Regarding deception, as detailed in the NPRM and in this SBP, cost is one of the most material pieces of information for a consumer in making an informed purchasing decision.[353] Yet it can be difficult for consumers to uncover the actual costs, and their

---

to collect payment for goods or services or a charitable contribution, directly or indirectly" without express verifiable authorization); 16 CFR 310.4(a)(7) (prohibiting as abusive the act or practice of "[c]ausing billing information to be submitted for payment, directly or indirectly, without the express informed consent of the customer or donor"); Mail, internet, or Telephone Order Merchandise Rule, 16 CFR 435.1(f) (defining "Telephone" as "any direct or indirect use of the telephone to order merchandise. . . ."); Preservation of Consumers' Claims and Defenses, 16 CFR 433.2 (prohibiting as an unfair or deceptive act or practice "for a seller, directly or indirectly" to take or receive a consumer credit contract which does not contain the Commission's "Holder Rule" provision); Prohibition of Energy Market Manipulation Rule, 16 CFR 317.3 (declaring "[i]t shall be unlawful for any person, directly or indirectly" to engage in certain energy market manipulation practices); Trade Regulation Rule Pursuant to the Telephone Disclosure and Dispute Resolution Act of 1992, 16 CFR 308.7(i) (declaring that regulated persons may not "report or threaten directly or indirectly to report adverse information" on a consumer report under certain circumstances).

[349] Importantly, as is the case under current law, a dealer may not mislead the consumer about the likelihood of qualifying for any particular credit or leasing terms in the course of providing this disclosure. Generally speaking, such deception is less likely where the dealer communicates to the consumer any assumptions it may have made, along

with the basis for any such assumptions, in a manner in which the consumer understands this information.

[350] Buckle Up, *supra* note 63, at 7.

[351] Consumer Fin. Prot. Bureau, "Quarterly Consumer Credit Trends: Growth in Longer-Term Auto Loans" 7–8 (Nov. 2017), *https://files.consumer finance.gov/f/documents/cfpb_consumer-credit-trends_longer-term-auto-loans_2017Q2.pdf; see also* Zhengfeng Guo et al., Off. of the Comptroller of the Currency, "A Puzzle in the Relation Between Risk and Pricing of Long-Term Auto Loans" 2, 4–5, 20 (June 2020), *https://www.occ.gov/publications-and-resources/publications/economics/working-papers-banking-perf-reg/pub-econ-working-paper-puzzle-long-term-auto-loans.pdf* (finding motor vehicle financing with six-plus-year terms have higher default rates than shorter-term financing during each year of their lifetimes, after controlling for borrower and loan-level risk factors).

[352] *See* Auto Buyer Study, *supra* note 25, at 14 ("[T]he dealer can extend the maturity of the financing to reduce the effect of the add-on on the monthly payment, obscuring the total cost of the add-on"); Auto Buyer Study: Appendix, *supra* note 66, at 229, 233 (Study participant 457481) (dealership pitching add-ons at the end of the negotiation, and in terms of consumer's monthly price); Auto Buyer Study: Appendix, *supra* note 66, at 701 (Study participant 437175) (dealership pitching add-ons in terms of monthly price); *see also* Complaint ¶¶ 12–19, *Fed. Trade Comm'n v. Liberty Chevrolet, Inc.,* No. 1:20–cv–03945 (S.D.N.Y. May 21, 2020) (alleging dealership included deceptive and unauthorized add-on charges in consumers' transactions); Complaint ¶¶ 21–28, *Fed. Trade Comm'n v. Ramey Motors,* No. 1:14–cv–29603 (S.D. W. Va. Dec. 11, 2014) (alleging dealer emphasized attractive terms such as low monthly payments but concealed substantial cash down payments or trade-in requirements); Complaint ¶¶ 38–46, *Fed. Trade Comm'n v. Billion Auto, Inc.,* No. 5:14–cv–04118–MWB (N.D. Iowa Dec. 11, 2014) (alleging dealer touted attractive terms such as low monthly payments but concealed significant extra costs).

[353] *See, e.g., Fed. Trade Comm'n v. Windward Mktg., Inc.,* No. Civ.A. 1:96–CV–615F, 1997 WL 33642380, at *10 (N.D. Ga. Sept. 30, 1997) ("[A]ny representations concerning the price of a product or service are presumptively material."); *Removatron Int'l Corp.,* 111 F.T.C. 206, 309 (1988) ("The Commission presumes as material express claims and implied claims pertaining to a product's . . . cost." (citing *Thompson Med. Co., Inc.,* 104 F.T.C. 648, 817 (1984)).

actual associated terms, for which a dealer will sell or lease an advertised vehicle until visiting the dealership and spending hours on the lot. When an advertisement or other communication references a monetary amount or financing term, it is reasonable for a consumer to expect that those amounts and terms are available for a vehicle at other standard terms, and, in the absence of information to the contrary, that no down payment or other consideration is required. If instead, for example, a dealer advertises a low monthly payment based on an unexpectedly long financing term or unexpectedly high interest rate that results in a higher total payment than standard terms would have yielded, or based on an expected but undisclosed down payment or other consideration to be provided by the consumer, the consumer will be induced to visit the dealership based on a misimpression of what they reasonably expect the total payment to be.

If consumers knew that the true terms were beyond what was expected, or their transaction included charges for unwanted items, that would likely affect their choice to visit a particular dealership over another dealership. Thus, misleading consumers about cost information is material. A lack of total payment information therefore is likely to affect a consumer's decision to purchase or lease a particular vehicle and is material, and paying an increased total cost causes substantial consumer injury.

Thus, it is an unfair or deceptive act or practice for dealers to fail to disclose when making any representation about a monthly payment for any vehicle, the total amount the consumer will pay to purchase or lease the vehicle at that monthly payment after making all payments as scheduled, inclusive of assumed consideration. Further, this provision also addresses the misrepresentations prohibited by § 463.3—including misrepresentations regarding material information about the costs or terms of purchasing, financing, or leasing a vehicle—by requiring consumers to be provided with the total payment amount associated with any represented monthly payment amount. It also helps prevent dealers from failing to obtain the express, informed consent of the consumer for charges, as required by § 463.5(c).[354] To address these unfair or deceptive acts or practices, the Commission is requiring dealers to

disclose, when making any representation about a monthly payment for any vehicle, the total amount the consumer will pay to purchase or lease the vehicle at that monthly payment after making all payments as scheduled, inclusive of assumed consideration. As with a vehicle's price, when cost information in the market is distorted or concealed—especially in document- and time-intensive vehicle transactions—consumers are unable to effectively differentiate between sellers, and sellers trying to deal honestly with consumers are put at a competitive disadvantage.

For the foregoing reasons, and having considered all of the comments that it received, the Commission is finalizing the required disclosure at § 463.4(d) largely as proposed, with the minor modifications of capitalizing the defined term "Vehicle," substituting a period for a semi-colon and the word "and" at the end of § 463.4(d)(1), and clarifying that the requirements of § 463.4(d) also are "prescribed for the purpose of preventing the unfair or deceptive acts or practices defined in this part, including those in §§ 463.3(a) and 463.5(c)."

### (e) Monthly Payments Comparison

Proposed § 463.4(e) required dealers, when making any comparison between payment options that includes discussion of a lower monthly payment, to disclose that the lower monthly payment will increase the total amount the consumer will pay to purchase or lease the vehicle, if true. For the reasons discussed in the following paragraphs, the Commission is finalizing the required disclosure at § 463.4(e) largely as proposed. The Commission is capitalizing the defined term "Vehicle" to conform with the definition at § 463.2(e). The Commission also is adding language to the end of § 463.4(e) clarifying that the requirements in § 463.4(e) "also are prescribed for the purpose of preventing unfair or deceptive acts or practices defined in this part, including those in §§ 463.3(a) and 463.5(c)."

A number of institutional commenters supported such a provision, emphasizing that it would provide an appropriate amount of helpful information and help make the true terms of a car deal much clearer to consumers. Many individual commenters also stressed the need for the Commission's proposal:

- My car buying experience involving dealers has include [sic] many of the issues identified, such as: . . . Negotiating a 4 year loan with a known loan payment (did math prior to final steps). Presented paperwork with a

similar but lesser monthly payment. Dealer had changed terms to 5 year loan without open disclosure. Happy to hear, "the bank gave you a better rate, you got a smaller payment," almost didn't catch what they'd done.[355]

- I have purchased about 10 new vehicles in my lifetime. . . . They prey on monthly payments as a tool, saying they can lower the monthly payment but not telling customers they added months or years to the term. Anything that forces them to be honest is a great justice for consumers![356]

- Sometimes, when you are in negotiations with a car dealer, they engage in deceptive practices by lowering your monthly payment amount without telling you how they lowered it. They may have increased your down payment or increased your interest rate or increased your term of the loan. This can lead [t]o much higher costs for the consumer. I had reached an agreement with a dealer to lower my monthly payments, but what they didn't tell me until I got into the F & I manager's office is that my deal [was] for 6 years, not 4, and they increased my interest rate.[357]

- . . . I was quoted a payment at 72 months with adding aftermarket warranty but come to find out they extended my term to 76 months in order to meet what I wanted to pay monthly. I did not find this out until after I bought the car. Very dishonest dealership. This last minute bait and switch has to stop.[358]

- I purchased a truck from a Tennessee truck dealer. After agreeing on a monthly payment of $920 for 72 months, I travelled to the dealership to complete the purchase, but the finance office changed the terms to 84 months with the same monthly payment, effectively adding $11,000 to their profit![359]

- I just want to walk in to a dealership, find a car that fits my needs and buy it. And what is up with these RIDUCULOUSLY [sic] long loan terms? 72 MONTHS? If someone cannot afford a car dealers shouldn't extend the loan, they should steer them to a more affordable car![360]

The Commission received numerous comments relating to the scope and

---

[354] See 15 U.S.C. 57a(a)(1)(B) (the Commission "may include requirements prescribed for the purpose of preventing" unfair or deceptive acts or practices).

[355] Individual commenter, Doc. No. FTC–2022–0046–0141.

[356] Individual commenter, Doc. No. FTC–2022–0046–0985.

[357] Individual commenter, Doc. No. FTC–2022–0046–1652.

[358] Individual commenter, Doc. No. FTC–2022–0046–7569.

[359] Individual commenter, Doc. No. FTC–2022–0046–0115.

[360] Individual commenter, Doc. No. FTC–2022–0046–0050.

terms of its proposed monthly payments comparison disclosure. A number of institutional and individual commenters urged the Commission to require that such disclosures uniformly be provided to consumers in writing. The Commission agrees with commenters that many monthly payment comparisons happen verbally, in the course of discussions with consumers. As proposed, the Commission's monthly payment comparison disclosure made clear that such discussions are covered, and that dealers would be required to inform consumers in the course of such discussions—"[w]hen making any comparison between payment options"—if a represented lower monthly payment will increase the total amount the consumer will pay to purchase or lease the vehicle. The Commission believes there are significant consumer benefits when such disclosures are made verbally, close in time to when monthly payment options are discussed. Given that car-buying and leasing transactions are already lengthy and paperwork-heavy, the Commission believes it must be judicious with any additional written disclosure requirements to avoid crowding out other disclosures or other important information. Accordingly, the Commission has determined not to modify § 463.4(e) from its original proposal in order to mandate that the required disclosure always be made in writing. The Commission will continue to monitor the market for any further developments in this area and will consider whether to modify this or other Final Rule provisions in the future.

Some commenters, including consumer advocacy organizations, urged the Commission to adopt specific proposed language rather than a general disclosure requirement, or a requirement that this disclosure include the total amount the consumer will pay at the lower monthly payment under discussion. Regarding the proposal to require particular, uniform disclosure language, the Commission did not receive, in the course of public comment, evidence sufficient to conclude that uniform formatting for the delivery of such disclosures would be necessary to make them effective. The Commission currently lacks information to evaluate whether any particular form disclosure would effectively communicate the required information to consumers in a manner that in all circumstances obviates deceptive or unfair conduct. Moreover, regarding the proposal to require that the monthly payment comparison disclosure additionally require dealers to disclose

the new total amount that the consumer will pay, the Commission emphasizes that part 463 will require such a disclosure without the need to modify this provision from the Commission's original proposal. As noted in the paragraph-by-paragraph analysis of § 463.4(d) in SBP III.D.2(d), the Commission is finalizing § 463.4(d), which requires dealers making any representation about a monthly payment for a vehicle to disclose the total amount the consumer will pay to purchase or lease the vehicle at a given monthly payment amount after making all payments as scheduled, inclusive of assumed consideration, largely as proposed. The monthly payment comparison discussions covered by § 463.4(e) are those that "include[] discussion of a lower monthly payment." To the extent a dealer, in the course of such discussions, makes a representation "about a monthly payment for any Vehicle," § 463.4(d) will require the dealer to disclose the total amount the consumer will pay at that monthly payment amount.

Comments, including those from a number of dealership associations [361] and an individual commenter, characterized the Commission's proposal as burdensome and likely to lead to excessive disclosures while providing little additional assistance to consumers. In response, the Commission emphasizes the streamlined nature of proposed § 463.4(e). In its proposal, the Commission refrained from additional formal mandates in order to provide dealers with flexibility, within the bounds of the law, to provide this essential information—that a given lower monthly payment will increase the total amount the consumer will pay—including so that dealers already conveying this information in a non-deceptive manner may continue to do so.

Thus, after careful review of the comments, the Commission has determined to finalize § 463.4(e) largely as proposed. When making any comparison between payment options, expressly or by implication, directly or indirectly, that includes discussion of a lower monthly payment, the failure to disclose that the lower monthly payment will increase the total amount the consumer will pay to purchase or lease the vehicle, if true, is likely to

mislead consumers regarding the total terms associated with the lower monthly payment amount. When a dealer elects to compare payment between different monthly payment options, if the lower monthly payment would result in a higher total transaction cost, discussion of this fact is necessary to prevent the comparison from being misleading. Absent this information, it is reasonable for a consumer who is presented with a monthly payment comparison to expect that the lower monthly payment amount would correspond to lower total transaction cost. This is because the opposite can only be true if the dealer has created a so-called "apples to oranges" comparison, in which an undisclosed element of the transaction—such as the length of the payment term, or the existence of a balloon payment—has not been kept constant across the two monthly payment scenarios being compared. Under such circumstances, without providing the consumer with further information, the dealer's claims regarding monthly payment amounts falsely imply saving or parity between different offers where reduced monthly payments increase the total vehicle cost. Thus, where a lower monthly payment amount represents a more expensive transaction, the dealer must, at a minimum, disclose this simple but counterintuitive fact to not deceive consumers.[362]

Furthermore, as explained in the NPRM and in the paragraph-by-paragraph discussion of § 463.4(d) in SBP III.D.2(d), cost is one of the most material pieces of information for a consumer in making an informed purchasing decision.[363]

Regarding unfairness, when making any comparison between payment options, expressly or by implication, directly or indirectly, that includes discussion of a lower monthly payment, the failure to disclose that the lower monthly payment will increase the total

---

[361] As previously indicated, some such association commenters contended generally that the proposed total of payments disclosures at § 463.4(d) and (e) overlapped with the Truth in Lending Act or other laws. The Commission responds to this point in the context of the discussion of § 463.4(d), in SBP III.D.2(d).

[362] Depending on the circumstances, a dealer may need to take additional measures, such as disclosing the specific basis for any increase in total costs, or amount of any such increase, in order to avoid deceiving consumers.

[363] See, e.g., Fed. Trade Comm'n v. Windward Mktg., Inc., No. Civ.A. 1:96–CV–615F, 1997 WL 33642380, at *10 (N.D. Ga. Sept. 30, 1997) ("[A]ny representations concerning the price of a product or service are presumptively material."); Removatron Int'l Corp., 111 F.T.C. 206, 309 (1988) ("The Commission presumes as material express claims and implied claims pertaining to a product's . . . cost." (citing Thompson Med. Co., Inc., 104 F.T.C. 648, 817 (1984)); see also Fed. Trade Comm'n v. Crescent Pub. Grp., Inc., 129 F. Supp. 2d 311, 321 (S.D.N.Y. 2001) ("Information concerning prices or charges for goods or services is material, as it is 'likely to affect a consumer's choice of or conduct regarding a product.'").

amount the consumer will pay to purchase or lease the vehicle, if true, is likely to cause substantial injury to consumers who waste time and effort pursuing offers that are not actually available at the total payment amount they expect; or who pay more for a vehicle sales or lease transaction than they expected by being subject to hidden charges or an unexpected down payment or trade-in requirement; or who are subject to the higher financing costs and greater risk of default associated with an unexpectedly lengthy loan term.

Furthermore, the injury caused by withholding this information is not reasonably avoidable by consumers. During negotiations, if dealers agree to a lower monthly payment, consumers have no reason to expect that this apparent "concession" in fact means an increased total vehicle cost due to an increased payment term or annual percentage rate. Under such circumstances, dealers can also add unwanted, undisclosed, or even fictitious add-on charges more easily, by increasing the payment term enough that including add-on charges would still result in a lower monthly payment as a "concession" to the consumer. The injury to consumers from a lack of price information is not outweighed by any benefits to consumers or competition from withholding this basic information. Instead, information about increased cost protects consumers from lost time and effort, and unexpected charges while increasing competition among dealers, who would be able to compete on truthful, standard terms. The costs of stating that the total payment has increased—which the dealer determines and can calculate upfront—are minimal for dealers that are already making representations about a monthly payment for a vehicle, especially when compared to the injury to consumers.

Thus, it is an unfair or deceptive act or practice for dealers to fail to disclose, when making any comparison between payment options, expressly or by implication, directly or indirectly, that includes discussion of a lower monthly payment, that the lower monthly payment will increase the total amount the consumer will pay to purchase or lease the vehicle, if true. Further, this provision also serves to prevent the misrepresentations prohibited by § 463.3—including misrepresentations regarding material information about the costs or terms of purchasing, financing, or leasing a vehicle—by requiring consumers to be given accurate information that the total payment will increase when presented with a lower

monthly payment. It also helps prevent dealers from failing to obtain the express, informed consent of the consumer for charges, as addressed by § 463.5(c), including charges relating to the financing or lease of a vehicle.[364] Thus, the Commission is requiring dealers to disclose, when making any comparison between payment options, expressly or by implication, directly or indirectly, that includes discussion of a lower monthly payment, that the lower monthly payment will increase the total amount the consumer will pay to purchase or lease the vehicle, if true. As with a vehicle's price, when cost information in the market is distorted or concealed—especially in document- and time-intensive vehicle transactions— consumers are unable to effectively differentiate between sellers, and sellers trying to deal honestly with consumers are put at a competitive disadvantage.

For the foregoing reasons, and having considered all of the comments that it received on this proposed provision, the Commission is finalizing the required disclosure at § 463.4(e) largely as proposed, with the minor modifications of capitalizing the defined term "Vehicle" and adding language clarifying that the requirements in § 463.4(e) "also are prescribed for the purpose of preventing the unfair or deceptive acts or practices defined in this part, including those in §§ 463.3(a) and 463.5(c)."

### E. § 463.5: Dealer Charges for Add-Ons and Other Items

#### 1. Overview

Proposed § 463.5 prohibited motor vehicle dealers from charging for add-on products or services from which the consumer would not benefit; from charging consumers for undisclosed or unselected add-ons unless certain requirements were met; and from charging for any item unless the dealer obtains the express, informed consent of the consumer for the item.

In response to the NPRM, various stakeholder groups and individuals submitted comments regarding these proposed provisions. Among these were comments in favor of the provisions; comments that urged the Commission to include additional restrictions on add-on charges; and comments questioning or recommending against the proposed provisions.

After careful consideration of the comments, the Commission has determined to finalize § 463.5(a) and (c)

without substantive modification and has determined not to finalize § 463.5(b) regarding undisclosed or unselected add-ons. The Commission also is making minor textual edits to the introductory language in § 463.5 for clarity and consistency: substituting "Federal Trade Commission Act" for "FTC Act"; adding "Covered" to "Motor Vehicle Dealer" to conform with the defined term at § 463.2(f) (" 'Covered Motor Vehicle Dealer' or 'Dealer' "), and capitalizing "Vehicles" to conform with the defined term at § 463.2(e) (" 'Covered Motor Vehicle' or 'Vehicle' ").

In the following analysis, the Commission examines each proposed provision in § 463.5; the substantive comments relating to each provision; responses to these comments; and the Commission's final determination with regard to each proposed provision.

#### 2. Paragraph-by-Paragraph Analysis of § 463.5

##### (a) Add-Ons That Provide No Benefit

Section 463.5(a) of the proposed rule prohibited motor vehicle dealers from charging for add-ons if the consumer would not benefit from such an add-on, including a pair of enumerated examples. For the following reasons, the Commission is finalizing this provision largely as proposed, with modifications to correct a misplaced hyphen; add the word "that" before "are duplicative of warranty coverage"; and capitalize the defined term "Vehicle" to conform with the revised definition at § 463.2(e). The Commission also is adding language to the end of § 463.5(a), at newly designated (a)(3), clarifying that the requirements in § 463.5(a) "also are prescribed for the purpose of preventing the unfair or deceptive acts or practices defined in this part, including those in § 463.3(a) and (b) and paragraph (c) of this section." Relatedly, the Commission is finalizing the definition of the term "GAP Agreement," which is referenced in this provision and defined in § 463.2(h) of the Final Rule, substantively as proposed, with minor modifications to correct a misplaced period, substitute "Vehicle" for both "vehicle" and "motor vehicle" to conform with the revised definition at § 463.2(e), and remove an extraneous term—"insured's"—without changing the definition's operation.

Many commenters, including a number of industry participants and associations, stated that products that provide no benefit to the consumer should not be sold in connection with the sale or financing of vehicles. Many commenters that supported the

---

[364] _See_ 15 U.S.C. 57a(a)(1)(B) (the Commission "may include requirements prescribed for the purpose of preventing" unfair or deceptive acts or practices).

provision stated, *inter alia,* that the examples the Commission enumerated in this paragraph were obvious[365] and particularly helpful for less-experienced buyers who may be led to believe that a particular product or service would be beneficial.[366] Some individual commenters, for instance, noted that they had no way to confirm whether the "nitrogen-filled" tires they purchased with their vehicle actually had more nitrogen than naturally exists in the air, even though they were told the purchase of this service was mandatory.[367] At least one individual commenter described requesting to see the nitrogen tank after such a purchase and being denied by the dealer.

Examples of public comments about add-ons include the following:

• I would argue that this does not go far enough but it [is] a good start. As someone who is trying to purchase a new vehicle, there is a[n] endless supply of "perk packages" or "Family deals" that I "must purchase" if I would like to acquire a car from a dealer. These include a variety of dubious products such as insurance policies that pay out $3,500 if your car is stolen (and can't be found) in the first 90 days of ownership, if your car is totaled by your insurance company in the first 90 days they'll pay $3,500. Nitrogen in the tires (A $196 value). Vin Etching on the windows, plastic stickers on the door handles to prevent scratches. These items are a requirement to bundle with the vehicle and a deal that provides "over $7,000 in value" for $2,995. These tricks ignore the obvious, such as your car can not be both stolen (unrecovered) AND totaled so it's impossible to collect on both policies so the cumulative "value" of this package is overstated.[368]

• One of the latest scams is to force you to buy a $1,000 gps unit so they can recover the car if you miss payments. This shouldn't be allowed.[369]

• Second vehicle I purchased had a $1,650 "protection pkg" plus the usual nitrogen in the tires BS. This time I asked to be shown the nitrogen tank they fill the tires with, they refused saying due to insurance rules customers aren't allowed in the shop. I asked them to take off the paint and fabric protection charge also, they declined at first until I reminded them they just got

the vehicle the night before and there was still plastic factory coverings on the seats and strips of plastic on the vehicles body protecting certain areas. This time they mumbled some excuse about the addendum added to the price is put on the vehicle as soon as it arrives and they hadn't had "time" to apply all the overpriced add[-]ons.[370]

• I'm a former carsalesperson [sic]. . . . Dealers include ban from selling . . . special paints to protect from rust . . . . No coatings are added.[371]

• I worked at a Dodge/Ram dealership for three years at the make ready (carwash) department. When new vehicles arrived their tires were rarely deflated and then filled with nitrogen. It is my understanding that the manufacture initially paid for the nitrogen fill and the customer was later charged.[372]

• [O]ne of my previous purchases almost ended . . . with GAP that was so unnecessary, the lender called us a few days later after we already had the car and told us we'd be experiencing a lower monthly payment unless we wanted the price of the product back in a check because of the price we negotiated and the sizable down payment, it was impossible for GAP to ever be required.[373]

A number of individual commenters indicated they did not consider nitrogen tires a valuable purchase and expressed no desire to purchase them. Many commented that, when they informed their respective dealers that they did not want these add-ons, the dealers would represent, *inter alia,* that nitrogen tires were required by law, that their insurance premium would increase without the add-on, that new foreign vehicles coming into the country must have nitrogen-filled tires under the law, or that the consumer needed to purchase nitrogen tires to meet fuel economy standards.

Other commenters supported this proposed provision while also recommending that the Commission broaden its scope to prohibit the sale of add-on products or services that provide only "minimal" benefit to consumers.[374] One such commenter, for instance, suggested the provision be expanded to prohibit dealers from

charging for an add-on unless it provides a "substantial, material benefit" to consumers.[375] Another commenter contended that there are a number of add-ons not meeting such standards being sold in connection with the sale or financing of vehicles, including future servicing packages for vehicle tune-ups and oil changes that are sold to remote or out-of-State consumers who are exceedingly unlikely to return to the dealership for such services; tracking devices that are used almost exclusively for electronic repossession; and "vendor's single interest" or "VSI" insurance, which protects the financing entity, but not the consumer, in the event that the vehicle is damaged or destroyed.[376]

The Commission acknowledges the considerable consumer harm that results from the sale of such add-ons and notes that several provisions in the Rule it is finalizing will address misconduct related to these and other add-ons, including many of the practices described by those commenters recommending further action. For example, to the extent that dealers make misrepresentations about any benefit of an add-on, such conduct would violate § 463.3(b) of the Final Rule. Thus, were a dealer, for instance, to promote the sale of an add-on—such as a tracking device that is used almost exclusively for electronic repossession—based on its supposed benefit to the consumer, when the product primarily benefits another party, such conduct would violate the Rule even if the product otherwise provides an ancillary or marginal benefit to consumers. And if the add-on provided no benefit to the consumer and only a benefit to another party, § 463.5(a) would prohibit the dealer from charging the consumer for it. Further, to the extent that dealers charge for add-ons without express, informed consumer consent for the charge, such conduct would violate § 463.5(c).

The Commission recognizes that there may be significant consumer benefits from implementing additional restrictions on the sale of add-on products or services. However, without additional information on costs and benefits to consumers or competition associated with such restrictions, the Commission has determined not to implement such restrictions in this Final Rule. The Commission will continue to monitor the motor vehicle

---

[365] *See, e.g.,* Individual commenter, Doc. No. FTC–2022–0046–1608 at 6.

[366] *See, e.g.,* Comment of 18 State Att'ys Gen., Doc No. FTC–2022–0046–8062 at 9.

[367] *See, e.g.,* Individual commenter, Doc. No. FTC–2022–0046–0565.

[368] Individual commenter, No. FTC–2002–0046–0565.

[369] Individual commenter, No. FTC–2002–0046–4552.

[370] Individual commenter, Doc. No. FTC–2022–0046–0854.

[371] Individual commenter, Doc. No. FTC–2022–0046–1393.

[372] Individual commenter, Doc. No. FTC–2022–0046–5493.

[373] Individual commenter, Doc. No. FTC–2022–0046–6816.

[374] *See, e.g.,* Legal Aid Just. Ctr., Doc. No. FTC–2022–0046–7833 at 3.

[375] Comment of Legal Action Chi., Doc. No. FTC–2022–0046–8097 at 10.

[376] *See also* Consumer Fin. Prot. Bureau, "What Is Vendor's Single Interest (VSI) insurance?" (Aug. 16, 2016), *https://www.consumerfinance.gov/ask-cfpb/what-is-vendors-single-interest-vsi-insurance-en-731/.*

marketplace to gather additional information on this issue and will consider whether to modify or expand § 463.5(a) in the future, including on the basis of stakeholder experience with this provision and whether it effectively addresses unlawful conduct.

Commenters also urged the Commission to adopt a number of additional measures regarding the sale of such add-ons. A consumer advocacy organization, for instance, proposed that the Commission require dealers to list coverage limitations for add-ons that may overlap with a vehicle's warranty coverage, observing that consumers commonly are not aware of important limitations until the add-on, such as a warranty or service contract, is needed, and only then does the consumer learn the add-on does not provide the anticipated benefits. A State consumer protection agency recommended that the Commission require affirmative disclosures for the sale of add-ons that may provide only "nominal" benefit, offering a list of what they characterized as such products for the Commission to consider in conjunction with this recommendation.

In response, the Commission notes that other provisions in part 463 address misconduct relating to these issues, including by prohibiting misrepresentations regarding material information about add-ons, by requiring disclosures about optional add-ons, and by requiring dealers to obtain the express, informed consent of the consumer for add-on charges. Thus, misrepresenting the coverage limitations of an add-on; making representations regarding an optional add-on without disclosing that it is not required and that the consumer can purchase or lease the vehicle without the add-on; and charging for an add-on under false pretenses or without the consumer's express, informed consent would violate other provisions the Commission is finalizing. The Commission is concerned that requiring additional disclosures may have the effect of reducing the saliency of key information in what is already a lengthy, paperwork-heavy transaction. Accordingly, the Commission has determined not to adopt additional such disclosure measures in this Final Rule.

In addition, at least one consumer protection agency commenter asked the Commission to consider deeming it an unfair or deceptive act or practice to sell any add-on product for a price greater than the value of the product itself. The Commission declines to restrict the sale of add-on products at a price higher than the value of the product itself, absent additional information, including information regarding the costs and benefits to consumers and competition of such a restriction.[377]

A number of industry association commenters claimed the provision was vague and requested the Commission set forth how to calculate the loan-to-value ("LTV") ratio at which a GAP agreement would be non-beneficial, given that there could be fluctuation of the vehicle value in the future. Some suggested that the Commission adopt a presumption or safe harbor that dealers complying with an LTV calculation set by the Commission be deemed in compliance with the portion of the proposal related to GAP agreements.

Other industry association commenters argued against adopting a set LTV ratio as the basis for determining whether a consumer would benefit from a GAP agreement, claiming that the vehicle financing entity is best positioned to determine whether such an add-on would be beneficial. Relatedly, some industry association commenters contended that certain GAP agreements sold on a low-LTV loan, or that limit benefits based on a consumer's LTV ratio, could still provide additional benefits.

A financing association commenter contended that any final rule should not create rules around the calculation of the LTV ratio. Another financing group proposed that the Commission require dealers to provide disclosures that would inform consumers of any potential value gap between a vehicle's purchase price and its appraised value.

With regard to establishing LTV ratio parameters for the sale of GAP agreements, without further information from commenters regarding the costs and benefits of establishing a particular LTV ratio as the basis for determining whether a consumer would benefit from a GAP agreement, or a particular method for calculating the LTV ratio, and given the Commission's previously stated information saliency concerns about finalizing additional disclosures in an already lengthy transaction, the Commission has determined not to establish in this Final Rule a particular numeric threshold or calculation regarding the sale of GAP agreements to consumers, or to require additional associated disclosures. Regarding the benefits of certain GAP agreements, this provision restricts sales of GAP agreements where the consumer would not benefit. If there are benefits to the consumer, dealers must abide by other provisions in the Final Rule, including the requirements that the dealer represents the extent of those benefits accurately (§ 463.3(b)) and obtains express, informed consent from the consumer for the charges for this item (§ 463.5(c)).

The Commission also received some industry association comments claiming that each State imposes differing requirements as to coverage, disclosures, exceptions, and product terms of GAP agreements. One such commenter asked for guidance on how a bright-line, State-law rule on LTV ratios would interact with the FTC's proposal. Another such commenter requested the FTC reconcile different State-law approaches to the sale of GAP agreements, particularly regarding how this proposed provision would interact with a State law that, according to the commenter, only requires a dealer to have a reasonable belief that the customer may be eligible for a benefit. In response, the Final Rule does not disturb State law unless it is inconsistent with part 463, and then only to the extent of the inconsistency. Where, for example, State laws restrict the sale of GAP agreements if the LTV ratio for the transaction is below a certain threshold, or require that dealers have a "reasonable belief" that the GAP agreement would benefit the consumer, dealers in that State can, and must, comply with the State law and with the Rule. Pursuant to such State law, dealers would be prohibited from selling the product if the LTV ratio is below the established threshold or if they do not reasonably believe the GAP agreement would benefit the consumer and, pursuant to the Final Rule, if the LTV ratio would result in the consumer not benefitting financially. To the extent there is an actual conflict between the Commission's Final Rule and a State law—and the Commission is skeptical that there is such a State law that explicitly allows for the sale of a product that does not benefit the consumer—the Commission refers commenters to § 463.9, which sets forth the Rule's relation to State laws.

With respect to the proposed definition of "GAP Agreement," an industry association commenter contended that the phrase "the actual cash value of the insured's vehicle in the event of an unrecovered theft or total loss" meant the value of the vehicle at some point in the future, and asserted that future vehicle values cannot be accurately determined at the

---

[377] One consumer attorney commenter requested that the Commission clarify that warranty disclaimers are not a valid defense to common law fraud and statutory consumer fraud, and that, if fraud is proven, warranty disclaimers are not an allowable defense to UCC actions. In response, the Commission notes that none of the provisions the Commission is finalizing state that warranty disclaimers are a defense to common law fraud or in UCC actions.

time of sale. The proposed definition, however, did not prescribe how dealers must calculate a vehicle's cash value; rather, it explains that the term "GAP Agreement" means an agreement to indemnify a vehicle purchaser for any difference between such value, however determined, in the event of an unrecovered theft or total loss, and the amount owed, regardless of what that difference may be. Upon examination of this phrase, however, the Commission has determined to remove the term "insured's" because it is extraneous and does not affect the operation of this definition: with or without the term, the phrase describes the manner in which a qualifying GAP agreement determines the amount to indemnify a vehicle purchaser or lessee. In context in this definition, it is clear without the term "insured's" that the applicable "Vehicle" is the one covered by the GAP agreement. Omitting this unnecessary term thus avoids confusion without substantively changing this definition.

One industry association commenter argued that reference to "GAP insurance" should be removed from the definition of "GAP Agreement" because of the McCarran-Ferguson Act's reverse-preemption of certain Federal laws that "invalidate, impair, or supersede" State laws enacted "for the purpose of regulating the business of insurance." [378] As previously discussed with regard to the definition of "Add-on," however, commenters have provided no evidence that the proposed or Final Rule would invalidate, impair, or supersede State laws enacted for the purpose of regulating insurance. Rather than affecting any State's regulation of insurance, the Final Rule prohibits dealers from making misrepresentations regarding add-ons, from failing to disclose when add-ons are not required, and from charging for add-ons that provide no benefit or for which the consumer has not provided express, informed consent. The Commission therefore finalizes the definition of "GAP Agreement" largely as proposed in its NPRM with minor modifications to correct a misplaced period, substitute "Vehicle" for both "vehicle" and "motor vehicle" to conform with the revised definition at § 463.2(e), and remove an extraneous term—"insured's"—without changing the definition's operation.

While acknowledging that products or services that provide no benefit to consumers should not be sold, commenters including an industry association also argued that the

Commission's proposed provision was vague and required more research. Some industry association commenters expressed concern regarding how the Commission would determine whether the item would not benefit the consumer. In response, the Commission provides the following information. Proposed § 463.5(a) included enumerated examples of add-ons from which consumers would not benefit: (1) nitrogen-filled tires that contain no more nitrogen than normally found in the air, and (2) products or services that do not provide coverage for the vehicle, the consumer, or the transaction, or are duplicative of warranty coverage for the vehicle, including a GAP agreement if the consumer's vehicle or neighborhood is excluded from coverage or the LTV ratio would result in the consumer not benefitting financially. [379] As these examples illustrate, determining that a consumer would not benefit from an add-on involves analyzing objective standards under the circumstances, such as whether the add-on provides benefits; whether the consumer is eligible to use the add-on; whether the add-on's coverage excludes the vehicle at issue; and whether the add-on is incompatible with the vehicle at issue. Thus, additional examples of add-ons that would be prohibited by this provision include the following: purported rust-proofing add-ons that do not actually prevent rust; purported theft-prevention or theft-deterrent add-ons that do not prevent or deter theft; and add-ons that the vehicle itself cannot support, including engine oil-change services for a vehicle, such as an electric vehicle, that does not use engine oil, or software or audio subscription services for a vehicle that cannot support the software or utilize the subscription. [380]

One association commenter argued that the phrase "nitrogen-filled tire related-products or services that contain no more nitrogen than naturally exists in the air" in proposed § 463.5(a)(1) would create a standard with which it may be impossible to comply because "no individual set of tires could have a higher total quantity of nitrogen than that in 'the air' that stretches around the planet." [381] This commenter requested that the Commission clarify to avoid this possible reading. Here, the Commission notes that the phrase does not prohibit such tires if they do not contain a "higher total quantity of nitrogen than that in the air"; instead, charging for a nitrogen-filled tire would fail by this standard if it contains "no more nitrogen than" the proportion that "naturally exists in the air."

One industry association commenter requested more explanation from the Commission regarding what would be considered "duplicative of warranty coverage" under proposed § 463.5(a)(2), while another contended that vehicle service contracts that overlap with a manufacturer's warranty may still provide additional, beneficial coverage, such as after the manufacturer's warranty expires. In response, the Commission notes that this provision prohibits the sale of warranties that are duplicative. A dealer may offer a warranty add-on that has some overlap in coverage with existing warranty coverage for the vehicle, but the add-on must provide additional protection. Moreover, other provisions of the Final Rule address misconduct relating to warranties, including by prohibiting misrepresentations regarding material information about any costs, limitation, benefit, or any other aspect of the warranty product or service. For example, under the Final Rule, a dealer may not mislead a consumer as to the benefits or conditions of the warranty, including amount or length of coverage (§ 463.3(b)). In addition, under § 463.5(c), the dealer must obtain the express, informed consent of the consumer for the charge for the warranty (§ 463.5(c)).

Other commenters, including an industry association, asserted that this proposed provision would cause dealers to stop offering beneficial products or services. The Commission notes that its proposal did not require such a result and emphasizes that this provision would prevent charges to consumers for products or services that provide them

---

[378] 15 U.S.C. 1012(b).

[379] See Consumer Fin. Prot. Bureau, "Supervisory Highlights: Issue 19, Summer 2019" 3–4 (Sept. 2019), *https://files.consumerfinance.gov/f/documents/cfpb_supervisory-highlights_issue-19_092019.pdf* (finding instances in which auto lenders sold "a GAP product to consumers whose low LTV meant that they would not benefit from the product").

[380] *See, e.g.,* Shannon Osaka, "Electric vehicles are hitting a road block: Car dealers," Wash. Post (Nov. 9, 2023), *https://www.washingtonpost.com/climate-solutions/2023/11/09/car-dealerships-ev-sales* (describing a dealership salesperson offering an electric vehicle-buyer a plan for oil changes and an extended warranty for a gas-powered car); *see also* Consumer Fin. Prot. Bureau, "Supervisory Highlights: Issue 24, Summer 2021" 3–4 (June 2021), *https://files.consumerfinance.gov/f/documents/cfpb_supervisory-highlights_issue-24_2021-06.pdf* (finding servicers added and maintained unnecessary collateral protection insurance (CPI) when consumers had adequate insurance and thus the CPI provided no benefit to the consumers, and also when consumers' vehicles had been repossessed even though no actual

insurance protection was provided after repossession).

[381] Comment of Competitive Enter. Inst., Doc. No. FTC–2022–0046–7670 at 6.

no benefit. To the extent that a prohibition against charging consumers for items that provide no benefit to the consumer may cause some dealers to discontinue offering beneficial products, consumers would be free to instead visit other dealerships or to seek the same or similar offerings from other providers. Dealers, of course, continue to be free under the Final Rule to offer beneficial add-ons to consumers—consistent with existing law and with other provisions of this Rule.

Some commenters, including industry associations and a dealership association, raised concerns about compliance administrability for this proposed provision in the case of products attached to a vehicle by manufacturers that may provide no benefit, questioning whether, if this proposal went into effect, dealers would be prohibited from charging for such products. In response, the Commission refers commenters to the definition of "Add-on" or "Add-on Product(s) or Service(s)" in § 463.2(a). Notably, "Add-on" is defined, in relevant part, as any "product(s) or service(s) not provided to the consumer or installed on the Vehicle by the Vehicle manufacturer . . ." Thus, if an add-on product or service is installed on the vehicle by the motor vehicle manufacturer, it falls outside the scope of this definition, and concomitantly, outside the scope of the provision at § 463.5(a). Nonetheless, other provisions in the Final Rule address misconduct relating to this issue. For instance, as examined in additional detail in the discussion of § 463.4, in SBP III.D, the offering price for the vehicle would be required to incorporate the charges for any such items if the dealer requires the consumer to pay for them. In addition, as described in additional detail in the discussion of § 463.5(c), in SBP III.E.2(c), a dealer may not charge for any such item unless the dealer obtains the express, informed consent of the consumer for the charge.

Another industry association commenter incorrectly stated that this provision was beyond the FTC's authority and correctly noted that the Commission has the authority to see that products are marketed and advertised fairly and honestly. As the commenter acknowledged, the Commission has the authority to address unfair and deceptive conduct; that is precisely what this provision does. Dealerships charging consumers for add-ons from which the consumers would not benefit is both a deceptive and unfair act or practice in violation of the FTC Act, as discussed in the following paragraphs. To address this

deception or unfairness, the Commission is finalizing this provision with minor modifications, including one to correct a typographical error in the placement of a hyphen in a phrase in proposed § 463.5(a)(1). In the NPRM, the relevant phrase appeared as, "(1) Nitrogen-filled tire related-products or services"; in the Final Rule, the corrected phrase will now read as follows: "(1) Nitrogen-filled tire-related products or services." For clarity, the Commission is also adding the word "that" before "are duplicative of warranty coverage;" capitalizing the defined term "Vehicle" to conform with the revised definition at § 463.2(e); and adding language clarifying that the requirements of § 463.5(a) also are "prescribed for the purpose of preventing the unfair or deceptive acts or practices defined in this part, including those in § 463.3(a) and (b) and paragraph (c) of this section."

Dealerships charging consumers for add-ons from which the consumers would not benefit involves deceptive conduct. When a dealer charges consumers for add-ons that would not benefit the consumers, the dealer either (1) discusses the add-on charges or (2) is silent about these items. In the first scenario, if a dealer discusses add-on charges, consumers typically would not agree to pay such charges for additional products from which they could not benefit unless they are led to believe, directly or by omission, that these products would in fact be beneficial to them. Thus, the dealer would be misleading consumers, even in the event the dealer subsequently provides a disclaimer indicating the add-on would not benefit the consumer.[382] In the second scenario, it is reasonable for consumers to believe that the terms they have agreed to are what was negotiated, and do not include additional charges for optional, undisclosed items— particularly items that would not benefit the consumer. If a dealer charges consumers for such items under such circumstances, the dealer is misleading the consumer. Misleading consumers about cost information is material.[383] If

consumers knew that a dealership was charging them for items from which they would not benefit, such knowledge likely would affect their commercial choices, including whether to continue with, or ultimately consummate, the vehicle sale or financing transaction.[384]

Such charges are also unfair. When charges for any add-on accompany the already lengthy and complex car-buying process, it is difficult to obtain consent that is truly express and informed.[385] Rather than prohibiting all such charges or taking other measures, as specifically contemplated in the NPRM,[386] however, this provision focuses on charges for add-ons that would not benefit the consumer. Charges for add-ons that would not benefit the consumer can cost consumers thousands of dollars and significantly increase the overall cost to the consumer in the transaction, including by increasing the amount financed and total of payments, thereby increasing the risk the consumer will ultimately default on repayment

---

[382] *Removatron Int'l Corp.* v. *Fed. Trade Comm'n,* 884 F. 2d 1489, 1497 (1st Cir. 1989) ("Disclaimers or qualifications . . . are not adequate to avoid liability unless they are sufficiently prominent and unambiguous to change the apparent meaning of the claims and to leave an accurate impression. Anything less is only likely to cause confusion by creating contradictory double meanings.").

[383] *See, e.g., Fed. Trade Comm'n* v. *Windward Mktg., Ltd.,* No. Civ.A. 1:96–CV–615F, 1997 WL 33642380, at *10 (N.D. Ga. Sept. 30, 1997) ("[A]ny representations concerning the price of a product or service are presumptively material."); *Removatron Int'l Corp.,* 111 F.T.C. 206, 309 (1988) ("The Commission presumes as material express claims

and implied claims pertaining to a product's . . . cost." (citing *Thompson Med. Co., Inc.,* 104 F.T.C. 648, 817 (1984)); *see also Fed. Trade Comm'n* v. *Crescent Pub. Grp., Inc.,* 129 F. Supp. 2d 311, 321 (S.D.N.Y. 2001) ("Information concerning prices or charges for goods or services is material, as it is 'likely to affect a consumer's choice of or conduct regarding a product.' ").

[384] Even under a hypothetical scenario wherein a consumer understood an add-on would not benefit them but wanted to pay extra for the add-on anyway, in the case of an act or practice challenged by the agency as deceptive or unfair, "the FTC need not prove that every consumer was injured. The existence of some satisfied customers does not constitute a defense . . . ." *Fed. Trade Comm'n* v. *Amy Travel Serv., Inc.,* 875 F.2d 564, 572 (7th Cir. 1989), *vacated in part on other grounds, Fed. Trade Comm'n* v. *Credit Bureau Ctr., LLC,* 937 F.3d 764 (7th Cir. 2019); *accord Fed. Trade Comm'n* v. *Stefanchik,* 559 F.3d 924, 929 n.12 (9th Cir. 2009).

[385] *See, e.g.,* Consumer Fin. Prot. Bureau, "Supervisory Highlights: Issue 19, Summer 2019" 3–4 (Sept. 2019), *https://files.consumerfinance.gov/ f/documents/cfpb_supervisory-highlights_issue-19_ 092019.pdf* (describing findings, from supervisory examinations, of lenders selling GAP agreements to consumers whose low LTV meant that they would not benefit from the product: "By purchasing a product they would not benefit from, consumers demonstrated that they lacked an understanding of a material aspect of the product. The lenders had sufficient information to know that these consumers would not benefit from the product. These sales show that the lenders took unreasonable advantage of the consumers' lack of understanding of the material risks, costs, or conditions of the product.").

[386] *See, e.g.,* NPRM at 42030 (Question 33) ("In particular, the Commission is contemplating whether any final Rule should restrict dealers from selling add-ons (other than those already installed on the vehicle) in the same transaction, or on the same day, the vehicle is sold or leased."); *id.* (Question 38) (discussing proposed § 463.5(c) and asking "Does the proposal provide a meaningful way to obtain consent in an already disclosure-heavy transaction? If it would result in too many disclosures, what other measures could be taken to protect consumers from unauthorized charges?").

obligations.[387] This injury is not reasonably avoidable by consumers when dealers are silent about such charges and simply include them in dense, lengthy contracts, as explained in detail in SBP II.B.2.[388] If a dealer instead describes what the charges are for, such a description either deceptively states or implies that the add-on would benefit the consumer, or acknowledges the add-on would not benefit the consumer, the latter of which would create "contradictory double meanings"[389] and, if discovered, would still result in the dealer wasting the consumers' time.[390] Further, there are no benefits to consumers or to competition from charging consumers for add-ons that would not benefit them. Moreover, charging for non-beneficial products is inconsistent with industry guidance,[391] and dealerships that profit from such sales place dealerships that do not at a competitive disadvantage. Thus, it is an unfair or deceptive act or practice for dealers, in connection with the sale or financing of vehicles, to charge for an add-on product or service if the consumer would not benefit from such an add-on product or service. This provision also serves to prevent

misrepresentations prohibited by § 463.3 of the Final Rule, including misrepresentations regarding material information about the costs or terms of purchasing, financing, or leasing a vehicle, and about any costs, limitation, benefit, or other aspect of an add-on. This provision further helps prevent dealers from failing to obtain express, informed consent for charges, as prohibited by § 463.5(c).[392]

**(b) Undisclosed or Unselected Add-Ons**

The Commission's proposed provisions relating to undisclosed or unselected add-on products or services, at § 463.5(b), prohibited dealers from charging for optional add-ons before undertaking certain measures. Specifically, proposed § 463.5(b)(1) prohibited dealers from charging for optional add-ons unless the dealers disclosed, and offered to consummate the transaction for, the cash price at which a consumer may purchase the vehicle without such add-ons. This proposed provision also required the consumer to decline to purchase the vehicle for the cash price without the add-on by means of a written declination, with date and time recorded, and signed by the consumer and a manager of the motor vehicle dealer. The proposed requirements of § 463.5(b)(1) applied before the dealer referenced any aspect of financing for a specific vehicle, aside from the offering price, or before consummating a non-financed sale. Proposed § 463.5(b)(2) required similar steps before charging for any optional add-on in a financed transaction, including that the dealer disclose, and offer to consummate the transaction for, a vehicle's cash price without optional add-ons plus the finance charge for such transaction, separately itemizing the components of the offer. This proposed provision also required a written, dated, time-stamped, and signed declination. Finally, proposed § 463.5(b)(3) required dealers to disclose the cost of the transaction, whether financed or not, without any optional add-ons, as well as the charges for the optional add-ons selected by the consumer, separately itemized. Each proposed provision required clear and conspicuous disclosure of specific information relating to optional add-ons and their associated costs.

As discussed in the following paragraphs, the Commission has determined not to finalize the proposed provisions at § 463.5(b) regarding

undisclosed or unselected add-ons. Many commenters described the likely benefits of such proposed provisions, and a number of commenters indicated how such provisions would be feasible, including by reference to similar disclosure regimes already in effect at the State or local level. Commenters also credited the Commission's goals for such provisions.

However, other commenters opposed these proposed provisions, contending they would be burdensome and time-consuming. Others similarly expressed concern that, given the duration, complexity, and paperwork-heavy nature of motor vehicle sales and financing transactions, these provisions would not effectively resolve the problem of add-ons being sold without express, informed consumer consent.[393]

Having considered the comments, the Commission declines to include in this Final Rule the proposed provisions relating to undisclosed or unselected add-on products or services at § 463.5(b). The Commission notes that various commenters were concerned about the extent to which this proposal would add documents and time to the transaction. If finalized, this would have been the sole provision in the Final Rule that affirmatively requires the dealer and consumer, in all circumstances, to view and sign additional documentation during the purchase, finance, or lease process, in what is already a document-heavy, time-consuming, and complicated transaction. The Commission further notes that, as a matter of existing law, dealers are already prohibited from engaging in misrepresentations regarding add-ons and from charging for add-ons without express, informed consent—conduct which the Final Rule prohibits as well. Accordingly, the Commission has determined not to include this provision in its Final Rule.

The Commission will continue to monitor the motor vehicle marketplace for issues pertaining to unselected or undisclosed add-ons, and will consider implementing additional measures in the future if it determines such measures are necessary to address deceptive or unfair practices relating to add-ons.

---

[387] See, e.g., Complaint ¶¶ 25–28, Fed. Trade Comm'n v. N. Am. Auto. Servs., Inc., No. 1:22–cv–01690 (N.D. Ill. Mar. 31, 2022).

[388] See, e.g., Auto Buyer Study, supra note 25, at 13–15, 17–18.

[389] See Removatron Int'l Corp. v. Fed. Trade Comm'n, 884 F. 2d 1489, 1497 (1st Cir. 1989) ("Disclaimers or qualifications . . . are not adequate to avoid liability unless they are sufficiently prominent and unambiguous to change the apparent meaning of the claims and to leave an accurate impression. Anything less is only likely to cause confusion by creating contradictory double meanings.").

[390] Even in the hypothetical scenario where some consumers could have avoided the injury because they understood that an add-on would not benefit them but wanted to pay extra for the add-on anyway, the dealer's conduct in selling non-beneficial add-ons would still be unfair because it substantially injures other consumers who do not wish to pay for items that would not benefit them and, as discussed in the SBP text, cannot reasonably avoid the harm, and no countervailing benefits outweigh the costs. See FTC v. Amazon.com, Inc., 2016 U.S. Dist. LEXIS 55569, *15, *18–21 (W.D. Wash. Apr. 26, 2016) (finding unfairness even though some consumers could have avoided the charge). Additionally, consumers who truly wish to purchase add-ons that do not benefit them may still be able to do so directly from the add-on provider.

[391] See Nat'l Auto. Dealers Ass'n et al., "Voluntary Protection Products: A Model Dealership Policy" 5 (2019), https://www.nada.org/regulatory-compliance/voluntary-protection-products-model-dealership-policy (explaining that when determining which voluntary protection products to offer to customers, "the dealership should have confidence in the value that the product offers to customers," including that the dealership should understand "whether its coverage is already provided by another product being purchased by the consumer," and stating "[i]t is essential that customers have a clearly defined path to receiving such benefits.").

[392] See 15 U.S.C. 57a(a)(1)(B) (the Commission "may include requirements prescribed for the purpose of preventing" unfair or deceptive acts or practices).

[393] See, e.g., Comment of Nat'l Consumer L. Ctr. et al., Doc. No. FTC–2022–0046–7607 at 30–31. Instead, advocates recommended that the Commission require a cooling-off period for add-ons, similar to that required by the Commission for door-to-door and other off-premises sales, which would grant consumers time to review the paperwork after the transaction, and to cancel unexpected or otherwise unwanted add-ons for a full refund. Id. This comment is addressed when discussing § 463.5(c) in SBP III.E.2(c).

(c) Any Item Without Express, Informed Consent

Section 463.5(c) of the proposed rule prohibited motor vehicle dealers, in connection with the sale or financing of vehicles, from charging consumers for any item unless the dealer obtains the express, informed consent of the consumer for the charge. Upon careful review and consideration of the comments, the Commission is finalizing this provision with one modification from its original proposal: the addition of language to the end of § 463.5(c) clarifying that the requirements in § 463.5(c) "also are prescribed for the purpose of preventing the unfair or deceptive acts or practices defined in this part, including those in §§ 463.3(a) and (b), 463.4, and paragraph (a) of this section." In addition, the Commission is finalizing the corresponding definition of "Express, Informed Consent," now at § 463.2(g).

Many commenters favored the proposed provision and expressed the need for such a provision. For example:

• In one instance a salesman who appeared busy and trying to help me efficiently navigate the process rushed me to sign a small paper, "just sign this quickly and we'll be on our way," I was told, without disclosure that they were selling me something that I did not want. I found it later and felt cheated.[394]

• They made me sign the sales bill on an electronic device, but the finance guy never pointed to me any number I was getting charge[d] for, and never pointed to me the total amount I was getting billed for. He seem[ed] to be in a hurry and he even told me he had people waiting for him to see. I think it was all planned to push the buyer to blindly sign the bill of sale without explaining anything because he was scrolling the electronic pages in a hurry and going straight to the sign box line. I thought I signed the agreed amount, I trust them, but, instead, they charge me for things I never agreed on. I went back to the dealer in less than 48 hours when I discovered the fraud and asked them to remove the extra fees they charged me for, they refused and they forced me to pay for it, I asked them and requested to take the car back, they refused it again, at the end, they gave me a little bit of a discount, but, not compared to what I got charged for. . . .[395]

• I am an attorney in private practice in NY representing consumers for 33 years. It never ceases to amaze me how car dealers defraud honest trusting

consumers substantial sums of money through various common deceptive and fraudulent practices ranging from altering documents, concealing documents, having consumers sign blank documents, lying about the material terms of the deal, altering the prices, adding on other contracts or items never discussed and selling vehicles with undisclosed damages and defects.[396]

• I have worked in the automotive business for many year[s]. I realize there are plenty of dealers around the US that have deceptive business practices, however this isn't the case for all dealers. I believe there can be laws that can be put in place to help prevent dealers from adding additional backend products without consent or knowledge.[397]

Others supported the proposed provision and urged the Commission to include additional measures, such as a thirty-day "cooling-off" period within which consumers would be able to receive a full refund for any add-ons. A number of commenters, including consumer advocacy organizations, contended that such an additional time frame to review, and potentially cancel, any add-ons would counter the high-pressure, confusing environment of the dealership F&I office and undermine any efforts to misrepresent add-on charges and coverage. Such commenters also indicated that such a provision would allow consumers the opportunity to compare prices and providers, and ultimately help increase competition in the marketplace. A few individual commenters requested that the Commission provide a cooling-off period not only for add-ons, but for the full vehicle purchase, and a prohibition on charging non-refundable deposits.

The Commission agrees that a "cooling off" provision could offer consumers additional protection from unwanted add-ons; however, additional information would assist the Commission in evaluating the potential benefits of such a provision. Such information might include, for example, what length a cooling-off period would need to be in order to offer adequate protection to consumers and to competition, or how consumers would most effectively be made aware of such a cooling-off period in the course of the complicated, lengthy, and document-heavy vehicle sale or financing transaction. Such information would be particularly relevant given that, in the

Commission's law enforcement experience, consumers have paid unauthorized charges on years-long contracts without learning of the charges.[398] Accordingly, the Commission will continue to monitor the market to determine whether, after adoption of this Rule, it appears that a cooling-off period or other measures would be warranted.

Other commenters, including consumer advocacy organizations, emphasized the importance of having disclosures and other documents available in the language used to negotiate the sale or lease. Here, the Commission notes that a dealer does not obtain the express, informed consent of the consumer if the consumer's assent to a charge is ambiguous or based on a disclosure the consumer does not easily understand.[399] Thus, if a dealer uses one language during negotiations and a different language in its contracts, and the consumer does not understand and assent to the charges, the dealer is violating § 463.5(c). Furthermore, the Commission notes that the definition of "Express, Informed Consent" it is finalizing at § 463.2(g) requires, *inter alia,* a clear and conspicuous disclosure of what the charge is for and the amount of the charge, and the Commission's definition of "Clear(ly) and Conspicuous(ly)," at § 463.2(d)(5), requires disclosures to appear "in each language in which the representation that requires the disclosure appears."

Other commenters, including a consumer advocacy organization and a consumer protection agency, recommended the Commission prescribe additional requirements for obtaining express, informed consent for charges, such as boxes for signatures and date-and-time recordings, and a requirement that dealers comply with the E-Sign Act. Other commenters also discussed obtaining consent through electronic signatures. Commenters including consumer advocacy organizations, for instance, reported cases wherein documents that were signed and supposedly provided electronically to consumers, were never actually delivered to the consumer, or delivered days later. According to these commenters, some consumers would sign on a small signature pad where they could not see the terms of the document being signed. Other practitioner commenters reported that

---

[394] Individual commenter, Doc. No. FTC–2022–0046–0794.

[395] Individual commenter, Doc. No. FTC–2022–0046–0671.

[396] Individual commenter, Doc. No. FTC–2022–0046–0073.

[397] Individual commenter, Doc. No. FTC–2022–0046–9917.

[398] *See* discussion in SBP II.B.2.

[399] *See* § 463.2(g) (defining "Express, Informed Consent" to include an affirmative act communicating "unambiguous assent to be charged"); § 463.2(d) (defining "Clear(ly) and Conspicuous(ly)" to include a manner that is "easily understandable").

consumers' electronic signatures were applied to contracts with very different terms from what the consumers believed they were accepting. An individual commenter recommended that dealers be required to provide paper documents where requested and consumers be allowed to consent on paper documents only, noting that elderly consumers or those for whom English is a second language may have difficulty with electronic signatures. Another individual commenter expressed the view that anyone needing assistance understanding the sales price or disclosures should be provided independent legal counsel at the dealership's expense.

While the Commission agrees that additional measures to promote express, informed consent could reduce the incidence of unauthorized charges and aid with enforcement efforts, the Commission has determined not to include in this Final Rule provisions that would require new forms during the vehicle sale or financing transaction. This way, law-abiding dealers would not have to change their practices for obtaining express, informed consent. Thus, the Commission declines to add further requirements, including those involving signature boxes or date-and-time recordings. Regarding the E-Sign Act, nothing in the Rule modifies compliance obligations under this Act. Instead, the Final Rule requires that, regardless of whether any given signature may have been obtained through electronic or other means, the dealer must obtain the express, informed consent of the consumer to any item for which the dealer charges the consumer. Furthermore, the Commission notes that a dealer has not obtained express, informed consent if a dealer has consumers sign an electronic keypad without seeing and understanding the terms, or applies their electronic signatures on contracts with terms different from those to which the consumer agreed.[400] In such circumstances, the consumer has not demonstrated informed consent, or unambiguous assent to be charged, including because the signatures are not in close proximity to clear and conspicuous disclosures regarding the charges.

Other commenters, including industry and dealership associations, claimed that the Commission did not provide enough information regarding what would constitute express, informed

consent to charges, contending that additional detail was needed, or that the provision and associated definition of "Express, Informed Consent" were too vague. The Commission notes, however, that the phrase "Express, Informed Consent" is consistent with existing legal standards.[401] Commission enforcement actions over the years have challenged as deceptive or unfair the failure to get express, informed consent to charges, including in actions involving motor vehicle dealers and others:

• Rushing consumers through stacks of auto paperwork more than 60 pages deep and requiring over a dozen signatures, where the paperwork included charges for unwanted add-ons.[402]

• Double charging certain fees without consumers' knowledge or consent in highly technical documents presented at the close of a long financing process after an already lengthy process of selecting a vehicle and negotiating over its price.[403]

• Presenting consumers with preprinted sales and financing forms that included add-ons consumers had not requested, and rushing consumers through the closing process while directing them where to sign forms, including forms that were blank.[404]

• Charging consumers more for a product or service than they agreed to pay.[405]

• Charging consumers for more products than they requested.[406]

• Cramming charges onto consumers' bills for services that the consumers did not request without the consumers' knowledge or consent.[407]

Courts have found the failure to obtain express, informed consent to be a violation of the FTC Act.[408] Other

statutes and rules enforced by the Commission include express, informed consent requirements for consumer purchases,[409] and similar provisions have appeared in Commission orders resolving charges that motor vehicle dealers or other sellers have levied unauthorized charges on consumers.[410] In short, the prohibition in § 463.5(c) against charging consumers for products or services without their express, informed consent, and the corresponding definition of "Express, Informed Consent" in § 463.2(g) are consistent with existing law in articulating what motor vehicle dealers must do—and already should be doing.

The Commission further notes that the proposed definition of "Express, Informed Consent" provided information regarding what was required by § 463.5(c): an affirmative act by the consumer communicating unambiguous assent to be charged, made after receiving and in close proximity to a clear and conspicuous disclosure, in writing, and also orally for in-person transactions, of the following: (1) what the charge is for; and (2) the amount of the charge, including, if the charge is for a product or service, all fees and costs to be charged to the consumer over the period of repayment with and without the product or service. As is evident from this language, there

---

[400] See § 463.2(g) (defining "Express, Informed Consent" to include requiring clear and conspicuous disclosures of what the charge is for and the amount of the charge).

[401] See, e.g., Fed. Trade Comm'n v. Amazon.com, Inc., 71 F. Supp. 3d 1158, 1163 (W.D. Wash. 2014).

[402] Complaint ¶¶ 24–25, 29–49, 76, Fed. Trade Comm'n v. North Am. Auto. Servs., Inc., No. 1:22–cv–01690 (N.D. Ill. Mar. 31, 2022).

[403] Complaint ¶¶ 17–19, 44, Fed. Trade Comm'n v. Liberty Chevrolet, No. 1:20–cv–03945 (S.D.N.Y. May 21, 2020).

[404] Complaint ¶¶ 59–64, 91, Fed. Trade Comm'n v. Universal City Nissan, No. 2:16–cv–07329 (C.D. Cal. Sept. 29, 2016).

[405] See, e.g., Complaint ¶¶ 29, 47, Fed. Trade Comm'n v. Yellowstone Cap. LLC, No. 1:20–cv–06023–LAK (S.D.N.Y. Aug. 3, 2020).

[406] See, e.g., Complaint ¶¶ 11–14, 21, Bionatrol Health, LLC, No. C–4733 (F.T.C. Mar. 5, 2021).

[407] See, e.g., Complaint ¶¶ 8–9, 42, Fed. Trade Comm'n v. T-Mobile USA, Inc., No. 2:14–cv–00967– JLR (W.D. Wash. July 1, 2014); Complaint ¶¶ 9, 49, Fed. Trade Comm'n v. AT&T Mobility, LLC, No. 1:14–cv–03227–HLM (N.D. Ga. Oct. 8, 2014).

[408] See, e.g., Fed. Trade Comm'n v. FleetCor Techs., Inc., 620 F. Supp. 3d 1268, 1333–38 (N.D. Ga. 2022); Fed. Trade Comm'n v. Amazon.com, Inc., No. C14–1038–JCC, 2016 WL 10654030, at *8 (W.D. Wash. July 22, 2016); Fed. Trade Comm'n v.

Inc21.com Corp., 745 F. Supp. 2d 975, 1005 (N.D. Cal. 2010), aff'd, 475 F. App'x 106 (9th Cir. 2012).

[409] 15 U.S.C. 8402(a)(2), 8403(2) (Restore Online Shoppers' Confidence Act); 16 CFR 310.4(a)(7) (Telemarketing Sales Rule).

[410] The Commission has required express, informed consent provisions in orders against motor vehicle dealers and others. See Stipulated Order at Art. IV, Fed. Trade Comm'n v. Passport Auto. Grp., Inc., No. 8:22–cv–02670–TDC (D. Md. Oct. 18, 2022); Stipulated Order at Art. II, Fed. Trade Comm'n v. North Am. Auto. Servs., Inc., No. 1:22–cv–01690 (N.D. Ill. Mar. 31, 2022) Stipulated Order at Art. II, Fed. Trade Comm'n v. Liberty Chevrolet, No. 1:20–cv–03945 (S.D.N.Y. May 22, 2020); Stipulated Order at Art. III, Fed. Trade Comm'n v. Consumer Portfolio Servs., No. 14–cv– 00819 (C.D. Cal. June 11, 2014). Similarly, the Commission has required such provisions in orders in other contexts. See, e.g., Stipulated Order at Art. III, Fed. Trade Comm'n v. Yellowstone Cap. LLC, No. 1:20–cv–06023–LAK (S.D.N.Y. May 4, 2021); Stipulated Order at Art. IV, Fed. Trade Comm'n v. Prog. Leasing, No. 1:20–cv–1668–IPB (N.D. Ga. Apr. 22, 2020); Decision and Order at Art. VI, Bionatrol Health, LLC, No. C–4733 (F.T.C. Mar. 5, 2021); Stipulated Order at Art. I.E, Fed. Trade Comm'n v. BunZai Media Grp., Inc., No. CV 15–4527–GW (PLAx) (C.D. Cal. June 27, 2018); Stipulated Order at Art. I, Fed. Trade Comm'n v. T-Mobile USA, Inc., No. 2:14–cv–00967–JLR (W.D. Wash. Dec. 19, 2014); Stipulated Order at Art. I, Fed. Trade Comm'n v. AT&T Mobility, LLC, No. 1:14–cv–03227–HLM (N.D. Ga. Oct. 8, 2014); Decision and Order at Art. I, Google, Inc., No. C–4499 (F.T.C. Dec. 2, 2014); Consent Order, Apple Inc., No. C–4444 (F.T.C. Mar. 27, 2014); cf. Fed. Trade Comm'n v. Kennedy, 574 F. Supp. 2d 714, 720–21 (S.D. Tex. 2008) (consumers charged without express, informed consent for web services could not reasonably avoid harm when told that websites were "free").

must be an affirmative act that itself conveys the consumer's unambiguous assent to the specific charge: it must clearly and expressly communicate both that the consumer has been *informed* about the charge and *consents* to the charge. This act cannot be susceptible to alternative interpretations, *i.e.*, that the consumer meant to communicate something other than the consumer's authorization to be charged for the specific add-on or other item in question. For example, a consumer might ask, "how much would it cost to get the car with [a specific add-on]?" Such a statement does not convey unambiguous assent to be charged for the mentioned add-on; rather, it could merely convey curiosity, interest, or a desire to evaluate options. Similarly, if a consumer responds to a salesperson's description of an add-on by saying "OK," this response may merely confirm that the consumer had heard or understood information and does not indicate the consumer's unambiguous assent to purchase, let alone be charged for, such an item.

Relatedly, some commenters, including dealership associations, suggested that the addition, by the consumer, of a signature or set of initials, accompanied by a corresponding date can be partial evidence of an affirmative, or "Express," act. The Commission notes that the extent to which these, or other, acts indicate "Express, Informed Consent" depends on circumstances and context. A consumer signing a lengthy document with pre-checked boxes does not, by itself, demonstrate express, informed consent. This is particularly so at the end of an hours-long transaction, at which point actions that, under other circumstances, may indicate assent are increasingly less likely to do so unambiguously, given that at the close of a transaction, consumers expect to be finalizing previously agreed-upon terms instead of discussing new products or services hours into the deal. For express, informed consent to be effective, the consumer must understand what a charge is for and the amount of the charge, including all costs and fees over the length of the payment period. A signed and dated document would not satisfy the requirement for express, informed consent, for example, if the consumer was directed to sign the final page of a contract or an electronic signature pad and the signed and dated document did not reflect the terms to which the consumer had agreed. In such cases, the signed and dated document does not represent the consumer's unambiguous assent to be charged,

made after receiving, and in close proximity to, a clear and conspicuous disclosure of what the charges are for and the amount of the charges.

Some industry association commenters argued that the proposed definition was too prescriptive, and would require, for instance, video records to demonstrate compliance, or that the proposed language was overreaching, and requiring express, informed consent for every item on a contract would be complicated and time-consuming. The Commission notes again that, under current law, dealerships are already required to obtain consumers' express, informed consent to charges. If dealers are already obtaining such consent, as is required by law, they need not take additional steps, such as by using a separate disclosure form or videos, or by spending additional time during the transaction to comply with this provision.

A dealership association commenter requested examples of recordkeeping and best practices evidencing oral disclosures that would satisfy the requirement to obtain express, informed consent. The express, informed consent requirement and definition require the disclosure to be made in *writing* in addition to orally for in-person transactions. Furthermore, under other provisions of the Rule, such as the definition of "Clear(ly) and Conspicuous(ly)" at § 463.2(d)(7), dealers are prohibited from contradicting information that is required to be disclosed; thus, for example, dealers' oral representations must be consistent with the written disclosure required for obtaining express, informed consent. Best practices for satisfying the requirement to obtain express, informed consent include presenting key information and finalizing actual terms early in the transaction—for example, by including full cost information, such as estimated taxes, costs of any selections made by the consumer, and any other components of cost, on dealer websites—and maintaining records that this was done. The Commission notes that, as a transaction progresses, consumers expect to be finalizing previously agreed-upon terms instead of discussing new charges and new products or services. In lieu of finalizing additional formal mandates in the Rule regarding recordkeeping and best practices evidencing express, informed consent, the Commission recognizes that industry members and other stakeholders will have significant room to develop self-regulatory programs and guidance tailoring these and other

topics to the specifics of their business operations.

Some dealership association commenters expressed concern that such a provision would be inconsistent with State laws and would complicate the car buying experience. While the Commission is not aware of any laws that allow dealers to charge consumers without their express, informed consent, and thus is not aware of any inconsistencies with this provision, § 463.9 of the Final Rule specifies what dealers must do in the case of actual conflicts with State law. State laws may provide more or less specific requirements—including requirements that provide greater protection—as long as they do not conflict with the Final Rule, as set forth in § 463.9. The Commission also notes that to the extent there is overlap with existing law, there is no evidence that duplicative prohibitions against deceptive and unfair conduct, including prohibitions against charging consumers without express, informed consent, have harmed consumers or competition.

Commenters, including an industry association, inquired whether the term "item," as used in this proposed provision, differed from the term "Add-on Product or Service" defined in § 463.2 of the Commission's proposal. The industry association also argued that requiring express, informed consent is beyond what is required under the Truth in Lending Act. The Commission responds as follows: Consistent with its plain meaning, the term "item" is broader than, and thereby encompasses, the term "Add-on Product(s) or Service(s)," which is limited by its definition in § 463.2 of the Final Rule.[411] As proposed, § 463.5 addressed "Dealer Charges for Add-ons and *Other Items*."[412] It did so in recognition of the fact that add-ons are one type of "item," but that "*Other Items*" for which a dealer might charge exist as well. Thus, as proposed, § 463.5 applied to charges generally, whether such charges were for an add-on or for another item. As previously discussed, charging consumers without their express, informed consent to the charge has long been an unfair or deceptive practice under the FTC Act. This has been the case regardless of what the charge is for. Accordingly, dealers already should be obtaining consumers' express, informed

---

[411] *See* NPRM at 42046. The term "item" includes "a distinct part in an enumeration, account, or series" as well as "a separate piece of news or information." *See Item* (defs. 1, 3), Merriam-Webster.com Dictionary, *https://www.merriam-webster.com/dictionary/item* (last visited Sept. 14, 2023).

[412] *See* NPRM at 42046 (emphasis added).

consent for charges, whether it is for an Add-on or any other item, regardless of what may be required under other laws.

Commenters, including this same industry association commenter, also questioned how a dealership would calculate "the amount of the charge . . . with and without the product or service" as would be required under proposed § 463.2(g)(2), as well as how this proposed provision would work in a non-financed transaction.[413] Conversely, an individual commenter stated that current F&I practices already routinely disclose the proposed charges with and without the product or service. The Commission notes that its proposed definition of "Express, Informed Consent" plainly required disclosure of the "amount of the charge, including, if the product is for a product or service, all fees and costs to be charged to the consumer over the period of repayment with and without the product or service." [414] The amount the dealer will charge the consumer over the period of repayment with the product or service is the total charge for that product or service. In the event the charge is for an optional product or service, the amount the dealer will charge the consumer without the product or service is zero; in the event the charge is for a non-optional item, the dealer's disclosure must clearly indicate as such. Regarding non-financed transactions, as with a financed transaction, the amount the dealer will charge the consumer over the period of repayment with the product or service is the total charge for that product or service. If the period of repayment is such that full payment is due upon receipt of the vehicle, the amount required to be disclosed is the total charge for that product or service to be paid upon receipt of the vehicle. The amount the dealer will charge the consumer without the product or service, if it is optional, is zero; in the event the charge is for a non-optional item, the dealer's disclosure must clearly indicate such. Sharing this basic information with consumers—how much they will pay for the item and how much they will pay without it—addresses practices, such as hiding add-on charges, misrepresenting whether such charges are required in connection with the vehicle sale or financing transaction, or misrepresenting how

such charges influence the total of payments for the transaction.

An industry association comment stated that, were the Commission's proposal to become final, the Commission would be able to obtain monetary relief from dealers for harmed consumers, and argued that Holder Rule protections for such consumers thus would be unnecessary.[415] Accordingly, it urged the Commission to modify its proposal to include a safe harbor for contract assignees, which it argued would be incapable of detecting deficiencies in sale or lease transactions, such as dealer misrepresentations or a lack of consumer consent, unless those deficiencies were apparent from the face of the contract. Here, the Commission emphasizes that no provision of the Final Rule changes the status quo regarding the responsibilities of assignees or other subsequent holders of motor vehicle financing under the Holder Rule. The Commission did not include, when enacting the Holder Rule, a safe harbor from liability for claims or defenses based on their capability of detection by such assignees or other subsequent holders, and the Commission does not believe on the basis of comments received in the course of this rulemaking that such a change would be warranted as a consequence of finalizing this Rule. The Holder Rule provides important protections for harmed consumers, even when there is law that allows the Commission or other law enforcers to obtain remedies for harmed consumers, including where the consumers are seeking recourse from, or defending themselves against, parties that have not been the subject of law enforcement actions.[416] Furthermore, while the Commission understands that dealers are often in the best position to ensure they have, in the first instance, obtained a consumer's express, informed consent for charges, there are steps an assignee or other subsequent holder of the consumer credit contract, such as a third-party financing entity, can take to address concerns about contracts obtained without express, informed consent. For example, if a financing entity receives complaints from consumers or others that specific charges were obtained without

authorization or sees that charges for a particular item are occurring substantially more frequently at a given dealership than at others, the financing company can take steps to make sure the dealer is obtaining express, informed consent. Further, if a financing entity is concerned that a dealership may be acting in violation of the Final Rule, it may arrange its business relationships accordingly, including by altering or withdrawing its business from the dealership.[417]

Another industry association commenter asked for clarification regarding the extent to which particular rules are necessary to obtain customer authorization for charges, thus reflecting what is already necessary under State or Federal law, as opposed to preventative measures that the Commission otherwise deems necessary. The Commission notes that this provision is consistent with the requirements of the FTC Act, which already prohibits charging consumers without express, informed consent, and is needed to address unfair and deceptive conduct. As the Commission set forth in its NPRM, the length and complexity of motor vehicle transactions has created an environment rife with deceptive and unfair conduct. Consumer complaints and the Commission's extensive law enforcement experience, among other sources, indicate that some dealers have added thousands of dollars in unauthorized charges to motor vehicle transactions, including for add-ons consumers had already rejected.[418] Such issues are exacerbated when, for example, preprinted dealer contracts automatically include charges for optional add-ons that the consumer has not selected; when dealers rush consumers through stacks of paperwork with buried charges after a lengthy process; when dealers misinform consumers that the documents they are signing represent agreed-upon terms; or when dealers ask consumers to sign blank documents.

Charging consumers without their express, informed consent causes substantial injury to consumers in the amount of the unauthorized charge. This injury is not reasonably avoidable when dealers do not clearly and conspicuously disclose to the consumer what the charge is for and the amount of the charge, since this information is within the unilateral control of the

---

[413] This commenter also contended that this provision would result in many disclosures when combined with proposed § 463.5(b). Comment of Nat'l Auto. Dealers Ass'n, Doc. No. FTC–2022–0046–8368 at 98–99. As discussed previously, the Commission declines to finalize proposed § 463.5(b).

[414] See NPRM at 42045.

[415] See Holder Rule, 16 CFR 433.2.

[416] See Holder Rule, 16 CFR 433.2; see also Fed. Trade Comm'n, Advisory Opinion Regarding F.T.C. Trade Regulation Rule Concerning Preservation of Consumers' Claims and Defenses (May 3, 2012), https://www.ftc.gov/system/files/documents/advisory_opinions/16-c.f.r.part-433-federal-trade-commission-trade-regulation-rule-concerning-preservation-consumers-claims/120510advisoryopinionholderrule.pdf (last visited Dec. 5, 2023).

[417] See Complaint ¶¶ 29–32, Fed. Trade Comm'n v. Tate's Auto Ctr. of Winslow, Inc., No. 3:18-cv-08176–DJH (D. Ariz. July 31, 2018) (alleging a financing entity ceased business with Tate's Auto Center after concerns about loan falsification and substantial losses).

[418] See SBP II.B.2.

dealer. There are no countervailing benefits to consumers or to competition that outweigh this injury. To the contrary, if all dealers obtained express, informed consent to charges, they would not lose business to dealers who do not do so.

Charging for an item without obtaining the consumer's express, informed consent is also a deceptive practice under section 5 of the FTC Act.[419] When a dealer presents a consumer with whom the dealer has negotiated a finalized sale or financing contract, the dealer is representing that the contract includes only charges that were negotiated and to which the consumer agreed. If the dealer failed to obtain the consumer's express, informed consent, however, such a representation is false or misleading. It is also material: if consumers knew that they had not, in fact, authorized a charge that the dealer nonetheless included in their sales or financing contract, this information likely would have affected the consumers' willingness to continue to engage with the dealership, as well as consumers' willingness to select and pay for any such item. The express, informed consent requirement also serves to prevent the misrepresentations prohibited by § 463.3 of the Final Rule—including misrepresentations regarding material information about the costs or terms of purchasing, financing, or leasing a vehicle, and about any costs, limitation, benefit, or other aspect of an add-on.[420] The requirement also serves to prevent violations of the disclosure requirements in § 463.4 and the prohibition against charging for non-beneficial add-ons in § 463.5(a). By operation of the definition of "Express, Informed Consent" at § 463.2(g), this requirement reduces the likelihood that dealers will fail to disclose what a given charge is for and the amount of the charge including all fees and costs to be charged to the consumer over the period of repayment with and without the charged item, thereby making the disclosures of information required by § 463.4 more likely. The same is true regarding the requirements of § 463.5(a): the requirement that dealers obtain informed and unambiguous assent to be charged for each product or service makes it less likely that dealers will charge consumers for items from which

they would not benefit; consumers typically do not provide informed, unambiguous assent to be charged for additional products from which they could not benefit unless they are led to believe, directly or by omission, that these products would be beneficial.

Thus, the Commission has determined to finalize proposed § 463.5(c), prohibiting dealers from charging a consumer for any item unless the dealer obtains the express, informed consent of the consumer for the charge, with the addition of language clarifying that the requirements in § 463.5(c) "also are prescribed for the purpose of preventing the unfair or deceptive acts or practices defined in this part, including those in §§ 463.3(a) and (b), 463.4, and paragraph (a) of this section." In addition, the Commission has determined to finalize its definition of "Express, Informed Consent," now at § 463.2(g), substantively as proposed.

*F. § 463.6: Recordkeeping*

Proposed § 463.6 required motor vehicle dealers to create and retain, for a period of twenty-four months from the date the record is created, all records necessary to demonstrate compliance with the Final Rule, including those in five enumerated paragraphs. This proposed section further provided that dealers may retain such records in any legible form, and in the same manner, format, or place as they may already keep such records in the ordinary course of business, and that failure to keep all required records required will be a violation of the Rule. As examined in additional detail in the following analysis, several commenters supported the proposal; several urged the Commission to adopt broader recordkeeping requirements; and several other commenters argued that the proposed requirements were too broad. After careful consideration, the Commission has determined to adopt these recordkeeping requirements largely as proposed, with two conforming modifications to remove references to proposed provisions not adopted in the Final Rule; one typographical modification to include a serial comma for consistency; and minor textual changes to ensure consistency with the defined terms at § 463.2(e) and (f) by replacing "Motor Vehicle Dealer" with "Covered Motor Vehicle Dealer" or "Dealer," replacing "Motor Vehicle" with "Vehicle," and capitalizing "vehicle." In the following paragraphs, the Commission discusses each proposed recordkeeping requirement, the comments the Commission received on each such requirement as well as the Commission's responses to such

comments, and the provisions the Commission is finalizing.

Section 463.6(a) of the proposed rule required motor vehicle dealers to create and retain, for a period of twenty-four months from the date the record is created, all records necessary to demonstrate compliance with the Final Rule, including (1) copies of materially different advertisements, sales scripts, training materials, and marketing materials regarding the price, financing, or lease of a motor vehicle that the dealer disseminated during the relevant time period; (2) copies of all materially different add-on lists and all documents describing such products or services that are offered to consumers; (3) copies of all purchase orders; financing and lease documents with the dealer signed by the consumer, whether or not final approval is received for a financing or lease transaction; and all written communications relating to sales, financing, or leasing between the dealer and any consumer who signs a purchase order or financing or lease contract with the dealer; (4) records demonstrating that add-ons in consumers' contracts meet the requirements of § 463.5, including copies of all service contracts, GAP agreements, and calculations of loan-to-value ratios in contracts including GAP agreements; and (5) copies of all written consumer complaints relating to sales, financing, or leasing, inquiries related to add-ons, and inquiries and responses about vehicles referenced in § 463.4.

Proposed § 463.6(b) provided that a motor vehicle dealer may keep the required records "in any legible form, and in the same manner, format, or place as they may already keep such records in the ordinary course of business." This proposed paragraph also specified that failure to keep all records required under paragraph (a) of this section would be a violation of the Final Rule.

Many commenters, including State regulators, legal aid groups, consumer advocacy organizations, and individual commenters, endorsed the Commission's proposed rule generally, without criticism of its proposed recordkeeping requirements. In addition, one such association commenter expressly stated that it supported each of the proposed recordkeeping provisions, explaining that these proposed provisions were needed to address "bait and switch" tactics, provide evidence of whether required disclosures are made, and identify consumers harmed by illegal

---

[419] *See, e.g.*, *Fed. Trade Comm'n* v. *FleetCor Techs., Inc.*, 620 F. Supp. 3d 1268, 1334–39 (N.D. Ga. Aug. 9, 2022); *Fed. Trade Comm'n* v. *Inc21.com Corp.*, 745 F. Supp. 2d 975, 1001–03 (N.D. Cal. Sept. 21, 2010).

[420] *See* 15 U.S.C. 57a(a)(1)(B) (the Commission "may include requirements prescribed for the purpose of preventing" unfair or deceptive acts or practices).

practices.[421] Here, the Commission notes that record retention requirements are necessary to preserve written materials that reflect the transactions between the dealer and purchasing consumers, and to assist the Commission to enforce its Rule by enabling it to ascertain whether dealers are complying with its requirements; to identify persons who are involved in any challenged practices; and to identify consumers who may have been injured. Such requirements are particularly important in the case of complicated, lengthy, and document-heavy vehicle sale or financing transactions, in which law violations may be more difficult for consumers and others to detect. Indeed, the Commission routinely includes recordkeeping requirements in its rules.[422]

Several commenters, including consumer advocacy organizations, consumer protection agencies, a group of State attorneys general, and individual commenters, urged the Commission to consider expanding the proposed twenty-four-month record retention period, noting that the contract period for most retail installment contracts is much longer than twenty-four months, and that State limitations periods for claims relating to the subject matter of the Commission's proposed rule often extend well beyond this proposed timeframe. Numerous such commenters, for instance, recommended a record retention period of the longer of seven years or the length of the consumer's financing contract.

The Commission understands that there would be benefits to a longer period, especially given that vehicle financing repayment terms are often far longer than twenty-four months, and that many dealers likely already maintain, in the ordinary course of business, the types of records set forth in proposed § 463.6. The Commission, however, is also mindful that other commenters raised concerns about the costs associated with record retention, including costs that would increase with any extension of the retention period. Rather than limiting the types of records to be maintained, and thus hampering the Commission's ability to ensure compliance with the Final Rule, the Commission has determined to adopt a retention period that is shorter than the time period of many motor

vehicle financing contracts, in order to minimize burdens. In the event the Commission subsequently determines that a twenty-four-month retention period is insufficient to ensure compliance with this Rule, the Commission may consider other measures in the future.

In addition, a number of commenters, including consumer advocacy organizations, recommended additional provisions, including an explicit requirement to retain language-translated versions of required records, and a requirement to make retained records available to consumers upon request. Regarding language-translated versions of required records, § 463.6(a)(3), (a)(4), and (a)(5) require dealers to retain copies of "all" listed records, while § 463.6(a)(1) mandates that dealers retain "Materially different" copies of records. Thus, for the records listed in § 463.6(a)(3), (a)(4), and (a)(5), any translations are required to be retained; in the case of § 463.4(a)(1), the Rule requires materially different translations to be maintained.[423] The Commission therefore has determined not to add to the recordkeeping section of the Rule a standalone requirement to retain translated versions. The Commission will continue to monitor the marketplace to determine whether additional action or protections are warranted.

The Commission also declines to include in this Final Rule an additional requirement that dealers provide retained records to consumers upon request. Such a requirement may be beneficial; however, it is not clear to what extent dealers currently refuse to provide consumers with such records, and there is insufficient information in the rulemaking record to assess the impact of—or need for—such a modification of the existing requirement to retain and preserve materials in the Rule. The Commission will continue to monitor the motor vehicle marketplace, including issues relating to information access, to determine whether additional action or protections are warranted.

Other commenters—particularly auto industry participants—objected to the proposed recordkeeping requirements.[424] Several such

commenters contended that the proposed requirements were new obligations that went beyond specific State recordkeeping requirements. Some dealership associations argued that existing State recordkeeping requirements are sufficient and that a Commission rule was unnecessary. One such commenter argued that the existence of overlapping, but different, State and Federal standards may make compliance difficult for motor vehicle dealers.

In response, the Commission notes that the recordkeeping requirement is necessary to ensure motor vehicle dealer compliance with the Final Rule, and therefore may have different requirements than State standards. To provide dealers with flexibility and to minimize burden, however, the proposed rule permitted dealers to retain records "in any legible form," including "the same manner, format, or place" in which records are kept in the ordinary course of business. To the extent dealers have fashioned their ordinary record retention practices around State recordkeeping standards, the proposed rule thus allowed for record retention in the form required by State recordkeeping standards. Additionally, as discussed in the following paragraphs, the Commission is not finalizing recordkeeping requirements that dealers maintain Add-on Lists and Cash Price without Optional Add-ons disclosures and declinations, further reducing burdens.

One industry association commenter suggested that this requirement would increase risks of identity theft and raise privacy concerns. The Commission notes that many dealers already have obligations to retain customer records under State law.[425] Dealers are required to have systems in place to protect this information, given that the failure to adequately protect such information violates existing law, including section 5 of the FTC Act and the Commission's Standards for Safeguarding Customer Information, also known as the

[421] Comment of Nat'l Consumer L. Ctr. et al., Doc. No. FTC–2022–0046–7607 at 48–49; *see also* Comment of N.Y.C. Dep't of Consumer and Worker Prot., Doc. No. FTC–2022–0046–7564 at 6 (noting retention requirements are vital to investigations, particularly with respect to mandatory disclosures).

[422] *See, e.g.,* Telemarketing Sales Rule, 16 CFR 310.5; Business Opportunity Rule, 16 CFR 437.7.

[423] *See* § 463.2(j).

[424] One industry commentor questioned the utility of records in FTC actions. This commenter also stated that the FTC is not a supervisory agency and thus should not be seeking to create a records inspection scheme. As noted previously, recordkeeping requirements are necessary here to prevent unfair and deceptive practices by mandating preservation of written materials that reflect dealer transactions and to enable effective enforcement of the Rule. The Commission has the authority to prescribe rules for the purpose of

preventing unfair or deceptive acts or practices. *See* 15 U.S.C. 57a(a)(1)(B). The Commission routinely includes recordkeeping requirements in rules, *see, e.g.,* Telemarketing Sales Rule, 16 CFR 310.5; Business Opportunity Rule, 16 CFR 437.7, and courts have ordered companies to maintain records in FTC orders, *see, e.g.,* Final Judgment at 20–21, *Fed. Trade Comm'n v. Elegant Sols., Inc.,* No. 8:19–cv–01333–JVS–KES (C.D. Cal., July 17, 2020); Order for Permanent Injunction and Monetary Judgment at 27–28, *Fed. Trade Comm'n. v. Consumer Defense, LLC,* No. 2:18–cv–00030–JCM–BNW (D. Nev. Dec. 5, 2019).

[425] *See, e.g.,* Va. Code sec. 46.2–1529 (requiring retention for five years of "all dealer records" regarding, among other things, vehicle purchases, sales, trades, and transfers of ownership).

Safeguards Rule.[426] Thus, to the extent the Final Rule requires dealers to collect personal information beyond that which they are already collecting, they should already have systems in place to protect such information.

Some commenters raised concerns about the requirement in proposed § 463.6(a)(1) to preserve, *inter alia*, materially different advertisements, sales scripts, and marketing materials. One such dealership association commenter argued that dealers should not be required to retain sales scripts, training materials, and marketing materials, while another dealership association commenter argued that dealers should not be required to maintain advertisements, positing that these materials are publicly available and could be requested from advertisers as concerns arise with respect to particular ads. Commenters including two dealership organizations argued that digital advertisements would be difficult to retain, with one such commenter urging the Commission to adopt an approach that would permit dealers to retain a representative example of a vehicle advertisement and the underlying data used to populate vehicle ads. The other such commenter suggested that the proposed recordkeeping requirement could be unduly burdensome because "all materials" related to its online inventory "could be deemed some version of materially different advertisements and marketing materials regarding price or financing of a motor vehicle." Another dealership organization commenter raised a similar concern about website listings and questioned whether the term "advertisement" includes television ads and email campaigns.

After considering these comments, the Commission has determined that the proposed recordkeeping requirements in § 463.6(a)(1) strike an appropriate balance by requiring the retention of materials needed to enable effective enforcement while only requiring such records to be retained for twenty-four months and in any legible form. Advertisements and marketing materials regarding the price, financing, or lease of a motor vehicle are critical to determining compliance with virtually every provision in the Final Rule, as they are often consumers' first contact

in the vehicle-buying or -leasing process, and often contain key representations about pricing, payments, and other terms. Scripts and training materials are important evidence of a dealer's compliance program regarding the Final Rule's requirements, including of the information and instructions that dealership staff are given with respect to the areas that are addressed by the Final Rule. Furthermore, regarding the contention that advertisements are available publicly or could be requested separately, a core purpose of the recordkeeping requirement is to ensure that disseminated representations are preserved for a sufficient period of time to allow for compliance concerns to be addressed. A compliance regime that, contrary to the Commission's proposal, allowed the destruction of advertisements after they have been publicly presented, or that requires the Commission to try to obtain materials from advertisers or third parties, would not serve this purpose.

With respect to the scope of advertisements that must be retained, the recordkeeping requirement does not differ with respect to the form of the advertisement, since the same enforcement concerns are raised regardless of whether an ad is presented in digital, hardcopy, email, audio, televised, or other format. The recordkeeping requirement does not require all advertisements to be retained, however, as § 463.6(a)(1) specifically includes the proviso that "a typical example of a credit or lease advertisement may be retained for advertisements that include different Vehicles, or different amounts for the same credit or lease terms, where the advertisements are otherwise not Materially different." Regarding the commenter's proposal to allow dealers to retain a "representative" example of an advertisement with digital data that can recreate different versions of the advertisement, this provision, as proposed, permitted dealers to preserve typical examples of advertisements in this manner so long as such records are already kept in in the ordinary course of business, capture all differences that would be material to consumers, and accurately show how the offers have been presented to consumers. Materially different website listings, television advertisements, and email campaigns must be preserved, consistent with the plain meaning of the terms used in the section.

With respect to proposed § 463.6(a)(2)'s requirement to maintain copies of all materially different add-on lists, an industry association commenter

contended that retaining materially different add-on lists would be difficult, given the scope of the term "Add-on" and the consequent size of the list as well as its dynamic nature. One dealership association commenter argued that the proposed requirement to retain add-on lists was unnecessary, contending that concerns could be addressed as they arise, and requesting to replace this proposed requirement with a requirement to retain a master copy of each insurance product, service contract, or other add-on in the dealer's general business file. After carefully considering the comments, the Commission has determined not to finalize the proposed requirement at § 463.4(b) to disclose an add-on list, and consequently will not be finalizing the proposed requirement at § 463.6(a)(2) that dealers retain materially different add-on lists.

Several commenters, including industry associations, argued that certain of the proposed requirements to preserve written material, including written communications under proposed § 463.6(a)(3) and written consumer complaints, and inquiries and responses about vehicles referenced in § 463.4, under proposed § 463.6(a)(5), would be unduly burdensome. Generally, these commenters contended that the various ways consumers may communicate with dealers—including chat features on a dealer's website, emails and text messages with salespersons, and social media posts— would require the development of new and onerous preservation systems. A dealership organization commenter raised concerns about retaining text messages and emails, contending that salespeople may use their personal phones and email addresses, even if the dealership has policies against such use. One industry association commenter argued that third parties might have records related to add-ons and that this provision should only apply to "complaints" relating to add-ons instead of "inquiries" relating to add-ons. One dealership association commenter argued that dealers should not be required to retain consumer complaints, contending it should be the businesses' decision whether to maintain such materials, and also arguing that the Rule should not require, under proposed § 463.6(a)(4), the preservation of materials such as pricing options presented to consumers, contending that such materials should be limited to the two parties to the agreement.

After considering these comments, the Commission has determined to finalize requirements to retain written materials

[426] 15 U.S.C. 45; 16 CFR 314; *see also* Decision and Order, *LightYear Dealer Techs., LLC,* No. C–4687 (F.T.C. Sept. 3, 2019) (consent order); FTC Business Guidance, "FTC Safeguards Rule: What Your Business Needs to Know," *https://www.ftc.gov/business-guidance/resources/ftc-safeguards-rule-what-your-business-needs-know* (last visited Dec. 5, 2023).

under § 463.6(a)(3), (4), and (5), with a limiting modification to § 463.6(a)(4). These requirements are necessary to address unfair and deceptive practices by mandating that dealers preserve written materials that reflect the transactions between the dealer and purchasing consumers, and to assist the Commission in its enforcement of the Rule.[427] Such materials are particularly important given that the vast majority of consumers do not file a complaint, and with hidden charges, many consumers never know about the illegal conduct in the first place.[428] For instance, as explained in SBP II.B, a survey of one dealership group's customers showed that 83% of the respondents were subject to the dealer's unlawful practices related to add-ons. This equals 16,848 consumers—far more than the 391 complaints received against the dealer over the time period covered by the survey.

To minimize burden, as previously noted, the retention requirements are for a period of twenty-four months. Further, as stated previously, § 463.6(b) permits dealers to retain records "in any legible form," which could, for example, include using the backup and export features that already exist in many social media services, email platforms, chat platforms, and text systems, instead of creating entirely new systems. Regarding dealers that use third parties to administer add-ons, commenters did not explain why they cannot access records related to add-ons from these parties.[429] Further, altering the language in the provision to apply to "complaints" rather than "inquiries" related to add-ons could invite arguments that consumer statements, such as, "Why was I charged for this add-on that I did not know about?" are not "complaints," but simply "inquiries." With respect to the use of salespeople's personal devices to conduct motor vehicle dealer activities, including the sale, financing, or leasing of vehicles, as with any business, dealers should ensure that their employees are communicating with consumers through appropriate channels that can be monitored and controlled by the dealership.

Some commenters, including an industry association and a dealership organization, also raised concerns about how to determine what would constitute "written consumer complaints" under proposed § 463.6(a)(5). For purposes of the Rule, the Commission refers commenters to the plain meaning of the terms used in the phrase, which terms are commonly used and understood.[430]

Two industry association commenters argued that the proposed requirement to retain written communications would be particularly burdensome for recreational vehicle dealers, contending that that this was particularly so given that many RV dealers are small businesses. In response, the Commission notes that, as explained in the paragraph-by-paragraph analysis of § 463.2(e) and (f) in SBP III.B.2(e) and (f), it has determined not to finalize the Rule with respect to dealers predominantly engaged in the sale, leasing, or servicing of RVs, but it will continue to monitor the marketplace to determine whether modifications or revisions may be warranted in the future.

Finally, one industry association commenter argued that the proposed recordkeeping requirements and costs were unwarranted given that the Commission has brought an average of fewer than four enforcement actions a year against motor vehicle dealers in the past decade. In response, the Commission notes that its experience indicates that the number of enforcement actions is not remotely reflective of the total violations of law in the auto marketplace. To uncover misconduct and bring actions, law enforcement agencies and officials often rely on complaints from affected parties. As previously discussed, however, consumer complaints typically represent just the "tip of the iceberg" in terms of actual violations, and the vast majority of consumers who are subjected to unlawful practices in this area may not realize they are being victimized.[431] Further, the Commission has limited law enforcement resources and jurisdiction over a broad range of commerce.[432] The number of actions it brings relating to motor vehicle dealers—as with actions in any area—is necessarily limited by these resource constraints, even when there are ongoing, chronic problems that cause substantial consumer harm. Despite these constraints, the Commission and its law enforcement partners have taken significant action aimed at addressing unfair and deceptive practices in the motor vehicle marketplace, as explained in SBP II.C. Given that problems with bait-and-switch advertising, add-ons, and other aspects of vehicle-buying and -leasing have continued to be a source of consumer harm despite this action, additional measures are warranted. And the Commission has taken steps to minimize burden, including by declining to finalize the add-on list disclosure requirements in proposed § 463.4(b), as well as the itemized disclosures required in proposed § 463.5(b) and their corresponding proposed recordkeeping requirements. Moreover, the recordkeeping provisions permit dealers to retain records in any legible form, providing a flexible standard that permits the use of ordinary and standard forms of data and document retention.

The Commission adopts in the Final Rule recordkeeping requirements largely as they were set forth in the proposed rule, with two substantive modifications. After careful consideration, the Commission is removing the requirements to retain copies of add-on lists required by proposed § 463.6(a)(2) and records showing compliance with the cash price without optional add-on disclosures and declinations required by proposed § 463.6(a)(4). These changes will reduce record creation and retention burdens for dealers. As previously described, the Final Rule also contains one typographical modification of adding a serial comma and conforming edits for consistency with the defined terms in § 463.2(e) and (f).

The Commission adopts these recordkeeping requirements to promote effective and efficient enforcement of the Rule, thereby deterring and preventing deception and unfairness. As discussed throughout this SBP, the rulemaking record, including the

---

[427] As noted previously, a dealership association commenter argued that dealers should not be required to preserve complaints and certain add-on materials, contending that it should be a business decision whether to retain such records. The Commission declines to substantively modify these requirements from the Commission's original proposal, given the importance of these materials in ensuring compliance with the other requirements of the Rule.

[428] See SBP II.B (discussing how complaints represent the tip of the iceberg in terms of actual consumer harm).

[429] This is consistent with the Commission's prior enforcement order practice. See, e.g., Stipulated Order at 25, Fed. Trade Comm'n v. N. Am. Auto. Servs., Inc., No. 1:22–cv–0169 (N.D. Ill. Mar. 31, 2022) (requiring retention of "records of all consumer complaints and refund requests, whether received directly or indirectly, such as through a third party, and any response").

[430] The term "written" means "made or done in writing." See Written, Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/written (last visited Dec. 5, 2023). The term "consumer" includes "one that utilizes economic goods." See Consumer (def. a), Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/consumer (last visited Dec. 5, 2023). The term "complaint" includes an "expression of grief, pain, or dissatisfaction," "something that is the cause or subject of protest or outcry," and "a formal allegation against a party." See Complaint (defs. 1, 2a, 3), Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/complaint (last visited Dec. 5, 2023).

[431] See SBP II.B.

[432] See 15 U.S.C. 45(a).

A69

Commission's law enforcement experience, indicates that there are chronic problems confronting consumers in the motor vehicle sales, financing, and leasing process, which include advertising misrepresentations and unlawful practices related to add-ons and hidden charges.[433] The recordkeeping requirements in the Final Rule will assist the Commission in investigating and prosecuting law violations and help the Commission identify injured consumers for paying consumer redress. The recordkeeping requirements are flexible, allowing dealers to retain materials in any legible form, and are limited to a period of twenty-four months from the date the record is created. The recordkeeping requirements are consistent with, and similar to, the recordkeeping requirements in other Commission rules, as tailored to individual industries and markets.[434]

*G. § 463.7: Waiver Not Permitted*

Proposed § 463.7 prohibited waiver of the requirements of the Final Rule by providing that it constituted a violation of the Rule "for any person to obtain, or attempt to obtain, a waiver from any consumer of any protection provided by or any right of the consumer under" the Rule. Comments that addressed this proposed provision generally either supported it or expressed no opinion on it. Comments in support noted that the provision would help provide consistency in the protection it would provide to consumers and emphasized that it would prohibit unscrupulous dealers from causing consumers to sign away their rights. This proposed provision was modeled on a similar provision in the Mortgage Assistance Relief Services ("MARS") Rule, which was originally promulgated by the Commission and subsequently republished by the CFPB.[435] Moreover, at least one State has a similar waiver provision in its rule covering motor

vehicle dealer practices.[436] The Commission concludes that this provision is necessary to prevent circumvention of the Rule, and, after review of the comments, adopts this prohibition as it was originally proposed.

*H. § 463.8: Severability*

Proposed § 463.8 provided that the provisions of the Final Rule "are separate and severable from one another. If any provision is stayed or determined to be invalid, it is the Commission's intention that the remaining provisions will continue in effect." This proposed provision was modeled on similar provisions in other rules, including the Commission's Telemarketing Sales Rule and the MARS Rule.[437] A number of commenters, including dealership associations, raised general concerns that the proposed provisions may be too integrated with each other for severability to be possible. Such commenters, however, did not provide examples of any such instances wherein they believed certain provisions could not remain in effect if other provisions were stayed or determined to be invalid. Upon consideration of the comments, the Commission concludes that severability is possible in the event any provision is stayed or determined to be invalid. The Rule the Commission is finalizing includes prohibitions against misrepresentations regarding material information (§ 463.3), required disclosures (§ 463.4), and prohibitions against charging for add-ons that provide no benefit or any item without express, informed consent (§ 463.5)—each of which dealers are capable of abiding by independently, as well as by the provisions that independently support their operation, including Authority (§ 463.1), Definitions (§ 463.2), Recordkeeping (§ 463.6), Waiver not permitted (§ 463.7), and Relation to State laws (§ 463.9). Thus, the Commission has determined to adopt this provision in the Final Rule as it was originally proposed.

*I. § 463.9: Relation to State Laws*

Proposed § 463.9 provided that the Rule does not supersede, alter, or affect "any other State statute, regulation, order, or interpretation relating to Motor Vehicle Dealer requirements, except to the extent that such statute, regulation, order, or interpretation is inconsistent

with" the Rule, "and then only to the extent of the inconsistency." Proposed § 463.9 further provided that, for purposes of this provision, a State statute, regulation, order, or interpretation is not "inconsistent" if the protection such statute, regulation, order, or interpretation affords any consumer "is greater than the protection provided under" the Rule. After carefully considering the comments, the Commission adopts § 463.9 largely as proposed in the Final Rule.

Numerous State regulator commenters contended that the proposed rule would create a uniform baseline of protection that would complement State standards. A comment from a group of eighteen State attorneys general contended that many of the Proposed rule's requirements were similar to, or the same as, requirements that currently exist under State laws or regulations, and highlighted the benefit to law enforcement from establishing a consistent Federal baseline while providing States with flexibility to impose heightened consumer protections.[438]

One municipal licensing entity commenter that expressed general support of the Commission's proposed rule also posited that the Commission should broaden proposed § 463.9 to expressly include municipalities. With respect to the applicability of the provision to municipalities, the Commission notes that State political subdivisions exercise delegated power of their State, and as such, § 463.9 applies to municipal standards as well.[439]

Other commenters, including dealership associations, referred generally to potential conflicts between the Commission's proposed rule and State laws, but such commenters typically did not point to any specific purported conflicts with State law. To the extent some such commenters argued that certain proposed provisions would conflict with State laws, such arguments are addressed in the SBP's corresponding paragraph-by-paragraph analysis of the relevant Rule provision. Generally, the Commission is not aware of State laws that allow dealers to make misrepresentations regarding material information; prohibit the disclosure of

---

[433] Some enforcement actions have specifically alleged that a defendant failed to maintain documents required under a prior order with the FTC. Complaint ¶¶ 42–45, *Fed. Trade Comm'n* v. *Norm Reeves, Inc.*, No. 8:17–cv–01942 (C.D. Cal. Nov. 3, 2017) (alleging dealer failed to keep records of previous advertisements needed to demonstrate compliance with prior order); Complaint ¶¶ 32–35, *Fed. Trade Comm'n* v. *New World Auto Imports, Inc.*, No. 3:16–cv–22401 at (N.D. Tex. Aug. 18, 2016) (same).

[434] See MARS Rule (Regulation O), 12 CFR 1015.8, previously published by the Commission at 16 CFR 322.1.

[435] See MARS Rule (Regulation O), 12 CFR 1015.8, previously published by the Commission at 16 CFR 322.1.

[434] *See, e.g.*, 16 CFR 310.5 (Telemarketing Sales Rule); 16 CFR 437.7 (Business Opportunity Rule); 16 CFR 453.6 (Funeral Industry Practices Rule); 16 CFR 301.41 (Fur Products Labeling Rule).

[436] *See, e.g.*, Wis. Admin. Code Trans. 139.09 (similar waiver prohibition clause in Wisconsin's Motor Vehicle Trade Practices rule).

[437] *See* MARS Rule, 16 CFR 322.8 (Commission Rule), 12 CFR 1015.11 (CFPB Rule); Telemarketing Sales Rule, 16 CFR 310.9.

[438] Comment of 18 State Att'ys Gen., Doc. No. FTC–2022–0046–8062 at 11.

[439] *See City of Columbus* v. *Ours Garage & Wrecker Serv., Inc.*, 536 U.S. 424, 433 (2002) ("The principle is well settled that local governmental units are created as convenient agencies for exercising such of the governmental powers of the State as may be entrusted to them in its absolute discretion.") (quoting *Wis. Pub. Intervenor* v. *Mortier*, 501 U.S. 597, 607–08 (1991)).

accurate information regarding a vehicle's offering price, optional vehicle add-ons, or total payment information; or permit dealers to charge consumers for add-ons that provide no benefit to the consumer or to charge for items without consumers' express, informed consent. To the extent there truly are conflicts, as discussed in the following paragraphs, § 463.9 establishes the framework for addressing any such inconsistencies.

Commenters including dealership associations also argued that existing State standards are sufficient and identified State requirements that the commenters argued would be redundant with, or superior to, one or more provisions in the Commission's proposed rule. To the extent the Rule prohibits conduct that is already prohibited by State laws, the Commission has not seen evidence that State and Federal standards prohibiting the same misconduct has harmed consumers or competition. Moreover, such overlap is indicative of dealers' ability to comply with the relevant provisions in the Rule. To the extent State laws have additional requirements that provide greater protections or are not otherwise inconsistent with part 463, dealers must continue to follow those laws.

Several dealership association commenters expressed concern regarding how to determine whether a State statute, regulation, order, or interpretation affords "greater protection" than a provision in the Commission's proposed rule. One such commenter, for example, raised concerns that proposed § 463.5(a) may conflict with a pending California bill that would prohibit the sale of GAP when a vehicle has less than a 70% loan-to-value ratio. An industry association commenter claimed that the Commission's proposed definitions of "Dealer or Motor Vehicle Dealer" would conflict with analogous State definitions. In response, the Commission emphasizes that § 463.9 would be triggered only if there were an actual inconsistency between State law and the Final Rule, and in the event of an inconsistency, the Rule only affects such State law to the extent of the inconsistency. The commenter examples did not present any such inconsistencies because it is possible to comply with both the cited State law examples and with the Final Rule. For instance, a dealer operating in a State that prohibits the sale of a GAP agreement when a vehicle transaction involves a loan-to-value ratio below 70% would need to abide by the ratio set forth by State law and also by the Rule's prohibition against charging for the product if the consumer would not benefit from it. Similarly, notwithstanding a commenter's claims that the proposed rule's definition of "Dealer or Motor Vehicle Dealer" would conflict with analogous State standards, the commenter did not identify any actual conflicts; nevertheless, to the extent State and Federal standards cover independent areas or actors, each actor must comply with the standards— whether State, Federal, or both—under which the actor is covered.[440] Further discussion of how State laws interact with specific sections of the Rule are explained in the corresponding section-by-section analysis for the relevant sections.

Some such commenters also questioned whether more coordination with States and Federal agencies was needed, without explaining what coordination was needed. In any event, the Commission coordinates regularly with States and Federal counterparts.

Many commenters' concerns focused on the written disclosures proposed in § 463.5(b), which the Commission has determined not to include in this Final Rule. For instance, a substantial number of commenters, including industry associations, argued that proposed § 463.5(b) would have created different Federal and State requirements for written disclosures that would result in duplicative paperwork. A dealership association specifically argued that proposed § 463.5(b) may have conflicted with a State pre-contract disclosure requirement pertaining to six categories of add-ons because it would have required an additional disclosure about a broader category of add-ons. An industry association similarly pointed to this State's pre-contract disclosure requirement as a reason that additional disclosures under this Rule, including those required by proposed § 463.5(b), could result in consumer confusion. At least four commenters, including industry associations and a dealership organization, argued that the proposed rule's requirement under § 463.5(b) to create new documentation may conflict with the "single document" requirements, in effect in many States, which mandate that the entire motor vehicle sale, financing, or lease agreement—including any add-on products or services—be within one document. As discussed in the

paragraph-by-paragraph analysis of § 463.5 in SBP III.E.2, the Commission has determined not to finalize the written disclosures requirement under this provision.

After carefully considering the comments regarding proposed § 463.9, the Commission is finalizing this section largely as proposed, with one minor modification: the Commission is adding "Covered" to the term "Motor Vehicle Dealer" in § 463.9(a) to conform with the revised definition in § 463.2(f). Section 463.9 provides a uniform floor of protection with the Commission's Final Rule, while also permitting States to enact stronger protections, using a standard that has been applied in other laws and regulations for several decades.[441] This provision is necessary to address unfair and deceptive practices and to enable the Commission to enforce the Rule.

## IV. Effective Date

The Final Rule becomes effective on July 30, 2024. One industry association commenter objected that the NPRM did not include an effective date or inquire into the timing for feasibly implementing the Rule. Another such commenter requested at least 18 months for stakeholders to prepare for Rule compliance, but did not explain why it would take 18 months to refrain from conduct that is already illegal, such as making misrepresentations. Rules are generally required to be published 30 to 60 days before their effective date, though in some circumstances, agencies may cite good cause for the rule to become effective sooner than 30 days from publication.[442] Given the significant harm to consumers and law-abiding dealers from deceptive or unfair acts or practices; and the fact that, for dealers already complying with the law, compliance with the Rule the Commission is finalizing should not be onerous; the NPRM did not propose or contemplate any additional delay. Nevertheless, after a review of comments, the Commission is providing dealers until July 30, 2024 to make

[441] *See, e.g.,* 10 U.S.C. 987(d)(1) (Military Lending Act); 15 U.S.C. 1692n (Fair Debt Collection Practices Act); 12 CFR 1006.104 (Regulation F); 15 U.S.C. 1693q (Electronic Funds Transfer Act); *see also* 21 U.S.C. 387p(a)(1) (Family Smoking Prevention and Tobacco Control Act).

[442] *See* 5 U.S.C. 553(d) (requiring publication of a substantive APA rule "not less than 30 days before its effective date" except "as otherwise provided by the agency for good cause found and published with the rule"). Significant rules defined by Executive Order 12866 and major rules defined by the Small Business Regulatory Enforcement Fairness Act are required to have a 60-day delayed effective date. *See* E.O. 12866, 58 FR 51735 (Oct. 4, 1993); 5 U.S.C. 801(a)(3)).

[440] *See, e.g., Pirouzian v. SLM Corp.,* 396 F. Supp. 2d 1124, 1131 (S.D. Cal. 2005) (reasoning that the more inclusive definition of "debt collector" under California law is not "inconsistent" with the Fair Debt Collection Practices Act because by "enlarging the pool of entities who can be sued" the State law offered greater protection).

changes to their operations, if needed, in light of the Rule's requirements.

## V. Paperwork Reduction Act

On July 13, 2022, the Commission submitted the NPRM and an accompanying Supporting Statement to the Office of Management and Budget ("OMB") for review under the Paperwork Reduction Act ("PRA"), 44 U.S.C. 3501–3521. On July 29, 2022, OMB directed the Commission to resubmit its request when the proposed rule was finalized.[443]

The Commission is now submitting the Final Rule and a Supplemental Supporting Statement to OMB. The disclosure and recordkeeping requirements of the Rule constitute "collection[s] of information" for purposes of the PRA.[444] The associated burden analysis follows.[445]

In the NPRM, the Commission provided estimates and solicited comments regarding the proposed rule, including regarding (1) the proposed add-on list disclosure requirement; (2)

the proposed cash price without optional add-ons disclosure requirement; (3) other proposed provisions prohibiting certain misrepresentations and requiring certain disclosures; (4) the proposed recordkeeping provisions; and (5) estimated capital and other non-labor costs. As previously discussed, after carefully reviewing the comments, the Commission has made certain changes to the relevant provisions in the Final Rule. Specifically, the Commission has determined not to finalize requirements, pursuant to proposed § 463.4(b), that dealers disclose an add-on list or, pursuant to proposed § 463.5(b), that dealers refrain from charging for optional add-ons unless enumerated requirements relating to the vehicle's cash price without optional add-ons are met.

In the NPRM, the Commission estimated that the disclosure and recordkeeping requirements would impact approximately 46,525 franchise, new motor vehicle and independent/used motor vehicle dealers in the U.S.[446] In the NPRM, the Commission explained that this figure was exclusive to automobile dealers, and invited comments regarding market information for dealers of other types of motor vehicles, such as boats, RVs, and motorcycles.[447] In response, one industry association commenter noted the absence of such other motor vehicle dealers from the Commission's estimate. Another commenter also noted the absence of such dealers in the estimate and argued that the Commission's estimate also erroneously included independent used motor dealers which the commenter contended do not perform any servicing work, but stated that the Commission's estimate was fairly accurate numerically. As discussed in the paragraph-by-paragraph analysis of § 463.2(e) in SBP III.B.2(e), the Commission has determined to expressly exclude "Recreational boats and marine equipment," "Motorcycles, scooters, and electric bicycles," "Motor homes, recreational vehicle trailers, and slide-in campers," and "Golf carts" from the Final Rule's definition of "Covered Motor Vehicle." Further, as examined in the paragraph-by-paragraph analysis of § 463.2(f) in SBP III.B.2(f), the plain meaning of the term "servicing" covers activities that are undertaken by independent used car dealers.[448] Thus,

the Commission bases its estimate of the entities covered by the Final Rule on the same North American Industry Classification System ("NAICS")[449] categories—"new car dealers" and "used car dealers"—as it did in the NPRM.[450] As with other figures in this section, the NAICS data assembled by the U.S. Census Bureau have been revised since the publication of the Commission's NPRM with more recent data. Based on these revisions, the Commission now estimates that the Final Rule's disclosure and recordkeeping requirements will impact approximately 47,271 franchise, new motor vehicle and independent/used motor vehicle dealers in the United States.[451]

The estimated overall annual hours burden for the Final Rule's collections of information is 1,595,085 hours. The estimated overall annual labor cost for the Final Rule's collections of information is $51,904,537. The estimated overall annual capital and other non-labor cost for the Final Rule's collections of information is $14,181,300.

### A. Add-On List Disclosures

Section 463.4(b) of the proposed rule required motor vehicle dealers that charge for optional add-on products or services to disclose clearly and conspicuously in advertisements and on any website, online service, or mobile application through which they market motor vehicles, and at any dealership, an itemized add-on list of such products

---

[443] OMB assigned the rulemaking control number 3084–0172 for PRA review purposes.

[444] 44 U.S.C. 3502(3); 5 CFR 1320.3(c).

[445] One commenter suggested the FTC did not comply with several provisions of the PRA, specifically those contained in 5 CFR 1320.5(a)(1)(iv), 1320.8(d)(1), 1320.11(a), 1320.11(b), and 1320.11(d). The commenter does not explain the basis for the purported deficiencies. These provisions generally relate to the submission of a collection of information to OMB, and solicitation and consideration of public comments. The FTC has complied with these provisions. The FTC submitted an Information Collection Request to Office of Management and Budget on July 13, 2022, concurrently with publication of the NPRM, in accordance with 5 CFR 1320.11(b). *See Motor Vehicle Dealers Trade Regulation Rule, ICR 202202–3084–001, OMB 3084–0172, https:// omb.report/icr/202202-3084-001.* Because the FTC complied with this requirement, the collection of information proposed in the NPRM is not, as the commenter contends, subject to disapproval under 5 CFR 1320.11(d).

The Commission also did not violate 5 CFR 1320.5(a)(1)(iv) and 1320.11(a), providing for comments to be submitted to OMB, as the commenter contends. Those provisions are limited by 5 CFR 1320.8(d)(3), which provides that the agency need not direct comments to OMB "if the agency provides notice and comment through the notice of proposed rulemaking . . . for the same purposes as are listed under" 5 CFR 1320.8(d)(1). The Commission solicited comments in the NPRM on the subjects enumerated in 5 CFR 1320.8(d)(1), *see* NPRM at 42028–31, 42035–43, and it was not necessary for the Commission to also direct those same comments to OMB. The Commission thus did not violate 5 CFR 1320.5(a)(1)(iv) or 1320.11(a).

Further, contrary to the commenter's assertion, the Commission demonstrated throughout the NPRM that the information collection-related requirements it embodies are necessary, offer utility and public benefit, and minimize burdens. *See, e.g.,* NPRM at 42027, 42043. Moreover, the Commission requested comments on the necessity, utility, benefits, and burdens of the proposed rule, *see* NPRM at 42028–31, 42035–43, and has further taken into consideration and addressed comments in this SBP.

[446] NPRM at 42031.

[447] NPRM at 42031 n.154, 42036.

[448] *See also* Used Car Rule, 81 FR at 81668 (noting that the term "servicing" used in this same context "captures activities undertaken by essentially all

used car dealers," including by preparing vehicles for sale by addressing any obvious mechanical problems and by undertaking the general industry practice of appearance reconditioning).

[449] NAICS is the standard used by Federal statistical agencies in classifying business establishments for the purpose of collecting, analyzing, and publishing statistical data related to the U.S. business economy. North American Industry Classification System, U.S. Census Bureau, *https://www.census.gov/naics/.*

[450] U.S. Census Bureau, "All Sectors: County Business Patterns, including ZIP Code Business Patterns, by Legal Form of Organization and Employment Size Class for the U.S., States, and Selected Geographies: 2019," *https:// data.census.gov/cedsci/table?q=CBP2019. CB1900CBP&n=44111%3A44112&tid= CBP2019.CB1900CBP&hidePreview=true&nkd= EMPSZES–001,LFO–001* (listing 21,427 establishments for "new car dealers," NAICS code 44111, and 25,098 establishments for "used car dealers," NAICS code 44112). *See* NPRM at 42031.

[451] U.S. Census Bureau, "All Sectors: County Business Patterns, including ZIP Code Business Patterns, by Legal Form of Organization and Employment Size Class for the U.S., States, and Selected Geographies: 2021," *https:// data.census.gov/table?q=CB2100CBP&n= 44111:44112&tid=CBP2021.CB2100CBP&nkd= EMPSZES–001,LFO–001* (listing 21,622 establishments for "new car dealers," NAICS code 44111, and 25,649 establishments for "used car dealers," NAICS code 44112).

or services and their prices. In the NPRM, the Commission estimated costs for the add-on list disclosure and solicited comments on its burden analysis.[452] One industry association made several arguments, including that the Commission underestimated the time and resources required because an add-on list can be lengthy, vary by vehicle and over time, and require working with several third parties. This commenter also argued that periodic revision of such lists would take more than the estimated one hour of clerical time per dealer, per year. The commenter, however, did not offer any specific estimates for such periodic revision activities.

As explained in the section-by-section analysis of § 463.4 in SBP III.D.2, after careful consideration, the Commission has determined not to finalize its proposed add-on list provision at § 463.4(b).

## B. Disclosures Relating to Cash Price Without Optional Add-Ons

Section 463.5(b) of the proposed rule required motor vehicle dealers that charge for optional add-on products or services to provide certain itemized disclosures regarding pricing and cost information without add-ons. In response to the Commission's estimates with respect to this proposed provision, one industry association argued that the Commission did not provide adequate explanation of the assumptions it used to arrive at its cost estimates for this proposed provision, and contended that the Commission underestimated the costs associated with developing, printing, and presenting the proposed disclosures. This commenter also contended that the proposed requirement would have required significant training costs; that multiple forms would have been required for each motor vehicle transaction; and that aspects of the required disclosures would be duplicative of information already provided by dealerships in the ordinary course of business. The commenter estimated that developing a disclosure form for this proposed provision would cost dealers at least $750 and suggested that other attendant costs would be in the hundreds of millions or billions of dollars, without explaining how it arrived at such estimated figures.

As explained in the section-by-section analysis of § 463.5 in SBP III.E, after careful consideration, the Commission has determined not to include in this Final Rule the itemized disclosure provisions at proposed § 463.5(b). The

Commission notes that imposing unauthorized charges—including charges buried in lengthy contracts or included in contracts that consumers are rushed through—is a violation of both the Final Rule's § 463.5(c) and of the FTC Act. The Commission will continue to monitor the market to determine whether additional steps are warranted to combat unauthorized charges for add-ons or other items in the motor vehicle marketplace.

## C. Prohibited Misrepresentations and Required Disclosures

Section 463.3 of the Final Rule prohibits dealers from making any misrepresentation regarding material information about the categories enumerated in the section.

The provisions in this section have been adopted largely without modification from the NPRM, wherein the Commission estimated that any additional costs associated with the proposed misrepresentation prohibitions would be *de minimis*.[453] One industry association commenter argued that a bar on misrepresentations in the Final Rule would require increased training and compliance costs and result in longer transaction times and costs related to working with vehicle manufacturers about online advertisements. This section, however, does not require any additional disclosures or information collection. Thus, while dealers might elect to enhance their training and compliance,[454] refraining from making misrepresentations does not require additional training or compliance costs or transaction time. The Commission therefore affirms its prior estimate that any additional costs associated with the prohibitions in § 463.3 against making misrepresentations would be *de minimis*.

Section 463.4(a) of the Final Rule requires dealers to clearly and conspicuously disclose a vehicle's offering price in advertisements and other communications that reference a

specific vehicle, or any monetary amount or financing term for any vehicle. "Offering Price" is defined in § 463.2(k) of the Rule as "the full cash price for which a Dealer will sell or finance the Vehicle to any consumer, provided that the Dealer may exclude only required Government Charges." The information required by § 463.4(a) is necessary to address unfair or deceptive conduct associated with the failure to provide such price information and unfairly charging unexpected prices or for hidden items that can add hundreds or thousands of dollars to a vehicle sale.[455]

This provision is being adopted largely as proposed.[456] In response to the NPRM, one industry association commenter claimed there would be an average of three offering price disclosures per transaction, since, according to the commenter, consumers, on average discuss three specific motor vehicles per transaction. This commenter also contended that the number of required offering price disclosures would obligate dealers to incur additional training costs. As the Commission explained in its NPRM, vehicle pricing activities and representations are usually and customarily performed by dealers in the course of their regular business activities. While this provision may increase the importance of those activities, or alter when in the course of business they are undertaken, the Commission estimates that any additional attendant costs are *de minimis*.[457]

Section 463.4(d) of the Final Rule require dealers, when making any representation about a monthly payment for any vehicle, to disclose the total amount the consumer will pay to purchase or lease the vehicle at that monthly payment after making all

---

[452] NPRM at 42032–33, 40235, 42040.

[453] NPRM at 42033, 42039.

[454] The Commission produced and considered alternative cost estimate scenarios for the Rule provisions in its preliminary regulatory analysis, *see* NPRM at 42036–44, and its final regulatory analysis in section VII. The Commission also invited comments on the accuracy of its PRA burden estimates, including the validity of the methodology and assumptions used, *see* NPRM at 42035. The Commission provides a single estimate per Rule provision for this separate Paperwork Reduction Act burden analysis in conformity with the PRA. *See* 44 U.S.C. 3506(c)(1)(A)(iv) (providing, for each collection of information, including those arising from rules published as final rules in the **Federal Register**, that agencies shall conduct a review that includes "a specific, objectively supported estimate of burden").

[455] Some commenters suggested that providing an Offering Price may be difficult due to pricing changes over time. As explained in SBP III.D.2(a), limited-time offers should be clearly disclosed as such. Advertising prices without disclosing material limitations that would mislead consumers is a deceptive or unfair practice.

[456] As stated in SBP III.B.2(k) and SBP III.D.2(a), the Commission is finalizing this Offering Price definition at § 463.2(k) largely as proposed, with a modification to clarify that dealers may, but need not, exclude required government charges from a vehicle's offering price. In addition, this definition in the Final Rule substitutes "Vehicle" for "motor vehicle" to clarify that the term is consistent with the revised definition of "'Covered Motor Vehicle' or 'Vehicle'" at § 463.2(e). The Commission also added language to the end of § 463.4(a) clarifying that the requirements in § 463.4(a) "also are prescribed for the purpose of preventing the unfair or deceptive acts or practices defined in this part, including those in §§ 463.3(a) and (b) and § 463.5(c)."

[457] *See* NPRM at 42033, 42039–40.

payments as scheduled, as well as the amount of consideration to be provided by the consumer if the total amount disclosed assumes the consumer will provide consideration. Section 463.4(e) of the Final Rule requires dealers, when making any comparison between payment options that includes discussion of a lower monthly payment to disclose, if true, that a lower monthly payment will increase the total amount the consumer will pay to purchase or lease the vehicle.

These provisions have been adopted largely as proposed.[458] In response to the Commission's estimates with respect to these proposed provisions, one commenter raised concerns that these disclosures would intrude on existing disclosures, and that any associated paperwork burden would be confusing, duplicative, and unnecessary. The commenter also argued that these disclosures would add time to the transaction process and require additional staff training. No commenters provided alternative estimates of the costs associated with this provision.

Failing to disclose information about the total of payments for a vehicle when representing monthly payment information is deceptive or unfair, as set forth in SBP III.D.2(d). Dealers already generate the required information during the normal course of business, and disclosing this total of payments information provides consumers with fundamental information that is readily available to the dealer when making representations regarding monthly payments, at which time such disclosures are required. Nevertheless, there may be upfront labor costs associated with developing procedures to provide these disclosures consistently at the appropriate point in the transaction and with training employees. The Commission estimates such upfront costs as follows: 8 compliance manager hours per dealer on implementing a template disclosure script that contains the required information and on ensuring sales staff consistently deliver the disclosure at an appropriate time during the transaction, for an upfront hours burden of 378,168 (8 hours × 47,271). Applying labor cost-rates of $31.21 per hour yields $11,802,623.28 ($31.21 × 378,168

hours).[459] After a review of comments, the Commission is adding ongoing training costs. Specifically, the Commission estimates annual ongoing costs of 1 hour of training time for sales and related employees per year, for an annual hours burden of 417,110 (1 hour × 417,110 sales and related employees). Applying labor cost-rates of $29.43 per hour, the total estimated ongoing labor cost burden is $12,275,547.30 across the industry (417,110 sales and related employees × 1 hour × $29.43).

Further, § 463.4(c) of the Final Rule requires dealers that sell optional add-on products or services to disclose to consumers that these add-ons are not required, and that the consumer can purchase or lease the vehicle without these add-ons. This requirement has been adopted largely as proposed, and is necessary to address deceptive and unfair practices regarding these products or services, including misrepresentations that these products are required when they are not, and charging consumers for such products without the consumers' express, informed consent.[460] It requires a simple disclosure of information that is known to the dealer, and the Commission anticipates that the information collection burdens associated with this requirement is *de minimis*.[461]

Similarly, § 463.5(c) of the Final Rule requires dealers to refrain from charging consumers for any item unless the dealer obtains the express, informed

consent of the consumer for the charge.[462] In response to the Commission's estimates with respect to these proposed provisions, some commenters generally discussed burdens, as addressed in the section-by-section analysis in SBP III, that they contended would accompany this proposed provision, but none provided sufficient detail for cost estimates. The Commission notes that this provision addresses the unfair or deceptive practice of charging consumers for items they do not know about or to which they have not agreed, or in amounts beyond those to which the consumer has agreed. As dealers must currently have policies in place to prevent charges without consent in order to comply with current law, the Commission anticipates that any burdens associated with this provision will be *de minimis*.[463]

*D. Recordkeeping*

Section 463.6 of the Final Rule requires dealers to create and retain, for a period of twenty-four months from the date the record is created, all records necessary to demonstrate compliance with the Rule, including with its disclosure requirements. This provision has been adopted with revisions to account for other changes in the Final Rule, as explained in SBP III.F.[464] These recordkeeping provisions are necessary to promote effective and efficient enforcement of the Rule, thereby deterring dealers from engaging in deceptive or unfair acts or practices.

In the NPRM, the Commission provided cost estimates and solicited comment on its recordkeeping burden analysis.[465] The Commission anticipated that dealers would incur certain incremental costs related to: (i) recordkeeping systems; and (ii) calculations of loan-to-value ratios for contracts with GAP agreements.

Several commenters, including industry associations, dealership organizations, and a dealership

---

[458] These provisions in the Final Rule capitalize the defined term "Vehicle" to conform with the revised definition of "'Covered Motor Vehicle' or 'Vehicle'" at § 463.2(e). The Commission also substituted a period for a semi-colon and the word "and" at the end of § 463.4(d)(1), and added language to the end of § 463.4(d) and (e) clarifying that the requirements in these paragraphs "also are prescribed for the purpose of preventing the unfair or deceptive acts or practices defined in this part, including those in §§ 463.3(a) and § 463.5(c)."

[459] The estimates throughout this section have been updated with more recent data since the publication of the NPRM. Labor rates are based on new data from the Bureau of Labor Statistics. See U.S. Bureau of Labor Statistics, "May 2022 National Industry-Specific Occupational Employment and Wage Estimates NAICS 441100—Automobile Dealers" (Apr. 25, 2023), *https://www.bls.gov/oes/current/naics4_441100.htm*. The number of dealerships has been updated to reflect new data from Census County Business Patterns. See U.S. Census Bureau, "All Sectors: County Business Patterns, including ZIP Code Business Patterns, by Legal Form of Organization and Employment Size Class for the U.S., States, and Selected Geographies: 2021," *https://data.census.gov/table?q=CB2100CBP&n=44111:44112&tid=CBP2021. CB2100CBP&nkd=EMPSZES–001,LFO–001*.

[460] This provision in the Final Rule capitalizes the defined term "Vehicle" to conform with the revised definition of "'Covered Motor Vehicle' or 'Vehicle'" at § 463.2(e). The Commission also added language to the end of § 463.4(c) clarifying that the requirements in this paragraph "also are prescribed for the purpose of preventing the unfair or deceptive acts or practices defined in this part, including those in §§ 463.3(a) and (b) and § 463.5(c)."

[461] As with § 463.3, § 463.5(a) does not require any additional disclosures or information collection. Thus, while dealers might elect to enhance their training and compliance policies, or to take steps to document compliance with § 463.5(a), any such additional measures are not required by this provision.

[462] *See* SBP III.E.2(b).

[463] In its NPRM, the Commission noted that it anticipated this section would require dealers to provide readily available information to consumers in direct communications with customers, and that dealers complying with existing law have policies in place to prevent charges without consent, thereby estimating minimal additional resulting costs. *See* NRPM at 42033, 42036–44. The Commission did not receive comments discussing attendant burdens in sufficient detail for revised cost estimates, and thus affirms its prior estimate regarding additional costs associated with § 463.5(c).

[464] The Final Rule also contains one typographical modification to § 463.6—adding a serial comma—and minor textual changes to ensure consistency with the defined terms at § 463.2(e) and (f).

[465] NPRM at 42033–34, 42043.

association, generally contended that the Commission underestimated the burdens of compliance relating to the changes dealers would need to make to their existing recordkeeping systems. These commenters, however, did not provide the Commission with alternative estimates regarding such burdens. As explained in the section-by-section analysis of the Recordkeeping section, § 463.6, in SBP III.F, this provision gives dealers the flexibility to retain materials in any legible form, including in the same manner, format, and place as they may already keep such records in the ordinary course of business. The Commission nonetheless has determined, in response to comments, to revise its estimates regarding incremental storage expenses that may be associated with the recordkeeping requirements in the Final Rule, and, as provided in the capital and other non-labor costs discussion in the following paragraphs, the Commission is adding an estimate of incremental additional storage costs to its estimate.

Further, the Commission notes that its initial recordkeeping cost estimates were based on a proposal that required records regarding add-on list disclosures and cash price without optional add-on disclosures—records that the Rule the Commission is finalizing does not require dealers to retain. Given that the Commission is not finalizing these additional record-related requirements, the estimates provided in its NPRM may overestimate attendant costs resulting from the Rule's recordkeeping requirements. Notwithstanding this possibility, the Commission maintains its prior calculations of the time required to modify existing recordkeeping systems.[466] The Commission anticipates that it will take covered motor vehicle dealers approximately 15 hours to modify their existing recordkeeping systems to retain the required records for the 24-month period specified in the Rule. This yields a general recordkeeping burden of 709,065 hours annually (47,271 motor vehicle dealers × 15 hours per year).

The Commission anticipates that programming, administrative, compliance, and clerical staff are likely to perform the tasks necessary to comply with the recordkeeping requirements in § 463.6 of its Rule. In particular, the Commission estimates this 15-hour per-dealer labor hours burden to design, implement, or update

systems for record storage and create the templates necessary to accommodate retention of all relevant materials, as follows: 8 hours of time for a programmer, at a cost-rate of $40.24 per hour; 5 hours of additional clerical staff work, at a cost-rate of $20.16 per hour; 1 hour of sales manager review, at a cost-rate of $80.19 per hour; and 1 hour of review by a compliance officer, at a cost-rate of $31.21 per hour.[467] Applying these cost-rates to the estimated per-dealer hours burden described previously, the total estimated initial labor cost is $534.12 per average dealership (($40.24 per hour × 8 hours) + ($20.16 per hour × 5 hours) + ($80.19 per hour × 1 hour) + ($31.21 per hour × 1 hour)), totaling $25,248,386.52 across the industry ($534.12 per average dealership × 47,271 dealerships).

The Commission also received comments regarding its cost estimates relating to the records of loan-to-value ratios for transactions that include GAP agreement sales. One industry association commenter argued that this recordkeeping requirement would also require additional training, that creating a loan-to-value calculator template for GAP agreements would be difficult given the variation of loan-to-value ratios, and that this recordkeeping requirement would lengthen the time to conduct vehicle sale or financing transactions.[468] No commenter provided alternative estimates of the costs associated with the Commission's proposed recordkeeping requirements.

As explained in the paragraph-by-paragraph analysis of § 463.5 in SBP III.E.2, the Commission is not mandating a particular LTV threshold or method of calculation, but rather requiring that dealers not charge a consumer for GAP agreements or other products or services if the consumer would not benefit from the product or service. The Commission anticipates that, to the extent dealers do not currently retain any materials used to make such an assessment, dealers may incur certain additional costs. Specifically, the Commission anticipates that dealers will expend one minute per sales or financing transaction for a salesperson to perform the calculation contemplated by this requirement, at a cost rate of $28.41 per

hour. The Commission estimates that covered motor vehicle dealers sell approximately 31,562,959 vehicles each year, and that approximately 17% of such sales include GAP agreements, for an estimated total of 5,444,502 covered vehicle sales.[469] While the number of motor vehicles sold will vary by dealership, this yields an average sales volume of 115 sales transactions per average dealership per year that include a GAP agreement (5,444,502 covered vehicle sales/47,271 dealerships). This yields an estimated annual hours burden for all dealers of 90,742 hours (5,444,502 covered transactions × 1/60 hours). Applying the associated labor rates yields an estimated annual labor cost for all dealers of $2,577,980.22 (90,742 hours × $28.41 per hour).

## E. Capital and Other Non-Labor Costs

The Commission anticipates that the Final Rule will impose limited capital and non-labor costs. The Commission presented estimates in the NPRM with respect to such costs and solicited comments on its burden analysis. Here, the Commission discusses its estimates for the capital and non-labor costs associated with the Rule's disclosure and recordkeeping requirements. While some commenters generally discussed burdens that they contended would accompany these proposed provisions, none provided any alternative cost estimates regarding capital and other non-labor costs.[470]

### 1. Disclosures

The Commission anticipates that the Rule's disclosure requirements will impose *de minimis* capital and other non-labor costs. As the Commission noted in the NPRM, dealers already have in place systems for providing sales- and contract-related disclosures to buyers and lessees, as well as to consumers seeking information during the vehicle-shopping process.[471] While the Final Rule's disclosure requirements may result in limited additions to the

---

[466] In its NPRM, the Commission estimated costs to create and implement a loan-to-value calculation process. NPRM at 42034. Such costs are already accounted for in the Commission's estimates for the time required to modify existing recordkeeping systems, and thus are not separately itemized here.

[467] Applicable wage rates are based on data from the Bureau of Labor Statistics. *See* U.S. Bureau of Labor Statistics, "May 2022 National Industry-Specific Occupational Employment and Wage Estimates NAICS 441100—Automobile Dealers" (Apr. 25, 2023), *https://www.bls.gov/oes/current/naics4_441100.htm.*

[468] These arguments are addressed in the section-by-section analysis of § 463.5. *See* SBP III.E.

[469] In response to comments, the Commission has revised the number of transactions across the industry from the NPRM to exclude private party and fleet transactions. The estimated percentage of sales including GAP agreements is derived from data provided by an industry commenter. Comment of Nat'l Auto. Dealers Ass'n, Doc. No. FTC–2022–0046–8368 at 12.

[470] One commenter claimed generally that the Commission underestimated these costs, referring to arguments the commenter made with respect to the Commission's burden analysis of specific disclosure and recordkeeping provisions. The Commission has responded to those arguments in the foregoing analysis, with the exception of recordkeeping storage costs, which are addressed in the following discussion.

[471] NPRM at 42034.

information that must be provided during the transaction process, depending on a dealer's current business operations, the Commission anticipates that these changes will not require substantial investments in new systems.[472] Further, many dealers may elect to furnish some disclosures electronically, further reducing total costs.[473]

The Commission previously estimated non-labor costs for providing disclosures in written or electronic form. This estimate was based on proposed § 463.5(b), which required written disclosures in all transactions in which dealers charge for optional add-ons. As discussed in the paragraph-by-paragraph analysis of § 463.5 in SBP III.E.2, the Commission has determined not to finalize the proposed provision at § 463.5(b). While some commenters generally discussed burden with respect to disclosure requirements being finalized by the Commission, no commenter estimated non-labor costs associated with such requirements. The Commission estimates that the non-labor costs related to disclosures, which relate to fundamental information (the vehicle offering price, that optional add-ons are not required, and regarding the total amount to purchase or lease the vehicle), will be *de minimis.*

2. Recordkeeping

In the NPRM, the Commission observed that dealers already have in place existing recordkeeping systems for the storage of documentation they would retain in the ordinary course of business irrespective of the Rule's requirements.[474] Commenters including industry associations, a dealership organization, and a dealership association argued that the Commission underestimated the burdens associated with the Commission's proposed requirements to retain written communications, as well as the need to develop new systems to capture these materials. The Commission disagrees that the recordkeeping requirements in § 463.6 mandate the creation of new recordkeeping systems. As explained in the section-by-section analysis of § 463.6, this provision gives dealers the flexibility to retain materials in any legible form, including in the same manner, format, or place as they may already keep such records in the ordinary course of business.

The Commission is, however, revising its estimates regarding incremental storage expenses that may be associated

with the recordkeeping requirements in the Final Rule to add such recordkeeping storage costs to its estimate. The Commission previously noted, and continues to believe, that dealers that store records in hard copy are unlikely to require extensive additional storage for physical document retention, and, due to the low cost of electronic storage options, that expanding electronic storage capacity would impose minimal costs.[475] The Commission also invited comments on estimated storage costs; while some commenters generally discussed burdens, as addressed in the section-by-section analysis of the recordkeeping requirements in § 463.6, that they contended would accompany the proposed provisions, the Commission did not receive any comments that provided estimates. The Commission nevertheless has conducted additional research, and now estimates that each dealer will need to spend approximately $300 per year in investment in additional IT systems and hardware for additional storage (either on premises or electronically) to retain records, the annual cost for which would be $14,181,300 for all covered dealers ($300 × 47,271 covered dealers).[476]

## VI. Regulatory Flexibility Act

The Regulatory Flexibility Act ("RFA"), as amended by the Small Business Regulatory Enforcement Fairness Act of 1996,[477] requires an agency to provide an Initial Regulatory Flexibility Analysis ("IRFA") and Final Regulatory Flexibility Analysis ("FRFA") of any rule subject to notice-and-comment requirements,[478] unless the agency head certifies that the regulatory action will not have a significant economic impact on a substantial number of small entities.[479] In the NPRM, the Commission provided

an IRFA, stated its belief that the proposal will not have a significant economic impact on small entities, and solicited comments on the burden on any small entities that would be covered.[480] In addition to publishing the NPRM in the **Federal Register**, the Commission announced the proposed rule through press releases, social media posts, and blog articles directed toward businesses and consumers, as well as through other outreach,[481] in keeping with the Commission's history of small business guidance and outreach.[482]

The Commission thereafter received over 27,000 public comments, many of which identified themselves as being from small dealers, industry associations that represent small dealers, and employees of small dealers.[483] The Commission greatly

[480] NPRM at 42035.

[481] *See, e.g.,* Press Release, Fed. Trade Comm'n, "FTC Proposes Rule to Ban Junk Fees, Bait-and-Switch Tactics Plaguing Car Buyers" (June 23, 2022), *https://www.ftc.gov/news-events/news/press-releases/2022/06/ftc-proposes-rule-ban-junk-fees-bait-switch-tactics-plaguing-car-buyers;* Lesley Fair, "Proposed FTC Rule Looks Under the Hood at the Car Buying Process," Fed. Trade Comm'n Business Blog (June 23, 2022), *https://www.ftc.gov/business-guidance/blog/2022/06/proposed-ftc-rule-looks-under-hood-car-buying-process;* Alan S. Kaplinsky, A Close Look at The Federal Trade Commission's Proposed Rule for Motor Vehicle Dealers, with Special Guests Sanya Shahrasbi and Daniel Dwyer, Staff Attorneys, FTC Bureau of Consumer Protection, Division of Financial Practices, Consumer Finance Monitor (Aug. 11, 2022), *https://www.ballardspahr.com/Insights/Blogs/2022/08/Podcast-The-FTCs-Proposed-Rule-Motor-Vehicle-Dealer-Guests-Sanya-Shahrasbi-and-Daniel-Dwyer.*

[482] Each year since FY2002, the Small Business Administration's Office of the National Ombudsman has rated the Federal Trade Commission an "A" on its small business compliance assistance work. *See* U.S. Small Business Administration, "2013–2020 SBA Nat'l Ombudsman's Ann. Reps. to Cong.," *https://www.sba.gov/document/report—national-ombudsmans-annual-reports-congress* (providing reports from FY2013–FY2020); Letter from Joseph J. Simons, Chairman of the Federal Trade Commission, to Senator James Risch, Chairman of the Committee on Small Business and Entrepreneurship, U.S. Senate, and to Congressman Steve Chabot, Chairman of the Committee on Small Business, U.S. House of Representatives, *https://www.ftc.gov/system/files/documents/reports/federal-trade-commission-rule-compliance-guides-small-businesses-other-small-entities-commission/tenth_section_212_report_to_congress_july_2016-june_2017_1_0.pdf* (citing Commission's "A" rating for "Compliance Assistance" by the National Ombudsman from FY2002–FY2016).

[483] The Commission received 27,349 comment submissions filed in response to its NPRM. *See* Gen. Servs. Admin., Doc. No. FTC–2022–0046–0001, Proposed Rule, Motor Vehicle Dealers Trade Regulation Rule (July 13, 2022), *https://www.regulations.gov/document/FTC-2022-0046-0001* (noting comments received). To facilitate public access, 11,232 such comments have been posted publicly at *www.regulations.gov. Id.* (noting posted comments). Posted comment counts reflect the number of comments that the agency has posted to *Regulations.gov* to be publicly viewable. Agencies may choose to redact or withhold certain
Continued

[472] *Id.*

[473] *Id.*

[474] *Id.*

[475] NPRM at 42034–35.

[476] Our review of dealer transaction records suggests that a typical transaction generates 3.4 MB of data under the status quo. Given the average number of transactions per dealer, this suggests that storing all these records would require dedicated space of roughly 4.2 GB per year. With a two-year retention window, this corresponds to 8.4 GB of storage at any given time. We estimate that the (annual) amount budgeted here should be sufficient to maintain at least 1 TB of storage—either on premises or through a cloud storage vendor—which is sufficient for more than 100 times the data storage capacity necessary to retain all transaction files generated by a typical dealership in a year under the status quo. The Commission anticipates that this amount of data storage capacity will be more than sufficient to also allow for dealers to keep any necessary records of correspondence with consumers who ultimately do not complete transactions at the dealership.

[477] *See* Public Law 104–121 (1996).

[478] 5 U.S.C. 603(a), 604(a).

[479] 5 U.S.C. 605(b).

appreciates, and thoroughly considered, the feedback it received from such stakeholders in developing the Final Rule; made changes from the proposed rule in response to such feedback; and will continue to engage with stakeholders moving forward to facilitate implementation of the Rule.

As previously discussed, after reviewing comments, the Commission has determined, as an alternative to finalizing the proposed rule in its entirety, to finalize a Rule that does not contain the proposed add-on list disclosure requirements at § 463.4(b), or the proposed disclosures and declinations pertaining to a vehicle's cash price without optional add-ons at § 463.5(b). Furthermore, as discussed in the paragraph-by-paragraph analysis of § 463.2(e) in SBP III.B.2(e), in response to public comments and after careful consideration, the Commission has determined to exclude recreational boats and marine equipment; motorcycles; and motor homes, recreational vehicle trailers, and slide-in campers from the Rule's definition of "Covered Motor Vehicle." After careful consideration of the comments and following its determination not to finalize the proposed rule in its entirety, the Commission is certifying that the Final Rule will not have a significant economic impact on a substantial number of small entities. In the following paragraphs, the Commission discusses comments from the public, as well as from the U.S. Small Business Administration Office of Advocacy ("SBA Advocacy"), and the reasons for the Commission's conclusion that the Rule will not have a significant economic impact on a substantial number of small entities.[484] Given,

however, that the Commission believes that the vast majority of covered entities are small entities and provided an IRFA in the NPRM, in the interest of thoroughness, the Commission has also performed an FRFA, as described in SBP VI.B.2.

*A. Significant Impact Analysis*

1. Comments on Significant Impact

In the NPRM, the Commission stated its belief that the proposed rule would not have a significant economic impact on a substantial number of small entities, and invited comments.[485]

Several commenters, including industry associations and a dealership association, generally argued that the Rule would impose substantial economic burdens on small entities, and some suggested that small entities may be disproportionately burdened by the Rule given limited legal and compliance staff. No commenters provided comprehensive alternative empirical cost or revenue data that could be used to put costs in context. Commenters, including an industry association and SBA Advocacy, argued that the Commission did not provide a sufficient factual basis for, or analysis of, the effects on small entities, and that the proposed rule would be unduly burdensome for smaller motor vehicle dealers.[486] The comment from SBA Advocacy further argued that the Commission provided no information about the economic impact of the proposed rule on small entities, but noted that if the total estimated cost of $1,360,694,552 were divided by the number of dealers estimated in the NPRM (46,525), the cost would be roughly $29,000 per such dealer.[487] The comment from SBA Advocacy also argued that the Commission failed to include familiarization and training costs or costs that the Commission could not quantify, such as investments in additional IT systems and hardware.[488]

The Commission has considered these comments carefully and has taken them into account in setting forth the factual basis for the certification in SBP VI.A.2, including by modifying its analysis to add an estimate of familiarization and training costs in response to such concerns.[489] The Commission notes, as

---

[484] The Office of Advocacy has emphasized that, while it is housed within SBA, it is an independent, stand-alone office that has its own statutory charter, leadership structure, and appropriations account. SBA Advocacy, "Background Paper: Office of Advocacy 2017–2020" 111–19 (Jan. 2021), *https://advocacy.sba.gov/wp-content/uploads/2021/02/Background-Paper-Office-of-Advocacy-2017-2020-web.pdf; see also* 15 U.S.C. 634a through 634g. SBA Advocacy's Chief Counsel is appointed from civilian life by the President, with the advice and consent of the Senate, and most of SBA Advocacy's professionals serve at the pleasure of the Chief Counsel. 15 U.S.C. 634a, 634d(1) (empowering Chief Counsel for Advocacy to employ and fix the compensation of additional staff personnel); SBA Advocacy, "Background Paper: Office of Advocacy 2017–2020" 95 (Jan. 2021), *https://advocacy.sba.gov/wp-content/uploads/2021/02/Background-Paper-Office-of-Advocacy-2017-2020-web.pdf.* SBA Advocacy does not circulate its work for clearance

submissions (or portions thereof) such as those containing private or proprietary information, inappropriate language, or duplicate/near duplicate examples of a mass-mail campaign. Gen. Servs. Admin., *Regulations.gov* Frequently Asked Questions, *https://regulations.gov/faq.*

[485] An industry association commenter argued that the Commission did not make a formal section 605(b) certification, publish the certification in the **Federal Register**, or provide the certification to the Chief Counsel for Advocacy of the Small Business Administration. This comment misunderstands the RFA. The RFA does not require certification when a rule is proposed. *See* 5 U.S.C. 605(b) (providing that the head of the agency may make the certification "at the time of publication of the final rule"). The Commission's NPRM stated its belief that the proposal would not have a significant economic impact on a substantial number of small entities, invited comment on this issue, and also provided an IRFA. The Commission has carefully reviewed the SBA's and others' comments, is making changes to the proposal, and is now publishing the Final Rule and making a formal certification, as is required by the RFA.

Although the Commission included the NPRM in its Fall 2022 Regulatory Agenda, and explained in its NPRM that the proposed rulemaking was not included in the Commission's Spring 2022 Regulatory Agenda because the Commission first considered the NPRM after the publication deadline for the Regulatory Agenda, *see* NPRM at 42031 n.153, the same commenter argued that the RFA and Executive Order 12866 required the Commission to include it in earlier Regulatory Agendas. As an initial matter, Executive Order 12866 does not apply to independent agencies such as the FTC. Regardless, as discussed in SBP II.C, Commission has engaged in a sustained effort over many years to engage with consumer and dealer groups, and other stakeholders, regarding the issues addressed in the Rule. *See supra* note 90. Neither the RFA nor Executive Order 12866 precludes the Commission from promulgating the Rule regardless of whether it was included in an earlier Regulatory Agenda (or even arguably could have been). Section 602(d) of the RFA explicitly provides that "[n]othing in this section precludes an agency from considering or acting on any matter not included in a regulatory flexibility agenda." *See Coastal Conservation Ass'n v. Locke,* No. 2:09–CV–641–FTM–29, 2011 WL 4530631, at *38 (M.D. Fla. Aug. 16, 2011), *report & recommendation adopted sub nom. Coastal Conservation Ass'n v. Blank,* No. 2:09–CV–641–FTM–29, 2011 WL 4530544 (M.D. Fla. Sept. 29, 2011) (denying request for injunction based on allegation of noncompliance with 5 U.S.C. 602(d)). Similarly, Executive Order 12866 explicitly provides that it "does not create any right or benefit, substantive or procedural, enforceable at law or equity by a party against the United States," let alone one that would preclude adoption of the Rule. *See* E.O. 12866, 58 FR 51735, 51744 (Sept. 30, 1993); *see also Trawler Diane Marie, Inc.* v. *Brown,* 918 F. Supp. 921, 932 (E.D.N.C. 1995), *aff'd sub nom. Trawler Diane Marie, Inc.* v. *Kantor,* 91 F.3d 134 (4th Cir. 1996) (denying request to invalidate regulation based on allegation of noncompliance with Executive Order 12866).

[486] *See* Comment of SBA Advocacy, Doc. No. FTC–2022–0046–6664 at 3.

[487] Comment of SBA Advocacy, Doc. No. FTC–2022–0046–6664 at 3.

[488] Comment of SBA Advocacy, Doc. No. FTC–2022–0046–6664 at 3.

[489] After additional research, the Commission estimates that each dealer will need to spend approximately $300 per year on storage (either on premises or in the cloud) to store the records the Rule requires them to maintain. Based on a review of the transaction records the Commission has received from dealers through investigations, this amount is likely to be more than sufficient. Commission review suggests that a typical vehicle transaction generates 3.4 MB of data under the status quo. Given the average number of transactions per dealer, this suggests that storing all these records would require dedicated space of roughly 4.2 GB per year. With a two-year retention window, this corresponds to 8.4 GB of storage at any given time. The Commission estimates that the $300 annual amount budgeted here should be sufficient to maintain at least 1 TB of storage—either on premises or through a cloud storage vendor—which is sufficient for more than 100 times the data storage capacity necessary to retain all transaction files generated by a typical dealership in a year under the status quo. The Commission

SBA Advocacy did in its comment, that the NPRM estimated a total cost for the proposed rule of $1,360,694,552. This estimate was for costs over a ten-year time period. Thus, dividing this estimate by the number of affected dealers estimated in the NPRM yields a cost of roughly $29,000 per dealer over a ten-year period—or approximately $2,900 per year per dealer.[490] This figure—$2,900—is slightly more than the average gross profit described in the NPRM for a single vehicle sale by a new vehicle dealer, and less than half of the average gross profit described in the NPRM for a single vehicle sale by an independent used vehicle dealer.[491]

After carefully reviewing the comments, the Commission does not conclude that the Final Rule will impose a significant economic burden on a substantial number of smaller entities.[492] As described in SBP VI.A.2(b), the estimated economic impact of the Final Rule, controlling for firm size based on available census data, is less than or equal to 0.27% of annual sales, 1.49% of the gross margin, and 4.12% of the gross margin minus operating expense for dealerships of all sizes.[493] The Commission further notes that, in response to comments from SBA

Advocacy and others, the Paperwork Reduction Act analysis incorporates additional estimates for training and storage costs beyond those estimated in the NPRM.

### 2. Certification of the Final Rule

The Commission hereby certifies that the Final Rule will not have a significant economic impact on a substantial number of small entities.

As an initial matter, the Commission believes that a substantial number of small entities are covered by the Rule. New vehicle dealers (NAICS code 44111) are classified as small entities if they have an average of 200 or fewer employees, and used car dealers (NAICS code 44112) are classified as small entities if they have average annual revenues of $30.5 million or less.[494] Census data indicate that the vast majority of dealers classified into these NAICS codes are small entities.[495] There are approximately 47,271 covered dealers in the United States, of which over 93% have fewer than 100 employees. Thus, while the Commission cannot determine the precise number of small entities affected by the Rule, census data suggest that the vast majority of covered dealers are small entities.

The Commission certifies that the Rule will not have a significant economic impact on a substantial number of small entities. The Commission has analyzed the costs of the Rule (1) based on industry averages and (2) accounting for dealer size based on the number of employees. Under either measure, the Rule will not have a significant economic impact on a substantial number of small entities.

### (a) Industry Averages

The Commission estimates a total cost for the Final Rule, at the scenario reflecting the Commission's highest cost estimates, of $1.075 billion to $1.270 billion over a ten-year period.[496] Using

the highest end of this highest-cost scenario, the Rule will have an estimated cost of $1.270 billion over ten years using a 3% discount rate. This translates to an average estimated per-year cost of $127 million ($1.270 billion × 0.1). Census data show that, in 2021, automobile dealers had annual sales of $1.265 trillion, gross margin of $226.118 billion,[497] and gross margin minus operating expenses of $81.850 billion. Discounting these numbers over a 10-year period using a 3% discount rate equates to average annual sales of $1.079 trillion, gross margin of $192.883 billion, and gross margin minus operating expenses of $69.820 billion. The estimated yearly cost of the Rule therefore is approximately 0.01% of annual sales ($127 million/$1.079 trillion), 0.07% of gross margin ($127 million/$192.883 billion), and 0.18% of gross margin minus operating expenses ($127 million/$69.820 billion) across the industry.[498]

### (b) Dealer Size Based on the Number of Employees

In addition to considering industry averages, the Commission has analyzed the cost of the Rule accounting for dealer size based on the number of employees. Certain costs are fixed (i.e., remain the same regardless of the number of employees) while other costs scale with dealer size. We consider both

---

[490] NPRM at 42013.

[491] As noted in the NPRM, new vehicle dealers averaged a gross profit of about $2,444 per new vehicle, and about $2,675 per used vehicle, and independent used vehicle dealerships had an average gross profit of more than $6,000 per vehicle. *See* NPRM at 42014 (citing Nat'l Auto Dealers Ass'n, "Average Dealership Profile" (1 (2020), *https://www.nada.org/media/4136/download?attachment* [*http://web.archive.org/web/20220623204158/https://www.nada.org/media/4136/download?attachment*] (June 23, 2022) and Nat'l Indep. Auto Dealers Ass'n, "NIADA Used Car Industry Report 2020" at 21).

[492] Notably, while many industry commenters claimed that the burden of the Rule would be substantial, none provided data on revenue or profit.

[493] U.S. Census Bureau, "Annual Retail Trade Survey: 2021" (Dec. 15, 2022), *https://www.census.gov/data/tables/2021/econ/arts/annual-report.html*. Gross margin minus operating expenses was determined by deducting total 2021 operating expenses ($144,268 million) from 2021 gross margin ($226,118 million). Gross margin represents total sales less the cost of goods sold. Operating expenses include but are not limited to annual payroll, commissions, data processing, equipment, advertising, lease and rental payments, utilities, and repair and maintenance. *See Glossary,* U.S. Census Bureau, *https://www.census.gov/glossary* (last visited Dec. 5, 2023). Note that the operating expenses amount may include some costs—such as payments for deceptive advertising or commissions earned on unauthorized charges—that are not legitimate expenses. If these were excluded, the gross margin minus operating cost figures would be even lower than those described in the text.

[494] *See* North American Industry Classification System, U.S. Census Bureau, *https://www.census.gov/naics/*. These standards are determined by the Small Business Size Standards component of the NAICS, which is available at *https://www.sba.gov/document/support-table-size-standards*.

[495] The census report does not provide sufficient detail to provide a precise numerical estimate of the number of small entities covered by the Rule. The census data provide the number of dealers with fewer than 250 employees, and also provide revenue and gross margin figures for the motor vehicle dealers industry, without further breakdown. For that reason, the census data do not provide sufficient information to calculate the specific number of dealers that are small entities. Nor did commenters provide comprehensive alternative firm size data.

[496] The $1.075 billion figure was determined by summing the unrounded total highest estimated

costs associated with the Final Rule's total of payments disclosure requirements ($246 million), offering price disclosure requirements ($46 million), requirements regarding certain add-ons and express, informed consent ($406 million), prohibitions on misrepresentations ($130 million), and recordkeeping requirements ($248 million), using a 7% discount rate. The $1.270 billion figure was determined by summing the unrounded total highest estimated costs associated with the Final Rule's total of payments disclosure requirements ($296 million), offering price disclosure requirements ($46 million), requirements regarding certain add-ons and express, informed consent ($475 million), prohibitions on misrepresentations ($157 million), and recordkeeping requirements ($296 million), using a 3% discount rate.

[497] U.S. Census Bureau, "Annual Retail Trade Survey: 2021, Sales" (Dec. 15, 2022), *https://www2.census.gov/programs-surveys/arts/tables/2021/sales.xlsx* (showing $1,264,635 million in estimated annual sales in 2021 for automobile dealers, NAICS code 4411); U.S. Census Bureau, "Annual Retail Trade Survey: 2021, Gross Margin" (Dec. 15, 2022), *https://www2.census.gov/programs-surveys/arts/tables/2021/gm.xlsx* (showing $226,118 million in estimated annual gross margin in 2021 for automobile dealers, NAICS code 4411); U.S. Census Bureau, "Annual Retail Trade Survey: 2021, Total Operating Expenses" (Dec. 15, 2022), *https://www2.census.gov/programs-surveys/arts/tables/2021/exp.xlsx* (showing $144,268 million in estimated annual operating expenses in 2021 for automobile dealers, NAICS code 4411).

[498] The calculations in this analysis were performed using unrounded inputs in order to maintain accuracy. Nevertheless, for ease of reference, such inputs have been rounded where they are described in the text.

(1) first-year compliance costs and (2) costs in subsequent years.

*(1) First-year compliance costs.* First-year compliance costs are the sum of: (1) upfront fixed costs; (2) one year of annual ongoing costs that are fixed; and (3) one year of annual ongoing costs that scale.

The Commission estimates the upfront fixed costs per dealer under the highest-cost scenario as follows: $963.44 to update policies and procedures to provide the offering price disclosure required by § 463.4(a) ((8 estimated pricing hours [499] × $80.19 per hour) + (8 estimated programming hours × $40.24 per hour)); $249.68 to design disclosures required by § 463.4(d) and (e) and inform associates of their obligations to provide these disclosures (8 estimated compliance manager hours × $31.21 per hour); $1,783.56 to cull add-ons with no consumer benefit from offerings, develop policies regarding when certain add-ons may or may not be sold, and create nonmandatory disclosures, in response to the requirements of § 463.5 ((16 estimated compliance manager hours × $31.21 per hour) + (12 estimated sales manager hours × $80.19 per hour) + (8 estimated programmer hours × $40.24 per hour)); and $534.12 to upgrade recordkeeping systems and create the templates necessary to accommodate retention of all relevant material under § 463.6 ((8 estimated programmer hours × $40.24 per hour) + (5 estimated clerical hours × $20.16 per hour) + (1 estimated sales manager hour × $80.19 per hour) + (1 estimated compliance manager hour × $31.21 per hour)). These figures total $3,530.80 per dealer.[500]

The Commission estimates the annual fixed ongoing costs per dealer for the first year under the highest-cost scenario as follows: $390.13 to conduct a heightened compliance review of public-facing representations to ensure compliance with § 463.3 (150 estimated documents per year × 5 estimated minutes of review per document × $31.21 per hour of compliance officer review); and $300 estimated for expanded storage to retain records required under § 463.6. These figures total $690.13 per dealer per year.

The Commission estimates annual ongoing costs that scale with dealer size

based on number of employees as follows. The Commission estimates that annual costs that scale with dealer size are $76.86 per employee per year. Annual ongoing costs that scale with dealer size include: $26.53 per employee to provide the total of payments disclosures required by § 463.4(d) and (e) (((417,110 sales & related employees × 1 estimated hour for training × $29.43 per hour) + (19,228,256 total covered transactions involving monthly payments or financing × (2/60 estimated disclosure hours per transaction × $28.41 per hour + $0.15 printing costs per disclosure)))/ 1,257,877 total employees); $36.40 per employee for training and the delivery of a disclosure under a regime in which dealers choose to deliver an itemized disclosure to comply with § 463.5 (((417,110 sales & related employees × 1 estimated hour for training × $29.43 per hour) + ((10,343,319 new vehicle sales + 21,219,640 used vehicle sales) × (2/60 estimated disclosure hours per sale transaction × $28.41 per hour + $0.11 physical costs per disclosure)))/ 1,257,877 total employees); and $13.93 per employee to generate and store calculations required to be retained under § 463.6 ((31,562,959 vehicle sales × 1/60 estimated hours per transaction × $28.41 per hour/1,257,877 total employees) + (5,444,502 vehicle sales with GAP agreement × 1/60 estimated hours per transaction × $28.41 per hour/ 1,257,877 total employees)).

Next, the Commission uses census data on the average number of employees at dealerships within different dealer size cohorts to determine the per-dealer cost for each dealer cohort.[501] Multiplying the

estimated cost per employee ($76.86) by the average number of employees within different dealer size cohorts yields annual ongoing scaled costs per dealer of: $124.59 per dealer with fewer than 5 employees ($76.86 × 1.62 employees); $499.59 per dealer with between 5 and 9 employees ($76.86 × 6.50 employees); $1,058.73 per dealer with between 10 and 19 employees ($76.86 × 13.77 employees); $2,584.18 per dealer with between 20 and 49 employees ($76.86 × 33.62 employees); $5,343.19 per dealer with between 50 and 99 employees ($76.86 × 69.52 employees); $10,784.88 per dealer with between 100 and 249 employees ($76.86 × 140.31 employees); $24,384.79 per dealer with between 250 and 499 employees ($76.86 × 317.25 employees); $44,623.26 per dealer with between 500 and 999 employees ($76.86 × 580.56 employees); and $147,085.08 per dealer with 1,000 or more employees ($76.86 × 1,913.60 employees).

Thus, the total first-year compliance costs based on dealer size are $4,345.51 ($3,530.80 + $690.13 + $124.59) per dealer with fewer than 5 employees; $4,720.51 ($3,530.80 + $690.13 + $499.59) per dealer with between 5 and 9 employees; $5,279.66 ($3,530.80 + $690.13 + $1,058.73) per dealer with between 10 and 19 employees; $6,805.11 ($3,530.80 + $690.13 + $2,584.18) per dealer with between 20 and 49 employees; $9,564.12 ($3,530.80 + $690.13 + $5,343.19) per dealer with between 50 and 99 employees; $15,005.80 ($3,530.80 + $690.13 + $10,784.88) per dealer with between 100 and 249 employees; $28,605.72 ($3,530.80 + $690.13 + $24,384.79) per dealer with between 250 and 499 employees; $48,844.18 ($3,530.80 + $690.13 + $44,623.26) per dealer with between 500 and 999 employees; and $151,306.01 ($3,530.80 + $690.13 + $147,085.08) per dealer with 1,000 or more employees.

To analyze the economic effect of the costs of the Rule by dealer size, the Commission compares per-dealer costs to per-dealer sales, gross margin, and gross margin minus operating expenses. The Commission does not have data on how sales, gross margin, and operating expenses are apportioned to dealerships based on the number of employees. Accordingly, the Commission assumes that sales, gross margin, and operating expenses are apportioned to dealerships *pro rata* with the number of employees. Dividing the 2021 industry-wide figures for annual sales ($1.265 trillion), gross margin ($226.118 billion), and gross margin minus operating expenses ($81.850 billion) by the total number of

---

[499] As used here, "pricing hours" means time spent by a sales and marketing manager reviewing dealership policies and procedures for determining the public-facing prices of vehicles in inventory.

[500] Applicable wage rates throughout this section are based on data from the Bureau of Labor Statistics. *See* U.S. Bureau of Labor Statistics, "May 2022 National Industry-Specific Occupational Employment and Wage Estimates NAICS 441100—Automobile Dealers" (Apr. 25, 2023), *https:// www.bls.gov/oes/current/naics4_441100.htm.*

[501] Based on 2021 census data, dealers with fewer than five employees have an average of 1.62 employees (34,616 employees at all dealerships with fewer than five employees)/21,356 dealers with fewer than five employees); dealers with 5–9 employees have an average of 6.50 employees (35,794 employees/5,507 dealers); dealers with 10–19 employees have an average of 13.77 employees (52,852 employees/3,837 dealers); dealers with 20–49 employees have an average of 33.62 employees (253,365 employees/7,536 dealers); dealers with 50–99 employees have an average of 69.52 employees (423,351 employees/6,090 dealers); dealers with 100–249 employees have an average of 140.31 employees (386,001 employees/2,751 dealers); dealers with 250–499 employees have an average of 317.25 employees (57,105 employees/180 dealers); dealers with 500–999 employees have an average of 580.56 employees (5,225 employees/9 dealers); and dealers with 1,000 or more employees have an average of 1,913.60 employees (9,568 employees/5 dealers). *See* U.S. Census Bureau, "All Sectors: County Business Patterns, Including ZIP Code Business Patterns, by Legal Form of Organization and Employment Size Class for the U.S., States, and Selected Geographies: 2021," *https://data.census.gov/table?q=CB2100CBP&n=44111:44112&tid=CBP2021.CB2100CBP&nkd=LFO–001.*

employees (1,257,877),[502] each employee represents an additional $1,005,372.54 in sales ($1.265 trillion/1,257,877 employees), $179,761.61 in gross margin ($226.118 billion/1,257,877 employees), and $65,069.96 in gross margin minus operating expenses ($81.850 billion/1,257,877 employees). Multiplying these per-employee figures by the average number of employees of dealers within different size cohorts provides per-dealer sales, gross margin, and gross margin minus operating expenses for each cohort. For instance, dealers with fewer than 5 employees have estimated annual sales of $1,629,611.16 (1.62 employees × $1,005,372.54 sales per employee), annual gross margin of $291,376.10 (1.62 employees × $179,761.61 gross margin per employee), and annual per-dealer gross margin minus operating expenses of $105,472.17 (1.62 employees × $65,069.96 gross margin minus operating expenses per employee).

The Commission then divides first-year compliance costs by these figures to yield cost as a percentage of sales, gross margin, and gross margin minus operating costs. Applying this method to each of the dealer size cohorts, first-year compliance costs are equivalent to: 0.27% of annual sales ($4,345.51/$1,629,611.16), 1.49% of gross margin ($4,345.51/$291,376.10), and 4.12% of gross margin minus operating expenses ($4,345.51/$105,472.07) for dealers with fewer than 5 employees; 0.07% of annual sales ($4,720.51/$6,534,647.69), 0.40% of gross margin ($4,720.51/$1,168,401.53), and 1.12% of gross margin minus operating expenses ($4,720.51/$422,936.98) for dealers with 5–9 employees; 0.04% of annual sales ($5,279.66/$13,848,305.89), 0.21% of gross margin ($5,279.66/$2,476,090.91), and 0.59% of gross margin minus operating expenses ($5,279.66/$896,293.27) for dealers with 10–19 employees; and less than one-half of one percent of the annual sales, gross margin, and gross margin minus operating expenses for the remaining categories of dealers.

*(2) Costs in subsequent years.* The estimated cost of compliance with the Rule drops after the first year, given the absence of upfront costs, which are not incurred after the first year. Compliance costs in subsequent years—which are limited to annual ongoing costs (both fixed and those that scale with dealer size)—are therefore a smaller percentage of annual sales, gross margin, and gross margin minus operating expenses, equal to less than two percent of these metrics for dealers of all sizes.[503]

The Commission does not find that these compliance costs represent a significant economic burden. The Commission therefore certifies that the Final Rule will not have a significant economic impact on a substantial number of small entities.

## B. Initial and Final Regulatory Flexibility Analysis

The NPRM noted the Commission's belief that the proposed rule would not have a significant economic impact on small entities, but nevertheless examined the six IRFA factors, and invited comment on the proposed rule's burdens on small businesses. In the following paragraphs, the Commission discusses comments and then sets forth a FRFA.

### 1. Comments on the Initial Regulatory Flexibility Analysis

#### (a) Description of the Reasons Why Action by the Agency Is Being Considered

The IRFA explained that the Commission proposed the Rule to address misleading practices and unauthorized charges to consumers during the vehicle buying or leasing process, and to deter dealer misconduct and remedy consumer harm. The Commission further noted that its law enforcement, outreach and other engagement in this area, and the hundreds of thousands of consumer complaints received by the FTC, indicated that dealership misconduct and deceptive tactics persisted despite Federal and State law enforcement efforts. In response, the comments from SBA Advocacy and one industry group argued that the number of complaints received by the Commission is insufficient to support a rulemaking given the total number of vehicle transactions in the United States.[504]

Similarly, the industry group argued that the Commission has not filed enough law enforcement actions against motor vehicle dealers to justify the proposal, and that, where it has brought enforcement actions, the Commission has managed to obtain redress for harmed consumers without the need for an additional monetary remedy. As explained in SBP II.B and in the section-by-section analysis of the recordkeeping requirements in § 463.6 in SBP III.F,

a signed or initialed document, by itself, or prechecked boxes to establish express, informed consent. These arguments are addressed in the discussion of disclosures in §§ 463.4, 463.5 and the definition of "Express, Informed Consent" in § 463.2.

The industry group also argued that the number of complaints is overstated because it includes: (1) complaints that are not applicable to motor vehicle dealers or conduct addressed by the Rule, and (2) consumers who did not report a loss. This industry group also argued that the Commission failed to take notice of survey data indicating that the majority of consumers are satisfied with their vehicle purchases. *See, e.g.,* Cox Auto., "2021 Cox Automotive Car Buyer Journey Study" (2022) [hereinafter 2021 Cox Automotive Car Buyer Journey Study], *https://www.coxautoinc.com/wp-content/uploads/2022/01/2021-Car-Buyer-Journey-Study-Overview.pdf.* First, in the Commission's experience, complaints *understate* harm caused by unlawful conduct in a given category, notwithstanding any inclusion of complaints that may pertain to ancillary or related issues. *See* SBP II.B (discussing how complaints represent the tip of the iceberg in terms of actual consumer harm and citing case where prior to FTC action, there were 391 complaints about add-ons *and other issues* but survey results during the same period indicted that at least 16,848 customers were subject to unlawful practices related to add-ons alone). Moreover, the Commission's reported complaint numbers may be underinclusive of relevant complaints filed by consumers (*e.g.,* complaints about vehicle financing issues may be filed under the "Banks and Lenders" category; vehicle repossession issues may be filed under the "Debt Collection" category; and complaints about deceptive online vehicle shopping may be filed under the "Online Shopping and Negative Reviews" category). With regard to consumers who did not report a loss, the Commission disagrees that such consumers were not harmed or that their experience is not relevant to the Rule. For example, many consumers experience a law violation or other harmful conduct, but choose not to consummate the transaction, including consumers who waste time pursuing misleading offers. Further, survey data indicating that a majority of customers are "satisfied" do not indicate whether those customers had hidden charges in their contracts and whether they ever became aware of such charges. Surveys cited by the Commission have identified situations where customers are unaware of add-on charges in their contracts; indeed, in one case, 79% of consumers were unaware of such charges. *See* SBP II.B (discussing hidden charges in auto contracts). Consumers might be satisfied with a purchase until they later learn they are paying for items they did not authorize, if they learn this at all. Further, "the FTC need not prove that every consumer was injured. The existence of some satisfied customers does not constitute a defense . . . ." *Fed. Trade Comm'n v. Amy Travel Serv., Inc.,* 875 F.2d 564, 572 (7th Cir. 1989), *vacated in part on other grounds, Fed. Trade Comm'n v. Credit Bureau Ctr., LLC,* 937 F.3d 764 (7th Cir. 2019); *accord Fed. Trade Comm'n v. Stefanchik,* 559 F.3d 924, 929 n.12 (9th Cir. 2009).

---

[502] Data on the number of employees comes from the 2021 census. *See* U.S. Census Bureau, "All Sectors: County Business Patterns, Including ZIP Code Business Patterns, by Legal Form of Organization and Employment Size Class for the U.S., States, and Selected Geographies: 2021," *https://data.census.gov/table?q=CB2100CBP&n=44111:44112&tid=CBP2021.CB2100CBP&nkd=EMPSZES–001,LFO–001.*

[503] Average ongoing compliance costs after the first year equal: 0.05% of annual sales, 0.28% of gross margin, and 0.77% of gross margin minus operating expenses for dealers with fewer than 5 employees, and less than one-half of one percent of annual sales, gross margin, and gross margin minus operating expenses for the remaining categories of dealers.

[504] Comment of SBA Advocacy, Doc. No. FTC–2022–0046–6664 at 6. SBA Advocacy also raised concerns that the proposal could make the buying process more cumbersome and confusing, noting that the proposal requires additional disclosures, and the proposal prohibited dealers from relying on

consumer complaints represent the "tip of the iceberg" of actual misconduct, as many unlawful practices go undetected or unreported by consumers. Further, the Commission has taken significant action aimed at addressing law violations in the motor vehicle dealer marketplace, despite limited resources and a broad mandate to address unlawful practices across much of the nation's commercial activity,[505] and, particularly given the Supreme Court's 2021 ruling limiting the FTC's ability to obtain redress for consumers, it is difficult to get full redress for consumers.[506] Despite these Commission actions, as well as the hundreds of additional actions brought by other Federal and State regulators, the deceptive or unfair acts or practices addressed by the proposed rule persist.

(b) Succinct Statement of the Objectives of, and Legal Basis for, the Proposed Rule

The objectives of the Rule and its legal basis, including the specific grant of rulemaking authority under section 1029 of the Dodd-Frank Act, 12 U.S.C. 5519, were set forth in the IRFA.[507] The objectives and legal basis, and comments on these topics, additionally have been discussed throughout this SBP.

(c) Description of and, Where Feasible, Estimate of the Number of Small Entities to Which the Proposed Rule Will Apply

In its IRFA, the Commission estimated that there were approximately 46,525 franchise, new motor vehicle, and independent/used motor vehicle dealers.[508] As discussed in the

Paperwork Reduction Act analysis in SBP III.V, the Commission received comments from SBA Advocacy and others on this estimate, and the Commission has responded to those comments by making certain changes to the proposal in light of the comments received. The Commission has revised its estimate of covered dealers to 47,271 franchise, new motor vehicle, and independent/used motor vehicle dealers based on newly available NAICS data assembled by the U.S. Census Bureau.[509]

Regarding the estimate of the number of small entities affected by the Final Rule, as noted in the Certification of the Final Rule,[510] while the Commission cannot determine the precise number of small entities, the data the Commission does have reinforce the Commission's initial view that most covered entities are small entities.

(d) Description of the Projected Reporting, Recordkeeping, and Other Compliance Requirements of the Proposed Rule

An industry association commenter argued that the Commission did not "accurately" lay out the proposed rule's projected requirements. The commenter did not provide an explanation of what it alleged to be inaccurate in the Commission's description. This comment notwithstanding, the NPRM described the proposed rule's projected requirements, including by elaborating on the proposed recordkeeping requirements and providing estimates regarding the anticipated recordkeeping time and resource obligations for programmers, clerical staff, sales managers, and compliance officers.[511] The NPRM also provided a detailed

description of the recordkeeping requirements for entities to be covered by the Rule.[512]

(e) Duplicative, Overlapping, or Conflicting Federal Rules

An industry association commenter argued that the Commission failed to identify relevant Federal rules that may duplicate, overlap, or conflict with the proposal. This commenter's arguments that the proposed rule conflicts with Federal statutes are addressed in the section-by-section analysis in SBP III. Commenters provided no examples of actual conflicts between the proposals and Federal law. Further, there is no evidence that duplicative laws prohibiting misrepresentations or unfair acts or practices have harmed consumers or competition. Moreover, the additional remedies provided by the Final Rule will benefit consumers who encounter conduct that is already illegal and will assist law-abiding dealers that presently lose business to competitors that act unlawfully.

(f) Description of Any Significant Alternatives to the Proposed Rule Which Accomplish the Stated Objectives of Applicable Statutes and Which Minimize Any Significant Economic Impact of the Proposed Rule on Small Entities

Statutory examples of "significant alternatives" include different requirements or timetables that take into account the resources available to small entities; the clarification, consolidation, or simplification of compliance and reporting requirements under the Rule for small entities; the use of performance rather than design standards; and an exemption from coverage of the Rule, or any part thereof, for small entities.[513] Comments from SBA Advocacy and from a national industry association argued that the Commission did not set forth alternatives to the proposed rule.[514]

In its Regulatory Flexibility Act compliance guidance to Federal agencies, the SBA Office of Advocacy provides that, "[i]f an agency is unable to analyze small business alternatives separately, then alternatives that reduce the impact for businesses of all sizes must be considered."[515] As the

---

[505] One industry group argued that the majority of the FTC's enforcement actions have pertained to deceptive advertising, and few have alleged unlawful conduct involving add-ons. The Commission agrees that many of its actions have alleged deceptive pricing. In focusing on certain actions that involved allegations that dealers placed unauthorized charges for add-ons, however, the commenter leaves out other unlawful conduct related to add-ons. Such conduct includes, for example, misrepresentations regarding the pricing of add-ons (Complaint ¶¶ 6–12, *TT of Longwood, Inc.*, No. C–4531 (F.T.C. July 2, 2015)), or failing to disclose that mandatory add-ons were included in the cost of credit (Consent Order ¶¶ 73–75, *Y King S Corp.*, CFPB No. 2016–CFPB–0001 (Jan. 21, 2016)). In addition, unauthorized charges are likely to go unnoticed by consumers, which can hamper enforcement efforts. *See, e.g.,* Auto Buyer Study, *supra* note 25, at 14 (describing several study participants who thought they had not purchased add-ons, or that add-ons were free, and only learned during the study that they were charged for add-ons).

[506] *See AMG Cap. Mgmt., LLC* v. *Fed. Trade Comm'n,* 141 S. Ct. 1341 (2021).

[507] NPRM at 42035.

[508] *Id.* at 42035. The Commission explained that, because of the relative size of the automobile

market compared to other types of motor vehicle dealers, and the greater availability of relevant information for this market, its NPRM analysis exclusively considered automobile dealers. The Commission invited submissions of market information for other types of motor vehicles such as boats, RVs, and motorcycles that would allow expansion of the scope of its analysis. *See* NPRM at 42035–36.

[509] U.S. Census Bureau, "All Sectors: County Business Patterns, Including ZIP Code Business Patterns, by Legal Form of Organization and Employment Size Class for the U.S., States, and Selected Geographies: 2021," *https://data.census.gov/table?q=CB2100CBP&n=44111:44112&tid=CBP2021.CB2100CBP&nkd=EMPSZES–001,LFO–001* (listing 21,622 establishments for "[n]ew car dealers," NAICS code 44111, and 25,649 establishments for "[u]sed car dealers," NAICS code 44112).

[510] *See* SBP VI.A.2.

[511] NPRM at 42035; *see also id.* at 42033–34 (describing recordkeeping requirements and analyzing cost burden). To avoid duplicative or unnecessary analysis, the information required by the IRFA can be provided with or as part of any other analysis required by any other law. 5 U.S.C. 605(a).

[512] *See* NPRM at 42027, 42035 (enumerating records to be retained and time period for retention).

[513] *See* 5 U.S.C. 603(c)(1)–(4).

[514] Comment of SBA Advocacy, Doc. No. FTC–2022–0046–6664.

[515] Off. of Advoc., U.S. Small Bus. Admin., "A Guide for Government Agencies: How to Comply with the Regulatory Flexibility Act" 39 (2017), *https://advocacy.sba.gov/wp-content/uploads/2019/06/How-to-Comply-with-the-RFA.pdf.*

Commission explained in its NPRM, it "envisioned and drafted this Rule mindful that most motor vehicle dealers are small entities," and drafted its proposal in the first instance to minimize economic impact on all motor vehicle dealers.[516] For example, the Rule prohibits conduct that already violates the FTC Act, but still takes steps to minimize burdens for dealers of all sizes, by, for example, allowing records to be kept in any legible form already kept in the ordinary course of business, and by limiting recordkeeping requirements to twenty-four months from the date the record is created despite the fact that motor vehicle financing terms are generally years longer than this period. Commenters generally appear to understand the relevant market in a similar manner. For instance, the possible alternatives raised by the comment from SBA Advocacy would apply uniformly to both large and small businesses. These alternatives included excluding vehicle dealers that do not sell automobiles, regardless of the size of the dealer, and creating a carve-out for banks and other financing companies that would cover multi-billion dollar institutions.[517] Comments from SBA Advocacy and a national industry association also discussed the proposed rule's disclosure requirements in an industry-wide manner, not limiting their comments to businesses under any particular size threshold.[518] Nevertheless, the Commission has reviewed these comments carefully, has responded to comments on alternatives in the corresponding sections of this section-by-section analysis, and has determined to modify the definition of "Covered Motor Vehicle" at § 463.2(e) and not to finalize the requirements proposed in §§ 463.4(b) and 463.5(b).[519]

2. Final Regulatory Flexibility Analysis

Although the Commission is certifying that the Rule will not have a significant economic impact on a substantial number of small entities, the Commission has prepared the following FRFA with this Final Rule. In the following paragraphs, the Commission provides the information required for a FRFA: (1) a statement of the need for, and objectives of, the Rule; (2) a statement of the significant issues raised by public comments in response to the IRFA, including any comments filed by the Chief Counsel for Advocacy of the Small Business Administration in response to the proposed rule, the Commission's assessment and response, and any resulting changes; (3) a description of and an estimate of the number of small entities to which the Rule will apply or an explanation of why no such estimate is available; (4) a description of the projected reporting, recordkeeping, and other compliance requirements; and (5) a description of the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes, including a discussion of any significant alternatives for small entities.[520]

(a) Statement of the Need for, and Objectives of, the Rule

The FTC issues this Final Rule to address deceptive and unfair acts or practices during the vehicle buying or leasing process, and to provide an additional enforcement tool to remedy consumer harm and assist law-abiding dealers. As detailed in SBP II.B.1, these deceptive and unfair practices include bait-and-switch tactics, such as dealers advertising deceptively low prices or other deceptive terms to induce consumers to visit the dealership, and charging such consumers additional, unexpected amounts, including after the consumers have invested significant time and effort traveling to, and negotiating at, the dealership premises. At present, consumers may never learn that they are paying substantial unexpected charges, given the complexity and length of the motor vehicle sale, financing, or lease transaction and its attendant contracts and other documents. Law enforcement, outreach and other engagement in this area, as well as the number of consumer complaints each year regarding motor vehicle dealer practices, indicate that unlawful conduct persists despite Federal and State law enforcement efforts.

(b) Issues Raised by Comments, Including Comments by the Chief Counsel for Advocacy of the SBA, the Commission's Assessment and Response, and Any Changes Made as a Result

The comments regarding the IRFA are addressed in SBP VI.B, and the comments regarding the other provisions of the NPRM are discussed in the SBP's section-by-section analysis in SBP III. As noted, the Commission has made certain changes to the Rule after carefully reviewing the comments. These changes include modification of the definition of "Covered Motor Vehicle" at § 463.2(e), removal of the add-on list disclosure requirement in proposed § 463.4(b) and the requirements in proposed § 463.5(b), and removal of the corresponding recordkeeping requirements in proposed § 463.6(a)(2) and (a)(4).

(c) Description and Estimate of the Number of Small Entities to Which the Final Rule Will Apply or an Explanation of Why No Such Estimate Is Available

The Final Rule applies to covered motor vehicle dealers, as defined in § 463.2(f), of covered motor vehicles at § 463.2(e): "any self-propelled vehicle designed for transporting persons or property on a public street, highway, or

---

[516] NPRM at 42036–37; *see also id.* at 42029–30 (indicating, in Questions for Comment 26.b, 28.a, & 30 that the Commission was considering alternative approaches).

[517] *See* Comment of SBA Advocacy, Doc. No. FTC–2022–0046–6664 at 4–6. As addressed in SBP III.C.2(a) and SBP III.E.2(c), in responding to a similar comment by financial institutions, the Final Rule does not change the status quo regarding the responsibilities of contract assignees or other subsequent holders of motor vehicle financing under the Holder Rule, and the Commission declines to create a safe harbor for contract assignees where it did not previously exist.

Similarly, one comment recommended that the Commission add a rule provision authorizing an alternative compliance mechanism, stating that such a provision would aid not just smaller entities but larger entities as well. Under this alternative mechanism, independent accountability organizations could apply to the Commission for authorization to review and assess auto dealers' adherence to a set of rule compliance guidelines that would be created. *See* Comment of BBB Nat'l Programs, Doc. No. FTC–2022–0046–8452 at 1–3. This comment suggested that such an alternative compliance mechanism would have several benefits, including educating industry participants and allowing for industry oversight beyond the capacity of the FTC. The Commission agrees with the goals of educating stakeholders and maximizing resources used to ensure compliance with the Rule but notes that these goals can be furthered without adding alternate mechanisms with as-yet unknown guidelines, that may or may not be sufficient to protect consumers, to the Rule that the Commission is finalizing. The Commission notes that the Rule finalizes certain baseline protections that should already be in place under the law. The Commission encourages stakeholders, such as auto dealer trade associations, BBB, and others, to educate their members and the public about the Rule and encourage compliance, as such groups have done when issuing guidance on other aspects of the law.

[518] Comment of SBA Advocacy, Doc. No. FTC–2022–0046–6664 at 5–6; *see generally* Comment of Nat'l Auto. Dealers Ass'n, Doc. No. FTC–2022–0046–8368. The National Automobile Dealers Association also argues that the Commission should have considered whether to do a rule in the first instance. The NPRM provides a detailed explanation of why, more than a decade after Congress granted the FTC APA rulemaking authority with respect to motor vehicle dealers, and continued enforcement, outreach, and other initiatives, a rule is needed to address ongoing problems related to bait-and-switch tactics and hidden charges.

[519] Separately, the Commission notes that the NPRM identified and solicited comments on alternatives to every substantive requirement, including the areas specifically addressed by the commenters. *See, e.g.,* NPRM at 42028–30 (Q4–7, Q10, Q16, Q28, Q33, Q36–38); *id.* at 42040–41.

[520] 5 U.S.C. 604(a)(1)-(6).

road,'' and, in light of comments received, excludes specific categories as detailed in § 463.2(e).[521] As explained in the Certification,[522] the Commission cannot determine the precise number of small entities to which the Final Rule applies, but census data indicate that the vast majority of the estimated 47,271 dealers covered by the Rule are small entities according to the applicable U.S. Small Business Administrator's relevant size standards.

(d) Description of the Projected Reporting, Recordkeeping, and Other Compliance Requirements

The Final Rule prohibits certain unfair or deceptive acts or practices and contains recordkeeping requirements. The Final Rule contains no reporting requirements.

The Final Rule requires covered motor vehicle dealers to clearly and conspicuously disclose the offering price of a vehicle in certain advertisements and in response to consumer communications. It also requires dealers to make certain other disclosures during the sale, financing, or leasing process. To enforce the Rule and prevent the unfair or deceptive practices prohibited by the Rule, the Rule further requires dealers to retain records necessary to demonstrate compliance with the Rule. Such records include advertising materials and copies of purchase orders and financing and lease documents. The Rule requires such records to be retained for a period of twenty-four months from the date they are created and provides that they may be kept in any legible form, and in the same manner, format, or place as they may already be kept in the ordinary course of business. Further details on these provisions are discussed throughout this SBP, including in the section-by-section analysis of the recordkeeping requirements in § 463.6, as well as in the preceding Paperwork Reduction Act analysis.

(e) Description of the Steps the Commission Has Taken To Minimize the Significant Economic Impact on Small Entities Consistent With the Stated Objectives of Applicable Statutes

The Final Rule addresses certain unfair or deceptive acts or practices in motor vehicle sales, financing, and leasing. In drafting its NPRM, reviewing public comments, and modifying the Rule from its original proposal, the Commission has taken specific steps to avoid unduly burdensome requirements for small entities. The Commission believes that the Final Rule—including the prohibitions against making specific misrepresentations and against charging consumers for any item unless the dealer obtains the express, informed consent of the consumer for the charge—is necessary to protect consumers, including small-business consumers that purchase, finance, or lease motor vehicles. By addressing these practices, the Rule also will benefit competition by preventing law-abiding dealers, many of which are small businesses, from losing business due to unlawful practices by other dealers.

For each provision in the Rule, the Commission has attempted to reduce the burden on businesses, including small entities. For example, the Commission limited the number of disclosures that dealers are required to make under the Final Rule, and in response to comments, further limited such disclosures by determining not to finalize the disclosures in proposed §§ 463.4(b) and 463.5(b). Similarly, the Commission has limited the duration of the Rule's recordkeeping requirements to twenty-four months from the date the relevant record is created, even though this period is far shorter than the length of many financing contracts.

As previously noted, the Commission does not believe the Final Rule imposes a significant economic impact on a substantial number of small entities. Nonetheless, the Commission has taken care to avoid extensive requirements related to form. For example, the Commission does not specify the form in which records required by the Final Rule must be kept. Moreover, the Rule's disclosure requirements do not mandate specific font sizes. In sum, the Commission has worked to minimize any significant economic impact on small businesses.

## VII. Final Regulatory Analysis Under Section 22 of the FTC Act

### A. Introduction

The Federal Trade Commission (FTC) is finalizing a Rule to address unfair or deceptive acts or practices by covered motor vehicle dealers when engaging with consumers who are shopping for covered motor vehicles. The Rule contains several provisions targeted at addressing price-related deception and unfairness for consumers with respect to purchasing, leasing, and financing new and used motor vehicles. The Final Rule prohibits misrepresentations regarding material information about certain aspects of motor vehicles and motor vehicle financing. The Final Rule also mandates certain disclosures about vehicle price, payments, and add-ons, while prohibiting charges for add-on products and services that would not benefit the consumer or for any item unless the dealer obtains the express, informed consent of the consumer for the charge.

Section 22 of the FTC Act, 15 U.S.C. 57b–3, requires the Commission to issue a final regulatory analysis when publishing a final rule. The final regulatory analysis must contain (1) a concise statement of the need for, and objectives of, the final rule; (2) a description of any alternatives to the final rule which were considered by the Commission; (3) an analysis of the projected benefits, any adverse economic effects, and any other effects of the final rule; (4) an explanation of the reasons for the determination of the Commission that the final rule will attain its objectives in a manner consistent with applicable law and the reasons the particular alternative was chosen; and (5) a summary of any significant issues raised by the comments submitted during the public comment period in response to the preliminary regulatory analysis, and a summary of the assessment by the Commission of such issues.

As discussed previously, the FTC issues this Final Rule to address deceptive and unfair acts or practices during the vehicle buying or leasing process, and to provide an additional enforcement tool to remedy consumer harm and assist law-abiding dealers. These deceptive and unfair practices include bait-and-switch tactics, such as dealers advertising deceptively low prices or other deceptive terms to induce consumers to visit the dealership; and charging such consumers additional, unexpected amounts, including after the consumers have invested significant time and effort traveling to, and negotiating at, the dealership premises. At present, consumers may never learn that they are paying substantial unexpected charges, given the complexity and length of the motor vehicle sale, financing, or lease transaction and its attendant contracts and other documents. Law enforcement, outreach, and other engagement in this area, as well as the number of consumer complaints each year regarding motor vehicle dealer practices, indicate that unlawful conduct persists despite Federal and State law enforcement efforts.

In response to public comments, the Commission considered and made a number of revisions from the proposed

---

[521] The Commission is authorized to prescribe rules with respect to a motor vehicle dealer that is predominantly engaged in the sale and servicing of motor vehicles, the leasing and servicing of motor vehicles, or both, as defined in 12 U.S.C. 5519(a).

[522] *See* SBP VI.A.2.

rule, which in turn have necessitated revisions to the regulatory analysis, resulting in this final regulatory analysis.[523] The most significant revisions to the proposed rule impacting the regulatory analysis are the removal of proposed §§ 463.4(b) (requiring the disclosure of add-on lists) and 463.5(b) (requiring various itemized disclosures relating to undisclosed or unselected add-ons). As a result of the Commission's determination not to finalize these sections of the proposed rule, costs and benefits associated with those provisions have been excluded from the final regulatory analysis. The Commission also has made revisions in response to public comments, the availability of newer data, the identification of additional relevant data, and the application of newer scholarly research. The final regulatory analysis thus builds upon the preliminary regulatory analysis, while incorporating several updates:

• The analysis of consumer time savings has been revised in response to public comments and changes following the NPRM.

• A section quantifying the reduction in deadweight loss resulting from the Rule has been added, based upon recent research that allows the Commission to quantify both how dealer markups will respond to price transparency and how new and used vehicle quantities will respond to changes in price.

• Training costs have been added for some provisions in response to public comments.

• Information systems costs have been added to the Recordkeeping section in response to public comments, based on estimates of how much data

would be required and the cost of cloud or on-premises data storage.

• Wages used to monetize labor costs have been updated to reflect new data from the Bureau of Labor Statistics.

• The number of dealers has been updated to reflect new data from Census County Business Patterns.

• The number of transactions subject to the Rule has been revised in response to public comments, and the Commission's identification of additional data sources that can be used to exclude private party and fleet transactions.

The Final Rule contains requirements in the following areas:

1. Prohibited misrepresentations;
2. Required disclosure of offering price in certain advertisements and in response to inquiry;
3. Required disclosure of total of payments for financing and leasing transactions;
4. Prohibition on charging for add-ons in certain circumstances;
5. Requirement to obtain express, informed consent before any charges; and
6. Recordkeeping.

In the following analysis, we describe the anticipated impacts of the Final Rule. Where possible, we quantify the benefits and costs and present them separately by provision. If a benefit or cost is quantified, we indicate the sources of the data relied upon. If an assumption is needed, the text makes clear which quantities are being assumed.

A period of 10 years is used in the baseline scenario because FTC rules are generally subject to review every 10 years.[524] Quantifiable aggregate benefits

and costs across three different sets of assumptions are summarized as the net present value over this 10-year time frame in Table 1.1. Quantifiable benefits include time savings from a more efficient shopping and sales process and a reduction in deadweight loss, both of which ultimately result from greater transparency under the Rule. Quantifiable costs primarily reflect the resources expended by automobile dealers in developing the systems necessary to comply with the provisions of the Rule. In addition, we expect additional benefits and costs that we are presently unable to quantify. Among the unquantified benefits are time savings that accrue to individuals who abandon vehicle transactions entirely; additional time savings on activities that individuals engage in digitally under the status quo; reductions in deadweight loss resulting from direct price effects in the markets for used vehicles or vehicle add-ons; and the benefit of reduced stress, discomfort, and unpleasantness experienced by motor vehicle consumers under the status quo. Among the unquantified costs would be any potential reductions in consumer information resulting from changes in dealers' policies regarding marketing and advertisements. The discount rate reflects society's preference for receiving benefits earlier rather than later; a higher discount rate is associated with a greater preference for benefits in the present. The present value is obtained by multiplying each year's net benefit by a discount factor a number of times equal to the number of years in the future the net benefit accrues.[525]

TABLE 1.1—PRESENT VALUE OF NET BENEFITS (IN MILLIONS), 2024–2033

| | Low estimate | | Base case | | High estimate | |
|---|---|---|---|---|---|---|
| | 3% Discount rate | 7% Discount rate | 3% Discount rate | 7% Discount rate | 3% Discount rate | 7% Discount rate |
| *Benefits:* | | | | | | |
| Time Savings ..................................... | $7,463 | $6,145 | $14,926 | $12,290 | $24,036 | $19,790 |
| Deadweight Loss Reduction .............. | 568 | 468 | 1,298 | 1,069 | 2,307 | 1,899 |
| Total Benefits .............................. | 8,031 | 6,613 | 16,224 | 13,359 | 26,343 | 21,690 |
| *Costs:* | | | | | | |
| Finance/Lease Total of Payments Disclosure ..................................... | 296 | 246 | 296 | 246 | 117 | 98 |
| Offering Price Disclosure .................. | 46 | 46 | 46 | 46 | 0 | 0 |
| Prohibition re: Certain Add-ons & Express, Informed Consent .......... | 475 | 406 | 475 | 406 | 147 | 128 |

[523] These revisions and alternatives the Commission considered are described in detail in the Commission's Statement of Basis and Purpose, as is the Commission's explanation why the Final Rule will attain its objectives in a manner consistent with applicable law.

[524] *See* Fed. Trade Comm'n, Notification of Intent to Request Public Comment, Regulatory Review

Schedule, 87 FR 47947 (Aug. 5, 2022), *https://www.govinfo.gov/content/pkg/FR-2022-08-05/pdf/2022-16863.pdf*.

[525] While whole calendar years are used here for ease of reference, this analysis estimates costs and benefits over a ten-year period running from the Rule's effective date. For the purposes of discounting, the Commission assumes that any

upfront costs or benefits occur immediately upon the effective date of the Rule and are therefore not discounted. The Commission further assumes that ongoing costs and benefits occur at the end of each period, such that even ongoing costs/benefits that occur in year 1 are discounted.

TABLE 1.1—PRESENT VALUE OF NET BENEFITS (IN MILLIONS), 2024–2033—Continued

| | Low estimate | | Base case | | High estimate | |
|---|---|---|---|---|---|---|
| | 3% Discount rate | 7% Discount rate | 3% Discount rate | 7% Discount rate | 3% Discount rate | 7% Discount rate |
| Prohibition on Misrepresentations .... | 157 | 130 | 157 | 130 | 0 | 0 |
| Recordkeeping ................................. | 296 | 248 | 296 | 248 | 296 | 248 |
| Total Costs ................................. | 1,270 | 1,075 | 1,270 | 1,075 | 559 | 474 |
| Net Benefits ............................... | 6,761 | 5,538 | 14,954 | 12,284 | 25,784 | 21,216 |

**Note:** ''Low Estimate'' reflects all lowest benefit estimates and high cost scenarios and ''High Estimate'' reflects all highest benefit estimates and low cost scenarios. ''Base Case'' reflects base case benefit estimates and high cost scenarios. Not all impacts can be quantified; estimates only reflect quantified costs and benefits.

*B. Estimated Benefits of Final Rule*

In this section, we describe the beneficial impacts of the Rule, by (1) providing quantitative estimates where possible, (2) identifying quantitative benefits that cannot be estimated at this time due to a lack of data, and (3) describing benefits that can only be assessed qualitatively. The benefits cut across multiple areas addressed by the Rule and these benefits are impossible to identify separately by area. As a result, we enumerate the benefits of the Rule not by provision, but by category.

1. Consumer Time Savings When Shopping for Motor Vehicles

Several provisions of the Rule would benefit consumers by saving them time as they complete motor vehicle transactions. Required disclosures of relevant prices and prohibitions of misrepresentations, *inter alia,* would save consumers time when shopping for a vehicle by requiring the provision of salient, material information early in the process and eliminating time spent pursuing misleading offers. The Commission's enforcement record shows that consumer search and shopping is sometimes influenced by unfair or deceptive advertising that draws consumers to a dealership in pursuit of an advertised deal, only to find out at some point later in the process (if at all) that the advertised deal is not actually available to them.[526] This bait-and-switch advertising has the effect of wasting consumers' time traveling to and negotiating with unscrupulous dealerships, time which would otherwise be spent pursuing truthful offers in the absence of deception and unfairness. If consumers are faced with hard constraints on their time or other resources, this wasted time may mean that they are unable to find the deal that best fits their needs and preferences. Additionally, motor vehicle consumers frequently begin the process

of shopping for a motor vehicle (*e.g.,* by visiting a dealership in response to an ad or initiating negotiations in response to a quoted price that is incomplete) and then later abandon the nascent transaction entirely when additional information is revealed. In these instances, consumers do not purchase or lease a vehicle at all. The Rule would also save consumers time by avoiding these abandoned transactions. However, because the Commission has been unable to identify data to determine the quantity of such abandoned transactions and the amount of time spent pursuing them, this benefit remains unquantified in the analysis.

Obviously, many consumers end up purchasing and leasing vehicles under the status quo—either because full revelation of prices and terms still results in a mutually beneficial transaction or because full revelation never occurs and consumers are deceived into completing a transaction that is not mutually beneficial. These consumers also spend additional, unnecessary time discovering information that dealers would be required to disclose earlier once the Rule is in effect. The Commission expects the Rule's required disclosures and prohibitions against misrepresentations to improve information flows and consumer search efficiency, including but not limited to, addressing the influence of deception and unfairness on consumer search and shopping behavior.

The Commission's preliminary analysis estimated that the proposed rule would allow consumers to spend 3 fewer hours completing each motor vehicle transaction and result in (quantifiable) overall time savings valued at between $30 billion and $35 billion. In this final regulatory analysis, the Commission takes into account the effects of revisions to the proposed rule and additional data, addresses industry comments, and employs an alternative analytical approach with a sensitivity

analysis. This sensitivity analysis reflects a ''high-end'' estimate that consumers will save as many as 3.3 hours per completed transaction; a ''base case'' estimate—representing the most likely scenario—that consumers will save 2.05 hours per transaction; and a possible ''low-end'' savings estimate of 1.02 hours. Using a 7% discount rate, these time savings estimates result in a range of between $6.1 billion and $19.8 billion in total savings, with a base case of $12.3 billion.

In its preliminary analysis, the Commission relied on results from the 2020 Cox Automotive Car Buyer Journey study, which showed that consumers spent roughly 15 hours researching, shopping, and visiting dealerships for each motor vehicle transaction.[527] Based on the proposed rule provisions prohibiting misrepresentations and requiring price transparency, the Commission assumed each consumer who consummated a vehicle transaction would spend 3 fewer hours shopping online, corresponding with dealerships, visiting dealer locations, and negotiating with dealer employees. The 3 hours corresponded to 20% of an average consumer's time spent on such activities in 2019 (pre-COVID).

The Commission received a number of comments emphasizing the unnecessary time consumers must spend to ascertain the price and terms when attempting to consummate a vehicle transaction. One group of commenters, for example, asserted that ''[t]he most important factor for consumers purchasing a vehicle is its price, yet the price is almost impossible to ascertain without spending hours at the dealership.'' [528] Another group of commenters provided a compilation of numerous consumer complaints, including many that described consumers spending hours at a

---

[526] *See* SBP II.B–C.

[527] NPRM at 42037 & n.180.
[528] Comment of Am. for Fin. Reform et al., Doc. No. FTC–2022–0046–7607.

dealership trying to ascertain the final price and terms of the transaction.[529] The improved information flow under the Final Rule will provide quantifiable benefits for consumers by reducing or eliminating this unnecessary need to spend time penetrating opaque pricing and terms, and will provide qualitative benefits by reducing frustration and stress in the car buying process.

Some industry commenters questioned the appropriateness of the data and assumptions used to quantify the time savings benefit. A number of industry association commenters argued that the 15-hour figure did not represent a reasonable base from which time savings attributable to the Rule could be derived. One such commenter criticism asserted that the publication from which it was sourced only surveyed consumers who used the internet during research and shopping and therefore could not be representative of the time spent by consumers who do not use the internet. Still other commenters noted that additional data from the same organization were available. The Commission disagrees that the 15-hour estimate is an unreasonable base from which to derive time savings from the Rule. While the Cox Automotive Study acknowledges only internet users were surveyed, the study also indicates its "[r]esults are weighted to be representative of the buyer population." [530] Also, while more recent data were available at the time of the analysis for the NPRM, those data were from an extraordinary period (the COVID–19 pandemic). The Commission expects that the data used for the preliminary analysis are more representative of consumer experiences over the analysis window than the more recent data. While not dispositive, the limited data available since the NPRM was published bears this hypothesis out. In the 2021 Cox Automotive Car Buyer Journey Study, consumers spent roughly

12-and-a-half hours researching, shopping, and visiting dealerships for each motor vehicle transaction.[531] In contrast, in the 2022 Car Buyer Journey study, consumers spent roughly 14-and-a-half hours researching, shopping, and visiting dealerships for each motor vehicle transaction.[532] This admittedly short trend suggests that the COVID–19 pandemic had a significant effect on motor vehicle shopping, reducing the amount of time the typical consumer spent on these activities, and that time spent on these activities has already rebounded to previous levels.[533]

Another industry association commenter suggested that the figure included categories of time use that could not conceivably be affected by the proposed rule, such as online research into vehicle features, and that attention should be restricted to time spent shopping. The Commission finds that several provisions in the Rule clearly have the potential to reduce time spent across most categories covered by the 15-hour figure, including the largest category ("Researching and Shopping Online"). This category of time use would include comparing listed vehicle prices across dealerships that, under the Rule, would be transparent and comparable in a way that they were not in the status quo, thus saving consumers time.

Some commenters also noted that the total base of transactions reported in the preliminary analysis appeared to overstate the number of transactions to which the proposed rule would apply. First, commenters asserted that the 62.1 million transactions double-counted new vehicle leases in the data source from which it was obtained (2019 National Transportation Statistics, Table 1–17). Second, commenters asserted that the number included private party transactions that would be entirely unaffected by the proposed rule. Finally, commenters argued that the transactions number contained wholesale and fleet transactions, where the amount of time spent researching, shopping, and visiting dealers is likely to be substantially different relative to a household consumer.

The Commission has verified that the source data were revised to fix the erroneous double-counting of leases

between the time they were accessed by the Commission for the drafting of the preliminary analysis and the time that comments were received. The final analysis uses the revised data. In addition, in response to comments that private party transactions should be excluded from the analysis, the Commission is revising its analysis. Additional data would be necessary to quantify any time savings benefits for wholesale and fleet transactions. Accordingly, the Commission has excluded all transactions occurring through non-retail channels from the final analysis.[534]

A number of comments raised concerns about the foundations of the 3-hour time-savings assumption. One industry organization noted that the Cox Automotive study cited in the NPRM does not itself address the proposals in the NPRM (which the survey, of course, predated) and does not estimate time savings.[535] Another organization

---

[529] Comment of Consumer Reps. et al., Doc. No. FTC–2022–0046–7520 at 3, 11, 12, 16, 38 (including story from Illinois consumer describing "[spending] about 4 hours at the dealership while the salesman kept changing the terms of the deal . . . ."; story from Connecticut consumer describing how, "[a]fter nearly three hours of paperwork . . . I was finally presented with the official bill to pay the balance. The price was now higher than the original adjusted sticker."; story from New Jersey consumer describing how, "[a]fter 4 hours of negotiations . . . I finally got nearly the same price as the verified offer [for the vehicle] but about $1000 less on my trade-in[ ] (that was also part of the verified offer). The [dealer] also added on Accessories 'other products' [of] $474.00 . . . ."; story from Texas consumer describing how "[t]he [dealership] finance manager kept me there for two hours, and said the deal was done. I went to get my wife, when we got back the price had gone up $3,000.00.").

[530] 2020 Cox Automotive Car Buyer Journey, *supra* note 25, at 1.

[531] *See* 2021 Cox Automotive Car Buyer Journey Study, *supra* note 504, at 16.

[532] *See* 2022 Car Buyer Journey, *supra* note 25, at 6.

[533] Interestingly, consumer satisfaction with the car buying process, as measured by this same survey, was highest during the COVID–19 pandemic when the time spent on research, shopping, and visiting dealerships was lowest, and has since dropped back to pre-pandemic levels. 2022 Car Buyer Journey, *supra* note 25, at 5.

[534] When the transaction volume from the preliminary analysis is applied to the Commission's current methodology and sensitivity analysis, time savings under the Final Rule ranges from a high-end of $35 billion to a low-end of $11 billion, with a base case of $22 billion (assuming a 7% discount rate). In comparison, the preliminary analysis computed savings under the proposed rule as approximately $31 billion (also assuming a 7% discount rate). The residual difference in base case savings is attributable to less time saved per transaction—partially explained by additional provisions in the NPRM that the Commission is not finalizing—as well as updates to the underlying wages used to monetize the consumer time savings.

[535] This same organization commissioned a study that was recently released asserting the proposed rule would lead to an increase in consumer transaction time. This survey, however, had numerous methodological shortcomings rendering its results unreliable. For example, the survey presented each respondent at the outset with a leading statement telling them the rule would impose "new duties [that] are expected to create additional monitoring, training, forms, and compliance review responsibilities as well as a modification of record keeping systems and coordination with outside IT and other vendors" and "increase the time of a motor vehicle transaction, inhibit online sales, limit price disclosures, and increase customer confusion and frustration." Edgar Faler et al., Ctr. for Auto. Rsch., "Assessment of Costs Associated with the Implementation of the Federal Trade Commission Notice of Proposed Rulemaking (RIN 2022–14214), CFR part 463'' 34–36 (2023), *https:// www.cargroup.org/wp-content/uploads/2023/05/ CAR-Report_CFR-Part-463_Final_May-2023.pdf* (introductory instructions on the survey instrument sent to respondents). Moreover, the survey started with a sample size of 60 dealers (*id.* at 7) in an industry with an estimated 46,525 dealers, NPRM at 42,031 & n.154, but only 40 dealers actually completed responses to many key questions (*id.* at 29). The survey does not describe how these 40– 60 dealers were chosen. Although the survey estimates that the proposed rule would require consumers to spend additional time on motor vehicle transactions, this conclusion is based on the responses of just 40 dealers and included no consumers. *Id.* at 29–32. Moreover, the survey report attributed much of this estimated increase to
Continued

expressed confusion as to whether the assumption was intended as a flat 3-hour time savings or a 20% time savings, asserting that dynamism in automotive retailing will likely lead to evolution in the total amount of time spent shopping.

While the Commission believes its 3-hour time-saving assumption in the NPRM remains reasonable, the Commission has conducted additional analyses, the results of which demonstrate the positive net benefits of the Rule even when applying more conservative assumptions around time savings and adjusting for the removal of certain proposed provisions from the NPRM.[536] Using recent figures from Cox Automotive's Car Buyer Journey 2019 study, the Commission notes that consumers who do various activities in the vehicle buying process digitally ("digital consumers") save time at the dealership relative to those who do not ("non-digital consumers").[537] The Commission's revised base case time savings calculation assumes that only the fraction of consumers who are not currently shopping digitally will experience time savings, and that these savings will be proportional to the time savings found in the Car Buyer Journey 2019 study for digital consumers.[538] Because the Commission expects the provisions of the Rule to emulate some of the time-saving features of completing these activities digitally, the time savings benefits of the Rule are assumed to be a proportion of the time saved by status quo digital consumers, with the proportion determined by how closely the status quo digital shopping experience is expected to resemble the shopping experience for all consumers once the Rule is in effect. Additionally, because these numbers only reflect time saved at the dealership of purchase, we assume that these same consumers will also save time on these activities to the extent that they are initiated at dealerships visited prior to the dealership at which they purchase ("non-purchase dealerships"). Based on 2020 data from Cox Automotive, the average consumer visits 1 non-purchase dealership for each transaction.[539] Table 2.1 documents both the fraction of consumers performing activities digitally under the status quo and the time saved at the dealership by these consumers on each activity.

TABLE 2.1—COMPLETING ACTIVITIES DIGITALLY

| Activity | % of Consumers digital (2020 digitization) | Time saved at dealership (2019 journey) (minutes) |
|---|---|---|
| Negotiating the Purchase Price | 20 | 43 |
| Select F&I Add-Ons | 18 | 33 |
| Discussing and Signing Paperwork | 13 | 45 |
| Get a Trade-In Offer | 31 | 26 |

Source: Car Buyer Journey 2019 and Digitization of End-to-End Retail.

Based on the description of these activities and the anticipated effects of the Rule, our base case estimates assume that non-digital consumers will save an amount of time negotiating a vehicle purchase price equal to the amount of time saved by those negotiating purchase price digitally under the status quo (43 minutes). For non-digital consumers, it is currently time-consuming to obtain comparable price quotes from dealerships. Many dealerships will not initiate price negotiations in earnest without a competing price quote in writing, which can only be obtained by visiting a dealership for the non-digital consumer. Mandating offering price disclosures—which are comparable across dealerships by definition—early in the shopping process will emulate the price discovery function of negotiating prices online, in which comparable price quotes can be obtained (with effort) via email.[540]

The Commission anticipates that the impact of the Rule on time spent selecting F&I add-ons and discussing and signing paperwork will be moderate. In our base case estimates, non-digital consumers will save an amount of time doing these activities equal to the half the amount of time saved by those doing these activities digitally under the status quo (33 × 0.5 = 16.5 minutes and 45 × 0.5 = 22.5 minutes, respectively). Time saved selecting add-ons flows primarily from the prohibitions on various misrepresentations, the mandatory disclosures regarding whether add-ons are required, and the prohibition on charging for add-ons under certain circumstances.[541] Time saved discussing and signing paperwork also flows from the prohibitions on various misrepresentations, several disclosures mandated by the Rule, and the

---

[536] In fact, the sensitivity analysis in Table 2.3 of this final regulatory analysis presents a range of reasonable estimates for time savings that includes the 3-hour time-saving assumption from the preliminary analysis in the NPRM.

[537] Cox Auto. et al., "Car Buyer Journey 2019" (2019) [hereinafter Car Buyer Journey 2019], *https://www.coxautoinc.com/wp-content/uploads/2019/06/2019-Car-Buyer-Journey-Study-FINAL-6-11-19.pdf*. While Cox Automotive has released subsequent Car Buyer Journey studies, none of these subsequent studies quantify time savings from shopping digitally. In addition, to the extent that shoppers compensate by spending more time at home on these activities, these time savings should be reduced to reflect *net* time savings from performing these activities digitally. We believe that the nature

proposed rule provisions that are not in the Final Rule. *Id.* at 25.

of performing these activities digitally vs. at the dealership suggests these offsets should be small.

[538] The 2020 Cox Automotive Digitization of End-to-End Retail study reports the fraction of consumers who are already engaging in various activities online under the status quo. Cox Auto., "Digitization of End-to-End Retail" (2021) [hereinafter Digitization of End-to-End Retail], *https://www.coxautoinc.com/wp-content/uploads/2021/01/2020-Digitization-of-End-to-End-Retail-Study-FINAL.pdf*. While the activities listed across studies do not match perfectly, we map the activity categories to the closest corresponding activity in the other study and, in our final analysis, exclude from the time savings calculation the percentage of transactions corresponding to the fraction of consumers already engaging in that activity online. While it is likely that consumers shopping digitally under the status quo will also experience some additional time savings under the Rule, there is

insufficient data to estimate this marginal savings and so we leave this benefit unquantified in the analysis.

[539] 2020 Cox Automotive Car Buyer Journey, *supra* note 25, at 15 (noting an average of 2.2 dealerships visited among new car buyers).

[540] Shoppers who negotiate purchase price digitally under the status quo will likely also obtain time savings from mandatory offering price disclosures, corresponding to the time and effort they put into contacting and exchanging email with dealerships. We lack sufficient data on the time spent on these activities to quantify these benefits, however.

[541] *See* §§ 463.3(a), (b), and (f); 463.4(c); and 463.5(a) and (c). The Commission notes that time savings would likely be higher in this category had it determined to finalize proposed § 463.4(b), which would have required disclosure of an add-on list.

prohibition on charging for items without express, informed consent.[542] For non-digital consumers, considerable time must be spent at the dealership both closely reviewing paperwork (*e.g.,* to ensure that unwanted optional add-ons are not being added to the transaction; to ensure that the financing terms, including monthly payments, total payments, and term length, are as expected; and to confirm that terms in the contract generally conform to what was discussed) and waiting for sales and F&I staff at the dealership to consult with managers and revise paperwork as needed. Digital consumers, however, may have access outside the dealership to add-on menus where they can select their desired F&I products affirmatively without worry that dealership staff will misrepresent the products or pressure them into selecting something unwanted. In addition, digital consumers may receive and review paperwork before arriving at the dealership. This way, any necessary revisions can be performed by the dealership asynchronously so that the consumer is free to spend that time as they wish instead of being stuck in an F&I office. The noted Rule provisions will give consumers confidence that the add-on options presented to them are non-deceptive and that the contract paperwork they are asked to review will not yield any unpleasant surprises. As a result, on average they will neither need to engage in such close scrutiny of their contract documents, nor spend as much time waiting for dealership staff to speak to managers or make changes as the first draft will be more likely to conform to their expectations.[543]

The Commission assumes that the Rule will likely not assist consumers much (if at all) in reducing time spent obtaining a trade-in offer. In our base case estimates, we assume non-digital consumers will not save additional time on obtaining a trade-in offer under the Rule. There are various provisions in the Rule that touch trade-in offers made by dealerships[544] and may increase consumer confidence in dealer contracts as discussed previously. In addition, trade-in values are an important piece of transaction pricing, so greater price transparency may save consumers time on the trade-in aspect of transactions

that involve them. There is a concern, however, that dealers may spend more time trying to extract maximum value out of any given trade-in opportunity once the Rule is in effect. Because the Commission believes that greater transparency in vehicle pricing and add-ons will lead to reduced markups on these products (*see* "Reductions in Deadweight Loss"), it is possible that dealers will attempt to make up these lost profits by maximizing trade-in margins, which may lead to increased time spent on negotiations. Since we do not have sufficient data to determine the balance of these two effects, we assume in the base case that they offset. In sensitivity analyses where we explore alternative assumptions, note that time savings from this activity only apply to the roughly 50% (by one estimate) of vehicle purchase transactions at dealerships where consumers trade in a vehicle.[545]

Finally, data from the 2021 Cox Automotive Car Buyer Journey Study reveal that consumer time spent at non-purchase dealerships is roughly 82% of the time spent at the dealership of purchase.[546] Additionally, the average consumer visits 1 non-purchase dealership for each transaction, so under the dual assumptions that (1) the proportions of time spent at dealerships across these activities is consistent across purchase and non-purchase dealerships and (2) the noted time savings are constant as a fraction of time spent, we multiply the time savings numbers by this ratio to obtain the additional time saved at non-purchase dealerships.

Proceeding as in the preliminary analysis, we assume that motor vehicle purchase, financing, and lease transactions will be stable at the 2019 level of 57.9 million transactions per year.[547] As discussed previously, the final analysis excludes private party, fleet, and wholesale transactions. According to Edmunds Automotive Industry Trends 2020, 19.3% of new

vehicle sales in 2019 were fleet sales.[548] This fraction of the 17.1 million new vehicle sales and leases in the data are excluded from the analysis. An Automotive News article from January 2023 (citing data from Cox Automotive) states that 48% of all used vehicle sales occurred outside of the retail channel.[549] As with new vehicle sales, this fraction of the 40.8 million used vehicle transactions in the data are excluded from the analysis. Adding up the covered transactions (35 million)[550] and applying the time savings calculated from the base case assumptions, we anticipate that the Rule will generate a total time savings of more than 72 million hours per year. According to the Bureau of Labor Statistics Occupational Employment Statistics, the average hourly wage of U.S. workers in 2021 was $29.76, and recent research suggests that individuals living in the U.S. value their non-work time at 82% of average hourly earnings.[551] Thus, the value of non-work time for the average U.S. worker would be $24.4 per hour. As a result, our final analysis refines the estimate to a present value of between $12.3 billion and $14.9 billion as described in Table 2.2, which translates to savings of roughly $1.75 billion per year.[552]

[542] *See* §§ 463.3; 463.4(c), (d), and (e); and § 463.5(c).

[543] Again, status quo digital shoppers will likely obtain time savings on these activities as well, to the extent that their paperwork will also be less likely to require close scrutiny and revisions. We lack sufficient data on the time spent on these activities to quantify these benefits, however.

[544] *See* § 463.3(i) and (j); 463.4(d).

[545] *See* Progressive, "Consumers embrace online car buying," *http://www.progressive.com/resources/insights/online-car-buying-trends/* (last visited Dec. 5, 2023).

[546] *See* 2021 Cox Automotive Car Buyer Journey Study, *supra* note 504, at 16 (noting total time of 2:09 spent "Visiting Other Dealerships/Sellers" and total time of 2:37 spent "With the Dealership/Seller Where Purchased").

[547] *See* U.S. Dep't. of Transp., Off. of the Sec'y of Transp., Bureau of Transp. Stat., "National Transportation Statistics 2021, 50th Anniversary Edition" 21 (2021), *https://www.bts.dot.gov/sites/bts.dot.gov/files/2021-12/NTS-50th-complete-11-30-2021.pdf* (Table 1–17).

[548] *See* Edmunds, "Automotive Industry Trends 2020" 7 (2020), *https://static.ed.edmunds-media.com/unversioned/img/industry-center/insights/2020-automotive-trends.pdf.*

[549] *See* Auto. News, "Used-vehicle volume hits lowest mark in nearly a decade" (Jan. 13, 2023), *https://www.autonews.com/used-cars/used-car-volume-hits-lowest-mark-nearly-decade* (estimating 19,100,000 of used vehicle sales in the year 2022 occurred within the retail channel). The same Automotive News source reports a total used vehicle sales number of approximately 40 million for 2019. *Id.* The conclusions of the analysis are robust to using this total figure instead.

[550] A recent report by the Center for Automotive Research estimates that there approximately 43 million non-fleet, non-private party sales in 2019 based on privately sourced data. Edgar Faler et al., Ctr. for Auto. Rsch., "Assessment of Costs Associated with the Implementation of the Federal Trade Commission Notice of Proposed Rulemaking (RIN 2022–14214), CFR part 463" 5 (2023), *https://www.cargroup.org/wp-content/uploads/2023/05/CAR-Report_CFR-Part-463_Final_May-2023.pdf.* While this would result in a savings estimate approximately 22% higher, the Commission relies on its analysis of the publicly available data described herein.

[551] Daniel S. Hamermesh, "What's to Know About Time Use?" 30 J. Econ. Survs. 198, 201 (2016), *https://onlinelibrary.wiley.com/doi/epdf/10.1111/joes.12107.*

[552] Note that we assume only one consumer is involved in each transaction; to the extent that multiple members of a household may visit dealerships for each transaction, these calculations are likely to underestimate the total time savings.

TABLE 2.2—ESTIMATED BENEFITS OF TIME SAVINGS FOR COMPLETED TRANSACTIONS

| | | 2024–2033 |
|---|---|---|
| Completed Transactions | | |
| *Avg. minutes saved at dealership of purchase/other dealers (by activity):* [a] | | |
| Negotiating the Purchase Price | | 34/28 |
| Select F&I Add-Ons | | 14/11 |
| Discussing and Signing Paperwork | | 20/16 |
| Get a Trade-In Offer | | 0/0 |
| Hours saved per transaction | | 2.05 |
| Number of covered vehicle transactions per year [b] | | 34,986,253 |
| Value of time for vehicle-shopping consumers [c] | | $24.40 |
| Abandoned Transactions | | *Unquantified* |
| Total Quantified Benefits (in millions) | 3% discount rate | $14,926 |
| Total Quantified Benefits | 7% discount rate | $12,290 |

**Note:** Benefits have been discounted to the present at both 3% and 7% rates.

[a] Averages are across all retail transactions; transactions where consumers performed activity digitally under the status quo will have a time savings of 0 for that activity.

[b] For total volume, National Transportation Statistics Table 1–17. For retail/non-fleet fraction, Edmunds Automotive Industry Trends 2020 (for new vehicles), *supra* note 548548, and Cox Automotive via Automotive News (for used vehicles), *supra* note 549549.

[c] BLS Occupational Employment Statistics (May 2022) and Hamermesh (2016).

Due to the uncertainty surrounding how the Rule will translate into time savings for consumers and to which activities it will most strongly apply, we explore a range of alternative assumptions regarding what fraction of the documented time savings digital consumers experience will be received by non-digital consumers under the Rule. In our low-end scenario, we assume that the Rule will result in half the consumer time savings of the base case. In our high-end scenario, we assume that all the time savings experienced by digital consumers under the status quo—including time saved getting a trade-in offer—will be received by non-digital consumers under the Rule. The low-end assumptions correspond to a total time savings of more than 35.85 million hours per year while the upper bound assumptions correspond to a total time savings of more than 115.47 million hours per year. The results of this analysis are presented in Table 2.3. Importantly, over the whole range of these alternative assumptions we find that benefits exceed costs. In fact, holding other benefit and cost estimates constant, the time savings generated by the Rule could be *de minimis* and the implied benefits would still exceed the costs. While there are some activities in the car buying process that the Rule may not affect (*e.g.,* test driving vehicles, etc.), the data discussed suggest that there is ample room for the Rule to eliminate unnecessary time across various activities. And even though digital consumers spend less time on these activities, results across several studies suggest that this reduction in time leads to a better experience for consumers.[553]

TABLE 2.3—SENSITIVITY ANALYSIS OF TIME SAVINGS

| | Low end | Base case | High end |
|---|---|---|---|
| *Avg. minutes saved at dealership of purchase/other dealers (by activity):* [a] | | | |
| Negotiating the Purchase Price | 17/14 | 34/28 | 34/28 |
| Selecting F&I Add-Ons | 7/6 | 14/11 | 27/22 |
| Discussing and Signing Paperwork | 10/8 | 20/16 | 39/32 |
| Get a Trade-In Offer | 0/0 | 0/0 | 18/15 |
| Hours saved per transaction [b] | 1.02 | 2.05 | 3.3 |
| Total Quantified Benefits (in millions) ... 3% discount rate | $7,463 | $14,926 | $24,036 |
| Total Quantified Benefits ... 7% discount rate | $6,145 | $12,290 | $19,790 |

**Note:** Benefits have been discounted to the present at both 3% and 7% rates.

[a] Averages are across all retail transactions; transactions where consumers performed activity digitally under the status quo will have a time savings of 0 for that activity.

[b] Time savings for "Get a Trade-In Offer" assumed to be zero for lease transactions or sales without trade-ins (estimated at 50%).

2. Reductions in Deadweight Loss

The status quo in this industry features consumer search frictions, shrouded prices, deception, and obfuscation. As a result, dealers likely charge higher prices for a number of products and services than could be supported once the Rule is in effect. Recent research suggests that when

---

[553] *See* Car Buyer Journey 2019, *supra* note 537, at 9 (Consumers who negotiate (88% vs. 64%) and complete paperwork online (74% vs. 65%) are more satisfied with their dealership experience.); 2022 Car Buyer Journey, *supra* note 25, at 22 ("More [financing] steps completed online = higher satisfaction & less time at the dealership"); Cox Auto., "Cox Automotive Car Buyer Journey Study: Pandemic Edition" 22 (2021), *https:// www.coxautoinc.com/wp-content/uploads/2021/02/* *Cox-Automotive-Car-Buyer-Journey-Study-Pandemic-Edition-Summary.pdf* ("Heavy Digital Buyers were the Most Satisfied").

consumers are able to observe prices for vehicles before visiting dealerships—as is intended by the Rule—prices and dealer profits are likely to fall.[554] When not accompanied by changes in quantity (due to a fixed supply of the good), price adjustments serve to transfer welfare from one side of the market (*e.g.,* dealers) to the other (*e.g.,* consumers), which typically have no net effect on the outcome in a regulatory analysis.[555] A decrease in vehicle prices, however, will likely also lead to an increase in the number sold as the supply is not fixed. As a result, this quantity expansion effect unambiguously increases welfare by reducing the deadweight loss that occurs when firms can charge prices that are marked up over marginal costs.

### 3. Framework

When a policy reduces the price of a good—either through a reduction in firm costs or, as in this case, a reduction in firm market power—the quantity of the good sold will typically increase. If a distortion exists in the market causing the product in question to be sold at a price above the marginal (social) cost of production (*e.g.,* a tax, an externality, or a markup enabled by market power), this quantity expansion has the effect of reducing deadweight loss in that market. In the simple case where there is one good subject to the policy and that good has no close substitutes or complements, this welfare effect can be easily illustrated as in Figure 1.



### Figure 1

The solid line reflects the demand for the good, where some quantity is purchased at a market price of $p_0$ (point A), which is higher than marginal costs (MC). Because of this wedge between price and marginal costs, there is a reduction in welfare relative to the outcome where prices equal marginal costs; this deadweight loss is illustrated on the graph by the bordered triangle (ACD). Holding everything else constant, when prices fall from $p_0$ to $p_1$, this deadweight loss is reduced to some extent. Part of this increase in welfare will go to consumers, and part will go to producers.

Imagine that this graph depicts the market for new automobiles. The Final Rule will increase price competition, thus reducing market power and shifting prices closer to marginal costs in the new automobile market. If this market satisfied the criteria for the simple case described herein (*i.e.,* no close substitutes or complements), the only data we would need to estimate this change in total welfare would be the predicted change in price, the predicted change in quantity (which can be calculated from an estimate of the slope or elasticity of the demand curve for new vehicles), and some information or assumption about the shape of the demand curve between points A and B. Of course, the new automobile market is closely linked to the used automobile market, so this simple picture does not capture the entire story.

When a good has a close substitute (like used versus new vehicles), a price decrease for that good will cause demand for the related good to decrease. Also, in the case of automobiles, there is a long-run link between the new and

[554] Marco A. Haan et al., ''A Model of Directed Consumer Search,'' 61 Int'l J. Indus. Org. 223, 223–55 (2018), *https://doi.org/10.1016/ j.ijindorg.2018.09.001;* José Luis Moraga-Gonzalez et al., ''Consumer Search and Prices in the Automobile Market.'' 90 Rev. Econ. Stud. 1394–1440 (2023), *https://doi.org/10.1093/restud/rdac047.*

[555] *See* Off. of Mgmt. & Budget, Exec. Off. of the President, ''Circular A–4'' 38 (2003), *https://*

*www.transportation.gov/sites/dot.gov/files/docs/ OMB%20Circular%20No.%20A-4_0.pdf:* ''A regulation that restricts the supply of a good, causing its price to rise, produces a transfer from buyers to sellers. The net reduction in the total surplus (consumer plus producer) is a real cost to society, but the transfer from buyers to sellers resulting from a higher price is not a real cost since the net reduction automatically accounts for the

transfer from buyers to sellers.'' To the extent any price changes caused by the Rule result in transfers to consumers from dealers who were in violation of existing laws, such transfers would be consistent with the agency's mission of providing redress to injured consumers and its history of doing so in enforcement actions.

used vehicle markets as a new vehicle purchased today becomes a potentially available used vehicle tomorrow. These linkages between the markets will dampen the demand response to any given price change in the primary market. In practice, this means that our estimates of the responsiveness of new vehicle purchases to price changes (*i.e.,* the price elasticity of demand for new vehicles) will overstate the change in quantity resulting from a change in prices, because such estimates typically assume that all other prices remain constant. In addition, if there are distortions present in the market for related goods (*i.e.,* used vehicles are also sold at a markup over marginal costs) only examining the welfare effect in the primary market will understate the total welfare effect, as there will be an analogous reduction in deadweight loss in the market for the related good. These linkages between markets for related goods become difficult to explain graphically. However, we have included in the technical appendix an algebraic derivation of the total welfare effect in new and used vehicle markets resulting from the finalization of the Rule. The resulting formula requires estimates of seven parameters in order to compute the welfare effect: two "policy elasticities" that reflect the responsiveness of quantities of new and used vehicles sold to a change in prices in the new vehicle market after all adjustments have occurred in both markets, two baseline markups that represent the differences between prices and marginal costs for new and used vehicles, two quantities that reflect the aggregate costs of all new and used vehicles sold under the status quo, and the predicted change in prices due to the Rule.

### 4. Estimation

To obtain "policy elasticities" we reference a U.S. Environmental Protection Agency report titled "The Effects of New-Vehicle Price Changes on New- and Used-Vehicle Markets and Scrappage" ("EPA Report").[556] In this report, the authors "developed a theoretical model of the relationships between new- and used-vehicle markets, scrappage, and total vehicle inventory" that allows for simulation of prices and quantities in these markets. The model is calibrated using a range of demand elasticity estimates from a review of the relevant literature on auto markets. The

resulting simulations examine the long-run "steady state" of vehicle inventories and demand, accounting for cross-market demand effects as well as the endogenous supply of used vehicles resulting from changes in demand for new vehicles in previous periods. Importantly, among the outputs of their simulations are the "policy price elasticities" required by our welfare change formula. Our base case estimates of deadweight loss reduction use the long-run policy price elasticities that result from calibrating the model with the EPA Report's intermediate values for the aggregate new vehicle and outside option demand elasticities, but we explore sensitivity to other calibration scenarios.

To obtain baseline estimates of new-vehicle markups, we refer to a recent paper entitled "The Evolution of Market Power in the US Automobile Industry" by Paul Grieco, Charles Murry, and Ali Yurukoglu.[557] The authors specify a model of the U.S. new car industry to explore trends in concentration and markups. The authors find that markups in the industry have been falling over time generally, but have been fairly stable since the early 2000s.[558] As our baseline, we use their most recent estimate of industry markups, which was 15% in 2018.[559] While this estimate reflects markups over production costs by manufacturers and not markups over wholesale prices paid by dealers, it is the wedge between retail price and production cost that matters for welfare. As we are unaware of any publicly available data measuring used-vehicle markups, we explore two alternatives that we believe reflect the limiting cases: (1) used vehicles have no markup and (2) used-vehicle markups are the same as new-vehicle markups.

We obtain both quantities of new- and used-vehicles sold as well as average prices from National Transportation Statistics, Table 1–17. As before, we exclude private party, fleet, and wholesale transactions. This exclusion is likely to bias our estimate of the total welfare effect downward because, unlike the time savings benefits of the Rule which may be restricted to dealer-consumer transactions, the price effects of the Rule are likely to carry over to private party and fleet transactions. Using these aggregate figures along with

an estimate of baseline markups, we estimate the aggregate cost of new- and used-vehicles sold in 2019.[560]

Finally, based on the academic literature on search costs in the automobile market, the Rule is expected to reduce prices of new vehicles by reducing the markup that dealers are able to charge over marginal costs. We have identified two papers that empirically estimate the effect of price transparency or reduced search frictions on auto markups by specifying a structural model of the new-vehicle market, estimating the structural parameters, and then conducting counterfactual simulations where search frictions are reduced. Murry and Zhou (2020) simulate a full information counterfactual in the Ohio automobile market where search frictions are eliminated entirely and find that markups are reduced by $333.[561] Moraga-Gonzalez et al. (2022) simulate a counterfactual in the Dutch automobile market where prices are observed prior to costly consumer search (*i.e.,* visiting dealerships) and find that markups are reduced from 40.52% to 32.59%.[562] For our base case estimates, we use the smaller Murry and Zhou (2020) estimate, primarily because their model is estimated using U.S. data consistent with our setting. However, we note that Moraga-Gonzalez et al. offers evidence to suggest that significantly larger changes in markups may result from the Rule.

Using these parameters obtained from the literature in combination, we implement the formula for the change in total welfare given in the technical appendix. For each market—new and used—the formula multiplies the policy price elasticity by the percent change in price to get the percent change in quantity, and then multiplies this by the aggregate markup (as given by the price-cost markup[563] at baseline times the aggregate cost of baseline transactions) to get the approximate change in total welfare per year. As an example, our base case estimate assumes a policy

---

[556] Assmt. & Standards Div., Ofc. of Transp. & Air Quality, U.S. Env't Prot. Agency, "The Effects of New-Vehicle Price Changes on New- and Used-Vehicle Markets and Scrappage" (2021), *https://cfpub.epa.gov/si/si_public_file_download.cfm?p_download_id=543273&Lab=OTAQ.*

[557] *See* Paul L. E. Grieco et al., "The Evolution of Market Power in the US Automobile Industry" (2022), mimeo.

[558] Paul L. E. Grieco et al., "The Evolution of Market Power in the US Automobile Industry" 19 (2022), mimeo.

[559] Paul L. E. Grieco et al., "The Evolution of Market Power in the US Automobile Industry" 19 (2022), mimeo.

[560] Aggregate cost of good $i$ is equal to $(1 - \mu_i) \times p_i \times Q_i$, where $\mu_i$, $p_i$, and $Q_i$ are the markup, price, and quantity sold of good $i$, respectively.

[561] Charles Murry & Yiyi Zhou, "Consumer Search and Automobile Dealer Colocation," 66 Mgmt. Sci. 1909–1934 (2020), *https://doi.org/10.1287/mnsc.2019.3307.*

[562] José Luis Moraga-Gonzalez et al., "Consumer Search and Prices in the Automobile Market," 90 Rev. Econ. Stud. 1394–1440 (2022), *https://doi.org/10.1093/restud/rdac047.*

[563] The baseline new vehicle markup estimate of 15% is defined as the ratio of the price-cost margin to unit price, i.e. $(p_i - MC_i)/p_i$, and is sometimes referred to as the Lerner index. With knowledge of either price or marginal cost, this can be rearranged to express the price-cost markup, i.e. $(p_i - MC_i)/MC_i$, which is used in the formula referenced here.

price elasticity of new-vehicle demand of −0.25, a policy price elasticity of used-vehicle demand (with respect to new-vehicle price) of −0.04, and used car markups equal to new car markups (15%), resulting in the following calculation:

$$\frac{dW(\theta)/d\theta}{\mu} = X_N \tau_N \hat{\varepsilon}_{NN} \frac{d\tau_N/d\theta}{1 + \tau_N} + X_U \tau_U \hat{\varepsilon}_{UN} \frac{d\tau_N/d\theta}{1 + \tau_N}$$

$$= 18\% \times \$334,115,569,664 \times -0.25 \times -1\% + 18\% \times \$371,555,893,248 \times -0.04 \times -1\%$$

$$= \$152,143,550 \text{ per year}$$

This annual reduction in deadweight loss is then applied to each year of the 10-year analysis period and discounted to the present to yield the total benefit. We highlight this base case (bolded in Table 2.4) but explore several scenarios that vary along two dimensions: (1) the "policy elasticity" of new- and used-vehicle demand with respect to the change in price and (2) the existence of baseline markups in the used-vehicle market. In Table 2.4, baseline markups for used vehicles vary across columns while the relevant policy price elasticities vary across rows: Scenario A corresponds to new-/used-vehicle elasticities of −0.14 and 0.01, Scenario B corresponds to new-/used-vehicle elasticities of −0.17 and −0.04, Scenario C corresponds to new-/used-vehicle elasticities of −0.23 and −0.10, and Scenario E corresponds to new-/used-vehicle elasticities of −0.39 and −0.12.

TABLE 2.4—REDUCTION IN DEADWEIGHT LOSS (IN MILLIONS), 2024–2033

| Scenario | No used-vehicle markups | | Symmetric markups | |
|---|---|---|---|---|
| | Total @ 3% discount | Total @ 7% discount | Total @ 3% discount | Total @ 7% discount |
| A | $617 | $508 | $568 | $468 |
| B | 749 | 617 | 945 | 778 |
| C | 1,014 | 835 | 1,504 | 1,238 |
| D | 1,102 | 907 | 1,298 | 1,069 |
| E | 1,719 | 1,415 | 2,307 | 1,899 |

**Note:** Benefits have been discounted to the present at both 3% and 7% rates. Scenarios correspond to those in Table 7–2 of "The Effects of New-Vehicle Price Changes on New- and Used-Vehicle Markets and Scrappage." New-vehicle demand elasticities range from −0.4 (Scenarios A, B, and C) to −0.8 (Scenario D) to −1.27 (Scenario E). Outside option elasticities vary from 0 (Scenario A) to −0.05 (Scenarios B and D) to −0.14 (Scenarios C and E). New/Used cross-price elasticities are set such that substitution away from new vehicles flows almost entirely to used-vehicles, with only small effects on the total number of vehicles. All scenarios hold scrappage elasticity fixed at −0.7.

5. Benefits Related to More Transparent Negotiation

An additional, albeit difficult to quantify, benefit is the reduction in discomfort and unpleasantness that consumers associate with negotiating motor vehicle transactions under the status quo. According to the 2020 Cox Automotive Car Buyer Journey study, filling out paperwork, negotiating vehicle price, and dealing with salespeople are three of the top four frustrations for consumers at car dealerships.[564] Once the Rule is in effect, all three of these issues will be mitigated somewhat by the transparency facilitated by the Rule's required disclosures and the time that consumers spend shopping and negotiating motor vehicle transactions will be less stressful. While we expect an increase in social welfare through this channel, due to a lack of data allowing this more qualitative benefit to be translated into a quantitative gain, these benefits are left unquantified in the analysis.

C. Estimated Costs of Final Rule

In this section, we describe the costs of the Rule provisions as enumerated in SBP VII.A, provide quantitative estimates where possible, and describe costs that we can only assess qualitatively. Some industry commenters questioned the appropriateness of the data and assumptions used in the NPRM, including the discussion of costs in the preliminary regulatory analysis. The Commission used a variety of data sources in its calculations for the NPRM and in the Rule, including wage data from the Bureau of Labor Statistics Occupational Employment Statistics, establishment counts from U.S. Census County Business Patterns, transaction counts from National Transportation Statistics, and breakdowns of motor vehicle transactions (e.g., by financing, GAP agreement, F&I add-ons) from numerous industry sources. Where such data was not available (e.g., regarding time devoted to compliance tasks), the Commission made assumptions based on a review of previous regulatory analyses that featured similar requirements, with adjustments made based on our understanding of the particulars of motor vehicle dealer operations.[565]

Throughout this section, the cost of employee time is monetized using wages obtained from the Bureau of Labor Statistics Industry-Specific Occupational Employment and Wage Estimates for Automobile Dealers.[566]

---

[564] 2020 Cox Automotive Car Buyer Journey, *supra* note 25, at 37.

[565] *See, e.g.,* Off. of the Sec'y, Dep't of Transp., Dkt. No. DOT–OST–2010–0140, "Enhancing Airline Passenger Protections II—Final Regulatory Analysis" (Apr. 20, 2011), *https://www.regulations.gov/document/DOT-OST-2010-0140-2046.*

[566] Applicable wage rates for the Commission's preliminary regulatory analysis, which was published in its NPRM, were based on data from the Bureau of Labor Statistics' May 2020 National Industry-Specific Occupational Employment and Wage Estimates for NAICS industry category 441100—Automobile Dealers, which is available at
Continued

This is valid under the assumption that the opportunity cost of hours spent in compliance activities is hours spent in other productive activities, the social value of which is summarized by the employee's wage.[567] To the extent that these activities can be accomplished using time during which employees would otherwise be idle under the status quo, our estimates will overstate the welfare costs of the Rule.

1. Prohibited Misrepresentations

In its preliminary analysis, the Commission presented two scenarios that estimated the costs associated with the Rule provisions prohibiting misrepresentations. First, as all the misrepresentations prohibited by the Rule are material and therefore deceptive under section 5 of the FTC Act, one scenario assumed that all motor vehicle dealers are compliant with section 5 under the status quo and will therefore conduct no additional review.

The second scenario allowed for costs incurred by firms because of the enhanced penalty associated with violating the Rule (relative to a *de novo* violation of section 5 of the FTC Act) under the assumption that dealers may expend additional resources to ensure compliance. This "heightened compliance review" scenario assumed that each of the 46,525 dealers would have a professional spend 5 additional minutes reviewing each public-facing representation (assumed to be 150 per year on average). At a labor rate of $26.83 per hour for compliance officers employed at auto dealers, this cost was estimated to be $15.6 million per year.

The Commission received comments about the appropriateness of the data and assumptions used to estimate the cost of complying with this provision of the Rule. The most specific criticism contended that the number of documents dealers would need to review would be "several times" the

150 assumed and that review would require at least 15 minutes per document because "dealers typically do not fully control the advertising platforms they use given the direct involvement of the vehicle OEMs . . . and that of other third parties. Also, many dealers, and especially small business dealers do not employ internal compliance officers or attorneys who could conduct marketing reviews." [568]

As there is scant empirical evidence provided for these assertions, the Commission's preliminary estimates remain unchanged (with the exception of updates to more recent data where available). However, we have conducted a sensitivity analysis in which all labor hours in the base case analysis are increased by an order of magnitude, in keeping with the spirit of the comments discussed; *see* SBP VII.G. As can be seen in the results from that analysis, the Rule clearly still generates net benefits for society.

TABLE 3.1—ESTIMATED COMPLIANCE COSTS FOR PROHIBITED MISREPRESENTATIONS

|  |  | 2024–2033 |
|---|---|---|
| Scenario 1—No Review: |  |  |
| No Cost ............................... | .......................................... | $0 |
| Total Cost ............................ | .......................................... | $0 |
| Scenario 2—Heightened Compliance Review: |  |  |
| Number of dealers [a] ............. | .......................................... | 47,271 |
| Number of documents per dealer per year ............. | .......................................... | 150 |
| Minutes of review per document ............. | .......................................... | 5 |
| Cost per hour of review ............. | .......................................... | $31.21 |
| Total Cost ............................ | 3% discount rate | $157,310,579 |
| Total Cost ............................ | 7% discount rate | $129,526,073 |

**Note:** In scenarios with ongoing expenses, costs have been discounted to the present at both 3% and 7% rates.
[a] County Business Patterns 2021, NAICS Code 4411 (Automobile Dealers, used and new).

2. Required Disclosure of Offering Price in Advertisements and in Response to Inquiry

The Rule requires all dealers to disclose an offering price in any advertisement that references an individual vehicle or in response to any consumer inquiry about an individual vehicle. For this provision, the Commission's preliminary analysis presented two cost scenarios for dealers when complying with the Rule. First, because dealers already price all vehicles in inventory under the status quo, one scenario assumed that there would be no additional cost of complying with this provision. This scenario assumes that the initial pricing

and any subsequent re-pricing of vehicles in inventory would take no (or minimal) additional time under the Rule.

As with the prohibition on misrepresentations, the second scenario considers the enhanced penalty associated with violating the Rule and allows for costs given that dealers may expend additional resources to ensure that the prices they disclose conform to the Rule's definition of offering price, thus minimizing the risk of penalties should they fail to conform to that definition. The latter scenario assumed that, in the first year under the Rule, each of the 46,525 dealers would have a sales and marketing manager spend 8 hours reviewing their policies and

procedures for determining the public-facing prices of vehicles in inventory. In addition, each dealer would employ a programmer for 8 hours to update any automated systems that need to be updated in accordance with these new policies and procedures. At labor rates of $63.93 per hour and $28.90, respectively, this cost was estimated at $34.5 million. Both scenarios assume that, once calculated, the time required to train employees to include prices in response to consumer inquiries about specific vehicles will either be negligible or be subsumed by training costs included under other provisions. Finally, the time required to deliver the disclosures is also negligible, as prices are already typically disclosed in

---

*https://www.bls.gov/oes/2020/may/oes_nat.htm.* Labor rates in the present analysis have been updated based on data from the Bureau of Labor Statistics' May 2022 National Industry-Specific Occupational Employment and Wage Estimates for

NAICS industry category 441100—Automobile Dealers, which is available at *https://www.bls.gov/oes/current/naics4_441100.htm.*

[567] This assumption would hold, for example, if both the product and labor markets in this industry were competitive.

[568] Comment of Nat'l Auto. Dealers Ass'n, Doc. No. FTC–2022–0046–8368 at 299–300.

advertisements and in interactions with consumers under the status quo; the Rule just requires the price to conform to a specific definition.

Some commenters raised issues with the assumptions regarding the time and resources necessary to determine compliant prices as well as deliver the required disclosures. The comments asserted that vehicle prices change frequently in response to market conditions, which would make it difficult to ensure that offering prices are accurate. Additionally, comments disputed the notion that delivery of the information to consumers in accordance with the Rule's provisions would not be costly, in terms of employee time and consumer time. One comment suggested that "there would be an average of three Offering Price disclosures based there [sic] being an average of three dealer-customer discussions regarding three specific motor vehicles, per transaction," [569] asserting that the frequency of these disclosures would have implications for the cost estimates

that had not been considered in the preliminary analysis.

If indeed the Rule required significant additional employee time spent per transaction, that would have implications for the cost estimates. However, as previously discussed, it is the understanding of the Commission that virtually all dealer-customer discussions regarding specific motor vehicles that occur under the status quo already include time devoted to a discussion of the vehicle's price. The only change under the Rule is that, within that price discussion an offering price (as defined by the Rule) must be provided. The cost of determining this price is included under the second scenario in our preliminary analysis, and sensitivity to the specific assumptions of that scenario have been explored in the Appendix. The results from our analysis indicate that the Rule generates net benefits for society under a wide range of plausible assumptions about the inputs to our cost calculations.

Commenters also raised concerns about the potential for behavioral adjustment by dealerships, choosing to refrain from advertising individual vehicles or responding to consumer inquiries about specific vehicles and thus increasing consumers' costs of search. The Commission, however, has not been presented with compelling evidence that dealers will forego competition with other dealers on price, choosing instead to default to advertising a focal price (such as MSRP). Indeed, the Commission's offering price disclosure requirement is similar to existing requirements in a number of States, and the Commission is not aware of any such behavioral adjustments (*e.g.*, eliminating prices from advertisements, refusing to respond to consumer inquiries, etc.) having occurred in those States. As a result, the Commission's preliminary estimates remain unchanged (with the exception of updates to more recent data where available).

TABLE 3.2—ESTIMATED COMPLIANCE COSTS FOR OFFERING PRICE DISCLOSURES

|  | 2024 |
|---|---|
| Scenario 1—No Review: |  |
| No Cost | $0 |
| Total Cost | $0 |
| Scenario 2—Calculation of Offering Price: |  |
| Number of dealers [a] | 47,271 |
| Pricing hours per dealer | 8 |
| Cost per hour of pricing | $80.19 |
| Programming hours per dealer | 8 |
| Cost per hour of programming | $40.24 |
| Total Cost | $45,542,772 |

[a] County Business Patterns 2021, NAICS Code 4411 (Automobile Dealers, used and new).

3. Disclosure of Add-On List and Associated Prices

In the NPRM, the proposed rule would have required all dealers to disclose an itemized menu of all optional add-on products and services along with prices, or price ranges, on all dealer-operated websites, online services, and mobile applications as well as at all dealership locations. Various commenters expressed concern that the add-on list requirement would have been too complex and potentially confusing, as discussed in the paragraph-by-paragraph analysis in SBP III.D.2(b). As a result, the Commission has determined not to finalize § 463.4(b) of the proposed rule. While the preliminary analysis estimated compliance costs between

approximately $42 million and $43 million for the disclosure of add-on lists and associated prices, those costs are not included in the final analysis.

4. Required Disclosure of Total of Payments for Financing/Leasing Transactions

The Rule requires all dealers to disclose, when representing a monthly payment, the total of payments for the financing or leasing contract. In addition, in any comparison of two payment options with different monthly payments, the dealer is required to disclose that the option with the lower monthly payment features a higher total of payments (if true).

The Commission's preliminary analysis presented two cost scenarios,

corresponding to different methods by which dealers may choose to comply with the Rule. In the first scenario, we assumed that dealers would incur a one-time, upfront cost of both designing the required disclosures and informing associates of their obligations to provide the disclosures. Importantly, ongoing costs on a per transaction basis were assumed to be negligible, reflecting a compliance regime where dealers already generate the required information during the normal course of business and must only convey it to consumers at an appropriate point in the transaction. In the second scenario, we assumed that dealers incur an additional ongoing cost per financed or leased transaction in order to communicate the required disclosures

---

[569] Comment of Nat'l Auto. Dealers Ass'n, Doc. No. FTC–2022–0046–8368 at 300.

to consumers in writing, reflecting a compliance regime where dealers find it necessary to maintain a documentary record of compliance with the Rule.[570]

The upfront costs (and total costs under Scenario 1) of complying with this provision as estimated by the preliminary analysis were limited to 8 hours spent by a compliance manager (at a rate of $26.83) on the creation of a template disclosure script that contains the required information and informing sales staff of their obligations to deliver the disclosure at an appropriate time during the transaction. This cost was estimated at $10 million.

The preliminary estimates of additional ongoing costs—as in Scenario 2—included 2 minutes of sales associate time per financed/leased transaction (at a rate of $21.84) spent on the process of populating and delivering a printed version of the disclosure, with $0.15 per disclosure spent on printing costs. The total additional cost under this scenario is estimated at $213.4 to $249.5 million.

Comments from industry groups asserted that the preliminary analysis underestimated training costs and that it would be difficult to determine the total of payments for financing prior to knowing the details of the transaction. One comment contended that "these mandates . . . necessarily would involve significant annual training requirements for new employees given

that . . . the average dealer experiences an annual sales consultant turnover rate of 67%." [571] The comment further asserted that dealers cannot determine the total cost of a financing or leasing agreement without knowing the terms for which consumers qualify and what terms they want. The comment argued that as a result, only the scenario with costs incurred on a per transaction basis should be considered. Finally, the comment argued that the per-transaction costs in Scenario 2 are too low, both because the Commission underestimates the time required to deliver, discuss, and review disclosures and because multiple disclosures would have to be made per transaction (as terms are changed).

These comments misunderstand the Commission's analysis with respect to the costs of complying with this provision. Scenario 1 does not anticipate that the dealer presents a consumer with the total of payments for a financing or leasing contract at the outset of the transaction. It requires only that, at the point where the dealer engages in discussions regarding different monthly payments for financing or leasing arrangements, the information that must be disclosed (*i.e.,* the total of payments and a comparison of these totals across differing monthly payments) is already available to the

dealer under the status quo. The only additional cost incurred per transaction would be the delivery of this information to the consumer (the determination of which is contemplated in the costs estimated under Scenario 1).

With respect to the comment regarding insufficient allowance for training costs in light of employee churn in the industry, the Commission has determined this to be a valid critique of the preliminary analysis. As a result, the final regulatory analysis includes an additional ongoing cost for both Scenarios. This ongoing cost includes training for sales staff and budgets 1 hour of training for each of the 417,110 sales and related employees across the industry, at an (average) cost of $29.43 per hour. The resulting additional ongoing costs in both scenarios amounts to $12.3 million per year. Further, as discussed in a previous section, the final analysis excludes private party, fleet, and wholesale transactions.[572] The remainder of the Commission's preliminary estimates remain unchanged (with the exception of updates to more recent data where available). Concerns about underestimates of the time required to review disclosures on a per-transaction basis are addressed by the Commission's sensitivity analyses conducted in the Appendix.

TABLE 3.4—ESTIMATED COMPLIANCE COSTS FOR FINANCING COSTS

| | | 2024 only | 2024–2033 |
|---|---|---|---|
| Scenario 1—Creation of disclosure and training only: | | | |
| *Upfront costs:* | | | |
| Number of dealers | | 47,271 | |
| Compliance manager hours per dealer | | 8 | |
| Cost per hour of disclosure creation | | $31.21 | |
| Subtotal | | $11,802,623 | |
| *Ongoing costs:* | | | |
| Number of sales and related employees [a] | | | 417,110 |
| Training hours per employee | | | 1 |
| Cost per hour of training | | | $29.43 |
| Subtotal | 3% discount rate | | $104,712,908 |
| | 7% discount rate | | $86,218,307 |
| Scenario 1—Total Cost | 3% discount rate | | $116,515,532 |
| | 7% discount rate | | $98,020,931 |
| Scenario 2—Disclosures per transaction: | | | |
| Covered new vehicle sales per year [b] | | | 10,343,319 |
| % New vehicle sales involving financing [c] | | | 81% |
| Covered used vehicle sales per year | | | 21,219,640 |
| % Used vehicle sales involving financing | | | 35% |
| Covered new vehicle leases per year | | | 3,423,294 |

[570] While disclosures of this nature are already required to be present in the financing contract by the Truth in Lending Act (TILA), the Rule would change the timing of a subset of those disclosures. As a result, the dealer may have to develop and deliver a separate document in the event that the standard TILA disclosure has not yet been generated at the point where disclosure is required under the Rule.

[571] Comment of Nat'l Auto Dealers Ass'n, Doc. No. FTC–2022–0046–8368 at 301.

[572] Without cross-tabulations of fleet sales and sales involving financing, we assume that these are independent such that the fraction of covered transactions involving financing is equal to the fraction of covered transaction times the fraction of financed transactions.

TABLE 3.4—ESTIMATED COMPLIANCE COSTS FOR FINANCING COSTS—Continued

|  |  | 2024 only | 2024–2033 |
|---|---|---|---|
| Total transactions involving monthly payments/financing. | ............................ | ............................ | 19,228,256 |
| Disclosure minutes per transaction ................. | ............................ | ............................ | 2 |
| Cost per hour of disclosure ............................. | ............................ | ............................ | $28.41 |
| Printing cost per disclosure ............................. | ............................ | ............................ | $0.15 |
| Subtotal ........................................................... | 3% discount rate ............................................. | ............................ | $179,930,957 |
|  | 7% discount rate ............................................. | ............................ | $148,151,196 |
| Total Cost ........................................................ | 3% discount rate ............................................. | ............................ | $296,446,489 |
|  | 7% discount rate ............................................. | ............................ | $246,172,126 |

**Note:** In scenarios with ongoing expenses, costs have been discounted to the present at both 3% and 7% rates.
a Bureau of Labor Statistics Industry-Specific Occupational Employment and Wage Estimates for NAICS Code 441100—Automobile Dealers, May 2021.
b For total volume, National Transportation Statistics Table 1–17. For retail/non-fleet fraction, Edmunds Automotive Industry Trends 2020 (for new vehicle) and Cox Automotive via Automotive News (for used vehicles).
c Melinda Zabritski, Experian Info. Sols. Inc., "State of the Automotive Finance Market Q4 2020".

## 5. Prohibition on Charging for Add-Ons That Provide No Benefit

The Rule prohibits dealers from charging for add-on products or services from which the targeted consumer would not benefit. Compliance with this provision will require dealers to develop policies and transaction-level rules about when consumers can be charged for add-on products and services. The Rule as proposed in the NPRM also would have included additional provisions relating to add-ons that have not been finalized. These included a prohibition on charging for optional add-on products or services unless dealership employees made a number of disclosures at various points before finalizing a transaction. This provision would have required each dealer to design form disclosures, create a system for populating these forms, train their sales staff on the disclosure requirements, and provide the disclosures in writing, with the appropriate information filled in, to each consumer prior to completing the transaction.

The Commission's preliminary analysis relating to the cost of complying with these disclosure requirements budgeted for 8 hours of compliance manager time at a cost of $26.83 per hour) and 4 hours of sales manager time (at a cost of $63.93 per hour) to design disclosure forms, and an additional 8 hours of programmer time (at a cost of $28.90) to create a system to populate these forms. The preliminary analysis also budgeted for 2 minutes of sales associate time (at a rate of $21.84 per hour) and $0.11 in printing/electronic delivery costs per disclosure, with the number of disclosures determined by the fraction of transactions involving optional add-ons and/or financing.

In response to numerous comments, the Commission has determined not to finalize the proposal in § 463.5(b), which would have required the delivery of written disclosures and acknowledgement via signature of those disclosures by consumers. Various commenters were concerned that the add-on disclosures would add documents and time to the transaction. In response to these comments, the Commission has determined to omit what would have been the only provision affirmatively requiring the dealer and consumer to review additional documentation during a transaction. As a result, while the preliminary analysis estimated compliance costs between approximately $883 million and $1 billion for the disclosure of total costs for cash and financed transactions with optional add-on products, the cost estimate in the final analysis is on the order of one-tenth to one-half of the preliminary estimate (depending on the scenario).

As a result, the Commission has substantially revised the cost analysis in this section. First, the Commission assumes that each dealer will employ 8 hours of compliance manager time (at a rate of $31.21) and 8 hours of sales manager time (at a rate of $80.19) in the first year under the Rule, to cull add-ons with no value from their offerings and develop policies regarding when certain add-ons may or may not be sold. Second, the Commission budgets for 1 hour of training per year for each of the 417,110 sales and related employees across the industry, to apprise them of these policies and their obligations under the Rule. Finally, the Commission includes a second cost scenario in which dealers will choose to deliver one itemized disclosure to each customer before the finalization of each transaction. Although this is not required under the Final Rule, dealers may wish to have documentation of compliance with the provisions of the Rule. As in the preliminary analysis, the Commission assumes that each dealer will employ 8 hours of compliance manager time and 4 hours of sales manager time creating this disclosure and 8 hours of programmer time creating a system to populate these forms when provided inputs by sales staff. The same occupational wage data have been used, but the rates have been updated to match the most recent data available. We further assume, as in the preliminary analysis, that sales staff will spend 2 minutes per disclosure (at a rate of $28.41 per hour) updating, printing, and delivering these forms to consumers and that the physical costs of delivering the disclosure are roughly $.11 per disclosure.[573] Finally, as discussed in a previous section, the final analysis excludes private party, fleet, and wholesale transactions.

---

[573] The physical costs are $.15 per paper disclosure and $.02 per electronic disclosure, assuming that 27% are made electronically. This assumption is informed by a consumer survey that indicates 73% of consumers with motor vehicles prefer to receive registration renewal notices by mail as opposed to electronically. *See* Consumer Action, "Your opinion wanted: Paper vs. electronic bills, statements and other communications" 4 (2018–2019), *https://www.consumer-action.org/downloads/Consumer_Action_Paper_v_electronic_survey.pdf* (showing that 1800 of 2456 respondents who owned and needed to periodically register a motor vehicle preferred mail notices).

TABLE 3.5—ESTIMATED COMPLIANCE COSTS FOR PROHIBITION ON CERTAIN ADD-ONS

|  |  | 2024 only | 2024–2033 |
|---|---|---|---|
| Scenario 1—Policies and Training Only: |  |  |  |
|   Upfront costs: |  |  |  |
|     Number of dealers | | 47,271 | |
|     Compliance manager hours per dealer | | 8 | |
|     Cost per hour of compliance manager | | $31.21 | |
|     Sales manager hours per dealer | | 8 | |
|     Cost per hour of sales manager | | $80.19 | |
|     Subtotal | | $42,127,915 | |
|   Ongoing costs: |  |  |  |
|     Number of sales and related employees | | | 417,110 |
|     Training hours per employee | | | 1 |
|     Cost per hour of training | | | $29.43 |
|   Scenario 1—Subtotal | 3% discount rate | | $146,840,824 |
| | 7% discount rate | | $128,346,223 |
| Scenario 2—Disclosure creation and delivery: |  |  |  |
|   Number of dealers | | 47,271 | |
|   Compliance manager hours per dealer | | 8 | |
|   Cost per hour of compliance manager | | $31.21 | |
|   Sales manager hours per dealer | | 4 | |
|   Cost per hour of sales manager | | $80.19 | |
|   Programmer hours per dealer | | 8 | |
|   Cost per hour of programmer | | $40.24 | |
|   Subtotal | | $42,182,750 | |
| Disclosure delivery (per transaction): |  |  |  |
|   New vehicle sales per year | | | 10,343,319 |
|   Used vehicle sales per year | | | 21,219,640 |
|   Minutes per disclosure | | | 2 |
|   Cost per hour of disclosure | | | $28.41 |
|   Physical costs per disclosure | | | $0.11 |
|   Subtotal | 3% discount rate | | $285,904,302 |
| | 7% discount rate | | $235,407,319 |
|   Scenario 2—Total Cost | 3% discount rate | | $474,927,875 |
| | 7% discount rate | | $405,936,291 |

**Note:** In scenarios with ongoing expenses, costs have been discounted to the present at both 3% and 7% rates.

6. Requirement To Obtain Express, Informed Consent Before Any Charges

The Rule requires dealers to obtain express, informed consent before charging any consumer for any product or service in association with the sale, financing, or lease of a vehicle. Because we presume that all dealers who are complying with the law currently have policies in place to prevent charges without consent, we assume that there will be no additional costs imposed by this provision.

7. Recordkeeping

The Final Rule requires dealers to retain records of all documents pertaining to Rule compliance. These recordkeeping requirements include:

• Copies of all materially different marketing materials, sales scripts, and training materials that discuss sales prices and financing or lease terms.

• Records demonstrating that all add-ons charged for meet the requirements stated in the Rule, including

calculations of loan-to-value ratios in contracts including GAP agreements.

• Copies of all purchase orders, financing and lease contracts signed by the consumer (whether or not final approval is received), and all written communications with any consumer who signs a purchase order or financing or lease contract.

• Copies of all written consumer complaints, inquiries related to add-ons, and inquiries and responses about individual vehicles.

Most of these documents are already produced in the normal course of business under the status quo, or the costs of creating them have already been accounted for in previous sections. In its preliminary analysis, the Commission assumed that each dealer would incur an upfront cost, employing 8 hours of programmer time, 5 hours of clerical time, 1 hour of sales manager time, and 1 hour of compliance officer time, at hourly rates of $28.90, $18.37, $63.93, and $26.83, respectively, in order to

upgrade their systems and create the templates necessary to accommodate retention of all relevant materials. The Commission also assumed that each dealer would employ 1 additional minute of sales staff time per transaction to populate forms and store relevant materials.

One industry commenter contended that the proposed rule would impose substantial and costly recordkeeping mandates, citing primarily the various channels through which dealers would be required to capture and retain communications. The Commission believes the recordkeeping requirements strike an appropriate balance, requiring the retention of materials needed to allow effective enforcement while being mindful of dealer burden. In addition, the recordkeeping requirements are similar to analogous requirements in other Commission disclosure rules, as

tailored to individual industries and markets.[574]

As such, the Commission's final analysis retains its preliminary estimates—appropriately updated where more recent data were available—with a few changes. First, we made adjustments to the cost estimates associated with the required loan-to-value calculations for all transactions with GAP agreements. Based on a comment from one industry group, we revised down the share of covered new

and used vehicle sales with a GAP agreement to 17%.[575] As in the preliminary analysis, for these transactions sales staff will spend an additional minute to generate and store the relevant calculations. As discussed in a previous section, the final analysis excludes private party, fleet, and wholesale transactions. In addition, the expansion of the volume of records that dealers are required to retain and manage will likely require investment in additional IT systems and hardware,

which was left unquantified in the preliminary analysis. After additional research, the Commission estimates that each dealer will need to spend approximately $300 per year on storage (either on premises or in the cloud) to house the records that the Rule requires them to maintain. Based on a review of the transaction records we have received from dealers through investigations, this amount is likely to be more than sufficient for compliance.[576]

TABLE 3.6—ESTIMATED COMPLIANCE COSTS FOR RECORDKEEPING

|  |  | 2024 only | 2024–2033 |
|---|---|---|---|
| Updating systems: |  |  |  |
| Number of dealers | | 47,271 | |
| Programming hours per dealer | | 8 | |
| Cost per hour of programming | | $40.24 | |
| Clerical hours per dealer | | 5 | |
| Cost per hour of clerical work | | $20.16 | |
| Sales manager hours per dealer | | 1 | |
| Cost per hour of sales manager review | | $80.19 | |
| Compliance manager hours per dealer | | 1 | |
| Cost per hour of compliance review | | $31.21 | |
| Subtotal | | $25,248,387 | |
| Hardware and Storage (per year): |  |  |  |
| Number of dealers | | | 47,271 |
| Cost of hardware/storage | | | $300 |
| Recordkeeping (per transaction): |  |  |  |
| Number of covered motor vehicle sales | | | 31,562,959 |
| % of sales with GAP agreement [a] | | | 17% |
| Number of motor vehicle sales with GAP agreement. | | | 5,444,502 |
| Sales staff minutes per transaction | | | 1 |
| Cost per hour of recordkeeping | | | $28.41 |
| Subtotal | 3% discount rate | | $270,444,391 |
| Subtotal | 7% discount rate | | $222,677,967 |
| Total Cost | 3% discount rate | | $295,692,777 |
| Total Cost | 7% discount rate | | $247,926,354 |

**Note:** In scenarios with ongoing expenses, costs have been discounted to the present at both 3% and 7% rates.
[a] Comment of Nat'l Auto. Dealers Ass'n, Doc. No. FTC–2022–0046–8368 at 12 n.43.

*D. Other Impacts of Final Rule*

As the status quo in this industry features consumer search frictions, shrouded prices, deception, and obfuscation, dealers likely charge higher prices for a number of products and services than could be supported once the Rule is in effect. SBP VII.B discussed the Commission's expectation that prices are likely to adjust in

response to the transparency facilitated by the Rule, and quantified the benefits that result when vehicle quantities increase in response to a more transparent and less deceptive equilibrium. The price changes in the new vehicle market discussed in SBP VII.B will also have the effect of transferring $3.4 billion per year from dealers whose conduct under the status

quo would not have complied with the Rule to consumers. In addition, other prices may be impacted by the Rule, such as used vehicle prices and add-on prices. As we have insufficient data to predict these price effects, neither the transfers associated with these potential price changes nor the resulting quantity adjustments and deadweight loss reductions are quantified in the current

[574] 16 CFR 310.5 (Telemarketing Sales Rule); 16 CFR 437.7 (Business Opportunity Rule); 16 CFR 453.6 (Funeral Industry Practices Rule); 16 CFR 301.41 (Fur Products Labeling).

[575] Comment of Nat'l Auto. Dealers Ass'n, Doc. No. FTC–2022–0046–8368 at 12 n.43 (indicating 15.3% (18.2%) for new (used) vehicles). These rates were weighted by transactions counts to calculate an overall rate of 17%.

[576] Our review of dealer transaction records suggests that a typical transaction generates 3.4 MB of data under the status quo. Given the average number of transactions per dealer, this suggests that storing all these records would require dedicated space of roughly 4.2 GB per year. With a two-year retention window, this corresponds to 8.4 GB of storage at any given time. We estimate that the (annual) amount budgeted here should be sufficient to maintain at least 1 TB of storage—either on

premises or through a cloud storage vendor—which is sufficient for more than 100 times the data storage capacity necessary to retain all transaction files generated by a typical dealership in a year under the status quo. The Commission anticipates that this amount of data storage capacity will be more than sufficient to also allow for dealers to keep any necessary records of correspondence with consumers who ultimately do not complete transactions at the dealership.

A98

analysis. Finally, it may be the case that enhanced transparency of the Rule leads to *fewer* of certain types of transactions relative to the status quo. Recent evidence suggests that price shrouding of the kind that is prevalent in the motor vehicle market results in consumers spending more than they would otherwise.[577] We expect that this phenomenon may extend especially to the motor vehicle add-on market, where the Commission has compiled substantial evidence that individuals frequently inadvertently purchase add-ons that they did not want and ultimately will not use.[578] While much of this effect may ultimately be transfers, we reiterate that to the extent they represent transfers from dishonest dealers to consumers, this may be considered a benefit of the Rule.

In addition, deceptive practices by dishonest dealers lead consumers to engage with those dealers instead of honest dealerships. Once the Rule is in effect, some business that would

otherwise have gone to dealers using bait-and-switch tactics or deceptive door opening advertisements will now go to honest dealerships. Again, assuming that the costs of the firms are similar, any one-for-one diversion of sales from one set of businesses to another is generally characterized as a transfer under OMB guidelines. However, in this case, it would represent a transfer from the set of dishonest dealers to honest dealers, which may weigh differently if profits from law violations are not counted towards social welfare in the regulatory analysis.

### E. Conclusion

The Commission has attempted to catalog and quantify the incremental benefits and costs of the provisions included in the Final Rule. Extrapolating these benefits over the 10-year assessment period and discounting to the present provides an estimate of the present value for total benefits and costs of the Rule, with the difference—

net benefits—providing one measure of the value of regulation.

Using our base case estimates, the present value of quantified benefits for consumers from the Rule's requirements over a 10-year period using a 7% discount rate is estimated at $13.4 billion. The present value of quantified costs for covered motor vehicle dealers of complying with the Rule's requirements over a 10-year period using a 7% discount rate is estimated at $1.1 billion. This generates an estimate of the present value of quantified net benefits equal to $12.3 billion using a discount rate of 7%. Using the best (or worst) case assumptions discussed in the preceding analysis results in net benefits of $21.2 billion (or $5.5 billion) using a discount rate of 7%.

Given that we expect unquantified benefits to outweigh unquantified costs for this Rule, this regulatory analysis indicates that adoption of the Rule would result in benefits to the public that outweigh the costs.

PRESENT VALUE OF NET BENEFITS (IN MILLIONS), 2024–2033

| | Low estimate | | Base case | | High estimate | |
|---|---|---|---|---|---|---|
| | 3% Discount rate | 7% Discount rate | 3% Discount rate | 7% Discount rate | 3% Discount rate | 7% Discount rate |
| *Benefits:* | | | | | | |
| Time Savings .................................... | $7,463 | $6,145 | $14,926 | $12,290 | $24,036 | $19,790 |
| Deadweight Loss Reduction ............. | 568 | 468 | 1,298 | 1,069 | 2,307 | 1,899 |
| Total Benefits ............................. | 8,031 | 6,613 | 16,224 | 13,359 | 26,343 | 21,690 |
| *Costs:* | | | | | | |
| Finance/Lease Total of Payments Disclosure ...................................... | 296 | 246 | 296 | 246 | 117 | 98 |
| Offering Price Disclosure ................. | 46 | 46 | 46 | 46 | 0 | 0 |
| Prohibition Re Certain Add-ons & Express, Informed Consent .......... | 475 | 406 | 475 | 406 | 147 | 128 |
| Prohibition on Misrepresentations .... | 157 | 130 | 157 | 130 | 0 | 0 |
| Recordkeeping ................................. | 296 | 248 | 296 | 248 | 296 | 248 |
| Total Costs ................................. | 1,270 | 1,075 | 1,270 | 1,075 | 559 | 474 |
| Net Benefits ................................. | 6,761 | 5,538 | 14,954 | 12,284 | 25,784 | 21,216 |

**Note:** "Low Estimate" reflects all lowest benefit estimates and high cost scenarios and "High Estimate" reflects all highest benefit estimates and low cost scenarios. "Base Case" reflects base case benefit estimates and high cost scenarios. Not all impacts can be quantified; estimates only reflect quantified costs and benefits.

---

[577] *See* Tom Blake et al., "Price Salience and Product Choice," 40 Mktg. Sci. 619–36 (2021), *https://doi.org/10.1287/mksc.2020.1261.*

[578] *See* Nat'l Consumer Law Ctr., "Auto Add-ons Add Up: How Dealer Discretion Drives Excessive, Inconsistent, and Discriminatory Pricing" (Oct. 1, 2017), *https://www.nclc.org/images/pdf/car_sales/report-auto-add-on.pdf*; Consumers for Auto Reliability and Safety, Comment Letter on Motor Vehicle Roundtables, Project No. P104811 at 2–3 (Apr. 1, 2012), *https://www.ftc.gov/sites/default/files/documents/public_comments/public-roundtables-protecting-consumers-sale-and-leasing-motor-vehicles-project-no.p104811-00108/00108-82875.pdf* (citing a U.S. Department of Defense data call summary that found that the vast majority of military counselors have clients with auto financing

problems and cited "loan packing" and yo-yo financing as the most frequent auto lending abuses affecting servicemembers); Adam J. Levitin, "The Fast and the Usurious: Putting the Brakes on Auto Lending Abuses," 108 Geo. L.J. 1257, 1265–66 (2020), *https://www.law.georgetown.edu/georgetown-law-journal/wp-content/uploads/sites/26/2020/05/Levitin_The-Fast-and-the-Usurious-Putting-the-Brakes-on-Auto-Lending-Abuses.pdf* (discussing "loan packing" as the sale of add-on products that are falsely represented as being required in order to obtain financing.); Complaint ¶¶ 12–19, *Fed. Trade Comm'n* v. *Liberty Chevrolet, Inc.,* No. 1:20–cv–03945 (S.D.N.Y. May 21, 2020) (alleging deceptive and unauthorized add-on charges in consumers' transactions); Complaint ¶¶ 59–64, *Fed. Trade Comm'n* v. *Universal City*

*Nissan,* No. 2:16–cv–07329 (C.D. Cal. Sept. 29, 2016) (alleging deceptive and unauthorized add-on charges in consumers' transactions); Complaint ¶¶ 6, 9, *TT of Longwood, Inc.,* No. C–4531 (F.T.C. July 2, 2015) (alleging misrepresentations regarding prices for added features); *see also* Auto Buyer Study, *supra* note 25, at 14 ("Several participants who thought that they had not purchased add-ons, or that the add-ons were included at no additional charge, were surprised to learn, when going through the paperwork, that they had in fact paid extra for add-ons. This is consistent with consumers' experiencing fatigue during the buying process or confusion with a financially complex transaction, but would also be consistent with dealer misrepresentations.").

*F. Appendix: Derivation of Deadweight Loss Reduction*

The derivation of the formula for the reduction in deadweight loss from the Rule follows from "Sufficient Statistics Revisited" by Henrik Kleven.[579] In the source article, the wedge between costs and prices is tax rates, but here we consider producer markups; the fundamental principles are unchanged.

We have a mass of consumers $i$ with utility function $u^i(x^i_O, x^i_N, x^i_U)$ over new cars, used cars, and the numeraire (good 0) who face the following budget constraint:

$$\sum_j (1 + \tau^i_j) x^i_j = Y^i$$

given markups $T^i_j$ for good $j$ and consumer $i$ and income $Y^i$ for consumer $i$. Pre-markup prices are normalized to one so $x_{ij}$ is the cost of consumer $i$'s purchase of good $j$. Total profits from the consumption of consumer $i$ are $T^i = \Sigma_j T^i_j x^i_j$.

Define a policy to be evaluated as $\theta$. Total welfare is defined as:

$$W(\theta) = \int_i v^i(\theta)\, di + \mu \int_i T^i(\theta)\, di$$

Here, $v^i(\theta)$ is the indirect utility function for consumer $i$, so the first term is consumer surplus and the second term is producer surplus, while $\mu$ is the value of a dollar of profit. The change in welfare from policy $\theta$, translated into dollars by dividing by $\mu$, is:

$$\frac{dW(\theta)/d\theta}{\mu} = \int_i \frac{dT^i}{d\theta} - \frac{\partial T^i}{\partial \theta}$$

The first term is the total effect on profit from the reform and the second term is the "mechanical" effect;

assuming quantities stay constant, how much profits will fall if the policy goes into effect. We can rewrite this as follows:

$$\frac{dW(\theta)/d\theta}{\mu} = \int_i \left[ \sum_{j=0}^{J} \tau^i_j x^i_j \frac{d \log x^i_j}{d\theta} \right] di$$

Where

$$\frac{d \log x^i_j}{d\theta}$$

is labelled the "policy elasticity" for good and consumer with respect to

policy . We make the following additional assumptions/simplifications:
1. The outside good is priced at cost.
2. All consumers face the same markups so $T_k = T_k$.
3. For simplicity, all elasticities are assumed to be cost share-weighted averages of individual effects, so

$X_j = \int_i x^i_j$ and $\epsilon_{jk} = \int_i \epsilon^i_{jk} \frac{x^i_j}{X_j}$.

As a result, the welfare change from the Auto Rule ($\theta$) is:

$$\frac{dW(\theta)/d\theta}{\mu} = X_N \tau_N \frac{d \log X_N}{d\theta} + X_U \tau_U \frac{d \log X_U}{d\theta}$$

Assuming that the Rule affects only markups for new vehicles, we can

rewrite the "policy elasticities" as a product of a price elasticity and the

elasticity of price with respect to the Rule, as follows:

$$\frac{dW(\theta)/d\theta}{\mu} = X_N \tau_N \hat{\varepsilon}_{NN} \frac{d\tau_N/d\theta}{1 + \tau_N} + X_U \tau_U \hat{\varepsilon}_{UN} \frac{d\tau_N/d\theta}{1 + \tau_N}$$

where

$$\hat{\varepsilon}_{jk} = \frac{d \log X_j}{d \log(1 + \tau_k)}$$

is the long-run "policy price elasticity" of demand for good w.r.t. the price of good , including the effects that a price change has on the prices of related goods. The formula accounts for demand feedback effects between the new and used car markets but assumes

no dynamics in the path from the policy to the long-run steady-state. Computing this formula requires estimates of seven parameters: two "policy price elasticities" that reflect the responsiveness of quantities of new and used vehicles sold to a change in prices in the new vehicle market after all adjustments have occurred in both markets, two baseline markups that represent the differences between prices

and marginal costs for new/used vehicles, two quantities that reflect the aggregate cost of all new/used vehicles sold under the status quo, and the predicted change in prices due to the Rule. Calibration of these parameters is discussed in the main text.

*G. Appendix: Uncertainty Analysis*

While the main text uses alternative assumptions to explore sensitivity to a

[579] See Henrik J. Kleven, "Sufficient Statistics Revisited." 13 *Annual Rev. Econ.* 515–38. (2021), https://doi.org/10.1146/annurev-economics-060220-023547.

number of discrete scenarios, in this appendix we allow variation in most of the assumptions that underlie our model. This Monte Carlo analysis procedure allows us to more fully characterize the uncertainty around our central estimate of net benefits, under the assumption that our basic model is specified correctly. Most of the assumptions in our analysis refer to amounts of time, either amounts of time dealerships employees must spend on a compliance task or amounts of time that consumers save on various activities related to the automobile shopping process. Deviations for these assumptions are centered on the parameters used in the main text. Elsewhere, as with assumptions regarding fractions or proportions, our base case is often an extreme case (*i.e.*, 0 or 1). In these cases, deviations are typically not centered on the base case and are allowed to vary across the whole range as dictated by the parameter. Still, we can expect the average results from this sensitivity analysis to be similar to the result in the main text. The object of interest here is the distribution of estimates, which indicates the expected variation in net benefits if the true parameters deviate from our predictions (with errors of the form modeled).

For most assumptions, we draw from a symmetric, triangular distribution around the base case assumption with a specified upper and lower bound. In this distribution, the probability of drawing particular parameter value increases linearly from the lower bound to the base case assumption before decreasing linearly to the upper bound, such that the area inscribed by the triangle is equal to 1. We emphasize this distribution because it is a parsimonious way to incorporate variation in parameter values over a finite range and incorporates our preferred estimates as the most likely outcome. For a few

parameters where we think it is appropriate to de-emphasize the main estimate parameter, we draw from a uniform distribution. Importantly, all draws are independent; there is no correlation between the deviations drawn in any given Monte Carlo trial. An additional sensitivity analysis considers a situation where our errors across all labor time parameters are correlated; specifically, that all of our estimates of the time required for compliance tasks are 1/10th of the true time required.

To incorporate uncertainty in time savings benefits to consumers, we allow the time saved by digital consumers to vary by up to ten minutes more or less than the main analysis parameters. The share of these time savings received by non-digital consumers under the Rule is modeled as uniformly distributed between zero (no savings) and one (savings equivalent to what digital consumers receive in the status quo).

TABLE A.1—ALTERNATIVE PARAMETERS: BENEFITS OF TIME SAVINGS FOR COMPLETED TRANSACTIONS

| Parameter | Base case | Monte Carlo | | |
| | Parameter value | Modeled distribution | Distribution lower bound | Distribution upper bound |
|---|---|---|---|---|
| Price Negotiation Time Savings ................................... | 43 | Triangular ........................ | 33 | 53 |
| Add-on Negotiation Time Savings ............................... | 33 | Triangular ........................ | 23 | 43 |
| Paperwork Time Savings ............................................. | 45 | Triangular ........................ | 35 | 55 |
| Trade-In Negotiation Time Savings ............................. | 26 | Triangular ........................ | 16 | 36 |
| Fraction of Price Time Savings Under Rule ................. | 1.0 | Uniform ............................ | 0 | 1 |
| Fraction of Add-on Time Savings Under Rule ............. | 0.5 | Uniform ............................ | 0 | 1 |
| Fraction of Paperwork Time Savings Under Rule ........ | 0.5 | Uniform ............................ | 0 | 1 |
| Fraction of Trade-In Time Savings Under Rule ........... | 0.0 | Uniform ............................ | 0 | 1 |

For the deadweight loss reduction component of benefits, we explore sensitivity only to baseline used-vehicle markups, allowing them to vary from 0 to the baseline new-vehicle markup of

15%. In the main text, we explore a number of scenarios for deadweight loss reduction corresponding to greater and lesser demand elasticities as well.

The following tables describe the distributions we model for cost

parameters in the simulation exercise. All cost parameters are assumed to be drawn from triangular distributions. The tables follow the same order as the discussion in the main text.

TABLE A.2—ALTERNATIVE PARAMETERS: COSTS OF MISREPRESENTATION PROHIBITION COMPLIANCE

| Parameter | Base case | Monte Carlo | | |
| | Parameter value | Modeled distribution | Distribution lower bound | Distribution upper bound |
|---|---|---|---|---|
| Document Review Minutes .......................................... | 5 | Triangular ........................ | 0 | 10 |
| Documents Reviewed .................................................. | 150 | Triangular ........................ | 100 | 200 |

TABLE A.3—ALTERNATIVE PARAMETERS: COSTS OF OFFERING PRICE DISCLOSURES

| Parameter | Base case | Monte Carlo | | |
| | Parameter value | Modeled distribution | Distribution lower bound | Distribution upper bound |
|---|---|---|---|---|
| Template Creation Sales Manager Hours .................. | 8 | Triangular ........................ | 4 | 12 |
| Template Creation Web Developer Hours .................. | 8 | Triangular ........................ | 4 | 12 |

TABLE A.5—ALTERNATIVE PARAMETERS: COSTS OF FINANCING DISCLOSURES

| Parameter | Base case | Monte Carlo | | |
| --- | --- | --- | --- | --- |
| | Parameter value | Modeled distribution | Distribution lower bound | Distribution upper bound |
| Disclosure Creation Compliance Manager Hours ...... | 8 | Triangular ........................ | 4 | 12 |
| Disclosure Training Hours ........................................ | 1 | Triangular ........................ | 0 | 2 |
| Disclosure Delivery Time Minutes ........................... | 2 | Triangular ........................ | 0 | 4 |
| Printing Costs ......................................................... | 0.15 | Triangular ........................ | 0.10 | 0.20 |

TABLE A.6—ALTERNATIVE PARAMETERS: COSTS OF ITEMIZED DISCLOSURES

| Parameter | Base case | Monte Carlo | | |
| --- | --- | --- | --- | --- |
| | Parameter value | Modeled distribution | Distribution lower bound | Distribution upper bound |
| Electronic Disclosure Share (Scenario 2 only) ........... | 0.27 | Triangular ........................ | 0.04 | 0.50 |
| Upfront Sales Manager Hours (Scenario 1) ............... | 8 | Triangular ........................ | 4 | 12 |
| Upfront Compliance Manager Hours (Scenario 1) ..... | 8 | Triangular ........................ | 4 | 12 |
| Disclosure Training Hours (Scenario 1) ...................... | 1 | Triangular ........................ | 0 | 2 |
| Disclosure Creation Sales Manager Hours (Scenario 2 only). | 4 | Triangular ........................ | 2 | 6 |
| Disclosure Creation Compliance Manager Hours (Scenario 2 only). | 8 | Triangular ........................ | 4 | 12 |
| Disclosure Creation Web Developer Hours (Scenario 2 only). | 8 | Triangular ........................ | 4 | 12 |
| Disclosure Delivery Minutes (Scenario 2 only) ........... | 2 | Triangular ........................ | 0 | 4 |
| Printing Costs (Scenario 2 only) ................................ | 0.15 | Triangular ........................ | 0.10 | 0.20 |
| Electronic Disclosure Costs (Scenario 2 only) ........... | 0.02 | Triangular ........................ | 0 | 0.04 |

TABLE A.7—ALTERNATIVE PARAMETERS: RECORDKEEPING COSTS

| Parameter | Base case | Monte Carlo | | |
| --- | --- | --- | --- | --- |
| | Parameter value | Modeled distribution | Distribution lower bound | Distribution upper bound |
| GAP Sales Share ................................................... | 0.17 | Triangular ........................ | 0.07 | 0.27 |
| GAP Sale Minutes .................................................. | 1 | Triangular ........................ | 0 | 2 |
| Upfront Web Developer Hours ................................. | 8 | Triangular ........................ | 4 | 12 |
| Upfront Clerical Hours ............................................ | 5 | Triangular ........................ | 2 | 8 |
| Upfront Sales Manager Hours ................................. | 1 | Triangular ........................ | 0 | 2 |
| Upfront Compliance Manager Hours ........................ | 1 | Triangular ........................ | 0 | 2 |
| IT Hardware Costs .................................................. | 300 | Triangular ........................ | 100 | 500 |

We simulate 1,000 scenarios drawing from these parameter distributions, recording the costs and benefits of each potential outcome. The distribution of costs and benefits is plotted in the following table for discount rates of 3% and 7%.

**692**     **Federal Register** / Vol. 89, No. 3 / Thursday, January 4, 2024 / Rules and Regulations



Differencing the costs and benefits from each simulation iteration yields a distribution of net benefits under the various parameter draws. We again plot this distribution under 3% and 7% discount rates.



This exercise finds heterogeneity in net benefits under the alternative parameter distributions, but the Rule still yields positive net benefits in all simulated outcomes.

Finally, to examine the sensitivity of the net benefits conclusions to the possibility of systematic underestimating of labor costs, we calculate costs and benefits in a scenario where all labor costs turn out to be ten

times larger than the parameter values in the main text. All non-labor hours costs (including benefits hours, wage rates, and prevalence counts) are unchanged in this analysis.

TABLE A.8—PRESENT VALUE OF NET BENEFITS (IN MILLIONS), LABOR COSTS × 10, 2024–2033

|  | Base case | |
|---|---|---|
|  | 3% Discount rate | 7% Discount rate |
| *Benefits:* | | |
| Time savings | $14,926 | $12,290 |
| Deadweight Loss Reduction | 1,298 | 1,069 |
| Total Benefits | 16,224 | 13,359 |
| *Costs:* | | |
| Prohibition on Misrepresentations | 1,573 | 1,295 |
| Offering Price Disclosure | 455 | 455 |
| Finance/Lease Total of Payments Disclosure | 2,743 | 2,279 |
| Prohibition re: Certain Add-ons & Express, Informed Consent | 4,471 | 3,830 |
| Recordkeeping | 1,868 | 1,583 |
| Total Costs | 11,111 | 9,443 |
| Net Benefits | 5,114 | 3,916 |

**Note:** ''Base Case'' reflects base case benefit estimates and high cost scenarios with ten times the labor costs as in the main analysis. Not all impacts can be quantified; estimates only reflect quantified costs and benefits.

## VIII. Other Matters

Pursuant to the Congressional Review Act (5 U.S.C. 801 *et seq.*), the Office of Information and Regulatory Affairs designated this Rule as a ''major rule,'' as defined by 5 U.S.C. 804(2).

## List of Subjects in 16 CFR Part 463

Consumer protection, Motor vehicles, Reporting and recordkeeping requirements, Trade practices.

■ For the reasons stated in the preamble, the Federal Trade Commission adds part 463 to subchapter D of Title 16 of the Code of Federal Regulations to read as follows:

## PART 463—COMBATING AUTO RETAIL SCAMS TRADE REGULATION RULE

Sec.
463.1   Authority.
463.2   Definitions.
463.3   Prohibited misrepresentations.
463.4   Disclosure requirements.
463.5   Dealer charges for Add-ons and other items.
463.6   Recordkeeping.
463.7   Waiver not permitted.
463.8   Severability.
463.9   Relation to State laws.

**Authority:** 15 U.S.C. 41 *et seq.*; 12 U.S.C. 5519.

## § 463.1   Authority.

This part is promulgated pursuant to section 1029 of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, 12 U.S.C. 5519(d). It is an unfair or deceptive act or practice within the meaning of section 5(a)(1) of the Federal Trade Commission Act (15

U.S.C. 45(a)(1)) to violate any applicable provision of this part, directly or indirectly, including the recordkeeping requirements which are necessary to prevent such unfair or deceptive acts or practices and to enforce this part.

## § 463.2   Definitions.

(a) ''Add-on'' or ''Add-on product(s) or Service(s)'' means any product(s) or service(s) not provided to the consumer or installed on the Vehicle by the Vehicle manufacturer and for which the Dealer, directly or indirectly, charges a consumer in connection with a Vehicle sale, lease, or financing transaction.

(b)–(c) [Reserved]

(d) ''Clear(ly) and Conspicuous(ly)'' means in a manner that is difficult to miss (*i.e.,* easily noticeable) and easily understandable, including in all of the following ways:

(1) In any communication that is solely visual or solely audible, the disclosure must be made through the same means through which the communication is presented. In any communication made through both visual and audible means, such as a television advertisement, the disclosure must be presented simultaneously in both the visual and audible portions of the communication even if the representation requiring the disclosure is made in only one means.

(2) A visual disclosure, by its size, contrast, location, the length of time it appears, and other characteristics, must stand out from any accompanying text or other visual elements so that it is easily noticed, read, and understood.

(3) An audible disclosure, including by telephone or streaming video, must be delivered in a volume, speed, and cadence sufficient for ordinary consumers to easily hear and understand it.

(4) In any communication using an interactive electronic medium, such as the internet or software, the disclosure must be unavoidable.

(5) The disclosure must use diction and syntax understandable to ordinary consumers and must appear in each language in which the representation that requires the disclosure appears.

(6) The disclosure must comply with these requirements in each medium through which it is received.

(7) The disclosure must not be contradicted or mitigated by, or inconsistent with, anything else in the communication.

(e) ''Covered Motor Vehicle'' or ''Vehicle'' means any self-propelled vehicle designed for transporting persons or property on a public street, highway, or road. For purposes of this part, the term Covered Motor Vehicle does not include the following:

(1) Recreational boats and marine equipment;

(2) Motorcycles, scooters, and electric bicycles;

(3) Motor homes, recreational vehicle trailers, and slide-in campers; or

(4) Golf carts.

(f) ''Covered Motor Vehicle Dealer'' or ''Dealer'' means any person, including any individual or entity, or resident in the United States, or any territory of the United States, that:

(1) Is licensed by a State, a territory of the United States, or the District of Columbia to engage in the sale of Covered Motor Vehicles;

(2) Takes title to, holds an ownership interest in, or takes physical custody of Covered Motor Vehicles; and

(3) Is predominantly engaged in the sale and servicing of Covered Motor Vehicles, the leasing and servicing of Covered Motor Vehicles, or both.

(g) "Express, Informed Consent" means an affirmative act communicating unambiguous assent to be charged, made after receiving and in close proximity to a Clear and Conspicuous disclosure, in writing, and also orally for in-person transactions, of the following:

(1) What the charge is for; and

(2) The amount of the charge, including, if the charge is for a product or service, all fees and costs to be charged to the consumer over the period of repayment with and without the product or service. The following are examples of what does not constitute Express, Informed Consent:

(i) A signed or initialed document, by itself;

(ii) Prechecked boxes; or

(iii) An agreement obtained through any practice designed or manipulated with the substantial effect of subverting or impairing user autonomy, decision-making, or choice.

(h) "GAP Agreement" means an agreement to indemnify a Vehicle purchaser or lessee for any of the difference between the actual cash value of the Vehicle in the event of an unrecovered theft or total loss and the amount owed on the Vehicle pursuant to the terms of a loan, lease agreement, or installment sales contract used to purchase or lease the Vehicle, or to waive the unpaid difference between money received from the purchaser's or lessee's Vehicle insurer and some or all of the amount owed on the Vehicle at the time of the unrecovered theft or total loss, including products or services otherwise titled "Guaranteed Automobile Protection Agreement," "Guaranteed Asset Protection Agreement," "GAP insurance," or "GAP Waiver."

(i) "Government Charges" means all fees or charges imposed by a Federal, State, or local government agency, unit, or department, including taxes, license and registration costs, inspection or certification costs, and any other such fees or charges.

(j) "Material" or "Materially" means likely to affect a person's choice of, or conduct regarding, goods or services.

(k) "Offering Price" means the full cash price for which a Dealer will sell or finance the Vehicle to any consumer, provided that the Dealer may exclude only required Government Charges.

## § 463.3 Prohibited misrepresentations.

It is a violation of this part and an unfair or deceptive act or practice in violation of section 5 of the Federal Trade Commission Act for any Covered Motor Vehicle Dealer to make any misrepresentation, expressly or by implication, regarding Material information about the following:

(a) The costs or terms of purchasing, financing, or leasing a Vehicle.

(b) Any costs, limitation, benefit, or any other aspect of an Add-on Product or Service.

(c) Whether the terms are, or transaction is, for financing or a lease.

(d) The availability of any rebates or discounts that are factored into the advertised price but not available to all consumers.

(e) The availability of Vehicles at an advertised price.

(f) Whether any consumer has been or will be preapproved or guaranteed for any product, service, or term.

(g) Any information on or about a consumer's application for financing.

(h) When the transaction is final or binding on all parties.

(i) Keeping cash down payments or trade-in Vehicles, charging fees, or initiating legal process or any action if a transaction is not finalized or if the consumer does not wish to engage in a transaction.

(j) Whether or when a Dealer will pay off some or all of the financing or lease on a consumer's trade-in Vehicle.

(k) Whether consumer reviews or ratings are unbiased, independent, or ordinary consumer reviews or ratings of the Dealer or the Dealer's products or services.

(l) Whether the Dealer or any of the Dealer's personnel or products or services is or was affiliated with, endorsed or approved by, or otherwise associated with the United States government or any Federal, State, or local government agency, unit, or department, including the United States Department of Defense or its Military Departments.

(m) Whether consumers have won a prize or sweepstakes.

(n) Whether, or under what circumstances, a Vehicle may be moved, including across State lines or out of the country.

(o) Whether, or under what circumstances, a Vehicle may be repossessed.

(p) Any of the required disclosures identified in this part.

(q) The requirements in this section also are prescribed for the purpose of preventing the unfair or deceptive acts or practices defined in this part, including those in §§ 463.4 and 463.5.

## § 463.4 Disclosure requirements.

It is a violation of this part and an unfair or deceptive act or practice in violation of section 5 of the Federal Trade Commission Act for any Covered Motor Vehicle Dealer to fail to make any disclosure required by this section, Clearly and Conspicuously.

(a) *Offering Price.* In connection with the sale or financing of Vehicles, a Vehicle's Offering Price must be disclosed:

(1) In any advertisement that references, expressly or by implication, a specific Vehicle;

(2) In any advertisement that represents, expressly or by implication, any monetary amount or financing term for any Vehicle; and

(3) In any communication with a consumer that includes a reference, expressly or by implication, regarding a specific Vehicle, or any monetary amount or financing term for any Vehicle. With respect to such communications:

(i) The Offering Price for the Vehicle must be disclosed in the Dealer's first response regarding that specific Vehicle to the consumer; and

(ii) If the communication or response is in writing, the Offering Price must be disclosed in writing. The requirements in this paragraph (a) also are prescribed for the purpose of preventing the unfair or deceptive acts or practices defined in this part, including those in §§ 463.3(a) and (b) and 463.5(c).

(b) [Reserved]

(c) *Add-ons not required.* When making any representation, expressly or by implication, directly or indirectly, about an Add-on Product or Service, the Dealer must disclose that the Add-on is not required and the consumer can purchase or lease the Vehicle without the Add-on, if true. If the representation is in writing, the disclosure must be in writing. The requirements in this paragraph (c) also are prescribed for the purpose of preventing the unfair or deceptive acts or practices defined in this part, including those in §§ 463.3(a) and (b) and 463.5(c).

(d) *Total of payments and consideration for a financed or lease transaction.* (1) When making any representation, expressly or by implication, directly or indirectly, about a monthly payment for any Vehicle, the Dealer must disclose the total amount the consumer will pay to purchase or lease the Vehicle at that monthly payment after making all payments as scheduled. If the representation is in

writing, the disclosure must be in writing.

(2) If the total amount disclosed assumes the consumer will provide consideration (for example, in the form of a cash down payment or trade-in valuation), the Dealer must disclose the amount of consideration to be provided by the consumer. If the representation is in writing, the disclosure must be in writing.

(3) The requirements in this paragraph (d) also are prescribed for the purpose of preventing the unfair or deceptive acts or practices defined in this part, including those in §§ 463.3(a) and 463.5(c).

(e) *Monthly payments comparison.* When making any comparison between payment options, expressly or by implication, directly or indirectly, that includes discussion of a lower monthly payment, the Dealer must disclose that the lower monthly payment will increase the total amount the consumer will pay to purchase or lease the Vehicle, if true. If the representation is in writing, the disclosure must be in writing. The requirements in this paragraph (e) also are prescribed for the purpose of preventing the unfair or deceptive acts or practices defined in this part, including those in §§ 463.3(a) and 463.5(c).

### § 463.5  Dealer charges for Add-ons and other items.

It is a violation of this part and an unfair or deceptive act or practice in violation of section 5 of the Federal Trade Commission Act for any Covered Motor Vehicle Dealer, in connection with the sale or financing of Vehicles, to charge for any of the following.

(a) *Add-ons that provide no benefit.* A Dealer may not charge for an Add-on Product or Service if the consumer would not benefit from such an Add-on Product or Service, including:

(1) Nitrogen-filled tire-related products or services that contain no more nitrogen than naturally exists in the air; or

(2) Products or services that do not provide coverage for the Vehicle, the consumer, or the transaction or that are duplicative of warranty coverage for the Vehicle, including a GAP Agreement if the consumer's Vehicle or neighborhood is excluded from coverage or the loan-to-value ratio would result in the consumer not benefiting financially from the product or service.

(3) The requirements in this paragraph (a) also are prescribed for the purpose of preventing the unfair or deceptive acts or practices defined in this part, including those in § 463.3(a) and (b) and paragraph (c) of this section.

(b) [Reserved]

(c) *Any item without Express, Informed Consent.* A Dealer may not charge a consumer for any item unless the Dealer obtains the Express, Informed Consent of the consumer for the charge. The requirements in this paragraph (c) also are prescribed for the purpose of preventing the unfair or deceptive acts or practices defined in this part, including those in §§ 463.3(a) and (b), 463.4, and paragraph (a) of this section.

### § 463.6  Recordkeeping.

(a) Any Covered Motor Vehicle Dealer subject to this part must create and retain, for a period of twenty-four months from the date the record is created, all records necessary to demonstrate compliance with this part, including the following records:

(1) Copies of all Materially different advertisements, sales scripts, training materials, and marketing materials regarding the price, financing, or lease of a Vehicle, that the Dealer disseminated during the relevant time period; *Provided that* a typical example of a credit or lease advertisement may be retained for advertisements that include different Vehicles, or different amounts for the same credit or lease terms, where the advertisements are otherwise not Materially different;

(2) [Reserved]

(3) Copies of all purchase orders; financing and lease documents with the Dealer signed by the consumer, whether or not final approval is received for a financing or lease transaction; and all written communications relating to sales, financing, or leasing between the Dealer and any consumer who signs a purchase order or financing or lease contract with the Dealer;

(4) Records demonstrating that Add-ons in consumers' contracts meet the requirements of § 463.5, including copies of all service contracts, GAP Agreements and calculations of loan-to-value ratios in contracts including GAP Agreements; and

(5) Copies of all written consumer complaints relating to sales, financing, or leasing, inquiries related to Add-ons, and inquiries and responses about Vehicles referenced in § 463.4.

(b) Any Dealer subject to this part may keep the records required by paragraph (a) of this section in any legible form, and in the same manner, format, or place as they may already keep such records in the ordinary course of business. Failure to keep all records required under paragraph (a) of this section will be a violation of this part.

### § 463.7  Waiver not permitted.

It is a violation of this part for any person to obtain, or attempt to obtain, a waiver from any consumer of any protection provided by or any right of the consumer under this part.

### § 463.8  Severability.

The provisions of this part are separate and severable from one another. If any provision is stayed or determined to be invalid, it is the Commission's intention that the remaining provisions will continue in effect.

### § 463.9  Relation to State laws.

(a) *In general.* This part will not be construed as superseding, altering, or affecting any other State statute, regulation, order, or interpretation relating to Covered Motor Vehicle Dealer requirements, except to the extent that such statute, regulation, order, or interpretation is inconsistent with the provisions of this part, and then only to the extent of the inconsistency.

(b) *Greater protection under State law.* For purposes of this section, a State statute, regulation, order, or interpretation is not inconsistent with the provisions of this part if the protection such statute, regulation, order, or interpretation affords any consumer is greater than the protection provided under this part.

By direction of the Commission.

**Joel Christie,**

*Acting Secretary.*

[FR Doc. 2023–27997 Filed 12–28–23; 8:45 am]

**BILLING CODE P**

## UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

NATIONAL AUTOMOBILE DEALERS
ASSOCIATION and TEXAS AUTOMO-
BILE DEALERS ASSOCIATION,

> *Petitioners,*

v.

FEDERAL TRADE COMMISSION,

> *Respondent.*

Case No.  24-60013

## DECLARATION OF JOSEPH STREET

I, Joseph Street, pursuant to 28 U.S.C. §1746, declare the following, which is true and correct to the best of my knowledge:

1. This declaration is based on my decades of first-hand experience running an automobile dealership, my familiarity with the industry, and my good-faith predictions about the likely effects of the FTC's new "CARS" Rule (the "Rule").

2. I own Street Automotive, Inc. and serve as its Dealer Principal. I have held this position for 41 years.

3. Our dealership is a member of the National Automobile Dealers Association and the Texas Automobile Dealers Association.

4. Our dealership takes pride in treating customers fairly and complying with all relevant federal and state laws. For at least the last two decades, I am not aware of

1

any state or federal enforcement actions, or private litigation, against Street Automotive alleging any unfair, deceptive, or fraudulent practices, or violation of any consumer protection laws.

5. Our dealership is based in Amarillo, Texas and has approximately 163 total employees. Of those, approximately 60 play some role in sales, marketing, financing, or recordkeeping functions and will be impacted by the FTC's new Rule. Those employees sell approximately 4,500 new and used vehicles per year and have many more interactions with potential customers who visit or contact the dealership but do not buy a vehicle from us. My dealership has a closing ratio of roughly 20%, resulting in interactions with approximately 22,500 customers per year concerning the sale, financing, and leasing of vehicles.

6. In my role as the Dealer Principal, it is my responsibility to ensure the dealership's compliance with applicable regulations. This includes ensuring that employees are trained in, understand, and follow all legal requirements in marketing and financing vehicles and negotiating terms of sale.

7. The Rule would radically overhaul how our employees interact with our customers during most of the approximately 22,500 interactions we have each year with actual and potential customers. It regulates how we advertise and disclose prices. It regulates how and when we communicate prices, discounts, financing terms, add-ons, and other information to customers. It makes us keep more records and paperwork. And it layers all of those new rules atop the many preexisting state and federal laws that already comprehensively regulate the car-buying and financing process.

8.  To illustrate, the Rule would effectively regulate virtually all written communications and many oral communications between our employees and potential customers concerning the sale, financing, or lease of a vehicle. Among other things, it requires the first response from an employee to a customer that refers, expressly or by implication, to a specific vehicle to disclose the vehicle's "Offering Price." Thus, during the first response to a customer about a specific vehicle, an employee cannot answer a customer's direct question about a vehicle's towing capacity, range, size, fuel economy, or any other characteristic without injecting an unasked-for discussion of the vehicle's "Offering Price" into the conversation.

9.  Further complicating matters, the "Offering Price" is an entirely new concept in the Texas regulatory scheme for vehicle dealerships, which will likely lead to confusion for customers and employees alike. The Rule's definition of "Offering Price" differs from both the "Cash Price" and the "Featured Sales Price" as defined under Texas law. *See* Tex. Fin. Code §348.004; 43 Tex. Admin. Code §215.250. And Texas law uses the latter two definitions to impose distinct (and potentially conflicting) state-law requirements addressing auto dealers' advertising, disclosures, and price negotiation.

10. Our dealership does not employ an in-house lawyer with regulatory compliance expertise. And dealership staff on their own will not be able to determine what compliance with the Rule requires with an adequate degree of confidence, which is especially troubling given the substantial financial penalties for noncompliance. This is a particular concern in situations where the Rule's requirements appear vague (such

3

as the application of several of the misrepresentations prohibited by 16 C.F.R. §463.3), or where they overlap and potentially conflict with other pre-existing regulatory requirements (such as other federal and state laws regulating price and financing advertising, disclosure, and negotiation).

11. If the Rule continues in effect, our dealership will thus need to hire outside consultants or legal counsel to help determine the Rule's requirements and help ensure that the dealership is compliant. Our dealership already spends tens of thousands of dollars yearly on outside compliance consultants, and I expect that we would need to spend significantly more money, and possibly hire additional personnel, to determine compliance requirements and train senior staff accordingly.

12. Specifically, once senior dealership staff have adequately determined what compliance requires, the dealership will need to create a comprehensive training program for all employees involved in sales, marketing, financing, advertising, and recordkeeping. The dealership currently has approximately 60 employees involved in these areas, and has historically hired approximately 25 new employees per year whose jobs involve such duties.

13. Beyond the additional employee training, we will need to substantially expand our current monitoring of our advertising and disclosure forms to ensure compliance with the Rule. This will also entail additional cost and possibly hiring additional employees to cover the increased workload.

14. Because the Rule imposes complicated new regulatory requirements on every dealership employee involved in the car-buying process, including by prescribing new

4

disclosures, prohibited communications, and recordkeeping requirements, it will take considerable training to bring all relevant dealership employees into compliance. Dealerships in general often experience relatively high turnover, particularly in sales positions, exacerbating this concern. Further, it will take substantial continuing supervision to ensure that the hundreds or thousands of advertisements and regulated communications and disclosures employees make each week are compliant with the Rule.

15. Based on the foregoing, I anticipate that senior dealership staff or outside consultants will need to devote at least an estimated 18 hours per employee to additional training and supervision in 2024 (8 hours of upfront training plus 30 minutes of additional training and supervision per week once the Rule goes into effect), followed by at least 10 hours for each such employee in future years (15 minutes per week of additional training and supervision).

16. This training and compliance burden will impose significant costs on our business in terms of both money and diverted employee time, as well as potential penalties and legal costs if the FTC deems us non-compliant during one of our countless interactions with actual and potential customers. These costs to our dealership will, in turn, be reflected in the prices and discounts we are able to offer our customers.

17. Because of the complexity of the Rule and the time required to train and monitor employees to ensure compliance, I anticipate that the dealership would need to begin devoting substantial resources to compliance efforts by March 2024, if not sooner, in order to come into full compliance by the Rule's July 30, 2024 effective date.

Per 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on January 5, 2024.

_____

Joseph Street

**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

| | |
|---|---|
| NATIONAL AUTOMOBILE DEALERS ASSOCIATION and TEXAS AUTOMOBILE DEALERS ASSOCIATION, *Petitioners,* v. FEDERAL TRADE COMMISSION, *Respondent.* | Case No. 24-60013 |

**DECLARATION OF PAUL METREY**

I, Paul Metrey, pursuant to 28 U.S.C. §1746, declare the following, which is true and correct to the best of my knowledge:

1. I am employed by the National Automobile Dealers Association (NADA) as Executive Vice President, Public Policy. I have worked for NADA for 23 years. My responsibilities include leading a team that assesses the impact of existing and proposed regulations on automobile dealerships and their customers, as well as evaluating feedback from dealers on regulatory issues and compliance burdens affecting their businesses.

2. This declaration offers my good-faith views and predictions based on my own experience with the automobile dealer industry, research conducted by NADA and others, and feedback received from dealership owners and employees.

1

3. NADA is the primary national trade association for the automotive retail industry, representing more than 16,000 franchised new car and truck dealerships throughout the United States.

4. There are more than 16,000 franchised new-car dealerships and more than 25,000 used-car dealerships in the United States. Just the new-car dealerships provide jobs to more than a million employees, whose average weekly earnings are more than $1,600.

5. American automobile dealerships are extensively governed by federal and state regulations. Among other laws, dealerships must comply with obligations under the Fair Credit Reporting Act, the Gramm-Leach-Bliley Act, the Truth in Lending Act, the Consumer Leasing Act, the Equal Credit Opportunity Act, and consumer protection statutes that exist in every state and broadly prohibit fraudulent, unfair, or deceptive practices. The FTC also has broad enforcement authority under the FTC Act to target unfair or deceptive acts or practices by auto dealerships. The attached Regulatory Maze publication provides a general description of federal laws and regulations applicable to franchise automobile dealership operations. *See* Ex. A.

6. American dealerships usually sell more than 40 million new and used vehicles to customers each year. Because most consumers consider multiple vehicles or visit multiple dealerships before purchasing a vehicle, dealership sales represent only a fraction of the total number of communications between dealership employees and potential customers each year.

2

7. The FTC's new "CARS" Rule (the "Rule") will overhaul the content of the millions of communications (written, spoken, and online) between dealerships and potential vehicle shoppers. For example, the Rule will inject a mandatory new disclosure requirement into the first dealership response about a particular vehicle, requiring employees to determine and provide an "Offering Price" even when a customer's basic question pertains to non-price aspects or features of a vehicle. The Rule also effectively imposes substantial new paperwork as well as new recordkeeping requirements on millions of transactions that dealers complete every year.

8. The Rule's numerous new regulatory mandates will likely lead to significant confusion, waste, and diversion of time among dealership employees. The need for new training, procedures, forms, recordkeeping, and compliance programs will be especially pronounced as dealership employees attempt to determine how to simultaneously comply with the Rule and numerous related state and federal regulatory requirements, all while trying to avoid frustrating and burdening customers with additional disclosures that they did not request and may not understand.

9. The Rule will likely also impose substantial monetary compliance costs on dealerships. Because of the Rule's breadth and the vagueness of many of its requirements and prohibitions, dealerships will need to employ or engage individuals with regulatory compliance expertise to craft compliance programs, train employees, prepare new forms, develop new recordkeeping procedures, and monitor how the FTC interprets and enforces the Rule's imprecise commands. And because the Rule regulates communication between dealership employees and vehicle shoppers,

3

dealerships will need to devote substantial resources to supervising employee inter-
actions on an ongoing basis to ensure compliance.

10. Because the Rule will require dealerships to create and impose new procedures
governing their advertising, disclosures, recordkeeping, and more, it would also be
time-consuming and costly to revert to the prior procedures if the Rule goes into effect
(or the effective date gets close enough that dealers must begin to implement new
procedures) and the Rule is later invalidated by a court.

11. At bottom, the Rule injects new and confusing regulatory requirements into
countless interactions between dealerships and their customers—on top of the com-
prehensive preexisting state and federal regulatory regimes that already seek to pre-
vent the precise sorts of bad acts (fraudulent, deceptive, or unfair practices) that the
Rule claims to target. The Rule will result in considerable diversion of resources and
employee time for training, compliance, monitoring, and paperwork, resulting in sub-
stantial out-of-pocket costs as well as opportunity costs across the nation's vehicle
dealerships.

Per 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true
and correct to the best of my knowledge.

Executed on January 8, 2024.

_Paul W. Metrey_

Paul Metrey

4

# EXHIBIT A

# REGULATORY MAZE



NADA'S ANNUAL UPDATE ON FEDERAL REGULATIONS

# REGULATORY MAZE

## Service and Parts Department

- Clean Air Act
- Clean Water Act
- DOT hazardous-materials-handling procedures
- FTC Used Parts Guide
- IRS Core Inventory Valuation
- LIFO/FIFO inventory accounting method
- NHTSA tampering rules
- NHTSA tire rules
- OSHA asbestos standards
- OSHA Hazard Communication Standard
- OSHA lock-out/tag-out procedures
- OSHA workplace health and safety standards
- RCRA
- Safe Drinking Water Act
- Superfund
- UNICAP

## Body Shop

- Clean Air Act
- EPA hazardous-waste rules
- OSHA Hazard Communication Standard
- OSHA Respiratory Protection Standard
- OSHA workplace health and safety standards
- UNICAP
- VIN and parts marking



## All Departments (Customer)

- Americans with Disabilities Act
- CAN-SPAM Act
- Consumer Review Fairness Act
- Driver's Privacy Protection Act
- Electronic Funds Transfer Act
- FTC Privacy Rule
- FTC prohibition against deceptive and unfair trade practices
- FTC Safeguards Rule
- FTC Telemarketing Sales Rule
- FTC warranty rules
- IRS Cash-Reporting Rule
- Magnuson-Moss Act
- OFAC restrictions
- Telephone Consumer Protection Act
- USA PATRIOT Act

**Our annual list of major federal regulations. State and local laws also apply and sometimes include additional requirements.**



### F&I Department

- Dodd-Frank Financial Reform Law
- Equal Credit Opportunity Act
- FACT Act of 2003
- Fair Credit Reporting Act
- FTC Credit Practices Rule
- FTC Holder-in-Due-Course Rule
- Gramm-Leach-Bliley Act
- Military Lending Act
- Producer-Owned Reinsurance Companies
- Truth in Lending and Consumer Leasing acts

### All Departments (General Management/Personnel)

- Affordable Care Act
- Age Discrimination in Employment Act
- Americans with Disabilities Act
- COBRA
- Electronic deposit of taxes
- Electronic records retention
- Emergency-response planning
- Employee drug testing
- Employee Polygraph Protection Act
- ERISA
- Employee verification rules
- Equal Pay Act
- Estate tax
- Family and Medical Leave Act
- Federal child-support enforcement regulations
- Federal Civil Rights Act
- FTC Repossession Rule
- Federal wage-hour and child labor laws
- Genetic Information Nondiscrimination Act
- Health Insurance Portability and Accountability Act
- IRS/DOL worker classification
- IRS treatment of demo vehicles
- IRS treatment of tool plans
- Mail, Internet or Telephone Order Merchandise Rule
- Mandatory workplace posters
- Mental Health Parity Act
- Miscellaneous recordkeeping requirements
- NLRB unionization rules
- Newborns' and Mothers' Health Protection Act
- OSHA Blood-Borne Pathogens Rule
- OSHA injury and illness recording and reporting requirements
- Section 179 expensing and bonus depreciation
- USERRA
- Walking-working surfaces and fall protection rule
- WARN

### New- and Used-Vehicle Sales Departments

- American Automobile Labeling Act
- CAFE and GHGs rules
- Diplomat vehicle purchases
- DOE/EPA gas-mileage guide
- Federal bankruptcy law
- FTC Cooling-Off Rule
- FTC guidelines for fuel-mileage advertising and alternative-fueled-vehicle advertising and labeling
- FTC Used Car Rule
- Gray-market vehicles
- Heavy-highway-vehicle excise tax
- IRS treatment of salesperson incentives
- LIFO inventory accounting method
- Monroney sticker (Price Labeling Law)
- Motor vehicle tax credits
- NHTSA alteration and tire-placarding rules
- NHTSA odometer rule
- NHTSA recall regulations
- NHTSA safety belt/airbag deactivation
- NHTSA tire regulations
- School van sales
- UNICAP

In addition to this list of federal laws and regulations, be sure to consult nada.org/regulatoryaffairs for more details.

## All Departments
### (General Management/Personnel)

■ **Affordable Care Act (ACA):** Extensive health care reforms enacted in 2010 affect dealerships and their health care plans. For example, most dealerships with more than 50 full-time employees had to decide by January 1, 2015, whether to offer health coverage that meets the federal requirements or pay a penalty. Many additional reporting, recordkeeping and other duties apply to dealerships and other businesses. For more information, visit healthcare.gov. The Tax Cuts and Jobs Act of 2017 (TCJA) eliminated the individual responsibility mandate after December 31, 2018.

■ **Age Discrimination in Employment Act:** Protects older individuals against age-based employment discrimination.

■ **Americans with Disabilities Act (ADA):** Prohibits discrimination against the physically handicapped in areas of public accommodation. Must make reasonable accommodations to facilities, such as by installing ramps, and accessible parking spaces, drinking fountains, public toilets and doors. While not clearly mandated by the ADA, businesses should consider developing and managing their websites to ensure they are accessible to those with disabilities.

■ **Consolidated Omnibus Budget Reconciliation Act (COBRA):** Dealerships with 20 or more employees must continue health care coverage for ex-employees and their families for 18 to 36 months, depending on circumstances.

■ **Electronic deposit of taxes:** Dealerships generally must use the Electronic Federal Tax Payment System.

■ **Electronic records retention:** Revenue Procedure 98-25 explains IRS requirements for retaining computerized accounting records.

■ **Emergency-response planning:** Federal, state and local laws require dealers to have emergency-response plans.

■ **Employee drug testing:** Unionized dealerships must bargain with unions before implementing employer drug policies (not necessary for pre-employment drug testing). The ADA prohibits employers from discriminating against employees or applicants who have completed or are currently undergoing drug treatment, as long as they aren't currently abusing drugs.

■ **Employee Polygraph Protection Act:** Prohibits dealerships from using polygraphs in pre-employment screening; allows use in limited cases where an employee is reasonably suspected of a workplace incident involving economic loss to the employer.

■ **Employee Retirement Income Security Act (ERISA):** Dealers offering retirement or health plans must, among other things, provide employees with plan information, keep records and abide by fiduciary responsibilities.

■ **Employment verification rules:** Dealerships must verify the employment eligibility of prospective new employees using I-9 forms and proper support documentation. Use of E-verify is optional.

■ **Equal Pay Act:** Prohibits wage discrimination on the basis of sex.

■ **Estate tax:** The estate tax limit for 2020 is $11.58 million. The annual gift exclusion remains at $15,000, with lifetime gifts beyond the annual exclusion counting toward the $11.58 million combined estate/gift tax exemption.

■ **Family and Medical Leave Act (FMLA):** Dealerships must post a notice informing employees of their right to take unpaid personal and family medical leave and must comply with appropriate requests for such leave. Special provisions apply to leave related to military service.

■ **Federal child-support enforcement regulations:** Requires states to govern liens put on personal property—including vehicles—for overdue child support. Dealerships should check that child-support liens don't exist on used cars, and must place liens on wages of employees who are delinquent on child-support payments.

■ **Federal Civil Rights Act:** Bars employment discrimination on the basis of race, sex, color, religion or national origin. Prevents employers from asking job applicants certain questions (such as age, marital status or childbearing plans). Prohibits workplace sexual harassment, including behavior that creates a hostile work environment.

■ **FTC Repossession Rule:** Requires formal accounting of money collected for repossessed vehicles.

■ **Federal wage-hour and child labor laws:** Address minimum-wage and overtime pay mandates and exemptions as well as standards for employing minors, including teen driving restrictions. Federal minimum wage is $7.25 per hour; state and local minimum wage rates may be higher.

■ **Genetic Information Nondiscrimination Act:** Prohibits discrimination based on health-related employee DNA information.

■ **Health Insurance Portability and Accountability Act:** Generally prohibits health insurers from denying coverage to workers who lose or change jobs and bars insurers from excluding coverage for preexisting conditions for more than a year.

■ **IRS/DOL worker classification:** Dealers must determine whether their workers are employees or independent contractors. The IRS and the Department of Labor use multi-factor legal standards and tests to evaluate this question. When making worker-classification decisions, dealerships should be conservative and prepared to document their decisions. Of greatest importance: the level of control employers exercise over workers as measured by the means and manner of the work performed. The IRS Voluntary Classification Settlement Program encourages employers to admit past worker misclassifications.

■ **IRS treatment of demo vehicles:** Revenue Procedure 2001-56 offers dealers alternative methods for determining the value of demo use by qualified salespeople and other dealership employees. It defines what constitutes limited personal use and streamlines recordkeeping requirements.

■ **IRS treatment of tool plans:** Tool and equipment plans for service technicians and other employees must comply with the IRS requirements for business connection, substantiation and return of excess payment.

■ **Mail, Internet or Telephone Order Merchandise Rule:** When you advertise merchandise that can be ordered by a buyer over the phone or internet for shipment to that buyer, you must either: (a) state when the merchandise will be delivered, or (b) if you make no shipment statement, you must have a reasonable basis for believing that you can ship within 30 days of a completed order. If, after taking a customer's order, you learn you cannot ship within the time stated or 30 days, you must: (a) seek the consumer's consent to a delayed shipment, or (b) if no consent is obtained, promptly refund all the money the customer paid.

■ **Mandatory workplace posters:** Notices, such as "Your Rights Under the FMLA," "Equal Employment Opportunity Is the Law," "Federal Minimum Wage" and "Notice: Employee Polygraph Protection Act," must be conspicuously displayed.

■ **Mental Health Parity Act:** Requires insurers and large health plans to offer mental illness coverage comparable to that for physical illness and to set dollar limits on mental health care comparable to that for general medical and surgical services. The ACA generally mandates minimum mental health coverages.

■ **Miscellaneous recordkeeping requirements:** A multitude of requirements govern the length of time records must be maintained. Examples: Notification forms for underground storage tanks must be kept indefinitely; and copies of Form 8300 cash reports must be kept for five years.

■ **National Labor Relations Board (NLRB) unionization rules:** Govern unionization activities, including employee rights, election rules, postings and unfair labor practices.

■ **Newborns' and Mothers' Health Protection Act:** Employers and insurers must provide minimum hospital-stay benefits.



■ **OSHA Blood-Borne Pathogens Rule:** Dealerships more than four minutes from an emergency health facility must have a program to respond to employees who suffer cuts. All dealerships must have adequate first-aid kits.

■ **OSHA injury and illness recording and reporting requirements:** Dealers with 10 or more employees are required to maintain a yearly log of work-related injuries and illnesses on OSHA Form 300. Dealers must also complete a report on each workplace injury or illness that occurs using OSHA Form 301. Even if no injuries or illnesses have occurred in a calendar year, all dealers with more than 10 employees must fill out and post an annual summary of work-related injuries and illnesses on OSHA Form 300A. Dealers also must report the following events to OSHA: all work-related fatalities; all work-related inpatient hospitalization of one or more employees; all work-related amputations; and all work-related losses of an eye. Heavy-duty truck dealerships with 20 to 249 employees per establishment also must electronically submit OSHA Form 300A. Both heavy-duty truck and light-duty car dealerships with more than 250 employees

per establishment must electronically submit OSHA Form 300A.

■ **Section 179 expensing and bonus depreciation:** Generally, businesses can expense qualified Section 179 property, subject to phaseout. The total Section 179 deduction limitation is $1,080,000 for 2022. Bonus depreciation is 100% for certain property acquired after September 27, 2017, and is good through 2022. Starting January 1, 2023, bonus depreciation will reduce to 80% of applicable asset cost and will reduce by an additional 20% per year until it reaches zero in 2027.

■ **Uniformed Services Employment and Reemployment Rights Act (USERRA):** Governs the employment and reemployment rights of members of the U.S. uniformed services.

■ **Walking-working surfaces and fall protection rule:** Must implement practices to prevent slips and falls, including personnel training and facility inspections.

■ **Worker Adjustment and Retraining Notification Act (WARN):** Dealerships must give 60 days' notice to workers before termination or store closings under certain circumstances.

## All Departments (Customer)

■ **Americans with Disabilities Act (ADA):** Prohibits discrimination against the physically handicapped in areas of public accommodation. Must make reasonable accommodations to facilities, such as by installing ramps, and accessible parking spaces, drinking fountains, public toilets and doors.

■ **CAN-SPAM (Controlling the Assault of Non-Solicited Pornography and Marketing) Act:** Emailers must identify a commercial message as an advertisement or solicitation and provide their physical postal addresses and a mechanism to opt out of future commercial emails. If recipients opt out, senders must stop sending them commercial email within 10 business days. The disclosure requirements don't apply to emails that relate to transactions or relationships, such as those containing exclusively warranty information or recall-repair messages, or messages related to the completion of transactions requested by the consumer. No one may send commercial emails to wireless devices without recipients' express prior authorization. So that senders can recognize wireless addresses, the FCC maintains a list of wireless domain names at fcc.gov/cgb/policy/DomainNameDownload.html. Commercial emailers must check the list monthly. (Additional provisions prohibit deceptive headers, misleading subject lines and other spam tactics.) A text message may also be considered an email and therefore subject to the CAN-SPAM Act if it is sent to an email address—that is, if it has an internet domain name after the "@" symbol (whether the email address is displayed or not). This means that no commercial text message (deemed to be an email) may be sent to a wireless device without "express prior authorization." Merely having an "established business relationship" with the recipient is not enough.

■ **Consumer Review Fairness Act (CRFA):** Effective March 2017, the CRFA voids any "Form Contract" that seeks to impede consumer reviews and makes it unlawful for a person to offer such a form contract to consumers. In particular, it prohibits provisions in form contracts that (1) restrict a consumer's ability to communicate reviews or performance assessments about a seller's goods, services or conduct; (2) impose a penalty or fee on a consumer who engages in communications of that nature; or (3) require people to give up their intellectual property rights in the content of their reviews.

■ **Driver's Privacy Protection Act:** Prohibits access to personal information in state motor vehicle records except for limited purposes, such as driver safety, theft and recalls. Also restricts the release or use of personal info for marketing.

■ **Electronic Funds Transfer Act (EFTA):** EFTA and its implementing "Regulation E" govern a variety of electronic transactions. Certain provisions of Regulation E apply directly to any "person" that engages in certain activities or transactions, regardless of whether the person is a financial institution. Examples of such transactions include: issuing access devices (such as debit cards, personal identification numbers [PINs] or payroll cards); issuing or selling gift cards; initiating electronic check conversions; preauthorizing electronic fund transfers; or operating ATMs.

■ **FTC Privacy Rule:** Dealers must issue notices of their privacy policies to their finance and lease customers and, in some cases, to consumers when the dealer discloses nonpublic information about consumers to third parties. The rule also restricts disclosure of nonpublic personal information and requires dealers to contractually limit their service providers' access to and use of that information. Dealers who correctly use an FTC model privacy notice receive safe harbor protection for the language used to describe their privacy policy.

■ **FTC prohibition against deceptive and unfair trade practices:** Section 5 of the FTC Act prohibits unfair and deceptive trade practices. For example, the FTC has found certain advertising practices to be deceptive, such as offering "50% OFF" the purchase prices of vehicles, but the discounted prices are only available to a very limited number of customers and the qualifications for receiving the discounted price are not prominently disclosed in the ad.

■ **FTC Safeguards Rule:** The FTC recently amended the Safeguards Rule to require a series of procedural, technical, training, policy and other requirements for dealers to ensure the security of consumer data. The deadline for compliance with the new rule is December 9, 2022. Dealers should review NADA guidance and consult with their advisors and vendors to ensure compliance.

■ **FTC Telemarketing Sales Rule (TSR):** Imposes many of the Telephone Consumer Protection Act (TCPA) restrictions (below) on dealers who telemarket across state lines. Requires dealers who sell or obtain payment authorization for goods or services during interstate phone calls to abide by the prohibition against numerous deceptive and abusive acts and to maintain certain records. Prohibits prerecorded telemarketing calls without a consumer's express written agreement, requires such calls to provide a key-press or voice-activated opt-out mechanism at the outset of the calls, and requires the calls to ring for 15 seconds or four rings before disconnecting.

■ **FTC warranty rules:** The Disclosure Rule mandates disclosure requirements for written warranties and requires simple language in a single document. The Pre-Sale Availability Rule details the methods by which warrantors and sellers must provide warranty terms before a sale. The E-Warranty Act allows warrantors to comply by posting warranty terms to a website, as long as the warrantor also provides consumers with a non-internet-based method

to obtain warranty terms, and allows sellers to use electronic methods to provide consumers with warranty terms pre-sale.

■ **IRS Cash-Reporting Rule:** Dealers receiving more than $10,000 in cash in one transaction or in two or more related transactions must file IRS/FinCEN Form 8300 with the IRS within 15 calendar days and must provide written notice that the report was filed to the person named in the report by January 31 of the following year. "Cash" includes certain cashier's checks, traveler's checks, money orders and bank drafts. The IRS permits dealers to file Form 8300 electronically.

■ **Magnuson-Moss Act:** Dealers must give consumers certain information on warranties and service contraints. Warrantors are generally prohibited from requiring customer-pay service to be performed at a dealership as a condition of a vehicle warranty.

■ **Office of Foreign Assets Control (OFAC) restrictions:** Dealerships may not enter into transactions with certain sanctioned countries, governments, or specially designated organizations or individuals. Dealers should check the electronic list maintained by OFAC to ensure compliance.

■ **Telephone Consumer Protection Act (TCPA):** Requires express written consent prior to any text message or prerecorded or autodialed telemarketing call to a cell phone. You cannot send any text message whatsoever to a cellular telephone number—solicitation or not, whether the number is on a do-not-call (DNC) list or not—using an "autodialer" unless you have the called consumer's "prior express consent." The act imposes national and company-specific DNC rules, calling-time restrictions, caller ID requirements, fax advertising rules, and restrictions on the use of autodialers and prerecorded messages. Fax ads may be sent only to authorized recipients and must include a phone number, fax number and toll-free opt-out mechanism (each available 24/7) on the first page of the fax ad. The FCC considers

text messages to be "phone calls" under the TCPA. Do not send text-message "solicitations" to phone numbers on the national DNC list (subject to the "established business relationship" and "prior express permission" exemptions to the national DNC rules) or your company-specific DNC list (to which there are no exemptions). See additional text-message restrictions under "CAN-SPAM Act."

■ **USA PATRIOT Act:** Dealers must search their records and provide information about individuals or entities with whom they conducted transactions or created accounts if requested by the federal Financial Crimes Enforcement Network. Dealers are currently temporarily exempt from the law's anti-money-laundering program requirements.

## New- and Used-Vehicle Sales Departments

■ **American Automobile Labeling Act (AALA):** New cars and light trucks must have a domestic-parts content label showing percentage of U.S. or Canadian parts; countries contributing more than 15% of the parts; origin of engine and transmission; and location of vehicle assembly. Dealers must ensure that labels remain on vehicles until sold.

■ **Corporate Average Fuel Economy (CAFE) and Greenhouse Gases (GHGs) rules:** NHTSA CAFE and EPA GHGs rules govern the fuel economy performance of all light-, medium- and heavy-duty vehicles, which affects their design, performance and cost. EPA also governs the use of alternative technologies and fuels.

■ **Diplomat vehicle purchases:** The State Department's Office of Foreign Missions must approve a diplomat's vehicle purchase before a tax exemption request may be honored.

■ **DOE/EPA gas-mileage guide:** Dealers must make this guide available to prospective new-vehicle buyers upon request. Download the guide from fueleconomy.gov.

■ **Federal bankruptcy law:** Dealerships should perfect security interests within

30 days after a customer takes possession of a vehicle, regardless of state law. Otherwise, if the customer files for bankruptcy within 90 days of when the financing agreement is signed, the bankruptcy trustee may avoid the lien. Dealerships failing to perfect liens in a timely manner may be liable for losses.

■ **FTC Cooling-Off Rule:** Gives consumers a three-day "cooling-off" period only for sales not consummated at a dealership. Does not apply to auctions, tent sales or other temporary locations if the seller has a permanent place of business. FTC guidance states that an online sale or delivery of a vehicle to a consumer does not implicate this rule as long as the sale is negotiated at the dealership or online, and that the only activity that takes place at the home are the administrative tasks of obtaining a signature and delivering the vehicle.

■ **FTC guidelines for fuel-mileage advertising and alternative-fueled-vehicle advertising and labeling:** Dealer and manufacturer fuel economy advertisements must state that the numbers are estimates and where they come from. Alternative-fueled vehicles must be properly labeled.

■ **FTC Used Car Rule:** "Buyers Guides" are required on all used vehicles offered for sale, disclosing whether the vehicle is offered "as is" or with a dealer warranty, other non-dealer warranty disclosures and service contract availability. Dealers must use the FTC-required Buyers Guide form.

■ **Gray-market vehicles:** EPA, NHTSA and U.S. Customs restrict the importation/sale of new and used vehicles.

■ **Heavy-highway-vehicle excise tax:** A 12% excise tax generally applies to the first retail sale of (1) truck chassis and bodies with a gross vehicle weight rating (GVWR) in excess of 33,000 pounds (Class 8); (2) truck trailer and semitrailer bodies with a GVWR in excess of 26,000 pounds (Classes 7 and 8); and (3) "highway tractors," unless they have a GVWR of 19,500 pounds or less (Class 5 and



under) and a gross combined weight rating of 33,000 pounds or less. Dealers selling Class 5 vehicles with more than 33,000-pound gross combined weight rating or Classes 6 or 7 vehicles should apply the "primary design" test to determine if a vehicle is a taxable tractor or a nontaxable truck.

■ **IRS treatment of salesperson incentives:** Factory incentives paid directly to salespeople by the factory are not required to be treated as wages for tax purposes. However, factories must report these incentives as taxable amounts to salespeople if $600 or more.

■ **LIFO (last-in/first-out) inventory accounting method:** The use of the LIFO inventory methods must comply with the conformity requirement.

■ **Monroney sticker (Price Labeling Law):** Dealerships must keep stickers on new passenger cars showing the manufacturer's suggested retail price, plus other costs, such as options, federal taxes, and handling and freight charges. Stickers also include EPA's revised fuel economy information and NHTSA's NCAP revised crash-test star ratings. Dealerships that alter covered vehicles must attach a second label adjacent to the Monroney label, stating, "This vehicle has been altered. The stated star ratings on the safety label may no longer be applicable." No size or form of this label is specified, but it must be placed as close as possible to Monroney labels on automobiles that (1) have been altered by the dealership and (2) have test results posted.

■ **Motor vehicle tax credits:** Customers may be eligible for up to a $7,500 personal federal tax credit when they buy new qualifying plug-in electric or dedicated electric vehicles. The Inflation Reduction Act of 2022 significantly modified eligibility for this "EV Tax Credit." It is now limited to vehicles assembled in North America (i.e., in the United States, Canada and Mexico) and, beginning January 1, 2023, is subject to critical minerals and battery component requirements, as well as MSRP and taxpayer income limits. Dealers should use caution when discussing the availability of this credit, and should ensure they do not provide legal or tax advice.

■ **NHTSA alteration and tire-placarding rules:** Significantly altered new vehicles must have labels affixed identifying the alterations and stating that they meet federal safety and theft standards. Tire-placarding and -relabeling rules require a new tire-information placard/label whenever parts or equipment are added that may reduce a vehicle's cargo-carrying capacity, or when replacement tires differ in size or inflation pressure from those referred to on the original.

■ **NHTSA odometer rule:** Prohibits odometer removal or tampering and misrepresentation of odometer readings. Requires recordkeeping to create a proof of disclosure to the customer and odometer disclosures on titles. Required disclosures may now be made electronically, consistent with state law. Vehicles with a greater than 16,000-pound gross vehicle weight rating and those 20 model years old or older are exempt, starting in 2021 for model years 2011 and later. Model years prior to 2011 are exempt from the 20-year disclosure requirement.

■ **NHTSA recall regulations:** New vehicles and parts subject to any safety recall, and used vehicles subject to "do-not-drive" safety recalls, should be brought into compliance before delivery.

■ **NHTSA safety belt/airbag deactivation:** Dealerships may install airbag switches for consumers with NHTSA authorization. Dealerships also must be responsive to consumer requests for rear-seat lap/shoulder safety belt retrofits in older vehicles.

■ **NHTSA tire regulations:** Rule requires proper replacement or modification of the tire-information labels when replacing tires or adding weight before first sale or lease.

Also, customers must be given registration cards when buying new tires or the tires may be registered electronically. Other rules govern the handling and disposal of recalled new and used tires.

■ **School van sales:** Dealers may not sell, lease or give away large, new passenger vans with more than 10 seating positions if they know the vehicle will be used to transport students to or from school or school activities. Schools must purchase or lease a school bus or multifunction school activity bus for such purposes.

■ **Uniform capitalization (UNICAP):** Dealers who (1) "produce" property or (2) acquire it for resale if their average annual gross receipts over the three preceding tax years exceed $25 million must comply with the UNICAP requirements contained in Section 263A of the Internal Revenue Code. Revenue Procedure 2010-44 creates two safe harbor methods of accounting, which dealers may elect by filing Form 3115 with the IRS, that generally permit dealers to expense, instead of capitalize, all handling and storage costs at certain dealership facilities.

## F&I Department

■ **Dodd-Frank Financial Reform Law:** Dealers engaged in three-party financing are excluded from the authority of the Consumer Financial Protection Bureau and remain subject to regulation by the Federal Reserve Board, the FTC (which has been given streamlined authority to declare dealer practices as unfair or deceptive) and state consumer protection agencies. Finance sources, including dealers who engage in BHPH financing, are subject to the bureau's jurisdiction. The Dodd-Frank law also created several new obligations for creditors, including additional disclosure requirements for risk-based pricing and adverse-action notices under the Fair Credit Reporting Act (Section-1100F). Plus, it contains a requirement to collect, report to the federal government, retain and make avail-

able to the public upon request certain data collected in credit applications from small, women-owned and minority-owned businesses. Dealers are temporarily exempt from this requirement pending promulgation of specific regulations.

■ **Equal Credit Opportunity Act (ECOA):** Regulation B prohibits discrimination in credit transactions based on race, sex, color, marital status, religion, national origin, age and public-assistance status. The government interprets this prohibition as applying not just to intentional discrimination, but also to credit practices that result in a negative "disparate impact" on consumers based on one of these prohibited factors. In addition, the dealer/creditor is required both to notify applicants in a timely fashion of actions taken on—and reasons for denying—applications, and to retain certain records. (See also "Dodd-Frank Financial Reform Law," above, for a description of small-business loan data collection requirements.) An optional ECOA compliance program template is available to dealers at nada.org/faircredit.

■ **Fair and Accurate Credit Transactions (FACT) Act of 2003:** Amends the Fair Credit Reporting Act (FCRA) and provides consumers with tools to help prevent identity theft and enhance the accuracy, security and reliability of their financial information. Dealer duties include: responding to requests for records from victims of ID theft and to fraud and active-duty alerts on credit reports; disposal requirements for credit report information; opt-out disclosure formatting requirements for prescreened credit solicitations; truncating the expiration date and all but the last five digits on electronically printed credit and debit card receipts provided to purchasers at the point of sale; the Federal Reserve's Regulation FF restrictions on obtaining, using and sharing "medical information" in credit transactions; the FTC Red Flags Rule, which requires creditors and financial institutions to develop and implement a written Identity Theft

Prevention Program that contains procedures to identify, detect and respond to "red flags" indicating the possibility of identity theft; the FTC Address Discrepancy Rule, which requires users of credit reports to develop and implement procedures to verify a customer's identity when receiving a "Notice of Address Discrepancy" from a consumer reporting agency; the FTC Affiliate Marketing Rule, which generally requires a business to offer customers the opportunity to opt out of receiving solicitations from the business's affiliates before affiliates may market to the customers; and the Risk-Based Pricing Rule, which generally requires initial creditors to issue either risk-based pricing notices to consumers to whom credit is granted but on relatively unfavorable terms, or credit score disclosure exception notices to all consumer credit applicants. Additional requirements apply to businesses that furnish negative information about consumers to consumer reporting agencies.

■ **Fair Credit Reporting Act (FCRA):** Dealers are restricted in their use of credit reports for consumers, job applicants and employees. Credit reports generally may be obtained only pursuant to consumers' written instructions or if consumers initiate a business transaction (not if they merely talk with salespeople). Dealers must give job applicants and employees a separate document informing them that a credit report may be obtained and must obtain prior, written authorization to access the report. Dealers generally may not share credit information with affiliates unless they give consumers notice and the opportunity to opt out. If dealers take adverse action based on the report, they must notify consumers and follow additional procedures with job applicants and employees.

■ **FTC Credit Practices Rule:** Dealers are required to provide a written disclosure statement to a cosigner before the cosigner signs an installment sale contract. Dealers cannot "pyramid" late charges (that is, add a late charge onto a

payment made in full and on time when the only delinquency was a late charge on a previous installment).

**■ FTC Holder-in-Due-Course Rule:** Preserves the consumer's right to raise claims and defenses against purchasers of consumer credit contracts (with auto- mobile sales, it protects consumers who buy vehicles from dealerships on credit). When dealerships sell credit contracts to lenders, consumers are obligated to pay the lenders instead of the dealerships. Under the rule, if a dealership engaged in fraud or made misrepresentations in sell- ing a car on credit, a consumer could raise the dealership's conduct as a defense against the lender's demand for payments. Dealerships must ensure that their credit contracts contain the precise disclosure required by the rule.

**■ Gramm-Leach-Bliley Act:** See "FTC Privacy Rule" and "FTC Safeguards Rule" under "All Departments (Customer)."

**■ Military Lending Act (MLA):** The MLA imposes duties and restrictions on certain types of consumer credit extended to active-duty service members and their dependents that is not covered by the motor vehicle financing exclusion, such as a motor vehicle financing transaction with an active-duty service member that includes a cash advance (i.e., "cashout" financing).

**■ Producer-Owned Reinsurance Companies (PORCs):** IRS Notice 2016-66 identifies certain reinsurance arrange- ments as "transactions of interest" requiring taxpayer disclosure by the filing of Form 8886. While this requirement does not involve all reinsurance arrange- ments, the IRS may continue to scrutinize any transaction that shifts income from taxpayers to related companies and results in tax benefits. The Tax Cut and Jobs Act of 2017 reduced the tax rate to 21% for domestic finance and insurance reinsurance companies, including small companies, electing to be taxed only on investment income and U.S.-taxed

"controlled foreign corporations." The law makes significant changes involving non- controlled foreign corporations by expand- ing the definition of a U.S. shareholder and, most importantly, by changing the definition of a passive foreign investment company. These changes may decrease the ability of U.S. shareholders to defer the taxable income from these companies. The IRS proposed regulations addressing this issue, which when finalized should provide clarity in this regard. Additionally, a recent 6th circuit ruling enjoined the IRS from enforcing the disclosure require- ments of IRS Notice 2016-66. The IRS response to this ruling is unclear and it may continue to pursue enforcement outside of the 6th district. Please consult your tax advisor.

**■ Truth in Lending and Consumer Leasing acts:** Regulations Z and M cover consumer credit and consumer leasing transactions, respectively, specifying information to be disclosed to a consumer before completing the transaction, and information to be disclosed when advertis- ing consumer credit transactions or leases. For example, dealers who advertise a lease down payment or monthly payment amount must disclose in lease ads that the advertised deal is a lease; the total amount due at lease signing; number, amount and period (for example, monthly) of payments; and whether a security deposit is required.

## Service and Parts Department

**■ Clean Air Act:** Dealerships may not tamper with, replace or remove emissions- control equipment, such as catalytic converters. CFC recycling regs require dealership air-conditioning techs to obtain certification and to use certified recycling and recovery equipment to capture spent refrigerant, including HFC-134a and other non-ozone-depleting refrigerants. The act also regulates any fuels dealers store and dispense, and the alternative fuels motor- ists use, including gasohol. It restricts emissions from solvents and chemicals.

**■ Clean Water Act:** Sets standards for regulation of wastewater and stormwater at dealerships and comprehensive rules governing aboveground oil storage tanks.

**■ Department of Transportation (DOT) hazardous-materials-handling proce- dures:** Require parts employees who load, unload and package hazardous products, such as airbags, batteries and brake fluid, to be trained in safe handling practices.

**■ FTC Used Parts Guide:** Prohibits misrepresentations that a part is new or about the condition, extent of previous use, reconstruction or repair of a part. Previously used parts must be clearly and conspicuously identified as such in advertising and packaging, and, if the part appears new, on the part itself.

**■ IRS Core Inventory Valuation:** Revenue Procedure 2003-20 creates an optional method for valuing core invento- ries for those using the Lower of Cost or Market Valuation Method.

**■ LIFO/FIFO inventory accounting method:** Revenue Procedure 2002-17 pro- vides a safe harbor method of accounting that authorizes the use of replacement cost to value year-end parts inventory.

**■ NHTSA tampering rules:** Prohibit deal- erships from rendering inoperative safety equipment installed on vehicles in compli- ance with federal law.

**■ NHTSA tire rules:** Dealerships must report sales of defective tires when they are sold separately from vehicles, and must properly manage recalled tires.

**■ OSHA asbestos standards:** Dealerships must use certain procedures during brake and clutch inspections and repairs to mini- mize workplace exposures. Water, aerosol cleaners or brake washers may be used to comply with the standard.

**■ OSHA Hazard Communication (HAZCOM) Standard (right-to-know laws):** Dealers must inform employees about chemical hazards they may be exposed to in the workplace, keep chemical product information sheets on-site and accessible, and train staffers to properly handle the



hazardous materials. Also, EPA's community right-to-know rules require dealers to list annually with state and local authorities tanks of more than 1,600 gallons.

■ **OSHA lock-out/tag-out procedures:** Explain what service departments must do to ensure machines, including vehicles, are safely disengaged before being serviced.

■ **OSHA workplace health and safety standards:** Extensive regulations cover a multitude of workplace issues and practices, from chemical labeling requirements to the number of toilets required. Example: Dealerships must determine if workplace hazards warrant personal protective equipment and, if so, to train employees on its use. Verbal or online reports must be made within eight hours of any incident involving the hospitalization or death of any worker.

■ **Resource Conservation and Recovery Act (RCRA):** Comprehensive environmental law regulating many dealership functions, including underground storage tanks and the storage, management and disposal of used oil, antifreeze, mercury products and hazardous wastes, including some airbags. Underground tanks must be monitored, tested and insured against leaks; leaks and spills must be reported to federal and local authorities and cleaned up. The law

also regulates new-tank installations. Dealers must obtain EPA ID numbers if they generate more than 220 pounds per month (about half of a 55-gallon drum) of certain substances; must use EPA-certified haulers to remove the waste from the site; and must keep records of those shipments. Used oil should be burned in space heaters or hauled off-site for recycling. Used oil filters must be punctured and drained for 24 hours before disposal.

■ **Safe Drinking Water Act:** To protect underground drinking water from contamination, dealerships should avoid discharging waste liquids (such as used oil, antifreeze and brake fluid) into septic system drain fields, dry wells, cesspools or pits.

■ **Superfund (Comprehensive Environmental Response, Compensation, and Liability Act):** As waste generators, dealerships may be subject to Superfund liability. Carefully select companies to haul waste off-site. Dealers can deduct the cost of cleaning up contaminated soil and water in the year it's done. Dealers may qualify for an exemption from liability for sites involving used oil managed after 1993. The service station dealer exemption application (SSDE) requires dealers to

properly manage their oil and to accept oil from do-it-yourselfers.

■ **UNICAP:** See "New- and Used-Vehicle Sales Departments."

## Body Shop

■ **Clean Air Act (CAA):** National paint and hazardous air-pollution rules require re-formulated, environmentally safer paints and finishes, special handling procedures, and recordkeeping.

■ **EPA hazardous-waste rules:** See "RCRA" under "Service and Parts Department."

■ **OSHA Hazard Communication (HAZCOM) Standard:** See "Service and Parts Department."

■ **OSHA Respiratory Protection Standard:** Requires written programs describing how to select, fit and maintain respirators to protect body shop workers from hazardous chemicals.

■ **OSHA workplace health and safety standards:** Extensive regulations affect body shops in many ways, including mandating the use and care of protective equipment such as face masks, gloves and respirators. Hex chrome standards limit air emissions during sanding and painting. (See also "Service and Parts Department.")

■ **UNICAP:** See "New- and Used-Vehicle Sales Departments."

■ **VIN and parts marking:** Dealers may not alter, destroy or tamper with vehicle identification numbers or antitheft parts-marking ID numbers and should use only properly marked replacement parts. ❖

*Greg Cote, Doug Greenhaus, Kaye Lynch-Sparks, Paul Metrey and Brad Miller of the NADA Legal and Regulatory Affairs Department contributed to this guide. For more info, visit nada.org/regulatoryaffairs.*

Legal disclaimer: The information provided in this document does not, and is not intended to, constitute legal advice; instead, all information, content and materials are for general informational purposes only. Information in this document may not constitute the most up-to-date legal or other information. Furthermore, each dealership should consult an attorney who is familiar with federal and state law applicable and the dealership's operations to obtain advice with respect to any particular legal matter.



**National Automobile Dealers Association**
Legal and Regulatory Affairs
703.821.7040
regulatoryaffairs@nada.org
nada.org

January 2023
© NADA 2023. All rights reserved.



Submitted via www.regulations.gov

September 12, 2022

Federal Trade Commission
Office of the Secretary
600 Pennsylvania Avenue, NW, Suite CC-5610 (Annex C)
Washington, DC 20580

   Re: Motor Vehicle Dealers NPRM, File No. P204800

The National Automobile Dealers Association (NADA)[1] respectfully submits the following comments in response to the motor vehicle trade regulation rule that the Federal Trade Commission (FTC or Commission) has proposed in the above captioned matter.[2]

On July 13, 2022, the FTC issued a comprehensive proposed Motor Vehicle Dealers Trade Regulation Rule (Proposed TRR) that is unprecedented in scope and would affect tens of millions of consumer transactions annually. The proposed rule seeks to:

1. prohibit a wide range of activity;
2. establish certain advertising standards;
3. require an extensive series of oral and written disclosures governing communications with consumers related to the sales price of motor vehicles, certain credit terms, and voluntary protection products (VPPs);
4. mandate the posting of certain information on dealer websites; and
5. impose a massive set of new recordkeeping requirements.

The Commission's notice of proposed rulemaking (NPRM) is ill-conceived, ill-supported, ill-coordinated, untested, and unlawful. It also is unnecessary as each harm it seeks to address is already regulated under existing law. If finalized as proposed, the NPRM will inject massive costs into the auto retailing process, greatly extend transaction times, greatly confuse consumers, and impede efficiencies aided by technological innovations that have significantly improved – and continue to improve – the customer experience. The NPRM is severely flawed both as a matter of law and public policy. It must be withdrawn.

---

[1] NADA represents over 16,000 franchised automobile and truck dealers in all 50 states who sell, finance, and lease new and used motor vehicles and engage in service, repair, and parts sales. This includes approximately 1,800 commercial truck dealers. NADA members collectively employ 1.2 million people nationwide.
[2] Motor Vehicle Dealers Trade Regulation Rule, 87 Fed. Reg. 42,012-42,048 (Jul. 13, 2022) (to be codified at 16 C.F.R. § 463).

NATIONAL AUTOMOBILE DEALERS ASSOCIATION 8484 Westpark Drive | Suite 500 | Tysons, VA 22102 | 703.821.7000 | nada.org

**Outline of Comments**

I. The motor vehicle retailing model is efficient, consumer friendly, fundamentally sound, heavily regulated, and will not benefit from additional governmental intervention.

    a. Motor vehicle retailing in today's market.

        1. The sale of the vehicle.
        2. The disposition of the trade-in vehicle.
        3. The financing of the vehicle.
        4. The protection of the customer's investment.

    b. The positive consumer experience.

    c. The FTC's proposed restructuring of the marketplace.

II. The NPRM violates the FTC's own procedural rules and does not provide adequate transparency or notice to the public.

    a. The NPRM violates 16 C.F.R. Section 1.10's ANPRM requirement.

        1. Section 1.10 remains in effect notwithstanding Dodd-Frank.
        2. The FTC's failure to comply with Section 1.10 violates the APA.

    b. The FTC failed to gather essential information or provide adequate notice or opportunity for public engagement.

    c. The NPRM violates the PRA, RFA, and OMB requirements.

        1. The FTC failed to comply with procedural requirements in the PRA and OMB implementing regulations.
        2. The FTC failed to comply with the RFA.
        3. The FTC failed to comply with Section 1 of E.O. 12866.
        4. The FTC failed to list the Proposed TRR in the Unified Agenda of Regulatory and Deregulatory Actions as required by the RFA and E.O. 12866.

    d. The Proposed TRR impermissibly seeks to regulate the business of insurance.

III. The NPRM is based on a flawed premise and inadequate data and fails to identify a regulatory problem in need of a solution.

    a. There is nothing that mandates this action.

NADA Comments to Federal Trade Commission
Page 3 of 140
September 12, 2022

      b.      There is no regulatory hole to fill.

      c.      There is no widespread misconduct that requires or justifies this action.

          1.      Motor Vehicle Roundtables
          2.      Qualitative Research
              A.      The Flawed Survey
              B.      The Flawed Use of the Survey
          3.      Complaint Data
              A.    Inflated Numbers
              B.      Lack of Context
          4.      Enforcement Actions
              A.      FTC Enforcement Actions
              B.      Law Enforcement Partners' Actions

IV.      The specific proposed rules in the NPRM are deeply flawed.

      a.      The substantive elements are unnecessary and ill-conceived.

          1.      The prohibitions are unnecessary, already unlawful, and many are poorly
                defined.
              A.      Conflicts with FTC Act and Policy Statement on Deception
              B.      Misrepresentation Standards Lacking Clarity
          2.      The obligations violate TILA.
              A.      Transactional Disclosures
              B      Advertising Disclosures
          3.      The obligations are unnecessary and counterproductive.
              A.      Advertisements
              B.      Disclosures
                  1)      Offering Price
                  2)      Credit Terms
                  3)      "Add-ons"
                      (i)      First Required Disclosure
                      (ii)      Second Required Disclosure
                      (iii)    Third Required Disclosure
                      (iv)    Fourth Required Disclosure
              C.      Websites
                  1)      Inconsistent Treatment of "Add-on" Sellers
                  2)      Overly Broad Definitions
                  3)      Failure to Consider Menu Pricing Disclosures
              D.      Other Prohibitions
              E.      Recordkeeping

      b.      The proposed disclosures have not been consumer tested.

     c.      The proposed requirements have not been subject to an adequate cost-benefit analysis.

     d.      The proposed requirements will significantly disrupt state regulatory regimes.

     e.      The NPRM does not adequately consider detrimental reliance.

V.      Even if additional regulation were necessary, there are better alternatives to the rules proposed in the NPRM.

VI.     The proposed TRR would violate the First Amendment.

VII.    Responses to Specific Questions

VIII.   Conclusion

<u>Attachments</u>

1)      NADA Letter to DOD re: Military Lending Act
2)      GAP Waiver Study
3)      NADA Extension Request to FTC
4)      *Back to the Future: How Not To Write A Regulation*
5)      Preamble to FTC submission to OMB for Fall 2021 Unified Agenda
6)      Preamble to FTC submission to OMB for Spring 2022 Unified Agenda
7)      NADA Comments to FTC re: Auto Buyer Consumer Survey (I)
8)      NADA Comments to FTC re: Auto Buyer Consumer Survey (II)
9)      *A Critique on the Limitations of the Recent FTC "Auto Buyer Study"*
10)    FRB Summary of Considerations when calculating the TILA/Reg Z "Finance Charge"
11)    Sample Disclosure - *Cash Price without Optional Add-ons*
12)    Sample Disclosure - *Cash Price without Optional Add-ons in a Financed Transaction*
13)    Sample Disclosure - *Itemization of Optional Add-ons*
14)    Sample Disclosure - *Express, Informed Consent*
15)    Examples of Multiple Rebate Listings for Same Vehicle
16)    GM Accessories available for 2022 Silverado Short Bed Crew Cab
17)    ABA Resolution 116B
18)    Paperwork Reduction Act Analysis Chart
19)    Regulatory Flexibility Act Analysis Chart
20)    *FTC Needs to Run Those Numbers Again*
21)    *NADA/NAMAD/AIADA Model Dealership Voluntary Protection Products Policy*
22)    *NADA/NAMAD/AIADA Fair Credit Compliance Policy & Program*
23)    *Know Before You Buy* brochure

# Comments

I.     The motor vehicle retailing model is efficient, consumer friendly, fundamentally sound, heavily regulated, and will not benefit from additional governmental intervention.

In assessing the FTC's comprehensive proposal to restructure multiple aspects of motor vehicle retailing in the United States, it is essential to consider key features of the current marketplace and how they serve consumers in an efficient and competitive manner and protect them from deception or manipulation by the very small number of bad actors.

a.     Motor vehicle retailing in today's market.

The process of selling a motor vehicle involves multiple necessary components that do not lend themselves to a rapid transactional experience.  Every sales transaction consists of up to four major segments, including the sale of the vehicle, the disposition of the trade-in vehicle, the financing of the vehicle, and the protection of the customer's investment.  As briefly explained below, each of these segments offers value and convenience to consumers but also involves the need to perform operational tasks and comply with applicable legal requirements.

1.     The sale of the vehicle.

The sale of motor vehicles involves multiple components that require the expenditure of considerable resources by motor vehicle dealers, provide significant value to consumers, and are subject to extensive preexisting regulation at the federal and state level.

On the front end of the process, motor vehicle dealers must acquire and store inventory (which typically must be financed via a wholesale "floor plan" line of credit), retain and train a sales force, provide necessary overhead support (buildings, computer hardware and software, electronic equipment, etc.), execute requirements associated with vehicle inventory such as preparing and affixing Used Car Buyers Guides on used vehicles,[3] comply with disclosure and other requirements applicable to warranties,[4] and advertise and market their products and services.  Dealership employees then engage their customers through a variety of channels (e.g., customer visits to showrooms, customer phone calls, and customer e-mails, text messages, and online chats), explain the features and pricing of their products and services, conduct test drives, and complete an array of required tasks associated with the sale and delivery of the vehicle.  A series of federal duties and restrictions apply to customer communications, including the

---

[3] Used Motor Vehicle Trade Regulation Rule, 16 C.F.R. § 455.2(a).
[4] Rules, Regulations, Statements and Interpretations Under the Magnuson-Moss Warranty Act, 16 C.F.R. Subchapter G.

Telephone Consumer Protection Act,[5] Junk Fax Prevention Act,[6] CAN-SPAM Act,[7] and Telemarketing Sales Rule.[8]  Numerous requirements also govern advertising at both the federal[9] and state level.

Sale and delivery tasks typically require: screening potential buyers against the List of Specially Designated Nationals maintained by the Office of Foreign Assets Control (OFAC); preparing and executing a Buyer's Order (the contractual agreement governing the sale of the vehicle); preparing and delivering a federal Odometer Disclosure Statement;[10] delivering the Monroney Label in a new vehicle transaction[11] and a Used Car Buyer's Guide in a used vehicle transaction;[12] complying with federal credit and debit card truncation requirements;[13] executing other tasks and/or transaction specific documents that could arise (e.g., the FTC Mail, Internet, or Telephone Order Merchandise Rule[14] and IRS/FinCEN Form 8300 Cash Report[15]); preparing tax, title, and registration documents and completing any associated state filing requirements; and fulfilling any additional state obligations.

In addition to the foregoing legal requirements, the FTC possesses broad enforcement authority to address unfair and deceptive acts and practices (UDAP) under Section 5 of the FTC Act. Each state also possesses independent state-law UDAP enforcement authority.  In addition, over half of the states further regulate motor vehicle sales transactions[16] and each provides remedies for contract law violations.

---

[5] Telephone Consumer Protection Act, 47 U.S.C. § 227.

[6] Junk Fax Prevention Act, 47 U.S.C. § 227; Junk Fax Prevention Act, 47 C.F.R § 64.1200.

[7] Controlling the Assault of Non-Solicited Pornography and Marketing Act (CAN-SPAM), 15 U.S.C. § 103; CAN-SPAM Act, 16 C.F.R. § 316.

[8] Telemarketing Sales Rule, 16 C.F.R. § 310.

[9] *See generally Advertising and Marketing*, FTC, https://www.ftc.gov/business-guidance/advertising-marketing (last visited Sept. 9, 2022).

[10] Odometer Disclosure Requirements, 49 C.F.R. § 580.

[11] *See* Label and entry requirements, 15 U.S.C. § 1232; Vehicle labeling of fuel economy, greenhouse gas, and other pollutant emissions information, 49 C.F.R. § 575.401(c)(4); and Fuel economy information, 49 U.S.C. § 32908(b).

[12] Used Motor Vehicle Trade Regulation Rule, 16 C.F.R. § 455.3(a).

[13] Fair and Accurate Credit Transaction Act, 15 U.S.C. § 1681c.

[14] FTC Mail, Internet, or Telephone Order Merchandise Rule, 16 C.F.R. Part 435.

[15] IRS Cash Reporting Rule, 26 U.S.C § 6050I.

[16] *See* Alaska Stat. § 45.25.610; Ariz. Rev. Stat. Ann. §§ 44-281 - 44-295; Cal. Civ. Code §§ 2981 - 2984.6; Colo. Rev. Stat. § 6-1-708; Del. Code Ann. tit. 5, §§ 2901 - 2915; Fla. Stat. §§ 520.01 - 520.14; Ga. Code Ann. §§ 10–1– 30 - 10–1–42; Haw. Code R. §§ 437-31.5 - 437-32; 815 Ill. Comp. Stat. §§ 375/1-§375/26.1; Ky. Rev. Stat. Ann. §§ 190.09 - 190.140; La. Stat. Ann. §§ 969.1 - 969.54; Md. Code Ann., Transp. Law. § 15-311; Mass. Gen. Laws ch. 255B, §§ 1 – 25; Mich. Comp. Laws §§ 492.101 - 492.151; Minn. R. §§ 53c.01 - 53c.14; Miss. Code Ann. §§ 63–19–1 - 63–19–57; Mo. Rev. Stat. §§ 365.01 - 365.200; Nev. Rev. Stat. §§ 97.297 - 97.304; N.H. Rev. Stat. Ann. §§ 361–a:1 - 361–a:13; N.J. Rev. Stat. §§ 39:10–1 - 39:10–25; N.M. Stat. Ann. §§ 57–11–1 - 57–11–13; N.Y. Pers. Prop. Law §§ 301 - 316; Ohio Rev. Code Ann. §§ 4517.40 - 4517.42; Or. Admin. R. §§ 83.510 - 83.680; 12 Pa. Cons. Stat. §§ 6201- 6275; Tex. Fin. Code Ann. §§ 348.001 - 348.606; Vt. Stat. Ann. tit. 9, §§ 2351 - 2362; Wis. Stat. § 218.0142.

While significant strides have been – and continue to be – made to streamline the sales and delivery process, it is not fast or easy as it still requires the execution of multiple steps and the need to comply with a series of consumer protection mandates at the federal and state level. Nevertheless, motor vehicle dealer retailing today is a community-based apparatus that effectively delivers over 40 million vehicles to consumers every year by franchised and independent motor vehicle dealers.[17]

### 2.    The disposition of the trade-in vehicle.

As part of the optional services motor vehicle dealers provide, a consumer may trade in a vehicle when purchasing a replacement vehicle and many choose to do so.[18]  This offers consumers (i) significant convenience by eliminating the need to market and sell their vehicle to another commercial establishment or private party and by facilitating necessary transactional requirements such as securing title transfers and lien releases, and (ii) a source of competitive pricing for their vehicles.

The disposition of trade-in vehicles requires motor vehicle dealers to execute a series of tasks such as appraisals, handling transactional requirements involving titles, liens, tags, and state personal property or excise taxes; ensuring any negative equity is properly disclosed if the consumer chooses to finance the replacement vehicle through the dealer;[19] and managing all of the functions and absorbing the corresponding overhead costs necessary to dispose of the trade-in vehicle at the dealership or through a wholesale auction.

The dealer's purchase of the trade in vehicle is subject to many of the requirements and restrictions listed above that apply to the dealer's sale of the replacement vehicle, including federal and state UDAP restrictions, supplemental state laws,[20] and state contract law requirements.

If consumers choose to dispose of their current vehicle through other means, they still must manage the tasks associated with its disposition. For example, the presence of negative equity

---

[17] Franchised and independent motor vehicle dealers delivered 41,906,758 new and used motor vehicles to consumers in 2021. *See* S&P Global; Wards Intelligence; NADA.

[18] In 2021, 50.3% of new vehicle deliveries involved a trade-in vehicle, while 38.1% of used vehicle deliveries involved a trade-in vehicle. *See* J.D. Power. J.D. Power, 2021 U.S. Sales Satisfaction Index (SSI) Study (2021).

[19] Consumer Leasing (Regulation M), 12 C.F.R. § 213.2(f). *See also* Supplement I to § 226 - Official Staff Interpretation to Regulation Z, 12 C.F.R. § 226.2(a)(18)(3).

[20] *See, e.g.*, Ark. Code Ann. 23-112-316, imposing a series of restrictions on the conditional sale of vehicles, including the disposition of a customer's trade-in vehicle.  Many other states impose similar restrictions. *See* Alaska Stat. § 45.25.500; Ariz. Rev. Stat. Ann. § 44-286; Cal. Veh. Code § 11709.4; Colo. Rev. Stat. § 6-1-708; Conn. Gen. Stat. § 14-62; Del. Code Ann. tit. 5, § 2907; 815 Ill. Comp. Stat. 636 / 15 and 815 Ill. Comp. Stat. 375 / 13; La. Stat. Ann. § 32:796; Me. Stat. tit. 10, § 1194; Md. Code Ann., Transp. § 15-311.3; Mass. Gen. Laws ch. 255B, § 13; Mich. Comp. Laws § 445.853; Miss. Code Ann. § 63-19-31; Mo. Rev. Stat. § 365.07; Mont. Code Ann. § 31-1-232; Nev. Rev. Stat. § 598.092; N.H. Rev. Stat. Ann. § 361-A:7; N.M. Stat. Ann. § 58-19-7; N.Y. Bus. Corp. Law § 198-c; Or. Rev. Stat. § 646A.090; Tex. Fin. Code Ann. § 348.013; Utah Code Ann. § 348.013; Vt. Stat. Ann. tit. 9, § 2355; Vt. Stat. Ann. tit. 9, § 2355.

on their existing vehicle does not disappear because they have chosen to sell the vehicle to another commercial establishment or private party instead of a motor vehicle dealer. Their current lien must be paid off, the title on their current vehicle must be released, and a host of other tasks must be performed as part of the sale process. Consequently, having the ability to execute these tasks at the same time and by the same business that sells the consumer the replacement vehicle is a very attractive feature of today's marketplace.

3.    The financing of the vehicle.

Franchised motor vehicle dealers also typically offer – and a large percentage of consumers enthusiastically elect and benefit from – financing from the motor vehicle dealer to purchase the motor vehicle they have selected. While some franchised motor vehicle dealers offer in-house financing for consumers who require but cannot secure financing for a motor vehicle purchase from other finance sources (which is typically referred to as "Buy Here Pay Here" financing), franchised dealers routinely engage in indirect vehicle financing to meet their customers' financing needs.

Indirect or three-party vehicle financing transactions provide an efficient and convenient means for consumers to arrange financing through the same dealership from which they purchase their vehicles. This optional means of financing has provided millions of consumers with access to competitively priced credit for their vehicle purchases.

The efficiency that makes it cost effective for finance sources to outsource to dealers the retail distribution of their financial products stems from the fact that each creditor involved in the finance transaction (the dealer as the initial creditor and the finance source as the assignee creditor) performs distinct functions that do not overlap and that match their respective capabilities.

Dealers establish relationships with prospective vehicle purchasers, take their applications for financing, and send the applications to either some or all of the many finance sources with which they conduct business (typically determined by matching the consumer's credit report to the finance sources' lending parameters). Finance sources thereupon conduct thorough and highly sophisticated underwriting on the finance applications they receive using their own proprietary systems, which include an analysis of risk-based factors such as loan-to-value (LTV) and debt-to-income ratios, verification of employment, and routine entries on the applicant's credit report (e.g., credit score, number of delinquent accounts, bankruptcy filings, etc.). Based on this analysis, the finance source determines whether, and at what wholesale rate, it will take assignment of the credit contract from the dealer. For consumers whose credit applications have been approved by at least one finance source, dealers will offer financing at a retail rate and, if the consumer consents to the terms, enter into a credit or lease contract with the consumer and then immediately assign it to the finance source.

Dealers thus do not consummate the credit or lease contract with the consumer until after the finance source has conducted underwriting and agreed to take assignment of the contract. This arrangement is necessary as dealers typically are not equipped to either serve as their own finance source or conduct the necessary underwriting.

The retail rate that is offered to the consumer reflects the separate functions performed by the finance source, in its capacity as the underwriter, source of the funds for the vehicle purchase, and servicer of the credit or lease contract during its life, and the dealer, in its capacity as the retail distributor of the financial product. The wholesale "buy" rate set by the finance source includes the entire risk premium, along with the finance source's costs of funds, loan production and servicing costs, and return on investment on its costs. The retail margin that the dealer adds to the wholesale buy rate (known as "dealer participation") does not include a risk premium, but rather consists of the dealer's loan distribution costs and return on investment on those costs.

Motor vehicle dealers must perform a series of government-imposed obligations related to the functions they perform when extending optional financing to consumers. These include, but are not limited to, complying with the following requirements:

(i)    Fair Credit Reporting Act (FCRA):
    a)    Obligations of Users of Credit Reports;[21]
    b)    Affiliate Information Sharing;[22]
    c)    Affiliate Marketing Rule;[23]
    d)    Prescreen Opt-Out Notice Rule;[24]
    e)    Red Flags Rule;[25]
    f)    Address Discrepancy Rule;[26]
    g)    Disposal Rule;[27]
    h)    Fraud and active-duty alerts;[28]
    i)    Victim requests for records;[29]
    j)    Medical Information (FRB[30] Regulation FF);[31]
    k)    Risk-Based Pricing Rule; and
    l)    Adverse Action Notices;
(ii)    Gramm Leach Bliley (GLB) Act:[32]

---

[21] 16 C.F.R. Part 601, Appendix C.
[22] 15 U.S.C. § 1681(d)(2)(A)(iii).
[23] 16 C.F.R. § 680.
[24] 16 C.F.R. § 642.
[25] 16 C.F.R. § 681.
[26] 16 C.F.R. § 641.
[27] 16 C.F.R. § 682.
[28] 15 U.S.C. § 1681c–1.
[29] *Id.*
[30] Board of Governors of The Federal Reserve System (FRB).
[31] Obtaining and Using Medical Information in Connection with Credit (Regulation FF), 12 C.F.R. § 232.
[32] Gramm–Leach–Bliley Act, Pub. L. No. 106–102, 113 Stat. 1338 (1999).

NADA Comments to Federal Trade Commission
Page 10 of 140
September 12, 2022

        a)      Privacy Rule;[33] and

        b)      Safeguards Rule;[34]

(iii)     Equal Credit Opportunity Act (ECOA) and FRB Regulation B;[35]

(iv)     Federal Consumer Leasing Act (CLA) and FRB Regulation M;[36] and

(v)     Federal Truth In Lending Act (TILA) and FRB Regulation Z.[37]

TILA and Regulation Z require that dealer-creditors provide consumers with a series of credit disclosures that appear prominently on the front of the retail installment sale contract (RISC). The CLA and Regulation M similarly require that dealer-lessors provide consumers with a series of lease disclosures that appear prominently on the front of the lease agreement.

In addition, the FTC possesses broad UDAP enforcement authority under Section 5 of the FTC Act, and it imposes additional requirements applicable to motor vehicle dealers. For example, the FTC Holder In Due Course Rule requires sellers to include in consumer credit contracts a notice concerning claims and defenses.[38]

---

[33] 16 C.F.R. § 313.

[34] 16 C.F.R. § 314.

[35] 15 U.S.C. § 1691. *See also* 12 C.F.R. § 202.

[36] 15 U.S.C. § 1667. *See also* 12 C.F.R. § 213.

[37] 15 U.S.C. § 1601. *See also* 12 C.F.R. § 226.

[38] 16 C.F.R. § 433. In November 2010, the Commission conducted a compliance sweep of 50 motor vehicle dealers and two large online dealers in 45 states that fount "broad compliance" with the rule (a finding which the NPRM fails to include in any of its multiple references to the FTC's 2010-2011 Motor Vehicle Roundtables discussed below). *See FTC Finds Broad Compliance Among Auto Dealers with Rule That Protects Consumers with Car Loans,* FTC, (May 16, 2011), https://www.ftc.gov/news-events/news/press-releases/2011/05/ftc-finds-broad-compliance-among-auto-dealers-rule-protects-consumers-car-loans-0.

NADA Comments to Federal Trade Commission
Page 11 of 140
September 12, 2022

Each state also possesses independent state-law UDAP enforcement authority, and virtually every state has enacted a law that further regulates consumer credit sales.[39] And every state has a statute addressing consumer leasing, with many of them specific to motor vehicle leasing.[40]

---

[39] *See* Ala. Code §§5-19-1 - 5-19-33 and Ala. Admin. Code r. 155-2-2-.01 - 155-2-2-.18; Alaska Stat. §§ 45.10.010 - 45.10.230; Ariz. Rev. Stat. Ann. §§ 44-281 - 44-295; Cal. Civ. Code §§ 1801 - 1812.20; Colo. Rev. Stat. §§ 5-1-101 - 5-9-102.5; Conn. Gen. Stat. §§ 36a-770 - 36a-788; Del. Code Ann. tit. 6, §§ 4301 - 4351; Fla. Stat. §§ 520.01 - 520.999 and Fla. Admin. Code Ann. r. 69V-60.001 - 69V-60.075; Ga. Code Ann. §§ 10-1-1 - 10-1-16; Haw. Code R. §§ 476-1 - 476-32; Idaho Code §§ 28-41-101 - 43-405; 205 Ill. Comp. Stat. §§ 660/1 - 660/20, §§ 670/1 - 670/27, §§ 405/1 - 405/33 and Ill. Admin. Code tit. 38, §§ 110.1- 110.430, § 160.1- §160.270; Ind. Code §§ 24-4.5-1-101 - 24-4.5-2-502 and Ind. Code §§ 24-5-2-21 - 24-5-2-24; Iowa Code §§ 537.1101 - §537.5302 and Iowa Admin. Code r. 61-10.1 - 61-14.1; Kan. Admin. Regs. §§ 16a-1-101, 16a-9-102 and Kan. Admin. Regs. §§ 75-6-9, 75-6-23, 75-6-26, 75-6-30 - 75-6-38; Ky. Rev. Stat. Ann. §§ 371.210 - 371.330; La. Stat. Ann. §§ 9:3510 - §9:3565, 10: XI.701 - §10:XI.905; Me. Stat. tit. 9a, §§ 1-101 - 8-511; Md. Code Ann., Com. Law. §§ 12-601 - 12-636; Mass. Gen. Laws ch. 255D, §§ 1 - 32 and 209 Mass. Code Regs. §§ 32.01 - 32.04; Mich. Comp. Laws §§ 445.851 - 445.873 and Mich. Admin. Code r. 125.1405; Minn. R. §§ 325G.15 - §325G.16, 53C.01 - 53C.14; Miss. Code Ann. §§ 63-19-31 - 63-19-45; Mo. Rev. Stat. §§ 364.010 - 364.070, 365.010 - 365.200, 408.250 - 408.380, 1140-3.020 -§1140-3.041; Mont. Code Ann. §§ 31-1-201 - §31-1-243; Neb. Rev. Stat. §§ 45-334 - § 45-353; Nev. Rev. Stat. §§ 97.015 - 97.335, 675.005 - 675.080; N.H. Rev. Stat. Ann. §§ 358-K:1 - 358-K:6, 361-A:1 - 361-C:4; N.J. Rev. Stat. §§ 17:16C-1 - 17:16C-103; N.M. Stat. Ann. §§ 56-1-1 - 56-1-16; N.Y. Pers. Prop. Law §§ 401 – 422, § 91.1 -§92.7; N.C. Gen. Stat. §§ 25A-1 - 25A-45; N.D. Cent. Code §§ 51-13-01 - 51-13-08; Ohio Rev. Code Ann. §§ 1317.01 - 1317.99; Okla. Stat. tit. 14a, §§ 1-101 - 9-101; Or. Admin. R. §§ 83.010 - 83.190; 12 Pa. Cons. Stat. §§ 6101 - 6355; 6 R.I. Gen. Laws §§ 6-27-1 - 6-27-11; S.C. Code Ann. §§ 37-2-101 - 37-2-416; S.D. Sess. Laws §§ 54-3A-1 - 54-3A-25; Tenn. Code Ann. §§ 47-11-101 - 47-11-111; Tex. Fin. Code Ann. §§ 345.001 - 345.357 and 7 Tex. Admin. Code §86.101 - 86.102; Utah Admin. Code r. §§ 70C-1-101 - 70C-8-203, 335-2-1 - 335-2-6; Vt. Stat. Ann. tit. 9, §§ 2351 - 2410; Wash. Rev. Code §§ 63.14.010 - 63.14.926; W. Va. Code R. §§ 46A-1-101- 46A-5-106 and W. Va. Code R. §§ 106-1-1 - 106-1-3, 106-11-1 - 106-11-7; Wis. Stat. §§ 421.101 - 422.422 and Wis. Admin. Code §§ 76.01 - 76.13; Wyo. Stat. Ann. §§ 40-14-101- 40-14-702 and 21-7 Wyo. Code R. § 1-5.

[40] *See* Ala. Code §§ 7–2a–101; Alaska Stat. §§ 45.12.101 - 45.12.532; Ariz. Rev. Stat. Ann. §§ 47–2a101 - 47–2a532; Cal. Civ. Code §§ 2985.7-2994; Colo. Rev. Stat. §§ 4–2.5–101 - 4–2.5–533 and Colo. Rev. Stat. §6-1-708; Conn. Gen. Stat. §§ 42–390 - 42-449 and Conn. Gen. Stat. §§ 42–270 - 42-279; Del. Code Ann. tit. 6, §§ 2a–101 - 2a–532; Fla. Stat. §§ 680.101 - 680.532 and Fla. Stat. § 520.07; Ga. Code Ann. §§ 11–2a–101 - 11–2a–532 and Ga. Code Ann. §10-1-39; Haw. Code R. §§ 490:2a –101 - 490:2a–532, Haw. Code R. § 437-31.5, and Haw. Code R. §§ 481L-1 - 481L-4; Idaho Code §§ 28–12–101 - 28–12–532; 815 Ill. Comp. Stat. §§ 636/1-636/999; Ind. Code §§ 26–1–2.1–101 - 26–1–2.1–532; Iowa Code §§ 554.13101 - 554.13532; Kan. Admin. Regs. §§ 84–2a–101 - 84–2a–532; Ky. Rev. Stat. Ann. §§ 355.2a–101 - 355.2a–532; La. Stat. Ann. §§ 3301 - 3342; Me. Stat. tit. 11, §§ 2–110 - 2–1532; Md. Code Ann., Com. Law. §§ 14–2001 - 14–2010); XV Mass. Code Regs. Chapter 106 §§ 2a–101 - 2a–532; Mich. Comp. Laws §§ 445.991 - 445.995; Minn. R. §§ 336.2a–101 - 336.2a–531; Miss. Code Ann. §§ 75–2a–101 - 75–2a–532; Mo. Rev. Stat. §§ 400.2a–101 - 400.2a–532; Mont. Code Ann. §§ 30–2a–101-30–2a–532; Neb. Rev. Stat. §§ 2a–101-2a–532; Nev. Rev. Stat. §§ 100.095 - 100.180; N.H. Rev. Stat. Ann. §§ 361–D:1 - 361–D:28; N.J. Rev. Stat. §§ 12a:2a–101 - 12a:2a–532; N.M. Stat. Ann. §§ 55–2a–101 - 55–2a–532; N.Y. Pers. Prop. Law §§ 9-a-330-9-a-353; N.C. Gen. Stat. §§ 25–2a–101 - 25–2a–532; N.D. Cent. Code §§ 41–02.1–01 - 41–02.1–80; Ohio Rev. Code Ann. §§ 1310.01 - 1310.78; Okla. Stat. tit. 12a, §§ 2a–101 - 2a–532; Or. Admin. R. §§ 72a.1010 - 72a.5310; 13 Pa. Cons. Stat. §§ 2a101-2a532; 6a-2.1 R.I. Code R. §§ 101-532; S.C. Code Ann. §§ 36–2a–101-36–2a–532; S.D. Sess. Laws §§ 25–2a–101 - 25–2a–532; N.D. Cent. Code §§ 47–2a–101 - 47–2a–532; Tex. Fin. Code Ann. §§ 348.001 - 348.014; Utah Admin. Code r. §§ 70a–2a–101 - 70a–2a–534; Vt. Stat. Ann. tit. 9a, §§ 2a–101-2a–532; 8.2a Va. Code Ann. §§ 8.2a–101 - 8.2a–532; Wash. Rev. Code §§ 62a.2a.101 - 62a.2a–532; W. Va. Code R. §§ 46–2a–101 - 46–2a–532; Wis. Stat. §§ 429.101-429.301; Wyo. Stat. Ann. §§ 34.1–2.a–101 - 34.1–2.a–532.

NADA Comments to Federal Trade Commission
Page 12 of 140
September 12, 2022

These requirements, many of which involve notice requirements, require time to execute. Nevertheless, optional dealer financing injects enormous competition into the marketplace that disciplines financing rates that are offered to consumers, and it provides government regulated financing to large numbers of consumers who cannot otherwise secure financing for their essential transportation needs.

> 4.    The protection of the customer's investment.

Motor vehicle dealers also offer their customers VPPs that can protect their investment in the motor vehicle being purchased and the financing commitment for that purchase.  These products offer a range of protection against the occurrence of different events (e.g., costly vehicle repairs, windshield cracks, tire and wheel damage, key fob loss, standard maintenance, and amounts owed on a finance contract when a vehicle is declared a total loss), and their utility and value can differ depending on the circumstances of the customer and the vehicle being purchased. While these products offer value to any consumer, they are particularly valuable to consumers who cannot self-insure against these events and would experience financial hardship if they were to occur.[41]  This provides consumers who are particularly vulnerable to such a loss with a convenient mechanism to budget against it, and it provides them peace of mind knowing that they have protection against these occurrences.

Motor vehicle dealers typically present consumers with VPP options when the consumer knows which vehicle the consumer will purchase and thus has some context for knowing which VPPs to consider.  (As with the timing of Truth In Lending disclosures, which must be presented "before consummation of the transaction,"[42] this offers the information at the time that is most relevant to the consumer.)   The dealer typically utilizes a simple and easy-to-read menu format to present these options and records the consumer's election to either purchase or decline these products.

Not surprisingly, many consumers decide to purchase VPPs, although the Commission overstates the percentage of such consumers.[43]  And consumers who purchase VPPs from motor vehicle dealers display a high level of satisfaction with these products and frequently purchase them again when buying subsequent vehicles.[44]  In addition, as reflected in a 2019 letter that NADA sent to the Department of Defense (DOD) after its subsequently withdrawn

---

[41] Many organizations have reported on this concern.  *See, e.g.*, Ellen Edmonds, *One-in-Three U.S. Drivers Cannot Pay for an Unexpected Car Repair Bill*, AAA, (Apr. 4, 2017), https://newsroom.aaa.com/2017/04/one-three-u-s-drivers-cannot-pay-unexpected-car-repair-bill/.

[42] 12 C.F.R. § 226.17(b).

[43] The Commission cites NADA data in support of its statement that "approximately 94% of new vehicle sales and 86% of used vehicle sales includes an optional add-on." 87 Fed. Reg. at 42,032 and Footnote 162.  This is incorrect as these percentages reflect the frequency with which a consumer elects either or both dealer-financing and at least one VPP.  NADA's 2021 data reflects the following VPP penetration rates: New vehicles - 50.8% for service contracts, 15.3% for GAP Waiver, and 13.4% for maintenance plans; Used vehicles – 56.1% for service contracts, 18.2% for GAP Waiver, and 6.2% for maintenance plans.

[44] *See* Section I.c below and Attachment 2.

NADA Comments to Federal Trade Commission
Page 13 of 140
September 12, 2022

interpretation of the Military Lending Act effectively precluded service members and their dependents from being able to purchase optional Guaranteed Asset Protection (GAP) Waiver, the loss of availability of these products can present a serious hardship to consumers. (See Attachment 1).[45]

Numerous protections are afforded to consumers as part of the VPP sales process. In addition to the fact that *voluntary* protection products are, as their name suggests, completely voluntary, many of them may be cancelled by consumers for a full refund during the initial period of the product's coverage and for a *pro rata* refund thereafter.

In addition, TILA and Regulation Z require that, in order to exclude the premiums for these products from the finance charge and include them in the amount financed (which is standard in the industry), the creditor must disclose the premium and voluntary nature of the product and the consumer must separately sign for it.[46] Thus, consumers do not purchase these products until they have separately signed for them, and this is in addition to the menu election they have made, any separate contract addenda they may be required sign, state contract law protections, and any additional state law requirements that may apply.[47] And both the FTC and the States may independently exercise their UDAP enforcement authority in the limited instances when VPP violations arise. Therefore, consumers who purchase these products do so in a highly regulated environment.

Collectively, each major phase of the car buying process, which is executed by personnel in different dealership departments who are trained to perform the functions of their department, involves cost and effort, requires time (a considerable portion of which is devoted to executing required government disclosures), offers value and convenience to consumers, and contains built in protections for consumers on both the front end of the car buying process and remedially should bad acts occur.[48] It is not in need of further regulation.

As is evident from this overview, purchasing a motor vehicle is a multifaceted transaction that significantly differs from the purchase experience for other consumer products and services. Consequently, any use of the latter as a metric to measure the former is inapposite and would yield an apples-to-oranges comparison. In addition, the Commission's criticism of the "high volume of dense information [that consumers are presented with] during the long and complex

---

[45] This is expressly recognized by the State of Louisiana which *requires* sellers to "offer the consumer the option of voluntarily purchasing gap coverage protecting the consumer from possible liability as a result of the consumer's property insurance being insufficient to fully pay and satisfy the unpaid balance under the consumer's contract as a result of a total loss of vehicle…." La. Stat. Ann. § 6:969.26.D.

[46] 12 C.F.R. § 226.4(d).

[47] *See, e.g.,* Cal. Veh. Code §§ 11713.18-11713.21.

[48] And additional protections exist as dealers must maintain their motor vehicle license, abide by the terms of the manufacturer-dealer sales and service agreement, and contend with all the adverse consequences that result from negative publicity incurred by a community-based business. In addition, further protections exist for certain group of consumers, such as service members. *See* 32 C.F.R. Part 631 (establishing procedures for military commanders to declare off-limits to service members businesses which engage in "unfair commercial or consumer practices.")

NADA Comments to Federal Trade Commission
Page 14 of 140
September 12, 2022

motor vehicle buying or leasing experience,"[49] which the Commission repeats throughout the NPRM, fails to recognize (i) the time needed to complete the multiple functions at each stage of this process, and (ii) as noted above, the fact that much of this time is needed to satisfy requirements that are imposed by the FTC and other federal and state agencies.

Even more confounding (and discussed in greater detail below) is the fact that the Commission's response to this "long and complex" process that involves a "high volume of dense information" is to add to it by requiring motor vehicle dealers to build into the sales process several new, confusing, dense, and redundant disclosures on multiple topics.

Equally concerning is that the Commission's proposals do not account for – and will only serve to frustrate – significant strides that have been made by motor vehicle dealers and their technology vendors to complete the required tasks in a more streamlined fashion. Innovation and competition have produced and resulted in the emergence and widespread adoption of improved in-store technologies and online sales to facilitate the purchasing experience. This positive trend should be encouraged and allowed to further develop without interference by the Commission.

> b.    The positive consumer experience.

The efficiencies provided by the current auto retailing model and its benefits to consumers are fully demonstrated by a wide range of data much of which is publicly available. These data, which the Commission has apparently not sought or even taken notice of, establish that the overwhelming majority of Americans are quite satisfied with their vehicle acquisition experiences. And these data speak both to consumers' general satisfaction with the car buying process and to their positive reactions to some of the specific sub-elements of that process that are the focus of the Proposed TRR. Of course, as with any sector of the economy, these data do not suggest that the process is perfectly executed in every transaction. But the fact that a small minority of consumers report some dissatisfaction with their experiences underscores that both (1) the data are valid (in that, given the size of the market, some level of dissatisfaction is inevitable) and (2) no systemic problem exists that warrants the radical restructuring that the Proposed TRR would bring.

Despite many unfounded stereotypes to the contrary, the public record contains ample data demonstrating that consumers are generally very happy with their experiences acquiring automobiles. For example, the Sales Satisfaction Index (SSI) compiled by renowned market research firm J.D. Power shows that overall customer satisfaction with all dealers (both those where they bought and those they interacted with but did not buy from) is high, scoring 789 on a 1,000-point scale in 2021.[50] Further, satisfaction with those dealers where buyers actually

---

[49] 87 Fed. Reg. at 42,025.
[50] *Despite Lack of New-Vehicle Inventory, Sales Satisfaction Unchanged from Year Ago, J.D. Powers Finds*, J.D. POWER, (Nov. 10, 2021), https://www.jdpower.com/business/press-releases/2021-us-sales-satisfaction-index-ssi-study.

purchased their vehicle is even higher, scoring 841 on the same scale.[51]  Similarly, the 2021 Cox Automotive Car Buyer Journey Study (2021 Cox Study) indicates that a full 78% of new car buyers are *highly* satisfied with their experience at their dealership of purchase.[52]  (And when additional data Cox provided to NADA is considered, which includes both moderately satisfied and highly satisfied customers, the combined overall satisfaction percentage jumps to 93 percent.)

Finally, even comments filed in this rulemaking docket demonstrate significant consumer satisfaction with the nation's auto dealers. For example, the Institute for Regulatory Analysis and Engagement (IRAE) submitted an analysis of over 300,000 randomly selected Google reviews of U.S. car dealerships.[53]  This sampling came from every state and included reviews of more than 11,000 different dealerships.  IRAE found the following:

- On average, dealers achieved an overall rating of 4.47 on a 5 star scale.
- Approximately 80 percent of the reviews in the set gave the subject dealer a full 5 star rating.
- The average rating has grown steadily over time, increasing from 4.25 in 2015 to 4.54 in 2022.

Supplementing this public information is data from DealerRater.com, a leading dealer review platform with more than 11 million consumer reviews of dealerships and dealership experiences on file.  DealerRater shared data with NADA from 2012-2022, and this information confirms what is shown in the J.D. Power and Cox data – namely, that American car buyers are very satisfied with their experiences at the nation's car dealerships.  Specifically, during that period, DealerRater collected just over 8 million consumer reviews of dealers, of which over 7.5 million were positive while approximately 500,000 were negative.  This means that during this nearly 11-year range, 93.7 percent of the consumers who submitted ratings to DealerRater viewed their dealers favorably while only 6.3 percent had negative reactions.  Further, during the time from January 1, 2019 through August 17, 2022 – a period in which DealerRater received over 3 million consumer reviews of dealers – only 12,730 of those (or 0.3 percent)

---

[51] *Id.*

[52] *2021 Cox Automotive Car Buyer Journey Study Overview*, COX AUTOMOTIVE, (Jan. 2021). Available at: https://www.coxautoinc.com/wp-content/uploads/2022/01/2021-Car-Buyer-Journey-Study-Overview.pdf. Although the study found that buyer satisfaction with price declined, it noted that buyers recognized the impact of the chip shortage on vehicle inventory and were still highly satisfied with their dealer experience.  *See also Despite Inventory Shortage, High Prices, Overall Car Buyer Satisfaction Remains Near Record Levels, According to Cox Automotive Study*, COX AUTOMOTIVE, (Jan. 18, 2022), https://www.coxautoinc.com/news/2021-car-buyer-journey-study/. Oddly, the Commission cites the 2020 version of this study in connection with its cost/benefit analysis, but omits any reference to this later study (which was available at the time the Proposed TRR was published).

[53] Andrew Langer, Comment Letter on *Federal Trade Commission Proposed Rulemaking on Motor Vehicle Dealers Trade Regulation, 87 FR 42012, Document Number 2022-14214*, (Sept. 8, 2022), https://www.instituteforreganalysis.org/motor-vehicles
.

were negative reviews mentioning "bait & switch" and only 754 (or less than 0.02 percent) were negative reviews mentioning extra fees, junk fees, or surcharges.[54] (These latter data also track what the IRAE analysis mentioned above found.  In IRAE's data set, only 361 of the reviews (or just over one tenth of one percent) mentioned either the term "bait and switch" or "junk fees."  IRAE further notes that 50 of those 361 reviews actually gave the dealer a 5 star rating, "principally because the customer was expressing appreciation for *not* having had a negative experience.")

Relevant data concerning consumer satisfaction with the auto retailing process are not limited to just these general impressions about the process as a whole.  There are also important data available regarding some of the key areas of focus of the Proposed TRR.  One of those key areas is the dealership finance office, as the proposal suggests that dealers are rampantly taking advantage of consumers in that portion of their operations.  In particular, GAP coverage products receive much criticism for being sold when they allegedly may have no value.  Indeed, part of the Proposed TRR specifically addresses GAP protection and proposes significant limitations on the ability to sell it.  The Commission cites no credible data to support its assumptions about market behavior in this area.  But there is actual market <u>evidence</u> available to inform this analysis, and those data paint a vastly different picture than that presented in the NPRM.

Notably, the 2021 Cox Study indicates that 75 percent of new car buyers were *highly* satisfied with their overall interactions with the dealer's finance office, a number that showed a statistically significant increase over the previous year.  And, again, when additional data Cox provided to NADA combining both moderately satisfied and highly satisfied customers is considered, the overall finance office satisfaction percentage jumps to 91 percent.

More specifically, another recent study shows that customers are exceedingly pleased with their purchase of GAP coverage products.[55]  This study was conducted by three financial experts, including one current and one former FRB economist, and explored consumer attitudes regarding GAP protection.  Analyzing the results of a representative national survey conducted by the Survey Research Center of the University of Michigan in 2020, the economists found that "[m]ore than 90 percent of GAP purchasers report that buying GAP is a good idea and that *they would buy it again*."  (Emphasis added.)[56]  Perhaps more importantly, the study also found that ***only about 1 percent*** of the surveyed purchasers indicated dissatisfaction with their

---

[54] While the DealerRater and some of the other data are not publicly available, it is clear from the NPRM that the Commission nevertheless finds probative value in such data as the National Consumer Law Center's 2017 report entitled *Auto Add-Ons Add Up* is "based on [non-public] data regarding the sale of vehicle add-on products from one major add-on provider," see Appendix, and the Commission cites to the report multiple times in the NPRM. However, the DealerRater data referenced in the text was discussed by officials from the company during a podcast conducted on September 8, 2022. S*ee Primary Care, Special Guest Jamie Oledershaw of DealerRater, FTC Comments,* AUTOMOTIVE STATE OF THE UNION, (Sept. 8, 2022), https://www.asotu.com/podcast/primary-care-special-guest-jamie-oledershaw-of-dealerrater-ftc-comments.
[55] *See* Attachment 2.
[56] *Id*. at 13 (emphasis added).

NADA Comments to Federal Trade Commission
Page 17 of 140
September 12, 2022

choice.[57]  These data run absolutely contrary to, and wholly refute, the Commission's conclusions in the NPRM.

NADA also obtained data from Strategic Vision that addresses whether consumers feel pressure from their selling dealer when buying a car.[58]  These data were drawn from the firm's highly regarded New Vehicle Experience Studies for 2018-2022.  Strategic Vision inquired into the presence or absence of pressure used by a dealer in selling its vehicles.  The Strategic Vision data, which are set out in the footnote,[59] show that, over this 5-year period, 72.5 percent of the buyers surveyed either loved the lack of pressure at their dealership or found it delightful or excellent and that another 22.5 percent of the respondents found it satisfactory.  Thus, only 5 percent of the consumers in the Strategic Vision survey had any type of negative reaction to the pressure used by their dealer.

Finally, the NPRM fails to recognize not only that consumers are largely satisfied with the auto retailing process, including the key aspects of the process targeted by the Proposed TRR, but also that the level of satisfaction has been increasing over time.  J.D. Power's data show that the overall SSI has increased from 664 to 789 from 2012-2021, and that this increase was largely attributable to the wider use of advanced sales technology by dealers.[60]  As the J.D. Power data

---

[57] *Id.*

[58] Strategic Vision is a research-based consultancy that helps companies understand human behavior and decision-making patterns.  The firm has a respected position in the automotive market with over twenty years of New Vehicle Experience Study (NVES) data.

[59]

| Overall Lack of Pressure Used By Selling Dealer | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Year | **2022** | **2021** | | **2020** | | **2019** | | **2018** |
| *Sample size (n=)* | *31,121* | *103,023* | | *77,066* | | *53,610* | | *58,622* |
| | | | | | | | | |
| 9.5:  I Love It | 30% | 27% | | 30% | | 33% | | 43% |
| 8.2:  Delightful | 13% | 13% | | 14% | | 15% | | 16% |
| 6.8:  Excellent | 29% | 29% | | 28% | | 25% | | 20% |
| 5.5:  Satisfactory | 24% | 25% | | 24% | | 22% | | 16% |
| 4.2:  Unsatisfactory | 3% | 3% | | 3% | | 3% | | 3% |
| 2.8:  A Failure | 1% | 1% | | 1% | | 1% | | 1% |
| 1.5:  I Hate It | 1% | 1% | | 1% | | 1% | | 1% |
| | | | | | | | | |
| Formatted Subset Total | 100% | 100% | | 100% | | 100% | | 100% |
| Formatted Sample Total | 100% | 100% | | 100% | | 100% | | 100% |
| Unweighted Sample Total | | | | | | | | |
| Count | 30,742 | 101,799 | | 76,318 | | 53,329 | | 58,844 |
| | | | | | | | | |
| © Strategic Vision; Source: 2018-2022 New Vehicle Experience Studies | | | | | | | | |

[60] *See* J.D. Power Sales Satisfaction Index, 2012-2021. *See* J.D. Power Sales Satisfaction Index, 2012-2021. *Despite Lack of New-Vehicle Inventory, Sales Satisfaction Unchanged from Year Ago, J.D. Powers Finds*, J.D. POWER, (Nov. 10, 2021), https://www.jdpower.com/business/press-releases/2021-us-sales-satisfaction-index-ssi-study. *Increase in Digital Automotive Retail Due to Pandemic Paves Way for New Normal, J.D. Power Finds*, J.D. POWER, (Dec. 10, 2020), https://www.jdpower.com/business/press-releases/2020-us-sales-satisfaction-index-ssi-

NADA Comments to Federal Trade Commission
Page 18 of 140
September 12, 2022

demonstrate, dealers significantly increased their deployment and use of technology in response to consumer demand over the past decade, especially as a result, and in the aftermath of the onset, of the COVID-19 pandemic. This trend of improving over time was, as noted above, also observed by IRAE, which found that dealer reviews climbed from 4.25 in 2015 to 4.54 in 2022. The Commission, however, fails to account for any of these market changes or their impact on consumer treatment and experiences.

In particular, these pro-consumer advances make the Commission's reliance on anecdotes collected during the 2011-2012 Motor Vehicle Roundtables particularly problematic. As explained in Section III.c.1 below, the record established during those Roundtables does not support the promulgation of the Proposed TRR. But even if it did, the changes in the market that have occurred since, as evidenced by technological improvements and the improvement in customer satisfaction, render the earlier material irrelevant. To borrow a term from the food distribution industry, the effective "use by" date of the decade-old Motor Vehicle Roundtables record has long since expired. At a minimum, the Commission needs to take a new look at the auto retailing market to determine what practices and experiences predominate *today* before deciding whether a regulation mandating significant structural changes to that market is warranted.

The foregoing data demonstrate that the NPRM's description of the auto retailing industry and the treatment of consumers inaccurately characterizes the current marketplace. Certainly, limited instances of bad behavior exist and should not be tolerated. But the Commission does not have a basis for concluding that the market as a whole is broken and needs to be fixed. To the contrary, as evidenced by this data, the market generally operates quite well, produces satisfied customers, and has been improving even more over the last decade. Rather than jump to conclusions based on dated, unverified, or limited anecdotes, the Commission should conduct a real assessment of the market before embarking on a total overhaul of it.

---

study. *First Impressions Critical to Closing Sales Even before Vehicle Shoppers Visit Dealership, J.D. Power Finds*, J.D. POWER, (Nov. 13, 2019), https://www.jdpower.com/business/press-releases/2019-us-sales-satisfaction-index-ssi-study. *Digital Communication Leads to Higher Satisfaction with Vehicle Sales Process, J.D. Powers Finds*, (Nov. 14, 2018), J.D. POWER, https://www.jdpower.com/business/press-releases/2018-us-sales-satisfaction-index-ssi-study. *Online Buyers Beware! Dealers are Crucial Part of Vehicle Purchases, J.D. Powers Finds*, J.D. POWER, (Nov. 15, 2017), https://www.jdpower.com/business/press-releases/jd-power-2017-us-sales-satisfaction-index-study. *Product Specialists Help New-Vehicle Owners Understand Technology, Enhance Ownership Experience, Increase Future Demand, J.D. Power Finds*, J.D. POWER, (Nov. 10, 2016), https://www.jdpower.com/business/press-releases/2016-us-sales-satisfaction-index-ssi-study. *Product Specialist Role in Sales Process Grows as Vehicle Technology and Complexity Increase*, J.D. POWER, (Nov. 13, 2014), https://www.jdpower.com/business/press-releases/2014-us-sales-satisfaction-index-ssi-study. *Satisfaction Increases Considerably When Auto Dealers Use Mobile Technology During the New-Vehicle Sales Process*, J.D. POWER, (Nov. 14, 2013), https://www.jdpower.com/business/press-releases/2013-us-sales-satisfaction-index-ssi-study. Jeff Youngs, *2012 U.S. Sales Satisfaction Index (SSI) Study Results*, J.D. POWER, (Nov. 28, 2012), https://www.jdpower.com/cars/ratings/dealers/2012/2012-us-sales-satisfaction-index-study-results.

    c.      The FTC's proposed restructuring of the marketplace.

Against this backdrop of a well-functioning marketplace with overwhelmingly satisfied consumers, the Commission proposes to inject a series of ill-defined prohibitions, unnecessary advertising requirements, convoluted and untested disclosure requirements, and massive recordkeeping obligations on new motor vehicle dealers and a subset of independent motor vehicle dealers. As explained in the sections that follow: (i) the NPRM violates the FTC's own procedural rules and does not provide adequate transparency or notice to the public; (ii) the NPRM is based on a flawed premise and inadequate data and fails to identify a regulatory problem in need of a solution; (iii) the specific proposed rules in the NPRM are deeply flawed; (iv) even if additional regulation were necessary, there are better alternatives to the rules proposed in the NPRM; and (v) the Proposed TRR would violate the First Amendment.

II.     The NPRM violates the FTC's own procedural rules and does not provide adequate transparency or notice to the public.

    a.      The NPRM violates Section 1.10's ANPRM requirement.

The Commission has ignored the first procedural step it must take when enacting unfair or deceptive acts or practices rules—the requirement to issue an advance notice of proposed rulemaking (ANPRM). Section 1.10 of the FTC's procedural rules provides: "Prior to the commencement of any trade regulation rule proceeding, the Commission must publish in the Federal Register an advance notice of such proposed proceeding."[61] A "trade regulation rule" is one that "define[s] with specificity acts or practices that are unfair or deceptive acts or practices in or affecting commerce."[62] Because the Proposed TRR proposes a new unfair or deceptive act rule "pursuant to … Section 5(a)(1) of the Federal Trade Commission Act,"[63] it is a "trade regulation rule" that cannot be promulgated unless the agency has first issued an ANPRM.[64]

    1.      Section 1.10 remains in effect notwithstanding Dodd-Frank.

Section 1.10 has been in force since 1981 and has not been repealed by either Congress or the Commission. In 1980, Congress passed the Federal Trade Commission Improvements Act, which required the Commission to begin the regulatory process with an ANPRM when it promulgates unfair or deceptive act rules. The Commission then issued a final rule of its own that also imposed an ANPRM requirement.[65] From that point forward, the FTC was under two distinct obligations to begin the rulemaking process with an ANPRM—a statutory one imposed by Congress and a regulatory one imposed by the agency itself.

---

[61] 16 C.F.R. § 1.10.
[62] 16 C.F.R. § 1.8.
[63] 87 Fed. Reg. at 42,024.
[64] 16 C.F.R. §§ 1.8, 1.10.
[65] *See* Organization Changes in the Commissions Rulemaking and Investigatory Procedures, 46 Fed. Reg. 26,284, 26,288 (May 12, 1981) (codified at 16 C.F.R. §1.10).

In 2010, Congress enacted the Dodd-Frank Act (Dodd-Frank), which repealed the statutory ANPRM requirement for unfair or deceptive act rules for auto dealers.  Section 1029(d) of Dodd-Frank provides: "Notwithstanding section 18 of the Federal Trade Commission Act, the Federal Trade Commission *is authorized* to prescribe rules under sections 5 and 18(a)(1)(B) of the Federal Trade Commission Act in accordance with [the APA] with respect to [auto dealers]."[66]  By using permissive language—"is authorized"— Congress restored the Commission's pre-1980 *statutory* power to promulgate Section 18(a)(1)(B) rules utilizing the APA's rulemaking procedures.[67] At the same time, however, nothing in Dodd-Frank limited the Commission's undisputed power to impose additional regulatory procedures *on itself* beyond the APA's minimum baseline. Although Dodd-Frank exempts rulemakings regarding motor vehicle dealerships from the enhanced statutory rulemaking procedures in Section 18 of the FTC Act, Section 1.10 of the Commission's regulations remains in force and contains no exemptions from its ANPRM requirement.

Notably, just last year, the Commission comprehensively overhauled its Section 18 procedural regulations for unfair and deceptive acts rulemakings to eliminate "unnecessary" procedural rules that are not "statutorily required."[68]  In doing so, the Commission expressly considered whether to amend or repeal Section 1.10 and decided not to.[69]  Nor did the Commission create any carve-out or exception from Section 1.10 for rulemaking proceedings involving motor vehicle dealerships.

Beginning the rulemaking process with an ANPRM is not only required by the Commission's regulations but reflects good government and common sense. *See, e.g.*, U.S. DoT, *Rulemaking Process* (June 7, 2022), bit.ly/3Aq5JGI (ANPRMs "increase or improve the opportunities for public participation and … obtain that participation very early in the development process," particularly where the agency could benefit from comments that can "solve a problem before making a proposal," "narrow" the agency's "choices" from "a wide range of alternatives," and provide "additional information to help analyze the problem and its solutions"); U.S. Dep't of HUD, *Rulemaking 101*, bit.ly/3dWMRYh (similar); U.S. NRC, *The Rulemaking Process* (Aug.

---

[66] Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, § 124 Stat. 1376 (2010) (emphasis added).

[67] For this reason, the Authority section of the Proposed TRR, proposed Section 463.1, is materially incomplete. That section currently invokes only Section 1029 of Dodd-Frank, 12 U.S.C. § 5519(d).  But Section 1029 does not confer substantive rulemaking authority on the FTC.  Rather that section expressly specifies that if the Commission were to promulgate rules defining unfair or deceptive practices by motor vehicle dealers it must do so pursuant its authority under Section 18(a)(1)(B) of the FTC Act.  The Commission even acknowledges this in the NPRM's preamble, stating: "Section 1029 of the Dodd-Frank Act authorizes the FTC to prescribe rules with respect to unfair or deceptive acts or practices by motor vehicle dealers, **and to do so pursuant to the Commission's authority under the FTC Act and in accordance with the [APA].**" 87 Fed. Reg. at 42,013 (emphasis added).  Accordingly, the Authority section of the Proposed TRR should also invoke FTC Act Section 18(a)(1)(B).  Indeed, the Proposed TRR must be promulgated under Section 18(a)(1)(B) if, as the FTC states is one of its objectives, monetary penalties are to be one of the remedies available in the event of a violation.  15 U.S.C. § 57b(b).

[68] Revisions to Rules of Practice, 86 Fed. Reg. 38,542, 38,543-38,544 (July 22, 2021) (to be codified at 16 C.F.R. §§ 0-1).

[69] *See id.* at 38,547-38,548 (making minor revisions).

17, 2021), bit.ly/3AlcIAF (ANPRMs are used for "especially important or complex rules"). An industry-specific Section 18 rule—like the Proposed TRR—has the potential to dramatically upend longstanding business practices and impose substantial costs on the regulated industry. It is thus imperative for the agency to ensure that it has comprehensively studied the industry and gathered all relevant data *before* beginning to formulate proposed rules. *Cf. Akina v. Hawaii*, 141 F. Supp. 3d 1106, 1120 (D. Haw. 2015) (agency changed course in response to ANPRM comments).

Indeed, the Commissioners who supported the FTC's 2021 revisions to the Section 18 procedural rules issued a statement emphasizing that while the rules "remove[d] those extraneous and onerous procedures that serve only to delay Commission business," they would still require an ANPRM to ensure there is "ample transparency and opportunity for public participation" that is "substantially greater … than [what] the Administrative Procedure Act" provides.[70]

        2.       The FTC's failure to comply with Section 1.10 violates the APA.

Having left Section 1.10 in place with no exceptions or carveouts for motor vehicle dealerships, the Commission must follow it as written. It is an "'established maxim' that agencies must 'adhere to their own rules.'" *United Space All., LLC v. Solis*, 824 F. Supp. 2d 68, 82 (D.D.C. 2011); *see, e.g.*, *U.S. ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 265 (1954). An agency's "procedural rule" is "enforceable against the agency" where it does not simply "'benefit[] the agency'" but also "affects a party's rights." *Solis*, 824 F. Supp. 2d at 83. A rule is also enforceable if it 'limits the agency's discretion.'" *Still v. U.S. Dep't of Lab.*, 2021 WL 4502053, at *4 (D.D.C.). And an agency's procedural rule is binding on the agency regardless of whether the rule was promulgated through notice and comment or some other means. *See, e.g.*, *Solis*, 824 F. Supp. 2d at 82-84.

The ANPRM requirement in Section 1.10 limits the Commission's discretion and significantly affects the rights of NADA and other interested stakeholders. It limits discretion by imposing, *without exception*, a more rigorous process of rulemaking to ensure enhanced transparency and public participation. And it affects the rights of stakeholders by ensuring they are able to offer input during multiple phases of the rulemaking process. *See Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 85 (D.C. Cir. 2020) (the "entire premise" of notice and comment is that it ensures that "an agency's decisionmaking may be affected by concerns aired by interested parties through those procedures").

Depriving NADA and other interested parties of the opportunity to participate in an ANPRM process in advance of any specific proposed rules results in manifest "prejudice" and is not "harmless." *U.S. Steel Corp. v. EPA*, 595 F.2d 207, 215 (5th Cir. 1979); *see, e.g.*, *Health Freedom Def. Fund, Inc. v. Biden*, 2022 WL 1134138, at *13 (M.D. Fla.). The Proposed TRR

---

[70] *See id.* at 38,551-38,552.

represents an entirely new regulatory framework with profound consequences for motor vehicle dealerships. The Commission itself described its proposal as a "comprehensive" rule for the industry.[71] That is an understatement, as the proposal includes several brand-new federal regulatory obligations on the industry that would cost about $1.5 billion under the Commission's own estimates.[72]

As one might expect for a rule of this size, complexity, and importance, the proposal includes an "extremely broad and open-ended set of 49 questions" and "requests additional cost information in several of its Questions for Comment."[73] Those questions can be answered only by "collect[ing] … widespread and extensive market information," such as "assumptions, methodologies, calculations, and projected costs, benefits, and economic impact of the various elements of the proposed rule."[74] But the Commission gave the public a mere 60 days to perform these "massive inquiries" and denied NADA's request for a 120-day extension to give it the necessary time to provide complete information in response to the NPRM, including commissioning a thorough study of the rule.[75] Thus, by refusing to begin its rulemaking with the ANPRM required by the Commission's own rules, the Commission deprived NADA of the chance to provide crucial information to the agency—including hard data that would have been highly pertinent to the agency's decision-making.

It is no answer that the Commission could now repeal Section 1.10 after having violated it. An agency must still follow its procedural rules even if those rules "need never have been promulgated." *Solis*, 824 F. Supp. 2d at 82 (citing *Lopez v. FAA*, 318 F.3d 242, 247 (D.C. Cir. 2003); *see also Vietnam Vets. of Am. v. Sec'y of the Navy*, 843 F.2d 528, 538 (D.C. Cir. 1988) ("Internal procedures … are exempt from the coverage of §553 … [but] will be binding [on the agency].").  Unless and until the Commission expressly repeals Section 1.10 with respect to motor vehicle dealerships, the APA requires the Commission to obey it—and the Commission failed to do so here.

      b.      The FTC failed to gather essential information or provide adequate notice or opportunity for public engagement.

A more detailed analysis of the rushed process the Commission has launched to promulgate the Proposed TRR further highlights these flaws.

---

[71] *See FTC Proposes Rule to Ban Junk Fees, Bait-and-Switch Tactics Plaguing Car Buyers*, FTC, (June 23, 2022), Available at www.ftc.gov/news-events/news/press-releases/2022/06/ftc-proposes-rule-ban-junk-fees-bait-switch-tactics-plaguing-car-buyers.
[72] 87 Fed. Reg. at 42,036.
[73] *See* NADA Extension Request to FTC (July 18, 2022) (Attachment 3).
[74] *Id*.
[75] *FTC Declines to Extend Comment Period on Proposed Auto Rule, Deadline For Comments Sept. 12*, FTC, (Aug. 23, 2022), https://www.ftc.gov/news-events/news/press-releases/2022/08/ftc-declines-extend-comment-period-proposed-auto-rule-deadline-comments-sept-12.

NADA Comments to Federal Trade Commission
Page 23 of 140
September 12, 2022

The Commission has skipped essential steps that are necessary to determine such basic elements as whether a rule is needed and, if so, how it should be structured and what its impact will be on the marketplace. Such an insular, non-transparent, and ill-informed process creates a substantial likelihood that its goals and objectives, even if well intended, will not be realized and may actually be undermined.

As explained in Section III.a below, this is not a situation where an agency's ability to engage in an adequate deliberative process is constrained due to a tight statutory deadline. Congress has not mandated this rulemaking. Rather, the Agency has chosen, on its own initiative, to dispense with basic procedures and public transparency that it and other agencies would typically follow even in far less impactful matters. These include the following:

- The Commission did not announce that it would be taking this action in advance of its issuance in any of the White House's semiannual unified regulatory agendas.

- The Commission did not precede this issuance with any attempt to gather information, consider alternatives, or measure the impact of proposals it was considering via a Request for Information or Comment, a review of an outline of proposals,[76] or an ANPRM.[77] This is in marked contrast to several other very recent Commission rulemakings.[78]

- The Commission issued an NPRM which reflects its premature nature in several important regards:

---

[76] In contrast, *see e.g.*, the Consumer Financial Protection Bureau's *Outline of Proposals Under Consideration and Alternatives Considered* (Sep. 15, 2020) to implement Section 1071 of the Dodd-Frank Act, which followed a Request for Information on the matter. *Small Business Lending Data Collection Rulemaking; Outline of Proposals Under Consideration and Alternatives Considered,* SMALL BUSINESS ADVISORY REVIEW PANEL FOR CONSUMER FINANCIAL PROTECTION BUREAU, (Sept. 15, 2020). Available at: https://files.consumerfinance.gov/f/documents/cfpb_1071-sbrefa_outline-of-proposals-under-consideration_2020-09.pdf. *See also* 82 Fed. Reg. 22,318-22,322 (May 15, 2017); 82 Fed. Reg. 32,177-32,178 (Jul. 12, 2017).

[77] *See* Administrative Conference of the United States' *Administrative Conference Recommendation 2018-7* explaining the importance for agencies to exercise due diligence before issuing a notice of proposed rulemaking ("Agencies should consider using requests for information (RFIs) or advance notices of proposed rulemaking (ANPRMs) when they need to: i. gather information or data about the existence, magnitude, and nature of a regulatory problem; ii. evaluate potential strategies to address a regulatory issue; iii. choose between more than one regulatory alternative; or iv. develop and refine a proposed rule…."). *Administrative Conference Recommendation 2018-7,* THE ADMINISTRATIVE CONFERENCE OF THE UNITED STATES, (Dec. 14, 2018), https://www.acus.gov/sites/default/files/documents/Recommendation%202018-7%20%28Public%20Engagement%20in%20Rulemaking%29.pdf (last visited July 18, 2022).

[78] *See, e.g.*, Trade Regulation Rule on Commercial Surveillance and Data Security, 87 Fed. Reg. 51,273-51,299 (Aug. 22, 2022); Telemarking Sales Rule, 87 Fed. Reg. 33,662-33,677 (Jun. 3, 2022) (to be codified at 16 C.F.R. § 310; Deceptive or Unfair Earnings Claims, 87 Fed. Reg. 13,951-13,958 (Mar. 11, 2022) (to be codified at 16 C.F.R. § 462; and Trade Regulation Rule on Impersonation of Government and Businesses, 86 Fed. Reg. 72,901-72,905 (Dec. 23, 2021) (to be codified at 16 C.F.R. § 461).

NADA Comments to Federal Trade Commission
Page 24 of 140
September 12, 2022

o   The NPRM does not include an effective date, and it fails to even inquire into when it would be feasible for its new duties and restrictions to take effect;

o   The NPRM asks an extremely broad and open-ended set of 49 questions that typically would be asked *before* proposed standards are created as the answers to those questions would *inform* such standards.  These questions include, but are not limited to, the following:

➢   the scope of the proposed rule (e.g., whether it should address a range of other topics including other unfair or deceptive acts or practices, leasing, interest rates, other financing terms, electronic disabling devices, online sales, electronic disclosures, the availability of vehicles, matters involving servicemembers, conditional sales, and lien payoffs); [79]

➢   the scope, timing, language, clarity, efficacy, and net effect of the proposed notice requirements;[80]

➢   how the "offering price" concept works in the present market and how it would or should affect other information with regard to both advertisements and disclosures;[81]

➢   what VPPs motor vehicle dealers offer, how dealers currently obtain consent for the purchase of VPPs, which other VPPs should be prohibited, whether VPP sales should be restricted when the vehicle sale occurs and whether they should be accompanied by a cancellation right, which VPPs involve pricing differentials, how VPP disclosures should be structured, and whether instructions should be provided on how to calculate LTV rations;[82]

➢   whether dealers can calculate accurate monthly payment information without calculating the total amount a consumer must pay to purchase or lease a vehicle and the value of such information, particularly if presented multiple times;[83]

➢   whether the scope and period of the records retention requirements is appropriate and how it affects the current records retention practices of motor vehicle dealers;[84] and

[79] Questions for Comment 2, 3, 7, 8, and 14-17. *See* 87 Fed. Reg. at 42,028-42,029.
[80] Questions for Comment 19-25. *Id.* at 42,029.
[81] Questions for Comment 26-27. *See id.*
[82] Questions for Comment 28, 31, and 33-39. *Id.* at 42,029-42,030.
[83] Questions for Comment 29 and 30. *Id.* at 42,030.
[84] Questions for Comment 40-47. *Id.* at 42,031.

NADA Comments to Federal Trade Commission
Page 25 of 140
September 12, 2022

> ➤ how the proposed rule affects state law and the state experience in these areas;[85] and

> o As explained in Section II.c, the NPRM fails to address the requirements of the Paperwork Reduction Act (PRA),[86] Regulatory Flexibility Act (RFA),[87] and the White House Office of Management and Budget (OMB); and

- The Commission has not indicated in the NPRM what, if any, coordination or research it has conducted with other federal and state agencies that exercise oversight in the areas addressed in the Proposed TRR.  This includes:

  > o The CFPB, with regard to motor vehicle dealers with a service facility who are not covered by Section 1029(a).  Such coordination is essential to fulfill the Commission's desire to "ensure that motor vehicle dealers compete on a level playing field";[88]

  > o The FRB, with regard to any of the credit-related disclosures imposed by the Proposed TRR. As Congress has entrusted to the FRB the development of content, form, and timing disclosures for credit-related information (see the discussion in Sections IV.a.2 and 3.B.2 below), such coordination is essential in order, at a minimum, to harmonize the Proposed TRR requirements with those that already exist in Regulations M and Z; and

  > o The various States, with regard to how the combined effect of the Proposed TRR requirements and related state law requirements will affect consumers and the ability of motor vehicle dealers to comply with each (which the Commission recognizes in Questions 48 and 49).[89]

- On top of these omissions and as noted above, the Commission denied requests for a reasonable extension of time to respond to its sweeping proposed rule that were requested by NADA, multiple other industry trade associations, and the Small Business Administration's Office of Advocacy (SBA OA).[90]  This violates the law, as it failed to give NADA "enough time to comment," *Prometheus Radio Project v. FCC*, 652 F.3d 431, 450 (3d Cir. 2011), and it unnecessarily and inconsistently closes the door on

---

[85] Questions for Comment 48-49. *Id.*
[86] 44 U.S.C. § 3501, et seq.
[87] 5 U.S.C. §§ 601-612.
[88] 87 Fed. Reg. at 42,019.
[89] 87 Fed. Reg. at 42,031.
[90] Major L. Clark, III, et al., Comment to *Request for Extension for the Motor Vehicle Dealers Trade Regulation Rule— Rulemaking, No. P204800*, (Aug. 22, 2022), https://www.regulations.gov/comment/FTC-2022-0046-2221.

NADA Comments to Federal Trade Commission
Page 26 of 140
September 12, 2022

essential information gathering that can inform the rulemaking process.  As noted in a recent comprehensive report by Former FTC Chairman Timothy Muris and Former FTC Bureau of Consumer Protection Director Howard Beales:[91]

> "Careful scrutiny and public input take time. This is the reality of good rulemaking. And producing sound and lasting rules is a far more important goal than producing rules quickly, with less attention to their merits and less public input in the process."[92]

- As highlighted below, the Commission's denial of a reasonable extension to prepare critical data and research (i) departs from the approach it has taken in rulemakings that were far less consequential and involved more process than the Proposed TRR, and (ii) precludes the ability of stakeholders to provide meaningful responses to questions that the Commission has asked in the NPRM that should inform its subsequent actions in this matter.  Two recent examples highlight the Commission's inconsistent (and inexplicable) treatment of comment periods in response to its issuances.

  o GLB Safeguards Rule.  On March 5, 2019, the Commission released on its website proposed amendments to the GLB Safeguards Rule.[93]  This followed a periodic review of the Safeguards Rule that the Commission issued for comment in 2016.[94]  The notice of proposed rulemaking containing the proposed amendments was published in the *Federal Register* on April 4, 2019 and provided a public comment period of 60 days.[95]

  o In response to this issuance, NADA and other trade associations filed extension requests with the Commission.[96]  The Commission responded by granting a 60-

---

[91] J. Howard Beales III et. al., *Back to the Future: How Not To Write A Regulation,* AMERICAN ENTERPRISE INSTITUTE (June 2022). Hereinafter the "Back to the Future Report" - (Attachment 4).

[92] *Id*. at 27.

[93] *FTC Seeks Comment on Proposed Amendments to Safeguards and Privacy Rules*, FTC, (Mar. 5, 2019), https://www.ftc.gov/news-events/news/press-releases/2019/03/ftc-seeks-comment-proposed-amendments-safeguards-privacy-rules.

[94] Standards for Safeguarding Customer Information, 81 Fed. Reg. 61,632-61,636 (Sep. 7, 2016) (to be codified at 16 C.F.R. § 314).

[95] Standards for Safeguarding Customer Information, 84 Fed. Reg. 13,158-13,177 (Apr. 4, 2019) (codified at 16 C.F.R. § 314).

[96] The NADA extension request stated, in part: "Our request for a longer comment period is consistent with information on the proposal that is sought by the Commission.  The NPR repeatedly and prudently seeks information on the burden that would be imposed by specific proposed requirements and whether they should be modified or eliminated for smaller firms or otherwise narrowed.  It also generally inquires into whether the Commission's proposed approach 'creates unintended consequences for businesses, may be more stringent than necessary to achieve the objective, and/or unnecessarily modifies the current rule without creating a material benefit to security.'  Developing thoughtful comments on the impact of these requirements, including 'any data, research or case studies' sought by the Commission, requires additional time to conduct sufficient outreach to our members on these matters."  Kaye Lynch-Sparks, Comment to *Request for Extension for Standards for*

day extension to the comment period.[97]  In approving the extension, the Commission stated:

> "The Commission agrees that allowing additional time for filing comments on the Safeguards Rule would help facilitate the creation of a more complete record…. A 60-day extension provides commenters adequate time to consider the proposed rule while not unduly delaying the rulemaking process."[98]

o    In the instant matter, the Commission has denied *any* extension of the comment period, summarily declaring that "[t]he public will… have had eighty days between the proposal's announcement [on the Commission's website] and the close of the comment period" and that "[t]his period affords the public a meaningful opportunity to provide the Commission with comments regarding its rulemaking proposal."[99]

o    Among the reasons NADA sought an extension of the comment period is because the NPRM (i) seeks information throughout its PRA and RFA analyses related to the assumptions, methodologies, calculations, and projected costs, benefits, and economic impact of the various elements of the proposed rule, and (ii) requests additional cost information in several of its Questions for Comment.[100]  As part of this process, NADA explained that the length of time needed to conduct a properly thorough cost study exceeds the deadline for

---

*Safeguarding Customer Information,* (Apr. 24, 2019), https://www.regulations.gov/comment/FTC-2019-0019-0008.

[97] 84 Fed. Reg. 24,049-24,050 (May 24, 2019).

[98] *Id*. at 24,049.

[99] *FTC Declines to Extend Comment Period on Proposed Auto Rule, Deadline for Comments Sept. 12*, FTC, (Aug. 23, 2022), https://www.ftc.gov/news-events/news/press-releases/2022/08/ftc-declines-extend-comment-period-proposed-auto-rule-deadline-comments-sept-12. If the Commission believes "[t]his period [eighty days] affords the public a meaningful opportunity to provide the Commission with comments regarding its rulemaking proposal," the Commission was required to measure the eighty days from the date on which it issued the NPRM in the *Federal Register* and thereby extend the comment period by at least 20 days, which it failed to do. *See* 5 U.S.C. § 553(b), requiring general notice to be published in the *Federal Register*, and 5 U.S.C. § 553(c), requiring an opportunity for comment "[a]fter notice required by this section." *See* also *Rodway v. U.S. Dep't of Agric.*, 514 F.2d 809, 815 (D.C. Cir. 1975) ("Only publication in the Federal Register meets the APA requirement of constructive notice."); *Util. Solid Waste Activities Grp. v. EPA*, 236 F.3d 749, 754 (D.C. Cir. 2001) (rejecting EPA argument that it provided actual notice by publishing amendment to rule on its website, stating "[t]his court has never found that Internet notice is an acceptable substitute for publication in the Federal Register, and we refuse to do so now").

[100] *See, e.g.*, Question 6 ("What economic burdens would be imposed on dealers if the Rule proposals were adopted?"); Question 16 ("Are there data regarding the feasibility of finalizing vehicle financing at or before the time the retail installment sales [sic] contract is signed?"); Question 20 ("What would be the economic impact, and costs and benefits, of these disclosure requirements?"); Question 21 (""If so, what are the costs and benefits associated with these additional disclosures?"); and Question 45 ("What costs would these recordkeeping requirements impose on businesses, including small businesses? What would be the overall economic impact of these requirements? Please quantify these benefits and costs wherever possible."). 87 Fed. Reg. at 42,028-42,031.

submitting comments (even if NADA had hypothetically been able to engage a research firm on the matter the day on which the Commission first announced the rule on its website).[101]

o    Comparing the two rulemakings, it is clear that in the 2019 GLB Safeguards rulemaking (i) that consisted of an amendment to an existing rule, (ii) that was preceded by a notice for comment, and (iii) that involved a period between the release of the NPRM on the Commission's website and the end of the comment period of 90 days, the Commission granted an additional 60 days to the comment period.

o    While in this 2022 rulemaking (i) that consists of an entirely new rule of far broader scope and magnitude, (ii) that was preceded by no advanced notice, (iii) that involves a period between the release of the NPRM on the Commission's website and the end of the comment period of only 80 days, and (iv) is filled with requests for extensive cost and other information on the impact of its proposals on businesses, the Commission remarkably shuts the door on *any* extension of the comment period.[102]

o    <u>Routine PRA Request</u>.  Equally remarkable is the Commission's failure to draw any distinction between the comment period it provides for a rulemaking of this magnitude and the comment period it provides for very basic matters such as routine PRA requests.  For example, on August 24, 2022, one day after the Commission denied the multiple extension requests it received in the instant matter, the Commission issued for comment in the *Federal Register* a proposal to extend for an additional three years information it collects pursuant to Regulation N.[103]  The proposal occupies less than three full pages in the *Federal Register*, consists of a burden statement that is three paragraphs long, and asks four routine questions.  The Commission affords the public the same 60-day comment period it has afforded for the Proposed TRR even though the latter involves, among other components (i) a series of unprecedented and never before

---

[101] NADA explained that "a respected industry research firm informed NADA that it would require a minimum of 120 days to prepare a report on the potential costs that the proposed rule would impose on franchised automobile dealers.  This would address only one of the many areas of inquiry the Commission has presented in the NPRM.  And we have recent experience that supports these time estimates.  NADA commissioned a narrower cost study in response to the CFPB's NPRM relating to the implementation of Section 1071 of the Dodd-Frank Act, 86 Fed. Reg. 56,356-56,606 (Oct. 8, 2021),… and that study took over 4 months to complete."

[102] The Commission's rejection of an extension of the comment period implies that its "ongoing engagement with stakeholders" over the years somehow excuses it from affording stakeholders additional time to comment on its sweeping proposal.  This ignores the obvious fact that at no time prior to the Commission's release of the NPRM on its website did it identify and describe the specific components of the Proposed TRR.  Consequently, there was no basis for motor vehicle dealers to assess the impact of the proposed rule on consumers and their business operations.

[103] Agency Information Collection Activities; Proposed Collection; Comment Request; Extension, 87 Fed. Reg. 51,982-51,984 (Aug. 24, 2022).

> announced advertising, disclosure, and recordkeeping requirements that span 37
> pages in the *Federal Register*, (ii) a request for answers to 49 open-ended
> questions, and (iii) a series of additional requests for specific data and cost
> information. This begs the question: Where is the Commission's sense of
> perspective? What happened to its recognition of the need to "facilitate the
> creation of a more complete record?"

It should be self-evident that no one gains from the insular, truncated, non-transparent, and
rushed process that has characterized this rulemaking to date. As it has in the past, the
Commission should recognize the value that can be derived from an informed rulemaking and
not view its process components simply as a check-the-box exercise that should be streamlined
at all costs. This imperative was aptly explained by Former FTC Chairman Muris and Former
FTC BCP Director Beales:

> "Because rulemaking involves generalization, sound rulemaking puts a particular
> premium on gathering systematic information. Sound generalizations depend on
> a deep understanding of why a practice occurs, the circumstances in which it is
> used, and the precise conditions under which the practice helps or harms
> consumers in different situations. Sound rulemaking procedures help ensure that
> the public and the potentially regulated community can examine the accuracy of
> information, offering critical commentary and contrary evidence as
> appropriate."[104]

> c.     The NPRM violates the PRA, RFA, and OMB requirements.

>      1.     The FTC failed to comply with procedural requirements in the PRA and
>             OMB Implementing Regulations.

The FTC acknowledges, as it must, that the PRA *"requires federal agencies to seek and obtain
… OMB approval before undertaking a collection of information directed to ten or more
persons."*[105] The FTC also correctly acknowledges that the "proposed rule contains disclosure
and recordkeeping requirements that constitute '''information collection requirements' as
defined by 5 C.F.R. §1320.3(c) under the OMB regulations that implement the PRA."[106] The
FTC purports to (i) list the universe of businesses subject to the proposed rule's paperwork
requirements, (ii) outline the disclosure and recordkeeping mandates associated with the
proposal, and (iii) estimate the burdens imposed by those disclosure and recordkeeping
mandates.[107] However, as detailed in Section IV.c and Attachment 18, the FTC has failed to
accurately assess the nature and scope of the actual paperwork burdens that would result if the

---

[104] Back to the Future Report at 3 (Attachment 4).
[105] 87 Fed. Reg. at 42,031.
[106] *Id.*
[107] *Id.*

NADA Comments to Federal Trade Commission
Page 30 of 140
September 12, 2022

proposal were to take effect. The FTC has also failed to comply with its statutory and regulatory procedural obligations under the PRA.

Among other things, the stated purpose of the PRA is to:

"(1)    minimize the paperwork burden for *individuals, small businesses*, educational and nonprofit institutions, Federal contractors, State, local and tribal governments, and other persons resulting from the collection of information by or for the Federal Government; [and]

(2)    ensure the greatest possible public benefit from and maximize the utility of information created, collected, maintained, used, shared and disseminated by or for the Federal Government."

(Emphasis added.)[108]

In furtherance of these important purposes, the PRA authorizes OMB to issue procedural regulations for agencies to follow and, as noted above, it has done so.[109]  Not unlike the PRA, OMB's regulations "are designed to reduce, minimize and control burdens and maximize the practical utility and public benefit of the information created, collected, disclosed, maintained, used, shared and disseminated by or for the Federal government."[110]

As noted above, the FTC acknowledges that the extensive disclosure and recordkeeping mandates in the Proposed TRR constitute "information collection requirements" for purposes of OMB's regulations.[111]  To aid in effectuating the purpose of the PRA, those regulations specify that "[a]gencies shall submit collections of information contained in proposed rules published for public comment in the Federal Register in accordance with the requirements in §1320.11."[112]  In pertinent part, that subsection specifies that:

"(a)    The agency shall include, in accordance with the requirements in §1320.5(a)(1)(iv) and §1320.8(d)(1) and (3), in the preamble to the Notice of Proposed Rulemaking a statement that the collections of information contained in the proposed rule, and identified as such, have been submitted to OMB for review under section 3507(d) of the Act. The notice shall direct comments to the Office of Information and Regulatory Affairs of OMB, Attention: Desk Officer for [name of agency].

---

[108] 44 U.S.C. § 3501(1)(2).
[109] 44 U.S.C. § 3516; 5 C.F.R. § 1320.
[110] 5 C.F.R. §1320.1.
[111] In this instance, the "collection of information" includes, but is not limited to, the categories listed in 5 C.F.R. § 1320.3(c)(1)(2) and (4)(ii).
[112] *See* 44 U.S.C. § 3506(c)(2)(B) and 5 C.F.R. §1320.5(c)(2).

(b)     All such submissions shall be made to OMB not later than the day on which the Notice of Proposed Rulemaking is published in the Federal Register, in such form and in accordance with such procedures as OMB may direct. Such submissions shall include a copy of the proposed regulation and preamble.

(c)     Within 60 days of publication of the proposed rule, but subject to paragraph (e) of this section, OMB may file public comments on collection of information provisions. The OMB comments shall be in the form of an OMB Notice of Action, which shall be sent to the Senior Official or agency head, or their designee, and which shall be made a part of the agency's rulemaking record.

(d)     If an agency submission is not in compliance with paragraph (b) of this section, OMB may, subject to paragraph (e) of this section, disapprove the collection of information in the proposed rule within 60 days of receipt of the submission. If an agency fails to submit a collection of information subject to this section, OMB may, subject to paragraph (e) of this section, disapprove it at any time.

(e)     OMB shall provide at least 30 days after receipt of the proposed collection of information before submitting its comments or making its decision, except as provided under §1320.13…."

(Emphasis added.)[113]

The FTC typically endeavors to comply with its responsibilities under the PRA.[114] But, in this instance, the Commission has failed to comply with the procedural requirements set out in 5 C.F.R. §1320.11(a) and (b), 5 C.F.R. §1320.5(a)(1)(iv), and §1320.8(d)(1). In addition, as detailed in Attachment 18 and elsewhere herein, the FTC has failed to demonstrate that its "information collection requirements" are necessary, that they minimize related burdens, and that they offer utility and public benefit. Consequently, in addition to filing these comments with the FTC, NADA is requesting that OMB disapprove the information collection as provided for in 5 C.F.R. §1320.11(d).

> 2.     The FTC failed to comply with the RFA.

The RFA reflects Congress's intent that federal agencies adopting regulations to protect the economic welfare do so effectively and efficiently and without imposing unnecessary burdens on the public. It requires that special attention be paid to unnecessary and disproportionately burdensome demands upon small businesses, including legal, accounting, and consulting costs, and recognizes that alternative regulatory approaches may minimize significant economic impacts on small business. Congress intended for agencies considering new regulations to

---

[113] 5 C.F.R. § 1320.11.

[114] OMB's website currently lists an inventory of more than 40 FTC items involving hundreds of information collection mandates.

solicit the ideas and comments of small businesses and to examine fully the potential impact of proposed rules on them, including whether such rules are necessary.

The FTC recognizes that it is an "agency" covered by the RFA and appears to acknowledge that a formal regulatory flexibility process, including OMB review, may be necessary to ensure that it has properly considered the small business impacts of the Proposed TRR.[115]  At the same time, the FTC asserts that a formal analysis is not required if a regulatory proposal would not have a significant economic impact on a substantial number of small entities and, further, that the Proposed TRR "will not have a significant economic impact on small entities, although they will likely affect a substantial number of small entities."[116]

As detailed in Section IV.c, Attachment 19, and elsewhere herein, the Proposed TRR undoubtedly would impose a significant economic impact on a substantial number of small businesses.  As a result, the FTC's statement to the contrary is without support.  That said, had the FTC believed to the contrary, it presumably would have attempted to take advantage of Section 605(b) of the RFA to forgo conducting an initial regulatory flexibility analysis by "formally certifying" that the Proposed TRR, if promulgated, would not have a significant economic impact on a substantial number of small entities.[117]  The FTC has not:

(i)     made a formal Section 605(b) certification;
(ii)    published such a certification together with a required factual basis statement; or
(iii)   provided any such certification and statement to the Chief Counsel for Advocacy of the Small Business Administration (Advocacy).

Given the FTC's failure to comply with Section 605(b) of the RFA, the FTC must comply with Section 603 of the RFA which requires it to publish an initial regulatory flexibility analysis with the Proposed TRR and to send a copy of that analysis to Advocacy for its review.[118]  Sections 603(b) and (c) specify what must be contained in an initial regulatory flexibility analysis.[119]

---

[115] 5 U.S.C. § 601(1), 5 U.S.C.§ 551(1).

[116] 87 Fed. Reg. at 42,035.

[117] The RFA states: "Sections 603 and 604 of this title shall not apply to any proposed or final rule if the head of the agency certifies that the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities. If the head of the agency makes a certification under the preceding sentence, the agency shall publish such certification in the Federal Register at the time of publication of general notice of proposed rulemaking for the rule or at the time of publication of the final rule, along with a statement providing the factual basis for such certification. The agency shall provide such certification and statement to the Chief Counsel for Advocacy of the Small Business Administration." 5 U.S.C. § 605(b).

[118] *Id.* at 603(a).

[119] 5 U.S.C. § 603(b) and (c) state:
"(b) Each initial regulatory flexibility analysis required under this section shall contain —
        (1) a description of the reasons why action by the agency is being considered;
        (2) a succinct statement of the objectives of, and legal basis for, the proposed rule;
        (3) a description of and, where feasible, an estimate of the number of small entities to which the proposed rule will apply;

The Proposed TRR contains a section entitled "Preliminary Regulatory Analysis;" however, neither in that section nor elsewhere does the FTC set out an initial regulatory flexibility analysis as required by Section 603(b) and (c) of the RFA.[120]  For example, the FTC has failed to:

(i)     accurately estimate the number of small entities to which the rule will apply;

(ii)    accurately lay out the projected reporting, recordkeeping, and other compliance requirements of the Proposed TRR, including an estimate of the classes of small entities which will be subject to those requirements and the type of professional skills necessary for compliance with them;

(iii)   identify relevant federal rules which may duplicate, overlap, or conflict with the proposal; and

(iv)    perhaps of greatest importance, make virtually any attempt to comply with Section 603(c)'s mandate to consider alternatives to the Proposed TRR.

Section 609 of the RFA lists the steps an agency must take when a proposed regulation will have a significant economic impact on a substantial number of small entities.[121]  In this instance, it was incumbent upon the FTC to assure that small entities were given an opportunity to participate in the rulemaking through the reasonable use of techniques such as—

"(1)    the inclusion in an advance notice of proposed rulemaking, if issued, of a statement that the proposed rule may have a significant economic effect on a substantial number of small entities;

(2)     the publication of general notice of proposed rulemaking in publications likely to be obtained by small entities;

(3)     the direct notification of interested small entities;

---

(4) a description of the projected reporting, recordkeeping and other compliance requirements of the proposed rule, including an estimate of the classes of small entities which will be subject to the requirement and the type of professional skills necessary for preparation of the report or record;

(5) an identification, to the extent practicable, of all relevant Federal rules which may duplicate, overlap or conflict with the proposed rule.

(c) Each initial regulatory flexibility analysis shall also contain a description of any significant alternatives to the proposed rule which accomplish the stated objectives of applicable statutes and which minimize any significant economic impact of the proposed rule on small entities. Consistent with the stated objectives of applicable statutes, the analysis shall discuss significant alternatives such as —

(1) the establishment of differing compliance or reporting requirements or timetables that take into account the resources available to small entities;

(2) the clarification, consolidation, or simplification of compliance and reporting requirements under the rule for such small entities;

(3) the use of performance rather than design standards; and

(4) an exemption from coverage of the rule, or any part thereof, for such small entities."

[120] 87 Fed. Reg. at 42,036-42,044.

[121] 5 U.S.C. § 609(a).

> (4)    the conduct of open conferences or public hearings concerning the rule for small entities including soliciting and receiving comments over computer networks; and
>
> (5)    the adoption or modification of agency procedural rules to reduce the cost or complexity of participation in the rulemaking by small entities."[122]

The FTC's failure to comply with Section 603(a), (b), and (c) of the RFA, or alternatively with Section 605(b), and its failure to comply Section 609 of the RFA, require that it withdraw the NPRM.

        3.      The FTC failed to comply with Section 1 of E.O. 12866.

Section 1 of E.O. 12866 – issued in 1993 by President Clinton – provides federal agencies, including independent agencies such as the FTC, with certain fundamental rulemaking principles and guidelines to promote transparency, informed decisionmaking, and good government.  Section 1(b) of E.O. 12866 specifically requires that:

> "(1)    Each agency shall identify the problem that it intends to address (including, where applicable, the failures of private markets or public institutions that warrant new agency action) as well as assess the significance of that problem.
>
> (2)    Each agency shall examine whether existing regulations (or other law) have created, or contributed to, the problem that a new regulation is intended to correct and whether those regulations (or other law) should be modified to achieve the intended goal of regulation more effectively.
>
> (3)    Each agency shall identify and assess available alternatives to direct regulation, including providing economic incentives to encourage the desired behavior, such as user fees or marketable permits, or providing information upon which choices can be made by the public.
>
> (4)    In setting regulatory priorities, each agency shall consider, to the extent reasonable, the degree and nature of the risks posed by various substances or activities within its jurisdiction.
>
> (5)    When an agency determines that a regulation is the best available method of achieving the regulatory objective, it shall design its regulations in the most cost-effective manner to achieve the regulatory objective. In doing so, each agency shall consider incentives for innovation, consistency, predictability, the costs of enforcement and compliance (to the government, regulated entities, and the public), flexibility, distributive impacts, and equity.
>
> (6)    Each agency shall assess both the costs and the benefits of the intended regulation and, recognizing that some costs and benefits are difficult to

---

[122] *Id.* at 609(a).

quantify, propose or adopt a regulation only upon a reasoned determination that the benefits of the intended regulation justify its costs.

(7)  Each agency shall base its decisions on the best reasonably obtainable scientific, technical, economic, and other information concerning the need for, and consequences of, the intended regulation.

(8)  Each agency shall identify and assess alternative forms of regulation and shall, to the extent feasible, specify performance objectives, rather than specifying the behavior or manner of compliance that regulated entities must adopt.

(9)  Wherever feasible, agencies shall seek views of appropriate State, local, and tribal officials before imposing regulatory requirements that might significantly or uniquely affect those governmental entities. Each agency shall assess the effects of Federal regulations on State, local, and tribal governments, including specifically the availability of resources to carry out those mandates, and seek to minimize those burdens that uniquely or significantly affect such governmental entities, consistent with achieving regulatory objectives. In addition, as appropriate, agencies shall seek to harmonize Federal regulatory actions with related State, local, and tribal regulatory and other governmental functions.

(10)  Each agency shall avoid regulations that are inconsistent, incompatible, or duplicative with its other regulations or those of other Federal agencies.

(11)  Each agency shall tailor its regulations to impose the least burden on society, including individuals, businesses of differing sizes, and other entities (including small communities and governmental entities), consistent with obtaining the regulatory objectives, taking into account, among other things, and to the extent practicable, the costs of cumulative regulations.

(12)  Each agency shall draft its regulations to be simple and easy to understand, with the goal of minimizing the potential for uncertainty and litigation arising from such uncertainty."

The FTC disregarded several regulatory best practices described in Section 1(b) of E.O. 12866 because the Proposed TRR does not:

- show the existence of a pervasive and significant set of unfair or deceptive practices involving motor vehicle dealers that warrant the mandates set out in the proposal;
- identify and assess available alternatives to the mandates in its proposal, including existing federal and state legal authorities and a combination of government and industry educational efforts;
- accurately evaluate and assess the proposal's negative impacts on prospective vehicle purchasers;

- assess the cost effectiveness of the mandates in its proposal, especially in the context of regulatory alternatives;
- recognize that the costs of the mandates imposed by its proposal, on both the regulated community and on consumers, far outweigh any potential benefits;
- collect and analyze sufficient accurate data and other information regarding motor vehicle dealers and the products that they sell;
- consider performance standards in lieu of prescriptive and often nonsensical regulatory mandates; or
- make any attempt to tailor the proposal to be the least burdensome possible.[123]

    4.    The FTC failed to list the Proposed TRR in the Unified Agenda of Regulatory and Deregulatory Actions as required by the RFA and E.O. 12866.

Section 602 of the RFA requires each agency to publish in the *Federal Register* twice annually a regulatory flexibility agenda containing a brief description of the subject area of any rule that the agency expects to propose or promulgate which is likely to have a significant economic impact on a substantial number of small entities, a summary of such rule and the objectives and legal basis for issuing it, an approximate schedule for completing action on proposed rules, and the name and telephone number of an agency contact.[124]

Section 602 also requires that each regulatory agenda be transmitted to Advocacy for possible comment, and that each agency endeavor to provide notice of their regulatory flexibility agendas to small entities (or their representatives) through direct notification, or in publications likely to be obtained by them and to invite comments on each subject area in the agenda.[125] Congress intended for these agendas to serve as important means by which small businesses are kept informed about agency regulatory plans generally and about rulemakings with potentially significant impacts on certain small businesses. As discussed below, by failing to reference the Proposed TRR in any regulatory flexibility agenda, the FTC violated Section §602 of the RFA.

In addition to Section 602(b) of the RFA, Section 4 of E.O. 12866 states that:

> *"Unified Regulatory Agenda.* For purposes of this subsection, the term ''agency'' or ''agencies'' shall also include those considered to be independent

---

[123] Although FTC rulemakings presently are exempt from the OMB review process set forth in Section 6 of E.O. 12866 (a review process which likely will be revisited for "independent agencies"), the FTC is not excused from complying with Section 1(b) of E.O. 12866. *See, e.g., Benefit-Cost Analysis at Independent Regulatory Agencies,* ADMINISTRATIVE CONFERENCE OF THE UNITED STATES, (June 13, 2013), https://www.acus.gov/research-projects/benefit-cost-analysis-independent-regulatory-agencies; and *2018, 2019,and 2020 Report to Congress on the Benefits and Costs of Federal Regulations and Agency Compliance with the Unfunded Mandates Reform Act,* OMB, https://www.whitehouse.gov/wp-content/uploads/2021/01/2018_2019_2020-OMB-Cost-Benefit-Report.pdf (pp.19-20).
[124] 5 U.S.C. § 602.
[125] *Id.* at 602(b) and (c).

NADA Comments to Federal Trade Commission
Page 37 of 140
September 12, 2022

regulatory agencies, as defined in 44 U.S.C. 3502(10). Each agency shall prepare an agenda of *all* regulations under development or review, at a time and in a manner specified by the Administrator of OIRA. The description of each regulatory action shall contain, at a minimum, a regulation identifier number, a brief summary of the action, the legal authority for the action, any legal deadline for the action, and the name and telephone number of a knowledgeable agency official. Agencies may incorporate the information required under 5 U.S.C. 602… into these agendas."

(Emphasis added.)[126]

According to OMB, the purpose of the Unified Agenda of Regulatory and Deregulatory Actions (Unified Agenda), published twice each year by OMB pursuant to both Section 602 of the RFA and Section 4 of E.O. 12866, is to provide members of the public, including small businesses and their representatives, with notice of the status of rulemakings under development.[127]  For each agency, including the FTC, potential short term regulatory actions are listed by their pre-rule, proposed rule, or final rule stage of development.[128]  Agencies also provide insightful regulatory activity preambles and/or priority statements and long-term regulatory initiatives, if any.  The FTC typically does a thorough job listing its regulatory initiatives in appropriate Unified Agendas, thereby giving interested parties an opportunity to prepare to participate in upcoming rulemakings.

The Fall 2021 Unified Agenda, dated December 7, 2021, was published in January 2022.[129]  It included an FTC Statement of Regulatory Priorities, in which the agency devoted attention to a recent Supreme Court case, recent modifications made to its rulemaking procedures, and the fact that "the Commission in the coming year will consider developing both unfair-methods-of-competition rulemakings as well as rulemakings to define with specificity unfair or deceptive acts or practices."[130]  The FTC then referenced its recently issued *Made in the USA* rule, concerns regarding surveillance-based business models, and that over the coming year, "the Commission will also explore whether rules defining certain "unfair methods of competition" prohibited by Section 5 of the FTC Act would promote competition and provide greater clarity to the market."[131]  Lastly, the FTC discussed potential new rulemakings aimed at promoting

---

[126] Regulatory Planning and Review - E.O. 12866, 58 Fed. Reg. 51,735 (October 4, 1993) (Section 4).
[127] *About the Unified Agenda*, OFFICE OF INFORMATION AND REGULATION AFFAIRS, https://www.reginfo.gov/public/jsp/eAgenda/UA_About.myjsp (last visited Sept. 7, 2022).
[128] *Id*. The activities included in individual agency agendas are primarily those currently planned to have an Advance Notice of Proposed Rulemaking (ANPRM), a Notice of Proposed Rulemaking (NPRM), or a Final Rule issued within the next 12 months.  Other listings may include long-term, complicated, and inactive actions.
[129] 87 Fed. Reg 5002, *et seq.* (Jan. 31, 2022).
[130] *Id.* at 5,177.
[131] *Id.* at 5,178.

competition, referenced rules under periodic review pursuant to Section 610 of the RFA,[132] and listed significant regulatory actions it was engaged in and final rules it had issued since 2020.[133]

The preamble to the FTC's submission to OMB for the Fall 2021 Unified Agenda, dated September 17, 2021 (Attachment 5), claimed that the agency was not working on "proposed rules that would meet the RFA's publication requirements" and that "the Commission has no proposed rules that would be a "significant regulatory action" under the definition in Executive Order 12866."[134] The FTC then identified and listed "rulemakings that are likely to have some impact on small entities, but do not meet the RFA's publication requirements."[135]

All told, the FTC's Fall 2021 agenda listed twelve pre-rule stage, four proposed rule stage, and one final rule stage rulemakings. Nowhere in the FTC's Fall 2021 regulatory agenda, including in the preamble or in its Fall 2021 Statement of Regulatory Priorities, did the FTC identify its soon-to-be Proposed TRR.

The Spring 2022 Unified Agenda was released by the White House on its website on June 21, 2022,[136] and published in the *Federal Register* on August 8, 2022.[137] The FTC's preamble submission to OMB for the Spring 2022 Unified Agenda (Attachment 6) also claimed that "the Commission has no proposed rules that would meet the RFA's publication requirements," and that,"[i]n addition, the Commission has no proposed rules that would be a 'significant regulatory action' under the definition in Executive Order 12866."[138] As in the preamble to its Fall 2021 agenda, the FTC then identified and listed rulemakings that are likely to have some impact on small entities, but do not meet the RFA's publication requirements.[139]

All told, the FTC's Spring 2022 agenda listed fourteen pre-rule stage, two proposed rule stage, and two final rule stage rulemakings. Nowhere in the FTC's Spring 2022 regulatory agenda, including in the preamble, did the FTC identify its soon-to-be Proposed TRR.

By failing to include the Proposed TRR in both the Fall 2021 and Spring 2022 Unified Agendas, the FTC violated Section 602 of the RFA and Section 4(b) of E.O. 12866.[140]

---

[132] 5 U.S.C. § 610.
[133] 87 Fed. Reg. at 5178-5181.
[134] *See* FTC Fall 2021 Agenda Preamble at pp. 1-2 – Attachment 5.
[135] *Id.* at 2.
[136] Sam Berger, *The Spring Regulatory Agenda*, THE WHITE HOUSE, (June 21, 2022), https://www.whitehouse.gov/omb/briefing-room/2022/06/21/the-spring-regulatory-agenda/.
[137] 87 Fed. Reg. 48,236, *et seq.* (Aug. 8, 2022).
[138] *See* FTC Spring 2022 Agenda Preamble at p. 1 – Attachment 6.
[139] *Id*.
[140] It is noteworthy that the FTC's explanation for failing to include the Proposed TRR in its regulatory agenda has shifted over time. In Footnote 153 of the pre-publication version of the proposed rule (which was posted on the FTC's website on June 23, 2022), the FTC stated that:

NADA Comments to Federal Trade Commission
Page 39 of 140
September 12, 2022

       d.     The Proposed TRR impermissibly seeks to regulate the business of insurance.

The Proposed TRR also seeks to impose a series of duties and restrictions on "add-ons" and defines "Add-on" or "Add-on Product(s) or Service(s)" in such a broad manner that it makes no distinction between – and therefore includes both – "add-ons" that are insurance products under state law and those that are not. A quintessential example is credit life insurance and credit disability insurance, which generally pays off an insured consumer's credit obligation if the consumer dies or becomes disabled. These products are regulated as credit insurance in every state and clearly are "product(s) or services(s) not provided to the consumer or installed on the vehicle by the motor vehicle manufacturer and for which the Motor Vehicle Dealer, directly or indirectly, charges a consumer in connection with a vehicle sale, lease, or financing transaction."[141] Other VPPs are regulated as insurance in some states but not others, yet all such products clearly also fall within this broad definition.

The McCarran-Ferguson Act[142] reserves to the states the right to regulate the business of insurance. The law is specific. It states:

> "Regulation by State law; Federal law relating specifically to insurance; applicability of certain Federal laws after June 30, 1948
>
> (a)    State regulation. The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.
>
> (b)    Federal regulation. No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance...."[143]

---

    "[T]his Notice of Proposed rulemaking was not included in the Commission's *Fall 2021 Regulatory Agenda* because the Commission first considered this notice after the publication deadline for the Regulatory Agenda."

(Emphasis added.) However, in the version of the proposal published three weeks later (on July 13, 2022) in the *Federal Register*, Footnote 153 had been edited to read as follows:

    "[T]his Notice of Proposed rulemaking was not included in the Commission's *Spring 2022 Regulatory Agenda* because the Commission first considered this notice after the publication deadline for the Regulatory Agenda."

(Emphasis added.) It strains credulity that the FTC would have referenced the publication deadline in the first version of this footnote for the Fall Regulatory Agenda if, at the time of the reference, the deadline for the Spring Regulatory Agenda had also passed.

[141] 87 Fed. Reg. at 42,044 (Proposed Section 463.2(a)).

[142] 15 U.S.C. §§ 1011-1015.

[143] 15 U.S.C. § 1012.

The Act prohibits the federal government from imposing requirements in connection with the business of insurance where the field is occupied by the States.  Nevertheless, the Commission seeks to regulate VPPs which are regulated as insurance by the States in each subsection of the Proposed TRR.  This violates the McCarren-Ferguson Act and these aspects of the Proposed TRR must be withdrawn for this reason alone.

III.    The NPRM is based on a *flawed premise* and *inadequate data* and fails to identify a regulatory problem in need of a solution.

     a.    There is nothing that mandates this action.

When reviewing the justification for the Proposed TRR, it is important to note that Congress has not mandated – nor has it in any way signaled – that the FTC issue a UDAP rule involving motor vehicle dealers.

As explained above, the FTC cites as the basis of its authority to prescribe the Proposed TRR Section 1029(d) of Dodd-Frank. This provision *authorizes* the FTC to promulgate UDAP rules as provided for in Section 1029(d), but it does not *direct* it to do so.  This is evident from the language in Section 1029(d) (stating that the FTC "is authorized to prescribe" UDAP rules) and, equally significant, the absence of language in Section 1029(d) that directs such activity or orders the issuance of rules by a specified date.

This grant of discretionary authority differs sharply from numerous other provisions in Dodd-Frank that both *authorize and direct* an agency to engage in certain activity.  *See, e.g.*, Section 1411 (stating that the FRB "shall" prescribe regulations to prohibit mortgage originators from engaging in several delineated practices), Section 1076 (stating that the CFPB "shall" conduct a study into reverse mortgage transactions not later than one year after the designated transfer date), Section 1034 (stating that the CFPB "shall" develop reasonable procedures to respond to consumer complaints and inquiries), Section 1028 (stating that the CFPB "shall" conduct a study into the use of pre-dispute arbitration agreements), and Section 941 (stating, under the heading "Regulations Required," that the Securities and Exchange Commission ("SEC") and the federal banking agencies "shall" issue risk retention regulations not later than 270 days after the enactment of this section).  Consequently, because there is not a statutory directive to promulgate UDAP rules or a statutory timeframe within which this must occur, the FTC may only exercise this discretionary authority if a sufficient record has been developed to justify and support this extraordinary action.

     b.    There is no regulatory hole to fill.

Lacking a statutory directive to act in this matter, the Commission does not identify in its explanation of the need for the rule any harmful market conduct for which remedies to protect consumers are lacking under current federal and state law.  Nor does the Commission identify elsewhere in the NPRM instances of harm to consumers that can only be addressed by the

NADA Comments to Federal Trade Commission
Page 41 of 140
September 12, 2022

imposition of new duties and obligations on motor vehicle dealers.  This reflects the fact that the Commission currently possesses adequate authority under Section 5 of the FTC Act to investigate marketplace misconduct – including the full range of concerns addressed in the NPRM – and to bring enforcement actions against bad actors.

> c.       There is no widespread misconduct that requires or justifies this action.

Lacking a statutory directive to act and already possessing adequate enforcement authority to address misconduct by any bad actors, the only justification for a new UDAP rule that imposes new duties and obligations on an entire industry – including the "law-abiding dealers" for which the Commission expresses concern – would be that (i) problems in the marketplace are so widespread that individual enforcement actions are insufficient to protect consumers, and (ii) the only way to provide such protection is to promulgate a new UDAP rule.[144]

The discussion that follows in this section explains in detail how each of the four primary sources the Commission has cited to justify this action completely fail to establish the presence of widespread misconduct in the marketplace.  Section IV then explains how the Commission's specific proposed rules would fail even to provide the protection that the Commission asserts is lacking while imposing massive countervailing costs and burdens on the industry.

> 1.       Motor Vehicle Roundtables

The Commission identifies as a major source of support for the Proposed TRR and cites over 25 times in the NPRM the Motor Vehicle Roundtables that it conducted in 2011.  However, in addition to the pitfalls of basing a current action on a stale record that was developed over a decade ago when the marketplace has since benefitted from significant improvements in the

---

[144] The Commission states that it has a "need for additional measures to deter deceptive and unfair practices" (and that "[i]n addition," a UDAP rule would allow it to seek consumer redress and impose civil monetary penalties for a violation of the rule. 87 Fed. Reg. at 42,013, 42,047.  These statements give pause for several reasons.  First, the Commission offers no support whatsoever for its contention that making deceptive and unfair practices – which by definition violate Section 5 of the FTC Act – doubly illegal will somehow create a further deterrent to misconduct by bad actors.  Second, in actions the Commission has brought against motor vehicle dealers where it has actually demonstrated consumer harm, it has been able to secure redress for harmed consumers. *See, e.g.,  FTC v. Liberty Chevrolet, Inc. et.al.*, No.: 1:20-cv-03945-PAE, (S.D.N.Y. May 22, 2020), Available at: https://www.ftc.gov/system/files/documents/cases/bronx_honda_stipulated_final_order_liberty_chevrolet.pdf; https://www.ftc.gov/system/files/ftc_gov/pdf/6-1%20Stipulated%20Order.pdf; *FTC v. Tate's Auto Center of Winslow, Inc., et. al.*,  No. 3:18-cv-08176-DJH, (D. Ariz.), Available at: https://www.ftc.gov/system/files/documents/cases/192_stipulated_order_for_permanent_injunction_and_monetary_relief_as_to_individual_defendant_0.pdf; and *FTC v. Universal City Nissan, Inc., et al.*, No 2:16-cv-07329-CAS(AJWx) (C. D. Cal.), Available at: https://www.ftc.gov/system/files/documents/cases/170327_final_orderjudgment.pdf.  And third, conferring upon itself the ability to impose civil monetary penalties of up to $46,517 per violation for alleged violations of any of the many ill-defined and cumbersome requirements in the Proposed TRR would subject thousands of well-intentioned dealers who seek to comply with these requirements, but allegedly fall short to potential crushing liability that could shut down their businesses.

customer experience aided by rapid advances in technology, the Motor Vehicle Roundtables, far from supporting the Proposed TRR, actually undermine it.

The FTC initiated the Motor Vehicle Roundtables[145] following the enactment of Section 1029 of Dodd-Frank to "inform the Commission regarding what consumer protection issues, if any, exist that could be addressed through a possible rulemaking or other initiatives."[146]  The Commission's subsequent examination of the industry was thorough.  It consisted of in-depth panel discussions in three cities on each of the following topics:

1)      Understanding the Motor Vehicle Sale, and Credit Transaction, From Both Prime and Subprime Perspectives;
2)      Interest Rates, Dealer Reserves, and Markups;
3)      Payment and Locator Devices and Consumer Privacy;
4)      Spot Delivery;
5)      Contract Add-Ons;
6)      Vehicle Title Problems and Dealer Bankruptcies;
7)      Military Consumers and the Auto Sales and Financing Process;
8)      The Online Auto Process for Military and Other Consumers;
9)      Military Consumers, Sales Representations, and Financing Process Issues;
10)     Military Consumer Complaints and Military Sentinel;
11)     Military Consumers, Vehicle Title Problems, and Repossessions;
12)     Financial Literacy and Capability for Military Consumers;
13)     Special Programs to Enhance Consumers' Financial Literacy;
14)     Financial Literacy and New Approaches for Auto Sales and Financing;
15)     Fair Lending – Interest Rates, Markups, and Payments;
16)     Fair Lending – Compliance, Risk, and Liability;
17)     Understanding the Motor Vehicles Leasing Process;
18)     Misrepresentations and Other Consumer Protection Issues in Motor Vehicle Leasing;
19)     Consumer and Business Education: What, If Anything, Is Needed and What Works?;
20)     Which Practices, If Any, Cause Significant Harm to Consumers, and What Are Potential Solutions?; and
21)     Which Practices, If Any, Are Widespread, and What Are Potential Solutions?

These panel discussions produced over 21 hours of oral testimony from 58 panelists and more than 500 pages of written transcripts.  The FTC selected the panelists from a diverse range of interests throughout the marketplace which, in addition to representatives of different segments of the auto industry, included: (i) consumer group representatives from the Center for Responsible Lending, Consumer Federation of America, Consumers for Auto Reliability and Safety, National Consumer Law Center, and National Council of La Raza; (ii) representatives from the Department of Justice and CFPB; (iii) representatives of the Office of Attorney

---

[145] Public Roundtables: Protecting Consumers in the Sale and Leasing of Motor Vehicles, 76 Fed. Reg. 14,014-14,017 (Mar. 15, 2011).
[146] *Id.* at 14,015.

NADA Comments to Federal Trade Commission
Page 43 of 140
September 12, 2022

General and other state consumer protection agencies from Illinois, Iowa, Maine, and Texas; (iv) various military and civilian representatives of military service members; and (v) several plaintiffs' attorneys.  The record was further supplemented by 100 written comments that the Commission received through May 2012.

A central purpose of the Roundtables was to allow the Commission to determine whether credible data existed demonstrating that alleged harmful conduct was *prevalent* in the industry. In identifying the roundtable goals and topics for comment, the Commission stated:

> "Of particular interest to the FTC staff is data and empirical evidence supporting comments provided in response to this request."[147]

In addition, in *each* of the *twelve* sets of topics for comment that the Commission set forth in the notice announcing the Motor Vehicle Roundtables, the Commission asked:

> "How prevalent is this practice in the industry as a whole or in any subset of the industry?"[148]

The importance of obtaining empirical data demonstrating the prevalence of harmful practices in the industry did not end with this *Federal Register* notice.  During each of the Roundtables, Commission officials repeatedly sought this information in the following pleas:

<p align="center">Detroit Roundtable[149]</p>

> "And just to emphasize, what we're going to be looking for throughout this session today and future sessions is as much empirical evidence as possible. We've all heard stories and anecdotes and individual cases where consumers were mistreated in one way or another.  One of the real goals of this process is to find out how prevalent those practices are.  So if there are any studies, any sort of empirical data – that's something we'd be interested in seeing;"[150]

> "Does anyone have data on these practices occurring?;"[151]

> "… And in order to get good useful answers, we need data.  And I know you've heard that from us as a constant refrain, but we really do…;"[152]

---

[147] *Id.*
[148] *Id.* at 14,015-14,016 (Topics for Comment 3-14).
[149] *The Road Ahead: Selling, Financing & Leasing Motor Vehicles*, FTC, (Apr. 12, 2011), https://www.ftc.gov/news-events/events/2011/04/road-ahead-selling-financing-leasing-motor-vehicles.
[150] Comments of FTC Division of Financial Practices Associate Director Joel Winston (Panel 1).
[151] Comments of FTC Division of Financial Practices Attorney Carole Reynolds (Panel 4).
[152] Comments of FTC East Central Region Director John Miller Steiger (Conclusion of Detroit Roundtable).

NADA Comments to Federal Trade Commission
Page 44 of 140
September 12, 2022

<div align="center">San Antonio Roundtable[153]</div>

"To the extent we have any information about widespread practices, that would be
helpful from the panelists;"[154]

""Has there been any kind of analysis of trends and complaints from military consumers or any
kind of… statistics or any widespread practices that we have any information about?;"[155]

<div align="center">Washington, D.C. Roundtable[156]</div>

"We are especially interested in data and empirical information;"[157]

"And, again, if you have data or other indicators of how frequently these
practices occur, that would be great;"[158] and,

at the conclusion of the roundtable process:

"…We are looking at whatever data we can get.  And I will continue to say,
please give us hard facts and data.  That's more persuasive than anecdotes."[159]

Despite this "constant refrain," the Commission did not receive credible data demonstrating that
the practices it examined were prevalent in the marketplace and, not surprisingly, the
Commission did not follow the Roundtables, whose express purpose was to determine whether
a UDAP rulemaking involving motor vehicle dealers was warranted, by initiating such a
rulemaking in the decade that followed.  Consequently, it strains credulity to identify the 2011
Motor Vehicle Roundtables as somehow supporting the 2022 Proposed TRR.

In addition, the current exercise begs the unavoidable question:

---

[153] *The Road Ahead: Selling, Financing & Leasing Motor Vehicles*, FTC, (Apr. 12, 2011),
https://www.ftc.gov/news-events/events/2011/04/road-ahead-selling-financing-leasing-motor-vehicles.
[154] Comments of FTC Division of Financial Practices Assistant Director Malini Mithal (Panel 1).
[155] *Id*.
[156] *The Road Ahead: Selling, Financing & Leasing Motor Vehicles*, FTC, (Apr. 12, 2011),
https://www.ftc.gov/news-events/events/2011/04/road-ahead-selling-financing-leasing-motor-vehicles.
[157] Comments of FTC Bureau of Consumer Protection Deputy Director Chuck Harwood (Beginning of
Washington, DC Roundtable).
[158] Comments of FTC Division of Financial Practices Attorney Robin Thurston (Panel 4).
[159] Comments of FTC Division of Financial Practices Acting Associate Director Reilly Dolan (Conclusion of
Washington, DC Roundtable).

NADA Comments to Federal Trade Commission
Page 45 of 140
September 12, 2022

**What happened to the Commission's inquiry into whether the conduct it is examining is _prevalent_ in the marketplace?**

The Proposed TRR is based on precisely the same authority and involves the same participants that were the subject of the Motor Vehicle Roundtables, yet the NPRM does not include any inquiries into whether credible data establishes that the conduct it addresses is prevalent in the marketplace. Nor is there is a single reference to "prevalence" in the 126-page NPRM, including in any of the Commission's 49 Questions for Comment.[160]

How can it be that in 2011 (post-enactment of Section 1029(d)) "one of the real goals of this process [was] to find out how prevalent [harmful] practices are" and, in 2022, this goal, or even any mention of it, is completely ignored by the Commission? The Commission's failure to address this about-face is arbitrary in its own right. It is also contrary to the Commission's regulations for Section 18(a)(1)(B) rulemakings, which expressly require – with no exceptions – "[a] statement regarding the prevalence of the Acts or practices treated by the rule," in the statement of basis and purpose supporting a final rule.[161]

When an agency establishes a standard for proposing a UDAP rule through prior proceedings or regulations, the agency cannot credibly ignore its own standard in subsequent rulemakings. Moving the goalposts to accommodate an otherwise unsupported rulemaking is a completely arbitrary exercise that invites cynicism into the decision to advance this proposed rule.

2.    Qualitative Research

Similarly perplexing and equally troubling is the Commission's reliance on a _qualitative_ survey to support the Proposed TRR. It is the most prominent source of support for the Proposed TRR that is mentioned in the joint statement issued by the commissioners who voted to approve the Proposed TRR,[162] and it is quoted more than 30 times in NPRM in support of the rulemaking. As explained below, the Commission's qualitative survey is severely flawed and, therefore, cannot be relied upon as an accurate expression of the experience of the consumers who were surveyed. Even more problematic is the Commission's use of a qualitative survey – which is not appropriate for forming generalizable conclusions – to support a proposed rule of general applicability in the marketplace. As stated by Former FTC Chairman Muris and Former FTC BCP Director Beales:

---

[160] Instead, the NPRM simply cites cherry-picked and unsupported allegations of harm while ignoring any information in the record that controverts those allegations.
[161] 16 C.F.R. § 1.14.
[162] Joint Statement of Chair Lina M. Khan and Commissioners Noah Joshua Phillips, Rebecca Kelly Slaughter, and Alvaro M. Bedoya Regarding the Notice of Proposed Rulemaking on a Motor Vehicle Dealers Trade Regulation Rule, FTC, (June 23, 2022), https://www.ftc.gov/legal-library/browse/cases-proceedings/public-statements/joint-statement-chair-lina-m-khan-commissioners-noah-joshua-phillips-rebecca-kelly-slaughter-alvaro.

NADA Comments to Federal Trade Commission
Page 46 of 140
September 12, 2022

"Rulemaking is an exercise in generalization.  Rules must apply to a well-defined population, with requirements that apply in well-defined circumstances.  They cannot account for the wide range of specific factors that may be relevant to evaluate a practice in a specific context."[163]

A.    The Flawed Survey

On July 30, 2020, the FTC issued two staff reports regarding the car buying experience.[164]  The main report (the Auto Buyer Study) was jointly prepared by the FTC's Bureau of Economics (BE) and Bureau of Consumer Protection (BCP).  It summarizes the results of 90-minute interviews with 38 consumers in a single market that the FTC conducted more than 5 years ago, in April 2017.  The second report (the Supplemental Commentary) is a companion report issued by BCP which does not contain the results of any new research but rather purports to "highlight[] results from the study that are related to the broader context of sales and financing issues BCP has encountered in its enforcement role."[165]

The FTC first announced its intention to conduct consumer surveys in two PRA notices in January 2016[166] and September 2016.[167]  NADA responded by filing written comments with the FTC in March 2016 (Attachment 7) and October 2016 (Attachment 8) that both questioned the need for the study and explained in detail – and asked the FTC to address – numerous flaws and missing information in the study design.  Notwithstanding the very detailed problems that NADA identified, Commission staff proceeded with the interviews as intended with few modifications.

Following the Auto Buyer Study's release, NADA retained Dr. John P. Vidmar, a recognized expert in market research who has performed market research for numerous entities, including the FTC and other federal agencies, to review the Auto Buyer Study and provide his findings.  Dr. Vidmar's report, *A Critique on the Limitations of the Recent FTC "Auto Buyer Study"* (September 11, 2020)("Auto Buyer Study Critique"), is set forth in full at Attachment 9.  Dr. Vidmar's critique identifies numerous flaws in the Auto Buyer Study that thoroughly discredit the underlying consumer survey process and the manner in which it was reported.  These flaws relate to a range of issues, including:

---

[163] Back to the Future Report at 3 (Attachment 4).

[164] Mary W. Sullivan et.al., *The Auto Buyer Study: Lessons from In-Depth Consumer Interviews and Related Research*, FTC (July 2020). Available at: https://www.ftc.gov/system/files/documents/reports/auto-buyer-study-lessons-depth-consumer-interviews-related-research/bcpreportsautobuyerstudy.pdf. Carole L. Reynolds et.al., *Buckle Up: Navigating Auto Sales and Financing*, FTC, (July 2020). Available at: https://www.ftc.gov/system/files/documents/reports/buckle-navigating-auto-sales-financing/bcpstaffreportautofinancing_0.pdf.

[165] Supplemental Commentary at 5.

[166] Agency Information Collection Activities; Proposed Collection: Comment Request, 81 Fed. Reg. 780-783 (Jan. 7, 2016).

[167] Agency Information Collection Activities; Submission for OMB Review; Comment Request, 81 Fed. Reg. 63,179-63,186 (Sep. 14, 2016).

NADA Comments to Federal Trade Commission
Page 47 of 140
September 12, 2022

- Geographic Bias;
- Clustering Effects;
- Database Bias;
- Compensation Bias;
- Filter Bias;
- Recall Bias;
- Overall Evaluation of the Experience;
- Lack of Questions and Probing on Emotions and Thought Processes;
- Assumption that Consumers are Irrational;
- Mingling of References to Other Research; and
- Absence of Recommendations for Next Steps.

While Dr. Vidmar describes each of these flaws in detail, Dr. Vidmar's findings related to the last two topics are particularly noteworthy. With regard to the mingling deficiency, Dr. Vidmar states:

> "The FTC Study intermingles research findings from other studies with observations from the qualitative research. This purports to provide an aura of quantitative legitimacy to the report. However, one has to be careful in reading the report to identify the unique findings of this research. If you strip out the literature review which is present throughout the report, the research findings do not sound as substantial…. [M]any statements (over 80) include references to "some" respondents. Does this mean three, 15, or 20? Placed alongside a citation from the literature that is assumed to be from qualitative research, it misleads the reader to feel that the observation is a significant finding."[168]

And with regard to next steps, Dr. Vidmar states:

> "Typically, a qualitative report would make recommendation for further qualitative work to explore the wording of issues to be used in a quantitative protocol. Another typical recommendation would be for quantitative research to rigorously test, using scientific methods, the incidence and prevalence of issues of concern. Such a recommendation is lacking. That implies that this is viewed as a finished product appropriate for recommendation towards regulatory action. This study lacks that rigor."[169]

---

[168] Auto Buyer Study Critique at 8.
[169] *Id.*

NADA Comments to Federal Trade Commission
Page 48 of 140
September 12, 2022

These deficiencies, many of which were identified to the Commission before it launched the consumer survey process, severely undermine the value of the information produced by the interviews and thoroughly discredit it as a reliable indicator of marketplace conduct.[170]

<div align="center">

B.     The Flawed Use of the Survey

</div>

However, the most egregious aspect of Auto Buyer Study is the manner in which the Commission uses it to support this rulemaking.

It is well recognized that "qualitative research is not designed to establish the prevalence of problems or characteristics"[171] and that it is typically "used as a precursor to quantitative research."[172] And these limitations on qualitative research are recognized in the Auto Buyer Study itself, which highlights the need for additional research[173] and explicitly states:

> "The study is qualitative *and exploratory*…. Because this is a qualitative study of a small, non-representative sample of consumers, *the data generated are not useful for forming quantitative or generalizable conclusions*."

(Emphasis added.) [174]

Notwithstanding these inherent limitations and the Auto Buyer Study's own acknowledgment, the Commission has used a qualitative survey that may not be used for forming generalizable conclusions to support a proposed rule of general applicability in the marketplace. In doing so, the Commission has skipped the concededly essential step of conducting quantitative research to provide scientific validity to the conclusions it has formed.

Just as the Commission has dispensed with the need to acquire credible data to determine whether certain practices are prevalent in the marketplace which it insisted upon during the Motor Vehicle Roundtables, the Commission has also dispensed with the need to conduct quantitative research to validate the "generalizable conclusions" that it has made to support the

---

[170] The Supplemental Commentary is also noteworthy for the selective manner in which it highlights information from the consumer surveys, omitting statements from the Auto Buyer Study such as "many of the participants considered dealer financing to be a large convenience overall," "[s]ome participants got lower rates from the dealer than they were offered by independent sources," and "[s]ome participants with lower credit scores could not get an offer from a bank or credit union." It also ignores many positive experiences reported by the consumer interviewees with regard to the purchase and financing of the vehicle and VPPs.

[171] Auto Buyer Study Critique at 2.

[172] *Id.* at 4.

[173] *See* Auto Buyer Study at 1 ("The following lessons from the study provide a foundation for development of consumer education or *further research* into *potential* modifications of the buying process.") (Emphasis added.). *See also* the Supplementary Commentary at 13 ("Topics that may merit further study include…. Potential information gathering endeavors may include additional qualitative research, copy testing for potential remedial use, discussion with industry leaders, or expanded case-by-case investigations.").

[174] *Id.*

Proposed TRR.  This reflects an arbitrary and rushed process that inspires little confidence in the support for this entire exercise.

### 3.    Complaint Data

Another source of support that the FTC identifies for the Proposed TRR is the number of "auto related" complaints that is maintained in its Consumer Sentinel Network.[175]  The FTC states that it has received "more than 100,000" such complaints in each of the past three years[176] and maintains that its inability to act upon and investigate complaints regarding motor vehicle dealerships support the need for this rulemaking.[177]

However, this eye-catching number is both significantly inflated and devoid of context and, consequently, not useful for the purpose for which it is offered.

### A.    Inflated Numbers

The FTC's Consumer Sentinel Network lumps into "auto related" complaints several subcategories of complaints that are (i) unrelated or not clearly applicable to motor vehicle dealers who are subject to the Proposed TRR, (ii) unrelated to conduct addressed in the Proposed TRR, and (iii) obtained from sources which report complaints that likely have nothing to do with motor vehicle dealers in the United States.

With regard to the business entities to which the complaints apply, subcategories of "auto related" complaints include those pertaining to Gasoline, which has no connection to motor vehicle dealers,[178] and those pertaining to Auto Renting, which likely involves companies other than motor vehicle dealers.  Other complaint subcategories, such as Auto Financing, are vague and could involve motor vehicle dealers but also could involve finance sources that take assignment of retail installment sale and lease contracts from motor vehicle dealers and engage in account underwriting, servicing, collections, and repossessions.  And while the subcategory Used Auto Sales certainly includes franchised motor vehicle dealers and independent motor vehicle dealers with a service facility who are covered by the Proposed TRR, it likely also includes to a large extent independent motor vehicle dealers who lack a service facility and likely fall outside the scope of the proposed rule.[179]

---

[175] *Consumer Sentinel Network; Data Book 2021*, FTC, (Feb. 2022). Available at: https://www.ftc.gov/system/files/ftc_gov/pdf/CSN%20Annual%20Data%20Book%202021%20Final%20PDF.pdf.
[176] 87 Fed. Reg. at 42,015.
[177] *Id*. at 42,013.
[178] This subcategory is described as "price fixing and price gouging concerns against gas stations and oil companies…." Consumer Data Book 2021 at Appendix B1.
[179] In its final 2016 amendments to the Used Car Rule, the Commission explained why it believes all independent motor vehicle dealers are engaged in "servicing" and thus are covered by a trade regulation rule issued pursuant to Section 1029(d) of Dodd-Frank.  81 Fed. Reg. at 81,668 (Nov. 18, 2016) (codified at 16 C.F.R. § 455).  The Commission maintained that "appearance reconditioning" to prepare a vehicle for sale is a "type of servicing" that

NADA Comments to Federal Trade Commission
Page 50 of 140
September 12, 2022

With regard to the subject matter of the complaints, two other subcategories – Auto Parts & Repairs and Auto Service & Warranties – could apply to motor vehicle dealers, but these subcategories are not covered by the Proposed TRR.[180]  These subcategories alone represent nearly 30% of the total number of "auto related" complaints reported in 2021, a percentage that would be considerably higher if the significant number of other non-pertinent complaints were removed from the total number of complaints.

With regard to the data contributors, it appears that the total number of "auto related" complaints also includes complaints reported by government agencies and other organizations which are located outside of the United States and presumably pertain to activity occurring in their localities.[181]  These organizations include the Australian Competition and Consumer Commission, which the Consumer Data Book 2021 identifies as both a new data contributor[182] and its third top data contributor,[183] as well as ten Better Business Bureau data contributors located in Canada and Mexico.[184]

---

is "undertaken by essentially all used car dealers."  However, if essentially all used car dealers engage in this activity because it is a routine part of the sales process, then why did Congress use the expansive phrase "sale and servicing" instead of just "sale" and "leasing and servicing" instead of just "leasing"?  In other statutes that apply to motor vehicle dealers, Congress has not used this expansive language.  *See, e.g.*, the Federal Odometer Act, 49 U.S.C. § 32702(2) and The Inflation Reduction Act of 2022, amending the Internal Revenue Code, 26 U.S.C. § 30D(g)(8).  Consequently, Congress clearly was seeking to capture activity beyond what is engaged in by dealers as part of the sale of motor vehicles.  In this regard, understanding market conditions when Section 1029 was drafted is important.  In 2009, 50.3% of the average franchised motor vehicle dealer's gross income was attributable to new and used vehicle sales, while in 2010, 51.6% of the average franchised motor vehicle dealer's gross income was attributable to new and used vehicle sales. NADA.  These figures are averages, meaning that many franchised motor vehicle dealers' gross income from new and used vehicle sales fell below the 50% threshold.  If Section 1029(a) had excluded from the CFPB's jurisdiction motor vehicle dealers who are "predominantly engaged" in the sale of motor vehicles, the leasing of motor vehicles, or both, many franchised dealers may have not been so excluded,  Accordingly, it was essential to add "or servicing" to ensure that such franchised motor vehicle dealers – whose gross income from their service departments would cover most of the remainder of their gross income from all sources, were covered by the "predominantly engaged" language in Section 1029(a).  While this is not presented in Section 1029's legislative history, it also is not refuted, and any contrary explanation, including that offered by the Commission in its explanation of the 2016 Used Car Rule amendments, ignores the conditions that prevailed when Dodd-Frank was enacted and fails to recognize that Congress does not use superfluous language when creating laws. *See Corley v. United States*, 556 U.S. 303, 314 (2009)("[O]ne of the most basic interpretive canons" is that a "'statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant....'" (quoting *Hibbs v. Winn*, 542 U.S. 88, 101 (2004)).

[180] The subcategory Auto Service, which is described as "including dissatisfaction with service provided by auto mechanics," as well as the subcategory Auto Parts & Repairs, undoubtedly also include complaints against independent service and repair facilities that are outside the scope of the Proposed TRR. Consumer Data Book 2021 at Appendix B1.

[181] *See id.* at 2 ("In addition to taking consumer reports directly from people who call the FTC's call center or report online, Sentinel includes reports filed with other federal, state, local, and international law enforcement agencies, as well as other organizations, like the Better Business Bureau and Publishers Clearing House.").

[182] *Id.*

[183] *Id*. at Appendix A3.

[184] *Id*. at Appendix A4.

NADA Comments to Federal Trade Commission
Page 51 of 140
September 12, 2022

It also is unclear to what extent a complaint involving a single activity has been reported multiple times because it has been (i) placed into more than one subcategory,[185] and/or (ii) reported to more than one data contributor to the Consumer Sentinel Network. Either of these occurrences will further inflate the complaint numbers.

In addition, the complaints maintained by the Commission are "based on *unverified* reports filed by consumers." (Emphasis added.)[186]

Taken together, it is clear that the Commission's "more than 100,000 complaints" figure is significantly inflated and does not serve as a reliable indicator of the prevalence of specific harmful activity in the marketplace by motor vehicle dealers who are covered by the Proposed TRR.

### B.    Lack of Context

The flaw in the Commission's use of its complaint data to support the Proposed TRR is not confined to these limitations. The other glaring problem with its use is that the Commission does not take into account the size of the market in which these complaints have been reported.

The Commission states that it received more than 100,000 auto-related complaints in each of the past three years, but it fails to state that the number of new and used vehicle deliveries to consumers during the same period was (i) 42,720,306 in 2019, (ii) 39,313,272 in 2020, and (iii) 41,906,758 in 2021.[187] Accordingly, even when factoring in all of the "auto related" complaints, including the large number of such complaints that have nothing to do with motor vehicle dealers or the subject matter of the Proposed TRR, this represents a complaint-to-vehicle delivery ratio of only a small fraction of 1 percent.[188]

However, the frequency of complaints is actually much lower because the complaints in the Consumer Data Book are not confined to interactions between consumers and motor vehicle dealers involving completed deliveries. They also involve interactions between consumers and motor vehicle dealers (i) where a vehicle sale or lease did not occur, and (ii) to schedule and perform maintenance or repair work on their vehicles.[189] Were these interactions added to the

---

[185] *See* Consumer Data Book 2021 at Appendix B3 ("Consumers can report more than one category or subcategory.").
[186] *Id.* at 2. In addition, the complaints include those from consumers who have not experienced a loss. *Id.* at 3 ("Except where otherwise stated, numbers are based on reports both from people who indicated a loss and people who did not.").
[187] S&P Global; Wards Intelligence; NADA.
[188] The "auto related" complaints reported by the Commission during this period are 126,096 or 3.68% of the total complaints received (2019), 131,687 or 2.71% of the total complaints received (2020), and 137,468 or 2.4% of the total complaints received. Consumer Data Book 2021 at Appendix B2.
[189] As noted above, the subcategories of "auto related" complaints in the Consumer Data Book include Auto Parts & Repairs and Auto Service. *Id.* at Appendix B3. While the NPRM does not specifically mention Auto Parts &

NADA Comments to Federal Trade Commission
Page 52 of 140
September 12, 2022

vehicle delivery figures, it would reflect a complaint ratio that is even more minute and certainly not indicative of prevalent or widespread problems in the marketplace.[190]

This highlights the flaw of focusing on numerators while ignoring denominators. It suffers from a lack of context that gives the reported figures outsized importance that, in turn, distorts their significance.

Similarly perplexing is how the "tens of thousands of consumer complaints received by the FTC each year"[191] that purportedly involve motor vehicle dealers are now viewed as adequate to support a UDAP rule that applies to motor vehicle dealers. During the 2011 Motor Vehicle Roundtables, the Consumer Data Book also existed and also contained tens of thousands of "auto related" complaints.[192] Nevertheless, as detailed above, the Commission repeatedly sought credible data during the Motor Vehicle Roundtables indicating that the reported abuses were prevalent in the marketplace. This included the following statement set forth earlier from an FTC official at the beginning of the first roundtable:

> "And just to emphasize, what we're going to be looking for throughout this session today and future sessions is as much empirical evidence as possible. We've all heard stories and anecdotes and individual cases where consumers were mistreated in one way or another. One of the real goals of this process is to find out how prevalent those practices are. So if there are any studies, any sort of empirical data – that's something we'd be interested in seeing;"[193]

If the "tens of thousands" of auto related complaints in the Consumer Data Book 2011 were sufficient to demonstrate prevalence, the Commission would have not needed to request such data thirteen times in its *Federal Register* notice announcing the Motor Vehicle Roundtables and eight additional times during the Roundtables themselves. How then does today's similarly structured Consumer Data Book now emerge as a major source of support for this rulemaking?

---

Repairs when providing the "more than 100,000 complaints in each of the past three years" figure, without it, there were fewer than 100,000 auto related complaints in 2019, so the Commission presumably is referring to the full range of subcategories when using this figure. 87 Fed. Reg. at 42,015.

[190] For example, in addition to sales interactions where a delivery did not occur, the number of service and parts transactions between franchised dealers and consumers was (i) 249,405,238 in 2019, (ii) 210,761,449 in 2020, (iii) 216,573, 707 in 2021. NADA.

[191] 87 Fed. Reg. at 42,013, 42,035.

[192] *See Consumer Sentinel Network; Data Book for January-December 2011*, FTC, (Feb. 2012). Available at: https://www.ftc.gov/sites/default/files/documents/reports/consumer-sentinel-network-data-book-january-december-2011/sentinel-cy2011.pdf. While the number of "auto related " complaints in Consumer Data Book 2021 is larger than the number of "auto related" complaints in Consumer Data Book 2011 (which undoubtedly is attributable to, among other factors, a far more robust market in 2021 than in 2011), the auto-related complaints in Consumer Data Book 2021 are (i) 2.4% of the total complaints received compared to 4% of the total complaints received in Consumer Data Book 2011, and (ii) comprise the lowest percentage of overall complaints in this category at least since 2011.

[193] Comments of FTC Division of Financial Practices Associate Director Joel Winston (Panel 1).

4.    Enforcement Actions

The final primary source of support that the Commission identifies for the Proposed TRR is the "more than 50 motor vehicle-related enforcement actions" it has brought in the past ten years.[194] The Commission also references actions that have been taken by its federal and state law enforcement partners.[195]  However, as with the other sources of support that it identifies, the Commission overstates the number and relevance of these law enforcement actions, which in turn fail to serve the purpose for which they are offered.

A.    FTC Enforcement Actions

The Commission's overstatement is evident from the following breakdown of the "more than 50" enforcement actions figure it uses in the NPRM:

- Nearly 1/3 of these actions (sixteen) did not involve motor vehicle dealers and, therefore, similar to complaints that do not involve motor vehicle dealers, have no application to a proposed rule that only applies to motor vehicle dealers;

- Among the 37 actions that involved motor vehicle dealers, only three included allegations of unlawful conduct involving "add-ons," even though new duties and restrictions pertaining to "add-ons" are a central component of the Proposed TRR;[196]

- Almost all of the remaining actions involved allegations of deceptive advertising; however, here too, a breakdown of this broad category reveals that the FTC enforcement actions pertaining to different types of alleged advertising violations are also limited and otherwise not in need of duplicating existing consumer protection standards under federal and state law.  For example:

  o Eighteen of the advertising actions involved alleged violations of TILA and Regulation Z disclosure requirements, while sixteen of the actions (most of which were against the same respondents) involved alleged violations of CLA and Regulation M disclosure requirements. These laws and regulations already establish federal disclosure standards pertaining to credit and lease advertising that are not in need of duplication;

  o The deceptive pricing claims involved 13 dealers with eight actions involving the availability of the purchase price, six actions involving monthly payments, and five actions involving the availability of rebates, incentives, and discounts;

---

[194] 87 Fed. Reg. at 42,013.

[195] *Id.* at 42,018.

[196] This includes the Commission's recent enforcement action against the Napleton Auto Group , which is not included in the list of Commission enforcement actions provided in Footnote 14 of the NPRM. *See F.T.C. & Illinois v. N. Am. Auto. Servs., Inc.*, No. 1:22–cv–0169 (N.D. Ill. Mar. 31, 2022); *see also* 87 Fed. Reg. at 42,013.

NADA Comments to Federal Trade Commission
Page 54 of 140
September 12, 2022

     o     Five of the actions pertain to disclosures related to unrepaired safety recalls, which are not addressed in the Proposed TRR; and

     o     Four of the actions pertain to statements made concerning the payoff of a consumer's trade in vehicle; however, these limited actions are both few in number and dated, as each of them occurred more than 10 years ago; and

- The remaining FTC enforcement actions involve different types of alleged violations, with two of them involving ECOA and Regulation B, which are not addressed in the Proposed TRR and which already provide protection to consumers under federal law that is not in need of duplication, and the others involve a single enforcement action per type of violation.

Consequently, the "more than 50 motor vehicle-related enforcement actions" taken over the last decade that are cited by the Commission are actually far more limited, with an average of fewer than four actions per year taken against motor vehicle dealers (during a period involving approximately 409 million motor vehicle deliveries by franchised and independent motor vehicle dealers to consumers and 2.3 billion service transactions between franchised motor vehicle dealers and consumers).[197]  And of the actions that have been taken, (i) several involved activity outside the scope of the Proposed TRR, (ii) most were confined to advertising actions even though the scope of the Proposed TRR is much broader than advertising, and (iii) those addressing the broad category of advertising, when broken down by the type of alleged violation involved, offer trivial support for "additional measures to deter deceptive and unfair practices."[198]

### B.    Law Enforcement Partners' Actions

The Commission also cites as support for the Proposed TRR enforcement actions taken by the CFPB and state law enforcement agencies.  However, these actions are similarly of limited relevance here.

---

[197] The total number of new and used vehicles that franchised and independent motor vehicle dealers delivered to consumers from 2012-2021 was 409,097,738, while the total number of service and parts transactions between franchised motor vehicle dealers and consumers during this time frame was 2,275,341,690.  (NADA does not have data on the number of service and parts transactions between independent motor vehicle dealers and consumers.) NADA, Wards Intelligence, and S&P Global Mobility.

[198] 87 Fed. Reg. at 42,013.  This is not to question or in any way discourage the Commission from bringing enforcement actions when the Commission possesses credible evidence of misconduct and affords respondents appropriate due process.  Indeed, the proper exercise of enforcement authority allows the Commission to target bad behavior where it exists without saddling the "law abiding dealers" and "honest dealerships" that it wishes to protect with a series of unnecessary, burdensome, and costly duties.  *See* 87 Fed. Reg. 42,013, 42,026.  When enforcement actions occur, NADA broadly announces them to its members to both promote compliance and help ensure the Commission's areas of concern are known to relevant actors in the marketplace.

NADA Comments to Federal Trade Commission
Page 55 of 140
September 12, 2022

With regard to the CFPB actions,[199] all but three of them pertain to entities other than motor vehicle dealers and two of the three actions that pertain to motor vehicle dealers do not involve conduct that is addressed in the Proposed TRR.  Thus, these actions clearly are inadequate to support the Proposed TRR in any fashion.

With regard to "law enforcement sweeps" that states purportedly have taken with the FTC, the Commission similarly provides inflated numbers.  It states: "Operation Steer Clear and Operation Ruse Control brought with state law enforcement partners around the nation and Canada, encompassed over 246 enforcement actions."[200]  According to the "Operation Ruse Control" Chart of Actions that accompanied the press release announcing these actions, (i) 69 of them were brought in Canada, (ii) several of them either did not involve enforcement actions or were pending when announced, and (iii) a significant number involved entitles other than motor vehicle dealers (e.g., auto manufacturer, auto shipment broker, multiple auto finance companies, multiple auto title lending companies, auto loan modification company, auto loan acceleration company, and multiple after-market providers).  Indeed, one action that was included in this count was brought by the Department of Justice's Antitrust Division against a Japanese parts manufacturer.[201]  Lumping into a rulemaking involving only motor vehicle dealers in the United States a series of actions against other entities distorts the magnitude of these actions and undermines the support for this exercise.

Similarly, lumping in alleged misconduct by motor vehicle dealers that is not addressed in the rulemaking does not support the need for the Proposed TRR.  In numerous actions identified as part of "Operation Ruse Control," the allegations have no connection to the conduct that is addressed in the Proposed TRR.  And with regard to other actions that state authorities have taken independently, the Commission does list those cases or describe how the allegations they involve are connected to the conduct that is addressed in the Proposed TRR.[202]

- - -

It is clear, then, that the Commission's attempt to support the Proposed TRR by piecing together cherry-picked elements from the non-data producing and dated Motor Vehicle Roundtables, the severely flawed and misused qualitative survey, the greatly exaggerated and vague complaint data, and the greatly exaggerated and limited enforcement actions falls well short of justifying

---

[199] These are identified in Footnote 82 of the NPRM. *See id.* at 42,018.

[200] *See* Footnote 83 of NPRM. *Id.* at 42,018.

[201] Notwithstanding these limitations, the Commission described Operation Ruse Control in the April 2015 edition of *Penn Corner* as "252 enforcement actions… against *dishonest car dealers*" (emphasis added). *Penn Corner: Your Update to the Federal Trade Commission,* FTC, (Apr. 15, 2015), http://content.govdelivery.com/accounts/USFTC/bulletins/fea7b5. NADA identified this mischaracterization to the Commission in NADA's first set of comments in response to the Commission's first notice of its planned Auto Buyer Consumer Survey.  *See* Attachment 7.

[202] The lone exception appears to be a California case cited by the Commission in Footnote 84 of the NPRM. *See* 87 Fed. Reg. at 42,018.

NADA Comments to Federal Trade Commission
Page 56 of 140
September 12, 2022

its imposition of a new and comprehensive set of duties and restrictions on an entire segment of the marketplace.

IV.     The specific proposed rules in the NPRM are deeply flawed.

Not surprisingly, the lack of substantiation, shortcuts, and untested assumptions in the NPRM – as well as the rushed and procedurally flawed manner in which this rulemaking has been conducted – have contributed to the development of a proposed rule that is substantively deficient and will ill-serve both consumers and small businesses.

      a.     The substantive elements are unnecessary and ill-conceived.

           1.     The prohibitions are unnecessary, already unlawful, and many are poorly defined.

Section 463.3 of the Proposed TRR sets forth sixteen prohibited misrepresentations which (i) impermissibly conflict with the FTC Policy Statement of Deception and Section 5 of the FTC Act, (ii) seek to address underlying conduct that is already unlawful under federal and state law and enforceable by both the Commission and the States, and (iii) in many instances, do not provide adequately defined standards for regulated entities.

         A.     Conflicts with FTC Act and Policy Statement on Deception

The Proposed TRR seeks to change and impermissibly expand the concept of "deception" under Section 5 of the FTC Act, setting a new standard that applies only to motor vehicle dealers. Such a change, without any process or explanation, would (i) disrupt nearly 40 years of FTC precedent upon which motor vehicle dealers have relied and (ii) be a massive and impermissible expansion of the formally stated and statutorily required definition of Section 5 "deception."

The Section 5 "deception" standard used by the Commission has been the same since the Commission issued to Congress its 1983 "Deception Policy Statement."[203] That issuance sought to address active efforts at that time by Congress to define "deception" which were themselves in response to the Commission's use of a former deception standard that was deemed too broad and amorphous.[204]

---

[203] *FTC Policy Statement on Deception*, FTC, (Oct. 14, 1983), https://www.ftc.gov/legal-library/browse/ftc-policy-statement-deception.

[204] *See* Jack E. Karns, *The Federal Trade Commission's Evolving Deception Policy*, 22 U. Rich. L. Rev. 399 (1988). Available at: http://scholarship.richmond.edu/lawreview/vol22/iss3/5. ("In 1982, Chairman Miller testified before Congress about the desirability of a statutory definition of deception.  He stated that the ad hoc decision making of the Commission in this area had 'done consumers more harm than good.' The central issue was the traditional deception standard's broad prohibition of acts and practices that 'could benefit the majority of consumers,' but which had been held deceptive due to a 'tendency to mislead an unreasonable few.'" [Internal citations omitted].)

NADA Comments to Federal Trade Commission
Page 57 of 140
September 12, 2022

According to the FTC's Deception Policy Statement, for there to be "deception":

> "First, there must be a representation, omission or practice that is likely to mislead the consumer….
> "Second, we examine the practice from the perspective of a consumer acting reasonably in the circumstances….
> Third, the representation, omission, or practice must be a 'material' one."[205]

This Policy Statement was not only cited in the NPRM,[206] it has been followed and cited by the Commission and by courts on numerous occasions in the last forty years and forms the bedrock of current market-wide understanding of what could be deemed "deceptive" under Section 5 by the Commission as to *all* entities subject to the Commission's authority.

- *The Proposed TRR impermissibly ignores both the "Materiality" and "Reasonable Consumer" requirements of deception.*

The Commission has clarified that materiality under this time-tested standard is linked to whether the representation or omission in an advertisement "is important to a consumer's decision to buy or use the product."[207]  Although Section 5 of the FTC Act does not specifically include materiality as part of the unfairness and deception standards, the term *is included* in the statutory definition of "false advertisement."[208]

However, the Proposed TRR states, categorically and without any explanation or rationale, that it is a violation of this rule *and* of Section 5 of the FTC Act, for a dealer to make "*any* misrepresentation, expressly or by implication regarding" a litany of issues, subjects, and disclosures – including some of which are made to individual consumers, and others that are made broadly to the public.[209]  That formulation completely rewrites the FTC's longstanding deception standard by removing both the materiality and reasonableness requirements.

---

[205] *Id.* 1-2.

[206] 87 Fed. Reg. at 42,015 ("The FTC uses its authority under Section 5 to stop deceptive and unfair acts or practices in the motor vehicle marketplace. A representation, omission, or practice is deceptive if it is likely to mislead consumers acting reasonably under the circumstances and is material to consumers—that is, it would likely affect the consumer's conduct or decisions with regard to a product or service.  Some deception cases involve omission of material information, the disclosure of which is necessary to prevent the claim, practice, or sale from being misleading.").

[207] *See Advertising FAQ's: A Guide for Small Business*, FTC, (Jan. 2022), https://www.ftc.gov/business-guidance/resources/advertising-faqs-guide-small-business. Section 463.2(i) of the Proposed TRR similarly defines "Material" as "likely to affect a person's choice of, or conduct regarding, goods or services."

[208] See 15 U.S.C. § 55(a)(1) ("The term "false advertisement" means an advertisement other than labeling, which is misleading in a *material* respect; and in determining whether any advertisement is misleading, there shall be taken into account (among other things) not only representations made or suggested by statement, word, design, device, sound, or any combination thereof, but also the extent to which the advertisement fails to reveal facts *material* in the light of such representations or material with respect to consequences which may result from the use of the commodity to which the advertisement relates under the conditions prescribed in said advertisement or under such conditions as are customary or usual."  (Emphasis added).

[209] 87 Fed. Reg. at 42,045 (Proposed Section 463.3) (Emphasis added.).

First, "*any* misrepresentation" express or implied, about any of the listed issues simply cannot meet the materiality threshold. For example, a typographical error adding $1 to an advertised price or a misleading implication made by a salesperson in a conversation with a consumer about whether the consumer may take a vehicle out of the country would arguably violate this requirement – whether or not it had any *possible* effect on the consumer's decision to buy a vehicle. That is, it would be deemed "deceptive" under Section 5 whether or not the statement was "likely to mislead" a consumer, or whether or not the consumer, in those examples, ever saw or was confused by the typo, or whether the consumer had any intention to leave the country with the vehicle.

There is no requirement in the Proposed TRR of any reliance or effect on the purchase decision, or even an understanding on the part of the listener or reader of such "misrepresentations," and of course no requirement that many of the listed misstatements be material. Indeed, this is made clear by the fact that several of the listed "Prohibited Misrepresentations" *contain a specific "materiality" qualifier while most do not*.[210] In short, deeming "any" misstatement about any of these topics as presumptively and conclusively deceptive, the Proposed TRR's standard completely disregards "materiality."

In addition, this new "any misrepresentation, express or implied" standard of deception also ignores the requirement that any such representation or omission be viewed "from the perspective of a consumer acting reasonably under the circumstances."[211] The Commission provides no explanation for this limitation and, given that some of the topics arise in the context of individual consumer conversations while others involve market-wide advertisements, it provides no recognition that those consumer circumstances can vary. Not only does the Proposed TRR fail to properly limit deception violations to statements likely to deceive a reasonable consumer, it also does not even limit it to a purely subjective standard. Instead, the Proposed TRR establishes a strict liability standard: *any* misstatement (implied or otherwise) on the listed topics – regardless of likelihood of deception, reasonable interpretation or, with many of the misstatements, materiality – is *de facto* deceptive.

The Proposed TRR is issued pursuant to the Commission's rulemaking authority under 15 U.S.C. § 57(A)(1)(B), which states that: "…the Commission may prescribe: …(B) rules which define with specificity acts or practices which are unfair or deceptive acts or practices in or affecting commerce (within the meaning of Section 45(a)(1) of this title)…"

However, this rule is not defining acts with specificity that violate Section 5 "within the meaning" of Section 5, but is instead seeking to establish a new, broader standard that ignores

---

[210] For an example of the former, *see* Proposed Section 463.3(b) ("…or any other Material aspect…") and (g) ("Any Material information…"). *Id.* And while the NPRM asserts that "the prohibited misrepresentations in this section of the proposed rule are material," that does not transform "any" statement about those topics into *de facto* material statements. *Id.* at 42,019.

[211] *FTC Policy Statement on Deception*, FTC, (Oct. 14, 1983), https://www.ftc.gov/legal-library/browse/ftc-policy-statement-deception (p. 1).

the current Policy Statement Section 5 standard as well as the statutory mandate of a materiality requirement and that will apply only to Motor Vehicle Dealers.[212]

Beyond the fact that this strict liability standard for any misstatement is impermissible under the Commission's grant of authority, it also is not practical.  In the real world, actual or perceived misstatements or omissions[213] frequently occur when people communicate with one another.  Under the proposed standard, a dealer could not make *any* inadvertent misstatement, nor fail to state something with precision that would otherwise make their silence misleading, in any interaction with individuals or the public regarding any of the listed prohibitions.  That is simply an unworkable, overly broad, and impermissibly vague standard.

And the Commission's limitation of this more rigid standard to motor vehicle dealers covered by the Proposed TRR relative to other entities subject to the Commission's Section 5 authority creates an inconsistent standard that arbitrarily treats similar entities differently under the same statutory authority.  The Commission simply cannot bootstrap a new standard into a concurrent Section 5 violation.  Any alleged violations of Section 463.3 of the Proposed TRR cannot be deemed deceptive under Section 5 unless they first meet the standard for deception under Section 5.[214]

### B.    Addressing Already Unlawful Conduct

The Commission presumably recognizes that there is no regulatory hole to fill with this rulemaking and that making unlawful conduct doubly illegal is a superfluous exercise.  Instead, it explains that its motive for including this subsection is to confer upon itself the ability to impose civil monetary penalties on top of the current set of adverse consequences that can result from such actions.[215]  However, the Commission should not underestimate the effect of its current Section 5 enforcement actions on either individual respondents or the marketplace generally.  Even when respondents present a meritorious defense to an investigation that does not result in the Commission filing a civil complaint in federal district court or the parties entering into a consent order to resolve the Commission's allegations, the need for a small business to engage legal counsel to respond to civil investigative demands and to interact with Commission enforcement attorneys is both costly and disruptive to its business operations.  Further, when consent orders are entered into (which many respondents feel compelled to do notwithstanding their good faith belief that they have not engaged in any misconduct), they typically impose a series of comprehensive duties and obligations and are in effect for a period of 20 years.  These actions are also accompanied by press releases that can be very problematic

---

[212] 15 U.S.C. § 55(a)(1).

[213] *See FTC Policy Statement on Deception*, FTC, (Oct. 14, 1983), https://www.ftc.gov/legal-library/browse/ftc-policy-statement-deception at 2 (Stating "[s]ome cases involve omission of material information, the disclosure of which is necessary to prevent the claim, practice, or sale from being misleading.").

[214] While Congress might be able to exercise such authority under duly passed legislation, the Commission's attempted exercise of it in the Proposed TRR raises potential Separation of Powers and Equal Protection issues as well.

[215] 87 Fed. Reg. at 42,013.

for a community-based business (and over which the Commission should exercise greater oversight as it has issued press releases that do not fairly characterize the nature of a respondent's actions).

In addition, several Commission enforcement actions against motor vehicle dealers have involved significant fines (see Footnote 144, *supra*).  This is not to question the Commission's use of its current Section 5 enforcement authority in appropriate circumstances, which, as noted above, it can and should exercise.  However, it would be a mistake to assume that, but for the civil monetary penalty authority the Commission is seeking, it lacks the ability to address problematic activity in the marketplace.

<p align="center">C.      Misrepresentation Standards Lacking Clarity</p>

In addition to these flaws, Proposed Section 463.3 sets forth several misrepresentations that are vague and unclear and would require further definition of the proscribed conduct.  These sections of the Proposed TRR simply do not do what FTC Act Section 18(a)(1)(B) rules are supposed to do – namely, "define with specificity acts or practices which are unfair or deceptive."

- *The costs or terms of purchasing, financing, or leasing a vehicle.*[216]

These items should never be misrepresented, but how is this standard to be applied beyond not intentionally misstating a cost or other term of the contract?  For example, if a dealership employee discusses some of the terms to purchasing, financing, or leasing a vehicle, is the employee required to discuss *all* of them so as not to be accused of omitting certain information?  If so, does the dealership employee in effect have to read orally all of the terms of the buyer's order, RISC, or lease agreement to fulfill this obligation?  How would this affect the length of the transaction and the consumer's comprehension of the information presented by the employee?  If not, what terms can be presented and what can be left for the consumer's review of the written agreements?  A regulated entity should know the Commission's expectations in this regard on the front end of this process.

- *Any costs, limitations, benefit, or any other Material aspect of an Add-on Product or Service.*[217]

Similarly, other than intentionally misstating the costs or a term set forth in an agreement to purchase an "add-on" product or service, what conduct runs afoul of this prohibition?  Can a dealership employee address any of these items without triggering the need to explain each one in detail?  If all the terms must be orally presented, does this mean the employee must orally present the entirety of the agreement for the product or service prior to the consumer's review of it during the closing process?  How would this affect the length of the transaction and the

---

[216] *Id.* at 42,045 (Proposed Section 463.3(a)).
[217] *Id*. (Proposed Section 463(b)).

consumer's comprehension of the information presented by the employee?  And, in light of the prohibition on presenting "any other written materials" in Proposed Sections 463.5(b)(1)(iv) and 463.5(b)(2)(iv), is the employee precluded from supplementing an oral presentation with the presentation of written information in a non-legalese format that explains costs, limitations, and benefits of a product or service being discussed?

Because the Proposed TRR addresses not simply advertisements but also written and oral disclosures that arise during interactions between consumers and dealership employees, the Commission must carefully consider how these proposed mandates would apply in various scenarios.

- *The availability of any rebates or discounts that are factored into the advertised price but not available to all consumers.*[218]

This standard represents a departure from standards the Commission has articulated in the past and without any explanation in the NPRM as to how these current standards are deficient.

For example, in one of the enforcement actions cited in the NPRM pertaining to this standard, the Commission alleged that "the advertised discount and price are not *generally available* to consumers" (Emphasis added.)[219]  And, in the consent order that accompanied the complaint in that action, the Respondent was prohibited from:

> "Represent[ing] that a discount, rebate, bonus, incentive or price is available unless:
>
> 1.     It is available to all consumers, and for all vehicles advertised; *or*
>
> 2.     The representation clearly and conspicuously discloses all qualifications or restrictions on: (a) a consumer's ability to obtain the discount, rebate, bonus, incentive, or price and (b) the vehicles available at the discount, rebate, bonus[,] incentive, or price."

(Emphasis added.)[220]

The new standard the Commission sets forth in Proposed Section 463.3(d) effectively converts this "generally available" standards into an "available to all" standard and dispenses with the second condition above.

---

[218] *Id*. (Proposed Section 463(d)).
[219] *In the matter of Jim Burke Automotive*, No. C-4523 (May 4, 2015). Available at: https://www.ftc.gov/system/files/documents/cases/150529jimburkenissancmpt.pdf (p. 9).
[220] *Id*. at II.A

NADA Comments to Federal Trade Commission
Page 62 of 140
September 12, 2022

And for what reason?  The legal standard and public policy goal is to ensure that an advertisement is not likely to "mislead consumers acting reasonably under the circumstances."[221]  Does an advertisement that prominently lists both the price that is available to all consumers and a lower price that is available to a substantial number of consumers based on a widely available and clearly identified rebate run afoul of the FTC's Policy Statement on Deception?[222]

- *The availability of vehicles at an advertised price*.[223]

This is another standard where the prohibition seems straightforward but there can be good faith reasons why an honest actor can run afoul of it (particularly since intentionality is not an element to a finding of deception).  The reality is that dealers often do not fully control their own advertising platforms, as the manufacturers with which dealers have sales and service agreements as well as third parties that list dealer inventories may post vehicles, update inventory, or add or amend available rebates.  Increasingly, with supply chain disruptions caused by the pandemic and especially with the oncoming introduction of new electric vehicles, automobile manufacturers are working with dealers to take "reservations" for vehicles that may not yet have been manufactured.  Of course, vehicle manufacturers control and have insight into the production of the vehicles, and dealers retail them only after they have been produced, but the confluence of these factors makes the retail atmosphere very different today than it has been historically, where dealers maintained a huge physical inventory and offered only those vehicles physically on their lots.

In addition, advertising in digital media can produce situations in which inventory that has been sold is reflected on one advertising medium but is not instantaneously reflected on another advertising medium.  This standard should be defined with more precision after examining both how vehicles are advertised in today's market and how state advertising requirements address vehicle availability.[224]

---

[221] *Advertising FAQ's: A Guide for Small Business*, FTC, (Jan. 2022), https://www.ftc.gov/business-guidance/resources/advertising-faqs-guide-small-business.

[222] The Commission states: "When dealers advertise rebates and discounts, or offer prices that factor in such rebates and discounts, but in fact those rebates and discounts are not available to the typical consumer, but only a select set of customers, such conduct induces the consumer to select and transact with the dealer under false pretenses." 87 Fed. Reg. at 42,020.  However, this ignores the fact that when "the representation clearly and conspicuously discloses all qualifications or restrictions," as provided for in the second condition in the consent order referenced in Footnote 220 above, then the dealer has not acted under false pretenses.

[223] *Id.* at 42,045 (Proposed Section 463(e)).

[224] These examples underscore the concerns expressed by Commissioner Wilson regarding how, among other factors, "[t]echnologies and markets evolve in ways regulators are unable to predict" thereby making attempts to narrowly tailor rules "frequently unsuccessful."  87 Fed. Reg. at 42,047-42,048 (Dissenting Statement).

NADA Comments to Federal Trade Commission
Page 63 of 140
September 12, 2022

- *When the transaction is final or binding on all partie*s.[225]

This is another area where it is essential that the Commission consider applicable state disclosure standards so motor vehicle dealers understand whether statements they make to consumers pursuant to those standards comport with the Commission's application of this proposed federal standard. Issues of contract formation are governed under state law, and the standards and required disclosures that flow from them can differ.

- *Keeping cash down payments or trade-in vehicles, charging fees, or initiating legal process or any action if a transaction is not finalized or if the consumer does not wish to engage in a transaction.*[226]

This provision, which is intended to "curb" so-called "yo-yo financing," is overly broad and not carefully tailored to address the anecdotal reports upon which it is based.[227] If it is the Commission's intention to ensure parties to a conditional vehicle delivery are not prevented from returning to the *status quo ante* if objective conditions to a conditional delivery transaction that have been agreed to by the parties have not been satisfied (such as the willingness of a finance source to take assignment of the conditional RISC on the terms submitted), then it should use language to address this circumstance instead of language that precludes a motor vehicle dealer from legitimately exercising its contractual rights because, *for any reason*, a transaction has not been finalized or a consumer "does not wish" to engage in it. The Commission should review comments filed by state automobile dealer associations to gain a better understanding of why a dealer would legitimately exercise these remedies in situations that have nothing to do with so-called "yo-yo financing."

- *Whether or when a Motor Vehicle Dealer will pay off some or all of the financing or lease on a consumer's trade-in vehicle.*[228]

A dealer acting in good faith may express its intention to facilitate the issuance of a lien release on a trade in vehicle (which the dealer is incentivized to pursue so it can dispose of the trade in vehicle) but then is unable to secure it due to factors over which it has no control (since the lienholder ultimately controls when the lien is released). Consequently, the Commission's statement that "this provision would also prohibit dealers… from failing to pay off liens in a timely manner"[229] creates a liability trap for dealers who confront this all-too-frequent occurrence. The Commission should narrow this prohibition to specifically address the fact patterns giving rise to it that the Commission sets forth in the NPRM, and, in so doing,

---

[225] 87 Fed. Reg. at 42,045 (Proposed Section 463(h)).
[226] *Id.* (Proposed Section 463(i)).
[227] *See* Footnote 99 of the NPRM. 87 Fed. Reg. at 42,020-42,021.
[228] 87 Fed. Reg. at 42,045 (Proposed Section 463(j)).
[229] 87 Fed. Reg. at 42,021.

recognize that the dealer's business interest is to pay off the existing loan quickly so that the vehicle can be more easily and quickly retailed.[230]

- *Whether consumer reviews or ratings are unbiased, independent, or ordinary consumer reviews or ratings of the Dealer or its products or services.*[231]

This provision similarly uses unnecessarily vague language and prohibits conduct that is broader than what the Commission is seeking to address. Because it is expressed in the passive voice, this provision does not make clear that a violation only arises when the dealer, and not some other entity, affirmatively publishes consumer reviews concerning the dealership or its products or services that falsely claim they are unbiased, independent, or from an "ordinary" consumer. In addition, the Commission should further define the term "ordinary consumer." Is a relative an ordinary consumer? What about a neighbor or a member of one's church, charity, or social club? And, if not, how does a dealer police this? Or is an ordinary consumer a non-celebrity and, if so, how is a "non-celebrity" defined?

Of course, there is a common thread to the foregoing concerns about the misrepresentations stated in this subsection. As noted, the issue is not whether the Commission should possess UDAP enforcement authority when misrepresentations clearly run afoul of existing deception standards. The Commission possesses such authority and should continue to exercise it. However, when the Commission establishes broadly worded and vague standards that can result in violations with enormously adverse consequences by small businesses acting in good faith, it threatens the "honest actors" that the Commission seeks to protect. Guarding against this possibility by simply relying on the exercise of appropriate enforcement discretion is not enough. If these rules are to be finalized, the Commission needs to provide much greater precision in the articulation of these standards.

2.    The obligations violate TILA.

A.    Transactional Disclosures

Sections 463.3 and 463.4 of the Proposed TRR contain both prohibited misrepresentations and disclosure requirements. Many of these requirements are redundant of prohibitions and disclosure requirements that are already specifically enshrined in federal law. For over a half-century, TILA and Regulation Z have provided detailed instructions to creditors, including motor vehicle dealers, on how both to advertise financing and to disclose clearly the terms of the consumer's credit transaction.

The purpose of TILA is to aid the "[i]nformed use of credit."[232] The Act is Congress' effort to guarantee the accurate and meaningful disclosure of the costs of consumer credit and thereby to

---

[230] *See* Footnote 102 of the NPRM. 87 Fed. Reg. at 42,021.
[231] *Id.* at 42,045 (Proposed Section 463(k)).
[232] 16 U.S.C. §1601(a).

enable consumers to make informed choices in the credit marketplace.[233]  TILA was enacted to ensure that "the American consumer will be given the information he needs to compare the cost of credit and to make the best informed decision on the use of credit."[234]

Rather than providing accurate and meaningful information, the proposed disclosures will have the effect of confusing consumers by supplying different *TILA-like* information.  The Commission is not empowered to inject new, contradictory credit protection product cost disclosure requirements, nor to intentionally enact additional barriers to a consumer's purchase of such products.  Congress has delegated to the FRB the authority to prescribe regulations that may contain "such classifications, differentiations, or other provisions, and may provide for such adjustments and exceptions for any class of transactions, as in the judgment of the Board are necessary or proper to effectuate the purposes of [TILA], to prevent circumvention or evasion thereof, or to facilitate compliance therewith."[235] Congress has specifically designated the FRB as the primary source for interpretation and application of TILA,[236] empowering it to formulate interstitial policy and to create rules for administering the statute.

Simply put, the FRB is vested with authority to issue substantive regulations under TILA applicable to motor vehicle dealers within the scope of the Proposed TRR[237] that govern the content, form, and timing of credit-related disclosures, and the FTC cannot expand or otherwise alter the requirements established by FRB regulations.[238]  While the Commission is empowered to enforce the provisions of TILA,[239] by encroaching into areas already clearly governed by TILA, the Proposed TRR exceeds the Commission's authority.

Moreover, by seeking to erect barriers to consumers (in the form of additional penalties, duties, repetitive and confusing disclosures, forms, limitations, and signatures), the Commission goes further, impermissibly venturing into the direct regulation of credit, rather than effectuating the Act's primary purpose which is to alleviate, through accurate disclosures, what the enacting Congress perceived as "widespread consumer confusion" about the cost of credit.[240]  TILA is

---

[233] *Id.*

[234] *Mourning v. Fam. Publ'n Serv., Inc.*, 411 U.S. 356, 364 (1973) (citing H.R. Rep. No 1040, 90th Cong. 1st Sess., p. 13, n.18 (1967)).

[235] 15 U.S.C. § 1604(a).

[236] *See* Household Credit Servs., Inc. v. Pfennig, 541 U.S. 232, 238 (2004).

[237] Sections 1029(a), 1029(c), and 1100A(7) of the Dodd-Frank Act. Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, § 124 Stat. 1376 (2010).

[238] *See USLIFE Credit Corp. v. FTC*, 599 F.2d 1387 (5th Cir. 1979).

[239] *See* 15 U.S.C. § 1607 ("Administrative enforcement
(c) Overall enforcement authority of the Federal Trade Commission
Except to the extent that enforcement of the requirements imposed under this subchapter is specifically committed to some other Government agency under any of paragraphs (1) through (5) of subsection (a), and subject to subtitle B of the Consumer Financial Protection Act of 2010, the Federal Trade Commission shall be authorized to enforce such requirements.  For the purpose of the exercise by the Federal Trade Commission of its functions and powers under the Federal Trade Commission Act, a violation of any requirement imposed under this subchapter shall be deemed a violation of a requirement imposed under that Act.").

[240] *See Gennuso v. Com. Bank & Trust Co.*, 566 F. 2d 437, 441 (3rd Cir. 1977).

meant to give consumers "the *facts* with which to make rational and informed credit judgments..." and to "...enhance and strengthen free competition in the consumer credit industry."[241]  It serves that purpose by simply and clearly disclosing relevant information, not by setting up a series of complicated and confusing puzzles for consumers to discern and a sea of documents to navigate.

The FRB rules have repeatedly been the subject of notice-and-comment rulemaking and periodic regulatory review.  They have been interpreted by the FRB through its Official Staff Commentary,[242] which has also been the subject of notice and extensive public comments.  Further, these requirements have been the subject of extensive court rulings, which has built a rich body of caselaw that provides additional guidance on meeting these requirements.

As noted, the extensive existing credit disclosure regime governs three critical dimensions of consumer credit disclosure: the content, form, and timing.  Each of these aspects has been carefully tested, adjusted, and calibrated to work together, and has been relied on by dealers and consumers for decades.

With virtually no mention of this rich and time-tested regulatory system, the Commission proposes to sprinkle in a new layer of disclosure and other regulatory requirements on the specific areas currently covered by TILA, often using the same or similar terms as those under TILA, but with different meanings.  No apparent thought has been given, no coordination with the FRB has been mentioned, and certainly no supporting study has been identified regarding how these new rules would interact with existing federal requirements and, more importantly, whether the interaction will improve consumers' understanding of credit products or leave them hopelessly confused.

For example, the term "Cash Price without Optional Add-ons" (discussed at length in Section IV.a.3.B(3) below), as defined in Proposed Section 463.5, differs from the definition of "cash price" under TILA, which provides:

> "*Cash price* means the price at which a creditor, in the ordinary course of business, offers to sell for cash property or service that is the subject of the transaction. At the creditor's option, the term may include the price of accessories, services related to the sale, service contracts and taxes and fees for license, title, and registration. The term does not include any finance charge."[243]

Under current practice and consistent with this definition, the cash price disclosed on a RISC may include, for example, accessories, services related to the sale, and service contracts, while the Proposed TRR's Cash Price without Optional Add-ons does not.  At the same time, the cash

---

[241] *Powers v. Sims & Levin Realtors*, 396 F. Supp. 12, 16 (E.D. Va. 1975), *aff'd in part and rev'd in part on other grounds*, 542 F.2d 1216 (4th Cir. 1976) (emphasis added.).
[242] 12 C.F.R. § 226, Supplement I.
[243] 12 C.F.R. § 226.2(a)(9).

price on a RISC will not have been reduced by any trade-in valuation but the Cash Price without Optional Add-ons is required to subtract that amount. As a result, the cash price on a RISC for a vehicle will very likely differ from the cash price disclosed under the Proposed TRR. At a minimum, this will cause confusion. Even worse, it could lead to consumer legal actions against dealer-creditors charging misrepresentation of the cash price prior to the disclosure under Regulation Z.

In addition, the Proposed TRR would require the dealer to disclose to the consumer (and get the consumer to countersign a document containing) a "finance charge," which is another defined term and required disclosure under TILA.[244] The required "finance charge" disclosures in the Proposed TRR may use the same term, but that term is not defined in the Proposed TRR, varies in the different required disclosures, and would seem to be based on a calculation different from that in TILA and Regulation Z.

For example, the Proposed TRR states that the dealer must disclose a form that contains the "Cash Price without Optional Add-ons in a financed transaction."[245] That figure must "factor[] in any cash down payment and trade-in valuation, and exclud[e] optional Add-ons [which could include insurance items…and] must separately itemize…the finance charge…"[246] As discussed in greater detail below, that calculation and disclosure lack clarity, but under any interpretation would be likely to result in a figure that is different from the Regulation Z required "finance charge" figure on the RISC.

Regulatory agencies have often made serious mistakes – or barely averted them – when they have proposed rules and disclosures without thoroughly testing their effectiveness. This risk of leaving consumers more confused than aided is even greater when the proposals mandate disclosures that are similar to, but different from, closely related existing regulatory requirements. Both regulatory information overload and the differences between the disclosures, which may be based on different facts, risk not only failing to add to consumers' understanding of the credit terms but also, and worse, reducing their understanding of information the Commission seeks to convey.

Section 465.3(d) of the Proposed TRR, which requires "Express, Informed Consent" from the consumer before a dealer may charge for any item, also disrupts the TILA disclosure regime. Express, Informed Consent is defined as:

---

[244] *See, e.g.*, *Regulation Z, Truth in Lending*, FRB, (Nov. 27, 2017), https://www.federalreserve.gov/boarddocs/supmanual/cch/200601/til.pdf#:~:text=The%20finance%20charge%20is%20a%20measure%20of%20the,or%20fees%20payable%20directly%20or%20indirectly%20by%20. (Noting that "[o]ne of the more complex tasks under Regulation Z is determining whether a charge associated with an extension of credit must be included in, or excluded from, the disclosed finance charge." Attachment 10 provides a visual summary of some of the considerations when calculating the TILA/Reg Z "Finance Charge."
[245] 87 Fed. Reg. at 42,046 (Proposed Section 463.5(b)(2)).
[246] *Id.*

NADA Comments to Federal Trade Commission
Page 68 of 140
September 12, 2022

> "…an affirmative act communicating unambiguous assent to be charged, made after receiving and in close proximity to a Clear and Conspicuous disclosure, in writing, and also orally for in-person transactions, of the following:

> (1)    What the charge is for; and
> (2)    The amount of the charge, including, if the charge is for a product or service, all fees and costs to be charged to the consumer over the period of repayment with and without the product or service.

> The following are examples of what does not constitute Express, Informed Consent:

> (i)    A signed or initialed document, by itself;
> (ii)   Prechecked boxes; or
> (iii)  An agreement obtained through any practice designed or manipulated with the substantial effect of subverting or impairing user autonomy, decision-making, or choice."[247]

TILA Section 106(b)(1) allows premiums and fees in connection with credit protection products to be excluded from the calculation of APR if the cost is disclosed, the consumer affirmatively elects coverage, and "coverage of the debtor by the insurance is not a factor in the approval by the creditor of the extension of credit…"[248]

The Commission, however, is proposing to require expanded disclosures related to "items"[249] currently disclosed under TILA which go far beyond the disclosures mandated (or even contemplated) by Section 106(b)(1) of TILA. TILA Section 105(a) authorizes the *FRB* to interpret TILA to effectuate the statute's purposes, to prevent circumvention or evasion of the statute, or to facilitate compliance with the statute, not the Commission.[250] However, the Proposed TRR would require that the purchase of credit protection products must be with "Express, Informed Consent" and that it is an entirely new and different standard than "voluntary," as it requires the consumer to be provided with additional information about such credit protection products including "all fees and costs to be charged to the consumer over the period of repayment with and without the product or service."

This new standard is not contained in the plain language of TILA. The applicable TILA section does not use the words "Express or Informed." Rather, it requires the three conditions noted

---

[247] *Id.* at 42,044 (Proposed Section 463.2(f)).
[248] 15 U.S.C. § 1605(b)(1).
[249] The scope of that term in the Proposed TRR is unclear and undefined but includes any "item" (Proposed Section 463.5(c)), for which a dealer charges a consumer "in connection with the sale or financing of vehicles." 87 Fed. Reg. at 42,046 (Proposed Section § 463.5). This would include not only "add-ons" (some of which are credit insurance products governed explicitly by TILA), but also the various "Cash Prices" and "finance charges" that are required to be disclosed under the Proposed TRR.
[250] 15 U.S.C. § 1604(a).

above to be satisfied.  The disclosures in the Proposed TRR impermissibly require creditors to disclose TILA information in a different context and format.

Indeed, the proposed requirement is complicated, confusing,[251] and will inhibit or dissuade consumers from buying consumer protection products that can benefit them.  This is inconsistent with the TILA mandate.

<div align="center">B.     Advertising Disclosures</div>

TILA's credit advertising rules, like its consumer disclosure rules, have been carefully considered by the FRB in consultation with public stakeholders. The rules have also been interpreted for decades by the FRB.  Courts have similarly interpreted them.  In short, these comprehensive rules have been rigorously reviewed and tested, and they have provided creditors and consumers with clear and enforceable credit and lease advertising disclosure standards.  Indeed, the FTC has brought more enforcement actions against motor vehicle dealers for credit advertising violations than for any other issue.  No additional regulation of credit and lease advertising is needed.

Nevertheless, the Proposed TRR contains several examples where that long-standing regime is duplicated, modified, or ignored.  For example, Section 463.3(a) prohibits any misrepresentation, expressly or by implication, regarding the costs or terms of financing or leasing a vehicle.  However, both TILA and CLA and their companion Regulations Z and M contain detailed rules that address finance and lease advertising.  Both regulations (i) require that any advertisements of credit terms state only terms that are actually offered,[252] (ii) require that disclosures in advertisements be clear and conspicuous,[253] (iii) describe how an advertisement must express a finance charge or lease rate,[254] (iv) specify which advertised terms "trigger" additional disclosures to ensure that omissions are not misleading,[255] and (v) contain special rules for television and radio advertisements.[256]

Section 463.3(c) of the Proposed TRR would require that ads not misrepresent whether any terms are, or the transaction is, for financing or a lease.  This provision is unnecessary. Regulation M already requires any advertisement containing any lease payment amount to state that the advertised transaction is for a lease.[257] Moreover, any credit advertisement containing a triggering term must disclose the annual percentage rate, using that term, which is not applicable to a lease transaction.  The possibility that a consumer might misunderstand a lower-than-expected payment amount to be for a credit transaction rather than a lease is already

---

[251] *See* discussion of "Express and Informed Consent" language in Section IV.a.3.B(3) below.
[252] 12 C.F.R. § 226.24(a); 12 C.F.R. § 213.7(a).
[253] 12 C.F.R. § 226.24(b); 12 C.F.R. § 213.7(b).
[254] 12 C.F.R. § 226.24(c); 12 C.F.R. § 213.7(b)(2).
[255] 12 C.F.R. § 226.24(d); 12 C.F.R. § 213.7(d).
[256] 12 C.F.R. § 226.24(g); 12 C.F.R. § 213.7(f).
[257] 12 C.F.R. § 213.7(d)(2)(i).

addressed by federal law.  But if more clarity is required regarding the question of whether the advertisement is for financing or a lease, the proper regulatory solution is for the FRB to amend Regulations Z and M, not for the Commission to impermissibly assign itself this function.

Section 463.4(a)(2) of the Proposed TRR similarly would effectively attempt to amend the credit advertising rules of Regulation Z and, as with the other elements of the proposed rule, impose it solely on motor vehicle dealers who would be subject to it.  This provision is not merely unnecessary; it is harmful to consumers and competition.  It would create an unlevel playing field not only among auto dealers based only on whether they have a service department, but also between motor vehicle dealers with service departments and all other types of consumer retail creditors.

Regulation Z requires three specified additional disclosures whenever a credit advertisement contains any one of four "trigger" terms.[258]  For covered motor vehicle dealers, the Proposed TRR would add the "Offering Price" to the additional terms required in response to a trigger term, and it would make *any* financing term a trigger term.[259]  The requirement would make it virtually impossible for a dealer to advertise a credit program without also advertising Offering Prices on every vehicle covered by the advertisement.  The Commission does not explain why it believes advertisements that do not contain misrepresentations about price – indeed ads that do not even reference a price – must contain these Offering Prices with any mention of a specific vehicle.

> 3.    The obligations are unnecessary and counterproductive.

> A.    Advertisements

The Proposed TRR creates other new advertising requirements that are duplicative of current prohibitions and will limit, not improve, price transparency.

Section 463.4 of the Proposed TRR contains a broad requirement that dealers "must disclose" the "Offering Price" in "any advertisement that references, expressly or by implication, a specific vehicle, [or] any monetary amount or financing term for any vehicle."[260]  As discussed in greater detail below, because of the nature of the "Offering Price" and the obligations it creates for dealers, this proposed requirement raises a number of practical issues that would raise difficult or impossible barriers to advertising compliance.  Because the Offering Price is a price for which a dealer must apparently be willing to "*sell or finance the motor vehicle to any consumer,*" it is no longer simply what is today presented as an advertised price, which is one that – while certainly accurate when posted – can change as the market changes.  As outlined

---

[258] 12 C.F.R. § 226.24(d).

[259] The offering price requirements in Section 463.4(a) of the proposed rule apply only to financing transactions, not leases.

[260] 87 Fed. Reg. at 42,045 (Proposed § 463.4(a)(1) and (2)).

NADA Comments to Federal Trade Commission
Page 71 of 140
September 12, 2022

below, vehicle prices change and change often.[261]  How would those changes be reflected as "Offering Prices" in static advertisements?

Moreover, this obligation will mean that dealers will certainly be more reluctant to advertise prices.  For example, what if an advertised vehicle was either sold or otherwise no longer available to a consumer who sought to purchase it?   Would the dealer be somehow obligated to sell some other vehicle to that consumer at that price?  And dealers would not find compliance assurance in broader advertisements because the same obligation arises when the dealer "refer[s] to a specific vehicle" or any financing term "by implication."  What does that mean?

This broad "by implication" standard is particularly problematic given the Commission's broad view of what constitutes an advertisement.[262]  For example, would this requirement apply to any ad that simply listed a dealer website – because by implication the website lists vehicle prices and refers to specific vehicles?

All of this means that these proposed requirements will ultimately limit, if not in some cases eliminate, price advertising by dealers – and may even suppress other types of dealer advertisements as well.[263]  Perhaps this is the underlying goal of this requirement, but that is unclear.[264]  What is clear is that fewer price advertisements will certainly severely limit price discovery which, in turn, will require consumers to visit dealerships for price information instead of conducting online research (which will further delay the car shopping process).  This will lead to less informed consumers, decrease price competition among dealers, and provide an unwarranted competitive advantage to vehicle advertisers who are not covered by the proposed rule.

---

[261] In fact, technology is increasingly enabling tools like dynamic pricing to be utilized in the automotive industry, just as they are in other industries.  Dynamic pricing is a strategy that involves setting flexible prices for goods or services based on real-time demand.  Tools that enable this strategy allow manufacturers and dealers to change prices routinely and in real time, to increase efficiencies and adjust to market needs.  The Proposed TRR would make such a practice virtually impossible, and that is yet another example of why a static rule such as the Proposed TRR risks "ossifying" practices in the market – to the detriment of consumers.

[262] For example, it would apply to "claims made online" and "[s]olicitations made in print, on the telephone, radio, TV, or online."  *See Advertising FAQ's: A Guide for Small Business*, FTC, (Jan. 2022), https://www.ftc.gov/business-guidance/resources/advertising-faqs-guide-small-business (pp 3-4).

[263] To be sure, in some states (e.g., New Jersey, N.J. Admin. Code § 13:45A-26A.5), dealers who advertise vehicles are required to include a price.  In those states, the likely outcome is that dealers will just list the MSRP, and forgo, for the reasons stated in the text, the advertisement of any discounts.

[264] The underlying premise of the Proposed TRR seems to be that dealer advertising, and in particular price advertising, is inherently problematic.  This may be why the outcome described above may be viewed by the Commission as a "feature not a bug."  However, such a view clearly underestimates the consumer benefit of price competition and discovery (however imperfect it may be in a negotiated marketplace) that is accomplished via advertising.  And if the goal is to limit price advertising, there is no stated reason (and of course no study or proof as to) why such a drastic approach would be in any way beneficial to consumers or the marketplace. *See, e.g. Virginia Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 764 (1976) (striking down limits on advertising of prescription drugs and emphasizing society's "strong interest in the free flow of commercial information").

Similarly problematic are the Section 463.3(d) and (e) prohibitions for the reasons stated in Section IV.a.1.

### B.   Disclosures

Section 463.4 of the Proposed TRR requires a series of new disclosures, forms, and signatures that will artificially disrupt and delay the sales process, limit price transparency, frustrate and confuse consumers, and limit online sales.  To be clear, *every single data item that these forms would require dealers to disclose to consumers is currently required to be (and is) disclosed to consumers before consummation of vehicle sales contracts*.  Consumers are clearly told the purchase price of the vehicle, the value of their trade-in, and the cost of financing and any VPPs they choose to purchase.  It is just that those disclosures are currently made in a more logical way, and at a point in the transaction process that makes sense given the nature of the transaction and the varying desires and needs of consumers.

Of course, the millions of interactions that consumers have with dealers every day vary widely, and many consumers express an interest in different portions of the overall vehicle purchase transaction at different stages of their interactions with dealers.  This is the product of a diverse and dynamic marketplace.  Some consumers are initially most interested in the vehicle sales price, others in performance and gas mileage, others in financing options, and still others in the value of their trade in or the cost of a service contract or other VPP.  But regardless of the nature of the conversations, each of these items is fully and clearly disclosed to consumers at the time when consumers will most benefit from the information.

- The Timing and Nature of the Disclosures and Signature Requirements Will Frustrate Online Sales

As noted in detail above, there has been a strong and growing trend in the automotive retail industry toward providing an online shopping and sales experience for those consumers who wish to complete some or all of the sales process remotely.  Of course, many, if not most vehicle purchasers still wish to visit the showroom to see, feel, and drive a vehicle they are considering purchasing, to ask questions, and to compare features, vehicles, and more.  But for those who do wish to shop online, it is increasingly common for an online experience to be offered by franchised dealers.  This trend was of course accelerated by the pandemic, but it continues to grow as a part of dealers' ongoing and successful efforts to streamline the sales process and provide world-class customer service.  This is a product of an evolving marketplace.

Unfortunately, the Proposed TRR is likely to frustrate those efforts, limit efficiency, and add confusion and regulatory roadblocks to the online sales process.  That is because the Proposed TRR will limit the ability of dealers to freely communicate with consumers online (and elsewhere), limit consumer price discovery, frustrate the vast majority of consumers who wish to shop online within the confines of monthly budgetary constraints, increase the time required to complete a transaction, and confuse consumers in the process.  As outlined below, the timing

of the disclosures, as well as the proposed rule's added consumer signature requirements, will broadly inhibit online price discovery, car shopping, and prevent many people with limited online presence from the ability to price shop for vehicles online at all.

<div align="center">

1)     Offering Price

</div>

The Proposed TRR imposes the following requirement on motor vehicle dealers:

"(3)    In any communication with a consumer that includes a reference, expressly or by implication, regarding a specific vehicle, or any monetary amount or financing term for any vehicle…

(i)    The Offering Price for the vehicle must be [clearly and conspicuously] disclosed in the Dealer's first response regarding that specific vehicle to the consumer; and

(ii)    if the communication or response is in writing, the Offering Price must be [clearly and conspicuously] disclosed in writing."[265]

The "Offering Price" is defined as:

"the full cash price for which a Dealer will sell or finance the motor vehicle to any consumer, excluding only required Government Charges."[266]

By artificially requiring disclosure of an Offering Price at the very first interaction with a consumer, the Proposed TRR will limit consumer price discovery, create confusion, add significant additional time to the sales process, and give rise to other problems.

First, most initial consumer communications are likely to include a term that triggers the Offering Price disclosure requirement.  However, at this initial stage of the process, there is a host of information that dealers do not have.  For example, the dealer will not know whether the consumer is seeking to have the dealer meet or beat a competing offer that the consumer has received from another dealer for the same vehicle, and other variables that operate to the consumer's benefit.  Consequently, dealers are likely to default to a price such as the Manufacturer's Suggested Retail Price (MSRP)[267] that is higher than the price they ultimately could offer the vehicle to the consumer.  If dealers are locked into this price, it will limit the ability of consumers to avail themselves of pro-competitive factors that can produce cost savings.  If dealers are not locked into this price and are able to discount it when more information is known, then what purpose does it serve?

---

[265] 87 Fed. Reg. at 42,045 (Proposed Section 463.4(a)).
[266] *Id.* (Proposed Section 463.2(k)).
[267] 15 U.S.C. §§ 1231-1233.

NADA Comments to Federal Trade Commission
Page 74 of 140
September 12, 2022

In fact, this outcome (Offering Price = MSRP) is seemingly required by the Proposed TRR for new vehicles because the first of the several new disclosure documents (discussed *infra)* requires the dealer to separately list any "discount,"[268] separately itemizing it as a deduction from the "Offering Price." That certainly seems to indicate that dealers would be unable to include any "discount" in the Offering Price.

The MSRP is, of course, already available and required on the Monroney label of the vehicle, and dealer fees are generally uniform (often governed by state law) and are disclosed on dealer websites, advertisements, and in sales paperwork. While there may be no obvious harm in requiring the disclosure of the MSRP and fees to consumers, it is difficult to determine how this is helpful or provides consumers with any new information.

This will further confuse consumers about the difference (if any) between the Offering Price and the MSRP. The MSRP is a well-established and understood concept that consumers rely on in the vehicle purchase process. The blurring of the lines between MSRP, Offering Price, and the various other prices and terms that the Proposed TRR requires to be disclosed will not only confuse consumers, but it will also weaken the efficacy of the MSRP disclosure.

There is also a good possibility that some, if not many, consumers could misinterpret this Offering Price disclosure as a one-price offer.[269] This is especially true as the disclosure must be in the dealer's "first response" to the consumer, and therefore the dealer would not be able to first explain why the Offering Price is being provided and what it may mean. As a result, many consumers may be less likely to negotiate a better price than they would have otherwise.

In addition, the forced disclosure of an "Offering Price" in connection with "*any communication* with a consumer," means that the first response from a dealer to most phone, text, and internet inquiries from a consumer about virtually anything will require a convoluted and overloaded disclosure communication back to the consumer. So, for example:

**Consumer text message**: "*Do you have a silver F-150 in stock?*"

**Required Reply**: "*Yes. We have 40 silver F-150s in stock: Stock no. 1234 - Offering Price $45,678, Stock no. 1237 - Offering Price $46,955, Stock no. 1276 - Offering Price $49,877, Stock no. 1298 - Offering Price $42,987, Stock no. 1222 - Offering Price $45,678 , Stock no. 1291 - Offering Price $55,122, Stock no. 1323 - Offering Price $55,877, Stock no. 1345 - Offering Price $55,877, Stock no. 1347 - Offering Price $55,448 , Stock no. 1987 - Offering Price $62,678 , Stock no. 1988 - Offering Price $45,678 , Stock no. 1332 - Offering Price $54,887 , Stock no. 1356 - Offering Price $39,555 , Stock no. 1654 - Offering Price $43,577 , Stock no. 2009 - Offering Price*

---

[268] And "any misstatement" about that or any other aspect of any required disclosure is a *de facto* Section 5 violation. *See* discussion of Section 5 standard *supra.*

[269] This is especially true in a market where many dealers offer "one-price" selling, and manufacturers without franchised dealers sell solely for MSRP (plus fees and other charges).

> *$58,855, Stock no. 2010 - Offering Price $58,885 , Stock no. 2011 - Offering Price
> $58,988 , Stock no. 2012 - Offering Price $58,887 , Stock no. 2013 - Offering Price
> $58,588, Stock no. 2020 - Offering Price $57,744 , Stock no. 2022 - Offering Price
> $45,678 , Stock no. 2021 - Offering Price $58,955 , Stock no. 2102 - Offering Price
> $54,555 , Stock no. 2103 - Offering Price $54,555, Stock no. 2104 - Offering Price
> $54,577, Stock no. 2104 - Offering Price $54,678, Stock no. 2105 - Offering Price
> $56,689,  Stock no. 2121 - Offering Price $62,688, Stock no. 2140 - Offering Price
> $62,655, Stock no. 2141 - Offering Price $63,633, Stock no. 2220 - Offering Price
> $38,998, Stock no. 2221 - Offering Price $38,998, Stock no. 2222 - Offering Price
> $38,998, Stock no. 2223 - Offering Price $38,998 , Stock no. 2224 - Offering Price
> $39,025, Stock no. 2225 - Offering Price $66,877, Stock no. 2239 - Offering Price
> $66,877, Stock no. 3030 - Offering Price $66,877, Stock no. 3558 - Offering Price
> $72,022, Stock no. 3636 - Offering Price $75,755.  Each of these vehicles is offered at the
> prices stated, but for more details and to see what price you may be eligible for, call me
> at 555-1212 for more details."*

It is difficult to see how this type of required disclosure benefits consumers or leads to improved price discovery.  In addition, aside from the time it would take for a dealership salesperson to respond to this customer, it is highly likely that many dealers will find it difficult to answer such inquiries – perhaps hundreds of times a day – efficiently and accurately.  As discussed, vehicle prices change – particularly used vehicles, and sometimes frequently – based on the market, and ensuring that Offering Prices like these are all accurate will be very difficult.

2)    Credit Disclosures

Sections 463.4(d) and (e) mandate certain disclosures when making any representation about a monthly payment or when making any comparison between payment options that include a discussion of a lower monthly payment.

As discussed above, these requirements impermissibly and imprudently intrude on the time-tested content, form, and timing disclosures developed by the FRB to inform consumers of the cost of motor vehicle credit and leasing.  The Commission has not explained (i) how the FRB's Reg Z and M disclosures are deficient in this regard; (ii) what, if any, coordination it has conducted with the FRB concerning the additional disclosures the Commission proposes to infuse into credit and lease transactions; and (iii) what, if any, level of testing the Commission has conducted to determine that its proposed disclosures would provide a net benefit to consumers.  It also has not explained why it is proposing the disclosure of information that is already provided by the FRB's Regulations Z and M disclosure regimes.

The Commission explains that its proposed credit disclosures are needed because consumers' "singular focus on monthly payments" can make them susceptible to harms such as payment

NADA Comments to Federal Trade Commission
Page 76 of 140
September 12, 2022

packing, and that they will allow consumers to "gauge how much a given financing or lease offer will ultimately cost[270] in order to compare different offers."[271]

This first concern is already squarely prohibited by both federal and state law.[272]  The second requirement is already expressly covered by Regulations Z and M.

---

[270] Of course, because of the time value of money, monthly payments later in a finance contract are less expensive than monthly payments in the earlier stages of the contract.  Using the example in the Proposed TRR, if a borrower who would finance the purchase of a $25,000 vehicle with a $5,000 down payment and a 10% APR and a five-year (60-month) term chooses instead to finance the purchase over a seven-year (84-month) term, the "additional" cost to a consumer over the term of that loan would *be far less* than the $2,394 figure cited in the TRR.  In theory, if the discount rate were equal to the APR, there would be *no additional cost* to the consumer that would result from the longer term.  The Proposed TRR would seemingly require dealers to calculate and disclose (unlike the Commission's cost and benefit analysis of the TRR) only a portion of this overall "cost" calculation.

[271] 87 Fed. Reg. at 42,024.  In his *Auto Buyer Study Critique*, Dr. Vidmar criticizes the assumption in the *Auto Buyer Study* that consumers who approach the car buying process with a monthly budget focus are irrational.  Dr. Vidmar states:

> "The Report Assumes Consumers Are Irrational
> The researchers' approach to the automobile-purchasing experience is biased by their perspective of what is a rational approach. They assume that a person desires a particular car, goes out and finds a dealership with that car, negotiates a final price for the car, and then arranges financing. To their chagrin, automobile buyers approach the task with a monthly budget in mind that focuses on what they can afford and then work from there. Given that most vehicle purchases are financed, and that this, along with either a home mortgage or rent, is one of two major monthly budget items, it is not surprising that car buyers focus on what they can afford and work within that framework.
> The research protocol should have been modified to start with this issue and explore how a respondent deals with lengths of payment and monthly amounts to acquire the car they want or need. It should have been evident after the pretest with five participants that the protocol was not oriented to the thought processes of vehicle purchasers. In consumer research, it is generally a mistake to assume that the consumer is not rational. Consumer research shows that people bundle prices to make decisions efficiently. One wonders if the research had started with a protocol that was more open and began by asking how people approached vehicle purchases, whether different conclusions may have been derived." Auto Buyer Study Critique at 8.

[272] Indeed, the Commission cites enforcement actions it has taken in this regard.  *See also* National Association Of Attorneys General, *Consumer Protection Regarding "Packing:" During Car Sale/Lease Negotiations* (Spring Meeting 1999).  In addition, market forces, like the change to "one-price" selling, along with changes in technology, including online sales tools and ubiquitous payment calculators, are making this practice difficult to impossible.  Most dealer (and many third-party) websites now contain tools that allow consumers to obtain a monthly payment with a simple calculator and some desired inputs.  Consumers can easily check a monthly payment using one of these tools, and dealers often make it part of the sales process to simply cover options using this type of technology.  These calculators and other technological tools used by dealers, finance sources, and others are making any unlawful attempt to disguise monthly payments virtually impossible.

NADA Comments to Federal Trade Commission
Page 77 of 140
September 12, 2022

*Compare and Contrast:*

- Proposed Section 463.4(d)(1) requires that dealers "disclose the total amount the consumer will pay to purchase or lease the vehicle at that monthly payment after making all payments as scheduled." Regulation Z requires that dealer-creditors disclose the Total of Payments with a descriptive explanation such as "the amount you will have paid when you have made all scheduled payments."[273] Regulation M similarly requires that dealer-lessors disclose the Total of Payments with a descriptive explanation such as "the amount you will have paid by the end of the lease."[274]

- Proposed Section 463.4(d)(2) requires that, if the consumer "will provide consideration (for example, in the form of a cash down payment or trade in valuation), dealers must disclose the amount of consideration provided by the consumer." Regulation Z requires that dealer-creditors provide a separate written itemization of the amount financed, which must include the "amount credited to the consumer's account with the creditor."[275] This disclosure includes any down payment or trade in allowance. Regulation M similarly requires that dealer-lessors disclose the Capitalized Cost Reduction, with a descriptive explanation such as "the amount of any net trade-in allowance, rebate, noncash credit, or cash you pay that reduces the gross capitalized cost."[276]

- Proposed Section 463.4(e) requires that when making any monthly payment comparison between payment options that includes discussion of a lower monthly payment, dealers must disclose that a lower monthly payment will increase the total amount that a consumer will pay to purchase or lease a vehicle, if true. Regulation Z requires that dealer-creditors disclose the Finance Charge with a description explanation such as "the dollar amount the credit will cost you."[277] Regulation M similarly requires that dealer-lessors disclose the Total of Payments, with a descriptive explanation such as "the amount you will have paid by the end of the lease."[278] This is in addition to required disclosures of other key terms such as Depreciation and Rent Charge.[279]

Each of these items is prominently disclosed at the top of the RISC and lease agreement (a consumer cannot miss them) and must be provided "before consummation" of the transaction.[280] In addition, the FRB has created model forms to provide the disclosures.[281]

---

[273] 12 C.F.R. § 226.18(h).
[274] 12 C.F.R. § 213.4(e).
[275] 12 C.F.R. § 226.18(c)(1).
[276] 12 C.F.R. § 213.4(f)(2).
[277] 12 C.F.R. § 226.18(d).
[278] 12 C.F.R. § 213.4(e).
[279] 12 C.F.R. § 213.4(f).
[280] 12 C.F.R. § 226.17(b); 12 C.F.R. § 213(a)(3).
[281] 12 C.F.R. § 226, Appendix H; 12 C.F.R. § 213, Appendix A.

Consequently, an effective disclosure regime already exists for the type of information the Commission desires dealers to convey.

But the problems do not end with the uncoordinated, redundant, and overlapping nature of the Commission's proposed credit and lease disclosures. They also extend to their timing and the effect that can have on their content.

The disclosures in the proposed rule are required whenever making any representation or comparison regarding monthly payments, which will necessarily be based on the *Offering Price*. As discussed, this will usually be the highest price at which the dealer would sell the vehicle. In contrast, the Regulation Z and Regulation M disclosures are based on the *actual contract price* after all price negotiations are complete. Thus, the disclosures under the proposed rule will typically be artificially high, but in any event not necessarily based on the contractual obligation.

As a result, these disclosures are likely to be different than the Regulation Z and Regulation M disclosures. Because the proposed rule's disclosures use many of the same terms as Regulation Z but will result in different numbers, consumers may find themselves confused and even overwhelmed by the volume of seemingly conflicting disclosures, rendering all of them less useful to consumers by virtue of their abundance.

The disclosure schemes in Regulations Z and M are time-tested and familiar to dealers and many or most consumers. They are reasonably uniform across creditor types. Most important, they are based on the consumer's legal obligation. The proposed rule's disclosures, in sharp contrast, are apt to be counterproductive. The Commission risks reducing consumer understanding and extending the vehicle acquisition process by sprinkling in its seemingly uncoordinated and untested proposed credit disclosures.

3)     "Add-ons"

As an initial matter, we note that, appropriately, the Commission's definition of "motor vehicle dealer" appears to include motor vehicle manufacturers who sell directly to consumers without utilizing the motor vehicle dealer retailing network. As a result, one would think that all of the provisions of the Proposed TRR would apply equally to all who sell motor vehicles to the public, independently-owned dealers and factory direct sellers alike. But this is not the case. Because of the way the Commission has defined "Add-on(s)," "Add-on Product(s) or Service(s)," and "Add-on List," direct sellers are effectively excused from having to comply with the disclosure, "value" determination, and other requirements related to the offering and sale of "Add-ons." This is because those retailers technically will not be selling "Add-ons" as defined by the Commission.

The only products that are "Add-ons" under the Commission's definition are those for which a dealer charges but that "are *not* provided to the consumer or installed on the vehicle by the

motor vehicle manufacturer." (Emphasis added.)[282]  But when the dealer selling the product is itself also the vehicle's manufacturer, then any product it sells is, by definition, "provided to the consumer . . . by the manufacturer."  And for physical "Add-ons," the product will also, again by definition, be "installed on the motor vehicle by the motor vehicle manufacturer."  Factory direct sellers of motor vehicles frequently offer and sell to consumers both types of "Add-ons."  For example, they sell items such as extended service contracts, towing packages, and the like.  But because of the way the term "Add-on" is defined, they will be able to offer and sell these products to consumers free of the disclosure requirements, "value" determinations, and other limitations that will burden other motor vehicle dealers under the Proposed TRR.  The same applies to motor vehicle manufacturers who utilize the motor vehicle dealer network but sell "Add-ons" directly to consumers, as they are not covered by the proposed definition of "motor vehicle dealer" and their products and services are not covered by the proposed definition of "Add-ons."

Whether a product or service is an "Add-on" should not depend on who is selling it; it should be a function of what the product or service is and when it is sold relative to the rest of the transaction.  But that is not the case in the Proposed TRR.  As a result, the foregoing outcome categorically contradicts the Commission's statement that "the Proposed TRR would help honest dealers compete on a level playing field."  As drafted, the Proposed TRR leaves an unjustified and unexplainable hole in the Commission's proposed consumer protection scheme.  This major flaw must be corrected.

This inconsistent treatment aside, each of the required "add-on" disclosures is problematic for a variety of reasons.

<div align="center">(i)     First Required Disclosure</div>

The Proposed TRR prohibits a motor vehicle dealer from charging for any optional "Add-on Product or Service" unless the following requirements are met:

> "(i)   *Disclosure*. Before referencing any aspect of financing for a specific vehicle (aside from the Offering Price) or before consummating a non-financed sale, whichever is earlier, the Motor Vehicle Dealer must Clearly and Conspicuously disclose:
>
> (A)   The Cash Price without Optional Add-Ons, separately itemizing the Offering Price, any discounts, any rebates, any trade-in valuation, and required Government Charges; and
>
> (B)   That the consumer may purchase the vehicle for the Cash Price without Optional Add-ons; and

---

[282] 87 Fed. Reg. at 42,044 (Proposed Section 463.2(a)).

(ii)     *Declination*.  The consumer must decline to purchase the vehicle for the Cash Price without Optional Add-ons.

(iii)     *Form and Signature*.  The Cash Price without Optional Add-ons disclosure and declination [set forth above] must be in writing, date and time recorded, and signed by the consumer and a manager of the Motor Vehicle Dealer.

(iv)     *Presentation*.  The Cash Price without Optional Add-ons disclosure and declination [set forth above] must be limited to the information required by this Section and cannot be presented with any other written materials."[283]

This requirement means that at the very start of the conversation with a consumer about "any aspect of financing," the dealer would first need to undertake a complex and burdensome analysis and disclosure, and obtain both a customer signature and a signature from a dealership manager.  "Any aspect of financing" specifically excludes "Offering Price," but that appears to mean that any conversation or consumer questions about the vehicle price would be deemed an "aspect of financing."  Therefore, before a dealer that wanted to preserve its ability to sell an "add-on"[284] could *answer consumer questions about price other than the Offering Price* or provide a consumer with *any estimated monthly payment, any financing offer,[285] or even whether a consumer could even possibly finance the purchase of any specific vehicle*, the Proposed TRR would require a dealer to complete, and get the customer to sign, a form that resembles the form at Attachment 11.[286]

Again, and importantly, each item on this form is currently disclosed to the consumer today.  The difference is that such disclosures currently take place at a more logical and consumer-friendly point in the sales process.  Of course, every new required disclosure form adds time to the transaction, costs to dealers and ultimately to consumers, inconvenience for both parties, and added compliance risk for dealers, which will ultimately lead to more restrictive and constrained disclosures.

---

[283] 87 Fed. Reg. at 42,046 (Proposed Section 463.5(b)).

[284] Of course, a dealer could avoid these requirements by exiting the "add-on" market altogether, but that certainly could not be the Commission's goal.  Accordingly, these comments proceed on the basis that dealers would not comply with the Proposed TRR by simply exiting the "add-on" market.

[285] In many cases, financing offers from captive or other finance companies are tied to specific vehicles, models, amounts financed, loan to value, or other information that cannot be determined at the very outset of the conversation with the customer.

[286] As with the other sample forms in this section of the comments, this form is simply an attempt at a mock-up. This is not a recommended format for a form or an assertion that the sample would satisfy the requirements of the Proposed TRR.

The issues created by the Proposed TRR relate primarily to the timing of these disclosures – but they are exacerbated by their nature and form. As an initial matter, the time and cost of providing this document should not be overlooked. Yet another required document and consumer signature at any point in the transaction adds very real costs – both direct and in terms of time. This form, in particular, is not simply a standardized disclosure document that can be provided and explained to all consumers. It is a highly customized document that – as discussed below – will require significant time to determine and complete. In addition, because it is vehicle and consumer specific, and because it must be provided well before the consummation of the transaction, it is highly likely that more than one form (and, in some cases, many) will need to be provided to most consumers. That is because the data in this document is dependent on the specific vehicle the consumer is interested in, and because consumers generally shop for 5, 10, or more different vehicles before choosing the vehicle they wish to purchase. Consumers will therefore need to review and sign multiple versions of this document, massively multiplying the cost in dollars and time, and only adding to consumer confusion.

Second, there is a significant question about the legal effect of this document. It seems clear from the language used in the Proposed TRR – and the required written, countersigned, and dated language stating that "[t]he consumer can purchase the vehicle for the Cash Price without Optional Add-Ons," – that the Commission is seeking to establish some kind of a legal obligation for the dealer to actually sell the vehicle to this consumer for the price listed. However, it is unclear from the Proposed TRR whether or how this legal obligation to sell a vehicle would arise between two contracting parties under state contract law and under what theory a dealer could be obligated to sell a vehicle to any consumer who inquired about financing if the dealer decided they did not want to or were unable to sell to that consumer for whatever reason.

For example, would a dealer be required to sell a vehicle to a consumer who raised "red flags" of identity theft under the Red Flags Rule? Would a dealer be required to sell a vehicle to a consumer who was abusive or violent at the dealership? What if the prospective customer was on the Specially Designated Nationals List maintained by the OFAC? Would a dealer be required to sell a vehicle to a consumer who could not produce the required proof of insurance or license? Can a consumer who does not qualify for financing somehow enforce this "right" to purchase the vehicle for this price? The potential reasons abound, and it seems clear that this required disclosure cannot create any legal obligation to honor that promise in all circumstances, and therefore it would be inaccurate at best and likely misleading to the consumer. Because the required disclosure that "*[t]he consumer can purchase the vehicle for the Cash Price without Optional Add-ons*" will often not be accurate, it would be misleading for a dealer to provide this disclosure.

One can imagine the response of the Commission to a dealer advertisement issued today that promised "Anyone who asks about this vehicle can finance it for $xx,xxx.xx." Commission enforcement actions have been brought against dealers for less categorical claims, and certainly no dealer today would legitimately make this kind of promise in an advertisement or elsewhere

because there is no way to ensure that *any* customer (most of whom need to finance their vehicle purchases) could qualify to finance any particular vehicle (or any vehicle at all).

Even if the Commission were to opine that such a written, countersigned, and dated document containing what appears to be a promise about a price from the dealer does not create any binding obligation between the parties (mutually or otherwise), will any such opinion be dispositive under the relevant state contract law? How can the Commission confirm that, and if it cannot and the document does operate to form a contract under state law, the dealer will have to proceed accordingly. For example, it would need to discharge all of its other pre-contract duties (such performing an OFAC check, etc.). Forcing the formation of a contract this early in the process will certainly not assist consumers in their shopping journeys."

Of course, even if this and the other required disclosures would not create legal obligations, they would clearly create risk for dealers. It would be a violation of the Proposed TRR for a dealer "to make any misrepresentation, expressly or by implication regarding: (a) the costs or terms of purchasing, financing, or leasing a vehicle…"[287] As discussed in detail above, this incredibly broad standard would present a wide array of risks to dealers should they discuss *any terms, costs, or other relevant pricing information* with *any* consumer at *any* time except in person and in a formalized (and highly trained) manner. The challenges associated with having to satisfy this obligation in an inflexible, formal manner will disincentivize dealers from communicating on price or offering any kind of price discovery to consumers.

In addition, what would be the result if that vehicle were no longer available to that consumer after such a disclosure were made? If the dealer offered another vehicle instead, would that be deemed "bait and switch" by the Commission?[288] What if the price of the vehicle changed before the consumer purchased it – would that result in a claim of deception? Does that mean that dealers would have to ensure that no vehicle prices changed after providing this document to any customer? That would be virtually impossible.

The misleading, confusing, and non-binding nature of this statement undermines its purpose. By requiring calculation and disclosure of this information prematurely, the Commission is creating tremendous inefficiencies and consumer confusion. And it overlooks the fact that a fully informed, binding offering price is presented to consumers today at the appropriate point in the transaction.

- *The requirement to provide a "trade-in valuation" at this point in the transaction is misguided and will create confusion and severely restrict online sales.*

---

[287] 87 Fed. Reg. at 42,045 (Proposed Section 463.3(a)).
[288] *See, e.g.,* 16 C.F.R. §§ 238 et. seq.

    o     *The term "trade-in valuation" is unclear and appears to be inaccurate.*

One element of this required price disclosure document is the "trade-in valuation." As an initial matter, the term is unclear and seems to suggest the overall value of the consumer's trade in vehicle. But that amount would not make sense to disclose in the context of this form. For example, if a consumer sought to trade in a vehicle with a valuation of $20,000, that had an outstanding auto loan of $15,000, listing the "trade-in valuation" ($20,000) would not reflect its net trade-in value ($5,000). Given that the information in this document "cannot be presented with any other materials,"[289] the dealer would arguably be *prohibited* from disclosing the net trade-in value at this point in the transaction. It is difficult to see how this restriction helps consumers.[290]

Even if this term is intended to reflect the amount of equity that a customer has in its trade-in vehicle that they wish to apply to the purchase price of a new vehicle, that would raise several issues. First, while many consumers wish to apply such equity to their next purchase, there is no requirement that they do so. For example, they may wish to sell the trade-in to the dealer separate and apart from a new vehicle purchase.

In addition, many consumers do not have equity in their trade-in and in fact have negative equity – that is, they owe more on their trade in vehicle than it is worth. When negative equity is present, dealers presumably would be required to include it on this form and add it back to the Offering Price to obtain the "Cash Price." However, this is not clear from the NPRM. Finally, the mathematical relationship between the itemized disclosures on this form makes the lack of such relationship in other forms even more confusing to consumers.[291]

    o     *Many dealers will not be able to provide a "trade-in valuation" to a consumer before physically evaluating and valuing their specific trade-in.*

In order to provide an accurate "trade-in valuation" number to a consumer, it is of course necessary that dealers have access to the vehicle being traded to perform the valuation. While valuations may be done virtually in some circumstances, in many others they cannot. In those situations, no consumer would be able to obtain any estimated monthly payment, or other relevant financing information, without visiting the dealer to enable their trade in vehicle to be evaluated. This would further limit the ability of consumers to conduct on-line shopping.

In this instance, consumers would not be able to get past the initial "sifting" steps in the shopping process without a visit to the dealership. Not only does that create a new and

---

[289] 87 Fed. Reg. at 42,046 (Proposed Section 463.5 (b)(iv)).
[290] And the "Trade-in Valuation" has a direct and variable connection to the calculation of "Required Government Charges."
[291] *See* discussion *infra* of the "Vehicle Cash Price with Optional Add-ons in a Financed Transaction" disclosure document.

unnecessary restriction for consumers, it would be particularly problematic for consumers in many parts of the country who do not live in close proximity to a dealership.[292]

This will necessarily limit price discovery for consumers, because rather than simply being able to freely communicate with dealers to obtain pricing and financing information (however much those numbers represent an estimate), consumers will not be able to obtain any price, much less any competing price from another dealer, without being forced to drive to the dealership(s) with their trade-in vehicle to obtain a valuation.[293]

In addition, the trade-in valuation process involves significant costs that will only add to consumer prices. Dealership personnel time, vehicle history reports, and third-party valuation products and pricing services each have a cost associated with it. While this cost is generally borne by dealers as a cost of doing business, the current governor on those costs is that at the outset of a transaction, they are tempered by providing estimates and using estimating tools.[294] Simply put, the requirements of the Proposed TRR will eliminate the ability of a consumer to obtain such estimates from the dealer, because that amount must now be disclosed on this countersigned disclosure document.

Moreover, these costs are currently not fully incurred at the outset of *every* consumer interaction; rather they are incurred only on those transactions that reach a point in the negotiation process where it makes sense for both the buyer and seller to undertake such efforts. By artificially forcing a *binding* trade-in valuation on virtually every consumer interaction, the Proposed TRR will add massive unnecessary cost to the shopping process and increase costs significantly – costs that eventually would lead to higher prices for consumers.[295]

This artificial and forced proposed mandate raises far more questions than it answers. What would a dealer do, if as would be expected and logical, a consumer refuses or does not wish to bring its vehicle to the dealership in order to get basic information from the dealer? Would a dealer be prohibited from providing any pricing or financing information? Could the dealer provide the information without the trade-in figure? Would the dealer be prohibited from adding a trade-in figure at a later point in the process? Would the dealer need to start all over and provide and obtain a customer's signature on another (different) copy of this same form? What if the consumer initially says they do not plan to trade in a vehicle, but later decides to do

---

[292] Even in urban areas, like downtown Washington, D.C., the nearest new car dealership of a particular brand may be a 45 minute or more drive – perhaps more if it is a niche or smaller brand.

[293] Assuming it is capable of being driven. Many consumers seek to trade in vehicles that require extensive repairs, and therefore the vehicle in many cases is not drivable or safely drivable at all.

[294] For example, there are a number of commonly used vehicle valuation estimator tools available to consumers and dealers. Tools such as the NADA Used Car Guide, Edmunds, or Kelley Blue Book provide prices for vehicles in an estimated range. Used vehicles are not fungible, however, and no binding price estimate can be provided without a physical inspection.

[295] The Commission's denial of NADA's request for an extension of the comment period precludes NADA from providing a projection of these and many other costs associated with the requirements in the Proposed TRR.

so?  Would the dealer be prohibited from including that trade in the sale?  How would the dealer prove that the customer changed their preference?

The bottom line is that this requirement fails to consider a host of factors that make it unworkable.

- *The required disclosures of "discounts" and "rebates" would require the dealer to obtain extensive information about the consumer, and in many cases will also add to consumer confusion.*

The NPRM does not define these terms or explain how they differ.  A "discount" could refer to any reduction in the listed sales price that the dealer is willing to offer as part of a negotiated transaction.  If so, that would clarify that the Proposed TRR is not seeking to eliminate the pro-competitive benefits of price negotiation and reduction,[296] and it would clarify that the Offering Price does not, and indeed *cannot*, contain any dealer discounts, or else it would not be susceptible to accurate disclosure in this form.

However, the requirement to disclose this figure at this point in the transaction raises questions.  Is this "discount" amount the "final" discount?  In other words, are dealers required to disclose the very lowest price they are willing to sell the vehicle for at this point in the transaction?  It does not seem that it could be, as such a requirement would eliminate a consumer's ability to negotiate on price, or to adjust the price based on its financing or trade-in needs.

However, if this figure is not the "final and best" discount, then why is it required and what is the purpose?  If, as it seems to be, it is simply the "first" offer from the dealership, what incentive (or ability) would any dealer have to disclose anything on this form for a "discount" other than $0?   A dealer would simply note that it is required by federal regulation to disclose this Offering Price, but that the price is negotiable, and then continue the negotiation process in the way that meets the consumer's needs.  While that outcome would limit the confusion and consumer inconvenience, it would serve no purpose.

In addition, as with all of these confusing new "price" terms and disclosures, this "discount" disclosure may be understandable to some consumers, but others may view it as the dealership's best discount offer and end up paying a higher price than they would have if they had understood that, like today, final sales price is negotiable at many dealerships, after due consideration of all parts of the transaction, and the consumer's specific needs, budget, and desires.

And the term "rebate" requires further definition.  Presumably, it refers to reductions in the sales price based on monetary contributions available to certain groups of consumers from third

---

[296] Given the massive consumer benefit of intrabrand competition created by the negotiated sale of new vehicles, we can only presume that the Commission is not seeking to limit in any way the consumer's ability to negotiate the sales price of the vehicle.

NADA Comments to Federal Trade Commission
Page 86 of 140
September 12, 2022

parties or dealers.  This term at least has some industry recognition, although there are a number of different types of rebates – some are from the manufacturer or other third party (like the finance company) to the consumer, while some incentive payments are called "rebates" and paid directly to the dealer, and still other "rebates" are offered by dealers to consumers.[297]

For franchised dealers, the availability of manufacturer and finance company rebates is a highly complex system that often changes quickly,[298] due to a changing mix of fact patterns, eligible models, and qualifications that become more complicated when consumers shop across brands. What would the implications be of providing such a document to a consumer on the last day of the month that a rebate is expiring?  Again, given that this information "cannot be provided with any other written materials,"[299] dealers would be unable to explain the time-limited nature (or any other relevant details) of any rebate offer.  Would a consumer somehow be entitled to that rebate even if the consumer did not purchase the vehicle until after the rebate expired?  This would lead to more confusion and cause consumer mistrust.

Moreover, many rebates provide options to the consumer, who can choose the form of rebate that works best for their circumstances.  For example, a manufacturer or captive finance company may offer a promotional incentive of "3.9% APR or $2,000 cash back."  This means that consumers can choose – after considering their other financing options, available cash down, monthly budget constraints, etc. – whether to seek the lower APR or to reduce the purchase price of the vehicle.  How would such a "rebate" be disclosed on this document at the very outset of the conversation with the consumer?  Presumably, the form would need to reflect one or the other of these options,[300] which could adversely affect many consumers.

In that context, it is critical to understand what it means to disclose "any rebates."  Does it mean "any rebate that could possibly be available?"  That would not make sense because it would require disclosing all possibly available rebates, no matter how remote the possibility that a particular consumer would qualify for a given rebate, which would further delay the sales process and could lead to allegations of deceptive "rebate stacking."[301]  Furthermore, that would

---

[297] Would a dealer-offered "rebate" be listed as a "rebate" or a "discount," and in all circumstances?

[298] *See* e.g., Attachment 15 containing one example of a website listing for a vehicle with seven active potential third-party rebates, each with different (and often overlapping) date ranges, different qualification requirements, different conditions upon which they relied (military service, trade-in of certain competitive vehicles, etc.), and many other complicating factors.  Not only do these rebates and terms change with considerable frequency, but their applicability is also often ultimately determined by a third party, not the dealer.  These and many other factors highlight that it is often very complicated, and impossible to determine with certainty, whether a consumer qualifies for all potentially available rebates until later in the transaction.

[299] 87 Fed. Reg. at 42,046 (Proposed Sections 463.5(b)(1)(iv) and (2)(iv)).

[300] There is no accommodation in the rule for any explanation of the "rebates."

[301] *See, e.g.,* 87 Fed. Reg. at 42,020 ("When dealers advertise rebates and discounts, or offer prices that factor in such rebates and discounts, but in fact those rebates and discounts are not available to the typical consumer, but only a select set of customers, such conduct induces the consumer to select and transact with the dealer under false pretenses.").

NADA Comments to Federal Trade Commission
Page 87 of 140
September 12, 2022

provide no benefit regarding price transparency because it would not be probative of the price available to *that* consumer.[302]

Therefore, it would only make sense for "any rebates" to mean "any rebates for which the consumer qualifies."  However, that is not only difficult to determine with any certainty at the outset of a conversation, it often requires due diligence and a more in-depth conversation than most consumers may wish to engage in at the very outset of their shopping experience.  For example, a dealer would have to determine and verify facts such as state and county of residence, current lease status, college graduation qualifications, military or first responder status, trade in vehicle, repeat customer status, or any of a myriad of other qualifiers for manufacturer, finance company, or dealer rebates.

This means that shoppers would again be unnecessarily bogged down in a lengthy "qualification" conversation before they could get even the most basic pricing information from the dealer.  Not only would this lead to consumer resentment and confusion, but it would also unnecessarily and considerably lengthen the sales process.

Forcing this disclosure in this way, at this point in the transaction, will also inconvenience consumers by making it far more difficult to shop online.  That is because many rebates are offered to certain individuals or certain types of individuals, and to provide a "binding" number on a formal, signed disclosure document, the dealer would need to take steps to ensure the customer qualifies for the rebate.  That may mean a physical identification, lease information, military ID,[303] copies of bills, or other stipulations required by the third party offering the rebate.  Obtaining or providing such proof would often be more difficult (or impossible) to do remotely.  Because the Proposed TRR requires dealers to disclose rebates in this way and at this time, it would in yet another way force a consumer to visit the dealership to obtain basic pricing information rather than engaging in remote price discovery.

These factors underscore why forcing an early rebate disclosure is problematic.  It is generally not worth the consumer's time and engagement at the very outset of the price discovery process to engage in these types of in-depth discovery conversations.  And dealers can provide broad guidance but are generally not willing to make firm commitments about rebates until all due diligence is completed.  In addition to the other problems noted, this could likely lead to an "underreporting" of available rebates.

---

[302] Indeed, it would be an explicit violation of the proposed rule to "make any misrepresentation, expressly or by implication regarding … the availability of any rebates or discounts that are factored into the advertised price but not available to all consumers."  Is that same standard – "available to all consumers" – the standard here?  If so, there will be virtually no rebates disclosed in this document, as there are very few third-party rebates available to all consumers.  If not, why not, and how can a consumer understand disclosures of the same information under different standards?  87 Fed. Reg. at 42,045 (Proposed Section 463.3(d)).

[303] And because it is illegal to make a copy of a military ID (*see* 18 U.S.C. § 701), a dealer would be unable to require an electronically sent copy of such an ID.

- *Required disclosure of any "rebates" at this point in the transaction would virtually eliminate a dealer's ability to disclose the federal EV tax credit.*

One "rebate" that would be directly implicated and adversely affected by the Proposed TRR is the federal EV tax credit "rebates" recently authorized in the "Inflation Reduction Act of 2022"[304] as a key element in the Administration's effort to address climate change concerns. This rebate will ultimately be made available to consumers "at the point of sale" – that is, as a reduction in the price of the vehicle at the time of sale from the dealer. This credit is intended to be paid to the dealer as a way to reduce the sales price of the qualifying EV – *i.e.,* a rebate. To qualify for the credit, a consumer must meet a series of tests, including a limitation on "modified adjusted gross income." In other words, only certain consumers will qualify for the credit, and dealers will likely be called upon to assist in determining whether a particular customer qualifies for the rebate. This, in turn, will require a complex and highly sensitive determination of a consumer's qualifications. Therefore, to accurately disclose the availability of this credit on the Proposed TRR's newly required form will require dealers – before they are able to discuss the price or provide *any* financing information – to undertake the complex inquiry to somehow determine and verify a consumer's *modified adjusted gross income* for the current and/or prior year.

This means that for consumers to obtain any information about financing a qualified EV vehicle, they would need to provide, among other information, their personal (and obscure) tax information. This would be impossible or, at the very best, so unwieldy that many consumers would not be aware of the potential EV tax credit. This will of course have a negative effect on the availability and attractiveness of the EV tax credit and impede the adoption of EVs.

This counterproductive policy outcome is yet another example of why this proposed mandate reflects a fundamental misunderstanding of the auto retail market, is likely to lead to unintended consequences, and requires far greater research before further action is taken.

- *Artificially separating consumer consideration of VPPs is unwarranted, misguided, and hurts consumers who need those protections most.*

One of the apparent goals of requiring this new disclosure document is to separate the consideration and negotiation of any VPPs from the consideration of the price of the vehicle. As best as can be determined, its purpose is so that consumers can fully consider the price of the vehicle apart from the price of any VPP. What perceived harm or market failure this is seeking to address is unclear, but it appears to be related to the Commission's unwarranted and misguided concern about consumer's shopping based on a monthly payment.

These comments address elsewhere (i) the flaws in assuming that consumers are irrational when they shop based on monthly budget considerations, and (ii) how consumers are provided with

---

[304] *See* Inflation Reduction Act of 2022, Pub. L. No. 117-169, § 13401.

disclosures that indicate the price of VPPs and their optional nature before they make a vehicle purchase. However, this form invites some additional considerations.

What happens if a consumer does *not* "decline" to purchase the vehicle for the "Cash Price without Optional Add-ons"? Presumably, that means that the consumer wishes to purchase the vehicle for the price listed (which for new cars, as discussed above, would likely be the MSRP). Aside from denying the customer the ability to negotiate the sales price, this forced "declination" also prevents consumers from fully considering VPPs. Would such a choice preclude the dealer from offering, or the consumer from considering, any VPP at a later point in the process? Presumably, the Commission would still allow consumers to purchase any product or service they wish, if they deemed it to be in their best interest.

So how will this play out? A consumer with the means to pay cash for the vehicle who does not "decline" this option would nevertheless be able to consider VPPs and is free to purchase those products. There is nothing in the Proposed TRR that prevents, or could prevent, a dealer from offering any product or service to such a consumer. So, for those consumers who have the means to simply purchase that product or service, this form will have little to no consequence. They would simply add this cost to their overall payment to the dealer.

However, for the vast majority of consumers who cannot afford to pay cash for their vehicle, this form would have different consequences. Because they are forced to choose whether to sign this document before they have been offered, or even know of the existence of, VPPs, they do not have the information needed to decide what they need or would like. Not aware of what VPPs may be available to them, some of these consumers may opt not to decline to purchase the vehicle for the "Cash Price without Optional Add-ons." While the dealer may still offer VPPs to those consumers, and those consumers may wish to purchase such protection, they are unlikely to be able to simply pay for those products. These consumers need to have the full option to consider and include such products in the amount financed/monthly payment *before* they know whether to "decline" to purchase the vehicle for the "Cash Price without Optional Add-ons," not *after*. However, the Proposed TRR would preclude them from doing so because they would be forced to choose before they have all the information needed to make an informed choice.

What will be the result? Those consumers who need to finance their purchase will be at a disadvantage. Those who most need the protection and peace of mind offered by VPPs could be faced with a large repair bill and no service contract, or the prospect of paying off a loan on a totaled vehicle without GAP protection. The presumption that people need to be protected in some way from themselves, or from shopping based on a monthly budget, is untested and threatens to hurt those who can least afford it.

- *The requirement that a dealer obtain a signed "declination" from the consumer at this point in the price discovery process will also unnecessarily restrict online shopping, inconvenience those consumers least able to overcome those inconveniences, and confuse many consumers.*

As noted above, the Proposed TRR requires that the consumer (and dealer) sign this "stand-alone" disclosure form before "referencing any aspect of financing." That creates several difficulties. First, this creates an additional form for consumers to sign as part of the sales process. As outlined in greater detail above, dealers have been successful in their long-term efforts to shorten the sales process, reduce unnecessary forms and signatures, and otherwise streamline the customer experience. This frustrates that progress.

Second, the timing requirements for this disclosure form would cause additional unnecessary inconvenience for finance customers. Because the form must be provided to non-finance customers at some point "prior to consummation of the sale," that likely means that form would be added to the many other legally required forms that "cash" customers must complete at the time the contract is consummated. However, a similar (but confusingly different) form must be presented to all finance (or potential finance) customers at a much earlier point in the transaction, and therefore finance customers would face a heightened and unexplained level of inconvenience.[305]

On the other hand, because this document must be completed and countersigned when "referencing any aspect of financing," it would likely inconvenience all customers (equally and unnecessarily) because dealers offer and/or at least discuss the possibility of financing with almost all of their customers. That is because many customers who come to the dealership anticipating that they will pay cash, ultimately decide to finance (or at least consider financing) through the dealership because the dealer can offer financing that is superior to the consumer's third-party finance source, or because the financing is otherwise advantageous to the consumer. As a result, because dealers or consumers generally address the possibility of financing, this document may be required for virtually all customers.

- *The requirement to obtain a consumer signature on this and other required disclosure forms presents unnecessary data security risks.*

To obtain a consumer signature, the consumer generally must be present to sign the document. That only exacerbates the concerns outlined above about limiting the ability for consumers to shop online. Presumably, the dealership *could* obtain such "declinations" via E-SIGN[306] technology, but even if that were an option, it is not a viable option for many. First, many dealers may not currently have E-SIGN compliant capabilities or technology. While they may be able to obtain such systems, those systems often come with substantial cost.

---

[305] Of course, cash customers will still face the unnecessary and confusing hassle of an additional form to sign at consummation of the transaction, but they, unlike finance customers, will at least theoretically be able to avoid the artificial restriction on information and/or an additional trip to the dealership.

[306] *See* 15 U.S.C. § 7001.

NADA Comments to Federal Trade Commission
Page 91 of 140
September 12, 2022

Moreover, many dealers do not engage in such remote E-SIGN transactions at least in part because of concerns about a data breach or otherwise exposing sensitive information to the risk of a breach. Requiring online shoppers to send this information remotely only adds to the security risks associated with such information. As noted above, for this form to be completed as proposed, it could require the dealer to obtain highly sensitive information like tax returns, lease status, or other information that would likely be deemed "non-public personal information" under GLB and "customer information" under the Safeguards Rule. By requiring the gathering of this information at this point in time, the Proposed TRR is requiring online shoppers to provide sensitive information and, in turn, creating data security risks where none exist today. And that is in addition to data security risks raised by the massively expanded document retention requirements. Consumers should not be forced to provide sensitive information to the dealer just to obtain basic price or financing information as part of their shopping process.

In addition, consumers without access to the internet[307] and E-SIGN compliant tools and technology will be forced to come to the dealership to sign this "declination" before they can engage in any conversations with the consumer about the vehicle purchase and finance process. This further frustrates their ability to easily access price discovery information.

- *The requirement to obtain a consumer "declination" will create tremendous consumer confusion.*

Lastly, and perhaps most importantly, this disclosure and the accompanying required "declination" will create tremendous consumer confusion. Consider a dealer who receives an inquiry from a consumer who is shopping for a new vehicle and asks for an estimated monthly payment or financing option on a particular vehicle. The Proposed TRR would appear to require the following type of response:

"I'd be happy to provide you with that information, but first you must come to the dealership to let me see and evaluate your trade, tell me lots of personal details about yourself (including your federal tax forms) to see what rebates you are qualified for, and then you must sign and date a document that says …. you could, but you don't want to buy the car" …

… **What**?

How would a consumer, at that point in the transaction, *know* whether they want to purchase the vehicle at all, much less whether to purchase it at the "Cash Price without Optional Add-ons?" Before the dealer "referenc[es] any aspect of financing," the consumer may not even have any

---

[307] *See e.g.* Kendall Swenson et.al., *People in Low-Income Households Have Less Access to Internet Services*, (Apr. 2020), U.S. Department of Health and Human Services, https://aspe.hhs.gov/sites/default/files/private/pdf/263601/Internet_Access_Among_Low_Income.pdf.

idea what vehicle they wish to purchase. The consumer does not know what the monthly payment will be, so they cannot know if this vehicle is in their budget. The consumer also does not know what VPPs might be advantageous, and the document does not contain the dealer's "final and best" "discount" offer, etc. The consumer simply does not have all the pieces of information needed to make this decision at the time and yet, the consumer is required to sign a document without such information.

Presumably, the dealer could try to explain that the price is dependent on financing and that there are VPPs that are available to protect the consumer's investment. But that information is prohibited from being provided in writing, and consumers who actually read this document standing alone would be confused by it. Moreover, as discussed above, "any misstatement" that a dealer may inadvertently make about these issues would violate the Proposed TRR. And inadvertent "omissions" would create the same risk. This will serve to frustrate – not facilitate – access to price discovery information.

<div align="center">(ii)    Second Required Disclosure</div>

But the confusion does not end there. A consumer who wishes to finance the purchase of a vehicle, after wading through the first required disclosure document, must also sign a second, similar, but different, document that resembles the form at Attachment 12.

The "Vehicle Cash Price without Optional Add-Ons in a Financed Transaction" disclosure document must be disclosed to a consumer (and signed, countersigned, and dated) *before charging for any optional Add-on in a financed transaction.*[308] The proposed requirement states:

> "(i)    *Disclosure*. Before charging for any optional Add-on in a financed transaction, the Motor Vehicle Dealer must Clearly and Conspicuously disclose:
>
>    (A)    The total of the Cash Price without Optional Add-ons plus the finance charge, factoring in any cash down payment and trade-in valuation, and excluding optional Add-ons. This disclosure must separately itemize the Cash Price without Optional Add-ons, the finance charge, any cash down payment, and any trade-in valuation; and
>
>    (B)    That the consumer can finance the vehicle for that total; and
>
> (ii)    *Declination*. The consumer must decline to purchase the vehicle for that total set forth in paragraph [A].

---

[308] 87 Fed. Reg. at 42,046 (Proposed Section 463.5(b)(2)).

NADA Comments to Federal Trade Commission
Page 93 of 140
September 12, 2022

   (iii)    *Form and signature*.  The disclosure and declination set forth [above] must be in writing, date and time recorded, and signed by the consumer and a manager of the Motor Vehicle Dealer.

   (iv)    *Presentation*.  The disclosure and declination set forth in paragraphs [above] must be limited to the information required by this Section, and cannot be presented with any other written materials."[309]

So, yet another form must be disclosed to and signed by the consumer.  Clearly this disclosure cannot be made until the consumer has agreed to and qualified for a specific APR, and the vehicle sales price and trade-in amount have been finally negotiated.  That is because the amount financed and APR must be known to calculate a finance charge.   Further, as outlined above, this "finance charge" is likely to be a different figure than the finance charge that is calculated and disclosed pursuant to TILA.

The document will likely further confuse consumers. That is because the document itself contains several disclosures that are not only different from the dollar figures that were presented to consumers previously but include other disclosures that are unclear and mathematically unrelated.

At this point in the process, a finance customer who selected a VPP will have been given a number of "prices": (1) the "*Offering Price*" – which is a price for which a dealer "will sell or finance the vehicle to any consumer"; (2) a second price called the "*A Cash Price without Additional Add-ons*" – which the consumer needs to have seen and signed saying that they *don't* want to buy the vehicle for that price; and now (3) a "*Cash Price without Additional Add-ons in a financed transaction*" which is a *third, different* price that the customer has been shown.  And the customer is now being told that they "can finance the vehicle" for this amount, but also being asked to sign this second document saying that they do not want to!  That is at least three different prices[310], two separate "declinations" and two disclosure documents with different, and often contradictory information – all for the same vehicle.

In many cases, consumers change their mind during the shopping process and end up purchasing a vehicle that is different from the one they first inquired about.  As noted above, it is common that consumers will inquire about several different brands, makes, and trim lines before making a final decision.  Because these forms are fact and vehicle specific, the dealership could be required to make three separate, different price disclosures for *each individual vehicle the consumer* expresses an interest in, with two separately signed documents for each.

And the terms they are being presented with are not only new to consumers, as discussed in greater detail above, they are inconsistent with the well-recognized industry terms required

---

[309] *Id*.
[310] And as discussed above, potentially many more, depending on the number of vehicles the consumer expresses interest in.

under TILA and numerous state laws.[311]  These documents, terms, and disclosures have not been tested with consumers, or analyzed in any way by the Commission prior to the issuance of the Proposed TRR.  The likelihood of massive consumer confusion related to these new "price" disclosures is inevitable.

- *The "Vehicle Cash Price without Optional Add-ons in a Financed Transaction" disclosure document is inconsistent – both with the first disclosure form and internally.*

This disclosure requirement is inherently confusing for a number of other reasons.  First, it discloses a dollar figure called "*Cash Price without Additional Add-ons plus finance charge*," and notes that figure is presented "*factoring in any cash down payment and trade-in valuation.*" What does that mean and what exactly does this amount reflect?

Does this mean that the "cash price" figure is net of the down payment and trade equity that the consumer intends to contribute to the sale?  Or does it mean that the finance charge has been calculated with the down payment and trade-in "factored into" the total?  The circumstances seem to suggest the latter, but if that were so, why would it "factor" in the down payment and trade-in, but not the discounts and rebates?  Trade-in valuation is an input into the "Cash Price without Optional Add-ons," yet it is also, for some reason and in some way, to be factored into the determination of the finance charge – yet neither discounts nor rebates are to be so "factored?"  It is inconsistent and confusing, which lessens any possible probative value of this disclosure.

Even if the calculation of the initial dollar figure were clarified in some way, the required additional "itemized" disclosures muddy the waters further.  The Proposed TRR requires an itemized disclosure of three additional figures: (1) the finance charge; (2) cash down payment, and (3) trade in valuation.   However, *there is no discernable connection between the down payment or trade in figures and the "*Cash Price without Optional Add-ons plus finance charge."

The first document discloses a "Vehicle Cash Price without Optional Add-Ons" that is the net figure resulting from a mathematically related series of itemized numbers.  Presumably, this is the same number that is the first itemized disclosure on this second document, under the heading "Vehicle Cash Price without Optional Add-ons."  (They are the same term, so that is a viable presumption.)  But once the other three required itemized disclosures are added, the final "Total of Vehicle Cash Price without Optional Add-ons Plus Finance Charge," is not a mathematical result of the itemized disclosures.  There is *no apparent connection between them.*

---

[311] See the comments filed by state automobile dealer associations.

NADA Comments to Federal Trade Commission
Page 95 of 140
September 12, 2022

For example:

| | |
|---|---|
| Vehicle Cash Price without Optional Add-ons: | $50,000 |
| Finance Charge[312]: | $4,500 |
| Down Payment: | $6,000 |
| Trade-in Valuation: | $8,500 |

Total of Vehicle Cash Price without Optional Add-ons Plus Finance Charge: $54,500

The down payment and trade-in valuation numbers are a mystery and would certainly confuse consumers. This disclosure is presumably supposed to represent another total price – one at which a consumer could finance a vehicle. However, the itemization of the down payment and trade in valuation (which are already part of the "Vehicle Cash Price without Optional Add-ons") mean that there is no mathematical relationship between these numbers, which makes the disclosure even more confusing.

And yet again, the consumer is presented with a novel and confusing "declination" option. In addition to the myriad reasons outlined above why such a "declination" creates consumer confusion, this form also requires dealers to make a representation about financing that is inconsistent with TILA and likely with the RISC and is misleading to many consumers. Because the required disclosure that "*the consumer can finance the vehicle for the total of the Cash Price without Optional Add-ons Plus Finance Charge Listed Above*" will often not be accurate, it would be misleading for a dealer to provide this disclosure.

That is because while the finance charge and APR must be "finalized" in the sense that a final figure must be obtained that will allow a "finance charge" to be calculated based on the "amount financed" not including VPPs and the APR that a consumer qualifies for at that amount financed, in many cases, even "final" qualified quotes from finance sources are contingent on certain "stipulations." For example, the finance source might communicate that "*this customer is qualified for a $35,000 loan at 4.5% APR, as long as you [the dealer] can obtain confirmation of their listed income and home address with a W-2, and a copy of a utility bill*." In that type of circumstance, the dealer would be able to provide these disclosures in good faith, but of course if the consumer is unable or unwilling to provide the required documentation, they will not be able to finance the vehicle at that price. Therefore, a countersigned document, even at this point in the transaction, should not definitively state that the consumer "can finance the vehicle" for this amount.

It is also important to note that a consumer may qualify for one APR at that amount financed and another when the VPPs they select are added to the amount financed, and that difference will certainly cause consumer confusion.

---

[312] Presumably, this is the same finance charge as that disclosed on the required TILA disclosures, but that is unclear.

NADA Comments to Federal Trade Commission
Page 96 of 140
September 12, 2022

For example:

Vehicle Cash Price without Optional Add-ons:        $39,950
Vehicle Cash Price with Optional Add-ons:          $43,000
Consumer qualifies for a 4.3% APR up to $40,000,[313] and a 3.9% APR for amounts over $40,000.

In this scenario, the consumer would need to be qualified by the finance source for both of the "amounts financed" at either rate before this disclosure is provided.  Using the example above, this disclosure form would presumably need to disclose a "finance charge" based on the 4.3% and $40,000 amount financed.[314]

Further, after the consumer signs this second "declination," the consumer would shortly thereafter be presented with the RISC and the federally required TILA disclosures contained therein.[315]  That document would contain *yet another* figure for the finance charge – in the example above, based on the 3.9% APR and the $43,000 amount financed.  This is inherently confusing.

### (iii)     Third Required Disclosure

Section 563.5(b)(3) of the Proposed TRR requires a *third* additional disclosure providing an "Itemization of Optional Add-ons." Specifically, "before charging for any optional Add-on," the dealer "must separately itemize and Clearly and Conspicuously disclose either the "Cash Price without Optional Add-ons" (non-financed transaction) or the Cash Price without Optional Add-ons plus finance charge (financed transaction), as well as the charges for any Optional Add-ons selected by the consumer, separately itemized, and the sum of those items.[316] Therefore, dealers (but not manufacturers who also retail vehicles) would need to provide forms for a financed transaction and a non-financed transaction that resemble the forms at Attachment 13.

It is important to note that, as explained in detail in Section IV.a.2 above, (i) current law already requires disclosure of the optional nature of "add-ons" and an itemized list of "add-ons" that are purchased, and (ii) NADA fully supports, and most dealers already routinely provide, clear and conspicuous disclosure of this information.  Therefore, these disclosures are unnecessary and, as proposed, present consumers with *yet another* price that they must consider and understand – at

---

[313] Financing offers are often tied to the amount financed and/or to other factors that would be affected by this discrepancy, like LTV ratios.

[314] This also raises whether a dealer could make such a "contingent" disclosure and still comply with the prohibition in the proposed rule to avoid any "misrepresentation, expressly or by implication regarding…when the transaction is final or binding on all parties." Proposed Section 463.3(h), or "whether any consumer has been or will be preapproved or guaranteed for any product, service, or term." *Id. at (f)*.

[315] Of course, the consumer might not understand why it is necessary to sign two declination documents with different prices listed.

[316] *Id.*

least the fourth price for the very same vehicle.  In addition, this disclosure for a finance transaction adds yet another confusing and potentially misleading number.  That is because, as outlined above, the "finance charge" portion of the "Vehicle Cash Price without Optional Add-ons Plus Finance Charge" is calculated (as it suggests) based on the Vehicle Cash Price without any VPPs.  A disclosure of this figure on a document disclosing the price of voluntary protection products seems to – but by definition does not - include the accurate and complete finance charge for the total transaction price listed in the form as the "sum of amounts A and B above."

As a result, a consumer in a finance transaction will see the disclosure of this "Vehicle Cash Price without Optional Add-ons Plus Finance Charge" but the finance charge could be different than the finance charge in the RISC and required by TILA.[317]  That will certainly cause confusion for consumers, raise many complicated questions, and further impede the sales process.

<div align="center">(iv)      Fourth Required Disclosure</div>

Even after all that, the Proposed TRR requires yet one more additional signed disclosure document – the "Express, Informed Consent" document.

Section 463.4 of the Proposed TRR states:

> "It is a violation of this part and an unfair or deceptive act or practice in violation of Section 5 of the FTC Act for any Motor Vehicle Dealer, in connection with the sale or financing of vehicles, to charge for any of the following:
> …
> (c)    *Any item without Express, Informed Consent*.  A Dealer may not charge a consumer for any item unless the Dealer obtains the Express, Informed Consent of the consumer for the charge."

Section 463.2(f) of the Proposed TRR states that "Express, Informed Consent" means –

> …an affirmative act communicating unambiguous assent to be charged, made after receiving and in close proximity to a Clear and Conspicuous disclosure, in writing, and also orally for in-person transactions, of the following: (1) what the charge is for; and (2) the amount of the charge, including, if the charge is for a product or service, all fees and costs to be charged to the consumer over the period of repayment with and without the product or service.  The following are examples of what does not constitute "Express, Informed Consent: (i) a signed or initialed document, by itself; (ii) prechecked boxes; or (iii) an agreement obtained through any practice designed or manipulated with the substantial effect of subverting or impairing user autonomy, decision-making, or choice."

---

[317] *See* discussion above about the multiple, conflicting "TILA-type" disclosures required by the Proposed TRR.

NADA Comments to Federal Trade Commission
Page 98 of 140
September 12, 2022

This is the most enigmatic of all the new required forms, but a best guess at its structure would resemble the form at Attachment 14.[318]

A copy of this completed document would be required to be provided to a consumer before a dealer "charges" the consumer for "any item"[319] "in connection with the sale or financing of vehicles."[320]  Because the disclosure must be Clear and Conspicuous, and the cost must be individually disclosed, it is unclear whether a copy of this document must be provided for each such item a consumer wishes to purchase.

Therefore, after the "Offering Price" disclosure, after the (second and different) "Cash Price without Optional Add-ons" disclosure and declination signature, after the (third and also different) "Cash Price without Optional Add-ons in a finance transaction" disclosure and declination signature, and after the explanation and decision about VPPs, financing, trade-in, and sales price, the consumer is still not done.  At that point,[321] before the consumer gets the keys and drives away, the consumer must also sign one or more additional documents.

It is far from clear how a dealer would calculate the information needed in order to provide this disclosure, but is seems that there is some kind of required calculation to enable the dealer to disclose the:

> "...amount of the charge, including, if the charge is for a product or service, all fees and costs to be charged to the consumer over the period of repayment with and without the product or service."

We have extensively reviewed the language in this requirement, sought the advice of outside third parties and industry experts, and we simply cannot determine what this means, or what it would require.  Our best guess is that it seeks to require the disclosure of the cost of an "Add-on" product, but if that is so, how is it different from the third form that itemized the cost of each such product?  What is an "item" that is not also an "Add-on" or the car itself?  What

---

[318] However, we cannot be at all sure whether this document will suffice to meet the "Express, Informed Consent" requirement.  The definition of that term requires "an affirmative act communicating unambiguous assent to be charged" but does not tell the regulated parties what acts will suffice; rather, it merely lists acts that do not suffice (signed or initialed document, by itself; prechecked box; practice that subverts choice).  *See* Proposed Section 463.2(f).  It does not assist the market to impose a requirement and then define its specifics largely by describing what does not suffice.  Decades, if not centuries, of state law have established what constitutes an adequate manifestation of assent in order to form a contract, including a consumer contract.  The Commission's introduction of the Express, Informed Consent concept will upset this established law and has not been justified; what's worse, to do so without describing the affirmative steps necessary to meet the new requirement will do little more than inject mass uncertainty into the auto retailing market that can only operate to raise prices and otherwise adversely affect consumers.

[319] 87 Fed. Reg. at 42,046 (Proposed Section 463.5(c)).

[320] *Id*. (Proposed Section 463.5).

[321] Or some point before "charging" for the item.  It is unclear when a consumer is "charged," and that term is undefined.

amount could possibly be charged that is **not** for a "product or service?" What fee or cost could be charged "for a product or service . . . without the product of service"? What is "the period of repayment," especially in a non-financed transaction? This is completely unclear and not a standard with which dealers can be expected to comply.

Even if this were corrected, it would still lead to a massive additional increase in confusing, repetitive disclosures to the consumer. For example, in connection with a vehicle purchase, a consumer who chooses to purchase a roof rack, upgraded wheels, floor mats, software upgrades, a satellite radio subscription, a service contract, wheel and tire protection, and GAP coverage, could need to be presented with – in addition to all the documents outlined above – *eight* additional documents, each signed, with at least two different prices that must be presented both in writing *and orally* by the dealer. This will *massively* slow down the sales process, costing consumers tremendous additional time and frustration.

Piling on disclosure after disclosure of information consumers already receive in a process the Commission desires to shorten, with all its attendant ambiguities, would not serve the interests of consumers. Any further consideration of the consumer disclosures in the proposed rule should be the product of extensive and industry engagement, research, and consumer testing.[322]

### C.    Websites

Proposed Section 463.4(b) of the TRR requires dealers who charge, directly or indirectly, for any optional "add-on" product or service to disclose an "Add-on List" on "each website, online service, or mobile application operated by or on behalf of the dealer, and at each dealership" and, for advertisements presented elsewhere, where to obtain the "add-on" list.

This provision suffers three major flaws. First, as explained above concerning the "add-on" disclosures required under Proposed Section 463.5, the proposed rule's definition of "Add-on," "Add-on Product(s) or Service(s)" and, "Add-on List" impermissibly excuses motor vehicle manufacturers from the "Add-on List" requirement. Second, it applies definitions of "add-on" and "add-on list" that are so overly broad and unwieldy that they will both deprive consumers of any value (and, worse, serve to confuse and frustrate consumers) and impose an enormous and unwarranted burden on motor vehicle dealers who are covered by this requirement. Third, it ignores a much more efficient and relevant approach to providing "add-on" pricing disclosures that has been endorsed by the American Bar Association (ABA).

---

[322] And, if the Commission were to finalize disclosures of this nature, it should develop model, safe harbor forms for making the disclosures that resolve the litany of issues raised herein.

1)      Inconsistent Treatment of "Add-on" Sellers

The Commission states that the "Add-on List" requirement would help ensure that dealers who provide such disclosures "will not be competitively disadvantaged relative to those that do not." Ironically, however, as discussed above, the Commission's definition of "Add-on," "Add-on Product(s) or Service(s)" and, "Add-on List" would excuse factory direct sellers of motor vehicles and motor vehicle manufacturers who utilize the motor vehicle dealer network from this requirement even though both sell "add-on" products directly to consumers. This unexplained (and unexplainable) differential treatment for businesses operating in the same market would create the competitive disadvantage that the Commission seeks to avoid. This must be corrected.

2)      Overly Broad Definitions

The second flaw is created by the sheer number of products captured by proposed rule's very expansive definitions of "Add-on" and "Add-on List." It states that an "Add-on" or "Add-on Product or Service" means:

> "…any product(s) or services(s) *not provided to the consumer or installed on the vehicle by the motor vehicle manufacturer* and for which the Motor Vehicle Dealer, directly or indirectly, charges a consumer in connection with a vehicle sale, lease, or financing transaction."

(Emphasis added.)[323]

This definition is considerably broader than what is commonly understood to constitute an "add-on" and how the Commission itself has presented the term. For example, the FTC staff's Supplemental Commentary states that:

> "'Add-ons' are ancillary products and services that are purchased and financed at the time of the transaction. Common add-ons include extended warranties, service contracts, Guaranteed Auto or Asset Protection ("GAP") insurance, window etching, and credit life and credit disability insurance."[324]

Similarly, the FTC staff's Auto Buyer Study uses the term "contract add-ons" to describe these types of products and services. However, the proposed rule seeks to pull into this definition any type of product or service that the dealer can sell with the vehicle that is not installed by the vehicle manufacturer.

---

[323] 87 Fed. Reg. at 42,044 (Proposed Section 463.2(a)).
[324] Supplemental Commentary at 8-9. (Internal Citations omitted.)

NADA Comments to Federal Trade Commission
Page 101 of 140
September 12, 2022

**These additions open up a pandora's box of "add-on" products and services that can reach several hundred items per vehicle**.

For example, there are 599 General Motors' accessories that a consumer can purchase from a dealer and have a dealer install for a single trim line of the 2022 Chevrolet Silverado pickup truck (the Silverado Short Bed Crew Cab) (see Attachment 16). This does not include accessories that a consumer can purchase from a dealer and have a dealer install that are available from accessory providers other than the vehicle manufacturer. Franchised motor vehicle dealers typically sell a variety of trim lines for each vehicle model, multiple vehicle models for each franchise, and many of them sell vehicles from more than one franchise. Indeed, the average franchised motor vehicle dealer rooftop has 1.9 franchises, and the average franchise offers twelve vehicle models. Applying the number of dealer-sold and installed accessories that are offered for the Silverado pickup truck to all of the models offered by a franchised dealership rooftop, the accessories offered by the average motor vehicle dealership numbers 13,657 (1.9 franchises x 12 models per franchise x 599 accessories). And this excludes different accessories that are offered for each trim line of each vehicle model (which would substantially increase this number) and dealer sold and installed accessories from providers other than the manufacturer.[325]

On top of this avalanche of "add-ons" covered by the Commission's open-ended definition is the proposed rule's definition of an "Add-on List," which provides:

> "'Add-on List' means an itemized list of all optional Add-on Products or Services for which the Motor Vehicle Dealer, directly or indirectly, charges consumers. The Add-on List must Clearly and Conspicuously disclose each such optional Add-on and the price of each such Add-on. If the Add-on price varies, the disclosure must include the price range the typical consumer will pay instead of the price."[326]

Therefore, in order to comply with the website disclosure requirement, motor vehicle dealers would be required to list literally thousands (if not tens of thousands) of items and their prices and routinely update that list to ensure it remains accurate. And they would be required to do the same on their mobile applications. What other important information on the dealer's website would this drown out? How would it be presentable and comprehensible on a mobile application? And when *all* of this must be presented in a manner that is "clear and conspicuous," how will *any* of it be "clear and conspicuous"?

This is not a workable regulatory scheme. Consumers clearly will not benefit from having their eyes glazed over with this information overload, and motor vehicle dealers will incur a very significant – if not impossible – burden attempting to provide it on their website and mobile applications. This is another area where the Commission needs to

---

[325] NADA, Wards Intelligence, and Automotive News Data Center.
[326] 87 Fed. Reg. at 42,044 (Proposed Section 463.2(b)).

completely revisit its approach to what it is attempting to accomplish and then, to the extent it decides some type of additional disclosure scheme is warranted, conduct valid testing of such scheme before moving forward.

<div style="text-align:center">3)      Failure to Consider Menu Pricing Disclosures</div>

The third flaw is the Commission's failure to consider the value of the menu pricing disclosure approach that most motor vehicle dealers utilize today to offer VPPs to consumers. The Commission is aware of this approach because it is explained in the optional *NADA/NAMAD/AIADA Model Dealership Voluntary Protection Products Policy*, which the Commission identifies and mentions throughout the NPRM. But the Commission fails to explain why this approach is less effective in carrying out the Commission's goals and objectives related to VPP disclosures than the approach the Commission adopted in the Proposed TRR.

Menus, which can be offered in both a paper and electronic format, present consumers with a list of financing and protection product options that they may choose to utilize with their vehicle purchase. The formats that have been developed by motor vehicle dealer vendors provide these disclosures in a simple, clear, and uncluttered manner at a time when consumers know which products could potentially benefit them based on the vehicle they have selected.

The menu approach also has been recently endorsed by the ABA. In August 2020, the ABA overwhelmingly adopted Resolution 116B (see Attachment 17), which provides in pertinent part:

> "RESOLVED, That the American Bar Association urges federal, state, local, territorial and tribal governments to:
>
> * * *
>
> c) adopt legislation requiring that the purchase of any voluntary vehicle protection product may not be made a condition of the sale or lease of the vehicle, and that there is clear and conspicuous disclosure of pricing of voluntary protection products by dealers *through reasonable means, such as a pricing sheet, menu*, and/*or* website, before a consumer purchases a vehicle…."

(Emphasis added.)[327]

The ABA resolution clearly recognizes the value that a menu can provide to consumers, and it is provided at a time when consumers have a clear understanding of what products they may need based on their purchasing decision. These products are optional and many of them may be

---

[327] American Bar Association, Resolution 116B (August 3-4, 2020). *See* Attachment 17.

cancelled by the consumer after they are purchased for a full refund during the initial period of the contract and a *pro rata* refund thereafter. If the Commission finds that a motor vehicle dealer has misrepresented the optional nature of these products, it may bring an enforcement action to address the misconduct. But to ignore the menu as an effective disclosure mechanism is to disregard a concise, timely, and straightforward method for presenting products and services that can be very beneficial to consumers.[328]

<p style="text-align:center">D.    Other Prohibitions</p>

Proposed Section 463.5(a) prohibits the sale of "add-ons" if the consumer "would not benefit" from the product or service[329] and includes in this prohibition the sale of "GAP insurance to buyers whose financing balance was so low that ordinary insurance would be adequate to cover any loss."[330] Proposed Section 463.6(a)(4) further "would require covered motor vehicle dealers to create and retain calculations of loan-to-value ratios in contracts including GAP agreements."[331]

While products certainly should not be sold that provide no benefit to consumers, the standard the Commission has proposed is vague and requires further research and definition.

As noted above, franchised motor vehicle dealers typically sell a variety of motor vehicles and these vehicles do not depreciate at a standard rate. For example, a 2019 BMW 750i could have lost 44% of its value in the first three years of ownership, while a 2019 Toyota 4Runner SR5 2WD could have lost less than 4% of its value. With regard to the sale of the BMW, if the consumer subsequently experienced a total loss of the vehicle, a "gap" could exist (and perhaps a significant gap) even with the presence of a down payment and/or positive trade equity. However, the likelihood of a significant gap with regard to the Toyota vehicle would be much less.[332]

Of course, franchised motor vehicle dealers sell a variety of new vehicle models (approximately 23 for the average franchised motor vehicle dealer with multiple trim lines for each model) and

---

[328] The NPRM incorrectly states that the proposed rule's website disclosure requirement "is consistent with industry guidance." 87 Fed. Reg. at 42,023. As the footnote offered in support of this statement (Footnote 118) makes clear, the *NADA/NAMAD/AIADA Model Dealership Voluntary Protection Products Policy* supports the use of a "simple menu format" to provide pricing and other disclosures related to voluntary protection products. Nowhere does this policy endorse either the use of a website or the Commission's overly broad definition of "add-ons" as a menu provides the most effective means of providing relevant and timely VPP information to consumers.

[329] In determining whether a consumer "would not benefit" from a particular "add-on," the Proposed TRR should not exclude the peace of mind and other comparable benefits that consumers can derive from VPPs and not supplant the Commission's judgment for that of the consumer in assessing whether the product is worth the price paid.

[330] 87 Fed. Reg. at 42,026.

[331] 87 Fed. Reg. at 42,034.

[332] Other variables would need to be known to determine the extent of any gap such as the amount of the consumer's auto insurance deductible and the presence of negative equity (both of which are typically covered by dealer-sold GAP Waiver protection).

NADA Comments to Federal Trade Commission
Page 104 of 140
September 12, 2022

their rate of depreciation varies.  In addition, it is one thing to calculate the rate of depreciation *after* it has occurred (as in the example above) and quite another to estimate the rate of depreciation *looking forward*.  The latter is unknown, meaning a projection must be made, and even sophisticated valuation experts struggle to provide accurate projections as valuations depend on market conditions and market conditions are not known in advance.[333]

Consequently, requiring that motor vehicle dealers, who certainly cannot know future market conditions, to "create and retain loan-to-value calculations in contracts including GAP agreements" for every model of vehicle they sell would be convoluted, burdensome, and of limited value.  Therefore, dealers should not be required to create and retain LTV calculations. In addition, to the extent the Commission seeks to establish an LTV threshold under which GAP Waiver may not be sold, it should (i) conduct considerably more research into the matter, and (ii) if an LTV threshold is retained, establish it as a safe harbor and permit dealers to rely on calculations provided by the finance source to which they assign the RISC.

<div align="center">

E.     Recordkeeping

</div>

Another major component of the Proposed TRR is its requirement that motor vehicle dealers produce and retain a series of records for a period of 24 months.[334]  This includes:

> "all materially different advertisements, sales scripts, training materials, and marketing materials regarding vehicle price, financing, or leasing terms; all materially different copies of lists of add-on products and services; consumer transaction documents such as purchase orders, financing and leasing agreements (and related correspondence, including declination documents as required by the preceding section); records to show compliance with monthly payment disclosure and add-on sales requirements; written consumer complaints and consumer inquiries regarding add-ons or individual vehicles; and other records needed to demonstrate compliance with this Rule."[335]

In crafting this sweeping proposal, which the NPRM erroneously describes as involving "some incremental recordkeeping burden,"[336] the Commission has both styled itself as a supervisory agency, which it is not, and developed a scheme that will harm the honest businesses it purports to protect.

---

[333]  *See, e.g.*, Jonathan Lopez, *Your End-Of-Lease GM Vehicle May Be Worth Buying*, (Mar. 4, 2022), GM AUTHORITY, https://gmauthority.com/blog/2022/03/your-end-of-lease-gm-vehicle-may-be-worth-buying/. ("*Edmunds* looked at the estimated residual values for 2019-model-year vehicles leased in February or January of 2019 and compared those residual values to the trade-in values for 2019 model year vehicles that were traded in during January and February of 2022. *Edmunds* found that on average, the 2022 trade-in value for all 2019 model year vehicles was well above the original estimated residual value, up an average of 33 percent, or $7,208.").

[334] 87 Fed. Reg. at 42,046 (Proposed Section 463.6).

[335] 87 Fed. Reg. at 42,027.

[336] 87 Fed. Reg. at 42,033.

NADA Comments to Federal Trade Commission
Page 105 of 140
September 12, 2022

       1)      The FTC is not a supervisory agency.

While the Commission has created recordkeeping requirements in other contexts, its role as an enforcement agency that lacks supervisory authority should not be overlooked. Unlike federal banking regulatory agencies, it is not charged with conducting inspections of regulated entities that must retain and produce detailed records demonstrating compliance. Rather, it is an antitrust and consumer protection agency responsible for enforcing federal laws prohibiting unfair and anticompetitive business practices, fraud, and deception.[337] The records it requires motor vehicle dealers to produce should not seek to create a records inspection scheme.

       2)      The recordkeeping obligation is massive and will only serve to burden the honest dealer.

This aside, nowhere is the Commission's desire to "help honest dealers"[338] more misplaced than with the massive records production and retention obligations it has delineated in the NPRM.

The imposition of this requirement is problematic for many reasons.

First, there is nothing "incremental" about the Commission's proposed recordkeeping requirements. With the exception of purchase orders and finance and lease documents identified in Section 463.6(3) and certain other select documents, the retention obligations for documents identified in this subsection represent entirely new obligations.

Second, these new proposed obligations represent massive burdens. For example, the need to retain "copies of all materially different Add-on Lists"[339] would, in light of the Commission's overly broad definition of an "add-on" (see the discussion above), require the retention of pricing lists for thousands of items that can change on a frequent basis.

In addition, the need to retain "all written communications relating to sales, financing, or leasing between the Motor Vehicle Dealer and any consumer who signs a purchase order or financing or lease contract with the Motor Vehicle Dealer"[340] opens up a pandora's box of records. There are a myriad of ways that such communications occur including, but not limited to, online chat features on dealer websites, e-mails and text messages with salespersons, and social media posts. This occurs on both dealer-owned devices and employee-owned devices and both during and after normal business hours. Requiring motor vehicle dealers to develop an apparatus to capture every such written communication involving every one of the over 40

---

[337] *See* 15 U.S.C § 45; *See also Enforcement*, federal trade commission, https://www.ftc.gov/enforcement. (last visited Sept. 9, 2022).
[338] 87 Fed. Reg. at 42,014.
[339] *Id.* at 42,047 (Proposed Section 463.6(a)(2)).
[340] *Id.* (Proposed Section 463.6(a)(3)).

million new and used vehicle transactions with consumers that occur every year is as unrealistic as it is massive.[341]

Further, the need to retain all "inquiries related to Add-ons, and inquiries and responses referenced in Section 463.4 of this part"[342] creates a broad, open-ended requirement that seeks to capture a significant portion of the additional communications that occur between motor vehicle dealers and their customers. It is fanciful to think that dealers can (without massive expenditures of resources and diversion of employee time) develop an apparatus that effectively and confidently collects and retains every chat, e-mail, text, and social media post involving a specific vehicle, any monetary amount, any financing term, any monthly payment amount, and any "add-on." And equally perplexing is how the Commission views this obligation as "incremental."

This is all on top of the need to (i) create and retain up to four written disclosures for every "add-on" sale,[343] (ii) create and retain LTV calculations for every contract involving a GAP Agreement,[344] and (iii) retain all of the advertising, sales, training, and marketing materials set forth in the NPRM.[345]

Third, and most problematic, is the punitive effect these proposed requirements will have on the "honest" and "law-abiding" dealers that the proposed rule purports to assist. The NPRM states: "These recordkeeping provisions are necessary to ensure that dealers make required disclosures under the Rule. They will also assist the Commission in assessing dealers' compliance with the Rule and help to ensure its effectiveness."[346] But at what cost? And how does that cost relate to the benefit they will produce?

As noted above, the Commission has brought an average of less than 4 enforcement actions per year against motor vehicle dealers in the past decade (and there is no indication that any of them suffered from a lack of documentation at the dealership). So, in order to enhance its ability to bring a handful of actions per year against motor vehicle dealerships under a new TRR, the Commission proposes to require every one of the nation's 16,745 franchised light-duty motor vehicle dealers and thousands of independent motor vehicle dealers to retain voluminous new

---

[341] And the burden is actually many multiples of this number as it is unrealistic to think that motor vehicle dealers could develop a mechanism that distinguishes between communications with consumers who end up signing a purchase, financing, or lease contract and those who do not. In addition, seeking to compel the retention of information on privately owned devices invites a range of privacy concerns.

[342] 87 Fed. Reg. at 42,047 (Proposed Section 463.6(a)(5)).

[343] *Id*. (Proposed Section 463.6(a)(4)).

[344] *Id*.

[345] *Id*. at 42,046 (Proposed Section 463.6(a)(1)). Other concerns with the proposed recordkeeping requirements exist, such knowing what constitutes a "written consumer complaint." *Id*. at 42,047 (Proposed Section 463.6(a)(5)). Given the variety of methods in which a written communication can occur, motor vehicle dealers would need to know what must be in a communication to meet this definition, and this standard would need to be one which can be easily implemented.

[346] 87 Fed. Reg. at 42,027.

documents in the unlikely event that the Commission will need to see them. This severely punishes honest and law-abiding dealers by requiring them to incur the burden and go to the expense of producing and retaining a massive cache of documents so that the Commission can more easily bring enforcement actions against bad actors under a new TRR even though there is plenty of basis to bring actions against such actors under existing law. This will add massive costs to the system while producing little, if any, corresponding benefit to consumers.[347]

       b.     The proposed disclosures have not been consumer tested.

The Commission's failure to gather adequate information on its proposals in advance of issuing them also extends to not knowing what real-world effect the multiple disclosures mandated by the Proposed TRR will have on consumers. Even if the Commission is convinced, notwithstanding the repeated concerns it has expressed about the current length of motor vehicle sale and lease transactions, that motor vehicle dealers should provide additional disclosures to consumers during the sale process, the Commission has to appreciate the importance of understanding what effect such disclosures will have on consumers before mandating them.[348] Federal agencies, including the Commission, routinely test the effectiveness of new disclosures they are contemplating for consumers *before* mandating them and often discover that such disclosures would not assist – and in some cases would actually operate to the detriment of – consumers if adopted as proposed.

A prominent example of such an exercise involved a 2002 Department of Housing and Urban Development (HUD) Real Estate Settlement Procedures Act (RESPA) reform proposal that, among other components, would have required mortgage brokers, but not other mortgage providers, to disclose certain types of compensation to consumers to assist them when shopping for mortgages. FTC BE conducted a quantitative study of the proposal and set forth its findings in a 2004 report entitled *The Effect of Mortgage Broker Compensation Disclosures on Consumers and Competition: A Controlled Experiment*.[349] It stated, in part:

    "This study of over 500 recent mortgage customers in an experimental setting finds that the mortgage broker compensation disclosure proposed by the

---

[347] Former FTC Chairman Muris and Former FTC BCP Director Beales similarly identify this concern: "Rules by their nature… also apply to legitimate companies that regularly keep their promises to consumers. Remedies appropriate for demonstrated bad actors can be quite burdensome for legitimate businesses, and there is often no straightforward way to limit required remedies to fraudulent practices. Overly burdensome rules can interfere with the market processes that actually serve consumers' interests, creating harm rather than preventing it." Back to the Future Report at 4.

[348] As noted by former FTC Chairman Muris and Former FTC BCP Director Beales: "Especially for a generalist agency like the FTC, quality rules depend on quality information. Quality information in turn requires a process that produces a fulsome record, in which the key information is subject to testing, analysis, and rebuttal by the various interested parties." Back to the Future Report at 5.

[349] James Lacko, et.al., *The Effect of Mortgage Broker Compensation Disclosures on Consumers and Competition: A Controlled Experiment*, Federal Trade Commission, (Feb. 2004). Available at: https://www.ftc.gov/sites/default/files/documents/reports/effect-mortgage-broker-compensation-disclosures-consumers-and-competition-controlled-experiment/030123mortgagefullrpt.pdf.

NADA Comments to Federal Trade Commission
Page 108 of 140
September 12, 2022

> Department of Housing and Urban Development (HUD) is likely to confuse
> consumers, cause a significant proportion to choose loans that are more
> expensive than the available alternatives, and create a substantial consumer bias
> against broker loans, even when the broker loans cost the same or less than direct
> lender loans.  Similar adverse effects were found for two alternative versions of
> the disclosure.
>
> If consumers notice and read the compensation disclosure, the resulting
> consumer confusion and mistaken loan choices will lead a significant proportion
> of borrowers to pay more for their loans than they would otherwise.  The bias
> against mortgage brokers will put brokers at a competitive disadvantage relative
> to direct lenders and possibly lead to less competition and higher costs for all
> mortgage customers."[350]

As is evident from the FTC BE's findings, the well-intended effect of HUD's proposal and its
actual effect were very different and only became known after the FTC conducted its controlled
consumer testing.

The FRB similarly recognized the importance of – and heavily relied upon – consumer testing
prior to issuing a final rule in 2010 amending Regulation Z that also related to mortgage broker
compensation disclosures.[351]  After engaging a survey research firm that conducted four rounds
of consumer testing in different cities and receiving its report entitled *Summary of Findings:
Consumer Testing of Mortgage Broker Disclosures*,[352] the FRB amended a previous proposal
stating:

> "Based on the Board's analysis of comments received on the 2008 HOEPA
> Proposed Rule, the results of consumer testing, and other information, the Board
> withdrew the proposed provisions relating to broker compensation. [Citation
> omitted.]  *The Board's withdrawal of those provisions was based on its concern
> that the proposed agreement and disclosures could confuse consumers and
> undermine their decision making rather than improve it*."

(Emphases added.)[353]

Consumer testing also was essential to the Commission's and other federal agencies' creation of
a model privacy notice under the GLB Privacy Rule that has been far more effective and
meaningful in explaining a financial institution's privacy policy to consumers than the privacy

---

[350] *Id.* at ES-1.
[351] 75 Fed. Reg. 58,509-58,538 (Sep. 24, 2010).
[352] *Summary of Findings: Consumer Testing of Mortgage Broker Disclosures*, MARCO INTERNATIONAL, INC., (July 10, 2008). Available at: https://www.federalreserve.gov/newsevents/pressreleases/files/20080714regzconstest.pdf
[353] 75 Fed. Reg. at 58,511.

notices financial institutions used before its creation.[354]  As the FTC and the other federal agencies recognized, the privacy notices that financial institutions issued to comply with the Privacy Rule when it took effect came in different shapes and sizes and were filled with legalese that clung closely to the language explaining the required disclosures that was set forth in the Privacy Rule.  Both Congress and the implementing agencies recognized early on the need for improvement, but they also recognized the importance of carefully testing the effectiveness of a new model privacy notice before issuing it to the public.

The steps the agencies took reflected a process that, while not fast or flawless, involved extensive consumer research, including quantitative testing, that effectively converted the distribution by financial institutions of unwieldy and confusing privacy notices to the distribution of a model notice with a standard format that far more effectively explains a financial institution's privacy policy to consumers. This culminated in a process that far more effectively carried out the statutory mandate than what would have occurred had the agencies engaged in a truncated process that lacked consumer input.[355]

In view of both the experience of the Commission and other federal agencies in these and many other instances and the magnitude of new disclosures that the Commission has proposed, the need for consumer testing in the instant matter should be self-evident.

The Commission is proposing a series of new disclosures involving an array of terms, including (i) the "offering price" in vehicle advertisements the first time that any of three items are referenced;[356] (ii) certain credit information whenever monthly payments are referenced or compared;[357] (iii) a series of disclosures related to "add-ons" before financing is referenced and still other disclosures before "add-ons" are sold;[358] and (iv) a list of all "add-ons" on the dealer's website and mobile applications.[359]  These disclosures are sprinkled and superimposed on top of existing disclosures that motor vehicle dealers currently make to consumers (a) under TILA and Regulation Z and the CLA and Regulation M, (b) under various state disclosure regimes, and (c) via menu formats that are widely used by motor vehicle dealers before consumers purchase, finance, or lease a motor vehicle.

It is essential, therefore, that the Commission conduct robust testing of these disclosures, particularly given their magnitude, to determine whether they will enhance or diminish consumers' understanding of key elements of the transaction.  And, as observed by Commission staff, "any recommendations to change or add to the current disclosures would need to consider

---

[354] 16 C.F.R. § 313.

[355] The joint Final Model Privacy Form Under the Gramm-Leach-Bliley Act, along with an explanation of the process used by the implementing agencies to produce the form, is available at 74 Fed. Reg. 62,890-62,994 (Dec. 1, 2009).

[356] 87 Fed. Reg. at 42,045 (Proposed Section 463.4(a)).

[357] 87 Fed. Reg. at 42,046 (Proposed Section 463.4(d) and (e)).

[358] *Id*. (Proposed Section 463.5(b)).

[359] *Id*. (Proposed Section 463.4(b)).

NADA Comments to Federal Trade Commission
Page 110 of 140
September 12, 2022

the effect on the duration of the transaction or the already large amount of paperwork to review."[360]

Simply assuming that these additional disclosures will aid consumers – without obtaining *any* validation from experts in this field of research – amounts to a wishful and uninformed *fire-then-aim* experiment that the Commission can only hope works out for the best.  The Commission should recognize from its own experience, and that of its sister agencies, that the development of sound public policy requires a more considered and responsible approach, especially for a rule of this scope and magnitude.

>   c.    The proposed requirements have not been subject to an adequate cost-benefit analysis.

The Commission's assessment of costs and benefits is also deeply flawed.[361]  The Commission's analysis both massively understates the costs of the Proposed TRR while wildly overstating its supposed benefits.

First, the Proposed TRR lacks any actual data on the economic costs of the rule, which the Commission effectively admits but tries to paper over with speculation and assumptions.[362] This failure to determine and explain the extensive costs of the rule is compounded by the FTC's refusal to go through an ANPRM process or to extend the comment period for the Proposed TRR, both of which would have allowed commenters to provide the agency with more accurate, comprehensive data.  This falls far short of an agency's requirement to consider cost estimates in a way that is rational, rather than "inconsistent[] and opportunistic[]." *E.g.*, *Bus. Roundtable v. SEC*, 647 F.3d 1144, 1148-49 (D.C. Cir. 2011)(faulting the agency's cost-benefit analysis for "inconsistently and opportunistically fram[ing] the costs and benefits of the rule; fail[ing] adequately to quantify the certain costs or to explain why those costs could not be quantified; neglect[ing] to support its predictive judgments; contradict[ing] itself; and fail[ing] to respond to substantial problems raised by commenters," among other things).

In response to the NPRM and the Commission's flawed burden analysis, NADA sought to engage a reputable, widely recognized auto industry expert research center to conduct a study analyzing both:

---

[360] Auto Buyer Study at 2.  Commission staff further observed and recognized that the lessons learned from the Auto Buyer Study, far from standing alone, "provide a foundation for development of consumer education or for *further research into potential modifications of the buying process*."). (Emphasis added.) *Id.*

[361] *See generally*, Dan Goldbeck , *FTC Needs to Run Those Numbers Again*, AMERICAN ACTION FORUM, (September 1, 2022), https://www.americanactionforum.org/insight/ftc-needs-to-run-those-numbers-again/  (*See also* Attachment 20).

[362] 87 Fed. Reg. at 42,039 (providing "quantitative estimates" and "qualitative[]" descriptions, while admitting it "lacks enough information to determine" certain costs); *See also id.* at 42,028-31 (broadly soliciting comments on costs).

1)      the cost to franchised light-duty motor vehicle dealerships of complying with the duties set forth in the Proposed TRR; and

2)      how the duties will affect the time and cost of the typical motor vehicle sales transaction.

This proposed study would break out its analysis by business size, to better understand the effect of the Proposed TRR on small businesses.[363]  NADA was informed that to conduct a study of this magnitude would require a minimum of four months to complete, as it would include analyzing the complex requirements of the Proposed TRR, developing a survey to obtain information about the effects of those new requirements, identifying and managing participants, conducting the survey, and analyzing the resultant data.  This would, in turn, require identifying and interviewing dealer principals, general managers, and finance and insurance (F&I) managers, with expert market experience and hands-on transactional insight.  It would also involve reaching out to dealership technology and advertising vendors to better understand how the Proposed TRR's mandatory forms, calculations, restrictions, disclosures, and other obligations would increase the time and cost to conduct a motor vehicle transaction.  Finally, an analysis of costs would address both one-time, up-front costs, and annual recurring costs – each of which will be significant under the Proposed TRR.

Unfortunately, NADA has been unable to conduct this study because the Commission did not provide ample time to develop it and submit the results in the time allotted for comments.  The FTC's failure to issue an ANPRM, together with its failure to provide a reasonable comment period extension (notwithstanding NADA's timely request), means that NADA's responses to the agency's assertions do not yet reflect any cost estimates supported by comprehensive data and rigorous analysis.

The Commission's failure to allow NADA sufficient time to conduct a cost analysis is problematic enough; but what is completely indefensible is that the Commission has apparently not undertaken any such study itself either.  As noted in greater detail above, the new duties imposed by the Proposed TRR, the conscious restructuring of the sales process, the introduction of multiple and repeated new forms and added disclosures, and the inappropriately heightened liability standards will impede the efficiencies of online sales and shopping and inject massive new delay and confusion into the overall auto retail market.  None of those clear effects are accounted for in the Proposed TRR – at least in part because the Commission failed to conduct a study of these consequences itself.

Indeed, there is not any clear analysis or discussion of any kind of the various additional costs.  The NPRM does little more than simply list each section of the Proposed TRR and then make a summary estimate of cost or a request for comments on potential costs.[364]  However, in doing so, the NPRM fails to identify many of the real world implications of the proposal, such as the

---

[363] Most of NADA's car dealer members are small businesses as defined by the Small Business Administration.  NAICS 44111 (200 employees or less).
[364] *See, e.g.,* 87 Fed. Reg. at 42,040.

NADA Comments to Federal Trade Commission
Page 112 of 140
September 12, 2022

need to provide multiple additional forms, the need to explain and countersign those forms, the need to orally explain the content of the forms, the need to conduct unnecessary trade in valuations, the impediments to online shopping, the added consumer confusion over the multiple price disclosures, etc., as described in detail above.

Despite NADA's inability, due to of the rushed nature of the current rulemaking process, to proffer a comprehensive cost analysis, we have attempted to provide the best assessment of costs that we can at this point in time. Based upon our own detailed analysis of the Proposed TRR and the discussions we have been able to have with members of NADA and their vendors, NADA has prepared the tables set forth in Attachments 18 and 19. These tables are, respectively, NADA's PRA responses (set out in Attachment 18) and its RFA responses (set out in Attachment 19). Although these tables do not provide the kind of comprehensive, in-depth data that an expert research center study would contain, they nonetheless reflect good-faith analyses of the Proposed TRR's likely consequences and are certainly more robust than the Commission's cost assessments.

Second, as for the purported "benefits" of the Proposed TRR, the FTC's estimates are even more egregious. The NPRM's benefit assertion is not complicated, but it is little more than unsupported *ipse dixit*. The Commission relies on one thing to estimate the dollar benefits of the Proposed TRR, and that one thing is *literally* pulled from nowhere. Here is the entire basis for the NPRM's claim that significant monetary benefits will flow to consumers from the Proposed TRR:

> "The Commission assumes that, as a result of the proposed Rule provisions prohibiting misrepresentations and requiring price transparency, each consumer will spend 3 fewer hours shopping online, corresponding with dealerships, visiting dealer locations, and negotiating with dealer employees per motor vehicle transaction."[365]

That's it. That is the sole source of asserted cost savings under the Proposed TRR. There is no study, no survey, no data, no support, no analysis, not even any discussion of how this estimate was derived. It is simply just asserted.

To be sure, the Commission does cite one study – the 2020 Cox Automotive Car Buyer Journey – in connection with its time saving assertion.[366] But all that study is cited for, and all it says, is that the overall time a consumer spends "researching, shopping, and visiting dealerships for each motor vehicle transaction" is about 15 hours. The FTC then states the mathematical truism that 20% of 15 is 3 and claims that consumers will therefore save three hours.[367] Significantly,

---

[365] 87 Fed. Reg. at 42,037.
[366] 87 Fed. Reg. at 42,013 (Citing the 2020 Cox Car Buyer Journey study).
[367] Curiously, the study cited by the NPRM is the 2020 version of Cox Automotive Car Buyer Journey, despite the fact that the 2021 version of the same study is available. Importantly, the 2021 study reports that the total time

NADA Comments to Federal Trade Commission
Page 113 of 140
September 12, 2022

the Cox study cited by the NPRM says nothing about the proposals in the Proposed TRR and has absolutely no connection to any estimate of time savings.[368]  The Commission's conclusory, unsupported reasoning could have equally justified an assumption that the Proposed TRR would save consumers 30% or 50% or even 90% of the time they currently spend researching, shopping, and visiting dealerships. The numbers are simply pulled from thin air.

Indeed, for many of the reasons previously discussed, far from delivering the benefits that FTC cites, the Proposed TRR will in reality result in zero benefits for consumers and, more likely, will introduce significant disbenefits.  As discussed in detail in Section IV.a.3.B., above and elsewhere, many of the Proposed TRR's requirements will operate to confuse consumers, resulting at best in lengthier transactions and at worst in consumers making bad choices (as their confusion will cause them to focus on the wrong variables or transaction attributes).

What is clear from any analysis of the Proposed TRR is that the mandates set out therein will impose prohibitive costs and burdens on many dealers and their customers, resulting in very significant increases in the cost and time for motor vehicle transactions, with little or no commensurate benefits.  And, because many of our members are small business and lack any in-house legal, administrative, or financial expertise necessary to comply with the mandates set out in the Proposed TRR, many dealers, particularly smaller ones, will be forced to rely more heavily on costly outside counsel and vendors to try to meet their compliance obligations.  This will, by necessity, increase any cost estimates for such smaller dealers.[369]

Indeed, given the complex and inexplicable nature of many of the Proposed TRR's mandates, as discussed in-depth above, a few small dealers have even expressed a concern that it would effectively mean all dealers are noncompliant in some way.  They fear that they will be unable to "self-insure" against any potential liability and would be forced instead to exit certain aspects of the motor vehicle sales market (which would make them noncompetitive and ultimately not viable) or need to sell their stores all together, which would necessarily lead to reduced employment and reduced competition.[370]

---

buyers spent researching and shopping for a vehicle had dropped to 12.5 hours.  *2021 Cox Automotive Car Buyer Journey Study Overview*, COX AUTOMOTIVE (Jan. 2021). Available at: https://www.coxautoinc.com/wp-content/uploads/2022/01/2021-Car-Buyer-Journey-Study-Overview.pdf. Of course, if the FTC applied its unexplained 20% metric to 12.5 hours, the number of hours saved would likewise drop – to 2.5.

[368] Even if the FTC did attempt to link the Cox study to the conclusion that 3 hours of time would be saved as a result of the Proposed TRR, it would have a very difficult time doing so.  As explained in detail in the American Action Forum's article at Attachment 20, the balance of the Cox study reveals that there are not 3 hours of time available to be saved in the portion of the auto retailing process the Proposed TRR would affect.

[369] And that fact is not accounted for in the Proposed TRR.

[370] NADA suspects that the Proposed TRR will have at least as great an impact on small businesses in the independent used car and other dealer sectors falling within the proposal's scope, but NADA lacks any data to suggest what those impacts would be. Of course, as detailed in Section II.c above, it is the FTC's responsibility, and not that of the regulated community, to analyze the potential impacts on small businesses, on consumers, and on the economy in general, of any regulatory mandates it is considering *prior to issuing a proposed rule.*

      d.     The proposed requirements will significantly disrupt state regulatory regimes.

The Commission also refuses to "consider whether existing [federal] regulations made its proposed regulation unnecessary." *Inv. Co. Inst. v. CFTC*, 720 F.3d 370, 377 (D.C. Cir. 2013); *see, e.g.*, *Am. Equity Inv. Life Ins. Co. v. SEC*, 613 F.3d 166, 179 (D.C. Cir. 2010) ("[F]ailure to analyze the efficiency of the existing state law regime renders arbitrary and capricious the [agency's] judgment."). The Commission knows that the problems it seeks to address – advertising misrepresentations and unlawful practices related to add-ons and deceptive pricing" – are already prohibited by federal and state laws across the country and therefore have already been the subject of federal and state enforcement actions for years.[371] To ensure that such widespread regulation continues, the proposed rule expressly states that it does not preempt state law.[372] Yet the Commission never explains how preexisting and "substantial" "federal and state law enforcement efforts" are insufficient beyond the fact that such efforts have not eliminated 100% of unfair and deceptive practices.[373] That is not a *reason* for piling on with new federal regulation; the fact that a very small number of willful lawbreakers continue to break state laws does not mean that existing state law is inadequate, that additional federal regulation would improve law enforcement or compliance, or that the benefits of additional federal regulation would outweigh the costs.

The Commission also must consider the effect its regulation will have on state VPP disclosure regimes and other requirements. For example, the California Automobile Sales Act requires a signed written pre-contract disclosure of six types of products or services, if charges for those items will be included in a conditional sale contract.[374] The six types of items are contract cancellation option agreements, insurance, service contracts, debt cancellation agreements, "surface protection products," and "theft deterrent devices" (as the latter two terms are defined by California law).[375] The required written disclosure must identify the charges for each item, a total, a disclosure of the amount of the regular monthly installment payment including the listed items, and the amount of the regular monthly installment payment excluding the listed items.[376] Assuming this disclosure would not be preempted by Section 463.9 of the Proposed TRR, how would the consumer comprehend this disclosure on top of the multiple disclosures described in Section IV.a.3.b above? It is difficult to image consumers benefitting from this information overload and the fatigue that would accompany it. And how would the proposed requirements affect consumer comprehension of disclosures required by other states?

---

[371] *See* 87 Fed. Reg. at 42,013, 42,015-18.

[372] 87 Fed. Reg. at 42,047 (Proposed Section 463.9).

[373] *Id*. at 42,035. The Commission effectively admits it has no evidence that state laws are deficient when it broadly seeks comments on their efficacy. *See* 87 Fed. Reg. at 42,031. And, again, the Commission's refusal to go through an ANPRM has tainted its entire decision-making process by depriving it of necessary data to conduct this analysis.

[374] Cal. Civil Code § 2982.2.

[375] Cal. Civil Code § 2982.2(a)(1)(B).

[376] Cal. Civil Code § 2982.2(a)(2)-(4).

It is essential that the Commission carefully review comments filed by state motor vehicle dealer associations to gain better insight into the disruption and confusion that the Proposed TRR would create for consumers and motor vehicle dealers on multiple fronts. Without such coordination and without adequate testing of the net effort of federal and state requirements on consumers, the FTC is inviting a costly, chaotic, and counterproductive implementation scheme.

e.    The NPRM does not adequately consider detrimental reliance.

The proposed rule also fails to consider the reliance interests of motor vehicle dealerships with respect to the existing regulatory regime. When "prior policy has engendered serious reliance interests," those interests "must be taken into account." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). This concern is particularly acute when the agency changes its position on a "longstanding policy" – a situation where "'serious reliance interests'" are far more likely. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016). Thus, for the agency to meet its obligations when it changes longstanding policy, it must affirmatively "assess whether there [are] reliance interests, determine whether they [are] significant, and weigh any such interests against competing policy concerns." *DHS*, 140 S. Ct. at 1915.

The Proposed TRR is a wholesale change to longstanding Commission policy regarding motor vehicle dealers, as it replaces targeted "federal and state enforcement actions" with a highly prescriptive regulatory regime with prophylactic disclosure rules to purportedly "deter" wrongdoing before it occurs.[377] The proposal would also empower the Commission for the first time to seek civil penalties for violations.[378] These changes upset the longstanding reliance of motor vehicle dealers on a more focused federal law enforcement regime that gave dealers flexibility to decide how they truthfully disclosed prices to consumers. The Commission's proposal arbitrarily fails to consider how auto dealers have developed such reliance or how significant those interests are. *DHS*, 140 S. Ct. at 1915.

V.    Even if additional regulation were necessary, there are better alternatives to the rules proposed in the NPRM.

Even if the data the Commission has put forward could show that there is currently a serious, national problem in the motor vehicle dealer industry that requires federal intervention, the Commission has not tested its proposed solutions to determine whether less burdensome alternatives exist. *See Am. Ass'n of Cosmetology*, 258 F. Supp. 3d at 75. Indeed, there is no indication that the Commission has considered any alternatives to its Proposed TRR.[379]

---

[377] 87 Fed. Reg. at 42,013.
[378] 87 Fed. Reg. at 42,039; 87 Fed. Reg. at 42,047 (Joint Statement of Comm'rs Khan, Phillips, Slaughter, and Bedoya).
[379] *See* 87 Fed. Reg. at 42,035 ("[T]he Commission has not proposed any specific alternative compliance mechanisms for small businesses. The Commission seeks comment and information on the need, if any, for

NADA Comments to Federal Trade Commission
Page 116 of 140
September 12, 2022

One less burdensome and more effective alternative that the Commission should have considered (and in the future should consider) to address its concerns involving VPPs (which is the largest component of the Proposed TRR) would have been to coordinate with the FRB and appropriate state authorities to establish a safe harbor against UDAP and pricing discrimination claims for motor vehicle dealers that adopt, implement, and maintain the *NADA/NAMAD/AIADA Model Dealership Voluntary Protection Products Policy* (Attachment 21). The Commission favorably cites the policy five times in the NPRM[380] but nowhere indicates that it has considered whether it provides a more prudent and cost-effective means of addressing its concerns than the approach the Commission has taken in the Proposed TRR.[381]

This is regrettable as the policy provides a robust array of protections for consumers that can be adopted in a manner that does not delay the sales process or impose massive, costly, and unnecessary burdens on motor vehicle dealers. The following is a summary of several key components of the *NADA/NAMAD/AIADA Model Dealership Voluntary Protection Products Policy* that address compliance at every stage of the life cycle of a VPP.

- *Policy Adoption and Statement*

Motor vehicle dealers who adopt the policy establish a comprehensive framework for promoting VPP compliance within the dealership and express that commitment in a poster that is prominently displayed to prospective customers. It clearly states that the purchase of VPPs is completely optional.

- *Legal Compliance, Training, Oversight, Coordination, and Records Retention*

The policy provides a mechanism to ensure that it is not simply adopted but also implemented and maintained. A key component is initial and ongoing training of all dealership employees who perform VPP functions.

- *Product Selection*

The policy provides that the dealership's VPPs must offer value, and it provides considerations for determining whether to include a particular protection product in the dealership's VPP offerings such as the product features, its claims payment and cancellation process, and the product provider's financial ability to provide the product benefits.

---

alternative compliance methods that would, consistent with the statutory requirements, reduce the economic impact of the proposed rule on small entities.").

[380] *See* Footnotes 17, 28, 118, 120, and 136.

[381] In addition to considering this compliance approach, the Commission should also consider using the term "voluntary protection products" to describe the types of products addressed in the policy. It is an accurate term (these are "voluntary" "products" that are offered to "protect" the consumer's investment in the motor vehicle being purchased or the financing commitment for the purchase) and it stresses their voluntary nature every time they are referenced.

NADA Comments to Federal Trade Commission
Page 117 of 140
September 12, 2022

- *Product Pricing*

The policy provides an optional framework for pricing the dealership's VPPs in a manner that (i) promotes standardization, in order to address concerns about arbitrary, inconsistent, and/or discriminatory pricing, and (ii) permits discounting for legitimate business reasons, in order to promote competition in the marketplace. This portion of the policy is modelled after a similar pricing approach that is contained in the optional *NADA/NAMAD/AIADA Fair Credit Compliance Policy & Program* (Attachment 22), which fully adopts and expands on a compliance requirement contained in prior Department of Justice (DOJ) consent orders with motor vehicle dealers,[382] and that shares many elements of compliance requirements recently imposed by the FTC in consent orders with motor vehicle dealers.[383]

This approach also has been endorsed by the ABA, which included in Resolution 116B the following recommendation:

> "RESOLVED, That the American Bar Association urges federal, state, local, territorial and tribal governments to:
>
> b)    adopt laws and policies that promote the adoption of an enhanced nondiscrimination compliance system for dealer compensation for arranging and/or originating a vehicle finance contract by offering a safe harbor against pricing discrimination claims for dealers that faithfully implement the NADA/NAMAD/AIADA Fair Credit Compliance Policy and Program…."[384]

- *Product Advertisement*

The policy states the imperative that the dealership will not advertise or market VPPs "in a manner that is deceptive, misleading, or otherwise inconsistent with their terms or conditions."[385]

- *Product Presentation and Sale*

The policy establishes several key responsibilities during this phase of the VPP sales process.

---

[382] *See* Section 2.c of *United States of America v. Pacifico Ford, Inc.*, (E.D. Pa. Sept. 4, 2007) (consent order), Available at: https://www.justice.gov/archive/usao/pae/News/2007/aug/pacificoorder.pdf; and *United States of America v. Springfield Ford, Inc.*, (E.D. Pa. Sept. 4, 2007) (consent order), Available at: https://www.justice.gov/sites/default/files/crt/legacy/2010/12/15/springfield_order.pdf.

[383] *See* Section VII *Federal Trade Commission and People of the State of Illinois v. North American Automotive Services et.al.*, No. 1:22-cv-01690, (N.D.Ill. Mar. 31, 2022), Available at: https://www.ftc.gov/system/files/ftc_gov/pdf/6-1%20Stipulated%20Order.pdf; *See* Section V of *Federal Trade Commission v. Liberty Chevrolet, Inc. et.al.*, No.: 1:20-cv-03945-PAE, (S.D.N.Y. May 22, 2020), Available at: https://www.ftc.gov/system/files/documents/cases/bronx_honda_stipulated_final_order_liberty_chevrolet.pdf.

[384] *See* Attachment 17.

[385] Section V, NADA/NAMAD/AIADA Fair Credit Compliance Policy & Program (Attachment 22).

  o  The dealership will ensure that employees who offer VPPs to customers fully understand the product features, and it will not offer VPPs for which customers are ineligible or would derive no value. Unlike Section 463.5(a) of the Proposed TRR, this provision does not impose an LTV calculation requirement for the reasons stated in Section IV.a.3.D above.

  o  The dealership will inform customers orally that the VPPs it offers are optional.

  o  The dealership will present VPPs to customers in a standard, simply menu format that prominently discloses (i) that the purchase of any listed VPP is optional, (ii) that the dealer may retain a portion of the sale price and the VPPs may be available from other sources, and (iii) the pricing of VPPs (both the dollar amount of each VPP and how its purchase would affect the customer's monthly payment if the vehicle is financed through the dealership). This approach does not require the creation of any new forms or extend the time required to complete the transaction as dealers routinely employ menus as part of the VPP sales process and therefore can utilize it to provide key disclosures at a time when the customer is in a position to assess fully its protection product needs.

  o  The dealership will present VPPs in a manner that is designed to assist customers in making informed purchasing decisions, and this includes providing customers with available information on the products' benefits and limitations. Proposed Sections 463.5(b)(1)(iv) and 2(iv) would imprudently limit the dealership from providing such information.

  o  The dealership will request the customer's acknowledgement of the menu disclosures and its election to purchase or decline the VPPs that are offered, and the dealership will provide the customer with the terms and conditions of each VPP selected by the customer.

- The policy explains how the dealership will facilitate a customer's desire to exercise a right to cancel a VPP after it is purchased.

- The policy states that the dealership will promptly and courteously respond to customer complaints regarding VPPs purchased from the dealership.

The need to coordinate with the FRB in this endeavor is essential because, as discussed above, Congress has entrusted the FRB with responsibility for determining the content, form, and timing of TILA disclosures provided by motor vehicle dealers covered by the Proposed TRR and those disclosures include premiums for VPPs. Similarly, coordination with state authorities

is essential as several have adopted VPP disclosure regimes that could be disrupted by any VPP mandates and indeed would be disrupted by those set forth in the Proposed TRR.[386]

The *NADA/NAMAD/AIADA Fair Credit Compliance Policy & Program* provides a sound approach to promoting VPP compliance at motor vehicle dealerships that avoids the burdens, complexities, confusion, costs, and excesses of the approach taken by the Commission in the Proposed TRR. The Commission should consider this reasonable and far less burdensome alternative to the proposed rule, and we welcome the opportunity to explore this further with the Commission moving forward.[387]

## VI.    The Proposed TRR would violate the First Amendment.

Finally, the Commission's disclosure rules in Section 463.4 of the Proposed TRR violate the First Amendment. The First Amendment protects speech even in the context of a "'commercial transaction.'" *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 762 (1976). Compelled speech, even in a commercial setting, triggers heightened scrutiny. *See id.* at 2374; *NAM v. SEC*, 800 F.3d 518, 524 (D.C. Cir. 2015).

Dealers' ability to tailor their speech in an automobile sale, deciding whether to disclose a final price toward the end of transaction rather than at other times, is a decision that implicates the First Amendment because it is directly related to the *message* being conveyed. Some customers may want to first discuss features, performance, gas mileage, or availability, while others may focus on price or credit terms first and foremost. But the *content* and *message* of that conversation directly implicates the First Amendment. Even if end-of-transaction pricing were "potentially misleading" (it is not), the timing of a price disclosure is "not *inherently* … misleading," and therefore cannot be freely regulated as if it were categorically suspect. *See Alexander v. Cahill*, 598 F.3d 79, 96 (2d Cir. 2010) (emphasis added); *see, e.g., Ocheesee Creamery LLC v. Putnam*, 851 F.3d 1228, 1238 (11th Cir. 2017). The Commission thus bears the "considerable" burden of justifying a restriction on this speech. *E.g., Pagan v. Fruchey*, 492 F.3d 766, 770 (6th Cir. 2007). The Commission's restriction "will be upheld [only] if the government 'assert[s] a substantial interest in support of its regulation,' 'demonstrate[s] that the restriction on commercial speech directly and materially advances that interest[,]' and draws the regulation narrowly." *Id.* at 771.

The Commission's proposed rule fails to justify its disclosure requirements at every point of this test. First, the Commission's primary interest for imposing disclosure rules is to help consumers

---

[386] *See, e.g.,* Cal. Veh. Code §§ 11713.18-11713.21, which requires that a Pre-Contract Disclosure Statement addressing VPPs be provided to consumers

[387] NADA also welcomes the opportunity to explore further with the Commission joint educational endeavors that can enhance consumer understanding of the issues addressed in the Proposed TRR without the adverse consequences that the proposed rule would create. This includes promoting the educational resources of the Americans Well-informed on Automobile Retailing Economics (AWARE) Coalition, as well as NADA's recent *Know Before You Buy* brochure (Attachment 23). *See* Americans Well-informed on Automobile Retailing Economics (AWARE), https://autofinancing101.org/ (last visited Sept. 8, 2022).

avoid "time … negotiating under false pretenses and visiting dishonest dealerships" and thus "reduce the number of inefficient transactions."[388]  But, as discussed above, the Commission has not produced reliable data showing how frequently these situations occur, how much of an economic burden they impose, and whether its proposed disclosures would alleviate those burdens.[389]  The Commission has therefore not carried its burden of showing that this interest is "substantial." *Pagan*, 492 F.3d at 771.

The Commission asserts a secondary interest in preventing transactions that are consummated under false pretenses.[390]  But that hypothetical involves an unscrupulous auto dealer that is *already* violating the law through active deception; the Commission fails to explain how additional burdensome regulation of *all* dealers would alleviate such harms.  And the Commission has failed to produce any data indicating how frequently such deceptions would occur or how likely the disclosure rules would be to thwart them.

The Commission has also failed to demonstrate how its mandatory disclosures would directly and materially address the problem of inefficient transactions.  The Commission is required to show "that the measure it adopted would 'in fact alleviate' the harms it recited 'to a material degree.'" *NAM*, 800 F.3d at 526-527; *see also AMI v. U.S. Dep't of Agric.*, 760 F.3d 18, 26 (D.C. Cir. 2014) (requiring "evidence of a measure's effectiveness").  Instead, the Commission rests on "speculation [and] conjecture," *NAM*, 800 F.3d at 526, assuming – without any evidence, data, or consumer testing – that its rules would save consumers a total of three hours per transaction.[391]  After simply guessing at the rule's efficacy, the Commission also fails to consider more tailored restrictions on auto dealer speech that could effectively achieve the Commission's goals.[392]

Even if the Commission's disclosure rules were not subject to heightened First Amendment scrutiny, they would still fail under the *Zauderer* standard that applies to certain disclosure requirements.[393]  *Zauderer* holds that any disclosure requirements must be "reasonably related to the State's interest in preventing [confusion or] deception of consumers." *Zauderer v. Off. of Disciplinary Couns. of Supreme Ct. of Ohio*, 471 U.S. 626, 651 (1985). A disclosure fails that test if it is "unjustified or unduly burdensome." *See NIFLA*, 138 S. Ct. at 2376-77.

The Proposed TRR fails the *Zauderer* standard.  To give just a few examples (which are each discussed in greater detail above), the proposal: (1) requires disclosures that are "subject to misinterpretation by consumers," *R.J. Reynolds Tobacco Co. v. FDA*, 696 F.3d 1205, 1217

---

[388] 87 Fed. Reg. at 42,038.

[389] *See* 87 Fed. Reg. at 42,022-25, 87 Fed. Reg. at 42,038-39.

[390] *See* 87 Fed. Reg. at 42,038.

[391] 87 Fed. Reg. at 42,037.

[392] *See* 87 Fed. Reg. at 42,022-25, 87 Fed. Reg. at 42,038-42,039.

[393] Zauderer does not apply here because it is limited to regulations of "voluntary commercial advertising," not price disclosures. *NAM*, 800 F.3d at 523; *see also NIFLA*, 138 S. Ct. at 2372 ("*Zauderer* does not apply outside of these circumstances.").  Moreover, *Zauderer* only applies to "purely factual" information, which does not include partial disclosures. *See R.J. Reynolds Tobacco Co. v. FDA*, 696 F.3d 1205, 1216 (D.C. Cir. 2012).

(D.C. Cir. 2012), *overruled on other grounds AMI*, 760 F.3d at 22; (2) imposes enormous actual costs with only hypothetical benefits, *cf. NIFLA*, 138 S. Ct. at 2376-77; (3) fails to show that the "the possibility of deception" without mandatory disclosures "is self-evident," *Zauderer*, 471 U.S. at 652-53; *see also Ibanez v. Fla. Dep't of Bus. & Pro. Regul., Bd. of Acct.*, 512 U.S. 136, 146 (1994); (4) imposes comprehensive obligations to speak that effectively prevent dealers from articulating their own views, *see Ibanez*, 512 U.S. at 146-47; (5) chills lawful commercial speech, *Zauderer*, 471 U.S. at 651; and (6) regulates all auto sales generally rather than sales that are most susceptible to deception, *cf. NIFLA v. Becerra*, 138 S. Ct. 2361, 2377 (2018) ("Our precedents require disclosures … to extend 'no broader than reasonably necessary.'"); *Am. Beverage Ass'n v. City & Cnty. of San Fran.*, 916 F.3d 749, 757 (9th Cir. 2019). The First Amendment further underscores that the Commission may not saddle dealers with forced disclosure obligations that are costly, burdensome, and confusing, and that the Commission has never shown are actually likely to achieve the Commission's purported objectives.

VII.    Responses to Specific Questions

As explained in Section II.b above, it is patently unreasonable for the Commission to expect commenters to be able to prepare comprehensive, industry-wide data, studies, and analyses in response to 49 expansive questions within the meager comment period provided by the Commission.  We also note that the tone of many of the questions, similar to the press release announcing the NPRM, reflects an unnecessary hostility to the industry that further undermines confidence in this exercise.  In addition, the open-ended nature of the questions, which seek information that should have been obtained prior to developing specific proposals, reflect an inadequate understanding of the marketplace that contradicts the Commission's apparent view that its prior activity involving motor vehicle dealers has made it sufficiently educated to craft informed and effective proposals in this matter.  Notwithstanding these flaws, we have set forth below, to the extent feasible, responses to the questions posed by the Commission that are not addressed elsewhere in these comments.

*1. Does the proposed rule further the Commission's goal of protecting consumers from unfair or deceptive acts or practices in the motor vehicle marketplace? Why or why not?*

It does not.  As addressed throughout these comments, consumer protections already exist under multiple federal and state laws in each area addressed in the Proposed TRR.  The Commission has put forth a series of requirements that are unnecessary, uninformed, unsupported, uncoordinated, untested, and highly problematic for both consumers and motor vehicle dealers.

*2. Are there any unfair or deceptive acts or practices not addressed by the proposed rule that should be? For example, should there be additional provisions pertaining to leasing or provisions pertaining to interest rates or other financing terms?*

There is no need or basis for such action.  Optional dealer-assisted financing is extraordinarily competitive and provides access to credit and competitive rates to millions of consumers each year.  See the discussion in Section I.a.3 above.

*4. Portions of the proposed rule contemplate additional disclosures in an already lengthy, confusing and disclosure-heavy but low-comprehension transaction. Would any of the additional proposed disclosures do more harm than good? If so, is there another measure that should be used to address the consumer protection concerns described herein?*

As discussed at length in Section IV.a above and elsewhere, the additional proposed disclosures would do much more harm than good.  Regarding another measure that should be explored to address the Commission's consumer protection concerns, see Section V above regarding the optional *NADA/NAMAD/AIADA Model Dealership Voluntary Protection Products Policy*.

*5. Should the Commission provide more detailed requirements regarding the content or form of any of the proposed disclosures?*

As explained in detail above, questions abound regarding how the disclosures would operate in the marketplace and, in a number of areas, even what they mean.  If additional disclosures are mandated, they should only be issued after extensive (i) coordination with the FRB and State authorities, (ii) stakeholder input, (iii) consumer testing regarding the efficacy of their content, form, and timing, and (iv) clarification of how they operate and should be implemented.  The Commission should also develop model forms for such disclosures and provide safe harbor protection to motor vehicle dealers who use them.

*6. What economic burdens would be imposed on dealers if the Rule proposals were adopted? Are there changes that could be made to lessen any such burdens without significantly reducing the benefits to consumers?*

In denying NADA's request for an extension of the comment period (see Attachment 3), the Commission precluded NADA from providing comprehensive research and data that would quantify the projected burden.  Multiple portions of the comments, including Attachments 18 and 19, explain the lack of justification for – and the extraordinary nature of – the burdens that the rule would impose on dealers.  With regard to possible changes, the Commission should engage in consumer testing of any requirements it contemplates imposing to determine how to properly structure them.

*7. Does the proposed rule adequately address sales and leasing practices that take place partially or completely online? If not, should there be different or fewer or additional requirements for online sales and leasing?*

The proposed rule would have a very adverse impact on online transactions. The Commission should not impose additional requirements that would impede the technological progress that has been – and continues to be – made in this area. See the discussion in Section IV.a.3 above.

*8. Should any final Rule include additional provisions to address electronic disclosures or recordkeeping? Why or why not? If yes, in what manner(s)?*

The Commission should not impose additional recordkeeping obligations and should recognize that the creation and retention of additional records creates burdens, increases risks of identity theft, and raises privacy concerns. See Section IV.3.C above. Records retention requirements should certainly permit the electronic storage of those records.

*9. Should any final Rule address disclosures in other languages? Why or why not? If yes, in what manner(s)?*

For the reasons stated in Section IV.A.2 and 3.B above, a final rule should not include any new disclosures, including those in other languages. The imposition of such a requirement would be very unwieldy and burdensome as it would involve both written and oral disclosures involving dealership personnel in multiple departments. This would be much broader and very different from the Spanish language requirement in the Used Car Rule, which is confined to a window form and contract disclosure in Spanish using a form layout and language that is provided in the rule.[394] The sheer number of forms and circumstances that would be affected by a multi-language disclosure requirement in the Proposed TRR would be completely unworkable. In addition, because the demographics of the population differ significantly from jurisdiction to jurisdiction, any assessment of the need for – and deployment of – a foreign language disclosure requirement should be addressed at the local level.

*10. Are the proposed definitions clear? Should any changes be made to any definitions? Should the scope of any of the proposed definitions be expanded or narrowed, and if so, why?*

This question is addressed throughout the comments as it relates to several terms. However, to reiterate what is discussed in Sections IV.a.3.B(3) and C(1) above, the definition of "Add-on" and "Add-on Product(s) or Service(s)" impermissibly excuses motor vehicle manufacturers (especially those that themselves retail motor vehicles) from the requirements related to these definitions. In addition, as discussed in Section IV.a.3.C(2), these definitions and the definition of "Add-on List" would make the website and mobile application requirement in Section 463.4(b) of the Proposed TRR completely unworkable for motor vehicle dealers and thoroughly unhelpful to consumers. Similarly, as explained in Section IV.a.3.b(3), there are portions of the definition of "Express, Informed Consent" that are incomprehensible and need to be addressed.

---

[394] 16 C.F.R. § 455.5.

*11. Are additional definitions needed?*

Yes. See the discussion in Section IV.a.3 above regarding the meaning of the following terms as used in the Proposed TRR: "charged," "item," "discount," "rebate," and "trade-in value." The term "online service" in Section 463.4(b) of the Proposed TRR should also be defined.

*12. Are the proposed prohibitions on misrepresentations in this section clear, meaningful, and appropriate? Should the scope of any of the proposed prohibitions be expanded or narrowed, and if so, how and why?*

The prohibitions on misrepresentation are unnecessary, conflict with the FTC Act and the FTC Policy Statement on Deception, and, in many respects, lack clarity. See the discussion in Section IV.a.1 above.

*13. Would any of the proposed prohibitions inadvertently discourage truthful advertising to the detriment of consumers? For example, would prohibitions against misrepresenting the cost of a purchase make it less likely dealers would include truthful pricing claims in their ads? If so, please provide suggestions on how to address these issues.*

Yes. As noted in Section IV.a.3.a above, the proposed requirements will ultimately limit, if not in some cases eliminate, price advertising by dealers – and may even suppress other types of dealer advertisements as well. Fewer price advertisements will severely limit price discovery which, in turn, will require consumers to visit dealerships for price information instead of conducting online research (which will further delay the car shopping process). This will lead to less informed consumers, decrease price competition among dealers, and provide an unwarranted competitive advantage to vehicle advertisers who are not covered by the proposed rule. To avoid this outcome, the Commission should focus its efforts on enforcing the existing advertising rules that already make illegal all of the problematic behavior at which the Proposed TRR is targeted. The Commission's current deception standard and state requirements provide defined, enforceable advertising standards that should not be disrupted.

*14. Are there any other practices by dealers relating to vehicle sales, financing, or leasing that are particularly harmful to military servicemembers? For example, are there particular unfair or deceptive acts or practices engaged in by dealerships in the proximity of, or within, military installations?*

There is no credible evidence of systemic problems in this area and, to the extent such actions occur, military commanders possess the authority to declare bad actors off limits to military personnel. See 32 C.F.R. Part 631. This area does not require further Commission intervention beyond enforcement activity against any wrongdoers.

*15. Proposed § 463.3(e) would prohibit dealers from misrepresenting the availability of vehicles at an advertised price. Are there situations in which dealers misrepresent the availability of*

*vehicles without reference to price (e.g., the total number of vehicles of a certain make, model, and year the dealer has available)? If so, should the Commission amend the proposal in § 463.3(e) to directly address such misrepresentations? Why or why not?*

See the discussion of this prohibition in Section IV.a.1.B above.

*16. Proposed § s 463.3(h) and (i) would prohibit dealers from misrepresenting when the transaction is final or binding on all parties and from making misrepresentations about keeping cash down payments or trade-in vehicles, charging fees, or initiating legal process or any action if a transaction is not finalized or if the consumer does not wish to engage in a transaction. As indicated in this document, these proposed provisions are intended to curb problems with the spot delivery of vehicles while the financing for the vehicle remains contingent—problems sometimes referred to as "yo-yo financing." Should the Commission consider alternative approaches to address such problems, such as requiring retail installment sales contracts to include a clause prohibiting financing-contingent sales, prohibiting the dealer from transferring title to a trade-in vehicle or performing any repairs or reconditioning before a sale is final or requiring dealers to return trade-in, deposit, and fees, if financing is not approved? What would be the effect of such a requirement, and what costs and benefits would it entail? Are there data regarding the feasibility of finalizing vehicle financing at or before the time the retail installment sales contract is signed?*

See the discussion in Section IV.a.1.B above.

In addition, the Commission should not take action to disrupt conditional sales to consumers. Such sales are very routine in the marketplace, serve consumer preferences (and sometimes a consumer's need) for the delivery of a new or used motor vehicle at the time the transaction is conducted, and overwhelmingly are finalized on the terms agreed to by the dealer and consumer. Indeed, dealers are incentivized to finalize conditional sale contracts on such terms as dealers typically earn less if they and the consumer decide to enter into a different RISC because no finance source was willing to take assignment of the conditional sale contract on the terms submitted. While abusive spot deliveries have occurred and should not be tolerated, there is no credible evidence that they are a systemic problem in the marketplace.

When an abusive spot delivery does occur, the Commission can address it under its Section 5 UDAP enforcement authority and an array of remedies exist under state law. Aside from contractual rights that consumers possess, consumers and state attorneys general can bring an action under common law and/or their state UDAP statute if a business engages in deception, misrepresentations, wrongful repossession, or other harmful practices. These statutes typically provide for actual damages, statutory damages, exemplary damages, and attorneys fees. Depending on the fact pattern involved, abusive spot deliveries may also give rise to causes of

action under TILA, CLA, FCRA, the Fair Debt Collections Practices Act,[395] and state laws including the Uniform Commercial Code and state retail installment sale acts.

*17. Proposed § 463.3(j) would prohibit misrepresentations regarding whether or when a dealer will pay off some or all of the financing or lease on a consumer's trade-in vehicle. Should there be additional protections here—for example, should there be a requirement that dealers pay off outstanding financing or liens on a trade-in vehicle within a specified amount of time, or before selling the trade-in vehicle?*

State laws already regulate business transactions of this nature, and paying off liens in a timely fashion is a normal business practice of dealers. When dealers take a consumer's vehicle in on trade with an outstanding lien, their primary objective is to pay off the lien as quickly as possible, obtain the title/lien release, and resell the vehicle. That's how dealers maximize profitability, improve cash flow, and maintain adequate working capital in the business. Any delays in that process hurt the dealer's business. Not surprisingly, there is no credible data that suggests there is a systemic problem that needs to be solved in this arena.

This question implies that a dealer would "intentionally" withhold payoff. There is no business reason for a dealer to delay or misrepresent paying off a trade in. Aside from the legalities and business disruption of delaying the payoff, an equally significant risk is the reputational damage caused by such action. With the free flow of information through social media, consumer advocate websites, the Better Business Bureau, and other public messaging, it wouldn't take long for such business practices to make it into the public domain. Dealers are community-based businesses that rely on their reputation for success. Such practices would also make their way to the office of the State Attorney General and Department of Motor Vehicles, possibly resulting in investigations and audits, which could lead to potential fines, suspension of business license, and/or criminal action. The consequences of delaying payoff are substantial and well known.

*19. Are the disclosures that would be required by this section [§ 463.4] clear, meaningful, and appropriate? Should the scope of any of the proposed disclosures be expanded or narrowed, and if so, how and why?*

These disclosures are problematic and should not be mandated for the reasons stated in Section IV.a above.

*20. What would be the economic impact, and the costs and benefits, of these disclosure requirements?*

In denying NADA's request for an extension of the comment period (see Attachment 3), the Commission precluded NADA from providing comprehensive research and data that responds

---

[395] 15 U.S.C. § 1601; 15 U.S.C. §§ 1667-1667f; 15 U.S.C. §§ 1681-1681; and 15 U.S.C. § 1681.

to this question.  A general discussion of the topic is set forth in Section IV.a. above and Attachments 18 and 19.

*21. Should this section include additional disclosure requirements? Given the length and complexity of the transaction, would additional disclosures make the consumer experience better or worse? Why or why not? If so, what are the costs and benefits associated with these additional disclosures?*

Neither the proposed disclosures nor additional disclosures are necessary.  See the discussion in Section IV.a above.

*22. Is the timing of disclosures contemplated by this section appropriate and sufficient to provide consumers with useful information regarding the purchase or lease of a motor vehicle?*

The timing of these disclosures is very problematic.  See the discussion in Section IV.a above.

*23. Would any of the required disclosures inadvertently discourage truthful advertising to the detriment of consumers? For example, to the extent the proposed rule would require that certain disclosures (e.g., Offering Price) must accompany other specific information, will dealers cease providing that other information altogether? If so, please provide suggestions on how to address these issues.*

This issue is discussed in Sections IV.A.2.B and 3.A above.

*24. Are there circumstances in which dealers should be required to make disclosures and contracts available in languages other than English? For instance, should dealers be required to provide disclosures and contracts in any language they use for advertising, or in any language they use to conduct sales, financing, or lease transactions? What would be the effect of such a requirement, and what costs and benefits would it entail? Are there other steps the Commission should consider taking to protect consumers from misrepresentations in dealer advertisements when the sale, lease, or financing transaction is conducted in a different language from the one  used in advertising?*

See the response to Question 9.

*25. Are the proposed disclosures sufficient to provide consumers with clear, meaningful and appropriate information about the financing terms of the transaction? Are there other steps the Commission should consider taking to protect consumers from being misled regarding their financing terms and to ensure that consumers understand their financing options?*

The proposed disclosures are very problematic.  See the discussion in Sections IV.a.2 and 3.B above.

*26. Proposed § 463.4(a) would require dealers to disclose the Offering Price in certain advertisements.*

*a. Do dealers already calculate a figure equivalent to the Offering Price for every vehicle in their inventory? If so, how is this calculated?*

The question is unclear.  Dealers determine the price at which they will advertise vehicles and frequently discount prices to remain competitive.

*b. In particular, the Commission is contemplating whether it is necessary to prohibit advertising any price aside from the Offering Price to address concerns with unfairness and deception, including those described in this Document. Or, alternatively, should dealers be permitted to state in advertisements the Offering Price along with other offers that may be of limited applicability (provided the nature of the limited applicability is clearly disclosed)? c. Would the mandatory disclosure of Offering Price where required "crowd out" other information in advertising formats where dealers pay for time or space?*

Dealers should be permitted to advertise consistent with the standards set forth in the FTC Policy Statement on Deception and state advertising requirements.  Properly disclosed rebate offers or other pertinent information that can inform consumer purchasing decisions should not be prohibited or discouraged.  See the discussion in Section IV.a above.  Further, the discounting of motor vehicles to meet competitive pressures is one of the great consumer benefits that the current auto retailing model delivers.  The Commission should not introduce limitations that operate to prevent or impede discounting and thereby force consumers to pay higher prices for the products they buy.

*27. Proposed § 463.4(a) would also require a dealer to disclose the Offering Price in the first response to any query about any specific vehicle.*

*a. Is it appropriate to limit this requirement to only the dealer's first response about the specific vehicle? Or, should the Commission require dealers to include the Offering Price in additional communications to potential buyers?*

The first response requirement would cause a variety of problems for consumers and motor vehicle dealers and extending it to additional communications with potential buyers would only exacerbate those problems.  See the discussion in Sections IV.a.2.A and 3.b(1) above.

*b. What other measures could be taken so consumers know the true Offering Price of a vehicle earlier in their decision-making process, including before expending resources to visit the dealership?*

See the discussion in Section IV.a.3.B(1) above.

*28. Proposed § 463.4(b) would require dealers to disclose an Add-on List in certain circumstances.*

*a. How many add-ons do dealers typically offer, and how many of those are sold regularly? Would this disclosure require such a lengthy list of add-on products and services that the list would be too long to be meaningful to consumers? If so, are there changes that could be made to this proposed requirement to reduce the amount of information disclosed while preserving the benefits to consumers? For example, would limiting this requirement to add-ons that are proposed by the dealer to a prospective buyer, as opposed to raised by the consumer, adequately address the harms that occur to consumers in the context of these transactions? Or, should the Add-on List be limited to a certain number (e.g., 15) of add-on products and services most frequently sold by the dealer in the previous quarter?*

See the discussion in Section IV.a.3.C above.  The Commission's proposed definitions applicable to "Add-ons" are so broad and unwieldy that they would smother the provision of any useful information to consumers.  Regarding whether to limit any disclosure obligation to only those "add-ons" proposed by the dealer instead of raised by the customer, how would this be managed by the dealer and enforced by the Commission (a concern that also arises with other elements of the proposed rule applicable to oral communications)?   Regarding the establishment of a limit on how many "add-ons" to include on an "Add-on" List based on a prior quarter sales calculation, this overlooks the more effective menu approach described in the same section.  Consumers are in the best position to assess their VPP needs when they know which vehicle they will purchase and how the products the dealer offers might protect their investment.  The menu format dealers use today provides those options without obscuring it with information that has no application to the consumer's circumstances.  VPPs are optional and generally cancellable after they are purchased, and any violation involving them exposes the dealer to UDAP enforcement by the Commission and the States.  See comments from state and metro automobile dealer associations regarding additional consumer protections related to "add-ons" that exist at the state and local level.

*b. How common is it for the price of a given add-on product or service to vary for different vehicles and different transactions, and on what basis would the price vary? Would it be necessary for dealers to provide disclosures specific to an individual consumer, or could this proposed requirement be satisfied with a pre-formatted disclosure that could be provided to all potential buyers or lessees? If prices vary greatly, would disclosing the price range provide meaningful information to consumers?*

The prices for certain "add-on" products can vary significantly, which is one of the reasons that the "Add-on" List disclosure requirement would be unhelpful to consumers and burdensome to dealers.  For example, extended service contract premiums can differ based on variables such as (i) whether a vehicle is new or used; (ii) whether the coverage is comprehensive, limited to powertrain and electronics, or limited to power train; and (iii) the consumer's selections regarding the amount of the deductible and the duration of coverage.  Differences can also be

present for different types of vehicles. The price ranges applicable to these variables typically would be very broad and, without knowing the consumer's specific circumstances and preferences (which would allow the range to be narrowed), unhelpful as a disclosure mandate.

*c. The proposed rule would allow certain advertisements (i.e., those not presented on a website, online service, or mobile application) to disclose the website, online service, or mobile application where the consumer can view the Add-on List, rather than disclosing the Add-on List itself within the advertisement. Should the Commission take the same or similar approach with advertisements presented via other forms of media? Why or why not?*

Yes, however the proposed rule's overly broad definition of "add-ons" makes their disclosure on any platform unworkable. Certainly, if a disclosure requirement were imposed and motor vehicle dealers had a viable path forward to managing the requirement, it should allow for the disclosure of a website where disclosures can be provided instead of having to pack them into the advertising medium being used. For example, how would dealers effectively disclose any product related content in a short radio advertisement if they had to provide a litany of "add-on" disclosures on top of the disclosures that already are required under current law?

*d. The proposed rule would require dealers that run certain types of advertisements and charge for optional add-ons to maintain a website, online service, or mobile application at which an Add-on List may be found. Do all or most such dealers already operate a website, online service, or mobile application that could display the Add-on List?*

Franchised motor vehicle dealers utilize websites, although it is not reasonable to expect them to clearly and conspicuously disclose all of their "add-ons" as required by Proposed Section 463.4(b). See the discussion in Section IV.a.3.C above.

*29. Proposed § 463.4(d) would require a dealer to disclose the total amount a consumer must pay to purchase or lease a vehicle when the dealer makes representations about monthly payments for a vehicle purchase. Can dealers calculate accurate monthly payment information for a consumer without calculating the total amount? If not, is there any value in a consumer learning monthly payment information before the total amount is calculated? If so, how can the proposal be adjusted to allow for such information without obscuring necessary information about the total amount required to purchase a vehicle?*

The total amount being financed is needed to calculate a monthly payment. As explained in Sections IV.a.2 and IV.a.3.B(2) above, the Commission should not seek to disrupt the form, content, and timing regime established by the FRB for disclosing the monthly payment and other credit terms.

*30. Proposed § 463.4(e) would require dealers to disclose that a lower monthly payment will increase the total amount, if lowering monthly payments will do so. This provision could require this disclosure multiple times in the same transaction, for example, when a dealer's financing*

*office is discussing a range of different monthly payments with the consumer. Would requiring multiple disclosures result in the disclosure losing effectiveness? Would limiting the disclosure, for example, to the first time the disclosure is triggered have benefits, or would this reduce the effectiveness of the disclosure by requiring it at a time that is not as meaningful to consumers?*

See the discussion in Sections IV.a.2 and IV.a.3.B(2) above. This type of repeated disclosure scheme would extend the time of the transaction, confuse consumers, and disrupt the form, content, and timing disclosure regime established by the FRB.

*31. Are the proposed prohibitions in this section [463.5(a)] clear, meaningful, and appropriate? Should the scope of any of the proposed prohibitions be expanded or narrowed, and if so, how and why?*

See the discussion in Section IV.a.3.D above.

*32. Is the proposal adequate and appropriate to address consumer harms that occur with the sale of add-on products or services from which the consumer cannot benefit? Why or why not? How could the proposal be modified to better address such harms?*

The proposal is not needed to address such consumer harms as the FTC and the States possess authority under current law to bring enforcement actions against the very small number of dealers who charge for products for which the consumer would not benefit.[396]

*33. This provision is intended to prevent conflicting and otherwise deceptive representations, and to protect consumers without requiring additional disclosures in an already lengthy, disclosure-heavy process. Given these concerns, should additional restrictions be placed on all add-ons? In particular, the Commission is contemplating whether any final Rule should restrict dealers from selling add-ons (other than those already installed on the vehicle) in the same transaction, or on the same day, the vehicle is sold or leased. Would such a provision better protect consumers without unduly burdening competition?*

There is no basis to place this unreasonable restriction on commerce and competition and to limit the consumer's ability to purchase "add-ons" in this manner. As discussed throughout these comments, consumers are the only ones who fully know their needs, desires, risk tolerance, budget, and other concerns to enable them to make an informed decision about the value of any VPP. Consumers can best assess the value of protection products when they have all relevant facts, including the vehicle and financing commitment they need to protect. Dealers present menus to consumers with this information at this time but before the consumer has

---

[396] *See, e.g.*, *In the Matter of Matt Blatt Inc.*, No 132 3285, (March 16, 2015) www.ftc.gov/system/files/documents/cases/150326mattblattcmpt.pdf; *Attorney General Josh Shapiro Announces Restitution For Faulkner Honda Dealership Consumers Who Were Sold Valueless Warranties*, PENNSYLVANIA OFFICE OF ATTORNEY GENERAL, (April 9, 2019), www.attorneygeneral.gov/taking-action/attorney-general-josh-shapiro-announces-restitution-for-faulkner-honda-dealership-consumers-who-were-sold-valueless-warranties/.

agreed to purchase any products. The products are optional (if they are not presented as such, it is actionable under both federal and state law) and they typically are cancellable. Therefore, there is no need or justification for the Commission to impose more mandates on this process.

In addition, consumers typically finance these products as part of their financing commitment to purchase the vehicle and therefore receive the APR for these products that applies to the vehicle purchase. If these products were sold outside of the vehicle financing transaction, how would consumers pay for them? How does the APR on a credit card (assuming the consumer can use it to pay for the products) compare to the APR applicable to the vehicle purchase? Would dealers even have authority under state law to sell certain products in a separate transaction? What optional protections would consumers not have access to if these restrictions were put in place? (See Attachment 1 explaining the adverse effect incurred by service members who experienced a total loss of their vehicle and could not protect their financing commitment with GAP Waiver protection as a result of an ill-advised interpretation that DOD issued and subsequently withdrew.)

It is essential that the Commission review comments filed by state and metro automobile dealer associations on this topic, and that the Commission conduct valid research on the value these optional products can offer consumers before seeking to limit their sale. In addition, if the Commission recognizes the presence of "honest" and "law abiding" dealers in the marketplace (which it does) and if it already possesses authority to initiate enforcement actions against the rare bad actors (which it also does), then it should recognize that these types of barriers impose unnecessary restraints on the former based on assumed, unmeasured benefits to consumers.

*35. The proposed rule would also prohibit dealers from charging for GAP Agreements if the consumer's vehicle or neighborhood is excluded from coverage or the loan-to-value ratio would result in the consumer not benefitting financially from the agreement. Should any final Rule set forth how to calculate the loan-to-value ratio? If so, what should such a provision require?*

See the discussion in Section IV.a.3.D above.

*36. Proposed § 463.5(b) would prohibit a dealer from charging for optional add-ons unless the dealer first discloses the vehicle's Cash Price without Optional Add-ons and records that a consumer has declined to purchase the vehicle at that price. Should the Commission consider means to require more affirmative engagement by consumers to consciously select add-on products and services? In particular, the Commission is contemplating whether any final Rule should require separating the purchase of add-ons from the vehicle sale or lease transaction, or permit consumers to cancel add-ons (that do not involve physical alteration to the vehicle) within a short time after the sale or lease transaction is concluded. What practical limitations might such additional requirements impose?*

Adequate VPP disclosures already are provided to consumers under federal and state law. See Section IV.a above. Moreover, most of these products already provide contract cancellation

rights. And the Commission and the States possess the necessary authority to address violations by bad actors. There simply is no need to impose additional federal mandates.

*37. Would the proposal prompt dealers to make offers regarding add-ons at a time and in a manner that is meaningful to consumers, or would it result in yet another disclosure being presented to consumers during an already disclosure-heavy transaction? If it would result in too many disclosures, what other measures could be taken to protect consumers from unauthorized add-ons, or from being induced to purchase add-ons under false pretenses?*

See the above answers and the discussion in Sections IV.a.3.B and 3.C(3) above.

*38. Proposed § 463.5(c) would prohibit dealers from charging consumers without their Express, Informed Consent, and would provide requirements for what constitutes Express, Informed Consent. Does the proposal provide a meaningful way to obtain consent in an already disclosure-heavy transaction? If it would result in too many disclosures, what other measures could be taken to protect consumers from unauthorized charges? Are there any additional requirements that should be mandated to gain Express, Informed Consent? How do dealers currently obtain consent for charges?*

See the discussion in Sections IV.a.3.B(3) and 3.C(3) above. To reiterate one key point, however, it does not assist the market to impose a requirement (Express, Informed Consent) and then define its specifics largely by describing what does not suffice (signed or initialed document; prechecked box; practice that subverts choice). Decades if not centuries of state law have established what constitutes an adequate manifestation of assent in order to form a contract, including a consumer contract. The Commission's introduction of the Express, Informed Consent concept will upset this established law and has not been justified; what's worse, to do so without describing the affirmative steps necessary to meet the new requirement, will do little more than inject mass uncertainty into the auto retailing market that can only operate to raise prices and otherwise adversely affect consumers.

*39. The proposed rule would define Express, Informed Consent to exclude signed or initialed documents by themselves (e.g., those without a closely proximate disclosure of the basis and amount for the charge), preprinted checkboxes, and practices designed or manipulated with the substantial effect of subverting or impairing user autonomy, decision making, or choice. Should the Commission identify other practices that do not, in themselves, constitute Express, Informed Consent? Why or why not? Are there other "dark patterns" that the Commission should address? Is there language, such as in other statutes, that the Commission should use to further protect consumers from being charged without Express, Informed Consent?*

See the answer to question 38 and the discussion in Section IV.a.3.B(3) above.

*40. Are the proposed recordkeeping requirements clear, meaningful, and appropriate? Should the scope of any of the proposed recordkeeping requirements be expanded or narrowed, and if so, how and why?*

The proposed requirements are unnecessary, exceedingly burdensome, and should be eliminated.   See the discussion in Section IV.a.3.E above.

*41. Would the specified records be appropriate to verify compliance with the proposed rule? Are any of the specified records unnecessary to verify compliance with the proposed rule? If the records listed are not required to be retained, how would such compliance be verified?*

Most of the records kept would have no relevance to any of the provisions of the Proposed TRR.  (For example, under the Proposed TRR, dealers would be required to retain any "written communication relating to sales" between it and a customer to which it sells a vehicle.  An email from the dealership to the customer establishing a time for the customer to come in and test drive a vehicle under consideration would not relate in the slightest to the subjects of the Proposed TRR but would nonetheless need to be retained.  And this is only one of an almost limitless set of examples of the proposal's overbreadth.)  The key consideration should be whether the imposition of this requirement would justify the massive burden it would impose on "honest" and "law abiding" motor vehicle dealers.  It would not and therefore should be eliminated.  See the discussion in Section IV.a.3.E above.

*42. Should any additional records be specifically listed?*

No.  The burden that the proposed recordkeeping requirements would impose is already massive and excessive.

*43. Is the 24-month record retention period appropriate? Why or why not? If not, what period is appropriate?*

No retention requirement should be imposed.  See the discussion in Section IV.a.3.E above.

*44. What are the current record retention policies and practices of dealers with respect to the records specified in proposed § 463.6?*

See the discussion in Section IV.a.3.E above.

*45. What benefits would these recordkeeping requirements provide to consumers and businesses? What costs would these recordkeeping requirements impose on businesses, including small businesses? What would be the overall economic impact of these requirements? Please quantify these benefits and costs wherever possible.*

No benefits would be provided to businesses. To the extent businesses benefit from retaining documents, they already will choose to do so (unless prohibited by law). As for consumers, the requirement will be a disbenefit as it will force the dealer to incur costs which will inevitably be passed on to the consumer. However, in denying NADA's request for an extension of the comment period (see Attachment 3), the Commission has precluded NADA from providing more specific cost and burden information that responds to these questions at this time. A general discussion of the topic is set forth in Section IV.a.3.E above and Attachments 18 and 19.

*46. What volume of records would have to be maintained to comply with this section?*

In denying NADA's request for an extension of the comment period (see Attachment 3), the Commission precluded NADA from providing comprehensive information that responds to these questions at this time. A general discussion of the topic is set forth in Section IV.a.3.E above and Attachments 18 and 19.

*48. Does any portion of the proposed rule duplicate, overlap, or conflict with any federal, state, or local laws or regulations?*

These comments identify and discuss the many ways in which the Proposed TRR conflicts with the Constitution, multiple federal laws and regulations, and state regulatory regimes. They also describe in detail the duplicative and overlapping nature of the various elements of the proposed rule with existing federal and state requirements. It is essential that the Commission review comments filed by state and metro automobile dealer associations regarding the manner in which the proposed rule conflicts with – and otherwise creates problems under – state and local law.

*49. What has been the experience in states that have regulated unfair or deceptive conduct involving motor vehicles sales, leasing, and financing, including with respect to add-ons? How have any such regulations assisted with combatting unfair or deceptive conduct?*

See the comments filed by state automobile dealer associations.

- - -

Questions from Commissioner Wilson

*1. Anticipated changes in the automobile marketplace with respect to technology, marketing, and sales, and whether it is possible to future-proof the proposed Rule so that it avoids inhibiting beneficial changes in these areas.*

As outlined above, there are a number of ways that the Proposed TRR would unnecessarily interfere with the growth and benefits of online sales, and other market innovations such as personalized marketing and dynamic pricing.

Requirements that include extensive, non-standard disclosures provided at artificial and forced stages in the customer relationship will inhibit the ability of dealers and the dealer vendor marketplace to bring innovations in online and electronic retailing to consumers. Required consumer signatures will often force in-person and often inefficient interactions where efficiencies could have been created. Online tools for consumers to explore payments, leasing options, and other personalization would be effectively prohibited in these instances.

In addition, the pandemic and the associated supply chain issues it helped to create have raised many questions about automotive retailing that are yet to be answered. Proper inventory levels, vehicle "reservations," online sales platforms, and other developments have changed the way people may shop for vehicles. The Proposed TRR would severely limit price discovery and dealer/consumer communications. Rather than having the flexibility to address these issues to meet consumer needs, dealers would instead be constrained by an artificial disclosure regime.

A series of untested prescriptive prohibitions with unintended consequences, which do not allow for consumers to shop the way they want, is a recipe for the restriction of innovation and for failure. Rather, if a rule is ultimately deemed necessary, to future-proof it, the Commission should consider the creation of safe harbor mechanisms related to technological innovations after an adequate period of research.

*2. Insights into why deceptive practices persist in this industry and whether additional business education would assist businesses with compliance.*

As noted extensively throughout these comments, no credible evidence demonstrates that deceptive practices by motor vehicle dealers are widespread or that there is any greater prevalence of deception in the auto retail market than in any other. Indeed, the evidence strongly suggest otherwise. However, in any industry, there can be bad actors and bad actions. This perception appears magnified in an industry that (1) implicates one of the largest financial transactions most consumer undertake, (2) is cuttingly competitive, (3) involves a process that is of necessity complex (in no small part because of preexisting state and federal laws and regulations), (4) has highly public advertising, (5) allows for negotiation, and (6) involves hundreds of millions of interactions each year. Dealers work incredibly hard to meet consumer demands. And as outlined above, the auto retailing market has responded in a number of ways to those consumer demands (online shopping, "one-price" dealers, etc.) That said, like in any industry, there will be some customers who are unhappy with the process, and unfortunately, some small number of dealers who do not do the right thing.

But the answer is not to lard on unnecessary disclosures, add massive document retention requirements, and set impossibly exacting standards of liability for everyone. Dealers will suffer for sure, but the harm will extend to consumers who will face further delay, confusion, and complexity as a result of the proposed regulations.

NADA Comments to Federal Trade Commission
Page 137 of 140
September 12, 2022

One of NADA's core missions – one which we continuously pursue and often in concert with the FTC and other Federal agencies – is to help educate dealers regarding their compliance obligations. Those obligations are extensive, but the overwhelming majority of dealers do their best to meet those obligations every day. This education is supplemented by state and metro automobile dealer associations and a full complement of other industry compliance professionals who offer extensive compliance guidance and tools.

*3. Avenues for consumer education to assist consumers with navigating these and other important financial transactions and decisions, including through improved financial literacy. How could state and local agencies support and amplify FTC consumer education efforts? To what extent is financial literacy taught in middle schools and high schools, and how effective are those efforts? What more could be done?*

NADA and our dealer members have also long-supported consumer education. NADA and the American Financial Services Association (AFSA) worked in cooperation with the Commission to draft the widely-recognized "Understanding Vehicle Finance" brochure, which provides consumers with guidance about the auto finance process. NADA is also a member of the AWARE coalition, a group formed and operated with the assistance of NADA and AFSA to educate consumers about the various aspects of financing motor vehicles.[397] And NADA produces additional educational material for consumers such as the *Know Before You Buy* brochure at Attachment 23.

NADA has long supported many other varieties of consumer education, including specifically to middle and high school students. In addition to the AWARE coalition, NADA also supports the AFSA Education Foundation, which is a nonprofit organization that provides MoneySKILL and other high quality, accessible financial education resources and training to educators and students across the country.[398] MoneySKILL is a set of tools for educators to create high-quality, custom, personal finance courses. The curriculum covers a broad range of personal finance topics and can be used in a variety of learning environments, including for middle school, high school, and college students.

*4. Potential negative consequences of, or costs attendant to, the Rule that the Commission may not have anticipated.*

There are a number of negative consequences and material and unnecessary additional costs that the Proposed TRR would generate. These are discussed in detail throughout the comments.

---

[397] AWARE stands for "**A**mericans **W**ell-informed on **A**utomobile **R**etailing **E**conomics." Information about and consumer education materials provided by AWARE can be found at www.autofinancing101.org.
[398] *See* AFSA Education Foundation, American Financial Services Association, https://afsaef.org/ (last visited Sept. 11, 2022).

VIII.    Conclusion

When Congress considered whether to include Section 1029 in the conference report that became the Dodd-Frank Act, Senator Brownback of Kansas made the following statement on the floor of the Senate with regard to subsection (d):

> "Section 1029(d) provides that the… FTC… will have the authority to write rules to address unfair or deceptive acts or practices by motor vehicle dealers pursuant to the procedures set forth in the Administrative Procedures Act instead of the Magnuson-Moss Act.  Motor vehicles dealers are set to become the only businesses in America singled out for regulation in this manner.  I want to emphasize that this specific provision was neither in the House or Senate bill and was not under consideration in either chamber.  It was added by House-Senate conferees.  Section 1029(d) was included without any evidence to justify its inclusion, or any debate for that matter.  I do not support this provision, as I believe it invites the FTC to again engage in regulatory overreach.  I am concerned that the removal of the well-established ``Magnuson-Moss'' safeguards gives the FTC free rein to conduct fishing expeditions into any area of automotive finance it perceives as ``unfair.''

> The present leadership of the FTC has promised that if Magnuson-Moss were repealed, they would use their new power prudently.  I hope that this is the case, because we do not want to repeat the kind of excessive FTC regulation that occurred in the 1970s.  For that reason, Congress must monitor the FTC very closely to ensure the vast power Congress will now bestow on this agency is not once again abused."[399]

Failing to heed these concerns, the Commission has dropped onto the marketplace an unannounced NPRM that lacks any semblance of a responsible rulemaking that is the product of due diligence.  It lacks critical stakeholder input, essential consumer testing, and needed coordination with other federal agencies and state governments.  It asks a range of questions but then shuts off the ability of the public to answer them.  It fails to support its need or properly measure its effect.  It ignores requirements imposed by the Constitution, federal statutes, other federal agencies, and even the Commission's own rules.  In short, it unfortunately fails at every level.

---

[399] 156 Cong. Rec. S5912, 105 (daily ed. July 15, 2010).

NADA Comments to Federal Trade Commission
Page 139 of 140
September 12, 2022

We therefore urge the Commission to withdraw the NPRM. Being proactive to protect consumers is laudable, but it must be the result of an informed process. NADA encourages the Commission to work with it and other stakeholders to achieve this result.

Sincerely,

/s/

Paul D. Metrey
Senior Vice President, Regulatory Affairs

Cc:    The Honorable Maria Cantwell
        Chairwoman, Senate Commerce, Science and Transportation Committee

        The Honorable Roger Wicker
        Ranking Member, Senate Commerce, Science and Transportation Committee

        The Honorable Frank Pallone
        Chairman, House Committee on Energy and Commerce

        The Honorable Cathy McMorris Rodgers
        Ranking Member, House Committee on Energy and Commerce

NADA Comments to Federal Trade Commission
Page 140 of 140
September 12, 2022

<u>Attachments</u>

1)      NADA Letter to DOD re: Military Lending Act
2)      GAP Waiver Study
3)      NADA Extension Request to FTC
4)      *Back to the Future: How Not To Write A Regulation*
5)      Preamble to FTC submission to OMB for Fall 2021 Unified Agenda
6)      Preamble to FTC submission to OMB for Spring 2022 Unified Agenda
7)      NADA Comments to FTC re: Auto Buyer Consumer Survey (I)
8)      NADA Comments to FTC re: Auto Buyer Consumer Survey (II)
9)      *A Critique on the Limitations of the Recent FTC "Auto Buyer Study"*
10)    FRB Summary of Considerations when calculating the TILA/Reg Z "Finance Charge"
11)    Sample Disclosure - *Cash Price without Optional Add-ons*
12)    Sample Disclosure - *Cash Price without Optional Add-ons in a Financed Transaction*
13)    Sample Disclosures - *Itemization of Optional Add-ons*
14)    Sample Disclosure - *Express, Informed Consent*
15)    Examples of Multiple Rebate Listings for Same Vehicle
16)    GM Accessories available for 2022 Silverado Short Bed Crew Cab
17)    ABA Resolution 116B
18)    Paperwork Reduction Act Analysis Chart
19)    Regulatory Flexibility Act Analysis Chart
20)    *FTC Needs to Run Those Numbers Again*
21)    *NADA/NAMAD/AIADA Model Dealership Voluntary Protection Products Policy*
22)    *NADA/NAMAD/AIADA Fair Credit Compliance Policy & Program*
23)    *Know Before You Buy* brochure

# NADA Letter to DOD
# re: Military Lending Act



August 12, 2019

*Via E-Mail*

The Honorable James N. Stewart
Acting Under Secretary of Defense (Personnel and Readiness)
Department of Defense
4000 Defense Pentagon
Washington, DC 20301-1000

Dear Mr. Stewart:

I write to follow up on several letters we have sent to the Department of Defense (DOD)[1] explaining the harm to service members that has been caused by DOD's issuance of Question and Answer 2 of its Interpretive Rule pertaining to the Amended Military Lending Act Regulation (Q&A 2)[2] and to provide recent market data demonstrating the continuing and increasing nature of this harm while Q&A 2 remains in effect.

The first attachment reflects the cumulative <u>number</u> of active duty service member customers of a single finance source who have experienced a total loss of their vehicles without GAP Waiver protection since the finance source ceased taking assignment of credit contracts with service members that included GAP Waiver as a result of DOD's issuance of Q&A 2.  (Prior to the issuance of Q&A 2, 81% of the credit contracts purchased by this finance source included optional GAP Waiver chosen by the service member.)

The second attachment reflects the cumulative <u>liability</u> of such active duty service member customers.

These numbers are alarming.  Since January 2018 –

1)      <u>310</u> service members have suffered a total loss of their vehicles without GAP Waiver protection, and

2)      they collectively owe <u>$837,000</u> in connection with vehicles that no longer exist.

---

[1]  See the Joint National Automobile Dealers Association (NADA)-American Financial Services Association petition to DOD to withdraw Q&A 2 dated January 18, 2018; the NADA letter to DOD Principal Deputy General Counsel William S. Castle, Esq. dated October 12, 2018; and the NADA letter to DOD Principal Deputy General Counsel William S. Castle, Esq. dated February 6, 2019.

[2]  82 Fed. Reg. 58,739 – 58,742 (Dec. 14, 2017).

**NATIONAL AUTOMOBILE DEALERS ASSOCIATION**  8484 Westpark Drive | Suite 500 | Tysons, VA 22102 | 703.821.7000 | nada.org

The Honorable James N. Stewart
August 12, 2019
Page Two

As noted, this is data from just one of hundreds of finance sources that serve the military community.  Clearly, the full effect on service members of this situation is much greater.  Indeed, as set out in our February 2019 letter to DOD, a conservative estimate of the <u>marketwide impact</u> of DOD's issuance of Q&A 2 is that it has exposed approximately 5,000 Warfighters who purchased and financed vehicles in 2018 to approximately $15 million in liability from total loss occurrences.

Further, as the bar graphs indicate, the loss numbers are <u>rapidly increasing</u>.  What adversely affected a limited number of service members in the months immediately following DOD's issuance of Q&A 2 now adversely affects a much greater – and growing – number of service members.

Regrettably, these service members now must contend with two sources of vehicle-related debt: that related to the vehicle they no longer possess and that related to a new vehicle they will have to acquire to satisfy their transportation needs.  This presents precisely the type of financial readiness challenge that the Military Lending Act was designed to prevent.

We therefore reassert our and many other organizations' ongoing requests to DOD to move expeditiously to withdraw Q&A 2 before additional harm is caused to the military community.

Thank you for your attention to this matter.  Please let me know if we can provide you with any additional information.

Sincerely,

/s/

Paul D. Metrey
Vice President, Regulatory Affairs

Cc:     The Honorable Mark T. Esper
        The Honorable James Michael Mulvaney
        The Honorable David L. Norquist
        The Honorable Paul C. Ney, Jr.

# The Effect of DOD Inaction on MLA
(Data from just one of hundreds of finance sources that serve the military)

## Cumulative Liability of Service Members Who Suffered Total Loss of Vehicle Without GAP Waiver Protection Since DOD Issued MLA Interpretive Rule





**NATIONAL AUTOMOBILE DEALERS ASSOCIATION** 8484 Westpark Drive, Suite 500 | Tysons, VA  22102
nada.org | 800.252.6232

# The Effect of DOD Inaction on MLA
(Data from just one of hundreds of finance sources that serve the military)

**Cumulative Number of Service Members Who Suffered Total Loss of Vehicle Without GAP Waiver Protection Since DOD Issued MLA Interpretive Rule**

Chart showing cumulative number with monthly bars. Y-axis ranges from 50 to 350. The final bar (Jul 2019) is labeled **310**. Months shown from Jan through Dec for 2018 (blue) and Jan through Jul for 2019 (yellow).



**NATIONAL AUTOMOBILE DEALERS ASSOCIATION** 8484 Westpark Drive, Suite 500 | Tysons, VA 22102
nada.org | 800.252.6232

A274

D19-0489.08082109

ATTACHMENT 2

# GAP Waiver Study

# The Consumers and Guaranteed Asset Protection ("GAP Protection") on Vehicle Loans and Sales-Financing Contracts: A First Look



September 2021

# Consumers and Guaranteed Asset Protection ("GAP Protection") on Vehicle Loans and Sales-Financing Contracts: A First Look

**Thomas A. Durkin**
Senior Economist
Board of Governors of the Federal Reserve System
Washington, D.C. (Retired)

**Gregory Elliehausen**
Principal Economist
Board of Governors of the Federal Reserve System
Washington, D.C.

**Thomas W. Miller, Jr.***
Professor and *Jack R. Lee Chair in*
*Financial Institutions and Consumer Finance*
Mississippi State University
Senior Research Fellow, Consumers' Research

Current Version: September 29, 2021

* Please direct questions to: twm75@msstate.edu. Cell: (314) 494-7823. The authors thank a subset of the Voluntary Protection Products Coalition for making their survey result available to the authors through the Survey Research Center (SRC) of the University of Michigan. The authors do not have any financial or other arrangements with any of these organizations or any financial or other arrangements with anyone to conduct the academic analysis of the survey. The authors maintain complete control of the academic research process. The views expressed are those of the authors alone and not those of any industry organizations, the SRC, the Board of Governors of the Federal Reserve System or its staff or of any other individuals or organizations. The authors thank Tuba Suzer-Gurtekin of the SRC for excellent and efficient management of the interviewing and coding process. The authors acknowledge an anonymous reviewer for helpful suggestions. Zhuo Li provided expert research assistance.

# Table of Contents

Abstract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.    Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.   GAP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

III.  GAP Uses and Users . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

IV.   A Multivariate Model of GAP Purchase . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

V.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Tables . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

# Abstract

Guaranteed Asset Protection (GAP) shields purchasers from financial risks of losses exceeding insured collateral values if vehicles become total losses. Yet surprisingly little is known about the sales of this voluntary product, or consumers' attitudes toward it. In this study, we report the results of a representative national survey conducted by the Survey Research Center (SRC) of the University of Michigan. The SRC interviewed 1,206 individuals in the fall of 2020. This survey shows consumers purchased GAP about 39 percent of financed vehicle transactions. Consumers purchase GAP more often when there is a heightened financial risk: larger credit amounts, longer loan maturities, and lower income levels. More than 90 percent of GAP purchasers report that buying GAP is a good idea and that they would buy it again. Only about 1 percent of surveyed purchasers indicate dissatisfaction with their choice. A multivariate model of GAP purchase suggests that consumers' financial situation and terms of the transaction are more important that risk aversion by itself.

JEL Classifications: G22, G23, G52

Keywords: GAP, GAP Waiver, GAP insurance, vehicle financing, ancillary products, consumer credit, debt cancellation agreements

# I. Introduction

Anecdotal evidence suggests growth in sales of an insurance-type protection developed in the 1980s and typically called today "Guaranteed Asset Protection," "GAP Protection," or just "GAP." GAP shields purchasers from financial risks of losses exceeding insured collateral values if vehicles become total losses due to accidents, theft, or natural disaster. GAP is found in three forms in the U.S.

1. **GAP Waiver.** The most common form is structured as a non-insurance two-party contract between the purchaser and the seller of a vehicle and is sold in connection with the extension of credit (known as "GAP waiver" since it "waives" all or a substantial portion of the owed credit amount greater than collateral value). In slightly more precise and technical language, Gap Waiver is part of a finance agreement between a motor-vehicle creditor and a motor-vehicle purchaser, in which the creditor agrees to waive its right to collect amounts the purchaser has agreed to pay the creditor in the event of a total physical damage loss or unrecovered theft (total loss) of the financed vehicle.

2. **GAP Rider.** A less-common form is offered under personal lines of auto insurance and structured as a rider to the physical damage coverage (known as "GAP rider"). It can be purchased at any time from a personal lines auto insurer, not just as part of a vehicle sale.

3. **GAP Written as Group Insurance.** The least pervasive form is GAP written as a group insurance product through an insurance company ("GAP insurance"), also sold in connection with the extension of credit. Whether insurance or not, most purchasers likely think of GAP as an insurance-type product.

Because vehicles often depreciate faster than financing for the vehicle is paid off, consumers may find themselves with "negative equity," "under water," or "upside down" on their loan contract if the remaining loan balance at any time exceeds the book value of the vehicle.[1] This might come about when there is a high loan-to-value ratio at the outset of a loan, a long maturity, or, more generally, whenever vehicle depreciation exceeds for a time the amortization of the loan balance (payoff rate). In these situations, an insured total loss of the vehicle can leave such borrowers with remaining loan balances even after the payment of the full book value by the casualty insurer. If a total loss of the vehicle arises from a catastrophe like an accident, theft, or natural disaster under such circumstances, the borrower no longer has the vehicle but is still liable for the remaining loan balance. This is hardly an enticing prospect for any borrower, and it produces situations where additional coverage of some kind might be attractive for at least some of them.

Financial inventors and entrepreneurs have stepped into this coverage gap with a product they have designated as "GAP." Although they sometimes have maintained that GAP is short for "Guaranteed Asset Protection," or "Guaranteed Auto Protection," probably most sellers and users think of it simply as coverage for the gap between loan amount still owing when a total loss of the vehicle occurs and the amount the casualty insurer pays (the book value).

---

1 The authors are aware that credit from or through a dealer may not legally be considered a loan under various state laws, particularly historically. Because the term "auto loan" is used so pervasively today, however, particular by consumers who are the subject of this study, the distinction between vehicle "credit" and vehicle "loans" is unimportant here and, consequently, is ignored in the terminology used.

A280

There is surprisingly little systematic information available even about the extent of sales of this product or consumers' attitudes toward it. Individual sellers undoubtedly understand their own sales experience, and insurance underwriters and their actuaries know about their loss rates, revenues, and loss reserves, but they typically know little about the activities of other market participants. There are virtually no academic studies of this subject and even relatively little journalistic description. There are some public-information sources that describe the product and outline when it can be useful, but there is little available in the way of statistical evidence of its uses and users.

To fill some of this information void, in 2020 an industry coalition sponsored a nationally-representative survey of consumers (exclusive of Alaska and Hawaii).[2] The survey, intended by the coalition for independent academic analysis of GAP, was undertaken by the well-known and highly respected Survey Research Center of the University of Michigan (SRC). SRC has been surveying consumers' financial attitudes and behavior, including vehicle buying, since 1946. The SRC added questions about vehicle financing and GAP to their monthly SRC survey that also produced the well-known University of Michigan Index of Consumer Sentiment. This index is widely cited by the financial press and has been an important monthly national economic indicator for decades. In the months of September and October 2020, the SRC completed 1,206 interviews about vehicle financing and GAP as part of this program. In December 2020, the coalition granted access to the survey results to the authors, directly through the SRC. The coalition did not place any conditions of any sort on the academic analysis.

The remainder of this article consists of three parts. The next section briefly describes GAP and why it may sometimes be attractive to vehicle buyers. The following section provides information from the consumer survey on such things as the frequency of GAP purchases on vehicle loans, characteristics of buyers, experiences with the purchase transaction, and consumers' attitudes toward the product. This section also contains an outline of elements of a model of the purchase decision. The final section examines hypotheses arising from the purchase model with further multivariate statistical analyses.

---

2    The funding organizations were a subset of the Voluntary Protection Products Coalition. See https://voluntaryproducts.org.

## II. GAP

As pointed out in an industry publication, even terminology in the GAP area has been somewhat imprecise. For this reason, at the outset it seems worthwhile to examine briefly some terms and product background. For its own purposes, the Consumer Credit Industry Association ("CCIA") considers it useful to define terms in its *Fact Book of Credit-Related Insurance* (2020 edition, p. 43):

> *GAP* [insurance] insures the excess of the outstanding indebtedness over the primary property insurance benefits that may occur in the event of a total loss to a collateral asset. *Primary property insurance* refers to the underlying insurance policy insuring the property, such as vehicle physical damage insurance. GAP can be written on a variety of assets that are used as collateral to secure credit; however, it is most commonly written for motorized vehicles.

> GAP may or may not be insurance depending on the state regulations and the contractual relationships. Since its introduction in the mid-1980s, the products and the applicable regulations have been evolving.

As noted here and in the Introduction above, for legal and regulatory purposes, GAP takes either of three forms, depending on state regulation and market channels, although the survey questioning does not focus closely on the distinctions among them. First, GAP rider is sold by primary auto insurers as an add-on ("rider") to physical damage coverage. Apparently, most GAP coverage, however, is of the second type designated as "GAP waiver." As indicated above, GAP waiver is a two-party agreement between the financing source and the consumer to cancel ("waive") any remaining GAP owed to the lender if a total loss of the vehicle occurs under circumstances when a gap exists. (The financial lender may enter into a master insurance policy with an insurer to cover all its GAP-waiver agreements, but this commercial arrangement behind the scenes is transparent to individual consumers.) Third, in contrast to GAP waiver, "GAP insurance" is a three-party insurance agreement among financer, consumer, and an insurance company that provides the GAP coverage directly to the customer as a legal matter rather than technically through the financer. Although the distinctions among GAP rider, GAP waiver, and GAP insurance are likely not of much interest to consumers (and so, ss indicated, the consumer survey does not make much of the distinctions), apparently there can be some feature and coverage differences between GAP rider and the other two products.

In recent years, sale of either GAP waiver or GAP insurance apparently has become common enough that in now appears in various widespread sources of consumer information, although using terminology meaning the same thing as industry definitions but employing different wording. For instance, in the section titled "Gap Coverage," the Federal Reserve Board's online source called Keys to Vehicle Leasing, Comprehensive Consumer Guide notes that "Gap coverage is often included in lease agreements. If it is not, it can be purchased." Concerning buying a vehicle rather than leasing, the Guide then continues:

> Gap coverage is usually not included in finance agreements, but it can be purchased.

> *Gap coverage.* Gap coverage is an agreement by a lender or a third party to cover the gap amount if your vehicle is stolen or totaled.

> *Gap amount.* The gap amount is typically the amount by which the early payoff, not including any past-due amounts, exceeds the insured value of your vehicle. Gap coverage is

4    Consumers and Guaranteed Asset Protection ("GAP Protection") on Vehicle Loans and Sales-Financing Contracts: A First Look

A282

usually not included in finance agreements, but you may be able to buy it separately. If you do, gap coverage usually has a one-time charge, or premium.

*Reason for gap amount.* The gap amount exists because your vehicle usually depreciates faster at the beginning of the loan than as you pay down your loan balance. Gap coverage is designed to cover the gap amount of your prepayment liability if your vehicle is stolen or totaled. See the section Early Termination. However, gap coverage does not reimburse you for any down payments you have made. It does not cover past-due amounts you owe under the financing agreement or other amounts you are responsible for such as personal property taxes or unpaid parking tickets. In most cases, gap coverage does not cover your insurance deductible, any insurance policy deductions for past-due premiums, and so forth.[3]

Many other public information sources provide similar descriptions, for example, the federal Consumer Financial Protection Bureau (CFPB), Wikipedia, Investopedia, Nerdwallet, and others. There also are many online advertisements for GAP products that provide information on GAP, of course sometimes also touting their own products.

---

3    Industry sources suggest that part of this last sentence is correct for GAP rider but incorrect for GAP waiver in that almost all GAP waivers cover the primary deductible up to a set amount of $500 or $1000. There also apparently are other differences between GAP waiver and GAP rider contractual arrangements. Without access to individuals' contracts, it is not possible with consumer population survey design like this one that is aimed at obtaining basic indications of purchase, buyers, and attitudes, to study the impact of specific differences in aspects of individual product offerings. The survey did determine, however, that only about a third of GAP purchasers indicated that their insurance agents had offered them a GAP rider product. The rest replied negatively or did not know. It is possible to conclude from this that the majority of GAP in the marketplace is GAP waiver. Only about a quarter of nonpurchasers said that their agent had offered a GAP product.

# III. GAP Uses and Users

Insurance companies, administrators, and sellers of GAP can assemble their own statistical information about their sales, and they may even survey customers about their experiences. Such information remains proprietary, however, and is not made available publicly. A search of indexing source Google Scholar using keyword terms like GAP waiver, GAP insurance, Guaranteed Asset Protection, and variations finds little analytical information beyond a few legal and legislative citations, some advertisements, some non-English citations to legal situations in other countries, a handful of citations to professionals like actuaries, and even some patent applications for product variations for the vehicle leasing market. There does not appear to be much available public analysis of the extent of GAP purchases, features of transactions where GAP purchase may be likely, consumer knowledge of and attitudes toward the product, or even consumers' purchase experience.

Among the limited available articles and sources on GAP protection, probably the most interesting is an online article by principals of the actuarial services firm Kerper and Bowron discussing some of the actuarial challenges in implementing a successful GAP program.[4] Underlying any such program are the basic elements of consumer demand for the protection. Actuarial concerns involve measuring the risks associated with product demand and then pricing the risks so that they do not endanger the solvency of the risk-coverage program. This necessarily involves explorations of the situations where demand for the risk-coverage program is likely. Presence of many of these demand elements can be measured with a consumer survey.

For instance, it is reasonable first to expect that demand for GAP would exist in situations where a large gap exists between the amount of a vehicle loan and the book value of the collateral. By definition, this occurs if vehicle depreciation is greater during some period than loan payoff, such as a high loan-to-value credit arrangement on a depreciating new vehicle. High loan to value could persist for a time if the payments are relatively small for the loan size due to extended maturity.

Second, demand for protection would be greater among individuals who are vulnerable to adverse events or are inherently more risk averse. Some people simply are more concerned about the possibility of facing unexpected large expenditures and will take more protective measures to smooth the expected value of losses than others. Degree of risk aversion among consumers can be measured by direct questioning about it, but also by exploring individual consumers' underlying financial situation, including income and liquidity.

Third, models of the marketing process find that knowledge, purchase experience, and attitudes toward a product can influence product demand. These also are measurable in a consumer survey, as marketers are well aware.

Taking these demand elements together produces a basic demand model of the following form:

$$D_{GAP} = f(\text{Loan to value, vulnerability to adverse events, risk aversion/demographics, attitude/purchase experience})$$

Unfortunately, directly comparing the size of the gap between loan amount outstanding and collateral value over time on automobile purchases (loan to value ratio) is inherently difficult without extensive details of

---

4    See A. Lee Bowron and John Kerper, "GAP Insurance – Techniques and Challenges," Casualty Actuarial Society E Forum, Winter 2011.

6    Consumers and Guaranteed Asset Protection ("GAP Protection") on Vehicle Loans and Sales-Financing Contracts: A First Look

A284

the initial financial terms necessary to calculate the repayment pattern and loan amount still outstanding over time. These components include purchase amount, down payment, interest rate, maturity, ancillary purchases, etc. Further information is also necessary for a reasonable estimate of collateral value over time as well (make, model, features, intensity of use of the vehicle, vehicle demand and supply, etc.).

Nonetheless, to develop an estimating model of the probability of GAP purchase, many of the underlying elements of these calculations are ascertainable through consumer surveys. For example, other things equal, loan value will be higher over time for larger initial loans (say, for new vehicles), loans with longer initial maturities, and for loans where a remaining balance from an earlier loan is carried over into the new transaction. Likewise, depreciation will be greater if intensity of use (mileage) is higher.

Concerning risk aversion, risk aversion itself can be measured through direct questioning. But risk aversion also can be associated with demographics such as income and presence of family, and with liquidity constraints and credit scores. These factors influence individuals' ability to withstand adversity. Attitude toward the product and information about the sales experience can also be the subject of questions.

Expanding the basic model above to include such elements provides an extended demand model of the following form:
$D_{GAP} = f$(Initial loan size, Loan maturity, New/used vehicle, Previous balance included, Mileage, Product recommendation, Availability of savings, Ability to borrow, Job security, Basic risk aversion, Demographic variables)

Table 1 provides some statistics on those who purchased (one or more) vehicles during this period and financed the purchase. The survey found that 63.2 percent of households (including single-person households) had purchased a car or truck in the prior four years and 60.0 percent of them financed the purchase. The sample consists of 1,206 individuals.[5]

Notably, among those who purchased a vehicle and financed it, 38.7 percent also purchased GAP. Whether this is a large or small proportion of households who purchased a vehicle and financed it probably depends upon the expectation of the individuals noting it, but it does seem large enough for further investigation to be interesting. How this proportion compares with past years or the trend over the past few years or decades likely will remain unknown, but what appears to be a fairly high proportion of GAP buyers among recent purchasers who financed vehicles may reflect in some way aspects of the high nominal cost of cars and trucks in recent years, especially new ones.

Table 2 provides comparisons on various dimensions of GAP purchasers and their loans compared to non-purchasers based upon the extended model above. Each comparison in the

For most questions, very few individuals answered "do not know" or refused to respond. In the statistical information and tables that follow, these cases are mostly excluded unless "do not know" is a meaningful response. Essentially, this exclusion is equivalent to the statistical assumption that the individuals answering "do not know" or refusing would have been distributed the same way as those who did respond. If the excluded cases were numerous, this would not be a good assumption. Such cases were rare, however, unless noted, and for this reason even if there were some sort of bias among them, statistical

---

5    All survey statistics are subject to a small sampling range that exists because it is never possible to interview everyone. At ninety-five percent confidence, all the statistics reported here are within a few, but varying, percentage points of the population value, depending on the individual measure in question.

results would not have differed more than slightly where they are excluded and would be less than the sampling-error range that exists in all surveys. table is along only one characteristic dimension at a time, but they reveal clear differences between GAP buyers and non-buyers and the circumstances of their loan arrangements. The table is divided into groupings based upon the GAP purchase model introduced above: Loan circumstances, risk aversion, vunerability to adverse events, personal circumstances, and attitudes and purchase experience. There are notable differences between GAP purchasers and non-purchasers in all of these areas.

Specifically, those borrowing larger amounts, for longer periods of time, or who rolled in a remaining balance upon trade in of a previous vehicle all exhibit more-frequent purchase of GAP products (first column, lines 1-3 of the table). These results are hardly surprising. Larger loans for longer time periods, especially with roll-in of a previous balance, are precisely the circumstances when a "gap" might arise and persist.

Some other features and expectations associated with the loan also showed association with greater prevalence of GAP purchase, although to somewhat lesser degree: expected mileage (intensity of use) of the vehicle, loan through dealer rather than directly from a financial institution (indirect versus direct credit), and purchase of a used vehicle compared to a new one (first column, lines 4-6 of the table). None of these findings is especially surprising either, and they likely are sometimes associated in various ways with the specific personal circumstances of the purchasers. For instance, those using the vehicle more intensively likely realize that value depreciation could take place more rapidly than otherwise. Likewise, some of those arranging financing through the dealer might exhibit more-fragile credit-worthiness characteristics suggesting usefulness of the dealer's participation in arranging for credit. If so, they might be more concerned about risks in the transaction and be interested in various sorts of protection, including GAP. Further, used-vehicle purchasers also often differ from new-vehicle buyers in ways that are associated with transaction risks.

The survey does show differences in various measures of personal circumstances that differ between GAP purchasers and non-purchasers. The second part of the table shows that GAP purchase was more frequent among those with lower income, with children at home, with more concern over credit history, and with more likely difficulty managing a financial emergency (first column, lines 7-10 of Table 2). Such individuals may feel they are not well suited to take on financial risks and, consequently, may become likely candidates for this sort of financial protection.

Responses to questions about attitudes and experience with the transaction and a further question about buyers' circumstances show that GAP purchase also was higher among those to whom the vehicle dealer recommended the product. Specifically, among those to whom the dealer recommended GAP coverage, more than 71 percent purchased it (first column, line 11 of Table 2). Among those who said the dealer "offered" it but who did not perceive a recommendation, only 45.3 percent purchased. Dealer salesmanship may certainly be involved in this finding, but it also seems possible that dealers would more likely recommend GAP to those with loan or personal characteristics that might make it more easily saleable (larger loans, longer maturities, previous balances rolled in, more concern over credit history, etc.). Dealers apparently never mentioned GAP to many customers, and, again hardly surprisingly, few of these individuals purchased GAP. Some did, however, in part because the customer brought up purchase of the product.

The table shows that GAP purchasers are generally much more favorably inclined to the product than non-purchasers, again hardly surprisingly (first column, line 12 of Table 3). More than 93 percent of purchasers reported that the GAP purchase was a good idea, compared to only about 43 percent of non-purchasers,

still a considerable proportion considering that they had not purchased the protection. While it is hardly surprising that those favorable to a product are more likely to purchase it, the high percentage of favorable feeling among buyers suggests that apparently at most only a few had downgraded their view after the purchase took place. The 4.2 percent of purchasers who indicated the view that purchase was a bad idea, may include some cases of buyers' remorse for an expenditure that, after the fact, could have been avoided since the protected loss had not occurred. Of course, no one has that sort of foresight at the moment of initiating a transaction with risks.

To learn more about reasons for favorable or unfavorable attitudes toward GAP, both groups of respondents (favorable and unfavorable) were asked the open-ended question, "Why do you say that." Coding the responses shows substantial understanding of the GAP product among both buyers and non-buyers.

For instance, as indicated, among buyers by far the most frequent answer was that purchase is a good idea. The follow-up question found a variety of reasons for this response, with by far the most frequent that GAP protects against losses (Table 3). Given that these individuals more often than non-purchasers include those with lower incomes, smaller reserves for emergencies, and longer and larger loans (that could indicate smaller down payments and higher loan-to value, although the survey could not measure this), this result is certainly not surprising either. Such conditions entail higher risks for the individuals involved.

Some of the few among buyers who indicated that GAP purchase was not a good idea mentioned that only some people needed it, that the risk was not very great or that the coverage is expensive relative to the perceived risk. Responses of this sort might well be expected of those with better personal circumstances who, while recognizing the risk, believe they are able to self-insure. Verbatim responses to the follow-up question about reasons for purchase or not illustrate the sorts of views that GAP purchasers and non-purchasers expressed. These statements show that most respondents appeared to be quite well aware of the features of the product (e.g., see some sample statements near the bottom of the table). By comparison, the second column of the top line of Table 3 shows (as did the second column, line 12 of Table 2) that a sizeable percentage of those not purchasing GAP still thought that GAP was a good idea. Again, availability of risk prevention was the chief among reasons given by non-purchasers. Table 3 shows that many of them simply perceived that the risks to them were not worth the costs of the protection. Ultimately, this is the way that markets work. Some people do not think that protecting against the potential risk was worth the cost and they do not buy protection.

Finally, the survey also asked some further questions of buyers concerning product satisfaction. Specifically, the survey whether they would buy this protection again, whether they would recommend GAP to family or a friend, and, overall, how satisfied they were with the purchase. Responses were very similar and very one sided (Table 4).

About ninety percent of purchasers said they would purchase the product again and would recommend it to family and friends. In each case, a few were unsure. Only a bit over one percent of respondents indicated they were dissatisfied or very dissatisfied with the protection on the loan (third panel of the table). A follow up to the recommendation question asking, "Why do you say that?" produced answers largely similar to the question on whether GAP was a good idea or not (results not in table).

Immediately before asking the series of questions about measures of satisfaction with the GAP product among purchasers, the survey asked all respondents who had purchased a vehicle and financed it some questions about the GAP sales experience. Immediately after describing the GAP product and asking

whether they had purchased it, respondents were asked about dealer/lender recommendation and explanation.

The first of this group of questions involved whether the dealer or lender (the latter in the case of direct credit) recommended GAP protection. A preliminary look at this question in discussion of line 11 of Table 2 described above suggested that there was a correlation between recommendation and purchase, with 71.7 percent of those receiving a recommendation also purchasing. Discussion above also briefly suggested the possibility that sellers can sometimes ascertain situations when GAP usefulness enters the picture and then recommend it, with correlated results. The survey results show that when they merely offer it, as opposed to recommending it, sales are lower, and if they do not mention it at all, sales are lower still. This, of course, does not demonstrate that it is the sales recommendation that itself produces the purchase outcome. It appears from responses to the full sequence of questioning, and especially from responses to the open-end question about why GAP purchase is a good idea or not, that customers on balance appear to understand the product pretty well and respond accordingly. Nonetheless, there were some additional questions about the sales experience.

Notably, respondents indicating that GAP was recommended or offered as an option then were asked whether they thought it was required. About 20 percent of those who purchased GAP thought it was required and 80 percent did not (Table 5). It is worth noting that requiring GAP is not illegal, if the representations and paperwork are managed and prepared properly, which cannot be determined in a consumer survey. In some cases, dealers are required to offer GAP, for instance, in Louisiana. In addition, GAP is typically included as mandatory protection in leasing transactions which may account for a portion of those purchasing GAP who thought it was "required," since it was not one of the purchase decisions they had to consider. Nonetheless, the large majority believed it was voluntary. A large majority also believed, even among non-purchasers, that the dealer or lender had explained the terms of the product (second panel of Table 5). For some non-purchasers, particularly if they announced early in the discussion that they were not going to purchase GAP, further review of costs and terms could well be perfunctory or even non-existent.

Finally, a hypothetical question about what they might do in a GAP situation was asked of those respondents who did not purchase GAP. Hypothetical questions of this kind do not necessarily indicate what actions would really be taken in actual situations. The motivation behind this question was more the exploration of knowledge of GAP situations than it was to determine likely actions. In this context, the hypothetical question did not elicit many vague or "do not know" responses (third panel of Table 5). Other possible answers such as taking money from savings, rolling the amount into a new loan or lease, or simply continuing to pay, were all reported frequently.

In sum, it appears that, based upon univariate responses to questions about GAP, that purchasers of vehicles who financed them and who, therefore, might be interested in the product not only purchase GAP with some frequency but also seem informed about the product and their choices. Also, a very high percentage of them would recommend the product to others. With all this as background, we now turn to a multivariate examination of GAP-purchase conditions.

10    Consumers and Guaranteed Asset Protection ("GAP Protection") on Vehicle Loans and Sales-Financing Contracts: A First Look

A288

# IV. A Multivariate Model of GAP Purchase

As indicated, exploration of potential demand for GAP protection purchase has proceeded so far only on a univariate basis, one variable at a time. So far, all the measurements of variables associated with the proposed demand model have been consistent with expectations. It is also worthwhile, however, to explore joint impact in a multivariate equation and to discuss which model elements might be most important holding others constant.

In the multivariate analysis that follows, the dependent variable $D_{GAP}$ equals one if the respondent obtained GAP protection and zero otherwise. Independent variables used in the multivariate equation reflect the model of the decision also outlined above:

$D_{GAP} = f$ [1. Transaction characteristics; 2. Vunerability to adverse events;
3. Risk aversion and demographics (including income, family, liquidity, credit score);
and; 4. Personal characteristics.]

The estimated logistic regression model is statistically significant.[6] Statistically significant explanatory variables and their signs include the following: (Table 6):

| | |
|---|---|
| Previous balance included | Positive |
| Amount of credit ≤ $10,000 | Negative |
| Amount of credit ≥ $40,000 | Positive |
| Recommended | Positive |
| Loan term ≥ 6 years | Positive |
| First and second lowest income quartiles | Positive |
| Age less than 35 | Positive |
| Education: High school diploma | Positive |
| Has children at home | Positive |

A positive sign indicates that holding other factors constant the variable is positively associated with likelihood of GAP purchase, and a negative sign means a negative association.

Positive signs for large loans, longer term to maturity, and need to include previous balances are suggestive that GAP purchases are associated with greater debt and higher LTV. Dealer or lender recommendations appear to play an important role in GAP purchase decisions as discussed earlier. Dealers likely visualize the situations where GAP purchase may be useful. Relatively low incomes, being young, and having children in the family suggest that early life-cycle stage and liquidity constraints might also influence GAP purchases.

In a logistic regression, the estimated coefficient for an explanatory variable indicates the rate of change in the log odds as the explanatory variable changes, which is not very intuitive. Consequently, the size of an effect is commonly evaluated by its odds ratio. The odds ratio for an indicator variable X is the probability that the dependent variable DGAP = 1 within that category of X, relative to the probability that DGAP = 1 within the reference category. An odds ratio greater than one indicates a positive effect, and less than one indicates a negative effect. For instance, in Table 7 the 2.204 odds ratio for credit amounts

---

6    The model likelihood ratio test statistic is 145.51. It has a chi-square distribution with 31 degrees of freedom and is significant at <0.0001.

greater than $40,000 indicates that individuals were 2.204 times more likely to purchase GAP protection than individuals borrowing between $20,001 and $30,000 (the reference group). The 0.187 odds ratio for individuals borrowing less than $10,001 indicates that these individuals were much less likely to purchase GAP protection than individuals in the reference group. Odds ratios for the statistically significant coefficients from Table 6 point to the importance of large credit amounts, previous balances rolled in, dealer or lender recommendations, and income and life-cycle considerations.[7]

These findings appear usefully indicative of buyers' reasoning concerning their GAP purchases. They also seem considerably less than surprising: Financial situation and terms of the transaction are more important than risk aversion by itself, although future research in this area should explore this contention further. Since many vehicle transactions today exhibit the characteristics where GAP purchase might be expected (Table 1), it is not surprising to find that GAP purchase also is fairly common, even if not much about its prevalence in vehicle lending has heretofore been known.

---

7    The logistic regression results do not mean that the vulnerability to adverse events or risk aversion considerations are not present.  Individuals in early life-cycle stages may have limited savings and therefore less than $400 of reserve funds or be unable to cover 3 months' expenses, for example.  Such considerations are simply weaker than those indicated by the statistically significant variables. Separate logistic regression models estimated using only variables in each of the four explanatory variables categories were all statistically significant.

12    **Consumers and Guaranteed Asset Protection ("GAP Protection") on Vehicle Loans and Sales-Financing Contracts: A First Look**

A290

# V. Conclusion

A nationwide consumer survey of consumers' use of auto financing and characteristics of their purchase transactions, features, demographics, and attitudes toward features of the transaction has shown that purchase of GAP on auto loans has become fairly common since its introduction about three decades or so ago. GAP relieves a consumer's responsibility for any remaining loan balance above the collateral value of the vehicle in the case of a total loss due to accident, theft, or natural disaster. As vehicle values have increased over this period and credit requirements have eased with widespread prosperity and improved credit-granting ability through statistical credit scoring, it has seemed likely that the potential for "gaps" might have grown along with ready credit availability and the desire for GAP might have become more common.

Specifics of past trends in GAP purchase are unknown, but the survey in 2020 has shown that GAP purchase reached almost 39 percent of recent financed vehicle transactions. Survey analysis shows that GAP purchase is related to these transactions in expected ways: GAP purchase is more likely when credit amounts are greater, loan maturities are longer, previously existing loan balances are rolled into the new loan balance, and purchasers' income is lower. All these factors are associated with heightened risk among consumers entering such transactions and it is not surprising that these situations are where GAP purchase is most common. Dealers appear to be aware of such situations and recommend GAP in them. Analysis of a nationwide survey in 2020 shows the importance of these factors in both univariate and multivariate contexts.

The survey also shows that auto purchasers have realized the usefulness of GAP. Not surprisingly, since they purchased it, more than 90 percent of purchasers report the view that GAP purchase is a good idea, and more than 40 percent of nonpurchasers agree. About nine tenths of GAP purchasers say they would purchase it again and would recommend purchase to friends and family members. Only about 1 percent of purchasers indicate dissatisfaction with their choice.

As the economy has expanded, consumer demand for vehicles and vehicle credit is both a cause and result. As credit inclusion has expanded along with the economy, apparently GAP has become a significant component and survey evidence clearly indicates its importance to many purchasers. None of this seems surprising. Although there always will be risk associated with any credit transactions, it appears that many potential vehicle purchasers have chosen to purchase GAP as a means of managing some of this risk and purchasers report their satisfaction with the product. All this now seems well established and seems unlikely to change in the environment of increasing vehicle prices.

**Table 1: Some Information on Households who Purchased a Vehicle
and Financed It in the Previous Four Years, in Percent**

Sample Size: 1,206.

| 1. Loan amount | Percent |
|---|---|
| $5000 or less | 4.0 |
| $5001 to $10,000 | 11.1 |
| $10,001 to $20,000 | 31.6 |
| $20,001 to $30,000 | 27.1 |
| $30,001 to $40,000 | 14.6 |
| Greater than $40,000 | 11.5 |
| **2. Loan maturity** | |
| Less than 3.5 years (i.e., 3 years) | 17.1 |
| 3.5 years and less than 4.5 (4 years) | 15.5 |
| 4.5 years and less than 5.5 (5 years) | 52.7 |
| 5.5 years and less than 6.5 (6 years) | 12.1 |
| Greater than 6.5 years | 2.6 |
| Home equity loan | 0.1 |
| **3. Dealer financed (indirect credit)** | **65.6** |
| **4. Expected annual mileage** | |
| Less than 12,000 | 44.7 |
| 12,000 and less than 20,000 | 42.7 |
| 20,000 or more | 12.5 |
| **5. Dealer recommended or offered GAP** | |
| Recommended | 20.9 |
| Offered | 38.6 |
| Never mentioned | 37.5 |
| Respondent initiated | 2.9 |
| **6. Purchased GAP** | **38.7** |
| **7. GAP Purchase a Good Idea or Bad Idea** | |
| Good | 61.6 |
| Good with Qualifications | 0.7 |
| Pro/Con (Depends) | 2.1 |
| Bad with Qualifications | 0.9 |
| Bad | 31.5 |
| Do not know; not ascertained | 3.1 |
| **8. Perceived Credit History** | |
| Excellent | 48.7 |
| Good | 25.2 |
| Average | 15.1 |
| Bad | 3.6 |
| Very bad | 1.5 |
| No credit history (if volunteered) | 0.6 |
| Do not know or not ascertained | 5.4 |

14    Consumers and Guaranteed Asset Protection ("GAP Protection") on Vehicle Loans and Sales-Financing Contracts: A First Look

A292

**Table 2: Some Comparisons of GAP Purchasers Versus Those Not Purchasing GAP**
**(Percentages of those with various transaction characteristics)**

| | Purchased GAP protection | Did not purchase GAP protection |
|---|---|---|
| **Loan circumstances** | | |
| **1.  Loan amount** | | |
| $10,000 or less | 20.0 | 80.0 |
| Greater than $10,000 | 42.1 | 57.9 |
| **2.  Loan maturity** | | |
| Five years or less | 36.6 | 63.4 |
| Greater than five years | 52.1 | 47.9 |
| **3.  Rolled in a balance from a previous loan upon trade in** | | |
| No | 32.8 | 67.2 |
| Yes | 81.0 | 19.0 |
| **4.  Expected mileage** | | |
| Fewer than 12,000/year | 37.6 | 62.4 |
| 12,000 to 20,000/year | 39.2 | 60.8 |
| More than 20,000/year | 41.3 | 58.7 |
| **5.  Indirect or direct loan** | | |
| Direct | 36.1 | 63.1 |
| Indirect | 40.0 | 60.0 |
| **6.  New car or used** | | |
| New | 36.2 | 63.8 |
| Used | 41.2 | 58.8 |
| **Risk aversion and personal circumstances** | | |
| **7.  Income** | | |
| Highest one third | 29.3 | 70.7 |
| Middle one third | 40.4 | 59.6 |
| Lowest one third | 54.6 | 45.4 |
| **8.  Has children at home under age 18** | | |
| No | 35.3 | 64.7 |
| Yes | 44.3 | 55.7 |
| **9.  Self-Perceived Credit History** | | |
| Excellent | 25.3 | 74.7 |
| Else (i.e. Good, Average, Bad, Very Bad) | 52.5 | 47.5 |

Continued on next page

**Table 2** (continued)

|  | Purchased GAP protection | Did not purchase GAP protection |
|---|---|---|
| **Risk aversion and personal circumstances** | | |
| **10. Could Cover Expenses for Three Months if Lost Income** | | |
| Yes | 35.9 | 64.1 |
| No | 55.7 | 44.3 |
| **Attitudes and purchase experience** | | |
| **11. Dealer/Lender Recommended or not** | | |
| Recommended | 71.7 | 28.3 |
| Offered | 43.5 | 56.5 |
| Never mentioned | 14.3 | 85.7 |
| Do not know/recall not ascertained | 24.2 | 75.8 |
| **12. GAP Purchase a Good Idea or Bad Idea††** | | |
| Good | 93.2 | 42.9 |
| Good with Qualifications | 0.3 | 1.0 |
| Pro/Con (Depends) | 1.0 | 2.3 |
| Bad with Qualifications | 0.0 | 1.5 |
| Bad | 4.2 | 49.1 |
| Do not know; not ascertained | 1.3 | 3.1 |
| Total | 100.0 | 100.0 |

††Note: Data presentation for this line does not sum across for purchasers and non-purchasers of GAP protection, but rather explores attitudes among GAP protection purchasers and non-purchasers, respectively (sums vertically).

16    Consumers and Guaranteed Asset Protection ("GAP Protection") on Vehicle Loans and Sales-Financing Contracts: A First Look

A294

**Table 3: Reasons Why GAP Purchase is a Good Idea or a Bad Idea**
**(Percentages of those purchasing GAP or not)**

| | Purchased GAP protection | Did not purchase GAP protection |
|---|---|---|
| Protects from losses/from risks of losses/ from risks of expensive cars | 80.9 | 38.4 |
| Protects in some situations | 1.5 | 4.0 |
| Gives sense of security/peace of mind | 5.8 | 0.9 |
| Inexpensive | 0.9 | |
| Protects borrower's credit rating | 0.3 | |
| Convenient to have full coverage | 0.6 | |
| Insurance is good/always good | 1.9 | 0.5 |
| Some people need it | | 0.4 |
| Depends on whether you have money | 1.6 | 2.1 |
| Not needed | | 0.2 |
| Expensive/expensive for risk/waste of money | 2.2 | 14.4 |
| Time of usefulness is limited | | 0.2 |
| Protects company, not borrower | | 0.5 |
| Redundant with other coverage | 0.3 | 5.0 |
| Just a profit item for company/dealer | 0.4 | 2.7 |
| Using debt/too much debt is the real problem | | 5.1 |
| Risk is low/not needed in many or most cases | 0.7 | 11.2 |
| I don't buy extra coverages (not ascertained why) | | 1.3 |
| Specific reasons given | 8.5 | |
| (E.g., I am a good driver/my mileage is low/GAP is not big/only needed if not upside down/not needed if down payment is high/not needed on used cars/not needed in rural areas/not needed because I can pay off loan) | | |
| Do not know/not ascertained | 2.8 | 4.7 |
| Total | 100.0 | 100.0 |

**Table 4: Some Experiences and Attitudes of Purchasers**
**(Percent of GAP purchasers)**

| Purchase this protection again | |
|---|---|
| Yes | 88.4 |
| No | 7.7 |
| Do not know/Not ascertained | 3.9 |
| Total | 100.0 |
| **Recommend this protection to friend or family** | |
| Yes | 90.2 |
| No | 6.8 |
| Do not know/Not ascertained | 3.0 |
| Total | 100.0 |
| **Overall, how satisfied** | |
| Very satisfied/Somewhat satisfied | 88.2 |
| Not particularly satisfied or dissatisfied | 10.4 |
| Somewhat dissatisfied/Very dissatisfied | 1.4 |
| Total | 100.0 |

18   Consumers and Guaranteed Asset Protection ("GAP Protection") on Vehicle Loans and Sales-Financing Contracts: A First Look

A296

**Table 5: Some Aspects of the GAP Sales Experience**
**(Percent of those purchasing GAP and not purchasing)**

| | Purchased GAP protection | Did not purchase GAP protection |
|---|---|---|
| **GAP was required or voluntary** | | |
| Required | 19.8 | 1.4 |
| Voluntary | 79.0 | 97.7 |
| Do not know/Not ascertained | 1.2 | 0.0 |
| Total | 100.0 | 100.0 |
| **Dealer explained costs and terms** | | |
| Yes | 94.8 | 86.6 |
| No | 4.0 | 10.4 |
| Do not know/Not ascertained | 1.2 | 3.0 |
| Total | 100.0 | 100.0 |
| **Responses to a hypothetical question about what non-purchasers might do in a GAP situation** | | |
| Take money from savings | 37.8 | |
| Roll into new lease/loan | 28.9 | |
| Continue to pay | 27.1 | |
| Insurance/comprehensive insurance will cover | 4.0 | |
| Do not know/Not ascertained | 2.2 | |
| Total | 100.0 | |

**Table 6: Logistic Regression of Factors Associated with Purchase of GAP Protection on Vehicle Financing (Statistically Significant Variables)**

| Variable | Coefficient estimate | Standard error | Probability > chi sq. |
|---|---|---|---|
| Previous balance included | 2.04 | 0.68 | 0.0027 |
| Credit ≤ $10,000 | −1.68 | 0.51 | 0.0011 |
| Credit ≥ $40,000 | 0.79 | 0.45 | 0.0763 |
| Loan term ≥ 6 years | 0.60 | 0.36 | 0.0989 |
| Recommended | 1.64 | 0.33 | 0.0000 |
| Lowest income quartile | 1.28 | 0.51 | 0.0119 |
| Second lowest income quartile | 1.00 | 0.40 | 0.0128 |
| Age less than 35 | 0.64 | 0.36 | 0.0804 |
| Ed: HS diploma | 0.60 | 0.35 | 0.0882 |
| Has children at home | 0.77 | 0.31 | 0.0115 |

**Table 7: Odds Ratios for Factors Associated with Purchase of GAP Protection on Vehicle Financing**

| Effect | Point estimate | 95% Wald confidence limits | |
|---|---|---|---|
| **Transaction characteristics** | | | |
| Bought new vehicle | 0.651 | 0.355 | 1.196 |
| Had trade in | 1.001 | 0.568 | 1.762 |
| Previous balance included | 7.718 | 2.028 | 29.378 |
| Indirect credit | 1.299 | 0.727 | 2.320 |
| Credit ≤ $10,000 | 0.187 | 0.069 | 0.510 |
| Credit $10,000-20,000 | 0.762 | 0.387 | 1.500 |
| Credit $30,001-40,000 | 0.860 | 0.380 | 1.946 |
| Credit ≥ $40,001 | 2.204 | 0.920 | 5.283 |
| Loan term ≤ 2 years | 1.313 | 0.730 | 2.362 |
| Loan term ≥ 6 years | 1.819 | 0.894 | 3.700 |
| Miles 20,00-29,999 | 1.001 | 0.583 | 1.720 |
| Miles ≥ 30,000 | 0.530 | 0.230 | 1.221 |
| Recommended | 5.161 | 2.703 | 9.853 |
| **Vulnerability of adverse effects** | | | |
| Credit history good | 0.624 | 0.288 | 1.351 |
| Credit history bad | 1.253 | 0.318 | 4.934 |
| Do not know whether credit history is good or bad | 0.338 | 0.040 | 2.849 |
| Has reserve funds ≥ 4,000 | 0.900 | 0.340 | 2.382 |
| Able to cover 3 months' expenses | 0.854 | 0.342 | 2.131 |
| Worried about job loss | 1.160 | 0.606 | 2.221 |
| **Risk aversion** | | | |
| Unwilling to take financial risk | 0.772 | 0.395 | 1.507 |

**Table 7** (continued)

| Effect | Point estimate | 95% Wald confidence limits | |
|---|---|---|---|
| **Personal characteristics** | | | |
| Lowest income quartile | 3.604 | 1.327 | 9.787 |
| Second income quartile | 2.721 | 1.237 | 5.986 |
| Third income quartile | 1.374 | 0.698 | 2.704 |
| Age less than 35 | 1.891 | 0.926 | 3.863 |
| Age 55 or older | 1.355 | 0.690 | 2.660 |
| Ed: Less than high school diploma | 1.304 | 0.236 | 7.214 |
| Ed: High school diploma | 3.498 | 0.547 | 22.374 |
| Ed: Some college | 1.824 | 0.914 | 3.641 |
| Homeowner | 0.696 | 0.362 | 1.339 |
| Married | 0.753 | 0.416 | 1.360 |
| Has children at home | 2.164 | 1.189 | 3.940 |

22     Consumers and Guaranteed Asset Protection ("GAP Protection") on Vehicle Loans and Sales-Financing Contracts: A First Look

A300

<u>ATTACHMENT 3</u>

# NADA Extension
# Request to FTC



Submitted via www.regulations.gov

July 18, 2022

Federal Trade Commission
Office of the Secretary
600 Pennsylvania Avenue, NW, Suite CC-5610 (Annex C)
Washington, DC 20580

> Re:    Request for Extension to Comment Period
>        Motor Vehicle Dealers NPRM, File No. P204800

The National Automobile Dealers Association (NADA)[1] hereby requests that the Federal Trade Commission (FTC or Commission) extend by a minimum of 120 days the 60-day period that the Commission has provided for the public to comment on the motor vehicle trade regulation rule it has proposed in the above captioned matter.[2]

On June 23, 2022, the FTC released on its website a comprehensive proposed unfair or deceptive acts or practices (UDAP) rule that is unprecedented in scope and would affect tens of millions of consumer transactions annually. The proposed rule seeks to:

1.    prohibit a wide range of activity;
2.    establish certain advertising standards;
3.    require an extensive series of oral and written disclosures governing communications with consumers related to the sales price of automobiles, certain credit terms, and voluntary protection products (VPP);
4.    mandate the posting of certain information on dealer websites; and
5.    impose a massive set of new recordkeeping requirements.

---

[1] NADA represents over 16,000 franchised automobile and truck dealers in all 50 states who sell, finance, and lease new and used motor vehicles and engage in service, repair, and parts sales. This includes approximately 1,800 commercial truck dealers. NADA members collectively employ 1.2 million people nationwide.
[2] 87 Fed. Reg. 42,012 – 42,048 (Jul. 13, 2022).

NADA Extension Request to Federal Trade Commission
Page 2 of 4
July 18, 2022

The Commission did not announce that it would be taking this action in advance of its release,[3] and it did not precede this broad exercise with a Request for Information or even an Advanced Notice of Proposed Rulemaking (ANPRM).[4]

Consequently, motor vehicle dealers who are covered by the proposed rule,[5] and the many other types of businesses that will be affected by it, have had no notice of – or any opportunity to research and address – the proposed components of the Notice of Proposed Rulemaking (NPRM) or even an outline of proposals, if any, that the Commission considered prior to its release.[6]

In addition, as part of this exercise, the Commission seeks comment on an extremely broad and open-ended set of 49 questions that include, but are not limited to, the following:

- the scope of the proposed rule (e.g., whether it should address a range of other topics including other unfair or deceptive acts or practices, leasing, interest rates, other financing terms, electronic disabling devices, online sales, electronic disclosures, the availability of vehicles, matters involving servicemembers, conditional sales, and lien payoffs); [7]

---

[3] The Commission states that "this Notice of Proposed rulemaking was not included in the Commission's Spring 2022 Regulatory Agenda because the Commission first considered this notice after the publication deadline for the Regulatory Agenda." 87 Fed. Reg. at 42,031. Given that the publication deadline must have been reasonably close in time to The White House's release of The Spring Regulatory Agenda on June 21, 2022 (two days before the Commission's release of the NPRM)(see www.whitehouse.gov/omb/briefing-room/2022/06/21/the-spring-regulatory-agenda/ (last visited July 18, 2022), it is remarkable that the Commission "first considered" a notice of this magnitude in this very short period of time.

[4] See Administrative Conference of the United States' *Administrative Conference Recommendation 2018-7* explaining the importance for agencies to exercise due diligence before issuing a notice of proposed rulemaking ("Agencies should consider using requests for information (RFIs) or advance notices of proposed rulemaking (ANPRMs) when they need to: i. gather information or data about the existence, magnitude, and nature of a regulatory problem; ii. evaluate potential strategies to address a regulatory issue; iii. choose between more than one regulatory alternative; or iv. develop and refine a proposed rule…."). The Administrative Conference of the United States, *Administrative Conference Recommendation 2018-7* (Dec. 14, 2018), https://www.acus.gov/sites/default/files/documents/Recommendation%202018-7%20%28Public%20Engagement%20in%20Rulemaking%29.pdf (last visited July 18, 2022).

[5] The proposed rule applies to motor vehicle dealers defined in proposed section 463.2(e) and therefore excludes motor vehicle dealers who lack a service facility.

[6] In contrast, see e.g., the Consumer Financial Protection Bureau's *Outline of Proposals Under Consideration and Alternatives Considered* (Sep. 15, 2020) to implement section 1071 of the Dodd-Frank Act, https://files.consumerfinance.gov/f/documents/cfpb_1071-sbrefa_outline-of-proposals-under-consideration_2020-09.pdf (last visited July 18, 2022), which followed a Request for Information on the matter. 82 Fed. Reg. 22,318 – 22,322 (May 15, 2017); 82 Fed. Reg. 32,177 – 32,178 (Jul. 12, 2017).

[7] Questions for Comment 2, 3, 7, 8, and 14-17.

NADA Extension Request to Federal Trade Commission
Page 3 of 4
July 18, 2022

- the scope, timing, language, clarity, efficacy, and net effect of the proposed notice requirements;[8]

- how the "offering price" concept works in the present market and how it would or should affect other information with regard to both advertisements and disclosures;[9]

- what VPPs motor vehicle dealers offer, how dealers currently obtain consent for the purchase of VPPs, which other VPPs should be prohibited, whether VPP sales should be restricted when the vehicle sale occurs and whether they should be accompanied by a cancellation right, which VPPs involve pricing differentials, how VPP disclosures should be structured, and whether instructions should be provided on how to calculate loan-to-value rations;[10]

- whether dealers can calculate accurate monthly payment information without calculating the total amount a consumer must pay to purchase or lease a vehicle and the value of such information, particularly if presented multiple times;[11]

- whether the scope and period of the records retention requirements is appropriate and how it affects the current records retention practices of motor vehicle dealers;[12] and

- how the proposed rule affects state law and the state experience in these areas.[13]

While it is extraordinary that this effort to collect such widespread and extensive market information was not initiated *prior* to the promulgation of a proposed rule,[14] stakeholders now find themselves with a very limited window of time to attempt to provide the Commission with accurate and meaningful responses to these numerous, in depth inquiries. In addition, the Commission also seeks information related to the assumptions, methodologies, calculations, and projected costs, benefits, and economic impact of the various elements of the proposed rule

---

[8] Questions for Comment 19-25.
[9] Questions for Comment 26-27.
[10] Questions for Comment 28, 31, and 33-39.
[11] Questions for Comment 29 and 30.
[12] Questions for Comment 40-47.
[13] Questions for Comment 48-49.
[14] This is particularly true of a discretionary rulemaking of this nature which is not mandated by Congress and, therefore, not subject to any statutory deadlines.

NADA Extension Request to Federal Trade Commission
Page 4 of 4
July 18, 2022

throughout its Paperwork Reduction Act and Regulatory Flexibility Act analyses.  And the Commission requests additional cost information in several of its Questions for Comment.[15]

Any attempt to provide the Commission with meaningful data, information, and perspective on these massive inquiries will require considerably longer than the 60-day comment period set forth in the NPRM.[16]  Accordingly, NADA respectfully requests that the FTC (i) extend the comment period by a minimum of 120 days, and (ii) act on this request at its very earliest opportunity.

Thank you for your consideration.

Sincerely,


        /s/


Paul D. Metrey
Senior Vice President, Regulatory Affairs

---

[15] See, e.g., Question 6 ("What economic burdens would be imposed on dealers if the Rule proposals were adopted?"); Question 16 ("Are there data regarding the feasibility of finalizing vehicle financing at or before the time the retail installment sales [sic] contract is signed?"); Question 20 ("What would be the economic impact, and costs and benefits, of these disclosure requirements?"); Question 21 (""If so, what are the costs and benefits associated with these additional disclosures?"); and Question 45 ("What costs would these recordkeeping requirements impose on businesses, including small businesses? What would be the overall economic impact of these requirements? Please quantify these benefits and costs wherever possible.").

[16] For example, a respected industry research firm informed NADA that it would require a minimum of 120 days to prepare a report on the potential costs that the proposed rule would impose on franchised automobile dealers.  This would address only one of the many areas of inquiry the Commission has presented in the NPRM. And we have recent experience that supports these time estimates.  NADA commissioned a narrower cost study in response to the CFPB's NPRM relating to the implementation of section 1071 of the Dodd-Frank Act, 86 Fed. Reg. 56,356 – 56,606 (Oct. 8, 2021)(see Footnote 6 above), and that study took over 4 months to complete.

ATTACHMENT 4

# *Back to the Future:*
# *How Not To Write A Regulation*



# Back to the Future

HOW NOT TO WRITE A REGULATION

**J. Howard Beales III and Timothy J. Muris**

JUNE 2022

AMERICAN ENTERPRISE INSTITUTE

# Executive Summary

For the first time since the 1970s, activists have taken control of the Federal Trade Commission (FTC), determined to remake the economy to match their progressive vision. To achieve that goal, the commission must again seek to become the second-most powerful legislature in Washington. When Congress authorized rulemaking authority in 1974, the commission proposed 16 transformative rules in only 12 months. Most were eventually rejected, but the reaction put the agency in serious jeopardy. Congress refused to provide funding at one stage and eventually enacted additional restrictions on the commission's rulemaking authority.

The agency's new leadership recently changed the procedures for making rules, changes based solely on the need for speed. These changes did not even consider the problems that led to the failures of 1970s rulemaking, particularly three key problems: the lack of clear theories of illegality, substantive theories of why the practices were occurring and how to fix them, and systematic evidence to evaluate the extent of the problem and the efficacy of the remedies. The new procedures, inconsistent with statutory requirements, sound public policy, or both, will increase political control of rulemaking while decreasing public participation. These procedures are contrary to the goals of Congress when it authorized FTC rulemaking and inconsistent with the development of high-quality rules.

# Back to the Future

## HOW NOT TO WRITE A REGULATION

## J. Howard Beales III and Timothy J. Muris*

"History doesn't repeat itself, but it rhymes."
—Mark Twain[1]

With the political wind at their backs, activists, concerned over the putative power of business and the harm they are sure it causes, take control of the Federal Trade Commission (FTC). They prepare an assault on that concentrated power and propose to use rulemaking to transform the economy.

Today? Apparently. The 1970s? Certainly. That effort came to ruin and the near destruction of the FTC. We do not know for certain the extent to which history's rhyming will follow the 1970s. We do know that today's FTC seems every bit as determined as its predecessor was to reshape the American economy to its own vision. Here we analyze recent changes made to the procedures for promulgating rules under the FTC's primary rulemaking tool, Section 18 of the FTC Act—changes for the sole purpose of making it easier to fulfill the renewed goals.

As an agency created to provide guidance for appropriate marketplace conduct,[2] the FTC has a variety of tools available, including rules, case-by-case enforcement, and research and advocacy. Each tool is valuable, with its own strengths and limitations, as part of a consumer protection strategy. Our focus is the role of consumer protection rules: When are they appropriate, and what processes and procedures should be used to develop them?

Rather than rely primarily on rules, the commission historically has used the common-law process of case-by-case enforcement to build legal principles, supplemented by official statements of enforcement policy.[3] This is a principles-based approach to regulating economic activity to protect consumers from conduct that is "unfair or deceptive." Although decades of commission and congressional action have given those terms more detailed meaning, they remain broad principles that leave considerable discretion for their application to specific circumstances.[4]

That approach has proved highly adaptable to new challenges, including the emergence of e-commerce and growing concerns about privacy, such as inadequate information security. Attempting to write rules defining who was liable for what in advance would have risked chilling many beneficial developments. It

* The authors have decades of experience with the Federal Trade Commission (FTC) as FTC leaders, staffers, managers, academics, and advisers to parties with business before the FTC. Most recently, from 2001 to 2004, Howard Beales was director of the Bureau of Consumer Protection, and Timothy Muris was its chairman. Of direct relevance to Section 18 rulemaking is their extensive and unique experience as firsthand participants in virtually all the major rulemakings from 1974 through 1987. As an assistant to the director of the Office of Policy Planning and Evaluation, Muris helped evaluate the then-ongoing release of proposals during the rulemaking binge. Beales arrived in 1977 as a staff economist assigned to the Children's Advertising Rule and the evaluation of multiple other rulemakings. Before he returned to Washington as a member of the 1980 Ronald Reagan FTC transition, as a law and economics professor, Muris worked extensively with others on a book about the FTC during the 1970s, published by Cambridge University Press in 1981. Beales and Muris joined together in the fall of 1981, with Muris as director of the Bureau of Consumer Protection and Beales as an assistant to the director. There, they worked extensively on the many rules that remained from the 1970s; Muris continued to do so through 1983 and Beales through 1987. Although primarily based on the Telemarketing Sales Act rather than Section 18, the FTC enacted the enormously popular National Do Not Call Registry during their most recent tenure at the agency.

seems highly unlikely, for example, that an ex ante privacy rule would have anticipated that billions of people would enjoy posting details of their personal lives on Facebook and other social media.

Agency discretion, however, is also a source of uncertainty for the business community, because predicting the application of general principles to particular cases can be challenging to those who must comply. That uncertainty risks deterring socially valuable activities that are not in fact unlawful but pose some risk of agency enforcement.[5] The risks of over-deterrence increase when there is more at stake for firms that must comply: Stiffer sanctions for violations will lead to greater chilling effects on legitimate business activity that consumers value.[6]

Principles-based enforcement can be more costly for the agency as well, which must consider a broad course of conduct in individual cases. Such cases can consume precious agency time and budget.

Rules, which establish brighter lines for what constitutes a violation, can reduce these costs and the risk of future harm to consumers. For the regulated community, specific rules provide clarity about compliance obligations that can reduce the costs of over-deterrence. For the agency, enforcement actions need only establish violation of a specific requirement of the rule, without the need to consider a fuller range of circumstances.[7] These advantages can be illusory, however, if a simple general principle is replaced by a complex set of specific rules or if an overly general rule creates pressures for frequent exemptions.[8]

Rules can also establish default rules and processes for transferring rights when doing so might otherwise be difficult. For example, the Mail Order Rule provides that unless the parties agree otherwise, goods must be delivered within 30 days.[9] Similarly, the Do Not Call Registry provides an easy way for consumers to opt out of unwanted telemarketing calls from legitimate businesses.[10]

Rulemaking is an exercise in generalization. Rules must apply to a well-defined population, with requirements that apply in well-defined circumstances. They cannot account for the wide range of specific factors that may be relevant to evaluate a practice in a specific context. In evaluating advertising, for example,

the meaning of words used frequently depends on their context, in a way that makes writing specific regulatory requirements difficult. Dictionaries offer multiple definitions of "natural," but in the 1970s the FTC proposed (and in the 1980s rejected) adopting a single definition that would have applied to *any* use of the word in food advertising. Another abandoned proposal would have limited drug advertising to precisely, and only, the words describing indications for use in Food and Drug Administration (FDA) regulations, a policy even the FDA eventually abandoned.

# Rules must apply to a well-defined population, with requirements that apply in well-defined circumstances.

In contrast, principles-based enforcement allows examination of specific advertisements to determine their likely meaning to consumers. Similarly, the principle of advertising substantiation—that advertisers must have support for their claims—is straightforward and well established. Writing sensible rules about how much evidence of what type is needed for particular claims would be immensely complicated, however, and would likely restrict efforts to provide consumers with truthful information.

Because rulemaking involves generalization, sound rulemaking puts a particular premium on gathering systematic information. Sound generalizations depend on a deep understanding of why a practice occurs, the circumstances in which it is used, and the precise conditions under which the practice helps or harms consumers in different situations. Sound rulemaking procedures help ensure that the public and the potentially regulated community can examine the accuracy of information, offering critical commentary and contrary evidence as appropriate.[11]

Promulgating good rules is particularly difficult for an agency that does not regulate specific industries, like the FTC. The agency lacks the regular contact and communication with entities in a specific industry that facilitate a deep understanding of what practices, or remedies, are appropriate.[12] Rather than relying on detailed knowledge of an industry, the commission's expertise is in applying general principles to a wide range of specific factual circumstances. To be sure, the commission in some areas (such as credit reporting or advertising) regulates well-established businesses, but large portions of its law enforcement deal with pathologies, bad actors with a demonstrated unwillingness to obey the law.

Rules by their nature, however, also apply to legitimate companies that regularly keep their promises to consumers. Remedies appropriate for demonstrated bad actors can be quite burdensome for legitimate businesses, and there is often no straightforward way to limit required remedies to fraudulent practices. Overly burdensome rules can interfere with the market processes that actually serve consumers' interests, creating harm rather than preventing it. For example, the commission's initial proposal for the Telemarketing Sales Rule (TSR) compiled order provisions from previous fraud cases that were designed to control the future behavior of proven violators. It would have been extremely broad and burdensome, and one of the first actions of Robert Pitofsky's commission in 1995 was to narrow it substantially.[13]

As we discuss in detail below, in the 1970s the FTC strayed from its traditional common-law approach and embarked on an extensive rulemaking campaign designed to restructure entire industries based usually on anecdotal evidence of alleged abuse by a few businesses. The effort consumed enormous resources but foundered on the commission's all-too-frequently inadequate preparation for and drafting of the many rules proposed, and it crumbled in the face of the overwhelming opposition it provoked. Even the few rules that became law were mostly pared down significantly from the initial proposals.

We believe it a mistake for the commission to devote substantial resources to rewrite rules to restructure the marketplace. As we have written extensively elsewhere, the commission has been successful when it operated as a referee, enforcing well-established legal principles against bad actors or bad acts from legitimate companies.[14] When it foundered decades ago, it was because it tried to be the second-most-powerful legislature in Washington.

> ## Rather than relying on detailed knowledge of an industry, the commission's expertise is in applying general principles to a wide range of specific factual circumstances.

Regardless of procedures, rulemaking consumes substantial resources that could be employed elsewhere. During our tenure at the commission, for example, we used substantial resources against deceptive practices in marketing subprime mortgages, alleging failure to disclose key terms of the transaction adequately. These cases, among others, led to a $215 million settlement with Citigroup based on conduct by subsidiaries it acquired[15] and a settlement with First Alliance Mortgage that ultimately returned $65 million to affected borrowers.[16] In 2005, however, after we left, problems grew with subprime markets, yet the FTC diverted substantial resources to rules and studies Congress mandated in the Fair and Accurate Credit Transactions Act of 2003.[17] Whatever the value of those rules and studies, they consumed resources the commission could have employed productively on cases.

The FTC's new leadership has renewed interest in industry-wide rulemaking. On July 1, 2021, in a public meeting without participation by its professional

staff and without public comment or input on the changes, the commission rewrote its rulemaking procedures substantially on a 3–2 party-line vote.[18] Adopted solely in the name of expediency, the rule changes are based on the myth that the Reagan administration adopted onerous procedures to curtail rulemaking for ideological reasons.[19] In fact, the rules the commission has changed were long-standing, with some changes resulting from the FTC Improvements Act of 1980, and were virtually all in place before Ronald Reagan's appointees arrived at the commission. Moreover, they have not actually been followed: In rulemakings initiated since 1976, the commission has used its authority under its rules to adopt alternative procedures.[20]

Especially for a generalist agency like the FTC, quality rules depend on quality information. Quality information in turn requires a process that produces a fulsome record, in which the key information is subject to testing, analysis, and rebuttal by the various interested parties. Unfortunately, these new procedures retreat from these goals and will likely result in rulemaking records with less public input and without a comprehensive review of the rulemaking record by an independent presiding officer that Congress required in 1980.[21] The changes also remove the statutory requirement that the commission explain its reasons for a proposed rule "with particularity."[22] They further greatly reduce the opportunity for public participation in identifying the crucial factual issues that must be resolved during the rulemaking, eliminate the ability of the public and the presiding officer to review the staff's recommended rule, and—unless great care is taken in implementation—could, in the words of the Michael Pertschuk–led commission in 1980, "create a privileged status for meetings between Commissioners and outside parties."[23]

Ironically, we think it unlikely that these changes will even serve the claimed purpose of expediting the rulemaking process. They are much more likely to result in worse rules and lost opportunities to improve consumer welfare. Moreover, some of these changes would appear to violate basic administrative law principles, which allow a court to set aside a rule "if the Commission promulgates it without observance of the procedure required by law,"[24] including respect of the underlying statutory authority.

---

## Adopted solely in the name of expediency, the rule changes are based on the myth that the Reagan administration adopted onerous procedures to curtail rulemaking for ideological reasons.

To support these conclusions, we begin with a history of the FTC's rulemaking efforts. The following section turns to a detailed discussion of the particular changes made on July 1, 2021, and the section after that discusses how best to conduct Section 18 rulemaking. A final section summarizes our evidence, reasoning, and conclusions.

### A Brief History of FTC Rulemaking

We first explore how FTC rulemaking was an innovation of the 1960s and then detail how codification of rulemaking authority helped launch a rulemaking binge in the 1970s. We next discuss how rules proposed after this initial binge used somewhat different procedures, and we consider rulemaking after Congress added additional requirements in the FTC Improvements Act of 1980. Finally, we draw some lessons from this history.

**Rulemaking Begins: The Rise of Unfairness.**
Effective September 1963, the commission adopted rules of practice authorizing Trade Regulation Rules (TRRs)[25] under Section 6(g) of the FTC Act. Because its only remedy was a cease and desist order, the commission contemplated that TRRs would resolve legal issues in subsequent adjudicative proceedings that would potentially result in such orders.

> Where a trade regulation rule is relevant to any issue involved in an adjudicative proceeding thereafter instituted, the Commission may rely upon the rule to resolve such issue, provided that the respondent shall have been given a fair hearing on the legality and propriety of applying the rule to the particular case.[26]

Importantly, the FTC thus envisioned a more limited role for a rule than the civil penalty authority for violation of a rule itself that Congress eventually enacted and the role that most envision today when they recommend that the FTC promulgate rules.[27] The original rules also provided for oral hearings "within the discretion of the Commission,"[28] and hearings were held for each of the early rules, including the Cigarette Rule. Thus, the hearings, important in most FTC rulemakings, were the commission's own creation.

The first rule, promulgated in October 1963 and since repealed, addressed advertising and labeling of sleeping bag sizes.[29] Although some early rules cited only unfair or deceptive practices as the basis for the rule, others also maintained that the prohibited practices were also unfair methods of competition.[30] When the latter authority was included, it was typically the "diversion of trade" theory that the commission had used to attack deception before the 1938 Wheeler-Lea Act expanded the agency's authority to unfair or deceptive acts or practices.[31] For example, the sleeping bag measurement rule cited not only deception but also unfair methods of competition, because inappropriate measurements would "divert business from competitors who clearly disclose."[32] Similar language appears in other rules from the late 1960s and early 1970s. The substantive rationale for

these rules is preventing deceptive practices, with diversion of trade thrown in to describe a consequence of the deception.

By far the most significant early rule, and one of the three most prominent rule proposals in FTC history,[33] was the Cigarette Rule, adopted in 1964 to require cigarette advertising to disclose the health risks of smoking. The rule was easily one of the most consequential steps in agency history, even when later overturned by Congress to impose less stringent disclosures.[34] Perhaps even more significant in its ultimate impact on the agency, the commission based its rule largely on the statutory prohibition of "unfair" practices and enunciated a three-part test for unfairness: whether a practice "offends public policy"; is "immoral, unethical, oppressive, or unscrupulous"; or "causes substantial injury to consumers."[35]

---

> By far the most significant early rule, and one of the three most prominent rule proposals in FTC history, was the Cigarette Rule.

Although rulemaking continued, perhaps because of the hostile congressional reaction to the Cigarette Rule, the commission made no further use of the new unfair acts or practices analysis. Then, on March 1, 1972, the Supreme Court decided *FTC v. Sperry & Hutchinson Co.* Originally, the commission had argued that Sperry & Hutchinson's (S&H) restrictions on swapping trading stamps were unfair methods of competition. On appeal, however, it advanced the new argument that S&H had committed unfair acts or practices. Because this theory had not been litigated

below, the Supreme Court remanded the case to the commission. The opinion stated, in a passage that we read dozens of times in internal staff memoranda during the 1970s, that the FTC

> does not arrogate excessive power to itself if, in measuring a practice against the elusive, but congressionally-mandated standard of fairness, it, like a court of equity, considers public values beyond simply those enshrined in the letter or encompassed in the spirit of the antitrust laws.[36]

The sentence ended with a footnote that, in dicta, appeared to bless the unfairness analysis underlying the Cigarette Rule.

Inspired by S&H, any reluctance to use the Cigarette Rule test disappeared, as the then–newly created Bureau of Consumer Protection devoted considerable resources and intellectual firepower to explore the outer limits of unfairness, particularly for use in rules. The bureau established a special unit, originally headed by Morton Needleman, a highly regarded career staff member, to develop rule proposals.[37] These proposals relied on the S&H "mandate" to define unfair or deceptive acts or practices.

Nevertheless, many of the proposals had a competition rationale. The Eyeglass and Prescription Drug Rules, which would have preempted state bans on advertising, were based on the anticompetitive effects of such bans, for example.[38] Similarly, the rule proposal for over-the-counter drugs, which would have required drugmakers to use only FDA-approved terminology to describe drug indications for use, was based on concerns that multiple terms for drug indications facilitated "spurious" product differentiation.[39] Although the Needleman group tried to develop coherent approaches for possible rules, what followed was the explosion of unfairness-based rulemaking discussed below.

From the beginning, the FTC's authority to write rules under Section 6(g) was in doubt, partly because the agency had contended until the 1962 revisions to the rules of practice that it lacked such authority.[40] It was not until the commission adopted the octane rule in 1971[41] (finding the failure to disclose

octane ratings "an unfair method of competition and an unfair or deceptive act or practice"[42]), however, that a circuit court addressed the FTC's rulemaking authority, with the DC Circuit upholding that authority in *National Petroleum Refiners Association v. FTC*.[43] Although the continued relevance of this decision has been questioned,[44] it is important to note that the court upheld a much more limited form of rulemaking than the broadly applicable modern TRR, in which violations trigger civil penalties. What the commission claimed in the octane rule was the authority only to write a rule that was binding in an administrative adjudication that could result only in a cease and desist order.

Moreover, the court noted specifically, as had the commission in the Cigarette Rule and its 1962 rules, that

> some opportunity must be given for a defendant in a Section 5 proceeding to demonstrate that the special circumstances of his case warrant waiving the rule's applicability, as where the rationale of the rule does not appear to apply to his own situation or a compelling case of hardship can be made out.[45]

Depending on the facts, the result of such a "rule" could be more like an industry guide than a modern rule.

While the octane rule was litigated, Congress debated the commission's rulemaking authority. Many in Congress were concerned about the breadth of the commission's discretion to declare practices "unfair or deceptive," especially given the lack of clear standards of what those terms meant. "As a result, the feeling was apparently widespread among the members of the congressional committees considering the Magnuson-Moss Act that some means had to be found to control this broad discretion."[46]

The result was the Magnuson-Moss Warranty–FTC Improvements Act, passed late in 1974 and effective January 4, 1975.[47] The statute gave the commission authority in Section 18 of the FTC Act to write rules that "define with specificity" unfair or deceptive acts or practices but did not affect the commission's authority for unfair methods of

competition rules.[48] Congress sought to control the agency's discretion via procedural requirements, discussed below in detail, that require hybrid rulemaking, between Administrative Procedure Act (APA) informal notice and comment rulemaking and the formal procedures of administrative litigation. The act also added Section 5(m) to the FTC Act, authorizing civil penalties for knowing violations of "any rule under this Act respecting unfair or deceptive acts or practices."[49]

Armed with Congress's new grant of authority and inspired by the Supreme Court's apparent blessing of an expansive view of unfairness, the commission launched a rulemaking binge. It published rules of practice implementing the initial notice provisions of Section 18 in April 1975, and by April 1976, it had launched 16 rulemakings under the act.[50] The rules sought to transform entire industries, touching myriad aspects of everyday life—vocational schools, food and drug advertising, used cars, clothing care labels, hearing aids, funerals, eyeglasses, and health spas, among others.[51] Of these initial rules, only five survived, virtually all in truncated form—hardly a record that inspires confidence.

The tidal wave of proposals provoked a backlash as numerous industry groups asked Congress to rein in the commission because, in their view, the rules imposed unnecessary burdens and too frequently demonstrated hostility to legitimate business practices. Early in 1978, a vote on the House floor rejected an FTC reauthorization bill backed by House leadership, with members of both parties in open revolt because the bill lacked controls over the FTC.[52]

The epitome of unfairness-based rulemaking was the Children's Advertising rule, initiated with a notice of proposed rulemaking (NPRM) in April 1978,[53] and the signature proposal of Chairman Pertschuk, an important Senate staffer while Section 18 was being drafted. The notice did not include a specific rule proposal, instead requesting comment on a range of possible remedies: a ban on all television advertising to children age 8 or younger, a ban on advertising of the foods most likely to cause cavities to children 12 and under, and a requirement for advertiser-funded counter-advertising to provide

nutritional information for other products advertised to older children but not included in the ban.[54]

The proposal signaled to many in the business community, Congress, and the media that the commission was embarked on a rulemaking campaign based on its own perceptions of what public policy should be rather than on actual consumer harm. The *Washington Post*, no bastion of conservatism, famously editorialized that the FTC was becoming the "National Nanny,"[55] and Congress at one point refused to provide funding, leading the agency to shut down briefly.[56] The proposal was a key motivation for the FTC Improvements Act of 1980, which specifically prohibited the commission from adopting a children's advertising rule based on unfairness in the same or similar rulemaking proceeding and added other requirements, discussed below, to the FTC rulemaking process.[57]

## The *Washington Post*, no bastion of conservatism, famously editorialized that the FTC was becoming the "National Nanny."

**Early Section 18 Rulemaking: Mishandled Rulemaking Overwhelms the Binge.** Although many have blamed the procedural requirements of Section 18 for the failures of 1970s rulemaking,[58] the causes lie elsewhere. In particular, the early proposals lacked clear theories of why a particular practice was unfair or deceptive, clear substantive theories of why the practice was occurring and therefore how the proposed remedies would solve the problem, and systematic evidence of the extent of the practices at issue, the market forces that produced the practices, and the likely effectiveness and impact of

the proposed remedy. We discuss those problems in turn.

When it codified the commission's rulemaking authority in 1974, Congress took two related approaches to curb agency discretion. First, it sought to "heighten the element of reasoned decision-making in trade regulation rulemaking."[59] Rules must be based on a defined record and supported by "substantial evidence in the rulemaking record . . . taken as a whole,"[60] and the commission must explain its reasons for the proposed rule "with particularity" in the NPRM.[61] If it decides to promulgate a rule, it must adopt a statement of basis and purpose (SBP) that, in explaining its decision, addresses the prevalence of the practices, provides "a statement as to the manner and context in which such acts or practices are unfair or deceptive," and includes a statement of the economic effect of the rule.[62] Thus, the rulemaking process Congress adopted focused on addressing directly the evidence bearing on the decision whether to promulgate a rule and explaining the steps from data to conclusions.

The second element to curb discretion, and thereby improve the commission's rulemaking process, was an enhanced emphasis on public participation. The law requires public comment in any Section 18 rulemaking, unlike the APA, which allows agencies in certain cases to adopt final rules without comment.[63] All comments must be publicly available.[64] The law codified the commission's practice of oral hearings, requiring "an opportunity for an informal hearing"[65] and, if there are "disputed issues of material fact it is necessary to resolve," the opportunity to present rebuttal submissions and conduct appropriate cross-examination.[66]

Congress clearly thought these opportunities important. The statute allows petitioners to request and courts to order "the Commission to provide additional opportunity to make" oral or written presentations if the court finds they "would be material and that there were reasonable grounds for the submissions and failure to make such submissions."[67] It also specifically provides that a "court shall hold unlawful and set aside" a rule if it finds that denying a petitioner the right to cross-examination or rebuttal submissions or a "rule or ruling" limiting such opportunities

"has precluded disclosure of disputed material facts which was necessary for fair determination by the Commission of the rulemaking proceeding taken as a whole."[68] Although there are no cases decided on these grounds, the tendency in the early rulemakings to designate numerous issues and allow broad cross-examination, discussed below, surely reduced the commission's risk of a successful legal challenge. These grounds for reversal complement the APA's usual requirements, such as the court's ability to set aside a rule "if the Commission promulgates it without observance of the procedure required by law."[69]

The commission's rules of practice provided for a presiding officer to oversee the hearings and designate issues.[70] As proposed, the commission would have appointed the presiding officer; as adopted, this task was delegated to the special assistant director for rulemaking in the Bureau of Consumer Protection.[71] In 1978, appointment of presiding officers shifted to the general counsel.[72] In 1980, Congress codified a role for the presiding officer, requiring a presiding officer responsible to a chief presiding officer who "shall not be responsible to any other officer or employee of the Commission."[73] (The commission initially implemented this provision by establishing an Office of Presiding Officers[74] and in 1989 shifted this function to the chief administrative law judge, or ALJ.[75]) The 1980 statute also codified and expanded the requirement in the commission's rules for a presiding officer's report, specifying that the presiding officer "make a recommended decision based upon the findings and conclusions of such officer as to all relevant and material evidence."[76]

The commission's original rules implementing Section 18 added one other requirement to those specified in the statute: a provision for a final staff report, analyzing the rulemaking record and making recommendations for a final rule, "taking into account the presiding officer's findings of fact."[77] The rules also provided for a 60-day post-record comment period on both reports.[78] When it implemented the 1980 FTC Improvements Act, the commission reversed the order of these reports, giving the presiding officer the opportunity to comment on the staff's recommendation while retaining the 60-day comment period.[79]

As the Administrative Conference of the United States (ACUS) noted in its 1979 report on FTC rulemaking:

> Effective implementation of the fact-testing objective of the Magnuson-Moss Act necessitates . . . a "funnel" approach in which agency practices and procedures are designed to achieve a progressive narrowing of the theories, factual issues, and policy considerations as the rule moves through the various procedural stages toward final decision.[80]

Unfortunately, FTC rulemaking practices and procedures did no such thing.

The problems began at the very start, with the initial notice of the rulemaking. Rather than explain its reasons for the rule "with particularity," ACUS found that these notices "often contained conclusory or truncated discussions of the tentative legal theories, policy judgments, and factual assumptions underlying the proposals."[81] The general standards for what constituted an unfair or deceptive practice, which too often left legality to the agency's discretion, compounded the problem.

As Barry B. Boyer, professor of law at Buffalo School of Law, noted in his consultant's report to ACUS, even when theories were discussed, they "may be so vague or incomplete as to leave the reader in a state of uncertainty about the doctrinal basis of the rule provision."[82] Teresa M. Schwartz, professor of law at George Washington University and deputy director of the FTC Bureau of Consumer Protection in the Clinton administration, came to the same conclusion, noting that the commission had not defined the legal theory of its rules, and "factors which are prominent in one rulemaking proceeding . . . are ignored in another or referred to so generally that the factor is rendered meaningless."[83] Indeed, Dorsey D. Ellis, law professor at Washington University in St. Louis, argued that the theories underlying some of the rules were directly in conflict.[84] Given the lack of standards for defining FTC Act violations, multiple vague theories empowered the bureaucrats to choose the most promising theory, while they also expanded the range of issues in dispute and the kinds of evidence that might be relevant to the ultimate decision.[85]

Besides lacking clear legal theories, the early rules often lacked clear theories of why a problem warranted regulatory intervention and why a proposed remedy would in fact solve the problem. Instead, remedies were viewed as matters for the commission's quasi-legislative discretion, rather than issues for which factual evidence could support or undermine their efficacy. Without a requirement to show why the remedy would work, the staff felt little need to develop record evidence regarding either the remedy's effectiveness or its impact.[86]

As noted above, the statutory scheme contemplated that "designated issues" would narrow the scope of rebuttal and cross-examination rights to "disputed issues of material fact it is necessary to resolve."[87] Although the commission's initial proposal for implementing this provision narrowed cross-examination to "disputed issues of specific fact, in contrast to legislative fact,"[88] the final rule broadened the requirement to "disputed issues of fact."[89] The final rule also allowed the commission or the presiding officer "to designate any other issues for consideration" using the same procedures.[90] After the initial notice was published, the rule allowed 60 days for comments proposing designated issues[91] but offered no guidance on how to determine which issues to designate, leaving the question to the discretion of the individual presiding officers. To further complicate the identification of key issues, the rules allowed written comments on any relevant issue up to 45 days before the start of the informal hearing,[92] a date that would necessarily fall after the final notice had identified the designated issues.

Of course, identifying the key factual issues that must be resolved depends on the proposed rule's theory. If that theory is ambiguous, the relevant facts are uncertain as well. As the ACUS noted, if designated issues are to narrow the matters in dispute, they can only be identified "after the major issues in the proceeding have been made as clear as possible, and with reference to specific evidence" on the rulemaking record.[93]

Yet another problem was the incentive of both presiding officers and rulemaking participants to designate issues broadly. For presiding officers, the threat of judicial reversal on appeal always existed. For participants, there would be no cross-examination unless an issue was designated, and participants erred on the side of inclusion. In many proceedings, "virtually all of the major participants favored freewheeling, unfettered cross-examination."[94] Moreover, presiding officers, drawn from staff members with prior experience in rulemaking, "seemed to exhibit a marked distaste for the procedural bickering and diversion from substantive matters"[95] that would result from limiting cross-examination. Rather than restricting cross-examination, presiding officers instead chose to limit the time allowed for cross-examination on essentially any issue.[96] ACUS termed this approach the "freedom-for-time" policy.[97]

The lack of clear theories and the scattershot approach to designating issues produced rulemaking records that all too often failed to include *any* systematic or projectable evidence about either the prevalence of the practices at issue or the effectiveness and impact of the remedy. Rulemaking by its nature is an exercise in generalization, as rules cannot account for the circumstances surrounding every specific instance of a practice. Wise decisions about rules require evidence about whether the practice is sufficiently common to justify a rule, whether a sufficient number of problems have a common cause to make the proposed remedy effective, and whether the benefits so obtained are large enough to justify the costs. All three questions require evidence that allows reasonable estimates that apply to the market as a whole,[98] yet most proposals in the rulemaking binge never developed such evidence.

As Boyer noted, for most rules the record consisted of "large quantities of almost random information" that "will not support systematic generalization to the industry as a whole."[99] When rules returned to the commission for a final decision, sufficient evidence to support them rarely existed.[100] Even when there was objective evidence, the staff often dismissed it based on "the subjective opinions of consumer advocates and enforcement officials."[101] As Ellis noted, "Reliance upon subjective and ad hoc evidence appears to be the rule, not the exception."[102]

## It was not the process that failed; it was the inadequacy of the proposals themselves.

Obtaining objective evidence is not particularly difficult. Indeed, as the proposals came back to the commission, the agency conducted "baseline" surveys to provide the foundation for a later assessment of the rule's effects. These surveys, however, were conducted after the commission had made a tentative decision to adopt a rule and thus *after* the rulemaking record had closed. The baseline study for proposed extensions of the Care Labeling Rule found that the overwhelming majority of consumers were satisfied with their experiences in cleaning the types of products the extensions would have covered, and the commission ended up rejecting those expansions.[103] The baseline study for the Funeral Rule substantially undercut a key factual premise of the rule: that funeral directors would not discuss prices over the telephone; the commission nevertheless adopted a modified rule. Unfortunately, however, these studies were never subject to public comment or careful exploration during the rulemaking itself. Similar studies should occur when the rulemaking starts, not after the fact.[104]

The lack of clear theories and systematic evidence produced records that were voluminous but often included little information addressing the key questions. It was not the process that failed; it was the inadequacy of the proposals themselves. In fact, the process did what a good process should do: It assured careful consideration of all the facts available to determine whether a rule should be promulgated. The deficiencies discussed here caused many rulemakings to take far longer than necessary. Tellingly, the process

often made the lack of evidentiary support for the original proposal apparent, and when the rules finally returned to the commission, the ultimate decision to terminate most of them without a rule was mostly uncontroversial.[105] The process worked: It prevented the promulgation of poorly thought-out and poorly supported regulations that were more likely to harm than to help consumers.

When theories were clear and facts were properly marshaled, Section 18 rulemaking was not unduly burdensome. The Eyeglass Rule, which originally would have preempted state bans on advertising of eyewear and was eventually narrowed to a requirement to give the consumer a copy of the eyeglass prescription after the Supreme Court's protection of commercial speech rendered the bans unconstitutional, was completed in just over two years. The R-Value Rule, which required labeling for home insulation to disclose a standardized measure of resistance to heat flow, took just under two years.[106] Each rule had a clear theory and clear evidence of both the effects of the challenged practices and the effectiveness of the proposed remedies.

**Rulemaking Procedures Immediately After the Binge: Alternative Procedures, Rule by Rule.** After the initial wave of rule proposals ended in April 1976, the commission used Rule 1.20 to "dispense with" the procedures required in its rules, if they were not otherwise required by statute, if it found those procedures were "impractical, unnecessary, or contrary to the public interest."[107] Thus, in three late 1970s rules, the commission used this authority essentially to endorse the "freedom-for-time" approach. For example, the notice in the Standards and Certification rulemaking invited comment on 37 questions the commission posed but made clear that the only limits on cross-examination were time, relevance, and the scope of the direct testimony.[108]

The commission also used special procedures for the Children's Advertising rulemaking, but with a different tack, seeking to employ the funneling approach to narrow the issues before hearings with cross-examination. It appointed Needleman, by then an ALJ, as presiding officer in the hope that a respected ALJ's experience with an adversarial process would help manage a proceeding that was clearly controversial and adversarial. The commission established a first round of written comments and "legislative" hearings, with only the presiding officer allowed to question witnesses,[109] concluding in March 1979. After the commission proposed that parties suggest disputed issues for later adjudicative hearings, with the commission itself to decide which issues to designate, interested parties proposed numerous issues as disputed; on July 30, however, the presiding officer recommended that the commission designate only three issues.[110]

The commission never ruled on this recommendation, and in May 1980, Congress, in the FTC Improvements Act of 1980, removed the commission's authority to promulgate the rule based on an unfairness theory and required the agency to publish the text of any newly proposed rule for comment. Instead, following the defeat of President Jimmy Carter in 1980, the commission decided to terminate the proceeding before President Reagan's appointees arrived.[111]

**Rulemaking After the FTC Improvements Act of 1980: The Decline of Rulemaking, the Demise of Designated Issues, and the Rise of the Search for Consensus.** Congress acted to rein in many of the real and perceived excesses of the unfairness-based rulemaking proposals with the 1980 FTC Improvements Act.[112] It prohibited the then-ongoing Standards and Certification rulemaking based on unfair or deceptive acts or practices[113] and a Children's Advertising rule based on unfairness,[114] while also changing Section 18's procedures. The act required that all rulemakings begin with an advance notice of proposed rulemaking (ANPRM)[115] and required an independent presiding officer, who shall "make a recommended decision based upon the findings and conclusions of such officer as to all relevant and material evidence."[116] It expanded the requirement that the commission explain the reasons for the rule "with particularity," requiring an NPRM to include the text of a proposed rule, "including any alternatives."[117] The act also restricted ex parte contacts with commissioners, including commissioner contacts with

the rulemaking staff;[118] required preliminary and final regulatory analyses for any rule, specifically including rules promulgated under Section 6; and extended this requirement to rule amendments that were expected to have major effects. The regulatory analysis is not subject to judicial review unless "the Commission has failed entirely to prepare a regulatory analysis."[119] Finally, the act adopted a two-house legislative veto, later ruled unconstitutional.[120]

The commission implemented these requirements in its rules in 1980 and 1981. Before July 2021, the only substantive change in the commission's rules of practice for rulemaking since the implementation of the 1980 Improvements Act was the designation of the chief ALJ as the chief presiding officer in 1989.[121]

Congress made one additional change in Section 18. Although the original Section 18 had required that the SBP include "a statement as to the prevalence of the acts or practices,"[122] Congress in 1994 required that the commission could issue an NPRM only "where it has reason to believe" the practices are prevalent. The commission can make this determination if it has issued cease and desist orders addressing the practice or if any other information "indicates a widespread pattern of unfair or deceptive acts or practices."[123] Because two orders may be enough to find prevalence under this requirement, it is not clear this provision has any significant effect.

After implementation of the FTC Improvements Act of 1980, Section 18 rulemaking has been rare, especially involving significant rules, to say the least.[124] We were in the leadership of the FTC's Bureau of Consumer Protection when the pivot from rulemaking occurred. The shift reflected not a decision that Section 18 procedures were too cumbersome, but instead our judgment that the rules the FTC should enforce already existed in the "principles" of Section 5 of the FTC Act, providing rules of the road for a market economy, best enforced case by case and through agency guidance.[125] As discussed below, rulemaking remained useful but was hardly the agency's central tool.

Jeffrey Lubbers, a professor at American University Washington College of Law, identified nine amendments of pre–Magnuson-Moss Warranty Act

rules promulgated since 1983.[126] One of these, an amendment of the Care Labeling Rule, was substantially complete before the FTC Improvements Act of 1980 and followed the commission's original rules of practice.[127] In addition, there was one new rulemaking, the Business Opportunity Rule, promulgated in 2011,[128] and proceedings that led to the repeal of 14 pre–Magnuson-Moss Warranty Act rules, virtually all of which had fallen into disuse.

None of the post–FTC Improvements Act of 1980 rulemakings followed the general rulemaking procedures in the commission's rules of practice. Instead, the commission used Rule 1.20 to adopt alternative rulemaking procedures after the ANPRM concluded.[129] Each proposal after 1984 used a modified format with a single NPRM[130] and no designated issues. The early proposals included a schedule of hearings in the notice for which parties could ask for cross-examination, subject to the presiding officer's discretion and limitations, on any issue.

This approach was followed for the Unavailability Rule,[131] Eyeglasses II,[132] the first Mail Order Rule amendment proceeding,[133] and the Funeral Rule.[134] In each instance, there were oral hearings, and the final rule SBPs specifically mention cross-examination, except for Eyeglasses II. Two rule repeals initiated in 1989 took a similar approach but without oral hearings. One was completed in 13.5 months, the other in just under 17 months.[135]

In 1995, the commission adopted a new tack for multiple rule repeals, seeking (successfully) to avoid oral hearings entirely. ANPRMs for eight rule repeals were published in 1995. Although one (the Light Bulb Rule) took 14 months to conclude,[136] six others were completed in seven months,[137] and one took just over eight months.[138] In each case, there were no hearings, no presiding officer, and no staff reports.[139] Although the Light Bulb Rule attracted five comments, the other seven rules received only two comments in total.

The commission also sought to discourage hearings when it proposed amendments to the Amplifier Rule in 1999. It did not schedule hearings and stated that "written comments appear to be adequate" to make a decision.[140] There were no requests for a

hearing, no presiding officer, and no staff report or post-record comment period.[141] The same process was followed for the amendments to the R-Value Rule, proposed in 2003. Again, there were no hearings, no presiding officer, and no staff report or post-record comment period,[142] and neither rule was controversial. There were only five comments on the Amplifier Rule[143] and apparently only limited comments on the R-Value Rule, although the SBP does not include a count.[144]

The commission took a similar approach with the NPRM for the proposed amendments to the Franchise Rule in 1999, noting that written comments appeared adequate and that anyone asking for a hearing "must designate specific facts in dispute."[145] Before the NPRM, however, there were extensive opportunities for oral input, as the commission conducted a series of six public workshops after the ANPRM, presumably seeking to build consensus about needed changes. It worked: There were no requests for a hearing and, again, no presiding officer. There was, however, a staff report and post-record comment period.[146] The second amendment to the Mail Order Rule proposed in 2011 followed a similar process, although there is no mention of public workshops.[147]

The commission's most recent rulemaking foray, the Business Opportunity Rule, is a revealing case study. The initial NPRM followed the same process as the Franchise Rule amendment,[148] and based on that proceeding, it was not expected to be controversial. Inadvertently, the proposed rule's coverage swept in all multilevel marketers, leading to extensive comment and numerous requests for hearings and cross-examination. Rather than appoint a presiding officer and proceed with hearings, the commission issued a revised NPRM exempting multilevel marketing firms.[149] Unlike the original proposal, which received more than 17,000 comments, the revised proposal received fewer than 125 comments, including some requests for oral hearings.[150] Rather than hold hearings, the commission held a public workshop that became part of the rulemaking record.[151] And although the commission never appointed a presiding officer, it did release a staff report and allow a post-record comment period.[152]

**The Lessons of History: Clarity and Evidence Matter.** Several conclusions emerge from this review of the FTC's history with rulemaking procedures. First, clarity is crucial. As detailed above in "Early Section 18 Rulemaking," failure to articulate and understand the basis for the rule, the industry involved, and the necessary connection between the proposed remedies and the asserted problems doomed most of the rules in the 1970s, not Section 18 procedures. Clear legal and substantive theories, along with systematic evidence supporting them, are the sine qua non of effective rulemaking. Multiple analyses of early Section 18 rulemaking echo the conclusions of ACUS that the rulemaking records were strikingly inadequate to support reasoned analysis of rulemaking proposals designed to transform major sections of the American economy.

---

## Clear legal and substantive theories, along with systematic evidence supporting them, are the sine qua non of effective rulemaking.

Second, the agency attempted seriously to use "disputed issues" to narrow the range of issues subject to hearings and cross-examination only once, perhaps ironically, in the highly controversial Children's Advertising rulemaking. In other cases, either the presiding officer or the commission itself defaulted to allowing cross-examination limited primarily by time, without regard to the issue. Moreover, although the controversy surrounding the rule was clear when the presiding officer recommended three designated issues in the Children's Advertising

rulemaking, this was the only time the commission reserved to itself the decision about which issues to designate, although it ultimately did not do so.[153]

Third, although the commission featured oral hearings from the beginning of its rulemaking in the early 1960s, over time it has sought increasingly to avoid oral testimony entirely. Consistent with the statutory requirement, it has always offered "an opportunity for an informal hearing"[154] but has sought to dissuade such requests by, for example, stating that it believes written comments are adequate or asking parties requesting a hearing to explain why they believe one is needed. Instead, it has substituted informal workshops that help identify the issues and build consensus (e.g., the Franchise Rule amendment) or as a replacement for a more formal hearing.

An approach that avoids requests for informal hearings also avoids entirely the need for a presiding officer. Indeed, the last appointed presiding officer was in 1989, for a Mail Order Rule amendment. Seeking to avoid hearings, however, is unlikely to succeed with a controversial rule that seeks major changes in industry practices. Workshops were a useful part of the rulemaking that led to the National Do Not Call Registry, but it is inconceivable that telemarketers with a statutory right to a hearing would have agreed to abandon that right. From their perspective, there would simply have been too much at stake.[155]

Fourth, the commission's success in avoiding requests for hearings suggests that, post-1980, it has provided much more clarity about its proposals, their rationales, and the supporting evidence. That greater clarity, so lacking in the early rulemakings, helps the parties determine whether a hearing might advance their interests. The ANPRM, required since 1980, has likely helped provide some of that clarity, because the commission has needed to respond to the comments filed in that proceeding. The ANPRM can thus help identify key facts and the most promising regulatory approaches.

Fifth, except when there was virtually no controversy, the commission has published a staff report summarizing the rulemaking record and solicited comment on the report. Only after public comment on the proposal, the staff's analysis of the record, and its recommendations has the commission determined whether to adopt a final rule.

Sixth, the well-thought-out and well-supported rule proposals (e.g., Eyeglasses and R-Value) and the swift action on uncontroversial rule repeals make clear that the statutory requirements are not the primary reasons that 1970s FTC rulemaking was protracted and contentious. The early rules themselves, and some subsequent proposals such as the Business Opportunity Rule, were controversial, leading to lengthy proceedings before the rulemaking finally concluded. Controversial rules, however, deserve careful attention and thorough exploration of their factual predicates. That is what Congress sought to require in establishing Section 18 rulemaking procedures.

What has made many rulemakings so time-consuming after the FTC Improvements Act of 1980 is not the time required for the steps in the process, but rather the time between steps. It would appear that the staff and the commission often have not regarded rulemakings as high-priority matters requiring prompt attention. In the six-year Funeral Rule amendment proceeding, for example, preparation of the staff report took 14 months, the commission took more than 19 months to vote on the staff's final recommendation, and preparation of the Final Rule took another 11.6 months. In contrast, it was only 10 months from the NPRM through the public hearings and to the close of the rebuttal comment period. The presiding officer's report and the post-record comment period added five months, and it took just under eight months for the staff to prepare its final recommendations.[156] Similarly, the repeal of the Picture Tube Rule in 2018 featured a 10-month delay between the ANPRM, which received only two comments, and the NPRM.[157]

To expedite rulemaking requires staff managers and commissioners themselves to make the rules a priority. The recent ill-considered steps to reduce public input and cut a few weeks from the basic process of promulgating a rule will likely not even serve the goal of expediting the process, as we show next.

## The Biden FTC Changes the Rules for Rulemaking

The commission's recent changes to its rules of practice were adopted in highly unusual haste. After first debunking the process and rationale for the FTC's changes of July 1, 2021, this section identifies various key changes in the rules and discusses how those changes degrade the quality of the rulemaking process.

**Are We There Yet? The FTC's Rush to Judgment.** One might think that an agency about to embark on a new rulemaking campaign would study its experience to find what had worked and what had not. It might even solicit the views of outside parties on how to improve the process. Instead, on July 1, 2021, the commission adopted substantial changes to its rulemaking procedures on a 3–2 party-line vote, in a meeting styled "public," with no public comment or input about the changes.

The commission majority's rationale for change is a myth—convenient, to be sure, but a myth nonetheless. The majority claims, truthfully to start, that the commission in the 1980s moved away from rulemaking, which the James Miller commission concluded had been a tremendous drain on the commission's resources, without producing commensurate consumer benefits. The majority then claims that "a fundamental part of that posture are the agency-promulgated Rules of Practice" that "shape Commission behavior and process for Section 18 rulemaking."[158]

As described in detail above,[159] this claim has two serious problems. First, the rules of practice have not changed in substance since implementation of the congressionally mandated changes in the FTC Improvements Act of 1980. The rules the Lina Khan commission revised are far more the product of FTC Chairman Pertschuk, part of the Carter administration and an architect of the original Section 18 when he was a Senate staffer, with the last of the rules implementing the 1980 act adopted before the Reagan-appointed chairman arrived. Second, the rules of practice the commission recently amended have not been followed since the initial wave of

rulemaking, with the commission opting for some form of alternative procedures in every rulemaking proposal since April 1976. Unfortunately, however, the recent changes ignore the successful innovations those alternative procedures incorporated.

# The commission majority's rationale for change is a myth— convenient, to be sure, but a myth nonetheless.

Similarly, the majority claims that the shift of the function of the chief presiding officer to the chief ALJ "reinforced the myth that Section 18 rulemakings required elaborate, interminable judicial processes."[160] In fact, it appears that the only practical effect of the change in the rule was to move Henry B. Cabell, who was chief presiding officer throughout the 1980s,[161] from the Office of the Chief Presiding Officer to the Office of the Administrative Law Judges. Only one presiding officer was ever appointed after that change, however, and that was none other than Henry B. Cabell.[162] It strains credulity to think that this organizational decision, made well after the 1970s rulemaking binge when there was no longer demand for presiding officers, is the reason that Section 18 rulemaking became cumbersome. In fact, the only time an experienced ALJ presided over a rulemaking was when Pertschuk's FTC decided to use one for the controversial Children's Advertising rule.

Rather than a careful consideration of what has worked and what has not, the revisions appear to be based substantially on an examination of differences between the precise statutory requirements and the commission's rules of practice.[163] The assumption seems to have been that anything not expressly required should be dropped because it interfered with "efficient" rulemaking, a word that the commission

uses repeatedly to explain its changes, seemingly as a synonym for "timely." Rulemaking procedures are supposed to gather reliable information, however, with the goal to improve agency decisions, and the quality of the resulting rules is crucial to assess the "efficiency" of the process. The commission's explanation contains not one word about writing better rules or about the possible impact of process changes on the substance of any rule that might be adopted.[164] The need for speed trumps all other considerations, so much so that other considerations *were not deemed worth even mentioning*.

The process to change the rules was very different from the process used before, reflecting the current leadership's belief in speed as *the* goal in making decisions. When Congress enacted Section 18, the commission published many key provisions as a proposed rule, seeking public comment.[165] These included the content of the final notice of rulemaking, the presiding officer, and the designation of issues. Comments led to changes in the rules eventually promulgated. Among other changes, while the proposal had specified that the commission would appoint the presiding officer, the final rule instead gave this responsibility to the special assistant director for rulemaking in the Bureau of Consumer Protection.[166] Moreover, although the 1975 proposal required cross-examination only for "disputed issues of specific fact, in contrast to legislative fact"[167] that are material and necessary to resolve, the final rule broadened the requirement to "disputed issues of fact."[168] Without even acknowledging this history or explaining the reasoning behind the change, the July 1 rules resurrect the distinction between "specific" and "legislative" facts as the first listed factor in deciding whether to grant requests for cross-examination.[169]

The commission followed a similar process when it amended its rules to implement the requirements of the FTC Improvements Act of 1980. It issued an interim rule,[170] accepted public comments, and later issued revised, final rules.[171] The commission's rules regarding ex parte communications went through four separate rounds of public comment—two in 1977,[172] one in 1979,[173] and one in 1980.[174] The current commission revised these rules without input from

anyone outside of a chosen few, excluding most of the career staff and the Republican commissioners.

Of course, efficiency and speed in rulemaking are important goals, but the process must be judged ultimately by its results. Rules have potentially major consequences for consumers and for businesses that must comply with them. Bad rules can produce long-lasting adverse effects that harm, not protect, consumers. As Congress understood when it gave the commission rulemaking authority, procedural checks help assure full consideration of the issues and the facts about whether a problem exists and, if so, a rule's potential effects.

If there is consensus about the outcome, as the commission carefully built during its Section 18 rulemakings starting in the late 1980s, the result is likely to be a good rule according to those who participate in the process, including the affected businesses and consumer advocates.[175] Consensus is built by acquiring the information necessary to understand the problem as those most affected see it and seeking solutions that maximize the benefit to consumers, net of compliance costs. Building consensus often takes time, however, and is not always consistent with the fastest-possible process. And, of course, sound and beneficial rules are possible even when some may disagree with the commission's decision.

When there is no consensus, and consensus is unlikely for controversial rules that seek substantial changes in industry practices, speed is only one dimension of rulemaking efficiency. Achieving the "right" result is most crucial, lest a rule inadvertently prohibit practices that benefit consumers or unnecessarily raise costs for consumers. In particular, rulemaking procedures should provide ample opportunity to clarify the issues, surface as much systematic evidence addressing those issues as feasible, and allow careful exploration of the proposal's factual predicates. Section 18 procedures were designed to do exactly that, even at the cost of some additional resources, including time, in rulemaking.

Careful exploration of the issues and impacts is especially important for an agency like the FTC. Many business practices are beneficial or benign in some contexts but harmful in others. Because much of its

activity involves law enforcement, often against clear frauds, the commission and its staff may see primarily instances in which the practice harms consumers and are far more likely to understand the operations of "bad actors." The agency staff and the commissioners themselves have far less experience with the impact of potential remedies on legitimate businesses using similar business practices.

# Achieving the "right" result is most crucial, lest a rule inadvertently prohibit practices that benefit consumers or unnecessarily raise costs for consumers.

That was the case earlier in this century with the Business Opportunity Rule, for example, when a rule based on seemingly simple disclosures that made sense for the fraudulent operations that the commission often attacked would have resulted in useless, telephone book–sized disclosures when applied to legitimate direct selling companies.[176] The rulemaking process identified the problem and led the commission to revise its proposal to exempt legitimate direct sellers.[177]

As we discuss in the next section, the commission's recent revisions to its rules of practice upset this careful congressional balance and are more likely to lead to bad rules. Ironically, past experience suggests that the changes are unlikely to achieve even the more expeditious process that is the only justification proffered for the changes. As we explain above,[178] failure to articulate and understand the basis for the rule, the industry involved, and the necessary connection between the proposed remedies and the asserted

problems doomed most of the rules in the 1970s, not Section 18 procedures. Undue haste now risks repeating those failures.

Taken as a whole, the commission's changes are reminiscent of the DC Circuit's concerns when it dismissed on grounds of ripeness an interlocutory challenge to the special procedures adopted for the Children's Advertising rule. The court noted:

> Indeed one gets the impression that the proceeding itself is window dressing for the benefit of a court passing on a final trade regulation rule that was in stock long before its tentative models were displayed in the children's advertising Notice. . . . Some of the Commission's activities at least suggest that it long ago settled on what it had in mind and deliberately fashioned its special rules to achieve that result with the fewest possible outside intrusions from precisely the parties Congress intended to have participate in a proceeding of this kind.[179]

Although specific rule proposals have yet to emerge, today's overall impression is much the same. The commission appears to have decided how to proceed, has sought to remove anything that might stand in the way, and will tell us what it proposes whenever it chooses.

Yet, even with a rule that appeared to the court predetermined, the facts were not as supposed. One of us, as a young economist at the FTC, was assigned to work with the Children's Rule staff on potential remedies. Audience and advertising data showed that the staff's initial idea, a ban on all advertising when young children were a majority of the audience, would have affected only one program in 1977—*Captain Kangaroo*, the cherished adult friend to millions of children who grew up before Mr. Rogers entered the neighborhood. Even had the captain survived without advertising, the impact on the amount of advertising seen by children would have been trivial. Indeed, most of the advertising that children saw was not in children's shows; it was in popular adult or family sitcoms such as *Laverne & Shirley* and *Happy Days* or in the reruns of older sitcoms such as *I Love Lucy* in the after-school hours on local television.

To say the least, these facts were disappointing to the rulemaking staff, who realized that any effective remedy was highly problematic. Thus, the final staff report concluded that any proposed rule would be both underinclusive (the *Captain Kangaroo* problem) and overinclusive (the *Happy Days* problem).[180] As John Adams famously said, "Facts are stubborn things."[181]

**Key July 1, 2021, Revisions to the Rulemaking Process: Enhancing Political Control and Downgrading Public Input.** Among the many changes the commission made, we consider in detail five key issues: particularity, the presiding officer, oral hearings and designated issues, the final staff report, and the ex parte rules.

*"Particularity."* When Congress first codified the commission's rulemaking authority, it required an initial NPRM "stating with particularity the reason for the proposed rule,"[182] a requirement included in the commission's original rules of practice implementing Section 18.[183] The FTC Improvements Act of 1980 amended this provision to require a notice "stating with particularity the text of the rule, including any alternatives, which the Commission proposes to promulgate, and the reason for the proposed rule."[184] The commission's 1981 implementing rules construed this language to publish the text of the rule as an additional requirement and retained the requirement to state its reasons "with particularity."[185] That is surely the text's plain meaning.

Moreover, in the rulemaking controversy at the time, there was no hint that Congress wanted to remove the requirement that the commission explain its reasons "with particularity." Instead, among other problems—the entire context of the 1980 amendments was a congressional reaction to the FTC's perceived excesses—Congress was trying to prevent a repeat of the Children's Advertising rule's failure to include the rule's text at the beginning. Thus, a far more sensible reading of the statute is that three elements must be described "with particularity"—the rule, any alternatives, and the commission's reasons.

Nevertheless, without any comment or explanation, the commission on July 1, 2021, deleted "with particularity" from the requirement to explain its reasons, leaving only "a statement describing the reason for the proposed rule."[186] A rule promulgated based on an NPRM that does not state the reasons for the rule "with particularity" would appear to be one promulgated "without observance of the procedure required by law,"[187] subject to reversal.

---

# The experience of the 1970s made clear that the problem with the commission's notices was too little explanation, not too much.

The experience of the 1970s made clear that the problem with the commission's notices was too little explanation, not too much. Given this history, a retreat from particularity is particularly ill-advised. As discussed above, the multiple, detailed assessments of the 1970s rule experience concluded that the commission needed to provide greater clarity and specificity about its theories for a rule. Experience demonstrated that, in Section 18 rulemaking, a general description of the reason for the rule is insufficient to define the issues. And, of course, it is hard to see how commission rules that begin by ignoring clear legal requirements will proceed on a sound footing; in fact, such changes to the rulemaking procedures will almost certainly lead to legal challenges, thus prolonging—not expediting—the rulemaking process.

*Presiding Officer.* A hearing requires a presiding officer, and the commission's initial rules provided for appointment of such an official, although there was no specific statutory requirement to do so. Congress

codified this unchanged requirement, used throughout the 1970s, in the FTC Improvements Act of 1980 and added that the officer "shall be responsible to a chief presiding officer who shall not be responsible to any other officer or employee of the Commission." Thus, Congress contemplated an independent review of the rulemaking record, requiring that official to "make a recommended decision based upon the findings and conclusions of such officer as to all relevant and material evidence."[188]

The July 2021 rules of practice make two changes inconsistent with the intent and language of the 1980 act. First, the rules gut the independence of the presiding officer. Second, they seek to limit the scope of the presiding officer's decision.

Regarding the presiding officer's independence, the changes seem clearly inconsistent with the 1980 act's intent. Under the new rules, the agency chair is the chief presiding officer, although the chair can choose to appoint someone else.[189] The commission offers no rationale for this change, which serves to consolidate the chair's control of the rulemaking process. Both the director of the Bureau of Consumer Protection, who manages the rulemaking staff and ultimately controls its recommendations, and the presiding officer for the particular rulemaking report directly to the chair. It is hard to imagine that they will publicly disagree about a rule proposal that the chair has presumably endorsed and perhaps emphasized as an important part of the agency's consumer protection agenda.

Second, the changes limit the scope of the presiding officer's decision. Although the new rule includes the statutory language quoted above, it also provides that "the presiding officer's recommended decision will be limited to explaining the presiding officer's proposed resolution of disputed issues of material fact."[190] Apparently, the presiding officer's recommended decision is to ignore any undisputed issues. The commission offers no basis for, nor explanation of, the rationale for this limitation and fails to reconcile the restriction with the plain statutory language. A "recommended decision based upon . . . all relevant and material evidence," as the statute requires, would

necessarily include both undisputed facts and the designated issues.

In the Children's Advertising rulemaking, for example, there was essentially undisputed record evidence that a ban on advertising would raise prices of products advertised to children and significantly undermine the financial foundations of television programs for children, facts surely relevant to any recommended decision.[191] Thus, while Congress envisioned an independent analysis of the entire rulemaking record—"all relevant and material evidence"—the commission now limits the recommendation to the answers to specific questions that the commission itself will pose. The rule changes presume that a presiding officer whom the chair appoints and supervises is not sufficient to ensure that inconvenient but undisputed facts can be ignored.

The early rulemakings revealed the value of a both broad and independent review of the rule's record. Until the FTC Improvements Act of 1980, the presiding officer's report came before the staff report. The staff often disagreed with the presiding officer, thus effectively surfacing issues that the commission itself had to resolve. After the 1980 act, the commission switched the order of the reports, thus allowing the presiding officer to comment on the staff's analysis, with the last (public) word on the recommended rule. In at least one instance under this process, the Unavailability Rule, the presiding officer recommended amendments that "deviated substantially" from the commission's proposal and the staff's recommendation, although the commission rejected his recommendation.[192]

Independence is particularly important because rulemaking staffs will always feel obliged to advocate for and defend the commission's proposal. In multiple rulemakings, advocacy for the original proposal occured over the objections of new bureau managers, who often added their different views in a separate memorandum accompanying the staff report.[193] To be sure, staff reports often recommended final rules that differed significantly from the original proposal, but the tendency to champion the proposal in whatever was the current form was unmistakable.

In his review of FTC rulemaking, Ellis concluded that "there appears to be a pattern of giving deference to evidence that supports regulation and downgrading, explaining away or disregarding that which is inconsistent with the need for further regulation."[194] As then-Commissioner Pitofsky (later FTC chairman) noted in his separate statement when the commission adopted its ex parte rules regarding staff communications,

> staff devotion to a single project over a period of years and the adversary clashes that often develop during the proceeding can generate in some rulemaking projects a will-to-win in the staff which influences their view of the record and their recommendations.[195]

In that statement, Pitofsky also noted that at a July 1980 policy review session, "a consensus was reached that the Presiding Officer should play a more important role in assessing staff recommendations."[196] These competing views of the same rulemaking record helped define the issues that the commission itself would ultimately resolve. Rather than following the commission's long-standing bipartisan consensus, first formed under Chairman Pertschuk, that the agency should use the presiding officers to check the staff, the July 1, 2021, changes ensure that the presiding officer *will not even see* the staff's recommendations, as discussed below.

When the FTC first required that the presiding officer be responsible to no one other than the chief presiding officer, the agency provided for periodic evaluations of the performance of presiding officers through the executive director.[197] This language was eliminated in 1989 when the function was transferred to the chief ALJ, given the existing process for evaluating ALJs.[198] It was not replaced in the 2021 revisions. Under the new rules, presiding officers are responsible to no official other than the chair, and there is no provision for periodic evaluations. Apparently the chair dictates all.

If the commission's new rule revisions aim to achieve greater political control of the rulemaking process, making the chair the chief presiding officer does exactly that. Enhancing the chair's power, however, is very different from the congressional goals of heightening reasoned decision-making and enhancing public participation as checks on agency discretion and to ensure that the outcome of FTC Section 18 rulemakings benefit consumers.[199] A promulgated rule based on a recommended decision from a presiding officer who is not independent and who only addresses some issues in the record would again appear to be one adopted "without observance of the procedure required by law"[200] and thus subject to reversal or at least prolonged challenge.

*Oral Hearings and Designated Issues.* Section 18 includes two provisions relevant to informal hearings. First, the initial notice must include "an opportunity" for an informal hearing.[201] If a hearing occurs, interested parties are "entitled" to present their position orally.[202] Neither the statute nor the commission's rules limit the content of oral presentations, although the commission has often required that written comments include the substance of any oral testimony. As noted above, recent practice and the July 1, 2021, rule provide for a hearing only on request, with the new rule requiring a request and a statement identifying the party's interests.[203] This is somewhat less restrictive than the 2006 Business Opportunity Rule, in which parties requesting a hearing were required to include "a statement explaining why they believe a hearing is warranted."[204] For any controversial proposal, there will surely be many such requests, as there were with the Business Opportunity Rule.

Second, if there are "disputed issues of material fact it is necessary to resolve," parties are entitled to present rebuttal submissions and cross-examination as the commission determines is appropriate and "required for a full and true disclosure"[205] about those issues. These are the "designated issues" in the proceeding. As ACUS saw it, designation is an important part of the process of progressive narrowing of the issues, using more formal proceedings to explore the key factual issues. Yet, as described above, outside of the Children's Advertising rule, that did not happen.

The 2021 rule revisions provide that the NPRM will include "a list of disputed issues of material fact designated by the Commission as necessary to be

resolved, if any."[206] This is a substantially different approach to designated issues than used in any prior proceedings. Originally, interested parties proposed designated issues to the presiding officer, who made a determination.[207] In the next set of rulemakings, the procedures the commission adopted generally took the "no designated issues" approach, essentially allowing cross-examination on any issue. After the FTC Improvements Act of 1980, parties were to propose designated issues in a second round of comments after the initial comment period closed.[208] And in the most recent consensus-based rulemakings, there were of course no designated issues and usually no hearings.

When the commission has allowed for the possibility of hearings and disputed issues, it used interested parties' comments to identify the key issues. As with the Business Opportunity Rule, the crucial issues may not become apparent until parties that have to comply with the rule weigh in. Thus, when it changed the rules to allow such parties to propose designated issues in rebuttal comments in 1981, the commission specifically noted that it "anticipates that interested persons will then be able to use the written comments in framing proposals for disputed issues."[209] Indeed, in the only rulemaking that actually tried to use designated issues to narrow the scope of the hearings, the Children's Advertising rule, the presiding officer identified three disputed issues based on the written comments.[210]

Under the new rules, the commission will define the issues first and only then hear from interested parties. Hearing the views of interested parties before identifying the key facts in dispute is a far more sensible way to proceed.

Designating issues in the NPRM seems particularly problematic. The commission will attempt to identify disputed issues before anyone outside the commission has seen the proposed rule. Comments on the ANPRM may offer some insights, but without a specific proposal on the table, the key issues may well remain ill-defined. The rules allow parties to propose other designated issues in their request to the commission for an oral hearing, but they too must do so without the benefit of public comments:

Requests must be made before the close of the written comment period. Because this is the only opportunity to propose designated issues, there will be a clear incentive for both interested parties and the commission staff to propose anything that might be disputed in the comments. This approach is inconsistent with the fundamental policy that designated issues should narrow the issues to be disputed in a more formal proceeding.

---

# Under the new rules, the commission will define the issues first and only then hear from interested parties.

Designating any issue creates a statutory right to rebuttal submissions and cross-examination, unless the commission determines that neither is appropriate nor required for full disclosure.[211] Were the commission to state at the beginning of the rulemaking that there are no material facts in dispute it would invite a claim that the commission has prejudged the matter and that comments from interested parties are simply a hoop to jump through. This is very different from the "no designated issues" approach used often in post-binge rulemakings, which scheduled a hearing and allowed cross-examination on essentially anything. There is a clear difference between "no facts are in dispute" and "you can dispute anything you want."

Returning designating issues to the commission when parties suggest other issues in their requests for a hearing seems more likely to delay than expedite the process. Identifying the issues in dispute requires some familiarity with the facts included in the record, but how will the commission acquire that familiarity? Relying on the staff to summarize the record would create at the very least the appearance of significant ex parte communication issues, giving

the staff a nonpublic channel to advise the commission. Although such communications might be technically permissible if they are confined to material in the record, because of the timing, the nature, and the significance of the conversation, the approach of the commission in the Children's Advertising rule is more prudent and thus preferable.[212]

Rulemaking decisions under Section 18, after all, are supposed to be based on the rulemaking record, which needs to be public. Nor is it likely, or feasible, for individual commissioners or their attorney advisers to invest the time necessary to read all the comments, let alone analyze them and separate the factual questions on which the written record is clear from those that are in dispute.[213] The lengthy delays in the commission's consideration of the Funeral Rule amendments[214] and the commission's failure to decide on designated issues in Children's Advertising[215] hardly inspire confidence that commission designation will expedite the process.

*Final Staff Report.* Until July 1, 2021, the commission's rules since Section 18 was enacted always provided for a final staff report, to include the staff's "analysis of the record and its recommendations as to the form of the final rule."[216] Until the 1980 act, the staff report followed the presiding officer's report; after that act, the staff report came first. Since 1975, both reports were subject to a post-record comment period.[217] The July 2021 changes eliminated the staff report and the post-record comment period to "provide more efficient proceedings."[218]

Rather than enhancing efficiency, this change will reduce the opportunity for public input into the decision-making process and thereby increase the probability that an overly invested rulemaking staff will influence the result. Because the staff will certainly prepare its analysis of the record and recommendations in any event, there is no avoiding the time it takes to do so. Under the new rules, however, only the commission will see that analysis. (Although the ex parte rules might be expected to make staff recommendations public, those rules only apply to communicating "any fact which is not on the rulemaking record."[219]) The presiding officer

will not see it, abandoning the long-standing consensus that presiding officers should independently review staff recommendations. Nor will there will be any opportunity for interested parties to assess this crucial analysis of the record, note key evidence that was overlooked or downplayed, or assess the impact of any recommended changes in the rule. In past rulemakings, such changes from the original proposal have sometimes been significant, and the views of interested parties on the adequacy of those changes to address concerns raised in earlier comments can be invaluable to the quality of the ultimate decision.[220]

Eliminating the public staff report will also undermine the comprehensiveness of the presiding officer's report. The team of attorneys and others who have worked on the rule prepare staff reports, which can be more thorough in their analysis of record evidence, including potentially numerous comments, because the staff can divide the labor. A presiding officer, limited to 60 days and charged with accounting for "all relevant and material evidence," can use the staff report as a guide to the key evidence. Working alone or with a much smaller staff than that on the rule, the presiding officer's assessment of the record will almost inevitably be both less complete and less comprehensive.

Reviewing courts have also found the staff report summary and analysis of record evidence useful. When it considered a challenge to the first Eyeglass Rule, for example, the DC Circuit cited the staff report's discussion of record evidence extensively.[221] Opinions upholding the Used Car Rule[222] and the Credit Practices Rule[223] also included numerous citations to the staff report.

*Ex Parte Rules.* Just as post-record comments on the staff report can be useful, post-record comments directly to the commission or individual commissioners can be valuable as well. The original rules of practice allowed oral presentations to the commission before final consideration, at the commission's discretion. Presentations had to be "confined to information already in the rule making record."[224] Such meetings, often in the form of round table discussions, were "routinely" part of the first wave of rulemaking.[225]

Of course, parties may communicate with individual commissioners as well. Since 1977, the commission's rules have required that any such communications be made public, but they distinguished between timely communications (within the comment period for the proceeding) and untimely ones. Only timely communications (or summaries of oral communications) were placed on the rulemaking record that forms the basis for the commission's decision, with other communications placed on the public record.[226] When Congress in 1980 required the commission to apply its ex parte rules to communications with the rulemaking staff, the commission specifically rejected proposals that argued for eliminating this distinction and including all communications to commissioners on the rulemaking record. The agency explained:

> We find no indication in the legislative history that Congress intended subsection 18(j) [of the 1980 act] to afford outside parties the opportunity to submit information for the record after established deadlines and thereby subvert the orderly rulemaking process and create a privileged status for meetings between Commissioners and outside parties.[227]

The July 2021 revisions to the ex parte rule abandon that decision in part. The distinction between timely and untimely communications remains for written comments, with only timely written communications included in the rulemaking record. But for oral communications, the new rule abandons the distinction, placing all communication summaries on the rulemaking record.[228] Moreover, the rule providing for oral presentations to the commission is gone, along with its requirement that presentations be confined to materials in the rulemaking record.

The "rulemaking record" is crucial in Section 18 proceedings. Commission decisions must be supported by "substantial evidence in the rulemaking record taken as a whole,"[229] which arguably requires the commission to consider the oral communication, if only to dismiss it. Moreover, the statute allows a court to order the commission to provide additional opportunities for presentations if there are "reasonable grounds for the

submissions and failure to make such submissions and presentations in the proceeding before the Commission."[230] The lack of an opportunity to respond to new, material evidence presented by a single party to a single commissioner would certainly appear to constitute "reasonable grounds" for failure to make the presentation earlier, unless the commission allows another opportunity for public comment.

---

# When communications include new evidence, effective public participation in the rulemaking process requires an opportunity for all parties.

Multiple objectives are at play in the treatment of ex parte communications. One is transparency: The public should be able to determine who communicates what to the ultimate decision makers. Placing ex parte communications on the public record satisfies this objective. A second objective is fairness and due process: When communications include new evidence, effective public participation in the rulemaking process requires an opportunity for all parties, not just those who can secure a meeting with a commissioner, to address the strength and the implications of that evidence.

Whether new evidence is sufficiently material to require reopening a rulemaking record and an additional round of public comment is often a difficult question that requires careful consideration. The commission's new ex parte rule makes the decision essentially automatic: Anything communicated orally to a commissioner becomes part of the rulemaking record, without any process for considering whether

that information requires additional opportunities for public comment.

The majority claims that the changes "enhance Commission transparency by requiring records of both written and oral communications to a Commissioner . . . will be placed on the rulemaking record."[231] This claim misstates the rule and the likely results. In fact, only timely written comments will be placed on the rulemaking record. Other written comments will be placed on the public record. For oral communications, all will go on the rulemaking record.

Rather than enhancing transparency, this could well, in the words of the Pertschuk-led commission in 1980, "create a privileged status for meetings between Commissioners and outside parties."[232] Those with whom any commissioner chooses to meet can provide whatever information they wish, whether it is already on the rulemaking record or not, and the commission can base its decision on that information—even if it was not submitted in a timely fashion, and there was therefore no opportunity for rebuttal comments that become part of the written comment process. It is hard to imagine how one might make the process any more opaque. To paraphrase George Orwell, all comments would be created equal—but some are more equal than others.

In principle, there is nothing wrong with putting material received late in the process on the record, and the rules of some agencies, such as the Federal Communications Commission, allow just that.[233] With such material, however, to avoid creating the "privileged status communications" that concerned the Pertschuk-led commission, the commission will have to allow sufficient time and opportunity for rebuttal. The FTC's rules do not even acknowledge this important issue.

## How to Run a Magnuson-Moss Rulemaking

Successful rulemaking using Section 18 procedures is quite feasible; it has been done multiple times with careful planning and effort.[234] We offer suggestions about how the commission could complete

rulemaking, even for a controversial rule. The modified procedures employed since the late 1980s are useful for rules that are not especially controversial, but they are unlikely to succeed when a rule proposes major changes for an industry.

We take as our model one of the three most significant rulemakings in FTC history, in which we were heavily involved: the National Do Not Call Registry. Although the rulemaking was conducted under APA procedures and was strongly contested by telemarketers, it could also have succeeded under Section 18 procedures.

First, the commission must be clear about the legal theories and the factual basis for its proposals. Too many of the 1970s rules avoided a clear statement of a particular legal theory; after all, if one theory was insufficient to justify a rule, a different one might succeed. Different theories often depend on different facts, however, expanding the range of issues in dispute, the opposite of the funneling approach that should be central to Section 18 rulemaking. As Boyer noted about the facts, "The investigational material available to support the first wave of proposed rules consisted of large quantities of almost random information collected for purposes other than that for which it was ultimately used."[235] He concluded that the data were more "fine-grained detail about individual firms and transactions than would be needed to assess general patterns and practices in the industry," but they were not gathered in a way that would "support systematic generalization to the industry as a whole."[236]

As Boyer described, agencies often use APA rulemaking

> as a loosely-structured process for fact-gathering and public statement of policy preferences—that is, as a form of decision-making in which the agency simply identified a problem, outlined possible solutions in general terms, and then sought public data, views and arguments as a means of educating itself about the subject matter.[237]

The experience of the 1970s shows that such an approach is unworkable using Section 18 procedures

for providing rules in which anyone could have confidence.

An ANPRM might become a fact-gathering tool for the agency to help educate itself, and workshops at an early stage could also help illuminate the issues in greater detail. Indeed, the staff first used workshops with an APA rulemaking to implement the 900-number provisions of the Telephone Disclosure and Dispute Resolution Act of 1992, reasoning that it would gain a far better understanding of the issues by hearing the affected interests debate those issues than it would gain from relying on only interviews or written comments. Such interchanges are likely highly informative at this early stage, as the parties may well differ on key facts, which should heavily influence the commission's own research and analysis.

Second, before issuing an NPRM, therefore, the commission should develop systematic, quantitative, and qualitative empirical evidence to address the extent of the problem it seeks to address, the forces that cause the problem or the reasons that prevent a market resolution, and the efficacy of the proposed remedy. The commission's research should complement and support its rulemaking efforts. As Boyer notes, rules such as "Ophthalmic Goods" (Eyeglass I) and "Prescription Drugs," which started with just such a foundation, "seemed to move more swiftly and smoothly through all stages of the process."[38]

In short, the commission needs to put its cards on the table. The earlier the commission articulates the law and the facts on which it relies, the better, thereby allowing interested parties to scrutinize that theory and those facts with the time often necessary to develop additional empirical analyses of a proposal's foundation and impact, including the viability of a remedy. Discovery rules in litigation seek to prevent parties from delaying key evidence to deny the other side the opportunity to respond effectively, thus improving the accuracy of fact-finding. The same principles apply to rulemaking: If the commission delays key evidence, it may succeed in promulgating more rules, but some are likely to be of poorer quality because their underpinnings have not been tested fully.

Third, use the designation of issues to narrow the range of facts in dispute and focus the hearing and the later stages of the process on the key issues. The initial round of public comments will likely provide the best insights into what matters, even in a highly controversial proceeding such as Children's Advertising. The combination of a clear theory and the commission revealing its own factual and legal analysis on the record should provide a firm basis for interested parties to identify both what remains in dispute and its importance to the outcome. Disputed issues can narrow the use of cross-examination and thereby increase its utility and focus rebuttal comments on the same, relatively narrow set of questions. The key, however, is to develop a record that narrows what is actually in dispute rather than simply limit time spent in cross-examination.

> In short, the commission needs to put its cards on the table. The earlier the commission articulates the law and the facts on which it relies, the better.

Finally, take public comments seriously. Interested parties will have knowledge about the likely effects of a proposed rule that are difficult for the commission to acquire elsewhere. Even in the most widely supported rule in FTC history, the Do Not Call Registry, public comments led to two significant changes in the final rule: an exemption allowing companies to call consumers if they had an established business relationship with the consumer and an exemption for paid telemarketers engaged in charitable solicitations. (Charities themselves were exempt because they are

not subject to the FTC's jurisdiction.) The existing business relationship exemption in particular made the rule far more workable, and far less burdensome, than it otherwise would have been. Public comment led to substantial changes in virtually all the early section 18 rule proposals, and, most recently, comments led to a far more focused and less burdensome Business Opportunity Rule.

More generally, the Do Not Call Registry, although using APA procedures, provides a useful example of a successful approach to rulemaking. Pursuant to a requirement in the Telemarketing Sales Act that authorized the rule, the commission launched a review of the TSR in November 1999. Comments during that review led the agency to hold public forums in 2000 on issues related to the rule's do not call provisions and a separate public forum to address other provisions of the TSR. In October 2001, the new leadership, including the authors, made do not call a centerpiece of the agency's new privacy agenda.[239]

In January 2002, the agency published an NPRM proposing the National Do Not Call Registry and several other changes to the TSR, including new restrictions on the use of pre-acquired account information and on the practice of "upselling" in telemarketing transactions. The proposal was based on clear evidence of increasing consumer concern about the intrusions of telemarketing, including rapid growth in sign-ups for state registries and the national registry maintained by the Direct Marketing Association, as well as surveys indicating that most consumers found calls to be annoying and intrusive and overwhelmingly wanted to stop them.[240] Following written comments, a three-day public forum in June 2002 explored the issues further, and a final rule was adopted in January 2003.[241]

The Do Not Call Registry is regarded as the most popular consumer protection measure in the agency's history.[242] It would have been somewhat more complicated as a Section 18 rulemaking, but it certainly could have been concluded expeditiously using those procedures. Because of telemarketer opposition, the full panoply of Section 18 procedures would have been necessary.[243]

## Conclusion

Regardless of the procedures used, writing good rules is a challenge for any agency, particularly for an enforcement agency like the FTC, which in its daily business develops far more detailed knowledge about bad actors with a demonstrated willingness to ignore the law than about legitimate businesses that normally comply. The commission has always imposed remedies on proven violators beyond the requirements that it would apply to legitimate companies. Rules, however, apply to all, and an understanding of their marketplace impact is essential if rules are to benefit consumers rather than damage the market processes that enable the most effective forces for consumer protection.

In the wake of the 2020 election, the commission appears poised to embark on a new rulemaking wave and appears willing to impose sweeping changes to long-standing business practices. Its December 10, 2021, Statement of Regulatory Priorities identifies possible Section 18 rules addressing "the abuses stemming from surveillance-based business models," including "lax security practices, limiting intrusive surveillance, and ensuring that algorithmic decision-making does not result in unlawful discrimination."[244] Regarding possible "unfair methods of competition," the agency lists noncompete clauses, pay-for-delay pharmaceutical agreements, and unfair competition in online marketplaces, among others.[245]

Priorities aside, the commission has given few clues about how it plans to address any of these practices. To prevent the excesses and backlash of the 1970s, the commission must follow a rulemaking process that guarantees careful scrutiny of its proposals, provides for a searching inquiry into their factual predicates, and ensures a critical evaluation of proposed remedies and their likely effects. That is what Congress sought to codify when it passed new rulemaking authority in 1974.

Careful scrutiny and public input take time. This is the reality of good rulemaking. And producing sound and lasting rules is a far more important goal than producing rules quickly, with less attention to their merits and less public input in the process.

To produce high-quality rules—indeed, to avoid the fiasco of the 1970s—the commission itself needs to know and be able to explain clearly, at the beginning of any rulemaking, the legal and substantive theories of why the rule is necessary and appropriate. It needs to detail the facts on which it relies to support those theories and subject both theories and evidence to searching scrutiny. It needs to articulate its rationales fully—"with particularity," as Congress required.

# Careful scrutiny and public input take time. This is the reality of good rulemaking.

Unfortunately, the changes in rulemaking procedures adopted on July 1, 2021, will result in decisions with more political, but less public, input and fewer opportunities to evaluate the commission's assertions about the facts. The changes remove the statutory requirement that the commission explain its reasons for a proposed rule "with particularity," allowing the agency to initiate rulemaking only with a general statement of its rationale. In the 1970s, that generality was at the root of many failures.

More problems exist. The rule changes effectively eliminate the presiding officer's independent review of the rulemaking record that Congress required in 1980. The chair is now the chief presiding officer, and anyone the chair appoints will report only to the chair, greatly reducing the independence of presiding officers. Although Congress required an independent recommendation from the presiding officer, "based upon . . . all relevant and material evidence,"[246] the new rules seek to limit the presiding officer's recommendation to the disputed issues that the commission itself will determine. In short, the commission will decide the questions that the presiding officer can address. Surely, however, when Congress mandates a recommended decision of the presiding officer based on "all relevant and material evidence," the presiding officer must also consider all the facts, not just those the commission considers to be disputed.

Having the commission identify designated issues in the NPRM reduces the opportunity for the public to participate in identifying the crucial factual issues that the rulemaking must resolve. The designation of issues should narrow the issues that are truly in dispute, rather than try to identify the issues before hearing about the proposed rule from any interested party. Moreover, the commission may fail to anticipate crucial issues a proposal raises, as it did in the initial version of the Business Opportunity Rule. Even if parties suggest other issues to the commission for designation, determining which issues are both disputed and necessary to resolve requires familiarity with the rulemaking record. It is difficult to see how the commission can develop that familiarity in the middle of the rulemaking process and, to avoid even the appearance of an ex parte problem, presumably without the assistance of the rulemaking staff.

With controversial rules, previously the commission has always published the staff's final recommendations for another round of comments. The new rules eliminate the public staff report and therefore require the presiding officer to make a recommended decision without knowing the staff's view of what the record supports. The presiding officer will apparently be the sole resource available to review what is likely to be an extensive record in any controversial proceeding. The commission will then make a final decision without an opportunity for public comment on the staff's final recommendations, which will have been made in any event and have often differed significantly from the original proposal. Rather than transparency, this is rulemaking by the wise and powerful Oz behind the curtain.

The commission resisted applying ex parte rules to communications with the rulemaking staff until Congress insisted it do so in 1980 but excluded staff communications that were confined to the rulemaking record. The commission nevertheless always distinguished between communications with outsiders during the comment period and those that came later.

Timely communications became part of the rulemaking record; communications received after the comment period closed were made public but excluded from the record. For oral communications, the new rules provide that all communications are in the rulemaking record on which the commission can rely for its decision.

When the Pertschuk-led commission rejected just such a proposal in 1980, it said that placing late communications on the rulemaking record would "create a privileged status for meetings between Commissioners and outside parties."[247] There are solutions to avoid this problem, consistent with transparency, fairness, and the full development of a high-quality rulemaking record. Solutions, however, depend on a process for considering whether any new information requires additional opportunities for public comment, and the new rules propose no such process.

All of these changes were adopted on July 1, 2021, solely in the name of speed. How the new FTC adopted these procedural rules bodes poorly for the substantive rules to come. Speed is not the sole—nor even the most important—goal in making a rule. A rule's quality matters far more, and that quality depends directly on the information in the rule's record.

Yet, there is no indication that the new FTC leadership believes there is a connection between how a rule is made and the quality of the rule itself. Had they believed such a connection exists, presumably they would have used the many studies of the 1970s to try to avoid that era's mistakes in drafting new procedures for making rules. Those studies documented the FTC's failures to develop the necessary prerequisites for successful industry-wide rules, gathering systematic evidence about the potential problems, seeking and using meaningful public comment, and linking the remedies to the perceived problems. Such an approach requires attention to history and to the public's views. Both were stunningly absent on July 1, 2021.

Perhaps, like their similarly activist and ambitious counterparts in the 1970s, the new FTC leadership has supreme confidence in its ability to remake the American economy in its own image. If so, then the goal of July 1, 2021, was to "streamline" the process to implement that vision as soon as possible. If that is their goal, then the new leaders would appear to think that they are smarter than their 1970s predecessors or that it was the process itself that defeated those long-ago progressives, or perhaps both.

Whatever the cause, to return to Mark Twain's view of history, we appear to be in for some serious rhyming with the FTC's disastrous past. Buckle your seat belts!

## About the Authors

**J. Howard Beales III** is Emeritus Professor of Strategic Management and Public Policy at the George Washington University School of Business and a visiting senior fellow at AEI. He was director of the Bureau of Consumer Protection at the Federal Trade Commission from 2001 to 2004. He was associate director for policy and evaluation in the Bureau of Consumer Protection from 1983 to 1987. He was an assistant to the director from 1981 to 1983 and a staff economist from 1977 to 1981.

**Timothy J. Muris** is a George Mason University Foundation Professor of Law at the Antonin Scalia Law School, senior counsel at Sidley Austin, and a visiting senior fellow at AEI. He was chairman of the Federal Trade Commission from 2001 to 2004. He was director of the Bureau of Consumer Protection from 1981 to 1983 and of the Bureau of Competition from 1983 to 1985, and an assistant to the director of the Office of Policy Planning and Evaluation from 1974 to 1976.

## Acknowledgments

We wish to thank David Clanton, James Cooper, William MacLeod, and Lee Peeler for helpful comments on earlier versions of this paper. We thank Evelyn Johns for her invaluable research assistance.

# Notes

1. Although widely attributed to Mark Twain, the origin of this aphorism is uncertain. See Quote Investigator, "History Does Not Repeat Itself, but It Rhymes," https://quoteinvestigator.com/2014/01/12/history-rhymes/.

2. See generally Sidney M. Milkis, *Theodore Roosevelt, the Progressive Party, and the Transformation of American Democracy* (Lawrence, KS: University Press of Kansas, 2009).

3. See, for example, James C. Miller III, letter to John D. Dingell, "FTC Policy Statement on Deception," https://www.ftc.gov/system/files/documents/public_statements/410531/831014deceptionstmt.pdf. We were the principal staff draftsmen of this policy statement.

4. For example, the statutory definition of unfairness helped narrow this discretion, as did the Federal Trade Commission's (FTC) Deception Policy Statement. See J. Howard Beales III, "Brightening the Lines: The Use of Policy Statements at the Federal Trade Commission," *Antitrust Law Journal* 72, no. 3 (2005): 1057–73.

5. The literature often discusses the issue as a choice between standards, which we term here "principles," and rules. See Richard A. Posner, *Economic Analysis of Law*, 9th ed. (New York: Wolters Kluwer Law & Business, 2014).

6. We have written elsewhere that the FTC's efforts to obtain monetary relief in conventional advertising cases risks chilling truthful commercial speech that is valuable to consumers. See J. Howard Beales III and Timothy J. Muris, "Striking the Proper Balance: Redress Under Section 13(b) of the FTC Act," *Antitrust Law Journal* 79, no. 1 (2013): 1–45, https://www.jstor.org/stable/43486952. See also J. Howard Beales III, Benjamin M. Mundel, and Timothy J. Muris, "Section 13(b) of the FTC Act at the Supreme Court: The Middle Ground," *Antitrust Source*, December 2020, https://www.americanbar.org/content/dam/aba/publishing/antitrust-magazine-online/2020/dec-2020/v20_i3_dec2020_beales.pdf.

7. FTC rules also allow the agency to obtain monetary relief, either through civil penalties pursuant to Section 5(m)(1)(A), USC § 45(m)(1)(A), or through an action under Section 19 , 15 USC § 57b(b).

8. See Posner, *Economic Analysis of Law*. Truth in Lending rules provide an example of both problems. The regulation itself has grown to 380,000 words of "complicated legalese," along with thousands more words of commentary and examples. See Bureau of Consumer Financial Protection, *Taskforce on Federal Consumer Financial Law Report*, vol. 1, January 2021, 322, https://files.consumerfinance.gov/f/documents/cfpb_taskforce-federal-consumer-financial-law_report-volume-1_2022-01_amended.pdf.

9. Federal Trade Commission, "Mail or Telephone Order Merchandise Rule," *Federal Register* 79, no. 180 (September 17, 2014): 55615.

10. Federal Trade Commission, "Telemarketing Sales Rule," *Federal Register* 68, no. 19 (January 29, 2003): 4580. See endnote 242 for discussion of Do Not Call's impact and coverage.

11. As we discuss in detail in the section titled "The Biden FTC Changes the Rules for Rulemaking," many of the commission's recently adopted changes in rulemaking procedures impair this crucial information-gathering function.

12. This regular interaction with an industry makes single industry regulators more prone to capture by the companies they are supposed to regulate, unlike a multipurpose agency such as the FTC.

13. Office of the Federal Register, National Archives and Records Administration, "Telemarketing Sales Rule," *Federal Register* 60, no. 30 (February 14, 1995): 8313–33 (original proposal); and "Telemarketing Sales Rule," *Federal Register* 60, no. 110 (June 8, 1995): 30406–28 (revised proposal).

14. See J. Howard Beales III and Timothy J. Muris, "FTC Consumer Protection at 100: 1970s Redux or Protecting Markets to Protect Consumers?," *George Washington Law Review* 83, no. 6 (November 2015): 2157–229, https://www.gwlr.org/wp-content/uploads/2016/01/83-Geo-Wash-L-Rev-2157.pdf.

15. *Federal Trade Commission v. Citigroup*, 239 F. Supp. 2d 1302 (ND Ga. 2001).

16. *Federal Trade Commission v. First Alliance Mortgage Co.*, No. SA CV 00-964 (CD Cal. 2000).

17. The commission, which had previously had no rulemaking authority under the Fair Credit Reporting Act, asked for rulemaking authority to address one practice, risk-based pricing. Instead, it received mandates for more than a dozen separate rules and studies.

18. US Federal Trade Commission, "FTC Votes to Update Rulemaking Procedures, Sets Stage for Stronger Deterrence of Corporate

Misconduct," press release, July 1, 2021, https://www.ftc.gov/news-events/press-releases/2021/07/ftc-votes-update-rulemaking-procedures-sets-stage-stronger.

19. US Federal Trade Commission, "Statement of Commissioner Rebecca Kelly Slaughter Joined by Chair Lina Kahn and Commissioner Rohit Chopra," July 1, 2021, https://www.ftc.gov/system/files/documents/public_statements/1591522/joint_rules_of_practice_statement_final_7121_1131am.pdf.

20. 16 CFR § 1.20.

21. The statute specifically requires a recommended decision by the presiding officer, separate from the rulemaking staff, and that the presiding officer be responsible only to a chief presiding officer. See Unfair or Deceptive Acts or Practices Rulemaking Proceedings, 15 USC § 57a(c)(1)(B). See the discussion in the text beginning at endnote 188.

22. Unfair or Deceptive Acts or Practices Rulemaking Proceedings, 15 USC § 57a(b)(1)(A). See the discussion in the text beginning at endnote 182.

23. Federal Trade Commission, "Oral Presentations Before the Commission and Communications with Commissioners and Their Staffs in Trade Regulation Rulemaking Proceedings," *Federal Register* 45, no. 230 (November 26, 1980): 78626–30.

24. *Association of National Advertisers v. Federal Trade Commission*, 617 F.2d 611, 615 (DC Cir. 1979).

25. 16 CFR § 1.63, as cited in the Cigarette Rule statement of basis and purpose (SBP). See Federal Trade Commission, "Unfair or Deceptive Advertising and Labeling of Cigarettes in Relation to the Health Hazards of Smoking," *Federal Register* 29, no. 129 (July 2, 1964): 8325, 8364. The rules were adopted at Federal Trade Commission, "Procedures, Rules of Practice, and Orders," *Federal Register* 27, no. 95 (May 16, 1962): 4611–12.

26. 16 CFR § 1.68(c),quoted in the Cigarette Rule SBP.

27. Because the current commission appears determined to return to rulemaking under 6(g), despite considerable uncertainty about its authority to do so, understanding the far more limited role of such rules is essential. See also the discussion at endnotes 40–45.

28. Commission Rule 1.67(c), quoted in the Cigarette Rule SBP, note 128.

29. 16 CFR § 400; and Federal Trade Commission, "Advertising and Labeling as to Size of Sleeping Bags," *Federal Register* 28, no. 199 (October 11, 1963): 10900.

30. These rules were originally codified as 16 CFR § 401; Federal Trade Commission, "Misuse of Term 'Automatic' or Terms of Similar Import as Descriptive of Household Electric Sewing Machines," *Federal Register* 30, no. 135 (July 15, 1965): 8900; 16 CFR § 402; Federal Trade Commission, "Deception as to Non-Prismatic and Partially Prismatic Instruments Being Prismatic Binoculars," *Federal Register* 29, no. 110 (June 5, 1964): 7316; 16 CFR § 403; Federal Trade Commission, "Deceptive Use of 'Leakproof,' 'Guaranteed Leakproof,' etc, as Descriptive of Dry Cell Batteries," *Federal Register* 29, no. 99 (May 20, 1964): 6535; 16 CFR § 404; Federal Trade Commission, "Deceptive Advertising and Labeling as to Size of Tablecloths and Related Products," *Federal Register* 29, no. 152 (August 5, 1964): 11261; 16 CFR § 405; Federal Trade Commission, "Misbranding and Deception as to Leather Content of Waist Belts," *Federal Register* 29, no. 126 (June 27, 1964): 8166; and 16 CFR § 406; "Deceptive Advertising and Labeling of Previously Used Lubricating Oil," *Federal Register* 29, no. 159 (August 14, 1964): 11650. All were subsequently repealed.

31. The problem with the "diversion of trade" theory is that all successful competition, including lowering the price, will divert trade from competitors. This "diversion" should be illegal only if it also harms consumers, not just competitors.

32. 16 CFR § 400.1(a)(2)(ii); and Federal Trade Commission, "Advertising and Labeling as to Size of Sleeping Bags."

33. The other two were Children's Advertising, proposed in 1978 and discussed in the text beginning at endnote 53, and the Do Not Call Registry, promulgated in 2003 and discussed in the section titled "How to Run a Magnuson-Moss Rulemaking." See Sidney M. Milkis, "The Federal Trade Commission and Consumer Protection: Regulatory Change and Administrative Pragmatism," *Antitrust Law Journal* 72, no. 3 (2005): 911–41; and William MacLeod, Elizabeth Brunins, and Anna Kertesz, "Three Rules and a Constitution: Consumer Protection Finds Its Limits in Competition Policy," *Antitrust Law Journal* 72, no. (2005): 943–68.

34. See An Act to Regulate the Labeling of Cigarettes, and for Other Purposes, Pub. L. No. 89-92, 79 Stat. 282 (1965). Congress temporarily "limited" the FTC's authority, prohibiting the imposition of any additional advertising requirements beyond those required in the statute, before July 1, 1969. See Federal Cigarette Labeling and Advertising Act, Pub. L. No. 89-92, §§ 5, 10.

35.  16 CFR § 408; Federal Trade Commission, "Unfair or Deceptive Advertising and Labeling of Cigarettes in Relation to the Health Hazards of Smoking," 8355.

36.  *Federal Trade Commission v. Sperry & Hutchinson Co.*, 405 US 233, 244 (1972). The footnote stated that "the Commission has described the factors it considers in determining whether a practice that is neither in violation of the antitrust laws nor deceptive is nonetheless unfair" and quoted the unfairness test from the Cigarette Rule SBP.

37.  The efforts to think creatively spawned a running joke among staff attorneys that lasted for decades about the "unfair distribution of wealth" rule. Perhaps such a rule will yet emerge.

38.  The proposals to preempt state advertising bans became unnecessary when the Supreme Court extended First Amendment protection to commercial speech. See *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council*, 425 US 748 (1976); and *Bates v. State Bar of Arizona*, 433 US 350 (1977). The policy underlying the substantive part of the Eyeglass Rule that became law, which requires that patients receive a copy of any prescription their doctor writes, is based on increasing competition among sellers of eyewear and related products.

39.  One rule with a substantive unfair methods theory was the Standards and Certification Rule, discussed in endnote 113.

40.  See Richard J. Pierce, "Can the Federal Trade Commission Use Rulemaking to Change Antitrust Law?" (working paper, George Washington University Law School, Washington, DC, September 30, 2021), https://ssrn.com/abstract=3933921.

41.  The rule was originally adopted as 16 CFR § 422. After passage of the Petroleum Practices Marketing Act, it was re-promulgated as 16 CFR § 306, a regulation under a specific act of Congress rather than a trade regulation rule.

42.  Federal Trade Commission, "Posting of Minimum Octane Numbers on Gasoline Dispensing Pumps," *Federal Register* 36, no. 242 (December 16, 1971): 23871.

43.  *National Petroleum Refiners Association v. Federal Trade Commission*, 482 F.2d 672 (DC Cir. 1973).

44.  See Maureen K. Ohlhausen and James Rill, *Pushing the Limits? A Primer on FTC Competition Rulemaking*, US Chamber of Commerce, August 12, 2021, https://www.uschamber.com/sites/default/files/ftc_rulemaking_white_paper_aug12.pdf ; and Pierce, "Can the Federal Trade Commission Use Rulemaking to Change Antitrust Law?".

45.  *National Petroleum Refiners Association v. Federal Trade Commission*, 482 F.2d 672, 692 (DC Cir. 1973). The opinion also referred to this as a "safety-valve" procedure. 482 F.2d at 705.

46.  Barry B. Boyer, "Report in Support of Recommendation 79-1: Executive Summary of Barry B. Boyer Report. Trade Regulation Rulemaking Procedures of the Federal Trade Commission," Administrative Conference of the United States, 43, https://www.acus.gov/sites/default/files/documents/1979-01%20Hybrid%20Rulemaking%20Procedures%20of%20the%20Federal%20Trade%20Commission.pdf. Congress mandated this study.

47.  Magnuson-Moss Warranty–Federal Trade Commission Improvement Act, Pub. L. No. 93-637.

48.  Unfair or Deceptive Acts or Practices Rulemaking Proceedings, 15 USC § 57a(a)(2).

49.  Unfair Methods of Competition Unlawful; Prevention by Commission, 15 USC § 45(m)(1)(A). This civil penalty authority is limited to Section 18 rules. Two of the 16 initial Section 18 rules were re-proposals previously published under section 6(g). When one of us began at the FTC in 1974, first as a student intern in the Los Angeles Regional Office and then in the planning office in Washington, DC, in the summer following graduation, he learned it was widely assumed that the agency would soon receive explicit statutory authority for rulemaking, with monetary penalties for rule violations.

50.  Boyer, "Report in Support of Recommendation 79-1," 49. We discuss the history of the implementing rules in the text beginning at endnote 165.

51.  For a table listing the 20 rules proposed before 1979, see Administrative Conference of the United States, "Recommendation 79-1, Hybrid Rulemaking Procedures of the Federal Trade Commission," 1979, https://www.acus.gov/sites/default/files/documents/79-1-with-table.pdf.

52.  The floor vote was 146 yeas, 255 nays, with House leadership voting for the measure. 124 Cong. Rec. 5017–18 (Feb. 28, 1978). Objections included the lack of controls over the FTC that became part of the 1980 FTC Improvements Act, such as the legislative veto. See, for example, 124 Cong. Rec. at 5012, detailing Rep. Joel Broyhill's (R-VA) remarks that

H.R. 3816, as it passed the House, contained a provision which provided for congressional review and possible veto of FTC trade regulation rules. This provision . . . was dropped in conference in favor of a provision which would merely require the FTC to forward to Congress a copy of any final rule . . . Frankly, I do not believe that the conference substitute addresses the concerns of the Members of the House who voted in favor of a congressional veto provision. The FTC has very broad authorities to prohibit conduct which is "unfair or deceptive." . . . The FTC's rules are not merely narrow interpretations of a tightly drawn statute: instead, they are broad policy pronouncements which Congress has an obligation to study and review. The congressional veto provision would have provided us with a mechanism to use to more closely scrutinize the rulemaking authorities exercised by the Federal Trade Commission.

53. 16 CFR § 461; and Federal Trade Commission, "Children's Advertising; Television Restrictions," *Federal Register* 43, no. 82 (April 27, 1978): 17967.

54. Federal Trade Commission, "Children's Advertising."

55. *Washington Post*, "The FTC as National Nanny," March 1, 1978, https://www.washingtonpost.com/archive/politics/1978/03/01/the-ftc-as-national-nanny/69f778f5-8407-4df0-b0e9-7f1f8e826b3b/.

56. See J. Howard Beales III, "The Federal Trade Commission's Use of Unfairness Authority: Its Rise, Fall, and Resurrection," *Journal of Public Policy & Marketing* 22, no. 2 (September 1, 2003): 192, 193.

57. Federal Trade Commission Improvements Act of 1980, Pub. L. No. 96-252.

58. See, for example, Dee Pridgen and Richard Alderman, *Consumer Protection and the Law* (Toronto, Canada: Thomson Reuters, 2017) (process is "too slow to be of much use"); and Mike Swift, "FTC's 'Mag-Moss' Rulemaking Authority Could Break Logjam on US Privacy Legislation," MLEX, March 8, 2021, https://mlexmarketinsight.com/news-hub/editors-picks/area-of-expertise/data-privacy-and-security/ftcs-mag-moss-rulemaking-authority-could-break-logjam-on-us-privacy-legislation ("unworkable"). A common view at the commission, until recently, that the process is unduly cumbersome is discussed in Kurt Walters, "Reassessing the Mythology of Magnuson-Moss: A Call to Revive Section 18 Rulemaking at the FTC," *Harvard Law & Policy Review* 16 (forthcoming), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3875970. Walters has three closely related papers posted on SSRN. When possible, we cite the most recent version, as we do here, except when the relevant information is only in an earlier version.

59. Boyer, "Report in Support of Recommendation 79-1," 46.

60. Unfair or Deceptive Acts or Practices Rulemaking Proceedings, 15 USC § 57a(e)(3)(A).

61. Unfair or Deceptive Acts or Practices Rulemaking Proceedings, 15 USC § 57a(b)(1)(A). After the FTC Improvements Act of 1980, rulemaking must begin with an advance notice of proposed rulemaking (ANPRM), submitted to the relevant congressional committees, that describes the area of inquiry and possible regulatory alternatives. Unfair or Deceptive Acts or Practices Rulemaking Proceedings, 15 USC § 57a(b)(2).

62. Unfair or Deceptive Acts or Practices Rulemaking Proceedings, 15 USC § 57a(d)(1).

63. Boyer, "Report in Support of Recommendation 79-1," 44.

64. Unfair or Deceptive Acts or Practices Rulemaking Proceedings, 15 USC § 57a(b)(1)(B).

65. Unfair or Deceptive Acts or Practices Rulemaking Proceedings, 15 USC § 57a(b)(1)(C).

66. Unfair or Deceptive Acts or Practices Rulemaking Proceedings, 15 USC § 57a(c)(2)(B).

67. Unfair or Deceptive Acts or Practices Rulemaking Proceedings, 15 USC § 57a(e)(2). The commission can also request remand for additional submissions, a procedure that was used in the Second Circuit in a challenge to the Used Car Rule. See the discussion in *Consumers Union of US v. Federal Trade Commission*, 801 F.2d 417, 420–21 (DC Cir. 1986).

68. Unfair or Deceptive Acts or Practices Rulemaking Proceedings, 15 USC § 57a(e)(3)(B).

69. *Association of National Advertisers v. Federal Trade Commission*, 617 F.2d 611, 615 (DC Cir. 1979).

70. The commission's 1962 rules provided that a presiding officer would conduct hearings. 16 CFR § 1.67(c)(2), quoted in Cigarette Rule statement of basis and purpose: Federal Trade Commission, "Unfair or Deceptive Advertising and Labeling of Cigarettes in Relation to the Health Hazards of Smoking," 8365. The 1975 rules established the role of the presiding officer in designating issues. 16 CFR § 1.13 (c)(1)(ii); and Federal Trade Commission, "Procedures and Rules of Practice: Trade Regulation Rulemaking Authority," *Federal*

*Register* 40, no. 157 (August 13, 1975): 33966, 33967.

71. Federal Trade Commission, "Rulemaking Authority."

72. Federal Trade Commission, "Rules and Rulemaking Under Section 18(a)(1)(B) of the FTC Act," *Federal Register* 43, no. 171 (September 1, 1978): 39083.

73. Unfair or Deceptive Acts or Practices Rulemaking Proceedings, 15 USC 57a(c)(1).

74. Federal Trade Commission, "Organization; General Procedures; Nonadjudicative Procedures; and Miscellaneous Rules," *Federal Register* 45, no. 105 (May 29, 1980): 36338.

75. Federal Trade Commission, "Employment of Administrative Law Judges as Presiding Officers in Rulemaking Proceedings," *Federal Register* 54, no. 88 (May 9, 1989): 19885. We shall see that an administrative law judge (ALJ) was used as the presiding officer in the highly controversial Children's Advertising rule.

76. Unfair or Deceptive Acts or Practices Rulemaking Proceedings, 15 USC 57a(c)(1)(B). Under the commission's original rules, the report was to be a "summary of the record" with "initial factual findings and conclusions" regarding the designated issues and "other findings and conclusion as he sees fit." See 16 CFR § 1.13(f); and Federal Trade Commission, "Procedures and Rules of Practice: Trade Regulation Rulemaking Authority," 33966, 33968.

77. 16 CFR § 1.13(g); and Federal Trade Commission, "Procedures and Rules of Practice: Trade Regulation Rulemaking Authority," 33966, 33968.

78. 16 CFR § 1.13(h); and Federal Trade Commission, "Procedures and Rules of Practice: Trade Regulation Rulemaking Authority," 33966, 33968.

79. 16 CFR § 1.13 (f)-(h); and Federal Trade Commission, "Organization; General Procedures; Nonadjudicative Procedures; and Miscellaneous Rules," *Federal Register* 45, no. 105 (May 29, 1980): 6338, 36341.

80. Boyer, "Report in Support of Recommendation 79-1," 46.

81. Administrative Conference of the United States, "Recommendation 79-1," 9.

82. Boyer, "Report in Support of Recommendation 79-1," 55.

83. Teresa M. Schwartz, "Regulating Unfair Practices Under the FTC Act: The Need for a Legal Standard of Unfairness," *Akron Law Review* 11, no. 1 (Summer 1977): 26, https://ideaexchange.uakron.edu/akronlawreview/vol11/iss1/1/.

84. See Dorsey D. Ellis Jr., "Legislative Powers: FTC Rule Making," in *The Federal Trade Commission Since 1970: Economic Regulation and Bureaucratic Behavior*, ed. Kenneth W. Clarkson and Timothy J. Muris (Cambridge, NY: Cambridge University Press, 1981), 163.

85. Boyer, "Report in Support of Recommendation 79-1," 54.

86. See Timothy J. Muris, "Rules Without Reason: The Case of the FTC," *Regulation: AEI Journal on Government and Society* (September/October 1982), https://techliberation.com/wp-content/uploads/2010/04/v6n5-4.pdf.

87. Unfair or Deceptive Acts or Practices Rulemaking Proceedings, 15 USC 57a(c)(2)(B).

88. Federal Trade Commission, "Trade Regulations Rulemaking Procedures," *Federal Register* 40, no. 66 (April 4, 1975): 15237.

89. 16 CFR § 1.13(d)(1); and Federal Trade Commission, "Procedures and Rules of Practice: Trade Regulation Rulemaking Authority," 33966, 33967.

90. 16 CFR § 1.13(d)(1); and Federal Trade Commission, "Procedures and Rules of Practice: Trade Regulation Rulemaking Authority," 33966, 33967.

91. 16 CFR § 1.13(b); and Federal Trade Commission, "Procedures and Rules of Practice: Trade Regulation Rulemaking Authority," 33966, 33967.

92. 16 CFR § 1.13(a); and Federal Trade Commission, "Procedures and Rules of Practice: Trade Regulation Rulemaking Authority," 33966, 33967.

93. Administrative Conference of the United States, "Recommendation 79-1," 5.

94. Boyer, "Report in Support of Recommendation 79-1," 61.

95. Boyer, "Report in Support of Recommendation 79-1," 61.

96. Boyer, "Report in Support of Recommendation 79-1," 63.

97. Boyer, "Report in Support of Recommendation 79-1," 12.

98. See Muris, "Rules Without Reason."

99. Boyer, "Report in Support of Recommendation 79-1," 57.

100. See Muris, "Rules Without Reason," 23. "The records of the commission's proceedings are voluminous indeed, but they are collections of trees from which the size and shape of the forest can seldom be determined."

101. See Ellis, "Legislative Powers," 182.

102. Ellis, "Legislative Powers," 182.

103. For the chronology of the rulemaking for the amendments, see Federal Trade Commission, "Amendment to Trade Regulation Rule Concerning Care Labeling of Textile Wearing Apparel and Certain Piece Goods," *Federal Register* 48, no. 99 (May 20, 1983): 22733, 22735, This is described in more detail in endnote 127.

104. Muris, "Rules Without Reason," 23.

105. The initial wave of proposals occurred during the Ford administration. The commission concluded several rulemakings during the Carter administration, but many rules were still pending at the beginning of the Reagan administration. Although the views of the Ronald Reagan appointees at the FTC clearly played a role, decisions to terminate rulemakings were often unanimous.

106. Jeffrey S. Lubbers, "It's Time to Remove the 'Mossified' Procedures for FTC Rulemaking," *George Washington Law Review* 83, no. 6 (2015), https://digitalcommons.wcl.american.edu/facsch_lawrev/1082/.

107. 16 CFR § 1.20; and Federal Trade Commission, "Procedures and Rules of Practice: Trade Regulation Rulemaking Authority," 33966, 33969.

108. Federal Trade Commission, "Standards and Certification," *Federal Register* 43, no. 236 (December 7, 1978): 57269. See the discussion in Boyer, "Report in Support of Recommendation 79-1," 63. A rulemaking, based on unfair or deceptive acts or practices was specifically prohibited in the Federal Trade Commission Improvements Act of 1980. See Unfair or Deceptive Acts or Practices Rulemaking Proceedings, 15 USC § 57a(a)(1)(B). See endnote 113 for its subsequent history. The other rulemakings were the R-Value Rule and the Games of Chance amendment.

109. Federal Trade Commission, "Children's Advertising." Although the DC Circuit rejected interlocutory challenges to the special rules on grounds of ripeness, it expressed serious reservations about some of the procedures. *Association of National Advertisers v. Federal Trade Commission*, 617 F.2d 611, 618–19 (DC Cir. 1979). See the discussion of the court's concerns in the text at endnote 179.

110. Although there was some delay, the publication of disputed issues was reasonably close to the February 27 date the commission had specified in the initial notice. Federal Trade Commission, "Children's Advertising." The issues were the extent to which children age 2–11 can distinguish between programs and commercials to comprehend the selling purpose of advertising, the extent to which they can defend against persuasive techniques, and the health effects of any lack of understanding. Federal Trade Commission, "Children's Advertising," *Federal Register* 46, no. 191 (October 2, 1981): 48710, 48711.

111. Federal Trade Commission, "Children's TV Advertising." The staff report, issued in March 1981, suggested that the commission could proceed with the rule based entirely on a deception theory, without relying on the unfairness theory that Congress had prohibited. Although the staff recommended terminating the proceeding, this theory could have been used to continue the rulemaking had President Jimmy Carter won reelection.

112. Federal Trade Commission Improvements Act of 1980, Pub. L. No. 96-252.

113. Federal Trade Commission Improvements Act of 1980, Pub. L. No. 96-252, § 7. Originally proposed on grounds of unfair methods of competition and unfair or deceptive practices, the FTC decided to continue the rulemaking under Section 6(g) early in 1981. See Federal Trade Commission, "Standards and Certification; Proposed Trade Regulation Rule," *Federal Register* 46, no. 23 (February 4, 1981): 10747. The Reagan administration began case-by-case investigations in 1983 and decided to terminate the rulemaking. Federal Trade Commission, "Standards and Certification," *Federal Register* 50, no. 209 (October 29, 1985): 44971. The rulemaking followed modified Section 18 procedures, as noted in the text at endnote 108.

114. Federal Trade Commission Improvements Act of 1980, Pub. L. No. 96-252, § 11.

115. Federal Trade Commission Improvements Act of 1980, Pub. L. No. 96-252, § 8. The ANPRM must be provided to the House and Senate Commerce Committees. The law also requires that a notice of proposed rulemaking (NPRM) be provided to those committees 30 days before publication.

116. Federal Trade Commission Improvements Act of 1980, Pub. L. No. 96-252, § 9.

117. Federal Trade Commission Improvements Act of 1980, Pub. L. No. 96-252, § 11.

118. Federal Trade Commission Improvements Act of 1980, Pub. L. No. 96-252, § 12.

119. Federal Trade Commission Improvements Act of 1980, Pub. L. No. 96-252, § 15.

120. Federal Trade Commission Improvements Act of 1980, Pub. L. No. 96-252. The veto was held unconstitutional in *Immigration and Naturalization Service v. Chadha*, 462 US 919 (1983).

121. Federal Trade Commission, "Practice and Procedure Rules: Administrative Law Judges as Presiding Officers in Rulemaking Proceedings," *Federal Register* 54, no. 88 (May 9, 1989): 19885.

122. Unfair or Deceptive Acts or Practices Rulemaking Proceedings, 15 USC § 57a(d)(1)(A).

123. Unfair or Deceptive Acts or Practices Rulemaking Proceedings, 15 USC § 57a(b)(3).

124. In contrast, there have been multiple, significant, and successful rules under specific statutes, including the Telemarketing Sales Rule, the amendments to that rule establishing the National Do Not Call Registry, and the Safeguards rule. Often, these rules have been principles based rather than including specific, detailed requirements. For example, the Safeguards Rule for information security requires firms to have a process for assessing and responding to security risks but does not require specific security measures.

125. See J. Howard Beales III and Timothy J. Muris, "FTC Consumer Protection at 100: 1970s Redux or Protecting Markets to Protect Consumers?," *George Washington Law Review* 83, no. 6 (November 2015): 2157–229, https://www.gwlr.org/wp-content/uploads/2016/01/83-Geo-Wash-L-Rev-2157.pdf.

126. Lubbers, "It's Time to Remove the 'Mossified' Procedures for FTC Rulemaking."

127. See Federal Trade Commission, "Textile Wearing Apparel and Piece Goods; Care Labeling." There were oral presentations before the commission in 1979, followed by a markup session at which the commission "approved in substance" an amended rule. It was published for "technical comments" in 1981. In 1982, the commission rejected the proposed expansions of the rule's coverage that had been the major focus of the rulemaking and eventually promulgated the more limited amendments in 1983.

128. Federal Trade Commission, "Business Opportunity Rule," *Federal Register* 76, no. 236 (December 8, 2011): 76816, https://www.federalregister.gov/documents/2011/12/08/2011-30597/business-opportunity-rule.

129. The alternative procedures appear to have respected the statutory requirements. In the uncontroversial rulemakings, there was no hearing, and therefore no presiding officer, because ultimately no party requested a hearing.

130. Without the alternative procedures, the rules of practice specified an initial NPRM with written comments, a rebuttal comment period for proposing designated issues, a final notice identifying designated issues and scheduling a hearing, and finally a hearing.

131. Federal Trade Commission, "Retail Food Store Advertising and Marketing Practices," *Federal Register* 49, no. 238 (December 10, 1984): 48059.

132. Federal Trade Commission, "Ophthalmic Practice Rule," *Federal Register* 50, no. 3 (January 4, 1985): 598.

133. Federal Trade Commission, "Mail Order Merchandise Rule," *Federal Register* 54, no. 227 (November 28, 1989): 49060.

134. Federal Trade Commission, "Funeral Industry Practices," *Federal Register* 53, no. 104 (May 31, 1988): 19864.

135. 16 CFR § 401; and Federal Trade Commission, "Misuse of 'Automatic' or Terms of Similar Import as Descriptive of Household Electric Sewing Machines," *Federal Register* 54, no. 84 (May 3, 1989): 18906. For its repeal, see Federal Trade Commission, "Misuse of 'Automatic' or Terms of Similar Import as Descriptive of Household Electric Sewing Machines," *Federal Register* 55, no. 114 (June 13, 1990): 23900. See also 16 CFR § 414; and Federal Trade Commission, "Deception as to Transistor Count of Radio Receiving Sets, Including Transceivers," *Federal Register* 54, no. 20 (February 1, 1989): 5090. For its repeal, see Federal Trade Commission, "Deception as to Transistor Count of Radio Receiving Sets, Including Transceivers," *Federal Register* 55, no. 119 (June 20, 1990): 25090. There were no hearings in either repeal, but there were presiding officer and staff reports and a post-record comment period.

136. 16 CFR § 409; and Federal Trade Commission, "Incandescent Lamps (Light Bulbs)," *Federal Register* 60, no. 66 (April 6, 1995): 17491. For its repeal, see Federal Trade Commission, "Incandescent Lamp (Light Bulb) Industry," *Federal Register* 61, no. 125 (June 27, 1996): 33308.

137. 16 CFR § 400, 402, 404, 413, 417, 418. ANPRMs for each rulemaking appear starting at Federal Trade Commission, "Sleeping Bags; Advertising and Labeling as to Size," *Federal Register* 60, no. 99 (May 23, 1995): 27240. The repeals appear starting at Federal Trade

Commission, "Sleeping Bags; Advertising and Labeling as to Size," *Federal Register* 60, no. 244 (December 20, 1995): 65528. Nevertheless, one (part 417) did not appear in the *Federal Register* until the next day.

138.  16 CFR § 405; and Federal Trade Commission, "Trade Regulation Rule on Misbranding and Deception as to Leather Content of Waist Belts," *Federal Register* 60, no. 180 (September 18, 1995): 48070. For its repeal, see Federal Trade Commission, "Trade Regulation Rule on Misbranding and Deception as to Leather Content of Waist Belts," *Federal Register* 61, no. 100 (May 22, 1996): 25560.

139.  In the Light Bulb Rule, two parties requested to participate in oral hearings if they were held, but when no other parties sought hearings, the requests were withdrawn. Federal Trade Commission, "Incandescent Lamp (Light Bulb) Industry." The same procedures were used to repeal 16 CFR § 410, the "picture tube rule," with an ANPRM in 2017. See Federal Trade Commission, "Trade Regulation Rule Concerning Deceptive Advertising as to Sizes of Viewable Pictures Shown by Television Receiving Sets," *Federal Register* 82, no. 123 (June 28, 2017): 29256. An NPRM followed almost 10 months later and a repeal within six months. See Federal Trade Commission, "Deceptive Advertising as to Sizes of Viewable Pictures Shown by Television Receiving Sets," *Federal Register* 83, no. 75 (April 18, 2018): 17117; and Federal Trade Commission, "Deceptive Advertising as to Sizes of Viewable Pictures Shown by Television Receiving Sets," *Federal Register* 83, no. 195 (October 9, 2018): 50484.

140.  Federal Trade Commission, "Trade Regulation Rule Relating to Power Output Claims for Amplifiers Utilized in Home Entertainment Products," *Federal Register* 64, no. 137 (July 19, 1999): 38610.

141.  See Federal Trade Commission, "Trade Regulation Rule Relating to Power Output Claims for Amplifiers Utilized in Home Entertainment Products," *Federal Register* 65, no. 247 (December 22, 2000): 81232.

142.  Federal Trade Commission, "Labeling and Advertising of Home Insulation: Trade Regulation Rule," *Federal Register* 68, no. 135 (July 15, 2003): 41872, https://www.federalregister.gov/documents/2003/07/15/03-17854/labeling-and-advertising-of-home-insulation-trade-regulation-rule.

143.  Federal Trade Commission, "Trade Regulation Rule Relating to Power Output Claims for Amplifiers Utilized in Home Entertainment Products," 81232, 81233.

144.  Federal Trade Commission, "Labeling and Advertising of Home Insulation: Trade Regulation Rule," *Federal Register* 70, no. 103 (May 31, 2005): 31258, https://www.federalregister.gov/documents/2005/05/31/05-10683/labeling-and-advertising-of-home-insulation-trade-regulation-rule.

145.  Federal Trade Commission, "Franchise Rule," *Federal Register* 64, no. 204 (October 22, 1999): 57294.

146.  See Federal Trade Commission, "Disclosure Requirements and Prohibitions Concerning Franchising," *Federal Register* 72, no. 61 (March 30, 2007): 15444, 15446, https://www.federalregister.gov/documents/2007/03/30/E7-5829/disclosure-requirements-and-prohibitions-concerning-franchising.

147.  Federal Trade Commission, "Mail or Telephone Order Merchandise Rule," *Federal Register* 76, no. 190 (September 30, 2011): 60765, https://www.federalregister.gov/documents/2011/09/30/2011-24352/mail-or-telephone-order-merchandise-rule. See also the SBP at Federal Trade Commission, "Mail or Telephone Order Merchandise Rule," *Federal Register* 79, no. 180 (September 17, 2014): 55615, https://www.federalregister.gov/documents/2014/09/17/2014-22092/mail-or-telephone-order-merchandise-rule.

148.  Federal Trade Commission, "Business Opportunity Rule," *Federal Register* 71, no. 70 (April 12, 2006): 19054, https://www.federalregister.gov/documents/2006/04/12/06-3395/business-opportunity-rule. We advised Primerica Financial Services, a multilevel marketer of term life insurance, during this proceeding.

149.  Federal Trade Commission, "Business Opportunity Rule," *Federal Register* 73, no. 59 (March 26, 2008): 16110, https://www.federalregister.gov/documents/2008/03/26/E8-6059/business-opportunity-rule.

150.  For the SBP, see Federal Trade Commission, "Business Opportunity Rule," 76816, 76819.

151.  Federal Trade Commission, "Public Workshop: Business Opportunity Rule an FTC Workshop Analyzing Business Opportunity Disclosure Form and Other Proposed Changes to the Business Opportunity Rule," *Federal Register* 74, no. 78 (April 24, 2009): 18712, https://www.federalregister.gov/documents/2009/04/24/E9-9440/public-workshop-business-opportunity-rule-an-ftc-workshop-analyzing-business-opportunity-disclosure.

152.  Federal Trade Commission, "Disclosure Requirements and Prohibitions Concerning Business Opportunities," *Federal Register* 75, no. 215 (November 8, 2010): 68559, https://www.federalregister.gov/documents/2010/11/08/2010-28044/disclosure-requirements-

and-prohibitions-concerning-business-opportunities.

153. See text beginning at endnote 109 for an explanation of the Children's Advertising timeline.

154. Unfair or Deceptive Acts or Practices Rulemaking Proceedings, 15 USC § 57a(b)(1)(C).

155. As discussed below, because Do Not Call was an Administrative Procedure Act (APA) rulemaking under the Telemarketing Sales Act, rather than a Section 18 proceeding, there was no right to a hearing or cross-examination.

156. See the detailed chronology in the Final Rule SBP: Federal Trade Commission, "Funeral Industry Practices Trade Regulation Rule," *Federal Register* 59, no. 7 (January 11, 1994): 1592, 1595. Few rules provide the specific dates of each event needed for similar calculations.

157. See endnote 139.

158. Federal Trade Commission, "Revisions to Rules of Practice," *Federal Register* 86, no. 138 (July 22, 2021): 38542, https://www.federalregister.gov/documents/2021/07/22/2021-15313/revisions-to-rules-of-practice; Federal Trade Commission, "Statement of Commissioner Rebecca Kelly Slaughter Joined by Chair Lina Khan and Commissioner Rohit Chopra Regarding the Adoption of Revised Section 18 Rulemaking Procedures," *Federal Register* 86, no. 138 (July 22, 2021): 38551, https://www.ftc.gov/public-statements/2021/07/statement-commissioner-rebecca-kelly-slaughter-joined-chair-lina-m-khan.

159. See the section titled "A Brief History of FTC Rulemaking."

160. Federal Trade Commission, "Statement of Commissioner Rebecca Kelly Slaughter Joined by Chair Lina Khan and Commissioner Rohit Chopra Regarding the Adoption of Revised Section 18 Rulemaking Procedures."

161. See, for example, *1989–1990 Official Congressional Directory* (Washington, DC: US Government Printing, 1989): 770. Henry B. Cabell was the last presiding officer appointed to oversee the Mail Order amendment proceeding in 1989. Federal Trade Commission, "Mail Order Merchandise Rule."

162. Cabell's obituary stated that he was an ALJ. See Tribute Archive, "Henry Bertrand Cabell," https://www.tributearchive.com/obituaries/2415667/Henry-Bertrand-Cabell. We do not know when he became an ALJ. He was not an ALJ during the several rulemakings over which he presided in the 1970s and early 1980s, and FTC *Federal Register* notices from 1995 and 1996 identify him as a presiding officer. See, for example, Federal Trade Commission, "FTC Staff Recommends Repeal of Trade Regulation Rule on Games of Chance in the Food Retailing and Gasoline Industries," press release, June 7, 1996, https://www.ftc.gov/news-events/news/press-releases/1996/06/ftc-staff-recommends-repeal-trade-regulation-rule-games-chance-food-retailing-gasoline-industries; and Rules for Using Energy Costs and Consumption Information Used in Labeling and Advertising of Consumer Appliances Under the Energy Policy and Conservation Act," *Federal Register* 58, no. 42 (March 5, 1993): 12818. Appliance labeling is a rule under the National Appliance Energy Conservation Act rather than Section 18.

163. See Walters, "FTC Rulemaking." The FTC's decisions on July 1 closely track these recommendations. See also Walters, "Reassessing the Mythology of Magnuson-Moss." As Walters reports, this article was "initially prepared while serving as a summer law clerk" in a commissioner's office and written in 2019.

164. See Federal Trade Commission, "Revision to Rules of Practice."

165. Federal Trade Commission, "Trade Regulations Rulemaking Procedures." Some provisions were adopted as a final rule. Federal Trade Commission, "General Procedures," *Federal Register* 40, no. 66 (April 4, 1975): 15232.

166. Federal Trade Commission, "Procedures and Rules of Practice."

167. Federal Trade Commission, "Trade Regulations Rulemaking Procedures."

168. Federal Trade Commission, "Procedures and Rules of Practice."

169. 16 CFR § 1.12(b)(1); and Federal Trade Commission, "Revisions to Rules of Practice."

170. Federal Trade Commission, "Organization; General Procedures; Nonadjudicative Procedures; and Miscellaneous Rules."

171. Federal Trade Commission, "Organization Changes in the Commission's Rulemaking and Investigatory Procedures," *Federal Register* 46, no. 91 (May 12, 1981): 26284.

172. Federal Trade Commission, "Restrictions on Ex Parte Communications," *Federal Register* 42, no. 170 (September 1, 1977): 43974; and Federal Trade Commission, "General Procedures," *Federal Register* 42, no. 228 (November 28, 1977): 60561.

173. Federal Trade Commission, "Ex Parte Communications," *Federal Register* 44, no. 54 (March 19, 1979): 16366.

174. Federal Trade Commission, "Oral Presentations Before the Commission and Communications with Commissioners and Their Staffs in Trade Regulation Rulemaking Proceedings."

175. What appears to be "consensus" could instead reflect incumbents in an industry seeking to disadvantage their competitors rather than a solution that helps consumers. Such problems are more likely in agencies subject to regulatory capture than in a generalist body with multiple constituencies, such as the FTC.

176. For example, the rule required sellers to disclose as references either all purchasers in the past three years or the 10 nearest purchasers. In the case of Primerica, for which we helped prepare a comment, the former option would have required a 2,000-page disclosure. The latter option would have required agents to produce a minimum of 200,000 customized forms, counting only the forms for consumers who actually applied for a position. See Federal Trade Commission, *Comment of Primerica Financial Services, Inc. on the Notice of Proposed Rulemaking on the Business Opportunity Rule R511993*, July 17, 2006, https://www.ftc.gov/system/files/documents/public_comments/2006/07/522418-11929.pdf.

177. The original NPRM was published April 12, 2006. See Federal Trade Commission, "Business Opportunity Rule." The revised proposal was published March 26, 2008. See Federal Trade Commission, "Business Opportunity Rule."

178. See the section titled "A Brief History of FTC Rulemaking."

179. *Association of National Advertisers v. Federal Trade Commission*, 617 F.2d 611, 618–19 (DC Cir. 1979).

180. For the commission's decision terminating the rulemaking, see Federal Trade Commission, "Children's Advertising," *Federal Register* 40, no. 191 (October 2, 1981): 48710, 48712.

181. John Adams, "Adams' Argument for the Defense: 3–4 December 1770," National Archives, Founders Online, https://founders.archives.gov/documents/Adams/05-03-02-0001-0004-0016.

182. Magnuson-Moss Warranty–Federal Trade Commission Improvement Act, Pub. L. No. 93-637. Section 202(a) added Section 18(b)(1) to the Federal Trade Commission Improvements Act of 1980.

183. 16 CFR § 1.11; and Federal Trade Commission, "Procedures and Rules of Practice."

184. Unfair or Deceptive Acts or Practices Rulemaking Proceedings, 15 USC § 57a(b)(1)(A). See Federal Trade Commission Improvements Act of 1980, Pub. L. No. 96-252, § 11(a)(3).

185. 16 CFR § 1.11(a)(1), (a)(3); and Federal Trade Commission, "Organization Changes in the Commission's Rulemaking and Investigatory Procedures."

186. 16 CFR § 1.11 (b)(3); and Federal Trade Commission, "Revisions to Rules of Practice." The discussion of the reasons for changes in this section of the rule is on page 38544, and the rule provision itself is on page 38548.

187. *Association of National Advertisers v. Federal Trade Commission*, 617 F.2d 611, 615 (DC Cir. 1979).

188. Unfair or Deceptive Acts or Practices Rulemaking Proceedings, 15 USC § 57a(c)(1)(B).

189. 16 CFR § 0.8; and Federal Trade Commission, "Revisions to Rules of Practice."

190. 16 CFR § 1.13(d); and Federal Trade Commission, "Revisions to Rules of Practice."

191. Moreover, as we discuss in the next subsection, under the new rules the commission will decide what constitutes a "disputed issue of material fact."

192. Federal Trade Commission, "Amendment to Trade Regulation Rule Concerning Retail Food Store Advertising and Marketing Practices," *Federal Register* 54, no. 165 (August 28, 1989): 35456, 35457. There were three other rulemakings in which a presiding officer was appointed and issued a report after the staff report: Eyeglasses II, Mail Order Merchandise (amendment), and Funeral Industry Practices (amendment).

193. See, for example, Ellis's discussion of the schism within the Bureau of Consumer Protection between the "new staff" and the "original staff" on the Funeral Rule. Ellis, "Legislative Powers," 170.

194. Ellis, "Legislative Powers," 183.

195. Federal Trade Commission, "Oral Presentations Before the Commission and Communications with Commissioners and Their Staffs in Trade Regulation Rulemaking Proceedings."

196. Federal Trade Commission, "Oral Presentations Before the Commission and Communications with Commissioners and Their Staffs in Trade Regulation Rulemaking Proceedings."

197.  16 CFR § 1.13(c)(5); and Federal Trade Commission, "Organization; General Procedures; Nonadjudicative Procedures; and Miscellaneous Rules," 36338, 36341.

198.  Federal Trade Commission, "Practice and Procedure Rules: Administrative Law Judges as Presiding Officers in Rulemaking Proceedings."

199.  See the discussion of these goals in the section titled "Early Section 18 Rulemaking."

200.  *Association of National Advertisers v. Federal Trade Commission*, 617 F.2d 611, 615 (DC Cir. 1979).

201.  Unfair or Deceptive Acts or Practices Rulemaking Proceedings, 15 USC § 57a (b)(1)(C).

202.  Unfair or Deceptive Acts or Practices Rulemaking Proceedings, 15 USC § 57a (c)(2)(A).

203.  16 CFR § 1.11(e).

204.  Federal Trade Commission, "Business Opportunity Rule."

205.  Unfair or Deceptive Acts or Practices Rulemaking Proceedings, 15 USC § 57a (c)(2)(B). The commission is authorized to prescribe rules "to avoid unnecessary costs or delay," including reasonable time limits. Unfair or Deceptive Acts or Practices Rulemaking Proceedings, 15 USC § 57a (c)(3). The Fourth Circuit upheld the presiding officer's decisions limiting cross-examination in the Funeral Rule proceeding. The proceeding included 52 days of hearings, at which 315 witnesses testified, all of whom were subject to cross-examination, albeit with some cross-examined only by the presiding officer. See *Harry & Bryant Co. v. Federal Trade Commission*, 726 F.2d 993 (4th Cir. 1984).

206.  16 CFR § 1.11(b)(5); and Federal Trade Commission, "Revisions to Rules of Practice," 38542, 38548.

207.  Interested parties could petition the commission to modify the presiding officer's determinations within 10 days after publication of the final notice (identifying designated issues), but the commission had discretion to permit the appeal, and the petition did not stay the rulemaking unless the commission or the presiding officer so determined. 16 CFR § 1.13(c)2(ii); and Federal Trade Commission, "Procedures and Rules of Practice," 33966, 33967.

208.  Federal Trade Commission, "Organization Changes in the Commission's Rulemaking and Investigatory Procedures," 26284, 26286.

209.  Federal Trade Commission, "Organization Changes in the Commission's Rulemaking and Investigatory Procedures," 26284, 26286.

210.  There were legislative hearings with oral testimony before the issue designation, but the procedures in use required that written comments include the substance of what would be in an oral statement. Federal Trade Commission, "Children's Advertising; Television Restrictions." Thus, it seems unlikely that the hearing, as opposed to the comments, made a significant contribution to identifying the key issues.

211.  The July 1, 2021, rules seek to limit this right, providing that requests for rebuttal submissions or cross-examination should be granted if it "is an issue of specific fact in contrast to legislative fact." 16 CFR § 1.12(b)(1). The commission offers no explanation for either the change or what the distinction means. As discussed above, the commission rejected this distinction, dubious under the statute, in its 1975 rules implementing Section 18. See the discussion in the subsection titled "Are We There Yet? The FTC's Rush to Judgment."

212.  In Children's Advertising, while reserving designated issues to itself, the commission treated the staff essentially as it did other interested parties, allowing it to file on-the-record comments on the presiding officer's recommendations.

213.  In the Do Not Call rulemaking, with which we were both involved, there were 65,000 comments. Although an APA rather than a Section 18 rule, the staff read all the comments. We are quite confident that no one in a commissioner's office did so.

214.  See text at endnote 156.

215.  See text at endnote 110.

216.  16 CFR § 1.13(f) (2020).

217.  16 CFR § 1.13(h) (2020). Post-record comments "shall be confined to information already in the record." Although always considered as "post-record," these comments are in fact part of the rulemaking record. See 16 CFR § 1.18(a) (2020).

218.  Federal Trade Commission, "Revisions to Rules of Practice," 38542, 38544.

219.  16 CFR § 1.18(c)(2). Because the commission can base its decisions only on the rulemaking record, staff analyses,

recommendations, and reports have always been confined to material on the record and therefore do not need to be public because they are not ex parte communications..

220.  See, for example, the *Staff Report and Recommendation on Proposed Trade Regulation Rule* from August 1980, which recommended significant changes in the Credit Practices rule, and the bureau director's memorandum (Appendix D of the *Staff Report*) specifically soliciting comment on several of those changes. The director's memorandum also highlights differences between the staff recommendations and those of the presiding officer, illustrating the value of an independent evaluation of the record discussed above. Federal Trade Commission, Bureau of Consumer Protection, *Credit Practices: Staff Report and Recommendation on Proposed Trade Regulation Rule*, August 1980, https://www.google.com/books/edition/Credit_Practices/7Z2YMfH1IToC.

221.  See *American Optometric Association v. Federal Trade Commission*, 626 F.2d 896 (DC Cir. 1980).

222.  *Consumers Union of US v. Federal Trade Commission*, 801 F.2d 417 (DC Cir. 1986).

223.  *American Financial Services Association v. Federal Trade Commission*, 767 F.2d 957 (DC Cir. 1985).

224.  16 CFR § 1.13(i); and Federal Trade Commission, "General Procedures."

225.  Boyer, "Report in Support of Recommendation 79-1," 49.

226.  16 CFR § 1.18(c); and Federal Trade Commission, "General Procedures."

227.  Federal Trade Commission, "Oral Presentations Before the Commission and Communications with Commissioners and Their Staffs in Trade Regulation Rulemaking Proceedings."

228.  16 CFR § 1.18(c)(ii).

229.  Unfair or Deceptive Acts or Practices Rulemaking Proceedings, 15 USC § 57a(e)(3)(A).

230.  Unfair or Deceptive Acts or Practices Rulemaking Proceedings, 15 USC § 57a(e)(2).

231.  Federal Trade Commission, "Revisions to Rules of Practice," 38542, 38552.

232.  Federal Trade Commission, "Oral Presentations Before the Commission and Communications with Commissioners and Their Staffs in Trade Regulation Rulemaking Proceedings."

233.  See 47 CFR §§ 1.1200–1.1216. Even at the FCC, comments can be disregarded because they are not timely. Unlike the FTC, the FCC does not appear to distinguish between the "rulemaking" record and the "public" record.

234.  See the discussion of successful rules in the subsection "Early Section 18 Rulemaking."

235.  Boyer, "Report in Support of Recommendation 79-1," 57.

236.  Boyer, "Report in Support of Recommendation 79-1," 57.

237.  Boyer, "Report in Support of Recommendation 79-1," 46.

238.  Boyer, "Report in Support of Recommendation 79-1," 57. Both rulemakings were completed in 1978. See endnote 51.

239.  See Timothy J. Muris, "Protecting Consumers' Privacy: 2002 and Beyond" (speech, Federal Trade Commission Privacy 2001 Conference, Cleveland, OH, October 4, 2001), https://www.ftc.gov/public-statements/2001/10/protecting-consumers-privacy-2002-and-beyond.

240.  For the discussion of the evidence in the NPRM, see Federal Trade Commission, "Telemarketing Sales Rule," *Federal Register* 67, no. 20 (January 30, 2002): 4517–18, https://www.federalregister.gov/documents/2002/01/30/02-1998/telemarketing-sales-rule.

241.  Federal Trade Commission, "Telemarketing Sales Rule," *Federal Register* 68, no. 19 (January 29, 2003): 4580, https://www.federalregister.gov/documents/2003/01/29/03-1811/telemarketing-sales-rule. The SBP for the rule summarizes the procedures and timeline.

242.  The Do Not Call Registry was extremely successful against the legitimate businesses that dominated telemarketing at the time. In the past few years, improvements in technology have allowed unscrupulous businesses to use robocalls to bombard consumers, in violation of numerous laws, many with more serious penalties than Do Not Call. As with email spam, the likely solution is better technology to screen such calls, not more government regulation.

243.  The challenges to the rule were many but in the end appeared to rest most strongly on First Amendment grounds, forcefully rejected by the 10th Circuit Court of Appeals. See *Mainstream Marketing Services v. Federal Trade Commission*, 358 F.3d 1228 (10th Cir. 2004). An initial decision questioning the FTC's authority was overturned by Congress in record time: The district court's decision was issued September 23, 2003, and Congress passed legislation on September 25 that was signed into law by President George Bush on

September 29. See *US Security v. Federal Trade Commission*, 282 F. Supp. 2d 1285 (WD Okla. 2003); CNN, "Bush Signs 'Do-Not-Call' Bill into Law," September 30, 2003, http://www.cnn.com/2003/ALLPOLITICS/09/29/do.not.call/index.html; and Rodney A. Smolla, "The 'Do-Not-Call List' Controversy: A Parable of Privacy and Speech," *Creighton Law Review* 38, no. 4 (2005): 743–60, https://scholar-lycommons.law.wlu.edu/cgi/viewcontent.cgi?article=1212&context=wlufac.

244. Executive Office of the President, Office of Management and Budget, Office of Information and Regulatory Affairs, "Federal Trade Commission (FTC): Statement of Regulatory Priorities," https://www.reginfo.gov/public/jsp/eAgenda/StaticContent/202110/Statement_3084_FTC.pdf.

245. Executive Office of the President, Office of Management and Budget, Office of Information and Regulatory Affairs, "Federal Trade Commission (FTC)."

246. Unfair or Deceptive Acts or Practices Rulemaking Proceedings, 15 USC § 57a (c)(1)(B).

247. Federal Trade Commission, "Oral Presentations Before the Commission and Communications with Commissioners and Their Staffs in Trade Regulation Rulemaking Proceedings."

© 2022 by the American Enterprise Institute for Public Policy Research. All rights reserved.

The American Enterprise Institute (AEI) is a nonpartisan, nonprofit, 501(c)(3) educational organization and does not take institutional positions on any issues. The views expressed here are those of the author(s).

ATTACHMENT 5

# Preamble to FTC submission to OMB for Fall 2021 Unified Agenda

**FEDERAL TRADE COMMISSION**

**16 CFR Ch. I**

**Semiannual Regulatory Agenda**

**AGENCY:** Federal Trade Commission.

**ACTION:** Semiannual regulatory agenda.

**SUMMARY:** The Federal Trade Commission (FTC or Commission) is publishing its semiannual regulatory agenda in accordance with section 22(d)(1) of the Federal Trade Commission Act, 15 U.S.C. 57b-3(d)(1), and the Regulatory Flexibility Act (RFA), 5 U.S.C. 601 to 612, as amended by the Small Business Regulatory Enforcement Fairness Act. The Commission's agenda follows guidelines and procedures issued August 16, 2021, by the Office of Management and Budget in accordance with the provisions of Executive Order 12866, "Regulatory Planning and Review," of September 30, 1993, 58 FR 51735 (Oct. 4, 1993).

The Government-wide Unified Agenda of Federal Regulatory and Deregulatory Actions includes the Commission's Regulatory Plan and a list of all regulatory actions under development or review and is scheduled for publication in its entirety on www.reginfo.gov and www.regulations.gov in a format that offers users a greatly enhanced ability to obtain information from the agenda database.

The RFA requires publication in the **Federal Register** of agenda entries for rules that are likely to have a significant impact on a substantial number of small entities (5 U.S.C. 602) and any such rules that the agency has identified for periodic review under section 610 of the RFA. For fall 2021, the Commission has no proposed rules that would meet the RFA's publication requirements. In addition, the

Commission has no proposed rules that would be a "significant regulatory action" under the definition in Executive Order 12866.

The Commission has identified rulemakings that are likely to have some impact on small entities, but do not meet the RFA's publication requirements. The current rulemakings that are likely to have some impact on small entities are:  (1) the Energy Labeling Rule, 16 CFR 305; (2) Telemarketing Sales Rule, 16 CFR 310; (3) Children's Online Privacy Protection Rule, 16 CFR 312; (4) Privacy of Consumer Financial Information, 16 CFR 313; (5) Standards for Safeguarding Customer Information, 16 CFR 314; (6) Health Breach Notification Rule, 16 CFR 318; (7) the Made in the USA Labeling Rule, 16 CFR 323, (8) the Care Labeling Rule, 16 CFR 423; (9) the Amplifier Rule, 16 CFR 432; (10) Disclosure Requirements and Prohibitions Concerning Franchising, 16 CFR 436; (11) Business Opportunity Rule, 16 CFR 437; (12) Funeral Rule, 16 CFR 453; (13) Eyeglass Rule, 16 CFR 456; (14) the Duties of Creditors Regarding Risk-Based Pricing Rule, 16 CFR 640; (15) the Duties of Users of Consumer Reports Regarding Address Discrepancies Rule, 16 CFR 641; (16) the Prescreen Opt-Out Notice Rule, 16 CFR 642; (17) the Duties of Furnishers of Information to Consumer Reporting Agencies Rule, 16 CFR 660; (18) the Affiliate Marketing Rule, 16 CFR 680; and (19) Identity Theft Rules, 16 CFR 681. The Commission's rulemaking review process carefully considers regulatory burdens and streamlines rules when feasible and appropriate.

The majority of the rulemakings listed in the agenda are being conducted as part of the Commission's systematic review of all of its regulations and guides on a rotating basis. Under the Commission's program, rules are reviewed on a 10-year schedule. In each rule review, the Commission requests public comments on, among other things, the economic impact and benefits of the rule; possible conflict between the rule and state, local, or other federal laws or regulations; and the effect on the rule of any technological, economic, or other industry changes. These reviews incorporate and expand upon the review required by the RFA and regulatory reform initiatives directing agencies to conduct a review of all regulations and eliminate or revise those that are outdated or otherwise in need of reform.

Except for notice of completed actions, the information in this agenda represents the judgment of Commission staff, based upon information now available. Each projected date of action reflects FTC staff's assessment that the specified event will occur this year. No final determination by the staff or the Commission respecting the need for, or the substance of a rule should be inferred from the notation of projected events in this agenda.  In most instances, the dates of future events are listed by month, not by a specific day. The information in this agenda may change as new information, changes of circumstances, or changes in the law occur.

**FOR FURTHER INFORMATION CONTACT:**  For information about specific regulatory actions listed in the agenda, call, email, or write the contact person listed for each proceeding. General comments or questions about the agenda should be directed to G. Richard Gold; Attorney, Federal Trade Commission, 600 Pennsylvania Avenue NW, Washington, DC 20580, telephone: (202) 326-3355; email: rgold@ftc.gov.

**DATE:** September 17, 2021.

By direction of the Commission.

**NAME: April Tabor,**

*Secretary.*

ATTACHMENT 6

# Preamble to FTC submission to
# OMB for Spring 2022 Unified Agenda

**FEDERAL TRADE COMMISSION**

**16 CFR Ch. I**

**Semiannual Regulatory Agenda**

**AGENCY:** Federal Trade Commission.

**ACTION:** Semiannual regulatory agenda.

**SUMMARY:** The Federal Trade Commission (FTC or Commission) is publishing its semiannual regulatory agenda in accordance with section 22(d)(1) of the Federal Trade Commission Act, 15 U.S.C. 57b-3(d)(1) and the Regulatory Flexibility Act (RFA), 5 U.S.C. 601 to 612, as amended by the Small Business Regulatory Enforcement Fairness Act. The Commission's agenda follows guidelines and procedures issued March 3, 2022, by the Office of Management and Budget in accordance with the provisions of Executive Order 12866, "Regulatory Planning and Review," of September 30, 1993, 58 FR 51735 (Oct. 4, 1993).

The Government-wide Unified Agenda of Federal Regulatory and Deregulatory Actions includes a list of all regulatory actions under development or review and is scheduled for publication in its entirety on www.reginfo.gov and www.regulations.gov in a format that offers users a greatly enhanced ability to obtain information from the agenda database.

The RFA requires publication in the Federal Register of agenda entries for rules that are likely to have a significant impact on a substantial number of small entities (5 U.S.C. 602) and any such rules that the agency has identified for periodic review under section 610 of the RFA. For spring 2022, the Commission has no proposed rules that would meet the RFA's publication requirements. In addition, the Commission has no proposed rules that would be a "significant regulatory action" under the definition in Executive Order 12866.

The Commission has identified rulemakings that are likely to have some impact on small entities, but do not meet the RFA's publication requirements. The current rulemakings that are likely to have some impact on small entities are: (1) the Energy Labeling Rule, 16 CFR 305; (2) Telemarketing Sales

Rule, 16 CFR 310; (3) Children's Online Privacy Protection Rule, 16 CFR 312; (4) Privacy of Consumer

Financial Information, 16 CFR 313; (5) Standards for Safeguarding Customer Information, 16 CFR 314;

(6) Health Breach Notification Rule, 16 CFR 318; (7) the Care Labeling Rule, 16 CFR 423; (8) the Use of

Prenotification Negative Option Plans, 16 CFR 425; (9) the Amplifier Rule, 16 CFR 432; (10) Disclosure

Requirements and Prohibitions Concerning Franchising, 16 CFR 436; (11) Business Opportunity Rule, 16

CFR 437; (12) Funeral Rule, 16 CFR 453; (13) Eyeglass Rule, 16 CFR 456; (14) Identity Theft Rules, 16

CFR 681; (15) the newly proposed Trade Regulation Rule on Commercial Surveillance, (16) the newly

proposed Trade Regulation Rule on Earnings Claims and (17) the newly proposed Trade Regulation Rule

on Impersonation of Government and Businesses.  The Commission's rulemaking review process

carefully considers regulatory burdens and streamlines rules when feasible and appropriate.

The majority of the rulemakings listed in the agenda are being conducted as part of the

Commission's systematic review of all of its regulations and guides on a rotating basis.  Under the

Commission's program, rules are reviewed on a 10-year schedule.  In each rule review, the Commission

requests public comments on, among other things, the economic impact and benefits of the rule; possible

conflict between the rule and state, local, or other federal laws or regulations; and the effect on the rule of

any technological, economic, or other industry changes.  These reviews incorporate and expand upon the

review required by the RFA and regulatory reform initiatives directing agencies to conduct a review of all

regulations and eliminate or revise those that are outdated or otherwise in need of reform.

Except for notice of completed actions, the information in this agenda represents the judgment of

Commission staff, based upon information now available.  Each projected date of action reflects FTC

staff's assessment that the specified event will occur this year.  No final determination by the staff or the

Commission respecting the need for or the substance of a rule should be inferred from the notation of

projected events in this agenda.  In most instances, the dates of future events are listed by month, not by

a specific day.  The information in this agenda may change as new information, changes of

circumstances, or changes in the law occur.

**FOR FURTHER INFORMATION CONTACT:**  For information about specific regulatory actions listed in

the agenda, call, email, or write the contact person listed for each particular proceeding.  General

comments or questions about the agenda should be directed to G. Richard Gold; Attorney, Federal Trade Commission, 600 Pennsylvania Avenue NW, Washington, DC 20580, telephone: (202) 326-3355; email: rgold@ftc.gov.

By direction of the Commission.

**April J. Tabor,**

*Secretary.*

ATTACHMENT 7

# NADA Comments to FTC
# re: Auto Buyer Consumer Survey (I)



March 7, 2016


*Via Web*

Office of the Secretary
Federal Trade Commission
Suite CC-5610 (Annex J)
600 Pennsylvania Avenue, NW
Washington, DC 20580

       Re:    Auto Buyer Consumer Survey
               Project No. P154800

Dear Secretary:

      The National Automobile Dealers Association ("NADA")[1] submits the following comments in response to the Notice that the Federal Trade Commission ("FTC" or "Commission") published in the *Federal Register* in the above captioned matter.[2]  As explained in detail below, NADA offers these comments (i) to question the purpose and necessity of the consumer survey initiative that the Commission has announced in the Notice, and (ii) if the Commission decides to proceed with the consumer survey, to identify – and request that the Commission address – a series of concerns with the manner in which it plans to conduct the survey.


<u>Description of Consumer Survey</u>

      The Notice states that the FTC plans to conduct a "qualitative survey of consumers who recently purchased an automobile and financed that purchase though a dealer" for the purpose of "inform[ing] the Commission about current consumer protections (sic) issues that may exist and that could be addressed through FTC action, including enforcement initiatives, rulemaking, or education."[3]  The survey will be conducted by a survey research firm, which will produce a brief methodological report and other written report as requested by the FTC.

      The respondents who will be surveyed are consumers who have (i) indicated that they are willing to participate in surveys but who have not participated in an in depth interview in the past year, (ii) purchased an automobile from a dealer in the previous six months and used financing

---

[1]  NADA represents over 16,000 franchised dealers in all 50 states who (i) sell new and used cars and trucks; (ii) extend vehicle financing and leases to consumers that routinely are assigned to third-party finance sources; and (iii) engage in service, repair, and parts sales.  Our members collectively employ over 1 million people nationwide. Most of our members are small businesses as defined by the Small Business Administration.
[2]  81 Fed. Reg. 780-783 (Jan. 7, 2016).
[3]  81 Fed. Reg. at 780, 781.

**NATIONAL AUTOMOBILE DEALERS ASSOCIATION**  8400 Westpark Drive, Tysons, VA 22102 | 703.821.7000 | nada.org

offered or arranged by the dealer, and (iii) retained the documentation received as part of the transaction.  The survey will involve in-person interviews that last approximately 90 minutes with 40 consumers (20 with prime credit scores and 20 with subprime credit scores) but may include interviews with 40 more consumers "if the FTC deems the additional interviews likely to be helpful."[4]  The respondents will be racially diverse and include participants of both sexes.

The scope of the planned interviews is very broad and, "among other things," will include: (i) the consumer's experience in shopping for and choosing an automobile; (ii) the process of agreeing to a price for the automobile; (iii) the process of trading in the consumer's old automobile, if applicable; (iv) the consumer's experience in obtaining financing; (v) additional products or services the dealer may have offered; (vi) contacts between the consumer and the dealer after the purchase; and (vii) the consumer's overall perception of the purchase experience.[5]  The survey questionnaire will be tested with "an initial sample of five in-person consumer interviews;" however, the questions that will be included are not identified. The interviews will conclude with the survey research firm reviewing the consumer's documentation and "exploring the consumer's understanding of that documentation."[6]

The results of the survey "will not be generalizable to the U.S. population." Nevertheless, the Commission "believes that they can provide useful insights into consumer understanding of the automobile purchasing and financing process at the dealership."[7]

<u>The Purpose and Necessity of the Survey</u>

As noted above, the FTC states that it plans to initiate this effort to "inform the Commission about current consumer protections (sic) issues that may exist and that could be addressed through FTC action, including enforcement initiatives, rulemaking, or education."[8] However, this statement ignores the fact that – less than four years ago - the Commission concluded an extraordinarily broad and comprehensive examination of the same question and developed an in depth record that completely obviates the need for a further examination of this matter.

The examination that the Commission conducted was a series of motor vehicle roundtables that it held in three cities across the country (Detroit, Michigan; San Antonio, Texas; and Washington, D.C.) in 2011.  In language nearly identical to the language in the instant notice, the FTC stated that the purpose of the motor vehicle roundtables was "to explore consumer protection issues pertaining to motor vehicle sales and leasing" and "to inform the Commission regarding what consumer protection issues, if any, exist that could be addressed through a possible rulemaking or other initiative."[9]

---

[4]  81 Fed. Reg. at 781.
[5]  Id.
[6]  Id.
[7]  Id.
[8]  Id.
[9]  76 Fed. Reg. 14,014, 14,015 (Mar. 15, 2011).

The breadth of the Commission's examination of these issues was enormous and included in-depth panel discussions on each of the following topics:

1)    Understanding the Motor Vehicle Sale, and Credit Transaction, From Both Prime and Subprime Perspectives;
2)    Interest Rates, Dealer Reserves, and Markups;
3)    Payment and Locator Devices and Consumer Privacy;
4)    Spot Delivery;
5)    Contract Add-Ons;
6)    Vehicle Title Problems and Dealer Bankruptcies;
7)    Military Consumers and the Auto Sales and Financing Process;
8)    The Online Auto Process for Military and Other Consumers;
9)    Military Consumers, Sales Representations, and Financing Process Issues;
10)   Military Consumer Complaints and Military Sentinel;
11)   Military Consumers, Vehicle Title Problems, and Repossessions;
12)   Financial Literacy and Capability for Military Consumers;
13)   Special Programs to Enhance Consumers' Financial Literacy;
14)   Financial Literacy and New Approaches for Auto Sales and Financing;
15)   Fair Lending – Interest Rates, Markups, and Payments;
16)   Fair Lending – Compliance, Risk, and Liability;
17)   Understanding the Motor Vehicles Leasing Process;
18)   Misrepresentations and Other Consumer Protection Issues in Motor Vehicle Leasing;
19)   Consumer and Business Education: What, If Anything, Is Needed and What Works?;
20)   Which Practices, If Any, Cause Significant Harm to Consumers, and What Are Potential Solutions?; and
21)   Which Practices, If Any, Are Widespread, and What Are Potential Solutions?

These panel discussions produced over 21 hours of oral testimony from 58 panelists (several of whom served on multiple panels) and more than 500 pages of written transcripts. The FTC selected the panelists from a diverse range of interests throughout the marketplace which, in addition to representatives of different segments of the auto industry, included: (i) consumer group representatives from the Center for Responsible Lending, Consumer Federation of America, Consumers for Auto Reliability and Safety, National Consumer Law Center, and National Council of La Raza; (ii) representatives from the Department of Justice and Consumer Financial Protection Bureau; (iii) representatives of the Office of Attorney General and other state consumer protection agencies from Illinois, Iowa, Maine, and Texas; (iv) various military and civilian representatives of military service members; and (v) several plaintiffs' attorneys. The record was further supplemented by 100 written comments that the Commission received through May 2012.[10]

In light of the foregoing, it is difficult to imagine how the Commission could have conducted a more comprehensive examination into issues that it now contends – less than four years after this process concluded – it needs to consider again. It is equally difficult to

---

[10] The record developed during the motor vehicle roundtable process is available at https://www.ftc.gov/policy/public-comments/initiative-369.

comprehend what justification – from either a substantive or budgetary perspective – exists for revisiting topics that are all a subset of those listed above.

The Notice fails to address these matters. It does not cite complaint data or data from any other source that supports this redundant exercise.[11] Nor does the Notice acknowledge that, during the year-long motor vehicle roundtable process, the Commission repeatedly requested credible data demonstrating that prevalent abuses exist in the auto industry but received none.[12] While the Notice states that the "proposed survey will explore in more detail the experience of actual consumers who recently purchased and financed an automobile from a dealer,"[13] it

---

[11] While offering no data to support the need for the proposed consumer survey, the FTC mentions some advertising enforcement actions it has taken against auto dealers since 2011 along with "a coordinated federal-state effort that yielded more than two hundred automobile actions for fraud, deception, and other illegal practices." 81 Fed. Reg. at 780. This statement, which refers to "Operation Ruse Control," omits the fact that, according to the Operation Ruse Control Chart of Actions that accompanied the press release announcing these actions, 69 of the them derived in Canada, several of them either did not involve enforcement actions or were pending when announced, many of them (including each of the FTC administrative actions that were listed as part of Operation Ruse Control) did not involve a finding or admission of a legal violation, and a significant number of actions involved entitles other than auto dealers (e.g., auto manufacturer, auto shipment broker, multiple auto finance companies, multiple auto title lending companies, auto loan modification company, auto loan acceleration company, and multiple after-market providers). Indeed, one action that was included in this count was brought by the Department of Justice's Antitrust Division against a Japanese parts manufacturer. Consequently, referencing "more than two hundred automobile actions for fraud, deception, and other illegal practices" as support for conducting consumer surveys that focus solely on consumer experiences with auto dealers is both hyperbolic and suggests a predisposition towards these issues. These concerns are further manifested by the Commission's erroneous description of Operation Ruse Control in the April 2015 edition of *Penn Corner* as "252 enforcement actions… against *dishonest car dealers*" (emphasis added). *See* http://content.govdelivery.com/accounts/USFTC/bulletins/fea7b5.

[12] *See, e.g.*, the Commission's Statement under "Roundtable Goals and Topics for Comment" in the FTC Notice announcing the motor vehicle roundtables (76 Fed. Reg. 14,014 – 14,017 (Mar. 15, 2011)): "Of particular interest is data and empirical evidence supporting comments provided in response to this request;" the comments of then-Associate Director of the FTC's Division of Financial Practices Joel Winston at Panel 1 of the Detroit Roundtable: "And just to emphasize, what we're going to be looking for throughout this session today and future sessions is as much empirical evidence as possible. We've all heard stories and anecdotes and individual cases where consumers were mistreated in one way or another. One of the real goals of this process is to find out how prevalent those practices are. So if there are any studies, any sort of empirical data – that's something we'd be interested in seeing;" the comments of FTC Division of Financial Practices Attorney Carole Reynolds at Panel 4 of the Detroit Roundtable: "Does anyone have data on these practices occurring?;" the comments of FTC East Central Region Director John Miller Steiger at the conclusion of the Detroit Roundtable: "… And in order to get good useful answers, we need data. And I know you've heard that from us as a constant refrain, but we really do…;" the comments of then-FTC Division of Financial Practices Assistant Director Malini Mithal at Panel 1 of the San Antonio Roundtable: "To the extent we have any information about widespread practices, that would be helpful from the panelists" and "Has there been any kind of analysis of trends and complaints from military consumers or any kind of… statistics or any widespread practices that we have any information about?;" the comments of then-FTC Bureau of Consumer Protection Deputy Director Chuck Harwood at the beginning of the DC Roundtable: "We are especially interested in data and empirical information;" the comments of then-FTC Division of Financial Practices Attorney Robin Thurston at Panel 4 of the DC Roundtable: "And, again, if you have data or other indicators of how frequently these practices occur, that would be great;" and the comments of then-Acting Associate Director of the FTC's Division of Financial Practices Reilly Dolan at the conclusion of the DC Roundtable: "…We are looking at whatever data we can get. And I will continue to say, please give us hard facts and data. That's more persuasive than anecdotes."

[13] 81 Fed. Reg. at 781. It is not apparent what level of detail the Commission hopes to explore that was not covered during the motor vehicle roundtables by many of the FTC-selected panelists who are trained to examine every aspect of the auto purchasing and financing process and who presented extensive written as well as oral comments on the range of topics listed above.

overlooks the fact that credible *quantitative* surveys into this process have been conducted in recent years that found a high level of consumer satisfaction.[14]

The dearth of indicators of systemic problems in this area should be recognized by the Commission as reflective of a fully functioning marketplace and not as an imperative to attempt to fill the void.  The fact that the Commission nonetheless is poised to move forward with this initiative, coupled with the concerns about the survey mechanics expressed below, invites cynicism into this process.

<u>Concerns with the Mechanics of the Survey</u>

In addition to NADA's concerns about the purpose and necessity of the survey, NADA also is concerned with how it will be conducted and analyzed and the very real possibility that the results it produces could serve to misinform – rather than inform – the Commission about "current consumer protections (sic) issues that may exist and that could be addressed through FTC action…."[15]  Consequently, NADA offers the following questions and comments concerning the survey mechanics.[16]

1)      The qualitative nature of the survey

        a.      How will the Commission control for the effects of respondent fatigue?

There is sufficient time in a 90-minute structured quantitative survey to ask more than 200 questions.  Questionnaires of this length will most likely breed survey respondent fatigue, causing respondents either not to answer questions or to answer them dismissively (quickly without thought), which will minimize the quality of information from the questionnaire.

---

[14]  *See, e.g.*, Sabatini, J. (Jan. 18, 2016). Survey Says! What Our Car-Shopping Survey Revealed About Enthusiasts vs. Non-Enthusiasts.  Retrieved from <u>http://blog.caranddriver.com/survey-says-what-our-car-shopping-survey-revealed-about-enthusiasts-vs-non-enthusiasts/</u> (80 percent of 4,977 respondents were "very satisfied" or "extremely satisfied" with their dealership experience).  Syndicated studies also have addressed the experience of consumers who purchase vehicles from auto dealers and reflect similar results.  One example is J.D. Power's 2015 U.S. Sales Satisfaction Index (SSI) Study (Nov. 12, 2015), which surveyed 27,831 consumers and found that (i) 80% of respondents rated their overall experience purchasing a new vehicle at a dealership as "truly exceptional" or "outstanding," and (ii) 87% of respondents stated that they either definitely or probably will purchase or lease a vehicle in the future from the same dealer.

[15]  81 Fed. Reg. at 781.

[16]  These questions and comments are consistent with the Office of Management and Budget's direction to agencies when designing and conducting a survey.  *See* Office of Information and Regulatory Affairs, Office of Management and Budget, *Questions and Answers When Designing Surveys For Information Collections* 15-16 (2006)("OMB Questions and Answers")("The quality of a survey design can be judged by the strategies that are taken to prevent, adjust for, and measure potential problems and sources of error in surveys.  How well a survey is designed and conducted can lead to either more or less variance (or noise) or bias (or systemic errors) in results.  Well-designed and conducted surveys anticipate potential problems and try to prevent or minimize the impact of different sources of error as much as possible.  Additionally, good surveys make efforts to measure and adjust for errors that are not controlled.  The best surveys are those that check and verify each step of the research process….  Agencies designing and conducting surveys need to consider all of the potential sources of errors and plan to adequately prevent, measure, and adjust for them.  Conducting a high quality survey requires careful planning and sufficient resources to yield quality data that have practical utility for the agency.  Agencies should carefully document and justify the adequacy of their survey methods in their ICRs [Information Collection Requests].").

b.      What questions will be asked and how will the Commission control for the effects of interviewer influence?

A loosely structured, 90-minute qualitative survey must be strictly monitored to ensure the moderators/interviewers do not influence the discussion and the opinions of the respondents. A one-on-one interview of this length creates significant opportunity for discussion, which can produce responses that include the effects of social desirability (which implies that respondents answer questions to achieve consensus with the perceived view of the interviewer or the sponsors of the survey). This happens most often in responses to open-ended, attitudinal, and recall questions. The likelihood of this occurring is enhanced given the Notice's reference to potential problems that consumers may experience when purchasing and financing the purchase of an automobile.[17] Consequently, the length and loose structure of the interview, coupled with the interviewer's inclination to search for problems, could lead to respondents providing answers that do not reflect their overall experience with the purchasing and financing process.[18]

c.      How will the Commission be aided by the anecdotal results that the survey will produce?

A 90-minute, loosely structured qualitative survey provides the Commission with a very limited ability to generalize and extrapolate from the answers of the 40 individuals. The results will provide impressions about some experiences, but it will not create a feel for the prevalence of practices or measures of perception with the consumers' experiences. This has little value and certainly does not comport with the FTC's repeated calls during the motor vehicle roundtables for credible data instead of anecdotes.[19]

2)      The survey design

a.      How will the Commission control for the limitations imposed by the use of central location research facilities?

Although the Notice states that the study will ensure racial and gender diversification, it nonetheless lacks breadth. It is unclear whether it will take place at one location in each of 4 or 5 major metropolitan areas or whether all 40 interviews will occur in a single metropolitan area. There will be a cost and logistical preference to conduct the study at one location. Either way, the prospective sample will be highly recruited from one or only a few concentrated areas.

---

[17] 81 Fed. Reg. at 780 ("Financing that is offered or arranged by dealers, however, can be a complicated, opaque process and potentially involve unfair and deceptive practices.").

[18] *See,* Arkowitz and Lilienfeld, *Why Science Tells Us Not to Rely on Eyewitness Accounts: Eyewitness testimony is fickle and, all too often, shockingly inaccurate,* Scientific American (Jan. 1, 2010), available at http://www.scientificamerican.com/article/do-the-eyes-have-it/ ("[P]sychologists have found that memories are reconstructed rather than played back each time we recall them. The act of remembering, says eminent memory researcher and psychologist Elizabeth F. Lotus of the University of California, Irvine, is "more akin to putting puzzle pieces together than retrieving a video recording." *Even questioning by a lawyer can alter the witness's testimony because fragments of the memory may unknowingly be combined with information provided by the questioner, leading to inaccurate recall.*" (internal citation omitted)(emphasis added)).

[19] *See* Footnote 12.

Facilities tend to recruit respondents that have to travel no more than 30 to 60 minutes from the facility and, indeed, the Commission estimates 60 minutes of roundtrip travel time in its Paperwork Reduction Act (PRA) Burden Analysis.[20]  To the extent that some perceived practices are more prevalent in one market than others, those practices will appear to have a much higher rate of occurrence than they do nationwide.  In fact, because consumers in certain sections of metropolitan areas may have only interacted with a limited number of automobile dealership chains, there is a strong possibility that the sample will simply pertain to the practices of those dealership chains and not the industry as a whole.

      b.      How will the Commission control for characteristics of the survey respondents that may not be representative of the consumer population at large?

Central location research facilities are very often used for specialized qualitative research.  The facilities often maintain lists of willing research participants, and they recruit from this list for many of their studies.  As a result, the list is very confined, and the respondents are likely to be more sensitive to the nuances of issues brought up during the session than the population at large.  Consequently, it is difficult to generalize beyond the experiences of the few people who are surveyed.

      c.      How will the Commission control for different attitudinal and experiential responses that occur over different periods of time?

The survey respondents must have purchased and financed an automobile in the past six months.  Six months is a long recall period to ask about nuances of the purchase and financing experience.  Consumers recalling the experience in the past 30 days will have very different levels of recall, saliency, and emotion compared to consumers whose purchase experience occurred almost a half year before the interview.[21]  This calls into question the consistency of the survey's attitudinal and experiential responses.

3)      The survey analysis

      a.      How will the Commission ensure that the survey analysis includes all of the key analytical variables?

How the survey research firm analyzes the 40 interviews is critical.  There are several key analytical variables that should be considered beyond simply the race and sex of the consumer and whether the consumer has a prime or subprime credit score.  (Examples of other key analytical variables include the age of the consumer, whether the vehicle purchased is new or used, and the amount financed.)  A sample size of 40 respondents will yield too little information

---

[20]  81 Fed. Reg at 782.

[21]  *See* Woocher, *Did Your Eyes Deceive You? Expert Psychological Testimony on the Unreliability of Eyewitness Identification*, 969, 982 (1977)("Even if someone accurately perceived an event, its representation in the observer's memory would not remain intact for very long.  People forget both quickly and easily.  The phenomenon of forgetting what once has been perceived and encoded in memory, known as 'retroactive inhibition,' is one of the earliest and most consistent findings of cognitive psychology.  Simply put, the more time that has elapsed since the perception of some event – and, therefore, the more intervening occurrences that must be stored in memory – the poorer a person's memory is of that event….").

to accurately analyze or compare the experiences of these subgroups or to ensure the respondents reflect the experiences of the population at large.

It is essential that the Commission keep in mind that the market it is attempting to examine consisted last year of the sale of 13.4 million new vehicles from franchised dealers to consumers[22] and 27.9 million used vehicles from franchised and independent dealers to consumers.[23]  Consequently, the Commission plans to survey one consumer for every 1,000,000 vehicle sales from dealers to consumers.  While the Commission acknowledges that its planned qualitative survey will not produce results that are generalizable to the U.S. population, it nonetheless must ensure that the survey's sample size is sufficient to "yield quality data that have practical utility for the agency."[24]

- - -

In light of the foregoing concerns, NADA requests that the Commission reconsider the necessity of pursuing this initiative.  If the Commission nonetheless decides to move forward, NADA requests that the Commission provide far greater transparency concerning the consumer survey process it will employ,[25] including by –

(i)     providing answers to the full range of questions and concerns raised above;

(ii)    prior to any data collection, publishing and making available for comment the full study design plan for the consumer survey;

(iii)   identifying the scope of – and the pre-set review criteria that will be applied to – the "review [of] the consumer's documentation;"[26]

(iv)    identifying the pre-set criteria the FTC will apply in determining whether to exercise the option to interview 40 consumers beyond the initial 40 consumers who will be interviewed "if the FTC deems the additional interviews likely to be helpful;"[27]

(v)     publishing and making available for comment the full "methodological report, or other written report as requested by the FTC;"[28] and

(vi)    identifying the additional stages, if any, of this initiative that the Commission will conduct and whether the public will have an opportunity to comment on them.

---

[22] WardsAuto and National Automobile Dealers Association.
[23] National Automobile Dealers Association.
[24] OMB Questions and Answers, *supra* Footnote 16, at 16.
[25] Id. ("Agencies should be transparent and report in their ICRs the methods they plan to use, what is known about the different sources of error, and the impact of the error on the analytical results.").
[26] 81 Fed. Reg. at 781.
[27] Id.
[28] Id.

Thank you for the opportunity to comment on this matter.  Please contact me if we can provide further information that would be useful to the Commission.

Sincerely,


Paul D. Metrey
Vice President, Regulatory Affairs

ATTACHMENT 8

# NADA Comments to FTC
# re: Auto Buyer Consumer Survey (II)



October 14, 2016


*Via Web*

Office of the Secretary
Federal Trade Commission
Suite CC-5610 (Annex J)
600 Pennsylvania Avenue, NW
Washington, DC 20580

>       Re:    Auto Buyer Consumer Survey
>              Project No. P154800

Dear Secretary:

The National Automobile Dealers Association ("NADA")[1] submits the following comments in response to the second Notice that the Federal Trade Commission ("Commission") published in the *Federal Register* in the above captioned matter,[2] which invites comment on, among other items, "the practical utility of the proposed survey" and "the proposed survey methodology and specific issues or questions that should be included in the interview process."[3] As briefly explained below, the Commission's limited and incomplete responses to the comments that were presented on these topics in response to the first Notice coupled with its apparent predisposition towards many of the issues it is examining continue to invite cynicism into this initiative.

NADA's comments in response to the Commission's first Notice (see attachment) described in detail how the Commission's planned Auto Buyer Consumer Survey was redundant and unnecessary and failed to provide important details about the mechanics of the survey process. We then requested that the Commission provide greater transparency about the survey process in six delineated areas. Our comments below briefly detail how the Commission, while providing some limited additional information about the survey mechanics, failed to address most of the questions presented to it and largely failed to provide greater transparency in the delineated areas specified in our comments.[4]

---

[1] NADA represents over 16,000 franchised dealers in all 50 states who (i) sell new and used cars and trucks; (ii) extend vehicle financing and leases to consumers that routinely are assigned to third-party finance sources; and (iii) engage in service, repair, and parts sales. Our members collectively employ over 1 million people nationwide. Most of our members are small businesses as defined by the Small Business Administration.

[2] 81 Fed. Reg. 63,179 – 63,186 (Sep. 14, 2016).

[3] 81 Fed. Reg. at 63,185.

[4] Regarding our concerns about the redundant and unnecessary nature of this exercise, the Commission cites several enforcement actions it has taken against auto dealers since the FTC Motor Vehicle Roundtable process concluded in 2012 as examples of "persistent conduct [which] indicates that additional measures are necessary, including to study

NATIONAL AUTOMOBILE DEALERS ASSOCIATION   8400 Westpark Drive, Tysons, VA 22102 | 703.821.7000 | nada.org

Examples of Issues That Are Inadequately Addressed by the Commission

In response to our question about how the Commission will control for the effects of respondent fatigue that can set in during a 90-minute interview, the Commission simply responded: "There is no indication that respondent fatigue will impede consumers in their ability to describe their own experiences, which they will do on a voluntary basis"[5] (suggesting that respondent willingness to participate in a voluntary survey somehow prevents the possibility of respondent fatigue and the inaccuracies that it can produce).

In response to our question about how the Commission will control for the effects of interviewer influence during the planned survey and our explanation of how a loosely structured qualitative survey is susceptible to such influence, the Commission simply ignored the issue of controls and declared: "The interviewer will avoid suggesting particular problems."[6]

In response to the question that we and others asked about what questions will be asked by the interviewers, the Commission acknowledged what we asked but failed to identify the questions that will presented to the respondents.

In response to our question about how the Commission will control for the distortions that can be produced by using a small number of central location research facilities to conduct its interviews, the Commission acknowledged that the interviews will take place in a single metropolitan area (Washington, DC) and failed to explain how such localized results are reflective of consumer experiences nationwide.[7]

Regarding the Commission's plan to interview consumers who had purchased and financed an automobile from an automobile dealer in the past six months, the Commission responded to our question about how it will control for different consumer attitudinal and

---

consumer experiences and help determine additional ways to protect consumers in auto transactions." 81 Fed. Reg. at 63,183. However, the examples cited by the Commission pertain almost exclusively to alleged federal advertising violations. The Commission's planned Auto Buyer Consumer Survey is considerably broader than advertising and includes topics, such as ("among other things") contacts between the consumer and the dealer after the purchase, that are completely unrelated to dealer advertising. Consequently, the Commission's recent enforcement actions do not support its foray into such a wide swath of issues. Nor does the Commission's reference to its "auto-related complaints" data in Footnote 35 of its second Notice offer support for this exercise as the complaints in its Consumer Sentinel Network Data Book are unverified, do not specify whether they involve alleged conduct by automobile dealers or other types of entities in the automotive sector, and include complaints such as "price gouging concerns against gas stations and oil companies" that cannot involve conduct by automobile dealers.

[5] 81 Fed. Reg. at 63,184.

[6] Id.

[7] While the Commission states that "this survey is not intended to be representative of the full population," it also states that "the proposed survey is expected to provide in-depth information about consumer protection issues that could be addressed through FTC initiatives, including enforcement, *rulemaking*, or education." (Emphasis added.) 81 Fed. Reg. at 63,183. In light of the Commission's acknowledgement that the localized information it will obtain is not generalizable to the entire population, it should not entertain the possibility that such information could be used to support a rulemaking that would affect businesses nationwide.

experiential responses that may occur throughout this time period by simply asserting that six months "is a recent timeframe."[8]

Our requests for greater transparency on several related issues – such as our recommendation that the Commission publish its study design plan and identify the scope of and the pre-set review criteria that will be applied to the review of the consumer's documentation – were also not addressed by the Commission. Similarly, the Commission did not respond to our recommendation that it identify the pre-set criteria the it will apply in determining whether to exercise the option to interview 40 consumers beyond the initial 40 consumers who will be interviewed other than to suggest that this decision "may, in part, be contingent on the time required for that first segment"[9] and that, ultimately, the decision will be based on whether "the FTC deems the additional interviews likely to be helpful."[10]

The Commission's unwillingness to provide important details about the survey it plans to conduct cannot be viewed in a vacuum. Unfortunately, it exists alongside recent Commission actions that suggest a predisposition towards the topics it intends to research. Recent examples of such a predisposition include the unbalanced nature of several videos the Commission recently posted to its website[11] and its erroneous description of "Operation Ruse Control" in 2015.[12]

Conclusion

For the Commission's planned Auto Buyer Consumer Survey to be probative of reliable and meaningful information that can assist it in its consumer protection mission, it must be structured in a transparent manner that controls for potential distortions,[13] and it must be

---

[8]  81 Fed. Reg. at 63,184.

[9]  Id.

[10]  81. Fed. Reg. at 63,180.

[11]  *See, e.g.*, the FTC video entitled "Understanding Car Add-ons" (Jun. 23, 2016)(currently available at https://www.ftc.gov/news-events/audio-video/video/understanding-car-add-ons), which focuses exclusively on the price of "add-on" products without any recognition of the benefits such products can provide to consumers.

[12]  *See* Footnote 11 of NADA's first set of comments in this matter. Regrettably, notwithstanding the information that we presented in that footnote specifying the inaccurate nature of the information the Commission has used to describe "Operation Ruse Control," the Commission continues to associate the full range of those actions with automobile dealer conduct. *See* 81 Fed. Reg. at 63,180, including the link it provides at the end of Footnote 7, which leads to a FTC blog entitled *Operation Ruse Control* (Mar. 26, 2015) that references "more than 250 enforcement actions" under the statement: "Not all dealers play by the rules" (currently available at https://www.consumer.ftc.gov/blog/operation-ruse-control).

[13]  *See* Office of Information and Regulatory Affairs. Office of Management and Budget, *Questions and Answers When Designing Surveys for Information Collections* 15-16 (2006)("The quality of a survey design can be judged by the strategies that are taken to prevent, adjust for, and measure potential problems and sources of error in surveys. How well a survey is designed and conducted can lead to either more or less variance (or noise) or bias (or systemic errors) in results. Well-designed and conducted surveys anticipate potential problems and try to prevent or minimize the impact of different sources of error as much as possible. Additionally, good surveys make efforts to measure and adjust for errors that are not controlled. The best surveys are those that check and verify each step of the research process…. Agencies designing and conducting surveys need to consider all of the potential sources of errors and plan to adequately prevent, measure, and adjust for them. Conducting a high quality survey requires careful planning and sufficient resources to yield quality data that have practical utility for the agency. Agencies should carefully document and justify the adequacy of their survey methods in their ICRs [Information Collection Requests].").

developed and executed in an objective manner.  Simply dismissing structural concerns that have been raised so as to move on to the next phase of the project falls well short of this imperative and inspires little confidence in this exercise.

Thank you for the opportunity to comment on this matter.  Please contact me if we can provide further information that would be useful to the Commission.

Sincerely,


Paul D. Metrey
Vice President, Regulatory Affairs

<u>ATTACHMENT 9</u>

# *A Critique on the Limitations of the Recent FTC "Auto Buyer Study"*

# A Critique on the Limitations of the Recent FTC "Auto Buyer Study"*

John P. Vidmar, Ph.D. | September 11, 2020

*The Auto Buyer Study: Lessons from In-Depth Consumer Interviews and Related Research. A Joint Report by the Bureau of Economics and the Bureau of Consumer Protection (Federal Trade Commission).

# Table of Contents

About the Author ................................................................................................ 1

Executive Summary ........................................................................................... 2

Critique of the Report: The Auto Buyer Study ................................................. 4

    Background: An Overview of Qualitative and Quantitative Research ............. 4

    Classifying the Methodology Reported in the FTC Study .............................. 5

    Limitations of the Research ........................................................................... 6

    Conclusion ..................................................................................................... 8

# About the Author



Dr. John P. Vidmar received his Masters Degree in Political Science from the University of Chicago, where he also trained at the National Opinion Research Center, one of the leading academic survey research organizations. He received his Doctorate in Public Policy Analysis from the University of Illinois. He also had an appointment in the Survey Research Laboratory at the University of Illinois and was adjunct faculty teaching Statistics and Research Methods. During this period, he was also a polling consultant for elections to NBC News, National Bureau.

Dr. Vidmar left the University of Illinois in 1989 and joined the Public Sector Research Group of Market Facts, Inc. This group within one of the largest market research firms served federal agencies such as the Federal Trade Commission, the Consumer Product Safety Commission, the Department of Health and Human Services, the National Institutes of Health, the Food and Drug Administration, the National Drug Administration, the Centers for Disease Control, the Environmental Protection Agency, the National Highway Traffic Safety Administration, the military health commands, the Veterans Administration, the Internal Revenue Service, and the Department of Housing and Urban Development. Market Facts subsequently merged into Synovate, which was acquired by Ipsos in 2011. Dr. Vidmar moved up through the ranks within this group to become its President and retired as its Chairman. During his tenure at Synovate, he was also the Head of the Solutions Group for North America and the Global Head of Tracking for Brand Tracking and Customer Satisfaction while still directing the Public Sector Research Group. Dr. Vidmar also sat on the global committee to review political polling for Ipsos across the world. He retired from Ipsos in December 2018.

From 1990 to 1995, Dr. Vidmar also served on the CASIC Committee for the U.S. Census Bureau, which conducted a review of the survey operations of the Census Bureau to prepare for the decennial Census of 2000. This committee was composed of survey research experts from the USA, Canada, and the UK, from both the academic and industry fields. They made a number of recommendations to update systems at the Census Bureau. Following this assignment, he was a member of a committee that evaluated the national and then global survey operations of Synovate.

# Executive Summary

## Nature of Study

The study upon which the report is based (the "FTC Study") was qualitative in nature and, as designed, cannot be used to extrapolate to any vehicle-buying population.

The context of qualitative research is to explore feelings, underlying thought processes, and a person's understanding of experiences. Qualitative research is not designed to establish the prevalence of problems or characteristics. Comments made by qualitative participants are heavily influenced by the direction of the probing done by moderators.

## Concerns Regarding the Selection of Survey Participants

The sample of participants selected for the FTC Study came from only one area: the suburbs of Washington, D.C. Due to geographic bias and clustering effects, these people are not representative of the USA and probably do not even reflect the automobile-buying population of the greater Washington, D.C., area.

Participants were recruited from a database of people who have agreed to participate in research in the past, thereby introducing database bias.

Participants may have visited the same automobile dealerships. There was no filtering to prevent this. This could defeat the goal in exploratory research to obtain as wide a distribution of experiences as possible.

Potential participants who refused to share financial documents related to the automobile purchase were excluded. These were potentially more knowledgeable respondents.

Focus group participants were compensated. There is no discussion whether compensation attracted a participant who differs from the typical automobile purchaser.

No information is provided to inform the reader of how many people were screened to obtain a sample of 43. (Five were used in a pretest, and a follow-up was done with 38.)

There was a serious memory recall issue introduced by recruiting participants who had purchased a motor vehicle as long as six months ago.

Ultimately, the sample is representative only of people in the Washington suburbs who have (i) a prior agreement to participate in market research studies for a given market research firm, (ii) agreed to provide financial documents related to an automobile sale, (iii) purchased a vehicle in the last half year, and (iv) agreed to participate in the qualitative sessions for compensation.

## Concerns Regarding Survey Design

The design of the interviewing protocol was more rigorous and looked more like a draft for a quantitative survey. The protocol lacked the typical probes for feeling, emotion, and underlying thought processes usually found in qualitative research. It appears to be an attempt to conduct quantitative research with a sample design and number of cases that do not permit extrapolation to any population.

The measurement of overall experience was placed at the end of the protocol so that it becomes a summary measurement of issues probed up to that point in time. It is not a measure of overall experience. The industry standard is to place overall experience questions before specific probing is begun.

## Concerns Regarding Reporting of Participant Experiences

The FTC Study focuses on incidences of experiences, although these remarks are limited by references using words such as "some." For example, the word "some" in reference to the participants is used over 80 times in the report without any explanation of how many participants that number references.

There is no reporting of emotions or underlying thought processes commonly found in qualitative research.

The FTC Study treats automobile purchasers as irrational for focusing on monthly budgets and what they can afford instead of focusing on the sales price. In consumer research, however, it is generally a mistake to assume that the consumer is not rational. If the protocol explored how an automobile purchaser approaches car buying instead of the assumed logical approach of the researcher, different conclusions might have been drawn.

## Recommendation

Based on this report, the FTC should consider conducting additional research on how motor vehicle purchasers think about the affordability of a purchase given a monthly budget and how they define affordability given the long-term cost of the vehicle.

# A Critique on the Limitations of the Recent FTC "Auto Buyer Study"*

**John P. Vidmar, Ph.D.** | **September 11, 2020**

## Background: An Overview of Qualitative and Quantitative Research

In survey research methods, a distinction is made between the two major branches of research: qualitative and quantitative research. Qualitative research is usually used as a precursor to quantitative research. Typically, the people recruited to qualitative research are referred to as participants and not respondents. The reference to participants more clearly identifies the role these people play in a process of dialogue that occurs between themselves and the moderator or facilitator who leads the qualitative sessions. To guide the facilitator or moderator, a protocol is put together that covers a series of topics about a subject. Questions are formulated, which tend to be probing questions on the subject of interest. This document is called an interviewing protocol. The term "questionnaire" is usually reserved for quantitative research. In quantitative research, a questionnaire is designed to ensure that every respondent is exposed to the same wording, with no influence from the person administrating the document. The data elicited from this process is meant to be used to extrapolate to provide definition to the prevalence of a subject topic.

Since the interviewing protocol in qualitative research is a dialogue between the participant and the moderator, the purpose is typically to probe underlying attitudes, emotions, and thought processes about a specific matter. Since this is a dialogue between the moderator and the participant, we accept the fact that the moderator can influence where a participant goes with his or her responses. In fact, instructions are often given to moderators to pursue issues which are of greater interest to the researchers. This, of course, sacrifices the route a participant may take in describing what happened, how he or she feels about it, and his or her thoughts about the process. The remarks made by participants are not considered to be any kind of representative sample of thoughts. We accept this so that the moderator may be permitted to probe deeply in areas that are of concern to the researcher to help understand underlying feelings and thoughts of participants. We leave the calculation of prevalence to quantitative research.

At this stage of the research process, the focus is not on understanding how often something happens or to what degree it happens. We want to understand how a person views and processes the matter at hand. For example, in a qualitative study about automobile purchasing, a respondent might say that they felt the salesperson was "pushy." The moderator would be expected to probe that statement with questions such as: "What did the salesperson do to make you feel that he was pushy?" or "Were you uneasy or uncomfortable as you began to feel that the salesperson was pushy?" or "Did you signal to the salesperson that you felt uncomfortable?" These types of questions can be leading because the moderator is probing by introducing different dimensions of what might encompass the concept of being "pushy" to see if there is something deeper in the feelings or thought processes of that participant that can help us understand what "pushy" means to that person. As biasing as this might be, these probes are valuable to understand the person's psychological stance in this situation. We are not trying to have them rate "pushy" on a 10-point scale. The probing is there to help us understand how to word quantitative measures to objectify the experience so that prevalence can be ascertained in a more rigorous study.

*The Auto Buyer Study: Lessons from In-Depth Consumer Interviews and Related Research. A Joint Report by the Bureau of Economics and the Bureau of Consumer Protection (Federal Trade Commission).

This evaluation of qualitative research is most frequently used to begin the formulation of a questionnaire that will be used in the quantitative phase. Oftentimes, a second wave of qualitative research is conducted to evaluate whether or not the questionnaire and its wording appropriately address the subject matter. In such a situation, qualitative research is used to probe to find out if the language of the questionnaire is understood correctly (an especially important issue in areas such as finance, which is dominated by technical terms not used in everyday language) and whether the appropriate terms are used to tap into a particular dimension of a respondent's thought processes. In this case, participants are administered a questionnaire draft and the moderator goes through the document question-by-question, and sometimes even word-by-word, to probe what the person thinks and understands about those words and phrases.

The quantitative stage is the culmination of this effort. Through rigorous scientific design, it can be used to determine prevalence and incidence rates of particular experiences. In survey research methods, we have a couple of methods of data collection that involve no facilitator, such as mail and internet surveys as well as some face to face and telephone, which do involve an administrator who is referred to as an interviewer. In the case of the latter, the interviewers undertake training to try to minimize their influence over the responses of the survey respondent. To further obviate any interviewer influence, additional measures are taken, such as making sure that the same interviewer does not conduct interviews in the same area or with the same types of respondents. Restrictions will be placed on the total number or proportion of interviews conducted by any given interviewer in order to reduce or wash any individual interviewer's impacts on the survey respondents.

# Classifying the Methodology Reported in the FTC Study

What type of research is reported in the FTC Study—that is, the document entitled *The Auto Buyer Study: Lessons from In-Depth Consumer Interviews and Related Research, Joint Staff Report of the Bureau of Economics and Bureau of Consumer Protection*?

The FTC Study is a hybrid of qualitative and quantitative research, which is not necessarily bad in and of itself. Research should always be focused on addressing the issue at hand and the methodology should be designed to address that question. However, one needs to then establish the purposes and limitations of the ensuing research design as well as what conclusions are appropriate to draw given the framework from which the methodology was designed and executed. The following sections present an evaluation of the limitations of the qualitative research reported in the FTC Study. These comments are meant to address the question: How can this report be used?

# Limitations of the Research

## 1. Obtaining Participants

### Geographic Bias

The FTC Study explains that five people were interviewed in a pretest of the protocol phase and that an additional 38 participants were engaged in the full qualitative study. These were combined for reporting to arrive at a total sample of 43 people for analysis. This sample of participants was recruited from a narrow geographical area, the suburbs of Washington, D.C. Since these people were recruited to a centralized facility, no information is provided concerning the distance the participants traveled to reach the facility where the interviews were conducted. Given the constraints of travel in a large metropolitan area such as Washington, D.C., we assume that there was a bias toward participants who lived closer rather than farther from the facility. Not only were these participants not representative of the USA, they probably do not reflect the automobile-buying population of the greater Washington, D.C., area.

## Clustering Effects

The danger of recruiting from a small geographical area is that the participants may have actually visited the same dealerships either in their search for a vehicle or for their final vehicle purchase. In the worst cases, participants may have actually encountered each other in the past. In exploratory research, the goal is to obtain as wide a distribution of experiences as possible. That means recruiting people who are "independent observations" (i.e., they are not associated with each other in any fashion). Recruiting from a small geographic area potentially compromises this goal. There is nothing in the research protocol that filters out people who have shopped for a vehicle at the same dealership.

There is also a secondary concern here. There was an attempt to recruit people who are demographically diverse. However, demographics do not define many consumer decisions. People are heavily influenced by the context of where they live and the existing market conditions of an area. Restricting the recruitment to just one area hinders the ability to capture more diverse experiences.

## Database Bias

Many marketing research firms that manage central focus group facilities build databases composed of lists of people who have agreed to participate in focus group activities. Recruiting from such a list is more efficient than recruiting from the general population because cooperation is much higher. In addition, the recruitment process includes gathering information about the recruits that can be used later to make screening for qualitative sessions more efficient. Various demographics, such as age, gender, ethnicity, and geographic location, are collected at a minimum. This permits artificially balancing the sample on critical demographics. Prior knowledge of this information makes screening respondents more efficient. However, no firm should claim that this type of database is representative of any population beyond agreeable responders who live close to their facilities. It is clear from the FTC Study that such a database was used.

These databases are biased by definition. They do not represent any kind of scientific sample of the general population nor the population that is critical to the issue at hand. The database represents a group of people who have agreed to participate in market research projects. The research methodology was designed to mitigate some of this bias by recruiting from people who had not participated in a research project in at least a year. Nonetheless, there is no information made available that explains why this makes the potential recruits more representative of the population in question. It does mitigate for any influence on a respondent of a recent in-depth interview.

## Compensation Bias

The FTC Study does not provide information about how many people were screened in order to find five participants for the pretest and 38 for the follow-up protocol. Typically, many people refuse because the demands of participating are not trivial. One has to drive back and forth to the central facility and then spend time going through the protocol. The level of traffic is fairly heavy in suburban Washington, and it is difficult to get anywhere in less than an hour. Respondents are usually compensated for their time. At times, it is necessary to vary compensation in order to recruit people who live farther away.

The FTC Study does not discuss compensation issues nor the impacts of compensation on the type of respondent likely to volunteer for such a task. Participation in these types of protocols is sensitive to compensation, and it is necessary to evaluate how this impacts the types of subjects who participate in the protocol. Is it possible that participants who were attracted to this study were also those for whom the compensation was meaningful? Were these less affluent people who agreed to participate? If the compensation were greater, would more knowledgeable people have agreed to participate in the study?

### Filter Bias

The protocol is designed so that it was necessary for participants to bring financial documents related to their vehicle purchase to the interview. People who refused to bring such documents were eliminated from the process. There is no information provided concerning how many people were eliminated because of these filters. Nor is there any discussion concerning how this may have biased the sample. A nonresponse bias analysis would be helpful to frame the findings of the study. The critical question should be addressed, which is, in terms of the automobile purchase experience, how different are people who are willing to provide their financial documents compared with those who are not.

### Recall Bias

Participants were recruited from the database who had purchased a motor vehicle within the last six months. Given that thousands of automobiles are purchased every week across the USA, it is difficult to understand why the research protocol would introduce a recall factor into the methodology. The thrust of the protocol was to look at finance issues. Previous research in the financial industry has documented that people throw themselves into the details of a particular purchase at the time of the purchase and then, after it is resolved (purchase made), they move on to other things. The details of the transaction are no longer top of mind and the longer the time elapsed from the purchase, the worse the recall of the details of the transaction. There really is no reason why they could not have recruited recent automobile purchasers for the study other than the convenience and cost of using an existing database of agreeable participants.

## 2. Protocol Issues

### Overall Evaluation of the Experience

Within the Customer Satisfaction Measurement community, it is an industry standard to ask for overall buying experience as close to the beginning of the questionnaire as possible. In the protocol reported in the FTC Study, overall evaluation of the buying experience was placed at the end of the protocol after asking about each segment of the buying experience and having the moderator probe in depth into problems. This decreases the value of obtaining the overall evaluation because it reflects the psychological sum of all of the preceding parts of the protocol. We typically find when analyzing overall satisfaction with a buying experience that, when it is located at the beginning of the questionnaire or protocol, the response reflects an experience that is more than the sum of all the parts of the buying experience that are reviewed in the rest of the questionnaire. This indicates that we as researchers struggle to identify all the parts of the buying experience from the perspective of the buyer and then properly weigh the individual parts of the buying experience. By parsing buying experiences into segments, we stray from the context of the purchasers. We need to do this, but we miss things that are important to buyers. That is why overall evaluations go first in protocols to reflect the context of the purchaser. This prevents the protocol from influencing the responses of the participants in qualitative research or respondents in quantitative research. That still leaves us an opening to ask respondents about things we may have missed, such as:

"Is there anything I missed in discussing your automobile purchasing experience that was important in your decision to purchase your automobile?"

This question was not asked in this research protocol.

### Lack of Questions and Probing on Emotions and Thought Processes

The protocol lacks references to emotions and underlying thought processes which are used to understand the psychological state of the participants as they talk about a particular experience. This is a key characteristic of qualitative research, and the absence of these references calls into question the purpose of the research effort.

Nor is there an attempt to test question or phrase wording. This looks like an attempt to conduct quantitative research under the guise of qualitative research.

### Mingling of References to Other Research

The FTC Study intermingles research findings from other studies with observations from the qualitative research. This purports to provide an aura of quantitative legitimacy to the report. However, one has to be careful in reading the report to identify the unique findings of this research. If you strip out the literature review which is present throughout the report, the research findings do not sound as substantial. As already mentioned, many statements (over 80) include references to "some" respondents. Does this mean three, 15, or 20? Placed alongside a citation from the literature that is assumed to be from quantitative research, it misleads the reader to feel that the observation is a significant finding.

### Absence of Recommendations for Next Steps

Typically, a qualitative report would make recommendation for further qualitative work to explore the wording of issues to be used in a quantitative protocol. Another typical recommendation would be for quantitative research to rigorously test, using scientific sampling methods, the incidence and prevalence of issues of concern. Such a recommendation is lacking. That implies that this is viewed as a finished product appropriate for recommendation towards regulatory action. This study lacks that rigor.

### The Report Assumes Consumers Are Irrational

The researchers' approach to the automobile-purchasing experience is biased by their perspective of what is a rational approach. They assume that a person desires a particular car, goes out and finds a dealership with that car, negotiates a final price for the car, and then arranges financing. To their chagrin, automobile buyers approach the task with a monthly budget in mind that focuses on what they can afford and then work from there. Given that most vehicle purchases are financed, and that this, along with either a home mortgage or rent, is one of two major monthly budget items, it is not surprising that car buyers focus on what they can afford and work within that framework.

The research protocol should have been modified to start with this issue and explore how a respondent deals with lengths of payment and monthly amounts to acquire the car they want or need. It should have been evident after the pretest with five participants that the protocol was not oriented to the thought processes of vehicle purchasers. In consumer research, it is generally a mistake to assume that the consumer is not rational. Consumer research shows that people bundle prices to make decisions efficiently. One wonders if the research had started with a protocol that was more open and began by asking how people approached vehicle purchases, whether different conclusions may have been derived.

# Conclusion

This critique addresses the limitations of the FTC Study and the resulting limits on how this research report can be used.

The critique of the recruitment process demonstrates that these findings cannot be used to extrapolate out to any population. They are representative only of a group of people who live in the Washington, D.C., area, have agreed to participate in market research studies, purchased a vehicle in the last half year, and were willing to bring personal financial documents to an interviewing situation.

The report was useful in identifying that people think about the process of automobile purchasing much differently than researchers, who broke the process down into logical steps assuming a person goes from step 1 to step 2 to step 3. However, the report identifies that people have monthly budgets in mind and work within that framework.

The report was useful in identifying the fact that people did research information about cars ahead of time. They probably had something in mind about what they might be able to afford as they walked in the door. The report seems to lead us to believe that sales and finance people understand this about vehicle purchasers as well.

This research found that the participants in this study consider a final sales price secondary and their monthly budget primary. There should be more research to look at how people think and feel about the final price and how comfortable they are with that as the "best price" if it fits within their monthly budget.

ATTACHMENT 10

# FRB Summary of Considerations when calculating the TILA/Reg Z "Finance Charge"

Truth in Lending

## Finance Charges



FINANCE CHARGE = DOLLAR COST OF CONSUMER CREDIT: Includes any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as a condition of or incident to the extension of credit

| CHARGES ALWAYS INCLUDED (A) | CHARGES INCLUDED UNLESS CONDITIONS ARE MET (B) | CONDITIONS FOR EXCLUSION (Any loan) (C) | EXCLUDABLE CHARGES* (Residential mortgage transactions and loans secured by real estate) (D) | CHARGES NEVER INCLUDED (E) |
|---|---|---|---|---|
| Interest | Premiums for credit life, accident and health, or loss-of-income insurance | Insurance not required, disclosures are made, and consumer authorizes | Fees for title insurance, title examination, property survey, etc. | Charges payable in a comparable cash transaction |
| Transaction fees | Debt-cancellation fees | Coverage not required, disclosures are made, and consumer authorizes | Fees for preparing loan documents, mortgages, and other settlement documents | Fees for unanticipated late payments |
| Loan origination fees Consumer points | Premiums for property or liability insurance | Consumer selects insurance company and disclosures are made | Amounts required to be paid into escrow, if not otherwise included in the finance charge | Overdraft fees not agreed to in writing |
| Credit-guarantee insurance premiums | Premiums for vendor's single interest (VSI) insurance | Insurer waives right of subrogation, consumer selects insurance company, and disclosures are made | Notary fees | Seller's points |
| Charges imposed on the creditor for purchasing the loan that are passed on to the consumer | | | | Participation or membership fees |
| Discounts for inducing payment by means other than credit | Security interest charges (filing fees), insurance in lieu of filing fees, and certain notary fees | The fee is for lien purposes, is prescribed by law, is payable to a public official, and is itemized and disclosed | Pre-consumation flood and pest inspection fees | Discount offered by the seller to induce payment by cash or other means not involving the use of a credit card |
| Mortgage broker fees | Charges imposed by third parties | Use of the third party is not required to obtain loan, and creditor does not retain the charge | Appraisal and credit report fees | Interest forfeited as a result of interest reduction required by law |
| Other examples: Fee for preparing TILA disclosures; real estate construction loan inspection fees; fees for post-consumation tax or flood insurance requirements; required credit life insurance charges | Charges imposed by third-party closing agents | Creditor does not require and does not retain the fee for the particular service | | Charges absorbed by the creditor as a cost of doing business |
| | Appraisal and credit-report fees | Application fees, if charged to all applicants, are not finance charges. Application fees may include appraisal or credit-report fees | | |

*To be excludable, fees must be bona fide and reasonable.

<u>ATTACHMENT 11</u>

# Sample Disclosure
## *Cash Price without Optional Add-ons*

DISCLOSURE FORM

# Vehicle Cash Price
# without Optional Add-ons

## Customer Information

Name

Address

City          State     Zip

## Vehicle Information

Make                    Model

Year                    Color

Odometer Reading        VIN #

---

Offering Price                              $

Discounts −                                 $

Rebates −                                   $

Trade-in Valuation −                        $

Required Government Charges +               $

**Vehicle Cash Price without Optional Add-ons**        ⟹  **Total**    $

---

***The consumer can purchase the vehicle for the Cash Price without Optional Add-ons.***

## Declination

I hereby decline to purchase the vehicle identified above for the Cash Price without Optional Add-ons.

## Customer

_____          _____
Print Name                           Date

_____          _____
Signature                            Time

## Dealership Manager

_____          _____
Print Name                           Date

_____          _____
Signature                            Time

ATTACHMENT 12

# Sample Disclosure
## *Cash Price without Optional Add-ons in a Financed Transaction*

# Sample Disclosure
## *Cash Price without Optional Add-ons in a Financed Transaction*

DISCLOSURE FORM

# Vehicle Cash Price
# without Optional Add-ons
## in a Financed Transaction

## Customer Information

Name

Address

City                State        Zip

## Vehicle Information

Make                    Model

Year                    Color

Odometer Reading        VIN #

**Total of Vehicle Cash Price without Optional Add-ons Plus Finance Charge** ----→ $

**Note:** *This Cash Price without Optional Add-ons Plus Finance Charge factors in any cash down payment and trade-in valuation but excludes optional Add-ons.*

| | |
|---|---|
| **Vehicle Cash Price without Optional Add-ons** | $ |
| **Finance Charge** | $ |
| **Down Payment** | $ |
| **Trade-in Valuation** | $ |

***The consumer can finance the vehicle for the total of the Vehicle Cash Price without Optional Add-ons Plus Finance Charge listed above.***

## Declination

I hereby decline to purchase the vehicle identified above for the total of the Vehicle Cash Price without Optional Add-ons Plus Finance Charge listed above.

## Customer

_____        _____
Print Name                              Date

_____        _____
Signature                               Time

## Dealership Manager

_____        _____
Print Name                              Date

_____        _____
Signature                               Time

APPENDIX 13

# Sample Disclosures
# *Itemization of Optional Add-ons*

DISCLOSURE FORM

# Itemization of Optional Add-ons
## (Financed transaction)

### Customer Information

Name

Address

City            State    Zip

### Vehicle Information

Make            Model

Year            Color

Odometer Reading    VIN #

---

**A. Vehicle Cash Price without Optional Add-ons Plus Finance Charge** ┈┈┈┈➤ $

**B. Charges for Optional Add-ons selected by the consumer**

| | |
|---|---|
| Extended Service Contract + | $ |
| Service and Maintenance Plan + | $ |
| Emergency Road Service + | $ |
| GAP Waiver + | $ |
| _____ + | $ |
| _____ + | $ |
| Total = | $ |

**C. Sum of amounts A and B, above** ┈┈┈┈┈┈┈┈┈➤ $

**Note:** *This total represents the sum of (i) the Cash Price without Optional Add-ons Plus Finance Charge and (ii) the charges for any optional add-ons selected by the consumer.*

DISCLOSURE FORM

# Itemization of Optional Add-ons
## (Non-financed transaction)

### Customer Information

Name

Address

City | State | Zip

### Vehicle Information

Make | Model

Year | Color

Odometer Reading | VIN #

---

**A. Vehicle Cash Price without Optional Add-ons** ▪▪▪▪▪▪▪▪▪▪ ➡ $

**B. Charges for Optional Add-ons selected by the consumer**

Extended Service Contract **+** $

Service and Maintenance Plan **+** $

Emergency Road Service **+** $

GAP Waiver **+** $

_____ **+** $

_____ **+** $

Total **=** $

**C. Sum of amounts A and B, above** ▪▪▪▪▪▪▪▪▪▪▪▪▪▪ ➡ $

**Note:** *This total represents the sum of (i) the Cash Price without Optional Add-ons and (ii) the charges for any optional Add-ons selected by the consumer.*

ATTACHMENT 14

# Sample Disclosure
# *Express, Informed Consent*

# Express, Informed Consent Form

## Customer Information

Name

Address

City          State     Zip

## Vehicle Information

Make                    Model

Year                    Color

Odometer Reading        VIN #

---

## Information about the item for which the consumer will be charged

What the charge is for:

Amount of charge:

$

If the item for which the consumer will be charged is a product or service, this includes all fees and costs to be charged to the consumer over the period of repayment with the product or service:

$

If the item for which the consumer will be charged is a product or service, this includes all fees and costs to be charged to the consumer over the period of repayment without the product or service:

$

---

## Consumer Consent to be Charged

I hereby consent to the purchase of the item described above.

## Customer

_____          _____
Print Name                              Date

_____          _____
Signature                               Time

ATTACHMENT 15

# Examples of Multiple Rebate Listings for Same Vehicle





## Conquest Offer : $1,500 cash back on select 2022 JEEP Wagoneer

**Cash Offer from Jeep**
Great Lakes BC Conquest Bonus Cash (GLCNN)

**Details**
Applies to select new 2022 Jeep Wagoneer.

$1,500 cash back

Effective Aug 2, 2022 through Sep 6, 2022

Disclaimer: Customers who currently own or are leasing a competitive brand vehicle (Expedition, Explorer, Suburban Tahoe, Blazer, Armada, Land Cruiser, Sequoia, Highlander, 4Runner, Navigator, Escalade, Mercedes-Benz GLS, Pilot, Range Rover, Telluride, Yukon , Yukon XL) and enter into a new purchase or lease of an eligible model are eligible to participate. Program compatibility is now available in DealerCONNECT. This program is NOT compatible with Returning Lessee or Owner Loyalty Programs. Offers for qualified buyers only. See dealer for details. Offer information and data is provided by a third-party source. Contact Dealer for any program details, rules or Incentive Questions. Dealer.com assumes no responsibility for errors or omissions.



## 0.00% APR for 72 months on select 2022 JEEP Wagoneer

**APR Finance Offer from Jeep**
Chrysler Capital Stand-Alone APR (42AN5C)

**Details**
Applies to select new 2022 Jeep Wagoneer.

Effective Aug 25, 2022 through Sep 6, 2022

Disclaimer: Residents residing in qualifying regions of the United States listed in the BUSINESS CENTER BOUNDARIES section. APR financing must go through Chrysler Capital. For Chrysler Capital qualification: Customers must be considered 1/2Tier This program is not compatible with the Customer Cash Allowance, Combo Cash and Combo APR programs, Bonus Cash programs, affinity. This program is compatible with employee purchase, CDI, Dealership Rewards and Affiliate programs. Offers for qualified buyers only. See dealer for details. Offer information and data is provided by a third-party source. Contact Dealer for any program details, rules or Incentive Questions. Dealer.com assumes no responsibility for errors or omissions. Truth in Lending Act Disclosure: Down payment will vary with APR and credit. For example, 0.0% APR with $2,500 down payment provides for 72 monthly payments of $13.89 per $1000 financed for qualified buyers. 0.0% APR for a term of 60 months corresponds to a monthly cost of $16.67 per $1000 financed. The rates described are for estimation purposes only; you may not be able to finance at this rate.



## Military Offer : $500 cash back on select 2022 JEEP Wagoneer

**Cash Offer from Jeep**
Military Program (39CNB)

**Details**
Applies to select new 2022 Jeep Wagoneer.

$500 cash back

Effective Aug 2, 2022 through Jan 3, 2023

Disclaimer: Eligible consumers include: active military, active military reserve, retired military (honorably discharged), and retired military reserve (honorably discharged). Honorably discharged veterans within 12 months of discharge date, and 100% disabled veterans are eligible. Eligible branches of the military are: Army, Navy, Air Force, Marines, Coast Guard, National Guard, Public Health Service Commissioned Corps and National Oceanic and Atmospheric Administration Commissioned Officer Corps. Eligible customers must be in possession of a valid Military Authorization Number that was generated either from the Get Military Authorization Number or Get Disabled Military Authorization link which is located on each of the Brands websites on the Military Bonus Cash page. The vehicle sale or lease must be registered in either the name of the eligible participant or registered in the name of an immediate family member living in the same household. Spouses of deceased military members who meet the eligibility criteria above are eligible to participate. These programs are compatible with the following program types, providing the vehicle meets all program eligibility requirements: Automobility Program, National or Regional Consumer Cash Allowance/APR Programs, National or Regional Lease Programs, National or Regional Consumer Lease Cash Programs, National or Regional Consumer Lease Loyalty Cash Programs, All other Certificate Programs, FCA US Employee Advantage Program, Dealership Employee Purchase Program, FCA US Affiliate Rewards Programs. This program is not compatible with the following program types: USAA Member Certificate Program. Any vehicle sold or leased to a registered Fleet Customer, regardless of whether a Fleet Allowance or payments are available or claimed. Offers for qualified buyers only. See dealer for details. Offer information and data is provided by a third-party source. Contact Dealer for any program details, rules or Incentive Questions. Dealer.com assumes no responsibility for errors or omissions.



## Automobility Offer : $1,000 cash back on select 2022 JEEP Wagoneer

**Cash Offer from Jeep**
Driveability / Automobility Program (38CN31)

**Details**
Applies to select new 2022 Jeep Wagoneer.

$1,000 cash back

Effective Aug 9, 2022 through Jan 3, 2023

Disclaimer: Residents residing in qualifying regions of the United States listed in the BUSINESS CENTER BOUNDARIES section. Offers for qualified buyers only. See dealer for details. Offer information and data is provided by a third-party source. Contact Dealer for any program details, rules or Incentive Questions. Dealer.com assumes no responsibility for errors or omissions.



## 5.11% APR for 60 months on select 2022 JEEP Wagoneer

**APR Finance Offer from Jeep**
Chrysler Capital Prime Standard Retail Rates

**Details**
Applies to select new 2022 Jeep Wagoneer.

Effective Aug 2, 2022 through Sep 6, 2022

Disclaimer: Residents residing in qualifying regions of the United States listed in the BUSINESS CENTER BOUNDARIES section. Offers for qualified buyers only. See dealer for details. Offer information and data is provided by a third-party source. Contact Dealer for any program details, rules or Incentive Questions. Dealer.com assumes no responsibility for errors or omissions. Truth in Lending Act Disclosure: Down payment will vary with APR and credit. For example, 5.11% APR with $2,500 down payment provides for 60 monthly payments of $18.92 per $1000 financed for qualified buyers. 5.11% APR for a term of 24 months corresponds to a monthly cost of $43.92 per $1000 financed. 5.11% APR for a term of 36 months corresponds to a monthly cost of $30.02 per $1000 financed. 5.11% APR for a term of 39 months corresponds to a monthly cost of $27.88 per $1000 financed. 5.11% APR for a term of 42 months corresponds to a monthly cost of $26.05 per $1000 financed. 5.11% APR for a term of 48 months corresponds to a monthly cost of $23.08 per $1000 financed. The rates described are for estimation purposes only; you may not be able to finance at this rate.



## Conquest Offer : $3,500 cash back on select 2022 JEEP Wagoneer

**Cash Offer from Jeep**
National Conquest Bonus Cash (39CN3)

**Details**
Applies to select new 2022 Jeep Wagoneer.

$3,500 cash back

Effective Aug 2, 2022 through Sep 6, 2022

Disclaimer: Customers who currently own or are leasing a competitive brand vehicle (non FCA Group vehicle) and enter into a new purchase or lease of an eligible model are eligible to participate. This program is NOT compatible with any Returning Lessee or Owner Loyalty Programs. Offers for qualified buyers only. See dealer for details. Offer information and data is provided by a third-party source. Contact Dealer for any program details, rules or Incentive Questions. Dealer.com assumes no responsibility for errors or omissions.



## 2.90% APR for 72 months on select 2022 JEEP Wagoneer



**APR Finance Offer from Jeep**
Chrysler Capital APR (42AN1C)

**Details**
Applies to select new 2022 Jeep Wagoneer.

Effective Aug 2, 2022 through Sep 6, 2022

Disclaimer: Residents residing in qualifying regions of the United States listed in the BUSINESS CENTER BOUNDARIES section. APR financing must go through Chrysler Capital. To qualify for all listed special APR rates through Chrysler Capital, customers must be considered 1/2 Tier. Customers who are considered Tier 3 will have an increased rate. Program compatibility is available in DealerCONNECT. This program is not compatible with the Customer Cash Allowance, Combo Cash, Combo APR and Non-prime programs. Offers for qualified buyers only. See dealer for details. Offer information and data is provided by a third-party source. Contact Dealer for any program details, rules or Incentive Questions. Dealer.com assumes no responsibility for errors or omissions. Truth in Lending Act Disclosure: Down payment will vary with APR and credit. For example, 2.9% APR with $2,500 down payment provides for 72 monthly payments of $15.15 per $1000 financed for qualified buyers. 2.9% APR for a term of 36 months corresponds to a monthly cost of $29.04 per $1000 financed. 2.9% APR for a term of 48 months corresponds to a monthly cost of $22.09 per $1000 financed. 2.9% APR for a term of 60 months corresponds to a monthly cost of $17.92 per $1000 financed. The rates described are for estimation purposes only; you may not be able to finance at this rate.

# GM Accessories available for
# 2022 Silverado Short Bed Crew Cab

| | | |
|---|---|---|
| Short Bed Supertop® Soft Top by Bestop® – Associated Accessories | 19420886 | $ 703.99 |
| Short Bed SmartCap™ EVO by RSi - Associated Accessories | 19421305 | $ 3,436.00 |
| Drop Rack for Short Bed SmartCap™ by RSi - Associated Accessories | 19431874 | $ 1,196.00 |
| Platform Rack for Short Bed SmartCap™ by RSi - Associated Accessories | 19431879 | $ 716.00 |
| Load Bars for Full-Size Truck SmartCap™ by RSi - Associated Accessories | 19431883 | $ 196.00 |
| Camp Kitchen for Full-Size Truck SmartCap™ by RSi - Associated Accessories | 19431885 | $ 1,436.00 |
| Drawer-Bin for Full-Size Truck SmartCap™ by RSi - Associated Accessories | 19431887 | $ 476.00 |
| Stow Away Table for SmartCap™ by RSi - Associated Accessories | 19432164 | $ 356.00 |
| Torch Magnetic LED Flashlight for SmartCap™ by RSi - Associated Accessories | 19432165 | $ 44.00 |
| Bed Mat in Gray for Short Box Models by BedRug™ - Associated Accessories | 19417380 | $ 167.20 |
| Bed Mat in Black with Bowtie Logo for Short Bed Models | 84050996 | $ 146.25 |
| Bed Liner with Bowtie Logo and Integrated Storage Pockets (for Short Bed Models) | 84648940 | $ 318.75 |
| Carpeted Bed Liner with Bowtie Logo (for Short Bed Models) | 84655118 | $ 446.25 |
| Bed Horizontal Cargo Net | 12343606 | $ 45.00 |
| Half-Steel Utility Ladder Rack by TracRac®, a Division of Thule® - Associated Accessories | 19299111 | $ 295.96 |
| Longer Bolts for use with Thule® Carriers on GearOn™ Bars by Thule® - Associated Accessories | 19330106 | $ 19.96 |
| Front Stake Pocket Push-Up Tie-Down Anchor by Putco® - Associated Accessories | 19353879 | $ 101.59 |
| 6-Foot Bed Cargo Net by LoadTamer™ - Associated Accessories | 19367357 | $ 159.20 |
| Cantilever Cab-Over Aluminum Ladder Rack Extension by TracRac® a division of Thule® - Associated Accessories | 19371246 | $ 383.96 |
| Complete Rack System Aluminum Ladder Rack by TracRac®, a Division of Thule® - Associated Accessories | 19371248 | $ 719.96 |
| D-Box Storage Box by DECKED® - Associated Accessories | 19371495 | $ 48.00 |
| BEDSLIDE 1000 Classic for Short Bed By BEDSLIDE® – Associated Accessories | 19417016 | $ 1,439.20 |
| Bed Extender/Bed Divider in Black by LUND® - Associated Accessories | 19417394 | $ 239.20 |
| Bed Extender/Bed Divider in Silver by LUND® - Associated Accessories | 19417395 | $ 239.20 |
| Short Bed Locker Side Rails Traditional in Chrome by Putco® - Associated Accessories | 19417434 | $ 359.19 |
| Short Bed Locker Side Rails Traditional in Black Powder Coat by Putco® - Associated Accessories | 19417436 | $ 256.79 |
| Short Box Truck Bed Storage System by DECKED® - Associated Accessories | 19417571 | $ 999.20 |
| Rear Stake Pocket Push-Up Tie-Down Anchor by Putco® - Associated Accessories | 19417688 | $ 127.99 |
| Full-Frame Steel Utility Ladder Rack by TracRac®, a Division of Thule® - Associated Accessories | 19417971 | $ 759.20 |
| ORIGINAL STYLE Rack by BACKRACK™ - Associated Accessories | 19417978 | $ 172.80 |
| SAFETY RACK by BACKRACK™ - Associated Accessories | 19417979 | $ 225.60 |
| Standard Hardware Installation Kit by BACKRACK™ - Associated Accessories | 19417980 | $ 100.80 |
| Toolbox Hardware Installation Kit by BACKRACK™ - Associated Accessories | 19417981 | $ 100.80 |
| Low Profile Hardware Installation Kit by BACKRACK™ - Associated Accessories | 19417982 | $ 143.20 |
| Wide Top Hardware Installation Kit by BACKRACK™ - Associated Accessories | 19417983 | $ 143.20 |
| SHORTENED ORIGINAL Rack by BACKRACK™ - Associated Accessories | 19417984 | $ 172.80 |
| Short Bed Bed Rail New in Black Powder Coat by Putco® - Associated Accessories | 19418293 | $ 308.79 |
| Short Bed Bed Rail New in Chrome by Putco® - Associated Accessories | 19418295 | $ 341.59 |
| Heavy Duty Bed Divider Cargo Net with Rope Tensioning Device and Gated S-Hooks by LoadTamer™ - Associated Accessories | 19419331 | $ 64.00 |
| VentureTEC Rack for LD Short bed (Rack, Cross Rails, 36 Blade) by PUTCO® - Associated Accessories | 19419390 | $ 1,591.20 |
| VentureTEC Grab Handle by Putco® - Associated Accessories | 19419395 | $ 56.80 |
| VentureTEC Small Mount Plate by Putco® - Associated Accessories | 19419396 | $ 95.20 |
| VentureTEC Full Length Mounting Plate - 54 by Putco® - Associated Accessories | 19419397 | $ 267.19 |
| VentureTEC Side Table Brackets w/12 x 24 Shelf by Putco® - Associated Accessories | 19419398 | $ 207.20 |
| VentureTEC Tie Down - Pair by Putco® - Associated Accessories | 19419399 | $ 32.80 |
| DRAWERGANIZER™ Tote by DECKED® - Associated Accessories | 19420424 | $ 24.00 |
| Short Bed Truck Bed Storage System by DECKED® - Associated Accessories | 19421491 | $ 1,199.99 |
| Short Bed TEC Rails in Black Powder Coat by Putco® - Associated Accessories | 19431718 | $ 441.59 |

| | | |
|---|---|---|
| Elevated Cross Rails for TEC Rails by Putco® - Associated Accessories | 19431721 | $ 425.59 |
| Elevated Cross Rails for Venture TEC Rack by Putco® - Associated Accessories | 19431722 | $ 383.99 |
| Full-Bin for Full-Size Truck SmartCap™ (Driver Side) by RSi - Associated Accessories | 19431889 | $ 356.00 |
| Full-Bin for Full-Size Truck SmartCap™ (Passenger Side) by RSi - Associated Accessories | 19431890 | $ 356.00 |
| Half-Bin for Full-Size Truck SmartCap™ (Driver Side) by RSi - Associated Accessories | 19431893 | $ 316.00 |
| Half-Bin for Full-Size Truck SmartCap™ (Passenger Side) by RSi - Associated Accessories | 19431894 | $ 316.00 |
| MOLLE Cab-Side Panel for Short & Standard 1500 Truck Bed by PUTCO® - Associated Accessories | 19431914 | $ 431.19 |
| MOLLE Driver-Side Panel for Short 1500 Truck Bed by PUTCO® - Associated Accessories | 19431915 | $ 331.99 |
| MOLLE Passenger-Side Panel for Short 1500 Truck Bed by PUTCO® - Associated Accessories | 19431916 | $ 331.99 |
| Mounting Kit - Freespirit Tent for VentureTEC Rack by PUTCO® - Associated Accessories | 19431980 | $ 46.39 |
| Double Drawerganizer™ Tote for DECKED® Full-Size Drawer by DECKED® - Associated Accessories | 19433726 | $ 36.00 |
| Wide Piecekeepers for DECKED® Wide Drawer by DECKED® - Associated Accessories | 19433727 | $ 64.00 |
| Cargo Tie-Down Rings | 23146899 | $ 78.75 |
| GearOn™ Tiered Storage Cross Rail | 84065979 | $ 296.25 |
| GearOn™ Utility Rack Stanchions | 84065985 | $ 562.50 |
| Tailgate Gap Cover | 84184471 | $ 48.75 |
| Tailgate Step Lighting | 84347814 | $ 112.50 |
| Cargo Light Kit | 84659238 | $ 116.25 |
| Bed Vertical Cargo Net with Storage Bag featuring Chevrolet Bowtie Logo | 84050683 | $ 48.75 |
| Tiered Storage Cross Rail Brackets | 84753982 | $ 225.00 |
| Mega Box for Hard Folding Tonneau Cover by REV® - Associated Accessories | 19370811 | $ 359.20 |
| Short Bed Hard Rolling Tonneau Cover by REV® —Associated Accessories | 19416967 | $ 863.20 |
| Short Bed Embark Poly Retractable in Black by Advantage® - Associated Accessories | 19416969 | $ 1,135.20 |
| Short Bed Embark Max Aluminum Retractable in Black by Advantage® - Associated Accessories | 19416971 | $ 1,463.20 |
| Short Bed Embark Power Max Retractable in Black by Advantage® - Associated Accessories | 19416974 | $ 2,079.20 |
| Short Bed Soft Tri-Fold Tonneau Cover in Black by Advantage® - Associated Accessories | 19416976 | $ 391.20 |
| Short Bed Soft Roll-Up Tonneau Cover in Black by Advantage® - Associated Accessories | 19416979 | $ 287.20 |
| REV® Megabox Storage Box for REV® Tonneau Covers - Associated Accessories | 19416982 | $ 359.20 |
| Short Bed Retractable Tonneau Cover by Roll-N-Lock® in Black - Associated Accessories | 19417403 | $ 1,191.20 |
| Short Bed One-Piece Hard Tonneau Cover Ready to Paint by UnderCover® - Associated Accessories | 19418032 | $ 1,023.20 |
| Short Bed One-Piece Hard Tonneau Cover by UnderCover™ in Summit White - Associated Accessories | 19418033 | $ 1,199.20 |
| Short Bed One-Piece Hard Tonneau Cover by UnderCover™ in Black - Associated Accessories | 19418034 | $ 1,199.20 |
| Short Bed One-Piece Hard Tonneau Cover by UnderCover™ in Silver Ice Metallic - Associated Accessories | 19418035 | $ 1,199.20 |
| Short Bed Hard Folding Tonneau Cover in Gloss Black by REV® - Associated Accessories | 19418277 | $ 919.20 |
| Short Bed E-Series Retractable Tonneau Cover by Roll-N-Lock® - Associated Accessories | 19419470 | $ 1,999.20 |
| Removable Rail Kit by Thule® for Embark LS Retractable Tonneau Cover by Advantage® - Associated Accessories | 19419777 | $ 511.84 |
| Short Bed Embark LS retractable Tonneau Cover by Advantage® - Associated Accessories | 19419842 | $ 1,679.20 |
| Short Bed Embark LS Power Retractable Tonneau Cover by Advantage® - Associated Accessories | 19419848 | $ 2,239.20 |
| Short Bed Tri-Fold Hard Tonneau Cover with Battery Operated LED Light in Black by UnderCover™ - Associated Accessories | 19431672 | $ 1,143.20 |
| Short Bed Tri-Fold Hard Tonneau Cover with Battery Operated LED Light in Silver by UnderCover™ - Associated Accessories | 19431675 | $ 1,143.20 |
| Short Bed Tri-Fold Hard Tonneau Cover with Battery Operated LED Light in Summit White by UnderCover™ - Associated Accessories | 19431678 | $ 1,143.20 |
| Short Bed Tri-Fold Hard Tonneau Cover with Battery Operated LED Light in Red by UnderCover™ - Associated Accessories | 19431681 | $ 1,143.20 |
| Short Bed Tri-Fold Hard Tonneau Cover with Battery Operated LED Light in White Frost by UnderCover™ - Associated Accessories | 19431684 | $ 1,143.20 |
| Short Bed Hard Retractable Tonneau Cover with T-Slot Rails by Roll-N-Lock® - Associated Accessories | 19433453 | $ 1,279.20 |
| Short Bed Hard Power Retractable Tonneau Cover with T-Slot Rails by Roll-N-Lock® - Associated Accessories | 19433456 | $ 2,063.20 |
| Short Bed Hard Folding Tonneau Cover in Matte Black by REV® - Associated Accessories | 19433568 | $ 959.20 |
| Short Bed Soft Tri-Fold Tonneau Cover with Chevrolet Bowtie Logo | 84060332 | $ 450.00 |
| Standard Bed Soft Tri-Fold Tonneau Cover with GMC Logo | 84625349 | $ 450.00 |

| | | |
|---|---|---|
| Short Bed Soft Tri-Fold Tonneau Cover with Chevrolet Bowtie Logo | 84815929 | $ 450.00 |
| Short Bed Soft Roll-Up Tonneau Cover with Chevrolet Bowtie Logo | 85120309 | $ 390.00 |
| Short Bed Soft Roll-Up Tonneau Cover with Chevrolet Bowtie Logo | 87816007 | $ 390.00 |
| Mega Box for Hard Folding Tonneau Cover by REV® - Associated Accessories | 19370811 | $ 359.20 |
| Short Bed Hard Rolling Tonneau Cover by REV® - Associated Accessories | 19416967 | $ 863.20 |
| Short Bed Embark Poly Retractable in Black by Advantage® - Associated Accessories | 19416969 | $ 1,135.20 |
| Short Bed Embark Max Aluminum Retractable in Black by Advantage® - Associated Accessories | 19416971 | $ 1,463.20 |
| Short Bed Embark Power Max Retractable in Black by Advantage® - Associated Accessories | 19416974 | $ 2,079.20 |
| Short Bed Soft Tri-Fold Tonneau Cover in Black by Advantage® - Associated Accessories | 19416976 | $ 391.20 |
| Short Bed Soft Roll-Up Tonneau Cover in Black by Advantage® - Associated Accessories | 19416979 | $ 287.20 |
| REV® Megabox Storage Box for REV® Tonneau Covers - Associated Accessories | 19416982 | $ 359.20 |
| Short Bed Retractable Tonneau Cover by Roll-N-Lock® in Black - Associated Accessories | 19417403 | $ 1,191.20 |
| Short Bed One-Piece Hard Tonneau Cover Ready to Paint by UnderCover® - Associated Accessories | 19418032 | $ 1,023.20 |
| Short Bed One-Piece Hard Tonneau Cover by UnderCover™ in Summit White - Associated Accessories | 19418033 | $ 1,199.20 |
| Short Bed One-Piece Hard Tonneau Cover by UnderCover™ in Black - Associated Accessories | 19418034 | $ 1,199.20 |
| Short Bed One-Piece Hard Tonneau Cover by UnderCover™ in Silver Ice Metallic - Associated Accessories | 19418035 | $ 1,199.20 |
| Short Bed Hard Folding Tonneau Cover in Gloss Black by REV® - Associated Accessories | 19418277 | $ 919.20 |
| Short Bed E-Series Retractable Tonneau Cover by Roll-N-Lock® - Associated Accessories | 19419470 | $ 1,999.20 |
| Removable Rail Kit by Thule® for Embark LS Retractable Tonneau Cover by Advantage® - Associated Accessories | 19419777 | $ 511.84 |
| Short Bed Embark LS retractable Tonneau Cover by Advantage® - Associated Accessories | 19419842 | $ 1,679.20 |
| Short Bed Embark LS Power Retractable Tonneau Cover by Advantage® - Associated Accessories | 19419848 | $ 2,239.20 |
| Short Bed Tri-Fold Hard Tonneau Cover with Battery Operated LED Light in Black by UnderCover™ - Associated Accessories | 19431672 | $ 1,143.20 |
| Short Bed Tri-Fold Hard Tonneau Cover with Battery Operated LED Light in Silver by UnderCover™ - Associated Accessories | 19431675 | $ 1,143.20 |
| Short Bed Tri-Fold Hard Tonneau Cover with Battery Operated LED Light in Summit White by UnderCover™ - Associated Accessories | 19431678 | $ 1,143.20 |
| Short Bed Tri-Fold Hard Tonneau Cover with Battery Operated LED Light in Red by UnderCover™ - Associated Accessories | 19431681 | $ 1,143.20 |
| Short Bed Tri-Fold Hard Tonneau Cover with Battery Operated LED Light in White Frost by UnderCover™ - Associated Accessories | 19431684 | $ 1,143.20 |
| Short Bed Hard Retractable Tonneau Cover with T-Slot Rails by Roll-N-Lock® - Associated Accessories | 19433453 | $ 1,279.20 |
| Short Bed Hard Power Retractable Tonneau Cover with T-Slot Rails by Roll-N-Lock® - Associated Accessories | 19433456 | $ 2,063.20 |
| Short Bed Hard Folding Tonneau Cover in Matte Black by REV® - Associated Accessories | 19433568 | $ 959.20 |
| Short Bed Soft Tri-Fold Tonneau Cover with Chevrolet Bowtie Logo | 84060332 | $ 450.00 |
| Standard Bed Soft Tri-Fold Tonneau Cover with GMC Logo | 84625349 | $ 450.00 |
| Short Bed Soft Tri-Fold Tonneau Cover with Chevrolet Bowtie Logo | 84815929 | $ 450.00 |
| Short Bed Soft Roll-Up Tonneau Cover with Chevrolet Bowtie Logo | 85120309 | $ 390.00 |
| Short Bed Soft Roll-Up Tonneau Cover with Chevrolet Bowtie Logo | 87816007 | $ 390.00 |
| 16-oz Hard Surface Cleaner by Adam's Polishes® – Associated Accessories | 19420391 | $ 10.40 |
| 1-Gallon Hard Surface Cleaner by Adam's Polishes® – Associated Accessories | 19420392 | $ 28.00 |
| 2-Pack of ProKure®V 32-oz. ClO2 Disinfectant and 32-oz. Spray Bottle by Proklean Services - Associated Accessories | 19421418 | $ 60.00 |
| 12-oz Hand Soap by Adam's Polishes® – Associated Accessories | 19420389 | $ 5.60 |
| 8-oz Hand Sanitizer by Adam's Polishes® – Associated Accessories | 19420390 | $ 3.67 |
| Wash and Wax Kit by Adam's Polishes® - Associated Accessories | 19355473 | $ 79.20 |
| Perfect Interior Cleaning Kit by Adam's Polishes® - Associated Accessories | 19355481 | $ 71.20 |
| Tire and Wheel Kit by Adam's Polishes® - Associated Accessories | 19368747 | $ 60.00 |
| Floor Liner Cleaning Kit by Adam's Polishes® - Associated Accessories | 19368930 | $ 20.00 |
| New Car Care Kit by Adam's Polishes® - Associated Accessories | 19370661 | $ 47.32 |
| Ceramic Paint Coating Kit by Adam's Polishes® - Associated Accessories | 19418578 | $ 128.00 |
| Swirl Killer Polisher Kit by Adam's Polishes® - Associated Accessories | 19421454 | $ 239.96 |
| Graphene Ceramic Coating Kit by Adam's Polishes® - Associated Accessories | 19431942 | $ 88.00 |
| Buttery Wax by Adam's Polishes® - Associated Accessories | 19355474 | $ 15.20 |

| | | |
|---|---|---|
| 16-oz Car Shampoo by Adam's Polishes® - Associated Accessories | 19355475 | $ 8.00 |
| 16-oz Detail Enhancer Spray by Adam's Polishes® - Associated Accessories | 19355476 | $ 10.40 |
| Double Soft Towel by Adam's Polishes® - Associated Accessories | 19355477 | $ 12.00 |
| Great White Towel by Adam's Polishes® - Associated Accessories | 19355478 | $ 20.00 |
| Microfiber Applicator Cloth by Adam's Polishes® - Associated Accessories | 19355479 | $ 4.80 |
| Wash Pad by Adam's Polishes® - Associated Accessories | 19355480 | $ 7.99 |
| 16-oz Tire and Rubber Cleaner by Adam's Polishes® - Associated Accessories | 19368748 | $ 10.40 |
| 1-Gallon Car Shampoo by Adam's Polishes® - Associated Accessories | 19369090 | $ 32.00 |
| 1-Gallon Detail Spray by Adam's Polishes® - Associated Accessories | 19369091 | $ 36.00 |
| 1-Gallon Tire and Rubber Cleaner by Adam's Polishes® - Associated Accessories | 19369092 | $ 36.00 |
| Waterless Wash Kit by Adam's Polishes® - Associated Accessories | 19417237 | $ 20.00 |
| 1-Gallon Waterless Wash by Adam's Polishes® - Associated Accessories | 19417238 | $ 32.00 |
| Standard Foam Gun by Adam's Polishes® - Associated Accessories | 19417715 | $ 32.00 |
| Clay Mitt by Adam's Polishes® - Associated Accessories | 19417716 | $ 24.00 |
| 16-oz. Waterless Wash by Adam's Polishes® - Associated Accessories | 19417717 | $ 8.00 |
| 24-Pack Super Black Tire Sponges by Adam's Polishes® - Associated Accessories | 19418010 | $ 24.00 |
| 16-oz Ceramic Boost Spray by Adam's Polishes® - Associated Accessories | 19418579 | $ 24.00 |
| 1-Gallon Ceramic Paint Coating Boost by Adam's Polishes® - Associated Accessories | 19418580 | $ 96.00 |
| 8-oz. Ceramic Paint Prep by Adam's Polishes® - Associated Accessories | 19418581 | $ 8.00 |
| Blue Microfiber Cutting Pad 5.5-Inch by Adam's Polishes® - Associated Accessories | 19421455 | $ 12.80 |
| Blue Foam Compound Pad 5.5-Inch by Adam's Polishes® - Associated Accessories | 19421456 | $ 10.40 |
| White Foam Polishing Pad 5.5-Inch by Adam's Polishes® - Associated Accessories | 19421457 | $ 10.40 |
| 16-oz Glass Cleaner by Adam's Polishes® - Associated Accessories | 19421466 | $ 10.40 |
| 1-Gallon Glass Cleaner by Adam's Polishes® - Associated Accessories | 19421467 | $ 32.00 |
| 16-oz Wheel Cleaner by Adam's Polishes® - Associated Accessories | 19421468 | $ 12.00 |
| 1-Gallon Wheel Cleaner by Adam's Polishes® - Associated Accessories | 19421469 | $ 48.00 |
| 16-oz Tire Shine by Adam's Polishes® - Associated Accessories | 19421470 | $ 12.00 |
| 1-Gallon Tire Shine by Adam's Polishes® - Associated Accessories | 19421471 | $ 48.00 |
| 12-oz Graphene Ceramic Spray Coating by Adam's Polishes® - Associated Accessories | 19432037 | $ 26.40 |
| 16-oz Graphene Detail Spray by Adam's Polishes® - Associated Accessories | 19432038 | $ 12.00 |
| 1-Gallon Graphene Detail Spray by Adam's Polishes® - Associated Accessories | 19432039 | $ 40.00 |
| 16-oz Graphene Tire Dressing by Adam's Polishes® - Associated Accessories | 19432040 | $ 13.60 |
| 1-Gallon Graphene Tire Dressing by Adam's Polishes® - Associated Accessories | 19432041 | $ 56.00 |
| 12-oz Compound by Adam's Polishes® - Associated Accessories | 19432042 | $ 20.00 |
| 12-oz White Polish by Adam's Polishes® - Associated Accessories | 19432043 | $ 20.00 |
| Interior Detailing Swabs by Adam's Polishes® - Associated Accessories | 19355358 | $ 8.00 |
| 16-oz Carpet and Upholstery Cleaner by Adam's Polishes® - Associated Accessories | 19355483 | $ 8.80 |
| 16-oz Leather Conditioner by Adam's Polishes® - Associated Accessories | 19355484 | $ 20.00 |
| Interior Applicator Pad by Adam's Polishes® in Red - Associated Accessories | 19355486 | $ 6.40 |
| Glass Cleaning Towel by Adam's Polishes® - Associated Accessories | 19355487 | $ 7.20 |
| Edgeless Utility Towel by Adam's Polishes® - Associated Accessories | 19355488 | $ 8.00 |
| Rubber Mat and Liner Cleaner by Adam's Polishes® - Associated Accessories | 19368931 | $ 12.00 |
| Two-Pack Waterless Wash Towels by Adam's Polishes® - Associated Accessories | 19417718 | $ 13.60 |
| Two-Pack Borderless Microfiber Utility Towels by Adam's Polishes® - Associated Accessories | 19418007 | $ 13.60 |
| 12-Pack Borderless Microfiber Utility Towels by Adam's Polishes® - Associated Accessories | 19418008 | $ 60.00 |
| 12-Pack Edgeless Microfiber Utility Towels by Adam's Polishes® - Associated Accessories | 19418009 | $ 36.00 |
| 16-oz Interior Detailer with Microban® by Adam's Polishes® - Associated Accessories | 19420340 | $ 10.40 |
| 1-Gallon Interior Detailer with Microban® by Adam's Polishes® - Associated Accessories | 19420341 | $ 32.00 |

| | | |
|---|---|---|
| EB300 Bluetooth® Earbuds by KICKER® - Associated Accessories | 19368028 | $ 63.20 |
| Bullfrog® BF100 Portable Bluetooth® Waterproof Speaker by KICKER® in Gray/Green - Associated Accessories | 19368951 | $ 143.96 |
| MultiPro™/Multi-Flex Tailgate Audio System By KICKER® - Associated Accessories | 19417163 | $ 591.20 |
| 200-Watt Subwoofer Kit by Kicker® - Associated Accessories | 19417164 | $ 599.20 |
| 200-Watt Subwoofer and 200-Watt Amp Kit by KICKER® - Associated Accessories | 19417165 | $ 1,023.20 |
| CushBT™ Bluetooth® Headphones by KICKER® - Associated Accessories | 19417989 | $ 120.00 |
| CushNC™ Bluetooth® Headphones by KICKER® - Associated Accessories | 19419586 | $ 160.00 |
| Tabor®2 Bluetooth® Headphones by KICKER® - Associated Accessories | 19420040 | $ 80.00 |
| G15000 Genius Smart Charger by NOCO® - Associated Accessories | 19417442 | $ 156.76 |
| XGC4 Power Adapter by NOCO® - Associated Accessories | 19418382 | $ 50.36 |
| Eyelet Terminal Connector by NOCO® - Associated Accessories | 19418383 | $ 14.36 |
| X-Connect 10-foot Extension Cable by NOCO® - Associated Accessories | 19418384 | $ 19.96 |
| XL Eyelet Terminal Connector by NOCO® - Associated Accessories | 19418385 | $ 14.36 |
| Genius 5 Smart Battery Charger by NOCO® - Associated Accessories | 19419854 | $ 67.16 |
| Genius 10 Smart Battery Charger by NOCO® - Associated Accessories | 19419855 | $ 95.96 |
| 3,000-Amp Battery Jump Starter by NOCO® - Associated Accessories | 19366933 | $ 260.76 |
| 2,000-Amp Battery Jump Starter by NOCO® - Associated Accessories | 19366934 | $ 172.76 |
| 1,000-Amp Battery Jump Starter by NOCO® - Associated Accessories | 19366935 | $ 87.96 |
| GB40 Boost Plus EVA Protective Case by NOCO® - Associated Accessories | 19418379 | $ 17.56 |
| GB70 Boost Plus EVA Protective Case by NOCO® - Associated Accessories | 19418380 | $ 26.36 |
| GB150 Boost Plus EVA Protective Case by NOCO® - Associated Accessories | 19418381 | $ 31.16 |
| Standard Thinkware F200 Dashcam by EchoMaster® - Associated Accessories | 19418274 | $ 239.99 |
| Premium Thinkware F800 Dashcam by EchoMaster® - Associated Accessories | 19418275 | $ 399.99 |
| IntelliHaul 2.0 Trailering Camera System by EchoMaster® - Associated Accessories | 19421450 | $ 959.20 |
| Add-On Front Camera for IntelliHaul 2.0 Systems by EchoMaster® - Associated Accessories | 19421452 | $ 120.00 |
| Add-On Wireless Trailer Camera for IntelliHaul 2.0 Systems by EchoMaster® - Associated Accessories | 19421453 | $ 326.40 |
| Full HD Front Dash Cam with ADAS, 32 GB SD Card and Full HD Rear Camera by EchoMaster® - Associated Accessories | 19433432 | $ 223.99 |
| 2K QHD Front Dash Cam with ADAS, 32GB SD Card and Full HD Rear Camera by EchoMaster® - Associated Accessories | 19433433 | $ 399.99 |
| 4K Ultra HD Front Dash Cam with ADAS, 32GB SD Card and available with 2K Quad HD Rear Camera by EchoMaster® - Associated Accessories | 19433434 | $ 519.99 |
| IntelliHaul 2.0 Trailering Camera System (for vehicles with IOK radios) by EchoMaster® - Associated Accessories | 19433460 | $ 959.20 |
| IntelliHaul 2.0 Trailering Camera System (for vehicles with IOR) by EchoMaster® - Associated Accessories | 19433462 | $ 959.20 |
| Trailering Camera System | 84946379 | $ 356.25 |
| Trailering Camera System | 85004154 | $ 446.25 |
| Trailering Camera System | 85587357 | $ 0.00 |
| Garage Door Opener Package (for Vehicles Equipped with Manual-Dimming Rearview Mirrors) | 84350232 | $ 138.75 |
| Garage Door Opener Package (for Vehicles Equipped with Auto-Dimming Rearview Mirrors) | 84738651 | $ 186.66 |
| Keyless Entry Keypad | 84945062 | $ 146.25 |
| 1-Meter Micro USB Cable by iSimple® - Associated Accessories | 19368579 | $ 20.00 |
| 1-Meter Lightning Cable by iSimple® - Associated Accessories | 19368580 | $ 24.00 |
| 1-Meter USB-C Cable by iSimple® - Associated Accessories | 19368581 | $ 20.00 |
| 1-Meter Lightning and Micro-USB Combination Cable by iSimple® - Associated Accessories | 19368582 | $ 24.00 |
| Universal Tablet Holder with Integrated Power | 84068618 | $ 112.50 |
| Universal Tablet Holder with Integrated Power | 84574938 | $ 112.50 |
| 4-Button Keyless Entry Remote Key Fob | 86810371 | $ 221.25 |
| 5-Button Keyless Entry Remote Key Fob | 86810372 | $ 221.25 |
| 60-Inch Blade LED Tailgate Light Bar by Putco® - Associated Accessories | 19418352 | $ 263.99 |
| Hornet 16-Inch Amber LED Light Bar Kit by Putco® - Associated Accessories | 19421081 | $ 288.79 |
| Hornet 24-Inch Amber LED Light Bar Kit by Putco® - Associated Accessories | 19421082 | $ 375.19 |

| | | |
|---|---|---|
| Short Bed Retractable Bed Step in Black by LUND® - Associated Accessories | 19417392 | $ 231.20 |
| Crew Cab 4-Inch Round Assist Steps in Black | 84011355 | $ 633.75 |
| Crew Cab 4-Inch Round Assist Steps in Chrome | 84011356 | $ 633.75 |
| Crew Cab 6-Inch Rectangular Wheel-to-Wheel Assist Steps in Chrome | 84016709 | $ 671.25 |
| Crew Cab Work Step Assist Steps in Black | 84017116 | $ 371.25 |
| Crew Cab Short Bed 6-Inch Rectangular Wheel-To-Wheel Assist Steps in Black | 84126245 | $ 671.25 |
| Crew Cab Off-Road High-Clearance Assist Steps in Black with Silverado Script | 84453734 | $ 858.75 |
| Crew Cab 6-Inch Rectangular Assist Steps in Chrome | 84676693 | $ 596.25 |
| Crew Cab 6-Inch Rectangular Assist Steps in Black | 84676694 | $ 596.25 |
| Crew Cab Sport Step Assist Steps in Black with Silverado Script | 84742421 | $ 821.25 |
| Crew Cab Rocker Panel Guard | 85534568 | $ 896.25 |
| Polished Stainless Steel CHEVROLET Tailgate Lettering by Putco® - Associated Accessories | 19417967 | $ 79.20 |
| 3-D Stamped CHEVROLET Tailgate Lettering in Polished Stainless Steel by Putco® - Associated Accessories | 19419884 | $ 87.19 |
| 3-D Stamped CHEVROLET Tailgate Lettering in Black Stainless Steel by Putco® - Associated Accessories | 19419885 | $ 112.79 |
| 3-D Stamped CHEVROLET Front Grille Lettering in Polished Stainless Steel by Putco® - Associated Accessories | 19421157 | $ 33.59 |
| 3-D Stamped CHEVROLET Front Grille Lettering in Black Platinum by Putco® - Associated Accessories | 19421158 | $ 39.99 |
| 3-D Urethane CHEVROLET Tailgate Lettering in Gloss Black by Nox-Lux™ - Associated Accessories | 19432560 | $ 79.20 |
| 3-D Urethane CHEVROLET Tailgate Lettering in Gloss Red by Nox-Lux™ - Associated Accessories | 19432561 | $ 79.20 |
| 3-D Urethane CHEVROLET Tailgate Lettering in Liquid Chrome by Nox-Lux™ - Associated Accessories | 19432562 | $ 79.20 |
| 3-D Urethane CHEVROLET Tailgate Lettering in Americana by Nox-Lux™ - Associated Accessories | 19432563 | $ 79.20 |
| 3-D Urethane CHEVROLET Tailgate Lettering in Carbon Fiber by Nox-Lux™ - Associated Accessories | 19432564 | $ 95.20 |
| 3-D Urethane CHEVROLET Tailgate Lettering in Gloss White by Nox-Lux™ - Associated Accessories | 19432565 | $ 79.20 |
| 4x4 Decal | 84324923 | $ 60.00 |
| CHEVROLET Tailgate Lettering Decal in Black Vinyl | 84370615 | $ 112.50 |
| Bedside Decal Package with Chevrolet Bowtie | 84425973 | $ 281.25 |
| CHEVROLET Tailgate Lettering Decal in Silver Vinyl | 84425985 | $ 112.50 |
| Fender Hash Mark Decal Package in Dark Grey with Red Outline | 84426011 | $ 131.25 |
| Fender Hash Mark Decal Package in Black with Silver Outline | 84426012 | $ 131.25 |
| Fender Hash Mark Decal Package in Silver with Black Outline | 84426013 | $ 131.25 |
| Rally Stripe Package in Black | 84426093 | $ 412.50 |
| Bodyside Decal Package in Matte Black and Carbon Grey Metallic for Crew Cab Models | 84476481 | $ 307.50 |
| Bodyside Decal Package in Grey Metallic and Light Grey Metallic for Crew Cab Models | 84476482 | $ 307.50 |
| Bedside 4x4 Decal in Matte Black | 85146630 | $ 75.00 |
| Aeroskin® Hood Protector in Smoke Black by LUND® - Associated Accessories | 19417396 | $ 87.20 |
| Aeroskin® Hood Protector in Matte Black by LUND® - Associated Accessories | 19417397 | $ 95.20 |
| Aeroskin® Hood Protector in Chrome by LUND® - Associated Accessories | 19417398 | $ 143.20 |
| Aeroskin II® Hood Protector in Textured Black by LUND® - Associated Accessories | 19417399 | $ 103.20 |
| Crew Cab Front and Rear Tape-On Low-Profile Door Window Weather Deflectors in Smoke Black by LUND® - Associated Accessories | 19417400 | $ 71.20 |
| Crew Cab Front and Rear Tape-On Low-Profile Door Window Weather Deflectors in Matte Black by LUND® - Associated Accessories | 19417401 | $ 79.20 |
| Crew Cab Front and Rear Tape-On Low-Profile Door Window Weather Deflector in Textured Black by LUND® – Associated Accessories | 19417402 | $ 87.20 |
| Hood Deflector in Dark Smoke by EGR® – Associated Accessories | 19417467 | $ 79.20 |
| Hood Deflector in Matte Black by EGR® - Associated Accessories | 19417468 | $ 87.20 |
| Crew Cab Tape-On Door Window Weather Deflectors in Dark Smoke by EGR® - Associated Accessories | 19417475 | $ 79.20 |
| Crew Cab In-Channel Door Window Weather Deflectors in Dark Smoke by EGR® - Associated Accessories | 19417480 | $ 79.20 |
| Crew Cab In-Channel Door Window Weather Deflectors in Matte Black by EGR® - Associated Accessories | 19417481 | $ 95.20 |
| Crew Cab Front and Rear Low Profile In-Channel Side Window Deflector in Chrome by Putco® - Associated Accessories | 19421170 | $ 158.39 |
| Front Bowtie Emblem in Black | 84293092 | $ 41.25 |
| Bowtie Emblems in Black (for Work Truck and Custom Trim Levels with Multi-Flex Tailgate) | 84434788 | $ 127.50 |

| | | |
|---|---|---|
| Front Illuminated Bowtie Emblem in Black | 84602325 | $ 217.50 |
| Silverado WT Emblems in Black | 84806931 | $ 52.50 |
| Silverado Custom Emblems in Black | 84806933 | $ 52.50 |
| Silverado LTZ Emblems in Black | 84806935 | $ 82.50 |
| Silverado LT Emblems in Black | 84806939 | $ 82.50 |
| Silverado RST Emblems in Black | 84950118 | $ 120.00 |
| Silverado Custom Trail Boss Emblems in Black | 84950119 | $ 112.50 |
| Silverado LT Trail Boss Emblems in Black | 84950122 | $ 112.50 |
| Silverado High Country Emblems in Black | 84978012 | $ 112.50 |
| Chevrolet Z71 Emblems in Black | 85109485 | $ 63.75 |
| Bowtie Emblems in Black (for LT, RST, LTZ and High Country Trim Levels with Multi-Flex Tailgate) | 85524932 | $ 127.50 |
| Silverado WT Emblems in Black | 85592697 | $ 52.50 |
| Silverado Custom Emblems in Black | 85592700 | $ 52.50 |
| Silverado LT Emblems in Black | 85592704 | $ 82.50 |
| Silverado LTZ Emblems in Black | 85592709 | $ 82.50 |
| Silverado RST Emblems in Black | 85592711 | $ 120.00 |
| Silverado LT Trail Boss Emblems in Black | 85592713 | $ 112.50 |
| Front Bowtie Emblem in Black | 86771880 | $ 63.75 |
| Front Illuminated Bowtie Emblem in Black (for Vehicles with Multi-Flex Tailgate) | 86777776 | $ 281.25 |
| Front Illuminated Bowtie Emblem in Black | 86777778 | $ 281.25 |
| Rugged Look Fender Flare Set by EGR® in Black - Associated Accessories | 19417482 | $ 383.20 |
| Bolt-On Look by EGR® in Black - Associated Accessories | 19417483 | $ 423.20 |
| Low Profile Fender Flare Set in Black by AirDesign® - Associated Accessories | 19419893 | $ 359.20 |
| Smooth Front and Rear Fender Flare Set in Black | 84297538 | $ 412.50 |
| Grille in Black with Chevrolet Script Lettering in Gloss Black (for Vehicles without HD Surround Vision Camera) | 84938575 | $ 375.00 |
| Grille in Black with Chevrolet Script Lettering in Galvano (for Vehicles without HD Surround Vision Camera) | 84938577 | $ 375.00 |
| Grille in Black with Chevrolet Script Lettering in Red (for Vehicles without HD Surround Vision Camera) | 85529035 | $ 375.00 |
| Chevrolet Script Lettering in Red | 85544866 | $ 63.75 |
| Chevrolet Script Lettering in Gloss Black | 85544867 | $ 63.75 |
| Chevrolet Script Lettering in Galvano | 85544868 | $ 63.75 |
| License Plate Frame by Baron & Baron® in Chrome with Black Chevrolet Script - Associated Accessories | 19330378 | $ 33.60 |
| License Plate Frame by Baron & Baron® in Chrome with Black Bowtie Logo and Chevrolet Script - Associated Accessories | 19330379 | $ 33.60 |
| License Plate Frame by Baron & Baron® in Chrome with Black Silverado Script - Associated Accessories | 19330384 | $ 33.60 |
| License Plate Frame by Baron & Baron® in Black with Chrome Chevrolet Script - Associated Accessories | 19330391 | $ 36.00 |
| License Plate Frame by Baron & Baron® in Chrome with Black Bowtie Logo and Performance Script - Associated Accessories | 19330392 | $ 33.60 |
| License Plate Frame by Baron & Baron® in Black with Bowtie Logo and Chrome Performance Script - Associated Accessories | 19330393 | $ 36.00 |
| License Plate Frame by Baron & Baron® in Chrome with Black Chevrolet Script - Associated Accessories | 19368098 | $ 33.60 |
| License Plate Frame by Baron & Baron® in Chrome with Black Bowtie Logo and Chevrolet Script - Associated Accessories | 19368099 | $ 33.60 |
| License Plate Frame by Baron & Baron® in Chrome with Black Chevrolet Script - Associated Accessories | 19368100 | $ 33.60 |
| License Plate Frame by Baron & Baron® in Chrome with Black Silverado Script - Associated Accessories | 19368101 | $ 33.60 |
| License Plate Frame by Baron & Baron® in Black with Chrome Silverado Script - Associated Accessories | 19368102 | $ 36.00 |
| License Plate Frame by Baron & Baron® in Black with Chrome Chevrolet Script - Associated Accessories | 19368103 | $ 36.00 |
| License Plate Frame by Baron & Baron® in Black with Chrome Chevrolet Script - Associated Accessories | 19368104 | $ 36.00 |
| License Plate Frame by Baron & Baron® in Chrome with Black Bowtie Logo and Performance Script - Associated Accessories | 19368105 | $ 33.60 |
| License Plate Frame by Baron & Baron® in Black with Chrome Bowtie Logo and Performance Script - Associated Accessories | 19368106 | $ 36.00 |
| License Plate Frame in Black with Trail Boss Logo by Baron & Baron® - Associated Accessories | 19432771 | $ 36.00 |
| Outside Rearview Mirror Covers in Black | 84328136 | $ 75.00 |
| Outside Rearview Mirror Covers in Chrome | 84328137 | $ 75.00 |

| | | |
|---|---|---|
| Outside Rearview Mirror Covers in Summit White | 84612941 | $ 75.00 |
| Double Cab and Crew Cab Pillar Trim in Stainless Steel by Putco® – Associated Accessories | 19417429 | $ 123.99 |
| Short Bed Crew Cab Rocker Panel Moldings in Stainless Steel by Putco® - Associated Accessories | 19417430 | $ 323.99 |
| Bolt-On Look Body Side Molding for Crew Cab Trucks by EGR® - Associated Accessories | 19418822 | $ 199.20 |
| Rugged Look Body Side Molding for Crew Cab Trucks by EGR® - Associated Accessories | 19418824 | $ 183.20 |
| Exhaust Bezels in Black | 84667764 | $ 206.25 |
| Wire Harness by Baja Designs® - Associated Accessories | 19369744 | $ 116.00 |
| A-Pillar Lights by Baja Designs® - Associated Accessories | 19417863 | $ 276.00 |
| Sport Bar Mounted Off-Road 40-Inch Light Bar by Baja Designs® - Associated Accessories | 19417864 | $ 1,188.00 |
| Outside Rearview Mirror Puddle Light kit with Bowtie Logo Projection (for Heated Outside Rearview Power-Adjustable Mirrors) | 84408372 | $ 93.75 |
| Recovery Hooks in Chrome | 84726048 | $ 127.50 |
| Recovery Hooks in Black | 84726049 | $ 56.25 |
| Recovery Hooks in Red | 84726050 | $ 93.75 |
| Front and Rear Rubber No-Drill Gatorback Mud Flap Kit with Black Chevrolet Bowtie Logo and Fender Plugs in Black by Truck Hardware - Associated Accessories | 19433173 | $ 349.60 |
| Front and Rear Rubber No-Drill Gatorback Mud Flap Kit with Black Chevrolet Bowtie Logo and Fender Plugs in Summit White by Truck Hardware - Associated Accessories | 19433174 | $ 349.60 |
| Front and Rear Rubber No-Drill Gatorback Mud Flap Kit with Black Chevrolet Bowtie Logo and Fender Plugs in Silver Ice Metallic by Truck Hardware - Associated Accessories | 19433175 | $ 349.60 |
| Front and Rear Rubber No-Drill Gatorback Mud Flap Kit with Silver Outlined Chevrolet Bowtie Logo and Fender Plugs in Black by Truck Hardware - Associated Accessories | 19433176 | $ 410.40 |
| Front and Rear Rubber No-Drill Gatorback Mud Flap Kit with Silver Outlined Chevrolet Bowtie Logo and Fender Plugs in Summit White by Truck Hardware - Associated Accessories | 19433177 | $ 410.40 |
| Front and Rear Rubber No-Drill Gatorback Mud Flap Kit with Silver Outlined Chevrolet Bowtie Logo and Fender Plugs in Silver Ice Metallic by Truck Hardware - Associated Accessories | 19433178 | $ 410.40 |
| Front and Rear Rubber No-Drill Gatorback Mud Flap Kit with Trail Boss Logo and Fender Plugs in Black by Truck Hardware - Associated Accessories | 19433179 | $ 419.20 |
| Front and Rear Rubber No-Drill Gatorback Mud Flap Kit with Trail Boss Logo and Fender Plugs in Summit White by Truck Hardware - Associated Accessories | 19433180 | $ 419.20 |
| Front and Rear Rubber No-Drill Gatorback Mud Flap Kit with Trail Boss Logo and Fender Plugs in Silver Ice Metallic by Truck Hardware - Associated Accessories | 19433181 | $ 419.20 |
| Front and Rear Rubber No-Drill Gatorback Mud Flap Kit with Black High Country Logo and Fender Plugs in Black by Truck Hardware - Associated Accessories | 19433182 | $ 349.60 |
| Front and Rear Rubber No-Drill Gatorback Mud Flap Kit with Black High Country Logo and Fender Plugs in Summit White by Truck Hardware - Associated Accessories | 19433183 | $ 349.60 |
| Front and Rear Rubber No-Drill Gatorback Mud Flap Kit with Black High Country Logo and Fender Plugs in Silver Ice Metallic by Truck Hardware - Associated Accessories | 19433184 | $ 349.60 |
| Front Flat Splash Guards in Black | 84109903 | $ 41.25 |
| Rear Splash Guards in Black with Bowtie Logo | 84109906 | $ 45.00 |
| Rear Flat Splash Guards in Black with Bowtie Logo | 84109907 | $ 41.25 |
| Front Splash Guards in Black | 84649174 | $ 45.00 |
| Standard Box Sportz® Camping Tent by Napier - Associated Accessories | 19329817 | $ 216.00 |
| Sportz Link Model 51000 Ground Tent by Napier - Associated Accessories | 19369207 | $ 175.99 |
| Short Box Sportz® Camping Tent by Napier® - Associated Accessories | 19417138 | $ 239.99 |
| Horizon Rooftop Tent by Napier - Associated Accessories | 19419283 | $ 1,599.20 |
| Adventure Series 55-inch Premium Gas Strut-Equipped Tent by Freespirit Recreation® - Associated Accessories | 19420418 | $ 2,076.00 |
| High Country 55-Inch Rooftop Tent by Freespirit Recreation® - Associated Accessories | 19420419 | $ 2,316.00 |
| High Country 80-inch Premium Tent by Freespirit Recreation® - Associated Accessories | 19420420 | $ 2,716.00 |
| Door Sill & Rocker Panel Protection by LUND® - Associated Accessories | 19432307 | $ 199.20 |
| Tubular Nudge Bar | 84027398 | $ 562.50 |
| Rear Wheelhousing Liner Set | 84263801 | $ 112.50 |
| Underbody Skid Shield Package | 84962765 | $ 146.25 |
| Rear Wheelhousing Liner Set | 85561532 | $ 112.50 |
| MultiPro™/Multi-Flex Protective Hitch Cap by CURT™ – Associated Accessories | 19421060 | $ 91.20 |
| TRANSPORTER COMBI™ Hitch-Mounted Cargo Box by Thule® - Associated Accessories | 19257871 | $ 719.96 |
| Hitch-Mounted Tram™ Ski Carrier by Thule® - Associated Accessories | 19302831 | $ 303.96 |
| Hitch-Mounted Bicycle Frame Adapter in Silver by Thule® - Associated Accessories | 19353376 | $ 55.96 |
| Hitch-Mounted 2-Bike T2 Classic Bicycle Carrier in Black by Thule® - Associated Accessories | 19366639 | $ 479.96 |
| Gate mate PRO Tailgate Pad/Bike Carrier in Large by Thule® - Associated Accessories | 19418147 | $ 199.96 |
| Hitch-Mounted 2-Bike Helium Pro Bicycle Carrier in Silver by Thule® - Associated Accessories | 19419507 | $ 415.96 |

| | | |
|---|---|---|
| Hitch-Mounted 2-Bike Camber™ Bicycle Carrier in Black by Thule® - Associated Accessories | 19419508 | $ 303.96 |
| Hitch-Mounted 4-Bike Camber™ Bicycle Carrier in Black by Thule® - Associated Accessories | 19419509 | $ 359.96 |
| ROOF-MOUNTED Board Shuttle Stand-Up PaddleBoard/Surfboard Carrier by Thule® - Associated Accessories | 19330171 | $ 159.96 |
| Roof-Mounted Portage™ Canoe Carrier by Thule® - Associated Accessories | 19331868 | $ 159.96 |
| Roof-Mounted Canyon XT™ Roof Basket by Thule® in Black — Associated Accessories | 19331872 | $ 399.96 |
| Roof-Mounted Stretch Cargo Net for Roof Basket by Thule® - Associated Accessories | 19331873 | $ 63.96 |
| Roof-Mounted Snowpack L Ski & Snowboard Carrier by Thule® - Associated Accessories | 19371249 | $ 303.96 |
| Roof-Mounted Dock Glide Kayak Carrier by Thule® - Associated Accessories | 19371250 | $ 239.96 |
| Roof-Mounted Force XT L™ Cargo Box by Thule® - Associated Accessories | 19419503 | $ 599.96 |
| Roof-Mounted Force XT XL™ Cargo Box by Thule® - Associated Accessories | 19419504 | $ 639.96 |
| Roof-Mounted ProRide XT™ Upright Bicycle Carrier in Black by Thule® - Associated Accessories | 19419505 | $ 207.96 |
| Roof-Mounted Compass Watersport Kayak Carrier by Thule® - Associated Accessories | 19419506 | $ 279.96 |
| Vacuum-Mounted 1-Bike Talon Bicycle Carrier by SeaSucker® - Associated Accessories | 19420399 | $ 239.20 |
| Vacuum-Mounted 2-Bike Mini Bomber Bicycle Carrier by SeaSucker® - Associated Accessories | 19420400 | $ 391.20 |
| Removable Roof Rack Package by Thule® - Associated Accessories | 19420413 | $ 575.84 |
| Axle Combo Set by SeaSucker® - Associated Accessories | 19421440 | $ 31.99 |
| First-Row Premium All-Weather Floor Liners in Jet Black with Chevrolet Script (for Models with Center Console) | 84333602 | $ 97.50 |
| First-Row Premium All-Weather Floor Liners in Very Dark Atmosphere with Chevrolet Script (for Models with Center Console) | 84333603 | $ 97.50 |
| First-Row Interlocking Premium All-Weather Floor Liner in Jet Black with Chevrolet Script (for models without Center Console) | 84333606 | $ 97.50 |
| First-Row Interlocking Premium All-Weather Floor Liners in Very Dark Atmosphere with Chevrolet Script (for models without Center Console) | 84333607 | $ 97.50 |
| Crew Cab Second-Row Interlocking Premium All-Weather Floor Liner in Jet Black | 84333635 | $ 67.50 |
| Crew Cab Second-Row Interlocking Premium All-Weather Floor Liner in Very Dark Atmosphere | 84333636 | $ 67.50 |
| First-Row Premium All-Weather Floor Liners in Jet Black with Chrome Z71 Logo (for models with Center Console) | 84348118 | $ 112.50 |
| First-Row Premium All-Weather Floor Liners in Very Dark Atmosphere with Chrome Z71 Logo (for models with Center Console) | 84348119 | $ 112.50 |
| First-Row Interlocking Premium All-Weather Floor Liners in Jet Black with Chrome Z71 Logo (for models without Center Console) | 84348123 | $ 112.50 |
| First-Row Interlocking Premium All-Weather Floor Liners in Very Dark Atmosphere with Chrome Z71 Logo (for models without Center Console) | 84348124 | $ 112.50 |
| Crew Cab Second-Row Interlocking Premium All-Weather Floor Liner in Jet Black for AT4/Z71 | 84348198 | $ 67.50 |
| Crew Cab Second-Row Interlocking Premium All-Weather Floor Liner in Very Dark Atmosphere for Z71 | 84348199 | $ 67.50 |
| Crew Cab First-and Second-Row Carpeted Floor Mats in Jet Black with Chevrolet Script | 84519743 | $ 97.50 |
| Crew Cab First-and Second-Row Carpeted Floor Mats in Jet Black | 84519750 | $ 120.00 |
| Crew Cab First-and Second-Row Carpeted Floor Mats in Atmosphere | 84519751 | $ 120.00 |
| Crew Cab First-and Second-Row Premium All-Weather Floor Mats in Jet Black | 84521602 | $ 138.75 |
| Crew Cab First-and Second-Row Premium All-Weather Floor Mats in Atmosphere | 84521603 | $ 138.75 |
| Crew Cab First-and Second-Row Carpeted Floor Mats in Jet Black | 84655254 | $ 150.00 |
| Crew Cab First-and Second-Row Carpeted Floor Mats in Dark Atmosphere | 84655255 | $ 150.00 |
| Crew Cab First-and Second-Row Premium Carpeted Floor Mats in Jet Black with Red Stitching, Bowtie and Chevrolet Performance Script | 84989131 | $ 120.00 |
| Crew Cab First-and Second-Row Premium Carpeted Floor Mats in Jet Black with Red Stitching, Bowtie and Chevrolet Performance Script | 85105239 | $ 120.00 |
| Rear Bench Seat Cover by ARIES™ Manufacturing in Black - Associated Accessories | 19367173 | $ 96.00 |
| Rear Bench Seat Cover by ARIES™ Manufacturing in Gray - Associated Accessories | 19367174 | $ 96.00 |
| Rear Bench Seat Cover by ARIES™ Manufacturing in Brown - Associated Accessories | 19367175 | $ 96.00 |
| Automatic Transmission Sport Pedal and Cover Package | 84712883 | $ 123.75 |
| Front Door Sill Plates with Jet Black Surround and Silverado Script | 84529475 | $ 93.75 |
| Illuminated Front Door Sill Plates in Stainless Steel with Silverado Script | 85527845 | $ 262.50 |
| Window Sunshade Package with Silverado Script | 84641433 | $ 93.75 |
| Interior Trim Kit in Silver for Crew Cab (for models without Center Console) | 84469330 | $ 112.50 |
| Crew Cab Under seat Lockable Storage Organizer in Black | 84734683 | $ 191.25 |
| Console-Mounted Safe | 84867168 | $ 206.25 |
| Under Rear Seat Lockbox with Three-Digit Combination Lock by Tuffy Security Products® - Associated Accessories | 19417361 | $ 463.20 |

| | | |
|---|---|---|
| Dometic CFX3-25 Powered Cooler - Associated Accessories | 19432145 | $ 671.99 |
| Dometic CFX3-35 Powered Cooler - Associated Accessories | 19432146 | $ 719.99 |
| Dometic CFX3-45 Powered Cooler - Associated Accessories | 19432147 | $ 767.99 |
| Dometic CFX3-55IM Powered Cooler IM - Associated Accessories | 19432148 | $ 879.99 |
| Dometic CFX3-75DZ Powered Cooler Dual Zone - Associated Accessories | 19432149 | $ 1,039.99 |
| Dometic CFX3-95DZ Powered Cooler Dual Zone - Associated Accessories | 19432150 | $ 1,199.99 |
| Dometic CFX3-100 Powered Cooler - Associated Accessories | 19432151 | $ 1,119.99 |
| Dometic CFX3-PC25 Powered Cooler Protective Cover - Associated Accessories | 19432534 | $ 103.99 |
| Dometic CFX3-PC35 Powered Cooler Protective Cover - Associated Accessories | 19432535 | $ 103.99 |
| Dometic CFX3-PC45 Powered Cooler Protective Cover - Associated Accessories | 19432536 | $ 103.99 |
| Dometic CFX3-PC55 Powered Cooler Protective Cover - Associated Accessories | 19432537 | $ 103.99 |
| Dometic CFX3-PC75 Powered Cooler Protective Cover - Associated Accessories | 19432538 | $ 119.99 |
| Dometic CFX3-PC95 Powered Cooler Protective Cover - Associated Accessories | 19432539 | $ 119.99 |
| Dometic CFX3-PC100 Powered Cooler Protective Cover - Associated Accessories | 19432540 | $ 119.99 |
| Dometic Cooler Tie-Down Kit - Associated Accessories | 19432541 | $ 39.99 |
| Dometic Cooler Tie-Down Straps (2) - Associated Accessories | 19432542 | $ 15.99 |
| Dometic Patrol 35 Cooler in White - Associated Accessories | 19432604 | $ 191.99 |
| Dometic Patrol 55 Cooler in White - Associated Accessories | 19432605 | $ 239.99 |
| Dometic Patrol 75 Cooler in White - Associated Accessories | 19432606 | $ 287.99 |
| Dometic Patrol 105 Cooler in White - Associated Accessories | 19432607 | $ 335.99 |
| Dometic Patrol 35 Cooler in Ocean Blue - Associated Accessories | 19432608 | $ 191.99 |
| Dometic Patrol 55 Cooler in Ocean Blue - Associated Accessories | 19432609 | $ 239.99 |
| Dometic PLB40 Portable Lithium Battery 40Ah - Associated Accessories | 19432628 | $ 679.99 |
| Fridge Slide for CFX3-35 and CFX3-45 Powered Coolers by Dometic - Associated Accessories | 19432631 | $ 279.99 |
| Fridge Slide for CFX3-55IM Powered Coolers by Dometic - Associated Accessories | 19432632 | $ 279.99 |

ATTACHMENT 17

# ABA Resolution 116B

**AMERICAN BAR ASSOIATION**

**ADOPTED BY THE HOUSE OF DELEGATES**

**AUGUST 3-4, 2020**

<u>**RESOLUTION**</u>

RESOLVED, That the American Bar Association urges federal, state, local, territorial and tribal governments to:

a) enforce fair lending laws and other federal, state and local laws targeting unfair or deceptive acts or practices to address discrimination in vehicle sales and financing markets;

b) adopt laws and policies that promote the adoption of an enhanced nondiscrimination compliance system for dealer compensation for arranging and/or originating a vehicle finance contract by offering a safe harbor against pricing discrimination claims for dealers that faithfully implement the NADA/NAMAD/AIADA Fair Credit Compliance Policy and Program; and

c) adopt legislation requiring that the purchase of any voluntary vehicle protection product may not be made a condition of the sale or lease of the vehicle, and that there is clear and conspicuous disclosure of pricing of voluntary protection products by dealers through reasonable means, such as a pricing sheet, menu, and/or website, before a consumer purchases a vehicle;

FURTHER RESOLVED, That the American Bar Association encourages state, local, territorial and tribal bar associations to work with consumer, dealer and creditor representatives to offer educational programming and materials to lawyers and consumers to help them understand and navigate purchases and financing of vehicles and understand consumers' legal rights with respect to such purchases and loans.

<u>ATTACHMENT 18</u>

# Paperwork Reduction Act Analysis Chart

| Table I    Paperwork Reduction Act Analysis | |
|---|---|
| **FTC Proposed Rule and PRA Estimate** | **NADA Response** |
| **General Estimate and Burdens Issues** | |
| The FTC estimates that there are some 46,525 franchised new and independent used motor vehicle dealers in the U.S.[1] | The FTC estimates that there are 21,427 franchised new motor vehicle dealers in the U.S., all of which fall within the scope of the proposed definition of "Dealer or Motor Vehicle Dealer."[2] There are some 25,000+ independent used motor vehicle dealers, but only those engaged in vehicle servicing fall within the proposed definition, so the FTC's estimate is inaccurate to that extent. The FTC's estimate also fails to recognize that the proposed definition of "Motor Vehicle" would cover motor vehicle manufacturers who sell directly to consumers without using a dealer retail network, as well as RV, marine, motorcycle, recreational, and other dealers licensed to sell or lease, and service, new and/or used motor vehicles.[3] It is estimated that there are some 20,000 dealers selling and leasing and servicing the other motor vehicles, which is approximately the same as the number of independent dealers that the FTC erroneously includes in its estimate. Consequently, the FTC's regulated entity estimate is fairly accurate numerically, but the Commission's understanding of the specific entities that comprise that universe is erroneous. |
| The FTC estimates the following total PRA burdens and costs: *Estimated Annual Hours Burden:* 7,816,819 hours. *Estimated Annual Labor Cost:* $221,870,782.[4] | Absent the type of rigorous study that NADA sought to conduct but that the FTC did not provide adequate time to complete, it is difficult to estimate the time and costs resulting from obligations and prohibitions contained in the Proposed TRR. Throughout the NPRM, the FTC fails to provide any basis for its task time estimates or to explain what assumptions underlie those estimates. Again, this makes it very difficult, if not impossible, to meaningfully assess or respond to the FTC's articulations of the burdens the Proposed TRR would impose. |
| | Nonetheless, in this Table, we provide a conservative analysis of the overall cost impact the proposal would have, although there are likely many additional material costs that this total would not include. And, for the reasons detailed below, the FTC's total PRA burden and cost estimates are inaccurate and insufficient and require the agency to revisit its burden and cost calculations. |
| **Add-on List Disclosures: Section 463.4(b)** | |
| The FTC claims that dealers would require approximately 14 hours to create initial disclosure systems, including the time necessary to create and review the required "Add-on" Lists and to design systems that provides for the display of "Add-on" Lists on websites and other online services.[5] | The FTC has underestimated the time and resources necessary to develop "Add-on" lists that comport with its very broad proposed definitions of "Add-on," "Add-on Products," and "Add-on List."[6] See NADA's comments for further discussion of these terms. The FTC also has failed to provide any basis for its task time estimates or any explanation of the assumptions it is making in proffering those estimates. For example, it does not explain its assumptions regarding how many different "Add-ons" an average dealership sells, which is critical to determining how long it would take to complete an "Add-on" List. |
| | These lists could be quite lengthy, with hundreds if not thousands of items per dealer. Moreover, they would vary widely by vehicle make and model, and thus would be very time intensive to develop and maintain. For example, for a single truck model at just one GM store, an "Add-on" List might include some 600 items that could be added before finalization of a transaction. See Attachment 16. |
| | And a dealer's "Add-on" lists would not be static; they would change regularly, and each change would require an updated listing. In addition, dealers frequently maintain multiple websites, web applications, and other places where such a list would need to be posted. Each of these facts would increase the costs associated with this requirement. |

---

[1] 87 Fed. Reg. 42012 at 42031.
[2] Section 463.2(e).
[3] Section 463.2(j).
[4] 87 Fed. Reg. at 42031.
[5] 87 Fed. Reg. at 42031-32.
[6] Sections 463.2(a) and (b).

| Table I    Paperwork Reduction Act Analysis | |
|---|---|
| **FTC Proposed Rule and PRA Estimate** | **NADA Response** |
| | Finally, the development of "Add-on" lists would require dealerships to work with, among others, their:<br><br>• OEMs who manufacture vehicle "Add-ons" for sale through their dealerships to determine what may apply for each vehicle make and model;<br>• financial product providers to determine acceptable price ranges;<br>• web and IT developers to modify dealership websites and mobile applications; and<br>• attorneys to review for compliance.<br><br>These interactions would also involve costs for dealers for which the FTC does not account. |
| The FTC assumes that all covered dealers charge for "Add-ons," and that none currently maintain "Add-on" Lists for customers. It estimates an initial burden of 651,350 hours (based on 46,525 dealers × 14 hours). The FTC estimates associated labor costs by applying hourly labor cost rates to the hours calculated above. The FTC expects certain managerial, administrative, and programming staff would likely perform the tasks associated with the creation, posting, and revision of "Add-on" Lists. For each dealer, the FTC estimates five hours of manager time at $65.54 per hour, one hour of compliance officer time at $26.83 per hour, and eight hours of programmer time at $28.90 per hour. These figures yield a total annual labor cost burden of $28.1 million.[7] | The FTC likely underestimates the actual labor involved for development and posting "Add-on" lists. To begin, the FTC again provides no basis for its assumed task time estimates or any explanation of the assumptions it is making in proffering those estimates. And, for all the reasons stated above, the actual per dealership hours that would be necessary for creating and posting "Add-on" lists would likely be significantly higher. |
| The FTC claims that some 81% of dealers with an online presence would require eight hours of programmer integration time, resulting in an estimated annual burden of 301,480 hours (based on 46,525 dealers × 81% × eight hours). A programmer rate of $28.90 per hour yields a total annual labor cost burden of $8.7 million.[8] | A more reasonable expectation would be that 100% of dealers would maintain an online presence and that integrations across platforms would be necessary for all dealers. But given the databases and number of entries involved and the need to coordinate with IT and website vendors, significantly more programmer time would be necessary. |
| The FTC claims that the periodic revision of these "Add-on Lists" would require one hour of clerical staff time per year, per dealer for a total annual periodic revision burden of 46,525 hours (based on 46,525 dealers × 1 hour). A per hour rate of $18.37 yields a total annual review estimate of $.855 million.[9] | As explained above, "Add-on" lists would be much more complicated and extensive than the FTC understands. And the same would be true of their maintenance and upkeep as prices and offerings change often. It strains credulity that all such changes would be able to be made in one hour per year. The periodic review of "Add-on" lists to ensure that they remain accurate, and the related coordination with multiple parties and vendors, would alone involve several more than one hour of clerical staff time per dealer, per year. |
| **Disclosures Relating to Cash Price without Optional Add-ons: Section 463.5** (See Attachments 11-13)<br>• **Vehicle Cash Price Disclosure: Cash Transactions: Section 463.5(b)(1)**<br>• **Vehicle Cash Disclosure: Financed Transactions: Section 463.5(b)(2)**<br>• **Itemization of Add On Disclosure: Section 463.5(b)(3)** | |
| The FTC anticipates that dealers charging for optional "add-ons" would incur certain initial and ongoing costs to provide the disclosures relating to Cash Price without Optional "Add-ons." Dealers likely would incur some costs to create and implement templates for these disclosures, either in paper or electronic form. The FTC estimates that these tasks would require some eight hours of compliance officer time at $26.83 per hour, four hours of sales manager time at $63.93 per hour, and eight hours of programmer time at $28.90 per hour, for a total of $701.56 per dealer, on average. The FTC claims that | The FTC underestimates the cost to develop the forms. First, the FTC has again failed to provide any basis for its task time estimates or any explanation of the assumptions it is making in proffering those estimates. Second, dealers would need to work with forms vendors, attorneys, compliance professionals and others to develop new forms and to deploy a rigorous forms review process. There is no market evidence to suggest that this process can be completed for less than $750. Rather, these interactions are likely to entail many more hours than the FTC estimates. |

---

[7] 87 Fed. Reg. at 42031-32.

[8] 87 Fed. Reg. at 42031-32.

[9] 87 Fed. Reg. at 42031-32.

| Table I   Paperwork Reduction Act Analysis | |
|---|---|
| **FTC Proposed Rule and PRA Estimate** | **NADA Response** |
| this yields an estimated total burden for all dealers, in the first year, of $32.6 million.[10] | |
| The FTC claims that the added time to input data for the disclosures relating to Cash Price without Optional "Add-ons" would be minimal, as they consist of information that dealers already obtain from customers in the ordinary course to complete vehicle sales transactions. The FTC estimates that, for each disclosure, mandated by Sections 463.5(b)(1), (b)(2), and (b)(3), it would take two minutes of salesperson time to complete at $21.84 per hour, yielding an average cost per disclosure of $0.73. Dealers would need to provide the Section 463.5(b)(1) disclosure for every vehicle they offer for sale with optional "add-on" products or services; the Section 463.5(b)(2) disclosure for every vehicle sale that is financed and includes an optional "add-on;" and the Section 463.5(b)(3) disclosure for every vehicle sale that includes optional "add-ons." The FTC claims that approximately 57,866,000 vehicles are sold annually by dealers, including 17,059,000 new and 40,807,000 used vehicles. The FTC also claims that each vehicle sale involves an offer of optional "add-ons," estimates that some 81% of new vehicle sales and 35% of used vehicle sales are financed, and that approximately 94% of new vehicle sales and 86% of used vehicle sales include optional "add-ons.[11] | The FTC grossly underestimates the costs that would be involved in making these disclosures. First, the FTC has again failed to provide any basis for its task time estimates or any explanation of the assumptions it is making in proffering those estimates. Second, there is at least one glaring omission from the FTC's enumeration of dealer costs; the training of sales staff, both initially and ongoing (given an industry average 67% annual turnover in sales staff). The need for, and cost of, such training would be significant, especially considering the consequences for not strictly complying with the proposal's disclosure mandates.

Further, although individually small, the combined cost of printing these forms would be significant and must not be overlooked. As discussed in NADA's comments, dealers would generally need a minimum of four, and in some cases many more, printed forms for each customer and their many prospective customers. Given the number of vehicle transactions that occur each year, the total number of forms needed would be in the hundreds of millions. Assuming a printing cost of $0.10 per form, a conservative estimate of the annual cost just for printing these forms would be tens of millions of dollars.

In addition, the disclosures mandated by Sections 463.5(b)(1) and (b)(2)) do not lend themselves to a standardized disclosure document that could be provided and explained to all customers. As discussed above, highly customized documents would be necessary that would require significant time to use. Moreover, because the form must be vehicle and customer specific, and because it would need to be provided well before transaction consummation, several iterations likely would need to be provided per customer since customers typically often inquire about more than one vehicle but rarely buy more than one. Similarly, since these forms must include a trade-in valuation at a very early point in the process, more trade-in valuations would need to be conducted than occur today. This is because in today's more rational and natural price discovery process, some customers decide not to proceed long before precise trade-in valuations are conducted. The FTC must assess and include additional estimates per transaction for the time it takes to complete the form multiple times, the time it takes for additional trade-in valuations, and the time it takes for customers to read and sign these disclosure forms.

And, of course, most of the time spent by dealers filling out and explaining these new forms would also be time spent by consumers either waiting for the forms or listening to and asking questions about the explanations. This would add hundreds of millions, if not billions, of dollars more in costs that would far exceed the purported consumer benefits of the Proposed TRR.

Finally, the FTC's estimates are incorrect for several additional reasons:
:
- The FTC fails to account for dealership and customer time expended on disclosures during transactions that are not completed.
- The FTC must assess and add to that subtotal the total number of new and used transactions made by the other "motor vehicle dealers" that would be subject to its Proposed TRR.
- The FTC wrongly assumes that all used vehicle transactions fall within the scope of its proposal by claiming that all 40,807,000 used vehicle transactions in the DOT table were made by either franchised or independent dealers subject to the Proposed TRR. But this 40.8 million transaction number includes those involving only private parties and |

[10] 87 Fed. Reg. at 42032.
[11] 87 Fed. Reg. at 42032.

| Table I    Paperwork Reduction Act Analysis | |
|---|---|
| **FTC Proposed Rule and PRA Estimate** | **NADA Response** |
| | independent dealerships without service shops, which would not be subject to the Proposed TRR. The FTC must subtract from its used vehicle number both those involving only private parties and those involving independent used vehicle dealers not covered by its proposal. |
| | • The FTC also assumes without support that approximately 94% of new vehicle sales and 86% of used vehicle sales include "optional add-ons." This is apparently based on a misinterpretation of NADA "F&I penetration" data measuring transactions where customers purchased at least one of the following: a finance, vehicle insurance, or GAP insurance contract. Because some customers buy more than one of these products, NADA estimates that many fewer transactions would involve them. |
| **Vehicle Cash Price Disclosure: Cash Transactions: Section 463.5(b)(1)** Given the above estimates and assumptions, the FTC claims that proposed Section 463.5(b)(1) disclosures would be provided in 1,244 transactions per dealer, on average, (based on 57,866,000 transactions ÷ 46,525 dealers), for a total annual burden of 1,929,237 hours, or 41 hours per dealer, on average (based on 1,244 transactions × 2/60 of an hour). The annual total labor cost estimate is $42.2 million (based on 1,244 transactions × 46,525 dealers × $0.73 per transaction), which equates to $908.12 per dealer, on average.[12] | The FTC has not provided any basis for its time estimates or any explanation of the assumptions it is making in proffering those estimates and has not properly identified the appropriate number of transactions or dealers subject to this disclosure mandate. Further, the FTC has failed to account for the time it takes 1) to provide multiple forms per negotiation, or 2) for customers to read, understand, and sign the proposed disclosure forms. As discussed in NADA's comments, each item on the proposed mandatory form is already disclosed to customers, but with those disclosures taking place at a more logical and consumer-friendly point in the sales process. Thus, the proposed mandate would be duplicative and would impose unnecessary paperwork burdens. |
| **Vehicle Cash Disclosure: Financed Transactions: Section 463.5(b)(2)** The FTC claims that dealers would provide proposed Section 463.5(b)(2) disclosures in an average of 543 transactions per year, on average, resulting in an annual burden of 842,103 hours, or some 18 hours per dealer, on average (based on 543 transactions × 2/60 hours). The FTC estimates an annual total labor cost of $18.4 million (based on 46,525 dealers x 543 transactions × $0.73 per transaction) or $396 per dealer, on average.[13] | The FTC has not provided any basis for its time estimates or any explanation of the assumptions it is making in proffering those estimates and has not properly identified the appropriate number of transactions and dealers subject to this disclosure mandate. Further, it has failed to account for the time it takes 1) to provide multiple forms per negotiation and 2) for customers to read, understand, and sign the proposed disclosure forms. As discussed in NADA's comments, each item on the proposed mandatory form is already disclosed to customers, but with those disclosures taking place at a more logical and consumer-friendly point in the sales process. Thus, the proposed mandate would be duplicative and would result in unnecessary paperwork burdens. |
| **Itemization of "Add-on" Disclosure: Section 463.5(b)(3)** The FTC claims that dealers would provide proposed Section 463.5(b)(3) disclosures in 1,099 transactions per dealer, on average. This yields a total annual burden of 1,704,366 hours, or 37 hours per dealer, on average, (based on 46,525 dealers × 1,099 transactions × 2/60 hours). The FTC estimates the total labor cost for this mandate to be $37.3 million or some $802 per dealer, on average (based on 46,525 dealers × 1,099 transactions × $0.73).[14] | The FTC has not provided any basis for its time estimates or any explanation of the assumptions it is making in proffering those estimates and has not properly identified the appropriate number of dealers or transactions subject to this proposed mandate. The FTC has also failed to account for the time it takes 1) to provide multiple forms per negotiation, or 2) for customers to read, understand, and sign the proposed disclosure forms. As discussed in NADA's comments, current law already requires disclosure of the optional nature of "add-ons" and an itemized list of "add-ons" that are purchased. Thus, the proposed mandate would be duplicative and would result in additional time added to the transaction and unnecessary paperwork burdens. |
| **Misrepresentations: Section 463.3** | |
| The FTC asserts that proposed Section 463.3 is consistent with existing misrepresentation prohibitions arising under Section 5 of the FTC Act, and thus do not themselves require additional information collection or disclosures. The FTC further states that, while dealers may elect to undertake monitoring or review to ensure compliance, any additional costs associated with proposed Section 463.3 would be *de minimis*.[15] | The broad nature of proposed Section 463.3 would necessitate additional annual training due to increased liability risks, and would require dealers to create, use, and keep records of additional forms, scripts, disclosures, and related training, imposing unnecessary paperwork burdens on both dealers and customers. Proposed Section 463.3 also would result in longer transaction times. And, as discussed in NADA's comments, since dealers selling new motor vehicles share control of their advertising platforms with the vehicle manufacturers with which they have sales and service agreements and with third parties, they have limited control over new vehicle advertising. Consequently, proposed Section 463.3 would result in very significant |

---

[12] 87 Fed. Reg. at 42032.
[13] 87 Fed. Reg. at 42032-33.
[14] 87 Fed. Reg. at 42033.
[15] 87 Fed. Reg. at 42033.

| Table I    Paperwork Reduction Act Analysis ||
| FTC Proposed Rule and PRA Estimate | NADA Response |
|---|---|
| | paperwork burdens and related costs, and it is incumbent upon the FTC to properly assess and codify those burdens and costs. |
| **Disclosure of Offering Price in Advertisements and In Response to Inquiry: Section 463.4(a)** ||
| The FTC asserts that any additional burdens and related costs associated with the proposed Section 463.4(a) offering price mandate would be *de minimis,* based on an assumption that such vehicle pricing activities are usually and customarily performed by dealers in the normal course, and that while proposed Section 463.4(a) may increase the importance of those activities, it would not alter when they are undertaken.[16] | The FTC incorrectly characterizes the burden and cost impact of proposed Section 463.4(a). As discussed above, the proposal does not accurately or realistically define "offering price," given the variety of circumstances that would trigger the proposed disclosure mandate during the initial stages of a motor vehicle sales negotiation. The proposed Section 463.4(a) mandate would make it difficult for dealers to respond to customer inquiries efficiently or accurately as they might trigger an offering price disclosure and would most certainly lengthen transaction times. The costs of training sales staff on how to navigate this mine field alone would be material. Moreover, it is estimated that for any given consummated new or used vehicle transaction, there would be an average of three Offering Price disclosures based there being an average of three dealer-customer discussions regarding three specific motor vehicles, per transaction. Thus, the FTC must reassess and codify the burdens and costs for both dealers and their customers that would result from the disclosures mandated by proposed Section 463.4(a). |
| **Disclosure of Total Cost: Section 463.4(d) and Disclosure of Effect of Lower Monthly Payments: Section 463.4(e)** ||
| The FTC claims that the disclosures mandated by Sections 463.4(d) and (e) would involve information produced in the ordinary course that would be known to dealer staff at the time such disclosures would be required. The FTC asserts that these proposed mandates would require dealers to provide readily available information, and that related paperwork burdens and costs would be *de minimis.*[17] | As discussed in NADA's comments, the FTC is proposing the disclosure of information that impermissibly and imprudently intrudes on the time-tested content, form, and timing disclosures developed by the FRB to inform consumers of the cost of motor vehicle credit and leasing. Therefore, any paperwork burden associated with this requirement is confusing, somewhat duplicative, and unnecessary. NADA is further concerned that these new disclosures would add time to the transaction process and create confusion as they may have to be updated and provided to the customer several times throughout the transaction. This necessitates time being added to the transaction to provide the disclosures and for customers to review, which the FTC has neglected to consider. Finally, the costs of training sales staff on how to navigate this mine field alone would be material and must be properly assessed by the FTC. |

---

[16] 87 Fed. Reg. at 42033.
[17] 87 Fed. Reg. at 42033.

| Table I    Paperwork Reduction Act Analysis | |
|---|---|
| **FTC Proposed Rule and PRA Estimate** | **NADA Response** |
| **Recordkeeping: Section 463.6** | |
| As detailed in its Preliminary Regulatory Analysis, the FTC claims "incremental" increases in recordkeeping burdens and costs related to retaining copies of "Add-on" Lists, of disclosures related to Cash Price without Optional "Add-ons", and of other records necessary to demonstrate compliance. The FTC asserts that it would take dealers approximately 15 hours to modify their existing recordkeeping systems to retain required records for the proposed 24-months. This would yield a general recordkeeping burden of 697,875 hours annually (based on 46,525 dealers × 15 hours per year).[18]<br><br>The FTC claims that, beyond those records created and retained in the ordinary course of business, proposed Section 463.6(a)(4) would mandate that dealers create and retain calculations of loan-to-value ratios in GAP contracts. The FTC estimates that of the 57,866,000 vehicles sold each year, approximately 25.7% or 14,871,562 sales include GAP agreements[19] | As discussed in NADA's comments, the recordkeeping costs and burdens associated with Section 463.6 would be major. Except for purchase orders and finance and lease documents identified in Section 463.6(3) and certain other select documents, the documents identified in this subsection represent new obligations. For example, dealer communications covered by the scope of this mandate include, but are not limited to, online chat features on dealer websites, e-mails and text messages with salespersons, and social media posts. These communications involve both dealer-owned and employee-owned devices and communications made both during and outside of normal business hours. Requiring dealers to develop systems to capture all written communications involving tens of millions of new and used motor vehicle transactions each year would, if possible, involve massive costs. As noted above, the costs of training sales staff on how to navigate these requirements would be significant and should be properly estimated by the FTC.<br><br>The FTC has severely underestimated the time and resources necessary to develop recordkeeping systems that would comport with the Section 463.6 mandate's very broad application. Moreover, it has virtually ignored the multiple dealership systems and vendors that would be involved with keeping a record of all dealer advertisements, customer communications, and transactions. The FTC also drastically underestimates the scope of this burden by incorrectly assuming that dealerships would only have to retain these records for vehicles sold. This requirement would apply to *all* consumer facing communications and consumer inquiries regardless of a vehicle sold, since dealers cannot predict which of their customers will ultimately purchase vehicles from them. |
| The FTC asserts that its loan-to-value recordkeeping mandate would require one hour of sales manager time to create and implement a loan-to-value calculation template, at a cost of $63.93, and one hour for a compliance officer to review the template, at a cost of $26.83. This equates to an estimated total initial burden of 93,050 hours (based on 46,525 dealers × 2 hours). Total labor costs are estimated at $4.2 million (based on a combined $63.93 per hour × 1 hour × 46,525 dealers and $26.83 per hour × 1 hour × 46,525 dealers).[20]<br><br>The FTC also claims that, with templates in place, dealers would expend one minute per transaction for a salesperson to perform the calculations contemplated by this mandate, at a cost of $21.84 per hour. Again, the FTC states that dealers sell approximately 57,866,000 vehicles each year, and that 25.7% of those or 14,871,562 sales include GAP agreements. This equates to 320 GAP sales transactions per dealer, per year, on average, and a total burden of 248,133 hours (based on 46,525 dealers × 320 transactions × 1/60 hour). Applying associated labor rates yields a total annual paperwork cost of $5.4 million (based on 248,133 hours × $21.84 per hour).[21] | As discussed in NADA's comments, LTV ratios vary by vehicle, by depreciation rate, by transaction, and over time. Consequently, it would be virtually impossible to create a simple calculator template. In addition, the Proposed TRR states that dealers would be prohibited from charging for "add-on" products that provide no benefit to customers. Because this standard is vague and requires further definition by the FTC, complying with it would require resolving or addressing those uncertainties, and that involves cost. Of course, while dealers should not be offering valueless products to customers, with respect to many products it is far from clear whether in the eyes of the FTC the product fails that standard. Indeed, the value of any product depends on several factors related to the customer and vehicle. For example, with GAP coverage: variable market conditions would have to be measured and assessed to determine in the LTV ~ depreciation relationship warrants the coverage to determine whether "value" is being provided.<br><br>To minimize recordkeeping burdens, the FTC must more clearly define the scope of the proposed mandate, accurately determine the number of annual transactions that are within that scope and apply a multiplier to those transactions to reflect those where assessments must be performed multiple times. Only after calculating an accurate number of assessments can the FTC further calculate the costs and burdens associated with those assessments, both for dealers and for their customers. And as with other mandates set out in the Proposed TRR, Section 463.6 would necessarily lengthen the time it takes to conduct transactions to which it applies. |
| *Capital and Other Non-Labor Costs* The FTC asserts that the Proposed TRR would impose limited capital and non-labor costs, stating that dealers already have systems for providing sales and contract-related disclosures to motor vehicle | As mentioned throughout this Table, the capital and other non-labor paperwork costs and burdens related to the Proposed TRR would not be *de minimis and* must be properly assessed and calculated by the FTC. |

---

[18] 87 Fed. Reg. at 42033.
[19] 87 Fed. Reg. at 42034.
[20] 87 Fed. Reg. at 42034.
[21] 87 Fed. Reg. at 42034.

| Table I    Paperwork Reduction Act Analysis | |
|---|---|
| **FTC Proposed Rule and PRA Estimate** | **NADA Response** |
| customers and to consumers seeking information during the vehicle-shopping process. The FTC asserts that the proposals' disclosure mandates might make limited additions to the types of forms and disclosures that must be provided, but that these changes would not require substantial investments in new systems. Moreover, many dealers would elect to furnish some disclosures electronically, further reducing total costs. <br><br> Section 463.4(b) would require dealers who engage in advertising and charge for optional add-ons to have a website, online service, or other mobile application by which to disclose "Add-on" Lists. The FTC claims that dealers who engage in covered advertising typically already operate websites or other applications by which they could make disclosures and asserts that the capital costs associated with such disclosures would likely be *de minimis*.[22] | |
| The FTC claims that dealers already have recordkeeping systems for the storage of documentation retained in the ordinary course of business, including records relating to vehicle financing and customer contracts and leases. As set out in detail in the Preliminary Regulatory Analysis, the FTC asserts that the proposals' additional recordkeeping mandates may result in incremental non-labor costs to add capacity to these systems to store records. The Proposed TRR provides that covered motor vehicle dealers may keep required records in any legible form, and in the same manner, format, or place as they may already keep records in the ordinary course. Accordingly, the FTC asserts that the proposal would not require dealers to invest in new recordkeeping systems.[23]. | As laid out above, the recordkeeping costs and burdens associated with Section 463.6 would be major, would impact every customer-facing communication, and would require investments in and coordination of new recordkeeping systems. |
| The FTC estimates the non-labor costs incurred by dealers for providing disclosures in written or electronic form would differ based on the method of disclosure employed. As detailed in its Preliminary Regulatory Analysis, the FTC estimates an average physical per disclosure cost of $0.11 across paper and electronic methods. This includes (1) a cost of $0.15 per printed single-sided page disclosure (based on printing costs associated with the Used Car Rule); and (2) a cost of $0.02 per electronic disclosure. As noted above, dealers would need to provide Section 463.5(b)(1) disclosures for every vehicle they offer with any optional" add-on" products or services; the Section 463.5(b)(2) disclosure for every vehicle sale that is financed and includes an optional "add-on"; and the Section 463.5(b)(3) disclosure for every vehicle sale that includes an optional "add-on". The estimated annual cost of providing these disclosures is approximately $317.45 per dealer, on average, for a total of $14.8 million.[24] | As mentioned above, the FTC has failed to address the following in providing its estimate regarding the Section 463.5(b) disclosures: <br><br> • These disclosures would likely be provided multiple times during a customer interaction <br> • These disclosures would be provided to customers who do not finalize a vehicle sale with the dealership <br><br> Without accounting for these facts, the FTC is drastically underestimating the cost of this paperwork burden. |
| The FTC further claims that dealers currently storing records in hard copy are unlikely to require extensive additional storage for physical document retention. Moreover, due to low cost of cloud and other electronic storage, dealers who store records electronically would incur minimal incremental costs to expand their storage to comply with Proposed TRR's recordkeeping mandates.[25] | As mentioned above, due to the scope of the recordkeeping requirement, the costs to expand storage capacity would be material and should be properly assessed and calculated by the FTC. |

---

[22] 87 Fed. Reg. at 42034.
[23] 87 Fed. Reg. at 42034.
[24] 87 Fed. Reg. at 42034.
[25] 87 Fed. Reg. at 42034-35.

A421

7

ATTACHMENT 19

# Regulatory Flexibility Act Analysis Chart

| Table II    Regulatory Flexibility Act Analysis | |
|---|---|
| **FTC RFA Analysis** | **NADA Response** |
| General The FTC asserts that its proposal would not impose a significant economic impact on small entities but acknowledges that it likely would affect a substantial number of small entities. The FTC notes that the proposal would apply to motor vehicle dealers predominantly engaged in the sale and servicing of motor vehicles, the leasing and servicing of motor vehicles, or both, as defined in Section 1029 of the Dodd-Frank Act, and that many such dealers would be classified as small businesses[1]. | As detailed below, the Proposed TRR would absolutely have a significant economic impact on small entities. It appears that the only small entities that would be impacted by the Proposed TRR would be small business "Dealers or Motor Vehicle Dealers" as defined in proposed Section 463.2(e). "Motor Vehicle" is defined in proposed Section 463.2(j).[2] |
| 1. Description of the Reasons That Agency Action Is Being Considered The FTC states that the Proposed TRR aims to curb misleading practices and unauthorized charges to consumers during the vehicle buying or leasing process, and to provide an additional enforcement tool to deter dealer misconduct and remedy consumer harm. The FTC claims that its law enforcement, outreach, and other engagement in this area, together with the tens of thousands of consumer complaints it receives each year, indicate that dealer misconduct and deceptive tactics persist despite substantial federal and state law enforcement efforts. The FTC issued the proposal pursuant to the Dodd Frank Act, which it claims authorizes it to prescribe rules addressing unfair or deceptive dealer acts or practices.[3] | Unfair or deceptive acts or practices by dealer are rare and, when they occur, are being addressed with existing federal, state, and industry tools. The FTC's claim that it receives tens of thousands of complaints each year involving dealers is addressed in NADA's comments. Also discussed in NADA's comments, is the FTC's characterization of the number and nature of unfair and deceptive acts and practices by dealers is unfounded. |
| 2. Statement of the Objectives of, and Legal Basis for, the Proposed Rule The FTC claims that the objective of the Proposed TRR is to prevent unfair or deceptive acts or practices involving the sale, financing, and leasing of motor vehicles. The FTC claims that the legal basis for the proposal is the FTC Act, 15 U.S.C. secs. 41 *et seq.*, and Section 1029 of the Dodd-Frank Act, 15 U.S.C. 5519, which authorizes it to prescribe rules with respect to motor vehicle dealers pursuant to the FTC Act, which prohibits unfair or deceptive acts or practices in or affecting commerce.[4] | The FTC's invocation of authority to in support of this rulemaking is addressed in NADA's comments. |
| 3. Description and Estimate of the Number of Small Entities to Which the Proposed Rule Would Apply The Proposed TRR applies to motor vehicle dealers as defined in Section 1029 of the Dodd-Frank Act. The FTC estimates that there are a total of approximately 46,525 franchised and independent/used dealers in the U.S. The FTC recognizes that many of these dealers are small businesses based on applicable Small Business Administration (SBA) size standards. SBA's standards classify as small businesses new vehicle dealers with fewer than 200 employees each and used vehicle dealers with annual receipts of less than $27 million.[5] | The FTC claims that there are 21,427 franchised new motor vehicle dealers in the U.S., all of which fall within the scope of the definition of "Dealer or Motor Vehicle Dealer" set out in proposed Section 463.2(e). There are some 25,000+ independent used motor vehicle dealers, but only those engaged in vehicle servicing fall within the proposed definition. The FTC's fails to recognize that the proposed definition of "Motor Vehicle" found in Section 463.2(j) would pull in RV, marine, motorcycle, recreational, and other dealers licensed to sell or lease, and service, new and/or used motor vehicles. See NADA's comments for further discussion of proposed Section 463.2(j). It is estimated that there are some 20,000 dealers selling or leasing and servicing those latter motor vehicles, which is approximately the same as the number of independent dealers that the FTC erroneously includes in its estimate. Thus, the FTC's regulated entity estimate is fairly accurate numerically, but its understanding of the specific entities that comprise that universe is erroneous.[6]

The average new vehicle dealer (NAICS 44111) employs 65 people and at least half fall within the SBA size standard. NADA has no information on the number of small businesses in the other covered "dealer" categories. The RFA requires the FTC to accurately determine the number of small businesses that would be impacted by the Proposed TRR in order that it properly analyze the nature and degree to which they would be impacted. |

---

[1] 87 Fed. Reg. at 42035.
[2] 87 Fed. Reg. at 42045.
[3] 87 Fed. Reg. at 42035
[4] 87 Fed. Reg. at 42035.
[5] 87 Fed. Reg. at 42035.
[6] 87 Fed. Reg. at 42045.

| Table II    Regulatory Flexibility Act Analysis | |
| --- | --- |
| **FTC RFA Analysis** | **NADA Response** |
| 5. Identification of Duplicative, Overlapping, or Conflicting Federal Rules Although other federal statutes, rules, or policies address motor vehicle sales and financing, the FTC states that it has not identified any duplication, overlap, or conflict with the proposal.[7] | The FTC's statement is inaccurate. As NADA discusses in its comments, the Proposed TRR problematically duplicates, overlaps with, and conflicts with other federal law. In addition, NADA's comments and those submitted by numerous state dealer associations also discuss the intersection of the Proposed TRR with various state UDAP and other laws. |
| 6. Description of Any Significant Alternatives to the Proposed Rule The FTC envisioned and drafted the Proposal TRR mindful that most dealers are small entities, and thus did not include alternative compliance mechanisms for small businesses. The FTC states that because of the relative size of the automobile market compared to other types of dealers, and the greater availability of relevant information for this market, its preliminary analysis exclusively considers motor vehicle dealers, and concludes that its analysis and results are representative of most dealers and transactions, and that expanding the scope of its analysis to other dealers is unlikely to lead to different conclusions.[8] | As noted above, the FTC has not accurately characterized the nature and scope of the small businesses that would be regulated by the Proposed TRR. Moreover, prior to issuing its proposal, the FTC neither attempted to consult with, survey, or otherwise study the dealers it intended to regulate, nor did it attempt to examine whether differing sets of potential mandates should apply to small dealers vs. large dealers. For example, there is no evidence suggesting that the FTC considered (1) different compliance or recordkeeping mandates for small entities, (2) clarifying or simplifying compliance or recordkeeping mandates for small entities, or (3) exempting certain or all small entities from all or part of its rule.<br><br>The FTC's obligations under the RFA and under E.O. 12866 include more than the proper consideration of appropriate accommodations for small businesses. Of great importance is the obligation of the FTC to consider alternatives to *doing a rule at all*. In its comments, NADA discusses the FTC's failure to consider any such alternatives. |
| The FTC uses 10 years in its baseline scenario as its rules are subject to review every 10 years. Quantifiable aggregate benefits and costs are summarized as the net present value over this 10-year time frame. Quantifiable benefits derive from time savings due to greater price transparency leading to a more efficient shopping and sales process. Quantifiable costs primarily reflect the resources expended by dealers in developing the systems necessary to comply with the Proposed TRR. The discount rate reflects society's preference for receiving benefits earlier rather than later; a higher discount rate is associated with a greater preference for benefits in the present. The present value is obtained by multiplying each year's net benefit by the discount rate equal to the number of years in the future the net benefit accrues.[9] | As discussed below, the FTC's benefits calculations are both misplaced and grossly inaccurate. The FTC's cost calculations, while not necessarily misplaced in that they attempt to assess the compliance costs associated with the Proposed TRR's up front and ongoing disclosure and recordkeeping mandates, also are grossly inaccurate. |
| **Estimated Benefits of Proposed Rule** | |
| 1. Consumer Time Savings When Shopping for Motor Vehicle Dealers The FTC claims that the Proposed TRR's mandates to disclose relevant prices, and its prohibitions on misrepresentations would save consumers time when shopping for motor vehicles as the provision of salient, material information early in the process would eliminate time spent pursuing misleading offers. The FTC further claims that its enforcement records show that consumer search and shopping behaviors are sometimes influenced by deceptive advertising that draws them to dealers in pursuit of an advertised deal, only to find out at some point later in the process (if at all) that the advertised deal is not actually available to them. The FTC further claims that motor vehicle consumers frequently begin the process of a motor vehicle transaction by visiting a dealer in response to an ad or initiating negotiations in response to a quoted price that is incomplete, and then later abandon the transaction when additional information is revealed. The FTC states that bait-and-switch or deceptive door-opener advertising has the effect of wasting a consumer's time traveling to and | NADA's comments discuss in detail the inadequacy of the FTC's benefits analysis. NADA also notes that, in Table 2.1 in the NPRM, the FTC points to U.S. Department of Transportation (DOT) Statistics[11] in support of its claim that there were 62.1 million covered transactions in 2019.[12] This 62.1 million transaction number is grossly inaccurate for the following reasons:<br><br>First, the FTC appears to have double-counted the new vehicle lease transactions listed in DOT's table. The U.S. DOT lists 57,865,000 total new and used vehicle sales and leases in 2019. The difference between this number and the 62.1 million number claimed by the FTC is 4,242,000, which coincides with the number of new vehicle leases listed in the DOT table. Second, the FTC wrongly assumes that all used vehicle transactions fall within the scope of its proposal by claiming that all 40,807,000 used vehicle transactions in the DOT table were made by either franchised or independent dealers subject to the Proposed TRR. But this 40.8 million transaction number includes those involving only private parties, which would not be subject to the Proposed TRR. Also, as stated previously, most of the transactions by independent dealers would not be subject to the |

---

[7] 87 Fed. Reg. at 42035.

[8] 87 Fed. Reg. at 42035-36.

[9] 87 Fed. Reg. at 42036.

[11] U.S. DOT Bureau of Transportation Statistics, National Transportation Statistics, (2021). Available at: https://www.bts.dot.gov/sites/bts.dot.gov/files/2021-12/NTS-50th-complete-11-30-2021.pdf. (Table 1-17, p. 21).

[12] 87 Fed. Reg. at 42037.

| Table II    Regulatory Flexibility Act Analysis | |
|---|---|
| **FTC RFA Analysis** | **NADA Response** |
| negotiating with a dishonest dealer time which would otherwise be spent pursuing truthful offers in the absence of deception. The FTC then notes that since it *lacks adequate information to determine the quantity of such abandoned transactions and the amount of time spent pursuing them,* this benefit is unquantified in the current analysis.<br><br>The FTC acknowledges that many consumers end up completing transactions under the status quo—either because full revelation of prices and terms still result in mutually beneficial transactions, or because of constraints on the time consumers can dedicate to their search. But the FTC claims that even these consumers spend unnecessary time discovering information that dealers would be required to disclose earlier under the proposal. The FTC claims further that these disclosure mandates would improve information flow and consumer search efficiency, including but not limited to, curbing the influence of deception on consumer search and shopping behavior.<br><br>Ultimately, the FTC asserts, without support, that the Proposed TRR's provisions prohibiting misrepresentations and requiring price transparency would result in *each consumer who ends up purchasing a vehicle would spend 3 fewer hours shopping online, corresponding with dealerships, visiting dealer locations, and negotiating with dealer employees per motor vehicle transaction.* The FTC then uses 62.1 million motor vehicle purchase, finance, and lease transactions per year to calculate a total time savings of more than 186.3 million hours per year. The FTC next applies an hourly rate of $22.20 per hour (based on average rate of $27.07 per hour x 82%) to claim a total time savings benefit for all completed transactions of $4.1 billion per year, which translates to a present value of between $31.1-$36.3 billion.[10] | Proposed TRR. The FTC must subtract from its 62.1 million transaction number both those involving only private parties and those involving independent used vehicle dealers not covered by its proposal. Lastly, the FTC must assess and add to that subtotal the total number of new and used transactions made by the other "motor vehicle dealers" that would be subject to its Proposed TRR. All told, NADA suggests that less (and likely significantly less) than 40 million new and used motor vehicle transactions in 2019 would fall under the Proposed TRR.<br><br>As explained in NADA's comments, the FTC's assertion that consumers would save three hours per transaction due to the Proposed TRR's mandates is without any basis or foundation. To arrive at this number, the FTC points to a 2020 Cox Automotive Study[13] stating that consumers spend roughly 15 hours researching, shopping, and visiting dealers per motor vehicle transaction. Notably, a 2021 version of the Cox Study[14] concludes that the total time spent by consumers in the car buying process fell in 2021 to an average of 12 hours and 27 minutes on shopping, researching, and visiting dealers.<br><br>It is well recognized within the auto retailing industry that the downward trend in the amount of time consumers spend researching, shopping, and visiting dealers will continue into the foreseeable future as dealers increasingly conduct motor vehicle transactions digitally.[15] This trend reflects both the degree to which (1) dealers are increasingly utilizing digital marketing and transactional tools and (2) consumers are moving to online sources for: A) background research on features and pricing; B) online dealer advertising and transactional portals. To better understand this very important trend in motor vehicle transactions, the FTC must conduct a thorough review of how much time consumers now spend, and in the future would spend, researching, shopping, and visiting dealers per motor vehicle transaction. By way of example, J.D. Power has studied for 36 years how much time is spent at dealerships during the sales process.[16]<br><br>The FTC then goes on to assume, *without explanation or support,* that 20% of the total time spent researching, shopping, and visiting dealers per motor vehicle transaction would be eliminated should the proposal take effect. This also assumes that *all* shopping experiences and transactions include additional time due to dealership misrepresentations. Again, as explained in the comments, the FTC is perpetuating a flawed narrative of widespread misconduct and underestimating the intelligence of customers.<br><br>As further discussed in NADA's comments, the more accurate conclusion is that the mandates in the Proposed TRR would result in an *increase* in the amount of time spent by consumers researching, shopping, and visiting dealers per motor vehicle transaction. The bottom line is that no consumer time savings would result from the mandates in the FTC's Proposed TRR and, in fact, the FTC's proposal would likely result in an *increase* in the time consumers would otherwise spend, per transaction. |

[10] 87 Fed. Reg. at 42036-37.

[13] Cox Automotive, 2020 Cox Automotive Car Buyer Journey Study Overview (2020). Available at: https://b2b.autotrader.com/app/uploads/2020-Car-Buyer-Journey-Study.pdf.

[14] Cox Automotive, 2021 Cox Automotive Car Buyer Journey Study Overview (Jan. 2021). Available at: https://www.coxautoinc.com/wp-content/uploads/2022/01/2021-Car-Buyer-Journey-Study-Overview.pdf.

[15] Cox Automotive, Digitization of End-to-End Retail (Jan. 2021). Available at: https://www.coxautoinc.com/wp-content/uploads/2021/01/2021-Digitization-of-End-to-End-Retailing-Study-Highlights.pdf.

[16] *U.S. Sales Satisfaction Index Study*, J.D. Power,  https://www.jdpower.com/business/automotive/us-sales-satisfaction-index-ssi-study (last visited Sept. 10, 2022). *Despite Lack of New-Vehicle Inventory, Sales Satisfaction Unchanged from Year Ago,* J.D. Power, https://www.jdpower.com/business/press-releases/2021-us-sales-satisfaction-index-ssi-study.

A425

3

| Table II    Regulatory Flexibility Act Analysis | |
|---|---|
| **FTC RFA Analysis** | **NADA Response** |
| **2. Consumer Welfare Benefits from Curbing Non-Mutually Beneficial Transactions or Price Effects of Deception** The FTC claims that, due to the obfuscation and deception it has identified in prior law enforcement actions, some consumers end up consummating transactions where the price paid is more than the value they obtain from the product or service ( *i.e.*, the highest price the consumer would be willing to pay were the product marketed transparently and non-deceptively). In cases where the value consumers obtain still exceeds the cost of providing the product or service, there is still a net gain in social welfare from that transaction despite the deception, as resources are allocated to a higher value use. However, those consumers may receive less benefit (*i.e.,* lower consumer surplus), and their dealers may receive higher profits in some transactions relative to a full information benchmark because of the higher prices that can be sustained through deception. Therefore, deceptive marketing can result in a transfer of welfare from consumers to dishonest dealers.

The FTC then states that, while it is possible that the proposal may prevent transfers of wealth that occur through prices supported by deception, the overall effects of the proposal on pricing and competition are difficult to predict. It goes on to assert that typically, transfers of welfare from one set of people in the economy to another are documented in a regulatory analysis, but do not weigh on the outcome, but as the redistribution of welfare from deceptive firms to victimized consumers is part of the FTC's mission, transfers of this kind might weigh in favor of proceeding with the proposal. The FTC also asserts that, in cases where the value a consumer obtains is less than the cost of providing the product, there is a net *loss* in social welfare from the transaction, as resources are allocated to a lower value use. Even under the lower prices that may result from prohibiting the deceptive or unfair practices considered in the proposal, no such transaction would transpire. These cases are emblematic of the reduction in social welfare caused by the information asymmetry under the status quo. The FTC then asserts that this information asymmetry between dealers and consumers would be mitigated, and some fraction of these transactions (and the associated welfare losses) would be prevented under the Proposed TRR.[17] | Notwithstanding its obligations under the RFA, the FTC fails to provide any support for, or quantification of, "non mutually beneficially transactions," the "consumer welfare benefits" associated with eliminating such transactions, or how the TRR would reduce those transactions relative to alternatives. The number of such transactions, and any benefits that would result from their elimination, likely are too small to measure.

As discussed in NADA's comments, motor vehicle customer satisfaction is strong and on the rise with survey after survey showing that most retail vehicle purchasers have a positive experience at and with their selling dealer. The FTC has failed to account for this overwhelming evidence on customer satisfaction, or to assess the real-world transaction experience of retail motor vehicle purchasers.

Such high satisfaction rates suggest that the FTC cannot show, let alone quantify, a significant number of "cases" or "fraction of transactions" where the benefits were not "mutually beneficial." It also suggests that the Proposed TRR is a solution in search of a problem and that, as mandated by the RFA, the FTC should have considered and analyzed alternatives that impose fewer burdens and costs on dealers and their customers while targeting in a focused manner those small number of "cases" or "fractions of transactions" where deceptive or unfair practices occur. |
| **i. Advertising Misrepresentations** The FTC asserts that some price advertising misrepresentations, the availability of rebates/discounts, monthly payment amounts, and amount due at signing are discovered before transactions are consummated. The FTC also asserts that consumers who learn that these deceptive door-opener claims were false or misleading, update their beliefs about the deal being presented, and either walk away from the transaction or proceed with the it anyway because they do not believe that they would find a better offer (especially considering the time and cost to start the process anew, which can be prohibitive). For these individuals, the time spent negotiating under false pretenses and visiting dishonest dealers is a source of injury.

The FTC goes on to assert that, in other cases, however, the inaccurate beliefs engendered by such misrepresentations can remain through the transaction consummation. For example, if actual terms differing from those that attracted consumers are buried in the paperwork, they can only discover them at signing. Consumers may persist in the belief that they are getting the deals | Motor vehicle advertising misrepresentations are, as they should be, already prohibited under Section 5 of the FTC Act and under state law. That said, the FTC provides no credible analysis to support its assertions regarding systemic consumer behavior in response to motor vehicle advertising misrepresentations. The RFA requires the FTC to identify with specificity the problems it seeks to address and to evaluate alternatives to address those problems. This is especially necessary where, as with the poorly defined mandates in the Proposed TRR, the costs imposed on dealers and consumers would be very large. |

---

[17] 87 Fed. Reg. at 42037-38.

| Table II | Regulatory Flexibility Act Analysis |
|---|---|
| **FTC RFA Analysis** | **NADA Response** |
| that the misleading advertising or salesperson's verbal misrepresentations suggested. Only after completing their transactions, if ever, may consumers realize that they have been misled into deals that they would not have agreed to with full knowledge of the terms. For these transactions, the cost may exceed the consumers' lost time, provided that the true value they would receive is less than the dealers' cost. In these cases, transactions reduce social welfare. As discussed above, these misrepresentations may also have price effects that result in transfers from the consumer to a dishonest dealer, which the Proposed TRR would reverse to some extent.<br><br>The FTC concludes that by prohibiting advertising misrepresentations and enhancing the flow of truthful information to consumers, the Proposed TRR would reduce the number of inefficient transactions. Fewer consumers would end up consummating transactions that do not benefit them but occur under the status quo due to false beliefs propped up by misleading advertisements or other dealer misrepresentations. The FTC concludes that this would not necessarily imply an overall reduction in vehicle sales, as consumers may instead find transactions with true terms that are mutually agreeable.[18] | |
| ii." Add-On" Products and Services The FTC states that dealers typically offer a host of optional "add-on" products and services that are sold in a bundle with the vehicle (*e.g.,* extended warranties, service and maintenance plans, payment programs, guaranteed asset protection insurance, emergency road service, VIN etching, undercoating, etc.). It further states that these "add-on" products are often not discussed until near the end of transactions, sometimes after financing terms have already been settled, and that some unscrupulous dealers then suggest that some set of "add-ons" may be required (even if they are truly optional), inflating the price of the bundle beyond what consumers thought they had negotiated. Alternatively, "add-ons" that are declined by consumers or not discussed at all may simply be "packed" into the contract paperwork near the end of the process without the consumers' knowledge. The presence or true price of these packed "add-ons" often can be obscured by dealers only reporting the monthly payment amount to consumers in these late stages of the transaction. The FTC then asserts that in cases where such misrepresentations are discovered before transactions are completed, consumers would learn of "add-on" prices and "add-on" features, decide whether the product is worth the price being charged, and either proceed or not. Again, the consumers' time is wasted, but the transaction itself still yields an increase in social welfare. Price effects of this type of deception may also result in transfers from the consumer to a dishonest dealer, the reversal of which may or may not weigh on the net benefits of the proposal depending on whether redistribution of welfare from dishonest dealers to consumers is a goal of the Proposed TRR.<br><br>The FTC also states that in cases where consumers never learn of misrepresented or packed "add-ons," they may end up paying for "add-ons" that they would not have purchased if dealers had been transparent about the terms of the contract. Additionally, when the dealers' cost of providing "add-ons" exceeds the true value "consumers" receive, transactions reduce social welfare, as resources are allocated to lower value uses. The timely flow of | As noted throughout, unfair or deceptive acts or practices involving voluntary protection products (VPPs), or so-called "add-ons," are, as they should be, already prohibited under Section 5 of the FTC Act and under state law. That said, the FTC acknowledges that it lacks any analysis in support of its assertions regarding consumer behavior in response to unfair or deceptive acts or practices involving "add-ons" and has not quantified how often misrepresentations involving "add-ons" occur. The RFA requires the FTC to identify with specificity the problems it seeks to address and to evaluate alternatives to address those problems. This is especially necessary where, as with the poorly defined mandates in the Proposed TRR, the costs imposed on dealers and consumers would be very large, and where, as discussed in NADA's comments, each of the disclosure mandates in the Proposed TRR regarding VPPs is currently being made today at a more logical and consumer-friendly point in the sales process. |

| Table II   Regulatory Flexibility Act Analysis | |
|---|---|
| **FTC RFA Analysis** | **NADA Response** |
| truthful information facilitated by the proposal would empower consumers to avoid such transactions and generate benefits.<br><br>Lastly, the FTC claims that some dealers would charge consumers for "add-ons" from which they cannot reasonably expect to receive any benefit. For example, guaranteed asset protection (GAP) is an insurance product that covers the difference between what a car is worth and the principal on one's loan to address when a vehicle is totaled and one's auto insurance payout would not cover the debt. In some circumstances, financing contracts would outright foreclose this possibility (*i.e.,* where a down payment is high enough so that a customer would never owe more than the car is worth). Some dealers, however, would still market GAP coverage to such consumers, extracting payments for a product that would never provide any benefit to them. In these cases, it is obvious that the transaction should never occur when a consumer has full information. The FTC asserts that the Proposed TRR would prohibit such charges, thus eliminating these transactions and generating benefits. The FTC acknowledges that without additional information, it is difficult to quantify the number of transactions or potential price effects that would be avoided by the proposal.[19] | |
| 3. Benefits Related to More Transparent Negotiation The FTC asserts that an additional, albeit difficult to quantify, benefit is a reduction in "discomfort and unpleasantness" that consumers associate with negotiating motor vehicle transactions under the status quo. According to the 2020 Cox Automotive Car Buyer Journey study, filling out paperwork, negotiating vehicle price, and dealing with salespeople are three of the top four frustrations for consumers at car dealers. The FTC then asserts that the proposal would, through greater transparency, mitigate all three of these issues. As a result, the time consumers spend shopping and negotiating motor vehicle transactions would be less stressful.[20] | The FTC's claim that the mandates in the Proposed TRR would mitigate consumer frustrations related to paperwork, negotiating vehicle price, and dealing with salespeople are without support or foundation. First, the FTC has made no attempt to quantify any "reduction" in alleged "discomfort or unpleasantness." As noted throughout NADA's comments, customers are generally very pleased with their motor vehicle shopping experiences and the unjustified and confusing mandates in Proposed TRR would only serve to confuse and frustrate those customers. Second, customer satisfaction, while a critical business objective for motor vehicle dealers, falls outside of the scope of Section 5 of the FTC Act and thus outside of the FTC's regulatory authority. Under the RFA, benefits must measurable and must directly relate to the legal purpose of the proposal. As noted in NADA's comments, the FTC should engage in thorough stakeholder engagement and consumer testing to ensure that any proposed benefits are realistic. |
| **Estimated Costs of Proposed Rule** | |
| 1. Prohibited Misrepresentations: Section 463.3 The FTC asserts that the misrepresentations prohibited by the Proposed TRR are all material and would therefore be considered deceptive under Section 5 of the FTC Act. As a result, motor vehicle dealers who are compliant with Section 5 would continue to be compliant under the TRR. The FTC points out that Table 3.1 includes a scenario where no additional reviews of potential misrepresentations would be conducted, but notes that because of the enhanced penalties associated with violating the Proposed TRR (versus a *de novo* violation of Section 5 of the FTC Act), dealers may choose to incur additional administrative burdens and costs to help ensure compliance. Consequently, a second scenario in Table 3.1 has dealers employing professionals to engage in additional compliance reviews for all new advertisements, websites, listings, etc. For this scenario, the FTC assumes that a professional would spend 5 additional minutes reviewing each public-facing representation, and that each dealer produces an average of 150 unique marketing representations per year. Using a compliance officer labor rate of $26.83 per hour, the FTC estimates a total compliance review cost of $15.6 million per year (based on 46,525 dealers x 150 reviews per dealer, on average x 5/60 hour. Total | The FTC significantly underestimates the compliance review costs and additional annual training costs that would be required by the Proposed TRR. Further, as discussed in NADA's comments and in Table I (Attachment 18), the broad nature of proposed Section 463.3 would require dealers to create, use, and keep records of additional forms, scripts, disclosures, and related training, imposing unnecessary costs for both dealers and their customers. Proposed Section 463.3 also would result in longer transaction times.<br><br>As also stated above, the FTC's 46,525 dealer estimate seems reasonable. However, the FTC's estimate of 150 reviews and of five minutes per review both fall short given that the actual average number of per dealer reviews is likely to be several times 150, and that each review likely would take at least 15 minutes. There are at least two reasons why these reviews would take at least 15 minutes. First, as stated in Table I (Attachment 18), dealers typically do not fully control the advertising platforms they use given the direct involvement of the vehicle OEMs with which they have sales and service agreements, and that of other third parties. Also, many dealers, and especially small business dealers do not employ internal compliance officers or attorneys who could conduct marketing reviews. Consequently, |

---

[19] 87 Fed. Reg. at 42038.
[20] 87 Fed. Reg. at 42038-39.

| Table II    Regulatory Flexibility Act Analysis ||
|---|---|
| **FTC RFA Analysis** | **NADA Response** |
| present value estimates for such costs range from $137.1-117.3 million.[21]. | they would need to pay outside vendors to ensure compliance, which would necessarily increase both the time and cost involved with each review.<br><br>The RFA requires the FTC to properly assess the costs of the Proposed TRR, especially as they would impact small businesses. It also requires the FTC to examine and consider less costly alternatives. With respect to the Proposed TRR's prohibited misrepresentations mandates, the FTC has failed to do either. |
| 2. Required Disclosure of Offering Price in Advertisements and in Response to Inquiry: Section 463.3(a) The Proposed TRR would require dealers to disclose an Offering Price in advertisements that reference individual vehicles, in response to consumer inquiries about individual vehicles, and in the disclosures required at various points in a negotiation. Since dealers already choose prices for all vehicles under the status quo, Table 3.2 contains a scenario involving no additional cost for dealers to comply.<br><br>A second scenario in Table 3.2 accounts for the increased costs to dealers resulting from the increased importance of pricing decisions under the Proposed TRR. The FTC considers the marginal costs to dealers associated with calculating prices that conform to the proposal. The FTC also assumes that all dealers would incur some upfront costs to create/update pricing models that incorporate the proposal's mandates. And the FTC assumes that each dealer would make a one-time investment in eight sales and marketing manager hours and eight programmer hours to reformulate their pricing system to comply with the Proposed TRR's required disclosures. At rates of $63.93 and $28.90, respectively, the FTC estimates a total pricing reformulation cost of $34.6 million (based on 46,525 dealers x 8 hours at $63.93 and 8 hours at $28.90).<br><br>The FTC further assumes that the marginal cost of including this information in response to consumer inquiries about specific vehicles would be negligible to the extent that dealers would respond to such inquiries under the status quo baseline. If, however, this Proposed TRR results in some dealers not responding at all to consumer inquiries about specific vehicles, there may be associated costs to consumers and dealers relative to the baseline. The FTC has not quantified the extent to which such behavioral responses would occur or what the welfare costs of those adjustments would be.<br><br>There is also an opportunity cost to dealers and consumers associated with the advertising Offering Price mandate. Dealers that choose to convey the same amount of information about offered vehicles must reformat their advertisements and spend the required resources to do so. Alternatively, dealers must choose which information would be replaced by the mandated Offering Price disclosure. Finally, it is also possible dealers would elect to refrain from advertising individual vehicles or to respond to consumer inquiries about specific vehicles. This would require consumers to seek this information elsewhere, increasing their costs of search. Since these opportunity costs are difficult to estimate, the FTC does not include them.[22] | As discussed in NADA's comments, it would be difficult to establish an upfront pricing model in conformance with the Proposed TRR, and unlikely that any small dealership would be able to achieve it without significant support. As discussed, vehicle prices change – particularly used vehicles, and sometimes frequently – based on market conditions, consequently ensuring that Offering Prices are accurate would often be difficult.<br><br>The FTC incorrectly assumes that, once calculated, the cost of including Offering Price information in response to consumer inquiries involving specific vehicles would be negligible. As noted in Table I (Attachment 18) and in the Offering Price discussion in NADA's comments, the Offering Price disclosure mandate set out in the Proposed TRR is very broad and would require a significant expansion in disclosure, legal review, and document storage. The FTC's estimates fail to include these issues, or the time it would take for dealers to make Offering Price disclosures and, importantly, the time it would take for customers to review, discuss, and understand, such disclosures.<br><br>It is estimated that for any given consummated new or used vehicle transaction, there would be an average of three Offering Price disclosures based there being an average of three dealer-customer discussions regarding three specific motor vehicles, per transaction. This impacts the Proposed TRR's cost estimates in two ways. First, it impacts the total number of disclosures and thus the total cost of making those disclosures. Second, it points to the fact that each time an Offering Price disclosure needs to be made, it would delay the transaction. Consequently, in addition to the cost of making and receiving and discussing Offering Price disclosures, the FTC must consider the cost of these transaction delays. |
| 3. Required Disclosure of "Add-on" List and Associated Prices: Section 463.4(b) The Proposed TRR would require dealers to | The FTC underestimates the time and resources necessary to develop" Add-on" lists that comport with its very broad proposed definitions of "Add- |

[21] 87 Fed. Reg. at 42039
[22] 87 Fed. Reg. at 42039-40.

| Table II    Regulatory Flexibility Act Analysis | |
|---|---|
| **FTC RFA Analysis** | **NADA Response** |
| disclose an itemized menu with prices of all optional "add-on" products and services at all dealer locations and on all dealer-operated websites, online services, and mobile applications. As laid out in Table 3.3, the FTC assumes that dealers would incur upfront costs to create master "Add-on" Lists and employ a finance manager for five hours at a rate of $65.54, a compliance manager for one hour at a rate of $26.83, and a programmer for eight hours a at a rate of $28.90 to do so. The FTC also assumes that each dealer with an online presence (assumes 81%) would employ eight additional hours of programmer time to implement such a system across their online and mobile applications.

Lastly, the FTC claims that the periodic revision of these lists would require one hour of clerical staff time per year, per dealer, at a rate of $18.37. All told, the FTC estimates the present value of compliance costs for the development, posting, electronic distribution, and annual review of "Add-on" Lists to total in the range of $42.4-43.5 million.[23] | on," "Add-on Products," and "Add-on List."[24] See NADA's comments for a further discussion of these terms. The FTC also fails to provide any basis for its task time estimates or any explanation of the assumptions it is making in proffering that estimates. For example, it does not explain its assumptions regarding how many different "Add-ons" an average dealership sells, which is critical to determining how many hours it may take to complete an "Add-on" list.

These lists would be lengthy, with hundreds if not thousands of items per dealer. Moreover, they would vary widely by vehicle make and model, and thus would be very time intensive to develop and maintain. For example, for a single truck model at just one GM store, an "Add-on" list might include some 600 items that could be added before finalization of a purchase. See Attachment 16.

The development of "Add-on" lists would require dealerships to work with, among others, their:

- OEMs who manufacture vehicle "Add-ons" for sale through their dealerships to determine what may apply for each vehicle make and model;
- financial product providers to determine acceptable price ranges;
- web and IT developers to modify dealership websites and mobile applications; and
- attorneys to review for compliance.

Outreach to the above-mentioned parties would be significantly more difficult for small dealers lacking the staff internally to perform this work.

The FTC underestimates the labor involved for "Add-on" list development and posting. A more reasonable expectation would be that 100% of dealers would maintain an online presence and that integrations across platforms would be necessary for all dealers. But given the databases and number of entries involved and the need to coordinate with IT and website vendors, significantly more programmer time would be required. Moreover, the periodic review and revision of "Add-on" lists to ensure that they remain accurate, and the related coordination with multiple parties and vendors, would involve several more that one hour of clerical staff time per dealer.

Importantly, the RFA requires the FTC to identify the degree to which these costs would impact small businesses and to identify less burdensome alternatives. This it has not done. |
| 4. Required Disclosure of Total Financing/Contract Costs: Section 463.4(d) The Proposed TRR requires dealers to disclose, in any transaction featuring a monthly payment, the total cost of the financing/leasing contract. In any comparison of two contracts with different monthly payments, dealers also must disclose that the contract with the lower monthly payment features a higher total cost (if true) and disclose the total cost corresponding to each monthly payment offer.

Table 3.4 considers two scenarios for implementing these mandates. In the first, dealers incur a one-time, upfront cost when designing these disclosures and informing staff of their obligations to provide them but incur negligible per transaction costs. This scenario assumes that dealers already generate the required information during the normal course of business and only need | As discussed in NADA's comments and in Table I (Attachment 18) , these disclosure mandates would impermissibly and imprudently intrude on the time-tested content, form, and timing disclosures developed by the FRB to inform consumers of the cost of motor vehicle credit and leasing and would create confusion by introducing new meanings for terms that currently have recognized (and statutorily required) definitions. In addition, these mandates, like all mandates related to the Proposed TRR, necessarily would involve significant annual training requirements for new employees given that, according to NADA's 2021 Dealership Workforce study (referencing 2020 data), the average dealer experiences an annual sales consultant turnover rate of 67%.

Dealers cannot provide a total cost figure that applies to *any* consumer at the outset of their relationship for a finance price for a vehicle because they do not know what the finance price would be. Dealers cannot with any |

---

[23] 87 Fed. Reg. at 42040.
[24] Sections 463.2(a) and (b).

| Table II    Regulatory Flexibility Act Analysis | |
|---|---|
| **FTC RFA Analysis** | **NADA Response** |
| convey it verbally at an appropriate point in the transaction. In the second scenario, dealers incur additional costs per financed transaction to communicate the required disclosures in writing. In this scenario, dealers may or may not generate the required information during the normal course of business and/or may find it necessary to maintain a documentary record of compliance.<br><br>The upfront costs of complying with this provision are relatively limited; every dealer must create a template disclosure script that contains this information and must communicate it to sales staff so that they understand their obligations. The FTC assumes a compliance manager would spend eight hours creating this disclosure and informing sales staff. At a labor rate of $26.83 for compliance managers, the total cost is estimated at $10 million (based on 46,525 dealers x 8 hours x $26.83 per hour).<br><br>For the second scenario, the FTC estimates that there are roughly 32 million vehicle transactions each year subject to this requirement (financed sales of new and used vehicles plus leased vehicles). The FTC assumes that a sales employee would spend two minutes per vehicle populating these disclosures and that dealers would incur a printing cost of $0.15 per transaction. At a labor rate of $21.84 for sales staff, the FTC estimates a total additional cost under this scenario of $213.4-$249.5 million.[25] | certainty know what rates consumers would qualify for with third-party finance sources, what terms consumers would want, or any other details of the finance transaction. For these reasons, the FTC's second scenario should be the only one considered. And the FTC's estimates of the costs associated with that scenario are too low in that they fail to account for disclosures being provided multiple times as terms change, or to assess the time involved with the discussing, reviewing, and completing forms with customers. |
| 5. Prohibition on Charging for Add-ons in Certain Circumstances: Section 463.5<br>**Section 463.5(a):** The Proposed TRR prohibits dealers from marketing or selling "add-on" products or services from which the targeted consumer would not benefit. This mandate would require dealers to have a transaction-level system for identifying consumers who would not benefit or, in some cases, to predict potential consumer benefits from "add-on" products and services. This system would have to be supplemented with policies and transaction-level rules about when "add-on" products or services could be offered. Because dealers would not always have all relevant information at their disposal, such systems are likely to falsely identify some transactions as non-beneficial for consumers. In cases where consumers would benefit in excess of the price of "add-on" products or services, Section 465(a) would result in welfare costs associated with the foreclosure of such transactions. The FTC, recognizing that these costs are difficult to quantify, has not done so.<br><br>The proposal also prohibits dealers from charging for optional "add-on" products or services unless certain disclosures are made at various points in the buying process. These include:<br><br>**Section 463.5(b)(1):** Disclosing the total cost of purchasing a vehicle in cash—without any charges for optional "add-ons" or financing—in a format that itemizes the Offering Price; any discounts, rebates, or trade-in values; and required government charges, before referencing any financing terms (other than Offering Price) for a specific vehicle or consummating a cash transaction. Dealers must further indicate clearly that consumers have the option to purchase the vehicle for this amount in cash and must obtain the consumer's signed declination of that option. | The Proposed TRR's prohibits dealers from charging for "add-on" products or services unless certain requirements are met. The RFA mandates that the FTC identify the cost and burdens associated with this mandate, especially with respect to small businesses, and to identify feasible and less burdensome alternatives.<br><br>The FTC underestimates how long it would take to develop necessary forms. Dealers typically work with forms vendors, attorneys, compliance professionals, and others to develop new forms and to deploy a rigorous forms review process. These interactions will likely entail many more hours than the FTC estimates. Also, as stated above, each disclosure required by proposed Section 463.5 is being disclosed to customers today, but at a more logical and consumer-friendly point in the sales process. Thus, the additional burdens associated with this mandate would be duplicative.<br><br>The disclosures mandated by Sections 463.5(b)(1) and (b)(2)) do not lend themselves to a standardized disclosure document that could be provided and explained to all customers. As discussed in NADA's comments, highly customized documents would be necessary that would require significant time to use. Moreover, because it must be vehicle and customer specific, and because it would need to be provided well before transaction consummation, several iterations would need to be provided per customer since customers typically inquire about more than one vehicle but rarely buy more than one.<br><br>Again, the FTC's estimates are based on all dealers covered by the TRR and on all motor vehicle sales by those dealers. The FTC has not properly identified the appropriate number of transactions or dealers subject to the Section 463.5(b)(1), (b)(2) and (b)(3) disclosure mandates. First, the FTC wrongly assumes that all 40,807,000 used on-road vehicle transactions are covered, as not all sales by independent used vehicle dealers and no private sales would be covered. The FTC also assumes without support that approximately 94% of new vehicle sales and 86% of used vehicle sales include optional "add-ons." This is apparently based on a misinterpretation |

---

[25] 87 Fed. Reg. at 42041.

| Table II    Regulatory Flexibility Act Analysis | |
|---|---|
| **FTC RFA Analysis** | **NADA Response** |
| **Section 463.5(b)(2):** Disclosing the total cost of financing the vehicle—without any charges for optional "add-ons"—in a format that itemizes the Offering Price; any discounts, rebates, or trade-in values; any cash down payment made; and required government charges, before charging for any optional "add-ons" in a transaction involving financing. Dealers must further indicate clearly that consumers have the option to finance the vehicle for this amount and must obtain the consumer's signed declination of that option. | of NADA "F&I penetration" data measuring transactions where customers purchased at least one of the following: a finance, vehicle insurance, or GAP insurance contract. Because some customers buy more than one of these products, NADA estimates that many fewer transactions involve them. The FTC also significantly underestimates the scope of this burden by incorrectly assuming dealers would only have to complete these disclosures for vehicles sold. But as explained in NADA's comments, the Section 463.5(b)(1) and (b)(2) disclosures would occur early in the sales process, and not every such transaction would proceed to completion. |
| **Section 463.5(b)(3):** Disclosing the total cost of purchasing or financing the vehicle plus the "add-ons" selected by the consumer—either as a separately itemized total cash price for a non-financed transaction, or a separately itemized total price for a financed transaction, before charging for any optional "add-ons."<br><br>To comply with these disclosure mandates, dealers would have to design disclosure forms containing the required information, create systems for populating those forms, and provide required disclosures to consumers in writing prior to completing transactions. The FTC assumes that each consumer would receive each Section 463.5(b) disclosure only once during each transaction (if relevant).<br><br>As shown in Table 3.5, the FTC assumes that each dealer would require eight hours of a compliance manager time, at a rate of $26.83, and four hours of sales manager time, at a rate of $63.93, to create these disclosures, and eight hours of programmer time, at a rate of $28.90, to create a system to populate these forms when provided inputs by sales staff. The FTC further assumes that sales staff would spend 2 minutes per disclosure, at a rate of $21.84, updating, printing, and delivering these forms to consumers, and that the physical cost of each disclosure would be roughly $0.11 each. The FTC assumes that one disclosure would be required for all new and used vehicle sales, that an additional disclosure would be required for transactions with optional add-ons (94% new and 86% used), and that a third disclosure would be required for financed transactions with optional add-ons (76% new and 30% used).[26] | Lastly, the FTC has fails to account for the time it takes for customers to read, understand, and sign the proposed disclosure forms. As discussed above, each item on the proposed mandatory form is already currently disclosed to customers, but with those disclosures taking place at a more logical and consumer-friendly point in the sales process. Consequently, these mandates would be duplicative, and given the requirements imposed on the FTC by the RFA, they should be eliminated as unnecessary. |
| 6. Requirement to Obtain Express Informed Consent Before Any Charges The proposal would mandate that dealers obtain the express informed consent of consumers before charging them for products or services in association with the sale, financing, or lease of motor vehicles. The FTC states that dealers that are complying with the law currently have policies in place to prevent charges without consent.[27] | As explained in NADA's comments, the mandate in the Proposed TRR to obtain express informed consent would upset years of state law and, in any event, is so vague as to be unworkable. |
| 7. Recordkeeping The Proposed TRR mandates that dealers retain records of all documents pertaining compliance. These recordkeeping requirements include:<br><br>• Copies of all materially different marketing materials, sales scripts, and training materials that discuss sales prices and financing/lease terms.<br>• Copies of all materially different "Add-on" Lists.<br>• Records demonstrating that all "add-on" charges comply with the Proposed TRR, including calculations of loan-to-value ratios in contracts with GAP Agreements. | As laid out in NADA's comments and in NADA's Responses in Table I (Attachment 18), the costs and burdens associated with the Proposed TRR's recordkeeping mandates would by no means be "incremental." To the contrary, the proposal would impose massive new and costly recordkeeping mandates. For example, dealers would have to keep records pertaining to a myriad of communications including, but not limited to, online website chats, e-mails, text messages, and social media posts involving both dealer-owned and employee-owned devices and occurring both during and after normal business hours. Mandating that dealers develop an apparatus to capture all such communications for tens of millions of new and used vehicle transactions would be extremely |

---

[26] 87 Fed. Reg. at 42041-42.
[27] 87 Fed. Reg. at 42043.

| Table II    Regulatory Flexibility Act Analysis | |
|---|---|
| **FTC RFA Analysis** | **NADA Response** |
| • Copies of all purchase orders, financing and lease contracts signed by consumers (whether final approval is received), and all written communications with consumers who sign purchase orders or financing or lease contracts.<br>• Copies of all written consumer complaints, inquiries related to "add-ons", and inquiries and responses about individual vehicles.<br><br>Most of these documents are already being produced in the normal course of business, or the costs of creating them have already been accounted for in this Preliminary Regulatory Analysis. As shown in Table 3.6, the FTC assumes that each dealer would incur the upfront cost of eight 8 hours of programmer time, five hours of clerical time, one hour of sales manager time, and one hour of compliance officer time, at hourly rates of $28.90, $18.37, $63.93, and $26.83, respectively, to upgrade their systems and to create the templates necessary to accommodate the retention of all relevant materials. In addition, loan-to-value calculations would be required for all transactions with GAP Agreements, the cost of which has not been accounted for in previous sections of the Preliminary Regulatory Analysis. The FTC assumes that each dealer would employ one additional minute of sales staff time per transaction with a GAP agreement to populate and store all relevant materials.<br><br>The FTC expects that some small dealers may not have the ability to automate these processes in a way that reduces the ongoing costs of recordkeeping to the level stated here. In addition, the expansion of the volume of records that dealers would be required to retain and manage would likely require investments in additional IT systems and hardware. In the absence of information regarding the volume of new data (*e.g.,* numbers of inquiries per dealer, numbers of consumer complaints, communications per consummated transaction, etc.), the FTC has not quantified these capital costs in its Preliminary Regulatory Analysis.[28] | expensive and unrealistic. The FTC is correct in assuming that small dealerships would not have the ability to automate these recordkeeping burdens and would have to perform those functions manually or to hire vendors to facilitate compliance.<br><br>With respect to specific recordkeeping mandates, including those summarized in the Proposed TRR Table 3.6, see the NADA Responses in Table I (Attachment 18). |
| **D. Other Impacts of Proposed Rule** The FTC asserts that the status quo in this industry features consumer search frictions, shrouded prices, deception, and obfuscation, and that dealers likely would charge higher prices than could be supported under the Proposed TRR for several products and services. The FTC claims that prices are likely to adjust in response to the transparency facilitated by the Proposed TRR. Part XII.B of the FTC's Preliminary Regulatory Analysis purports to discuss the benefits that occur when quantities adjust in a more transparent and less deceptive equilibrium. Price adjustments typically serve to transfer welfare from one side of the market to the other. For example, in a typical market if quantity sold remains constant in response to the implementation of a rule but prices decrease, consumer welfare would increase, but producer profits would decrease by roughly the same amount, leaving total social welfare roughly constant. The FTC claims further that if the Proposed TRR curbs price effects caused by *deception,* the transfers caused by these price effects would redistribute welfare away from dishonest dealers and toward consumers.<br><br>The FTC also claims that deceptive practices by dishonest dealers lead consumers to engage with those dealers instead of honest dealers, and that under the Proposed TRR, some business that | The main foreseeable pricing impact of the Proposed TRR is that the costs and burdens of compliance would inevitably be passed onto customers, thereby increasing the price of motor vehicle sales transactions for customers. In addition, the costs and burdens directly imposed on customers by the Proposed TRR would serve to decrease consumer welfare and would undermine customer satisfaction. The FTC's description without evidence of potential benefits of the proposal cannot stand. The RFA requires the FTC to analyze and assess such hypothetical potential benefits, especially given the proposal's massive cost and burdens on dealers (and especially small business dealers) and their customers. |

---

[28] 87 Fed. Reg. at 42043.

| Table II    Regulatory Flexibility Act Analysis | |
| --- | --- |
| **FTC RFA Analysis** | **NADA Response** |
| would otherwise have gone to dealers using bait-and-switch tactics or deceptive door opening advertisements would instead go to honest dealers. Again, assuming that the costs of the firms are similar, any one-for-one diversion of sales from one set of businesses to another is generally characterized as a transfer under the OMB guidelines for regulatory impact analysis. However, in this case, it would represent a transfer from a set of dishonest dealers to honest dealers, which may weigh differently if profits from law violations are not counted towards social welfare in a regulatory analysis.<br><br>While each provision above would affect consumer prices for vehicles, "add-ons", financing etc. and the distribution of sales across dealerships, estimating the magnitudes of these effects is difficult and requires information that is currently not available. As a result, the FTC has not attempted to quantify these impacts. However, these transfers should be documented because, at minimum, they inform the distributional effects of the proposal. | |

ATTACHMENT 20

# *FTC Needs to Run Those Numbers Again*



**Insight**

# FTC Needs to Run Those Numbers Again

**DAN GOLDBECK | SEPTEMBER 1, 2022**

## EXECUTIVE SUMMARY

- The Federal Trade Commission (FTC) recently published a proposed rule seeking to establish more rigorous regulatory standards for automobile dealerships that – especially for an agency known for its enforcement actions – stands as its most significant rulemaking action in recent memory.
- The FTC expects the proposal to yield tens of billions of dollars in benefits due primarily to time savings for consumers, but a closer look at the agency's underlying assumptions and emerging market trends suggests that such estimates are dramatically overstated.
- The proposal's cost calculations take an overly conservative estimate that, when adjusted to account for more realistic circumstances, make the benefits-to-costs ratio appear at best to be roughly even, in contrast to the 30-to-1 benefits-to-costs ratio put forth in the rulemaking's current analysis.

## INTRODUCTION

For many people, the process of buying a car can be a challenging, albeit important one. The amount of effort and time involved in acquiring what is likely one of a person's most valuable material assets (outside of perhaps their home) can be extensive. The Federal Trade Commission (FTC) – armed with regulatory authority granted to it by the Dodd-Frank Act of 2010 – has recently decided to step into the fray here with a proposed rule that would require more rigorous cost disclosure requirements for automotive dealers.

Beyond simply the subject at hand, this proposal is notable because it represents the first time in at least recent history that FTC has promulgated a rulemaking of this magnitude with a cost-benefit analysis. Considering how relatively novel this may be for an agency that is traditionally more focused on enforcement instead of rulemaking, it is perhaps unsurprising to find that, upon greater scrutiny of some key assumptions, the monetized cost-benefit balance is potentially closer to even, if not on the net-cost side, than the roughly 30-to-1 benefits-to-costs ratio the agency's current calculations suggest. Having billions of dollars of potential impact hinge on a few flawed assumptions should give FTC pause and perhaps spur a re-evaluation of this rulemaking's overall direction.

## A NOVEL RULEMAKING FOR FTC

According to FTC, "many of the problems observed in the motor vehicle marketplace persist in the face of repeated federal and state enforcement actions, suggesting the need for additional measures to deter deceptive and unfair practices." As such, the agency is invoking its authority under Section 1029 of the Dodd-Frank Act to

"to prescribe rules with respect to unfair or deceptive acts or practices by motor vehicle dealers."

In particular, the key parts of the proposed rule's potential new regulatory standards include: "Requiring dealers, whether acting directly or indirectly, to refrain from misrepresentations, provide for material disclosures at key points in the transaction, refrain from the sale of deceptive or unfair add-on products, and require retention of dealers' advertisements and consumer transaction documents." Enshrining these provisions into relevant regulatory code would allow FTC to utilize its authority under Section 19 of the FTC Act to bring legal action against "any person, partnership, or corporation," in the automobile dealer industry, that "violates any rule under [the FTC Act] respecting unfair or deceptive acts or practices."

Per FTC's economic analysis, this proposal would impose nearly $1.4 billion in total costs on automobile dealers to provide roughly $31 billion in benefits to consumers, primarily through expected time savings in the car-buying process. Given the magnitude of these figures, it is one of the more consequential rulemakings of the year thus far. Moreover, it represents (by a wide margin) the most economically significant FTC rulemaking currently on record.

The American Action Forum's (AAF) RegRodeo contains 28 rules from FTC since 2005 that had some quantified cost or paperwork estimate. The most significant rule recorded in RegRodeo beyond this current proposal is a 2010 rule (jointly produced with the Federal Reserve) regarding credit reporting practices that brought an estimated $252 million in total costs. No other proposed or final rule from FTC has costs that exceed the $100 million threshold (since 2005, at least).

Of note, while virtually all of the FTC rulemakings included in RegRodeo draw their estimated economic impact from their discussions of paperwork burdens, this FTC proposal includes a full-blown "Preliminary Regulatory Analysis" that mirrors much of the same structure as other agencies' cost-benefit analyses. This is because a statutory requirement (Section 22 of the FTC Act, 15 U.S.C. 57b-3,) compels FTC to produce such an analysis. Despite being statutorily required, however, a search of FTC final rules that address this provision at all currently yields five entries (essentially 1.2 percent of the more than 400 final rules from FTC currently posted on federalregister.gov).

Yet all five of these entries only mention this cost-benefit analysis section by way of establishing that they do not meet the economic impact threshold that would require a full analysis. As such, if this current automotive dealer proposal were to become finalized it would represent *the only* FTC rule (currently available online, at least) to ever trigger this provision. Given its singular nature, it is more understandable that – as discussed in the following sections – perhaps an agency historically more focused on handing out enforcement decisions on antitrust proceedings could use more refinement in its cost-benefit calculations.

# EXAMINING THE BENEFITS

## *Core Time Savings Estimate*

FTC discusses a number of qualitative benefits this proposed rule could produce, but in terms of quantified benefits its core contention boils down to the following table:

AMERICANACTIONFORUM.ORG

Table 2.1—Estimated Benefits of Time Savings for Completed Transactions

|  | 2022-2032 |
|---|---|
| Completed Transactions: |  |
| Number of vehicle transactions per year [a] | 62,107,000 |
| Hours saved per transaction | 3 |
| Value of time for vehicle shoppers | $22.20 |
| Abandoned Transactions | *Unquantified* |
| Total Quantified Benefit: |  |
| 3% discount rate | $36,337,956,234 |
| 7% discount rate | $31,081,811,411 |

*Note: Benefits have been discounted to the present at both 3% and 7% rates.*

[a] *National Transportation Statistics, Table 1-17.*

Essentially, FTC expects that the clarity afforded to the average consumer by these newly required disclosure materials would save this typical consumer three hours in their car-buying experience.[1] The agency then applies the monetary value of this avoided opportunity cost and extrapolates it out to the overall total number of transactions in a year. This "three hours saved" figure is the most questionable component of these calculations. In footnote 180, FTC explains its assumption thusly:

> According to the 2020 COX Car Buyer Journey study, consumers spent roughly 15 hours researching, shopping, and visiting dealerships for each motor vehicle transaction. 3 hours corresponds to 20% of an average consumer's time spent on such activities. Cox Automotive, *2020 Cox Automotive Car Buyer Journey* 5-6 (2020), *available at* *https://b2b.autotrader.com/?app/?uploads/?2020-Car-Buyer-Study.pdf*.

First, it should be noted that the FTC doesn't cite the Cox study to support its assertion that the proposed rule will save consumers three hours per transaction. Indeed, the FTC cites the Cox study only to support the claim that consumers spend a total of 15 hours purchasing a car. The FTC then simply calculates 20 percent of 15 hours, and thus arrives at its conclusion that three hours will be saved per transaction.

But even if this 20 percent reduction in transaction time seems plausible and reasonable on its face, a closer look at the very report the FTC cites calls that into question. Take page 36 of said report:

AMERICANACTIONFORUM.ORG



In this breakdown of the time spent at a dealer, the only item that this rulemaking would materially affect would be the 32 minutes spent "Negotiating a Price and Trade-In Offer;" all other aspects of this estimated "visit" are rote aspects of the process that largely fall outside the scope of the new requirements. While these increased disclosures may have some ancillary savings to the pre-visit time or time spent at another dealership, it is difficult to see how one can expect 3 hours of savings when the primary aspect of the car-buying process that the proposal seeks to address is roughly half an hour. If one applies 30 minutes saved (instead of the original 3 hours) to FTC's benefits formulation, it yields only $689 million in annual benefits, or $5.2 billion in present value under a 7 percent discount rate.

## Broader Market Trends

Beyond the exact components of FTC's current calculations, there is also the issue of how changing market conditions may provide diminishing returns in terms of the amount of time savings benefits a regulation like this can really draw from the car-buying process going forward. For instance, take this chart from the 2021 Cox report:

AMERICANACTIONFORUM.ORG



These data suggest that, in recent years, the time spent interacting with a dealer has generally declined. Examining further data across the past few years of reports suggests that this trend also applies to the overall buying process (from research to purchase):



These trends make some sense intuitively as consumers have moved toward online sources for either: A) background research on features and pricing to leverage during in-person negotiations, or B) online dealer portals that market themselves as low- or no-hassle operations. Another portion of the 2021 Cox report demonstrates one aspect of this phenomenon:

AMERICANACTIONFORUM.ORG



As consumers continue to gain relative advantages in terms of time savings and increased satisfaction due to these already-occurring market trends, it raises the question of how many more benefits a rulemaking like this could squeeze out of the process – and thus, calls into question the rationale for such a dramatic rule.

## EXAMINING THE COSTS

The costs portion of FTC's economic analysis also suffers from some questionable assumptions that, if adjusted, could potentially shift the calculations involved in such a way that their magnitude becomes comparable to the agency's potential benefits, further eroding the rationale for the rulemaking. The most substantial portion of FTC's cost estimates comes in its calculation of the cost to dealers in disclosing accurate pricing information regarding potential "add-ons":

AMERICANACTIONFORUM.ORG

| Disclosure delivery (per transaction) | | |
|---|---|---|
| New vehicle sales per year | | 17,059,000 |
| % New vehicle sales involving optional add-ons[a] | | 94% |
| % New vehicle sales involving financing | | 81% |
| Used vehicle sales per year | | 40,807,000 |
| % Used vehicle sales involving optional add-ons[b] | | 86% |
| % Used vehicle sales involving financing | | 35% |
| Minutes per disclosure | | 2 |
| Cost per hour of disclosure | | $21.84 |
| Physical costs per disclosure | | $0.11 |
| Subtotal | | |
| 3% discount rate | | $994,356,865 |
| 7% discount rate | | $850,526,991 |

The calculation here is that each disclosure costs the dealer two minutes in labor costs and 11 cents in materials that is then extrapolated as: "One disclosure is required for all new and used vehicle sales, an additional disclosure is required for transactions with optional add-ons (94% new and 86% used), and a third disclosure would be required for financed transactions with optional add-ons (76% new and 30% used)." This requirement accounts for a majority of the proposal's overall cost estimate.

The issue with this calculation, however, is that FTC only applies it once for each transaction. See footnote 187:

> One consequence of this provision is that consumers, with the benefit of clear disclosure of the various prices, will renegotiate some aspect of the sale in order to obtain a more favorable deal. Any such renegotiation would require the completion of another disclosure prior to consummating the transaction, *which is assumed away here*. [emphasis added]

FTC acknowledges that having this additional information will spur more negotiation, which will in turn require additional disclosures and the commensurate costs from such. Nevertheless, its current topline cost estimate is largely based on the (unlikely) assumption that there will only be one disclosure per transaction.

Perhaps this assumption stems from the lack of data available on the question of "how many specific negotiation points would require this disclosure?" Turning back to the 2020 Cox report (the 2021 version did not contain these data), however, one can find at least a potential baseline to this question. Take, for instance, this section:

AMERICANACTIONFORUM.ORG



According to this, each eventual transaction involves the buyer visiting at least two dealerships. One can reasonably assume that there would thus be *at least* one "disclosure point" at each dealership. Doubling up this disclosure cost section would yield total costs of $1.7 billion. If one merely assumes that there are, say, three "disclosure points" at each of these two dealership visits to yield a six-fold increase in add-on disclosure costs, that would bring total costs of $5.1 billion. If one simply adds on the roughly $510 million for all other cost subsections as they currently stand per FTC's estimation, then the proposal's total costs would exceed its benefits under the half-hour savings scenario discussed earlier.

# CONCLUSION

It is often easy to see why the car-buying experience is a vexing one for many consumers. Between the high economic stakes, potential information asymmetry, and incentives for dealers to "upsell," purchasing a car can be a challenging process. Yet with greater amounts of information available online for consumers and an increasing prevalence of dealers that make of point of taking the "haggle" out of the process, it is difficult to assert that consumers are suffering from a clear market failure in the automotive sales industry that requires dramatic FTC intervention. In fact, the proposed rule contains minimal quantitative assessments that federal agencies typically rely on to justify the need and cost of such comprehensive rulemakings. Even if one grants FTC's overall rationale, one hopes that the agency would be thorough and deliberative in drafting its most significant rulemaking in modern times. Yet the potential flaws in the FTC's calculations reveal a lack of

AMERICANACTIONFORUM.ORG

analytical rigor – perhaps driven by a relative lack of familiarity with considering cost-benefit balances – that raises significant questions about the underlying merits of this rulemaking.

[1] Although it should be noted, there is a possibility that the proposed rule could actually increase the length of the average motor vehicle transaction. The rule would require several additional disclosures, including a number that must be signed by the customer and countersigned by the dealer. This additional material could confuse consumers and drive additional questions and increased transaction times.

AMERICANACTIONFORUM.ORG

ATTACHMENT 21

# *NADA/NAMAD/AIADA Model Dealership Voluntary Protection Products Policy*



NADA/NAMAD/AIADA

# Voluntary Protection Products: A Model Dealership Policy





NATIONAL
AUTOMOBILE
DEALERS
ASSOCIATION

A447

This management guide has been prepared for informational purposes to assist dealerships in presenting their Voluntary Protection Products (VPPs) in a fair, ethical and legally compliant manner. Nothing in this guide, including the appendices, is intended as legal advice. Furthermore, each dealership should consult an attorney who is familiar with federal and state law applicable to VPPs and the dealership's operations before deciding whether and how to adopt this optional VPP policy. The presentation of this information is not intended to encourage concerted action among competitors or any other action on the part of dealers that would in any manner fix or stabilize the price or any element of the price of any good or service.

L60



NADA/NAMAD/AIADA

# Voluntary Protection Products: A Model Dealership Policy



## TABLE OF CONTENTS

**Introduction** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**Instructions for Completing the VPP Policy Template** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

General Instructions and Disclaimers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

Specific Instructions for Using the VPP Policy Template . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

**Templates**

Voluntary Protection Products Policy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15

Appendix A. Voluntary Protection Products Policy Poster . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

Appendix B. Voluntary Protection Products Certification Form . . . . . . . . . . . . . . . . . . . . . . . . . . .18



NADA/NAMAD/AIADA

# Voluntary Protection Products: A Model Dealership Policy

## Introduction

Among the many products and services that automobile and truck dealerships offer their customers are voluntary products designed to protect their customers' investment in the vehicles they purchase or lease.

When offered, sold, and administered in a professional and consumer-friendly manner, these voluntary protection products (VPPs) can offer customers valuable protection against an unexpected and potentially costly event such as a flood, hail damage, theft, vandalism, vehicle accident, mechanical breakdown or the customer's death, disability, or unemployment. In addition to the economic protection they provide, VPPs also can offer customers—particularly those who live paycheck to paycheck or who otherwise cannot self-insure—peace of mind knowing that the occurrence of such an unexpected event will not prevent them from keeping current on their financial obligations.[1]

Conversely, to the extent VPPs are not offered, sold, and administered in a professional manner, they can fail to provide these valuable protections, confuse and create a false sense of security for customers, result in litigation and/or administrative enforcement actions against the dealership, and undermine the goodwill of the dealership in the community.

Consequently, it is essential that dealerships strive to develop an approach toward VPPs that ensures they are offered, sold, and administered in an ethical, lawful, transparent, professional, and consumer-friendly manner. This requires that dealerships engage in several proactive steps such as conducting product research, employee training, and sales oversight, and executing their post-sale responsibilities. However, this process all begins with articulating a clear, straightforward VPP policy that provides a framework for the dealership's VPP activities. The *NADA/NAMAD/AIADA Model Dealership Voluntary Protection Products Policy*[2] provides an optional policy template that is intended to assist a dealership with this process.

### ESSENTIAL STATE LAW CONSIDERATIONS

Several states impose VPP requirements that address one or more components of this optional policy template. Some of these requirements could make portions of the policy template inapplicable to—or not prudent to adopt for—dealerships operating in those states. It is essential that dealerships review communications from their state dealer associations concerning such requirements and consult with legal counsel to determine whether—and to what extent—they should adopt the policy template.

---

[1] In April 2017, AAA cited a new study indicating that "64 million American drivers would not be able to pay for an unexpected vehicle repair without going into debt" and noted that "the average repair bill is between $500 and $600."

[2] For ease of reference, this title will be used to refer to *NADA/NAMAD/AIADA Voluntary Protection Products: A Model Dealership Policy*.

# Instructions for Completing the VPP Policy Template

**GENERAL INSTRUCTIONS AND DISCLAIMERS**

## Coverage and Approach

The *NADA/NAMAD/AIADA Model Dealership Voluntary Protection Products Policy* template applies to optional products that a dealership offers to its customers to protect their investment in vehicles being purchased or leased.

The policy template is structured to:

i.   have the dealership provide upfront a prominent poster informing customers of the optional nature of VPPs and the dealership's commitment to providing information about each VPP before a customer decides to purchase it;

ii.  state the dealership's commitment to legal compliance, training, and interdepartment coordination to effectively carry out the dealership's VPP policy; and

iii. provide a sequential list of duties the dealership will execute throughout the life cycle of VPPs, from their selection to their pricing, advertisement, presentation, sale, and, if applicable, cancellation and any customer complaints pertaining to them.

## Relationship to *NADA/NAMAD/AIADA Fair Credit Compliance Policy & Program*

The *NADA/NAMAD/AIADA Model Dealership Voluntary Protection Products Policy* template is separate from— but entirely consistent with—the *NADA/NAMAD/AIADA Fair Credit Compliance Policy & Program* template.

The *NADA/NAMAD/AIADA Fair Credit Compliance Policy & Program* provides an optional template for developing a policy—and a detailed program to implement that policy—to promote compliance with the Equal Credit Opportunity Act (ECOA). It primarily focuses on one item (dealer participation, which is the portion of the finance charge that a dealership retains for originating a finance contract), one element of that item (pricing), and one of several statutes governing that item (ECOA), and is modeled on a consent order that the Department of Justice (DOJ) entered into with two automobile dealerships in 2007 to resolve allegations of ECOA violations.

Conversely, the *NADA/NAMAD/AIADA Model Dealership Voluntary Protection Products Policy* template focuses on multiple products (service contracts, GAP coverage, and other VPPs), multiple elements of those products (selection, pricing, advertisement, presentation, sale, cancellation, and customer complaints), multiple statutes governing those products (ECOA, the federal prohibition on unfair and deceptive acts or practices— UDAP—and other federal laws), and is not modeled on a government consent order with automobile dealerships.

These differences suggest that policy template documents for these items (dealer participation and VPPs) may need to differ. Accordingly, the *NADA/NAMAD/AIADA Model Dealership Voluntary Protection Products Policy* template is (i) broader in coverage than its fair credit counterpart (applying to the vast array of products and product elements mentioned above), and (ii) not as deep as its fair credit counterpart (as a detailed approach to compliance in a nationwide template would be difficult given the widespread differences in the state regulatory regimes and provider contractual requirements that govern these products). The *NADA/NAMAD/AIADA Model Dealership Voluntary Protection Products Policy* template therefore is more general in nature and is designed to give a dealership that chooses to adopt it a general framework for VPPs without including an extensive series of detailed requirements that may be inapplicable in a dealership's state and/or that may not fit a dealership's product offerings.

Notwithstanding the different approaches to the fair credit and VPP policy templates, they are designed so that both may be adopted by a dealership, and a dealership that chooses to adopt both may conclude that its Fair Credit Compliance Program Coordinator should also oversee the development and implementation of its VPP Policy. In addition, both templates adopt a standardized approach to pricing with a dealership that chooses to adopt the VPP policy establishing a standard retail price for its VPPs (to the extent it has discretion to do so) and only deviating from its standard retail price for pre-established, legitimate business reasons. Additionally, a dealership may conclude that it should adopt other aspects of the fair credit policy and program template that are not included in the VPP policy template, such as having the dealership's board of directors or other governing officer formally approve the policy and having the person who is responsible for executing the policy conduct periodic compliance audits and submit annual compliance reports to the board of directors or other governing officer.

**Disclaimers**

The *NADA/NAMAD/AIADA Model Dealership Voluntary Protection Products Policy* is an optional template that is not mandated by federal law and has not been adopted by any federal agency as a means of satisfying the requirements of federal law. In addition, as noted above, as a template that is being made available to dealerships across the country whose operations and state laws vary significantly, portions of the template may not be applicable to—or prudent to adopt by—an individual dealership. For these reasons, it is essential that each dealership consult with legal counsel who is familiar with its operations to determine whether—and to what extent—it should adopt the *NADA/NAMAD/AIADA Model Dealership Voluntary Protection Products Policy* template.

**SPECIFIC INSTRUCTIONS FOR USING THE VPP POLICY TEMPLATE**

**Overview**

This paragraph generally describes the purpose and scope of the VPP Policy.

It also contains a footnote stating that the policy does not confer any rights, benefits, or remedies to any person, except that it may be used by the dealership to discipline employees who do not comply with its terms. This is intended to forestall a third party from bringing a legal action against the dealership for a violation of the policy.



### Section I.    Policy Statement

This section states that the dealership will prominently display to customers a poster stating that (i) VPPs offered by the dealership are optional and are not required to purchase or lease a vehicle or obtain warranty coverage, financing, financing on particular terms, or any other product or service offered by the dealership, and (ii) the dealership is fully committed to providing customers with the price, terms, and conditions of each VPP before they decide to purchase it. The sample poster at Appendix A is available for this purpose.

The dealership should consult with its counsel concerning whether the poster should be adopted and, if so, the language it should contain. For example, if the dealership already displays a poster with similar or related language, the creation of an additional poster could be distracting or otherwise create confusion. However, it is essential that customers understand that the VPPs offered to them are completely optional.

### Section II.    Legal Compliance, Training, Coordination, and Document Retention

Section II.a states the dealership's commitment to complying with all applicable legal requirements,



A453

including governing statutes, regulations, and contracts with third parties. This applies to both:

i.   requirements applicable to customers, such as (a) ECOA's prohibition against discrimination on a prohibited basis, (b) the Truth in Lending Act's disclosure requirements applicable to VPPs, (c) federal and state prohibitions on unfair and deceptive acts or practices; and (d) state requirements applicable to retail installment sales and leases, VPPs that are insurance products under state law, and licensing and other requirements applicable to VPPs; and

ii.  requirements applicable to other businesses, such as contractual obligations to VPP providers pertaining to remitting premiums, registering contracts, and verifying the payment of refunds.

Sections II.b and II.c state that the dealership will (i) conduct initial and periodic training of—and oversee—its employees involved in the VPP sales process, and (ii) coordinate within its departments as necessary to ensure its VPP Policy is properly carried out. An element of the oversight process could include periodically spot-checking or reviewing a sample of vehicle sales or leases entered into with customers to ensure the dealership's transactions comport with this policy. Training, oversight, and coordination are essential as the development of a policy document—by itself—will not give effect to the policy. Rather, this can only occur if the dealership takes the necessary steps to implement and maintain it.

Section II.d states that the dealership will retain records used to demonstrate compliance with this policy for an appropriate period. This should include the VPP Certification Form referenced below as well as other records documenting the completion of the various elements of this policy. The dealership should consider retaining such documents for the greater of (i) any records retention period under federal and state law for the VPPs it offers,[3] and (ii) the statute of limitations under federal and state law for violations involving those products.[4] The dealership should consult with counsel concerning the appropriate records retention period for these documents.

## Section III.   Product Selection

This section sets forth criteria for determining whether a particular product will be included in the dealership's VPP offerings to customers. In making this determination, the dealership should only engage reputable VPP providers, and the dealership should have confidence in the value that the product offers to customers. While a dealership may determine that additional or other criteria should be used, the following criteria in the policy template should assist the dealership with this analysis:

a.   *Cost, coverage, limitations, and other terms and conditions.* The dealership should understand how a product's features offer protection of the customer's investment and whether its coverage is already provided by another product being purchased by the customer.

b.   *Claims payment process.* The dealership similarly should understand the ease with which customers can file claims and receive the product benefits when a triggering event occurs. It is essential that customers have a clearly defined path to receiving such benefits. The same applies to the customer's ability to cancel and obtain any available refund for a product.

c.   *Financial ability to provide product benefits.* The dealership should also consider the financial ability of the VPP provider to provide the product benefits. While this may be self-evident for many VPP providers, with others it may be prudent to inquire into their ability to pay claims.

Of course, other factors such as known reputational concerns stemming from customer complaints or litigation should not be ignored.

The analysis the dealership conducts is not intended to validate or guarantee the services provided by its VPP providers. Rather, as with vendors that dealerships retain, it is prudent to review the quality of the company, the products and services it provides, and the terms and conditions of the provider-dealer contract as part of the VPP selection process.

---

[3] The federal records retention requirements applicable to documents retained by automobile and truck dealerships are set forth in NADA's *A Dealer Guide to Federal Records Retention and Reporting.* Consult your state automobile dealers association concerning any applicable state records retention requirements.

[4] Among the federal laws that are most likely to apply to the sale of a VPP (e.g., ECOA, Truth in Lending Act, Federal Consumer Leasing Act, and Section 5 of the Federal Trade Commission Act), ECOA has the longest statute of limitations which generally is five years after the occurrence of a violation. See 15 U.S.C. § 1691e(f). Consult your state dealer association concerning applicable statutes of limitations under state law.

### Section IV.    Product Pricing

This section establishes the manner in which the dealership will determine the retail price for each VPP it offers to customers for which pricing discretion exists. For example, pricing discretion does not exist for—and this section therefore does not apply to—a VPP that is defined as an insurance product under state law and that must be offered to customers at an amount that has been established by the state insurance commissioner. Pricing discretion also may not exist as a result of—or may be limited by—other provisions of state law or policies of the VPP provider.

Where pricing discretion does exist, Section IV.a states that the dealership will establish a standard retail price (SRP) for each VPP and each bundle of VPPs it offers to customers. The dealership should sell the VPP or VPP bundle at its SRP unless one of the reasons set forth in Section IV.b for discounting that price is present in the transaction. (Section IV.c clarifies that the limitation on discounts in Section IV.b does not preclude the dealership from establishing an SRP for a bundle of VPPs that is less than the combined sum of the SRP of each individual VPP in the bundle.)

Section IV.b identifies five good-faith, competitive reasons unrelated to the customer's background that, if present, allow the dealership to sell a VPP or VPP bundle at a price that is lower than its SRP for that product or bundle. These reasons (which are set forth and described below) are among the allowable reasons for discounting a standard dealer participation rate

in credit offers to customers that were (i) included in 2007 consent orders that DOJ entered into with two dealerships to resolve allegations of credit pricing discrimination, and (ii) incorporated into the *NADA/NAMAD/AIADA Fair Credit Compliance Policy & Program* as allowable reasons for discounting a standard dealer participation rate in credit offers to customers. A dealership should be able to identify additional or different pre-established reasons for discounting the SRP it has established for a VPP or VPP bundle provided they are limited to good-faith, competitive factors that are completely unrelated to the customer's background. However, as explained in the *NADA/NAMAD/AIADA Fair Credit Compliance Policy & Program*, dealerships should proceed cautiously in allowing discounts that differ from those listed in the DOJ consent orders.

Section IV.d states that the dealership will establish procedures for recording, reviewing for corrective action, and retaining determinations that a pre-established, legitimate business reason supported a decision to discount the SRP the dealership has established for a VPP (or VPP bundle), and that the dealership will utilize the Voluntary Protection Products Certification Form at Appendix B for this purpose. (As noted below, if the dealership has another mechanism to record such discounting decisions, it would not need to adopt the VPP Certification Form at Appendix B to carry out this policy.) In order to implement these requirements, the dealership should consider adopting the following:

## PRICE NEGOTIATIONS

Nothing in the model policy or these instructions is intended to foreclose price negotiations that can result in lower prices to customers for VPPs if a dealership chooses to allow them. Rather, as noted in the Introduction, the model policy and instructions are intended to promote the offering, sale, and administration of VPPs in an ethical, lawful, transparent, professional, and consumer-friendly manner. As part of this process, a dealership could allow price negotiations for VPPs while adopting and implementing appropriate procedures to ensure those negotiations are conducted in a fair and non-discriminatory manner. Alternatively, the dealership could adopt an approach that does not involve price negotiations such as the approach discussed in this section.

a. *VPP Certification Form.* The dealership should use the VPP Certification Form to record VPP discounting decisions. If the dealership does not discount any VPP or VPP bundle (i.e., if the customer pays the SRP for each VPP or VPP bundle that he or she selects), it is not necessary to execute the VPP Certification Form. The dealership should modify the VPP Certification Form template at Appendix B to reflect the dealership's specific circumstances and it may be possible, in consultation with a menu and/or software provider, to forgo the use of the VPP Certification Form by incorporating the information it contains into the menu described in Section VI.c of this policy. However, it is important to note that while the menu is presented to customers, the VPP Certification Form is intended solely as an internal dealership document to record the legitimate business reason for a VPP or VPP bundle discount.

Because the customer may choose to purchase more than one VPP and it could be unwieldy to complete a separate certification form for each VPP that the customer purchases, the VPP Certification Form at Appendix B includes a table that allows a dealership to record on a single form the pricing determination applicable to the sale of one or more VPPs to a customer.

The VPP Certification Form at Appendix B is structured in the following manner:

1. *Buyer/Lessee Information.* The top section of the form identifies the buyer(s) or lessee(s) and other transaction-specific information such as the date of the VPP sale and the VIN of the vehicle being purchased or leased. The dealership should replace or add to these data fields as necessary to reflect the information it uses to identify a vehicle delivery (such as by adding the stock number or deal number).

2. *Pricing Determination Table.* A table appears below the Buyer/Lessee Information that includes the following columns:

   A. *Name of VPP.* This column should include a preprinted listing of all VPPs or VPP bundles offered by the dealership (with the information in the columns to the right only filled in for VPPs purchased by the customer) or, alternatively, a listing of only those VPPs or VPP bundles purchased by the customer.

   B. *Standard Retail Price.* This column states the SRP for each listed VPP and VPP bundle.



For many VPPs or VPP bundles, it may be possible to preprint this price.

For others, such as an extended service contract where a dealership has established standard pricing but the SRP differs based on the deductible amount, length of coverage, or other selections made by the customer, the SRP may need to be entered after the customer has made the necessary selections. The dealership should consult with software vendors to determine how it may enter an SRP when such variables are present.

C. *Selling Price.* This is the price the customer paid for the VPP or VPP bundle. As noted above, it is only necessary to use the VPP Certification Form when the Selling Price for a VPP or VPP bundle is less than the SRP.

D. *Number of Allowable Discount.* After entering a Selling Price that is less than the SRP, the Number of the Allowable Discount from the list of Allowable Discounts that appears below the table should be entered. For example, if the Selling Price had to be discounted due to a payment cap imposed by the finance source that took assignment of the credit contract, then "1" should be entered.

E. *Discount 2.* If the SRP was discounted because the customer stated a monthly payment constraint in a fixed dollar amount that would preclude the customer from accepting a VPP or VPP bundle at the SRP, then the amount of the monthly payment constraint stated by the customer should be entered in this column. Otherwise, nothing should appear in this column.

F. *Discount 3.* If the SRP was discounted because the customer stated that he or she had access to a lower price for the same or similar VPP, then the name of the entity that offered the competing product and the price of the product stated by the customer should be entered in this column. Otherwise, nothing should appear in this column.

3. *List of Allowable Discounts.* Below the Pricing Determination Table is a list that contains the number and identification of each of the five allowable discounts (discussed in greater detail below) under the *NADA/NAMAD/AIADA Model Dealership Voluntary Protection Products Policy.* As noted above, an adopting dealership may determine that fewer or additional pre-established discounts are allowed for good-faith, competitive reasons that are unrelated to the customer's background, but such



dealerships should consult with counsel before adding to the list of allowable discounts.

4. *Selling Employee's Certification.* Below the list of Allowable Discounts is a certification that should be signed and dated by the dealership employee who arranged the sale of the VPP(s) to the customer.

5. *Reviewer Certification.* A Reviewer's Certification is set forth in a separate box on the VPP Certification Form. Within two business days of—or another specified time period shortly after—the transaction, a senior manager who was not involved in the transaction should review the VPP Certification Form completed by the Selling Employee and any other required substantiating documentation to ensure that each VPP or VPP bundle sold to the customer was priced in accordance with this policy. (As noted above, a dealership that has also adopted the *NADA/NAMAD/AIADA Fair Credit Compliance Policy & Program* should consider designating its Program Coordinator under that program as the reviewer of its VPP Certification Forms.) If the reviewer determines that this policy was not followed, the reviewer should initiate appropriate corrective action as it relates to the customer, the employee who arranged the VPP sale, or otherwise, and record such action on the VPP Certification Form. The reviewer should then sign, date, and retain the document.

b. *Supporting Information & Document Retention.* For each allowable discount from the SRP, the dealership should clearly state the prerequisites that must be present in order to apply that discount and retain in the deal jacket or other specified location the VPP Certification Form and, if applicable, other supporting documentation. At a minimum, the documentation should include:

1. *Pricing or Payment Cap.* For the first discount, a pricing cap imposed by state law or a payment cap imposed by the company providing financing for the purchase serves as an allowable basis to discount the SRP to the pricing cap level. Documentation of— or reference to—the applicable pricing or payment cap serves as documentation for this discount.

2. *Monthly Payment Constraint.* For the second discount, a monthly payment constraint in a fixed dollar amount stated by the customer that precludes the dealership from selling a VPP or VPP bundle at its SRP serves as an allowable basis to discount the SRP to the level that allows the customer to purchase the VPP or VPP bundle. The VPP Certification Form records this information and therefore serves as appropriate documentation for this discount.

3. *More Competitive Offer.* For the third discount, a more competitive offer for the same or similar VPP to which the customer states that he or she has access serves as an allowable basis for the dealership to discount the SRP to the level necessary to either meet the competing offer or beat the competing offer by a certain set amount. (In order to promote consistent discounting decisions, the dealership should determine, as a matter of policy, whether it will offer to meet competing offers or beat competing offers by a set amount.) The VPP Certification Form records this information (the name of the VPP provider and the price of the VPP) and therefore serves as appropriate documentation for this discount. **As part of this process, the dealership should not seek to verify the existence of a more competitive offer by contacting the competitor.**

4. *Promotional Pricing.* For the fourth discount, a promotional program that allows all customers to receive a VPP or VPP bundle at a discounted price serves as an allowable basis to discount the SRP pursuant to the terms of the promotional program. The dealership advertisement or other communication identifying the terms of the promotional program serves as appropriate documentation for this discount.

5. *Employee Pricing.* For the fifth discount, a dealership employee incentive program that allows employees to receive a VPP or VPP bundle at a discounted price serves as an allowable basis to discount the VPP or VPP bundle pursuant to the terms of the program. The dealership employee incentive program or reference to it serves as appropriate documentation for this discount.

### Section V.    Product Advertisement

This section states that the dealership will not advertise, solicit, or otherwise market VPPs in a manner that is deceptive, misleading, confusing, or otherwise inconsistent with their terms and conditions. While all areas addressed by the *NADA/NAMAD/AIADA Model Dealership Voluntary Protection Products Policy* can invite scrutiny by regulators, this area in particular has witnessed several recent enforcement actions by federal agencies alleging that finance sources, VPP providers, and dealers have deceptively marketed VPPs to consumers.[5] It is essential that the dealership have a process in place to review all forms of marketing (e.g., newspaper and internet ads, YouTube videos, emails, text messages, social media, signage at the dealership, etc.) to ensure its marketing materials comport with this section.

### Section VI.    Product Presentation and Sale

This section establishes a process for ensuring that customers are fully informed about the features, optional nature, and price of VPPs before deciding to purchase them.

a.    Section VI.a states that the dealership will (i) ensure its employees who offer VPPs to customers fully understand their benefits, limitations, and other terms and conditions before offering them to customers; and (ii) not offer products to customers for which they are ineligible or would derive no value. As with the other elements of this section, information about dealer product offerings should be a component of the VPP training that such employees receive, and customers should not be offered products

---

[5] Recent examples include (i) a consent order the Consumer Financial Protection Bureau (Bureau) entered into with a bank engaged in indirect vehicle financing to resolve allegations that the bank overstated to consumers the extent of coverage provided by its optional Guaranteed Asset Protection (GAP) product (*Santander Consumer USA, Inc.*, BCFP File No. 2018-BCFP-0008 (Nov. 20, 2018)); (ii) consent orders the Bureau entered into with a bank engaged in indirect vehicle financing and its non-bank partner company to resolve allegations that the respondents understated to service members the costs of optional vehicle service contracts and GAP coverage (*U.S. Bank Nat'l Ass'n*, BCFP File No. 2013-CFPB-0003 (Jun. 26, 2013) and *Dealers' Fin. Serv., LLC*, BCFP File No. 2013-CFPB-0004 (Jun. 25, 2013)); and (iii) consent orders that the Federal Trade Commission entered into with the provider of an optional bi-weekly payment product and an automobile dealership group that sold the product to resolve allegations that the respondents failed to disclose to consumers the total amount of the fees associated with the product and that those fees could offset any savings to consumers who purchased the product (*Nat'l Payment Network, Inc.*, FTC Docket No. C-4521 (May 4, 2015) and *Matt Blatt, Inc.*, FTC Docket No. C-4532 (Jul. 2, 2015)).



that would not provide value based on the circumstances of the customer's transaction (such as being offered an extended service contract on a leased vehicle whose protection is covered by the manufacturer's warranty during the lease term). During this training, employees should be reminded that while knowledge of the product and the elements of the customer's transaction are essential, dealer employees are not—and should not present themselves as—agents of the customer who are working on the customer's behalf.

b.　Section VI.b states that the dealership will inform customers orally that the VPPs it offers are optional, and that the dealership will not contradict this disclosure in any way such as by stating or implying that the purchase of a VPP is required as a condition of purchasing or leasing the vehicle, obtaining warranty coverage, qualifying for financing or obtaining particular financing terms, or executing any other part of the transaction. Because this involves an oral disclosure that cannot be monitored solely through a document review, the dealership should have a process in place to monitor periodically product presentations by its employees to ensure they adhere to this requirement, and the dealership should take immediate corrective action if it learns that an employee has deviated from it.

c.　Section VI.c states that the dealership will present VPPs to customers in a standard, simple menu format that, at a minimum, prominently discloses:

1.　that the purchase of any listed product is optional;

2.　that any listed product may be purchased separately;

3.　that the purchase of any listed product is not required to purchase or lease a vehicle, obtain warranty coverage, qualify for financing, or receive financing on particular terms;

4.　that the listed products or the protections they provide may be available from other sources;

5.　that the dealer may retain a portion of the sale price of the listed products;

6.　the price of—and monthly payment for—the vehicle without the purchase of a VPP;

7.　the price of—and monthly payment for—each product if purchased separately; and

8.　the price of—and monthly payment for—each product bundle if products are purchased as a bundle.

By making these disclosures prominently, dealers provide useful information that facilitates the customer's understanding of the price, optional nature, and potential availability from other sources of—and the dealer's economic interest in—the VPPs being offered.

d.　Section VI.d states that the dealership will present VPPs in a manner that is designed to assist customers in making informed purchasing decisions by presenting information on the VPP's price, deductible, limitations, benefits, eligibility, requirements for maintaining coverage, claims process, cancellation and refund rights and procedures, and other important terms and conditions. Section VI.e further states that prior to the sale of a VPP, the dealership will provide the customer with a copy of—and an opportunity to review—each purchased VPP's terms and conditions as well as other required disclosures and request the customer's acknowledgement that he or she has received the menu disclosures and elected to (i) purchase each selected VPP or VPP bundle, or (ii) decline purchasing any VPP or VPP bundle.

While it typically is not practical to present orally to customers all of the information about a VPP that is contained in the VPP policy document(s), dealership employees should explain to customers (i) basic product information that may inform their purchasing decision, and (ii) that the full terms and conditions applicable to the VPP are contained in the written VPP policy document(s), which the dealership employee should provide the customer—and ensure the customer has an opportunity to review—prior to the sale of the VPP. The customer should then acknowledge in writing that he or she has received the menu disclosures and elected to purchase the VPP.

e.　Section VI.f states that the dealership will provide to customers all required post-sale forms. The dealership should consult with counsel to ensure that any requirement to provide such forms under state law or pursuant to the dealer's agreements with the finance or lease source and VPP provider is fulfilled.

### Section VII.    Product Cancellation

This section generally establishes that the dealership will facilitate both customer requests to cancel VPPs customers have purchased from the dealership and the customer's receipt of any refunds due.

Section VII.a states that the dealership will ensure customers have a simple and clear method to exercise any cancellation rights applicable to VPPs they have purchased. While state law and/or VPP provider policy documents typically specify how VPP cancellations and refunds will be administered, the dealership, as noted above, should consider the ease with which customers can exercise these rights when deciding whether to offer particular VPPs. This process should not be convoluted or unnecessarily burdensome to the customer.

Section VII.b states that the dealership will take no action to delay, prevent, or otherwise frustrate customers' exercise of such rights. This is another area that should be particularly emphasized during the employee training to carry out this policy.

Section VII.c states that the dealership will promptly and courteously process customer cancellation requests and issue, or facilitate the issuance of, refunds due to customers or to the finance or lease source, as required. If the dealership is responsible for providing such refunds, then the dealership should have a process in place to process the refund request without delay. If the dealership is not responsible for providing such refunds but the dealership nonetheless receives a cancellation request from a customer, the dealership should provide information to the customer on how to exercise his or her cancellation right.

Section VII.d states that the dealership will maintain, or send to the VPP provider, verification that the refund was provided to the customer or to the finance or lease source, as required, if the dealership issues the refund. Because multiple parties may be involved in the sale, financing, and administration of VPPs to customers, it is incumbent on all parties (the dealership, the finance or lease source, and the VPP provider) to communicate with one another to ensure customer cancellation requests have been honored. The dealership should



review state law as well as its contract with the finance or lease source and VPP provider to ensure it is fulfilling any obligations in this regard.

### Section VIII.  Customer Complaints

This section states that the dealership will promptly and courteously respond to customer complaints regarding VPPs purchased from the dealership. While robust training, transparency, clear communications, responsiveness, and oversight should greatly diminish the likelihood of customer complaints regarding VPPs, the dealership should nonetheless be prepared to handle customer complaints that may arise (both as a complaint applies to the individual transaction involved and any systemic problems that the complaint may reveal). Developing the following procedures is one way to assist the dealership in addressing customer complaints:

a. Assign an appropriate dealership manager with responsibility for overseeing the dealership's customer complaints process;

b. Ensure customers are provided with the name and

phone number of the dealership manager to contact if they have a complaint;

c. Establish a process for logging in customer complaints;

d. Direct the manager with oversight responsibility to handle the customer complaint or refer it to another dealership employee to (i) determine how the complaint can be resolved, and (ii) attempt to resolve the complaint; and

e. Record (i) the resolution of the complaint and whether the customer is satisfied with the resolution, or (ii) the reason it cannot be resolved.

As with other aspects of this policy, the development of a customer complaint process should be tailored to the dealership's circumstances. However, if the dealership develops an effective customer complaint process (which should be in place for all of the dealership's departments), it will help the dealership address customer concerns in their early stages, enhance its business processes, and further demonstrate its commitment to a fair, ethical, and legally compliant VPP sales process.



# Templates



## [*Name of Dealership*] Voluntary Protection Products Policy

**OVERVIEW**

Among the many products and services that the Dealership offers its customers are voluntary products that are designed to protect the customers' investment in the vehicles they purchase or lease. These voluntary protection products (VPPs) can provide great value to customers when they are offered in a fair and transparent manner and customers fully understand their costs, benefits, and limitations. In order to facilitate a compliant, professional, and consumer-friendly VPP sales process, the Dealership adopts the following Policy:[1]

**I.    POLICY STATEMENT**

The Dealership will prominently display the poster at Appendix A, within clear view of prospective customers, stating that (i) VPPs offered by the Dealership are completely optional and are not required to purchase or lease a vehicle or to obtain warranty coverage, financing, financing on particular terms, or any other product or service offered by the Dealership, and (ii) the Dealership is fully committed to providing customers with the price, terms, and conditions of each VPP before they decide to purchase it.

**II.    LEGAL COMPLIANCE, TRAINING, OVERSIGHT, COORDINATION, AND RECORDS RETENTION**

  a.  The Dealership will fully comply with federal, state, and local law (including applicable licensing and insurance requirements and the prohibition against discrimination on a prohibited basis) as well as contractual obligations the Dealership has entered into with VPP providers, finance and lease sources, and other third parties.

  b.  The Dealership will conduct initial and periodic training on this Policy for—and oversee—Dealership employees involved in VPP selection, pricing, advertisement, presentation, sales, cancellation, and customer complaints.

  c.  The Dealership will coordinate the efforts of its departments to ensure a consistent and harmonized approach toward the proper execution of this Policy.

  d.  The Dealership will retain records used to document compliance with this Policy for an appropriate period.

**III.    PRODUCT SELECTION**

The Dealership will only offer to customers VPPs that offer value. At a minimum, to the extent it is available, the Dealership will consider:

  a.  the product's cost, coverage, limitations, and other terms and conditions;

  b.  the product's claims payment and cancellation process; and

  c.  the product provider's financial ability to provide the product benefits.

**IV.    PRODUCT PRICING**

  a.  The Dealership will establish a Standard Retail Price (SRP) for each VPP and each bundle of VPPs it offers for which pricing discretion exists.

  b.  The Dealership will only discount the SRP for the following pre-established, legitimate business reasons:

    1.  a pricing or payment cap imposed by law or by the company providing financing for the purchase;

    2.  a customer's stated monthly payment constraint;

    3.  a more competitive offer for the same or similar VPP;

    4.  promotional pricing for which the customer qualifies; and

    5.  employee pricing for which the customer qualifies.

  c.  The limitation on discounts in Section IV.b of this Policy does not preclude the Dealership from establishing an SRP for a bundle of VPPs that is less than the combined sum of the SRP of each individual VPP in the bundle.

  d.  The Dealership will establish procedures, including the utilization of the VPP

---

[1] Nothing in this policy, express or implied, is intended to or shall confer upon any person any right, benefit, or other remedy of any nature whatsoever under or by reason of these standards or any federal, state, or local law. However, any violation of this Policy by a Dealership employee can be the basis for disciplinary action, including termination of employment and/or the agency or independent contractor relationship.

Certification Form at Appendix B, to record, review for corrective action, and retain determinations that a pre-established, legitimate business reason supported a decision to discount the SRP.

## V. PRODUCT ADVERTISEMENT

The Dealership will not advertise, solicit, or otherwise market VPPs in a manner that is deceptive, misleading, confusing, or otherwise inconsistent with their terms and conditions.

## VI. PRODUCT PRESENTATION AND SALE

a.  The Dealership will ensure its employees who offer VPPs to customers fully understand their benefits, limitations, and other terms and conditions before offering them to customers. The Dealership will not offer products to customers for which they are ineligible or would derive no value.

b.  The Dealership will inform customers orally that the VPPs it offers are *optional*. The Dealership will not contradict this disclosure in any way, including by stating or implying that the purchase of a VPP is required as a condition of purchasing or leasing a vehicle, obtaining warranty coverage, qualifying for financing or obtaining particular financing terms, or executing any other part of the transaction.

c.  The Dealership will present VPPs to customers in a standard, simple menu format that, at a minimum, prominently discloses:

1.  that the purchase of any listed VPP is optional;

2.  that any listed VPP may be purchased separately;

3.  that the purchase of any listed VPP is not required to purchase or lease a vehicle or to obtain warranty coverage, qualify for financing, or receive financing on particular terms;

4.  that the listed VPPs or the protections they provide may be available from other sources;

5.  that the dealer may retain a portion of the sale price of the listed VPPs;

6.  the price of—and monthly payment for—the vehicle without the purchase of a VPP;

7.  the price of—and monthly payment for—each VPP if purchased separately; and

8.  the price of—and monthly payment for—each product bundle if VPPs are purchased as a bundle.

d.  The Dealership will present VPPs in a manner that is designed to assist customers in making informed purchasing decisions. This includes presenting to the customer information about the VPPs' price, deductibles, limitations, benefits, eligibility, requirements for maintaining coverage, claims process, cancellation and refund rights and procedures, and other important terms and conditions.

e.  Prior to the sale of a VPP, the Dealership will:

1.  provide the customer with a copy of—and an opportunity to review—each selected VPP's terms and conditions as well as any other required disclosures; and

2.  request the customer's acknowledgement of the menu disclosures and election to:

A.  purchase each selected VPP or VPP bundle, or

B.  decline purchasing any VPP or VPP bundle.

f.  Following the sale of a VPP, the Dealership will provide to customers all required post-sale forms.

## VII. PRODUCT CANCELLATION

The Dealership will:

a.  ensure customers have a simple and clear method to exercise any cancellation rights applicable to VPPs they have purchased;

b.  take no action to delay, prevent, or otherwise frustrate customers' exercise of such rights;

c.  promptly and courteously process customer cancellation requests and issue, or facilitate the issuance of, refunds due to customers or to the finance or lease source, as required; and

d.  maintain, or send to the VPP provider, verification that the refund was provided to the customer or to the finance or lease source, as required, if the Dealership issues the refund.

## VIII. CUSTOMER COMPLAINTS

The Dealership will promptly and courteously respond to customer complaints regarding VPPs purchased from the Dealership.

# [*Name of Dealership*]
## Voluntary Protection Products Policy

[*Name of Dealership*] offers vehicle service contracts and other voluntary products that are designed to protect your investment in a vehicle you purchase or lease from us. The purchase of any of these voluntary protection products is completely **optional** and is **not** required to purchase or lease a vehicle or obtain warranty coverage, financing, financing on particular terms or any other product or service offered by the dealership. [*Name of Dealership*] is fully committed to providing you the price, terms and conditions of each voluntary protection product before you decide to purchase it.

# Voluntary Protection Products Certification Form

Buyer(s)/Lessee(s) Name(s) _____ Date _____ VIN _____

| Name of VPP (or VPP Bundle) | Standard Retail Price | Selling Price | If Selling Price is less than Retail Price, enter the Number of the Allowable Discount from the list below. | If Discount 2 is selected, enter the Amount of the Monthly Payment Constraint. | If Discount 3 is selected, enter the Name of the Competing Offeror *and* the Price of the Competing Offer. |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

## Allowable Discounts

**Discount 1**    VPP limited by pricing or payment cap

**Discount 2**    Customer stated monthly payment constraint

**Discount 3**    Customer stated competing offer

**Discount 4**    Customer qualified for Dealership Promotional VPP Campaign

**Discount 5**    Customer qualified for Dealership Employee Incentive Program

**I certify that the information above is true and correct to the best of my knowledge and that any discount from the Standard Retail Price was made in good faith and in a manner that is consistent with the requirements of the [*Name of Dealership*] Voluntary Protection Products Policy.**

_____
Signature

_____
Date

_____
Printed Name

_____
Title

A467

## Reviewer Certification

I have reviewed the above information and supporting documentation and:

❑   certify that the Selling Price complies with the [*Name of Dealership*] Voluntary Protection Products Policy, or

❑   certify that I have initiated the corrective action noted below.

• Reduced the customer's Selling Price for _____ to $_____ or provided a refund to the customer in the amount of $_____.

• Taken the following employee corrective action (describe):_____ _____

• Other (describe): _____ _____

_____
Signature

_____
Date

_____
Printed Name

_____
Title







nada.org

© NADA 2019. All rights reserved.

ATTACHMENT 22

# NADA/NAMAD/AIADA Fair Credit Compliance Policy & Program





# Fair Credit Compliance
# POLICY & PROGRAM



## Table of Contents

Overview of Fair Credit Policy &
Fair Credit Compliance Program Templates          1

Instructions for Completing Fair Credit Policy &
Fair Credit Compliance Program Templates          4

***Templates***

Fair Credit Compliance Program          9

    Appendix A: Fair Credit Policy          15

    Appendix B: Standard Dealer
    Participation Rate          16

    Appendix C: Inventory
    Reduction Criteria          17

    Appendix D: Dealer Participation
    Certification Form          18

Fair Credit Policy & Fair Credit Compliance Program Templates          i

# Overview of Fair Credit Policy & Fair Credit Compliance Program Templates

The Equal Credit Opportunity Act ("ECOA") and its implementing regulation, Regulation B, prohibit discriminating against credit applicants on the basis of their race, color, religion, national origin, sex, marital status, age and other factors.[1] Regulation B states that this prohibition applies not just to intentional discrimination[2] but also to credit practices that appear neutral but nevertheless *result* in a negative "disparate impact" on customers who are members of one of these protected classes (assuming the customers in the different classes being compared are similarly situated).[3] Because a finding of disparate impact typically is established by a statistical evaluation of past credit transactions, dealers and other creditors cannot ensure they are complying with ECOA solely by training their employees to avoid considering these prohibited factors when making credit decisions. Dealers must also ensure that their policy for determining the amount they earn for arranging financing will not give rise to post-transaction claims that the policy resulted in a negative statistical disparity in the amount of dealer participation paid by customers in a protected class (i.e., a class defined by color, national origin or one of the other prohibited bases listed above).[4]

On March 21, 2013, the Consumer Financial Protection Bureau ("CFPB") issued a fair lending guidance bulletin to indirect auto finance sources (which the CFPB refers to as indirect auto lenders) stating "that certain lenders that offer auto loans through dealerships are responsible for unlawful, discriminatory pricing" and that lender policies "that allow auto dealers to mark up lender established buy rates and that compensate dealers [for originating credit contracts] in the form of dealer [participation]" create a "significant risk" of fair lending violations.[5] The bulletin instructs indirect auto finance sources on steps they should take to address this risk, which include either (i) eliminating dealer pricing discretion (such as by paying dealers a flat fee per transaction), or (ii) constraining dealer pricing discretion (by adopting a series of controls and monitoring the credit contracts the finance source purchases from dealers to see if there exists a statistical disparity in dealer participation as described above). Because the bulletin sets forth limitations on how indirect auto finance sources may compensate dealers for arranging financing for customers, it affects dealers even though the Dodd-Frank Act prohibits the CFPB from exercising any authority over dealers engaged in indirect financing transactions.[6]

---

[1]   Other factors include the fact that a credit applicant relies on social security, welfare or other public assistance or has exercised a right under a federal consumer credit law.

[2]   The term usually associated with intentional discrimination is "disparate treatment." Disparate treatment involves treating credit applicants differently on a prohibited basis even if there is not a deliberate intent to discriminate. An example of disparate treatment would be if a creditor were to require that a minority applicant provide greater documentation to secure financing than a similarly situated non-minority applicant.

[3]   While ECOA clearly prohibits disparate treatment, substantial controversy exists over whether ECOA also prohibits disparate impact. Consistent with NADA's cautious approach to disseminating compliance guidance to its members, this guidance and the policy and program templates assume (but do not concede) that a disparate impact theory of liability exists under ECOA.

[4]   The term "dealer participation" (also known by such terms as "dealer reserve" or "dealer spread") refers to the dealer's participation in (i.e., its portion of) the contract interest rate that the customer pays to finance the purchase of a vehicle from the dealer. It is the difference between this retail rate (also known as the Annual Percentage Rate or "APR") and the wholesale "buy rate" at which a finance source buys the finance

contract (also known as a retail installment sale contract or "RISC") from the dealer. Finance sources typically compensate dealers for arranging financing with the customer by permitting dealers to retain the dealer participation subject to parameters established by the finance source.

[5]   The guidance bulletin (CFPB Bulletin 2013-02) and its accompanying press release are available at www.consumerfinance.gov/newsroom/consumer-financial-protection-bureau-to-hold-auto-lenders-accountable-for-illegal-discriminatory-markup/.

[6]   The CFPB was created in Title 10 of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, Pub. Law. §§ 111-203 (July, 21, 2010)("Dodd-Frank Act"). Section 1029 of the Dodd-Frank Act excludes motor vehicle dealers engaged in indirect financing transactions (in which a dealer enters into a RISC with a customer and then assigns the contract to a third party finance source) from the authority of the CFPB, while continuing to subject dealers to the authority of the federal agencies that could exercise authority over dealers prior to the enactment of the Dodd-Frank Act. The CFPB, therefore, may not take actions directly against dealers engaged in indirect financing. However, CFPB actions affecting indirect finance sources (over which the CFPB may exercise authority) can also affect dealers to the extent they

Since the CFPB issued its fair lending guidance bulletin, several indirect auto finance sources have informed dealers that they will monitor (i.e., conduct a statistical analysis of) the contracts they purchase from dealers. In many cases, these indirect finance sources have sent letters to dealers indicating that the finance source's statistical analysis identified unexplained differences in the amount of dealer participation paid by customers who are members of protected classes and customers who are not members of those classes. These letters typically offer the dealer the opportunity to respond to the finance source's preliminary findings. Usually as part of this process, dealers may provide to the finance source legitimate (non-prohibited) reasons that explain the purported pricing disparities.

In addition, on December 20, 2013, the CFPB and the Department of Justice announced an enforcement action against an indirect auto finance source (Ally) for alleged disparate impact discrimination. The action resulted in a consent order between the United States and Ally to resolve the government's allegation that "Ally engaged in a pattern or practice of discrimination on the basis of race and national origin in violation of ECOA based on the interest rate 'dealer markup' – the difference between Ally's buy rate and the contract rate – paid by African-American, Hispanic, and Asian/Pacific Islander borrowers who received automobile loans funded by Ally." Ally did not admit to the allegations and no court determined their validity. In addition, Ally stated in a press release that "it does not believe that there is measurable discrimination by auto dealers."[7] Nevertheless, to resolve the matter, Ally agreed to undertake several actions, including the payment of a civil penalty and compensation to the alleged victims, monitoring the amount of dealer participation earned by dealers in retail installment sale contracts ("RISC") purchased by Ally, and taking "appropriate corrective action" if such monitoring reveals that dealers charged a higher amount of dealer participation to similarly situated protected groups of customers.[8]

## Fair Credit Compliance Program

These and other related developments have prompted dealers and their attorneys to seek from NADA compliance guidance to minimize the fair credit risk identified in the CFPB guidance bulletin. This guidance and the *Fair Credit Policy* and *Fair Credit Compliance Program* templates are intended to respond to these requests. NADA may issue supplemental guidance as necessary to address additional compliance issues or subsequent developments related to this topic.

Although NADA is not aware of any evidence demonstrating that the ability of automobile dealers to negotiate contract rates with their customers results in disparate impact discrimination in today's marketplace, we recognize that our members strive to adopt policies and procedures that will reduce their litigation exposure while demonstrating their ongoing commitment to regulatory compliance and the fair treatment of their customers. Therefore, in order to promote these goals, we set forth below and in the Fair Credit Compliance Program template that follows an alternative means for dealers to arrive at the amount of compensation they earn for arranging financing. **Keep in mind that the finance compensation model that dealers adopt is an individual dealer decision that must be consistent with federal and state law as well as any contractual restrictions imposed on the dealer by its finance sources. It is essential that dealers consult their legal counsel when making decisions related to this topic.**

The most obvious way to reduce the possibility of a finding of disparate impact discrimination is for individual dealers to establish a means of compensation in which the determination of the amount of finance income they earn does not vary on a customer-by-customer basis. Examples of such an approach include charging each customer (i) a fixed number of basis points over the wholesale buy rate (i.e., the rate at which the finance source will purchase the credit contract from the dealer), (ii) a fixed percentage of the amount financed or (iii) a fixed dollar amount. Of course, a major drawback to customers of such a rigid pricing policy is that it deprives dealers of the ability to "meet or beat" the most competitive credit offer that the customer has received from another creditor, which in turn limits the customer's ability to reduce the amount that the customer pays for credit. It also may be unrealistic to assume that most dealers would be able

---

cause indirect finance sources to amend the contracts that govern their relationship with dealers.
[7]  Ally's press release is available at http://media.ally.com/2013-12-20-Ally-Financial-Statement-on-Auto-Financing-Consent-Orders.
[8]  The full terms of the consent order are available at http://images.magnetmail.net/images/clients/NADA/attach/Ally_Consent_Order.pdf.

to adopt such an inflexible compensation approach when they typically have contractual arrangements with multiple finance sources and each of those sources establishes its own compensation schedule and financing parameters.

One potential way to eliminate a customer-by-customer determination of the amount the dealer earns for arranging financing while preserving sufficient flexibility to accommodate scenarios that may benefit customers, such as the "meet or beat" dynamic, is to establish a pre-set amount of compensation but allow for downward adjustments to that amount in the event that one or more pre-determined conditions occur. Examples of such conditions could include (i) the customer's inability to satisfy a monthly payment constraint at the pre-determined amount, (ii) the customer's access to a more favorable offer of credit from another creditor, (iii) a promotional offer that the dealer extends to all customers on the same terms, (iv) the fact that a particular transaction is eligible for a subvened interest rate from a manufacturer, finance source, or other non-affiliated third party, (v) the fact that a transaction is eligible for an employee incentive program, and (vi) documented inventory reduction considerations that are related to specific vehicles.[9]

If a dealer chooses to adopt this or a similar approach to dealer finance compensation, it should adopt written procedures that (a) identify each pre-determined condition that permits a downward deviation from its pre-set amount of dealer participation, (b) require its finance personnel to execute a standardized form that identifies the pre-set dealer participation amount, the final dealer participation amount, and, where the two differ, which pre-determined condition or set of conditions is present in the transaction that authorizes the deviation, (c) conduct formal training of all relevant personnel on its finance compensation policy, and (d) retain the compensation forms and otherwise monitor and document its compliance efforts.[10] The training and monitoring functions are particularly important as fidelity to the program from the employees who must carry it out is essential to its success.

An attractive feature of this approach is that if the dealer develops appropriate, well-defined allowable adjustments and ensures that its personnel properly and consistently apply, document and retain them, then the dealer is in a much better position to explain any unexplained pricing disparities that might otherwise lead a court, governmental enforcement agency or indirect auto finance source that is monitoring the dealer's credit contracts to conclude that such disparities are attributable to a customer's background[11] and therefore in violation of ECOA.

**Dealers are not required to adopt this approach to standardizing the amount of dealer participation they charge in credit transactions and should consult with their individual legal counsel about whether they should do so.** For dealers who wish to adopt this or a similar approach, we have developed the Fair Credit Policy and Fair Credit Compliance Program templates that begin at page 9. General and specific instructions for completing these forms are provided below.

---

[9]  Dealers who follow this approach may wish to identify and include additional or different pre-determined reasons for deviating from their pre-set dealer participation amount. This should be acceptable provided the additional or different reasons are limited to neutral, pro-competitive factors that are completely unrelated to the customer's status as a member of a protected class and are executed in good faith. However, it must be noted that the ECOA compliance approach set out in the text and the attached Program is modeled after the ECOA compliance framework that the Department of Justice ("DOJ") incorporated into consent orders with two automobile dealers in 2007 to resolve claims of unintentional disparate impact discrimination. One of the consent orders is available at www.justice.gov/crt/about/hce/documents/pacifico_order.pdf (see, in particular, paragraph 7 entitled "Guidelines for Setting Dealer Reserves" and Appendix B). While this framework was developed solely for that purpose (and therefore does not create a safe harbor for complying with ECOA), it nevertheless provides a useful template for dealers to consider in developing their own approach to ECOA compliance. With this in mind, dealers should be aware that the specific allowable deviations noted in the text and the attached Program are those that were included in the DOJ consent orders. Dealers and their attorneys who adopt this compliance approach should proceed cautiously in adopting specific allowable deviations that differ from or are in addition to those contained in the DOJ consent orders.

[10]  These features were also part of the DOJ ECOA compliance framework that was included in the 2007 consent orders referenced above.

[11]  As used in this document, the term "customer's background" refers to the customer's status as a member of a protected class.

# Instructions for Completing Fair Credit Policy & Fair Credit Compliance Program Templates

## General Instructions and Disclaimers

**Use of Templates.** It is essential that, prior to adopting this *Fair Credit Policy* and *Fair Credit Compliance Program*, dealers read the templates carefully, make adjustments that are appropriate to their individual circumstances, and ensure that the final policy and program they adopt are reviewed by qualified counsel. While italicized language that appears in brackets identifies areas of the document where an individualized dealer entry is appropriate, dealers should modify both italicized and non-italicized portions of the document that they and their counsel determine is necessary.

**Program Scope.** The *Fair Credit Compliance Program* is broader than a pure dealer participation pricing policy that is designed to help mitigate a finding of disparate impact discrimination under ECOA and Regulation B. This is because, as explained above, ECOA and Regulation B prohibit intentional discrimination and (in the view of federal regulators) disparate impact discrimination, and it is therefore essential that fair credit training programs address both prohibitions. However, the *Program* does not attempt to address every issue that potentially relates to fair credit compliance at a franchised automobile dealership (e.g., how the dealership handles oral requests for financing, desking procedures, conditional sales agreements and the sale of products to protect the customer's investment in the financed vehicle). These issues are very dealer specific and need to be addressed in a manner that is appropriate to the dealership's circumstances. For these reasons, the *Program* template should be viewed as part of a broader dealership effort to develop a comprehensive approach to fair credit compliance.

**Program Approval.** Neither ECOA nor Regulation B require creditors to adopt a written fair credit program or, if they adopt such a program, to have it approved by any particular body or individual officer within their business.[12] However, for the reasons stated above, it is prudent for creditors to do so.

The *Program* template assumes that a board of directors will adopt the dealership's *Fair Credit Compliance Program*, appoint a Program Coordinator to administer the *Program*, receive compliance reports from the Program Coordinator, and amend the *Program* as necessary to address fair credit risks that are present at the dealership. If the dealership's governing structure dictates that another dealership body or officer should exercise these functions, the template should be modified accordingly. Regardless of which dealership body or officer acts in this manner, it is important that its leadership affirmatively establish and express support for its fair credit commitment.

**Program Limitations.** The *Program's* approach to determining the compensation dealers receive for arranging financing for customers is not, and the *Program* template has not been, mandated by ECOA or Regulation B and neither have been formally adopted by any federal agency as a means of satisfying the requirements of federal law. Nor is there any guarantee that adopting the attached *Program* or any component of it will adequately protect a dealership from a governmental enforcement action or private lawsuit.[13]

Notwithstanding these limitations, NADA believes that the *Program* template represents a solid attempt to promote compliance with ECOA and Regulation B while preserving enough flexibility to allow customers to continue leveraging the overwhelming benefits that are produced by today's intensely competitive vehicle financing market.

---

[12] This is in contrast to other regulatory requirements such as the FTC Red Flags Rule, which requires financial institutions and creditors to adopt a written identity theft prevention program and to have it approved by their board of directors or an appropriate committee of the board of directors. See 16 C.F.R. § 681.1(e)(1).

[13] As with other areas of the law, it is essential that dealers and their attorneys stay abreast of legislative, regulatory and judicial developments as well as finance source issuances that could affect their compliance obligations.

## Specific Instructions

### Fair Credit Policy

This document, which is set forth at Appendix A of the *Program*, serves as a strong, unambiguous statement affirming the dealership's commitment to ensuring equal credit opportunity and complying with all applicable fair credit laws. Whether adopting this or a different statement, dealers should ensure that their fair credit commitment is stated clearly and unequivocally. In addition, dealers should strongly consider prominently posting their fair credit policy in locations where it can easily be viewed by both consumers and employees.

### Fair Credit Compliance Program

**Section I – Scope.** Paragraph (a) identifies the dealership employees, agents, and/or independent contractors ("dealership employees") who are covered by the *Policy* and *Program* and the consequences for failing to comply with the *Program*.

Paragraph (b) states that the *Program* (i) carries out the *Policy*, (ii) applies to all activity related to the extension of credit at the dealership, and (iii) establishes how dealership compensation will be determined in indirect vehicle financing transactions (which it defines).

Paragraph (c) states that the *Program* does not confer any rights, benefits or remedies to any person, except that it may be used by the dealership to discipline dealership employees who do not comply with the terms of the *Program*. This is intended to forestall a third party from bringing a legal action against the dealership for a violation of the *Program*.[14]

**Section II – ECOA and Regulation B Compliance.** Paragraph (a) states the dealership's strict prohibition against unlawful credit discrimination and defines what constitutes credit discrimination under ECOA and Regulation B. If the law of the dealer's state or municipality (or other states or municipalities where the dealer conducts business) identifies "prohibited bases" beyond those contained in ECOA (for example, some jurisdictions identify sexual orientation as a prohibited basis), the additional prohibited bases

should be listed in this paragraph (by entering them either in subparagraph 1 or in a new subparagraph 4) and the name of the state or local law containing the prohibition should be added to the section heading (after "Regulation B"). Paragraph (a) also states that this prohibition applies to disparate treatment as well as disparate impact discrimination.

Paragraph (b) states that the dealership complies with all applicable requirements contained in ECOA and Regulation B (not just the prohibition against unlawful discrimination) and cites, in particular, the dealership's adherence to the law's adverse action and other notification requirements (such as the need to issue a notice of incompleteness to credit applicants if the credit application is missing information required to make a credit decision) and the law's records retention requirements.[15] It then includes a placeholder for dealers to either (i) incorporate into this portion of the *Program* its written procedures for adhering to these requirements, or (ii) cross-reference the separate procedures the dealer has adopted for this purpose.

**Section III – Appointment of Program Coordinator.** This section creates the position of Fair Credit Compliance Program Coordinator to administer the *Program* and specifies that the Program Coordinator will report directly to the board of directors. The person who will perform this function is identified at the end of the *Program* (just above the resolution and signatures of the board of directors adopting the *Program*) and his or her specific duties are delineated in section V of the *Program*.

It is important to note that, as with the adoption of a written fair credit program, nothing in ECOA or Regulation B mandates the appointment of a Program Coordinator.[16] However, the dealership's ability to implement and carry out an effective fair credit compliance program will clearly be strengthened if it designates a senior manager to oversee (and, in many cases, execute) the multiple, recurring functions

---

[14]  However, this language would not prevent a third party from bringing a legal action against a dealership for a violation of applicable federal, state or local law to the extent permitted by such law.

[15]  Additional information on these topics is contained in NADA University's publications entitled *A Dealer Guide to Adverse Action Notices* (2011) and *A Dealer Guide to the Federal Records Retention Requirements* (1998), which are available at www.nadauniversity.com.
[16]  This is in contrast to other federal rules, such as the requirement in the FTC Safeguards Rule that financial institutions appoint an employee or employees to coordinate the comprehensive written information security program that the rule requires financial institutions to develop, implement and maintain. See 16 C.F.R. § 314.4(a).

established by the *Program*.[17] It is essential that the Program Coordinator (i) have the full support of the board of directors, (ii) have the substantive expertise, time and seniority to carry out the duties established in sections IV and V of the *Program* (including the ability to initiate the corrective action identified in the Dealer Participation Certification Form Review process set forth in section IV.d and Appendix D of the *Program*), and (iii) is not routinely involved in establishing the Final Dealer Participation Rate offered to the customers in individual transactions. This last requirement is important because the *Program* (a) requires in section IV.d that a review of the transaction be conducted by a person who did not participate in it to ensure it was carried in a manner that is consistent with the terms of the *Program*, and (b) designates the Program Coordinator to carry out this function. While the *Program* permits the Program Coordinator to designate another employee to perform the review function, the Program Coordinator generally should not participate in transactions as this could compromise the integrity of the designee's review.

**Section IV – Guidelines for Establishing Dealer Participation.** This section establishes the manner in which the dealership will determine the dealer participation amount to include in credit offers to customers.

Paragraph (a) states that the Program Coordinator will establish the pre-set standard dealer participation rate for the dealership and identify that rate (the "Standard Dealer Participation Rate") on the form at Appendix B. Unless an allowable downward deviation identified in Paragraph (b) applies, the Standard Dealer Participation Rate will be added to the buy rate of the indirect finance source to which the dealer will assign the RISC to arrive at an APR that the dealership will offer to the customer.

Paragraph (b) identifies seven good-faith, competitive reasons that are unrelated to the customer's background which, if present, allow the dealership to include in credit offers a dealer participation rate

that is lower than the Standard Dealer Participation Rate. These are the same reasons listed in the 2007 DOJ Consent Orders mentioned in footnote 9 above. As stated in that footnote, dealers should be able to identify additional or different reasons for downward deviations in paragraph (b) provided they are limited to neutral, pro-competitive factors that are completely unrelated to the customer's background and are executed in good faith. However, as also explained, dealers should proceed cautiously in adopting downward deviations that differ from those listed in the DOJ consent orders.

For each allowable deviation that is contained in this paragraph, dealers should clearly state the prerequisites, including the necessary supporting documentation, that must be present in order to apply that deviation. In addition, dealers should, to the maximum extent possible, standardize the application of each deviation. For example, the third deviation allows the dealership to reduce the Standard Dealer Participation Rate when the customer states that he or she has access to a more competitive offer from another dealer or finance source. Dealers should determine whether, as a matter of policy, it will (i) reduce the Standard Dealer Participation Rate by the amount necessary to meet the competing offer, or (ii) reduce the Standard Dealer Participation Rate so as to beat a competing offer by a certain number of basis points. The bracketed italicized language that appears in the description of this allowable deviation should be modified to reflect this determination.

Similarly, the seventh deviation allows the dealership to reduce the Standard Dealer Participation Rate based on Inventory Reduction Considerations. It is essential that this subparagraph explain the process by which such considerations will be applied. In addition, because inventory reduction criteria may change more frequently than the frequency with which the dealership would be able to amend this portion of the *Program*, it may be prudent to permit the Program Coordinator to establish the current inventory reduction criteria on a separate document that can be provided to dealership employees who arrange the credit sale with the customer. The *Program* adopts this approach and creates Appendix C for this purpose.

---

[17]  Because dealerships require the services of a Program Coordinator to oversee their compliance efforts in a variety of areas (whether as a matter of prudence or as necessary to comply with federal mandates such as the FTC Safeguards Rule requirement mentioned in the previous footnote), dealers should consider whether their management structure would allow them to achieve greater operational efficiency by consolidating the various program coordinator functions under a single senior dealership manager.

Paragraph (c) states that dealership employees who arrange the credit sale with the customer must complete, sign, and date a Dealer Participation Certification Form that documents the Standard Dealer Participation Rate, the final Dealer Participation Rate, and, where the two rates differ, the allowable deviation that applies to the transaction. Appendix D has been created to record this determination. Note that dealership employees who arrange credit sales with customers should be required to complete a Dealer Participation Certification Form for every credit sale transaction regardless of whether the Standard Dealer Participation Rate or a different dealer participation rate based on an allowable deviation was applied.

Paragraph (d) states that the Program Coordinator, or his or her designee, must (i) review each dealership credit sale within two business days of the credit sale to ensure that the Dealer Participation Certification Form was executed properly and in a manner that is consistent with the terms of the *Program*, and (ii) complete, sign and date the Reviewer Certification that appears on that form. Should the reviewer determine that the form was improperly executed or that the *Program* terms were not otherwise followed, he or she will initiate the corrective action set forth in this paragraph and record that action in the Reviewer Certification. This may require coordinating with the finance source that took assignment of the RISC. In order to preserve the integrity of the review, the *Program* does not permit the reviewer to have participated in the credit transaction under review.

Dealers should ensure this paragraph and the corresponding language in Appendix D are tailored to reflect the dealership's operational circumstances. For example, dealers should determine whether the reviewer requires two business days or a slightly longer period to complete the review and the date on which that period will begin (e.g., date of the credit sale, date of delivery, etc.) Similarly, dealers should identify the employees within the dealership with whom the Program Coordinator must coordinate to ensure corrective action is carried out with regard to both the affected customer and the responsible employee.

**Section V – Training, Oversight, and Reporting.** This portion of the *Program* is intended to ensure that the dealer's fair credit commitment is fully carried out.

Paragraphs (a) through (h) delineate and explain the Program Coordinator's duties. Dealers should carefully review this list to determine whether any of these duties, such as setting and prospectively changing the Standard Dealer Participation Rate, should be retained by the board of directors. If dealers decide that the board should retain any of these duties, this must be reflected in the other portions of the *Program* (including the appendices) that reference the retained duty.

With regard to paragraph (d), the Program Coordinator must clearly identify and communicate to dealership employees who arrange credit sales with customers both the Standard Dealer Participation Rate (as required in section IV.a of the *Program*) and the documentation required to substantiate each of the allowable deviations contained in section IV.b. This will facilitate the consistent application of the allowable deviations by dealership employees and will assist the Program Coordinator or his or her designee in completing the Reviewer Certification set forth in section IV.d and Appendix D of the *Program*.

With regard to paragraph (f), the Program Coordinator must randomly monitor dealership credit offers and conduct periodic audits of dealership credit sales to ensure the *Program* is being effectively implemented. As part of this auditing function, the Program Coordinator should monitor the frequency with which different dealership employees who arrange credit sales apply the dealership's allowable deviations to the Standard Dealer Participation Rate. If such monitoring reveals that particular dealership employees have applied one or more allowable deviations significantly more or less frequently than the other dealership employees who arrange credit sales, then the Program Coordinator should closely scrutinize the employee's application of such deviations to determine whether the employee is correctly applying the deviations and whether additional corrective action may be necessary.

The documents that should be retained (or cross-referenced) in the deal jacket or other location specified by the Program Coordinator include, at a minimum, those that set forth the buy rate and –

- for the first deviation, the rate cap imposed by the finance source (including a transaction specific rate cap that is lower than the finance source's standard

rate cap based on its assessment of the customer's repayment ability);

- for the second deviation, the monthly budget constraint stated by the customer (the Dealer Participation Certification Form records this information and therefore serves as appropriate documentation for this deviation);

- for the third deviation, the name of the dealer or lender that provided the more competitive offer and the APR contained in that offer (the Dealer Participation Certification Form records this information and therefore serves as appropriate documentation for this deviation);

- for the fourth deviation, the dealership advertisement or other communication identifying the terms of the dealership's promotional financing campaign;

- for the fifth deviation, the manufacturer's, finance source's, or other third party's advertisement or other communication identifying the terms of the subvention program;

- for the sixth deviation, the terms of the dealership's employee incentive program; and

- for the seventh deviation, a description of how the vehicle to which the indirect financing transaction applies satisfies the inventory reduction criteria set forth on the form at Appendix C (the Dealer Participation Certification Form records this information and therefore serves as appropriate documentation for this deviation).

**Section VI – Program Amendments.** This section establishes that the Program may only be amended by the board of directors, except that the Program Coordinator may, after consulting with the dealership's legal counsel, add an allowable deviation from the Standard Dealer Participation Rate provided it consists of a good-faith, competitive reason and the board of directors approves the amendment at its first meeting following such amendment. If this occurs, the Program Coordinator needs to ensure that dealership employees are trained on the appropriate application and documentation of the added deviation and it needs to be appropriately reflected on the Dealer Participation Certification Form. Program Coordinators should be reminded of the need to exercise caution in adding to the list of allowable deviations.

### Appendix A – Fair Credit Policy
See the description above under Fair Credit Policy.

### Appendix B – Standard Dealer Participation Rate
See the description above under section IV.a.

### Appendix C – Inventory Reduction Criteria
See the description above under section IV.b.

### Appendix D – Dealer Participation Form
See the description above under sections IV.c and IV.d.

---

## Attached Templates

Fair Credit Compliance Program

| | |
|---|---|
| Appendix A | Dealership Fair Credit Policy |
| Appendix B | Dealership Pre-Set Dealer Participation Rate ("Standard Dealer Participation Rate") |
| Appendix C | Dealership Inventory Reduction Criteria |
| Appendix D | Dealer Participation Certification Form |

Nothing in this guidance or the *Fair Credit Policy* or *Fair Credit Compliance Program* templates is intended as legal advice. It is essential that dealers consult with an attorney who is familiar with applicable federal, state, and local law and their operations to determine appropriate fair credit compliance procedures for their business to adopt.

This information is also not intended to urge or suggest that dealers adopt any specific practices or policies for their dealerships, nor is it intended to encourage concerted action among competitors or any other action on the part of dealers that would in any manner fix or stabilize the price or any element of the price of any good or service.

# [*Name of Dealership*]
## Fair Credit Compliance Program

*[It is essential that dealers and their attorneys read the NADA Overview and Instructions that accompany this Program template before deciding whether and how to adopt it.]*

I.    Scope

a.    Persons Covered

This Program (which includes all appendices to this Program) applies to all employees, agents, and/or independent contractors of [*Name of Dealership*] who are involved in any aspect of the Dealership operations described in section I.b of this Program ("Dealership employees"). Failure to comply with any requirement in this Program may result in disciplinary action, including termination of employment and/or the agency or independent contractor relationship.

b.    Operations Covered

This Program carries out the [*Name of Dealership*] Fair Credit Policy at Appendix A of this Program, sets forth the fair credit requirements applicable to all Dealership activity related to the extension of credit, and prescribes in section IV the manner in which [*Name of Dealership*] determines the amount of its compensation when it engages in an indirect vehicle financing transaction. For purposes of this Program, an "indirect vehicle financing transaction" refers to a transaction in which –

1.    [*Name of Dealership*] enters into a retail installment sale contract ("RISC") with a customer for the purchase of a vehicle from [*Name of Dealership*];

2.    [*Name of Dealership*] subsequently assigns the RISC to a third-party finance source ("the Assignee"); and

3.    [*Name of Dealership*] retains its right to receive a portion of the finance charge payable under the RISC, specifically the difference between the retail annual percentage rate ("APR") and the wholesale interest rate at which the Assignee will buy the RISC from the dealer ("buy rate") within the parameters established by the Assignee. This amount is referred to in this Program as "dealer participation."

c.    No Third-Party Beneficiaries

Nothing in this Program, express or implied, is intended to or shall confer upon any person any right, benefit, or remedy of any nature whatsoever under or by reason of this Program or by reason of any federal, state or local law. Notwithstanding this provision, this is a program of [*Name of Dealership*], and any violation of the Program by a Dealership employee can be the basis for disciplinary action, including termination of employment and/or the agency or independent contractor relationship.

II. Complying with the Equal Credit Opportunity Act and Regulation B

    a. Prohibition Against Unlawful Credit Discrimination

        As part of its fair credit commitment, [*Name of Dealership*] strictly prohibits discriminating against any credit applicant with respect to any aspect of the credit transaction –

        1. on the basis of race, color, religion, national origin, sex, marital status or age (provided the applicant has the capacity to contract);

        2. because all or part of the applicant's income derives from a public assistance program; or

        3. because the applicant has in good faith exercised any right under the federal Consumer Credit Protection Act.

        *[These are the "prohibited bases" set forth in the federal Equal Credit Opportunity Act. Add any additional prohibited bases that are identified by the law of your state and/or municipality and add the title of that law to the heading of this section.]*

        This prohibition against credit discrimination extends to both disparate treatment (i.e., treating a credit applicant differently than other credit applicants on one of the prohibited bases mentioned above) and disparate impact (i.e., applying a facially neutral policy in a manner that has an adverse impact on credit applicants who are members of a class protected against discrimination relative to similarly-situated credit applicants who are not members of that protected class).

    b. Other Requirements

        [*Name of Dealership*] also fully adheres to and will comply with other applicable requirements set forth in the Equal Credit Opportunity Act and Regulation B including, but not limited to, the adverse action and other notification requirements prescribed in 12 CFR § 202.9 and the records retention requirements prescribed in 12 CFR § 202.12.

        *[Set forth or cross-reference the Dealership's specific procedures for complying with these requirements.]*

III. Appointment of Fair Credit Compliance Program Coordinator

    Upon its adoption of this Program, the [*Name of Dealership*] Board of Directors will appoint (and, thereafter, replace as necessary or appropriate) a Fair Credit Compliance Program Coordinator who will administer the Program. The Program Coordinator will report directly to the Board of Directors.

IV. Guidelines for Establishing Dealer Participation

    The dealer participation rate that [*Name of Dealership*] will include in a credit offer to a customer in an indirect vehicle financing transaction will be determined in accordance with the guidelines set forth in this section.

    a. Pre-Set Standard Dealer Participation Rate

        The Program Coordinator will establish a pre-set rate of dealer participation that will be included in all credit offers that the Dealership extends to customers (the "Standard Dealer Participation Rate") except as provided in section IV.b of this Program. The Program Coordinator will set forth the Standard Dealer Participation Rate in writing on the form at Appendix B of this Program and provide it to all Dealership employees. The Program Coordinator may change the Standard Dealer Participation Rate prospectively on a periodic basis through a written declaration to all Dealership employees.

b.  Pre-Determined Allowable Deviations

Dealership employees may include a lower dealer participation rate in a credit offer to a customer only for the good faith, competitive reasons listed below. (Immediately below each reason is how that reason appears on the Dealer Participation Certification Form at Appendix D of this Program, which is described in paragraph (c) of this section.) When this occurs, Dealership employees must include sufficient documentation in the deal jacket or other location specified by the Program Coordinator to support the Dealership employee's application of that reason and to verify that the final dealer participation rate was determined in a manner that comports with the terms of this Program.

1.  Lower Cap Imposed by Assignee

❑  Dealer participation limited by finance source

If the Assignee has imposed a cap on the dealer participation that may be earned in the transaction that is lower than the Standard Dealer Participation Rate, the credit offer may include a dealer participation rate that is reduced to the rate cap level.

2.  Monthly Payment Constraint

❑  Customer stated monthly payment constraint of $_____ per month

If the customer states a monthly payment constraint in a fixed dollar amount that would preclude the customer from accepting a credit offer made under this Program, the Standard Dealer Participation Rate may be reduced to the level that will allow the customer to satisfy the monthly payment constraint.

3.  More Competitive Offer

❑  Customer stated competing offer by _____ (name) of _____%

If the customer (i) states that he or she has access to a credit offer from another dealer or a lender that is lower than the credit offer from the Dealership made under this Program and (ii) identifies the terms and source of the competing credit offer, the Dealership's credit offer may include a dealer participation rate that is reduced so as to [*select one of the following* — [*meet the competing credit offer*][*beat the competing credit offer by a pre-determined number of basis points established by the Program Coordinator for all such scenarios*]].

4.  Dealership Promotional Financing Campaign

❑  Customer qualified for Dealership Promotional Financing Campaign

If the Dealership extends a promotional credit offer to all customers on the same terms or to all purchasers of certain vehicles on the same terms, the credit offer may include a dealer participation rate that is reduced to the level necessary to extend the promotional credit offer.

5.  Manufacturer Subvention Program

❑  Customer qualified for subvened interest rate of _____% from _____ (name)

If the customer qualifies for a manufacturer, finance source, or other third-party interest rate subvention program, the credit offer may be made pursuant to the terms of that program without regard to the Standard Dealer Participation Rate.

6.    Dealership Employee Incentive Program
[*Include only if applicable.*]

❑    Customer qualified for Dealership Employee Incentive Program

> If the customer qualifies for [*Name of Dealership*]'s Employee Incentive Program, the credit offer may include a dealer participation rate that is reduced pursuant to the terms of that program.

7.    Dealership Inventory Reduction Considerations

❑    Customer purchased a vehicle that satisfies the Dealership's pre-determined inventory reduction criteria (describe how vehicle satisfies the criteria)

> If the Dealership extends a credit offer pertaining to a vehicle that satisfies inventory reduction criteria that have been pre-determined by the Program Coordinator, the credit offer may include a dealer participation rate that is reduced in order to secure the sale of the vehicle. In establishing the inventory reduction criteria, the Program Coordinator will (i) consult with the manager(s) responsible for vehicle sales and the Dealership's floor plan line of credit, and (ii) identify in writing on the form at Appendix C of this Program and provide to Dealership employees the written inventory reduction criteria that a vehicle must satisfy in order to qualify for the reduction in the Standard Dealer Participation Rate. The written inventory reduction criteria should include relevant thresholds that the vehicle must satisfy such as the number of such vehicles in stock, the number of days the vehicle has been in inventory and/or the declining value of the vehicle. The Program Coordinator may revise the inventory reduction criteria on a prospective basis as warranted by the circumstances provided these requirements are satisfied.

c.    Dealer Participation Certification Form

A Dealership employee who arranges a credit sale with a customer must fully complete, sign and date the Dealer Participation Certification Form set forth at Appendix D of this Program for each such credit sale and place the form in the deal jacket. The Dealer Participation Certification Form will be retained for the same period of time that the Dealership retains other documents related to credit transactions as set forth in section II.b of this Program.

d.    Dealer Participation Certification Form Review

The Program Coordinator, or his or her Designee, will review each Dealership credit sale within two (2) business days of the sale to ensure that the Dealership employee who arranged the transaction executed a Dealer Participation Certification Form and completed and retained it in a manner that is consistent with the terms of the Program. The person conducting this review may not have participated in the credit transaction under review. If the reviewer determines that the Form was executed in a manner that is inconsistent with the terms of the Program, the reviewer will note the defect on the Form and initiate appropriate corrective action. Such action will include (i) ensuring that the customer receives a reduced interest rate or a refund if the transaction should have resulted in a lower interest rate for the customer, (ii) ensuring that appropriate corrective action is taken with regard to the Dealership employee who improperly executed the Form, and (iii) if the reviewer is not the Program Coordinator, promptly notifying the Program Coordinator of the defect. The Program Coordinator will coordinate with the [*enter position title of appropriate employee(s)*] to ensure such corrective action was carried out. Upon completion of the review, the reviewer will complete, sign, and date the Form's Reviewer Certification.

V.  Training, Oversight and Reporting

The Program Coordinator will complete the tasks listed below.

a.  Ensure all current Dealership employees receive training on the [*Name of Dealership*] Fair Credit Policy and Fair Credit Compliance Program within 60 days of the Board of Director's adoption of the Program.

b.  Ensure all new Dealership employees receive training on the [*Name of Dealership*] Fair Credit Policy and Fair Credit Compliance Program prior to engaging in any credit operation described in Section I.b of the Program.

c.  Ensure all current Dealership employees receive recurring training on the [*Name of Dealership*] Fair Credit Policy and Fair Credit Compliance Program on a periodic basis, at least once per year, and more frequently if the Program is amended in a substantive manner or if the Program Coordinator determines that additional training is necessary.

d.  Establish the Standard Dealer Participation Rate as set forth in section IV.a of this Program and provide to Dealership employees this and any other information that is necessary to carry out the terms of the Program, including the documentation that must be present to support a Dealership employee's application of an allowable deviation to the Standard Dealer Participation Rate.

e.  Complete or ensure the completion of the Dealer Participation Certification Form Review as described in section IV.d of this Program.

f.  Randomly monitor Dealership credit offers and conduct periodic audits of Dealership credit sales to ensure the [*Name of Dealership*] Fair Credit Compliance Program is being effectively implemented.

g.  Submit a report to the Board of Directors, at least once per year, that sets forth (i) the Dealership's level of compliance with the Fair Credit Compliance Program, and (ii) any recommended changes to the Program that may assist in carrying out its purpose.

h.  Retain records documenting the completion of the training, oversight and reporting tasks outlined in this section.

VI.  Program Amendments

a.  Except as provided for in section VI.b of this Program, amendments to the Program may only be made by the [*Name of Dealership*] Board of Directors.

b.  After consulting with the Dealership's legal counsel, the Program Coordinator may amend section IV.b of this Program in a manner that adds a good-faith, competitive reason for an allowable deviation from the Standard Dealer Participation Rate that is consistent with [*Name of Dealership*]'s Fair Credit Policy and is capable of being uniformly applied by Dealership employees. Any such amendment must be ratified by the Board of Directors at its first meeting following such amendment.

# Appointment and Policy & Program Approval

The following employee has been appointed as the [*Name of Dealership*] Fair Credit Compliance Program Coordinator pursuant to section III of this Program:

_____

[*Insert appropriate language indicating the Dealership's approval of this Policy and Program, such as:*]

By signing below, the undersigned, constituting all of the members of the [*Name of Dealership*] Board of Directors, acknowledge the Board's approval of the foregoing [*Name of Dealership*] Fair Credit Policy and Fair Credit Compliance Program and its appointment of the [*Name of Dealership*] Fair Credit Compliance Program Coordinator this _____ day of _____, 201_.

_____        _____

_____        _____

_____        _____

_____        _____

_____        _____

Appendix A

# [*Name of Dealership*]
# Fair Credit Policy

[*Name of Dealership*] is fully committed to complying with the letter and spirit of federal, state, and local laws and regulations that are designed to protect its customers. This includes ensuring that all qualifying credit applicants have equal access to credit and are treated in a manner that is fair, professional and consistent with the terms of the [*Name of Dealership*] Fair Credit Compliance Program. Engaging in any form of unlawful credit discrimination is destructive, morally repugnant and will not be tolerated by [*Name of Dealership*].

**Appendix B**

# [*Name of Dealership*]
# Standard Dealer Participation Rate

The [*Name of Dealership]* Pre-Set Dealer Participation Rate ("Standard Dealer Participation Rate") is _____%.

This rate applies to all indirect vehicle financing transactions beginning on _____ (enter date) and is in effect until further written notice from the [*Name of Dealership*] Fair Credit Compliance Program Coordinator.

**[*Name of Dealership*] Fair Credit Compliance Program Coordinator:**

_____
Signature

_____
Printed Name

**Appendix C**

# [*Name of Dealership*]
# Inventory Reduction Criteria

In order for a Dealership employee to reduce the [*Name of Dealership*] Pre-Set Dealer Participation Rate ("Standard Dealer Participation Rate") based on Inventory Reduction Considerations as set forth in section IV.b.7 of the [*Name of Dealership*] Fair Credit Compliance Program, the vehicle must meet or exceed the following threshold(s):

_____

_____

_____

_____

These inventory reduction criteria apply to all vehicle indirect financing transactions beginning on _____ (enter date) and is in effect until further written notice from the [*Name of Dealership*] Fair Credit Compliance Program Coordinator.

**[*Name of Dealership*] Fair Credit Compliance Program Coordinator:**

_____
Signature

_____
Printed Name

**Appendix D**

# Dealer Participation Certification Form

Buyer(s) Name(s) _____ Date _____

Assignee _____ VIN _____

Standard Dealer Participation Rate ____% Final Dealer Participation Rate ____%

If the Final Dealer Participation Rate does not equal the Standard Dealer Participation Rate, check the allowable deviation box below and fill in the corresponding blanks.

❑ Dealer participation limited by finance source

❑ Customer stated monthly payment constraint of $_____ per month

❑ Customer stated competing offer by _____ (name) of _____%

❑ Customer qualified for Dealership Promotional Financing Campaign

❑ Customer qualified for subvened interest rate of ____% from _____ (name)

❑ Customer qualified for Dealership Employee Incentive Program

❑ Customer purchased a vehicle that satisfies the Dealership's predetermined inventory reduction criteria (describe how vehicle satisfies the criteria)

_____

_____

**I certify that the information above is true and correct to the best of my knowledge and that any deviation from the Standard Dealer Participation Rate was made in good faith and in a manner that is consistent with the requirements of the [*Name of Dealership*] Fair Credit Compliance Program.**

_____

Signature

_____

Date

_____

Printed Name

_____

Title

## Reviewer Certification

I have reviewed the above information and supporting documentation and:

❑ certify that the Final Dealer Participation Rate complies with the [*Name of Dealership*] Fair Credit Compliance Program, or

❑ certify that I have initiated the corrective action noted below.

• Reduced the customer's interest rate to ____% or provided a refund to the customer in the amount of $_____.

• Taken the following employee corrective action (describe):

_____

_____

• Other (describe):

_____

_____

_____

Signature

_____

Date

_____

Printed Name

_____

Title



© National Automobile Dealers Association (2015). All rights reserved.

ATTACHMENT 23

# *Know Before You Buy*
## brochure



DEALERS ASSOCIATION

NATIONAL AUTOMOBILE

# KNOW BEFORE YOU BUY

**NADA**

A492

**TIPS FOR SERVICE MEMBERS BEFORE BUYING OR LEASING THEIR NEXT CAR**

# Ensure your vehicle purchase is affordable and supports your transportation needs.

- **DETERMINE HOW MUCH YOU CAN AFFORD**

  Never make a big purchase decision in a vacuum.

  - Figure out how much money to apply toward a down payment (a larger down payment reduces the amount you need to borrow).

  - Determine how much you will be able to spend every month for the car you want to buy—plus the sales tax, financing costs and any voluntary protection products (like service contracts) that you choose to purchase.

  - Estimate your annual insurance, fuel and maintenance costs.

- **RESEARCH THE TYPE OF CAR YOU WILL NEED**

  Be realistic about the type of car you will need and can afford.

  - A sports car may be fun, but is it practical for hauling kids or supplies?

  - Did you know some cars are more expensive to insure than others?

  - Is fuel economy important, especially if you drive a lot of miles?

  - Do you want to buy new or used?

  **TIP:** You may have to live with your vehicle for a long time, so be sure to make a wise choice.

- **KNOW THE DIFFERENCE BETWEEN BUYING AND LEASING**

  - When you buy a car, you own it.

  - When you lease a car, you use it for the lease term and then must return it.

  Buying usually involves higher monthly payments, but—unlike leasing—there are no annual mileage limits and you own the vehicle after you pay it off.

  **TIP:** Learn more about these and other differences between buying and leasing in *Keys to Vehicle Leasing*.

- **RESEARCH THE PRICE OF THE VEHICLE YOU WANT TO BUY**

  Many websites give you an idea of what buyers generally pay for the make and model of a vehicle.

- **RESEARCH YOUR TRADE-IN VALUE**

  Many consumers like the convenience of trading in their current vehicle to the dealership when buying or leasing a new vehicle. But just as you should research the price of a car before buying it, be sure to research the value of your trade-in. Then, determine how you want to sell your old vehicle.

  **TIP:** Be sure to pay off as much as possible on your current auto loan to limit your financing obligation on the new vehicle.

- **RESEARCH FINANCING OPTIONS**

  Most consumers need to borrow money to purchase a car. Learn how to obtain financing that is competitive and affordable.

  - Check your credit report and correct any mistakes. Get a free copy of your credit report at annualcreditreport.com.

  - Remember, you are not required to obtain financing from any particular source. It's your decision, so find out what annual percentage rate (APR) you can get from banks, finance companies and credit unions. Then, see if the dealer can meet or beat that rate.

  - Compare the length of financing terms that are offered. The longer the term, the more interest you pay.

- **RESEARCH VOLUNTARY PROTECTION PRODUCTS**

  Local dealerships often offer products like extended service contracts (to protect your vehicle if there is a mechanical breakdown) or a GAP waiver (to help pay for any obligations not covered by your insurance company if your vehicle is totaled, stolen or destroyed). These products are completely optional and may be available from other sources.

  - Know what these products cost, as well as what they do and do not cover (including whether any geographical limitations apply to the coverage).

  - Know whether—and how—these products may be cancelled after you purchase them.

- **NEGOTIATE**

  You often can negotiate prices for new or used vehicles, trade-ins, optional financing and voluntary protection products. Knowing what other dealerships and finance sources are offering for these items puts you in the driver's seat to get a competitive deal.

- **ALWAYS READ THE CONTRACT BEFORE YOU SIGN IT**

  The documents presented to you contain important terms and conditions. Take your time and read these documents carefully and thoroughly before you sign them.



U.S. SMALL BUSINESS ADMINISTRATION
**OFFICE OF ADVOCACY**
REGULATION ● RESEARCH ● OUTREACH

September 8, 2022

April Tabor
Acting Secretary of the Commission
Federal Trade Commission
Office of the Secretary
600 Pennsylvania Avenue NW, Ste. CC-5610
Washington, DC 20580

Re:    Comment on the Notice of Proposed Rulemaking on the Motor Vehicle Dealers Trade
       Regulation Rule—Rulemaking, No. P204800

Dear Secretary Tabor:

The Office of Advocacy of the U.S. Small Business Administration (Advocacy) submits this
letter in response to the Federal Trade Commission's (FTC) notice of proposed rulemaking
(NPRM) on *Motor Vehicle Dealers Trade Regulation*.[1] The Office of Advocacy (Advocacy) is
concerned about the potential economic impact of the proposed rule on small entities. Advocacy
encourages the FTC perform an initial regulatory flexibility analysis to provide information
about the economic impact of the proposed rule and to implement less costly alternatives.

**Request for Extension of the Comment Period**

On August 22, 2022, the Office of Advocacy submitted a request for extension of the comment
period for this rulemaking. As noted in the letter, the proposed rule contained 49 questions that
required extensive research by the industry. The small entities that will be required to comply
with the regulation are in the best position to provide the FTC with information about the
potential costs associated with the proposal, but the amount of time provided for the comments is
insufficient. This information is crucial for determining the economic impact of the rule and for
considering less costly alternatives as required by the Regulatory Flexibility Act (RFA).
Advocacy reiterates the need for an extension of the comment period for this rulemaking and
reserves the right to submit supplemental comments.

**Advocacy Background**

Advocacy was established pursuant to Pub. L. 94-305 to represent the views of small entities
before federal agencies and Congress. Advocacy is an independent office within the U.S. Small

---

[1] 87 FR 42012, July 13, 2022.

409 3ʳᵈ Street SW / MC 3110 / Washington, DC 20416
Ph 202-205-6533 / advocacy.sba.gov



Business Administration (SBA), so the views expressed by Advocacy do not necessarily reflect the views of the SBA or the Administration. The RFA,[2] as amended by the Small Business Regulatory Enforcement Fairness Act (SBREFA),[3] gives small entities a voice in the rulemaking process. For all rules that are expected to have a significant economic impact on a substantial number of small entities[4], federal agencies are required by the RFA to assess the impact of the proposed rule on small business and to consider less burdensome alternatives.

The Small Business Jobs Act of 2010 requires agencies to give every appropriate consideration to comments provided by Advocacy.[5] The agency must include a response to these written comments in any explanation or discussion accompanying the final rule's publication in the Federal Register, unless the agency certifies that the public interest is not served by doing so.[6] Advocacy's comments are consistent with Congressional intent underlying the RFA, that "[w]hen adopting regulations to protect the health, safety, and economic welfare of the nation, federal agencies should seek to achieve statutory goals as effectively and efficiently as possible without imposing unnecessary burdens on the public."[7]

**The Proposed Rule**

On July 13, 2022, the FTC published an NPRM in the Federal Register on Motor Vehicle Dealers Trade Regulation. The proposed rule relates to the sale, financing, and leasing of motor vehicles by motor vehicle dealers. The proposed rule would prohibit motor vehicle dealers from making certain misrepresentations in the course of selling, leasing, or arranging financing for motor vehicles; require accurate pricing disclosures in dealers' advertising and sales discussions; require dealers to obtain consumers' express, informed consent for charges; prohibit the sale of any add-on product or service that confers no benefit to the consumer; and require dealers to keep records of advertisements and customer transactions.

**Advocacy is Concerned About the FTC's Treatment of the RFA in the NPRM**

When an agency issues an NPRM, it is required to perform an initial regulatory flexibility analysis (IRFA) unless it can certify that the proposed rule will not have a significant economic impact on a substantial number of small entities.[8] In the RFA section, the FTC states that it believes that the NPRM will not have a significant economic impact on small entities, although it will likely affect a substantial number.[9] The FTC then lists different elements of an IRFA but states that it did not consider specific alternatives for small businesses.[10] It also does not provide a description of the impact of the rule as required by section 603(a) of the RFA. Since the FTC did not consider alternatives, the document is not an IRFA.

---

[2] 5 U.S.C. § 601 et seq.
[3] Pub. L. 104-121, Title II, 110 Stat. 857 (1996) (codified in various sections of 5 U.S.C. § 601 et seq.).
[4] Under the RFA, "substantial number" refers only to those regulated small entities that will experience a significant economic impact as a result of the rule.
[5] Small Business Jobs Act of 2010 (PL 111-240) § 1601.
[6] Id.
[7] Id.
[8] See, 5 USC §605 (b).
[9] 87 FR at 42035
[10] Id. at 42035-42036.

The FTC Failed to Provide a Sufficient Factual Basis to Support Its Certification

Section 605 of the RFA allows an agency to prepare a certification in lieu of an IRFA, if the proposed rulemaking is not expected to have a significant economic impact on a substantial number of small entities. However, the certification must be supported by a factual basis. Advocacy asserts that the FTC's certification is not supported by a factual basis.

The FTC Provides No Information about the Economic Impact of the Proposed Action on Small Entities in the RFA Section

In the RFA section, the FTC states that the Commission believes that the amendments will not have a significant economic impact on small entities.[11] The FTC does not provide information to support that claim.   In fact, the FTC does not provide specific information about the economic impact on small entities at all. However, in other parts of the preamble, the FTC provides some cost information. For example, Table 1.1 assumes a cost of $1,360,694,552.[12] If that number is divided by 46,525, the number of entities stated in the RFA section,[13] the cost is roughly $29,000 per entity. These costs do not include familiarization and training costs. The FTC also fails to include multiple types of costs that they admit they cannot quantify, such as investments in additional IT systems and hardware. Advocacy contends that the costs could be significant.

Advocacy encourages the FTC to perform threshold analyses to determine whether the costs associated with the proposal are significant. If they are not, Advocacy encourages the FTC to provide support for its conclusion that the rulemaking will not have a significant economic impact. If the threshold analysis indicates that there is a significant economic impact, Advocacy encourages the FTC to publish an IRFA outlining the costs associated with the rulemaking.

As noted above, the FTC did not consider alternatives to reduce the economic impact on small entities. As such, the FTC cannot go forward with final regulatory flexibility analysis (FRFA) until it publishes an IRFA for public comment.[14] In addition, if an IRFA and FRFA are required, the FTC must publish a compliance guide along with the final rule.

The FTC's Estimation of the Number of Small Entities Impacted Is Inaccurate

In the RFA section, the FTC states that there are 46,525 franchise, new motor vehicle, and independent/used motor vehicle dealers in the United States. However, the FTC does not indicate the number of small entities among that total. FTC's current estimate of the number of affected small businesses is the total number of establishments in NAICS code 4411 (Automobile Dealers) from the County Business Patterns dataset. The FTC omits the other industries referenced in the definition of motor vehicles, which would fall under NAICS code 4412 (Other Motor Vehicle Dealers). Advocacy encourages the FTC to provide specific information about the

---

[11] 87 FR at 42035.
[12] Id at 42036.
[13] Id at 42035.
[14] See, *Southern Offshore Fisheries v. Daley*, 995 F. Supp. 1411 (M.D. Fla. 1998).

number of small entities that will be required to comply with the rulemaking as required by the RFA.

**The Definition of Motor Vehicle Is Overly Broad and Vague**

Section 463.2 (j) of the proposed rule defines a motor vehicle as:

> (1) Any self-propelled vehicle designed for transporting persons or property on a street, highway, or other road; (2) Recreational boats and marine equipment; (3) Motorcycles; (4) Motor homes, recreational vehicle trailers, and slide-in campers, as those terms are defined in §§ 571.3(b) and 575.103(d) of title 49, Code of Federal Regulations, or any successor thereto; and (5) Other vehicles that are titled and sold through Dealers.[15]

The language defining the scope of the proposal is overly broad, vague, and confusing. For example, does the proposed rule include electric bicycles, all-terrain vehicles, go-carts, scooters, golf carts, and snowmobiles? They are all vehicles that can be used to transport a person or property on a street, highway, or other road. Advocacy encourages the FTC to specifically state the types of motor vehicles that are included in the proposal.

Advocacy further asserts that there is no reasonable explanation for the proposal to apply to any vehicle besides automobiles. The information provided in the preamble for the most part refers to studies about behavior observed in the sale of automobiles. There is no indication that the FTC has done sufficient research on the practices of dealers of recreational vehicles, boats, motor homes or any other vehicles. The FTC states that they receive thousands of complaints a year about dealership misconduct but has not offered any evidence that this is a prevailing problem outside of automobile dealerships.[16] As such, the inclusion of anything besides an automobile may be deemed arbitrary and capricious under the Administrative Procedure Act.

Furthermore, the Marine Retailers Association has told Advocacy that boats are high end luxury items that have a different business model from automobile sales.[17] Unlike an automobile, a boat is not a necessity. As such, the consumer has more bargaining power. Advocacy submits that dealers of vehicles other than automobiles may have a different business model as well.

Finally, in the Joint Statement of Chair Lina M. Khan, Commissioner Noah Joshua Phillips, Commissioner Rebecca Kelly Slaughter, and Commissioner Alvaro M. Bedoya, the Commissioners stated:

---

[15] Id at 42045.

[16] The FTC has several footnotes throughout the document to support its claim that unfair and deceptive practices are a problem in dealerships. However, the footnotes refer to automobiles.

[17] Email from Chad Tokowicz, Government Relations Manager, Marine Retailers Association of the Americas, August 30, 2022.

> "The Commission has voted today to release a Notice of Proposed Rulemaking to address unfair and deceptive practices in *car* sales. *Cars* are vital for Americans…." (Emphasis added.)[18]

The definition provided in the NPRM goes beyond the stated intent of the Commissioners. Advocacy encourages the FTC to limit the scope of the rulemaking to car dealerships as indicated in the Joint Statement of the Commissioners.

### The Definition of Motor Vehicle Dealer Needs to Be Clarified

Section 463.2(e) of the proposed rule's definition of dealer includes:

> (3) is predominately engaged in the sale and servicing of motor vehicles, the leasing and servicing of motor vehicles, or both."[19]

According to the American Financial Services Association (AFSA), some vehicle finance companies maintain licenses as Dealers in order to facilitate the sale of a leased vehicle to customers who decide to purchase the vehicle at the end of the leased term. The definition is confusing because the existing Used Motor Vehicle Trade Regulation Rule excludes banks and financial institutions.[20] Advocacy encourages the FTC to clarify that the definition of "dealer" does not include a bank or financial institution.

### The Proposal Could Make the Buying Process More Cumbersome and Stifle Innovation

The proposal, while intended to provide the consumer with clarifying information, could make the buying process more cumbersome and confusing for consumers and interfere with progress. As noted in Commissioner Christine S. Wilson's dissent, regulation can stifle innovation, increase costs, raise prices, limit choice, and decrease output.[21]

Also, as Commissioner Wilson states, the industry is rapidly evolving. Consumers can already purchase cars without walking into a physical dealership. Instead, a consumer can purchase a car online and have it delivered to their door. If in-person shopping becomes more cumbersome, more consumers may opt to shop online rather than visit a dealership. Such a decision would be harmful to small businesses that compete based on personal service and relationships and is potentially problematic for the consumer.

As the FTC acknowledges, purchasing a vehicle is a time-consuming process that involves paperwork. The dealer prepares it and the consumer reads it. The proposal requires additional disclosures that the business will need to prepare, and the consumer will need to review and provide consent. The additional disclosures may prolong the car buying process.

---

[18] 87 FR at 42047.
[19] 87 FR at 42045.
[20] 16 CFR § 455.1(d)(3).
[21] 87 FR at 42047.

Furthermore, in accordance with section 463.2 (f), consent does not include (i) a signed or initialed document, by itself; (ii) prechecked boxes; or (iii) an agreement obtained through any practice designed or manipulated with the substantial effect of subverting or impairing user autonomy, decision making, or choice.[22] Removing those methods of consent may add additional paperwork and time to the process, which would not be good for consumers or small dealerships.

**The FTC Does Not Provide Sufficient Information to Support a Rulemaking for Automobile Dealerships**

The basis of this rulemaking is that deceptive practices are occurring at automobile dealerships. To support this assertion, the FTC states that the tens of thousands of complaints received by the FTC each year indicate that dealership misconduct and deceptive practices persist.[23] Advocacy submits that the FTC is making an incorrect assumption. While tens of thousands may seem like a large number of complaints, according to the National Automobile Dealers Association, 14.9 million light duty vehicles were sold to customers in the United States in 2021.[24] Even if you assume that the FTC received 99,000 complaints about deceptive practices in automobile and truck sales, less than one percent of consumers reported a problem. Advocacy asserts that less than one percent does not indicate a pervasive problem but rather the presence of bad actors. It is counterproductive to penalize the industry and its customers to regulate the activities of a few bad actors.

As noted above, if anything, the additional disclosures and requirements in the proposal may prolong the car buying process and create frustration for consumers. Rather than penalizing the industry, it may be more productive to educate consumers about the car buying process. The FTC should not go forward with this proposed rule until it has evidence to support its claim that deception is a pervasive problem in motor vehicle dealerships. In the meantime, the FTC could develop a plan to educate consumers. Doing otherwise may be seen as an abuse of discretion.

**Safe Harbor**

Section 463.3 of the proposed rule provides that misrepresentations relating to the costs or terms of purchasing, financing, or leasing a vehicle constitute unfair and deceptive acts or practices.[25] Misrepresentations of the costs, limitations, benefit, or any other material aspect of an Add-on Product or Service also constitute unfair and deceptive acts or practices.[26] Misrepresentations can be statements or omissions in either written or oral form.

As noted above, the proposal defines "dealer" in a manner that includes finance companies. The finance companies may not have knowledge of misrepresentations made by a salesperson or someone else at the dealership. As such, if the FTC maintains the proposed definition of dealer, Advocacy encourages the FTC to work with the industry to develop a safe harbor so that finance companies are not liable for activities of which they have no knowledge or control.

---

[22] 87 FR at 42045.
[23] 87 FR at 42035.
[24] NADA Data | NADA
[25] 87 FR at 42045.
[26] Id.

**Conclusion**

As noted throughout this letter, the proposed rule, while well intended, is problematic. It is overly broad and may have a significant economic impact on a substantial number of small entities. Advocacy encourages the FTC to produce an IRFA, including less costly alternatives. Some less costly alternatives may be to clarify and exempt entities that were not intended by the Commission to be included in this rulemaking and to create a safe harbor to limit liability. Advocacy further encourages the FTC to determine if there is a way to target the bad actors rather than this rulemaking which targets an entire industry for behavior that impacts less than one percent of the market.

Thank you for the opportunity to comment on this important proposal and for your consideration of Advocacy's comments. If you have any questions regarding these comments or if Advocacy can be of any assistance, please do not hesitate to contact me or Jennifer Smith at (202) 839-5600.

Sincerely,

/s/

Major L. Clark, III
Deputy Chief Counsel
Office of Advocacy
U.S. Small Business Administration

/s/

Jennifer A. Smith
Assistant Chief Counsel
for Economic Regulation & Banking

Copy to:        Dominic Mancini
                Deputy Associate Administrator