No. 24-60013

# IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

_____

NATIONAL AUTOMOBILE DEALERS ASSOCIATION;
TEXAS AUTOMOBILE DEALERS ASSOCIATION,
*Petitioners,*

v.

FEDERAL TRADE COMMISSION,
*Respondent.*

_____

On Petition for Review of a Final Rule of the
Federal Trade Commission

_____

## BRIEF OF THE FEDERAL TRADE COMMISSION

_____

ANISHA S. DASGUPTA
*General Counsel*

Of Counsel:
JAMIE D. BROOKS
DANIEL DWYER
*Attorneys*

MATTHEW M. HOFFMAN
BENJAMIN F. AIKEN
*Attorneys*

FEDERAL TRADE COMMISSION
Washington, D.C. 20580

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, N.W.
Washington, D.C. 20580
(202) 326-2151
baiken@ftc.gov

## STATEMENT REGARDING ORAL ARGUMENT

The Federal Trade Commission believes oral argument would assist the Court in resolving this case.

# TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT ...................................... i

TABLE OF AUTHORITIES ................................................................. iv

GLOSSARY ...................................................................................... ix

INTRODUCTION ............................................................................... 1

JURISDICTION ................................................................................. 3

QUESTIONS PRESENTED ................................................................. 4

STATEMENT OF THE CASE ............................................................... 4

     A.     Statutory Authority ................................................. 4

     B.     Commission Action Prior to Rulemaking............................ 7

     C.     The Notice of Proposed Rulemaking and Comments on the Proposed Rule ............................................... 10

     D.     The Final Rule........................................................ 13

         1.     Background Findings................................. 14
         2.     The Rule's Provisions................................. 16
         3.     The Section 22 Final Regulatory Analysis ................. 19

SUMMARY OF ARGUMENT ................................................................. 20

STANDARD OF REVIEW..................................................................... 23

ARGUMENT ...................................................................................... 23

I.     The Commission Was Not Required To Provide Advance Notice Before Proposing the CARS Rule......................... 23

     A.     The Commission's Rules Did Not Require Publication of an Advance Notice of Proposed Rulemaking. ......................................................... 24

B.    To the Extent the Commission's Rules of Practice Are Ambiguous, the Court Must Defer to the Commission's Reasonable Interpretation. ............................ 31

C.    In Any Event, the Lack of an ANPRM Was Harmless ................................................................ 34

II.    NADA Raises No Meritorious Challenge to the Commission's Basis for Issuing the CARS Rule. ........................... 39

A.    The Commission Was Not Required To Find "Widespread Misconduct." ...................................... 40

B.    The Commission Was Not Required To Identify a "Regulatory Gap" To Justify the Rule. ................................. 42

C.    The Commission Articulated a Reasoned  Basis for the CARS Rule. ....................................... 44

III.    The Commission's Cost-Benefit Analysis Is Not Judicially Reviewable, and NADA's Arguments Lack Merit Anyway. .................................................... 54

A.    The Cost-Benefit Analysis Is Not Subject to Judicial Review .................................................... 54

B.    In Any Case, the Commission Properly Assessed the Benefits and Costs of the Rule. ............................ 56

1.    The Commission properly estimated benefits. ............ 57
2.    The Commission properly estimated dealer costs. .................................................... 61
3.    NADA has not shown that any error in the cost-benefit analysis affected the end result. .............. 65
4.    There is no basis for a remand. .................................. 66

CONCLUSION ......................................................... 67

STATUTORY ADDENDUM

# TABLE OF AUTHORITIES

## CASES

*Am. Equity Inv. Life Ins. Co. v. SEC,*
    613 F.3d 166 (D.C. Cir. 2010) ........................................................ 44

*Am. Farm Lines v. Black Ball Freight Serv.,*
    397 U.S. 532 (1970) ...................................................................... 35

*Anthony v. United States,*
    520 F.3d 374 (5th Cir. 2008) ................................................... 24, 25

*Auer v. Robbins,*
    519 U.S. 452 (1997) ...................................................................... 31

*Bd. of Cnty. Comm'rs of Washington Cnty. v.*
    *United States Dep't of Transp.,*
    955 F.3d 96 (D.C. Cir. 2020) ......................................................... 60

*Business Roundtable v. SEC,*
    647 F.3d 1144 (D.C. Cir 2011) ................................................. 41, 44

*Chamber of Commerce v. SEC,*
    85 F.4th 760 (5th Cir. 2023) ...................................................... 55, 56

*Data Marketing Partnership, LP v. DOL,*
    45 F.4th 846 (5th Cir. 2022) ......................................................... 41

*Doe v. SEC,*
    28 F.4th 1306 (D.C. Cir. 2022) ..................................................... 33

*Elldakli v. Garland,*
    64 F.4th 666 (5th Cir. 2023) ......................................................... 55

*Huawei Techs. USA, Inc. v. FCC,*
    2 F.4th 421 (5th Cir. 2021) ........................................................... 56

*IMS, P.C. v. Alvarez,*
    129 F.3d 618 (D.C. Cir. 1997) ....................................................... 35

*Kirby Corp. v. Pena,*
    109 F.3d 258 (5th Cir. 1997) ......................................................... 55

*Kisor v. Wilkie,*
    139 S. Ct. 2400 (2019) ....................................................... 31, 32, 33

*Lara v. Cinemark USA, Inc.,*
  207 F.3d 783 (5th Cir. 2000) .......................................................24, 25

*Lopez v. FAA,*
  318 F.3d 242 (D.C. Cir. 2003) ............................................................35

*Lundeen v. Mineta,*
  291 F.3d 300 (5th Cir. 2002).............................................................55

*McGavock v. City of Water Valley,*
  452 F.3d 423 (5th Cir. 2006) .............................................................30

*Mississippi Valley Gas Co. v. FERC,*
  659 F.2d 488 (5th Cir. 1981) .............................................................35

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) ......................................................................41, 45

*Mourning v. Family Publ'ns Serv., Inc.,*
  411 U.S. 356 (1973) ...........................................................................41

*N.Y. Stock Exch. LLC v. SEC,*
  962 F.3d 541 (D.C. Cir. 2020) ......................................................42, 43

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife,*
  551 U.S. 644 (2007) ...........................................................................34

*Shinseki v. Sanders,*
  556 U.S. 396 (2009) ......................................................................34, 36

*Sid Peterson Mem'l Hosp. v. Thompson,*
  274 F.3d 301 (5th Cir. 2001) .............................................................41

*Smith v. Sch. Bd. of Concordia Parish,*
  88 F.4th 588 (5th Cir. 2023) .............................................................38

*Stockman v. FEC,*
  138 F.3d 144 (5th Cir. 1998).............................................................55

*United States v. Johnson,*
  632 F.3d 912 (5th Cir. 2011)...............................................34, 35, 39

## STATUTES

5 U.S.C. § 553 ........................................................................................5

5 U.S.C. § 553(b) .................................................................................39

5 U.S.C. § 701(A)(1) ............................................................................55

5 U.S.C. § 706 ......................................................................... 34

12 U.S.C. § 5491............................................................................ 4

12 U.S.C. § 5519(d) ....................................................................... 53

12 U.S.C. § 5519(e) ....................................................................... 10

15 U.S.C. § 45(a) ...................................................................... 5, 42

15 U.S.C. § 45(m)(1)(A) ................................................................. 54

15 U.S.C. § 5711(a)(8) ................................................................... 28

15 U.S.C. § 5711(b) ....................................................................... 28

15 U.S.C. § 57a(a)(1)(B) .......................................................... 5, 6, 53

15 U.S.C. § 57a(b) ................................................................... 6, 40

15 U.S.C. § 57a(b)(1) .............................................................. 25, 26

15 U.S.C. § 57a(b)(2)(A) ......................................................... 37, 39

15 U.S.C. § 57a(b)(3) ..................................................................... 40

15 U.S.C. § 57a(e)(3) ............................................................... 23, 34

15 U.S.C. § 57b(a)(1) ..................................................................... 53

15 U.S.C. § 57b(b) ........................................................................ 53

15 U.S.C. § 57b-3(b)(2) .................................................................. 19

15 U.S.C. § 57b-3(b)(2)(C) ........................................................ 19, 54

15 U.S.C. § 57b-3(c)(1) ............................................................ 54, 55

15 U.S.C. § 57b-3(c)(2) ............................................................ 55, 66

## REGULATIONS

12 C.F.R. § 1026.1(c) ................................................................... 50

12 C.F.R. § 213.3(a) .................................................................... 50

12 C.F.R. § 213.4(e) .................................................................... 50

12 C.F.R. § 226.17(b) ................................................................... 50

12 C.F.R. § 226.18(h) ................................................................... 50

12 C.F.R. § 226.18(j) .................................................................... 50

12 C.F.R. Part 226 ....................................................................... 50

16 C.F.R. § 1.10 ................................................................25, 27

16 C.F.R. § 1.10(b)(1) ............................................................37

16 C.F.R. § 1.21 .....................................................................25

16 C.F.R. § 1.26 .....................................................................25

16 C.F.R. § 1.7 ................................................................26, 28

16 C.F.R. ch. I, subch. A, pt. 1, subpt. B................................5, 6

16 C.F.R. ch. I, subch. A, pt. 1, subpt. C....................................5

FTC Improvements Act of 1980,
Pub L. 96-252, 94 Stat. 374 ................................................29

## OTHER AUTHORITIES

A.H. Studenmund,
*Using Econometrics: A Practical Guide* (6th ed. 2017) ......................59

Administrative Conf. of the U.S.,
*Rulemaking Comments* (June 16, 2011) .............................................38

*Combating Auto Retail Scams Trade Regulation Rule,*
89 Fed. Reg 590 (Jan. 4, 2024) ................................................... passim

*Combating Auto Retail Scams Trade Regulation Rule,*
89 Fed. Reg. 13267 (Feb. 22, 2024) .....................................................14

Fed. Trade Comm'n,
*FTC Announces CARS Rule to Fight Scams in
Vehicle Shopping* (Dec. 12, 2023) .........................................................18

*Motor Vehicle Dealers Trade Regulation Rule,*
87 Fed. Reg. 42,012 (July 13, 2022) .....................................................10

*Organization Changes in the Commission's
Rulemaking and Investigatory Procedures,*
46 Fed. Reg. 26,284 (May 12, 1981) .....................................................29

Prevalent, Merriam-Webster Dictionary (online ed.),
https://www.merriam-
webster.com/dictionary/prevalent. .......................................................40

*Public Roundtables: Protecting Consumers in the*
  *Sale and Leasing of Motor Vehicles,*
  76 Fed. Reg. 14,014 (Mar. 15, 2011) ..................................................... 7

*Revisions to Rules of Practice,*
  86 Fed. Reg. 38542 (July 22, 2021) ..................................................... 29

*Trade Regulation Rule Pursuant to the Telephone*
  *Disclosure and Dispute Resolution Act of 1992,*
  58 Fed. Reg. 42,364 (Aug. 9, 1993) ..................................................... 28

*Unfair or Deceptive Advertising and Liability of Cigarettes*
  *in Relation to the Health Hazards of Smoking,*
  29 Fed. Reg. 8324 (July 2, 1964) ....................................................... 28

# GLOSSARY

This Brief uses the following abbreviations:

| | |
|---|---|
| ANPRM | Advance Notice of Proposed Rulemaking |
| APA | Administrative Procedure Act |
| Br. | Petitioners' Opening Brief |
| CARS Rule | Combating Auto Retail Scams Trade Regulation Rule, 89 Fed. Reg. 590 (Jan. 4, 2024) (to be codified at 16 C.F.R. Part 463). |
| CFPB | Consumer Financial Protection Bureau |
| CLA | Consumer Leasing Act |
| Dodd-Frank | Dodd-Frank Wall Street Reform and Consumer Protection Act |
| FTC | Federal Trade Commission |
| FTC Act | Federal Trade Commission Act |
| NADA | National Automobile Dealers Association |
| NPRM | Notice of Proposed Rulemaking |
| R. | Record |
| SEC | Securities and Exchange Commission |
| TADA | Texas Automobile Dealers Association |
| TILA | Truth in Lending Act |

## INTRODUCTION

Cars are an essential feature of modern-day life for many Americans, who use them for work, school, childcare, groceries, medical visits, and more. In some parts of the United States, it is hard to live without a car. Cars are also one of the most expensive purchases many Americans will ever make. Unfortunately, the process of buying or leasing a car is time-consuming, complicated, and opaque. It typically takes consumers several hours to wrest true pricing information from dealers and more time to wade through voluminous paperwork and dense fine print. Unscrupulous dealers have long taken advantage of consumers during this process through a variety of unfair or deceptive practices. And dealers who take a more honest tack face serious competitive headwinds.

Acting with specific authorization from Congress, the Federal Trade Commission issued the Combating Auto Retail Scams Trade Regulation Rule ("CARS Rule") to curb some of the most common unlawful practices used by dishonest dealers: bait-and-switch tactics, hidden fees, and "junk" fees for add-on products or services that provide no benefit (like duplicative warranties and oil change services for

electric cars). Specifically, the Rule (1) prohibits material misrepresentations about key transaction terms; (2) requires certain affirmative disclosures; (3) prohibits add-ons that provide no benefit; and (4) prohibits charges for any item without the customer's express, informed consent. The Rule requires no additional paperwork from consumers and imposes minimal burdens on dealers; dealers must keep records to demonstrate compliance but can do so the same way they already keep records in the ordinary course of business.

 Petitioners, the National Automobile Dealers Association and the Texas Automobile Dealers Association (collectively, "NADA"), challenge the Rule under the Administrative Procedure Act ("APA"). NADA's challenges lack merit and the petition for review should be denied.

Although NADA argues that the Rule is invalid because the Commission did not publish an advance notice of proposed rulemaking ("ANPRM"), NADA admits that Congress gave the Commission clear statutory authority to prescribe rules respecting unfair or deceptive acts or practices by motor vehicle dealers without an ANPRM. The Commission's rules do not require an ANPRM in these circumstances,

and in any event NADA has not shown any prejudice from the lack of an ANPRM.

NADA's other arguments are equally meritless. The Commission amply documented the factual basis for the Rule and explained why it was needed, which is all the APA requires. The Commission was not required either to find that misconduct among automobile dealers was widespread or to identify a specific regulatory gap that the Rule would fill. As for NADA's challenge to the Commission's cost-benefit analysis, Section 22(c) of the FTC Act expressly bars judicial review of that analysis, *see* 15 U.S.C. § 57b-3(c), and NADA's attacks on the analysis are baseless anyway.

## JURISDICTION

The Commission was authorized to issue the CARS Rule under 12 U.S.C. § 5519(d). The Rule was published in the Federal Register on January 4, 2024; NADA filed its petition for review the same day. This Court has jurisdiction to review the Rule under 15 U.S.C. § 57a(e), but 15 U.S.C. § 57b-3(c) bars review of the Commission's final regulatory analysis.

## QUESTIONS PRESENTED

1. Whether the Commission was required to publish an ANPRM despite Congress having exempted the Commission from that requirement.

2. Whether the Commission was required to find either that misconduct by automobile dealers is widespread or that the Rule was needed to fill a specific regulatory gap, even though the APA imposes no such requirements and Congress specifically authorized the Commission to regulate automobile dealers without imposing such preconditions.

3. Whether Section 22(c) of the FTC Act bars judicial review of the Commission's cost-benefit analysis.

## STATEMENT OF THE CASE

### A.    Statutory Authority

In 2010, Congress enacted the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"), which among other things created the Consumer Financial Protection Bureau ("CFPB"). *See* 12 U.S.C. § 5491. Congress exempted most motor vehicle dealers from the CFPB's jurisdiction, *see id.* § 5519(a), but it recognized that further regulation of this industry might be needed. Accordingly, Dodd-

4

Frank authorized the FTC to "prescribe rules under sections 5 and 18(a)(1)(B) of the Federal Trade Commission Act" with respect to motor vehicle dealers. 12 U.S.C. § 5519(d).[1] Section 5 of the FTC Act outlaws unfair or deceptive acts or practices, 15 U.S.C. § 45(a), while Section 18(a)(1)(B) authorizes the Commission to prescribe rules to "define with specificity acts or practices which are unfair or deceptive" and prescribe requirements "for the purpose of preventing such acts or practices," *id.* § 57a(a)(1)(B).

The Commission uses two different sets of procedures for promulgating rules. *See* 16 C.F.R. ch. I, subch. A, pt. 1, subpts. B and C. Which set applies in any particular rulemaking turns on the authority granted by Congress. For all rulemakings, the Commission must provide notice and an opportunity to comment, as required by the APA. *See* 5 U.S.C. § 553. And when issuing rules to define unfair or deceptive acts or practices under Section 18(a)(1)(B), the Commission generally must follow additional procedures—unless Congress specifies otherwise, as it did here. These additional procedures (known as the "Magnuson-

---

[1] Quotations from statutes are to the language enacted by Congress rather than codified in the U.S. Code (*i.e.*, they refer to FTC Act section numbers rather than the corresponding U.S. Code section numbers).

Moss" procedures, after the statute that added Section 18 to the FTC Act) require the Commission, among other things, to (1) publish an ANPRM at the start of the rulemaking process; (2) find that the unfair or deceptive acts or practices at issue are "prevalent"; and (3) provide interested parties an opportunity for an informal hearing. 15 U.S.C. § 57a(b); *see also See* 16 C.F.R. ch. I, subch. A, pt. 1, subpt. B. No such requirements exist in standard APA rulemaking.

As relevant here, Dodd-Frank authorized the Commission to issue rules respecting motor vehicle dealers "under" Section 18(a)(1)(B), but it specified that "[n]otwithstanding section 18 of the [FTC] Act," the Commission should issue such rules "in accordance with section 553 of title 5, United States Code." 12 U.S.C. § 5519. In other words, Congress authorized the Commission to issue rules defining "unfair or deceptive acts or practices" by motor vehicle dealers, *see* 15 U.S.C. § 57a(a)(1)(B), but directed it to do so using regular APA procedures, not the extra Magnuson-Moss procedures—including an ANPRM—that ordinarily apply to Section 18(a)(1)(B) rulemakings. NADA concedes that this language exempted the Commission from the statutory ANPRM requirement. Br. 19, 20.

**B.    Commission Action Prior to Rulemaking.**

Shortly after Dodd-Frank was enacted, the Commission held three public roundtables to explore consumer protection issues related to motor vehicle sales, including what issues could be addressed in a possible rulemaking. 76 Fed. Reg. 14,014 (Mar. 15, 2011) (R. 1). Participants included industry representatives (including NADA's general counsel), military servicemembers, regulators, and consumer advocates. The Commission also received and reviewed over 100 filed comments, including comments from NADA. R. 2-5; Comment No. FTC-2022-0036-0034 (NADA); *see also, e.g.*, Comment No. FTC-2022-0036-0124 (State AGs). Although the roundtables and comments revealed a host of practices that harmed consumers and law-abiding dealers, the Commission initially chose to address these problems through case-by-case enforcement and issuance of business guidance rather than rulemaking. CARS Rule, 89 Fed. Reg. 590, 591 (Jan. 4, 2024) (R. 322.)

Over the next few years, the Commission and its law enforcement partners at the federal and state level took numerous steps to try to curb unfair or deceptive practices by motor vehicle dealers. Among other things, the Commission brought dozens of actions against motor

vehicle dealers, led federal and state officials in two nationwide law enforcement sweeps (one involving 181 separate enforcement actions), published two reports on consumer vehicle purchasing experiences, and held workshops with various stakeholders to discuss the motor vehicle marketplace. 89 Fed. Reg. at 598 & nn.88-90.[2]

Despite these efforts, unfair or deceptive practices persisted, especially bait-and-switch tactics—where dealers try to get customers in the door by advertising prices, discounts, or other terms that are not actually available to typical consumers—and hidden or junk fees, which are charged without customers' knowledge, under false pretenses, or for add-on products or services that provide no benefit. *Id.* at 600. And those practices sparked numerous consumer complaints. In each of the four years leading up to the CARS Rule, the FTC received more than 100,000 complaints about motor vehicle dealers; the industry was also consistently at or near the top of private sources of consumer complaints. *Id.* at 594. In addition, complaints about motor vehicle transactions are regularly in the top ten complaint categories tracked in the FTC's Consumer Sentinel database, which includes complaints from

---

[2] *See also, e.g.*, R. 15, 21, 29, 42, 51, 52, 61, 64, 95, 97, 109.

federal agencies, states, Better Business Bureaus, and some businesses. *Id.*[3]

And consumer complaints are just the tip of the iceberg. Most consumers subjected to these unlawful practices may not even realize they were deceived, and only a fraction of those who know they have been victimized lodge complaints. *Id.* at 658. Investigation often reveals additional victims. For example, in 2020, the Commission filed an enforcement action against a large multistate dealership after receiving 391 complaints about add-ons and other issues. But a later survey showed that some 83% of the dealer's customers—more than 16,000 people—were subject to unlawful practices regarding add-ons alone. *Id.* at 594.

Although tactics like bait-and-switch advertising and hidden or junk fees affect all consumers, those serving in America's military are often particularly vulnerable to these predatory practices—a concern that Congress expressly recognized in Dodd-Frank, *see* 12 U.S.C.

---

[3] NADA cites the Commission's 2011 statement that dealers were in "broad compliance" with the FTC's Holder Rule (which requires certain provisions in consumer financing contracts), Br. 4, but that had nothing to do with consumer experience, satisfaction, or deceptive practices like bait-and-switch advertising or hidden fees.

§ 5519(e). Servicemembers generally require private vehicles for transportation while living on military bases, 89 Fed. Reg. at 592, and hidden fees for add-on products or services have been a particular concern in the military community. *Id.* at 595. Overall, auto-related complaints consistently rank among the top ten complaint categories outside of identity theft for military consumers. *Id.* at 594.

## C.  The Notice of Proposed Rulemaking and Comments on the Proposed Rule

In light of all this evidence, the Commission determined that a rulemaking under Dodd-Frank was necessary to address unfair or deceptive practices by motor vehicle dealers. The Commission published a notice of proposed rulemaking in 2022. *See* 87 Fed. Reg. 42,012 (July 13, 2022) (R. 142.) It received more than 27,000 comments, reflecting a wide range of viewpoints from numerous stakeholders, including civilian and military consumers, dealerships, industry associations, community and consumer groups, states, lawmakers, and law enforcement agencies. 89 Fed. Reg. at 591-92.

Numerous consumers described deceptive pricing and hidden fee practices they experienced during recent car purchases. *See id.* at 597-98, 610, 629-30. One recounted spending "five hours at the dealership"

in 2022 before "discover[ing]" that "the dealer had added on a $3,000 market adjustment and $3,100 in other add-ons," with the result that the consumer had to take time off from work "to find a new vehicle at a price within [the family's] budget." *Id.* at 598 (quoting Comment No. FTC-2022-0046-0001).[4] Another recalled "having to drive 3 hours" to get the vehicle they "wanted," and being told upon arrival there was a $4,300 increase over MSRP. *Id.* at 597 (quoting Comment No. FTC-2022-0046-1878).

Many similar comments came from current or former military servicemembers. A former Marine described being "taken advantage of by a dealership when purchasing my first car," which "set me back financially for years" and stated that he knew many young military members in similar situations. *Id.* at 597 (quoting Comment No. FTC-2022-0046-4648). Another former servicemember labeled "absurd" the number of "scams and horror stories" he had "heard regarding young service members buying cars." *Id.* at 591-92 n.11 (quoting Comment No. FTC-2022-0046-0542). An active military member and combat veteran

---

[4] All comments in response to the NPRM are included in R. 145, and the online docket can be found at https://www.regulations.gov/document/FTC-2022-0046-0001/comment.

said he could not "list the number of times I have either seen, or have stepped in a situation, where car dealers have either attempted to take, or have successfully taken, advantage of a young military member or their family by baiting and switching when it came to the price of a car, or stated that the price was one amount, only to be charged, and over-charged a higher amount." *Id.* (quoting Comment No. FTC-2022-0046-9840).

The proposed rule also garnered support from several current and former dealers and dealership employees. A "family run 'mom and pop' dealer" commented that "[o]verwhelmingly, automotive dealership advertising is ridiculously deceptive" and "a contest of which dealership can effectively lie the best."[5] One former dealer stated that the Rule has been needed "for a very long time" to address the "massive deceptive and unethical business practices that are currently taking place in the car industry," and that it "will only help good dealers and clean up the industry by exposing the bad apples who are a stain on the car industry and should be driven out ASAP."[6] Dealers expressed concern that the

---

[5] Comment No. FTC-2022-0046-0003.

[6] Comment No. FTC-2022-0046-6852.

12

abusive practices by unscrupulous dealers placed them at a competitive disadvantage and indicated that adoption of the proposed rule would help level the playing field.[7]

The Commission also received comments critical of the proposed rule. Some dealers and industry groups argued there was no need for a rule at all and that particular provisions of the proposal would be unduly burdensome. NADA submitted 140 single-spaced pages of comments plus 224 pages of attachments.[8] TADA submitted another 48 single-spaced pages with 53 pages of attachments.[9]

## D.   The Final Rule

After carefully considering each of the comments and making revisions to the proposed rule in response—including changes that narrowed its scope and eliminated paperwork requirements—the

---

[7] *See* Comment No. FTC-2022-0046-2323 (Comment from "a licensed motor vehicle dealer" complaining that certain "practices … make it harder for honest dealers to compete with bait and switch specialists").

[8] Comment No. FTC-2022-0046-8368.

[9] Comment No. FTC-2022-0046-8102.

Commission published the final CARS Rule (to be codified at 16 C.F.R. Part 463).[10]

### 1.   Background Findings

The preamble to the Rule (also referred to as the statement of basis and purpose) sets forth the background that prompted the Commission to act. The Commission noted the essential role cars play in American life and their increasing cost. 89 Fed. Reg. at 592. Vehicles "are now many consumers' largest expense—on a par with housing, child care and food, and accounting for 16% of the median annual household income before taxes." *Id.* Some 81% of new motor vehicle purchases and 35% of used vehicles are financed, and "[b]y the first quarter of 2023, Americans had more than 107 million outstanding auto financing accounts and owed more than $1.56 trillion thereon, making auto finance the third-largest source of debt for U.S. consumers, and the second largest for U.S. consumers ages 40 and over." *Id.* And servicemembers "have an average of twice as much auto debt as

---

[10] The Commission set July 30, 2024, as the effective date for the Rule, 89 Fed. Reg. at 660, but postponed that date under 5 U.S.C. § 705 pending this Court's expedited review. *See* 89 Fed. Reg. 13267 (Feb. 22, 2024).

civilians." *Id.* "By the age of 24, around 20 percent of young service members have at least $20,000 in auto debt." *Id.* at 592-93.

The Commission found that the process of buying or leasing a vehicle was "time-consuming and arduous." *Id.* at 593. "It can take several hours or days to finalize a transaction, on top of the hours it can take, particularly in rural areas, to drive to a dealership. Consumers may need to take time off work or arrange childcare, and families with a single vehicle may be forced to delay other important appointments due to the length of the vehicle-buying or -leasing process." *Id.*

Further, the Commission found that consumers are too commonly "confronted with chronic deceptive or unfair practices, including bait-and-switch tactics and hidden charges." *Id.* at 594. It described these practices in detail, quoting extensively from the comments, *id.* at 594-98, and recounted past efforts to address these problems through enforcement and education. *Id.* at 598-600. It concluded that the persistence of such practices warranted a rule to "address the harm these issues inflict on consumers and on law-abiding dealers." *Id.* at 600.

## 2.    The Rule's Provisions

As finalized, the CARS Rule has four main provisions that specifically target bait-and-switch tactics and hidden or junk fees by covered automobile dealers.[11]

*First*, the Rule spells out specific kinds of misrepresentations that are unlawful. It prohibits a covered dealer from making material misrepresentations about certain key facts, including the cost or terms of purchasing, financing, or leasing a vehicle; the availability of rebates or discounts; the availability of vehicles at an advertised price; information about financing; whether consumer reviews are unbiased or independent; and whether the dealer or its personnel or products have any affiliation or connection with the United States government or the military. 89 Fed. Reg. at 694 (16 C.F.R. § 463.3).

*Second*, the Rule requires covered dealers to make disclosures about three pieces of information: price, add-ons, and payments. *Id.* at 694-95 (16 C.F.R. § 463.4). Dealers must disclose the true price when advertising or discussing a specific vehicle, monetary amount, or

---

[11] Although the proposed rule would have applied to motor vehicle dealers as defined by Dodd-Frank, the Commission narrowed the scope of the Final Rule to focus on automobile dealers. 89 Fed. Reg. at 607-08, 693-94.

financing term, and must provide that information in their first response to a consumer inquiry. When discussing an optional add-on, dealers must tell the consumer it is optional. Finally, dealers must disclose the total of all monthly payments whenever they make representations about what the consumer will pay if all payments are made on schedule, and must also disclose if a lower monthly payment will increase that total.

*Third*, the Rule prohibits covered dealers from charging consumers for add-ons that confer no benefit to the consumer, such as warranties that duplicate the manufacturer's coverage. *Id.* at 695 (16 C.F.R. § 463.5(a)).

*Fourth*, the Rule bars covered dealers from charging for any item without express, informed consent from the consumer. *Id.* (16 C.F.R. § 463.5(c)).

The Rule imposes minimal administrative burdens. Dealers must keep records sufficient to demonstrate their compliance for 24 months, but the Rule does not impose any special recordkeeping format. Records may be kept in the same manner, format, or place as dealers already use in the ordinary course of business. *Id.* (16 C.F.R. § 463.6). Nothing

in the Rule requires consumers to complete any additional paperwork. In fact, in response to comments from NADA and others, the Final Rule eliminated provisions from the NPRM that would have required additional forms from dealers.[12] Nor does the Rule require dealers to use specific language or formatting when making the mandatory disclosures. Dealers thus retain considerable flexibility in deciding how best to comply with the Rule's requirements.

The Commission expects the Rule's provisions will benefit all American consumers, but as discussed above, its protections are particularly important for military servicemembers and their families. The Department of Defense has stated that "[f]or our service members and their families a car is an essential purchase, and this CARS Rule will help fight predatory practices that target our men and women in uniform" and "contribute to service members' overall economic security and readiness."[13] And it is not just consumers (civilian and military)

---

[12] *See* 89 Fed. Reg. at 636, 650, 658 (determining not to finalize add-on list, cash price without optional add-ons disclosure and associated recordkeeping requirements).

[13] Fed. Trade Comm'n, *FTC Announces CARS Rule to Fight Scams in Vehicle Shopping* (Dec. 12, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/12/ftc-announces-cars-rule-fight-scams-vehicle-shopping.

who will benefit. Curbing misconduct will benefit honest dealers by ensuring that they can compete on a level playing field.

### 3.    The Section 22 Final Regulatory Analysis

Section 22 of the FTC Act generally requires the Commission to issue a "final regulatory analysis" when it promulgates a final rule under Section 18. 15 U.S.C. § 57b-3(b)(2). The analysis must contain, among other things, "an analysis of the projected benefits and any adverse economic effects and any other effects of the final rule." *Id.* § 57b-3(b)(2)(C). The Commission conducted this analysis, *see* 89 Fed. Reg. at 672-93, and concluded that the benefits to the public from the CARS Rule would vastly outweigh the costs to dealers. *Id.* at 688. The Commission estimated that over a 10-year period, the Rule would confer $13.4 billion in benefits by saving consumers time while shopping for cars and reducing the deadweight loss caused by shrouded prices, deception, and obfuscation. *Id.* By contrast, the Commission estimated that the rule would impose costs of only $1.1 billion on dealers over that period. *Id.*

## SUMMARY OF ARGUMENT

1.    The Commission was not required to publish an ANPRM.
Although NADA concedes that Congress exempted Dodd-Frank
rulemakings from Section 18's ANPRM requirement, NADA argues that
the Commission's rules of practice imposed a distinct ANPRM
requirement. That argument ignores the plain text of the relevant
Commission rules of practice, which establish that Magnuson-Moss
procedures—including the ANPRM requirement—do not apply to rules,
like the CARS Rule, issued under authority other than Section
18(a)(1)(B). NADA also ignores the history of the Commission's internal
rules, which show that NADA's cited regulatory provision merely
implements Section 18 and does not impose a separate mandate.
Further, NADA's interpretation would improperly thwart the provisions
of Dodd-Frank directing the Commission to prescribe Dodd-Frank rules
through the ordinary APA process. To the extent that there is any
ambiguity, the Commission's interpretation of its own rules is entitled
to deference under *Auer v. Robbins*, 519 U.S. 452 (1997), and *Kisor v.
Wilkie*, 139 S. Ct. 2400 (2019).

In any event, the omission of an ANPRM was harmless. NADA is wrong that the Commission bears the burden of showing harmless error. The burden is squarely on NADA to show that any error was harmful. NADA has not met that burden because the record shows that it had ample opportunities to participate in the regulatory process both before and after the issuance of the NPRM and took full advantage of those opportunities. NADA has not identified any information it was unable to bring to the Commission's attention or pointed to anything it would have done differently if an ANPRM had been issued.

2.     NADA is also wrong that the Commission was required to find widespread misconduct and a regulatory gap as a precondition to rulemaking. Although Section 18 requires the Commission to find that misconduct is "prevalent" in a Magnuson-Moss rulemaking, Dodd-Frank exempted the Commission from that requirement here—and NADA does not argue otherwise. Congress authorized the Commission to prescribe rules respecting motor vehicle dealers even though it knew they were already subject to other regulatory schemes and the FTC Act's general prohibition of unfair or deceptive acts or practices. It did

not say the Commission needed to identify a regulatory gap before issuing such rules.

Under the APA, the Commission merely needed to show a rational connection between the facts found and the decision made. It easily satisfied that deferential standard here by showing that unfair or deceptive practices by automobile dealers—specifically bait-and-switch tactics and hidden or junk fees—remain a serious and persistent problem despite more than a decade of enforcement efforts and business and consumer education.

3.   The Court lacks jurisdiction to consider NADA's attacks on the Commission's cost-benefit analysis. Section 22 of the FTC Act expressly bars judicial review of the contents or adequacy of the cost-benefit analysis and precludes the court from setting aside the Rule or remanding on account of any alleged errors in that analysis.

In any event, NADA has not shown any error in the cost-benefit analysis—much less one that could have affected the outcome, given the vast disparity between the Rule's estimated benefits to society ($13.4 billion over ten years) and the cost to dealers ($1.1 billion over the same period). And another part of the Commission's analysis—which NADA

does not challenge—shows that even if some of the Commission's assumptions were off by an order of magnitude, the end result would be the same. Finally, there is no basis to remand for consideration of additional evidence. The Commission already addressed the only additional evidence NADA cites and found that evidence unreliable.

## STANDARD OF REVIEW

The Rule is subject to review under 5 U.S.C. §706(2)(A)-(D). *See* 15 U.S.C. § 57a(e)(3).

## ARGUMENT

### I.    THE COMMISSION WAS NOT REQUIRED TO PROVIDE ADVANCE NOTICE BEFORE PROPOSING THE CARS RULE.

Contrary to NADA's argument, the Commission was not required to publish an advance notice of proposed rulemaking. NADA concedes that Dodd-Frank exempted the Commission from Section 18's statutory ANPRM requirement (Br. 20) but argues that the Commission's rules of practice create an independent obligation to publish an ANPRM. Br. 17-23. In other words, NADA claims that the Commission imposed on itself an obligation to publish an ANPRM even where Congress said not to. This argument fails for three reasons. First, it is contrary to the plain text of the relevant Commission rules and would thwart Congress's

directive that the Commission should issue Dodd-Frank rules through the ordinary APA procedure. Second, even if there were some ambiguity in the Commission's rules, the Commission's interpretation of those rules is entitled to deference. Finally, even if an ANPRM were required, NADA has not shown any prejudice from its omission.

### A. The Commission's Rules Did Not Require Publication of an Advance Notice of Proposed Rulemaking.

The plain language of the Commission's rules of practice makes clear that the Commission was not required to publish an ANPRM. This Court "interpret[s] regulations in the same manner as statutes, looking first to the regulation's plain language" and going no further where that language is unambiguous. *Anthony v. United States*, 520 F.3d 374, 380 (5th Cir. 2008). A regulation "should be interpreted in a manner that effectuates its central purposes" and does not "thwart the statutory mandate it was designed to implement." *Id.*; *see also Lara v. Cinemark USA, Inc.*, 207 F.3d 783, 787 (5th Cir. 2000) (rejecting interpretation that "would contravene the very purpose of the regulation and [statute]"). Moreover, a regulation must be read "as a whole, with the assumption that … each of [its] terms … convey[s] meaning," *Cinemark,*

207 F.3d at 787, and considering each phrase "in context," *Anthony*, 584 F.3d at 380.

The Commission's rules of practice describe two different kinds of rulemaking proceedings, which are set forth in subparts B and C of 16 C.F.R. ch. I, subch. A, pt. 1. The subpart B rules implement the procedures Congress established for Magnuson-Moss rulemakings, *i.e.*, Section 18(a)(1)(B) rulemakings undertaken without other authorization from Congress. 15 U.S.C. § 57a(b)(1). Accordingly, subpart B contains a section that implements the ANPRM requirement. *See* 16 C.F.R. § 1.10. The subpart C rules apply to all other rulemaking proceedings, *i.e.*, APA rulemakings, and do not require an ANPRM. *See id.* §§ 1.21, 1.26.

The Commission properly determined that the CARS rulemaking proceeding was governed by subpart C, not subpart B. 89 Fed. Reg. 601 n.115. This is evident from § 1.21, which defines the scope of subpart C. It states that "[t]his subpart sets forth procedures for the promulgation of rules *under authority other than* section 18(a)(1)(B) of the FTC Act." 16 C.F.R. § 1.21 (emphasis added). The CARS Rule was promulgated under the authority of Dodd-Frank, as both the preamble and the

authority provision of the Rule (§ 463.1) make clear. *See* 89 Fed. Reg. at 591, 693. Because Dodd-Frank is an "authority other than section 18(a)(1)(B)," subpart C plainly applied.

The scope provision of subpart B confirms this conclusion. Section 1.7 provides that "[t]he rules in" subpart B will "apply to and govern proceedings for the promulgation of rules as provided in section 18(a)(1)(B) of the [FTC] Act" and that "[a]ll other rulemaking proceedings will be governed by the rules in subpart C." 16 C.F.R. § 1.7. Section 18(a)(1)(B) does not itself specify procedures for the promulgation of rules, but Section 18(b) sets forth procedures (including the ANPRM requirement) that apply "[w]hen prescribing a rule under subsection (a)(1)(B)." 15 U.S.C. § 57a(b)(1). Thus, the most natural reading of § 1.7 is that the subpart B rules apply to proceedings for the promulgation of rules in the manner that Congress provided for ordinary Section 18(a)(1)(B) rulemakings—*i.e.*, rules that must be promulgated using the procedures in Section 18(b).

Notably, § 1.7 does not say that subpart B applies to any rule "under" Section 18(a)(1)(B); it focuses instead on rules that Congress required to be promulgated using the Magnuson-Moss procedures.

Here, in this Dodd-Frank rulemaking, Congress directed the Commission to prescribe rules under Section 18(a)(1)(B) but to do so through regular APA procedures "[n]otwithstanding section 18 of the [FTC] Act." 12 U.S.C. § 5519. In other words, Congress told the Commission not to use the procedures that ordinarily apply to a section 18(a)(1)(B) rulemaking. Accordingly, this rulemaking proceeding was not one for "the promulgation of rules as provided in section 18(a)(1)(B)," and subpart B did not apply.

NADA's contrary arguments (Br. 17-23) ignore the text of § 1.7 and § 1.21 and would lead to the absurd result of requiring the Commission to comply with the very procedures that Congress dispensed with. NADA focuses on § 1.10, which says that an ANPRM must be published "[p]rior to the commencement of any trade regulation rule proceeding." 16 C.F.R. § 1.10. But § 1.10 is part of subpart B, and the plain text of § 1.7 and § 1.21 makes clear that this rulemaking was governed by subpart C.

NADA notes that the Commission described the CARS Rule as a "trade regulation rule," Br. 18, but that description has no bearing on whether an ANPRM was required. Although § 1.7 says that rules

"promulgat[ed] … as provided in section 18(a)(1)(B) … will be known as trade regulation rules," 16 C.F.R. § 1.7, it does not say that *only* those rules will be called "trade regulation rules." In fact, the Commission was describing some of its rules as "trade regulation rules" more than a decade before the enactment of Section 18.[14] And even after the enactment of Section 18, the Commission continues to describe some rules that were not promulgated using the Magnuson-Moss procedures as "trade regulation rules." For example, in the Telephone Disclosure and Dispute Resolution Act of 1992, Congress gave the Commission rulemaking authority in language very similar to that in Dodd-Frank; it told the Commission to prescribe rules by APA rulemaking but specified that such a rule would be "treated as a rule under section 18(a)(1)(B)." 15 U.S.C. § 5711(a)(8), (b). The Commission issued the rules without an ANPRM, but still called them a "trade regulation rule," just as it did in this case. *See* 58 Fed. Reg. 42,364 (Aug. 9, 1993).

NADA's argument that § 1.10 creates a distinct regulatory ANPRM requirement untethered to the Commission's statutory

---

[14] *See, e.g.*, 29 Fed. Reg. 8,324 (July 2, 1964) (adopting trade regulation rule regulating cigarette advertising).

authority is also at odds with the regulation's purpose as reflected in its history. Congress added the ANPRM requirement to Section 18 in 1980. *See* Pub L. No. 96-252, § 8, 94 Stat. 374, 376 (May 28, 1980). The following year, the Commission adopted or amended various rules to implement the changes to the Commission's authority made by the 1980 Act. *See* 46 Fed. Reg. 26,284, 26,288 (May 12, 1981). The Commission noted that the Act "amends section 18 of the FTC Act by requiring the publication of an [ANPRM] prior to the commencement of a rulemaking proceeding," and that amendments to § 1.10 and other rules "implement those sections." *Id.* at 26,286. Thus, the Commission plainly did not intend to create a regulatory ANPRM requirement distinct from the statutory requirement—it was merely implementing the new requirement imposed by Congress.

Nor do the FTC's revisions to its subpart B regulations in 2021 suggest that it was imposing a regulatory ANPRM requirement separate and distinct from the statutory requirement. The 2021 amendment merely made cosmetic changes, *e.g.*, changing "shall" to "must" and updating the name of the House of Representatives committee to which ANPRMs are submitted. *See* 86 Fed. Reg. 38,542,

38,545 (July 22, 2021). NADA suggests that the Commission could have included a specific carveout in § 1.10 to reflect that the ANPRM requirement does not apply to rulemakings to regulate motor vehicle dealers as authorized by Dodd-Frank. Br. 21. But the Commission had no reason to do so because, as shown above, the scope provisions for subparts B and C (§§ 1.7 and 1.21) already make clear that the subpart B provisions would not apply to a rulemaking under the authority of Dodd-Frank.

NADA is not aided by its reliance (Br. 21) on *McGavock v. City of Water Valley*, 452 F.3d 423 (5th Cir. 2006). In *McGavock*, the Court held that a Department of Labor regulation was "obsolete and without effect" in light of a subsequent Congressional enactment. *Id.* at 428. Here, to the extent § 1.7 would otherwise have required the Commission to follow the subpart B rules, Dodd-Frank made that requirement obsolete for rulemakings respecting motor vehicle dealers.

The overarching problem with NADA's reading of the Commission's rules is that it would effectively thwart a key provision of Dodd-Frank. The relevant Commission rules—§§ 1.7, 1.10, and 1.21—all existed in substantially the same form that they do today when

Congress enacted Dodd-Frank. NADA admits that Dodd-Frank intentionally exempted the Commission from the ANPRM requirement. Yet according to NADA, that exemption was inoperable the day it was enacted and remains inoperable to this day due to preexisting Commission regulations. The Commission's rules, however, are designed to implement Congress's instructions. Congress gave the Commission a clear directive to use regular APA procedures—which do not require an ANPRM—when prescribing rules under Dodd-Frank. The Commission's rules of practice must be construed consistent with that mandate.

### B. To the Extent the Commission's Rules of Practice Are Ambiguous, the Court Must Defer to the Commission's Reasonable Interpretation.

To the extent the Court finds any ambiguity in the Commission's rules of practice, it must defer to the Commission's interpretation. Under *Auer v. Robbins*, 519 U.S. 452 (1997), an agency's interpretation of its own regulations is "controlling unless plainly erroneous or inconsistent with the regulation." *Id.* at 461 (cleaned up). In *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019), the Supreme Court reaffirmed *Auer* and explained in more detail when deference is appropriate. First, the

agency's regulation must be "genuinely ambiguous" after a court has "exhaust[ed] all the 'traditional tools' of construction," including construction of the "text, structure, history, and purpose of [the] regulation." *Id.* at 2415. Second, the agency's interpretation must be "reasonable," i.e., within "the zone of ambiguity the court has identified after employing all its interpretive tools." *Id.* at 2415-16. Additionally, the interpretation must be "one actually made by the agency," *id.* at 2416, must "implicate its substantive expertise," *id.* at 2417, and must reflect the agency's "fair and considered judgment," *id.*

Here, the text of the relevant rules (§ 1.7 and § 1.21) plainly supports the Commission's reading, but if the Court concludes otherwise, the Commission's interpretation is sufficiently plausible to show a genuine ambiguity. Further, the Commission's interpretation is reasonable because it gives effect to Congress's intent as set forth in Dodd-Frank, rather than thwarting that intent as NADA's interpretation would.

The "character and context" of the Commission's interpretation also show that the interpretation is entitled to controlling weight. *Kisor*, 139 S. Ct. at 2416. First, in response to NADA's comments, the

Commission itself actually made the determination that its rules did not require an ANPRM as part of the Rule. *See* 89 Fed. Reg. at 601 n.115. Second, the Commission's interpretation implicates its substantive expertise. *Kisor* explains that this factor asks whether "the subject matter of the dispute is distant from the agency's ordinary duties or falls within the scope of another agency's authority." *Kisor*, 139 S. Ct. at 2417 (cleaned up); *see also Doe v. SEC*, 28 F.4th 1306, 1315 (D.C. Cir. 2022) (deferring to SEC's interpretation of its regulations where "no other agency [was] involved" in administering the relevant program). Here the regulations implicate authority under Dodd-Frank and the FTC Act that Congress explicitly assigned to the FTC and no other agency. Finally, the Commission's conclusion that the subpart B regulations did not apply to this rulemaking in light of Dodd-Frank, *see* 89 Fed. Reg. at 601 n.115, reflects the Commission's "fair and considered judgment," and is not merely a "convenient litigating position or *post hoc* rationalization advanced to defend past agency action against attack." *Kisor*, 139 S. Ct at 2417 (cleaned up). Accordingly, under *Auer* and *Kisor*, the Court should give the Commission's interpretation controlling weight.

**C.    In Any Event, the Lack of an ANPRM Was Harmless.**

Even if the Commission was required to publish an ANPRM, NADA still cannot prevail because it has not shown harm from the alleged error. The APA instructs that on review of an agency action, "due account shall be taken of the rule of prejudicial error." 5 U.S.C. § 706; *accord* 15 U.S.C. § 57a(e)(3); *see also United States v. Johnson*, 632 F.3d 912, 930 (5th Cir. 2011) ("In administrative law, as in federal civil and criminal litigation, there is a harmless error rule." (quoting *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*. 551 U.S. 644, 659-60 (2007))).

In numerous cases, the Supreme Court and this Court have recognized that an agency's failure to provide a required notice or to strictly comply with the agency's regulations may be harmless. For example, in *Shinseki v. Sanders*, 556 U.S. 396, 413 (2009), the Supreme Court held that the Veterans' Administration's failure to provide a disability claimant with a required notice was harmless under the circumstances presented there. *Id.* Similarly, the Interstate Commerce Commission's failure to "require strict compliance with its own rules" was harmless where it "did not prejudice" the carriers challenging the

agency action. *Am. Farm Lines v. Black Ball Freight Serv.*, 397 U.S. 532, 537-38 (1970).

Likewise, this Court has held that the Attorney General's failure to provide notice and comment under the APA before promulgating an interim rule was harmless where the preamble to the rule "thoroughly engage[d] the issues and challenges inherent in the regulation." *Johnson*, 632 F.3d at 931. The Court explained that "when a party's claims were considered, even if notice was inadequate, the challenging party may not have been prejudiced." *Id.*; *see also Mississippi Valley Gas Co. v. FERC*, 659 F.2d 488, 501 (5th Cir. 1981) (petitioner "made no showing of substantial prejudice resulting from any deviation from the Commission's regulations," and therefore any error was harmless where "[t]he "issues [were] clear to all parties" and the petitioner "had an opportunity to present its views on the issues.").[15]

NADA is wrong that the agency has the burden of showing an error is harmless. Br. 23. The "burden of showing that an error is

---

[15] NADA is incorrect in suggesting that an agency's failure to follow its own regulations is always fatal. *See* Br. 23-24 (citing *IMS, P.C. v. Alvarez,* 129 F.3d 618, 621 (D.C. Cir. 1997)). Indeed, in one of NADA's cases, the D.C. Circuit held that the Federal Aviation Administration's failure to provide the petitioner with a required notice of an adverse decision was harmless where the petitioner pursued his rights anyway and showed no prejudice. *Lopez v. FAA*, 318 F.3d 242, 248 (D.C. Cir. 2003).

harmful normally falls upon the party attacking the agency's determination." *Shinseki*, 556 U.S. at 409.

NADA fails to meet its burden. Since the 2010 enactment of Dodd-Frank, NADA has been aware that the Commission possesses authority to prescribe regulations to address unfair or deceptive acts or practices by motor vehicle dealers, and NADA had plenty of opportunities to share its views with the Commission before a rule was proposed. Indeed, NADA has taken full advantage of those opportunities over the years. Among other things, NADA participated in three public roundtables and a financial workshop specifically addressing military consumers. R. 2-4, 78. It submitted comments on the roundtables, *see, e.g.*, Comment No. FTC-2022-0036-0034, as well as voluminous comments in response to the NPRM. NADA now asserts that the Commission had "an incomplete understanding of the relevant market and would have benefitted from greater stakeholder participation," Br. 24, but it has not tried to show why the extensive stakeholder opportunities the Commission provided were inadequate, nor has it

explained what else it would have told the Commission if an ANPRM had been issued.[16]

NADA also overstates the limited form of the notice that an ANPRM provides. An ANPRM is not a proposed rule. It need only contain a "brief description of the area of inquiry under consideration, the objectives which the Commission seeks to achieve, and possible regulatory alternatives under consideration by the Commission," and invite the responses of interested parties. 15 U.S.C. § 57a(b)(2)(A); 16 C.F.R. § 1.10(b)(1). All this information was in the NPRM. Furthermore, the NPRM contained the actual text of the proposed rule—which is by far the most important information that stakeholders need to review. NADA argues that the lack of an ANPRM "substantially curtail[ed] [its] ability to engage in the rulemaking process," Br. 24, but it does not identify any specific information it wanted to bring to the Commission's attention that was not or could not have been included in the detailed

---

[16] In a different section of its brief, NADA points to a study it submitted after the comment deadline. That study, which addressed the costs of the proposed rule set forth in the NPRM, could not have been submitted before the NPRM issued. And anyway, as discussed *infra* at 66-67, the Commission addressed this study in the Final Rule even though NADA's submission was untimely.

comments petitioners submitted on the NPRM—a combined total of 188 single-spaced pages with 277 pages of attachments.

NADA's complaint that the Commission provided a "mere 60 days" for comment on the NPRM and denied a request to extend the comment period (Br. 11-12) likewise does not show that the lack of an ANPRM caused any prejudice. First of all, NADA has not actually argued that the Commission abused its discretion by not extending the comment period, so it has forfeited any challenge to that decision. *See, e.g.*, *Smith v. Sch. Bd. of Concordia Parish*, 88 F.4th 588, 594 (5th Cir. 2023). In any event, a 60-day comment period is consistent with the best practices recommended by the Administrative Conference of the United States for significant regulatory actions.[17] And as the Commission noted, interested parties actually had 80 days to prepare comments because 20 days elapsed between the public announcement of the NPRM and the NPRM's publication in the Federal Register. 89 Fed. Reg. 601 n.115. That gave NADA plenty of time to gather any information it needed to respond to the NPRM.

---

[17] Administrative Conf. of the U.S., *Rulemaking Comments* (June 16, 2011), https://www.acus.gov/document/rulemaking-comments.

38

NADA complains that the NPRM contained a "wide-ranging and open-ended set of 49 questions," and suggests that these questions could instead have been posed as part of an ANPRM. Br. 24-25. But Section 18(b) does not require the Commission to ask any questions in an ANPRM. *See* 15 U.S.C. § 57a(b)(2)(A). Nor are specific questions required even in an NPRM. *See* 5 U.S.C. § 553(b). That NADA did not have an earlier opportunity to answer questions that the Commission was not required to pose is not a cognizable harm.

In short, this is a case like *Johnson,* where the agency "thoroughly engage[d] the issues and challenges inherent in the regulation." 632 F.3d at 931. NADA had a full and fair opportunity to bring any information it wanted to the Commission's attention, and it has not specified anything it would have done differently if the Commission had issued an ANPRM. Any error was harmless.

## II.    NADA RAISES NO MERITORIOUS CHALLENGE TO THE COMMISSION'S BASIS FOR ISSUING THE CARS RULE.

NADA's second line of attack is based on false premises. NADA argues that the Rule is arbitrary and capricious because the Commission did not expressly find either (1) "widespread misconduct" or (2) a "regulatory gap" that needed to be filled. Br. 26, 30. But the

Commission was not required to make either of those findings. The

Commission's findings that unfair or deceptive practices by automobile

dealers are a persistent problem that the existing scheme has not

adequately addressed are more than sufficient to justify the Rule.

### A. The Commission Was Not Required To Find "Widespread Misconduct."

The Commission was not required to find "widespread"

misconduct to justify the CARS Rule because Congress said it did not

have to. As discussed above and as NADA acknowledges, Dodd-Frank

directs the Commission to use APA procedures rather than Magnuson-

Moss rulemaking procedures when promulgating rules respecting

unfair or deceptive acts or practices by motor vehicles. And only

Magnuson-Moss procedures require the Commission to find that "the

unfair or deceptive acts or practices which are the subject of the

proposed rulemaking are prevalent."[18] 15 U.S.C. § 57a(b)(3).

The APA does not require an agency to find a "widespread"

problem to justify issuance of a rule. To the contrary, the Supreme

---

[18] "Prevalent" and "widespread" are synonyms. Prevalent, Merriam-Webster Dictionary (online ed.), https://www.merriam-webster.com/dictionary/prevalent. The FTC Act uses both terms. *See* 15 U.S.C. § 57a(b)(3).

Court has held that agencies may impose rules as "prophylactic measure[s]" to "discourage" misconduct. *Mourning v. Family Publ'ns Serv., Inc.*, 411 U.S. 356, 377 (1973); *see also Sid Peterson Mem'l Hosp. v. Thompson*, 274 F.3d 301, 313 (5th Cir. 2001) ("It is well within the power of an agency to promulgate prophylactic regulations which are broad in scope in order to effectuate the purposes of the enabling legislation."). Such rules help to ensure that misconduct never becomes widespread in the first place.

NADA does not cite a single case supporting its claim that the Commission was required to find widespread misconduct. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983), which is the seminal Supreme Court decision on the arbitrary-and-capricious standard, imposes no such requirement. Nor does *Data Marketing Partnership, LP v. DOL*, 45 F.4th 846 (5th Cir. 2022), or *Business Roundtable v. SEC*, 647 F.3d 1144 (D.C. Cir 2011). The portion of *Data Marketing* that NADA cites (Br. 27-28) merely reiterates the *State Farm* standards. *See* 45 F.4th at 855-56. And *Business Roundtable* dealt with statutory requirements "unique" to the SEC requiring that agency to consider the economic implications of a new rule. 647 F.3d at 1148.

Neither case holds that widespread misconduct is necessary to justify a new rule.

### B.   The Commission Was Not Required To Identify a "Regulatory Gap" To Justify the Rule.

NADA's assertion that the Commission had to identify a specific "regulatory gap" to justify the Rule likewise lacks any legal basis. In Dodd-Frank, Congress gave the Commission broad power to prescribe rules to define and prevent unfair or deceptive acts or practices by motor vehicle dealers. Congress did not say that the Commission could act only if it found a regulatory gap, nor did Congress impose any other preconditions on the Commission's rulemaking authority. To the contrary, Congress gave the Commission specific rulemaking authority in this area even though automobile dealers were already subject to existing regulations and the FTC Act already prohibits unfair or deceptive acts or practices. *See* 15 U.S.C. § 45(a).

Nothing in the APA requires an agency to identify a "regulatory gap" before issuing a new rule. NADA is not aided by its reliance (Br. 30-31) on *N.Y. Stock Exch. LLC v. SEC*, 962 F.3d 541 (D.C. Cir. 2020). That case concerned an SEC "pilot program" that would have applied new transaction restrictions to two randomly selected "test groups" of

stock and assigned other stocks to a "control group" not subject to these restrictions. *Id.* at 545. The program "was not a trial run of a new regulation," but instead was "designed to gather data so that the Commission *might* be able to determine in the future whether regulatory action was necessary." *Id.* at 544 (cleaned up).

The D.C. Circuit held that this kind of "one-off" rule "[i]n the name of collecting data for subsequent regulatory decisions that the Commission can neither predict nor commit to" was beyond the SEC's delegated authority. *Id.* at 545-46, 554-55 (cleaned up). In that context, the court explained that the SEC had "adopted the Pilot Program without any regulatory agenda" and "without explaining what problems with the existing regulatory requirements it meant for the Rule to correct." *Id.* at 554. The court held that the SEC lacked authority to follow "this aimless regulatory approach." *Id.* at 555. The court did not hold or even suggest that an agency may issue a regulation only after identifying a "regulatory gap."

Here, the Commission is not establishing some new program that randomly selects certain automobile dealers for disparate treatment to gather data to determine whether future regulation is warranted.

43

Rather, the Commission has already determined that regulation is needed and has explained that determination in the course of exercising the authority that Congress conferred in Dodd-Frank.

The other two cases NADA references also do not impose a general requirement that an agency identify a regulatory gap to justify a rulemaking. *See* Br. 33 (citing *Business Roundtable*, 647 F.3d 1144 and *Am. Equity Inv. Life Ins. Co. v. SEC*, 613 F.3d 166 (D.C. Cir. 2010)). Those two cases involve statutory provisions "unique" to the SEC that require the agency to consider the effects of a new rule on "efficiency, competition, and capital formation." *Business Roundtable*, 647 F.3d at 1148; *Am. Equity*, 613 F.3d at 176. Conducting such an analysis requires the SEC to compare the changes made by the new rule to the "existing regime." *Am. Equity*, 613 F.3d at 179. That is a special procedural requirement that Congress has imposed on the SEC but not the FTC.

## C. The Commission Articulated a Reasoned Basis for the CARS Rule.

The Commission's factual findings are more than sufficient to satisfy judicial review. APA arbitrary-and-capricious review "is narrow and a court is not to substitute its judgment for that of the agency."

*State Farm*, 463 U.S. at 43. The question for the Court is simply "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* The Commission's decision to issue the CARS Rule easily satisfies this deferential standard.

The Commission's factual findings amply document that unfair or deceptive practices by auto dealers, including bait-and-switch advertising and hidden or junk fees, are serious problems that cause significant harm to American consumers. 89 Fed. Reg. at 594-98. These problems have persisted for well over a decade, notwithstanding efforts by the Commission and its law enforcement partners to address them through case-by-case enforcement and business and consumer education. *See, e.g.*, *id.* at 598-600; *supra* n.2; R. 141, 151, 154, 155. Under these circumstances, the Commission reasonably determined that it was appropriate to use the specific authority granted by Congress to prescribe rules to curb this serious and persistent problem.

None of NADA's various attacks on the factual basis for the Rule has merit.

1.     NADA wrongly claims (Br. 27) that "the conduct addressed by the Rule affects less than 1% of transactions," mischaracterizing a comment from the Small Business Administration's Office of Advocacy that less than 1% of car-buying consumers *reported a problem to the FTC*. Comment No. FTC-2022-0046-6664 at 6. *See* 89 Fed. Reg. at 594. But as the Commission explained, the number of consumers who go to the trouble of reporting a problem is "just the tip of the iceberg." *Id.* The Commission's experience in enforcement actions shows that many other consumers experience the same problems but do not bother to report them—or, for example in the case of hidden charges, may not even realize they are being victimized. *Id.* at 594, 658. And the absolute number of auto-related complaints to the Commission is large: The Commission receives more than 100,000 such complaints a year, putting auto-related complaints regularly in the top 10 categories of complaints that the agency tracks.[19]

---

[19] Although the FTC does not verify every complaint it receives, it views the number of such complaints as providing important information about the comparative scope of consumer issues and harm, and uses this information to spot trends, identify questionable business practices and targets, enforce the law, and inform other agency decisions. Here, the number of complaints is indicative of serious problems regarding motor vehicle sales, financing, service and warranties, and rentals and leasing.

NADA's argument that the Commission "vastly inflated" the number of consumer complaints about auto dealers (Br. 29) is also incorrect. NADA argues that some of the auto related categories listed in the Commission's database involve categories "with little or no connection to the Rule," such as "Gasoline" or "Auto Parts & Repairs." Br. 29. But the numbers reported in the Rule do not include all these categories; they reflect only "complaints regarding motor vehicle sales, financing, service and warranties, and rentals and leasing." 89 Fed. Reg. at 594. The overwhelming majority of these complaints involve new and used auto sales. R. 153 at 85. NADA speculates that some of the complaints may involve non-dealer entities, but it has raised no basis to question that the majority of them do involve dealers. The sheer number of complaints, combined with the rest of the FTC's evidence, strongly supports the Commission's conclusion that regulatory action is needed.

2.    NADA attempts to minimize the extent of dealer misconduct by arguing that the NPRM cited "just" 37 examples of FTC enforcement actions against automobile dealers and the Final Rule added "just" two

additional actions. Br. 28.[20] NADA argues that this works out to fewer than four enforcement actions by the FTC per year. But four cases a year against one type of entity (auto dealers) in one specific industry represents a significant commitment of resources by an agency responsible for preventing unfair or deceptive acts or practices across most of the American economy. That the Commission has needed to use its limited enforcement resources to bring such cases consistently, over more than a decade, underscores the severity and persistence of misconduct in the industry.

Further adding to the picture, state regulators and attorneys general have participated in law enforcement sweeps with the FTC—one of which involved 181 separate enforcement actions—and have also filed actions on their own against motor vehicle dealers. 89 Fed. Reg. at 598-99 & n.89, 92. Indeed, the Attorneys General of 18 States commented that "the continued widespread" misconduct in the industry "demonstrates the need for 'more cops on the beat' with authority to

---

[20] NADA notes that some of the auto-related enforcement actions cited in the NPRM were not brought against dealers. The Commission cited a broad range of auto-related actions to demonstrate the breadth of its experience in this field.

secure restitution and other redress for harmed consumers." Comment No. FTC-2022-0046-8062 at 4. NADA ignores all this evidence.

3.      NADA complains that the Commission cited consumer interviews from a qualitative study that NADA deems insufficiently rigorous. Br. 28-29. The Commission acknowledged industry critiques of this study but concluded that despite its limitations the study "provides helpful qualitative insight from consumer interviews." 89 Fed. Reg. at 597 n.74.  In any event, the study was only "one of the many sources" the Commission considered. *Id.* The Commission did not act arbitrarily and capriciously by considering qualitative insights from the study in conjunction with other evidence, "including consumer complaints, enforcement actions, [and] outreach and dialogue with stakeholders and consumer groups, among others." *Id.*

4.      NADA is also incorrect in arguing (Br. 31-32) that the CARS Rule's disclosure requirements are merely "duplicative" of existing regulatory requirements.[21] NADA argues that regulations under the Truth in Lending Act ("TILA") and the Consumer Leasing Act ("CLA")

---

[21] NADA does not contend that the Rule's add-on disclosure (§ 463.4(c)) is duplicative.

already require disclosure of a vehicle's price and the total of payments. Br. 31; *see* 12 C.F.R. § § 213.4(e), 226.18(h), (j).[22] But those regulations apply only to financed or leased transactions, whereas the CARS Rule also applies to cash purchases. Furthermore, even with respect to financed and leased transactions, the CARS Rule requires different timing for the disclosures, as NADA concedes. Br. 31. The TILA and CLA regulations (which apply broadly to many kinds of transactions, not just car financing or leases) require, among other things, certain disclosures before "consummation" of a transaction. 12 C.F.R. §§ 213.3(a)(3), 226.17(b). By contrast, the CARS Rule requires earlier disclosures. For instance, dealers must include the offering price in advertisements for specific vehicles and in their first communication with a customer about a specific vehicle, and they must disclose the total of payments whenever they make a representation about a monthly payment for a vehicle. *See* 89 Fed. Reg. at 694-95 (§ 463.4(a), (d)).

---

[22] NADA mistakenly refers to the TILA regulations issued by the CFPB, but those regulations do not apply to motor vehicle dealers. *See* 12 C.F.R. § 1026.1(c)(1). The applicable TILA regulations are issued by the Board of Governors of the Federal Reserve. *See* 12 C.F.R. Part 226.

The Commission clearly explained why up-front disclosures are important. The process of buying or leasing a car is "time-consuming and arduous." *Id.* at 593. One study cited found that the average consumer spends almost 15 hours shopping for a vehicle. *Id.* at 634. n.303. Currently, many consumers do not learn the actual out-the-door price of their vehicle or the total amount they will pay for a financed or leased transaction until the very end of the process. This lack of transparency fosters the bait-and-switch tactics and addition of junk or hidden fees that the Rule seeks to prevent. For these reasons, many commenters called for uniform, comprehensive, and accurate price information *up-front* in the vehicle buying process.[23] As one group of commenters asserted, "[t]he most important factor for consumers purchasing a vehicle is its price, yet the price is almost impossible to ascertain without spending hours at the dealership."[24]

---

[23] *See, e.g.*, Comment No. FTC-2022-0046-7607 at 17-22 (Nat'l Consumer L. Center); Comment No. FTC-2022-0046-3693 (Nissan salesperson commenting that dealers "have made the car buying process needlessly confusing, expensive, and frustrating by engaging in false advertising and hidden add-on products."); Comment No. FTC-2022-0046-8919 (member of a "military family" offering details about the "scary scam" she has faced while car shopping; Comment No. FTC-2022-00046-8062 (State AGs).

[24] Comment No. FTC-2022-0046-7607 at iii; *see also* Comment No. FTC-2022-0046-7520 at 3, 11, 12, 16, 38 (Consumer Reports and others compiling numerous

NADA's other criticisms of the disclosures are equally meritless. Contrary to NADA's suggestion (Br. 31-32), the substance of the Rule's required disclosures are not inconsistent with TILA or the CLA. As the Commission explained in response to comments from NADA and others, by making the disclosures that the CARS Rule requires, dealers can comply with those other requirements. 89 Fed. Reg. at 633. NADA does not challenge this finding, nor does it offer any support for its claim that customers would be "confused" or that it would be "burdensome" to make dealers disclose earlier in the process information that they already must disclose. Contrary to NADA's assertion, the Rule does not require any "government-scripted boilerplate" (Br. 32)—it merely requires that disclosures be made clearly and conspicuously. 89 Fed. Reg. at 693-94 (§§ 463.2(d), 463.4). The Commission reasonably found that, far from causing confusion, up-front disclosures would save consumers time and help protect them from unlawful practices like hidden fees and bait-and-switch advertising.

---

consumer complaints, including many that described consumers spending hours at a dealership trying to ascertain the final price and terms); Comment No. FTC-2022-0046-1690.

NADA is equally misguided in arguing that the misrepresentation provisions in § 463.3 of the Rule are unnecessary because the FTC Act already broadly prohibits all unfair or deceptive acts or practices. By that logic, the FTC would never be able to issue *any* rules that define specific conduct as unfair or deceptive. But Congress, in Section 18 and Dodd-Frank, expressly authorized the Commission to issue rules "which define with specificity acts or practices which are unfair or deceptive." 15 U.S.C. § 57a(a)(1)(B); 12 U.S.C. § 5519(d). Congress itself thus recognized that the FTC Act's general prohibitions might not be sufficient to protect the public.

Furthermore, as the Commission noted, a rule will provide "additional remedies that will benefit consumers who encounter conduct that is otherwise already illegal under Federal law" and "aid law-abiding dealers that lose business to competitors that act unlawfully." 89 Fed. Reg. at 611. With a rule in place, the Commission can sue violators under Section 19 of the FTC Act and obtain "such relief as the court finds necessary to redress injury to consumers or other persons," including the refund of money or payment of damages. 15 U.S.C. § 57b(a)(1), (b). Additionally, the Commission may obtain monetary

penalties for violations of the Rule, *see* 15 U.S.C. § 45(m)(1)(A). These additional remedies will give teeth to the FTC Act's general prohibitions and create incentives for dealer compliance that are lacking under the existing regime.

### III. THE COMMISSION'S COST-BENEFIT ANALYSIS IS NOT JUDICIALLY REVIEWABLE, AND NADA'S ARGUMENTS LACK MERIT ANYWAY.

This Court cannot consider NADA's attacks on the Commission's cost-benefit analysis (Br. 35-47) because it is part of the final regulatory analysis the Commission prepared under Section 22 of the FTC Act, *see* 89 Fed. Reg. at 672-93, and Section 22(c) explicitly bars judicial review. 15 U.S.C. § 57b-3(c)(1). Even if judicial review were available, however, the challenge would fail because NADA has not shown that any aspect of the Commission's analysis was arbitrary and capricious or that any purported errors in the analysis caused harm.

#### A. The Cost-Benefit Analysis Is Not Subject to Judicial Review.

The Commission's cost-benefit analysis was undertaken pursuant to Section 22, which requires "an analysis of the projected benefits and any adverse economic effects and any other effects of the final rule." 15 U.S.C. § 57b-3(b)(2)(C). As relevant here, Section 22 also provides that "[t]he contents and adequacy of any regulatory analysis prepared

or issued by the Commission under this section, including the adequacy of any procedure involved in such preparation or issuance, *shall not be subject to any judicial review in any court*" unless the Commission "failed entirely to prepare a regulatory analysis." 15 U.S.C. § 57b-3(c)(1) (emphasis added). Section 22 further provides that "no Commission action may be invalidated, remanded, or otherwise affected by any court on account of any failure to comply with the requirements of this section." *Id.* § 57b-3(c)(2). Here, NADA is challenging "the contents and adequacy" of the Commission's cost-benefit analysis—exactly what Section 22 forbids.

By its terms, the APA does not apply where "statutes preclude judicial review." 5 U.S.C. § 701(A)(1); *accord Elldakli v. Garland*, 64 F.4th 666, 670 (5th Cir. 2023). This Court has repeatedly applied that principle and declined to review agency action where Congress said it could not. *E.g.*, *Lundeen v. Mineta*, 291 F.3d 300, 310-11 (5th Cir. 2002); *Stockman v. FEC*, 138 F.3d 144, 156 (5th Cir. 1998); *Kirby Corp. v. Pena*, 109 F.3d 258, 261 (5th Cir. 1997). NADA thus misplaces its reliance on *Chamber of Commerce v. SEC*, 85 F.4th 760 (5th Cir. 2023). That case held that as a general matter, an agency action is arbitrary

and capricious if the agency failed to adequately consider the costs and benefits of a rule. *Id.* at 777. But *Chamber of Commerce* did not involve a statute like Section 22, which specifically instructs the Commission to conduct a cost-benefit analysis and expressly bars courts from reviewing that analysis.

Since Congress has clearly and explicitly precluded judicial review of the Commission's cost-benefit analysis, the Court may not consider the merits of NADA's challenge.

## B.    In Any Case, the Commission Properly Assessed the Benefits and Costs of the Rule.

Even if judicial review were available, NADA's challenges would fail on the merits. This Court "afford[s] agencies considerable discretion in conducting the complex economic analysis typical in the regulation promulgation process." *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 452 (5th Cir. 2021) (cleaned up). The Commission's findings are amply supported by evidence and well within the agency's discretion.

### 1.   The Commission properly estimated benefits.

The Commission estimated that the Rule's quantified benefit to consumers over 10 years would be $13.4 billion.[25] 89 Fed. Reg. at 688. Most of that benefit—$12.3 billion—comes from time savings. As the Commission explained, "[r]equired disclosures of relevant prices and prohibitions of misrepresentations, *inter alia*, would save consumers time when shopping for a vehicle by requiring the provision of salient, material information early in the process and eliminating time spent pursuing misleading offers." *Id.* at 674. The other $1.1 billion comes from a reduction of deadweight loss associated with "search frictions, shrouded prices, deception, and obfuscation." *Id.* at 678, 688.[26]

To quantify the time-savings benefits, the Commission used survey data comparing consumers who perform various activities in the car-buying process digitally (*i.e.*, online) relative to consumers who went

---

[25] These figures represent the Commission's base case using a 7% discount rate. The Commission also conducted a sensitivity analysis to prepare high and low estimates and alternative calculations using a 3% discount rate. 89 Fed. Reg. 688; *see also infra* n.27 (explaining sensitivity analysis).

[26] The Commission described other time-saving benefits, such as avoiding time spent on transactions that are abandoned when consumers learn that the initial price information they received was misleading, but it left those benefits unquantified. 89 Fed. Reg. at 673-74.

to dealerships in person. *Id.* at 676. The Commission explained that because it "expects the provisions of the Rule to emulate some of the time-saving features of completing these activities digitally," it would use those figures as a baseline to estimate time savings, taking into account for each activity "how closely the status quo digital shopping experience is expected to resemble the shopping experience for all consumers once the Rule is in effect." *Id.* The Commission estimated that the time savings in negotiating a purchase price would be approximately equal to the time digital consumers save vis-à-vis non-digital consumers under the status quo, but that the time savings for selecting add-ons and discussing and signing paperwork would be more moderate and there would be little or no time savings for obtaining a trade-in offer. *Id.* at 676-77. Based on the survey data and these estimates, the Commission calculated base-case savings of 2.05 hours per transaction. *Id.* at 674, 678.

NADA disagrees with the Commission's analysis but has not shown that it was arbitrary and capricious. NADA first argues that the NPRM's initial estimate of 3 hours saved per transaction was unreasonable. Br. 35-36. But the NPRM is not under review here—the

Final Rule is. The Commission refined its analysis in the Final Rule after taking into account revisions to the proposed rule, stakeholder comments, and additional data. The Commission further stress-tested its revised estimate of 2.05 hours by conducting a sensitivity analysis that considered savings estimates between 1.02 hours and 3.3 hours per completed transaction, resulting in total savings to consumers between $6.1 billion and $19.8 billion with a base case of $12.3 billion.[27] 89 Fed. Reg. at 674, 678.

NADA next takes issue with the Commission's comparison of the time saved by digital versus non-digital consumers in the current regime as a basis for estimating the Rule's benefits, incorrectly claiming that the Commission offered "no support whatsoever" for this approach. Br. 37. In fact, the Commission explained in detail why its assumptions were reasonable. For example, the Commission explained that "[f]or non-digital consumers, it is currently time-consuming to obtain comparable price quotes from dealerships," because many dealers "will not initiate price negotiations in earnest without a competing price

---

[27] "Sensitivity analysis consists of purposely running a number of alternative specifications to determine whether particular results are robust…." A.H. Studenmund, *Using Econometrics: A Practical Guide* 174 (6th ed. 2017).

59

quote in writing, which can only be obtained by visiting a dealership for the non-digital consumer." 89 Fed. Reg. at 676. Mandating up-front offering price disclosures will make the process more like the existing process for digital consumers, who can obtain price quotes by email without traveling to multiple dealerships. *Id.*

NADA may disagree with the Commission's methodology, but it cites no contrary evidence and instead relies solely on rhetoric and NADA's own unsupported speculation. In contrast, the Commission's estimate is based on facts and data that NADA does not challenge, and "[b]oth the Supreme Court and [other] court[s] have recognized that agencies should be given a wide berth when making predictive judgments … because such predictions are policy-laden, and courts are not well equipped to second-guess agency estimates." *Bd. of Cnty. Comm'rs of Washington Cnty. v. United States Dep't of Transp.*, 955 F.3d 96, 99 (D.C. Cir. 2020).

Finally, NADA rehashes the meritless argument that prohibiting misrepresentations and requiring up front disclosures about pricing will not actually help consumers. Br. 39-42. The Commission reasonably concluded otherwise, based on an extensive evidentiary record. NADA's

claim that the rule will somehow harm consumers is based on the false assertion (Br. 39) that the Rule will inject more paperwork into the process. To be clear, the Rule does not insert a single additional piece of paperwork into the dealer-consumer transaction. NADA suggests that the Commission should have conducted additional research or consumer testing, but it cites nothing to suggest that the APA requires such time-consuming and expensive studies.

### 2. The Commission properly estimated dealer costs.

The Commission calculated the total cost of the Rule to dealers—including the costs of compliance with the three mandatory disclosures, the prohibition on misrepresentations, and recordkeeping obligations—at $1.1 billion over 10 years. 89 Fed. Reg. at 688. NADA's assertion that the FTC assumed many of these requirements would "impose no compliance costs at all" (Br. 42) is wrong. Although the Commission considered scenarios that assumed the misrepresentation prohibition and offering-price disclosure requirements would impose no additional costs, its final calculations were based on scenarios that assumed that dealers would incur additional costs to ensure compliance. 89 Fed. Reg. at 682-83, 688.

NADA doubly errs in claiming that the Commission's assessment of dealer costs suffers from a miscalculation of the reduction in deadweight loss resulting from the Rule. Br. 43-45. First, reduction in deadweight loss is not a cost to dealers at all. It is a benefit to society, and the Commission therefore included it in the Commission's discussion of benefits. 89 Fed. Reg. at 678-81. Second, while NADA argues that some portion of dealers' compliance costs will be passed along to consumers in the form of increased prices (Br. 44), it points to no evidence supporting that assertion. Indeed, the Commission found that "based on the academic literature on search costs in the automobile market, the Rule is expected to *reduce* prices of new vehicles by reducing the markup that dealers are able to charge over marginal costs." 89 Fed. Reg. at 680 (emphasis added).[28]

In any event, the reduction in deadweight loss accounts for only $1.1 billion of the total $13.4 billion in quantified benefits to consumers that the Commission calculated. Even if that number were zero, there

---

[28] In discussing the consumer time-savings benefit, the Commission assumed that the number of vehicle transactions would be stable at 2019 levels. 89 Fed. Reg. at 677. NADA misconstrues this as a statement about vehicle pricing. Br. 44. As noted above, the Commission found that the Rule would reduce vehicle prices.

would still be $12.3 billion in consumer benefits, which dwarfs the $1.1 billion in dealer costs. Any error in the deadweight loss analysis is therefore harmless.

NADA next attacks the Commission's cost estimate for the offering-price disclosure requirement. Br. 45-47. The Commission estimated that this requirement could impose $46 million in upfront compliance costs based on the time necessary to review policies and procedures for determining public-facing prices and to update any automated systems that need to be updated. 89 Fed. Reg. at 683, 688. The Commission assumed that any additional time "required to deliver the disclosures is … negligible, as prices are already typically disclosed in advertisements and in interactions with consumers under the status quo." *Id.* at 682-83.

NADA argues that the Commission's analysis fails to take into account that dealers need to update prices frequently in response to market conditions. Br. 46. But that is not a cost imposed by the Rule because dealers already update prices as part of their normal business. As the Commission explained, "the Rule just requires the price to conform to a specific definition." 89 Fed. Reg at 683. NADA does not

dispute that dealers already spend time to disclose prices to consumers, and it offers no support for its argument that the Rule will somehow add time to these discussions—just a vague assertion that "the stakes … are far higher under the Rule." Br. 46-47. But the Commission's analysis explicitly priced in those higher stakes, 89 Fed. Reg. at 682-83. As noted above, the Commission also performed a sensitivity analysis, which showed that the end result would not change even if the Commission's assumptions were off by an order of magnitude.

NADA's complaints about the costs imposed by the total-payments disclosure are similarly off-base. The Commission's final analysis assumed that dealers would incur "a onetime, upfront cost of both designing the required disclosures and informing associates of their obligations to provide the disclosures" plus "an additional ongoing cost per financed or leased transaction in order to communicate the required disclosures to consumers in writing." *Id.* at 683-84. This is the scenario NADA urged the Commission to consider in its comments. *See* Comment No. FTC-2022-0046-8368 attach. 19 at 9 ("[T]he FTC's second scenario should be the only one considered."). NADA's comments also argued that the Commission's estimates of ongoing costs were "too low

in that they fail to account for disclosures being provided multiple times as terms change." *Id.* NADA now reiterates this argument and asserts that the Commission did not adequately respond.[29] Br. 47. But the Commission expressly acknowledged the comment and explained that "[c]oncerns about underestimates of the time required to review disclosures on a per-transaction basis are addressed by the Commission's sensitivity analyses," which addressed how changes in the assumptions would affect the results. 89 Fed. Reg. at 684, 689-93. NADA did not provide any alternative cost estimates, and it has not shown why the sensitivity analysis does not address its vague assertion that the parameters the Commission used were too low.

### 3.    NADA has not shown that any error in the cost-benefit analysis affected the end result.

Even if NADA could identify some error in an individual component of the calculation, it has not met its burden of showing that any such error was not harmless. The Commission's analysis showed a vast disparity between the benefits to consumers ($13.4 billion over 10

---

[29] NADA also argues that the Commission's analysis fails to account for "disclosures preceding abandoned transactions" (Br. 47), but NADA did not make that argument in its comments and cannot raise it now. *See also supra* n.26.

years) and the costs to dealers (only $1.1 billion over the same period),

and as a result, even major adjustments to individual components are

unlikely to affect the ultimate conclusion that the Rule's benefits

outweigh the costs. 89 Fed. Reg. at 688. Furthermore, as noted above,

the Commission conducted a sensitivity analysis to test how variations

in the parameters used might affect the bottom line. That analysis

simulated 1,000 possible scenarios and found "positive net benefits in

all simulated outcomes." *Id.* at 691-92. NADA has not identified any

flaw in this analysis or otherwise explained how the purported errors in

the Commission's analysis could possibly have affected the net result.

### 4.    There is no basis for a remand.

As a final throwaway argument, NADA asks the Court to remand

the Rule to the Commission for further consideration of costs and

benefits. As noted above, Section 22 not only precludes judicial review of

the cost-benefit analysis, it also expressly precludes any remand on that

issue. *See* 15 U.S.C. § 57b-3(c)(2). Regardless, NADA has not shown any

legitimate need for a remand. NADA argues that if the case were

remanded, it would submit "a comprehensive study" prepared by the

Center for Automotive Research purportedly estimating the costs of

implementing the Rule as originally proposed. Br. 48. Although this study was not completed until after the comment period closed, the Commission nonetheless received the study and discussed it in the Final Rule. 89 Fed. Reg. at 613 n.185, 675 n.535, 677 n.550.

The Commission found that the study had "numerous methodological shortcomings rendering its results unreliable." *Id.* at 675 n.535. In particular, it included leading statements, was based on a sample of only 60 dealers out of more than 46,000 nationwide, and gave no explanation as to how the dealers were chosen; moreover, only 40 dealers completed responses to many key questions. *Id.* Additionally, many of the costs discussed related to provisions dropped from the Final Rule. NADA does not challenge these findings and has shown no basis for a remand to consider this study or any other evidence relating to costs and benefits (even if remand were permissible).

## CONCLUSION

The petition for review should be denied.

Respectfully submitted,

ANISHA S. DASGUPTA
   *General Counsel*

May 14, 2024     /s/ Benjamin F. Aiken
BENJAMIN F. AIKEN
MATTHEW M. HOFFMAN
   *Attorneys*

FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, N.W.
Washington, D.C. 20580


Of Counsel:
JAMIE D. BROOKS
DANIEL DWYER
   *Attorneys*

FEDERAL TRADE COMMISSION
Washington, D.C. 20580

# CERTIFICATE OF COMPLIANCE

I certify that the foregoing brief complies with the volume limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 12,950 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), and that it complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and (a)(6) and 5th Cir. R. 32.1 because it was prepared in a proportionally spaced typeface using Microsoft® Word. The body text is in 14-point Century Schoolbook type; the footnote text is in 12-point Century Schoolbook type.

May 14, 2024                    /s/ Benjamin F. Aiken
                                Benjamin F. Aiken
                                Attorney
                                Federal Trade Commission
                                600 Pennsylvania Avenue, N.W.
                                Washington, D.C. 20580

# ADDENDUM OF RELEVANT STATUTES
# AND REGULATIONS

Dodd-Frank Wall Street Reform and Consumer Protection Act

 Section 1029, 12 U.S.C. § 5519 .............................................. A2

Federal Trade Commission Act

 Section 5, 15 U.S.C. § 45 ........................................................ A4

 Section 18, 15 U.S.C. § 57a ..................................................... A5

 Section 22, 15 U.S.C. § 57b-3 ............................................... A13

FTC Rules of Practice

 16 C.F.R. § 1.7.......................................................................... A16

 16 C.F.R. § 1.10........................................................................ A17

 16 C.F.R. § 1.21........................................................................ A18

**12 U.S.C. § 5519. Exclusion for auto dealers**

**(a) Sale, servicing, and leasing of motor vehicles excluded**

Except as permitted in subsection (b), the Bureau may not exercise any rulemaking, supervisory, enforcement or any other authority, including any authority to order assessments, over a motor vehicle dealer that is predominantly engaged in the sale and servicing of motor vehicles, the leasing and servicing of motor vehicles, or both.

\* \* \*

**(d) Federal Trade Commission authority**

Notwithstanding section 57a of title 15 [section 18 of the FTC Act], the Federal Trade Commission is authorized to prescribe rules under sections 45 and 57a(a)(1)(B) of title 15 [sections 5 and 18(a)(1)(B) of the FTC Act].[1] in accordance with section 553 of title 5, with respect to a person described in subsection (a).

**(e) Coordination with Office of Service Member Affairs**

The Board of Governors and the Federal Trade Commission shall coordinate with the Office of Service Member Affairs, to ensure that—

(1) service members and their families are educated and empowered to make better informed decisions regarding consumer financial products and services offered by motor vehicle dealers, with a focus on motor vehicle dealers in the proximity of military installations; and

(2) complaints by service members and their families concerning such motor vehicle dealers are effectively monitored

---

[1] So in original. The period probably should be a comma.

and responded to, and where appropriate, enforcement action is pursued by the authorized agencies.

* * *

**15 U.S.C. § 45 [Section 5 of the FTC Act]. Unfair methods of competition unlawful; prevention by Commission**

**(a) Declaration of unlawfulness; power to prohibit unfair practices; inapplicability to foreign trade**

(1) Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful.

(2) The Commission is hereby empowered and directed to prevent persons, partnerships, or corporations, except banks, savings and loan institutions described in section 57a(f)(3) of this title [section 18(f)(3) of the FTC Act], Federal credit unions described in section 57a(f)(4) of this title [section 18(f)(4) of the FTC Act], common carriers subject to the Acts to regulate commerce, air carriers and foreign air carriers subject to part A of subtitle VII of title 49, and persons, partnerships, or corporations insofar as they are subject to the Packers and Stockyards Act, 1921, as amended [7 U.S.C. 181 et seq.],[2] except as provided in section 406(b) of said Act [7 U.S.C. 227(b)],[3] from using unfair methods of competition in or affecting commerce and unfair or deceptive acts or practices in or affecting commerce.

* * *

---

[2] Brackets in original.

[3] Brackets in original.

### 15 U.S.C. § 57a [Section 18 of the FTC Act]. Unfair or deceptive acts or practices rulemaking proceedings

**(a) Authority of Commission to prescribe rules and general statements of policy**

(1) Except as provided in subsection (h), the Commission may prescribe—

(A) interpretive rules and general statements of policy with respect to unfair or deceptive acts or practices in or affecting commerce (within the meaning of section 45(a)(1) of this title [section 5(a)(1) of the FTC Act]), and

(B) rules which define with specificity acts or practices which are unfair or deceptive acts or practices in or affecting commerce (within the meaning of section 45(a)(1) of this title [section 5(a)(1) of the FTC Act]), except that the Commission shall not develop or promulgate any trade rule or regulation with regard to the regulation of the development and utilization of the standards and certification activities pursuant to this section. Rules under this subparagraph may include requirements prescribed for the purpose of preventing such acts or practices.

(2) The Commission shall have no authority under this subchapter, other than its authority under this section, to prescribe any rule with respect to unfair or deceptive acts or practices in or affecting commerce (within the meaning of section 45(a)(1) of this title [section 5(a)(1) of the FTC Act]). The preceding sentence shall not affect any authority of the Commission to prescribe rules (including interpretive rules), and general statements of policy, with respect to unfair methods of competition in or affecting commerce.

**(b) Procedures applicable**

(1) When prescribing a rule under subsection (a)(1)(B) of this section, the Commission shall proceed in accordance with section 553 of title 5 (without regard to any reference in such

section to sections 556 and 557 of such title), and shall also (A) publish a notice of proposed rulemaking stating with particularity the text of the rule, including any alternatives, which the Commission proposes to promulgate, and the reason for the proposed rule; (B) allow interested persons to submit written data, views, and arguments, and make all such submissions publicly available; (C) provide an opportunity for an informal hearing in accordance with subsection (c); and (D) promulgate, if appropriate, a final rule based on the matter in the rulemaking record (as defined in subsection (e)(1)(B)), together with a statement of basis and purpose.

(2)(A) Prior to the publication of any notice of proposed rulemaking pursuant to paragraph (1)(A), the Commission shall publish an advance notice of proposed rulemaking in the Federal Register. Such advance notice shall—

(i) contain a brief description of the area of inquiry under consideration, the objectives which the Commission seeks to achieve, and possible regulatory alternatives under consideration by the Commission; and

(ii) invite the response of interested parties with respect to such proposed rulemaking, including any suggestions or alternative methods for achieving such objectives.

(B) The Commission shall submit such advance notice of proposed rulemaking to the Committee on Commerce, Science, and Transportation of the Senate and to the Committee on Energy and Commerce of the House of Representatives. The Commission may use such additional mechanisms as the Commission considers useful to obtain suggestions regarding the content of the area of inquiry before the publication of a general notice of proposed rulemaking under paragraph (1)(A).

(C) The Commission shall, 30 days before the publication of a notice of proposed rulemaking pursuant to paragraph (1)(A), submit such notice to the Committee on Commerce, Science, and

Transportation of the Senate and to the Committee on Energy and Commerce of the House of Representatives.

(3) The Commission shall issue a notice of proposed rulemaking pursuant to paragraph (1)(A) only where it has reason to believe that the unfair or deceptive acts or practices which are the subject of the proposed rulemaking are prevalent. The Commission shall make a determination that unfair or deceptive acts or practices are prevalent under this paragraph only if—

(A) it has issued cease and desist orders regarding such acts or practices, or

(B) any other information available to the Commission indicates a widespread pattern of unfair or deceptive acts or practices.

## (c) Informal hearing procedure

The Commission shall conduct any informal hearings required by subsection (b)(1)(C) of this section in accordance with the following procedure:

(1)(A) The Commission shall provide for the conduct of proceedings under this subsection by hearing officers who shall perform their functions in accordance with the requirements of this subsection.

(B) The officer who presides over the rulemaking proceedings shall be responsible to a chief presiding officer who shall not be responsible to any other officer or employee of the Commission. The officer who presides over the rulemaking proceeding shall make a recommended decision based upon the findings and conclusions of such officer as to all relevant and material evidence, except that such recommended decision may be made by another officer if the officer who presided over the proceeding is no longer available to the Commission.

(C) Except as required for the disposition of ex parte matters as authorized by law, no presiding officer shall consult any person or party with respect to any fact in issue unless such officer gives notice and opportunity for all parties to participate.

(2) Subject to paragraph (3) of this subsection, an interested person is entitled—

(A) to present his position orally or by documentary submission (or both), and

(B) if the Commission determines that there are disputed issues of material fact it is necessary to resolve, to present such rebuttal submissions and to conduct (or have conducted under paragraph (3)(B)) such cross-examination of persons as the Commission determines (i) to be appropriate, and (ii) to be required for a full and true disclosure with respect to such issues.

(3) The Commission may prescribe such rules and make such rulings concerning proceedings in such hearings as may tend to avoid unnecessary costs or delay. Such rules or rulings may include (A) imposition of reasonable time limits on each interested person's oral presentations, and (B) requirements that any cross-examination to which a person may be entitled under paragraph (2) be conducted by the Commission on behalf of that person in such manner as the Commission determines (i) to be appropriate, and (ii) to be required for a full and true disclosure with respect to disputed issues of material fact.

(4)(A) Except as provided in subparagraph (B), if a group of persons each of whom under paragraphs (2) and (3) would be entitled to conduct (or have conducted) cross-examination and who are determined by the Commission to have the same or similar interests in the proceeding cannot agree upon a single representative of such interests for purposes of cross-examination, the Commission may make rules and rulings (i) limiting the representation of such interest, for such purposes, and (ii) governing the manner in which such cross-examination shall be limited.

(B) When any person who is a member of a group with respect to which the Commission has made a determination under subparagraph (A) is unable to agree upon group representation with the other members of the group, then such person shall not be denied under the authority of subparagraph (A) the opportunity to conduct (or have conducted) cross-examination as to issues affecting his particular interests if (i) he satisfies the Commission that he has made a reasonable and good faith effort to reach agreement upon group representation with the other members of the group and (ii) the Commission determines that there are substantial and relevant issues which are not adequately presented by the group representative.

(5) A verbatim transcript shall be taken of any oral presentation, and cross-examination, in an informal hearing to which this subsection applies. Such transcript shall be available to the public.

**(d) Statement of basis and purpose accompanying rule; "Commission" defined; judicial review of amendment or repeal of rule; violation of rule**

(1) The Commission's statement of basis and purpose to accompany a rule promulgated under subsection (a)(1)(B) shall include (A) a statement as to the prevalence of the acts or practices treated by the rule; (B) a statement as to the manner and context in which such acts or practices are unfair or deceptive; and (C) a statement as to the economic effect of the rule, taking into account the effect on small business and consumers.

(2)(A) The term "Commission" as used in this subsection and subsections (b) and (c) includes any person authorized to act in behalf of the Commission in any part of the rulemaking proceeding.

(B) A substantive amendment to, or repeal of, a rule promulgated under subsection (a)(1)(B) shall be prescribed, and subject to judicial review, in the same manner as a rule prescribed under such subsection. An exemption under subsection (g) shall not be treated as an amendment or repeal of a rule.

(3) When any rule under subsection (a)(1)(B) takes effect a subsequent violation thereof shall constitute an unfair or deceptive act or practice in violation of section 45(a)(1) of this title [section 5(a)(1) of the FTC Act], unless the Commission otherwise expressly provides in such rule.

### (e) Judicial review; petition; jurisdiction and venue; rulemaking record; additional submissions and presentations; scope of review and relief; review

(1)(A) Not later than 60 days after a rule is promulgated under subsection (a)(1)(B) by the Commission, any interested person (including a consumer or consumer organization) may file a petition, in the United States Court of Appeals for the District of Columbia circuit or for the circuit in which such person resides or has his principal place of business, for judicial review of such rule. Copies of the petition shall be forthwith transmitted by the clerk of the court to the Commission or other officer designated by it for that purpose. The provisions of section 2112 of title 28 shall apply to the filing of the rulemaking record of proceedings on which the Commission based its rule and to the transfer of proceedings in the courts of appeals.

(B) For purposes of this section, the term "rulemaking record" means the rule, its statement of basis and purpose, the transcript required by subsection (c)(5), any written submissions, and any other information which the Commission considers relevant to such rule.

(2) If the petitioner or the Commission applies to the court for leave to make additional oral submissions or written presentations and shows to the satisfaction of the court that such submissions and presentations would be material and that there were reasonable grounds for the submissions and failure to make such submissions and presentations in the proceeding before the Commission, the court may order the Commission to provide additional opportunity to make such submissions and presentations. The Commission may modify or set aside its rule or make a new rule by reason of the additional submissions and

presentations and shall file such modified or new rule, and the rule's statement of basis of[4] purpose, with the return of such submissions and presentations. The court shall thereafter review such new or modified rule.

(3) Upon the filing of the petition under paragraph (1) of this subsection, the court shall have jurisdiction to review the rule in accordance with chapter 7 of title 5 and to grant appropriate relief, including interim relief, as provided in such chapter. The court shall hold unlawful and set aside the rule on any ground specified in subparagraphs (A), (B), (C), or (D) of section 706(2) of title 5 (taking due account of the rule of prejudicial error), or if—

 (A) the court finds that the Commission's action is not supported by substantial evidence in the rulemaking record (as defined in paragraph (1)(B) of this subsection) taken as a whole, or

 (B) the court finds that—

  (i) a Commission determination under subsection (c) that the petitioner is not entitled to conduct cross-examination or make rebuttal submissions, or

  (ii) a Commission rule or ruling under subsection (c) limiting the petitioner's cross-examination or rebuttal submissions,

 has precluded disclosure of disputed material facts which was necessary for fair determination by the Commission of the rulemaking proceeding taken as a whole.

The term "evidence", as used in this paragraph, means any matter in the rulemaking record.

(4) The judgment of the court affirming or setting aside, in whole or in part, any such rule shall be final, subject to review by

---

[4] So in original. Probably should be "and".

the Supreme Court of the United States upon certiorari or certification, as provided in section 1254 of title 28.

(5)(A) Remedies under the preceding paragraphs of this subsection are in addition to and not in lieu of any other remedies provided by law.

(B) The United States Courts of Appeal shall have exclusive jurisdiction of any action to obtain judicial review (other than in an enforcement proceeding) of a rule prescribed under subsection (a)(1)(B), if any district court of the United States would have had jurisdiction of such action but for this subparagraph. Any such action shall be brought in the United States Court of Appeals for the District of Columbia circuit, or for any circuit which includes a judicial district in which the action could have been brought but for this subparagraph.

(C) A determination, rule, or ruling of the Commission described in paragraph (3)(B)(i) or (ii) may be reviewed only in a proceeding under this subsection and only in accordance with paragraph (3)(B). Section 706(2)(E) of title 5 shall not apply to any rule promulgated under subsection (a)(1)(B). The contents and adequacy of any statement required by subsection (b)(1)(D) shall not be subject to judicial review in any respect.

\* \* \*

## 15 U.S.C. § 57b-3 [Section 22 of the FTC Act]. Rulemaking process

\* \* \*

### (b) Notice of proposed rulemaking; regulatory analysis; contents; issuance

(1) In any case in which the Commission publishes notice of a proposed rulemaking, the Commission shall issue a preliminary regulatory analysis relating to the proposed rule involved. Each preliminary regulatory analysis shall contain—

(A) a concise statement of the need for, and the objectives of, the proposed rule;

(B) a description of any reasonable alternatives to the proposed rule which may accomplish the stated objective of the rule in a manner consistent with applicable law; and

(C) for the proposed rule, and for each of the alternatives described in the analysis, a preliminary analysis of the projected benefits and any adverse economic effects and any other effects, and of the effectiveness of the proposed rule and each alternative in meeting the stated objectives of the proposed rule.

(2) In any case in which the Commission promulgates a final rule, the Commission shall issue a final regulatory analysis relating to the final rule. Each final regulatory analysis shall contain—

(A) a concise statement of the need for, and the objectives of, the final rule;

(B) a description of any alternatives to the final rule which were considered by the Commission;

(C) an analysis of the projected benefits and any adverse economic effects and any other effects of the final rule;

(D) an explanation of the reasons for the determination of the Commission that the final rule will attain its objectives in a manner consistent with applicable law and the reasons the particular alternative was chosen; and

(E) a summary of any significant issues raised by the comments submitted during the public comment period in response to the preliminary regulatory analysis, and a summary of the assessment by the Commission of such issues.

(3)(A) In order to avoid duplication or waste, the Commission is authorized to—

(i) consider a series of closely related rules as one rule for purposes of this subsection; and

(ii) whenever appropriate, incorporate any data or analysis contained in a regulatory analysis issued under this subsection in the statement of basis and purpose to accompany any rule promulgated under section 57a(a)(1)(B) [section 18(a)(1)(B)] of this title, and incorporate by reference in any preliminary or final regulatory analysis information contained in a notice of proposed rulemaking or a statement of basis and purpose.

(B) The Commission shall include, in each notice of proposed rulemaking and in each publication of a final rule, a statement of the manner in which the public may obtain copies of the preliminary and final regulatory analyses. The Commission may charge a reasonable fee for the copying and mailing of regulatory analyses. The regulatory analyses shall be furnished without charge or at a reduced charge if the Commission determines that waiver or reduction of the fee is in the public interest because furnishing the information primarily benefits the general public.

(4) The Commission is authorized to delay the completion of any of the requirements established in this subsection by publishing in the Federal Register, not later than the date of publication of the final rule involved, a finding that the final rule is

being promulgated in response to an emergency which makes timely compliance with the provisions of this subsection impracticable. Such publication shall include a statement of the reasons for such finding.

(5) The requirements of this subsection shall not be construed to alter in any manner the substantive standards applicable to any action by the Commission, or the procedural standards otherwise applicable to such action.

## (c) Judicial review

(1) The contents and adequacy of any regulatory analysis prepared or issued by the Commission under this section, including the adequacy of any procedure involved in such preparation or issuance, shall not be subject to any judicial review in any court, except that a court, upon review of a rule pursuant to section 57a(e) of this title, may set aside such rule if the Commission has failed entirely to prepare a regulatory analysis.

(2) Except as specified in paragraph (1), no Commission action may be invalidated, remanded, or otherwise affected by any court on account of any failure to comply with the requirements of this section.

(3) The provisions of this subsection do not alter the substantive or procedural standards otherwise applicable to judicial review of any action by the Commission.

* * *

**16 C.F.R. § 1.7 Scope of rules in this subpart.**

The rules in this subpart apply to and govern proceedings for the promulgation of rules as provided in section 18(a)(1)(B) of the Federal Trade Commission Act (15 U.S.C. 57a(a)(1)(B)). Such rules will be known as trade regulation rules. All other rulemaking proceedings will be governed by the rules in subpart C of this part, except as otherwise required by law or as otherwise specified in this chapter.

**16 C.F.R. § 1.10 Advance notice of proposed rulemaking.**

(a) Prior to the commencement of any trade regulation rule proceeding, the Commission shall publish in the FEDERAL REGISTER an advance notice of such proposed proceeding.

(b) The advance notice shall:

(1) Contain a brief description of the area of inquiry under consideration, the objectives which the Commission seeks to achieve, and possible regulatory alternatives under consideration by the Commission; and

(2) Invite the response of interested persons with respect to such proposed rulemaking, including any suggestions or alternative methods for achieving such objectives.

(c) The advance notice shall be submitted to the Committee on Commerce, Science, and Transportation of the Senate and to the Committee on Interstate and Foreign Commerce of the House of Representatives.

(d) The Commission may, in addition to publication of the advance notice, use such additional mechanisms as it considers useful to obtain suggestions regarding the content of the area of inquiry before publication of an initial notice of proposed rulemaking pursuant to § 1.11.

A17

**16 C.F.R. § 1.21 Scope of the rules in this subpart.**

This subpart sets forth procedures for the promulgation of rules under authority other than section 18(a)(1)(B) of the FTC Act except as otherwise required by law or otherwise specified in the rules of this chapter. This subpart does not apply to the promulgation of industry guides, general statements of policy, rules of agency organization, procedure, or practice, or rules governed by subpart B of this part.