No. 24-60013

# IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

NATIONAL AUTOMOBILE DEALERS ASSOCIATION; TEXAS AUTOMOBILE DEALERS ASSOCIATION,
*Petitioners*,

v.

FEDERAL TRADE COMMISSION
*Respondent.*

On Petition for Review of a Final Trade Regulation Rule of the Federal Trade Commission

# BRIEF OF AMICI CURIAE CONSUMER FEDERATION OF AMERICA, CONSUMERS FOR AUTO RELIABILITY AND SAFETY, NATIONAL ASSOCIATION OF CONSUMER ADVOCATES, NATIONAL CONSUMER LAW CENTER, AND PUBLIC CITIZEN IN SUPPORT OF RESPONDENT

Lauren E. Bateman
Allison M. Zieve
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

*Attorneys for Amici Curiae
Consumer Federation of America,
et al.*

May 21, 2024

# SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS

No. 24-60013

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

NATIONAL AUTOMOBILE DEALERS ASSOCIATION;
TEXAS AUTOMOBILE DEALERS ASSOCIATION,
*Petitioners*,

v.

FEDERAL TRADE COMMISSION,
*Respondent.*

On Petition for Review of a Final Trade Regulation Rule
of the Federal Trade Commission

Pursuant to this Court's Rule 29.2 and Federal Rule of Appellate Procedure 26.1, amici curiae Consumer Federation of America, Consumers for Auto Reliability and Safety, National Association of Consumer Advocates, National Consumer Law Center, and Public Citizen submit this supplemental certificate of interested persons to fully disclose all those with an interest in this brief and to provide the required information as to their corporate status and affiliations.

i

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1, in addition to those identified by Petitioners in their opening brief and by Amici, have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

A.     Amicus curiae **Consumer Federation of America** is a nonprofit, non-stock corporation. It has no parent corporation, and no publicly traded corporation has an ownership interest in it of any kind.

B.     Amicus curiae **Consumers for Auto Reliability and Safety** is a nonprofit, non-stock corporation. It has no parent corporation, and no publicly traded corporation has an ownership interest in it of any kind.

C.     Amicus curiae **National Association of Consumer Advocates** is a nonprofit, non-stock corporation. It has no parent corporation, and no publicly traded corporation has an ownership interest in it of any kind.

D.    Amicus curiae **National Consumer Law Center** is a nonprofit, non-stock corporation. It has no parent corporation, and no publicly traded corporation has an ownership interest in it of any kind.

E.    Amicus curiae **Public Citizen** is a nonprofit, non-stock corporation. It has no parent corporation, and no publicly traded corporation has an ownership interest in it of any kind.

F.    The above-listed amici curiae are represented by **Lauren E. Bateman** and **Allison M. Zieve** of **Public Citizen Litigation Group**.

/s/ Lauren E. Bateman
Lauren E. Bateman

*Attorney for Amici Curiae*
*Consumer Federation*
*of America, et al.*

May 21, 2024

# TABLE OF CONTENTS

SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS .........i

TABLE OF AUTHORITIES .......................................................................v

INTEREST OF AMICI CURIAE..................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ............................3

ARGUMENT ...........................................................................................5

I.    Existing regulations are insufficient to protect consumers from widespread industry abuses............................................................5

II.   The CARS Rule will provide meaningful protections for consumers from many of the industry's worst practices. ...............................12

    A.    Prohibition on Misrepresentations ......................................13

    B.    Requiring Accurate Pricing Disclosures..............................17

    C.    Obtaining Express, Informed Consent for Charges ............22

    D.    Prohibition on Useless Add-On Products ...........................26

CONCLUSION ........................................................................................30

CERTIFICATE OF COMPLIANCE.........................................................32

CERTIFICATE OF SERVICE..................................................................33

# TABLE OF AUTHORITIES

**Cases**                                                         **Pages**

*FCC v. Prometheus Radio Project*,
   592 U.S. 414 (2021) ............................................................. 16

*FTC v. Fleetcor Technologies, Inc.*,
   No. 1:19–CV-5727–AT, 2022 WL 3350066,
   (N.D. Ga. Aug. 9, 2022) ......................................................... 9

*FTC v. Liberty Chevrolet, Inc.*,
   No. 1:20–cv–03945 (S.D.N.Y. May 21, 2020) ........................... 11, 23, 24

*FTC v. North American Automobile Services, Inc.*,
   No. 1:22–cv–0169 (N.D. Ill. Mar. 31, 2022) .......................... 6, 7, 11, 23

*FTC v. Passport Auto. Grp., Inc.*,
   No. 8:22–cv–02670 (D. Md. Oct. 18, 2022) ............................ 11

*FTC v. Rhinelander Auto Center, Inc.*,
   No. 3:23–cv–000737 (W.D. Wis. Oct. 24, 2023) ..................... 11

*FTC v. Universal City Nissan, Inc.*,
   No. 2:16–cv–07329 (C.D. Cal. Sep. 29, 2016) ......................... 24

*Motor Vehicle Manufacturers Association of U.S., Inc. v.*
   *State Farm Mutual Automobile Insurance Co.*,
   463 U.S. 29 (1983) ............................................................... 13

*Timonium Chrysler, Inc.*,
   No. C–4429 (FTC Jan. 28, 2014) ........................................ 13, 14

**Statutes**

12 U.S.C. § 5519(d) .............................................................. 12

**Regulations**

12 C.F.R. § 213.4(e) ............................................................. 20

12 C.F.R. § 1026.18(h) ................................................................20

12 C.F.R. § 1026.18(j) .................................................................20

16 C.F.R. § 463.3 ........................................................................15

16 C.F.R. § 463.4 ........................................................................21

16 C.F.R. § 463.4(a)(1) ...............................................................19

16 C.F.R. § 463.4(a)(3)(i) ...........................................................19

16 C.F.R. § 463.4(d) ...................................................................19

16 C.F.R. § 463.4(e) ...................................................................19

16 C.F.R. § 463.5 ........................................................................29

16 C.F.R. § 463.5(a) ...................................................................27

16 C.F.R. § 463.5(c) ...................................................................22

## Other Authorities

Attorneys General of 31 States & DC, Comment Letter on
  Public Roundtables: Protecting Consumers in the Sale and
  Leasing of Motor Vehicles, Project No. P104811,
  Submission No. 558507–00112  (Apr. 13, 2012),
  https://www.regulations.gov/comment/FTC-2022-0036-0124 .......17, 18

*Combating Auto Retail Scams Trade Regulation Rule*,
  89 Fed. Reg. 590 (Jan. 4, 2024) .................................................... passim

Comment of 18 State Attorneys General,
  Doc. No. FTC–2022–0046–8062 .........................................................25

Comment of Andew Ferras,
  Doc. No. FTC–2022–0046–1114 ........................................................25

Comment of Auto Brasil,
  Doc. No. FTC–2022–0046–0576 .........................................................20

Comment of Blake Brown,
   Doc. No. FTC–2022–0046–7068......................................................25

Comment of Christopher Fazzalare,
   Doc. No. FTC–2022–0046–1365.............................................24, 25

Comment of Consumer,
   Doc. No. FTC–2022–0046–3686......................................................13

Comment of Consumer,
   Doc. No. FTC–2022–0046–5238......................................................17

Comment of Consumer,
   Doc. No. FTC–2022–0046–6089......................................................18

Comment of Consumer Federation of America, et al.,
   Doc. No. FTC–2022–0046–7589.......................................................10

Comment of Consumer, submitted by Consumer Reports,
   Doc. No. FTC–2022–0046–7520.............................................22, 26

Comment of Gary Pearce,
   Doc. No. FTC–2022–0046–5227......................................................19

Comment of Kieran Donahue,
   Doc. No. FTC–2002–0046–4552......................................................29

Comment of Mark Steinbach,
   Doc. No. FTC–2022–0046–7445........................................................5

Comment of National Consumer Law Center, et al.,
   Doc. No. FTC–2022–0046–7607.............................................3, 6, 10, 11

Comment of Seth Campbell,
   Doc. No. FTC–2022–0046–6490......................................................18

Comment of Tom Demeri,
   Doc. No. FTC–2022–0046–0637......................................................12

Comment of Tomlinson Motor Company,
   Doc. No. FTC–2022–0046–0003......................................................20

Comment of Wallace Lay,
  Doc. No. FTC–2022–0046–4959 .................................................... 28, 29

Consumer Federation of America, *2022 Consumer Complaint
  Survey Report* (May 2023), https://consumerfed.org/reports/
  consumer-complaint-survey-report-2022/ ............................................. 6

Consumers for Auto Reliability and Safety, Comment Letter
  Motor Vehicle Roundtables, Project No. P104811 (Apr. 1, 2012),
  https://www.ftc.gov/sites/default/files/documents/
  public_comments/public-roundtables-protectingconsumers-
  sale-and-leasing-motor-vehicles-projectno.p104811-00108/
  00108-82875.pdf ................................................................. 7, 8

FTC, *Buckle Up: Navigating Auto Sales and Financing* (2020),
  https://www.ftc.gov/reports/buckle-navigating-auto-sales-
  financing ...................................................................... 15, 23

Mary W. Sullivan, Matthew T. Jones & Carole L. Reynolds,
  FTC, *The Auto Buyer Study: Lessons from In-Depth
  Consumer Interviews and Related Research* (July 2020),
  https://www.ftc.gov/system/files/documents/reports/auto-
  buyer-study-lessons-depth-consumer-interviews-related-
  research/bcpreportsautobuyerstudy.pdf ........................................... 8, 9

*Motor Vehicle Dealers Trade Regulation Rule*,
  87 Fed. Reg. 42012 (proposed July 13, 2022) ...................................... 12

National Consumer Law Center, *Auto Add-ons Add Up:
  How Dealer Discretion Drives Excessive, Arbitrary, and
  Discriminatory Pricing* (Oct. 1, 2017), https://www.nclc.org/
  images/pdf/car_sales/report-auto-add-on.pdf ...................... 9, 10, 27, 28

National Consumer Law Center, *In Harm's Way—At Home:
  Consumer Scams and the Direct Targeting of America's
  Military and Veterans* (May 2003) ............................................... 11, 12

Press Release, Office of the New York Attorney General,
  *Attorney General James Secures More Than $125,000 For
  Consumers After Car Dealerships Illegally Overcharged For
  Bogus Anti-Theft Product* (July 26, 2019), https://ag.ny.gov
  /press-release/2019/attorney-general-james-secures-more-
  215000-consumers-after-car-dealerships) ..........................................24

## INTEREST OF AMICI CURIAE[1]

Amici curiae are five non-profit membership organizations devoted to consumer protection. Amici submit this amicus brief to support the Federal Trade Commission (FTC) rule challenged in this case, which aims to protect consumers from unfair and exploitative practices of automobile dealerships.

**Consumer Federation of America** (CFA) is an association of 250 national, state, and local consumer groups that was founded in 1968 to advance the consumer interest through research, advocacy, and education. For over 50 years, CFA has been at the forefront of ensuring that the marketplace is fair and safe through advancing the consumer interest across a broad portfolio of issues, including advocating for the right of consumers to be treated fairly and honestly when they purchase vehicles.

**Consumers for Auto Reliability and Safety** is a national non-profit auto safety and consumer advocacy organization. Its mission is to

---

[1] This brief was not authored in whole or part by counsel for a party, and no one other than amicus curiae or its counsel made a monetary contribution to the preparation or submission of the brief. Counsel for all parties have consented to its filing.

prevent motor vehicle-related fatalities, injuries, and economic losses. It accomplishes this mission through legislative and regulatory advocacy, public education, outreach, aid to victims, and related activities.

**National Association of Consumer Advocates** is a non-profit group of attorneys and advocates committed to promoting consumer justice and curbing abusive business practices that bias the marketplace to the detriment of consumers. Its membership is comprised of over 1,500 private, public sector, and legal services lawyers, law professors, and other consumer advocates from across the country.

**National Consumer Law Center** is a national research and advocacy organization focused on the legal needs of consumers, focusing on low-income and elderly consumers. For more than 50 years, it has been the consumer-law resource center to which legal services and private lawyers, state and federal consumer protection officials, public policymakers, consumer and business reporters, and consumer and low-income community organizations across the nation have turned.

**Public Citizen** is a nonprofit consumer advocacy organization founded in 1971, with members in all fifty states. Since its founding in 1971, Public Citizen has worked before Congress, administrative

agencies, and courts for enactment and enforcement of laws protecting consumers from unfair or deceptive practices. Public Citizen has appeared as amicus curiae to advocate for increased consumer protections and stronger regulatory authority across a variety of industries, including in cases involving the FTC.

## INTRODUCTION AND SUMMARY OF ARGUMENT

For millions of Americans, a vehicle is essential for travel to and from work and school, for picking up groceries, and for medical appointments. At the same time, cars are increasingly costly. In 2022, the average price of a new car was $46,000; the average price of a used car from a dealer was $30,000. *See Combating Auto Retail Scams Trade Regulation Rule*, 89 Fed. Reg. 590, 592 (Jan. 4, 2024), RE-3 (CARS Rule). That price represents a significant proportion of many American households' total annual income; as a result, consumers finance more than 81 percent of new car purchases and 35 percent of used car purchases. *Id*. For many people, a car is the most expensive purchase they will ever make. Comment of Nat'l Consumer L. Ctr., et al., Doc. No. FTC–2022–0046–7607 at 18.

In light of these facts, it is crucial that American consumers can participate on a fair playing field when buying, financing, and leasing vehicles. Yet the marketplace is fundamentally broken. Automobile dealerships routinely engage in deceptive or unfair practices—such as making material misrepresentations, using bait-and-switch pricing, sneaking charges into purchase contracts, and charging for useless add-on products or services—all of which impose an enormous cost on consumers. The pervasiveness of these unfair practices is well documented: For the past seven years, State and local consumer enforcement agencies have received more complaints about the automotive industry than any other industry in the United States. And year after year, complaints about car dealers routinely are among the top complaints to the Better Business Bureau. It is not surprising, then, that state attorneys general from around the country have condemned widespread fraud in the industry and repeatedly urged the Federal Trade Commission (FTC) to crack down on dealerships' deceptive practices.

After actively soliciting input from motor vehicle dealers, consumers, and other stakeholders for well over a decade, in July 2022, the FTC invoked its express authority under the Dodd-Frank Act to

announce that it was pursuing a rule aimed at creating more fairness in the automobile purchasing marketplace. After receiving more than 27,000 comments, the FTC issued the CARS Rule in January 2024. The Rule is simple and common-sense: It creates transparency, thereby helping consumers to make informed choices and promoting a competitive marketplace for honest dealers. It is a measured regulatory action to limit material misrepresentations, bait-and-switch tactics, hidden charges, and charges for useless add-on products or services, and this Court should deny the petition for review.

## ARGUMENT

### I. Existing regulations are insufficient to protect consumers from widespread industry abuses.

An overwhelming number of consumers have reported being victimized by unfair and deceptive practices at automobile dealerships: In each of the past four years, the FTC received more than 100,000 complaints regarding motor vehicle sales, financing, service and warranties, and rentals and leasing. 89 Fed. Reg. at 594, RE-5; *see also* Comment of Mark Steinbach, Doc. No. FTC–2022–0046–7445 at 2 (observing that 100,000 is a "huge number" given that many consumers never realize they were defrauded, many of the most vulnerable

consumers may not be able to articulate what happened, many people do not know about the FTC, and even if they did, they may not think the FTC can do anything about their problem). State and local consumer protection agencies have received more complaints about the automotive industry than any other industry in the United States. *See* Comment of Nat'l Consumer L. Ctr., et al., Doc. No. FTC–2022–0046–7607 at 13; Consumer Fed'n of Am., *2022 Consumer Complaint Survey Report* 4–5 (May 2023), https://consumerfed.org/reports/consumer-complaint-survey-report-2022/, *cited at* 89 Fed. Reg. at 594, RE-5 n.46. And the Better Business Bureau receives more complaints about car dealers than almost any other industry. *See* Comment of Nat'l Consumer L. Ctr., et al., Doc. No. FTC–2022–0046–7607 at ii. Indeed, the automobile sales industry is "consistently at or near the top of private sources of consumer complaints." 89 Fed. Reg. at 594, RE-5.

A 2022 FTC enforcement action against one multi-state dealership is illustrative. In *FTC v. North American Automobile Services*, the FTC took action after receiving nearly 400 complaints from consumers alleging that, "[a]fter an often hours-long process" discussing financing of a vehicle, dealers "present consumers with a stack of complex, highly

technical documents" and "then rush consumers through the closing process, which typically requires paperwork that is more than 60 pages deep and over a dozen signatures, simply indicating where to sign." Complaint ¶ 24, *FTC v. N. Am. Auto. Servs., Inc.,* No. 1:22–cv–0169 (N.D. Ill. Mar. 31, 2022), *cited at* 89 Fed. Reg. at 594, RE-5 n.26. Car buyers who had been hurried through closing later discovered that, on numerous occasions, add-on charges amounting to "hundreds or thousands of dollars" had been tacked on without their knowledge or consent. *Id.* at ¶ 25. The complaints that originally formed the basis of the action reflected only a miniscule fraction of the consumers affected by the dealer's business practices: When the FTC investigated the dealer, nearly 17,000 of the dealer's customers responded to an agency survey indicating that they had experienced the same deceptive and unfair practices. *See id.* at ¶ 27; 89 Fed. Reg. at 594, RE-5.

Additionally, many victims of dealers' fraudulent practices may be unaware that they have been defrauded because "unscrupulous dealers are able to slip … often considerable additional costs" into purchase contracts through deceptive means, "including by not mentioning them at all, or by focusing consumers' attention on other aspects of the complex

transaction, such as monthly payments, which might increase only marginally with the addition of prorated add-on costs, or may even be made to decrease if the financing term is extended." 89 Fed. Reg. at 596, RE-7. Indeed, many types of unfair or deceptive automobile sales tactics—including misrepresentation and dealer markups—"are extremely lucrative and widespread precisely because they are unlikely to trigger consumer complaints at all." Consumers for Auto Reliability and Safety, Comment Letter on Motor Vehicle Roundtables, Project No. P104811 at 2–3 (Apr. 1, 2012), https://www.ftc.gov/sites/default/files/ documents/public_comments/public-roundtables-protecting-consumers-sale-and-leasing-motor-vehicles-project-no.p104811-00069/00069-82601.pdf, *cited at* 89 Fed. Reg. at 595, RE-6 n.62.

The FTC's efforts to capture consumers' qualitative experiences corroborate these quantitative metrics. In 2020, the FTC conducted in-depth interviews of consumers who had purchased a new or used car within six months prior to the interview. *See* Mary W. Sullivan, Matthew T. Jones & Carole L. Reynolds, FTC, *The Auto Buyer Study: Lessons from In-Depth Consumer Interviews and Related Research* (July 2020),

https://www.ftc.gov/system/files/documents/reports/auto-buyer-study-lessons-depth-consumer-interviews-related-research/bcpreportsauto buyerstudy.pdf, *cited at* 89 Fed. Reg. at 593, RE-4 n.25. The majority of study participants indicated that their dealer tacked on "contract add-ons" after the price of the car was negotiated, and several "were surprised to learn . . . that they had in fact paid extra"—a finding consistent with both "dealer misrepresentations" and "fatigue during the buying process or confusion with a financially complex transaction." *Id.* at 14.

The most vulnerable consumers disproportionately bear the brunt of deceptive industry practices. "Dealers may notice the way customers are dressed, their perceived level of educational attainment, and many other characteristics when judging how to price a customer." Nat'l Consumer L. Ctr., *Auto Add-ons Add Up: How Dealer Discretion Drives Excessive, Arbitrary, and Discriminatory Pricing* 27 (Oct. 1, 2017), https://www.nclc.org/images/pdf/car_sales/report-auto-add-on.pdf (NCLC Auto Add-ons Add Up), *cited at* 89 Fed. Reg. at 595, RE-6 n.61; *cf. FTC v. Fleetcor Techs., Inc.*, No. 1:19–CV–5727–AT, 2022 WL 3350066, at *13 (N.D. Ga. Aug. 9, 2022) (noting that the "disparate bargaining power" between a corporation and its consumers—some of whom were

unsophisticated—might have led consumers to be unaware of add-on fees or to incorrectly believe the fees were mandatory).

An analysis by the National Consumer Law Center of approximately 1.8 million car sale transactions at over 3,000 car dealers, resulting in the sale of almost three million add-on products, revealed that the combined average markup for certain add-ons (service contracts, guaranteed automobile or asset protection (GAP) products, and etch products) was 170%. NCLC Auto Add-ons Add Up at 10. This study also found that existing practices in the sale of add-on products "leads to discriminatory pricing for Hispanics and very likely for other minorities." *Id.* at 42. Other consumer advocacy and public interest organizations have likewise noted that "Hispanic and Black consumers" are not only targeted for more add-on products and services, but also "dealers have charged them more for these products than they charge white consumers." Comment of Consumer Fed. of Am., et al., Doc No. FTC–2022–0046–7589 at 2. One study showed that Black and Latino consumers were sold multiple add-on products almost twice as often as white consumers, and that purchases that included multiple add-ons were associated with higher delinquency rates and greater risk of

repossession. Comment of Nat'l Consumer L. Ctr., et al., Doc. No. FTC–2022–0046–7607 at 9. In the past several years, the FTC has brought multiple enforcement actions against dealership groups that unfairly charged higher markups, add-on prices, and interest charges to Black, Hispanic, and Native American consumers. *See, e.g.*, Complaint ¶¶ 44–51, *FTC v. Rhinelander Auto Ctr., Inc.*, No. 3:23–cv–00737 (W.D. Wis. Oct. 24, 2023); Complaint ¶¶ 23–32, *FTC v. Passport Auto. Grp., Inc.*, No. 8:22–cv–02670 (D. Md. Oct. 18, 2022); Complaint ¶¶ 46–49, *FTC v. N. Am. Auto. Servs., Inc.*, No. 1:22–cv–0169 (N.D. Ill. Mar. 31, 2022); Complaint ¶¶ 9, 26, *FTC v. Liberty Chevrolet, Inc.*, No. 1:20–cv–03945 (S.D.N.Y. May 21, 2020).

Military families and veterans are frequently targeted by automobile dealerships near military bases—a situation that resulted in at least one group of Army commanders creating a "Code of Ethics" for nearby dealers in hopes of encouraging those dealers to stop misleading military customers. Nat'l Consumer L. Ctr., *In Harm's Way—At Home: Consumer Scams and the Direct Targeting of America's Military and Veterans* 22 (May 2003), *cited at* 89 Fed. Reg. at 619, RE-30 n.207; *see also* 89 Fed. Reg. at 591–92, RE-2–3 n.11 (collecting individual comments

from service members and veterans describing "scams and horror stories," "unethical tricks," and "predatory practices" of automobile dealerships). As one active duty service member put it: "Nowhere else in our society do so many average citizens have to mentally prepare for a battle over fair pricing and treatment for something that is realistically a modern necessity." Comment of Tom Demeri, Doc. No. FTC–2022–0046–0637.

## II.    The CARS Rule will provide meaningful protections for consumers from many of the industry's worst practices.

In response to these widespread problems, the FTC—pursuant to an express delegation of authority under the Dodd-Frank Act to prescribe rules for "motor vehicle dealer[s]" who are "predominantly engaged in the sale and servicing of motor vehicles, the leasing and servicing of motor vehicles, or both," 12 U.S.C. § 5519(d)—issued a notice of proposed rulemaking to address unfair or deceptive acts or practices by motor vehicle dealers. *See Motor Vehicle Dealers Trade Regulation Rule*, 87 Fed. Reg. 42012 (proposed July 13, 2022). After the comment period, the FTC reviewed more than 27,000 comments from stakeholders, many of whom were "individual consumers who described deceptive practices during recent car purchases," 89 Fed. Reg. at 591, RE-2. The agency then issued

a final rule in January 2024, based on a record that amply establishes a "rational connection between the facts" and the regulatory choice made. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983).

Amici focus on four aspects of the final rule—the prohibition on misrepresentations, the requirement of accurate pricing disclosures, the requirement of express and informed consent for charges, and the prohibition against useless add-on products—that are measured, rational regulatory interventions to protect consumers and honest dealers alike.

## A.    Prohibition on Misrepresentations

*"9 out of the 10 dealerships I contacted online or visited in-person in California changed or lied about the online advertised price of the vehicle I was inquiring about or said the car was sold or not available and tried to sell me a more expensive vehicle."*
                    Comment of Consumer, FTC–2022–0046–3686.

The agency record strongly demonstrates the unfair and deceptive industry practices addressed in the CARS Rule. Material misrepresentations in automobile transactions take a variety of forms. In one type of bait-and-switch scheme, "the advertised discount and price are not generally available to consumers," or they "are subject to various qualifications or restrictions," or are not available "even if consumers

meet all of these qualifications or restrictions." Complaint ¶ 5, *Timonium Chrysler, Inc.*, No. C–4429 (FTC Jan. 28, 2014) (alleging dealership advertised internet prices and dealer discounts that were only available through rebates not applicable to the typical consumer), *cited at* 89 Fed. Reg. at 595, RE-6 n.56. In another scheme, a dealer advertisement may misrepresent the availability of a given vehicle at the advertised price. "Such misrepresentations are likely to induce consumers" to travel "to a particular dealership to pursue a specific offer on a specific vehicle when the offer or vehicle itself may not actually be available." 89 Fed. Reg. at 617, RE-28. This practice gets the consumer in the door, either wasting their time or leading them to buy a vehicle at a higher price than advertised, and in the process creates a competitive disadvantage for dealers who do not engage in deceptive tactics to induce customers to visit their dealership. *Id.* at 595, RE-6.

Another scheme involves increasingly expensive ancillary products or services, such as extended warranties, service and maintenance plans, payment programs, GAP products, VIN etching and other theft protection devices, and undercoating. *Id.* "[I]n the past two years, dealers have substantially increased prices for these add-ons, notwithstanding

that such products or services largely are not constrained by supply." *Id.* The record shows that dealers sometimes fraudulently misrepresent that add-ons are "mandatory … in order to get financing" or suggest that "add-ons were included in [the] deal at no additional charge," only to charge the customer in the final paperwork. *See* FTC, *Buckle Up: Navigating Auto Sales and Financing* 8–10 (2020), https://www.ftc.gov/reports/buckle-navigating-auto-sales-financing, *cited at* 89 Fed. Reg. at 595, RE-6 n.63.

It is no wonder, then, that thousands of consumers expressed support for section 463.3 of the CARS Rule, which prohibits, as unfair or deceptive, making misrepresentations regarding material information in vehicle sales and leasing transactions, including costs or terms of purchasing financing or leasing; the availability of rebates; whether the transaction is final; and whether, and under what circumstances, a vehicle can be repossessed. 89 Fed. Reg. at 610, RE-21; *see* 16 C.F.R. § 463.3, RE-105. This provision also targets deceptive conduct related to add-ons, such as misrepresenting whether they are required in order to purchase or lease a vehicle, misrepresenting what the add-ons entail, or

misrepresenting that consumers have provided express, informed consent to be charged for add-ons. 89 Fed. Reg. at 614, RE-25.

Objecting to the CARS Rule, petitioners assert that such misrepresentations are already illegal. *See* Opening Br. 32–33. However, the FTC reached the rational, reasonable, and empirically uncontroverted conclusion that "there is no evidence that duplicative misrepresentation prohibitions have harmed consumers or competition." *See* 89 Fed. Reg. at 611, RE-22. Further, the CARS Rule provides additional remedies for consumers who are harmed by misrepresentations, including by adding a mechanism for the Commission to redress consumers injured by a dealer's violation of the rule, thereby benefiting "consumers who encounter conduct that is otherwise already illegal" and "aid[ing] law-abiding dealers that lose business to competitors that act unlawfully." *Id*. The agency therefore reasonably considered the industry's objections and reasonably explained its decision to impose the requirement. The Administrative Procedure Act requires nothing more. *See FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

### B.    Requiring Accurate Pricing Disclosures

*"[W]hy do we need to haggle or expend additional intellectual and emotional bandwidth towards ensuring that the transaction is as initially stated? There are instances where I'd rather be back conducting combat operations in Iraq than go through the dealer process, as it incenses me that this corrupt way of doing business is given a free pass. … If you are a reputable and honest dealership, then there should be no worry; it will be business as usual."*
Comment of Consumer, FTC–2022–0046–5238.

Accurate, up-front pricing disclosures are a priority for car buyers and would-be buyers. Consumers often expend significant time and resources to visit dealerships, primarily because they cannot obtain crucial pricing information without physically doing so. In rural areas, it may take several hours to drive to a dealership, and consumers may need to take time off work, arrange childcare, or delay important appointments. 89 Fed. Reg. at 593, RE-4. Dishonest dealers exploit consumers' commitment of resources to the transaction by "hiding information about pricing, imposing surprise price increases, or using pricing advertising tactics that systematically deceive consumers." *Id*. at 629, RE-40.

One tactic sometimes used to obscure the true price of the vehicle is to speak in terms of monthly payments, as opposed to the total price to the consumer. *See* Att'ys General of 31 States & DC, Comment Letter on

Public Roundtables: Protecting Consumers in the Sale and Leasing of Motor Vehicles, Project No. P104811, Submission No. 558507–00112 at 5 (Apr. 13, 2012), https://www.regulations.gov/comment/FTC-2022-0036-0124 (discussing the "age-old auto salesperson's trick" of quoting monthly payment prices without disclosing that the quote includes the cost of optional items that the customer has not yet agreed to purchase), *cited at* 89 Fed. Reg. at 596, RE-7 n.69.

As the comments from many individual consumers make clear, this aspect of the vehicle marketplace causes American consumers significant pain and expense. Writing in support of a pricing disclosure requirement, one consumer wrote, "[w]e should not have to spend hours at a dealer and go through mounds of paperwork with a fine tooth comb in order to simply see the ACTUAL price of the vehicle. It is a ridiculous ploy to confuse people into purchasing things they do not want or need." Comment of Consumer, Doc. No. FTC–2022–0046–6089. Another shared, "I have financed all of my cars, and the total cost for the vehicle has always been hidden, either physically or through the dealer trying to move focus onto other numbers such as the monthly payment." Comment of Seth Campbell, Doc. No. FTC–2022–0046–6490. And another, asking

the FTC to take action, wrote: "Think of us, the car buying public. We are mad as hell. Please start fixing this crooked business model where nobody even knows what they are supposed to be paying." Comment of Gary Pearce, Doc. No. FTC–2022–0046–5227.

The CARS Rule targets these abuses by requiring dealers to clearly and conspicuously disclose a vehicle's offering price in its advertisements and from the first response to the consumer regarding that specific vehicle. 89 Fed. Reg. at 694, RE-105; 16 C.F.R. § 463.4(a)(1); (a)(3)(i). It also requires dealers to provide the total contract price when discussing monthly payments, and to provide a monthly payments comparison statement that explains the effect on the contract when payments are lowered. 89 Fed. Reg. at 694, RE-105; 16 C.F.R. § 463.4(d), (e). "This provision allows consumers to compare offers based on the same price terms and to select dealers that truly offer the lowest price rather than dealers that advertise deceptively low prices but charge more." 89 Fed. Reg. at 636, RE-47. The ability to compare is important for consumers trying to knowledgably make financial decisions. Yet "[w]hen price information in the market is distorted or concealed—especially in document- and time-intensive vehicle transactions—consumers are

19

unable to effectively differentiate between sellers, and sellers trying to deal honestly with consumers are put at a competitive disadvantage." *Id.*; *see also* Comment of Tomlinson Motor Company, Doc. No. FTC–2022–0046–0003 (noting, as an independent car dealer, that, "[o]verwhelmingly, automotive dealership advertising is ridiculously deceptive. Advertised prices often assume a trade-in credit, a finance credit, or maybe some sort of incentive or rebate that usually doesn't apply. The advertised prices will also not include add-ons such as dealer fees, prep fees, market adjustment fees, and/or reconditioning fees. These fees add up to thousands of dollars that have been undisclosed to the consumer. It's really become a joke."); Comment of Auto Brasil, No. FTC–2022–0046–0576 ("We are an independent motor vehicle dealer in Pompano Beach, Florida and [have provided] quality cars and trucks for our community since 2004… It is really time to end the current madness of lying competition at this marketplace. The general public and the majority of the automotive industry needs this reform, everyone will benefit from transparency. It's that plain and simple.").

Petitioners' response is primarily that these disclosure requirements are duplicative, because the Truth in Lending Act requires

that a vehicle's "total sales price" and the "total number of payments" must be disclosed in any credit transaction, and the Consumer Leasing Act requires that lessors disclose the "total of payments" before leasing a vehicle. Opening Br. 31–32 (citing 12 C.F.R. § 1026.18(h), (j); 12 C.F.R. § 213.4(e)). Under the CARS Rule, however, the offering price disclosure requirement covers *all* transactions—not just those subject to financing or leasing—and requires disclosure of that price as soon as a specific vehicle is advertised or a dealer receives a customer communication about a specific vehicle. *See* 16 C.F.R. § 463.4, RE-105–06. It therefore is specifically tailored to enable consumers to "know the true price of the vehicle and to comparison shop *before* selecting and visiting a particular dealership." 89 Fed. Reg. at 602, RE-13 (emphasis added). Furthermore, as the FTC did in connection with the prohibition on misrepresentations, the agency considered industry comments stating that the provision overlapped with existing State and federal law but disagreed that the overlap warranted omission of the new rule. Rather, the FTC reasonably concluded that the CARS Rule disclosure requirement is "consistent" with existing legal obligations and that "dealers can and should make the disclosures required under TILA and other laws as well as the offering

price disclosure required by the Final Rule. … [because p]roviding consumers with accurate and timely pricing and financing information is critical, especially in the context of motor vehicle sales." 89 Fed. Reg. at 633, RE-44.

All told, the FTC's decision to require dealers to disclose simple and highly material pricing information under circumstances where dishonest dealers withhold that information to create an unfair competitive advantage is both rational and is essential to fairness in the marketplace.

### C.    Obtaining Express, Informed Consent for Charges

*"I was hurried through the signing of the numerous documents and trusted the dealership to charge me what the car (and other same model cars) was advertised for. When I got home I realized that I paid an unspoken markup of $8000 for the car. When I questioned the ethics of this, the day after I bought this car, I was told that the figures were there when I signed the papers. The dealership was not willing to change anything."*

> Comment of Consumer, submitted by Consumer Reports, FTC–2022–0046–7520.

The CARS Rule prohibits a dealer from charging a consumer for any item without the consumer's express, informed consent. 89 Fed. Reg. at 695, RE-106; 16 C.F.R. § 463.5(c). Petitioners' brief does not address this provision, and extensive evidence in the record demonstrates that

dealers regularly sneak charges into the final bill, to the surprise of the consumer. *See* FTC, *Buckle Up: Navigating Auto Sales and Financing* 9–10 (noting that many individuals who purchased a car and were later interviewed by the FTC "were unclear" as to what add-ons their contract included, and "sometimes did not realize they had purchased any add-ons at all"). A long history of enforcement actions shows that unscrupulous dealerships across the country engage in practices like rushing consumers through signing paperwork, thereby causing them to unwittingly agree to additional charges; double charging for fees at the conclusion of the sale; and "[c]ramming charges onto consumers' bills for services that the consumers did not request without the consumers' knowledge or consent." 89 Fed. Reg. at 652, RE-63; *see, e.g.*, Complaint ¶ 27, *FTC v. N. Am. Auto. Servs., Inc.*, No. 1:22–cv–0169 (alleging that at least 83% of dealership's customers indicated that they "were charged for add-on products without authorization or as a result of deception"); Complaint ¶¶ 17–19, *FTC v. Liberty Chevrolet, Inc.*, No. 1:20–cv–03945 (S.D.N.Y. May 21, 2020) (alleging that defendants "inflate the final sales price of vehicles by adding sales tax and certain fees twice in the transactions, without the consumers' knowledge, when finalizing

financing," resulting in several cases where consumers were charged thousands in "fabricated fees" without their knowledge); Complaint ¶¶ 59–64, *FTC v. Universal City Nissan, Inc.*, No. 2:16–cv–07329 (C.D. Cal. Sep. 29, 2016) (alleging that multiple consumers complained about inclusion of fees they did not authorize or charges for add-on products that the consumers had rejected); *see also* Press Release, Office of the New York Att'y Gen., *Attorney General James Secures More Than $125,000 For Consumers After Car Dealerships Illegally Overcharged For Bogus Anti-Theft Product* (July 26, 2019), https://ag.ny.gov/press-release/2019/attorney-general-james-secures-more-215000-consumers-after-car-dealerships (noting that consumers had been charged as much as $4,000 extra for window etching, in many cases without their knowledge or consent).

Individual comments in the administrative record likewise emphasize the importance of obtaining express, informed consent for charges. As one consumer wrote, "I am not against business making a profit, in fact most Americans understand businesses need to make money too, however most dealers will not disclose additional costs to the purchaser until it is time to sign paperwork for purchase. … Even more

insulting is when buyer[s] ask to have options removed from the vehicle dealers stall or flat out refuse to do so." Comment of Christopher Fazzalare, Doc. No. FTC–2022–0046–1365; *see also* Comment of Blake Brown, Doc. No. FTC–2022–0046–7068 ("This will level the playing field so that dealerships aren't trying to sneak in additional cost[s] that are not needed or the buyer doesn't know they have agreed to."); Comment of Andew Ferras, Doc. No. FTC–2022–0046–1114 ("I am tired of dealerships trying to sneak more fees and add-ons onto a purchase. Vehicles are needed to perform life's functions, so why is the public being taken advantage of just so profits can line the pockets of the dealerships?"); Comment of 18 State Attorneys General, Doc. No. FTC–2022–0046–8062 (supporting the express, informed consent requirement because state attorneys general "receive many complaints from consumers" charged for fees to which they did not consent and reasoning that the Rule "will ameliorate consumer confusion and the attendant opportunity for deceptive exploitation").

As the agency sensibly concluded, "[c]harging consumers without their express, informed consent causes substantial injury to consumers in the amount of the unauthorized charge. This injury is not reasonably

avoidable when dealers do not clearly and conspicuously disclose to the consumer what the charge is for and the amount of the charge, since this information is within the unilateral control of the dealer." 89 Fed. Reg. at 654–55, RE-65–66. The Rule therefore both benefits consumers insofar as it protects them from this injury and protects the health of the marketplace. As the FTC observed, "if all dealers obtained express, informed consent to charges, they would not lose business to dealers who do not do so." *Id.* at 655, RE-66.

### D.    Prohibition on Useless Add-On Products

*"I just purchased a new Chevy Bolt EUV that came with several dealer-applied items such as ... (worthless) nitrogen in the tires, etc. I did not want any of these items, but I was told that it was mandatory. Every car on the lot gets these things—no exceptions. These unwanted items increased the price of the car over $1,000.... I've been through the same thing over and over as I've purchased cars over the years. I wonder how many thousands of dollars I've spent on things I didn't want. It's something akin to going to the grocery store to purchase a gallon of milk and being told that you have to buy a box of cereal with it—no exceptions."*

> Comment of Consumer, submitted by Consumer Reports, FTC-2022-0046-7520.

The CARS Rule also contains important requirements related to add-on products and services that provide little or no benefit to consumers. Among other things, the CARS Rule takes the measured step

of prohibiting the sale of add-ons that provide "no benefit" to consumers. *See* 89 Fed. Reg. at 695, RE-106; 16 C.F.R. § 463.5(a).

Charging a consumer for a useless product is misleading. As the FTC recognized, "[i]f consumers knew that a dealership was charging them for items from which they would not benefit, such knowledge likely would affect their commercial choices, including whether to continue with, or ultimately consummate, the vehicle sale or financing transaction. 89 Fed. Reg. at 649, RE-60. Further, the sale of useless add-ons can cost the consumer "thousands of dollars," at no benefit to the consumer or to competition. *Id.* at 649–50, RE-60–61.

Take, for example, GAP products. GAP products are advertised as protecting consumers whose automotive debt exceeds the value of the car by holding the consumer harmless for the difference between the balance on the debt and the amount paid under an automobile physical damage insurance policy in the event that the vehicle is totaled or stolen. *See* NCLC, *Auto Add-ons Add Up*, 7, 9 (noting that reasons a car loan may be underwater include depreciation and also "consumers being overcharged for the car and being sold expensive add-ons"). Up to 50 percent of vehicle transactions include a provision for a GAP product, and dealers are often

eager to sell them because they are highly profitable. *Id.* at 7. But unscrupulous dealerships sometimes recommend that customers buy GAP products that would not benefit the consumer at all because, for example, the provisions exclude the consumer's vehicle from coverage, exclude the neighborhood in which the consumer resides, or the loan-to-value ratio means that the consumer would not conceivably benefit financially from the arrangement. 89 Fed. Reg. at 648, RE-59.

Dealerships also frequently add nitrogen-filled tires as an add-on, but the product, while expensive, may provide no value to the consumer. In comments to the proposed rule, many consumers "indicated they did not consider nitrogen tires a valuable purchase and had expressed no desire to purchase them." 89 Fed. Reg. at 646, RE-57. Yet, they wrote, dealers had insisted that they buy them, sometimes by misrepresenting that "nitrogen tires were required by law, that their insurance premium would increase without the add-on, that new foreign vehicles coming into the country must have nitrogen-filled tires under the law, or that the consumer needed to purchase nitrogen tires to meet fuel economy standards." *Id.*; *see also* Comment of Wallace Lay, Doc. No. FTC–2022–0046–4959 ("I am in the auto industry and work at a very transparent

and honest dealership… I passionately feel that nitrogen filled tires are akin to snake oil.").

Likewise, dealerships sometimes require the customer to pay for "GPS tracking and theft recovery devices" that serve only to enable repossession of the vehicle. Comment of Wallace Lay, Doc. No. FTC–2022–0046–4959; *see* Comment of Kieran Donahue, No. FTC–2002–0046–4552 ("One of the latest scams is to force you to buy a $1,000 gps unit so they can recover the car if you miss payments.").

In light of these practices, the CARS Rule prohibits dealers from charging for "[a]dd-ons that provide no benefit." 89 Fed. Reg. at 595, RE-106; 16 C.F.R. § 463.5. It also enumerates certain types of products and services that are useless to the consumer, including GAP products with exclusions that make the product useless and supposedly nitrogen-filled tires that "contain no more nitrogen than naturally exists in the air." *Id.* To give the industry further guidance, the FTC indicated that analyzing whether a product provides benefits "involves analyzing objective standards under the circumstances," including "whether the add-on provides benefits; whether the consumer is eligible to use the add-on; whether the add-on's coverage excludes the vehicle at issue; and whether

the add-on is incompatible with the vehicle at issue." 89 Fed. Reg. at 648, RE-59. Common-sense application of these standards would prohibit dealerships from charging consumers for "purported rust-proofing add-ons that do not actually prevent rust; purported theft-prevention or theft-deterrent add-ons that do not prevent or deter theft; and add-ons that the vehicle itself cannot support, including engine oil change services for a vehicle, such as an electric vehicle, that does not use engine oil, or software or audio subscription services for a vehicle that cannot support the software or utilize the subscription." *Id*.

There is no justification for charging consumers for products and services that are useless to them. It was eminently reasonable for the FTC, based on the administrative record, to prohibit such transactions.

## CONCLUSION

For the foregoing reasons, this Court should deny the petition for review of the FTC's Rule.

Respectfully submitted,

/s/ Lauren E. Bateman
Lauren E. Bateman
Allison M. Zieve
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

*Attorneys for Amici Curiae*
*Consumer Federation of America, et al.*

May 21, 2024

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B)(i) because, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and the Rules of this Court, it contains 5,938 words.

This brief also complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 29(a)(4), 32(a)(5), and 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook.

/s/ Lauren E. Bateman
Lauren E. Bateman
*Attorney for Amici Curiae*
*Consumer Federation of America, et al.*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing Brief of Amici Curiae Consumer Federation of America, et al. with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit on May 21, 2024, using the Appellate Electronic Filing system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Lauren E. Bateman
Lauren E. Bateman
*Attorney for Amici Curiae Consumer Federation of America, et al.*